## IN THE UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

ROBERT CYRUS,

      Plaintiff,

v.

HYUNDAI MOTOR
MANUFACTURING ALABAMA, LLC,

      Defendant.

Case No.: 2:07-cv-00144-ID-TFM

---

## DEFENDANT'S BRIEF IN SUPPORT OF ITS
## MOTION FOR SUMMARY JUDGMENT

Timothy A. Palmer
J. Trent Scofield
Brian R. Bostick
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART
One Federal Place, Suite 1000
1819 5th Avenue North
Birmingham, Alabama 35203
(205) 328-1900 Telephone
(205) 328-6000 Facsimile

Attorneys for Defendant
Hyundai Motor Manufacturing
Alabama, LLC

## TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................................. 1

II.     STATEMENT OF FACTS ................................................................................... 2

    A.    Cyrus' Employment with HMMA ................................................................ 2

    B.    The September 2005 Meeting with Murakami Manufacturing Company ...................... 3

    C.    The Investigation Reveals That Cyrus Engaged In Unprofessional Behavior at the

          Meeting ..................................................................................................... 6

    D.    Cyrus Becomes Concerned That He Might Be Discharged ............................................. 9

    E.    Cyrus' Belatedly Named Comparator:  J.Y. Choi......................................................... 10

    F.    Keith Duckworth Meets With Plaintiff......................................................................... 12

    G.    Cyrus is Formally Discharged....................................................................................... 14

    H.    Cyrus' Alleged Complaints of Discrimination ............................................................. 14

        1.    Cyrus' "Formal Complaint" in November of 2005.............................................. 14

        2.    Cyrus' Complaints of Differential Treatment Because of His Medical

            Condition .............................................................................................. 15

        3.    Cyrus' Executive Meetings in the Summer of 2005 ............................................ 16

III.    ARGUMENT.................................................................................................... 17

    A.    Cyrus' Race and National Origin Discrimination Claims Must Be Dismissed ............ 17

        1.    Cyrus Cannot Prove Prima Facie Case of Race or National Origin

            Discrimination...................................................................................... 18

        2.    Cyrus Cannot Challenge HMMA's Reason for his Discharge ............................ 22

    B.    Cyrus' Retaliation Claim Fails as a Matter of Law....................................................... 23

i

1.   Cyrus Did Not Engage In Protected Activity Until After He Was Notified of His
     Termination ..................................................................................................... 24

     a.   Cyrus' Complaints About Disability Discrimination Do Not Implicate
          Title VII.................................................................................................. 25

     b.   Merely Performing One's Required Job Duties Is Not Protected
          Activity.................................................................................................... 25

2.   Cyrus Cannot Prove a Causal Connection Between His Complaint and His
     Discharge......................................................................................................... 29

3.   Cyrus Cannot Dispute the Legitimate, Non-Retaliatory Reasons for His
     Discharge......................................................................................................... 30

IV.    CONCLUSION.......................................................................................................... 31

# I.     INTRODUCTION

Plaintiff, Robert Cyrus, is a former management employee of Defendant Hyundai Motor Manufacturing Alabama, LLC ("HMMA"). Cyrus claims he was discharged because of his race, Caucasian, and national origin, American, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). He also asserts a claim for retaliation under Title VII. His claims are without merit, and HMMA is entitled to summary judgment.

In September of 2005, Cyrus was involved in a meeting between HMMA executives and employees and the executives and employees of a parts supplier. Cyrus was accused of engaging in unprofessional behavior during the meeting, including cursing at and challenging the competency of fellow HMMA executives and ignoring the instructions of his superior. Based on the concerns raised by Cyrus' reported conduct at this meeting and other reports of troubling behavior by Cyrus, it was determined that a meeting should be held with Cyrus to discuss HMMA management's concerns with his performance and whether Cyrus would be willing to improve his attitude. During the meeting, Cyrus refused to acknowledge any wrongdoing and gave no indication that he was willing to improve his attitude. Instead, Cyrus claimed there was a conspiracy to have him discharged. Given Cyrus' unwillingness to accept any fault and his unwillingness to improve his attitude, HMMA informed Cyrus that he would be discharged.

Cyrus cannot prove a prima facie case for his race or national origin discrimination claims because he cannot prove that he was treated differently than others outside his protected class who engaged in similar misconduct. He alleges that a Korean employee (J.Y. Choi) conducted himself in the same manner at the supplier meeting, but the reports from the meeting clearly show otherwise.

1

Even if Cyrus could prove a prima facie case of discrimination, he cannot dispute HMMA's legitimate, non-discriminatory reasons for its actions (*i.e.*, his unprofessional and insubordinate behavior and his refusal to improve his attitude).

Cyrus's retaliation claim must also fail. Cyrus first made a formal complaint of discrimination (as prepared by his lawyer) on November 10, 2005, two weeks after he had been informed that he was being terminated. Cyrus cannot prove his retaliation claim because he cannot demonstrate a causal connection between that complaint and his termination. Finally, as with his discrimination claim, Cyrus cannot dispute HMMA's stated reasons for his discharge. HMMA is entitled to summary judgment on all claims.

## II.    STATEMENT OF FACTS[1]

### A.    Cyrus' Employment with HMMA

Plaintiff, Robert Cyrus, was hired by Hyundai in May of 2002. (Cyrus Depo., at 23:17-24:2). At the time of his initial hiring by Hyundai Motor America, HMMA was still in its formative stages. (Cyrus Depo., at 23:17-24:2, 25:9-26:7). During Cyrus' initial hiring, his American contact during the hiring process was Keith Duckworth (Caucasian Male), Vice President of Administrative Services for Hyundai Motor America. (Cyrus Depo., at 23:17-26:7) (Duckworth Decl., ¶ 2). Duckworth later served a temporary 2-year assignment as the Deputy President and Chief Administrative Officer of HMMA. (Duckworth Decl., ¶ 2). Duckworth is the person who ultimately decided to terminate Cyrus' employment with HMMA. (Duckworth Decl., ¶ 9). Cyrus was employed by Hyundai Motor Manufacturing Alabama LLC ("HMMA") from September of 2002,

---

[1] For purposes of this motion and supporting brief only, HMMA accepts the facts viewed in the light most favorable to Plaintiff as required under Fed. R. Civ. P. 56.

until December 7, 2005. (Cyrus Depo., at 25:9-22, Ex. 19). Cyrus worked as the Director of Purchasing – Parts Development, for HMMA. (Cyrus Depo., at 31:13-16). In Cyrus' position as Director of Purchasing – Parts Development, he was responsible for negotiating with outside vendors to obtain contracts for the purchase of all parts that would be necessary for the production of automobiles at HMMA's automotive manufacturing plant in Montgomery, Alabama. (Cyrus Depo., at 33:21-34:9, 35:10-36:19).

**B.      The September 2005 Meeting with Murakami Manufacturing Company**

On September 16, 2005, HMMA called for a meeting with a parts supplier (Murakami Manufacturing Company) to discuss defects that were appearing on several of the outside mirrors that Murakami was producing for HMMA. (Cyrus Depo., at 47:9-18, 52:20-54:12, Ex. 5, Bates No. 357). The meeting was called by HMMA Chief Operating Officer H.I. Kim, and he also chaired the meeting. (Cyrus Depo., at 47:9-18, 52:20-53:13) (Kim Depo., at 47:4-16, 53:8-13). Kim and others at the meeting spoke in Korean and their comments were translated into English. (Cyrus Depo., at 62:22-63:5)(Kim Depo., at 53:14-19). Cyrus does not speak Korean and did not understand comments made in Korean by Kim or others at the meeting. (Cyrus Depo., at 48:17-19, 107:12-13, 115:3-16).

During the meeting, Murakami representatives advised that there were several internal issues within their production process that were causing these defective parts. (Cyrus Depo., at 60:10-22, 64:2-65:23, Ex. 5, Bates No. 358, 364-69). Murakami representatives advised that the parts were not being cured for a long enough period of time, which caused the paint to not be completely dry when the product was placed in its packaging, which then caused "buff marks." (Cyrus Depo., at 67:6-

3

68:9). They also advised that low light levels in the plant prevented their operators from seeing the "buff marks" and stated that the lighting levels in the Murakami plant had been increased in an attempt to resolve the issue. (Cyrus Depo., at 60:13-64:1). COO Kim expressed concern that Murakami, an experienced auto parts manufacturer who supplied parts to numerous other auto manufacturers, had such a basic quality issue as poor lighting in its plant. (Cyrus Depo., at 64:2-22).

Prior to this meeting, Cyrus had a "pre-meeting" with Murakami representatives, who advised him that they felt they had been unfairly assessed a penalty by the HMMA Quality Control Department over some of their defective parts. (Cyrus Depo., at 85:12-87:15, Ex. 5, Bates No. 357-58). HMMA Quality Control will assess a penalty against a supplier if it determines that the supplier's defective parts cause a production line stoppage. (Cyrus Depo., at 87:16-89:4). Cyrus and the Purchasing Department have no involvement in these determinations. (Cyrus Depo., at 89:5-19). Despite that fact, Cyrus says that he spoke with the Murakami representatives and came to the conclusion that a large portion of the defective parts that caused the downtime were the result of "scratch marks" made by the employees of the company that operates the parts consolidation warehouse, Glovis Alabama (not Murakami employees) when sequencing and delivering the product to the HMMA plant. (Cyrus Depo., at 74:11-75:21). The issue of "scratch marks" was an entirely separate issue from the "buff marks" caused by improper curing time at the Murakami plant. (Cyrus Depo., at 72:7-13, 76:6-77:16). Cyrus made no effort to determine the nature or extent of the "buff mark" defects during the pre-meeting. (Cyrus Depo., at 73:15-74:10).

COO Kim wanted to focus the Murakami meeting on the defects that were being caused within Murakami's plant. (Kim Depo., at 42:4-9, 47:4-16). Murakami's PowerPoint presentation

was also focused on defect issues within its control at its plant, and did not address the "scratch mark" issue. (Cyrus Depo., at 60:1-61:17, Ex. 5, Bates No. 363-69). During the meeting with Murakami representatives, Cyrus attempted to shift the discussion from "buff marks" to the issue of "scratch marks" on the mirrors that he claimed were being caused by Glovis employees. (Cyrus Depo., at 108:18-110:11, 112:9-113:6, 115:3-13). Cyrus insisted that Murakami should not be responsible for downtime penalties for defects caused by Glovis' handling of the product. (Cyrus Depo., at 112:13-115:2, 130:11-23) (Duckworth Decl., ¶ 5) (Jin Decl., ¶ 3, Ex. 1, Bates Nos. 0205, 0239, 0244, 0249). When an executive for HMMA's Quality Control Department stated that Murakami's quality control problems were, in fact, the cause for the downtime in the plant, Cyrus said "that's bullshit." (Duckworth Decl., ¶ 5) (Jin Decl., Ex. 1, Bates Nos. 0206, 0240, 0245, 0249).

During the meeting, COO Kim attempted several times to return the focus of the meeting back to the issue that he wanted to discuss ("buff marks" caused by Murakami's quality control issues and packaging), but Cyrus insisted upon re-directing the focus of the meeting to the issue of "scratch marks" and the downtime issue. (Kim Depo., at 141:18-148:22, 152:18-155:6) (Jin Decl., Ex.1, Bates Nos. 0205, 0239, 0240, 0244, 0245, 0249). Kim advised the group that he wanted to focus on quality issues within Murakami's control, and he further advised that the "scratch mark" issue relating to Glovis should be addressed in a separate meeting with Glovis representatives present and he asked for a Glovis representative to be contacted by telephone to come to the plant. (Kim Depo., at 126:12-134:2). Nonetheless, Cyrus persisted in raising the issue of "scratch marks" and downtime. (Cyrus Depo., at 114:3-115:16) (Kim Depo., at 149:2-10) (Choi Depo., at 174:23-176:20).

5

At one point, one of the Murakami representatives jumped up, grabbed two outside mirrors, slammed them together causing scratches to the paint, and threw them on the table, saying "that is what Glovis does." (Jin Decl., Ex. 1, Bates Nos. 0205, 0240, 0249). The Murakami representative added, "HMMA has asked us to come here and speak and we are going to speak about what we want to speak about!" (Jin Decl., Ex. 1, Bates Nos. 0205, 0240, 0249). At this point, COO Kim became upset at this unprofessional outburst from the supplier. (Kim Depo., at 155:5-22). COO Kim ultimately ended the meeting because of the disruptions of Cyrus and the Murakami representative. (Kim Depo., at 156:1-157:13).

## C.    The Investigation Reveals That Cyrus Engaged In Unprofessional Behavior at the Meeting

After the meeting, COO Kim reported to HMMA President & CEO J.S. Ahn that he was very concerned about the events that had occurred at the meeting. (Kim Depo., at 60:5-64:2, Ex. 3)(Duckworth Decl., ¶ 3). Kim was concerned that Cyrus' continuous arguing within the meeting was a challenge to his leadership and he felt that he would not be able to lead any future meetings with suppliers because it was a blow to his credibility. (Kim Depo., at 166:1-168:4). President Ahn thereafter requested that several of the persons in attendance at the meeting provide written statements to him about what had occurred during the meeting. (Choi Depo., at 155:21-156:10, 196:5-197:14)(Jin Decl., ¶ 3, Ex. 1). Cyrus prepared his own statement, but did not provide it until two weeks after the meeting because Cyrus went on paid medical leave for some undisclosed medical condition almost immediately following the Murakami meeting. (Cyrus Depo., at 182:20-184:15, 152:2-153:20, Ex. 5, Bates No. 357-59).

The statements provided to President Ahn gave some troubling descriptions of Cyrus' behavior during the meeting. (Duckworth Decl., ¶¶ 4, 5)(Jin Decl., ¶ 3, Ex. 1). Chris Susock, a Senior Manager in the Quality Control Department, reported that Cyrus twice interrupted COO Kim to argue on behalf of Murakami about the "scratch marks" and further stated that Cyrus told Susock "that's bullshit" when Susock tried to concur with Kim that the buff mark issues being caused in the Murakami plant were the focus of the meeting. (Duckworth Decl., ¶ 5) (Jin Decl., Ex. 1, Bates Nos. 0244-46). Susock also heard Cyrus quarrel with John Kalson, HMMA's Director of Production, over which HMMA team members were having to repair the defective parts, and heard Cyrus make the comment "is this the Toyota Production System way to pass on the defects to the next customers?" (Id.). Susock gave the following opinion about Cyrus' actions:

> It is of my opinion that the meeting began as being controlled and well structured with professionalism as Mr. Kim had requested by addressing the real problems that the suppliers are accountable for controlling and that any other issue should be addressed outside and separate from this forum. This however was disrupted several times by the continuous contesting and disregard of Mr. Kim's intentions and direction.

(Jin Decl., Ex. 1, Bates No. 0246). HMMA's Director of Production John Kalson also reported that:

> Mr. Cyrus also then defended the packaging concerns that Murakami was facing and stated that HMMA accepted it and that Murakami did not do any other packaging like that for any of its other customers.
>
> During this part of the conversation, Mr. Kim again stated the purpose of the meeting was to review the basic quality problems that were the responsibility of Murakami, and what they were doing about that. Mr. Kim also stated that a meeting between the parties (HMMA, Glovis, and Murakami) would be necessary to discuss and solve the issues that were stated by Mr. Cyrus.
>
> Mr. Cyrus then stated something to the effect that "how can we ask a supplier to come and present the issues when we (HMMA) don't even

7

have any data?" He also stated that we are in the process of charging Murakami with "over 200 minutes of downtime" and they are not responsible for that.

\* \* \*

At some point Mr. Chris Susock, stated that the concerns with the mirrors were causing HMMA downtime and repairs and that Murakami has a responsibility for that. <u>Mr. Cyrus at some point here said "that's Bullshit"</u>.

I (John Kalson) interjected that "I expect the parts to be "good" out of the box and it is the responsibility of the supplier to make sure they are, and if the parts are not good, we must repair". Mr. Cyrus then said that "the operator should find the defects before the parts are installed". I said to Mr. Cyrus that "the job of the operator is not to inspect the parts, that is the responsibility of the supplier, if the operators [sic] does see a defect, he will not put the part on, otherwise we have inspection process downstream that finds defects, and when we find defects we must fix them". <u>Mr. Cyrus then stated to me "that's not how Toyota does it, and let me teach you something about production systems"</u>.

(Jin Decl., Ex. 1, Bates nos. 0205-06)(emphasis added).

Jason Chi (Manager, Parts Quality) reported that Cyrus twice ignored COO Kim's request to not discuss the "scratch mark" issue and also reported that Cyrus made the "bullshit" comment to Chris Susock and heard a comment made by Cyrus to John Kalson to the effect of "Is this Toyota Way to pass on the defects to the next customers?" (Thompson Decl., Ex. 1, Bates Nos. 0238-41). Chi gave the following opinion of the situation: "I think Rob could have discussed the downtime issue against Murakami mirrors directly with COO Kim before or after the meeting. This is the reason that well-prepared meeting had to be ended in disrupted manner." (Jin Decl., Ex. Bates Nos. 0241).

8

Gerald Horn, an Assistant Manager in Parts Quality, also reported that Cyrus ignored Kim's instructions to focus on Murakami quality issues and also heard Cyrus say "Bullshit" to Chris Susock when Susock said that Murakami should be responsible for the downtime, and heard Cyrus ask Kalson "if that was the Toyota way – to pass defects on to the customer." (Jin Decl., Ex. 1, Bates No. 0249). H.I. Kim witnessed Cyrus quarreling with Susock and Kalson, but does not know what Cyrus said because he does not speak English fluently. (Kim Depo., at 170:15-174:19).

In his deposition, Cyrus denied quarreling with Susock or Kalson, he denied that he was taking the side of the Murakami representative against HMMA Quality Control, and he denied that he said anything derogatory to John Kalson or Chris Susock. (Cyrus Depo., at 111:21-112:19, 118:22-119:5, 127:22-128:14, 133:3-135:21). But Cyrus does admit that each of these things of which he was accused are highly unprofessional and would warrant disciplinary action. (Cyrus Depo., at 119:13-20). He also claims that it would be "taboo" to mention Toyota processes during the meeting, but denies doing so. (Cyrus Depo., at 136:4-12).

**D.    Cyrus Becomes Concerned That He Might Be Discharged**

Cyrus approached Duckworth later in the day after the Murakami meeting and advised that he was concerned that he might be discharged. (Cyrus Depo., at 140: 3-19, 188:12-189:14) (Duckworth Decl., ¶ 4). Cyrus was afraid that COO Kim might discharge him because of Kim's "unreasonable and vindictive working style." (Cyrus Depo., at 155:12-20, 190:14-191:1). Cyrus felt COO Kim was a "prima donna" who is "not used to being questioned, even though he tried to charge a supplier . . . back in excess of $100,000. (Cyrus Depo., at 305:1-11) Duckworth said that he had not heard any reports from the meeting and told Cyrus that he probably did not have anything to worry about

9

and that it was just the Korean management style. (Cyrus Depo., at 189:1-14)(Duckworth Decl., ¶ 4). Cyrus went on sick leave for some unknown medical condition almost immediately following the September 16, 2005 Murakami meeting and missed work for the next several weeks. (Cyrus Depo., at 152:21-153:16) (Duckworth decl., ¶ 8).

**E.     Cyrus' Belatedly Named Comparator:  J.Y. Choi**

In his lawsuit, Cyrus contends that J.Y. Choi, who was then Senior Manager in Purchasing at HMMA, engaged in the same behavior as he did at the Murakami meeting, but was not discharged. (Cyrus Depo., at 142:3-143:22) (Choi Depo., at 36:7-13).  During the time he worked at HMMA Cyrus said that Choi "worked for me." (Cyrus Depo., at 50:7-51:14, 302:23-303:23). Cyrus now claims that he and Choi are equals within the organization. (Cyrus Depo., at 303:18-23).  Cyrus first formulated this theory of discrimination only after being notified that he was going to be discharged. (Cyrus Depo., Exs. 5, 16).

This was the first meeting of its kind and Choi suggested that it would be helpful to provide notice further in advance than had been done so for this meeting. (Choi Depo., at 133:17-134:8). Choi testified that he initially made the point that he wished to make in a controlled and very polite manner to one of his Korean colleagues in the Quality Control Department. (Choi Depo., at 134:5-19).  Choi addressed this HMMA team member individually, whereas Cyrus was addressing everyone at the meeting.  (Choi Depo., at 134:9-19).

Choi was given a stern instruction by Kim in Korean to stay focused on the purpose of the meeting and that other issues should be resolved directly between HMMA and Glovis at a working level meeting. (Choi Depo., at 146:6-148:20).  Choi ceased his conversation after being instructed to

10

cease by COO Kim. (Choi Depo., at 175:1-23). COO Kim took out his frustrations on Choi (who was also in the Purchasing Department) after Cyrus continued to ignore Kim's requests and scolded Choi in Korean for the way the meeting had been diverted from the purpose upon which Kim wanted to focus. (Choi Depo., at 176:1-178:3). Choi unfortunately received the brunt of Kim's ire because he worked in the Purchasing Department with Cyrus and he was able to understand Korean. (Choi Depo., at 176:18-177:2)[2].

The statements prepared after the meeting do not support Cyrus' claims. None of the statements suggested that Choi had argued with his co-workers in front of this supplier. (Duckworth Decl., ¶ 13)(Jin Decl., Ex. 1, Bates Nos. 0205-06, 0238-44, 0244-46, -249). None of the statements suggested that Choi had used vulgar language in the meeting. (Id.). None of the statements accused Choi of questioning the competency of other HMMA team members. (Id.). Cyrus himself did not even make any comments in his statement about any supposed conduct of Choi. (Cyrus Depo., Ex. 5) (Duckworth Decl., ¶ 13). He first began making complaints about Choi engaging in the same behavior only after he had been warned that he would be terminated and after he had consulted a lawyer. (Cyrus Depo., at 196:21-197:9, Ex. 16). Cyrus admits that Choi never argued with other HMMA executives during the meeting. (Cyrus Depo., at 178:18-21). Cyrus also admits that Choi did not make any derogatory comments during the meeting. (Cyrus Depo., at 178:10-17).

---

[2] Choi advised Cyrus after the meeting that COO Kim was extremely upset over the meeting. (Cyrus Depo., at 179:21-180:7). He told Cyrus "it may be better for us to go home early today. . ." in an effort to convey to Cyrus that "this incident is really serious here." (Choi Depo., at 163:3-5, 164:9-11).

**F.      Keith Duckworth Meets With Plaintiff**

After reviewing the statements from the meeting, President Ahn concluded that there were serious problems with Cyrus' business judgment and his attitude.  (Duckworth Decl., ¶¶ 4, 7).  He spoke with Keith Duckworth, HMMA's Deputy President and Chief Administrative Officer, about the matter, and they discussed what options were available to redress the situation.  (Duckworth Decl., ¶ 7).  Duckworth advised that he would meet with Cyrus and explain to him that HMMA management was dissatisfied with his attitude, and attempt to reach an understanding whether Cyrus would be willing to work to improve his attitude and performance.  (Duckworth Decl., ¶ 7).  Duckworth advised President Ahn that if he did not feel that Cyrus was willing to work to improve on his attitude, then he would make the decision as to whether or not to terminate Cyrus' employment.  (Duckworth Decl., ¶ 7).  President Ahn agreed with Duckworth's proposal for handling the situation.  (Duckworth Decl., ¶ 7).

Duckworth contacted Cyrus by telephone on Saturday, October 22, 2005, and advised him that HMMA management was concerned about the deterioration of his work performance as attributable to his attitude, and asked Cyrus if they could meet for dinner to discuss these concerns.  (Duckworth Decl., ¶ 8).  There was some delay in the occurrence of this conversation because Cyrus was out on paid medical leave for an extended period of time, which, coincidentally, commenced immediately following the meeting in September when he feared that he would be discharged.  (Duckworth Decl., ¶ 8).  Duckworth met with Cyrus for dinner at a restaurant called the "City Grill" on that Saturday night.  (Cyrus Depo., at 185:4-16)(Duckworth Decl., ¶ 8).  Duckworth hoped to

discuss his concerns with Cyrus and get a positive response from Cyrus that he was willing to work to improve his attitude. (Duckworth Decl., ¶ 7).

Upon his arrival, Duckworth met Cyrus and they sat at a table together. (Duckworth Decl., ¶ 8). They were immediately met by a man named Michael Hansford, who was unknown to Duckworth, but who greeted Cyrus in a friendly and familiar manner. (Cyrus Depo., at 200:9-22) (Duckworth Decl., ¶ 8). Hansford is a former HMMA employee who was discharged after the company learned that he falsified information on his employment application regarding his education. (Cyrus Depo., at 198:4-199:3) (Duckworth Decl., ¶ 8). Hansford joined them at the table and spent the next hour complaining to Duckworth about many things that he was unhappy about with HMMA, including his own termination. (Cyrus Depo., at 200:23-202:4) (Duckworth Decl., ¶ 8). Cyrus says that he did not make any complaints himself, but sat quietly and listened to Hansford's complaints. (Cyrus Depo., at 209:5-210:23).

Hansford eventually left the restaurant, and Duckworth was finally allowed to address the performance issues for which the dinner meeting was called. (Duckworth Decl., ¶ 9). Duckworth advised Cyrus that there was concern over his attitude and the adversarial and antagonistic way in which he had been conducting himself recently. (Duckworth Decl., ¶ 9)(Cyrus Depo., at 216:3-217:23, 310:17-312:12). Duckworth asked Cyrus what he thought about these issues, and Cyrus refused to acknowledge that there were any problems with his attitude. (Duckworth Decl., ¶ 9). Instead, Cyrus argued that there was a conspiracy to have him terminated. (Duckworth Decl., ¶ 9). Cyrus took the position that he was an exemplary employee and that there was no problem with his

13

attitude or his behavior at the Murakami meeting or otherwise. (Cyrus Depo., at 219:18-21)(Duckworth Decl., ¶ 9).

Based on Cyrus' response, Duckworth concluded that Cyrus was unwilling to try to improve his attitude. (Duckworth Decl., ¶ 9). Duckworth told Cyrus that he felt Cyrus should sever his ties with HMMA and asked Cyrus to propose a severance package. (Cyrus Depo., at 219:22-220:14) (Duckworth Decl., ¶ 9). HMMA offered Cyrus a severance package with 24 weeks of severance pay, but Cyrus rejected that proposal and countered with a request for four years of severance pay, which HMMA rejected. (Cyrus Depo., at 347:16-348:17) (Duckworth Decl., ¶ 10, Ex. 1). Cyrus filed an EEOC charge alleging race and national origin discrimination on March 2, 2006. (Cyrus Depo., at 318:14-323:18, Ex. 21).

## G.    Cyrus is Formally Discharged

Because Cyrus was on extended medical leave, HMMA allowed Cyrus to exhaust all FMLA medical leave available to him before finally notifying him of his termination. (Cyrus Depo., Ex. 18) (Duckworth Decl., ¶ 8). Cyrus exhausted his twelve (12) weeks of FMLA medical leave, which was all paid leave by HMMA, on December 5, 2005, and Duckworth advised Cyrus by letter dated December 6, 2005, that HMMA was terminating his employment effective at the close of business on December 7, 2005. (Cyrus Depo., Ex. 19) (Duckworth Decl., ¶ 10, Ex. 1).

## H.    Cyrus' Alleged Complaints of Discrimination

### 1.    Cyrus' "Formal Complaint" in November of 2005

Cyrus and his attorney drafted a letter of complaint dated November 6, 2005, in which he contended for the first time that he was being discriminated against because he is a white American.

14

(Cyrus Depo., at 315:22-318:10, Ex. 16). Prior to the drafting of this letter, Plaintiff was recording several telephone conversations with friends, co-workers, attorneys, and family members in which he contended that he felt he had been terminated because: (1) he had missed time from work in May of 2005 to have a stent placed in his heart, (2) because of his age, and (3) because his ancestors came to the United States from Iran over 150 years ago. (Cyrus Depo., at 259:7-260:11, 297:4-16, 301:18-303:23, 306:1-308:11, 310:8-313:21)[3].

At the time Cyrus and his attorney drafted the "formal complaint," Cyrus had already been warned by Duckworth several weeks prior that he was going to be discharged. (Cyrus Depo., at 214:4-217:23). Cyrus made his first accusation in this document of disparate treatment between him and Choi. (Cyrus Depo., at 101:10-104:6, 141-144:1, Exs. 5, 6, 16). Even Cyrus himself had made no mention in his report to President Ahn dated October 2, 2005, about any behavior by Choi at the Murakami meeting. (Jin Decl., Ex. 1, Bates Nos. 0258-60).

## 2. Cyrus' Complaints of Differential Treatment Because of His Medical Condition

Cyrus argues that he made a complaint of discrimination to General Counsel Rick Neal and Director of Human Resources Greg Kimble in the Summer of 2005. (Cyrus Depo., at 252:15-253:15, 256:6-257:13, 273:15-274:1). He claims that he complained to them that he felt he was being treated differently by co-workers since his return to work from having a heart procedure done. (Cyrus Depo., at 253:9-21). Cyrus had a stent placed in his heart in May of 2005. (Cyrus Depo., at 41:16-

---

[3] Cyrus asserted in one conversation: "Disability is the big thing, you know. Because, you know, I had a heart attack or a heart condition, I'm being penalized. I think – and, you know, being over 40, and you know, I'm – my descent is Iranian. I mean, Iranians are [not] very popular right now, you know. Even though my family has been in the states for, you know, 150 years with impeccable reputations." (Ex. E, Tape 4, at 13:18-14:4). He also refused to acknowledge that there was any problem with his attitude in another call: "Attitude. You know what is attitude? It's simply because I've been sick and they don't like it." (Ex.E, Tape 4, at 22:16-18).

15

42:18).  He felt that it was unfair that some of his co-workers were bypassing him to obtain

signatures on forms because he was away from work attending cardio rehabilitation. (Cyrus Depo., at

260:22-261:22, 268:23-270:18).  Cyrus has not asserted a claim under the Americans with

Disabilities Act either before the EEOC or in this lawsuit. (Complaint) (Cyrus Depo., Ex. 21).

### 3.      Cyrus' Executive Meetings in the Summer of 2005

Cyrus may also assert that he engaged in protected activity by arguing that a meeting that

Keith Duckworth held with him and various other members of executive management should now be

construed as protected activity.  (Cyrus Depo., at 221:3-222:2).  It is undisputed that Cyrus never

complained to Duckworth in these meetings that he felt that he or anyone else had been the subject of

discriminatory conduct.  (Cyrus Depo., at 252:15-255:9).  Cyrus raised various issues because he was

merely voicing "concerns for the benefit of the company, the things that we needed to rectify."

(Cyrus Depo., at 254:20-255:9).  The subjects that Cyrus raised (safety issues, altercations between

Korean workers, not properly using the SAP computer system, communication breakdowns between

departments) did not implicate Title VII.  (Cyrus Depo., at 242:14-246:16).

Cyrus says that he may also have discussed a situation during the meeting where HMMA had

several months previously investigated a complaint that a manager offered a resigning female

employee to receive two weeks of severance pay without working it if the employee slept with him.

(Cyrus Depo., at 246:17-247:22).  Cyrus admitted that this incident had been investigated and

resolved several months before his discussions with Duckworth, and that he had absolutely no

involvement in or personal knowledge of the situation.  (Cyrus Depo., at 247:19-248:9).  He also

mentioned another matter that had long since been resolved by the Team Relations Department

16

regarding an employee who felt that her Korean Manager was unfairly refusing to assign her to be in charge of the department when he was away from the plant. (Cyrus Depo., at 248:19-251:22). Cyrus used these as explanations of problems in the plant, and not in any sort of request for action or to remedy the situations because both had been previously resolved. (Cyrus Depo., at 254:20-255:9).

## III.     ARGUMENT

### A.     Cyrus' Race and National Origin Discrimination Claims Must Be Dismissed[4]

Cyrus has failed to offer any evidence to support his claims of discrimination. The decision to discharge Cyrus was made by Keith Duckworth. There is no evidence that Duckworth, who is a white American himself, harbors animus against other white American employees. See Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1471 (11th Cir. 1991) (persons inside protected group are more likely to be victims of discrimination than its perpetrators). To the extent Cyrus argues that Duckworth discriminated against him because his great-great-grandfather was from Iran, Cyrus himself concedes that Duckworth had no way of even knowing that Cyrus was of Iranian descent. (Cyrus Depo., at 310:14-16) (Duckworth Decl., ¶ 12).

As explained below, Cyrus cannot establish a prima facie case of discrimination for his termination claim because he cannot point to any similarly situated Korean co-workers who were treated differently. Further, Cyrus cannot dispute HMMA's proffered reason for his termination. It

---

[4] To the extent Cyrus asserts that Choi was treated more favorably because of his Korean citizenship, such a claim does not violate Title VII and also would be precluded by the Friends, Commerce, and Navigation Treaty between Korea and the United States. See Espinoza v. Farah Manufacturing Co., Inc., 414 U.S. 86, 89 (1973)(Title VII does not prohibit discrimination based on citizenship); Nov. 28, 1956, 8 U.S.T. 2217, 2223 ("[C]ompanies of either Party shall be permitted to engage, within the territories of the other Party, accountants and other technical experts, executive personnel, attorneys, agents and other specialists of their choice.")

is undisputed that the reports from the meeting showed that Cyrus engaged in unprofessional behavior unbecoming an HMMA executive. HMMA relied in good faith on the reports of those persons. There is no evidence that any of these employees were motivated by racial bias. Although Cyrus could have legitimately been discharged based on this incident alone, it is undisputed that Duckworth met with Cyrus and only decided to discharge him after Cyrus was unwilling to acknowledge any problems with his attitude and refused to give any indication that he would try to improve his performance. Cyrus has not identified any comparator who similarly engaged in unprofessional behavior and further rejected a request to improve their behavior when confronted with performance concerns.

### 1.    Cyrus Cannot Prove Prima Facie Case of Race or National Origin Discrimination

Cyrus does not have any direct evidence of discrimination. Therefore, he must prove his claims through the circumstantial evidentiary model created in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). To prove a prima facie case of race or national origin discrimination, a Plaintiff must prove he was: (1) a member of the protected class; (2) qualified for the position; (3) subjected to adverse employment action; and (4) replaced by a person outside the protected class or suffered from disparate treatment because of membership in the protected class. <u>See McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973); <u>Chapman v. AI Transport</u>, 229 F.3d 1012, 1024-25 (11th Cir. 2000); <u>Armstrong v. Flowers Hosp., Inc.</u>, 33 F.3d 1308, 1313-14 (11th Cir. 1994). After the Plaintiff proves a prima facie case of discrimination, the Defendant need only to produce evidence that there is a legitimate, non-discriminatory reason for the challenged employment action. <u>See McDonnell Douglas Corp.</u>, 411 U.S. at 802; <u>Chapman</u>, 229 F.3d at 1024-25; <u>Armstrong</u>, 33 F.3d at

18

1313-14. The presumption of discrimination is then rebutted and the employer is entitled to summary judgment unless the Plaintiff proffers evidence sufficient to create a genuine issue of material fact that discrimination was actually the reason for the challenged action. Chapman, 229 F.3d at 1024-25. If the employer offers more than one reason for the stated employment action, then the plaintiff must dispute each stated reason to survive summary judgment. See Chapman v. AI Transp., 229 F.3d 1012, 1025 (11th Cir. 2000) (noting that plaintiff must rebut each of the employer's proffered reasons for its challenged action) (emphasis added) (citing Combs v. Plantation Patterns, 106 F.3d 1519, 1529 (11th Cir. 1997)).

To establish a prima facie case, Cyrus must come forward with evidence that he was treated differently than others outside the protected class. See Maniccia v. Brown, 171 F.3d 1364, 1369 (11th Cir. 1999)(affirming grant of summary judgment for employer and noting that employee could not establish a prima facie case because he failed to point to any persons outside the protected class who were treated more favorably than her). Cyrus has failed in this regard. The Eleventh Circuit has stated the following about comparator evidence:

> In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways. The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed. We require that the quantity and quality of the comparator's misconduct be **nearly identical** to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges. Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.

Maniccia v. Brown, 171 F.3d 1364, 1368-69 (11th Cir. 1999)(citations and quotations omitted)(emphasis added).

Cyrus points to a single comparator, J.Y. Choi. Cyrus claims that Choi engaged in the same behavior as him at the Murakami meeting, but a review of the reports made to President Ahn show that Choi is not a proper comparator.[5] As a matter of law, HMMA management was entitled to rely upon what Cyrus' fellow employees reported. See Jones v. Gerwins, 874 F.2d 1534, 1540 (11th Cir. 1989)("The law is clear that, even if a Title VII claimant did not in fact commit the violation with which he is charged, an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation.").

It is undisputed that Caucasian, American members of HMMA management reported to President Ahn that Cyrus: (1) challenged the judgment of HMMA's Quality Control Department and used profanity toward another HMMA member of management, Chris Susock, by saying "that's bullshit" when Susock tried to explain that Quality Control believed it had properly assessed a penalty for downtime against Murakami; (2) questioned the knowledge and experience of HMMA's Director of Production, John Kalson, in front of one of HMMA's outside suppliers, by telling him "let me teach you something about production systems"; and (3) ignored numerous directives of HMMA's Chief Operating Officer not to discuss issues that the COO did not want to discuss at the

---

[5] Choi is not a proper comparator to Cyrus for the additional reason that Choi was in a lesser job position than Cyrus. Choi was a Senior Manager, whereas Cyrus was at the higher level of Director. (Choi Depo., at 35:7-37:18)(Cyrus Depo., at 31:13-16). See Hanley v. Sports Authority, 143 F. Supp. 2d 1351, 1359 (S.D. Fla. 2000)(holding that co-employee in a different position than plaintiff was not an appropriate comparator for race-based disparate treatment claim), citing Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). Although Cyrus contended at his deposition that they were equals within the organization, Cyrus previously admitted that Choi "worked for him." (Cyrus Depo., at 302:23-303:19) (Jin Decl., Ex. 1).

meeting. (Cyrus Depo., Exs. 8, 9) (Jin Decl., Ex. 1, Bates Nos. 0205-06, 0249). None of the reports to President Ahn, including Cyrus' own report, accuse Choi of disrespecting other members of HMMA management or quarreling with them in such a manner. (Duckworth Decl. ¶ 13) (Jin Decl., Ex. 1, Bates Nos. 0205-06, 0238-40, 0244-46, 0249, 0258-60). Cyrus admits that Choi never argued with other HMMA executives during the meeting. (Cyrus Depo., at 178:18-21). Cyrus also admits that Choi did not make any derogatory comments during the meeting. (Cyrus Depo., at 178:10-17). Therefore, Cyrus and Choi are not similarly situated. See Silvera v. Orange County School Bd., 244 F.3d 1253, 1258 (11th Cir. 2001)(holding that plaintiff is required to show the comparator's misconduct is nearly identical to the plaintiff's in order "to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges"), cert. denied, 534 U.S. 976 (2001).

It is also undisputed that it was only after Duckworth met with Cyrus and determined that Cyrus was unwilling to improve his attitude that Cyrus was discharged. (Duckworth Decl., ¶ 9). There is no evidence that Choi made any kind of similar refusal to address concerns raised by his supervisor. (Choi Depo., at 175:1-23, 185:22-188:6). To the contrary, Choi apologized to Kim for speaking on a topic different than what Kim wanted to speak about in the meeting. (Choi Depo., at 188:7-189:1). Further, there is no evidence that Choi had engaged in other incidents such as the directors meeting in which Cyrus attempted to embarrass another member of management, Kenny Song. (Duckworth Decl., ¶ 6). Thus, the "quantity" of Cyrus' misconduct was far different than anything attributed to Choi.

21

## 2.     Cyrus Cannot Challenge HMMA's Reason for his Discharge

Even if Cyrus could establish a prima facie case of discrimination, Cyrus' unprofessional behavior and refusal to improve his attitude constitute legitimate, non-discriminatory reasons for his discharge. An employer may legitimately discharge an employee who displays unprofessional behavior or a poor attitude.  Ashe v. Aronov Homes, Inc., 354 F. Supp. 2d 1251, 1259 (M.D. Ala. 2004)(holding failure to follow instructions and insubordination are legitimate, nondiscriminatory considerations); Garcia-Cabrera v. Cohen, 81 F. Supp. 2d 1272, 1281 (M.D. Ala. 2000)(holding "[i]t is beyond question that an inability to get along with co-workers and demonstrate caustic or rude behavior is a legitimate, non-discriminatory reason for an employment decision."), aff'd, 237 F.3d 636 (11th Cir. 2000).

It should be noted that the relevant inquiry is whether HMMA management had a good faith belief that Cyrus engaged in unprofessional behavior, not whether Cyrus actually did.  The Eleventh Circuit has discussed this critical distinction in the case of Elrod v. Sears, Roebuck & Co., 939 F.2d 1466 (11th Cir. 1991).   In Elrod, the plaintiff contended that the employer's stated reason for termination (i.e., Elrod's alleged sexual harassment of another employee) was pretextual and that he was actually discharged because of his age in violation of the ADEA.  Id. 939 F.2d at 1470.  Just as here, Elrod focused his evidence on his general denial of the alleged misconduct, and he sought to prove that the co-workers who implicated him were mistaken.  But the Eleventh Circuit made clear that such efforts missed the point:

> We must make an important distinction before proceeding any
> further.  Much of Elrod's proof at trial centered around whether Elrod
> was in fact guilty of the . . . allegations leveled at him by his former

22

> co-workers.  We can assume for purposes of this opinion that the complaining employees interviewed by [the employer] were lying through their teeth.  The inquiry . . . is limited to whether [the employer] *believed* that Elrod was guilty . . ., and if so, whether this belief was the reason behind Elrod's discharge.

Elrod, 939 F.2d at 1470 (emphasis in original).

It is undisputed that the reports of those who attended the Murakami meeting (including Cyrus' white American co-workers) advised President Ahn of alleged behavior by Cyrus that he himself admits would warrant disciplinary action.  (Cyrus Depo., at 119:13-20) (Jin Decl., Ex. 1, Bates Nos. 0205-06, 0238-40, 0244-46, 0249).  Cyrus has offered no evidence that any of these reports were tainted by discriminatory animus. (Cyrus Depo., at 139:18-141:21).  Further, he offers no explanation why Chris Susock, John Kalson, Gerald Horn, and others in the meeting reported that he engaged in unprofessional behavior.  (Cyrus Depo., at 118:22-119:20, 133:8-22, 136:13-139:17).  Cyrus cannot defeat summary judgment now as a matter of law by simply denying that he committed the conduct of which he was accused.

**B.      Cyrus' Retaliation Claim Fails as a Matter of Law**

Cyrus claims that he was discharged in retaliation for his complaints of discrimination. (Cyrus Depo., at 319:2-320:23, Ex. 21).  To establish a prima facie case of retaliation, Cyrus must show:  (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression.  See, e.g., Weaver v. Casa Gallardo, 922 F.2d 1515, 1524 (11th Cir. 1991).  Cyrus cannot establish the first or third required elements of his prima facie case.

### 1.    Cyrus Did Not Engage In Protected Activity Until After He Was Notified of His Termination

Title VII contains two different types of protected activity, known as the "opposition clause" and the "participation clause." Under the opposition clause, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Likewise, "under the participation clause," an employer may not retaliate against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." Id. Cyrus did not file his EEOC Charge until after his termination, so the participation clause is inapplicable.

Cyrus will presumably argue that he engaged in protected activity by: (1) making complaints to Greg Kimble and Rick Neal that he was being discriminated against because of his health condition in early Summer of 2005; (2) having some generalized discussions with Keith Duckworth during executive meetings in the Summer of 2005 that may have involved discussion of inappropriate behavior in the workplace; and (3) writing his letter of "formal complaint" on November 10, 2005, making a written complaint of discrimination. The first two incidents do not implicate Title VII. The third incident constitutes protected expression, but Cyrus cannot show a causal connection between this complaint and his termination because he was notified several weeks before making his complaint that he would be terminated.

24

### a.    Cyrus' Complaints About Disability Discrimination Do Not Implicate Title VII

Cyrus argues that he made a complaint of discrimination to General Counsel Rick Neal and Director of Human Resources Greg Kimble in the Summer of 2005. (Cyrus Depo., at 253:12-21). He claims that he complained to them that he felt he was being treated differently by co-workers after his return to work from having a heart procedure done.  (Cyrus Depo., at 256:6-257:13).  Although this allegation might implicate the Americans with Disabilities Act, there is no such claim in this lawsuit and this allegation does nothing to prove that Cyrus made prior complaints about conduct that allegedly violated Title VII. See 42 U.S.C. § 2000e-3(a)(employee must oppose a practice made unlawful by Title VII to assert a retaliation claim).

### b.    Merely Performing One's Required Job Duties Is Not Protected Activity

Cyrus also may assert that he engaged in protected activity by arguing that occasional meetings that were held by Keith Duckworth with various members of executive management should be now construed as protected activity.  (Cyrus Depo., at 221:3-222:12).  It is undisputed that Cyrus never complained to Duckworth in these meetings that he felt that he or anyone else had been the subject of discriminatory conduct.  (Cyrus Depo., at 252:15-253:12).  Cyrus raised various issues because he was merely voicing "concerns for the benefit of the company, the things that we needed to rectify."  (Cyrus Depo., at 254:13-255:9).  The subjects that Cyrus raised (safety issues, altercations between Korean workers, not properly using the SAP computer system, communication breakdowns between departments) did not implicate Title VII.  (Cyrus Depo., at 242:14-245:8).

Cyrus says that he may also have discussed a situation during the meeting where HMMA had several months previously investigated a complaint that a manager offered a resigning employee to receive two weeks of severance pay without working it if the employee slept with him. (Cyrus Depo., at 247:6-22). Cyrus admitted that this incident had been investigated and resolved several months before his discussions with Duckworth, that he had absolutely no involvement in or personal knowledge of the situation. (Cyrus Depo., at 247:19-248:18). He also mentioned another matter that had long since been resolved by the Team Relations Department regarding an employee who felt that her Korean Manager was unfairly not assigning her to be in charge of the department when he was away from the plant. (Cyrus Depo., at 242:14-243:20).

The law is clear that an employee needs to make a specific and reasonably clear protestation against conduct that the employee believes violates Title VII to engage in protected activity. See e.g., Coutu v. Martin County Bd. Of Comm's, 47 F.3d 1068, 1074 (11th Cir. 1995)(conclusory allegation of discrimination in grievance did not constitute protected activity); Durkin v. City of Chicago, 341 F.3d 606, 614-15 (7th Cir. 2003) (employee's repeated complaints, which were "vague and concerned subject matters other than harassment," and did not adhere to the "formal channels of the City's complaint mechanism," were not statutorily protected activity); Woods v. Illinois Dep't of Transp., 2005 U.S. Dist. LEXIS 32708, No. 03 CV 4098 JPG, 2005 WL 1691107, at *4 (S.D. Ill. May 31, 2005) (holding that informal complaint was not protected activity where plaintiff "did not complain of race discrimination or any other practice made unlawful by Title VII"); Schulz v. Varian Med. Sys., Inc., 315 F. Supp. 2d 923, 937 (N.D. Ill. 2004) (finding that plaintiff's complaints were "too generic to rise to the level of statutorily-protected activity"); Drago v. Aetna Plywood, Inc., 968

26

F. Supp. 1251, 1255-56 (N.D. Ill. 1997) (finding that plaintiff's complaints did not constitute statutorily protected expression where she did not explicitly report sexual harassment or other activity that violated Title VII). These prior vague statements in executive meetings do not constitute statutorily protected expression as a matter of law.

In addition, to engage in protected activity, the employee must actually <u>oppose</u> the conduct made unlawful under Title VII. <u>See</u>  <u>United States EEOC v. Bojangles Rests., Inc.</u>, 284 F. Supp. 2d 320, 326 (M. D. N.C. 2003)("the plain language of [Title VII] clearly covers only those who 'actually oppose' discrimination or those who "participate, assist, etc.," in an investigation or proceeding. In other words, the person must have some connection to the protected activity")(emphasis added). Here, it is undisputed that Cyrus was aware of HMMA's policies prohibiting discrimination and harassment, (Cyrus Depo., at 251:17-22), and he does not dispute that he never made any complaints through these mechanisms regarding any alleged conduct that could violate Title VII prior to being notified of his discharge. (Cyrus Depo, at 284:5-13). The mere fact that Cyrus may have mentioned incidents of which he had no personal knowledge, and of which he never complained, and of which had been fully investigated and resolved months earlier, does not constitute <u>opposition</u> to conduct made unlawful under Title VII as a matter of law. Because Cyrus had no "connection to the protected activity" of these situations, these allegations cannot support his retaliation claim.

Cyrus' contention is even more removed than the claim of protected activity made by the plaintiff in <u>Hamm v. Florida</u>, 708 F.2d 647 (11th Cir. 1983). In <u>Hamm</u>, the plaintiff argued that she had engaged in protected activity under Title VII because her job duties including investigating

27

instances of alleged discrimination, filing reports on her findings and making recommendations to her supervisor as to what would be appropriate measures to take to resolve the situation. The Eleventh Circuit upheld the district court's finding that "plaintiff failed to show protected activity." Hamm, 708 F.2d at 654.

The hallmark of "protected activity" under any retaliation provision is "taking some action adverse to the company." McKenzie v. Renberg's, Inc., 94 F.3d 1478 (10th Cir. 1996), cert. denied, 520 U.S. 1186 (1997). The Tenth Circuit's holding in McKenzie provides the proper analysis as to why Cyrus failed to engage in protected activity prior to being notified of his termination. The plaintiff in McKenzie sought to assert a retaliation claim under the FLSA, claiming that she was discharged from her position as personnel director because she reported her good faith concerns about the company's possible wage and hour violations. Id., 94 F.3d at 1485-86. The Tenth Circuit concluded that McKenzie failed to show that she engaged in protected activity under the act. The Court noted:

> [I]t is the assertion of statutory rights (i.e., the *advocacy* of rights) by taking some action adverse to the company . . . that is the hallmark of protected activity. . . .
>
> Here, McKenzie never crossed the line from being an employee merely performing her job as personnel director to an employee lodging a personal complaint about the wage and hour practices of her employer and asserting a right adverse to the company. Rather, in her capacity as personnel manager, she informed the company that it was at risk of claims that might be instituted by others as a result of its alleged FLSA violations. In order to engage in protected activity . . ., the employee must step outside his or her role of representing the company and . . . engage in activities that reasonably could be perceived as directed towards the assertion of rights protected by the FLSA.

McKenzie, 94 F.3d at 1486 (emphasis in original).

Just as in McKenzie and Hamm, Cyrus never took on the role of an advocate and never opposed any conduct made unlawful by Title VII. Merely mentioning hearsay situations within a generalized "brain storming" session does not constitute opposition. Absent some evidence that Cyrus took some steps to engage in activities that could be perceived as directed towards the assertion of rights under Title VII, his retaliation claim should be dismissed.

### 2. Cyrus Cannot Prove a Causal Connection Between His Complaint and His Discharge

Cyrus' letter of November 10, 2005, constitutes protected activity, but Cyrus cannot prove a causal connection between that complaint and his discharge. Cyrus is not allowed to manufacture a retaliation claim by making complaints only in response to learning that his job is in jeopardy. Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir.)("Although contesting an unlawful employment practice is protected conduct, the anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the workplace."), cert. denied, 528 U.S. 818 (1999); Mason v. Huttig Sash & Door Co. Ret. Plan for Salaried Employees, 26 Fed. Appx. 531, 535 (6th Cir. 2004)(plaintiff could not show causal connection between his complaint and discharge where he had already been notified that his job was in jeopardy before making any complaints)(unpublished).

It is undisputed that Cyrus was notified by Duckworth that he was being terminated on October 22, 2005. (Cyrus Depo., at 214:4-217:23). Thus, Duckworth could not have been motivated to retaliate by this complaint made by Cyrus in November 2005. See, e.g., Brungart v. BellSouth Telecommunications, Inc., 231 F.3d 791, 799 (11th Cir. 2000)("A decision maker cannot have been

motivated to retaliate by something unknown to him."), cert. denied, 532 U.S. 1937 (2001). The mere fact that Cyrus was not formally discharged until December does not affect the required outcome in this case. See Morgan v. Hilti, 108 F.3d 1319, 1324 (10th Cir. 1997) (plaintiff's argument that his termination was retaliatory was rejected because the court noted that the termination decision "simply completed the . . . process already set in motion" before the specific incidents of protected activity occurred).

Further, even if Cyrus' vague conversations in executive meetings could be construed as protected activity, Cyrus cannot show any causal connection between these incidents and his termination. More than four months had passed between Cyrus' meeting with Duckworth in the early-Summer and his termination in late October, which suggests no causal connection. See Clark County School Dist. v. Breeden, 532 U.S. 268, 273 (2001)("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close'"); See e.g., Richmond v. Oneok, Inc., 120 F.3d 205, 209 (10th Cir. 1997)(3-month period insufficient); Hughes v. Derwinski, 967 F.2d 1168, 1174-1175 (7th Cir. 1992)(4-month period insufficient). Thus, Cyrus has failed to establish a prima facie case for his retaliation claim.

**3.    Cyrus Cannot Dispute the Legitimate, Non-Retaliatory Reasons for His Discharge**

HMMA has offered legitimate, non-retaliatory reasons for Cyrus' discharge. He exhibited unprofessional behavior and an unwillingness to improve his attitude. As discussed supra at pages 22 - 23, Cyrus has failed to offer any evidence to suggest that HMMA's stated reasons for its actions

are a pretext for discrimination or retaliation. For all of these reasons, Cyrus' retaliation claim must be dismissed.

## IV.    CONCLUSION

For all the foregoing reasons, HMMA is entitled to summary judgment on all of the Plaintiff's claims. Defendant respectfully requests that this Court grant its Motion for Summary Judgment, dismiss this case with prejudice, and award the Defendant its costs and attorneys' fees in defending against this case.

/s/  Brian R. Bostick
TIMOTHY A. PALMER (PAL009)
J. TRENT SCOFIELD (SCO024)
BRIAN R. BOSTICK (BOS015)
**OGLETREE, DEAKINS, NASH,**
  **SMOAK & STEWART, P.C.**
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, AL 35203
(205) 328-1900
brian.bostick@odnss.com
Attorneys for Defendant Hyundai Motor
Manufacturing Alabama, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of January, 2008, I electronically filed the foregoing Defendant's Brief in Support of Its Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:   Richard J. Stockham, III, Esq.

/s/ Brian R. Bostick
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone: (205)328-1900
Facsimile: (205)328-6000
brian.bostick@odnss.com

32