**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| **ROBERT CYRUS,** | |
| **Plaintiff,** | |
| **v.** | **Case No.:  2:07-cv-00144-ID-TFM** |
| **HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC,** | |
| **Defendant.** | |

**DEFENDANT'S EVIDENTIARY SUBMISSION IN SUPPORT OF ITS**
**MOTION FOR SUMMARY JUDGMENT**

COMES NOW Defendant Hyundai Motor Manufacturing Alabama, LLC (hereinafter "HMMA") and submits this Evidentiary Submission in Support of Its Motion for Summary Judgment.  HMMA relies upon the following evidence:[1]

| | |
|---|---|
| Exhibit A | Deposition of Plaintiff Robert Cyrus, Part I and Exhibits Thereto |
| Exhibit B | Deposition of J.Y. Choi and Exhibits Thereto |
| Exhibit C | Deposition of H.I. Kim and Exhibits Thereto |
| Exhibit D | Declaration of Keith Duckworth and Exhibits Thereto |
| Exhibit E | Transcripts of Telephone Conversations Recorded by Plaintiff |
| Exhibit F | Declaration of Eui Hwan Jin and Exhibits Thereto |
| Exhibit G | Declaration of Ihn Hwan Chu and Exhibits Thereto |

---

[1] Information such as home addresses, telephone numbers, and the names of persons not pertinent to this litigation have been redacted in accordance with the E-Government Act of 2002 and Section II.I of the Administrative Procedures for the CM/ECF System for the United States District Court, Northern District of Alabama.

WHEREFORE, HMMA respectfully requests that this Court grant its Motion for Summary

Judgment, dismiss Cyrus' claims with prejudice, and award HMMA its costs in defending against

this action.

<div style="margin-left:40%">

/s/  Brian R. Bostick
TIMOTHY A. PALMER (PAL009)
J. TRENT SCOFIELD (SCO024)
BRIAN R. BOSTICK (BOS015)
**OGLETREE, DEAKINS, NASH,**
 **SMOAK & STEWART, P.C.**
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, AL 35203
(205) 328-1900
brian.bostick@odnss.com
Attorneys for Defendant Hyundai Motor
Manufacturing Alabama, LLC

</div>

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on the 18th day of January, 2008, I electronically filed the foregoing Defendant's Brief in Support of Its Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:  Richard J. Stockham, III, Esq.

<div align="center">

/s/ Brian R. Bostick<br>
OGLETREE, DEAKINS, NASH,<br>
SMOAK & STEWART, P.C.<br>
One Federal Place, Suite 1000<br>
1819 Fifth Avenue North<br>
Birmingham, Alabama 35203<br>
Telephone: (205)328-1900<br>
Facsimile: (205)328-6000<br>
brian.bostick@odnss.com

</div>

# Exhibit A

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


ROBERT CYRUS,

     Plaintiff,

vs.               CASE NO. 2:07cv144-ID

HYUNDAI MOTOR

MANUFACTURING OF

ALABAMA, LLC,

     Defendant.

_____

\*   \*   \*   \*   \*   \*

DEPOSITION

OF

ROBERT CYRUS,

taken pursuant to notice and stipulation on

behalf of the Defendants, at the Offices of

MAYNARD COOPER & GALE, PC, RSA Union Building,

100 North Union Street, Suite 650, Montgomery,

Alabama 36104, before DAWN A. GOODMAN,

Certified Shorthand Reporter and Notary Public

in and for the State of Alabama at Large, on

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

---

Page 2

1  Tuesday, November 27, 2007, commencing at 10:09
2  o'clock a.m.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
3

---

Page 4

1  CO-COUNSEL FOR THE DEFENDANTS:
2      JEFFREY A. LEE, Esquire
3      MAYNARD COOPER & GALE, PC
4      1901 Sixth Avenue North
5      2400 AmSouth/Harbert Plaza
6      Birmingham, Alabama 35203-2618
7
8  ALSO PRESENT:
9      RICHARD E. NEAL, Esquire
10     HYUNDAI MOTOR MANUFACTURING
11     ALABAMA, LLC
12     700 Hyundai Boulevard
13     Montgomery, Alabama 36106
14
15     KYLE McKINNON, Videographer
16
17
18
19
20
21
22
23

---

Page 3

1              APPEARANCES
2
3  FOR THE PLAINTIFF:
4      RICHARD J. STOCKHAM, III, Esquire
5      STOCKHAM, CARROLL & SMITH, P.C.
6      2204 Lakeshore Drive
7      Suite 114
8      Birmingham, Alabama 35209
9
10 FOR THE DEFENDANTS:
11     BRIAN R. BOSTICK, Esquire
12     OGLETREE, DEAKINS, NASH, SMOAK &
13     STEWART, P.C.
14     One Federal Place
15     1819 5th Avenue North
16     Suite 100
17     Birmingham, Alabama 35203
18
19
20
21
22

---

Page 5

1              INDEX
2          EXAMINATION
3                              Page
4  Examination by Mr. Bostick        11
5          EXHIBITS
6  For the Defendants:
7  No.                      Page
8  1  Three-page document, dated May    14
9     9, 2006, from Matthias
10    Erdmannsdorfer and
11    Herbert J. Buder to
12    Robert Clay Cyrus
13 2  Two-page document, dated        16
14    October 26, 2006, from
15    Herbert J. Buder to
16    Robert Cyrus
17 3  Three-page document,          22
18    undated, resume of Robert
19    Clay Cyrus, C.P.M.
20 4  Two-page document, dated May    41
21    4, 2005, from Melanie L.
22    McCormick to Rob Cyrus
23

---

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

<table>
<tr><td colspan="2">Page 6</td></tr>
</table>

**Page 6**

| No. | | Page |
|---|---|---|
| 5 | Thirteen-page document, dated October 2, 2005, Murakami Meeting document, with attachments | 56 |
| 6 | Two-page document, dated September 16, 2005, handwritten notes | 57 |
| 7 | Three-page document, dated September 16, 2005, notes of Chris Susock entitled Weekly Supplier Quality Meeting | 107 |
| 8 | Two-page document, dated September 17, 2007, notes of John Kalson entitled Weekly Part Quality Meeting Events | 126 |

**Page 7**

| No. | | Page |
|---|---|---|
| 9 | One-page document, dated September 16, 2005, notes of Gerald Horn entitled Weekly Parts Quality Review Meeting - Murakami | 136 |
| 10 | Three-page document, dated November 6, 2005, handwritten notes of Robert Cyrus entitled Chronological Events H.I. Kim Retaliation | 152 |
| 11 | Four-page document, dated September 17, 2005, interoffice memorandum from Jason Chi to Mr. H.I. Kim, COO | 165 |
| 12 | Two-page document, dated October 31, 2007, Progress Note of Robert C. Cyrus by Paul B. Moore, M.D. | 168 |

**Page 8**

| No. | | Page |
|---|---|---|
| 13 | One-page document, dated October 13, 2005, e-mail from Laura L. Stone to Melanie L. McCormick | 173 |
| 14 | One-page document, dated October 18, 2005, entitled Report Approval | 174 |
| 15 | Three-page document, dated October 22, 2005, handwritten notes | 185 |
| 16 | Multi-page document, first page dated November 10, 2005, from Robert C. Cyrus, C.P.M. to Mr. Keith Duckworth | 196 |
| 17 | Two-page document, undated, entitled Concern in upper left-hand corner | 272 |
| 18 | One-page document, dated October 24, 2005, from M. Keith Duckworth to Mr. Rob Cyrus | 314 |

**Page 9**

| No. | | Page |
|---|---|---|
| 19 | Two-page document, dated December 6, 2005, from M. Keith Duckworth to Mr. Rob Cyrus | 315 |
| 20 | Three-page document, dated November 6, 2005, from Robert C. Cyrus, C.P.M to Mr. Keith Duckworth | 315 |
| 21 | One-page document, dated March 2, 2006, entitled Charge of Discrimination | 318 |

3 (Pages 6 to 9)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| | |
|---|---|
| **Page 10** | **Page 12** |

**Page 10**

1  PROCEEDINGS
2      THE VIDEOGRAPHER:  This is the
3      beginning of Tape No. 1 in
4      the deposition of Robert
5      Cyrus in the matter of Robert
6      Cyrus versus Hyundai Motor
7      Manufacturing of Alabama,
8      Case No. 2:07cv144-ID.
9  We're on the record at 10:09 a.m.
10      on Tuesday, November 27th,
11      2007.  This deposition is
12      taking place at Maynard
13      Cooper & Gale, located at 100
14      Union Street, Suite 650,
15      Birmingham, Alabama 36104.
16  The court reporter is Dawn
17      Goodman, and the videographer
18      is Kyle McKinnon.
19  Would counsel please yourself
20      yourselves, after which the
21      court reporter will swear in
22      the witness.
23      MR. STOCKHAM:  I'm Richard

**Page 12**

1      40475.
2  Q.  How long have you lived at that
3      address?
4  A.  Since March of 2007.
5  Q.  Where'd you live prior to that address?
6  A.  Chrystal Lake, Illinois.
7  Q.  And prior to the time you lived in
8      Illinois, where did you live?
9  A.  Montgomery, Alabama.
10  Q.  When did you move from Montgomery?
11  A.  I moved from Montgomery in -- let's see
12      here.  May of 2005.  Yeah, that's right.
13  Q.  I think you're --
14  A.  2006.
15  Q.  Okay.  Have you given a deposition
16      before?
17  A.  Yes.
18  Q.  Okay.  How many times have you been
19      deposed?
20  A.  Once.
21  Q.  Okay.  What kind of case was that in?
22  A.  It was a case involving Hyundai and
23      a company that was going to provide

| | |
|---|---|
| **Page 11** | **Page 13** |

**Page 11**

1      Stockham.  I represent the
2      plaintiff.
3  MR. BOSTICK:  Brian Bostick, I
4      represent Hyundai Motor
5      Manufacturing Alabama, LLC.
6  MR. LEE:  Jeff Lee.  I represent
7      Hyundai Motor America.
8  MR. BOSTICK:  We also have Rick
9      Neal, who's corporate counsel
10      for HMMA.
11      (ROBERT CYRUS, of lawful age,
12      having been duly sworn,
13      testified as follows:)
14      EXAMINATION
15  (BY MR. BOSTICK:)
16  Q.  Good afternoon.  I will be asking you the
17      questions today, Mr. Cyrus.  My name's
18      Brian Bostick.  I'm attorney for HMMA.
19      Can you state your full name
20      for me, please.
21  A.  Robert Clay Cyrus.
22  Q.  And what's your current address?
23  A.  ███████████████, Richmond, Kentucky

**Page 13**

1      bumper fascias to the company.
2  Q.  A supplier?
3  A.  Yes.
4  Q.  Okay.  Was the litigation between HMMA
5      and the supplier?
6  A.  Yes.
7  Q.  What was the name of the supplier?
8  A.  Venture.
9  Q.  What was your testimony regarding?
10  A.  Their ability to execute the contract.
11  Q.  There was an allegation the supplier
12      breached the contract?
13  A.  Yes.
14  Q.  When did that testimony take place?
15  A.  I couldn't tell you the exact date.  In
16      2000 -- probably 2003.
17  Q.  Okay.  Were you based in Montgomery at
18      the time?
19  A.  Yes.
20  Q.  Okay.  Are you presently employed?
21  A.  No.
22  Q.  Who was your last employer?
23  A.  Eisenmann Corporation.

4  (Pages 10 to 13)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 14 | Page 16 |
|---|---|
| 1 Q. And were you let go there as a result of | 1 (The referred-to document was |
| 2 a reduction in force? | 2 marked for identification as |
| 3 A. The company shut down operations and | 3 Defendants' Exhibit No. 2) |
| 4 moved to Stuttgart, Germany where their | 4 Q. (By Mr. Bostick) Do you recall receiving |
| 5 headquarters resides. There was an | 5 this letter? |
| 6 entire shut down of the office, | 6 A. Yes. |
| 7 300-and-some people. | 7 Q. And is that consistent with your |
| 8 (The referred-to document was | 8 recollection that the layoff occurred on |
| 9 marked for identification as | 9 December 31st, 2006? |
| 10 Defendants' Exhibit No. 1) | 10 A. Yes. |
| 11 Q. (By Mr. Bostick) Can you identify | 11 Q. Or it says with 13 days -- 14 days |
| 12 Exhibit 1 for me? | 12 thereafter? |
| 13 A. It looks like an offer letter from | 13 A. Yes. |
| 14 Eisenmann. | 14 Q. Where all have you applied for jobs since |
| 15 Q. Did -- did you accept this offer | 15 leaving Eisenmann in December of 2006? |
| 16 letter? | 16 A. I provided you a list of all of the |
| 17 A. Yes. | 17 employment efforts. You should have |
| 18 Q. And were you making a salary of $125,000 | 18 that. It's numerous. Hundreds. |
| 19 there? | 19 Q. Who all have you had a face-to-face |
| 20 A. Yes. | 20 interview with? |
| 21 Q. Any other additional income that you'd | 21 A. Ostal Company (sic) in Mobile, Alabama; |
| 22 received in relation to bonuses or other | 22 Thyssen-Krupp in Mobile, Alabama area; |
| 23 income in addition to that 125,000 a | 23 Whirlpool Corporation in Benton Harbor, |

| Page 15 | Page 17 |
|---|---|
| 1 year? | 1 Michigan; Zedeff Bosche Corporation in |
| 2 A. As indicated in Point 4, there was a | 2 Cincinnati, Ohio, Northern Kentucky area; |
| 3 signing bonus for $20,000. | 3 Boise Cascade in Boise, Idaho. That's |
| 4 Q. Okay. Did -- did that loan ultimately -- | 4 all for face-to-face. |
| 5 was it forgiven for -- | 5 Q. Have you received any offers of |
| 6 A. Yes. | 6 employment since -- from any entities |
| 7 Q. -- your work there? You never had to pay | 7 since leaving Eisenmann? |
| 8 any of it back? | 8 A. No. |
| 9 A. That's correct. | 9 Q. Do you have any sources of income for |
| 10 Q. Do -- I guess, let's just go over a | 10 2007? |
| 11 little bit of the rules for the | 11 A. No. |
| 12 deposition today. I'll be asking you | 12 Q. Are you receiving unemployment? |
| 13 questions about your lawsuit. If | 13 A. I received it until I reached a threshold |
| 14 something about my question is unclear, | 14 in which they -- my benefits ran out. |
| 15 feel free to ask me to rephrase it or | 15 Q. And what -- what state are you receiving |
| 16 clarify it for you. But if you answer | 16 unemployment benefits -- or were? |
| 17 it, we'll work under the understanding | 17 A. I was from Illinois, but it was Alabama |
| 18 that you were able to understand the | 18 prior to that. |
| 19 question and answered it clearly. Is | 19 Q. Okay. Do you currently have any |
| 20 that fair? | 20 prospects for face-to-face interviews or |
| 21 A. Yes. | 21 job offers as we sit here today? |
| 22 MR. BOSTICK: I'll show you what I | 22 A. I am in constant discussion with |
| 23 marked as Exhibit 2. | 23 potential employers, yes. I spoke to one |

5 (Pages 14 to 17)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 18

1     on the phone on the way up here,
2     actually. But I don't have anything
3     scheduled.
4  Q. Okay. Are you -- are you primarily
5     looking for jobs in -- purchasing-type
6     jobs or --
7  A. Mainly, since that's my career background
8     for 18, 20 years, yes.
9  Q. Okay. Now, you were previously married;
10    correct?
11 A. That's correct.
12 Q. And then you were divorced in, it looked
13    like, October of 2005?
14 A. That sounds about right. Trying to get
15    it exactly.
16 Q. The petition was filed on October 17th,
17    '05.
18 A. Okay.
19 Q. Does your wife live in Kentucky now?
20 A. She does.
21 Q. What is her name?
22 A. Cynthia Carol Cyrus.
23 Q. And then you have two children?

Page 19

1  A. Yes.
2  Q. Are either of them above the age of 18?
3  A. No.
4  Q. Is that why you moved to Kentucky to be
5     near --
6  A. I moved back to Kentucky to be near my
7     children while seeking employment.
8  Q. Did you have any contacts with Kentucky
9     prior to coming to Alabama or --
10 A. What do you mean "contacts"?
11 Q. I mean, had you lived there before?
12 A. Yes.
13 Q. Does your wife have family there or --
14 A. She does.
15 Q. Okay. Did she move there with the
16    children after y'all got divorced in
17    2005?
18 A. She did. After I was terminated from
19    Hyundai and she was no longer -- she no
20    longer had to remain within a 60-mile
21    perimeter, since I was no longer
22    employed, which also pulled my kids away
23    from me when I was terminated.

Page 20

1  Q. Well, y'all had a divorce decree entered
2     that set the terms.
3  A. And the terms were a 60-mile radius of
4     Montgomery, Alabama.
5  Q. It looked like you had initially claimed
6     that she had -- the initial petition that
7     you filed asserted that she had a
8     drinking problem and irrational and
9     abusive behavior. And then there was an
10    amended petition.
11       Did you ever seek to have --
12    it looked like you had requested
13    counseling as part of the settlement.
14    Was that resolved where she would engage
15    in that counseling?
16 A. We came to an agreement with the parties
17    involved.
18 Q. Okay. So, was the -- when you say you
19    lost your job at Hyundai and whatnot --
20 A. I said I was terminated from Hyundai.
21 Q. -- the -- did you have a term that y'all
22    negotiated for in the decree that said as
23    long as you worked there she would stay

Page 21

1     there or what --
2  A. No.
3  Q. -- specific provision required her to
4     stay there?
5  A. Alabama state law.
6  Q. That you have a job?
7  A. That for the interest of the children, my
8     understanding, that they are not allowed
9     to move within -- beyond a 60-mile radius
10    without the permission of both parents.
11 Q. Okay. And so you did give the permission
12    at that time?
13 A. At which time?
14 Q. When they moved further than 60 miles
15    away?
16 A. Uh-huh. After termination.
17 Q. You didn't go to court and seek some kind
18    of petition to hold her in contempt;
19    correct?
20 A. I don't understand. Why would I do that?
21 Q. Okay. Well, I guess you're telling the
22    law is she's got to stay here unless she
23    has your permission.

6  (Pages 18 to 21)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

## Page 22

1  A.  Right.
2  Q.  So either she had your permission or she
3      didn't.
4  A.  After I was terminated, she had my
5      permission to move to Kentucky, since she
6      had no reason to stay here and I am
7      terminated in Montgomery, Alabama where
8      Hyundai is founded. The likelihood of me
9      finding a job in Montgomery would be
10     questionable.
11             (The referred-to document was
12             marked for identification as
13             Defendants' Exhibit No. 3)
14 Q.  (By Mr. Bostick) Can you identify
15     Exhibit 3 for me?
16 A.  It's a resume.
17 Q.  It looks like there may be a fourth page
18     that I don't have on here.
19             Do you know --
20             MR. STOCKHAM: Do you happen to
21             have another copy?
22             MR. BOSTICK: Oh, I'm sorry.
23             MR. LEE: I've got one.

## Page 23

1  Q.  (By Mr. Bostick) Is this a correct
2      statement of your work experience through
3      the time you were with HMMA?
4  A.  Yes, it is.
5  Q.  And do you understand, Mr. Cyrus, you
6      have two separate lawsuits against HMMA:
7      one in state court and one in federal
8      court?
9  A.  Yes, I do.
10 Q.  In discussions with your attorney, we
11     agreed to focus today's deposition on
12     events that occurred during the time you
13     were actually in Montgomery.
14             Do you recall what -- when
15     it was that you actually arrived in
16     Montgomery to start working for HMMA?
17 A.  I started with Hyundai in May of 2002. I
18     think the official date was May 22nd.
19     The first 24 days were spent in Korea and
20     Orange County, Hyundai Motor America
21     Corporation, in California. So I had
22     seven days in -- six to seven days, as I
23     recall, in California, and 24 days in

## Page 24

1      Korea, Seoul, Korea. After that, I moved
2      to Montgomery.
3  Q.  Okay. It looked like there was some
4      discussion about you possibly working in
5      Detroit for another Hyundai entity for a
6      period of time. Did that ever come to
7      fruition?
8  A.  No. I mean, the original intent, and in
9      Ted Chung's handwriting, is that you will
10     work for the "V" project, which is the
11     Alabama project, from Day One. The
12     determination of the actual plant had not
13     even been determined at that point. The
14     finalists were Kentucky and Alabama.
15     Later on we determined it would be
16     Alabama.
17             The discussion focused,
18     is it going to be in Southfield, Michigan
19     in the development office for a period of
20     time, or is it going to be in Montgomery,
21     Alabama from the onset. It turned out to
22     be the determination by Ted Chung to be
23     in Montgomery, Alabama.

## Page 25

1  Q.  So, when did you actually arrive in
2      Montgomery?
3  A.  Shortly after -- I couldn't give you an
4      exact date -- shortly after returning
5      from Korea. I lived in Birmingham at
6      that time, and I got a rental house paid
7      for by Hyundai Motor America of
8      California.
9  Q.  It looked like there was an offer letter
10     of HMMA in around September of 2002. I
11     think your initial negotiations with
12     Chung were around May. Would that be
13     consistent with your recollection?
14 A.  There's -- the original offer for the
15     Alabama project, the "V" project, from
16     Keith Duckworth through Jerry Peterson
17     and Duck- --- Chung, Ted Chung, and at
18     that point, Hyundai Motor Manufacturing
19     Alabama was not a formed entity, so I had
20     to go under Hyundai Motor America out of
21     California until the actual corporation
22     entity was in place in Alabama.
23             That's why, in September,

7 (Pages 22 to 25)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 26

1    HMMA was at a point which they were
2    incorporated in an entity within the
3    state. I had to switch over to HMMA.
4    But at no time was -- you know, it was
5    always the Alabama project. I didn't
6    work in the sales department in
7    California.
8  Q.  I got a lot there, but I don't know did I
9    get, when did you move? Was it September
10   of 2002?
11 A.  When did I move?
12 Q.  When did you move to Montgomery was my
13   question and nothing else.
14 A.  I mentioned to you earlier that that was
15   shortly after I returned from Korea. So
16   that would probably be in the June time
17   frame.
18 Q.  Okay.
19 A.  June, July. I have a lease.
20 Q.  Do you have -- are you on any medications
21   today?
22 A.  Yes.
23 Q.  What are you -- what are you on?

Page 27

1  A.  Altace, Atenolol, baby aspirin, a
2    multi-vitamin, Tonocard, Cymbalta, Zetia
3    and that's it.
4  Q.  What is -- what do you take the Altace
5    for?
6  A.  My cardiologist gave it to me for my
7    heart.
8  Q.  And how often do you take it?
9  A.  Daily.
10 Q.  Did you take it this morning?
11 A.  I did.
12 Q.  And then, I can't read my -- At- --
13 A.  Atenolol.
14 Q.  Atenolol. How often do you take that?
15 A.  Daily.
16 Q.  And what is it prescribed for?
17 A.  Heart also.
18 Q.  And?
19 A.  Baby aspirin?
20 Q.  Yeah, baby aspirin. You take that once a
21   day?
22 A.  That's recommended by my cardiologist
23   also.

Page 28

1  Q.  And the multi-vitamin as well?
2  A.  Yes.
3  Q.  How about the next one. It looks like it
4    starts with an O?
5  A.  Tonocard?
6  Q.  Yeah.
7  A.  It's a triglyceride reducer for
8    cholesterol control.
9  Q.  Okay. Cymbalt (sic), is that what the
10   next --
11 A.  Cymbalta.
12 Q.  What is that?
13 A.  It is an anti-depressant.
14 Q.  Okay. Who has prescribed that; which
15   doctor?
16 A.  My general practitioner.
17 Q.  How long have you been taking that?
18 A.  Probably three years.
19 Q.  Who was the first doctor who prescribed
20   you that?
21 A.  A gentleman in Montgomery, Alabama. I
22   can get you his name.
23 Q.  Is he a general practitioner?

Page 29

1  A.  No. He's a psychiatrist.
2  Q.  Okay. What period of time were you going
3    to see the psychiatrist in Montgomery?
4  A.  I'd have to look back. I provided that
5    to you already, on the dates, when we did
6    the discovery phase.
7  Q.  Do you know what -- what group he's with
8    or what entity?
9  A.  It's provided in the documentation we
10   gave you. I don't recall.
11 Q.  I'm just asking what's your name -- what
12   you recall; do you know?
13 A.  What the name of his group is?
14 Q.  Practice was.
15 A.  No.
16 Q.  Not what his name is.
17       Have you been consistently
18   taking that anti-depressant for the last
19   three years?
20 A.  Yes.
21 Q.  How about the Zetia?
22 A.  Zetia's a cholesterol medication.
23 Q.  And how long have you been prescribed

8 (Pages 26 to 29)

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO
56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

**Page 30**

1 that?
2 A. Since the -- I have been on a number of
3 cholesterol medications since the
4 coronary artery disease discovery. It's
5 prescribed by my cardiologist.
6 Q. Did you look -- one of the documents we
7 requested was your credit card records
8 during the period of time, I believe it
9 was, July through October of 2005. Did
10 you check and see if you had copies of
11 those records?
12 A. I don't have copies of them, no.
13 Q. Okay. What --
14 A. I don't keep copies of them.
15 Q. Do you have an online account that can
16 check past records?
17 A. No.
18 Q. What -- who is your credit card through,
19 at that time, that you were using?
20 A. The bank, you mean?
21 Q. Um-hum.
22 A. Wachovia, American Express.
23 Q. Did you have a bank account with

**Page 31**

1 Wachovia?
2 A. Yes, I did.
3 Q. Okay. And was your credit card a Visa or
4 MasterCard through Wachovia?
5 A. Yes.
6 Q. Any other credit cards other than the
7 American Express?
8 A. At the period of time through employment
9 with Hyundai they were?
10 Q. Yeah.
11 A. I don't believe so. I mean, I don't know
12 if I have a gas card anymore.
13 Q. What was your title when you -- when you
14 arrived in Montgomery?
15 A. Director of purchasing, parts
16 development.
17 Q. And who -- who -- who did you report to
18 when you first arrived?
19 A. When I first arrived physically or
20 through organizational charts?
21 Q. Both.
22 A. Well, as indicated in the handwritten
23 notes from Ted Chung, I reported directly

**Page 32**

1 to Ted Chung, the chairman's son-in-law.
2 And then a Mr. Min Ho Lee, Mark Lee, was
3 assigned to the Alabama project. I met
4 him in Korea during my 24-day -- but when
5 I first arrived, the gentleman was J.B.
6 Lee.
7 It was later determined by
8 Mr. Ted Chung that he was going to put
9 Mr. Mark Lee in there. ███████████
10 ████████████████████████████
11 ████████████████████████
12 ████████████████████. And
13 that was Mark Lee he chose.
14 Q. So had Mark Lee arrived in Montgomery at
15 the time that you first arrived?
16 A. No.
17 Q. Okay.
18 A. But within 30 days of my departure from
19 Korea, he arrived.
20 Q. And then so, J.B. Lee was -- what was his
21 title when you arrived in Montgomery?
22 A. You have that documentation. I couldn't
23 tell you exactly. He's probably vice

**Page 33**

1 president of purchasing. But there is
2 many different divisions and vice
3 presidents in purchasing in Korea.
4 Q. Was he in purchasing or --
5 A. Purchasing, yes, sir. Parts
6 development.
7 Q. When did Mr. Ahn arrive at the plant?
8 A. Which Mr. Ahn?
9 Q. The president, Mr. Ahn.
10 A. He was the second president or third set
11 of executive management. I couldn't tell
12 you the day. It was in 2005.
13 Q. Okay. Who was the president prior to his
14 arrival?
15 A. Y.S. Kim.
16 Q. Who was in the -- tell me a little bit
17 about the organizational structure there
18 in the production department.
19 A. You have the -- you have the
20 organizational charts. What do you mean?
21 Q. You were director?
22 A. Director of purchasing.
23 Q. Director of purchasing.

9 (Pages 30 to 33)

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO
56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 34

1  A.  Correct.
2  Q.  Would -- say, at the time of Mr. Lee's
3      arrival, would you have been considered
4      the head of the purchasing department, or
5      would he have been considered the head?
6  A.  You know, in my offer letter, or in my
7      discussions with Ted Chung, he said I
8      would be the top American in purchasing
9      always.  He indicated that a vice
10     president would join me for two years.
11     And at the time of his departure, I would
12     be promoted to vice president.
13            So Mr. Mark Lee was the vice
14     president that came over from Korea.  He
15     totally --
16 Q.  So, the answer to my question is, he is
17     the vice president.  So you reported to
18     him?
19 A.  Yes.
20 Q.  Correct?
21 A.  Yes.  Right.  And also to Ted Chung.
22 Q.  I know you've got a lot of stories that
23     you want to tell on your case.  But it

Page 35

1      will make our deposition go a lot
2      smoother today if you listen to the
3      question that I ask and answer that
4      question and try and be responsive to
5      that.
6  A.  All right.  Yes, sir.
7  Q.  It seems like we're getting a lot of
8      liturgy of history to get to the point of
9      the specific question.
10            Who were your direct reports
11     in the purchasing department?
12 A.  My direct reports?  How do you want to
13     define "direct reports"?
14 Q.  People that reported to you directly.
15 A.  I had -- in the beginning, we had a
16     structure of 50 people.  Okay.  These
17     were not all direct reports, but they are
18     not structured typically like a company
19     that operates in America.  I had 25
20     colleagues from Korea.  And we were to
21     bring on 25 local employees.
22            Now, these colleagues from
23     Korea, they would be -- they weren't

Page 36

1      buyers or beginning purchasing people.
2      They were all at the assistant manager or
3      manager or senior manager level.  So they
4      also all had buying-in-commodity
5      responsibility with us, which is not
6      typical in a U.S. business culture.
7             So when we had direct
8      reporting or staff meetings, I had to
9      have all 25 of the Korean colleagues in
10     there.  And then I hired four managers in
11     the purchasing department from local --
12     local hires.  And then I hired one
13     manager for supplier development which
14     oversees the suppliers' capabilities and
15     quality aspects as far as their internal
16     production.  I had that responsibility
17     also.  That was on the direct side, which
18     is anything that is a part that leaves on
19     the vehicle, which is parts development.
20            At that time also, Mr. H.J.
21     Hyun reported to me.  He later became my
22     equal as a director.  And his
23     responsibilities -- he had indirect

Page 37

1      purchasing, which is anything that is
2      purchased that does not leave on a
3      vehicle.  And he also had construction,
4      capital equipment and these
5      responsibilities.
6  Q.  So it sounds like you identified, in
7      response to my question, five direct
8      reports:  four managers; and one manager
9      of over support development or supplier
10     development?
11 A.  That's not -- that's not correct.  I
12     identified in the initial statement that
13     the 25 individuals that came over from
14     Korea reported to me directly also.
15 Q.  Okay.  Who were the four -- the five
16     managers you identified that you were
17     involved in the hiring?
18 A.  Dave Mark, Lin Sullivan, Craig
19     Lindemann -- who else did we have --
20     Chuck Knowles.  We had two assistant
21     managers, which were Warren Gappa and
22     Roger Licht, L-I-C-H-T, on the indirect
23     side.

10  (Pages 34 to 37)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

---

Page 38

1  Q.  Did you have the ability to hire or
2     fire?
3  A.  Yes.
4  Q.  Okay.  Well, let me rephrase that.
5        You know, I had the ability
6     to hire.  I never encountered a situation
7     where firing became a point of
8     discussion.  So I really don't know if I
9     had the ability to fire.  I would assume
10    so.  But that would always be in
11    conjunction with human resources.
12 Q.  Have you ever been a party to a lawsuit
13    other than this action here and -- and
14    excluding your divorce?
15 A.  No, sir.
16 Q.  Ever been arrested?
17 A.  No, sir.
18 Q.  Ever filed for bankruptcy?
19 A.  No, sir.
20 Q.  Ever sought Social Security disability
21    benefits?
22 A.  No, sir.
23 Q.  Have you ever sought long-term disability

---

Page 39

1     benefits?
2  A.  I don't know the real definition.  The
3     only thing I've ever been involved with
4     is the Family Medical Leave Act at
5     Hyundai.
6  Q.  Okay.
7  A.  Not long-term disability.
8  Q.  I think you received salary continuation
9     benefits there.
10 A.  FMLA.  Whatever that is.  Family Medical
11    Leave Act.  However that's classified,
12    I'm not sure.
13 Q.  Do you know -- do you know what a salary
14    continuation benefit is?
15 A.  Not specifically, no.
16 Q.  Do you know what the FMLA entitles you
17    to?
18 A.  Some portions of it.  I'm not a human
19    resource expert.
20 Q.  Are you aware to -- you received 12 weeks
21    of unpaid leave while you were unable to
22    work; is that correct?
23 A.  Well, I received -- you know, according

---

Page 40

1     to Greg Kimble, I was under -- covered
2     under the Family Medical Leave Act.  So
3     if that's the same thing.
4  Q.  But do you know if you were still
5     receiving some form of compensation
6     during the time that you were out from
7     work while you were at Hyundai?
8  A.  Yes, I was.
9  Q.  But you don't know what.
10 A.  According to Greg Kimble, the
11    continuation was for Family Medical Leave
12    Act.  I had to file two different sets of
13    documentation.  Actually, the first one
14    was filed for me after the heart attack.
15    And the second time, after the reaction
16    to medication, they asked me to fill out
17    another form.  "They" being human
18    resources, Kimble and Ms. Melanie
19    McCormick.
20        THE COURT REPORTER:  Excuse me.  I
21        didn't hear that.  Kimble
22        and --
23        THE WITNESS:  I'm sorry.  Ms.

---

Page 41

1        Melanie McCormick.
2  Q.  (By Mr. Bostick) Did your -- did your job
3     title stay the same throughout the time
4     you worked at HMMA?
5  A.  Yes, sir.
6        MR. BOSTICK:  Am I on Exhibit 4?
7        MR. LEE:  Yes.
8        (The referred-to document was
9        marked for identification as
10       Defendants' Exhibit No. 4)
11 Q.  (By Mr. Bostick) Can you identify Exhibit
12    4 for me, please?
13 A.  This is -- appears to be a letter from
14    Melanie McCormick regarding paperwork
15    required for Family Medical Leave Act..
16 Q.  And you mentioned earlier there were, it
17    sounded like, two stints where you had
18    time away from work due to your heart
19    condition.  Does May 4th, 2005 -- is that
20    consistent with your recollection as --
21    as to when you had your first time away
22    from work?
23 A.  When I had the stents placed in?

---

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS -
Court Reporting*Legal Videography*Trial Services

Page 42

1  Q.  Tell me what -- what -- what caused the
2      onset of your issue and what medical
3      treatment you had during that period of
4      time focusing on May 2005.
5  A.  Okay.  Sure.  All right.
6          I was having shortness of
7      breath and difficulty walking, you know,
8      marked by difficulty breathing, and I had
9      chest pain.  And I called my family
10     practitioner, and he said, Go to the
11     emergency room right now.  And I went to
12     the emergency room, and they discovered
13     that I had a partial blockage in a
14     coronary artery.  And the next morning
15     they put me under surgery, through a
16     balloon angioplasty, for the placement of
17     two stents in one of my coronary
18     arteries.
19 Q.  And approximately how -- how much time
20     did you miss from work after the
21     surgery?
22 A.  I don't know.  I'd have to look back at
23     the documentation.

Page 43

1  Q.  I mean, a couple weeks, a month, I mean
2      roughly?
3  A.  I need to look back.  I mean, I've got a
4      letter from Melanie McCormick that
5      indicates every date I was out.  And I
6      think it was two to four months.
7  Q.  Okay.  And so your doctor releases you
8      back to work.  And it sounds like there
9      was a period of time where you were
10     having rehabilitation therapy?
11 A.  Yes.
12 Q.  What was your -- what was the therapy you
13     were undertaking?
14 A.  Cardio rehab.
15 Q.  Which entails what?
16 A.  It was physical activity at the cardio
17     hospital.  I can't remember the name of
18     it.  Saint -- it was the -- you know,
19     connected to the hospital where I had my
20     surgery, and it was -- it was exercise
21     and cardio rehabilitation.
22 Q.  Are you -- I mean, just on a treadmill
23     and that type thing?

Page 44

1  A.  Yes.  Treadmill.
2  Q.  What was your -- how often during the
3      week would you go to that?  Was it once a
4      week, or how many times --
5  A.  It was, I think, three to four days a
6      week, depending on when they had
7      availability.  I had to fit into their
8      program.
9  Q.  How long a period of time did that go
10     forward that you were doing the
11     therapy?
12 A.  I don't recall, but it is what my doctor
13     prescribed.  I think it was -- I don't
14     recall.  Six weeks, maybe, in that range.
15     And that was just, you know, a few hours
16     in the morning.  It wasn't an all-day
17     activity, obviously.
18 Q.  And I think I saw that you had moved out
19     of the -- your primary residence around
20     May of 2005?
21 A.  Around then.  I couldn't tell you
22     exactly.  Yeah, after the divorce
23     situation started.

Page 45

1  Q.  Do you recall whether or not you had
2      moved out of the house before you had the
3      surgical procedure on your heart?
4  A.  I was still in my house with my wife when
5      I had the procedure on my heart.
6  Q.  Okay.  Do you -- when's your best
7      estimate as to when you moved out of the
8      house?
9  A.  I can look at my lease.  I couldn't tell
10     you.  I think you have a copy of that.
11 Q.  Do you know if it was during the period
12     of time you were going to the rehab?
13 A.  I'm sorry.  Was I in the original house
14     with my wife, or was I in the other
15     house?
16 Q.  Where did you move -- I guess when you
17     separated, did you buy a separate
18     house?
19 A.  I rented a house, you know, within one
20     mile of my other house --
21 Q.  Okay.
22 A.  -- to be near my kids.
23 Q.  Do you have a best estimate as to when

12 (Pages 42 to 45)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 46

1    that took place?
2 A. Like I said, I've got a lease. I think
3    you guys have that document. I'd have to
4    look at it.
5        MR. BOSTICK: Why don't we take a
6        break and let me go grab all
7        of these documents. And
8        we'll just throw 4,000
9        documents out in front of him
10        and we will just take the
11        time to pin all this down.
12        MR. STOCKHAM: Sure.
13        MR. BOSTICK: Let me get those.
14        We will need to get specific
15        about this.
16        THE VIDEOGRAPHER: We are going
17        off the record at 10:46 a.m.
18        (Short recess)
19        THE VIDEOGRAPHER: We are back on
20        the record at 11:10 a.m.
21 Q. (By Mr. Bostick) Mr.Cyrus, I think we
22    discussed while we were off the record
23    that you'd found a document that helped

Page 47

1    refresh your recollection when it was
2    that you moved out of the house or
3    approximately.
4 A. Yes.
5 Q. When -- when was your best recollection
6    that you moved out of the house?
7 A. End of May, June time frame, beginning of
8    June, perhaps.
9 Q. Now, I want to get us to the point of
10    discussing the Murakami meeting in
11    September of 2005.
12        Prior to that time, when was
13    your understanding as to when Mr. H.I.
14    Kim arrived at the plant in Montgomery?
15 A. My guess would be four to eight weeks
16    prior to that.
17 Q. Okay. And what was his title?
18 A. He was chief operating officer, COO.
19 Q. And would you report to him either
20    directly or indirectly, or how would your
21    position link to his?
22 A. My -- you know, I didn't report to him
23    directly.

Page 48

1 Q. Okay. Prior to the September Murakami
2    meeting, had you had any interaction with
3    H.I. Kim?
4 A. Yes.
5 Q. Okay. Tell me about your interactions
6    with him prior to that time.
7 A. We had a weekly directors' meeting in
8    which I was a participant. We had one
9    other specific meeting with H.I. Kim. My
10    Korean manager brought me a document
11    written in Korean that expressed that
12    production, which H.I. Kim was in charge
13    of, had some difficulties with the
14    supplier PPG regarding incorrect
15    sequencing activities. And I had to take
16    it up to Mr. Choi and with my other
17    Korean manager and say, What is this?
18    Because I don't speak Korean or read
19    Korean. And he said, Mr. Choi, it's a
20    formal report that he is having
21    difficulty with the supplier and their
22    sequencing activities.
23        So we went -- I went with

Page 49

1    Choi and my manager, my Korean manager,
2    we talked to Mr. Choi -- I'm sorry -- we
3    talked to H.I. Kim, and the appropriate
4    actions that needed to be taken was to
5    call PPG in.
6        We had their top executive
7    that dealt with the Hyundai account, we
8    had the local Alabama sequencing quality
9    manager and plant manager come in. We
10    held the meeting, and we went over root
11    cause analysis and corrective action to
12    keep this from happening in the future.
13    That was it. At that time, he had an
14    interpreter also.
15 Q. Okay. Did you have any other interaction
16    with Mr. H.I. Kim prior to the Murakami
17    meeting?
18 A. No.
19 Q. Any of those interactions with Mr. Kim
20    where you and he had any type of
21    disagreements or any reason for him to
22    not get along with you?
23 A. No.

13 (Pages 46 to 49)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

---

Page 50

1  Q.  Okay.  At any point during the time that
2      you worked at HMMA, or since leaving,
3      have you ever heard of Mr. Kim, H.I. Kim,
4      making any derogatory comments towards
5      Americans because of their nationality?
6  A.  No.
7  Q.  What was J.Y. Choi's title at Hyundai?
8  A.  Director of purchasing, parts
9      development.
10 Q.  Did he report to you?
11 A.  No.
12 Q.  All right.  Did -- have you ever told
13     anybody that he reported to you?
14 A.  No, I don't believe so.
15 Q.  When did Mr. Choi come to -- arrive at
16     the plant?
17 A.  We probably worked together, prior to the
18     Murakami in September, probably, what,
19     four to five, six months, perhaps.
20 Q.  And how was he -- what were his -- what
21     were his job responsibilities there in
22     the purchasing department?
23 A.  He was also a director of purchasing for

---

Page 51

1      parts development, and he was almost a
2      mirror of my function in that he tried to
3      focus on issues that he could help out as
4      a liaison between Seoul and Montgomery.
5      So he brought that to the table.
6  Q.  So, what would be the interaction between
7      your position and his position?
8  A.  Well, we -- you know, most things were
9      management by consensus by -- there were
10     sign-off boxes.  So we had to concur in
11     every direction, sourcing activities.
12     You know, we interfaced on a daily basis.
13     A lot of documentation we would get would
14     be in Korean, and he would help with that
15     activity, obviously, with me.
16 Q.  So, what -- was this -- the meeting with
17     Murakami, there was another supplier that
18     was on the agenda that day as well?
19 A.  Yes, sir.
20 Q.  Tell me a little bit about what was
21     the -- how -- it looks like these were
22     weekly meetings that were taking place.
23 A.  This was the first meeting of this type

---

Page 52

1      ever that I was aware of.
2  Q.  What was your understanding about how --
3      what was going to be the process in these
4      meetings or how it was coming about.  Was
5      it your understanding they were going to
6      be on the weekly basis?  And what was
7      going to be the purpose of the meeting?
8  A.  Not until the meeting itself.  And the
9      purpose of the meeting was to go over
10     supplier issues regarding quality or any
11     other activity:  commercial issues,
12     vehicle-related issues, line stoppage.
13 Q.  And so it would be with the suppliers or
14     could -- explain to me a little bit about
15     how -- it's my understanding there's
16     suppliers and then distributors.  Is
17     that --
18 A.  No.
19 Q.  Tell me --
20 A.  This is H.I. Kim's meeting and his
21     brainchild, so this isn't something we
22     had in place prior to him arriving.  So
23     you'd have to ask him what his intent

---

Page 53

1      was.  But my understanding of the one
2      meeting that did occur was to review, per
3      his agenda, quality concerns that the
4      factory had realized within the past week
5      or month, and the suppliers to come in
6      and give a presentation to address the
7      root cause analysis, and, you know, to
8      say what happened and what the cause was
9      and how we could prevent it from
10     occurring again.
11 Q.  And so Mr. Kim was going to be heading
12     the meeting up?
13 A.  He did, yes.
14 Q.  Okay.  Did you -- how -- how did you
15     first become aware that the meeting was
16     going to take place?
17 A.  We had a team-building activity with my
18     group at a bowling alley in Montgomery.
19     And Mr. Brian Hwang, who's one of my
20     direct report managers in charge of
21     plastic injection molding that would
22     encompass outside mirrors, came to me and
23     said, Rob, I need your support in a

---

14  (Pages 50 to 53)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

**Page 54**

1  meeting with H.I. Kim. He is too high
2  up. I cannot speak to him. I need your
3  support to be fair and represent the
4  supplier's side in the Murakami defect.
5  That's the first I had ever heard of any
6  Murakami defect issues.
7      So I told him that I would
8  be glad to support it. And I told him,
9  and I actually wrote an e-mail, that, you
10 know, my role in this was to be neutral
11 and present strictly the facts. And he
12 said that's all he expected.
13 Q. What was his position again?
14 A. Manager, purchasing manager.
15 Q. Purchasing?
16 A. Purchasing manager, parts development.
17 And again, you know, the 25 Koreans,
18 probably 15 of them are managers. So it
19 doesn't mean that they manage people.
20 Q. So, what was your -- I guess, who were
21 the different departments that were going
22 to be represented at this meeting in
23 terms of HMMA?

**Page 55**

1  A. Again, I didn't call the meeting; but
2  what I observed there was quality,
3  production, production control and
4  purchasing, parts development.
5  Q. Okay. And -- and then you had the
6  Murakami representatives there as well?
7  A. Yes, sir.
8  Q. And there weren't -- were there any
9  representatives from Glovis?
10 A. Yes.
11 Q. Who was Glovis?
12 A. Who is Glovis?
13 Q. Yes.
14 A. Glovis is Hyundai Glovis. It's a company
15 corporation-owned by Hyundai. It's a
16 third party involved in internal material
17 handling of goods within the plant.
18 That's one of their capacities. They do
19 many different things.
20 Q. Who was the representative there for
21 Glovis?
22 A. I couldn't tell you.
23 Q. Okay. Was he the person that was called

**Page 56**

1  to coming to the meeting at a later point
2  in the meeting?
3  A. I believe he was there from the
4  beginning. You know, we had a large
5  table, like this, that probably 25 people
6  could sit at. And on the outskirts of
7  the walls another 20 people could sit.
8  And he was on the wall portion, because
9  he didn't -- he didn't speak until later
10 on when we talked about Glovis causing
11 potential problems. I wasn't aware he
12 was in there until then. He wasn't
13 introduced. He wasn't on the agenda.
14     (The referred-to document was
15     marked for identification as
16     Defendants' Exhibit No. 5)
17 Q. (By Mr. Bostick) I ask you to identify
18 Exhibit 5 for me, if you will.
19 A. These are meeting minutes that I was
20 requested to make, demanded to make, for
21 the first time ever being there three and
22 a half years. And these are the actual
23 presentation materials and agenda -- one

**Page 57**

1  of the agendas, because there's another
2  one, for the quality meeting.
3      MR. STOCKHAM: There's something
4      missing here from this
5      document. I don't know if
6      you have got it elsewhere.
7      If you look at the last
8      sentence on it, it says it
9      attaches the actual meeting
10     notes. And that was the last
11     thing which you produced
12     right behind this, three
13     pages of handwritten notes.
14     MR. BOSTICK: Okay. Is it these
15     right here?
16     MR. STOCKHAM: Yeah.
17 Q. (By Mr. Bostick) Let's go through what
18 we've got, and then we'll get to these in
19 a second. I think a lot of these are
20 restated. So I'm clear, I'll go ahead
21 and mark this as an exhibit.
22     (The referred-to document was
23     marked for identification as

15 (Pages 54 to 57)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 58

1      Defendants' Exhibit No. 6)
2      MR. STOCKHAM:  That should be part
3      of 5.  You might just call it
4      5-A.
5   Q.  (By Mr. Bostick)  Can you identify
6      Exhibit 6 for me, please?
7   A.  These are my actual minutes in my diary
8      that I wrote as the meeting was
9      occurring.
10  Q.  The meeting with Murakami?
11  A.  Yes, sir.
12  Q.  Okay.  So looking at Exhibit 6 --
13  A.  Um-hum.
14  Q.  -- you say, I'm looking at what Brian
15     told.  What is the symbol there?
16  A.  Key.
17  Q.  What?
18  A.  It's a key.  Like the key point.
19  Q.  Oh, okay.  Tell me what that little --
20  A.  Brian Hwang told myself and Mr. Choi to
21     talk strongly to H.I. Kim to be fair to
22     the supplier.
23  Q.  Okay.  Was that said during the meeting,

Page 59

1      or was that in a conversation prior to
2      the meeting?
3   A.  A conversation prior to the meeting.
4   Q.  Okay.  Now, I notice some discussion in
5      your notes about you had gone out into
6      the plant.
7   A.  Um-hum.
8   Q.  Was that the morning before the
9      meeting?
10  A.  Yes.
11  Q.  Who did you -- who all did you speak with
12     prior to that time.  Not necessarily the
13     substance of what you said, but who all
14     did you talk to?
15  A.  Who did we take in the pre-meeting?
16  Q.  Yes.
17  A.  Paula Gonzales -- Gonsalves, Brian Hwang,
18     Chris McClain, myself, the actual line
19     workers that put the parts on the
20     vehicle.  I didn't get their names.  I
21     also talked to Ashley Frye, the head of
22     assembly.  I talked to Chris Susock, the
23     head of quality.  I talked to Choi.

Page 60

1   Q.  Now, looking at Exhibit 5 --
2   A.  Um-hum.
3   Q.  -- do you see the Bates number in the
4      corner of the documents?
5   A.  Yes.
6   Q.  Can you identify this for me, by the
7      Bates-number pages, the documents that
8      were prepared by Murakami for their
9      presentation during the meeting?
10  A.  Their letterhead is on here.  It would be
11     Bates No. 363, Page 1 through 7, as
12     indicated in their page marks.  That
13     appears -- that appears to be their
14     presentation.
15  Q.  Okay.  And then was -- was this presented
16     in the form of a PowerPoint, or how was
17     it presented to --
18  A.  I can't recall if it was a slide or a
19     PowerPoint.  I think it was a PowerPoint.
20  Q.  How did you get this actual printout?
21     Was there a handout as well?
22  A.  Yes.
23  Q.  Okay.  Now, the first Page 2 of their

Page 61

1      presentation, Document 364, discusses
2      paint buff marks.
3   A.  Um-hum.
4   Q.  And it lists the description of the
5      problem, cause of the problem and
6      countermeasure.
7          Okay.  It looks like on the
8      buff mark issues they say there was
9      insufficient lighting in the Murakami
10     plant.  Tell me which discussion you
11     recall about the insufficient lighting in
12     the plant.
13  A.  I didn't speak about insufficient
14     lighting.  This was a presentation by
15     Murakami to identify how they would think
16     that a -- a defect got out of their
17     plant.
18  Q.  Okay.  What specifically did -- who -- do
19     you recall what the name of the person
20     from Murakami who was giving the
21     presentation was?
22  A.  Let me look back to the notes here.  I
23     know there were three individuals there:

16 (Pages 58 to 61)

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO
56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 62

1    Toru Komatsu, Mark McDonald and Glen
2    Roberts. I believe Mark McDonald and
3    Glen Roberts; it was one of the American
4    colleagues.
5 Q. Okay. Who was actually giving the
6    presentation?
7 A. Yeah, together. One was quality, and one
8    was the account rep or sales
9    individual.
10 Q. Do you recall if Mr. Komatsu spoke in
11    English, or was there --
12 A. He spoke in English, yes.
13 Q. Okay. Was there any translation going on
14    between what was being said by Murakami
15    representatives at the presentation?
16 A. Murakami to Murakami?
17 Q. Or was anybody translating to anybody
18    during the meeting?
19 A. Translating, no.
20 Q. Okay.
21 A. You know --
22 Q. Was someone translating so Mr. Kim could
23    understand what was being translating

Page 63

1    from English to Korean?
2 A. In some cases, yes.
3 Q. Okay. Who was the person doing the
4    translating?
5 A. Jason Chi.
6 Q. Okay. And what was Jason Chi's title?
7 A. He was new to the organization. We later
8    found out that he was a quality
9    manager.
10 Q. Okay.
11 A. I don't know if he's senior manager or
12    manager. He came from Toyota.
13 Q. Okay. So, what do you recall the
14    Murakami representative saying about
15    insufficient lighting in their plant and
16    the steps to improve that?
17 A. Nothing more than what's indicated here;
18    that they needed to improve the
19    lighting.
20 Q. Do you recall them saying -- it looks
21    like they're saying they are -- that they
22    did install additional lighting?
23 A. I believe that's correct. There's a

Page 64

1    picture somewhere before and after.
2 Q. Do you recall if there was any discussion
3    by Mr. Kim about this lighting issue?
4 A. He made a comment about how long they had
5    been in business providing mirrors, and
6    shouldn't -- shouldn't lighting be a
7    fundamental requirement to -- for an
8    effective product or good product.
9    THE VIDEOGRAPHER: Two minutes
10    left on tape.
11 Q. (By Mr. Bostick) And then what was the
12    response from the Murakami representative
13    at that point or that question?
14 A. They agreed.
15 Q. Well, and Mr. Kim's point, as I
16    understand it, was, this a basic quality
17    issue to have insufficient lighting in
18    the plant. And the question was, how can
19    you be in business for 60 years with a
20    basic quality issue like that. Is that
21    just his general point he was making?
22 A. Yes, sir.
23 Q. And what response, if any, did they

Page 65

1    provide to that?
2 A. They -- like I said, they agreed that
3    that was a fundamental, and they had put
4    a countermeasure in place to correct
5    it.
6 Q. Okay. And so the buff marks, you know, I
7    understand you got insufficient lighting.
8    What exactly is a buff mark?
9 A. You know, I'm not a paint engineer. A
10    buff mark, to my novice understanding,
11    would be after paint process, there's a
12    blemish that would be deemed to be
13    repairable in Murakami, so they would
14    buff the mirror to get it within the
15    inspection parameters agreed to in the
16    contract.
17 Q. Okay. But clearly, Murakami is saying
18    this is an issue at our manufacturing
19    plant that we're working to resolve;
20    right?
21 A. That was one of the -- his feelings at
22    the time.
23 Q. The buff marks?

17 (Pages 62 to 65)

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO
56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 66

1  A.  Right.
2  Q.  There's nothing in regards to the buff
3      marks that says there is any issue with
4      Glovis; correct?
5  A.  I don't believe so.
6          MR. BOSTICK:  Okay.  Why don't we
7      change tapes now.
8          THE VIDEOGRAPHER:  All right.
9          This is the end of the Tape
10         No. 1 in the deposition of
11         Robert Cyrus to be continued
12         on Tape No. 2.  We're going
13         off the record at 11:33 a.m.
14         (Short recess)
15         THE VIDEOGRAPHER:  This is the
16         beginning of Tape No. 2 in
17         the deposition of Robert
18         Cyrus.  We're going on the
19         record at 11:37 a.m.
20 Q.  (By Mr. Bostick) We'd just finished
21     looking at the first point on the
22     Murakami presentation of the buff marks
3      which they'd identified the need for

Page 67

1      additional lighting in their
2      manufacturing facility.  Do you have any
3      knowledge as to where that manufacturing
4      facility was located?
5  A.  I believe it's in Kentucky.
6  Q.  Okay.  Then the second point, Bates No.
7      366, or Page 407 on the Murakami
8      presentation, is bag marks.
9  A.  Um-hum.
10 Q.  Do you recall there being some discussion
11     about there being insufficient cure time
12     for the parts at that point in the
13     discussion?
14 A.  Yes.
15 Q.  Okay.  Explain to me what cure time is.
16 A.  It's just like with the spray-paint can.
17     It's the time it takes for the paint to
18     harden to a handable (sic) -- if that's a
19     word -- form which would be appropriate
20     in which they could place in it
21     returnable package.
22 Q.  Okay.
3  A.  That's to dry basically.

Page 68

1  Q.  And so this is -- my understanding is the
2      paint not sufficiently hardened because
3      of an insufficient cure time, and it's
4      being placed in some form of packaging,
5      and the packaging and the packaging is
6      causing the marks because the paint is
7      not properly cured.  Is that your
8      understanding of what the problem was?
9  A.  Yes, sir.
10 Q.  Okay.  And what does -- what does this
11     mean -- what do they propose when they
12     say the countermeasure was stabilizing
13     cure time?
14 A.  I'm not really sure.  You know, one of
15     the reasons they have the cure time
16     difficulty, from my understanding of the
17     explanation in talking to Harry Chase,
18     who was the production control manager --
19     he's the one that would indicate to them
20     the schedule and how frequently they
21     needed to deliver line side into the
22     plant.  We changed our production
23     schedule in a dramatic fashion above and

Page 69

1      beyond what we'd given to them in
2      writing.
3          So this new cure time had to
4      be -- the cure time problems occurred
5      when they rechanged the schedule and
6      didn't allow for their process to keep
7      pace, so they had to -- they couldn't
8      allow them to cure appropriately.
9  Q.  So, where -- where is that referenced in
10     their countermeasures?
11 A.  I don't think it's referenced in their
12     countermeasures.
13 Q.  Murakami didn't -- did Murakami
14     identify --
15 A.  That's not a countermeasure; that's one
16     of the causes of why they're running into
17     shipping parts that aren't fully cured,
18     because we changed the schedule on
19     them.
20 Q.  Did Murakami identify that as one of the
21     causes in the root cause?
22 A.  They identified it in the meeting.
23 Q.  Under the document, the presentation?

18 (Pages 66 to 69)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 70

1  A.  I don't see it in writing, no, sir.
2  Q.  But let me -- I'll ask it again:  Along
3      with the buff marks we saw earlier, this
4      is a problem with cure time that's
5      occurring in the manufacturing plant of
6      Murakami; correct?
7  A.  Yes, sir.
8  Q.  And so, there's a picture of the
9      container, and dunnage should be
10     modified.  That's Bates No. 367.
11 A.  Um-hum.
12 Q.  Do you recall what discussion there was
13     about modifying the container and
14     dunnage?
15 A.  There was discussion to take it to the
16     three-mirror format from the five-mirror
17     format.  That's the only thing that we --
18     that we -- that's all we talked about,
19     you know.  We didn't think either one of
20     the formats would be acceptable.  The bag
21     mark was caused from putting the shipping
22     bag on the mirror before it cured
3      properly and completely.

Page 71

1  Q.  Okay.  And then the next point listed is
2      poor heat staking of inside bush nut.
3          What do you recall being
4      discussed on that point?
5  A.  I don't think we got to that point.
6  Q.  Did Mr. Kim end the meeting prior to that
7      time?
8  A.  He walked out of the meeting after saying
9      something -- screaming in Korean twice.
10 Q.  Again, this looks to be a presentation on
11     some, in this case, machine malfunction
12     or human error there at the Murakami
13     Manufacturing Plant.  Is that your
14     understanding?
15 A.  I don't have an understanding of it
16     because they didn't go over it.
17 Q.  So you're not able to read this document
18     and, with your experience in the
19     automotive industry, gain an
20     understanding and opinion as to whether
21     or not they were referring to a problem
22     there in their own plant?
3  A.  I would agree with you that this would be

Page 72

1      a problem within their own plant, yes.
2  Q.  So, have we looked over the complete
3      documents that Murakami represented and
4      prepared for their presentation at the
5      meeting?
6  A.  As far as I'm aware.
7  Q.  Okay.  And nowhere in those documents do
8      they address this issue of scratch marks
9      being caused at Glovis; correct?
10 A.  Well, on the agenda right there, it says,
11     Scratches, and it says downtime.  This
12     was sent to Murakami:  Be prepared to
13     discuss these issues.
14 Q.  Tell me what document are you --
15 A.  362.
16 Q.  Okay.  And this is not a document
17     prepared by Murakami?
18 A.  No, it's not.
19 Q.  My question is this:  We just looked at
20     Murakami's presentation.  Take your time
21     and look over it, and tell me if there is
22     a single word anywhere in their
23     presentation about scratch marks caused

Page 73

1      at Glovis.
2  A.  Scratch marks caused at Glovis?
3  Q.  Yes.
4  A.  No.
5  Q.  Okay.  Now, the issue that Mr. Hwang
6      spoke to you about was downtime that had
7      been caused in the plant previously; is
8      that correct?
9  A.  I wouldn't identify it at that point.  It
10     was a number of Murakami quality issues.
11 Q.  Okay.  And --
12 A.  Including the three indicated buff marks,
13     bag marks, scratches, craters and wind
14     noise.
15 Q.  So, when you went out in the plant and
16     talked to the team members, did you
17     determine -- did you see for yourself
18     some of these items that had buff marks
19     or bag marks?
20 A.  No.  Those were in a quarantine area.
21 Q.  Okay.  Do you know how many of those
22     items there were?
23 A.  How many of which items?

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 74

1  Q.  First, how many defective products had
2      been sent with buff marks.
3  A.  I don't know specifically with the buff
4      marks.
5  Q.  Okay.  Do you know with regard to bag
6      marks?
7  A.  No.
8  Q.  Do you know with regard to scratch
9      marks?
10 A.  No.
11 Q.  Okay.  So, what do you know about the
12     composition of the defective products
13     that you were looking at the morning in
14     the pre-meeting?
15 A.  There are 280-some parts involved.
16     250-some were deemed to be acceptable.
17     So the operators pulled them off saying,
18     This is suspect.  But when the final
19     determination was made, it was, These
20     were acceptable to go on the vehicle.
21         The other remaining ones
22     were typically the scratch marks, which
3      were gouges. I mean, all the way down to

Page 75

1      the raw material.  So these were not in
2      the same category.  These were products
3      that I don't feel any supplier would ship
4      in that -- that flagrant-type defect.
5  Q.  Okay.  And what was your understanding
6      about how the scratches were occurring?
7  A.  We went through the process from receipt
8      of goods into the plant from the Murakami
9      truck or our prescribed trucking.  They
10     were taken out of the returnable
11     packaging indicated on Bates No. 367, and
12     Glovis was taking them and stacking them
13     in an empty tote, like a milk crate, on
14     top of each other.
15 Q.  Okay.  So --
16 A.  So in the pre-meeting, quality agreed,
17     production agreed, purchasing agreed, Mr.
18     Choi and I and Hwang and the supplier,
19     that this was a Glovis handling issue.
20 Q.  The scratch marks.
21 A.  Yes.  Yes.
22 Q.  Okay.  So -- so I'm clear, the buff
3      marks, the bag marks are issues that are

Page 76

1      happening either at the Murakami plant in
2      the manufacturing process or in the
3      placement into the container; correct?
4  A.  Yes, all at the Murakami -- that's all
5      their responsibility, yes.
6  Q.  Then the scratch mark is an issue that's
7      happening once the items are shipped from
8      the plant to Glovis and they're being
9      removed by Glovis employees at that
10     point; is that correct?
11 A.  Well, they're handled by a number of
12     employees.  I mean, I don't know the
13     specific details, but they come in to our
14     plant.  I don't know if a Hyundai person
15     receives it or a Glovis person receives
16     it.  They go from returnable packaging,
17     and they're supposed to be sequenced,
18     like I need a red one, and a green one
19     and a blue one to match the vehicles
20     coming down the line.  Glovis'
21     responsibility was that sequencing
22     activity.
23         So they were taking them out

Page 77

1      of the returnable packaging and getting
2      them lined up for the cars coming down
3      the line correctly and stacking them
4      inappropriately in their own admission.
5  Q.  So there's -- so I'm clear, there's not
6      an intermediary Glovis facility where the
7      items are shipped.
8  A.  No, sir.  It's just Glovis employees in
9      the Hyundai plant.
10 Q.  Okay.  But there is a Glovis facility
11     here in Montgomery that's located near
12     the plant?
13 A.  Yes.
14 Q.  But these Glovis employees would actually
15     work on site at Hyundai?
16 A.  Yes.
17 Q.  Okay.
18 A.  Both.
19 Q.  Okay.  Do you recall if the Murakami
20     mirrors would be shipped first to that
21     Glovis facility, or would they be shipped
22     directly to Hyundai?
23 A.  I don't know.  I believe direct.

20 (Pages 74 to 77)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

---

Page 78

1  Q.  Okay.
2  A.  I don't know.
3  Q.  Okay. So you say, the last sentence on
4      Page 357, you say -- well, I guess
5      you're -- let's look at the last two
6      sentences.
7  A.  Okay.
8  Q.  You say: She stated there really hasn't
9      been much of any difficulty with the
10     mirrors and the only thing that has been
11     occurring is occasional severe gouges or
12     scratches all the way down to the plastic
13     raw material, not light scratches.
14 A.  Um-hum.
15 Q.  Do you recall the name of this HMMA team
16     member who told you this?
17 A.  No.
18 Q.  I mean, do you know what her job or title
19     would be?
20 A.  Her job is -- her title is team member,
21     and her job is to put parts on the
22     vehicle in assembly. She may be rotated.
23     She may -- my job is not to interrogate

---

Page 80

1  Q.  So, do you know -- my understanding is
2      you talked to some of these people on the
3      line and gained an understanding about
4      these scratch mark issues. I mean, what
5      investigation, if any, did you do to look
6      into how big a problem the buff marks or
7      the bag marks were?
8  A.  Well, that's kind of misstated there. We
9      went there to find out what the defects
10     were. And at that point, we didn't know
11     if they were scratch, buff or bag.
12 Q.  Okay. So --
13 A.  I asked her, what -- what -- how's
14     Murakami doing? You know, what type of
15     supplier? Then she indicates, They're --
16     as stated here, They're generally a good
17     supplier. The only thing we see is
18     severe gouges and scratches all the way
19     down to the plastic raw material.
20         So you need to understand
21     also that there's another party involved
22     in the sequence called QLS, which Chris
23     Susock is responsible for, in the

---

Page 79

1      her. She was very helpful.
2  Q.  Right. Did you ask her about buff marks
3      or bag marks?
4  A.  I asked her in general what quality
5      defects she'd seen from Murakami.
6  Q.  I mean, prior to your pre-meeting, I
7      guess you had had this -- would you have
8      had the agenda we listed as 362?
9  A.  I may have. I couldn't tell you for
10     sure. I know there's another one that
11     shows occurrence -- it says 341. So
12     that's why I'm saying this is not the
13     complete documentation. I've seen that
14     yesterday when we reviewed documents.
15 Q.  What is -- what are you referring to?
16 A.  There's a document that's also an agenda
17     for the H.I. Kim quality meeting which
18     says, Murakami Downtime; and it's also,
19     under an Occurrence heading, says 341.
20 Q.  Some specific number of items?
21 A.  Right.
22 Q.  Okay.
23 A.  Yes.

---

Page 81

1      quality, which he's aware prior to the
2      meeting that this is an internal issue.
3      QLS, I believe, is the party that
4      rejected the mirrors as an interim
5      inspection stage.
6  Q.  Okay.
7  A.  So --
8  Q.  So the parts come in, and QLS will review
9      the parts before they get sent --
10 A.  Case by case, depending on quality's
11     direction.
12 Q.  What do you mean "case by case"?
13 A.  I mean, we have 2,000 SKU's, or part
14     numbers, that come in and items for 1,375
15     vehicles a day. So it's not practical to
16     run an assembly plant looking at every
17     part. Suppliers provide parts that meet
18     our specifications and no inspection's
19     required.
20         If quality has had
21     experience in the past with a specific
22     problem, they may assign like a third
23     party, like QLS. They will see some lug

---

21 (Pages 78 to 81)

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO
56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 82

1  nuts with corrosion. Let's -- let's
2  inspect those for a period of time. But
3  that's up to Susock's discretion or his
4  department or Kwak or Jason Lee, and
5  they're all aware of that at the
6  pre-meeting.
7  Q.  Did -- did Mr. Susock attend the
8  pre-meeting?
9  A.  No.  No, but we spoke to him afterwards,
10  the quality people with us.
11  Q.  Who from quality control attended the
12  pre-meeting?
13  A.  Paula Gonsalves.
14  Q.  Was that two names, or is that --
15  A.  I'm sorry.  It's right here.  It's on
16  Bates No. 358.  HMMA parts quality, Ms.
17  Paula Gonsalves.
18  Q.  What did Ms. Gonsalves tell you about her
19  understanding about rejected Murakami
20  parts?
21  A.  She'd had conversations with Murakami.
22  They wanted to address all of the
23  defects.  I mean, we all went on this

Page 83

1  investigation together, this discovery
2  phase.
3  Q.  I guess, did she say anything about buff
4  marks or bag marks during your
5  discussions with her in the pre-meeting
6  phase?
7  A.  The pre-meetings were, you know, at
8  the -- at the line side.  The
9  pre-meetings, we went to the conference
10  room and we talked about the issues and
11  then we went to the line side.
12  Q.  Well, I guess if a quality -- if QLS
13  reviews a case with mirrors --
14  A.  Um-hum.
15  Q.  -- and finds that every mirror in the
16  case has a buff mark on it and is not
17  usable, would the person who's sitting on
18  the line, the team member, ever have any
19  knowledge that that had even happened?
20  A.  That -- I'm sorry.  That it had gone to
21  QLS?
22  Q.  They would know it had to Q --
23  A.  No, they wouldn't know.  They wouldn't

Page 84

1  know if it had gone to QLS.
2  Q.  So the team member has no idea on --
3  A.  Typically it's not required for parts to
4  go through an interim inspection.  That's
5  a double handling.
6  Q.  Well, but the team member on -- on -- on
7  the line --
8  A.  Um-hum.
9  Q.  -- doesn't know what parts are being
10  pulled out upstream for defective issues;
11  correct?
12  A.  Right.
13  Q.  Okay.
14  A.  Typically.  I'm not the quality person.
15  Q.  Okay.
16  A.  That would be my thought on that issue.
17  Q.  Okay.  So you can't really rely on just
18  what the team member on the line is
19  telling you about the concerns with the
20  parts as much as you need to figure out
21  what quality the QLS is seeing?
22  A.  That's why quality is involved.  They're
23  -- they're -- they're involved in the

Page 85

1  interface to QLS.  They trigger QLS, and
2  they stop QLS.
3  Q.  Well, that's my question is, did Paula
4  Gonsalves, at any point in y'all's
5  pre-meeting, talk about buff marks or bag
6  marks and what was being pulled out of
7  the pool for those two issues?
8  A.  No.  Not specifically.
9  Q.  Did you ask her about those?
10  A.  No.  We talked about buff marks and bag
11  marks and scratches in general.
12  Q.  Do you have any idea why you sit here
13  today -- as you sit here today, why the
14  Murakami representatives preparing their
15  presentation had nothing in their agenda
16  to discuss the scratch mark issues?
17  A.  No.  They were involved with us the
18  meeting -- the morning of the meeting,
19  and that's -- you know, we talked about
20  scratch marks with them at that point
21  also.
22  They talked about that we
23  had returned parts to them that had been

22 (Pages 82 to 85)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 86

```
 1    run over by a fork truck and tried to
 2    charge them for them.  So they were
 3    flagrant returns that could not have
 4    occurred at Murakami, and they -- they
 5    didn't want to be penalized for that, for
 6    line stoppage on a part that we had run
 7    over with a forklift.
 8  Q.  And you had no reason why that was not a
 9    slide presented as part of their
10    presentation in the meeting.
11  A.  I had no idea.  I had not seen the
12    materials prior to that.
13  Q.  Okay.  So, what Murakami representatives,
14    if any, were involved in this -- this
15    pre-meeting that you had?
16  A.  We had Glen Roberts.
17  Q.  Okay.  Did he tell you anything about bag
18    marks or buff marks?
19  A.  We talked about all three categories.
20  Q.  What did he tell you about bag marks?
21  A.  One of the discussions was, every party
22    was unclear at that point if they were
 3    truly buff marks or they were bag marks.
```

Page 87

```
 1    Because they can appear the same,
 2    apparently.
 3  Q.  Did -- did he -- did you and he have any
 4    discussion specifically about this
 5    downtime charge?
 6  A.  Yes.
 7  Q.  Tell me what that discussion was.
 8  A.  That discussion was simply that they were
 9    to address the downtime in the meeting.
10    That's why it was on the agenda, H.I.
11    Kim's agenda.  And they didn't feel that
12    the -- the majority of the problems were
13    not Murakami's fault.  And they wanted
14    fair and ample time just to present their
15    facts.
16  Q.  If -- if -- if -- my understanding is
17    that there is -- what you have in here
18    is, you know, you have 163 minutes, and
19    there is a dollar amount sign.  Who is
20    the person or entity within HMMA that
21    draws the conclusion that a supplier
22    should be assessed that charge for
 3    downtime?
```

Page 88

```
 1  A.  Operations.
 2  Q.  How would -- would QLS be involved in
 3    that as well?
 4  A.  No, not to my knowledge.
 5  Q.  I mean, I assume that when you say
 6    operations, are you talking about, for
 7    example, Mr. Kim as being chief of
 8    operations?
 9  A.  Kim and Kalson.
10  Q.  Okay.  And so --
11  A.  Probably Susock also since it's a quality
12    problem.
13  Q.  Well, that's what I am wondering is, is
14    there a standard process for -- you know,
15    obviously the line shuts down, you know
16    that.  And then if it's a quality parts
17    issue, I guess Susock is going to be the
18    one who is first alerted to that issue?
19  A.  He or members within his team.
20  Q.  Okay.  And so, will they then make a
21    report to say, Here is what we found is
22    the cause of this downtime, and then, you
23    know, there will be some kind of
```

Page 89

```
 1    determination made on that end?
 2  A.  He, along with operations, because
 3    operations tracks the downtime.  That's
 4    their baby.
 5  Q.  Would you -- would you have any
 6    involvement in the entire process of
 7    examining the downtime issue and making
 8    an assessment of downtime penalty or, for
 9    lack of a better word --
10  A.  I just get the facts as represented from
11    Hyundai.
12  Q.  Okay.  So, but you don't make that
13    determination, you don't go review the
14    parts that are --
15  A.  Case by case.
16  Q.  You do?
17  A.  Case by case, if needed.
18  Q.  If needed?
19  A.  I wasn't asked to do it in this case.
20  Q.  After the downtime penalty -- I'm asking
21    as the downtime issue was addressed in
22    the initial process.
23  A.  Purchasing is the window to the supplier.
```

23 (Pages 86 to 89)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 90 | Page 92 |
|---|---|

**Page 90**

1  So if there's any commercial activities
2  that have to take place between Hyundai
3  Motor Manufacturing of Alabama and the
4  supplier, it has to go through
5  purchasing.
6  Q.  And here you had a downtime assessment
7  that a supplier spoke to you about and
8  said we're not happy with; correct?
9  A.  I didn't say they weren't happy with it.
10  They said they wanted to review the facts
11  on the table.
12  Q.  And that was your first involvement in
13  this downtime issue.
14  A.  No; my first involvement was Brian Hwang
15  at the bowling alley telling me, I need
16  you to go and support me in this meeting
17  tomorrow.
18  Q.  Okay.  And -- and Brian Hwang is not in
19  QLS; correct?
20  A.  No, he works for me.  Parts development.
21  Q.  Okay.  So parts development -- were you
22  ever aware of a situation where parts
23  development assessed a penalty for

**Page 92**

1  A.  I was bowling with the whole team.  It's
2  a team-building activity.
3  Q.  Okay.  The whole parts development
4  team?
5  A.  Yes.
6  Q.  Okay.
7  A.  And supplier development.  My whole
8  group.
9  Q.  Okay.  Approximately how many people
10  would have been there?
11  A.  There is 50 in the department, including
12  myself and Mr. Lee and Mr. Hyun.  And I
13  couldn't tell you -- 35 people were
14  there?
15  Q.  Okay.  So --
16  A.  40?
17  Q.  And I think you said your explanation to
18  him was you would look into it the next
19  morning, and then you would take a
20  neutral stance during the meeting?
21  A.  Absolutely.
22  Q.  Okay.  Now, who coordinated this
23  pre-meeting, for lack of a better word?

**Page 91**

1  downtime in the plant?
2  A.  Yes.
3  Q.  Who did they make that assessment with?
4  A.  Smart, the company.  Shin Junk (sic);
5  it's done in Korea.
6  Q.  What was -- what was that related to?
7  A.  They provide metal stamping components,
8  like floors and fire wall and other
9  various components.  One case I can
10  remember, they -- they had to put on weld
11  studs that help us secure the parts on
12  the vehicle.  And we had a missing weld
13  studs issue.  We had cold welds also with
14  them.  So when the parts arrive at line
15  side and the workers are ready to put
16  them on and they can't see what they
17  build because of the parts quality,
18  that's -- purchasing gets a call
19  typically immediately.
20  Q.  So, but your -- but your first knowledge
21  on this particular instance, you were
22  bowling with Mr. Hwang the night
23  before?

**Page 93**

1  A.  Brian Hwang and Chris McClain.
2  Q.  Okay.  What is Chris McClain's title?
3  A.  He's assistant of purchasing, parts
4  development.
5  Q.  Who contacted Paula Gonsalves to
6  attend?
7  A.  I think Chris and Hwang.
8  Q.  Okay.  Do you know if anybody called
9  Chris Susock to see if he could
10  participate?
11  A.  I don't know.  He was informed after the
12  determination was made.
13  Q.  What determination was made?
14  A.  That we thought we had three problems:
15  buff marks, bag marks and scratches.
16  Q.  Okay.
17  A.  And he concurred that the scratches were
18  an internal Hyundai handling issue with
19  Glovis.
20  Q.  He said, Facts presented in the
21  pre-meeting with HMMA quality and parts
22  development showed of the 282 mirrors
23  returned -- I'm sorry.  I'm looking at

24  (Pages 90 to 93)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 94 | Page 96 |
|---|---|

**Page 94**

1     Page 358.
2 A. Okay.
3 Q. So, of the 282 mirror that were returned,
4    251, 80 percent, were good and
5    acknowledged so by HMMA QC.
6 A. Uh-hum.
7 Q. How did you come to that understanding?
8 A. That was presented in the meeting.
9 Q. The pre-meeting?
10 A. No, in the meeting.
11 Q. It says this was the facts presented in
12    the pre-meeting.
13 A. Well, you know, let me read this again.
14    The facts presented in the pre-meeting
15    with HMMA Quality and Parts Development
16    showed of the 282 mirrors returned as
17    defective, 251 were good and acknowledged
18    so by HMMA QC.
19       Yeah, that's correct.
20 Q. I mean, what were you looking at to make
21    that determination?
22 A. I didn't make that determination.
3    Susock's department made that

**Page 95**

1    determination.
2 Q. Okay.
3 A. He and Kwak.
4 Q. How did you learn --
5 A. And Chi.
6 Q. -- that Chi -- is Chris Susock a
7    female?
8 A. No.
9 Q. How -- what information was conveyed to
10    you to lead you to put this in the
11    statement is what I'm asking? Was it --
12    did Paula Gonsalves tell you this?
13 A. I don't remember who told me. You know,
14    we had that internally as parts that were
15    quarantined, and of the parts that were
16    quarantined, which ones were deemed to be
17    acceptable.
18 Q. Did you look at any documentation on
19    this?
20 A. No, I don't recall that.
21 Q. So this is -- your basis for this
22    statement is word of mouth?
3 A. No, it's based on factual -- you know,

**Page 96**

1    you don't come up with a number like 282
2    from an arbitrary word of mouth. This is
3    based on defect material tags.
4 Q. I mean, so -- well, that's what I asked.
5    Was there some specific documentation
6    that you reviewed to get you these
7    numbers?
8 A. I don't recall looking at 282 defect
9    material tags. I -- probably
10    Ms. Gonsalves told us the count. That's
11    her responsibility.
12 Q. And so you heard it word of mouth from
13    Ms. Gonsalves. You didn't see any
14    reports or specific document that gave
15    you these numbers; is that correct?
16 A. Well, we saw the actual parts and the
17    defective material tags.
18 Q. Did you see a report that listed out a
19    classification?
20 A. I don't recall.
21 Q. Okay. It says, The remaining 31 parts
22    were either were either handling damage
23    caused by Glovis or defects caused by

**Page 97**

1    Murakami's packaging format previously
2    approved by HMMA Production Control in
3    writing.
4       What was the issue with the
5    packaging format?
6 A. That's the bag mark issue again.
7 Q. So the bag mark issue by Murakami's
8    representative's representation is being
9    caused by the incorrect curing time;
10    right?
11 A. Yes.
12 Q. Okay. Who is telling you that it's the
13    packaging format?
14 A. Who's telling me that it's the packaging
15    format?
16 Q. Yes. I mean, where did you gain this
17    knowledge that that was an issue with the
18    remaining -- some of the remaining 31
19    parts?
20 A. The -- from my recollection, there was
21    two bags. There was a plastic bag, like
22    a Ziploc bag. And then it went to a
23    tie-back-type bag. That was a format

25 (Pages 94 to 97)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 98 | Page 100 |
|---|---|

Page 98

1     change in the packaging.
2 Q.  Did anybody during this pre-meeting
3     mention incorrect curing time as an
4     issue?
5 A.  I don't recall.
6 Q.  Okay. Did you have any discussions in
7     the pre-meeting about the improper
8     lighting?
9 A.  I don't -- I don't believe so.
10 Q.  Okay.
11 A.  I don't recall.
12 Q.  You say Mr. Roberts was in this meeting
13     from Murakami?
14 A.  Uh-huh.
15 Q.  Did he make mention of any of the points
16     during this pre-meeting that are
17     identified in the Murakami presentation
18     that we looked at previously?
19 A.  Say that again, please.
20 Q.  Yeah. The Murakami -- we looked at the
21     Murakami --
22 A.  Presentation.
23 Q.  -- presentation that had buff marks, bag

Page 99

1     marks and something with the nut that
2     y'all didn't get to --
3 A.  (Witness nods head)
4 Q.  -- the countermeasures of lighting and
5     then the countermeasures of correcting
6     the cure time and also proposing a
7     different packaging. Were any of those
8     items brought up by Mr. Roberts in the
9     pre-meeting as concerns with some of the
10     defective products?
11 A.  I think so.
12 Q.  Okay. Would you agree with me that your
13     statement that the packaging formatting
14     was causing the problem is inconsistent
15     with Mr. -- with the Murakami
16     presentation statement that those buff
17     marks were being caused by improper
18     curing?
19 A.  Can you say that again, please.
20 Q.  Yeah. The problems that Murakami
21     identified on their end in the plant
22     were, one, improper cure time; and two,
3     improper lighting.

Page 100

1 A.  And packaging.
2 Q.  Well, the issue with the packaging, as
3     they explained, was because there was
4     improper cure time when it's being placed
5     in the package that was causing --
6 A.  There's two animals: One was the plastic
7     bag, and one was a tie-back bag, and one
8     was that, with either bag, that the cure
9     time hasn't been reaching beyond that
10     sticking problem.
11 Q.  Okay. So, is there anything about the
12     packaging format that you could have
13     changed that would have solved the
14     problem of the cure time issue?
15 A.  No.
16 Q.  Okay. So, you -- did you -- did you draw
17     any conclusions prior to going in the
18     meeting that led you to decide to take a
19     different position than just remaining
20     neutral, as you had said earlier?
21 A.  No. I mean, in the meeting, the only
22     approach was to present the facts.
23     That's the intent of the meeting.

Page 101

1     If the facts are that it's a
2     bag issue or a cure issue, the facts
3     present themselves, and are concurred
4     with with quality, production, production
5     control that, yes, we agree, and the
6     scratches we agree, I mean, that's the
7     facts that we know at that point through
8     root cause analysis concurred by parties
9     in the meeting.
10 Q.  So is there anywhere in your memorandum
11     that we're looking at, Exhibit 5 -- is
12     there anywhere in your memorandum where
13     you identify any statements that Mr. Choi
14     made during the meeting?
15 A.  On Bates No. 358, last paragraph, first
16     line: Murakami and Parts Development --
17     Choi and myself -- attempted to intervene
18     to clarify the facts with an open
19     dialogue.
20 Q.  Did you just -- you added in the words
21     "Choi" and "myself." Do you mention Mr.
22     Choi in the document?
23 A.  I don't mention myself either.

26 (Pages 98 to 101)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 102

1 Q. Okay. My question is simply: Did you
2    identify in this document anywhere where
3    you attribute any statement made by Mr.
4    Choi?
5 A. Yeah. Parts development is Choi.
6 Q. Mr. Choi by name. How many people did
7    you tell me earlier are in parts
8    development?
9 A. How many are in parts development?
10 Q. Didn't you say it's more than 50?
11 A. No, it's about 40.
12 Q. Okay.
13 A. Ten of them are in supplier -- quality
14    supplier development, under me, but it's
15    a different area. Parts development in
16    this meeting in conversations were Choi
17    and myself and Mr. Hwang and
18    Mr. McClain.
19    MR. BOSTICK: Can you read back my
20       question? I don't think that
21       that got answered.
22    THE COURT REPORTER: Before didn't
3       you say it's more than 50.

Page 103

1    MR. BOSTICK: No, the one before
2       that about Mr. Choi.
3       (Record read as follows:
4       "Question: Did you - you added
5       in the words 'Choi' and
6       'myself.' Do you mention Mr.
7       Choi in the document?")
8    THE WITNESS: Mr. Choi isn't
9       mentioned in the document.
10 Q. (By Mr. Bostick) I guess my more specific
11    question is, is there anywhere in your
12    memorandum, that we labeled as Exhibit 5,
13    where you specifically attribute any
14    statement in the Murakami meeting to J.Y.
15    Choi?
16 A. No. Nobody's mentioned specifically from
17    parts development in this, in Exhibit
18    5.
19 Q. I ask the same question with regard to
20    Exhibit 6.
21 A. Exhibit 6.
22    I'm sorry. Do you have a
3    question with Exhibit 6?

Page 104

1 Q. My question is: Is there anywhere in
2    Exhibit 6 where you make a notation where
3    you specifically identify made -- a
4    comment made by Mr. Choi at the Murakami
5    meeting?
6 A. No.
7 Q. Okay.
8       At the bottom, can you read
9    for me what -- what your notation is? It
10    looks like you say, H.I. Kim yelling and
11    throwing paper.
12       Do you see that?
13 A. Uh-huh.
14 Q. And it says, Very unprofessional.
15    Everyone uncomfortable. Is that, H.I.
16    Kim yelled at me?
17 A. At Murakami -- "M" is Murakami -- to
18    behave themselves.
19 Q. And it says, Glovis will come to meeting
20    now to address.
21 A. Um-hum.
22 Q. Does your refresh your recollection about
23    whether or not there was a Glovis

Page 105

1    representative there?
2 A. Glovis was, like I mentioned to you, they
3    were in the meeting, but they were not
4    sitting at the presentation table.
5    They were along the wall. So I don't
6    know if somebody called them at the
7    beginning of the discussion or if they
8    had been sitting in the room with 50, 35,
9    whatever, the whole time.
10 Q. I mean, do you recall that there was some
11    discussion to call a Glovis
12    representative to come to the meeting?
13 A. Yes. Glovis will come to meeting now to
14    address.
15 Q. But it's your testimony, to the best of
16    your recollection, that there were Glovis
17    representatives already in the meeting
18    prior to --
19 A. I don't know if they were already in
20    there or when they showed up. You know,
21    people come and go from two- or
22    three-hour meetings all the time.
23 Q. Did you -- who did you provide Exhibit

27 (Pages 102 to 105)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 106

```
 1      5 -- I think you said Exhibit 6.  Who did
 2   you actually provide that to back at the
 3   time?
 4   A.  Five, I provided to Mr. Hyun.
 5   Q.  And what was his title?
 6   A.  He was a senior, I believe -- it's on the
 7      chart -- senior director of parts
 8      development, purchasing.
 9   Q.  And what was your understanding as to who
10      he had requested statements from?
11   A.  Who he requested statements from?
12   Q.  Yes.
13   A.  To myself and Mr. Choi.
14          (Vibrating sound).
15          THE WITNESS:  Sorry.  That's
16          Germany calling.
17   Q.  (By Mr. Bostick)  The -- were there --
18      was it your understanding that the
19      statements had been requested by
20      Mr. Ahn?
21   A.  Let me -- let me clarify that.  People
22      within parts development is Choi, myself,
`3      McClain and Hwang.
```

Page 107

```
 1   Q.  Okay.
 2   A.  All right.
 3   Q.  Were -- did you -- was it your
 4      understanding that the statements had
 5      been requested by Mr. Ahn?
 6   A.  My understanding it was from H.I. Kim.
 7      But I knew that H.I. Kim -- well, we'll
 8      speak to that.
 9          (The referred-to document was
10          marked for identification as
11          Defendants' Exhibit No. 7)
12   Q.  Do you -- do you speak any Korean?
13   A.  Hello.  That's about it.  No.
14   Q.  Have you reviewed what I've marked as
15      Exhibit 7 prior to the deposition?
16   A.  Yesterday.
17   Q.  Okay.  Now, Mr. Susock states that the
18      executive management attendees were John
19      Kalson, Rob Cyrus and S.G. Kwak.  Was
20      that consistent with your recollection?
21   A.  You know, I didn't take meeting minutes,
22      you know, in the meeting and go through a
`3      head count because, like I said, after
```

Page 108

```
 1      being the first employee there and being
 2      there three and a half years, we'd never
 3      written meeting minutes ever or since.
 4      So I didn't go in there and do a head
 5      count.
 6   Q.  All right.  Do you agree with me that
 7      each of those three people --
 8   A.  Yes.
 9   Q.  -- identified are members of executive
10      management?
11   A.  Kwak is not.  Well, he is a quality
12      director.  I guess it depends on what you
13      define executive management.
14   Q.  So is Mr. Choi not a member of executive
15      management?
16   A.  Yes, he is, yeah.  Well, he's a director,
17      so it would be under the same logic.
18   Q.  Do you agree with his statement that the
19      Murakami representatives began discussing
20      the issue of buff marks?
21   A.  The meeting opened with Murakami
22      Manufacturing Company to discuss the
23      quality issues of buff marks on the
```

Page 109

```
 1      outside mirror commodity that they
 2      supply.
 3          I don't know what was the
 4      sequence of the pages in Exhibit 5.
 5      Yes.
 6   Q.  Okay.  He says you interjected at that
 7      point.  Stated -- and you stated that you
 8      had pre-meeting with Murakami and that
 9      they concluded that due to an EO
10      change --
11   A.  Where are you?
12   Q.  Sorry.  I'm looking at -- see the, Rob
13      Cyrus interjected.  Do you see that
14      paragraph?
15   A.  Yes.
16   Q.  Read that paragraph and tell -- you can
17      just read it silently, but tell me if you
18      agree or disagree with what he says in
19      that paragraph.
20   A.  You know, I don't know if I interjected
21      at that point.  I think Choi and I made
22      it a point at that point.  I don't even
23      know at what point that Choi and I
```

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 110

1    discussed this.
2 Q.   What specifically did you say about -- I
3      guess, first, what is an EO change?
4 A.   Engineering order.
5 Q.   Okay.  What do you recall stating at the
6      meeting about an EO change?
7 A.   We said -- we addressed that the curing
8      time was affecting the buff -- was
9      affecting the bag marks.  Choi and I said
10     that.  Because he got the EO information
11     from a Korean, Mr. Kwak.
12 Q.  We'll talk in a second about what Mr.
13     Choi said at the meeting.  I want to talk
14     about what specifically you said.
15          Did you -- did you say that
16     this engineering order change was causing
17     problems with the cure time, or did you
18     not?
19 A.  I don't recall saying that.
20 Q.  Okay.  Do you recall if Harry Chase made
21     this response that he refers to in the
22     next paragraph?
3 A.   Harry Chase, manager of production

Page 111

1      control department, stated that the
2      packaging was -- I don't recall verbatim,
3      but there was discussion on that.  That's
4      a standard practice.
5 Q.   Okay.
6 A.   The suppliers provide the packaging, but
7      Hyundai approves the packaging.  So it
8      can't be one-sided.  Both parties have to
9      concur.
10 Q.  Then he identifies, after this back and
11     forth with Chase, that Mr. Kim
12     interjected and inquired how many years
13     has Murakami been in the business and who
14     were some of their customers that they
15     provided for.  Expressing concern over
16     basic quality issues.  I'm paraphrasing.
17 A.  Um-him.
18 Q.  I mean, do you recall him making that
19     point?
20 A.  Yes.
21 Q.  Okay.  And next says, Rob Cyrus replied
22     for Mr. Komatsu-San and stated that
3      Murakami was not the problem for all the

Page 112

1      issues that caused 200 minutes of
2      downtime in general assembly, that much
3      of the mirror problems are caused by
4      Glovis handling.
5 A.   That's not true.
6 Q.   What did you say?
7 A.   That's not true.  I didn't reply for
8      Murakami at any point.
9 Q.   Did you make a statement during the
10     meeting about the downtime?
11 A.  About the downtime -- the meeting was
12     about the downtime.
13 Q.  Did you make a statement during the
14     meeting that Murakami was being
15     improperly charged for downtime?
16 A.  No.  I made a fact -- a statement of the
17     facts that the downtime was caused by
18     "X," and "X" was identified as whatever
19     it was factually.
20 Q.  Tell me specifically, the best you can
21     recall, what you said about this downtime
22     issue during the meeting.
23 A.  I didn't say anything about it other than

Page 113

1      that we concurred with quality and
2      production control and production that a
3      number of the -- of the defects seemed to
4      be, you know, related to internal
5      handling issues.  Choi and I stated
6      that.
7 Q.   Did Mr. Kim at some point say that the
8      purpose of the meeting was to -- it says
9      here, review major supply problems
10     identified and the supplier to address
11     those problems?
12 A.  No.
13 Q.  I mean, did Mr. Kim make the point that
14     he was wanting to focus on the specific
15     issues -- that -- the quality issues that
16     were occurring in the Murakami plant?
17 A.  No.  I mean, he wanted to cover
18     everything was the understanding per his
19     agenda.
20 Q.  I'm not talking about what it says in his
21     agenda.  What he specifically said in the
22     meeting.
23 A.  We covered all issues on the agenda in

29 (Pages 110 to 113)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 114 |
| --- |

1    the meeting: Myself, Choi, Kim, Kwak,
2    Kalson, Susock.
3  Q.  Did Mr. Kim, at some point in the
4    meeting, say that he wanted to focus on
5    the quality issues that were occurring at
6    the Murakami plant or words to that
7    effect?
8  A.  That's one topic that he wanted to
9    discuss of multiple.
10 Q.  When you brought up the issue of downtime
11   and the handling issues with Glovis, did
12   Mr. Kim say to you words to the effect
13   of, I don't want to talk about that
14   issue; I want to focus on the issues that
15   were occurring at the Murakami plant?
16 A.  First of all, I didn't bring it up.  Choi
17   and I brought it up together.  And we
18   said that we would like to allow the
19   supplier to address all of the issues.
20   They understood that the downtime was one
21   of the major reasons they brought their
22   vice president in, because of this in
3    excess of $100,000 chargeback that they

| Page 115 |
| --- |

1    didn't feel was correctly assigned to
2    them.
3  Q.  So you deny, then, that Mr. Kim made a
4    comment to you trying to redirect the
5    focus of the meeting from the point that
6    you were raising?
7  A.  He made a comment to myself and Choi and
8    the table that, you know, when we started
9    talking about scratches and chargeback
10   and root cause determination, he appeared
11   like he didn't like the answer.  He
12   didn't like the outcome, and that's when
13   he started to get upset.
14 Q.  What specifically did he say?
15 A.  I don't remember.  A lot of it was in
16   Korean.
17 Q.  Well, I guess -- I mean, we'll lead to
18   documents earlier.  You were concerned
19   enough about what happened in this
20   meeting to go to Mr. Duckworth; weren't
21   you?
22 A.  After the meeting.
3  Q.  I mean, what specifically did Mr. Kim say

| Page 116 |
| --- |

1    to you in the meeting that caused you to
2    go track Mr. Duckworth?
3  A.  That's not the case at all.  What caused
4    me is, Mr. Choi calling me that afternoon
5    about 1:45 on my cell phone and saying,
6    Rob, you and I may be going home early
7    today.  Mr. Kim is very upset with us.
8    That's how I went to Duckworth.
9  Q.  So --
10 A.  Because that was so flabbergasting.
11 Q.  So when you walked out of the meeting,
12   you did not know that Mr. --
13 A.  I didn't walk out of the meeting.
14 Q.  When the meeting ended --
15 A.  And everybody walked out.
16 Q.  And it's your testimony as you sit here
17   today, when that meeting ended, at that
18   time, you did not know what -- that
19   Mr. Kim was upset with you?
20 A.  No.  I knew that he was upset --
21 Q.  Just answer my question.
22 A.  -- and acting childish.
23 Q.  That's all I need to know.

| Page 117 |
| --- |

1  A.  That's indicated there.
2  Q.  So -- let me be clear on this.  Is it
3    your testimony that if you wrote a note
4    back at the time that it's supposed to be
5    accepted as true as we sit here today?
6  A.  Is it supposed to be accepted as true?
7  Q.  Yeah.
8  A.  I mean, whose determination is that?
9  Q.  Well, I guess, you've seen from reviewing
10   these statements there's several versions
11   of what happened in that meeting.
12 A.  Uh-huh.
13 Q.  You know, is it your position in this
14   lawsuit that only your version is the
15   true version in the meeting?
16 A.  I can only speak for my version.  You
17   know, I wrote these minutes -- I even
18   wrote the time, 11:00 o'clock, H.I. Kim
19   now repeatedly slamming items on tables.
20   Got up and left.  Embarrassing.
21      So, I mean, that was
22   occurring at the time.  Those are my
23   specific notes.  You can look at my

30 (Pages 114 to 117)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 118 | Page 120 |
|---|---|
| 1  previous diary entries, and that's | 1  focus on the quality issues with the |
| 2  something that I do. | 2  supplier. |
| 3  Q.  Okay.  Did you tell Mr. Kim during the | 3     MR. STOCKHAM:  I'm going to |
| 4     meeting that Murakami was being blamed | 4     object. |
| 5     for downtime and that there was | 5  Q.  (By Mr. Bostick) I'm paraphrasing. |
| 6     insufficient data to substantiate that | 6     Do you recall there being |
| 7     assessment? | 7     some statement by Mr. Kim, a second time, |
| 8  A.  No. | 8     trying to say, Let's focus on the issues |
| 9  Q.  Did Mr. Susock tell you at some point | 9     with regard to the supplier as opposed to |
| 10    during the meeting that the buffing (sic) | 10    these with the Glovis issue? |
| 11    marks quality issue was the primary issue | 11 A.  No.  They're all about the supplier as |
| 12    being addressed in the meeting? | 12    Murakami.  That's why they were asked to |
| 13 A.  No. | 13    drive 575 miles with one day's notice to |
| 14 Q.  What did Mr. Susock tell you during the | 14    present and defend their position. |
| 15    meeting? | 15    Glovis is not on the agenda. |
| 16 A.  It's not his meeting.  He's an attendee. | 16 Q.  What do you recall about Mr. Roberts |
| 17 Q.  I'm not asking whose meeting.  What | 17    taking the two mirrors and smacking them |
| 18    specifically do you recall Mr. Susock | 18    together?  To the best of your |
| 19    saying to you in the Murakami meeting? | 19    recollection, how did that unfold? |
| 20 A.  I don't recall him saying anything to me | 20 A.  He took the mirrors and wanted to show |
| 21    specifically in the meeting. | 21    that the placement of the mirrors in a |
| 22 Q.  Did you tell Mr. Susock "That's bullshit" | 22    milk-carton-type tote were causing the |
| ?3    during the meeting? | 23    weld studs to hit the plastic painted |

| Page 119 | Page 121 |
|---|---|
| 1  A.  Absolutely not.  Those words were never | 1     surface and showing the defects, the deep |
| 2     uttered. | 2     gouges.  So he was demonstrating how this |
| 3  Q.  Did you ever use the word "bullshit" | 3     would occur.  I mean, they were -- you |
| 4     during that meeting? | 4     could see that they were like threaded |
| 5  A.  Absolutely not. | 5     scratches, like if you took a screw and |
| 6  Q.  You realize that's what Mr. Susock | 6     scraped it up against a plastic part. |
| 7     represented happened in the meeting. | 7     THE VIDEOGRAPHER:  We have five |
| 8  A.  Yeah, I was kind of surprised to see | 8     minutes left on tape. |
| 9     that. | 9  Q.  (By Mr. Bostick) Did you -- did Mr. Kim |
| 10 Q.  Because you had never had any problems | 10    ever bring up the issue of addressing the |
| 11    with him prior to this time; correct? | 11    scratching issue in a working meeting |
| 12 A.  No. | 12    separately? |
| 13 Q.  And that would be unprofessional | 13 A.  No. |
| 14    behavior. | 14 Q.  I guess Mr. Kim -- is he speaking in |
| 15 A.  I didn't have problems with him in the | 15    Korean at the meeting and then |
| 16    meeting.  There was no prior to. | 16    someone's -- Mr. Lee or Mr. Choi -- who's |
| 17 Q.  And you -- but you would acknowledge that | 17    translating? |
| 18    telling someone "That's bullshit" in this | 18 A.  Chi. |
| 19    meeting would have been unprofessional? | 19 Q.  Chi? |
| 20 A.  Absolutely. | 20 A.  Jason Chi. |
| 21 Q.  Mr. Cyr- -- I'm sorry.  Mr. Susock's | 21 Q.  Jason Chi.  Did you ever make any |
| 22    recollection, then, is that Mr. Kim, for | 22    statements in the meeting that the |
| 3     a second time, tries to say, I want to | 23    about the buff mark issue being a -- |

31 (Pages 118 to 121)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 122

1  concern, that HMMA was not repairing the
2  problems, but just sending them back to
3  Murakami?
4  A.  Can you say that again, please.
5  Q.  Yeah.  In Mr. Susock's statement, he said
6  Mr. Kim said the scratches are a matter
7  for a working level meeting or words to
8  those effect.  I'm paraphrasing.
9        MR. STOCKHAM:  Where are you?
10 Q.  (By Mr. Bostick) I am on 245, fifth full
11 paragraph down.  The purpose today is to
12 discuss the buffing mark issue.  This is
13 a repair that is being performed by HMMA
14 and that they should be charged back to
15 Murakami.
16       And then Mr. Susock says
17 that you said, Rob Cyrus then stated that
18 this should be a case-by-case basis and
19 that he does not believe that HMMA is
20 repairing these at all because they are
21 continuously returned to Murakami.
22       Do you recall any of that
23 discussion?

Page 123

1  A.  Let me read this again, please.  The
2  comment on 245, Bates number: Mr. Kim
3  stated the scratches are a matter that
4  must be addressed at a working level
5  after this meeting.
6        That -- that did not happen.
7  That comment did not happen.
8        The purpose today is to
9  discuss the buffing mark issue from
10 Murakami.
11       That statement did not
12 happen.  The discussion was all defects.
13 And the repair discussion is contrary to
14 our production philosophy.  You know, if
15 we have a defect part, it goes back to
16 the supplier.  We don't have the
17 capabilities in the assembly shop to do
18 paint repairs.
19       THE VIDEOGRAPHER:  You lost your
20 microphone.
21       THE WITNESS:  I'm sorry.
22 A.  So that, you know, doesn't sit correctly
23 with our production process.  We don't do

Page 124

1  paint repairs in the assembly shop.  So
2  this doesn't make sense.
3  Q.  (By Mr. Bostick) So you didn't say
4  anything to that effect?
5  A.  No.
6  Q.  Do you recall any conversations between
7  you and John Kalson --
8        MR. BOSTICK:  How much have we got
9        left?
10       THE VIDEOGRAPHER:  Less than two
11       minutes.
12 Q.  (By Mr. Bostick) Do you recall any
13 conversation with John Kalson during the
14 meeting between you and Kalson
15 directly?
16 A.  We had conversations about passing on
17 defects to the next process.
18 Q.  Did -- did Mr. Kalson say that the items
19 were being prepared by HMMA team members
20 on the line and off line in QA?
21 A.  I don't recall that.  That would be
22 contrary to what we do -- what we did, so
23 --

Page 125

1  Q.  My question is:  Did he say that in the
2  meeting?
3  A.  As I said, I don't recall him saying
4  that.
5  Q.  Do you recall saying to him -- something
6  to him about the Toyota way or the Toyota
7  production system?
8  A.  No.  I talked about the production
9  systems,  that we don't act on defects.
10 Q.  Did you use the word "Toyota" at any
11 point --
12 A.  No.
13 Q.  -- in the meeting.
14       Why don't we go ahead and
15 switch the tape..
16       THE VIDEOGRAPHER:  All right.
17       This is the end of Tape No. 2
18       in the deposition of Robert
19       Cyrus to be continued on Tape
20       No. 3.  We are going off the
21       record at 12:38 p.m.
22       MR. STOCKHAM:  It's 12:30.  Let's
23       take a lunch break.

32 (Pages 122 to 125)

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO
56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 126

1    (Whereupon, the luncheon recess was
2    taken at 12:40 o'clock p.m. to 1:26
3    o'clock p.m.)
4        (The referred-to document was
5        marked for identification as
6        Defendants' Exhibit No. 8)
7    THE VIDEOGRAPHER:  This is the
8        beginning of Tape No. 3 in
9        the deposition of Robert
10       Cyrus.  We're on the record
11       at 1:26 p.m.
12 Q.  (By Mr. Bostick) We've just taken a lunch
13       break, Mr. Cyrus.  And I wanted to ask
14       you next about Exhibit 8.
15 A.  Okay.
16 Q.  Did you review this prior to the
17       deposition today?
18 A.  Yesterday, yes, sir.
19 Q.  Okay.  Had you had any difficulties with
20       Mr. Kalson prior to the Murakami
21       meeting?
22 A.  No.
3  Q.  Okay.  In his recollection, he's saying

Page 127

1        Mr. McDonald is the person making the
2        presentation for Murakami.  Do you agree
3        or disagree with that?
4  A.  I mean, they all spoke.  So I don't know
5        what "making the presentation" indicates.
6        All three of the members from Murakami
7        spoke in the meeting, made a
8        presentation.
9  Q.  He says McDonald spoke first to the
10       buff-marks issue and low light levels.
11       It was raised at that point.
12 A.  Okay.
13 Q.  And then he says he went on to the
14       packaging issue and lack of proper cure
15       time.  Is that consistent with your
16       recollection?
17 A.  Yes.
18 Q.  Okay.  Talked about the question about
19       Mr. Kim asking about how long they'd been
20       in business.  Do you remember that?
21 A.  Yes.
22 Q.  Now, he says next that it was stated by
3        Mr. Cyrus that all defects were not

Page 128

1        caused by Murakami, and that Glovis was
2        the problem with the mirror defects.  Do
3        you recall him saying words to that
4        effect?
5  A.  No.
6  Q.  Okay.  He says that you then defended
7        the packaging concerns that Murakami was
8        facing and stated that HMMA accepted it
9        and that Murakami did not do any other
10       packaging like that for any of its other
11       customers.
12 A.  Absolutely not.
13 Q.  You did not say that.
14 A.  That's not consistent with anything.
15 Q.  Okay.  He says, Mr. Kim stated the
16       purpose of the meeting was to review the
17       basic quality of problems that were the
18       responsibility of Murakami.  Do you agree
19       or disagree with that?
20 A.  Can you repeat it again, please?
21 Q.  Yeah.  Mr. Kim is saying the purpose of
22       the meeting was to review basic quality
23       problems that were the responsibility of

Page 129

1        Murakami.
2  A.  I agree that the purpose was to discuss
3        quality problems, and the responsibility
4        has yet to have been determined.
5  Q.  But did Mr. Kim say he wanted to focus on
6        the quality problems that Murakami would
7        have control over?
8  A.  Not specifically, unless he said it in
9        Korean.
10 Q.  Okay.  Do you recall Mr. Kim saying
11       something about having a separate meeting
12       with HMMA, Glovis and Murakami to discuss
13       the issues that you raised?
14 A.  No.
15 Q.  Okay.  He gives a -- a quote by you.  It
16       says, How can we ask a supplier to come
17       and present the issues when we don't even
18       have any data.
19 A.  Where?  I'm sorry.
20 Q.  Paragraph 10.
21 A.  Something to the effect.  I don't recall
22       that.
23 Q.  Do you recall --

33 (Pages 126 to 129)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 130

1  A.  That didn't happen, I should say.
2  Q.  Are you -- do you recall saying something
3      to the effect that HMMA was charging
4      Murakami for over 200 minutes of downtime
5      that they were not responsible for?
6  A.  Nope. I would have it my meeting
7      minutes. It's 116 and 47 minutes. And
8      the determination and the purpose of the
9      meeting was to determine whose
10     responsibility was what.
11 Q.  Well, did you say that at some point
12     during the meeting that the downtime
13     charge was not the responsibility of
14     Murakami?
15 A.  No. Mr. Choi and I both indicated that
16     the downtime was shared responsibility
17     based on what caused it. If they had bag
18     marks, then they were responsible to take
19     care of that situation and the downtime.
20     If the chargeback on the portions that we
21     controlled internally had caused the
22     defect, then they shouldn't be
3      responsible for it, as with any supplier.

Page 131

1  Q.  He says in Paragraph 11, Mr. Cyrus was
2      very outraged. Would you agree with that
3      statement?
4  A.  Absolutely not.
5  Q.  It says that you said, "Murakami has
6      spent 2-, 3-, $4,000 coming here to
7      present their issues and that we need to
8      let them speak."
9  A.  Nope.
10 Q.  You did not say anything --
11 A.  Murakami said -- Murakami said themselves
12     that they had spent thousands of dollars
13     to come down here and they would like an
14     opportunity to present their issues, but
15     it didn't come from me.
16 Q.  We had mentioned that Glen Roberts with
17     the issue with the mirrors; do you
18     remember Mr. Roberts saying something to
19     the effect of what's mentioned in
20     Paragraph 13 here in quotes?
21 A.  Let me read it, please. "Mr. Roberts"
22     said -- "then said something to the
3      effect "of HMMA has asked us to come here

Page 132

1      and speak and we are going to speak about
2      what we want to speak about."
3          I remember that Mr. Roberts
4      raised his voice, and he was frustrated.
5      That was, you know, a Murakami -- it was
6      his own personal decision to act in that
7      manner. But he was a little
8      flabbergasted on why they were requested
9      to come down in writing to address
10     specific issues, including downtime, and
11     then they weren't allowed to -- didn't
12     appear to be -- wanting to be discussed
13     by H.I. Kim.
14 Q.  Did Mr. Kim say again that there should
15     be a separate meeting on this issue of
16     the scratches and that -- that that was
17     not the purpose of this meeting?
18 A.  No. Unless he said it in Korean.
19 Q.  Was it ever translated to you that that's
20     what he said?
21 A.  No, no.
22 Q.  Is it possible that you were over --
23     talking over the translator so you didn't

Page 133

1      hear what was being said by Mr. Kim?
2  A.  Absolutely not.
3  Q.  Do you recall Mr. Susock stating that the
4      concerns were causing HMMA downtime in
5      Paragraph 15 and repairs, that Murakami
6      was responsible for that?
7  A.  I'm sorry. Say your question again.
8  Q.  Do you recall Chris Susock saying that
9      the concerns with the mirrors were
10     causing downtime and that Murakami was
11     responsible for that?
12 A.  Not specifically. You know, they were
13     responsible for the portion of the
14     defects that they caused, and we were
15     responsible for the portion of the
16     defects that we caused. Mr. Choi and I
17     said on that issue.
18 Q.  Mr. Kalson says -- again, he says at some
19     point he said "That's bullshit"; you deny
20     that?
21 A.  That is ludicrous. That is not correct.
22     I have a stronger vocabulary than that.
23 Q.  Did he say, I expect the parts be good

34 (Pages 130 to 133)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

---

Page 134

1    out of the box, and it's the
2    responsibility of the supplier to make
3    sure they are?
4  A.  Yes.
5  Q.  He did say that?
6  A.  Uh-huh.
7  Q.  And if parts are not good, we must repair
8    them.  Did he say that?
9  A.  I don't remember him saying that because
10   we don't do that.
11 Q.  Okay.  Did you say the operator should
12   find the defects before the parts are
13   installed?
14 A.  No.  I indicated when Choi and I talked
15   about that we are not -- you know,
16   Hyundai production system is not to pass
17   on the defects to the next operator.  So
18   the line operator does have the
19   responsibility, if they notice the
20   defect, to not pass it on down to be
21   repaired at a later time.  That's not the
22   Hyundai production system.
23 Q.  Did he say words to the effect of what he

---

Page 135

1    says in 16, that the job of the operator
2    is not to inspect parts?
3  A.  Did he say that?
4  Q.  Yes.
5  A.  He may have.  I don't recall exactly.
6  Q.  He's saying, that's the responsibility of
7    the supplier, if the operator does see a
8    defect, he will not put the part on;
9    otherwise we have an inspection process
10   downstream that finds defects; and when
11   we find defects, we must fix them.
12 A.  I don't recall ever if he said that.  He
13   doesn't really understand what the
14   production system is about --
15 Q.  Okay.
16 A.  -- according to our procedures.
17 Q.  He says then you said, Mr. Cyrus then
18   said to me, "That's not how Toyota does
19   it, and let me teach you something about
20   production systems."
21 A.  That's not true at all.
22 Q.  Had you worked for Toyota previously?
23 A.  Yes.  Me and many, many other Hyundai

---

Page 136

1    employees.
2  Q.  Had Mr. Kalson ever worked for Toyota?
3  A.  Nope.
4  Q.  But your recollection was you didn't say
5    anything about Toyota or their systems
6    during the meeting?
7  A.  That's correct.  That was a taboo word at
8    Hyundai.
9  Q.  Why would that be taboo?
10 A.  Because Hyundai feels that they can do it
11   better themselves with their own
12   system.
13 Q.  Who is Gerald Horn?
14 A.  He was a quality team member or engineer
15   or assistant manager.  He quit, like most
16   of the people under Jason Chi.
17       THE VIDEOGRAPHER:  You lost your
18       microphone.
19       THE WITNESS:  He went to Nissan.
20       (The referred-to document was
21       marked for identification as
22       Defendants' Exhibit No. 9)
23 Q.  (By Mr. Bostick) Did you see Mr. Horn's

---

Page 137

1    statement?
2  A.  Yes, yesterday.
3  Q.  Defendants' Exhibit 9?  Did you speak --
4    I don't want to know about any
5    conversations in which your attorney was
6    involved in.  Did you have a conversation
7    with Mr. Horn that led to him providing
8    an affidavit when your charge was at the
9    EEOC stage?
10 A.  We called him, you know, to talk about
11   the events of that day, Richard and I.
12 Q.  Did -- did Mr. Horn tell you during that
13   telephone conversation that he had given
14   a statement previously?
15 A.  No.  He had to write meeting minutes for
16   the first time ever.
17 Q.  Is that his signature at the bottom?
18 A.  I couldn't tell ya.
19 Q.  Now, Mr. Horn, in his statement, says
20   that you asked several questions
21   regarding the presentation and then asked
22   about scratches and downtime charged to
23   Murakami.  Is that true?

---

35 (Pages 134 to 137)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 138

1   A.   Murakami asked about scratches and
2        downtime.
3   Q.   So you deny that you said that?
4   A.   We had conversations about scratches and
5        downtime, but I didn't ever bring it up.
6        That was, you know, in their points.
7   Q.   But you commented on -- it says you --
8        Rob Cyrus then commenced to talking about
9        the downtime and scratches on the OSRV
10       mirrors; is that true?
11  A.   In a sequence of what? During the course
12       of the presentation? No, that didn't
13       occur. This -- you know, stifling of
14       systematic quality problems only.
15  Q.   Mr. Kim did not say that to you that
16       --where you tried --
17  A.   No, that wasn't the intention of the
18       meeting. And we were covering all of the
19       quality issues.
20  Q.   Well, there's a little bit of a
21       difference here between what your
22       perception of the meeting is, what's in
3        the document itself and what Mr. Kim's

Page 139

1        comments are at the meeting. And I've
2        asked you several times about whether
3        Mr. Kim said this or not. And I keep
4        getting the response to the effect of
5        that was not the limited purpose of the
6        meeting. So I want to be clear here.
7        Did Mr. Kim twice direct to you and/or
8        Murakami that he wanted to focus on the
9        meeting only on issues related to --
10  A.   No.
11  Q.   -- the Murakami plant? You deny that?
12  A.   Excuse me.
13  Q.   You deny that.
14  A.   If he said it, he said it in Korean,
15       perhaps to Mr. Choi, but he did not
16       address me with this or anyone within my
17       parts development staff.
18  Q.   So Mr. Horn, Mr. Susock and Mr. Kalson
19       are all incorrect when they each state in
20       their statements that there were --
21       Mr. Kim twice made the comments that he
22       wanted to redirect the focus of the
3        meeting.

Page 140

1   A.   Yes.
2   Q.   Okay.
3   A.   Mr. Kim pulled them in a room and asked
4        them -- made them write meeting minutes
5        before they could leave on a Friday
6        night.
7   Q.   Because he was very upset; wasn't he?
8   A.   He may have been. I don't know how his
9        attitude is typically.
10  Q.   Well, you learned later that he was
11       upset.
12  A.   Yes, we both did, Choi and I, when I got
13       the call from Choi saying, We may be
14       going home.
15            When I talked to Duckworth
16       twice and he said, Don't give it another
17       thought, I haven't heard anything about
18       it. That's just that Koreans are
19       typically aggressive in meetings.
20  Q.   Are you reading that in this statement?
21  A.   No, I am telling you what happened.
22  Q.   So you deny again coming back and saying,
23       Rob Cyrus stated that not all of the

Page 141

1        downtime was not attributable to
2        Murakami?
3   A.   I'm not denying that. But we haven't
4        talked about that one yet.
5   Q.   Tell me what -- what you said.
6   A.   No. Choi and I indicated that the
7        downtime was multi-faceted and had a
8        number of different root causes.
9   Q.   Do you have any explanation as to why
10       none of these statements make any mention
11       of any comments made by Choi in the
12       meeting, including your own?
13  A.   Do I have any what? Can you repeat that,
14       please.
15  Q.   Yeah. Do you have any opinion why this
16       statement by Mr. Horn, Mr. Kalson, Mr.
17       Susock and your own statements do not
18       make any mention of any specific comments
19       by Mr. Choi being made in the meeting?
20  A.   I couldn't -- you know, it doesn't make
21       sense for me to guess at that; does it?
22  Q.   Okay. Mr. Horn says, You brought them
23       all the way down here; at least hear what

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 142

1  they have to say. Do you remember saying
2  anything to that effect?
3  A.  I did say that we want to give Murakami
4  the opportunity -- Choi and I said, we
5  want to give Murakami the opportunity to
6  review their data that they produced to
7  go over their presentation.
8  Q.  What did you specifically say?
9  A.  I just told you.
10 Q.  No, you told me what you and Choi. There
11 is two different mouths at this meeting;
12 correct?
13 A.  Well, we both pretty much spoke in
14 lockstep since we had the pre-meeting,
15 and we were of the same opinion on
16 everything.
17 Q.  So it's your testimony that every word
18 that came out of your mouth was exactly
19 mimicked by Mr. Choi; is that --
20 A.  But that's not very realistic; is it?
21 Q.  No, it's not. But that's what I've heard
22 your testimony -- every time I've asked
3  you a question about what you said in

Page 143

1  this meeting, you tried to answer it by
2  you and Choi said the exact same thing.
3  Now, you agree with me that that is not a
4  realistic answer; correct?
5  A.  In -- in content, it was the same
6  thing.
7  Q.  You're saying there is nothing in
8  substance different from what you said
9  from what Mr. Choi said.
10 A.  Absolutely not.
11 Q.  Did Mr. Choi speak in English the entire
12 time?
13 A.  No.
14 Q.  So you already testified you don't know
15 what he would have said in Korean.
16 A.  Right.
17 Q.  Okay. So as you're sitting here today,
18 you don't know what Mr. Choi said to
19 Mr. Kim; correct?
20 A.  In Korean, you mean?
21 Q.  Right.
22 A.  Well, yes, that's correct.
3  Q.  You don't know what Mr. Kim said to Mr.

Page 144

1  Choi; correct?
2  A.  That's correct.
3  Q.  So do you have any knowledge as to
4  whether or not Mr. Kim directed a comment
5  to Mr. Choi himself to be quiet at the
6  meeting?
7  A.  Do I -- I'm sorry. Can you rephrase
8  that?
9  Q.  Do you know if Mr. Kim directed a comment
10 to Mr. Choi in Korean at the meeting to
11 be quiet?
12 A.  I don't know. I didn't pick up on
13 Korean.
14 Q.  Did Mr. --
15 A.  My mic just came off. I'm sorry.
16 Q.  Did Mr. Choi tell you at some point later
17 that he had been directed to be quiet
18 by --
19 A.  It's stuck in the wheel here.
20 Q.  -- Mr. Kim.
21 A.  Yes, he did tell me that.
22 Q.  Okay. Did Mr. -- did Mr. Kim at some
23 point in the meeting scream out your

Page 145

1  name?
2  A.  No.
3  Q.  He never said, Rob, more than one time?
4  A.  No. They don't use first names anyway,
5  so that wouldn't be very consistent;
6  would it?
7  Q.  So it's your testimony that he never made
8  any direction to you, either directly or
9  through a translator, to get off of one
10 subject and move on to another?
11 A.  Not at me directly, no.
12 Q.  Again, Mr. Horn says that Chris Susock
13 stated that -- that he says PQ said
14 they'd already calculated the downtime to
15 the best of their ability and that you
16 responded "That's bullshit." Do you
17 agree or disagree with that?
18 A.  I emphatically disagree.
19 Q.  Did you ask if the team members were
20 required to inspect the parts before
21 putting them on?
22 A.  Did I ask them?
23 Q.  Yes.

37 (Pages 142 to 145)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 146

1   A.  No.  Why would I ask them?
2   Q.  And then this is John Kalson's response:
3       That's not part of their job.
4   A.  I don't -- you know, I didn't ask if
5       they were required to inspect the part
6       before putting them on.
7   Q.  Again, you said you never mentioned
8       anything about Toyota during the
9       meeting?
10  A.  No.
11  Q.  Did this conversation happen between you
12      and Susock about what was the appropriate
13      reason for the meeting take place?
14  A.  No, absolutely not.  This was a new
15      meeting for everybody.  So Chris didn't
16      know what to expect anyway.  This is the
17      first time this meeting occurred.
18  Q.  The -- so what all do you recall Mr. Choi
19      saying in English at this meeting?
20  A.  What did Choi say?
21  Q.  Yeah.
22  A.  Choi said that we want to get to the root
3       cause.  Choi said that we had a

Page 147

1       pre-meeting; and we feel that some of the
2       defects are caused by Murakami; and some
3       of them are caused by our internal
4       company, ourselves and Glovis; and that
5       the chargebacks should be calculated
6       accordingly.  What else did he say?
7   Q.  And he's saying all of this in English,
8       according to your testimony?
9   A.  Yes.  How would I know it otherwise?
10  Q.  Was Mr. Kim -- Mr. Choi involved in this
11      conversation where you mentioned in your
12      notes the request to speak out at the
13      meeting?
14  A.  I don't know what you're talking about
15      there.
16  Q.  Talked strongly to H.I. Kim to be fair to
17      supplier.
18  A.  Does he know about that?
19  Q.  Yes.
20  A.  Yes, he does.
21  Q.  He was at that same --
22  A.  We had the pre-meeting, and that was
3       Brian Hwang told myself and Choi, plus

Page 148

1       told me and Choi to talk strongly to H.I.
2       Kim to be fair to supplier.  Not take the
3       supplier's side, to be fair to supplier,
4       like we always have been.
5   Q.  But it's your position that -- that you
6       were neutral in the meeting?
7   A.  Absolutely.
8   Q.  Okay.
9   A.  No, not even neutral.  I was taking
10      Hyundai's best interest, as we had done
11      from the beginning since I started up the
12      department with Mr. Lee.  It was a
13      long-term mutually beneficial
14      relationships with suppliers.  It's not
15      something you just toss out the window
16      when you choose another supplier.
17  Q.  Well, would you agree with me that --
18  A.  We needed them as much as they needed us.
19      That's our only supplier for mirrors.  If
20      you want to change suppliers, it's going
21      to take you a year at least.
22  Q.  Would you agree with me that someone
23      within HMMA telling another member of

Page 149

1       HMMA that his opinion on a subject is
2       "bullshit" in front of an outside
3       supplier could be cause for concern?
4   A.  Absolutely.  I've never done that in my
5       20 years in purchasing.
6   Q.  Well, you know, your supplier does work
7       with you in -- in obviously providing
8       your parts, but this is an arm's-length
9       transaction; correct?
10  A.  What do you mean?
11  Q.  Well, I mean, this is not an HMMA entity;
12      correct?
13  A.  It's an outside independent supplier.
14  Q.  Right.  And so if -- if an HMMA
15      department has gone to them and said,
16      We're charging you for these errors --
17  A.  Um-hum.
18  Q.  -- would you agree with me that it might
19      not be in Hyundai -- in HMMA's best
20      interest to have another member of HMMA
21      arguing, or challenging that decision, in
22      a meeting in front of the supplier?
23  A.  There's no challenging there.

38  (Pages 146 to 149)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

---

Page 150

1  Q.  I agree you took a neutral position.
2  A.  No, I presented the facts.  You know, I
3      took care of Hyundai's interest.
4  Q.  So but --
5  A.  But in a fair and honest manner.
6  Q.  Did you, in that meeting, say anything
7      that questioned whether or not a correct
8      decision had been made by quality QLS
9      earlier?
10 A.  QLS didn't speak in the meeting.
11 Q.  Earlier.  I mean, did you say anything to
12     challenge this decision?
13 A.  There is no challenge.  The determination
14     from 282 parts to 251 was made by QLS and
15     quality.
16 Q.  Right.
17 A.  Purchasing was not involved.
18 Q.  Okay.  Who -- who made the decision on
19     the chargeback?
20 A.  I don't know.  Somebody -- who makes on
21     the decision on the quality or the
22     chargeback?
3  Q.  The chargeback.

---

Page 151

1  A.  That's recommended by operations and
2      quality.
3  Q.  Did you, at any point during that
4      meeting, say that it was wrong for
5      Murakami to be charged for that
6      $100,000?
7  A.  No, I didn't say anything in that manner.
8      I said that we need to determine the root
9      cause of the defects and assign
10     responsibility both financially as a
11     chargeback to the appropriate parties.
12 Q.  Did you -- tell me about what Mr. Kim
13     said at the end of the meeting, or how
14     did the meeting end?
15 A.  Well, as I indicated in Exhibit 6, 272
16     Bates Number, 11:00 o'clock, this is on
17     9-16: H.I. now repeatedly slamming items
18     on table.  Got up mad and left.  And I
19     wrote embarrassing after that.  That's
20     how the meeting ended.
21 Q.  Okay.
22 A.  That was written as it happened.
3  Q.  And then what did you -- what did you do

---

Page 152

1      after the meeting ended?
2  A.  What did I do after the meeting ended?  I
3      went to another meeting.
4  Q.  Do you recall what that meeting was?
5  A.  It was a supplier quality meeting at 1:00
6      o'clock.  And I got a call from Mr. Choi
7      at 1:45 saying, Rob, you and I may be
8      going home early today.  H.I. Kim is very
9      upset with us.  So he asked me to come to
10     my desk immediately.
11         We were asked to write
12     meeting minutes for the first time in our
13     career with Hyundai.
14         (The referred-to document was
15         marked for identification as
16         Defendants' Exhibit No. 10)
17 Q.  (By Mr. Bostick) Are the meeting notes
18     that you prepared and submitted Exhibit 5
19     that we looked at earlier.
20 A.  Yes.
21 Q.  If you were asked on that September 16th,
22     why is this dated October 2nd?
23 A.  Where's October 2nd on here?

---

Page 153

1  Q.  On Exhibit 5.
2  A.  Because I didn't write up the formal
3      meeting minutes until October 2nd.
4  Q.  Why was there a --
5  A.  Because I was out sick on FMLA as
6      indicated by Melanie McCormick in human
7      resources.
8  Q.  So you weren't at work any from the day
9      of the meeting until --
10 A.  We reviewed that yesterday.  I think
11     after the meeting -- I have to look at
12     the documents here.
13 Q.  But there wasn't apparently enough time
14     for you to prepare this memorandum until
15     October 2nd?
16 A.  That's correct.
17 Q.  Okay.  This Exhibit 10 has 11-6 up in the
18     upper right-hand corner.  Is that the
19     date this was prepared?
20 A.  11-6.  It may have been, but I can't -- I
21     wasn't even at work then.  Looks like
22     terminated on 10-26.
23 Q.  You have the line here, it says, Pull

---

39 (Pages 150 to 153)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 154

1   notes. Do you see that?
2   A.  Um-hum.
3   Q.  Is that -- is that referring to your
4       notes from the actual meeting?
5   A.  It could be those or other, you know,
6       calendar -- I don't know.
7   Q.  And here you're -- I'm sorry.
8   A.  I'm sorry. Go ahead.
9   Q.  Here you're saying, They specifically
10      requested me to, quote, talk strongly to
11      H.I. Kim to assure the supplier was
12      treated fairly.
13  A.  Right. In quotation marks. That's their
14      English, broken English, of what they
15      said to me.
16  Q.  So it's Choi and Hwang making that
17      request of you; correct?
18  A.  That's what this says.
19  Q.  Is that consistent with your
20      recollection?
21  A.  I remember Hwang talking to me that
22      night. But, you know, we spoke that
3       morning of the meeting with Choi also.

Page 155

1   Q.  Well, at least at the time you wrote this
2       on November 6, you were indicating in
3       this document that it was both of them
4       making that request; correct?
5   A.  Yes.
6           The bottom is cut off on 324. Do
7           you know what that says?
8       MR. STOCKHAM:  Mine is not
9           cut off.
10      THE WITNESS: H.I. Kim.
11  Q.  (By Mr. Bostick) I see Mr. Choi and --
12  A.  Hwang said thank you for your help. They
13      are afraid to speak to COO, H.I. Kim, due
14      to his unreasonable and vindictive
15      working style. That's what it says.
16  Q.  So you -- had you -- had anybody else
17      before you, before this conversation,
18      told you that Mr. Kim had a temper or
19      words to that effect?
20  A.  Mr. Hyun had.
21  Q.  Okay.
22  A.  Let me think who else.  Mr. Youn had.
3       Juan D. Youn.  And most of the Koreans

Page 156

1   that had been with the company for a
2   number of years understood who he was.
3       THE VIDEOGRAPHER:  Could you raise
4       your microphone a little bit.
5       It's pressing against the
6       papers.
7   MR. BOSTICK:  Sorry.
8   THE VIDEOGRAPHER:  Thanks.
9   Q.  (By Mr. Bostick) And Bates No. 325 looks
10      like a listing of what you did in the
11      pre-meeting; is that right?
12  A.  I haven't seen this document in years.
13  Q.  I'm looking on page Bates No. 325.  Do
14      you have --
15  A.  I'd like to read this so I understand the
16      content and context of the comments.
17  Q.  Sure.  Just tell me when you're done.
18  A.  Sure.
19          Okay.
20  Q.  Okay.  It appears from these notes that
21      the statement about what number of the
22      mirrors -- I'm looking at the paragraph
23      that starts, I asked her about the recent

Page 157

1   line stoppage and the 282 mirrors sent
2   back to Murakami as rejects.
3   A.  Um-hum.
4   Q.  Her under- -- this is a team member
5       that's working on the line that you are
6       talking to; correct?
7   A.  Yes.
8   Q.  Her understanding was that the vast
9       majority of -- what's that word?
10  A.  The parts.
11  Q.  -- the parts sent back were --
12  A.  Borderline defective.
13  Q.  -- and 251 of the 282 parts were later
14      agreed to be a quality miscall on HMMA's
15      behalf.
16  A.  Right.
17  Q.  Then you said, is there any documentation
18      to support that?  And she said --
19  A.  No.  I said is there any documentation
20      that says how do you identify when a part
21      is  acceptable or within our acceptable
22      boundaries or not.  She said there is
23      nothing like that that exists.

40 (Pages 154 to 157)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

---

Page 158

1  Q.  Okay.  Then it says on the next page --
2      do you need to read that?
3  A.  No, I've read that.  Go ahead.
4  Q.  Who is Michael Kirk?
5  A.  He is Paula Gonsalves' boss as a manager
6      within plastic quality, exterior parts
7      and interior parts.  He quit also.
8  Q.  And then you say you met with Murakami to
9      get their side of the situation, and they
10     too were in agreement with us.
11 A.  Where do you see that?  I want to see the
12     actual words instead of paraphrasing.
13 Q.  You see the dash, we then meet with.
14 A.  We then met with the three gentlemen from
15     Murakami to get their side of the
16     situation and they were too in agreement
17     with us.  Plus they had already, this
18     morning, gone over to the Glovis
19     sequencing operation to clearly
20     understand how parts were being
21     handled.
22 Q.  What are you saying they were in
3      agreement with you on at that point?

Page 159

1  A.  They're in agreement that they are
2      meeting our requirements, and the lack of
3      line side inspection is why 89 percent of
4      the parts that were indicated to be
5      defective were later found to be okay.
6  Q.  So at this point, you're no longer
7      sticking with your initial position that
8      you'll be neutral?
9  A.  This is fact-finding.  This is with
10     Hyundai people; this is listening to the
11     supplier and talking about how these
12     problems occurred.  This is not neutral.
13     This is fact-finding.
14 Q.  So when someone --
15 A.  Something happened to the mirrors.  It
16     wasn't fairies that came down.
17 Q.  Well, let me clarify.  Let's talk about
18     what fact-finding is.
19 A.  Okay.
20 Q.  You didn't review a single mirror that
21     morning; did you?
22 A.  Review a sing- -- yes, I did.
3  Q.  Did you look at the actual defects?

Page 160

1  A.  Yes.
2  Q.  Okay.  How many did you look at?
3  A.  Of the scratch and buff marks, probably
4      two to three.  I saw the bags, the
5      previous design, the current design, saw
6      probably seven to ten examples of the
7      gouge marks, scratch marks.
8  Q.  Okay.  Now, but there wasn't any
9      documentation to review that would
10     confirm this team member's, you know,
11     estimate as to the number of products
12     that she is telling you about?
13 A.  I didn't ask her.  That was from quality.
14     Those numbers were from quality, not from
15     the team member.
16 Q.  But do you -- do you --
17 A.  I asked her --
18 Q.  Are you saying that what she told you is
19     an absolute and unquestioned truth, or
20     was she stating an opinion?
21 A.  She has no reason to make any comment
22     other than what happened.  I wanted to
23     talk to them to see if they were

Page 161

1      misapplying the parts or mishandling
2      them.  We watched them put it on, and
3      then we went and spoke with them.
4  Q.  Was she telling you a fact or an
5      opinion?
6  A.  A fact.
7  Q.  And these three guys, when they say --
8      I'm sorry.  The quality --
9  A.  Uh-huh.
10 Q.  -- people, they had the same feeling?
11     Are you saying that their feelings are
12     facts?
13 A.  You can mince the words how you wish.
14     They had the same opinion of the facts.
15 Q.  So what is your understanding of the
16     difference between an opinion and a
17     fact?
18         MR. STOCKHAM:  I'm going to
19         object; that's arguing with
20         the witness.
21         THE WITNESS:  That's crazy.
22 Q.  (By Mr. Bostick)  No.  I'm just trying to
23     get clarification as best you can tell

41 (Pages 158 to 161)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 162

1    me.
2  A.  There is no reason that we did an
3      investigation looking for suspect
4      comments from people on the line that
5      they were going to -- what reason would
6      they have to tell us anything but what
7      they knew?  Typically when management
8      comes down to the line, the people are
9      very polite, very cooperative, probably
10     somewhat intimidated.  They're not going
11     to lie.  You know, oh, they have been
12     terrible, but I am going to say they are
13     a good supplier.
14 Q.  Well, obviously Mr. Susock had a
15     different opinion on this issue than what
16     you reached from your pre-inspection;
17     correct?
18 A.  No.
19 Q.  Did he not say during the meeting that
20     Murakami was going to be responsible?
21 A.  He knew prior to the meeting that 89
22     percent of the defects were our problem.
23     I stated that earlier.

Page 163

1  Q.  Did he say anything in the meeting to the
2      effect that Murakami should be
3      responsible for the defects that they had
4      caused?
5  A.  Well, he may have.  I mean, that's a
6      correct statement, and I agree with
7      him.
8  Q.  Okay.
9  A.  If they caused problems, then they should
10     be responsible for those problems.  If
11     they didn't, then we need to get the
12     facts straight.
13 Q.  So you knew going -- I'm sorry.
14 A.  I'm sorry.  I was trying to finish,
15     but --
16 Q.  Go ahead.
17 A.  Just be fair and factual.
18 Q.  So you knew going into the meeting that
19     there was at least a certain percentage
20     of downtime that Murakami was responsible
21     for; correct?
22 A.  We didn't know if it was 11 percent or
23     100 percent.

Page 164

1  Q.  Did you make any attempt to determine
2      that number before going into the
3      meeting?
4  A.  No.
5  Q.  Why not?
6  A.  No, it was not possible, because we
7      didn't have the data.  I mean, that's
8      what the meeting for was, for Murakami to
9      make their presentation.
10 Q.  So did you ever make any suggestion that
11     Murakami -- that the amount be reduced by
12     a certain percentage, or were you saying
13     they shouldn't be charge at all, or did
14     you just not state any opinion
15     whatsoever?
16 A.  You know, those -- those comments weren't
17     made by myself or Choi.
18 Q.  Whether or not the comments were made,
19     did you have any thought process about
20     how you would go about determining what
21     had --
22 A.  Yeah.  I had a thought process from the
23     initial concept when I said, I am going

Page 165

1      to go gather facts, be neutral and
2      represent Hyundai and the supplier in a
3      fair and equitable manner, like we did
4      all relationships.
5             That's how I got recruited
6      to Hyundai; that's how I was named one of
7      the best employees in all of Mercedes,
8      not by doing underhanded things.
9  Q.  So what was the plan to designate a
10     certain percentage to?
11 A.  There was no plan to designate any
12     percentage.
13            (The referred-to document was
14            marked for identification as
15            Defendants' Exhibit No. 11)
16 Q.  (By Mr. Bostick)  Have you reviewed
17     Exhibit 11 prior to preparing for this
18     deposition?
19 A.  I haven't seen this one.  Richard went
20     over some things, but I didn't look at
21     this one.  He and I discussed it
22     yesterday.
23 Q.  I don't want to know what y'all talked

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 166

1  about.
2  A.  Okay.  Excuse me.
3  Q.  Have you had a chance to review it?
4  A.  Yes.
5  Q.  Do you agree or disagree with his
6      contention that you twice interjected to
7      bring up the issue of downtime being
8      charged to Murakami?
9  A.  I disagree that it was interjected at
10     inappropriate times.  It was a topic of
11     discussion for the meeting that was
12     discussed by Choi and myself.
13  Q.  Now, he says here, Kim twice reminded
14     that the purpose of the meeting is to
15     review the supplier's quality problems
16     and countermeasures.  Do you agree with
17     that statement?
18     MR. STOCKHAM:  Where is that?
19  Q.  (By Mr. Bostick) I'm looking at the
20     first, Line 50; second, Line 60.
21  A.  No, that wasn't stated in that fashion.
22  Q.  And you deny telling Chris Susock
3      "bullshit" or words to that effect?

Page 167

1  A.  Absolutely, once again.
2  Q.  You deny that Kim said that he wanted the
3      scratching issue to be resolved on a
4      working-level meeting?
5  A.  That didn't happen, unless he said it in
6      Korean.
7  Q.  Do you recall Mr. Kim -- did you have any
8      conversations with Jason Chi at any
9      point?  He states a personal opinion at
10     the end of this.  He says, I think Rob
11     could have discussed the downtime issue
12     against Murakami mirrors directly with
13     COO Kim before or after the meeting.
14     This is the reason that well-prepared
15     meeting had to end -- had to be ended in
16     this disruptive manner.
17         Did he ever tell you that at
18     any point that that was his opinion?
19  A.  No.
20  Q.  Did you have any conversations with
21     Mr. Chi after the Murakami meeting?
22  A.  No.
3  Q.  Did you ever have any prior disagreements

Page 168

1      or any reason for Mr. Chi to dislike you
2      prior to this Murakami meeting?
3  A.  No.  Why is Choi not indicated on any of
4      these meeting minutes as an attendee?
5      MR. STOCKHAM:  Let him ask the
6      questions.
7      THE WITNESS:  Okay.
8  Q.  (By Mr. Bostick) I don't know.  If you
9      remember, I tried to ask why you didn't
10     think about Choi in there earlier.  I
11     don't know that you responded to that
12     question.
13         (The referred-to document was
14          marked for identification as
15          Defendants' Exhibit No. 12)
16  Q.  (By Mr. Bostick) Have you seen this
17     document before?
18  A.  No.
19  Q.  This looks like an office visit on
20     September 13th, two days prior to the
21     Murakami meeting.
22  A.  Okay.
23  Q.  Is that consistent with your

Page 169

1      recollection, that you visited them at
2      that time?
3      MR. STOCKHAM:  The one I've got is
4      October 31.
5      THE WITNESS:  Yeah.  Which one is
6      it?
7  Q.  (By Mr. Bostick) That's the date it was
8      printed off to be produced, I believe.
9      See down -- Robert Cyrus it has 9-13
10     office visit, progress notes?
11  A.  It says date 9-13, yeah.  9:59.
12         So what is your question,
13     sir?
14  Q.  Do you recall going to the doctor on or
15     about September 13th?
16  A.  I guess so.
17  Q.  Okay.  And this is your cardiovascular
18     doctor?
19  A.  No.
20  Q.  Who is this?
21  A.  It says Paul Moore; doesn't it?  Paul B.
22     Moore.
23  Q.  Who is that?

43 (Pages 166 to 169)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 170 | Page 172 |
|---|---|
| 1 A. He's a family practitioner. Paul Moore. | 1 complained about, we don't get any |
| 2 Hold on a second. There's Daniel Moore, | 2 information; we're not included in the |
| 3 and there is Paul Moore. | 3 meetings; we don't get the build |
| 4 Q. This says Montgomery Cardiovascular. | 4 schedule. |
| 5 A. Yeah. Hold on, please. | 5 You know, I had to deal with |
| 6 There -- Paul Moore, M.D. | 6 that on an everyday basis. Rick and I |
| 7 Daniel Moore was my family practitioner, | 7 had been in meetings to talk about the |
| 8 general practitioner. And then Moore -- | 8 stress-inducing problems at Hyundai. |
| 9 I don't have the other guy's name; | 9 Greg Kimble and I have been in meetings |
| 10 there's two people. There's two people | 10 with that. |
| 11 in the cardio-, you know, -vascular | 11 Q. Did you tell your doctor anything other |
| 12 operations that I saw. | 12 than the fact that you had a large |
| 13 Q. Okay. | 13 backlog of work at Hyundai? |
| 14 A. I would have to look it up. It's on my | 14 A. I don't recall. |
| 15 calendar. Probably. | 15 Q. Do you remember telling your doctor you |
| 16 Q. I mean, is this consistent with your | 16 had a large backlog? |
| 17 recollection of going to the doctor on | 17 A. I don't recall really, you know. |
| 18 September 13th and complaining of | 18 Q. Do you remember telling -- |
| 19 shortness of breath? | 19 A. I had no reason to make something up. |
| 20 A. I mean, I've been to the doctor so many | 20 Q. Do you recall any conversations about |
| 21 times over the last year, yeah. I went | 21 feeling dizzy while you played golf |
| 22 to the doctor. I can't remember exactly | 22 earlier in the week? |
| 3 if it's -- I don't -- I don't doubt that | 23 A. That's probably why I went there, yeah. |

| Page 171 | Page 173 |
|---|---|
| 1 this date is correct. | 1 I didn't go for a social visit. At this |
| 2 Q. What -- what do you recall telling him | 2 time, you know, we were still doing |
| 3 about being under a great deal of social | 3 management of my medications. |
| 4 stress? | 4 (The referred-to document was |
| 5 A. Well, I am under a great deal of stress. | 5 marked for identification as |
| 6 He asks that typically -- | 6 Defendants' Exhibit No. 13) |
| 7 Q. What was your -- | 7 MR. BOSTICK: 13? |
| 8 A. -- with a heart situation. | 8 THE WITNESS: Yeah. |
| 9 Q. And it says he is going through a | 9 THE VIDEOGRAPHER: We have about |
| 10 divorce. Do you recall if you talked to | 10 six minutes left on this |
| 11 him about your divorce? | 11 tape. |
| 12 A. I'm sure I talked to him about | 12 MR. BOSTICK: Okay. |
| 13 everything. | 13 MR. STOCKHAM: Do you have another |
| 14 Q. I guess, as of September 13th, what were | 14 copy? |
| 15 the stressors that you had in your | 15 MR. BOSTICK: I'm sorry. Yes, |
| 16 life? | 16 I've got an extra one. |
| 17 A. At September 13th, going through a | 17 Q. (By Mr. Bostick) Who's Laura Stone? |
| 18 divorce; Hyundai was very stressful to | 18 A. She is assistant staff within parts |
| 19 almost everybody there. You know, the | 19 development. |
| 20 Americans were treated distinctly | 20 Q. Is this -- her -- she's identifying |
| 21 different than the Korean colleagues. We | 21 when -- when you had been in attendance |
| 22 were two distinct teams, two silos. You | 22 and in absence. Are the weeks she |
| 3 know, much of the time my local employees | 23 identifies consistent with your |

44 (Pages 170 to 173)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| Page 174 |
| --- |

1    recollection?
2    A.  I have no idea.  I have never seen this
3        document.
4            (The referred-to document was
5            marked for identification as
6            Defendants' Exhibit No. 14)
7    Q.  (By Mr. Bostick) Do you know who Mike
8        Youn is?
9    A.  "Youn."
10   Q.  "Youn"?
11   A.  Yeah.
12   Q.  Do you recall running into him at a --
13           MR. STOCKHAM:  Is that Exhibit 18?
14           MR. BOSTICK:  14.
15   Q.  (By Mr. Bostick) Do you recall running
16       into him at the Red Star Tavern while you
17       were out on FMLA leave?
18   A.  Yes.
19   Q.  Who were you with at the Tavern?
20   A.  Who was I with?
21   Q.  Yes.
22   A.  I don't know.  I may have met Dave Mark
 3       probably.  It was called having dinner.

| Page 175 |
| --- |

1    Q.  Did you tell him not to tell anyone that
2        you saw him?
3    A.  Let me -- let me read this if I could,
4        please.  Sorry.
5    Q.  Okay.
6    A.  Within the gathering, there were females.
7        Reason why Rob showed up.  Okay.
8    Q.  Okay.  Do you recall telling Mr. Youn, do
9        not tell anybody you saw me here?
10   A.  Absolutely not.
11   Q.  Tell me what in this statement you recall
12       this happening and what you say is
13       accurate.
14   A.  I don't think any of this is true, other
15       than me sitting down outside on the
16       patio.  I'm not trying to hide in the
17       restaurant.  And I had dinner.
18   Q.  Did you have any drinks?
19   A.  Probably.
20   Q.  Were there any females there?
21   A.  Not at our table.
22   Q.  Who -- who is your recollection that you
 3       were sitting with?

| Page 176 |
| --- |

1    A.  Like I said, I think it was Dave Mark.
2    Q.  Anybody else?
3    A.  I don't recall anybody else.
4    Q.  You deny saying, I'll fire you if you do
5        or words to that effect?
6    A.  Absolutely not.
7    Q.  Did he work within the purchasing
8        department?
9    A.  He worked under Mr. Hyun --
10   Q.  Okay.
11   A.  -- in the purchasing department for
12       indirect purchasing.
13   Q.  Had you had any problems with him prior
14       to this time?
15   A.  Never did have any problems with him.
16   Q.  Did -- did you have any conversations
17       with anybody about this statement prior
18       to today, other than your attorney?
19   A.  No.
20           MR. BOSTICK:  Do you want to take
21           a break there.
22           THE VIDEOGRAPHER:  Sure.  All
23           right.  This is the end of

| Page 177 |
| --- |

1            Tape No. 3 in the deposition
2            of Robert Cyrus to be
3            continued on Tape No. 4.  We
4            are going off the record at
5            2:25 p.m.
6            (Short recess)
7            THE VIDEOGRAPHER:  This is the
8            beginning of Tape No. 4 in
9            the deposition of Robert
10           Cyrus.  We are on the record
11           at 2:36 p.m.
12   Q.  (By Mr. Bostick) Mr. Cyrus, I'm trying to
13       move us forward a little bit more quickly
14       to our next subject, which is --
15   A.  Excuse me.
16   Q.  -- your conversation that you had at
17       dinner with Mr. Duckworth.  Okay?
18   A.  Yes.
19   Q.  Now, before we get there, we'll make sure
20       that we kind of properly cover -- to the
21       best of your recollection, have you told
22       me what you recall about conversations
23       you had during the pre-meeting meeting

45  (Pages 174 to 177)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 178

1    with -- before the Murakami meeting?
2 A.  Just the pre-meeting, or that and the
3    Murakami?
4 Q.  Just the pre-meeting.
5 A.  Yes, sir.
6 Q.  The same question for the Murakami
7    meeting.  Have you told me what you
8    recall?
9 A.  Yes, sir.
10 Q.  Were there any -- to your knowledge, did
11    Mr. Choi engage in any -- make any
12    derogatory statements during the meeting
13    with Murakami?
14 A.  No.
15 Q.  You didn't hear him say any curse words
16    in English; correct?
17 A.  No.
18 Q.  And to your knowledge, he didn't argue
19    with any other Hyundai executives at the
20    meeting; correct?
21 A.  No.  Neither of us did.
22 Q.  You had mentioned having the conversation
3    with Mr. Choi after the Murakami meeting.

Page 179

1 A.  Um-hum.
2 Q.  There was a conversation where you said
3    he called you and said, get back to your
4    desk.
5 A.  Well, he called and said, Rob, where are
6    you?  I said, I am in a quality meeting.
7    He said, You and I may be going home
8    early today.  H.I. Kim is very upset.
9    And at that point, he told me to come
10    back to my desk, and I did.
11 Q.  Okay.  Did you have a conversation with
12    him again when you came back to your
13    desk?
14 A.  Oh, absolutely, yes.
15 Q.  Tell me about that conversation.
16 A.  Well, we talked about, you know, what --
17    what was going on, why -- what does he
18    mean that we may be going home early
19    today.
20 Q.  And what did he say?
21 A.  He said, H.I. Kim is very upset, and he's
22    talking to President Ahn, and he's
3    talking to the president of quality in

Page 180

1    Korea, Mr. Seo.  I think S-E-U or S-E-O
2    or S-U-H.
3 Q.  Other than saying he was angry,
4    did he say what exactly Mr. Kim -- what
5    was his understanding Mr. Kim was mad
6    about?
7 A.  Not at all.
8 Q.  Okay.  Is that the best that you can
9    recall took place in that conversation?
10 A.  I went to Duckworth twice after that
11    call, two separate occasions, and then --
12 Q.  I'm just trying to make sure I talked to
13    you about the Choi conversation here.  We
14    can talk about the Duckworth in a second.
15 A.  This is the Choi conversation.
16 Q.  Okay.
17 A.  And at the end of the day, after Keith
18    had assured me that I was in good
19    standing and not to give it another
20    thought, we talked to Jason Lee.  I
21    initiated a meeting with the CFO because
22    he understood Western business practices.
23    He went to the University of Michigan.

Page 181

1    Jason and I had a good rapport.  We got
2    along well.
3        And I pulled Choi and myself
4    in the room, and we discussed the events
5    of the meeting.  And at that time, Choi
6    cried and said, Jason, Rob and I did
7    nothing wrong.  It's H.I. Kim that should
8    apologize.  So we went over the whole
9    spiel with what happened in the meetings.
10    He went over and talked to President
11    Ahn.
12 Q.  Who went over and talked to President
13    Ahn?
14 A.  Jason Lee.
15 Q.  Did you sit in on any --
16 A.  Jae Rok Lee.
17 Q.  Did you sit in on any meeting between Mr.
18    Lee and Mr. Ahn?
19 A.  No.
20 Q.  How do you know whether he spoke with
21    Mr. Ahn or not?
22 A.  Because we left his conference room, and
23    he said he was going to go talk to the

46 (Pages 178 to 181)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 182

1    president.
2  Q. But you don't have any personal knowledge
3     as to whether or not he did, in fact,
4     speak to Mr. Ahn or not?
5  A. No, sir, I do not.
6  Q. Okay. Was Mr. Lee in attendance at the
7     Murakami meeting?
8  A. Jason Lee?
9  Q. Yes.
10 A. CFO? No, sir.
11 Q. I notice there was a telephone
12    conversation between you and Mr. Choi
13    that you recorded.
14 A. Um-hum.
15 Q. Other than that conversation, did you
16    have any other conversations with Mr.
17    Choi after the Murakami meeting other
18    than what you mentioned to me today?
19 A. I don't believe so, no, sir.
20 Q. Who -- who was it that told you that
21    there was a request to stay late and
22    prepare --
3  A. Harry Chase.

Page 183

1  Q. Okay. Did he ask you to do the same, to
2     prepare a statement too?
3  A. Harry Chase, I called him Friday night,
4     and he was still at work. And he was
5     kind of like, you know, I can't believe
6     you are still here. Well, what are you
7     doing? He said, I'm writing meeting
8     minutes. They won't let us leave until
9     we finish the meeting minutes.
10       I mean, H.I. Kim instructed
11    him to do it. He reported to H.I. Kim.
12    H.I. Kim only asked his direct reports
13    and myself and Choi and one other -- two
14    team members in parts development to
15    write meeting minutes.
16 Q. Okay. How -- how did you learn of the
17    request by H.I. Kim?
18 A. Mr. -- Mr. Choi told me about it through
19    Mr. Hyun. When we came back, we met with
20    Hyun and Mr. Choi. H.J. Hyun, my boss.
21 Q. Okay. That -- was that the afternoon
22    after the meeting?
3  A. Yes.

Page 184

1  Q. What do you recall Mr. Hyun saying in
2     that meeting?
3  A. He wanted to understand what happened,
4     and we told him, you know, that we didn't
5     understand why he got so adamant, that
6     all parties involved in the meeting
7     understood what the -- the -- what the
8     status of the parts were. And he said,
9     Well, you need to write meeting minutes.
10    That was the main message.
11 Q. Okay. Did he give you any indication
12    about Mr. Kim was upset?
13 A. I don't -- I think he had talked to
14    somebody, but I don't -- I can't really
15    tell you if he gave me an indication. I
16    think that he felt that Mr. Kim was
17    upset.
18 Q. Okay. You don't remember exactly what
19    was said, but he conveyed that?
20 A. Yeah. I mean, that's why we were -- I
21    had to get back to my desk right now.
22 Q. So why did you not draft your statement
23    up that night?

Page 185

1  A. Because I was in multiple meetings and,
2     you know, I did it as soon as I had the
3     opportunity to do it.
4  Q. Okay. Do you recall when it was that you
5     met with Mr. Duckworth at the -- I'm
6     sorry -- at the --
7  A. City Grill?
8  Q. Yes.
9  A. When did he request the meeting? It was
10    on Saturday. It was on the 22nd. I
11    don't have my calendar in front of me.
12 Q. Of October?
13 A. The 22nd? I'm sorry. I believe so. Is
14    that a Saturday?
15 Q. Okay.
16 A. Is that a Saturday? I'm sorry.
17       MR. BOSTICK: Let me show you your
18       actual notes. What was our
19       last -- 14.
20       MR. STOCKHAM: 14.
21       (The referred-to document was
22       marked for identification as
23       Defendants' Exhibit No. 15)

47 (Pages 182 to 185)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

---

Page 186

```
 1   Q.  (By Mr. Bostick) Can you identify Exhibit
 2       15 for me?
 3   A.  I have to read it.  I haven't seen this.
 4       Okay.
 5   Q.  Tell me -- tell me what this document is.
 6   A.  It just looks like notes.  It starts out
 7       with, Received call from Keith Duckworth
 8       at 3:31 p.m.  No. 1, received call from
 9       Keith's cell.
10   Q.  What does that say, took BP 9:15?
11   A.  Blood pressure.
12   Q.  Okay.  Who is Judy's cell?
13   A.  She's an attorney.
14   Q.  Does she work with Kay Dickey?
15   A.  I think she's just an acquaintance.  Judy
16       Bargainnear (sic), she did my divorce.
17       She was my attorney representing me.
18   Q.  Is that saying that you called her?
19   A.  I telephoned Judy, 8:05.  She will
20       telephone tomorrow.  Kay, Kathleen, she
21       will telephone tomorrow.  Kay, Kathleen
22       Dickey, 462-0835.  Jimmie Jacobs -- that
23       must be another partner or somebody I
```

Page 187

```
 1       never spoke to.  I don't think I spoke to
 2       Mr. Jacobs.
 3   Q.  What's this say, restless, astonished?
 4   A.  Uh-huh.
 5   Q.  Severe headache?
 6   A.  Um-hum.
 7   Q.  What does that mean?
 8   A.  How I felt.
 9   Q.  Okay.
10   A.  You've got to remember: I'm doing --
11       having my blood pressure medication
12       changed with my doctor and the other
13       Lipitor stuff, and 162 over 121 is not --
14       not good.
15   Q.  I notice in the -- in the tape-recorded
16       conversations, it sounds like the first
17       suggestion, that there may be problems
18       with Lipitor.  In the tapes, at least,
19       there's a conversation with Greg Kimble
20       talking about --
21   A.  Um-hum.
22   Q.  -- his sister-in-law.  Is that what
23       prompted you to go inquire of your doctor
```

Page 188

```
 1       if that was a possibility, or had you
 2       already discussed that?
 3   A.  No.  I'd already discussed it with him.
 4       It's a statin drug, Crestor and Lipitor,
 5       and that's one of the main side effects
 6       is flu-like symptoms.
 7   Q.  Did you ever get diagnosed with mono
 8       during that period of time?
 9   A.  I think one doctor felt that it might be,
10       but I think the mono test came back
11       negative.
12   Q.  So, let's look at the next paragraph.
13       Can you read this for me --
14   A.  Yeah.
15   Q.  Starting with H.I. --
16   A.  Yes.  When H.I. threw his fit and went to
17       Keith Duckworth, Keith D., and explained
18       the situation and threats of firing from
19       Mr. Choi, he said, Don't give it another
20       thought.  Nothing will come of it.  Told
21       him specifically the work environment was
22       hostile.
23   Q.  Okay.  So this is -- I guess, are you
```

Page 189

```
 1       talking about your first conversation
 2       with Duckworth after the meeting?
 3   A.  Yes.
 4   Q.  What -- what specifically did you tell
 5       Keith about this?
 6   A.  I went to him and said that -- told him
 7       about the meeting and told him that
 8       things seemed to be, you know,
 9       escalating.  And I got the call from Choi
10       about he and I going home early.  And
11       Keith reassured me, I haven't heard a
12       thing.  And, you know, Don't give it
13       another thought.  Kind of just blew it
14       off.
15   Q.  Okay.  Anything else you recall telling
16       him?
17   A.  Telling him?
18   Q.  Yes.
19   A.  No.  Just the facts of what happened that
20       day.
21   Q.  When you say, I told him specifically the
22       work environment was hostile, what
23       specifically did you tell him?
```

48  (Pages 186 to 189)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

---

Page 190

1  A.  Well, I mean, this meeting with H.I. Kim
2      was very hostile and very, you know,
3      throwing papers, and grown men doing that
4      and walking out of the room twice.  And
5      it was very embarrassing and not the
6      environment that I'm used to in my
7      past -- past employers.  And, you know,
8      it was a hostile environment.
9  Q.  Okay.
10 A.  Especially with someone calling you
11     saying you will probably be fired
12     today.
13 Q.  And then read the next --
14 A.  The second time after Choi requested me
15     to write meeting minutes for Murakami
16     meeting, I again went to Keith Duckworth,
17     Keith D. and told him, to my surprise,
18     things seemed to be escalating.  Told him
19     that Choi, Jason Lee -- he's the CFO --
20     and all in meeting thought nothing was
21     wrong or inappropriate except for H.I.
22     Kim's rage and two tantrums.  I told him
3      I was worried about retaliation from H.I.

---

Page 191

1      Kim since his reputation is vengeful.  He
2      again reassured me that nothing would
3      come of it.  It's just the Hyundai style
4      way of operating.  He said, Don't worry
5      at all and have a nice weekend.
6  Q.  Okay.
7  A.  Okay.
8  Q.  Anything else that you recall in your
9      second conversation with Duckworth other
10     than -- than what you put there?
11 A.  Nope.
12 Q.  Okay.  Next looks like Harry --
13 A.  Yeah.
14 Q.  -- Chase.
15 A.  Harry Chase phoned me approximately 7:00
16     p.m.  Said he was still at work, because
17     H.I. Kim ordered his direct reports to
18     make meeting minutes of what occurred in
19     Murakami meeting.  Approximately 12 team
20     members.  He did not request other
21     attendees except for Choi and myself to
22     knowledge approximately -- approximately
3      30 people in attendance.  Told Dave Mark

---

Page 192

1      of all occurrences, including two
2      meetings with Keith Duckworth and about
3      hostility and retaliation.
4  Q.  Who's Dave Mark?
5  A.  He's one of my managers.  Was.
6  Q.  You called Dave Mark, and you say -- you
7      say you told him about two meetings --
8  A.  Um-hum.
9  Q.  -- with Duckworth.
10 A.  Um-hum.
11 Q.  And what did you say specifically about
12     hostile and retaliations?
13 A.  Well, you know, the first -- I wanted to
14     make it clear and have somebody else
15     aware that what I had indicated to
16     Duckworth about the hostility of the
17     meeting and the fear of retaliation.
18 Q.  Other than -- other than saying you were
19     concerned about retaliation from Mr. Kim,
20     did you tell Mr. Mark anything else on
21     that subject?
22 A.  No, he was aware.  I told him what
23     occurred in the meeting.

---

Page 193

1  Q.  I guess you said you'd heard that he had
2      a vengeful personality or words to that
3      effect?
4  A.  I don't think I told that to Dave.  I
5      think, you know, that's what we had been,
6      you know, convinced to fear this
7      gentleman from my Korean staff.
8  Q.  And then what -- on the third page, what
9      are these?
10 A.  Telephone Judy, 2:13 p.m.  There's the
11     number for the Dickey, McClanahan --
12     McClendan?  Complete the application --
13     these are, like, things to do.  Complete
14     the application for medical leave, FMLA.
15     Go ahead and post office this.  10-24,
16     telephone 11:18, text message, voicemail,
17     FMLA, telephone cardiologist, telephone
18     Ted Chung.  Assured me it's just their
19     style.  That was a Keith comment.  At the
20     bottom of the list is telephone Laura.
21 Q.  Who's Laura?
22 A.  She's one of the assistant staff we
23     talked about earlier in parts

---

49  (Pages 190 to 193)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

---

Page 194

1   development.
2   Q.   Did you actually speak to Ted Chung?
3   A.   No, I did.
4   Q.   What -- what was your intent in calling
5        him?
6   A.   Because he's the one who hired me.  He
7        was the one I was to report to.  And I
8        didn't know if he was going to talk --
9        discuss the situation with him.
10  Q.   Now, I notice in the telephone
11       conversation there was some back and
12       forth between you and Ms. McCormick over
13       the FMLA paperwork.
14  A.   Um-hum.
15  Q.   But it looks from that that there was
16       some lack of request for different
17       documentation or whatnot, and that -- but
18       ultimately you get your FMLA approved; is
19       that right?
20  A.   Yes, sir.
21  Q.   Okay.  I mean, and then it looks like --
22       do you dispute that you received all of
3        the FMLA leave you were entitled to?

Page 195

1   A.   No.
2   Q.   Okay.  You contend you were entitled to
3        additional FMLA?
4   A.   No.
5   Q.   Okay.  I may have --
6            MR. LEE:  I'm sorry.  I'm sorry
7            You said "Do you dispute."
8   Q.   (By Mr. Bostick) I'm sorry.  So you --
9        you -- you agree that once the issue was
10       resolved, you got all the FMLA leave you
11       were entitled to?
12  A.   Yes, sir.
13  Q.   Okay.  And you had written a letter in, I
14       think, saying that you disputed some of
15       the days that she had identified you
16       being absent.  And I believe
17       Mr. Duckworth sends a letter back saying,
18       We're going to give you ten days of
19       vacation.  Is that --
20  A.   Well, I don't think it was a ten-day
21       vacation gift.  It was, These areas are
22       gray, so to err on the safe side, we will
3        make it "X."

Page 196

1   Q.   I mean --
2   A.   That's okay.
3   Q.   Are you -- you don't have any claim in
4        this case of unpaid vacation that you
5        claim you are entitled to?
6   A.   No.
7   Q.   I'm trying to speed the process and
8        trying to figure out what we are really
9        here about.
10  A.   No.
11  Q.   I think for simplicity's sake, we might
12       want to just -- I realize you meet with
13       Mr. Duckworth on about the 22nd;
14       correct?
15  A.   Right.
16            (The referred-to document was
17            marked for identification as
18            Defendants' Exhibit No. 16)
19            MR. BOSTICK:  Did I give you one?
20            MR. STOCKHAM:  No.
21  Q.   (By Mr. Bostick) Can you identify Exhibit
22       16 for me, please.
23  A.   It's titled Formal Complaint.

Page 197

1   Q.   Did -- did you fax this to Duckworth?
2   A.   Yes.
3   Q.   Okay.
4   A.   Well, I faxed it to Ahn, Duckworth, Kim
5        and Kimble.
6   Q.   Okay.  Did you prepare this by
7        yourself?
8   A.   In conjunction with Rick -- Richard, my
9        attorney.  It was at his direction.
10  Q.   Okay.  I'm looking at the second full
11       paragraph.  You say that Mr. Duckworth
12       requested a dinner meeting with you.
13       When you say you had over 100 pages of
14       documentation, was this relating to your
15       medical condition?
16  A.   Um-hum.
17  Q.   What -- what specific type of
18       documentation?
19  A.   Releases from my angioplasty surgery,
20       medication, follow-up visits with
21       cardiologists, general practitioners.  I
22       had a whole notebook full of just, you
23       know, my health stuff.

50  (Pages 194 to 197)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 198

1 Q. Did you -- I mean, is this documents you
2     provided, since, to your attorney?
3 A. Yeah, I think so.
4 Q. Okay. Who is Michael Hansford?
5 A. He was the HMMA employee. He was a
6     manager of FTZ, foreign trade zone, and
7     logistics.
8 Q. Do you know what the circumstances were
9     that led to him leaving?
10 A. Not until he was fired. He was my
11     employee, and I didn't even know why he
12     was fired.
13 Q. Why was he fired?
14 A. He was fired because he said he had a
15     degree from a university, and he did
16     not.
17 Q. What university did he say he had a
18     degree from?
19 A. I have no idea. In the Virgin Islands or
20     something.
21 Q. What level degree was it that he said he
22     had?
3 A. I have no idea.

Page 199

1 Q. Had he represented to you during the time
2     he was at HMMA that he had that degree?
3 A. Yes.
4 Q. And then prior --
5 A. I'm sorry.
6 Q. Prior to the meeting, tell me about your
7     conversation with Mr. Duckworth on the
8     phone and what he said to you about the
9     meeting.
10 A. He called me out of the blue, first time
11     ever, you know, in like a -- I didn't get
12     calls from Keith Duckworth. And he said
13     that he was concerned about my health and
14     how I was doing, and he just wanted to
15     check on me. And, you know, let's go to
16     dinner tonight. And, you know, I was
17     feeling very poorly that day. And I was
18     just like, Well, what's going on here.
19     And he suggested we go to Cracker Barrel.
20        And I said, Well, if we're
21     going to discuss my medical issues, I'd
22     rather go someplace a little more
3     private. So that's how we ended up at

Page 200

1     City Grill. So, that's how -- you know,
2     it was purely under the pretense of, I
3     want to see how you are doing
4     healthwise.
5 Q. Was there any discussion about possible
6     performance concerns during the telephone
7     call?
8 A. No.
9 Q. Okay. And then, tell me about your
10     conversation with Mr. Hansford before you
11     meet with Mr. Duckworth.
12 A. There was no conversation with Mr.
13     Hansford before I meet with Mr.
14     Duckworth.
15 Q. Did you see him in the parking lot?
16 A. I saw him smoking outside City Grill.
17     There is a bar next called Next Door, and
18     that's what he was doing. He was with --
19     having dinner with his wife.
20 Q. He says that he asked you to meet
21     Mr. Duckworth?
22 A. Yes.
23 Q. And what specifically did he say --

Page 201

1 A. I think he was a little --
2 Q. -- he wanted to talk to him about?
3 A. I'm sorry. I think he was a little
4     frustrated about being terminated.
5 Q. And --
6 A. He wanted to talk about his treatment
7     from Wendy Warner, who was the HR
8     manager. I asked her about Mike's firing
9     and background check when -- after it
10     occurred. And she said, Well, we check
11     everybody's background. We call all
12     their universities. And that would put
13     it at hundreds, if not thousands, of
14     people.
15        They had a dispute when he
16     sold his house and bought his house. And
17     I think that they had sour grapes between
18     them from that point on. I honestly
19     think it was a, you know, witch hunt.
20 Q. He and Wendy Warner had problems?
21 A. Yes. Uh-huh. So there's no reason that
22     he would be singled out. Let's check his
23     credentials. He worked at Toyota. He

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 202

1  worked at Mercedes.  He worked -- he's
2  older generation.  He has 30 years
3  experience.  He set up the FTZ for
4  Hyundai.
5  Q.  So, you say that Duckworth asked us what
6  you-all knew about serious problems going
7  on at HMMA.
8        Then there's this mention
9  about [REDACTED] sleeping with his staff.
10  What -- what do you recall the discussion
11  being with regard to that?
12  A.  He asked us specifically if [REDACTED]
13  still sleeping with staff.
14  Q.  What was your response?
15  A.  And Mike -- I didn't respond.  Mike is
16  the one that -- [REDACTED] was sleeping with
17  the [REDACTED] whose
18  [REDACTED] works for Hyundai, works for [REDACTED]
19  So not only is it somewhat awkward that
20  he's sleeping with the [REDACTED] but
21  [REDACTED] works for [REDACTED]  So he asked
22  if that was still occurring.  When that
3  occurred in the parking lot in his

Page 203

1  company car of a bar, Michael Hansford
2  had firsthand knowledge of it.  I did
3  not.  I let him speak to it.
4  Q.  Did you have any prior involvement in any
5  investigations into whether [REDACTED]
6  was engaged in any inappropriate
7  behavior?
8  A.  Yes, with [REDACTED]  He asked me about
9  it.
10  Q.  Who -- who was the employee that was
11  involved with that?
12  A.  With what?  I'm sorry.
13  Q.  With [REDACTED]
14  A.  Who was the employee involved?
15  Q.  Was there a female employee that was
16  involved in that incident?  Who was that
17  person be?
18  A.  [REDACTED]  I don't know her
19  last name.  And I don't know the
20  [REDACTED] name.
21  Q.  Approximately when did that investigation
22  take place?
3  A.  I couldn't tell you.  I mean, that was

Page 204

1  probably -- probably a year prior to my
2  termination date.
3  Q.  Okay.  Do you know what the result of
4  that investigation was?
5  A.  The res- -- I mean, the result -- [REDACTED]
6  asked me if I would sign an affidavit on
7  when I heard from [REDACTED] and Michael
8  Hansford that [REDACTED] would be
9  gone.
10  Q.  What -- what had you said that you had
11  heard?
12  A.  [REDACTED]
13  [REDACTED]
14  [REDACTED]
15  [REDACTED]
16  [REDACTED]
17  [REDACTED]
18  [REDACTED]
19  [REDACTED]
20  [REDACTED]
21  [REDACTED]
22  [REDACTED]
23  [REDACTED]

Page 205

1  Q.  So you weren't -- didn't have any
2  personal knowledge that night about
3  this?
4  A.  No, I was home.
5  Q.  But you had heard that from Hansford?
6  A.  I heard that from Hansford, from [REDACTED]
7  [REDACTED] from [REDACTED], from [REDACTED]
8  [REDACTED] -- I mean there -- I don't know the
9  total number, but there were probably 10
10  to 15 Hyundai employees.
11  Q.  And then --
12  A.  [REDACTED]
13  [REDACTED]
14  Q.  And then [REDACTED] asked you to provide an
15  affidavit?
16  A.  To sign the affidavit.
17  Q.  Did you sign the affidavit?
18  A.  No.
19  Q.  Is that when you said words to the effect
20  of, [REDACTED] got a family, and you don't
21  want to cause him to lose his job.
22  A.  I didn't -- I did say that, but I didn't
23  have direct knowledge of it.  And when --

52 (Pages 202 to 205)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 206

1    it even was brought up to my Korean
2    colleague, ████████who was also a
3    ████████████. And he
4    said, Rob, you know, what do you think
5    about it?
6              And then he said -- I said,
7    I don't know. What do you think about
8    it? He said, Oh, good strong man. ██
9    ████████████████████
10   ████████
11 Q.  That's what your interpretation was from
12     Keith?
13 A.  No, he told me directly.
14 Q.  Who said that?
15 A.  ████████████
16 Q.  That's a little bit racist, isn't it, to
17     assume that every Korean that works in
18     that plant has the same --
19 A.  Well, that's -- that's --
20 Q.  Is that your testimony that what one
21     Korean person told you in that plant is
22     the collective mentality of every Korean
3      there?

Page 207

1  A.  Absolutely not.
2  Q.  Okay. Did I not just hear you say that,
3      that that was the Korean -- I'm just
4      going to --
5  A.  No. He said, Good strong man.
6  Q.  Okay. So you have one person telling you
7      that.
8  A.  That's not a Korean. It's his own
9      opinion.
10 Q.  Okay. Okay. Did you ever have any
11     conversations with Mr. Ahn or Mr. Kim
12     about any of these issues with██████
13
14 A.  There weren't there at the time.
15 Q.  Did you ever have any conversations with
16     ████████about the fact that you'd
17     been asked to give an affidavit?
18 A.  No. ████████████████████
19   ████████████████████████
20   ████████████████████████
21   ████████████████████████
22   ████████████████████████
3    ████████████████████████

Page 208

1   ████████ So he apparently wasn't too
2   distracted by the actions from Hyundai or
3   lack of action.
4  Q.  But you don't know what specific action
5      was taken?
6  A.  I mean -- no.
7  Q.  Okay. Did there -- was there any --
8      next, he says he asked you about other
9      concerns, such as kickbacks. What do you
10     recall the conversation being with regard
11     to kickbacks?
12 A.  He mentioned specifically about -- I
13     think it's ████████-- were we aware of
14     any kickbacks taking place between
15     construction suppliers and ████████,
16     ████████. And I'd never heard that from
17     anybody. So --
18 Q.  Okay. You didn't have any personal
19     knowledge about kickbacks?
20 A.  I never heard anything about that, no. I
21     never heard anything.
22 Q.  Had you ever, prior to November 6th, gone
23     and reported some possible kickbacks or

Page 209

1    financial --
2  A.  No.
3  Q.  -- improprieties?
4  A.  Not at all.
5  Q.  Okay. Any other issues that you recall
6      being discussed while Mr. Hansford was
7      still there in the meeting?
8  A.  Keith really grilled us for 45 minutes,
9      you know, and he did it under the false
10     pretense of We're going to make this
11     company better, and -- you know, trying
12     to get all the information out, and we're
13     going to correct these things. And we
14     agreed that a lot of the things were
15     unacceptable behavior. So Mike talked,
16     I'd say, 95 percent of the time.
17 Q.  Okay.
18 A.  I wasn't feeling well. I just wanted to
19     get on with the evening.
20 Q.  And so, I mean, did Mr. Hansford take the
21     opportunity to complain about his own
22     personal situation, his termination?
23 A.  Yes.

53 (Pages 206 to 209)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

---

Page 210

1  Q.  Okay.  And what was his complaint in that
2      regard?
3  A.  That he was witch-hunted.
4  Q.  By Wendy Warner?
5  A.  Yes, sir.
6  Q.  Did he admit to Mr. Duckworth, though,
7      that what he had represented on his
8      resume was not true?
9  A.  Yes.
10 Q.  Okay.  You said he -- Mr. Hansford
11     mentioned about 95 percent of the issues
12     and you about five percent.  Just tell me
13     what specific issues you recall bringing
14     up, if any.
15 A.  I don't think I brought up any issues.
16     We brought up -- like the only thing I
17     remember bringing up was the workplace
18     violence where Korean colleagues were
19     hitting and kicking other Korean
20     colleagues and the American colleagues
21     without any repercussions --
22 Q.  What --
3  A.  -- and other suppliers.

---

Page 211

1  Q.  What specific incidents were you
2      referring to on that?
3  A.  There was a Korean gentleman in the plant
4      who kicked a team member, an Alabama
5      employee.  I don't know where he's from.
6      And the gentleman went to human
7      resources, and he didn't retaliate.  And
8      they said, Yes, that's inappropriate
9      behavior.  And they pretended to send the
10     guy back to Korea.  They took him to the
11     airport, gave him a suitcase, and then he
12     went back in the car and went to a sister
13     supplier, Mobis.
14 Q.  Who is the person who was allegedly sent
15     back to Korea?  What's his name?
16 A.  I don't have his name.  I can get it.
17 Q.  Did he work in your department?
18 A.  No, nothing to do with that.
19 Q.  Did you have any personal knowledge
20     regarding that situation?
21 A.  No.
22 Q.  Okay.  At what period of time did that
3      incident occur?

---

Page 212

1  A.  I don't know.  I mean, I can look at -- I
2      don't have a copy.  I don't think I wrote
3      it down.  It was just what we heard that
4      had happened.  And then the guy did show
5      up at the supplier, you know.  We found
6      him out at the supplier's, at Mobis,
7      which is owned by Hyundai.
8  Q.  Is this -- do you think it's more or less
9      than a year prior to your termination?
10 A.  Probably more than a year.
11 Q.  Okay.  So we don't know that person's
12     name, though?
13 A.  I'm sure human resources has that.
14 Q.  But you personally don't recall?
15 A.  No, sir.
16 Q.  And then, were you interviewed by human
17     resources as part of any of that
18     investigation?
19 A.  No.  There was an investigation.  There
20     was a general meeting with Keith when he
21     came to Alabama as a deputy president.
22     And again, it was what difficulties he
23     had been reported in Alabama, you know,

---

Page 213

1      what can we make improvements on.
2          There was also a meeting
3      with the Korean colleagues that came over
4      from the legal staff and also interviewed
5      all the directors and other team members,
6      you know, about this type of workplace
7      violence events.
8  Q.  These are meetings that you're involved
9      with personally?
10 A.  Yes.
11 Q.  Okay.  My question is:  Other than when
12     you met with ▓▓▓▓▓▓▓ with regard to the
13     ▓▓▓▓▓▓▓ situation, was there another
14     investigation conducted by human
15     resources or Team Relations where you
16     were interviewed?
17 A.  No.
18 Q.  Okay.  Were there other instances of
19     workplace violence that you brought up
20     with Mr. Duckworth during your meeting?
21 A.  Not in that meeting.  But there were
22     subsequent to that -- or prior to that.
23     I'm sorry.  Prior to that.  Prior to the

---

54 (Pages 210 to 213)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 214

1    City Grill dinner, we discussed about
2    workplace violence issues -
3  Q.  Okay.
4  A.  -- on a one-on-one basis.
5  Q.  Other than this one incident you've
6    referred to, is that the only one that
7    you recall being discussed in the
8    specific meeting that you had on October
9    22nd?
10 A.  On the 22nd?
11 Q.  Right.
12 A.  No, like I said, the other ones were
13    discussed prior to that.
14 Q.  Okay.  That was the only one you
15    mentioned on the 22nd.
16 A.  Yes.
17 Q.  Any other workplace violence issues you
18    brought up?
19 A.  Ever?  Or during the meeting?
20 Q.  During the 22nd.  I'm focusing on that
21    right now.
22 A.  No.  I don't think so.  No.
3  Q.  Then, were there any other issues that

Page 215

1    you brought up at the plant other than
2    that workplace violence issue during the
3    October 22nd meeting?
4  A.  Like I said, I wasn't feeling well.  I
5    didn't speak hardly at all.  I thought we
6    were there to go over my medical stuff.
7    MR. STOCKHAM:  Did you ask him at
8      the plant or at the meeting?
9    MR. BOSTICK:  In the meeting on
10      the 22nd.
11    MR. STOCKHAM:  So the -- your
12      question is on the meeting on
13      the 22nd?
14    MR. BOSTICK:  Yes.
15    MR. LEE:  He said any issues at
16      the plant that he discussed
17      with him in the meeting.
18    THE WITNESS:  That's okay.
19    MR. STOCKHAM:  I just want to make
20      sure it was not just limited
21      to what was in the meeting on
22      the 22nd.
  Q.  (By Mr. Bostick) I'm just trying to pin

Page 216

1    down what exactly you communicated with
2    Duckworth on this meeting on the 22nd.
3  A.  You know, my -- my whole dinner
4    experience with Duckworth, you know,
5    nothing came up about anything other than
6    30 seconds of him looking at my medical
7    information to him at the meeting.  I
8    remember he said, Rob, do you want
9    dessert?  And I said, No, thank you.  I
10    don't care for dessert.  He said, Go
11    ahead; get a dessert.  And I said, Okay.
12    And I got something, and he got
13    something.
14      And when dessert came, he
15    said, Well, Rob, the executive management
16    at Hyundai is unhappy with you and they'd
17    like you to resign.  That was the first
18    indication ever from the company period
19    at any level of any problems.
20      And I said, Who is executive
21    management?  And he stumbled around, and
22    he said, President Ahn.  I said, You
23    know, I've only spoken to that gentleman,

Page 217

1    hi, bye, to the bathroom and in the
2    hallway.
3      And I said, we -- You're
4    aware of the H.I. Kim situation, and you
5    said, Don't worry about it.  That's just
6    the behavior that we see in Hyundai's
7    management style.
8      And then he stumbled around,
9    and he said, and -- and -- and Rick Neal.
10    I said, Rick Neal?  I said, Rick and I
11    have a great rapport.  We work together.
12    We help each other.  We like each other.
13      I said, Let's call Rick
14    right now.  And he says, No, no, no, not
15    Rick Neal, not Rick.  He retracted that
16    statement.
17      And then by the end of the
18    dinner, by the end of the conversation, I
19    said, Well, this is just surreal to me,
20    you know.  I said, Is there anything we
21    can do?  And, you know, This is the first
22    I've heard of anything.  He goes, It's --
23    it's done.

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

---

Page 218

1           And he -- I walked out to my
2   car and drove home to my rental house
3   with no job now and going through a
4   divorce and heart problems. And, I mean,
5   it was just a stellar evening.
6   Q.   Did Mr. --
7   A.   Oh, let me -- let me say one more thing.
8        Oh, he said at the end -- he said, Well,
9        Rob, it's not me. When I said, you know,
10       Who is executive management? What -- is
11       there any recourse? He's like, It's not
12       me, you know. He -- he's being directed.
13  Q.   Well --
14  A.   And it's not Rick Neal, and it's not Ahn,
15       because I didn't speak to him. So it
16       must be H.I. Kim.
17  Q.   Well --
18  A.   Even though I went to him twice and he
19       said, Oh, don't give it another
20       thought.
21  Q.   That's going to Duckworth?
22  A.   Right. This is Duckworth in the
3        meeting.

---

Page 219

1   Q.   You never went to Mr. Kim and spoke to
2        him after the meeting; is that correct?
3   A.   No.
4   Q.   Okay. After the Murakami meeting, you
5        never spoke with him?
6   A.   No, sir.
7   Q.   Did Mr. Duckworth say specifically what
8        Mr. Kim was upset about?
9   A.   Not at all.
10  Q.   Did he mention the Murakami --
11  A.   He said, the executive --
12  Q.   -- meeting?
13  A.   No. He said, the executive management at
14       Hyundai is upset with you, and they would
15       like you to resign.
16            Believe me, I have said this
17       statement in my interviews when they ask,
18       Why did you leave Hyundai? So I know the
19       story very well. It's a tremendous black
20       mark on my career in which I have never
21       had a blemish.
22  Q.   Did Mr. Duckworth bring up the idea of a
         severance package in that meeting?

---

Page 220

1   A.   He did.
2   Q.   What was discussed about that?
3   A.   He said that it was already a done deal
4        and for me to go home and think of a -- I
5        don't know if he said compensation or
6        severance -- my head was kind of swimming
7        at that point -- severance package and
8        then we'll talk again. I can't remember
9        the date.
10            But I received a letter, I
11       believe, a few days afterwards,
12       indicating not to come to the plant and
13       so forth, not to represent myself as a
14       Hyundai employee.
15  Q.   Look for me, if you would, on Page Bates
16       No. 44.
17  A.   Okay.
18  Q.   You say, Between -- do you see the
19       paragraph that says, Between the
20       September 16th, 2005 -- I guess that's
21       the meeting -- dinner meeting with Mr.
22       Duckworth -- I had no further meetings
23       with Mr. Kim or Mr. Ahn. Is that a true

---

Page 221

1        statement?
2   A.   Um-hum, yes.
3   Q.   You said, A few weeks prior to that,
4        however -- are you saying a few weeks
5        prior to your meeting with Duckworth or a
6        few weeks prior to the September 16th
7        meeting?
8   A.   One second, please. This was prior to
9        the Murakami meeting.
10  Q.   Okay.
11  A.   Like I said earlier, when they brought
12       people in from Korea and when Duckworth
13       arrived in Alabama and wanted to meet
14       with the directors individually to
15       verify, correct, the improprieties that
16       they had heard were occurring at
17       Hyundai.
18  Q.   So this was an issue Mr. Duckworth
19       requested?
20  A.   Yes.
21  Q.   Okay. Approximately when did that
22       meeting take place?
23  A.   Well, I don't know when Keith came here

---

56 (Pages 218 to 221)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 222

1    as deputy president. I think it was the
2    summer of 2005.
3  Q.  Okay.
4  A.  So then -- and then, after he'd been
5    here, I would say, a month or so, the
6    individuals came in from Korea, the
7    attorneys and some other -- I can't
8    remember their title. But they spoke
9    English very well, and they wanted to
10   hear exactly what had been happening.
11   And that's how, I think, this list was
12   generated.
13 Q.  Okay. And I'm looking at Bates No. Page
14   60 through 62.
15 A.  Um-hum.
16 Q.  Is that a document you prepared?
17 A.  No.
18 Q.  Who prepared that?
19 A.  I have no idea. It was in my in-box.
20 Q.  Okay.
21 A.  It's written -- it seems to me it's
22   written in Korean and English. It
3    doesn't sound -- you know, I can only

Page 223

1    guess.
2  Q.  Do you know whose handwriting this is?
3  A.  That's my handwriting.
4  Q.  In the black pen?
5  A.  That's my handwriting.
6  Q.  Who all was in attendance at this
7    meeting?
8  A.  Which meeting?
9  Q.  This one we've got from.
10 A.  I have no idea what these meeting minutes
11   are from.
12 Q.  You don't know?
13 A.  No. They appeared in my box.
14 Q.  Well, you attached this as --
15 A.  I showed it to Richard when we had the
16   consultation, and he draft- -- told me
17   to --
18      MR. STOCKHAM: Don't -- don't --
19 Q.  (By Mr. Bostick) Don't tell me what he
20   said.
21 A.  Okay.
22 Q.  So is that an incorrect statement in the
     letter when you say, The minutes of this

Page 224

1    meeting are attached?
2  A.  The meeting of the minutes is the
3    Murakami minutes pages. They're Murakami
4    meeting minutes.
5  Q.  So you don't know what meeting is being
6    referred to when it talks about a meeting
7    with Duckworth?
8  A.  Where are you, sir?
9  Q.  I'm -- I'm back on Bates No. 44.
10 A.  Okay.
11 Q.  This paragraph refers to a meeting.
12 A.  Which paragraph?
13 Q.  It says, Between the September 16th,
14   2005.
15 A.  A few weeks prior to that, however, I met
16   with Mr. Duckworth and reported, among
17   other things, about executives involved
18   in sexual harassment and other
19   misconduct.
20      What's your question? When
21   was it did this occur or --
22 Q.  Keep reading the whole paragraph.
23 A.  Okay. -- and misconduct with employees

Page 225

1    about safety issues, because workers were
2    not following safety policies, and the
3    discriminatory treatment given to
4    American managers and workers who were
5    treated less favorably than the Korean
6    managers. I am enclosing a copy of the
7    meetings of that -- minutes of that
8    meeting.
9       These meeting minutes, I
10   don't feel, were ever intended to be
11   distributed to anybody but between
12   Duckworth and Korea. So how they ended
13   up in my box, I have no idea.
14 Q.  Do you know how --
15 A.  But some of the --
16 Q.  -- they got attached to your letter?
17   That's my question.
18 A.  I'm sorry?
19 Q.  Do you know how they got attached to your
20   letter here?
21 A.  Because I showed Richard documents that I
22   had about this case, and this is the one
23   that he suggested.

57 (Pages 222 to 225)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

<table>
<tr><td>

Page 226

1　　MR. STOCKHAM: Don't tell him what
2　　　we talked about.
3　　THE WITNESS: Okay. Well, then I
4　　　can't tell you then.
5　Q. (By Mr. Bostick) So do you know if these
6　　meeting minutes, Bates No. 60 through
7　　62 --
8　A. Um-hum.
9　Q. -- are minutes of a meeting you're
10　　referring to in this paragraph on 44?
11　A. The elements within these meeting
12　　minutes, the bullet points and the topics
13　　discussed, were discussed with myself,
14　　Keith Duckworth and the gentleman from
15　　Korea that came over. Some of these
16　　were. Some of these weren't ever talked
17　　about.
18　Q. Okay.
19　A. So I think this is a compilation of all
20　　directors' inputs on -- this is my
21　　guess -- after the meetings with
22　　Duckworth and the Korean colleagues on
3　　things that we needed to correct.

</td><td>

Page 228

1　A. So when we had -- I had the meeting with
2　　the Korean colleagues, it went from,
3　　Okay, Rob, you go from this conference
4　　room to this conference room where Mr. X
5　　from Korea is residing. So there was
6　　never a time where all three of us worked
7　　together.
8　Q. So the second meeting Mr. Duckworth is
9　　not involved in.
10　A. He's involved in the first part.
11　Q. The first meeting?
12　A. He's involved in the second -- there's
13　　two meetings with Duckworth.
14　Q. Okay.
15　A. And then Keith's like, Well, this is
16　　interesting what you had to say. I'd
17　　like you to tell our Korean colleagues
18　　this also.
19　Q. Okay.
20　A. So he walked me to the room, and he said,
21　　This is Mr. X, Y, Z. He walked -- he
22　　introduced me, and he walked away.
23　Q. Okay. Do you know what that person's

</td></tr>
<tr><td>

Page 227

1　Q. Okay. When -- looking at Paragraph 44,
2　　you are saying you had a meeting with
3　　Duckworth.
4　A. Yes.
5　Q. Okay. And you're saying here that's
6　　sometime before the Murakami meeting;
7　　right?
8　A. Yes.
9　Q. Tell me by name who you specifically
10　　recall being in that meeting other than
11　　you and Keith Duckworth.
12　A. That's it.
13　Q. Okay.
14　A. He then said -- there were two meetings.
15　　The Duckworth when he arrived in
16　　Alabama.
17　Q. Okay.
18　A. Then there was a meeting where -- a
19　　Duckworth meeting, and then he referred
20　　me to the Korean colleagues that were
21　　invisible that wanted to be updated
22　　directly on this.
3　Q. Okay.

</td><td>

Page 229

1　　name is, or job title?
2　A. He was an attorney for Hyundai --
3　Q. Okay.
4　A. -- my understanding, from Korea. He was
5　　a Korean colleague. He spoke in
6　　exceptional English. He did a good
7　　job.
8　Q. So the meeting minutes -- or notes that
9　　are attached are not notes that you
10　　prepared?
11　A. Absolutely not.
12　Q. And you don't know if these relate to the
13　　first meeting or the second meeting;
14　　right?
15　A. Or a meeting with me, with Kalson, with
16　　Greg Kimble, with Rick Neal, or all four
17　　or some part thereof.
18　Q. Okay. So, the Duckworth meeting was with
19　　directors from all areas when he gets
20　　there?
21　A. Um-hum.
22　Q. Okay. So there was a similar meeting
23　　between he and you and who else?

</td></tr>
</table>

58　(Pages 226 to 229)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 230

1  A.  All four directors, again.
2  Q.  Tell me who those are.
3  A.  Rick Neal.  There's only four directors.
4  Q.  And Rick Neal is over what?
5  A.  Legal.
6  Q.  Okay.
7  A.  And IT, I think, at the end.
8  Q.  Greg Kimble?
9  A.  Is over human resources.
10  Q.  John Kalson?
11  A.  He's over production.
12  Q.  Okay.
13  A.  And myself over purchasing.
14  Q.  You mentioned earlier John Kalson -- you
15      said that he must not understand
16      Hyundai's production system, and he was
17      the head of the production department?
18  A.  He was.
19  Q.  I mean, did you feel like you had
20      superior knowledge than him about the
21      production operation there?
22  A.  Not superior.  Just perhaps different
23      approaches.  Just different ways to get

Page 231

1      from A to B.
2  Q.  But, I guess, if there's a production
3      issues, that's going to be a decision for
4      him to make and not you?
5  A.  If there's a production issue?
6  Q.  Yeah.
7  A.  Typically, yes; that's correct.  We --
8      you need to understand --
9  Q.  Go ahead.
10  A.  -- we have written policies and
11      procedures how production is to take
12      place.  So, all parties should be aware
13      of that.
14  Q.  Look -- let's look at these meeting
15      notes, Bates No. 60.
16  A.  Okay.
17  Q.  It says, Internal investigation will be
18      done for wrongdoing with the executive
19      side.  If the rumors (financial payment
20      being made by supplier or other sexual
21      services may be provided) are true, the
22      action must take now.
23      Do you know what that is

Page 232

1      referring to?
2
3  A.  Yeah, you know, it sounded to me the only
4      sexual indiscretion I was aware of at the
5      company was with            .  And that
6      was to notify Richard.  These are notes
7      for Richard.
8  Q.  Okay.  And then, Really mainly barely.
9  A.  Yes, that's what I said.  Sorry.
10      We need to force vendors to
11      keep price low.  Enforce rules equally.
12      I really can't tell you what
13      that was: Really mainly fairly.  That
14      doesn't make sense to me, but that is my
15      writing.
16  Q.  So what do you -- what do you recall
17      telling Mr. Duckworth during your meeting
18      with him when and -- he arrives at the
19      plant and he's trying to figure out what
20      the issues are?
21  A.  We talked about -- That is, the ones that
22      I can recall as of today.  I don't think
23      I'm going to encompass them all.

Page 233

1      We talked about there's a
2      major problem with the Korean colleagues
3      and the American colleagues being on two
4      separate teams; that we're not included
5      in meetings; that we need a go-to to
6      conduct our jobs correctly.
7      We were asking repeatedly to
8      Korean management, please include us.
9      We'd always hear, We will start this, you
10      know, at the next launch.  We'll start
11      this in January.  We'll start including
12      you in May.  You know, these type of
13      push-offs, or the excuse would be, It
14      would take us too long to go through the
15      meetings if we have to do them in
16      English.
17      So we had really two
18      distinct teams:  You know, the Korean
19      colleague team that wanted to conduct
20      business the way they did it in Korea
21      both on the ethical business cultural
22      fashion; and then people that understood
23      American business practices that we hired

59 (Pages 230 to 233)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 234

1    locally that wanted to do it the same way
2    Ford or GM or Toyota would do it.  So
3    that -- that was a problem.
4            We talked about the violence
5    in the workplace.  I mentioned the
6    kicking of the line worker.  One of my
7    employees was kicked by my -- ████████
8    ████████████████ until he was in the
9    fetal position in the conference room.
10   And that was in front of my American
11   colleagues.  So they were a little
12   disconcerned (sic) with ████████
13   behavior.  That was to ████████
14   Let's see.
15 Q.  Who was the kicker, and who was the
16   kickee?
17 A.  ████████████████████ the one
18   that ████████████ That one.
19
20 Q.  And who was kicked?
21 A.  ████████ He worked for ████████
22   He was an equal with ████████ They
3    were both -- the fight started in the

Page 235

1    cubicle and then went into a conference
2    room where he proceeded to kick him until
3    he laid on the ground in front of ████
4    ████
5            And let's see.  KPMG, we
6    gave them approximately $10 million to
7    conduct a contract for SAP system
8    orientation.
9 Q.  Before you move on that.  Let me just --
10   you know, did you personally witness any
11   of this incident with ████████
12 A.  I did not.
13 Q.  Okay.
14 A.  But my people came to me with concern
15   and, What is going on here?  Is this what
16   we're to expect, you know.
17 Q.  Did you -- did you report that on to Team
18   Relations?
19 A.  I reported that on to Team Relations and
20   to Greg Kimble.
21 Q.  And do you know if there was an
22   investigation on it?
3 A.  I don't know.

Page 236

1 Q.  Okay.  Do you know if anything happened
2    to ████████ after that?
3 A.  I don't know.  I mean, ████████
4    ████████
5 Q.  Okay.
6 A.  ████████████████████
7 Q.  But you know Mr. Kimble --
8 A.  Was aware of it, was advised.
9 Q.  And to your knowledge, it was
10   investigated by Team Relations?
11 A.  They said they would take care of it,
12   yes.
13 Q.  Okay.  Were you ever interviewed?
14 A.  No.
15 Q.  But you didn't personally witness any of
16   this?
17 A.  No, sir.
18 Q.  Do you know if any of the people that you
19   said had witnessed it spoke to Team
20   Relations?
21 A.  I don't know.  I mean, the only one that
22   I know that witnessed it personally was
23   ████████████  And she worked for

Page 237

1    ████████████  So she saw ████████ get
2    kicked, you know, down to the fetal
3    position.
4 Q.  Do you know if she was interviewed?
5 A.  I don't know.
6 Q.  Did she speak to anybody in Team
7    Relations?
8 A.  I don't know.
9            THE VIDEOGRAPHER:  You have three
10           minutes on this tape.
11 Q.  (By Mr. Bostick) Did you prepare any
12   documentation for your meeting with Mr.
13   Duckworth?
14 A.  No.
15 Q.  Okay.  You said the next item you were
16   talking about was the SAP issue.
17 A.  Yes.  We had a contract with KPMG, who
18   later became BearingPoint, a consulting
19   firm, and they had a meeting with -- an
20   update meeting with the Korean colleagues
21   on the IT framework.  And this was
22   reported to me by the BearingPoint's
23   project manager.

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 238

1    And she said that they were
2  in discussions. One of the Korean
3  colleagues didn't like one of the status
4  reports, and they reached across the
5  conference table and punched the one of
6  the BearingPoint gentleman in the face.
7  He got up and walked down the hall, and
8  the Korean gentleman, the Hyundai
9  gentleman, ran down the hall and tackled
10  him in the hall.
11    So they were a little
12  alarmed at this behavior, so they went to
13  the ▬▬▬▬▬▬▬ at that time --
14  and said, This is not appropriate
15  behavior in America. And his solution
16  was, Don't bring this guy back from
17  BearingPoint again.
18 Q. Okay. And this -- who was the person who
19    did the punching?
20 A. I don't have their name.
21 Q. Was it a man?
22 A. Yes.
3 Q. And was the subordinate a man?

Page 239

1 A. It wasn't a subordinate. It was somebody
2    from a consultant firm, KPMG.
3 Q. Was that a man as well?
4 A. A man.
5 Q. Both men. Any other interaction you
6    talked about?
7 A. No, I mean, the lady -- there was a ▬▬▬
8    ▬▬▬, she was the head of the project
9    for KPMG, BearingPoint. She's the one
10    that told me about the activity.
11 Q. No, but I'm talking about ▬▬▬▬ and
12    then the person that he was involved
13    with. That was a man that he kicked?
14 A. Yes.
15 Q. Okay. Any other points you remember
16    bringing up with Mr. Duckworth?
17 A. Duckworth? I mean, we talked about that
18    there's no master schedule in the
19    company; there's no way to communicate to
20    our suppliers; that we're going to build
21    1,375 vehicles a day, and then we build
22    500, and then we build 800. And then we
3    change the schedule to 2,000. And

Page 240

1  then -- so we -- we needed clarity and
2  everybody to be on the same page within
3  the organization so our suppliers can
4  react.
5    THE VIDEOGRAPHER: You have two
6    minutes.
7    THE WITNESS: So, you know, it was
8    of importance for the company
9    for us to be on the same page
10    on what the production
11    schedule was going to be so
12    we can communicate to our
13    suppliers so they know what
14    parts to provide so we can
15    build the vehicles. But
16    Mr. Kenny Song, who was in
17    production control, refused
18    to use our SAP system, which
19    we paid $10 million for. He
20    thought it would be best just
21    to send the supplier Excel
22    spreadsheets telling them
23    what we thought we were going

Page 241

1    to build.
2  So that went on for a good year.
3  And the suppliers are used to
4  dealing with GM, Ford,
5  Toyota, everybody. And, you
6  know, you get a release for
7  the parts you need, and
8  Mr. Song wanted to just send
9  an Excel spreadsheet or just
10  give them a call and say, I
11  know we told you we needed
12  1,375 vehicle sets of tires
13  and wheels today, but we're
14  only going to do 900. And
15  leave voice mails. So if we
16  were trying to get -- if you
17  want to be one of the big
18  boys, you need to do things
19  professionally and
20  appropriately. That was one
21  of the communication issues
22  we talked about.
23    MR. BOSTICK: Why don't we stop

61 (Pages 238 to 241)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 242

1    here.
2    THE VIDEOGRAPHER: Okay. All
3    right. This is end of Tape
4    No. 4 in the deposition of
5    Robert Cyrus to be continued
6    on Tape No. 5. We are going
7    off the record at 3:38 p.m.
8    (Short recess)
9    THE VIDEOGRAPHER: This is the
10   beginning of Tape No. 5 in the
11   deposition of Robert Cyrus.
12   We're on the record at 3:50
13   p.m.
14 Q. (By Mr. Bostick) Mr. Cyrus, we were
15   talking about your prior meeting with Mr.
16   Duckworth and all of the issues that you
17   raised with him. Any other issues, other
18   than those that you've already discussed,
19   that you recall specifically
20   discussing?
21 A. I'm sorry to interrupt you there. We
22   talked about discrimination issues as far
3    as a couple of different instances.

Page 243

1    For example, I had a woman
2    we hired, ████████ She was the
3    assistant manager in indirect purchasing,
4    and she reported directly up to the
5    chain, not directly, but eventually to
6    Mr. Hyun. And she probably had 25 years
7    experience, a very talented lady from
8    Alabama.
9    And when her boss would go
10   out of town, Mr. Hyun would put the
11   Korean-American colleague in charge,
12   because he couldn't leave a woman in
13   charge, even though she was his boss. So
14   we talked about these issues. So when
15   their boss would go out of town, he would
16   be in charge, because he was Korean and a
17   man. So she came to me numerous times
18   about this type of behavior, and we
19   talked to Mr. Hyun about it, and he
20   continued to act in the same fashion.
21   As far as the way American
22   colleagues and Korean colleagues or HMC
3    colleagues were treated, our expense

Page 244

1    reports, for example, were scrutinized,
2    and it would take two to four weeks to
3    get our money back. The Koreans would
4    have their money back in two or three
5    days. So there was -- I don't know if it
6    was a lack of trust or what. It was
7    definitely different -- different
8    handling of the same type of procedure in
9    Alabama.
10   Again, you know, when cars
11   would come out, many of our members had
12   leased car programs. The Americans would
13   get their cars last. They are not
14   available, but all of the Koreans would
15   have a new car as soon as they needed it.
16   We talked about the promises
17   of yearly reviews and compensation and
18   raises in bonuses being put into place.
19   You know, I was there three and a half
20   years, and we still -- HR never did come
21   up with a performance review process.
22   They would give employees an
23   across-the-board rate increase. So when

Page 245

1    I had employees that were doing
2    exceptionally well, for example, they
3    would get a five-percent raise. And the
4    ones that were barely squeaking by would
5    get a five-percent raise. So we -- we
6    talked to Keith -- I talked to Keith
7    about this, you know, continually. It's
8    a moral issue.
9  Q. What are you looking at?
10 A. I made some notes. You're welcome to
11   have a copy of it if you would like.
12 Q. Go ahead.
13 A. You know, there were -- there were safety
14   issues in the plant and at the suppliers
15   where the Koreans colleagues or HMC
16   colleagues didn't feel that those rules
17   applied to them, you know, as far as
18   safety shoes.
19   Or stepping inside, I
20   remember a supplier Shin Young Smart --
21   these are, you know, 4,000-ton presses
22   that make stamped parts. You are not
23   even supposed to be near them when

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 246

1  they're operating.  There are safety
2  gates, safety curtains, lock-out tags.
3  They were sitting in the press and
4  hand-feeding blanks in there because they
5  couldn't get the Robots to work.  So we
6  talked to the safety manager there.  And
7  again, you know, the rules didn't apply
8  to the Korean colleagues.
9       You know, there were a lot
10  of indiscretions.  Like the work:  We
11  talked about the differences in treatment
12  between the American colleagues and the
13  Korean colleagues.
14  Q.  Are these all you can specifically
15  recall?
16  A.  Right now.
17  Q.  And I know these are your lawyer's words
18  more so than you when you say you
19  discussed sexual harassment.  Is that
20  something we already talked about?
21  A.  Well, we talked about the ████ thing.
22  We talked about --
3  Q.  Did you discuss the ████ issue with

Page 247

1  Duckworth in this meeting -- in this
2  meeting in the summer?
3  A.  Yeah.
4  Q.  Okay.
5  A.  Yes.
6  Q.  And we've already covered your extent of
7  your knowledge with regard to that?
8  A.  Right.
9       There is another -- we had a
10  Korean colleague in ████ What's his
11  name? ████ He went to school in
12  America.  I think he went to ████
13  ████. I think he has his master's
14  degree.  He was firing ████
15  And he said, quid pro quo, You can either
16  work the two weeks out and we'll pay you,
17  or you can take the two weeks off, if you
18  sleep with me.  So, you know, that was a
19  pure quid pro quo.  He was sent back to
20  Korea, still employed with Hyundai.  But,
21  you know, we talked about that issue
22  also.
3  Q.  He was sent back --

Page 248

1  A.  He was ████-
2  Q.  -- as a result of that issue?
3  A.  I'm sorry?
4  Q.  He was sent back to Korea as a result of
5  that issue?
6  A.  Yes.
7  Q.  When did that take place?
8  A.  I would say the last five months that I
9  was employed with Hyundai.
10  Q.  Okay.  And was that -- what department
11  did ████ in?
12  A.  ████ in purchasing.
13  She worked as -- the lady in question
14  worked in ████ also.
15  Q.  Did you have any personal knowledge of
16  any of this going on during the time it
17  was happening?
18  A.  No.
19  Q.  Okay.  And the question -- Ms. ████ is
20  that what you said the lady's name was?
21  A.  Yes.
22  Q.  Was that -- How was that issue
23  resolved?

Page 249

1  A.  Again, it was discussed with ████ and
2  with Greg Kimble, and Team Relations was
3  supposed to talk to ████ about it.  I
4  don't know if that occurred or not.
5  Q.  Okay.  Do you know, did she come back to
6  you at some point and say it had been
7  resolved?
8  A.  When she came back to me, you know, it
9  had not been.  No improvement, you know.
10  Q.  What period of time are we talking about
11  for this?
12  A.  You know, I probably -- this is in the
13  latter -- in the last nine months to six
14  months or nine months before my
15  termination.
16  Q.  And then did you follow up after that
17  when she said it hadn't be resolved?
18  A.  I talked to Hyun again, and I talked to
19  Kimble again.  And, you know, he talked
20  to who was over ████ He
21  talked to him about, you know, When you
22  go out of town, you need to put the next
23  individual by rank, you know, by her

63 (Pages 246 to 249)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 250

1    position in charge, not a Korean
2    colleague because he is male and
3    Korean.
4  Q.  I mean, did --
5  A.  So that stopped.
6  Q.  You're telling me that it stopped at that
7    point?
8  A.  Yes.
9  Q.  I mean, do you have any personal
10 .  knowledge, other than what ~~~~~~~ is
11    saying to you, that that was his reason
12    for not putting her in charge?
13  A.  That's what she felt.
14  Q.  That's what she felt?
15  A.  That's what she told me.
16  Q.  Did she tell you that somebody had
17    specifically told her that was the
18    reason?
19  A.  No.
20  Q.  Okay.
21  A.  He put out a memo saying, While I'm gone,
22    Mr. X is in charge, even while she is
3    there.

Page 251

1  Q.  Well, part of it -- it could be he had
2    concerns about her performance?
3  A.  Quite possibly.
4  Q.  Or there could have been other legitimate
5    non-discriminatory reasons as to why he
6    wasn't putting her in charge?
7  A.  That's possible, yes.
8  Q.  As far you know, you don't have any
9    personal knowledge of why he wasn't
10    putting her in charge?
11  A.  That's possible, yes.
12  Q.  As far as you know, you don't have any
13    personal knowledge one way or the other?
14  A.  Just her coming to me and saying, you
15    know, This is not typical, and it's very
16    offensive.
17  Q.  And you did -- you followed Hyundai's
18    policies and reported it on to Team
19    Relations; and to the best of your
20    knowledge, it was investigated from there
21    and resolved?
22  A.  Yes.
3  Q.  Okay.  Any other specific instances when

Page 252

1    you say you mentioned sexual harassment
2    or differences in treatment of Americans
3    and Koreans that you can recall?
4  A.  Not at this point.
5  Q.  Okay.  Other than -- now, that was the
6    meeting with Mr. Duckworth.  Did you go
7    into all these subjects in your meeting
8    with the Korean attorney?
9  A.  Yes.
10  Q.  Okay.  Did you have notes or anything?
11  A.  I don't think I had notes.  I don't think
12    there was anything in writing.  If I did,
13    it would have been in my log or journal
14    or diary or whatever.
15  Q.  Were there any specific points that you
16    brought up with the Korean attorney that
17    you hadn't spoken about with
18    Mr. Duckworth?
19  A.  No.
20  Q.  Okay.  Other than that meeting that you
21    have referred to in the letter, were
22    there any other meetings with Mr.
23    Duckworth prior to the Murakami meeting

Page 253

1    where you complained that you thought you
2    were being treated unfairly?
3  A.  Did I meet with him and say I was being
4    treated unfairly?
5  Q.  Yes.
6  A.  With Duckworth?
7  Q.  Yes.
8  A.  Other than the points addressed?
9  Q.  No.  Any other meetings, other than that
10    at that time prior to the Murakami
11    meeting?
12  A.  No, I had a meeting with Rick Neal and
13    with Greg Kimble after I started going to
14    cardio rehab for, I think it was, an hour
15    three days a week.
16  Q.  We will get to that.  I just want to make
17    sure.  I'm trying to do all the
18    conversations.
19  A.  I informed the executive management that
20    I was being treated differently because
21    of my cardio.
22  Q.  I understand about that.  Mr.
23    Duckworth -- I don't want -- you

64  (Pages 250 to 253)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 254

1    understand the reason I am asking this,
2    is that I don't want to get in trial a
3    year from now and have you say, Well, I
4    met with Mr. Duckworth four times,
5    whereas I only told you one time before.
6    So I'm making clear: We had one
7    conversation in the summer that was in
8    relation to the gentleman arriving from
9    Korea?
10  A.  And one previous to that --
11  Q.  Okay.
12  A.  -- when he arrived in Alabama.
13  Q.  Okay.  Have we fully discussed the
14    substance of those meetings?
15  A.  To my knowledge at this point, yes, my
16    recollection at this point.
17      Now, I had meetings with
18    Keith every Monday when we had the
19    directors' meetings.
20  Q.  As far as your complaints to him about
21    your treatment there at Hyundai?
22  A.  It really wasn't -- it was concerns for
3     the benefit of the company, the things

Page 255

1    that we need to rectify.
2  Q.  I understand.
3  A.  Okay.
4  Q.  Okay.
5  A.  It wasn't personal complaints.  I did
6    meet with him about one other issue at a
7    different time about the promise to me to
8    become a vice president after two years
9    after Mark Lee went back.  And --
10      THE COURT REPORTER:  Excuse me.
11      Who went back?
12      THE WITNESS:  Mark Lee.  Min Ho
13      Lee.
14  Q.  (By Mr. Bostick)  I understand that's an
15    allegation in your Complaint in your
16    state court about the fraud.
17  A.  Yes.  I want to make it clear that's
18    another separate discussion that we
19    had.
20  Q.  We will discuss that tomorrow.
21  A.  Okay.
22  Q.  I think that would be more appropriate.
3     But that was in the conversation, you

Page 256

1    know, when you're identifying for me the
2    meetings where you complained to Mr.
3    Duckworth about wrongful treatment.
4  A.  You know, these -- I mean, I already
5    clarified my position on that.
6  Q.  Okay.  Now, you also mentioned, I've seen
7    that you talked to Mr. Neal and to
8    Mr. Kimble when you came back from
9    your --
10  A.  Heart stent procedure.
11  Q.  -- heart procedure.
12  A.  Uh-huh.
13  Q.  And you expressed concern to them that
14    you felt like you had been treated
15    differently after you had come back from
16    the procedure?
17  A.  Yes.
18  Q.  Okay.  Tell me first when these
19    conversations took place.  Is there just
20    one conversation you had with both, or
21    are we talking about --
22  A.  No, there was one conversation I had with
23    both --

Page 257

1  Q.  Okay.
2  A.  -- in a conference room by Rick's
3    cubicle.
4  Q.  Okay.
5  A.  And Greg's area also.
6  Q.  Okay.  And then did you have other
7    conversations other than that one with
8    them separately, or are we just talking
9    about this one conversation?
10  A.  I am just mentioning this one
11    conversation that I had about being
12    treated differently after I returned from
13    the cardio situation.
14  Q.  Okay.  And I think, in your tape, you
15    called Mr. Kimble and mentioned the
16    conversation.
17  A.  Yes.
18  Q.  And why don't we look at that.
19  A.  Yes.
20  Q.  While I am looking at that, do you
21    remember there being an executive meeting
22    where you got in a discussion with --
23    over the use of the SAP system versus the

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 258

1    spreadsheets?
2  A. In the executive meeting?
3  Q. Yes.
4  A. I mean, we talked about topics such as
5     that in the directors' meetings on, you
6     know, an as-need basis.
7  Q. Who -- who was the executive you said was
8     having real reservations about using SAP?
9  A. Kenny Song, S-O-N-G.
10 Q. I mean, do you remember having any
11    disagreements with him in an executive
12    meeting about the use of SAP?
13 A. No. We had a polite request: that, you
14    know, in order to function correctly, we
15    need to do this based on the $10 million
16    system that we need paid for and not an
17    Excel spreadsheet and not leaving
18    messages, Oh, by the way, this is
19    Hyundai. Stock production from 1,375 to
20    800. That's not how you -- you know, we
21    can't operate that way.
22 Q. That was something that you said during
3     the meeting?

Page 259

1  A. I said and -- yes, I said it.
2  Q. What was Mr. Song's response to that?
3  A. He -- he agreed and said that he would,
4     you know, go with the system that we paid
5     for, the SAP system that we would -- he
6     would utilize it, but he didn't.
7  Q. We won't make this an exhibit.
8            Look on Page 28 of this.
9  A. Okay.
10 Q. Do you see down at the bottom it's a
11    voice-mail message?
12 A. Um-hum.
13 Q. I need to talk to you about some issues
14    with rumors I'm hearing. Remember when I
15    sat you and Greg down and made formal
16    notice that I had been treated
17    differently, felt that I was treated
18    differently because of my medical
19    condition with my heart. Do you know now
20    if they -- this is coming to fruition?
21 A. Um-hum.
22 Q. Do you recall approximately when this
3     conversation took place -- this voice

Page 260

1     mail was left? It says 2:30 on Monday.
2  A. You mean, does the tape not indicate
3     that?
4  Q. Well, the date -- it says October 24th.
5  A. That's what I'm thinking.
6  Q. But --
7  A. I think it -- you know, it's either
8     Sunday the 23rd or Monday the 23rd. It's
9     probably Monday the 24th since it's -- I
10    don't know if it's voice mail on his cell
11    phone or voice mail.
12 Q. And then following -- this is following
13    the meeting you had Saturday night,
14    though.
15 A. Yes.
16 Q. Okay. So --
17 A. Well, let me see, yeah.
18 Q. Okay. And here you're referring to this
19    earlier conversation you had with --
20          MR. STOCKHAM: Greg and --
21          THE WITNESS: Greg and Rick.
22 Q. (By Mr. Bostick) Greg and Rick. Tell me
23    what you told them about why you felt you

Page 261

1     were being treated differently because of
2     your medical condition.
3  A. Specifically, when we make major
4     decisions, a sourcing decision or a
5     movement of personnel, it requires my
6     signature in a consensus form where you
7     have a signature block where it would go
8     from the author to their boss, to their
9     boss, to their boss, to the director, to
10    the vice president. And depending on the
11    importance of it, it may go to the
12    president of the company and so forth.
13          So, even though I'm just at
14    a cardio rehab from 8:00 in the morning
15    until 9:30 in Montgomery, Alabama. You
16    were never here; I heard those comments
17    many times. I am never here from Choi
18    and Juan Young. And that's why they said
19    they would avoid my signature and take
20    actions without even consulting me on
21    issues that were required -- that
22    required my signature.
23          For one example, we had a

66 (Pages 258 to 261)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

1  lady -- ███████ -- who worked for us
2  in parts development. She was an
3  assistant staff. She was an excellent
4  worker, very intelligent. I think she
5  had a master's degree. ██████ treated
6  her like a waitress: Get me coffee, get
7  me -- you know, she was a woman, so she
8  really wasn't -- this is my perception --
9  in his eyes -- in Korea, there are very
10  limited -- or I didn't see any women in a
11  professional manner there other than only
12  secretaries.
13      So she was doing well. I
14  had conversations that, We need to make
15  her a buyer. She already her degree,
16  which was a requirement. When I was
17  gone, I wanted her to be in my group.
18  They pushed through a signature approval
19  to move her to a different area without
20  my agreement. So I discussed that with
21  them. You know they changed --
22 Q.  Who's "they"?
3  A.  Mr. ████████, who is general manager

1  of purchasing administration, and ██
2  ████████████, who was my boss. I
3  think his title at that point is senior
4  director of purchasing, parts
5  development.
6  Q.  And what was ████████?
7  A.  ███████
8  Q.  Was she promoted as part of that move?
9  A.  Yes. And that's what I wanted, but I
10  wanted her to go in a specific area where
11  she would have some leadership and
12  guidance. You know, she was new to this
13  area. We needed somebody who had strong
14  managerial capabilities. And they just
15  tossed her is an area, you know, where I
16  didn't think it was appropriate.
17  Q.  Did you specifically mention that when
18  you talked to --
19  A.  Yes, I took the document with me. Okay?
20  Q.  And -- and so your -- your thing with
21  that was that your signature should have
22  been on the document?
3  A.  Well, they're making decisions in my

1  department about my employees without
2  even notifying me of it. She was going
3  to go back to Korea. They gave her the
4  job unbeknownst to me. We already had a
5  going-away party for her. And it's like,
6  Well, ██████, you're still here. Oh, yeah,
7  ████████ moved me.
8  Q.  And do you know when the move was for
9      her?
10 A.  The documents should be available. You
11     know, that was within the last nine
12     months of my employment.
13 Q.  Were you --
14 A.  It mean, it was after my heart condition,
15     so that was in April, May. So it was
16     probably the summer of 2005.
17 Q.  But I guess was the move done at a time
18     when you were out on FMLA leave, or were
19     you actively back at work?
20 A.  Both. I mean, I'd come back to work, and
21     then I had medication reaction. So --
22 Q.  But, I guess, was her promotion decision
23     made at a time when you were out on

1  leave?
2  A.  I couldn't tell you. I'd have to look at
3      Melanie McCormick's documentation.
4  Q.  Do you know what date --
5  A.  You know, most of it wasn't because it
6      was a complaint about the, Why do I have
7      to go to cardio rehab? And Kimble was
8      complaining the same time that he had
9      hurt his knee and he needed to go to
10     rehab, and the Korean colleagues wouldn't
11     allow him to leave.
12 Q.  Well, you -- my question is that, you
13     know, a promotion is a discreet decision
14     that's made. I'm just wondering, was
15     that discreet decision to promote
16     ████████ done while you were actively at
17     work or not?
18 A.  I was -- I was in cardio rehab for, you
19     know, less than half of the first portion
20     of the morning.
21 Q.  Okay. So you were not out still
22     recovering from surgery at that point is
23     your testimony.

67 (Pages 262 to 265)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 266

1  A.  No. No, sir.
2  Q.  Why was she going to go back to Korea?
3  A.  Well, she wasn't happy, you know, getting
4      her master's degree and being very
5      talented and asked to be a secretary.
6          She -- you know, I had to
7      attend these meetings. This is another
8      issue on different treatment.
9          I had to attend a meeting
10     from 5:30 to 7:30 or 8:00 p.m., 9:00,
11     o'clock every night. It was a quality
12     audit vehicle review. It was 100 percent
13     in Korean language, written and spoken.
14     So I had to go; Mr. Kalson had to go;
15     typically Susock was there; Chuck
16     Knowles, my supplier -- supplier
17     development manager.
18         And, you know, after a week
19     or two, I went back to Min Ho Lee. I
20     said, Mr. Lee, these meetings aren't in
21     English at all, nothing written, nothing
22     spoken. You know, can I get a
3      translator?

Page 267

1          That's when, you know, he
2      wouldn't get us a translator, but he
3      would send ████████ there. So she
4      didn't -- she wasn't hired to be a
5      translator. She didn't get her master's
6      degree to be a translator. So she, out
7      of the kindness of her heart, did these
8      meetings for, I'd say, a month or so.
9      And then she says, You know, I have a
10     life. I want to get out of here and, you
11     know, enjoy whatever she wants to enjoy.
12         So I went back to Mr. Lee.
13     He would assign other individuals to go,
14     other Korean colleagues in my department.
15     They'd be very resentful. They wanted to
16     go to the meetings, but they didn't want
17     to translate. So us Americans are
18     standing around for hours on end without
19     one word in English.
20         So when I come back to Mark
21     Lee again, he said to me repeatedly, If
22     you do not go to these meetings, I cannot
3      guarantee your neck. So he's saying

Page 268

1      unless you go to these meetings, even
2      though he agrees there is probably no
3      benefit to them, then, you know, you will
4      lose your job.
5          So -- and when we went to
6      these meetings, the three top guys --
7      Mr. Mon He Lee, who was the COO before
8      H.I. Kim -- they would push a chair up to
9      him, so he sat during until the entire
10     three-hour daily meeting. And if Y.S.
11     Kim was there -- the top three Koreans
12     were all pushed up a chair like they were
13     royalty while everybody else stood around
14     for three hours and we listened to
15     Korean. And so that was very
16     enlightening.
17 Q.  Is -- is that something you raised with
18     Rick and Greg?
19 A.  Oh, yeah.
20 Q.  Okay.
21 A.  I talked to them. I talked to Duckworth
22     about it.
23 Q.  My question is trying to finish out what

Page 269

1      did you tell Kimble and Rick in this
2      meeting?
3  A.  The meeting that I had was to talk about
4      the signature and going around my back to
5      make decisions.
6  Q.  Okay.
7  A.  Not that issue. I'm sorry if I strayed
8      there.
9  Q.  That's all right. So you -- so you
10     mentioned -- well, it sounds like the --
11     with that that you were saying you felt
12     like you --
13 A.  Well, ████ -- I'm sorry. That's how we
14     connected there. I mean, she was --
15 Q.  That was about a signature?
16 A.  She had had it. You know, she wasn't
17     moving up in the company. She was going
18     above and beyond. She was an excellent
19     employee. Then all of a sudden she's
20     leaving and going back to Korea.
21         And then I come back to
22     work, and she's still there. And we had
23     a going-away party and, you know, Mr.

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 270

1  ██████ and ████████ did all that without
2    telling me, advising me. It's very, you
3    know, awkward.
4  Q. Okay. So have you told me fully what you
5    told Mr. -- excuse me -- Kimble and
6    Mr. Neal during this meeting?
7  A. That I was being treated distinctly
8    different after --
9  Q. Coming back from your heart procedure.
10 A. Yes, sir.
11 Q. Okay. Was there any response taken with
12   regard to the signature issue after
13   that?
14 A. None that I could tell.
15 Q. Okay. What was -- what was the response
16   in the meeting?
17 A. They -- they listened, you know,
18   concerningly.
19 Q. And you'd always gotten along with
20   Mr. Kimble and Mr. Neal prior to that
21   time.
22 A. Oh, absolutely.
23 Q. Okay. Look on Page 32. I guess, did you

Page 271

1    have any other meetings other -- other
2    than the one we just talked about with
3    Mr. Neal or Mr. Kimble?
4  A. You know, I can go back through my
5    calendar and see if there's ever a
6    meeting I had with them. I mean, I can't
7    tell you exclusively I never spoke to
8    them ever again.
9  Q. I'm talking about where you had a
10   specific complaint of, I'm being treated
11   differently since I've gotten back from
12   my --
13 A. Regarding the heart situation?
14 Q. Right.
15 A. No, I don't believe there was a set
16   --another meeting.
17 Q. I mean, any other specific meetings where
18   you can recall going back and saying, I'm
19   being treated differently because I'm an
20   American?
21 A. Now, that's a different issue. We had
22   those discussions. You know, Rick and I
23   and Greg Kimble, and Kalson was supposed

Page 272

1    to attend, but he dodged out of the
2    meeting. But we put together a list of
3    concerns with the company and things that
4    we needed to level up to be a real
5    automotive company. So we had numerous
6    meetings throughout my tenure. Rick was
7    in the meeting. Greg was in the meeting.
8    John promised to come, but John's a very
9    snaky individual in my personal
10   opinion.
11       MR. LEE: He didn't mark the last
12   one.
13       MR. BOSTICK: What's my --
14       MR. STOCKHAM: 16 is the last one,
15   so --
16       MR. BOSTICK: 17.
17       MR. STOCKHAM: -- 17 would be the
18   next one. You did not mark
19   that --
20       MR. BOSTICK: I didn't mark that
21   document.
22       MR. STOCKHAM: Tape 1.
23       (The referred-to document was

Page 273

1        marked for identification as
2        Defendants' Exhibit No. 17)
3  Q. (By Mr. Bostick) Is that the document you
4    are referring to?
5  A. No. Huh-huh.
6        Let me look at this. I
7    don't even know if I've even seen it.
8    Control issues are creating an
9    us-and-them environment.
10       MR. STOCKHAM: Do you have one for
11   me?
12 Q. (By Mr. Bostick) Oh, I'm sorry.
13 A. I have no idea who generated this, but
14   not me.
15 Q. So, I guess I'd like to distinguish
16   between -- there's a difference between
17   you going to Mr. Kimble or Mr. Neal about
18   a specific incident related to your
19   situation. You know, you went --
20 A. My heart situation?
21 Q. Right. You went to them and said, I am
22   being treated differently, I feel,
23   because of my heart situation.

69 (Pages 270 to 273)

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO
56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 274

1  A.  Right.  That's one distinct issue.
2  Q.  Now, I understand that there were
3      meetings you had where y'all are talking
4      about collective issues there at the
5      plant.
6  A.  Yes.
7  Q.  These type things.
8  A.  That's correct.
9  Q.  I mean, my question is:  Do you recall
10     specific meetings that you had with
11     Mr. Neal or Mr. Kimble other than the one
12     we talked about when you went and
13     addressed a specific issue --
14 A.  Yes.
15 Q.  -- relating to you.
16 A.  Yes.  I'm sorry to cut you off there.
17 Q.  Okay.  You do recall other meetings.
18 A.  Um-hum.
19 Q.  Tell me about them.
20 A.  Well, the meeting that's -- it's
21     handwritten from a Panaboard to a copy
22     board.  And I started out taking the
3      notes.  It's my handwriting, but it's not

Page 275

1      all of my opinions.  And then, at the
2      end, either Greg wrote the end of it.
3      It's one of the documents we provided to
4      you.  And there's a list probably -- it's
5      three columns -- probably a list of 40
6      things that are concerns.
7              This was early on when we
8      were kind of astonished at the Hyundai
9      style, and, Wow, you know, what have we
10     gotten ourselves into?
11 Q.  I mean, what was the nature of this
12     meeting?
13 A.  Improvement.  You know, what we needed to
14     improve.  You know, Greg Kimble's the one
15     that called this meeting, initiated this
16     meeting, and I think he felt handcuffed.
17     He wasn't able to conduct his business.
18     His people certainly didn't listen to him
19     or give him any authority.  His
20     manager -- he's a director -- scoffed
21     him.  They did whatever the heck they
22     wanted, whenever they wanted.
3  Q.  I guess my question is:  Was there an

Page 276

1      incident -- we'll talk about this meeting
2      later -- a specific meeting where you
3      went to Kimble or Neal, other than the
4      one incident upon your return, where you
5      said, I have a particular issue I need
6      addressed with how I'm being treated
7      personally.
8  A.  Not other than the Murakami meetings
9      we've talked about in excruciating
10     detail.
11 Q.  Okay.  And then the -- the earlier
12     meeting about, Am I being treated
13     differently since I have had my heart
14     surgery; right?
15 A.  That's -- that meeting occurred.
16 Q.  That's an issue:  I am being treated
17     differently because of my heart.
18 A.  Yes.
19 Q.  Over here, you got:  I feel like I'm
20     being treated unfairly as a result of
21     this Murakami meeting.
22 A.  Right.
23 Q.  Other than that, is there any other

Page 277

1      meetings with Kimble or Neal or
2      Duckworth -- both of them -- where you
3      said I've got to --
4  A.  Let's keep that separate.
5  Q.  Okay.
6  A.  Not -- I'm sorry.  I cut you off.
7  Q.  -- where you're going and saying -- I
8      mean, that we've talked about already
9      where you're saying to Kimble and Neal or
10     Duckworth, I am being treated
11     differently.
12 A.  Well, we're changing it here.  You said
13     Kimble and Neal, and now we are doing
14     Kimble, Neal and Duckworth.
15 Q.  Okay.  We can take --
16 A.  The Duckworth one -- I am trying to
17     cooperate here.
18 Q.  Okay.  Let's talk -- okay, this is
19     different:  Mr. Kimble -- have you told
20     me every conversation you had with
21     Mr. Kimble where you went to him and
22     said, I feel like I'm being personally
23     treated differently.

70 (Pages 274 to 277)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 278

1  A.  The ones I told you about; that's it.
2  Q.  Okay.
3  A.  Now, we may have had conversations about
4     problems with the company 50 different
5     times.
6  Q.  Right. Okay. Now, but you had a
7     conversation with him when you returned
8     from your stent surgery.
9  A.  Yes.
10 Q.  We've got that one. And we've seen some
11    phone conversations you had with him.
12 A.  Right.
13 Q.  Other than that, you're not aware of any
14    other specific --
15 A.  Where I went for a specific Rob Cyrus
16    concern?
17 Q.  Right.
18 A.  About treated differently?
19 Q.  Right.
20 A.  No.
21 Q.  Okay.
22 A.  It did not occur at the time. Didn't
3     happen.

Page 279

1  Q.  Rick Neal: You had with meeting with he
2     and Mr. --
3  A.  Kimble.
4  Q.  -- Kimble -
5  A.  Yes.
6  Q.  -- after you returned from stent surgery.
7  A.  This is -- right. During the rehab
8     period, yes.
9  Q.  Right. You had a voice mail -- I didn't
10    see from the tapes where you had -- ever
11    had a conversation with him after the
12    Murakami meeting; is that right?
13 A.  With -- with Rick?
14 Q.  With Rick Neal.
15 A.  No, I called him, but I don't think I was
16    able to reach Rick. I did talk to Rick
17    one time about I had to get salary
18    information on my last salary for a
19    prospective employer, because I didn't
20    want to tell them an incorrect last
21    salary. And he was nice enough to call
22    payroll, and he called me back. He
3     didn't want me talking to anybody else at

Page 280

1     Hyundai but himself.
2  Q.  But other than a complaint to him about
3     your personal situation, other than the
4     meeting after you returned from surgery,
5     that's it?
6  A.  That's it. Sorry.
7  Q.  Okay. And then with Mr. Duckworth, you
8     talked about the general meeting when he
9     arrives at the plant. There's the
10    follow-up meeting when the attorney
11    arrives. And then you have the meetings
12    with him immediately following the
13    Murakami meeting.
14 A.  Um-hum.
15 Q.  And then, I guess, the later -- the
16    dinner meeting?
17 A.  And then we had a meeting about not
18    coming to fruition the commitments from
19    Ted Chung and from Keith Duckworth about
20    me being promoted to vice president
21    within two years after Mark Lee leaves.
22    There was an extensive -- numerous
23    discussions about that -- correspondence

Page 281

1     and actual meetings.
2  Q.  Okay.
3  A.  And there's actually discussions with
4     Keith about --
5        MR. STOCKHAM: We can talk about
6        that tomorrow.
7        THE WITNESS: I mean I --
8  Q.  (By Mr. Bostick) But -- and we'll discuss
9     those.
10 A.  I'm not saying that's the last -- I
11    apologize. I'm not saying that's the
12    only time I ever talked to Keith is what
13    I'm trying to get across.
14 Q.  I'm talking about the particular
15    complaints, other than -- you know, I
16    guess, other than, Hey, I think I should
17    have gotten a vice president promotion.
18    Were there any --
19 A.  No, it wasn't, Hey, I think I should
20    have. It was in writing, and that was
21    part of the inducement to get me away
22    from Mercedes Benz.
23 Q.  Right. Other than discussions over that

71 (Pages 278 to 281)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 282

```
1      issue --
2   A.  We had other discussion besides that
3       also.
4           MR. STOCKHAM:  Yeah, what he's
5           asking you is, were there any
6           complaints you had about the
7           way you were treated as
8           opposed to the Koreans with
9           Mr. Duckworth.
10          THE WITNESS:  I remember one
11          specific conversation in the
12          stairway down to the lower
13          level lobby, and we were
14          talking about -- I don't
15          remember what we were talking
16          about.  We were talking about
17          some Korean colleague
18          behavior.
19      And I was surprised because he
20          said to me, Well, Rob, you
21          can't make a cat a dog,
22          meaning, the Korean
23          colleagues will do their
```

Page 283

```
1       business in this nature.  In
2       Korea you can't make a cat a
3       dog.  You cannot -- they were
4       not going to effectively
5       adapt to American business
6       practices.
7       And I was shocked at that comment.
8           I mean, that's like giving
9           up.  And when we know that
10          things aren't done
11          appropriately in America --
12          it may work in Korea, but it
13          doesn't work here, but his
14          comment was, Well, you can't
15          make a cat a dog.
16  Q.  (By Mr. Bostick) Was -- do you recall
17      what the specific --
18  A.  I'm sorry, I don't.
19  Q.  -- comment was?
20  A.  I just remember that comment.  It's like,
21      Whoa.
22  Q.  Other than that, do you remember a
23      specif- -- any other specific
```

Page 284

```
1       conversations with Mr. Duckworth about
2       your individual treatment as compared to
3       your Korean co-workers?
4   A.  I can't recall any at this time.
5   Q.  Okay.  Did you ever make any complaints
6       to Mr. H.I. Kim about the way you were
7       treated during the time you were there?
8   A.  No.
9   Q.  Did you ever make any complaints to Mr.
10      Ahn, other than the letter you wrote in
11      early November, about the way you were
12      treated?
13  A.  No.
14  Q.  Did Mr. -- in -- in looking on Page 32 of
15      the Transcript 1 that we were looking at
16      earlier, it says, But I -- this looks
17      like you are talking H.J. --
18  A.  32?
19  Q.  Yeah.
20  A.  It goes up to -- Okay.
21  Q.  It says -- look at the paragraph: But I
22      needed to speak with you.  I'm hearing
23      rumors about me getting terminated for
```

Page 285

```
1       missing work on a heart-related issue.
2   A.  Um-hum.
3   Q.  Who --
4   A.  Let me look.
5   Q.  Yeah, sure.
6   A.  Let me, please, understand the
7       conversation here.
8           All right.  I'm sorry.  What
9       was your question?
10  Q.  Yeah, my question is:  Had you heard a
11      rumor that you were being terminated for
12      a heart-related --
13  A.  No.
14  Q.  -- condition prior to that time?
15  A.  No.
16  Q.  Why did you make that statement, or do
17      you --
18  A.  Well, I mean, I was -- I didn't -- didn't
19      know why anything had happened that
20      happened with --
21  Q.  Did you leave this voice mail at a point
22      in time after you had your dinner with
23      Mr. Duckworth?
```

72 (Pages 282 to 285)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 286

1  A.  Yes.
2  Q.  Okay. Mr. Duckworth had said the concern
3      was over your attitude; right?
4  A.  He never mentioned the word "attitude"
5      ever. He only said, Rob, the executive
6      management at Hyundai is unhappy with
7      you, and they would like you to resign.
8      That's why it was so strange and surreal.
9      What? Never was a mention of the word
10     anything other than that.
11         If Keith had had an attitude
12     problem with me, he wouldn't say, Rob,
13     it's not me.
14 Q.  Let's look on Page 39. There's this
15     reference where you say, you know, I've
16     cover their butts.
17         MR. STOCKHAM: Yes. This is 32.
18         MR. BOSTICK: Yeah, I just put in
19         excerpts of this instead of
20         the full thing.
21         MR. STOCKHAM: The last page you
22         got was 32. Oh, did you just
23         put it in?

Page 287

1          MR. BOSTICK: I just went over to
2          the next one.
3          MR. STOCKHAM: Okay.
4          MR. BOSTICK: Sorry.
5          MR. STOCKHAM: 39, you say?
6          MR. BOSTICK: Yeah, 39.
7  Q.  (By Mr. Bostick) Do you see that
8      statement at the top saying, I am a
9      stellar employee. It says, You know, I
10     covered their butts a thousand times.
11         I mean, who -- we see you
12     kind of go through a listing a little
13     bit. What specifically were you
14     referring to there in talking about
15     covering people's butts?
16 A.  Let's see. I got us to launch the plan
17     on time by recovering -- our bumper
18     supplier was pushed on us by Mr. Lee. I
19     indicated to him in writing, and verbally
20     many times, this -- this supplier you are
21     forcing us to use is rumored to be in
22     financial straights and will be filing
23     bankruptcy. He made us use them anyway.

Page 288

1      They did file bankruptcy. They could not
2      secure financing. They could not
3      complete the contract.
4          ████ and I had numerous,
5      numerous meetings with their executive
6      management. We went to court up in
7      Detroit. We finally rescued them by
8      bringing on another supplier by very
9      creative means by using the bankrupt
10     supplier's equipment suppliers to -- if
11     we hadn't done this, the plant wouldn't
12     have launched. That's one -- one of the
13     issues I was referring to.
14         Other ones could be, when
15     they wrecked their cars and called their
16     wives to come pick them up because they
17     were drunk and left the scene of an
18     accident. You know, I didn't really
19     cover their butts that way, but, I mean,
20     that kind of -- that's not a good
21     example.
22 Q.  Well, let me -- look on Page 50. I'm
23     curious about --

Page 289

1  A.  Page what?
2  Q.  -- what you actually did.
3  A.  50?
4  Q.  Yeah. -- what you did in regard to this
5      car wreck.
6  A.  50?
7  Q.  Yeah.
8  A.  Which car wreck? The one last month?
9  Q.  Page 50, you say -- this is the
10     conversation with your mother.
11 A.  Uh-huh.
12 Q.  Midway saying, Because, you know, I have
13     done a great service.
14 A.  I need to find out where you're at.
15     Okay.
16 Q.  Because I've done a great service, and
17     this is what they do to me. And you say,
18     I've gotten their children in school.
19         Let's start with that first.
20     Who have you gotten in school?
21 A.  ████████ failed to apply for school for
22     his children in the appropriate time. So
23     I got with Jean Charbonneau, who was on

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| | |
|---|---|
| **Page 290** | **Page 292** |

Page 290

1  loan from us from the state, to see if we
2  could get his children into school. I
3  think it was a magnet school or one of
4  the schools.
5  A.  So, you know, I spent hours with the
6  school, with Jean Charbonneau, going
7  above and beyond my purchasing
8  requirements to try to help out my Korean
9  colleagues. Because if I was in Korea, I
10  would need help that -- I mean, I'm just
11  trying to do the right thing and help
12  them out where they need help.
13          I had their gas turned on.
14  I had -- you know, numerous countless
15  things.
16  Q.  What did you do in regard to this car
17  wreck?
18  A.  Let's see. Actually, I didn't -- you
19  know, the car wreck, there's one with a
20  ▓▓▓▓▓▓ where he left our second
21  office, which was the Halcyon office.
22  He -- oh, this is about ▓▓▓▓
3  No, that's not it. There's so many

Page 292

1  Q.  I mean, you seem to be bragging about
2  some great service you've done. Is this
3  just hyperbole here?
4  A.  This is -- that's -- I didn't do anything
5  with driving the car or anything.
6  Q.  So you're -- you're taking claims for
7  things you didn't do to your mother in
8  the conversation. Is that what's going
9  on here?
10  A.  Yeah. It sounds like it, yeah.
11  Q.  Okay. So your Mom says, Well, it's just
12  that one probably nasty son of a bitch
13  who wants to get rid of you, the one you
14  had the words with, isn't it?
15          And your response is, Yeah,
16  the one that lied to me and admitted he
17  lied to me. And I said yesterday you
18  told me X, Y, Z. He goes, I changed my
19  mind.
20  A.  Oh, that was --
21  Q.  Can you tell me who this is referring
22  to?
23  A.  Yeah, it's Mr. Hyun.

Page 291

1  different wrecks.
2  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
3  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
4  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
5  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
6  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
7  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
8  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
9  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
10  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
11  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
12  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
13  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
14  ▓▓▓▓.  So I didn't really help out
15  anything. I just listened. ▓▓▓▓▓▓
16  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓was in
17  the meeting. I mean, really I didn't
18  aid -- do anything really.
19  Q.  Okay.
20  A.  Let's see. I got -- go ahead.
21  Q.  You didn't drive the car from one spot to
22  another?
3  A.  Me? I wasn't even --

Page 293

1  Q.  What had he said to you that he then
2  changed?
3  A.  He -- this was in regards to the stand-up
4  meeting on the concrete for three hours
5  every night, Monday through Friday. He
6  told me that Mr. Simon -- San Shin Young
7  was his name, He would go to the
8  meetings, and he would report back to me
9  because they were not in English.
10          So I went to Song and said,
11  I need the meeting minutes from
12  yesterday's meeting; and he said, I am
13  not your translator. I am not your
14  secretary. So I went back to Hyun, and
15  Hyun just bold-faced lied to me and said
16  that he told Song to do it. And then when
17  I talked to Song, he said, He never told
18  me to do that.
19          And then H.J. said, Yeah,
20  yeah. I lied to you. So that was our --
21  our leader in the department now.
22  Q.  Well, she -- she says down here, They're
23  just ruthless. There's no rules. And

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 294

1    then she says, And you've known that all
2    along, and you've wanted out. But then I
3    guess the tape breaks off. I mean, had
4    you told your mother prior to this time
5    that all this stuff happened with
6    Murakami that you wanted to get out of
7    there?
8  A.  It's not -- you know, get out of there
9    would be -- you know, not only the
10   Murakami situation, but all of the things
11   that were promised that didn't come to
12   fruition. The two different teams.
13        You know, mainly everything
14   that was promised: This is going to be
15   just like any other American company.
16   This is going -- your future is X, Y, Z,
17   in writing, and nothing comes to
18   fruition.
19 Q.  I guess, prior to the Murakami incident,
20   were you displeased enough with your work
21   there at HMMA where you had started to
22   look for work elsewhere?
23 A.  No, I never did, no.

Page 295

1  Q.  Were you displeased with your working
2    environment there?
3  A.  At Hyundai?
4  Q.  Yeah.
5  A.  I was disappointed.
6  Q.  I mean, were you having thoughts of --
7  A.  Everybody was disappointed there.
8  Q.  I mean, were you -- were you looking at
9    the possibility of -- of getting another
10   job?
11 A.  No. I've never left a job without having
12   a job. That's not very intelligent.
13 Q.  Look at 56 through 57. This is a
14   conversation with Ms. White, I believe,
15   at Thomas, Means & Gillis firm.
16 A.  Um-hum.
17 Q.  I'm looking at the very bottom of 56. It
18   says, And this past Saturday, the
19   executive vice president, or he's the No.
20   2 in command out at Hyundai -- I assume
21   that's Duckworth?
22 A.  Well, let's go on. Okay.
23 Q.  -- calls me to dinner and he says he

Page 296

1    wants to check on my health and how I'm
2    doing. And in the last ten minutes of
3    the conversation, he said, Well, Rob, the
4    executive management at Hyundai is
5    uncomfortable with your attitude, and we
6    would like to ask you to resign.
7        Does that refresh your
8    recollection that he did tell you in that
9    meeting at dinner that the management was
10   unhappy with your attitude?
11 A.  No. That's a misspeak on my behalf at
12   that point.
13 Q.  Okay. So this is just your words
14   being -- you just misspoke?
15 A.  Yes. I mean, in content -- like I said
16   the third time now, he said, The
17   executive management at Hyundai is
18   unhappy with you, and they would like you
19   to resign.
20 Q.  But your testimony is, as you sit here
21   today, he never said anything about your
22   attitude; correct?
23 A.  Absolutely not. Why would he say, Rob,

Page 297

1    it's not me, if he had any ability to
2    change anything, or if I had an attitude
3    issue that he could affect.
4  Q.  What -- what kind of device were you
5    using to record these conversations?
6  A.  Device? A tape recorder? What do you
7    mean?
8  Q.  I mean, was it just a typical tape
9    recorder or something that you had hooked
10   into the phone?
11 A.  It's from Wal-Mart or Radio Shack. I
12   think I got it at Radio Shack.
13 Q.  Is it -- what type of size tape does it
14   use?
15 A.  It uses a standard tape, and there's one
16   that uses a little tape.
17 Q.  It's Tape 3 we'll look at next. Do you
18   recall calling BellSouth on November 2nd
19   and asking somebody if there had been
20   tampering with your --
21 A.  I do.
22 Q.  What was that about?
23 A.  Well, I walked down beside my house when

75 (Pages 294 to 297)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 298

1  I cut my grass, and there's a utility box
2  out there which typically has a wire tie
3  on it. And it was gone, and the box was
4  ajar. So I called them and said, Have
5  you guys been out here? And they said,
6  No. I said, Well, that's unusual. And
7  that's it.
8  Q.  Anything else you did, I mean, other than
9  that?
10 A.  What's that mean?
11 Q.  I mean, did you ever have any suspicions
12  that someone from Hyundai was
13  tampering?
14 A.  I have no idea. I didn't know who would
15  be in the utility box.
16 Q.  Look for me -- I want to ask you about a
17  comment up at the top of Page 16. I
18  think this is an extended discussion
19  between you and Mr. Kimble.
20 A.  Um-hum.
21 Q.  There was a comment on there that says --
22  it looks like on the top of 16 you are
3   referring to a conversation you had with

Page 299

1  Duckworth. When you say --
2  A.  Well, let me -- let me --
3  Q.  Read as much as you need to.
4  A.  Thank you.
5       Okay. What's your question,
6  please?
7  Q.  My question is: At top of Page 16, it
8  looks like you're talking about a
9  question with Duckworth. And you say --
10 A.  It's a conversation with Kimble.
11 Q.  The conversation is with Kimble --
12 A.  Yes.
13 Q.  -- and you're talking about a prior
14  conversation you had with Duckworth, I
15  believe.
16 A.  Yes.
17 Q.  And you say, And I said, Well, I don't
18  know -- I'm sorry. Well, I don't want to
19  be, you know, blacklisted because I'm
20  trying to take, you know, a fair position
21  on an issue for chargeback in excess of
22  $100,000.
3       Did you tell Mr. Kimble

Page 300

1  that?
2  A.  Yes.
3  Q.  What was the position you were taking on
4  chargebacks?
5  A.  That's the scratch issue, the buff issue,
6  the bag issue on the Murakami meeting to
7  take a fair position on an issue for
8  chargeback. Chargeback is downtime.
9  Downtime is on the agenda.
10 Q.  So did you take a position --
11 A.  A fair position.
12 Q.  -- on that issue, or did you remain
13  neutral?
14 A.  No, I took a fair position as indicated
15  on here.
16 Q.  Okay. What was your -- who -- who
17  determined it was a fair position? Was
18  that you -- is that you stating your
19  opinion?
20 A.  You know, I've done this for 20 years. I
21  have an excellent reputation. I'm
22  featured in magazines of what happened to
23  the superstars at Toyota. You know, I

Page 301

1  didn't get to where I am by making poor
2  decisions. So, in my opinion, the
3  position was based on purely factual,
4  non-emotional issues, period.
5  Q.  Okay. So -- so are you revising your
6  testimony now that you remained neutral
7  during the meeting?
8  A.  No, it's the same thing.
9  Q.  Okay. You took a neutral, but fair,
10  position --
11 A.  Neutral and fair.
12 Q.  -- based on your experience in the
13  industry. Is that your testimony?
14 A.  Yes.
15 Q.  Okay.
16       THE VIDEOGRAPHER: We've got six
17  minutes left on this tape.
18 Q.  (By Mr. Bostick) Do -- this is -- I am
19  looking on Page 11. Do you know -- and
20  we can get the full transcript out. Can
21  you tell who this conversation is you're
22  having with?
23 A.  One second, please.

76 (Pages 298 to 301)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 302

1     I can't tell, based on the
2     middle of Page 11.
3  Q.  Okay. Let's see if I can get a full copy
4     of the transcript.
5  A.  It's with Dave Mark.
6  Q.  What is his -- was he an HMMA employee --
7  A.  Yes.
8  Q.  -- or is he still?
9  A.  He is.
10 Q.  What -- what area was he working in?
11 A.  He worked for me as a manager of parts
12    development of purchasing.
13 Q.  Look on Page 11.
14 A.  Uh-huh.
15 Q.  It says inaudible. But it's halfway down
16    the page. Dave was saying, If he's in on
17    it -- I think it's talking about H.J.
18 A.  Uh-huh.
19 Q.  -- you know that Choi is in on it,
20    because he wouldn't make a -- do you know
21    what he said there?
22 A.  No.
3  Q.  But it says you say, Choi works for me.

Page 303

1  A.  Um-hum.
2  Q.  Was that your response?
3  A.  Um-hum.
4  Q.  Did Choi work for you?
5  A.  He was the same level as a director,
6     because he was a director in Korea. But
7     as far as handling parts development,
8     that was my responsibility as indicated
9     by Mr. Hyun and Mr. Mark Lee, Min Ho Lee.
10    Because I remember when he started, the
11    comment from Mark Lee and Mr. Hyun and
12    Mr. Choi were, Don't worry. I will not
13    get in your way. That's what Choi said
14    to me.
15 Q.  So, but according to this statement,
16    you're saying he worked for you; correct?
17    He was subordinate to you.
18 A.  I -- I'm in charge of parts development,
19    not Mr. Choi.
20 Q.  Okay. So he was your subordinate;
21    correct?
22 A.  Well, not really. No, he's my equal and
3     peer. He's a director of purchasing.

Page 304

1  Q.  So why did you say, He works for me?
2  A.  Because, like on these signature blocks
3     for approvals, he has to sign it; then I
4     have to sign it; then the VP has to sign
5     it; then the president has to sign it.
6  Q.  So is it your testimony that any equal at
7     Hyundai works for you?
8  A.  No. H's in parts development.
9  Q.  What did you mean by "works for me"?
10 A.  I just told you.
11 Q.  But you -- you don't claim that he's your
12    subordinate now.
13 A.  I -- I ex- -- I just explained that to
14    you. Did you want me to say it again?
15 Q.  Yeah. I didn't -- if that's your full
16    answer on that --
17 A.  Okay.
18 Q.  -- that's fine.
19        Look on Page 12.
20 A.  Um-hum.
21    I'm looking at, You know, H.I. Kim --
22    starting that paragraph.
23 A.  Uh-huh.

Page 305

1  Q.  You say, He's a prima donna.
2        Are you referring to H.I.
3     Kim there?
4  A.  Um-hum.
5  Q.  He's not used to being questioned, even
6     though he tried to charge a supplier, a
7     Japanese supplier, back in excess of
8     $100,000.
9  A.  Um-hum.
10 Q.  Is that true?
11 A.  Um-hum.
12 Q.  My question is: What did you do to
13    question Mr. Kim?
14 A.  What do you mean what did I do to
15    question Mr. Kim?
16 Q.  You say, He's not used to being
17    questioned. Did you do something to
18    question his --
19 A.  Not questioned. He's questioned with the
20    facts. H's not questioned. Murakami
21    questioned him.
22 Q.  And it was on the addenda, and he
23    wouldn't address it. We were simply

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 306

1  trying to -- and you say, they didn't
2  want to come down. It was after a
3  hurricane.
4  A. Uh-huh.
5  Q. So your testimony is you didn't do
6  anything to question Mr. Kim during the
7  meeting?
8  A. No, I did not confront Mr. Kim during the
9  meeting. Choi and I had discussions
10  about all other points --
11  Q. Okay. Look on --
12  A. -- but not directly to Mr. Kim.
13  Q. Look at Page 13 at the bottom.
14  A. Absolutely not.
15  Uh-huh.
16  Q. Did you tell this state person that you
17  felt part of the reason you were being
18  discriminated against was because you
19  were of Iranian descent?
20  A. I did.
21  Q. How -- just tell me if this -- It says,
22  Disability is the big thing, you know.
3  I guess that's referring to

Page 307

1  returning from your heart condition.
2  A. It says that; doesn't it?
3  Q. You are over 40. How old are you?
4  A. 45.
5  Q. What's your date of birth?
6  A. January 4th, '62.
7  Q. My descent is Iranian?
8  A. Um-hum.
9  Q. You say your family has been in the
10  United States for 150 years with
11  impeccable reputations.
12  Is that true?
13  A. Yes.
14  Q. Did you, in any of the documents you
15  completed at HMMA, ever identify yourself
16  as being of Iranian descent?
17  A. No.
18  Q. I mean, did you --
19  A. But Mark Lee asked me what my name meant.
20  And individuals in Korea always ask you,
21  What does your name mean.
22  Q. Did you --
3  A. Not at other companies.

Page 308

1  Q. Did you --
2  A. Not at regular American companies.
3  Q. Did you have any conversations with Mr.
4  Ahn or Mr. Cyrus -- I'm sorry. Mr. Ahn.
5  It's a long day -- Mr. Ahn or H.I. Kim
6  where you discuss your Iranian descent?
7  A. No.
8  Q. Any conversations with J.Y. Choi?
9  A. I don't believe so.
10  Q. Okay.
11  A. About that, no.
12  THE VIDEOGRAPHER: You have about
13  a minute left.
14  MR. BOSTICK: Okay. Let's go
15  ahead and switch out tapes.
16  I think we're getting pretty
17  close.
18  THE VIDEOGRAPHER: Okay. This is
19  the end of Tape No. 5 in the
20  deposition of Robert Cyrus to
21  be continued on Tape No. 6.
22  We're going off the record at
23  4:51 p.m.

Page 309

1  (Short recess)
2  THE VIDEOGRAPHER: This is the
3  beginning of Tape No. 6 in
4  the deposition of Robert
5  Cyrus. We're on the record
6  at 4:56 p.m.
7  THE WITNESS: May I -- May I go
8  back to one additional
9  comment --
10  Q. (By Mr. Bostick) Sure.
11  A. -- based on the last -- I want to say
12  Page 11 -- about that Iranian comment?
13  Q. Um-hum.
14  A. When we were doing -- I was doing initial
15  hiring of staff in the department, we
16  received resumes from human resources.
17  And Greg Kimble came over
18  one day and, you know, he was looking at
19  the resumes. And there was a gentleman
20  there who had a name Mohammad or
21  something like that. And he said to me,
22  he goes, We don't want to hire any Arabs.
23  And that was striking to me. It's like,

78 (Pages 306 to 309)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 310

1    Uh, okay.
2         So when you -- the
3    sensitivity to the Iranian thing is --
4    you know, that's part of it also. I
5    thought that was a very unusual comment.
6    I didn't say anything. But I was like,
7    All right.
8    Q. Did you tell Greg Kimble that you were of
9    Iranian descent?
10   A. No.
11   Q. Do you know if he ever knew that?
12   A. No. I doubt he did since he made that
13   comment.
14   Q. Did Mr. Duckworth ever know you were of
15   Iranian descent?
16   A. No. I have no idea.
17   Q. Look on Page 21 for me.
18   A. Tape 4?
19   Q. Yes. If you need to look in context by
20   looking at Tape 4, I'm just looking
21   at the -- I'm just looking at the -- it
22   looks like a relay of your conversation
3    with Mr. Duckworth again.

Page 311

1    A. Is this the same speaker? Dave or --
2    Q. This may be with Kimble.
3    A. It says, Unidentified speaker.
4    Q. Or it may be part of that same.
5    A. Okay. I think this is Dave Mark.
6    Q. Okay. I'm just -- about a third of the
7    way down, there's a statement, You know,
8    the executive management is unhappy with
9    my attitude.
10   A. Where's that?
11   Q. On Page 21.
12   A. I'm sorry.
13        MR. LEE: Line 5.
14        THE WITNESS: Okay.
15   Q. (By Mr. Bostick) Are you telling him what
16   Duckworth told you during the meeting
17   then?
18   A. Yes.
19   Q. Okay. Does that refresh your
20   recollection that Mr. Duckworth did tell
21   you that there was a concern with your
22   attitude?
3    A. I don't honestly remember saying attitude

Page 312

1    or hearing attitude. But that's on the
2    tape; I agree with you.
3    Q. Well, that's two instances now that were
4    a lot more closer in time --
5    A. You're right.
6    Q. -- to these events.
7         So, I guess, are you saying,
8    No, it didn't happen; or you don't
9    recollect it, and it could have
10   happened?
11   A. I don't recollect it, and it could have
12   happened, but --
13   Q. You certainly mentioned it twice back at
14   the time as it having happened.
15        Look back at Tape 3, and
16   we'll be done with the transcripts.
17   A. Okay.
18   Q. Look on Page 20.
19   A. Okay.
20   Q. This is you and Kimble talking.
21   A. Um-hum.
22   Q. I'm just looking about starting on Line
23   10: You know, and H.I. Kim and I had the

Page 313

1    run-ins on the Murakami issue where he
2    got upset that we covered an item on the
3    agenda, and he didn't want to listen to
4    it, and that's what he got all upset
5    about.
6    A. Um-hum.
7    Q. What was the item on the agenda? I mean,
8    what did you mean by "run-in" there?
9    A. "Run-in" is him acting the way he acted
10   in the meeting. He got upset for no
11   reason.
12   Q. Did he get upset with you?
13   A. No, he got upset in general. I don't
14   know what he got upset about.
15   Q. So you didn't mean to say that you and he
16   had a run-in in this comment?
17   A. Well, this means the meeting that we had
18   with Murakami. Me and Choi and --
19   Q. 35 other people?
20   A. Right. Well, mainly Choi. Yes, that's
21   what we covered.
22        MR. BOSTICK: What was my last
23        exhibit number?

79 (Pages 310 to 313)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 314

1      MR. LEE: 17, I think.
2          (The referred-to document was
3          marked for identification as
4          Defendants' Exhibit No. 18)
5   Q.  (By Mr. Bostick) I don't have a sticker
6       on it. But we'll call that 18.
7   A.  Is this my copy? Is that 4?
8   Q.  Do you recall receiving Exhibit 18?
9   A.  Yes.
10  Q.  And this -- was this the letter you
11      referred to earlier saying to report back
12      to the plant and not represent yourself
13      as a --
14  A.  I think it states it in there; doesn't
15      it. B says during your work absence from
16      HMMA you are not to represent the company
17      in any business, negotiations or conduct
18      any company business on behalf of HMMA.
19  Q.  And then, did you have any telephone
20      conversations with Mr. Duckworth between
21      the meeting you had with him and the
22      dinner and the time you got your
3       termination notice from him?

Page 315

1   A.  I think the dinner was the 22nd; correct?
2   Q.  Yes.
3   A.  And this is the 24th.
4   Q.  I'm talking about conversations.
5   A.  I'm -- yeah, I'm just trying to get the
6       time frame straight. No, I didn't speak
7       with him.
8          (The referred-to document was
9          marked for identification as
10         Defendants' Exhibit No. 19)
11  Q.  (By Mr. Bostick) Is Exhibit 19 a correct
12      copy of the termination notice you
13      received?
14  A.  I'm sorry. What's your question again?
15      Is this the termination notice I
16      received?
17  Q.  Yes.
18  A.  Yes, it is. It appears to be.
19         (The referred-to document was
20         marked for identification as
21         Defendants' Exhibit No. 20)
22  Q.  (By Mr. Bostick) Can you identify Exhibit
3       20 for me?

Page 316

1   A.  It's a letter to Keith Duckworth.
2   Q.  Did you mail this letter?
3   A.  I don't know if it was mailed or faxed.
4       I think it was faxed.
5   Q.  Why -- why did you do a separate letter
6       to Mr. Duckworth and then the letter to
7       Mr. Ahn?
8   A.  You mean the letter to Ahn and Kim and --
9       the four-recipient letter?
10  Q.  Right.
11  A.  Because my attorney instructed me to do
12      so.
13  Q.  Did you -- was Duckworth listed on the
14      multiple-recipient letter as well?
15  A.  I would have to look at that. Yes.
16  Q.  Okay. What is the notations HRAR? Are
17      those specifics policies you are
18      referencing?
19  A.  Where are you? I'm sorry.
20  Q.  I'm on the first page of Exhibit 20 in
21      the subject line.
22  A.  Subject line. Yes.
23  Q.  Okay.

Page 317

1   A.  I don't know what they stand for. I
2       would imagine Human Resource Alabama. I
3       don't know. They look like policy
4       procedure numbers.
5   Q.  But you don't know what the specific
6       policies being referenced are?
7   A.  These are the ones my attorney advised me
8       to obtain.
9          MR. STOCKHAM: Don't tell him what
10         I -- what we talked about.
11         THE WITNESS: Okay. I wasn't
12         Supposed to answer that.
13  Q.  (By Mr. Bostick) So you don't know
14      personally what policies those are that
15      are being referenced?
16  A.  They're provided to you in the discovery
17      phase. I don't recall the name of it.
18  Q.  I'm just asking what your -- I'm talking
19      about what's your personal knowledge
20      versus what was manufactured by your
21      attorney in the drafting of this letter.
22  A.  What's my personal -- restate that, if
23      you would.

80 (Pages 314 to 317)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 318

1  Q.  Do you know personally what those two
2      policies are that are being referred
3      to?
4  A.  At the time of authoring the letter?
5      Yes.
6  Q.  Okay.  But as you sit here today, you're
7      not sure?
8  A.  Well, I think one is discrimination, and
9      I'm not sure what the other one is.
10     Harassment.
11             (The referred-to document was
12             marked for identification as
13             Defendants' Exhibit No. 21)
14  Q.  (By Mr. Bostick) Can you identify Exhibit
15     21 for me1?
16  A.  Charge of discrimination.
17  Q.  Did you -- did you sign this?
18  A.  Yes.
19  Q.  Okay.  And just so I'm clear, you got
20     date of most recent discrimination is
21     December 6, 2005.  That's the date you
22     were notified of your termination; is
3      that correct?

Page 319

1  A.  Um-hum.
2  Q.  And just summarizing this, you know, one
3      of the questions is, what is -- what are
4      the employment actions that your lawsuit
5      is based upon?  And my understanding,
6      just so we're clear is, your contention
7      is that your termination was
8      discriminatory, because of your
9      contention that Mr. Choi engaged in the
10     same behavior you did but was not
11     terminated; is that correct?
12  A.  That's correct.  And retaliation is
13     another element.
14  Q.  Okay.  Based on your complaints that you
15     say that you were retaliated against for
16     complaints earlier?
17  A.  Yes, sir.
18  Q.  And have we fully talked about all of
19     your complaints that you've made that you
20     base your retaliation claim on today?
21  A.  As I stated, as I can recall at this
22     point in time.
3   Q.  Okay.  Is there anything in your

Page 320

1      documents that would refresh your
2      recollection on that point?
3  A.  Not that I'm aware of.
4  Q.  Okay.  Anything in the documents, because
5      we could hold the deposition.  You're
6      going to be tomorrow anyway.  If you want
7      to have time to look through your notes
8      and go through and look and see if
9      there's any other point, we'll be glad to
10     do that.
11  A.  I don't get -- point for what?  Can you
12     please elaborate on that?
13  Q.  What you are saying is, you were
14     retaliated against for complaints.  I'm
15     asking if we talked fully about whatever
16     complaints you have made.
17  A.  Right.  To my knowledge now, I mean, as
18     we talked about it in excruciating detail
19     about my discussions with Keith
20     Duckworth.
21  Q.  Okay.
22  A.  That's honest and full disclosure at this
23     point.

Page 321

1  Q.  Okay.  Now, in this point, the second
2      sentence of the charge says, In September
3      I had met with Mr. Duckworth and reported
4      issues of Korean's discriminating against
5      Americans, sexual harassment and Korean's
6      involved in workplace violence.
7              Is that September date
8      incorrect to where you're talking about
9      the meeting you had with him when he got
10     there in the summer?
11  A.  Let's see here.
12              This is probably when we met
13     when the Korean colleagues came over.  So
14     I had the meeting with Duckworth, and
15     then he introduced me to the Korean
16     colleagues to reiterate what I just told
17     him.
18  Q.  Okay.  But I thought you said that was
19     closer in time to June or July.
20  A.  Whenever Duckworth came over is the first
21     occurrence.  And when the Korean
22     colleagues came over in number, that's
23     the second occurrence.

81 (Pages 318 to 321)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 322

1  Q.  Okay.  When --
2  A.  I don't have the dates.  I mean, there
3     should be some --
4  Q.  What's your best recollection about when
5     Duckworth came over?
6  A.  The summer of 2005.  I really couldn't
7     tell you, sir.  I'm sure Hyundai knows
8     when he came over.  I mean, that really
9     wasn't of importance to me where I made a
10    note of it.
11 Q.  Did you understand you were signing this
12    under penalty of perjury?
13 A.  Yes.
14 Q.  Just so I am clear, I know that you --
15    you contend that you were made promises
16    about a promotion.  But as it relates to
17    your federal court lawsuit where you're
18    talking about being treated differently
19    than Korean counterparts, are there any
20    promotions, reprimands or other
21    employment actions, other than your
22    termination, that you contend that you
3     were treated differently than?

Page 323

1  A.  There were -- there were no reviews, so
2     there couldn't have been any review
3     data.
4  Q.  You were never suspended.
5  A.  Never.
6  Q.  You were never demoted.
7  A.  Nothing.  Nothing.  I was given letters
8     from the chairman's son and handwritten
9     notes from the president about how good a
10    job I'm doing.  Nothing derogatory in the
11    least.
12 Q.  So other than your termination, there's
13    not an employment action that happened
14    somewhere other --
15 A.  Not at all.
16 Q.  -- along the way that you are bringing a
17    suit over.
18 A.  Not in my career at any company.
19    MR. BOSTICK:  Why don't we go off
20    the record for a second.
21    THE VIDEOGRAPHER:  We are going
22    off the record at 5:14 p.m.
3     (Discussion off the record)

Page 324

1     THE VIDEOGRAPHER:  We're back on
2     the record at 5:21 p.m.
3     MR. BOSTICK:  We had a discussion
4     trying to get this wrapped
5     up.  Just off the record, I
6     had given a copy of a consent
7     form regarding some medical
8     records that we requested.
9     And I think we jointly agreed
10    to leave the deposition open
11    for the limited purpose of if
12    we need to come back with
13    regard to anything in the
14    medical records we receive
15    down the road.
16    MR. STOCKHAM:  That's fine.
17    MR. BOSTICK:  Is that fine?
18    MR. STOCKHAM:  We will review.  If
19    there is no issue, we will.
20 Q.  (By Mr. Bostick)  For purposes of our
21    deposition tomorrow, you mentioned there
22    being some type of written correspondence
23    between you and Mr. Duckworth that

Page 325

1     related to the vice president issue and
2     some type of written promise.
3  A.  Um-hum.
4     MR. BOSTICK:  Can you see if you
5     can locate that document.
6     MR. STOCKHAM:  Sure.
7     MR. BOSTICK:  That might speed the
8     questions along.
9  Q.  (By Mr. Bostick)  Finally, I just wanted
10    to ask you some questions about damages
11    in this case and what do you -- how do
12    you contend --
13    MR. STOCKHAM:  I tell you what, to
14    short-circuit that part, at
15    least with regard to the --
16    to the back pay and benefits
17    issue and lost future earning
18    potential, we -- we can
19    provide you that in just --
20    MR. BOSTICK:  Well, It was
21    supposed to be provided in
22    the initial disclosures,
23    which I haven't received yet.

82 (Pages 322 to 325)

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO
56d0f432-d945-405e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

1    So --
2    MR. STOCKHAM: Well, the back pay
3    and benefits are just
4    depending on -- you know,
5    it's an ongoing thing until
6    we get to the time of
7    trial.
8    MR. BOSTICK: Right. Well, I
9    guess if we want to reserve
10   on those issues keeping that
11   open to see what you've
12   got.
13   I guess, back pay, that's fine
14   with me. It's, the documents
15   are what they are.
16   MR. STOCKHAM: Sure.
17 Q. (By Mr. Bostick) Are there any
18   out-of-pocket expenses, i.e., like moving
19   from here to Illinois that you incurred
20   that you would claim that Hyundai is
21   responsible for?
22 A. No. I mean, specifically about that, my
23   move was paid for my Eisenmann

1    Corporation.
2  Q. Okay. Were there any -- you had already
3    sold your house. Were there any issues
4    with foreclosure or any type of loans
5    that went bad and you didn't file
6    bankruptcy or any kind of debts
7    outstanding that you say you were unable
8    to pay because of a period of
9    unemployment?
10 A. I am racking up expenses from borrowed
11   money from my father in the tune of
12   $8,000 every month. That's net.
13 Q. Okay. Have you repaid him yet?
14 A. I have no means to repay him.
15 Q. Okay.
16 A. He is retired. They are both 70. It's
17   wonderful to ask for $8,000 from your
18   parents every month.
19 Q. Did you -- when did you start asking for
20   that money?
21 A. After I was -- Eisenmann shut up shop in
22   the States. Well, prior to that also.
23 Q. I mean, had you asked for any money from

1    them during the period of time between
2    when you worked for Hyundai and --
3  A. Absolutely.
4  Q. How much did you receive per month
5    then?
6  A. I couldn't tell you on a monthly basis.
7  Q. Approximately what was the total amount
8    you received?
9  A. You know, I had to pay my COBRA, which is
10   $1,000 a month. My life insurance was
11   $406 a month. My alimony and child
12   support, which was 3,084 a month. My
13   rent on my house, which was about 1,200 a
14   month. Utilities, food, shelter. Just
15   the basic necessities. Food, gasoline.
16 Q. And so we are -- between the time you got
17   the job at Eisenmann, we are talking
18   about approximately January, February,
19   March, April and maybe part of May?
20 A. Yes.
21 Q. Okay. So what's your best estimate as to
22   the amount of money you borrowed from
23   your dad in that five-month period?

1  A. Close to 100,000 -- oh, from this point
2    on during --
3  Q. No, just that period of time.
4  A. Oh, you know, I would have to guess. I
5    don't know. 15- to $30,000.
6    MR. STOCKHAM: We can get you the
7    specifics about it.
8  Q. (By Mr. Bostick) Okay. But you don't
9    make any contention in this lawsuit that
10   Hyundai had anything to do with you
11   losing your job at Eisenmann; do you?
12 A. No, they shut down. They didn't
13   really -- I mean, yes, you can phrase it
14   that way, I guess.
15 Q. Tell me about how you contend, you know,
16   one of the claims is emotional distress
17   damages. Tell me how you suffered any
18   emotional distress, if any, as a result
19   of being terminated.
20 A. How about sitting in the house 40 hours a
21   week trying to find a job. My flawless
22   resume and background is marred by a
23   termination from Hyundai as a director of

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 330

1    purchasing. Every interview is, Well,
2    why did you leave Hyundai? And I have to
3    tell them exactly what happened. And I
4    do.
5            And they are like, Well, you
6    know -- Well, there are other candidates
7    that don't have this suspicious
8    background. And, you know, if Hyundai
9    indicates to a prospective employer that
10   I am involved in a litigation, which I
11   believe has happened a number of times,
12   that sabotages me.
13           So not only are my children
14   away from me, I am not able to pay for
15   anything. I don't have any camaraderie.
16   I don't have any interaction with any
17   human other than looking for jobs.
18 Q.  What -- what is --
19 A.  I have been to numerous psychiatrists
20   about this, counselors, to talk about the
21   grief and how to handle this. I've never
22   had to ask for a penny from anybody in my
`3   life. I have been working since I was 15

Page 331

1    years old. This is a change for me.
2  Q.  What -- what do you base this belief on
3    that somebody from Hyundai has advised
4    current or prospective --
5  A.  Well, let's see. I talked to a steel
6    corporation in Virginia Beach, had a
7    phone screen. They were ready to -- they
8    were talking to -- trying to convince me
9    to -- you will love the area. Come on
10   down. The next thing I know, they said
11   that they spoke to Hyundai and I just
12   wasn't the right fit at this point.
13           So I called Richard and
14   said, Hey, I have reason to believe --
15       MR. STOCKHAM: Don't discuss --
16       THE WITNESS: Okay. All right.
17       MR. STOCKHAM: -- what we talked
18   about.
19 Q.  (By Mr. Bostick) You are not talking Rick
20   Neal; are you? You're talking about your
21   attorney? Okay. Go ahead.
22 A.  Richard.
`3           I applied for a job. I was

Page 332

1    actually contacted by a recruiter for a
2    job with ThyssenKrupp. I had a phone
3    screen. The guy flies down to
4    Louisville, flew up from Atlanta. We had
5    a meeting. This is a recruiter. I
6    passed that hurdle.
7            They flew me to Mobile. I
8    met with the chief financial officer, Dr.
9    Marcus Boning. He would be my boss. He
10   calls me later that week and says, Rob, I
11   have good news for you. We want you to
12   join our team. You are perfect. They
13   wanted somebody that had lived in
14   Alabama, had worked for a German company,
15   and had done plant start-ups.
16           This is $4.5 billion project
17   in Mobile. Then two weeks later all I
18   have to do is meet with the president for
19   basically a hello meeting and then to
20   formalize it. So between the time of Dr.
21   Boning saying, Rob, I want you to join the team, I meet
22   for you, I want you to join the team, I meet
23   with Bob Sulliey, who is the president of

Page 333

1    ThyssenKrupp, carbon division, and he was
2    as cold as ice to me as if something
3    occurred. I mean --
4  Q.  But do you know of any specific
5    communications between Hyundai and any
6    Hyundai official and any official of
7    those companies?
8  A.  The recruiter, Mr. Michael Ladd, out of
9    the Atlanta, the Harvard Group, contacted
10   my references. So I don't know if he
11   contacted Hyundai or not.
12 Q.  Is he your person -- does he represent
13   you?
14 A.  He represents the company. You know, he
15   is a recruiter under the services of
16   ThyssenKrupp.
17 Q.  I mean, other than speculation, do you
18   have any personal knowledge that somebody
19   from Hyundai said something to anybody --
20 A.  No, but I have personal knowledge that in
21   my past I have never interviewed for a
22   job that I have not gotten. So this is
23   very unusual to go from, Welcome to the

84 (Pages 330 to 333)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 334

1　team to this situation. You know, the
2　key person working with ThyssenKrupp is
3　Todd Strange, the same gentleman who got
4　Hyundai to Alabama. So I am pretty
5　sure.
6　Q.　Do you know of any specific
7　　conversations --
8　A.　It's a small -- it's a small community.
9　Q.　-- between any steel corporation
10　　employees and Hyundai?
11　A.　They said that they talked to individuals
12　　at Hyundai.
13　Q.　Who did they say they spoke to?
14　A.　They didn't know.
15　Q.　Did they say what they were told?
16　A.　No.
17　Q.　Did they say anything about if they were
18　　told you had a lawsuit or anything to
19　　that effect?
20　A.　No.
21　Q.　Okay. Do you know anything more than
22　　that comment?
3　A.　No.

Page 335

1　Q.　Did they tell you they talked to other
2　　past employers other than Hyundai as
3　　well?
4　A.　No.
5　Q.　Who are -- can you give me the
6　　identification of these doctors you say
7　　you have spoken to about --
8　A.　You have the --
9　Q.　The emotional distress?
10　A.　I mean, Steven Shaffer is the one in
11　　Chicago. Gerald Ivy's the counselor at
12　　the firm. I can't remember in
13　　Montgomery, but he is not a psychiatrist,
14　　but I met with both of the individuals.
15　　Who else?
16　Q.　Anybody in Kentucky?
17　A.　The guy in Kentucky. Yep. Perry Sutton
18　　and Craig Congulton.
19　Q.　Do you know anybody else that you can
20　　think of?
21　A.　No.
22　Q.　Did you lose any weight during the period
3　　of time or have any physical

Page 336

1　　manifestations of your anxiety over
2　　losing the job after --
3　A.　Did I lose weight?
4　Q.　Yes.
5　A.　I mean, that's not really -- that's one
6　　indication. Gaining weight could be
7　　another indication.
8　Q.　I am asking you, have you had that
9　　indication?
10　A.　Has my weight fluctuated? I have gained
11　　weight, and I have lost weight.
12　Q.　Okay.
13　A.　So I don't think that's an indicator.
14　Q.　No specific weight. Did you have any --
15　A.　I didn't say no specific weight.
16　Q.　-- problem with sleep?
17　A.　Yeah. I have had sleep studies done,
18　　sleep apnea studies, two of them.
19　Q.　When did you first have sleep apnea
20　　issues?
21　A.　I did that in Chicago.
22　Q.　Okay. Did you ever go to anybody here
23　　while you were in Alabama?

Page 337

1　A.　For sleep apnea?
2　Q.　Sleep apnea?
3　A.　No.
4　Q.　Ever go -- have any issues with crying?
5　A.　Crying?
6　Q.　Yes.
7　A.　No. Crying? I mean, what's the
8　　question? Issues with crying? What does
9　　that mean?
10　Q.　Bouts of crying as a -- I'm asking you
11　　about physical manifestations of this
12　　supposed --
13　A.　Bouts of crying?
14　Q.　-- emotional distress that you are
15　　telling me.
16　A.　No, no bouts of crying.
17　Q.　But we've already established you're
18　　going through a pretty nasty divorce
19　　during this same period of time?
20　A.　I divorced her, you know.
21　Q.　Yeah, but I mean --
22　A.　It's not nasty, really.
23　Q.　Okay.

85 (Pages 334 to 337)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS  ·
Court Reporting*Legal Videography*Trial Services

Page 338

1  A.  We are still friends.
2  Q.  So that was an easy divorce for you?
3  A.  I mean, you can say what you would like
4      to say. I didn't say that.
5  Q.  Is it your testimony that your divorce
6      didn't cause you any stress in your life
7      during that period of time?
8  A.  My marriage caused me stress because of
9      my wife's drinking problem.
10 Q.  Okay. But you know --
11 A.  The divorce caused stress.
12 Q.  Was that something you were talking to
13     your counselor about as well?
14 A.  I talked to my boss. Did I tell you
15     about talking to ▓▓▓▓▓ about possibly
16     getting a divorce? ▓▓▓▓▓▓▓ And
17     he said, Rob, that would be very bad for
18     your career. This was the day or two
19     before our 4th of July picnic at the
20     amusement park in Birmingham -- Bessemer.
21         So he -- I explained that,
22     you know, we were going through --
3      through some difficult times, and I

Page 339

1      thought I was going to file for divorce.
2      ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
3      ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
4      ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
5      ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
6      ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
7      ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
8      ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
9      ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
10     ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
11     ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
12     ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
13 Q.  Okay.
14 A.  When I went to HR after I got a divorce,
15     Kisha Morris didn't want to change my
16     address in the system to my rental house
17     because everybody would know I was
18     getting divorced.
19 Q.  So is it your contention now that you
20     were terminated from Hyundai because you
21     got a divorce?
22 A.  I didn't say that.
3  Q.  Okay. Any other physical

Page 340

1      manifestations --
2  A.  Depression.
3  Q.  -- of any anxiety that you had during the
4      time you were here in Montgomery after
5      you were terminated?
6  A.  You know, you would have to talk to the
7      medical experts on that. I mean,
8      depression obviously.
9  Q.  Okay. And I'm asking what manifestations
10     you had physically. I mean, if you don't
11     know --
12 A.  Headaches, depression, sleeplessness, too
13     much sleep. You know, incredible
14     depression. As far as, you know, my life
15     was very good, solid and on track; and
16     now it's in this situation because of
17     Hyundai.
18 Q.  Have you talked to anybody about being a
19     potential witness in your case?
20 A.  Anybody about being a potential witness
21     in my case?
22 Q.  Yes.
23 A.  Can you elaborate on that, please.

Page 341

1  Q.  Did you have a call with someone and say,
2      I would like for you to be a witness in
3      my case?
4  A.  No.
5  Q.  You never talked to Mike Hansford about
6      that?
7  A.  About, Will you be a witness in my case?
8  Q.  Yes.
9  A.  No, not a witness in my case. I've
10     talked to him about items that have
11     occurred. I haven't asked anybody to be
12     a witness.
13 Q.  Since you first consulted your attorney,
14     who have you spoken with about your
15     potential claims there at Hyundai?
16 A.  Dave Mark, Gerald Horn, Will Caldwell,
17     Chuck Knowles, Chris McClain. Did I say
18     him already?
19 Q.  Huh-huh.
20 A.  Who have I discussed the lawsuit with?
21     Kimble. I mean, other than the obvious,
22     Neal and Kimble. If I had an org chart I
23     could tell you more definitely. Let's

86 (Pages 338 to 341)

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO
56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 342

1  see. Harry Chase. I mean, there is more
2  people.
3  Q. What did you talk to Will Caldwell
4  about?
5  A. I talked to him about the Murakami
6  meeting.
7  Q. Was he in attendance?
8  A. He was in attendance. I talked to him.
9  He went to dinner. I don't know if I
10  should -- I need to ask my attorney
11  something.
12  THE WITNESS: Can we discuss the
13  dinner?
14  MR. STOCKHAM: Sure.
15  THE WITNESS: We had a dinner with
16  myself and Richard and talked
17  about their recollection of
18  the -- of the meeting and
19  activities at Hyundai. And
20  that was with Dave and Harry
21  and Will Caldwell. And who
22  else was there? I think
3  that's it.

Page 343

1  Q. (By Mr. Bostick) Did Will Caldwell or
2  Harry give any kind of affidavit to
3  you?
4  A. We got one from -- do we need to discuss
5  this?
6  MR. STOCKHAM: No.
7  THE WITNESS: Don't discuss it?
8  MR. STOCKHAM: Just tell him.
9  THE WITNESS: Gerald Horn. I
10  think we got one from him.
11  Q. (By Mr. Bostick) And Michael Hansford?
12  A. And Hansford; that's correct.
13  Q. Do you know if there was an affidavits
14  from anyone else?
15  A. I don't think so.
16  Q. Was Chuck Knowles at this meeting as
17  well?
18  A. Yes, he was.
19  Q. Did any of the people meeting in that
20  meeting say that they heard you use the
21  word "bullshit"?
22  A. No.
3  Q. Okay. Did any of them say they felt you

Page 344

1  acted inappropriately or ignored Mr.
2  Kim's instructions to refocus the
3  subject?
4  [text redacted]
5  [text redacted]
6  [text redacted]
7  [text redacted]
8  [text redacted]
9  [text redacted]
10  [text redacted]
11  [text redacted]
12  [text redacted]
13  [text redacted]
14  [text redacted]
15  [text redacted]
16  [text redacted]
17  Q. What did you talk to her about?
18  A. The case.
19  Q. When did you talk to her?
20  A. I would say within 30 to 90 days after
21  the termination.
22  Q. Is that one of the recorded
23  conversations, or was it --

Page 345

1  A. I think it is. I'm not sure. I can look
2  back at that.
3  Q. Did you --
4  A. Yeah, I think it is. Well, I'm not sure.
5  I think it's about her because we talked
6  about Chappy's.
7  Q. Did -- did you ever hear Mr. Duck- -- did
8  Mr. Duckworth ever say anything about --
9  did he ever say that you were being fired
10  for -- in retaliation for any kind of
11  complaints?
12  A. Did he ever say that?
13  Q. Yeah.
14  A. No, he did not.
15  Q. I take it Mr. Kim or Mr. Ahn never said
16  that to you?
17  A. I never spoke to them after the
18  meeting.
19  Q. Okay. I mean, is there anybody that
20  works at HMMA that told you that they had
21  heard you were fired for making
22  complaints?
23  A. No.

87  (Pages 342 to 345)

56d0f432-d945-406e-9720-c4dc38812a6a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 346

1  Q.  Okay. Has anybody expressed that opinion
2      to you?
3  A.  Yes.
4  Q.  Who expressed that opinion to you?
5  A.  Let's see. Will Caldwell, Dave Mark,
6      Hansford, Harry Chase. Probably those
7      people.
8  Q.  Those people that expressed their
9      opinion --
10 A.  Retaliation, you know -- let's clarify.
11     Retaliation or Murakami; which one? I
12     know you said "retaliation."
13 Q.  They suspect you were terminated because
14     of the events at the Murakami meeting.
15 A.  Dave thinks that and retaliation.
16     Hansford thinks that and retaliation.
17 Q.  Okay.
18 A.  The other ones think it's Murakami. I
19     would say Caldwell thinks it's
20     retaliation too.
21 Q.  But any -- did any of these people, when
22     they told you their opinions, say that
3      they were basing that on something that

Page 347

1      they were told by Duckworth, Ahn or H.I.
2      Kim?
3  A.  No.
4  Q.  Okay. Just so I am clear, from the time
5      you got the termination letter from Mr.
6      Duckworth, did you have any meetings or
7      conversations with him after that point
8      in time?
9  A.  I had to go back in the day that my
10     Family Medical Leave expired and report
11     to work. And I did that in my uniform
12     and said, I am ready to go to my desk.
13     And he advised me that I am not to do
14     that. That was the last meeting I had --
15     discussion I had with him.
16 Q.  Okay. You know it looks like the
17     termination letter had a severance
18     package discussion. I mean, did you ever
19     call him back to talk about that or to
20     say that, I am not going to take this, or
21     or, I'll take it if I can get more, or
22     anything like that?
3  A.  We talked about that in the face-to-face

Page 348

1      meeting down by the security office in
2      the Hyundai building in Montgomery.
3  Q.  Okay. And what was your response to the
4      severance package?
5  A.  My response that 24 weeks was not
6      adequate for the damage that it had
7      caused me through no result of my own
8      actions.
9  Q.  Did you make any kind of counteroffer?
10 A.  Yeah, I did.
11 Q.  What was your counterproposal?
12 A.  Four years.
13 Q.  Did you get a response to that?
14 A.  He said -- I believe, he said, No way.
15 Q.  Was that the end of the back and forth
16     with regard to the severance package?
17 A.  Yes.
18     MR. BOSTICK: Do you want to take
19     a break?
20     MR. NEAL: I have nothing.
21     MR. BOSTICK: I think we are done
22     subject to leaving open the
23     points earlier.

Page 349

1      THE VIDEOGRAPHER: All right.
2      This is the end of Tape No. 6
3      and concludes today's portion
4      of the deposition of Robert
5      Cyrus taken on November 27th,
6      2007. We're going off the
7      record at 5:44 p.m.
8  (Whereupon, the proceedings adjourned
9  at 5:44 p.m.)

88  (Pages 346 to 349)

56d0f432-d945-406e-9720-c4dc38812a6a

# EISENMANN

Corporation

May 9, 2006

Mr. Robert Clay Cyrus

Montgomery, AL 36117

Dear Mr Cyrus:

### Subject:  Your Employment with EISENMANN CORPORATION

We are delighted that you have decided to join EISENMANN on or about May 15, 2006; however, your employment is conditioned upon you passing the required pre-employment drug test.

An employee manual providing you with general information and guidelines about EISENMANN is attached; however, for the sake of good order, we would like to outline the terms of your employment below:

1.  As the General Manager, Procurement you will report to the President, who will advise you of your duties.  These duties may change from time to time during your employment.

2.  You will receive an annual salary of $ 125,000.00, payable in monthly installments. Your performance and salary will be reviewed on an annual basis, usually at the end of the calendar year, with any adjustments becoming effective the beginning of the following year.

3.  You will earn twenty (20) days of vacation per year, which will be prorated during the first year.

4.  EISENMANN CORPORATION agrees to pay you, upon joining the company, a sum of $20,000.00 in the form of a "forgivable loan"; specifically, the loan shall be considered repaid upon your second anniversary of employment.

5.  Should you decide to move into the Crystal Lake area within one year of, and during your employment at EISENMANN CORPORATION, we agree to reimburse your direct moving expenses.

EXHIBIT

1

EISENMANN Corporation
150 East Dartmoor Drive • Crystal Lake, Illinois 60014
Phone: (815) 455-4100 • Fax: (815) 455-1018
www.eisenmann.com

Divisions of EISENMANN:
Finishing Systems • Application Systems • Material Handling • Ceramic Kilns
Environmental Protection • Porcelain Enamel Systems • Wood Technology

CYRUS   309

Mr. Cyrus
May 9, 2006
Page 2

6.   You will be eligible for a one bedroom corporate apartment up to a period of six
     months.  For a period of one year, you will receive family medical coverage and the
     total cost will be paid by EISENMANN.

7.   You shall be entitled to participate in any benefit programs offered by EISENMANN
     from time to time to similarly situated employees so long as you meet the eligibility
     requirements, including such things as reimbursement of expenses, fringe benefits,
     group health insurance plans, life insurance and incentive savings/profit sharing plan.

8.   You agree to promptly disclose and grant to EISENMANN any title and interest in and
     to any inventions, patents, trademarks, copyrights, and applications therefore, trade
     secrets, technical information, customer lists, supplier sources and all other related
     matters made, conceived, developed, and/or acquired by you solely or jointly with
     others during your employment with EISENMANN and for a period of six (6) months
     thereafter, which relate to the business and affairs of EISENMANN and thereafter to
     sign such assignments and other papers and documents, and perform such acts as
     may be necessary or convenient to effectuate the provisions under this paragraph as
     from time to time requested by EISENMANN.  This provision does not apply to any
     invention for which no equipment, supplies facilities, or trade secret information of
     EISENMANN was used and which was developed entirely on your own time unless
     (a) the invention relates (i) to the business of EISENMANN, or (ii) to EISENMANN's
     actual or demonstrably anticipated research or development, or (b) the invention
     results from any work performed by you for or at EISENMANN.

9.   As a result of your employment, you will have access to and learn certain confidential
     business information regarding EISENMANN, including but not limited to specific
     customer information and proprietary technical data.  All such information is the sole
     and exclusive property of EISENMANN, and its unauthorized use and/or disclosure by
     you could cause serious and irreparable damage to EISENMANN.  Therefore you
     agree that you will not, either during your employment with EISENMANN or at any
     time thereafter, reveal to any person or use without EISENMANN's specific written
     authorization any confidential information pertaining to the business and affairs of
     EISENMANN which has not theretofore been disclosed to the public by EISENMANN
     or some other authorized source.  All such information is considered confidential
     unless it is available from a published source, provided that publication was not
     effected in violation of this agreement or any other obligation.

10.  Your employment is for an indefinite period of time, and it may be terminated by you or
     EISENMANN at any time by giving thirty (30) days' written notice.  EISENMANN may
     in its discretion elect to pay you thirty (30) days' pay in lieu of notice.

11.  This Agreement shall be construed in accordance with the laws of the State of Illinois.
     Any claim or controversy that arises out of or relates to this Agreement or the validity,
     interpretation, enforceability or breach thereof, which is not settled by agreement
     between the parties, will be filed within (60) days and settled by arbitration in Chicago,
     Illinois, in accordance with the Commercial Arbitration Rules of the American
     Arbitration Association.  The parties may agree on the selection of a single arbitrator,
     but if they cannot so agree, each party shall select an arbitrator and the two selected
     arbitrators shall select a third arbitrator.  The award by the arbitrators shall be final, and
     judgment upon the award rendered may be entered in any court having jurisdiction

Mr. Cyrus
May 9, 2006
Page 3

thereof. Each party shall bear its own expenses (including without limitation, legal fees, costs and other expenses) in connection with any such arbitration. If a single arbitrator is involved, the parties shall share equally any costs related thereto; provided that if three arbitrators are involved, each party shall bear the costs for the arbitrator which it individually selects and share the costs for the third arbitrator.

The above is personal and must be kept confidential.

Please indicate your agreement with the above by signing on the line provided below.

EISENMANN CORPORATION

_____
Matthias Erdmannsdörfer
President

_____
Herbert J. Byder
Vice President

_____
Robert Clay Cyrus

_____
Date

V:\HR\Employees

# EISENMANN

Corporation

October 26, 2006

Dear Robert Cyrus:

We are submitting this notice of mass layoff in compliance with the federal Worker Adjustment and Retraining Notification Act (WARN) and the Illinois Worker Adjustment and Retraining Notification Act.

### 1. Nature of Planned Action

The planned action is a mass layoff and is expected to be permanent.

### 2. Expected Date of the Mass Layoff

The mass layoff is expected to occur on December 31, 2006, or within 14 days thereafter. Your current pay and benefits will be continued though December 31, 2006 but you will only be required to come to work between October 26 and December 21 as directed by the company.

### 3. Applicable Bumping Rights

There are no job displacement procedures established for employees in your job category.

### 4. Name and Telephone Number of Company Officials to Contact for Further Information

Herbert J. Buder (815-477-5314) or Donna Waller (815-477-5702).

We will contact you if there are any changes in the situation.

Sincerely,

EISENMANN CORPORATION

Herbert J. Buder
Vice President
Finance and Administration

EXHIBIT
2

EISENMANN Corporation
150 East Dartmoor Drive • Crystal Lake, Illinois 60014
Phone: (815) 455-4100 • Fax: (815) 455-1018
www.eisenmann.com

Divisions of EISENMANN:
Finishing Systems • Application Systems • Material Handling • Ceramic Kilns
Environmental Protection • Porcelain Enamel Systems • Wood Technology

CYRUS   218

# EISENMANN

Corporation

October 26, 2006

Robert Cyrus

Crystal Lake IL  60014

Dear Robert Cyrus:

In line with the W.A.R.N. act, this letter serves as your 60 day notice of our mass layoff.  Your employment will be terminated effective December 31, 2006.  We regret having to take this action, but as you are aware, the company has to re-direct its business focus on the profitable process system products to remain viable.

You will be paid through December 31, 2006, and your November and December pay checks will be issued on the regularly scheduled pay dates in each of those months.  All unused vacation days will be paid out along with the December pay.

To assist you in finding new employment we waive our right to have you report to work; you are free to leave after you have taken care of any open business.  Please, coordinate your departure with your supervisor.

Your life and health insurance will continue through December 31, 2006.  Enclosed in this packet you will find information regarding your 401(k) plan, continuation of the health coverage, as well as information regarding an outplacement seminar scheduled for November 1, 2006 at the Holiday Inn for Eisenmann employees.  If you have any questions regarding these matters, please phone Donna Waller in the Human Resources Department.

If you have any outstanding expenses, we ask that you submit them for reimbursement to the Accounting Department as soon as possible.  All laptops, phones, phone cards, keys or other company equipment must be returned to Michael Wood before you leave.  Specific needs and questions should be directed to Herbert J. Buder (477-5314) or Donna Waller (477-5702).

Please remember that all EISENMANN industrial and intellectual property must remain with the company.  We expect you to honor our right of ownership.

We wish you much success in your future endeavors.

Sincerely yours,

EISENMANN CORPORATION

Mark West
President

Herbert J. Buder
Vice President

EISENMANN Corporation
150 East Dartmoor Drive · Crystal Lake, Illinois 60014
Phone: (815) 455-4100 · Fax: (815) 455-1018
www.eisenmann.com

Divisions of EISENMANN:
Finishing Systems · Application Systems · Material Handling · Ceramic Kilns
Environmental Protection · Porcelain Enamel Systems · Wood Technology

CYRUS  219



EXHIBIT

3

# Robert Clay Cyrus, C.P.M.

Montgomery, AL 36117
*Home Phone: (334)* ▓▓▓▓▓
*Cell Phone: (334)* ▓▓▓▓▓

## *Executive Summary*

- <u>Extensive Manufacturing and Plant Start-up experience</u>
  - ➤ **Toyota** Motor Manufacturing Plant #1 and #2, Georgetown, Kentucky
  - ➤ **Mercedes Benz** U.S. International, Vance Alabama
  - ➤ Mercedes-Benz M-Class CKD Operation, Graz, Austria *(SFT Steyer Daimler Puch)*
  - ➤ **Hyundai** Motor Manufacturing Alabama, Montgomery, Alabama
- Diverse International Business Development Experience.
- Strong Leadership, Strategic Development and Negotiation Skills.
- Hands on knowledge of "Toyota Production System".

## *Employment History*



### HYUNDAI Motor Manufacturing Alabama, LLC        May 2002 to Dec 2005

### Director of Purchasing (Parts Development)

- Recruited as first American hired (badge #1) for Hyundai's first U.S. Automotive Manufacturing Plant with investments of over $1.3 Billion USD, 2 Million+ square feet.
- Recruited, hired and developed entire Direct Purchasing department staff (50+).
- Developed HMMA's overall purchasing long term sourcing strategy for Sonata and Santa Fe models (300,000 / year) plus Lambda Engine Plant (200,000 / year).
- Selected, negotiated and developed HMMA's supply base with annual buy in excess of $4.5 Billion (USD).
- Achieved world class material costs, with continuing emphasis on lean manufacturing.
- Work as a team with (15) Greenfield suppliers to establish manufacturing in Alabama.
- Full responsibility for Supplier Development Group (Engineering and Supplier Quality)
- Industry leading Minority Content achieved from" Job 1". (Excess of 8%)

Robert C. Cyrus, C.P.M.                                              Page 2 of 4


Mercedes-Benz

## MERCEDES-BENZ U.S. International Inc.          May 1994 to May 2002

- Named as one of two individuals within MB as having "Unlimited Potential". *(From MB Stuttgart Executive Assessment Division).*

### Project Manager
- Responsible for M-Class successor and new model (R-Class) sourcing.
- Accountable for new Plant #2 construction and equipment contracts.
- Project Manager for M-Class manufacturing in Graz, Austria.
- Coordinated and led activities for CKD operation for MBUSI.
- Successfully launched production of M-Class in Austria (30,000 units annually).

### Assistant Manager of Purchasing
- Supervise staff of six including buyers in Stuttgart, Germany.
- Responsible for buys in excess of $750 million annually.
- Work extensively in Germany and Austria.
- Leader for Globalization and "Parts Sharing Studies" of Chassis, Electrical and Raw Materials.
- Leader of "SMG"-Supplier Management Group for all Electrical systems.

### Buyer
- First production Buyer hired *(Recruited from Toyota, Georgetown, KY).*
- Responsible for procurement of all Chassis, Electrical, Fuel, Audio systems, and all Raw Materials.
- Developed MBUSI's Chemical Handling System. *(MSDS)*
- Exceeded aggressive cost target levels.


TOYOTA

## TOYOTA Motor Manufacturing USA          April 1989 to May 1994

### Purchasing Buyer

- Responsible for procurement of production raw materials with annual expenditure exceeding $75 million.
- Accountable for Steel, Plastics, Paint, Lubricants, Adhesives and MRO commodities.
- Extensive knowledge and application of the Toyota Production System.
- Developed / implemented "CPS" Centralized Purchasing System" for Tier One steel buys.

Robert C. Cyrus, C.P.M.                                      Page 3 of 4

**BANK ONE**

**BANK ONE** (First Security Bank)                          **1988-1989**

**Financial Analyst**

- Responsible for financial analysis and auditing of unsecured lines of credit.
- Customer Account Representative for delinquencies.



**GKN Automotive, Inc.**                                     **1986-1987**

**Sales Representative**

- Responsible for account development and sales coverage over a three state area.
- Worked closely with buyers and purchasing agents to negotiate contracts and develop annual pricing strategies.

## *Activities and Honors*

- ❑ Board Member Alabama Automobile Manufacturers Association (AAMA).
- ❑ Board Member South Regions Minority Supplier Development Council.
- ❑ Currently featured on the cover of Automotive Logistics magazine. 11/05
- ❑ **Featured in numerous Automotive News issues.** *(see attached)*
- ❑ Member of the International Chamber of Commerce.
- ❑ Member of the Birmingham, and Montgomery Chambers of Commerce.

## *Education*

MARSHALL UNIVERSITY
- ❑ Bachelor of Business Administration (Graduated 1985)
- ❑ Dean's List

## *Professional Certification*

- ❑ Certified Purchasing Manager (C.P.M.) - Institute of Supply Management, Tempe, AZ
- ❑ Certified Driver - Fittapaldi Driving School
- ❑ Certified VDA Auditor

 **HYUNDAI**  Hyundai Motor Manufacturing Alabama, LLC
700 Hyundai Boulevard, Montgomery, AL 36105
TEL: 334-387-8000 FAX: 334-387-8999
www.hmmausa.com

May 4, 2005

Rob Cyrus

Montgomery, AL 36117

Rob,

I hope you are recovering well from your recent illness. I spoke briefly with your wife regarding your need for a medical leave of absence. You have been employed by Hyundai since May 22, 2002 and are eligible to request salary continuation and Family Medical Leave. Please complete the enclosed paperwork and return it to me as soon as possible. This letter is to state that your salary continuation and FMLA are provisionally approved, but we are awaiting the necessary completed paperwork for final determination.

Salaried Team Members are eligible to request salary continuation for a personal illness on the first day of employment. If a Team Member is out for a personal illness and is under a doctor's care, he/she may qualify for salary continuation. If you qualify for a medical leave of absence, your salary continuation will take effect and your pay at 100% of your hourly wage will continue until the doctor releases you to come back to work. If you are out longer than 26 consecutive weeks, you must qualify for Long Term Disability with Jefferson Pilot at that time to continue any type of salary payment. Long Term Disability pays 60% of a Team Member's monthly salary.

You have a right under the Family and Medical Leave Act (FMLA) for up to twelve (12) weeks of unpaid leave in a twelve (12) month period for the reason stated above, if eligible. As referenced in our FMLA policy, a Team Member must use all paid vacation and personal days prior to being eligible for unpaid leave. If your salary continuation is approved, it will run concurrently with your FMLA and you will not be required to use all paid time off until Salary Continuation ran out or if it is not approved.

You are required to furnish medical certification of a serious health condition. The doctor's certification must be completed and returned no later than Thursday, May 26, 2005 to the Benefits Department. Once this completed certification is received, a determination will be made. If the completed certification submitted does not support your request, or if you fail to provide the requested documentation, the leave will not be approved as Family and Medical Leave and Hyundai's policies and procedures covering absences will be applied.

Your health benefits will be maintained under the same condition. You will receive a final determination letter confirming approval or denial of your request for salary continuation and the Family and Medical Leave Act once you return the completed paperwork. Also, please refer to the enclosed Family and Medical Leave Policy.

You must make an appointment with the Medical Center's Clinic Manager prior to your release date. The Medical Center's number is (334) 387-8240. In order to return to work, the Medical Center requests a doctor's statement from your treating physician stating the following information:

- Specific dates of illness
- Detailed diagnosis of illness
- Medical release return to work date
- Details of any related restrictions and/or medications

**EXHIBIT**
4

0169

If you have any questions, please let me know.  I hope all goes well and wish you a speedy recovery.

Sincerely,

Melanie L. McCormick
Human Resources-Benefits Specialist
(334) 387-8115
(334) 387-8162 fax

# CONFIDENTIAL

**Date:** October 2, 2005

**Subject:** <u>Murakami Manufacturing U.S.A. Inc. (MMUS), Quality Meeting</u>

**Date of Meeting:** September 16, 2005 (Friday)

**Time:** 10:00 am

**Location:** HMMA Pearl Room

**Attendees from MMUS:**
Mr. Toru Komatsu — Senior Vice President
Mr. Mark McDonald — General Manager – Quality
Mr. Glen Roberts — General Manager – Sales

## Events of September 15/16, 2005

On Thursday September 15, 2005 I was approached by Mr. B.D. ("Brian") Hwang, Manager – Parts Development, Exterior Plastics. Mr. Hwang has been with Hyundai for 11 years. Mr. Hwang stated Mr. H.I. Kim had requested Murakami to join the "quality review meeting" scheduled for the next morning at 10:00 am. I told Mr. Hwang I would support him and asked the main purpose of the meeting. He stated Q.C. has some serious concerns regarding cosmetic defects (scratches, buff marks and other damage). He specifically asked me as a Director to strongly defend the Supplier based on actual facts. He felt he could not speak freely to the C.O.O. since he is only at the level of Manager (*This was a hierarchy issue, not personal*). I told him I would gather the facts and take a neutral position in the meeting tomorrow.

On the morning of September 16, 2005 I went to investigate the situation prior to the meeting and arranged a pre-meeting with Murakami at 9:30 am to clearly understand their position. I spoke with actual HMMA team member who receives the Murakami parts line side and installs them. She stated "there really hasn't been much of any difficulty with the mirrors" and "the only thing that has been occurring is occasional severe gouges or scratches all the way down to the plastic raw material, not superficial light scratches". Meaning most of the defects identified at line side are handling issues from Glovis to HMMA, not Murakami in the vast majority of the cases.



We started the pre-meeting around 9:30 am in the Quality Department. *Attendees were:*

| | |
|---|---|
| *Ms. Paula Gonsalues* | *HMMA Parts Quality* |
| *Mr. B.D. Hwang* | *Parts Development* |
| *Mr. Chris McClain* | *Parts Development* |
| *Mr. Rob Cyrus* | *Parts Development* |

Murakami brought in actual examples of the suspect parts. There were significant "gouge like" defects not likely to be shipped to any OEM customer; too obvious. Murakami explained they had visited Glovis this morning and observed how Glovis is removing the mirrors from the HMMA approved packaging and stacking them haphazardly in non-approved totes. This is where the deep gouging is taking place. The three mounting studs are contacting the mirror housing painted surfaces when handled in this fashion.

After the review we and Murakami attended the Quality Meeting hosted by Mr. H.I. Kim. Two suppliers were in attendance for this meeting (*Murakami first, followed by Hwashin*). Murakami brought defect samples and started to explain that these defects (*gouges*) were caused by handling issues between Glovis and HMMA based on their root cause analysis. This item was identified as the first discussion agenda item HMMA provided to Murakami (see attached). Mr. H.I. Kim seemed upset that Murakami was bringing up this topic and said via translator (Mr. Jason Chi) that he did not want to discuss this matter.

Murakami seemed a little taken aback. Why did they have three individuals come down to HMMA at significant time and cost and yet are not permitted to discuss and defend their position? HMMA QC wanted to charge back 163 minutes of down time to Murakami. **This would equate to 163 minutes x $843.50/minute (GA) = $137,490.**

The facts presented in the pre-meeting with HMMA Quality and Parts Development showed of the 282 mirrors returned as defective, 251 (89%) were good and acknowledged so by HMMA QC. The remaining 31 parts were either handling damage by Glovis or defects caused by Murakami's packaging format previously approved by HMMA Production Control in writing. Murakami also received parts returned from HMMA that had been dropped and run over by our tuggers and we were trying to charge *them* back.

Murakami and Parts Development attempted to intervene to clarify the facts with an open dialogue but Mr. H.I. Kim got visibly upset. He was yelling at various attendees and threw his papers on the table in disgust. He abruptly turned and walked out of room. All attendees were surprised, confused and felt uncomfortable.

He later returned and we tried to continue with an open dialogue approach to allow for a fair and productive meeting. Mr. Glen Roberts from Murakami asked why they were asked to drop everything immediately and come down to HMMA at significant cost and time if no one will listen. He then held up two new mirror assemblies and struck them together to replicate the damage being seen at HMMA line side by Glovis mishandling issues.

We attempted to discussed this matter and the related cost impact again, Mr. H.I. Kim seemed even further infuriated and yelled very loudly at both HMMA team members and the supplier Murakami with other supplier present. He again left the room again without any discussion or reason and never returned even though we had another supplier that was to present (Hwashin).

I was later called by my colleague Mr. J.Y. Choi and informed that Mr. H.I. Kim was very upset with Mr. Choi and me based on the Murakami meeting. Mr Choi told me "to leave my present meeting and join him at once, as he and I may have the rest of the day off" insinuating that we may be fired.

In addition I later learned that after our Murakami meeting that Mr. Jason Chi had a separate meeting with Murakami and told Mr. Glen Roberts to "shut up and sit down". He will address his comments to Mr Komatsu. He told Mr. Komatsu that Mr. Roberts was to cancel his trip back today and insisted that he stay here at HMMA.

Attached for back up are my actual meeting notes from the 16th, along with the Agenda we sent Murakami and Murakami's presentation.

Please feel free to contact me if you have any questions or concerns.

Mr. Robert Cyrus
Director of Parts Development

# Weekly Parts Quality Review Meeting

## 2005. 9. 16.

## HMMA QC Department

CYRUS   360

# ■ Schedule and Structure of the Meeting

◆ **When:** 10:00 AM to 11:30 AM, Every Friday

◆ **Where:** Alabama Room (1st floor of GA shop office building)

◆ **Chaired by:** H. I. Kim, COO

◆ **Attendees:** B.G. Cho, Senior director of Manufacturing
John Kalson, Director of Manufacturing
Simon Sung, Sr. Manger of Parts Development
Rob Cyrus, Director of Parts Management
Chuck Knowles, Manager of Parts Management
Chris Susock, Sr. Manager of Quality Control
Richard Chai, Sr. Manager of Line Inspection
Dave Choi, Sr. Manager of GA shop
Danny Seo, Sr. Manager of Parts Quality, and Related people

◆ **Presenters:** CEO, COO and Quality Manager of Supplier
Suppliers that caused line-stoppage at HMMA
Suppliers that caused major shipping and field Quality issues.

◆ **Format:** HMMA Corrective Action Request Form (Powerpoint format)
(Presentation file to be submitted to HMMA PQ one day in advance)

◆ **Prepared by:** Jason Chi, Parts Quality Manager

CYRUS    361

# ■ Presentation Topics for the week of 9/16/2005

| Supplier | Part Name | Nonconformity | Occurrence | Issue Type | Presentation Time |
|---|---|---|---|---|---|
| Lear | Seat | Rear head rest not locked, high effort | 5 % | Quality Audit | 15 Min. |
| | | Seat back rubbing noise | 1 | | |
| Murakami | Outside mirror | Too much wrinkles and folds (Leather) | 10 % | Downtime VPC inspection | 15 Min. |
| | | Paint issues (Polishing mark, Crater, Scratches) | | | |
| | | Poor heat staking of inside bush nut (Wind noise) | 2 | Test track | |
| | | Oil contamination (Crater) | 100 % | Paint shop | |
| Hwashin | Package tray panel | Subwoofer weldnuts misaligned | 25 | GA T3 | 15 Min. |
| | | Stamping Split | 6 | Body shop | 15 Min. |
| | | Weld spatter | 27 | QA line | |
| Dongwon | Door frame | Channel too wide at upper corner (Wind noise) | 100 % | Test track | 15 Min. |

**MMUS**

*Murakami Manufacturing USA, Inc.*
*Campbellsville, KY*

# NF Outer Mirror Assembly
## Countermeasure Report

DATE REPORTED : 09/16/2005

1/7

# Buff Marks

**DESCRIPTION OF PROBLEM :**

Parts with paint buff marks found at HMMA assembly line.

**ROOT CAUSE OF NON-CONFORMANCE :**

Uncompleted buff finishing was performed under insufficient lightening (1,000 lux).

**COUNTERMEASURE :**

- Additional lighting installed (2,500 lux) into buff area
- Lighting check sheet created
- Check before operation on 1st and 2nd shifts using lighting meter
- Lighting criteria : more than 2,500 lux
- Effective date : Sep 14, 2005

**METHOD OF COUNTERMESURE EFFECT (RESULT) :**

100 % Inspection of all assemblies prior to shipping to HMMA.

**REFLECTION TO NEW MODEL :**

The countermeasure is included in CM process launched in April, 2006

2/7

CYRUS   364



# Lighting Status

## Before

1,000 Lux

## After

2,500 Lux





3/7

CYRUS   365

# Bag Marks

**DESCRIPTION OF PROBLEM :**

Parts with paint bag marks found at HMMA assembly line.

**ROOT CAUSE OF NON-CONFORMANCE :**

The paint bag mark is caused by protective bag being imprinted into the paint after leaving MMUS (dark colors only).

Root cause:

1.  Insufficient paint cure time (2~4 hrs – after EC change to Housing).
2.  Container design (vertical position & rough dunnage).

**COUNTERMEASURES IMPLEMENTED :**

- Stabilized curing time (7/25/05)
- New type of protective bag (8/7/05)
- Currently packaging all dark colors outside of the dunnage and protecting part with bubble wrap (extra time & cost).

**REFLECTION TO NEW MODEL :**

For CM program, different type of part container / dunnage will be proposed.

4/7

CYRUS  366

# Bag Mark

## Permanent countermeasure :

- Container & Dunnage should be modified.



Current NF Container & Dunnage

Container & Dunnage currently used by another customer

5/7

# Poor Heat Staking of Inside Bush Nut

* Root cause of non-conformance:
1) Machine malfunction   2) Miss-operation (human error)

* Temporary Countermeasure :

1) Operator verification – Mark a Dot on cover-base to ensure the heat stake process is complete
- First the operator at heat stake process marks a dot on cover-base after the process then the next operator verifies the heat stake condition is acceptable and marks the part ( on cover-base) (1st operator 8/15/05) (2nd / audit operator 9/15/05)

2) Machine check – Increased frequency of machine function check
- Check 2 times a day ( start & end of shift) (9/14/05)

* Permanent countermeasure :
- Heat Staking Process to be eliminated by introducing the elimination of Bracket and Bracket A (Engineering Change).

CYRUS   368

# Poor Heat Staking

## Permanent Countermeasure:

Engineering Change to eliminate heat staking process





9/16/05                    HYUNDAI

H.I. KIM / JASON CHAI

QUALITY MTG + MURAKAMI / WASHER

10:00 MTG

↳ ADD TO SCHEDULE PERMANENT

8th BRIAN TOLD CHEI TO "TALK STRONGLY
TO H.I. KIM TO BE FAIR TO SCHEDULE."

DOWN-TIME 9/1 - 9/3

MURAMI (18 OCCURRENCES / 12 OCCURRENCES
47 MINUTES / 116 MINUTES

S/M QC. MARK MACDONALD

● BUFF MARKS = REALLY "BAG" MARKS
CAUSED BY DUNNAGE STYLE = NEED TO △

LIGHTING = AB ALREADY FIXED.
1,000 LUX → 2,500 LUX ✓

292 PARTS RETURNED TO MURAKAMI
251 APPROVED OKAY BY AHMAD

H.I. KIM YELLING & THROWING PAPER
↳ VERY UNPROFESSIONAL - EVERYONE
UNCOMFORTABLE. H.I. KIM YELLED @ M

www.hyundai-motor.com

EXHIBIT
6

0271



Daily Plan

"TO BEAVE THEMSEALVES"

• ELANIS WILL COME TO MEETING HOW
  TO ADDRESS

• M. H: A NEW REPEATIVELY SLAMMING ITEMS
  ON TABLE, GOT UP AND NO LEFT.

  EMBARRASING —

HARASSMENT

0272

*Chris Susock ,*
*Sr Mgr. QC*
*# ρ*

September 16, 2005

Weekly Supplier Quality Meeting:

Observational account of the facts of this event:

This meeting was hosted by the Part Quality team of the Quality Control department and was chaired by COO Mr. H.I. Kim.

HMMA executive management attendees were Production Director John Kalson, Purchasing Director Rob Cyrus, and Quality Director S.G. Kwak. Several other HMMA salaried members were also in attendance along with other supplier representatives.

The meeting opened with the Murakami Manufacturing Company to discuss the quality issue of Buff Marks on the outside mirror commodity that they supply to HMMA.

Murakami Quality Control Manager began to discuss the issue of the Buff Marks and explain the reasons of which they believe may have caused this issue.

Rob Cyrus interjected and stated that he had a pre-meeting with Murakami and that they concluded that due to an EO change that limited there curing time to 3 hours was insufficient and that the designed packaging caused the buff marks to the product. He also concluded that the packaging should be changed.

Harry Chase, Manager of Production Control department stated that the packaging was designed by Murakami and that they were responsible for the results.

Rob Cyrus stated that that may have been true, but it now needs to be changed.

Harry reiterated that that is still a Murakami issue they own the packaging design but we will work with them.

Mr. Kim interjected and inquired by asking the Sr. VP of Murakami Mr. Komatsu-san how many years has Murakami been in business and who some of there other customers that they provided for. He had also asked that with 60 years of experience that they had, how could they have such basic quality issues like Buff Marks to be supplied to HMMA? This is a basic quality system issue.

Rob Cyrus replied for Mr. Komatsu-san and stated that Murakami was not the problem for all the issues that cause 200 minutes of downtime in General Assembly and that much of the mirror problems are caused by Glovis handling.

At this time Mr. Kim attempted to get the meeting back on track and stated that the purpose of this meeting is to review major supplier problems identified and for the supplier to address those problems that they can control and that we can be assured they

**EXHIBIT**

**7**

0244

will not repeat. Mr. Kim had also inquire to Mr. Komatsu-san how Murakami could not know that insufficient lighting, curing time and packaging could cause these types of quality issues and not be detected or tested adequately in their quality system.

Rob Cyrus then interrupted by stating that there is much more on today's agenda to discuss then the buff marks, that why don't we discuss the 200 minutes of downtime that Murakami is being blamed for and there is insufficient data to substantiate that they are the major source of the problem that GA is experiencing with the mirrors.

I myself then interceded by telling Rob that the Buffing Marks quality issue is real and that we need to stick to this issue, the 200 minutes of downtime is irrelevant at this point and that the Buffing Mark quality issue is real.

Rob stated that this is "Bullshit" and that Murakami was forced to come down here to address and issue that is irrelevant compared to other issues with Glovis.

Mr. Kim at this point stressed again that the purpose of this meeting was to address the basic quality system issues of the supplier and that the other issues being raised by Rob Cyrus should be addressed outside of this meeting at the engineering working level. At this point Mr. Kim was interrupted by the Assistant General Manager Murakami Glen Roberts by standing up walking over and grabbing two sample mirrors tossing them on the table and banging them against each other so that he could demonstrate how he believes damage occurs at Glovis stating to the effect that "this is why I came down here let's talk about how these mirrors are being damaged."

Mr. Kim stated that the scratches are a matter that must be addressed at a working level after this meeting. The purpose today is to discuss the buffing mark issue from Murakami. This is a repair that is being performed by HMMA and that they should be charged back to Murakami.

Rob Cyrus then stated that this should be a case to case basis and that he does not believe that HMMA is repairing these at all because they are continuously returned to Murakami.

John Kalson then stated that these issues were being repaired by HMMA members both on line in system and off line in QA.

Rob Cyrus replied to John Kalson by stating "is this the Toyota Production System way to pass on the defects to next customers?"

John replied he doesn't know what the Toyota Production system is and that it is a fact that we have to repair them with HMMA members.

Mr. Kim at this point ended the discussion with the Murakami presentation.

Note: It is of my opinion that the meeting began as being controlled and well structured with professionalism as Mr. Kim had requested by addressing the real problems that the suppliers are accountable for controlling and that any other issue should be addressed outside and separate from this forum. This however was disrupted several times by the continuous contesting and disregard of Mr. Kim's intentions and direction.

/cs

# 3

**From:** Kalson, John HMMA/Production Sub_Div
**Sent:** Saturday, September 17, 2005 8:02 AM
**To:** Kalson, John HMMA/Production Sub_Div
**Subject:** Weekly Part Quality Meeting Events - 9/16/2005

The following is a sequence of events that occurred during the Weekly Parts Quality Meeting held at
HMMA on 9/16/2005.

1.   Side mirror supplier Murakami was invited to present the status of defects that have been
     affecting quality at HMMA.
2.   The meeting was attended by HMMA members, HMC members, Murakami representatives,
     and another supplier who was also scheduled to present status.
3.   The meeting began with Mr. Mark McDonald (Murakami Quality Manager) presenting status
     of "buff" marks on the outer surface of the mirror assemblies.
4.   Mr. McDonald stated that low light levels were the root cause of the buff marks since the
     operators could not see buff marks and scratches and fix them during their operations. He
     also stated that the light levels were increased to solve the problem.
5.   Mr. McDonald then proceed to go to the next issue which he reported that was a packaging
     issue and lack of proper cure time (bar marks were being left on the mirrors, and he believed
     these were the root causes).
6.   At some point during these discussions, Mr. H.I. Kim (COO - HMMA) asked the Murakami
     representatives how long they had been in business. The answer was given as 60 years. Mr.
     Kim then asked how come the light levels were not correct at the start. The question was
     stated as that Murakami has been in business so long; that he wanted to know how a basic
     quality system item could have not been correct.
7.   During this part of the conversation, it was stated by Mr. R. Cyrus (Director Purchasing –
     HMMA) that all defects were not caused by Murakami, and that Glovis was the problem with
     the mirror defects.
8.   Mr. Cyrus also then defended the packaging concerns that Murakami was facing and stated
     that HMMA accepted it and that Murakami did not do any other packaging like that for any
     of its other customers.
9.   During this part of the conversation, Mr. Kim again stated the purpose of the meeting was to
     review the basic quality problems that were the responsibility of Murakami, and what they
     were doing about that. Mr. Kim also stated that a meeting between the parties (HMMA,
     Glovis, and Murakami) would be necessary to discuss and solve the issues that were stated by
     Mr. Cyrus.
10.  Mr. Cyrus then stated something to the effect that "how can we ask a supplier to come and
     present the issues when we (HMMA) don't even have any data?" He also stated that we are
     in the process of charging Murakami with "over 200 minutes of downtime" and they are not
     responsible for that.
11.  At some point in these discussions Mr. Cyrus was very outraged and said that "Murakami has
     spent 2,3,4 thousand dollars coming here to present their issues and that we need to let them
     speak"
12.  Some time during this exchange, Mr. Glen Roberts (Assistant General Manager – Murakami)
     went over and picked up two mirrors violently hit them together to cause a scratch, said that
     this is what Glovis does, and threw the mirrors in the middle of the table.
13.  Mr. Roberts then said something to the effect of "HMMA has asked us to come here and
     speak, and we are going to speak about what we want to speak about"
14.  Mr. Kim again re-emphasized the fact that a separate meeting needed to be had by the parties
     to discuss the scratches and that it was not the intent of the meeting to discuss those items at
     this point.



15. At some point Mr. Chris Susock, stated that the concerns with the mirrors were causing HMMA downtime and repairs and that Murakami has a responsibility for that. Mr. Cyrus at some point here said "that's Bullshit".

16. I (John Kalson) interjected that "I expect the parts to be "good" out of the box and it is the responsibility of the supplier to make sure they are, and if the parts are not good, we must repair". Mr. Cyrus then said that "the operator should find the defects before the parts are installed". I said to Mr. Cyrus that "the job of the operator is not to inspect parts, that is the responsibility of the supplier, if the operators does see a defect, he will not put the part on, otherwise we have inspection process downstream that find defects, and when we find defects we must fix them". Mr. Cyrus then stated to me "that's not how Toyota does it, and let me teach you something about production systems".

17. At some point during theses ongoing exchanges (which had been going on a while now), Mr. Kim stated that this meeting cannot go on like this and ended this session immediately.

In my opinion Murakami did not act as a respectful supplier. All of the Murakami representatives did represent themselves in a professional manner. They were confrontational and could not accept that they were indeed causing issues at HMMA.

Also, I was very embarrassed at how our purchasing team acted. It seemed like they were working for the supplier. In my opinion, no matter if HMMA is right or wrong; we need to always stick together.

Finally I respect how Mr. H. I. Kim conducted the meeting in the face of the "battle". He was calm. He tried to get the supplier on track and speaking about their issues several times. Finally when there was no hope for further discussion, he ended that portion of the meeting.

J. G. Kalson
Director - Production
Hyundai Motor Manufacturing Alabama
(334) 387- 8564

#9

Weekly Parts Quality Review Meeting – Murakami
9/16/05

The meeting started as usual at about 10:00 am. Murakami was giving their presentation and countermeasures regarding shipping and cloth marks.

During the course of the presentation Rob Cyrus asked several questions regarding the presentation and then asked about the scratches and downtime charged to Murakami. Murakami objected to the Downtime charged to them.

Rob Cyrus then commenced to talking about the downtime and scratches on the OSRV mirrors. At about this time COO Kim informed Murakami and Rob that the meeting was meant to resolve systematic quality issues and not specific issues.

Murakami stayed on the subject of downtime and scratches – going so far as to hit two mirrors together to show how some of the scratches. Again COO Kim stated that this meeting was to resolve systematic problems, and that the issue of downtime and scratches could be addressed later.

Rob Cyrus stated that not all of the downtime was attributable to Murakami. COO Kim wanted to move on with the meeting; COO Kim reiterated that the matter of downtime and scratches would be addressed later today. Glen Roberts of Murakami said "you wanted to have a meeting, so let's have a meeting", which is when he hit the two mirrors together.

Again, several people tried to move the meeting into the next slide, but Rob Cyrus said "you brought them all the ways down here, at least hear what they have to say".

Again, the amount of downtime charged to Murakami was raised – Chris Susock stated that PQ has already calculated the downtime to the best of their ability – to which Rob said "Bull s _ _ t!"

Rob asked if the team members were required to inspect the parts before putting them on. John Kalson responded that that is not a part of their job. Rob then asked if that is the Toyota way – to pass defects on to the customer.

At this time Chris Susock tried to get the meeting back on track by stating that the reason for the meeting was to resolve the buff mark issue – to which Rob said the accurate reporting of downtime is the issue.

COO Kim, clearly very agitated by the actions of the supplier, got out of his seat and walked out of the conference room. He came back in a short time later and requested Murakami meet with some other members of HMMA staff.

Gerald Horn, AM – Parts Quality, Trim Exterior



EXHIBIT
9

0249



11/6

CHRONOLOGICAL EVENTS H.I. KIM RETALIATION

RE: INTERACTION

9/15/05

BYUNG-DALL

° APPROACHED BY MR. B.D. HWANG — PARTS DEVELOPMENT
MANAGER & MR. J.Y. CHOI MY FELLOW DIRECTOR
WITHIN PURCHASING — PURCHASING ADMINISTRATION.
HWANG & CHOI A. THEY BOTH SAID THAT THEY NEED
MY HELP IN THE QUALITY REVIEW MEETING OF TOMORROW
9/16/05 TO DEFEND MURAKAMI. BOTH MURAKAMI &
HMMA AGREED THAT THE TOPIC OF THIS UPCOMING
MEETING HAD ALREADY BEEN SOLVED. H.I. KIM
WANTED TO CHARGE MURAKAMI FOR A LINE
STOPPAGE EVENT.

⟹ PULL NOTES

THEY SPECIFICALLY REQUESTED ME TO
"TALK STRONGLY TO H.I. KIM (COO) TO
ASSURE THE SUPPLIER WAS TREATED FAIRLY"
— I TOLD THEM I WILL CONDUCT AN
INVESTIGATION PRIOR TO THE ACTUAL H.I. KIM
TO GATHER FACTS AND THEN TAKE A
NEUTRAL POSITION BASED ON FACT PRESENTED
FROM BOTH MURAMI AND OURSELVES (HMMA).

— MR. CHOI & HWANG SAID THANK YOU FOR
YOUR HELP. THEY ARE AFRAID TO SPEAK TO
C.O.O. H.I. KIM DUE TO HIS UNREASONABLE
AND VINDICTIVE WORKING STYLE.

CYRUS   324

9-16-05 (AM)

- I KNOW OUR MEETING WAS AT 10:00 AM THE
FIRST THING I DID THAT MORNING WAS TO GO
GATHER FACTS RATHER THAN EMOTION.

① I WENT TO THE ACTUAL LINE SIDE AND
SPENT 5-10 MINUTES TALKING TO THE
T/M WHO INSTALLS MURAKAMI'S OUTSIDE
MIRRORS EVERYDAY.
   - SHE SAID FRANKLY MURAKAMI HAS BEEN
   ONE OF BETTER SUPPLIERS — NO REAL
   ISSUES.
   - I ASKED HER ABOUT THE RECENT LINE
   STOPPAGE AND THE 282 MIRRORS
   SENT BACK TO MURAKAMI AS REJECTS.
   - HER UNDERSTANDING WAS THAT THE
   VAST MAJORITY OF PARTS SENT BACK
   WERE BORDERLINE DEFECTIVE AND 251
   OF THE 282 PARTS WERE LATER AGREED
   TO BE A QUALITY MIS-CALL ON HMMA'S
   BEHALF
   - I ASKED HER IF SHE WOULD PLEASE SHOW
   ME WHAT INSPECTION DOCUMENTATION WAS
   USED BY HER AND HER COLLEAGUES. SHE
   SAID WELL WE REALLY DON'T HAVE ANY
   SET STANDARDS OR BOUNDARY SAMPLES,
   IN HER OPINION THIS IS WHY MANY PARTS
   HAVE INITIALLY BEEN JUDGED NG — LATER
   TO BE VALIDATED OKAY.
   - I THANKED HER FOR HER TIME AND
   FRANK HONESTY.

- MY NEXT STEP WAS TO MEET WITH OUR HMMA INTERNAL PARTS QUALITY T/MS, MR GERARD HOOK, MS. PAUL GONSALVES AND MR. MICHAEL KIRK.

THEY HAD THE SAME FEELINGS ABOUT THE FACT THAT MURAKAMI IS MEETING OUR REQUIRE-MENTS & THE LACK OF LINESIDE INSPECTION STANDARDS AND BOUNDARY SAMPLES CAUSED THIS SITUATION. NOT MURAKAMI'S ISSUE.

- WE THEN MEET w/ THE 3 GENTLEMEN FROM MURAKAMI TO GET THEIR SIDE OF THE SITUATION AND THEY TOO WERE IN AGREEMENT WITH US PLUS THEY HAD ALREADY THIS MORNING GONE OVER TO THE GLOVIS SEQUENCING OPERATION TO CLEARLY UNDERSTAND HOW PARTS WERE/ARE BEING HANDLED.

- THEY OBSERVED THE GLOVIS WORKERS WERE TAKING THE MIRRORS OUT OF THEIR PROTECTIVE PACKAGING AND HAPHAZARDLY STACKING THE MIRRORS IN A PILE. THIS PRACTICE WAS CAUSING EXTREME SCRATCHES AND GOUGES. THIS MISHANDLING SITUATION ACCOUNTED FOR THE 31 OTHER PARTS OF THE ORIGINAL 282 OF 251.

SO PRIOR TO THE ACTUAL MEETING ALL HMMA & MURAKAMI PERSONNEL WERE ON THE SAME PAGE.

# 7

---

## INTEROFFICE MEMORANDUM

---

TO:       COO MR. H. I. KIM

FROM:     JASON CHI /MANAGER, PARTS QUALITY

SUBJECT:  ACCOUNTS ON WEEKLY PARTS QUALITY REVIEW MEETING OF 9/16/05

DATE:     9/17/2005

          [ENGLISH/ 한글 VERSION]

---

### Background

The Weekly Parts Quality Review Meeting was initiated by COO Mr. Kim on 9/7/05 in an effort to resolve major quality problems from suppliers that had resulted in to HMMA line downtime with repeated occurrence.

|                    |                                         |
|--------------------|-----------------------------------------|
| When:              | 10:00 AM to 11:30 AM Every Friday       |
| Where:             | Alabama Room                            |
| Chaired by:        | H.I. Kim, COO                           |
| Regular Attendees: | John Kalson, Director of Manufacturing  |
|                    | Simon Sung, Sr. Manager of Parts Development |
|                    | Rob Cyrus, Director of Parts Management |
|                    | Chuck Knowles, Manager of Parts Management |
|                    | Chris Susock, Sr. Manager of Quality Control |
|                    | Danny Seo, Sr. Manager of Parts Quality. |

The parts quality issues are notified to suppliers immediately at the occurrence of the issues using Corrective Action Request form which requires a temporary countermeasure reply within 24 hours followed by permanent countermeasure reply. The request to attend the review meeting is typically notified no later than 48 hours prior the meeting.

For the week of 9/16, Murakami on Side Mirror Paint Issues and Hwashin on Package Tray Oil Contamination and Split were requested to attend the meeting. The quality

EXHIBIT
11

0238

30    issues of both suppliers were repeated and pending over 4 weeks.

31

32

## The Retrospect Minutes of the Meeting

34

35    The weekly meeting was started as normal. All HMMA executives and the suppliers'

36    representatives were arrived on time. First, Pareto analysis of overall downtime and

37    repeated problems by suppliers for the month of August and first two weeks of

38    September was reviewed. Then, the issues of Murakami were discussed.

39

40    COO Kim asked Sr. Vice President of Murakami, Komatsu-san, why Murakami such a

41    supplier with over 60 years of experience of mirror business could make defects like buff

42    marks and bag marks? These are fundamental quality system issues.

43

44    Rob interjected and stated that all defects are not created by Murakami and in fact,

45    Glovis made many defects such as scratches on the mirror by handling mistakes.

46    Rob also stated to Harry Chase, PC Manager that HMMA PC accepted Murakami's

47    packaging design and now PC says the design is No Good (exchanged with Harry for

48    more statements defending Murakami).

49

50    COO Kim reminded that the purpose of this meeting is to review the major supplier's

51    quality problems and counter-measure not to repeat the problems. COO Kim asked again

52    to Komatsu-san how and why Murakami did not know that a simple insufficient lightening

53    at packaging causes buff marks and cure time is required more than 3 hours before

54    shipping the mirrors.

55

56    Rob again interjected the questions from COO and stated that 200 minutes of downtime

57    charged to Murakami is not accurate and much of time should have been charged to

58    Glovis.

59

60    COO Kim reminded the participants that the purpose of the meeting is to review the

61    major quality issues created by suppliers and their counter measure plan. There can be

0239

62  some calculation errors on downtime. Those errors can be worked out in working level
63  discussion. This meeting is to discuss more fundamental and systemic major quality
64  issues.
65
66  Rob stated that accurate downtime is the root of the issue. Murakami has right to speak
67  what they want and PQ should have been clear on downtime of Glovis and Murakami.
68
69  Chris Susock, Sr. Manager of QC stated to Rob that PQ has already calculated down time
70  to the best of ability and Buffing marks issue is real and we need to stick to the issue and
71  200 minutes down time is irrelevant at this point.
72
73  Rob sated back to Chris "Bull Sh__s!"
74
75  COO Kim reminded again the purpose of this meeting. At this point, Glenn Roberts,
76  General Manager in Sales of Murakami, stand up without permission from his chair in
77  agitated mode and grabbed two mirror samples from parts container and threw onto the
78  meeting table and banged each other and stated "I'll talk and discuss what I want to
79  discuss and that's reason for that I came down here." He went on to explain how many
80  scratched mirrors that he is getting from Hyundai.
81
82  COO Kim stated that scratches on the mirror are not that I'm concerned about today with
83  Murakami. As far as scratches on the mirrors are concerned, I would like to resolve in
84  working level after this meeting. The concern that I have today is the buffing on the
85  mirrors. This requires an extensive repair by HMMA members and therefore, I would like
86  to charge back to all incurred cost of repairs by HMMA members to Murakami.
87
88  Rob interjected by saying "That too is case by case. I don't believe HMMA is repairing
89  the mirrors since many mirror are being returned to Murakami."
90
91  John Kalson, Director of production, stated that the repair is either being done on-line or
92  off-line. Rob stated "Is this Toyota way to pass on the defects to next customers?"
93

0240

94   John Kalson stated "Toyota way or not, it is the fact we have to repair them all by HMMA
95   members."
96
97   COO Mr. Kim, at this point, ended the review meeting stating in Korean "How can I run
98   this meeting when our own Purchasing is siding with suppliers on the quality problems?"
99
100   As COO Mr. Kim left the room, John Kalson chaired the rest of review meeting with
101   Hwashin to end.
102
103

## Personal Opinion

104

105

106   I think Rob could have discussed the downtime issue against Murakami mirrors directly
107   with COO Kim before or after the meeting. This is the reason that well-prepared meeting
108   had to be ended in disrupted manner.   The behavior of Glenn Roberts of Murakami was
109   not acceptable as a supplier that supplied the defective parts HMMA line and came to
110   review the problem. As a result of the disrupted meeting, HMMA had lost chance to
111   discuss and plan to resolve the issues of NF side mirror buffing, heat staking, and scratch
112   related downtime.

113

114

## 배경

115

116

117   주간 부품 중점 점검 회의는 HMMA 생산 효율에 지대한 영향을 미치는 부품 불량률을 항상 시키
118   고자 하는 취지에서 공장장, 김 이사님의 지시에 의거 9월 7일부터 첫 회의가 시작됐고 공장장님
119   이 직접 회의를 주재 해 오셨다.

120

121                [구체적 회의 구성은 영문판 참조]

122

123   불량 부품의 업체 통보는 CAR을 사용 발생 즉시 전송되며, 업체는 24시간 내로 임시 대책서와
124   영구 대책서의 계획을 부품 검수과에 제출할 의무를 갖는다. 회의 참석 요망 업체는 회의 당일로
125   부터 최소 48시간 이전에 통보되고 있다.

126

127   9월 16 일의 회의에 참석할 업체로 Murakami와 화신으로 결정되었고 이 업체의 불량 부품문제
128   는 다수의 재발과 영구적인 대책의 부재가 그 결정 이유였다.

129

0241

**Montgomery Cardiovascular Associates, P.C.**
273 Winton Blount Loop  Montgomery, AL 36117
(334)280-1500  Fax: (334)280-1600

October 31, 2007
Page 1
Chart Document

| **ROBERT C CYRUS** | | Home: (334)~~280-0000~~ Office: (334)~~280-0000~~ |
|---|---|---|
| Male  DOB:0~~●●●~~1962 | 56300 | Ins: B/C OF A (1) Grp: 48584 |

09/13/2005 ~ Office Visit: Progress Note
Provider: PAUL B MOORE MD
Location of Care: Montgomery Cardiovascular Associates, P.C.

<u>PROGRESS NOTE</u>

NAME:              CYRUS, ROBERT C
MCA CHART NO.:     107106-1-mc
D.O.B.:            ~~●●●~~1962
DATE:              09/13/2005 9:59 AM
PHYSICIAN:         PAUL B. MOORE
REFERRING M.D.:    DANIEL MOORE

PROBLEMS:

CARDIOVASCULAR DISEASE (ICD-429.2)
   ANGINA PECTORIS (ICD-413.9)
   ABNORMAL TGXT  4/28/05 (ICD-794.30)
HYPERLIPIDEMIA (ICD-272.4)
SHORTNESS OF BREATH (ICD-786.05)
HYPERTENSION UNSPECIFIED (ICD-401.9)

ALLERGIES:  This patient has no known allergies.

CURRENT MEDICATIONS:

LIPITOR TAB 20MG (ATORVASTATIN CALCIUM) Q HS
CYMBALTA 60 MG CPEP (DULOXETINE HCL) QD
FIORICET 50-325-40 MG TABS (BUTALBITAL-APAP-CAFFEINE) PRN
XANAX 0.5 MG TABS (ALPRAZOLAM) prn
PLAVIX TAB 75MG (CLOPIDOGREL BISULFATE) QD
ASPIRIN 81 MG TABS (ASPIRIN) qd
NITROGLYCERIN 0.4 MG SUBL (NITROGLYCERIN) prn

INTERIM HISTORY:  Mr. Cyrus called the office this morning saying that he had shortness of breath. He tells me that he has been feeling pretty well up until recently. He is still under a great deal of social stress. He is going through a divorce. He just went back to work at the Hyundai plant about two weeks ago and has a large backlog of work to do. He tells me that this weekend he was playing golf. He became nauseated and "dizzy". He thinks he may have been dehydrated. Of course, it was very hot as well. Since then he has been fatigued.

This morning he felt short of breath just walking across the parking lot. He also noticed that he felt "dizzy" when he got up from his desk. He had his blood pressure taken in the health clinic and it was noted to be elevated. He called the office and this appointment was made.

VITAL SIGNS:
Weight (lbs): 191
Pulse rate: 80

EXHIBIT
12

CYRUS V HMMA 0520  SUBPOENAED DOCS

**Montgomery Cardiovascular Associates, P.C.**
273 Winton Blount Loop  Montgomery, AL 36117
(334)280-1500  Fax: (334)280-1600

October 31, 2007
Page 2
Chart Document

| ROBERT C CYRUS | | Home: (334) Office: (334) |
|---|---|---|
| Male  DOB:  1962 | 56300 | Ins: B/C OF A (1) Grp: 48584 |

Respirations: 14, unlabored
Blood Pressure: 136/100, right arm; 132/100, left arm

PHYSICAL EXAM: Well developed, well nourished, somewhat anxious, middle aged white male in no acute distress.
CHEST EXAM: Clear lung fields. No wheezes or rales. Normal respiratory effort.
CV EXAM: No JVD at 45 degrees. PMI is not displaced. First and second heart sounds are normal. There are no murmurs, rubs, or gallops audible.
ABDOMINAL EXAM: Soft. Bowel sounds are present. No tenderness or masses appreciated.

DATA:

EKG: Sinus rhythm. Normal axis. Normal intervals. Otherwise, normal EKG.

ASSESSMENT:

1.0    Cardiovascular.
1.1    CAD. Seems stable.
2.0    Shortness of breath. I believe that his shortness of breath is related to stress and some degree of anxiety. His blood pressure may be playing a role as well. I do not think that he has significant residual coronary ischemia. His stress test back in June looked okay.
3.0    Hypertension. Diastolic blood pressure has crept up. He finished the cardiac rehab program about two weeks ago, but he has not exercised since then.

PLAN/SUGGEST:

1.    Altace 5 mg daily.
2.    Continue other therapy as is.
3.    I have strongly encouraged him to go back to regular exercises he was doing with the cardiac rehabilitation program for stress relief, nonpharmacologic control of his blood pressure, etc.
4.    Return to see me in six months.
5.    I have advised him to continue with his efforts at behavior modification and stress relief.
6.    Routine follow up with Daniel Moore.

Paul B. Moore, M.D.

PBM/lw

Manual Fax to:

Dr. Daniel L. Moore
8190 Seaton Place
P. O. Box 240369
Montgomery, Alabama 36124
Phone: 396-9100
Fax: 396-9110

Job ID: 220251
DD:    09/13/2005
DT:    09/14/2005

Message                                                                      Page 1 of 1

## McCormick, Melanie L HMMA/HR

From:    Stone, Laura L HMMA/Parts Development
Sent:    Thursday, October 13, 2005 10:14 AM
To:      McCormick, Melanie L HMMA/HR
Subject: RE: Help

The week of 10/3 - 10/7 he was here. He was out (9/20 - 9/23) and out the following week (9/26 - 9/30) and out all this week.

-----Original Message-----
From: McCormick, Melanie L HMMA/HR
Sent: Thursday, October 13, 2005 9:48 AM
To: Stone, Laura L HMMA/Parts Development
Subject: Help

Laura, I am trying to make sure I have Rob's time in correctly in the system since he is out on a medical leave. Please let me know when he has been out. I know he is out this week. Did he miss all of last week? What about the week prior?

*Melanie L. McCormick*
Hyundai Motor Manufacturing Alabama, LLC
HR Benefits Specialist
(334) 387-8115
(334) 387-8162 fax
mmccormick@hmmausa.com

EXHIBIT
13

0135

| □REPORT ■APPROVAL | | | | | Conservation Pd. ( ) years | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Enforceable under approval of ( | | | | |
| Date | 10/18/2005 | R E P O R T | Prepared | Manager | Sr. Director | Exec VP | President | |
| Team in Charge | General Purchasing | | Mike Youb | | | | | |
| | | | 10/18/2005 | / / | / / | / / | / / | |
| Cooperation | | | | | | | | |

**Subject :** Rob Cyrus incident 10/11/05

Mr Hyun,

This information is confidential and only for your viewing.

On 10/11/2005 evening at Red Star Tavern restaurant, I saw Rob Cyrus joining two other Hyundai employees to have a social drink. Within the gathering there were females there which I think that was the reason why Rob Cyrus showed up. Rob was not at work that week due to illness and still have not come into work week of 10/17/2005.

When I saw Rob Cyrus there, Rob had said to me "DO NOT TELL ANYONE YOU SAW ME HERE". I didn't know what that meant. Why can't someone come out and have a drink on a week day? Well I told him I would not say anything to anyone but when I was about to leave, he yelled out "I'm serious, do not tell anyone" and said "I'll fire you if you do". I know he said that jokingly but I did not take that as a joke since he was dishonest about not coming to work and wanted to let the girls know who was the boss. I didn't take that comment too well and thought that I should report this to management. I feel that Rob Cyrus using Hyundai and don't feel right he should be working at Hyundai especially at a director position.

10/18/05

HMMA 0001                                H.M.M.A                      000mm×000mm



EXHIBIT
14

0038



10/22/05    4/3

EXHIBIT 15

2/3

- HYUNDAI STYLE - WAY OF OPERATING. HE
SAID DON'T WORRY @ AT ALL AND TO
HAVE A NICE WEEKEND,

- HANNY CALLED PHONED MY ≈ 7PM SAID
HE WAS STILL AT WORK BECAUSE H. L. KIM
ORDERING HIS DIRECT REPORTS TO MAKE
MEETING MINUTES OF WHAT OCCURRED
IN MORNING MTG, (AT R 7/PM) HE DID
NOT REQUEST OTHER ATTENDEES EXCEPT
FOR CHIEF & MYSELF TO MY KNOWLEDGE,
(APPROXIMATELY 30 PEOPLE IN ATTENDANCE)

- TOLD DAVE MARK OF ALL OCCURRENCE
INCLUDING 2 MEETINGS W/ R.D, HOSTILE ①
RETALIATION ②

CYRUS   316

3/3

10/23 ② JUDY (2:13)

OFFICE
262-0720

• DICKEY MACWILLIAMS
ALABAMA ST.

COMPLETE THE APPLICATION
FOR FAMILY MEDICAL
LEAVE

FMLA
GO AHEAD AND DO
THIS.

10/24
① 11:15
LMVM.

① TED CHIARO

MIC ①

① CANDID

FMLA

ASSURED ME
IT'S JUST THEIR
STYLE

OBAMA

Nov 10 05 04:24p     Rob Cyrus                                   334-215-1567          p.1

# FAX COVERSHEET

Date: November 10, 2005

*To: Mr. Keith Duckworth*

*From: Robert C. Cyrus C.P.M.*

## Topic: Formal Complaint

Pages not including coversheet: 21

EXHIBIT
16

0041

November 6, 2005

Mr. Ahn
President and CEO HMMA

Mr. Keith Duckworth
Deputy President HMMA /
Vice President Human Resources and Administration Services

Mr. B.K. Kim
Senior Director of Human Resources and Public Relations

Mr. Greg Kimble
Director of Human Resources HMMA

Subject: Formal complaint for racial discrimination and retaliation

I wish to file a complaint that the demand for my resignation violates company policies that protect employees from discrimination based on race. I am American and was forced to resign and my Korean peer Mr. J.Y. Choi (Korean) who did the same thing as I did and was not forced to resign. I also believe my termination was in retaliation for my reporting sexual harassment, race discrimination and safety policy violations.

Mr. Duckworth requested a dinner meeting with me on October 22, 2005 he said it as to check on how I was doing (health wise), and to see if he could be of any help. I brought my medical documentation for you to review. I had over 100 pages of documentation.

Upon arrival at the restaurant I ran into Mr. Michael Hansford. Mr. Hansford said he would like to meet Mr. Duckworth and joined us at our table maybe 10 minutes after I arrived. While Mr. Hansford was present, Mr. Duckworth asked us about what we knew about serious ongoing problems at HMMA. Specifically he asked us █████████ was still sleeping with ████. He asked us of other concerns he had heard of such as "kick-backs". Then Mr. Hansford left.

Mr. Duckworth then said the executive management at Hyundai was upset with me and would like me to resign. I was flabbergasted. I said I wasn't aware of any performance, demeanor or relationships issues. I asked Mr. Duckworth specifically who is "executive management". He said the President, Mr. Ahn, Mr. H.I. Kim and Mr. Rick Neal.

I told Mr. Duckworth the President Ahn has only been at HMMA a few months and speaks very limited English. Our conversations have been "hello" in the hallways and bathroom. He has never expressed any dissatisfaction with me directly or through any Korean colleagues. I As far as Mr. H.I. Kim is concerned. I had a meeting with Mr. H.I. Kim was regarding the supplier Murakami who traveled 500+ miles to come down to HMMA to address a problem concerning their outside mirrors. The meeting was September 16th at HMMA at 10:00 in the Pearl Room.



PAGE 1 OF 21

Nov 10 05 04:24p    Rob Cyrus                    334-215-1957            p.3

I provided meeting minutes to the President, Mr. Ahn via Mr. H.J. Hyun. I am endorsing a copy of these.

As the meeting minutes show Mr. H.I. Kim was upset over our efforts to have the supplier Murakami address the quality concerns and related line stoppage. This was specifically what Murakami was asked to come down for. It was on the agenda for the meeting, all parties attending had copies and in fact Mr. H.J. Kim's department wrote the agenda and Mr. H.I. Kim presided over the meeting.

As my meeting minutes indicate Mr. H.I. Kim became enraged at Murakami, Mr. J.Y Choi (Director of HMMA Purchasing) and me (Director of HMMA Purchasing / Parts Development). I could feel his anger even though he only spoke in Korean. Mr. J.Y. Choi and I spoke as one voice with the same inflection to simply try to allow Murakami to make their presentation. As Mr. Choi and I later that afternoon discussed our surprised reaction from the C.O.O. Mr. H.I. Kim to Mr. Jason (Jae Rok) Lee, Mr. J.Y. Choi repeatedly stated in English to Mr. Jason Lee in my presence that we (Purchasing), (Choi and Cyrus), did absolutely nothing wrong, Mr. Choi was very upset almost crying. We both spoke to H.I Kim calmly and with respect.

Later on September 16th 2005 I received a call from Mr. Choi at approximately 1:30pm. He said "Rob, you and I may be going home early today". He said Mr. H.I. Kim has gone to President Ahn to complain about the Murakami meeting. I said Kim is the one that acted unprofessional. Mr. Choi said and agreed that we did nothing wrong.  Mr. Choi said Mr. Kim should actually apologize to HMMA staff and Murakami.

Mr. Choi told me come to my desk immediately.  When I arrived he said Mr. H.I. Kim had demanded that Mr. Choi and I write meeting minutes to cover what occurred in the Murakami meeting.

I asked why we had to write meeting minutes. There were 30+ people in the meeting along with the two suppliers, (Murakami and Hwashin), everyone knew what happened. I told him that I had many critical things to finish that and this seemed like an unreasonable priority. In the three plus years I have been with Hyundai I had never has such a request.

At this point I went to Mr. Duckworth's office and met with him to discuss this. I explained what had occurred. He stated "don't worry about it. It's just the Korean's style". I said I don't want a black mark next to my name because of this meeting. He said "don't give it another thought; everyone knows your good standing at Hyundai". I specifically told him that this was a very hostile environment and was surprised that the now third set of Executive management sent over from HMMA was acting in such a hostile fashion. He said again "don't give it another thought your reputation and standing in the company were excellent". I then went back to my desk.



As I continued to work on my scheduled activities for that afternoon I was again called over to Mr. Choi's desk. Mr. Hyun then joined us. Mr. Choi updated me and told me that now Mr. H.I. Kim phoned President Mr. Seo in Korea about this meeting. I discussed this new escalating factor with Mr. Hyun and Mr. Choi. They both agreed that we acted in the proper fashion in the meeting and that the thing to do was let his anger try to blow over.

Late in the afternoon of September 16, I again went over to see Mr. Duckworth. I explained the latest developments and my concern about Mr. H.I. Kim. Mr. Duckworth said "don't give it another thought; I haven't heard anything about this meeting". I then specifically stated that "I don't want any negative repercussions or retaliation from Mr. H.I.Kim". Mr. Duckworth then again reassured me that "I had nothing to worry about and to forget about it and have a nice weekend".

Between the September 16, 2005 and my dinner meeting with Mr. Duckworth I had no further meetings with Mr. Kim or Mr. Ahn. A few weeks prior to that however, I met with Mr. Duckworth and reported among other things, about executive involved in sexual harassment and about misconduct with employees about safety issues because workers were not following safety policies and the discriminatory treatment given to American managers and workers who were treated less favorably then the Korean managers I am enclosing a copy of the minutes of that meeting.

On the 24th of October 2005 I phoned Mr. J.Y. Choi my peer as Director of Purchasing – Administration. I asked him what ever happened with the H.I. Kim Murakami situation. He said "nothing happened, it is done". I reminded him of his call to me the day of the meeting when he said "Rob, you and I may be going home early today". He and acknowledged the conversation. I asked him if he was or will be penalized in any way. He said nothing happened to him.

Please investigate these matters and get back to me. I have sacrificed much and worked hard for this company. Terminating me is unfair.

Sincerely,
Robert C. Cyrus C.P.M.
HMMA Director of Purchasing Parts Development

*[signature]*

21
3/

Nov 18 05 04:24p    Rob Cyrus                                334-215-1957        p.5

CONFIDENTIAL

ORIGINAL

Date:            October 2, 2005

Subject:         Murakami Manufacturing U.S.A. Inc. (MMUS), Quality Meeting

Date of Meeting: September 16, 2005 (Friday)

Time:            10:00 am

Location:        HMMA Pearl Room

Attendees from MMUS:    Mr. Toru Komatsu      Senior Vice President
                        Mr. Mark McDonald     General Manager – Quality
                        Mr. Glen Roberts      General Manager – Sales

Events of September 15/16, 2005

On Thursday September 15, 2005 I was approached by Mr. B.D. ("Brian") Hwang, Manager – Parts Development, Exterior Plastics. Mr. Hwang has been with Hyundai for 11 years. Mr. Hwang stated Mr. H.I. Kim had requested Murakami to join the "quality review meeting" scheduled for the next morning at 10:00 am. I told Mr. Hwang I would support him and asked the main purpose of the meeting. He stated Q.C. has some serious concerns regarding cosmetic defects (scratches, buff marks and other damage). He specifically asked me as a Director to strongly defend the Supplier based on actual facts. He felt he could not speak freely to the C.O.O. since he is only at the level of Manager (This was a hierarchy issue, not personal). I told him I would gather the facts and take a neutral position in the meeting tomorrow.

On the morning of September 16, 2005 I went to investigate the situation prior to the meeting and arranged a pre-meeting with Murakami at 9:30 am to clearly understand their position. I spoke with actual HMMA team member who receives the Murakami parts line side and installs them. She stated "there really hasn't been much of any difficulty with the mirrors" and "the only thing that has been occurring is occasional severe gouges or scratches all the way down to the plastic raw material, not superficial light scratches". Meaning most of the defects identified at line side are handling issues from Glovis to HMMA, not Murakami in the vast majority of the cases.

4/21

0045

We started the pre-meeting around 9:30 am in the Quality Department. Attendees were:

| | |
|---|---|
| Ms. Paula Gonzalves | HMMA Parts Quality |
| Mr. B.D. Huang | Parts Development |
| Mr. Chris McClain | Parts Development |
| Mr. Rob Cyrus | Parts Development |

Murakami brought in actual examples of the suspect parts. There were significant "gouge like" defects not likely to be shipped to any OEM customer, too obvious. Murakami explained they had visited Glovis this morning and observed how Glovis is removing the mirrors from the HMMA approved packaging and loading them haphazardly in non-approved totes. This is where the deep gouging is taking place. The three mounting studs are contacting the mirror housing painted surfaces when handled in this fashion.

After the review we and Murakami attended the Quality Meeting hosted by Mr. H.I. Kim. Two suppliers were in attendance for this meeting (*Murakami first, followed by Hwashin*). Murakami brought defect samples and started to explain that these defects (*gouges*) were caused by handling issues between Glovis and HMMA based on their root cause analysis. This item was identified as the first discussion agenda item HMMA provided to Murakami (see attached). Mr. H.I. Kim seemed upset that Murakami was bringing up this topic and said via translator (Mr. Jason Chi) that he did not want to discuss this matter.

Murakami seemed a little taken aback. Why did they have three individuals come down to HMMA at significant time and cost and yet are not permitted to discuss and defend their position? HMMA QC wanted to charge back 163 minutes of down time to Murakami. This would equate to 163 minutes x $843.50/minute (GA) = $137,490.

The facts presented in the pre-meeting with HMMA Quality and Parts Development showed of the 282 mirrors returned as defective, 251 (89%) were good and acknowledged so by HMMA QC. The remaining 31 parts were either handling damage by Glovis or defects caused by Murakami's packaging format previously approved by HMMA Production Control in writing. Murakami also received parts returned from HMMA that had been dropped and run over by our tuggers and we were trying to charge them back.

Murakami and Parts Development attempted to intervene to clarify the facts with an open dialogue but Mr. H.I. Kim got visibly upset. He was yelling at various attendees and threw his papers on the table in disgust. He abruptly turned and walked out of room. All attendees were surprised, confused and felt uncomfortable.

5/21

0046

He later returned and we tried to continue with an open dialogue approach to allow for a fair and productive meeting. Mr. Glen Roberts from Murakami asked why they were asked to drop everything immediately and come down to HMMA at significant cost and time if no one will listen. He then held up two new mirror assemblies and struck them together to replicate the damage being seen at HMMA line side by Glovis mishandling issues.

We attempted to discussed this matter and the related cost impact again, Mr. H.I. Kim seemed even further infuriated and yelled very loudly at both HMMA team members and the supplier Murakami with other supplier present. He again left the room again without any discussion or reason and never returned even though we had another supplier that was to present (Hwashin).

I was later called by my colleague Mr. J.Y. Choi and informed that Mr. H.I. Kim was very upset with Mr. Choi and me based on the Murakami meeting. Mr Choi told me "to leave my present meeting and join him at once, as he and I may have the rest of the day off' insinuating that we may be fired.

In addition I later learned that after our Murakami meeting that Mr. Jason Chi had a separate meeting with Murakami and told Mr. Glen Roberts to "shut up and sit down". He will address his comments to Mr Komatsu. He told Mr. Komatsu that Mr. Roberts was to cancel his trip back today and insisted that he stay here at HMMA.

Attached for back up are my actual meeting notes from the 16th, along with the Agenda we sent Murakami and Murakami's presentation.

Please feel free to contact me if you have any questions or concerns.

Mr. Robert Cyrus
Director of Parts Development

6/21

Nov 10 05 04:25p     Rob Cyrus                    334-215-1967          p.8

# Weekly Parts Quality Review Meeting

2005. 9. 16.

## HMMA QC Department

7/21

0048

Nov 10 05 04:25p    Rob Cyrus                    334-215-1557                p.9

# ▣■Schedule and Structure of the Meeting

**◆When:** 10:00 AM to 11:30 AM, Every Friday

**◆Where:** Alabama Room (1st floor of GA shop office building)

**◆Chaired by:** H. I. Kim, COO

**◆Attendees:**
B.G. Cho, Senior director of Manufacturing
John Kalson, Director of Manufacturing
Simon Sung, Sr. Manger of Parts Development
Rob Cyrus, Director of Parts Management
Chuck Knowles, Manager of Parts Management
Chris Susock, Sr. Manager of Quality Control
Richard Chai, Sr. Manager of Line Inspection
Dave Choi, Sr. Manager of GA shop
Danny Seo, Sr. Manager of Parts Quality, and Related people

**◆Presenters:** CEO, COO and Quality Manager of Supplier

Suppliers that caused line-stoppage at HMMA
Suppliers that caused major shipping and field Quality issues.

**◆Format:** HMMA Corrective Action Request Form (Powerpoint format)
(Presentation file to be submitted to HMMA PQ one day in advance)

**◆Prepared by:** Jason Chi, Parts Quality Manager

8/21

Nov 10 05 04:25p     Rob Cyrus                                    334-215-1967         p.10

# Presentation Topics for the week of 9/16/2005

| Supplier | Part Name | Nonconformity | Occurrence | Issue Type | Presentation Time |
|---|---|---|---|---|---|
| Lear | | Rear head rest not locked, high effort | 5 % | Quality Audit | 15 Min. |
| | Seat | Seat back rubbing noise | 1 | | |
| | | Too much wrinkles and folds (Leather) | 10 % | | |
| Murakami | Outside mirror | Paint issues (Polishing mark, Crater, Scratches) | | Downtime VPC Inspection | 15 Min. |
| | | Poor heat staking of inside bush nut (Wind noise) | 2 | Test track | |
| Hwashin | Package tray panel | Oil contamination (Crater) | 100 % | Paint shop | 15 Min. |
| | | Stamping Split | 6 | Body shop | |
| | | Subwoofer weldnuts misaligned | 25 | GA T3 | |
| Dongwon | Door frame | Weld spatter | 27 | QA line | 15 Min. |
| | | Channel too wide at upper corner (Wind noise) | 100 % | Test track | |

9/21

Nov '10 05 04:26p    Rob Cyrus    334-215-1967    p.11

1/2

**MMUS**

Murakami Manufacturing USA, Inc.
Campbellsville, KY

# NF Outer Mirror Assembly
# Countermeasure Report

DATE REPORTED : 09/16/2005

10/21

Nov 10 06 04:26p    Rob Cyrus                    334-215-1967         p.12

# Buff Marks

## DESCRIPTION OF PROBLEM :

Parts with paint buff marks found at HMMA assembly line.

## ROOT CAUSE OF NON-CONFORMANCE :

Uncompleted buff finishing was performed under insufficient lightening (1,000 lux).

## COUNTERMEASURE :

- Additional lighting installed (2,500 lux) into buff area
- Lighting check sheet created
- Check before operation on 1st and 2nd shifts using lighting meter
- Lightning criteria : more than 2,500 lux
- Effective date : Sep 14, 2005

## METHOD OF COUNTERMESURE EFFECT (RESULT) :

100 % Inspection of all assemblies prior to shipping to HMMA.

## REFLECTION TO NEW MODEL :

The countermeasure is included in CM process launched in April, 2006

2/7

11/21

Nov 10 05 04:26p    Rob Cyrus                    334-215-1667        p.13



12/21

Nov 10 05 04:26p    Rob Cyrus    334-215-1957    p.14

# Bag Marks

## DESCRIPTION OF PROBLEM :

Parts with paint bag marks found at HMMA assembly line.

## ROOT CAUSE OF NON-CONFORMANCE :

The paint bag mark is caused by protective bag being imprinted into the paint after leaving MMUS (dark colors only).

Root cause:

1. Insufficient paint cure time (2–4 hrs – after EC change to Housing).
2. Container design (vertical position & rough dunnage).

## COUNTERMEASURES IMPLEMENTED :

- Stabilized curing time (7/25/05)
- New type of protective bag (8/7/05)
- Currently packaging all dark colors outside of the dunnage and protecting part with bubble wrap (extra time & cost).

## REFLECTION TO NEW MODEL :

For CM program, different type of part container / dunnage will be proposed.

13/21

Nov 10 05 04:27p    Rob Cyrus                    334-216-1967              p.15

# Bag Mark

<u>Permanent countermeasure :</u>

- Container & Dunnage should be modified.



Container & Dunnage currently
used by another customer

Current NF Container & Dunnage

14/21

0055

# Poor Heat Staking of Inside Bush Nut

* Root cause of non-conformance:
1) Machine malfunction  2) Miss-operation (human error)

* Temporary Countermeasure :

1) Operator verification - Mark a Dot on cover-base to ensure the heat stake process is complete
  - First the operator at heat stake process marks a dot on cover-base after the process then the next operator verifies the heat stake condition is acceptable and marks the part ( on cover-base) (1st operator 8/15/05) (2nd / audit operator 9/15/05)

2) Machine check - Increased frequency of machine function check
  - Check 2 times a day ( start & end of shift) (9/14/05)

* Permanent countermeasure :
  - Heat Staking Process to be eliminated by introducing the elimination of Bracket and Bracket A (Engineering Change).

15/21

67

Nov 10 05 04:27p    Rob Cyrus    334-215-1967    p.17

# Poor Heat Staking

**Permanent Countermeasure:**

Engineering Change to eliminate heat staking process



16/21

Cyrus, Robert C HMMA/Part Development

| | |
|---|---|
| **From:** | McClain, Christopher C HMMA/Parts Development |
| **Sent:** | Monday, October 03, 2005 9:50 AM |
| **To:** | Cyrus, Robert C HMMA/Part Development |
| **Subject:** | FW: C.O.O. Meeting Observation |
| **Importance:** | High |

FYI, you were copied too...

## Chris McClain
*Buyer - Parts Development*
**Hyundai Motor Manufacturing Alabama, LLC**
**PHONE (334) 387-8172**
**FAX: (334) 387-8299**
Email: chrismcclain@hmmausa.com
www.hgmausa.com

  **HYUNDAI**

*WARNING:*
*The information contained in this communication is confidential, may be Hyundai-Supplier privledged, and is intended only for the addressee. Unauthorized use, disclosure, or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you receive this communication in error, please notify us immediately by return e-mail or by calling the number above, and destroy this communication and all copies therof, including all attachments.*

-----Original Message-----
**From:** McClain, Christopher C HMMA/Parts Development
**Sent:** Friday, September 16, 2005 3:27 PM
**To:** Choi, Jung Yun HMMA/Parts Development
**Cc:** Cyrus, Robert C HMMA/Part Development
**Subject:** C.O.O. Meeting Observation

Hello Mr. Choi...below is a summary of what I observed in the meeting this morning.

> Our mirror supplier, Murakami was called in and asked to do a short presentation regarding an issue that occurred earlier this week
> Murakami had not received the parts in question to do root cause analysis and requested that they be allowed to attend next Friday's meeting
> In an effort to comply with HMMA's request, the supplier's quality general manager, sales general manager and VP of manufacturing re-arranged their schedules to attend this meeting
> After beginning the presentation, it became clear that Murakmi would not be allowed to address the real cause of the rejected parts although they were listed on HMMA's agenda
> Murakmi personnel became upset that after driving 8 hours to be here, they were not being allowed to speak
> Parts development staff attempted to explain the supplier's position, they were told that the meeting was not the place to discuss these issues.
> The suppliers point of view is that if they were not to speak, there was not reason for them to come to HMMA on such short notice
> Staff from other departments made negative non-factual comments about the supplier's parts...again, purchasing staff intervened in an attempt to stick to facts and be fair.
> Neither purchasing, nor the supplier denies that there was an issue on a sample of parts, but the real

10/3/2005                                                        **17/21**

consensual root cause was not able to be discussed.
> At not time, were purchasing staff disrespectful during the meeting. They were trying to do the right thing by addressing real Issues which was supposed to be the reason for having the meeting.

## Chris McClain
*Buyer – Parts Development*
**Hyundai Motor Manufacturing Alabama, LLC**
PHONE (334) 387-8172
FAX: (334) 387-8298
Email: chrismcclain@hmmausa.com
www.hmmausa.com

 **HYUNDAI**

WARNING:
*The information contained in this communication is confidential, may be Hyundai-Supplier privileged, and is intended only for the addressee. Unauthorized use, disclosure, or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you receive this communication in error, please notify us immediately by return e-mail or by calling the number above, and destroy this communication and all copies thereof, including all attachments.*

10/3/2005

*18/21*

Meeting with Mr. Duckworth,

List of issues

- Supervisors were not familiar using SAP to record workers' overtime which will get annoyed. There shouldn't be any mistakes on the pay.
  - Extra help is required to entering those data.
- Communication with employee. Currently, there is no way to communicate with employees. It is very difficult to put people together in the meeting.
  - We need to invest some money to put CCTV in the plant, so the president can talk to workers at same time. Cafeteria is also good place. It is budged for 2006.
- Plant objectives. Employees do not understand plant objective other than making cars.
  - We need let workers know that objectives are more than building cars. Quality, quantity, and providing jobs to support their family are also objective. And those plant goal as well
- Executive management needs some strategic plan in coordinated operation.
- Bonus was budged but nothing paid other than blanket.
- Vehicle lease program
- Internal investigation will be done for wrong-doing on executive side. If the rumors (financial payment being made by supplier or other sexual service may be provided) are true, the action must take now.
  - Mitsubishi lost 15 million dollar as well as company reputation over public. We must cut it really fast.
- Managements are not able to get approve regiment expenses. Mostly, it is turn down. This is showing the Company tried to limit the expense by cutting down the benefits.
- Holiday party plan. There was some concern that we may not have holiday party because of budget issue.
- Employee protection demand. There is impression that safety policy secondary in the plant. It is perception issue. To American, workers some of the Korean workers are not following the policy even though Korean worker knows what he is doing and this gives impression that supervisor doesn't care about safety. UAW can attack on these issues.
- American manage complains that they have limited authority. They (Director, Senior Manager) say that their signature means nothing. One of the director

19/21

couldn't send out *federal express mail* with getting approval by Korean manager.
  - ✖ We need to work on these.
- Hyundai Culture must be developed.
  - ✖ We need to build sense of Unity.
- Team unification.
  - ✖ A team needs to work, think and eat together. They need spend more time together.
- Family enrichment program.
  - ✖ Family picture at the plant. Hyundai jacket, because in Alabama wearing cloth with where they belong is very important.
- Plant friendly.
  - ✖ We need to put benches around the plant, so workers can rest. Sports centers such as Softball field and basketball fields. Korean and/or American management must tell workers that we will do these after we make profit. Average workers don't understand when we are going to start making profits. UAW will use this to attack us.
- Flue shot for all employee
  - ✖ This shows workers that we care and it also helps good attendance.
- Making productive place than fighting against UAW. If we just fight with UVW, we will just end up spending so much money.
  - ✖ We need integrated program. Give confidence and direction to workers. Care the team member family. Care suppliers because UVW will attack because they are weaker. We must work together and get support from City and State. We need to show that we are here.
- Majority can be solved we act soon. We are still in honeymoon period.
- Food price is too high.
  - ✖ We need to force vendors to keep price low.
- Enforce rules equally. → *REALLY MAINLY FAIRLY!*
  - ✖ Workers don't understand if some Korean/American executive park inside of the plant.
- Amount Money to invest.
  - ✖ We need much to show that we care.
- Salary is currently acceptable at least 2 ~ 3 years.
  - ✖ Pay is the last reason for workers join the Union. Lack of simple programs such as family program is what force workers to join the Union.
- Bonus is the name we want use. Appreciation is more proper work to use.

*20/21*

- ✻ Workers don't understand if line is down because of robotic problem or any machinery problem.
- – 401k.
  - ✻ We need to meet current industry standard. ?
- – Do it partially over the period of time.
- – Mr. Ahn needs to be more visible to workers and all employees. He needs to become like father of the plant.
- – Any negative issue must come from American management side. They must be able say. They need to have authority and responsibility. With strong responsibility, they must take care of their own people.
- – HR must coordinate and all others such as HMA, HAC, Mobis, Glovis and etc.

21/21

| Concern | If Left Un-resolved | Recommended Solution |
|---------|---------------------|----------------------|
| Control issues are creating an us and them environment | Will hinder the Positive Team Atmosphere that we are trying to create and will create more of an environment that could foster union mentality. | Evaluate and commit to understanding the root cause if. Lack of Trust. (Team Building) Recommend Coordinator roles instead of Direct Management |
| Opinions are not necessarily welcomed and when they are sought, they are typically not implemented or changed. When opinions are requested they are challenged as being wrong i.e. (Calls are made to Bankers, Vendors after things are decided and completed) | Team Members will be reluctant to give opinions or advice.  Feelings from Team Members that they are not trusted | When Team Members present information we can not always challenge. We hired them for their expertise but do not allow them to use it or respect their talents |
| American Leadership feels that they are not well respected or supported or allowed to make decisions. | Team Members will avoid American Managers or go over their heads or worst will not share critical information to support the organization. | Create more Win/Win situations rather than adversarial Win/Loose. Be allowed to make decisions without fear of American managers to win sometime. |
| Team Members are frustrated that policies are still not in place. By not having policies it causes our management to be inconsistent from department to department. | Team Members believe others are being shown favoritism because of inconsistencies. | Approve all policies as soon as possible. So the handbook can be completed, printed, and distributed. |
| Approval process requires too many levels of approval. Once all approvals have been obtained another department has the authority to refuse. | Team Members impression is that HR is the sole decision maker. When we have made a decision and then another department says no they don't agree. The Team Members view us as unreliable. | We must support decisions that have been approved by our executives. |



EXHIBIT

| Korean Team Members are not sharing information about business plan. | Causes duplication of work. One department believes it is their responsibility to develop a program only to find out the responsibility is in another department. | Communicate clearly to all departments their area's of responsibility. |
| --- | --- | --- |



**Hyundai Motor Manufacturing Alabama, LLC**
700 Hyundai Boulevard, Montgomery, AL 36105
TEL: 334-387-8000  FAX: 334-387-8999
www.hmmausa.com

October 24, 2005

Mr. Rob Cyrus
~~7                                    ~~
Montgomery, AL  36117

Dear Rob,

    In order to ensure clear understanding of the employment differences between HMMA and yourself, as discussed in our business dinner of October 22, 2005, the following information will clarify actions necessary to resolve the issues which were raised.

    a. Prior to coming back to HMMA, you are directed to make an appointment to further discuss your issues of concern about your employment with HMMA. This appointment should be made with me through Nancy Powers at extension 8164. Please provide two days notice so that I can arrange my schedule.

    b. During your work absence from HMMA you are not to represent the company in any business negotiations or conduct any company business on behalf of HMMA

    c. Please note, until your employment relationship can be evaluated, your access card will be temporarily suspended. Please do not remove any items from HMMA premises until we complete further discussions concerning your employment status.

    d. During your absence, with appropriate medical documentation you will be on medical leave, at which time if because of my schedule we are unable to meet, you will be placed on administrative leave pending consideration and action by the company.

    I believe my instructions to you are prudent and will seek to protect all parties in this matter from misunderstanding or mistake.

Sincerely,

*M. Keith Duckworth*

M. Keith Duckworth
Deputy President and Chief Administrative Officer

*18*



Hyundai Motor Manufacturing Alabama, LLC
700 Hyundai Boulevard, Montgomery, AL 36105
TEL: 334-387-8000 FAX: 334-387-8999
www.hmmausa.com



Via Federal Express and Certified Mail, Return Receipt Requested

December 6, 2005

Mr. Rob Cyrus

Montgomery, AL 36117

Dear Rob,

Hyundai Motor Manufacturing Alabama, LLC ("HMMA") is exercising its rights under Alabama's employment-at-will doctrine to end your employment with the company at the close of business on December 7, 2005. HMMA will pay your salary and furnish your company car through that date and continue your existing health insurance through December 31, 2005. As you know, your letter of engagement dated May 16, 2002 specifically states that your employment with HMMA is "at will" and may be terminated by either party at any time.

It is with regret that this action is necessary.

In order to help you transition to other employment or endeavors of your choice, HMMA is prepared to offer you a payment equal to twenty-four (24) weeks of your gross salary (minus appropriate legally-required state and federal deductions and tax withholdings) subject to your execution of the attached Separation Agreement and Release, and on the terms set forth therein. Additionally, HMMA will pay you a lump sum amount equal to the current amount of your health insurance premiums for a period of twenty-four (24) weeks. This offer will remain open (subject to the following paragraph) for 21 days in accordance with current law, but may be accepted prior to the expiration of that time. Additionally, by law, you have 7 days within which to revoke your acceptance.

Regardless of your decision, please be advised that HMMA will vigorously enforce the terms and provisions of the Confidentiality Agreement you executed on August 12, 2003, and will pursue its legal remedies in the event of any breach of that agreement. Any violations of that agreement that become known to HMMA prior to your acceptance of the Separation Agreement shall void this offer. Any violations of that agreement after your acceptance of the Separation Agreement shall entitle HMMA to recover any amounts paid to you thereunder.

EXHIBIT

19

As of the effective date of your separation from employment, you are no longer an authorized operator of HMMA's company-provided vehicle. Please make immediate arrangements to return your car to HMMA by contacting David Colmans in the Vehicle Services Department. Additionally, we will need to promptly collect from you all other HMMA-issued property.

You are encouraged to review this offer with legal counsel of your own choice and at your own expense. Should your legal counsel have questions about this matter, they should be addressed to Mr. Rick Neal, General Counsel, HMMA at 700 Hyundai Blvd, Montgomery, AL 36105, telephone 334-387-8043. If you have any questions, you may direct them to my attention.

I regret that your employment with HMMA was not in concert with your expectations but I sincerely wish you the greatest success in the future.

Sincerely,

M. Keith Duckworth
Deputy President and Chief Executive Officer

November 6, 2005

Mr. Keith Duckworth
HMMA Deputy President

Subject: Formal complaint for racial discrimination as written in HMMA policies
HR-AL-HR-TR-S-00014 and HR-AL-HR-TR-S-00037.

Per your requested dinner meeting held with me on October 22, 2005 as you stated "to
check on how I am doing (health wise), and to see if you could be of any help". I
attended in good faith and actually brought my medical documentation for you to review.
I had over 100 pages of documentation which you glanced at for maybe 30 seconds.

Upon my arrival at the restaurant City Grill I ran into Mr. Michael Hansford and his wife
outside. They were surprised to see me as I had been mostly bed ridden of the past few
weeks. They asked what I was doing here and I said Keith had requested a dinner with
me to check to see if I was doing okay. Michel said he would like to meet Mr. Duckworth
and joined us at our table maybe 10 minutes after I arrived. The discussions about my
medical issues were sidelined until Mr. Hansford could excuse himself as I needed to talk
with Keith about my ongoing medical problems.

While Mr. Hansford was present Keith asked about Mike's experience at HMMA. He
went into some detail on his termination but then the remaining topics switched to
"grilling" Mike I about what we knew about serious ongoing problems at HMMA.
Specifically he asked us if ▬▬▬▬▬▬▬▬ was still sleeping with ▬▬▬▬▬▬▬▬
▬▬▬▬▬ replied that he was ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬ I did not comment on this issue. Keith then asked about ▬▬▬▬▬▬▬▬▬
with ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ again said he had ▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ apparently took place.

He asked us of other concerns he had heard of such as "kick-backs". We both said we had
heard simply rumors about ▬▬▬▬▬▬▬ with no concrete proof. The conversation
initiated by Keith went on for some time. At this point I asked Mike to please excuse
himself as I needed some time in private with Keith. Mike then left.

Out of the blue Mr. Duckworth said well "Rob the executive management at Hyundai is
upset with you and we would like you to resign". I was flabbergasted. I said what? I don't
understand I wasn't aware of any performance, demeanor or relationships issues. I told
Keith as you may or may not be ware we have no review process for employee
performance after three years with a Human Resources Director and full staff on board. I
asked Keith specifically just who is "executive management". He said President Ahn,
COO H.H. Kim and Rick Neal HMMA in-house General Council.

I told Keith President Ahn has only been at HMMA a few months and speaks very
limited English. Our conversations have been "hello" in the hallways and bathroom. He



EXHIBIT
Z 0

CYRUS   825

has never expressed any dissatisfaction with me directly or through any Korean colleagues. As far as Mr. H.I. Kim is concerned my only encounters with him have been in relation to issues with PPG's performance. We can go into excruciating detail on this topic when you wish.

The other quite astounding meeting with H.I. Kim was regarding his unreasonable demand for Murakami to come down to HMMA immediately from Lexington, Kentucky to address a perceived quality problem concerning their outside mirrors. The demanded date was September 16th at HMMA at 10:00 in the Pearl Room.

See my meting minutes provided to President Ahn via Mr. H.J. Hyun.

As the meeting minutes clearly show Mr. H.I. Kim appeared to strangely enraged over our efforts to have the supplier Murakami address the quality concerns and related line stoppage. This was specifically what Murakami was asked to come down for. It was on the agenda for the meeting, all parties attending had copies and in fact H.I. Kim's department wrote the agenda and H.I. Kim proceeded over the meeting.

As my meeting minutes clearly and accurately indicate Mr. H.I. Kim became enraged at Murakami, Mr. J.Y Choi (Director of HMMA Purchasing) and apparently me (Director of HMMA Purchasing / Parts Development) for I could feel his anger even though he only barked in Korean. Mr. J.Y. Choi and I spoke as one voice with the same inflection to simply try to allow Murakami to make their presentation. As Mr. Choi and I later that afternoon discussed our surprised reaction from C.O.O. H.I. Kim to Mr. Jason (Jae Rok) Lee, Mr. J.Y. Choi said repeatedly  stated in English to Jason in my presence that we (Purchasing), (Choi and Cyrus), did absolutely nothing wrong, Mr. Choi was very upset almost crying. We both spoke to H.I. Kim calmly and with respectfully.

Still on September 16th 2005 I receive a call from Mr. Choi approximately 1:30pm. He said that quote "Rob, you and I may be going home early today". I said what? He said H.I. Kim has gone to President Ahn to complain about the Murakami meeting. I said what? What for, he is the one that acted juvenile and unprofessional in his meeting. He said I know we did nothing wrong he (H.I. Kim), should actually apologize to HMMA staff and Murakami.

He told me to leave my present meeting in the plant and come to my desk immediately. I arrived back at my desk approximately 1:45pm. He said H.I. Kim has demanded that Mr. Choi and I write meeting minutes to cover what occurred in the Murakami meeting.

I asked why we had to write meeting minutes. There were 30+ people in the meeting along with the two suppliers, (Murakami and Hwashin), everyone knew what happened. I told him that I had many critical things to finish today and this seems like an unreasonable priority. In the three plus years I have been with Hyundai I had never has such a request.

At this point I went immediately to Mr. Keith Duckworth's office and met with him to discuss this greatly inflated issue. I explained in detail to Keith what had occurred in the meeting. He stated quote "don't worry about it. It's just the Korean's style". I said I don't want a black mark next to my name because of this meeting. He said quote "Again don't give it another thought; everyone knows your good standing at Hyundai". I specifically told him that this was a very hostile environment and was surprised that the now Third set of Executive management sent over form HMC was acting in such a non American type hostile fashion. He said again don't give it another thought your reputation and standing in the company were excellent. I then went back to my desk.

As I continued to work on my scheduled activities for that afternoon I was again called over to Mr. Choi's desk. H.J. Hyun then joined us. Choi now updated me and told me that H.I. Kim has now also phoned President Seo in Korea (HMC) to vent about this one meeting. I discussed this new escalating factor with Mr. Hyun my boss and Mr. Choi my peer. They both agreed fully that we acted in the proper fashion in the meeting and just let his anger try to blow over.

Now I am getting more concerned about this situation and how it appeared to be escalating out of reasonableness.

It was now late in the afternoon on the 16th (9/2005) and I again went over to see Mr. Duckworth. I explained the latest developments and my concern about H.I. Kim's wrath. Keith calmly said "again don't give it another thought; I haven't heard anything about this meeting". I then specifically stated that I don't want any negative repercussions or retaliation from H.I.Kim". Keith then again reassured me that I have nothing to worry about and to forget about it and have a nice weekend. I thanked Keith for his time.

This takes us back to my first paragraph and my surprise dinner requested by Mr. Keith Duckworth.

On the 24th of October 2005 I phoned Mr. J.Y. Choi my peer as Director of Purchasing – Administration. I asked him what ever happened with the H.I. Kim Murakami situation. He said "nothing happened, it is done". I reminded him of his call to me the day of the meeting when he said "Rob, you and I may be going home early today". He acknowledged the conversation. I asked him if he was or will be penalized in any way. He said "no, nothing happens to me, I don't mind about his opinion my boss is in head office (HMC). He said again nothing at all happened to me.

As a current employee of HMMA I wish to formally file a complaint about clear violations of HMMA's policies that protect employees based on race. I the American am asked to resign and my peer Mr. J.Y. Choi (Korean) has had absolutely no penalty, or been asked to resign.
Please follow up on this request to me formally in writing.

Sincerely,
Robert C. Cyrus C.P.M.    HMMA Director of Purchasing Parts Development

| CHARGE OF DISCRIMINATION | | ENTER CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form. | | ☐ FEPA<br>X EEOC |

| NAME | HOME TELEPHONE NO. |
|---|---|
| Robert C. Cyrus | 334-215-1967 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| ~~7000 Larrienmore Loop~~ | Montgomery, AL 36117 | Montgomery |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NO. OF EMPLOYEES/MEMBERS | TELEPHONE NUMBER |
|---|---|---|
| Hyundai Motor Manufacturing Alabama LLC | SEVERAL HUNDRED<br>500 + | 334-~~ |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| 700 Hyundai Blvd., Montgomery, AL 36105 | |

| CAUSE OF DISCRIMINATION BASED ON | DATE MOST RECENT OR CONTINUING DISCRIMINATION TOO PLACE |
|---|---|
| Race, National Origin and Retaliation | 12/6/05 |

THE PARTICULARS ARE:

I am a white American. I was employed at HMMA. Prior to October 22, 2005, I had no problems in my position at HMMA. My position with HMMA was director of purchasing. In September I had met with Mr. Duckworth and reported issues of Koreans discriminating against Americans, sexual harassment and Koreans involved in workplace violence. I had no difficulty with anyone except on one occasion in September, 2005. I and my Korean counterpart Mr. J. Y. Choi went to a meeting where Mr. H. I. Kim became enraged at some visitors. Mr. J. Y. Choi, also director of purchasing at HMMA, but a Korean, and I both spoke to have Mr. Kim allow the visitor to make their presentation. Later that afternoon Mr. Choi told me in front of Mr. Lee, another Korean that we had done nothing wrong. Mr. Choi told me that Mr. Kim had gone to President Ahn, another Korean, complaining about the meeting. I then spoke with Mr. Duckworth, an American, who is Deputy President of HMMA. Mr. Duckworth assured me that I had nothing to worry about, it was just the Korean's style. He said my reputation and standing with the Company were excellent. However, on October 22, 2005, with nothing in the intervening period, Mr. Duckworth called me to a meeting away from work and asked me to turn in my resignation stating that President Ahn and Mr. Kim were upset with me and would like for me to resign. I asked Mr. Choi after this meeting with Mr. Duckworth, Mr. Choi said nothing happened to him. I wrote a letter to President Ahn, Mr. Duckworth, and Mr. Kim, the director of Human Resources of HMMA complaining about race discrimination on November 6, 2005. On December 6, 2005, I received a letter from Mr. Duckworth terminating my employment at HMMA. Between the time of my meeting with Mr. Duckworth on October 22, 2005, and my termination on December 6, 2005, I was not allowed to return to my regular duties. I believe that my termination was based on race and National Origin and that I am a American and a Korean, who did exactly what I did, was in the exact same position that I was, received no adverse employment action. Furthermore, the individual requesting my resignation were identified as the Korean President and Korean Chief Operating Officer of HMMA.

I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

| I declare under penalty of perjury that the foregoing is true and correct. | ATTORNEY FOR THE CHARGING PARTY: |
|---|---|
| | Richard J. Stockham, III<br>Stockham, Carroll & Smith, P.C.<br>2204 Lake Shore Drive, Suite 114<br>Birmingham, AL 35209<br>Telephone (205) 879-9954 |
| *signature* _____ *signature* | |
| Date        Charging Party (Signature) | |

Copy of EEOC FORM 5

EXHIBIT
21

0036

# Exhibit B

IN THE UNITED STATES DISTRICT COURT FOR

THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


ROBERT CYRUS,              )

                          )

        Plaintiff,         )

                          )

vs.                        )  Civil Action No.

                          )  2:07-CV-144-ID

                          )

HYUNDAI MOTOR              )

MANUFACTURING             )

OF ALABAMA LLC,            )

                          )

        Defendant.         )


        DEPOSITION OF J. Y. CHOI


    S T I P U L A T I O N S


        IT IS STIPULATED AND AGREED,

by and between the parties through

| Page 2 | Page 4 |
|---|---|

**Page 2**

1  their respective counsel, that the
2  deposition of J. Y. CHOI may be
3  taken before Sandra Peebles Daniel,
4  Commissioner, Notary Public, State
5  at Large, at the offices of MAYNARD
6  COOPER & GAYLE, PC, RSA UNION
7  BUILDING, 100 Union Street, Suite
8  650, Montgomery, Alabama, 36104, on
9  the 29th day of November, 2007,
10  beginning at approximately 2:45 p.m.
11       IT IS FURTHER STIPULATED AND
12  AGREED that the reading of and
13  signature to the deposition by the
14  witness is not waived, the
15  deposition to have the same force
16  and effect as if full compliance had
17  been had with all laws and rules of
18  Court relating to the taking of
19  depositions.
20       IT IS FURTHER STIPULATED AND
21  AGREED that it shall not be
22  necessary for any objections to be
23  made by counsel to any questions,

**Page 4**

1            I N D E X
2  EXAMINATION BY:          PAGE:
3  Mr. Stockham ................... 8
4
5
6            E X H I B I T S
7  FOR THE PLAINTIFF:        PAGE:
8
9  Exhibit 1 .................... 76
10      (document in Korean)
11  Exhibit 2 ................... 169
12      (to pages of e-mails,
13       McClain to Cyrus)
14
15
16
17
18
19
20
21
22
23

**Page 3**

1  except as to form or leading
2  questions, and that counsel for the
3  parties may make objections and
4  assign grounds at the time of the
5  trial, or at the time said
6  deposition is offered in evidence,
7  or prior thereto.
8       IT IS FURTHER STIPULATED AND
9  AGREED that notice of filing of the
10  deposition by the Commissioner is
11  waived.
12
13
14
15
16
17
18
19
20
1
22
23

**Page 5**

1        A P P E A R A N C E S
2
3  BEFORE:
4  Sandra Peebles Daniel,
5  Commissioner, Notary Public
6
7  FOR THE PLAINTIFF:
8  Mr. Richard J. Stockham
9  STOCKHAM, CARROLL & SMITH, P.C.
10  2204 Lakeshore Drive
11  Suite 114
12  Birmingham, Alabama  35209
13
14  FOR THE DEFENDANT:
15  Mr. Brian R. Bostick
16  OGLETREE, DEAKINS, NASH,
17   SMOAK & STEWART, P.C.
18  One Federal Place
19  Suite 1000
20  1819 5th Avenue North
21  Birmingham, Alabama  35203
22
23

Page 6

FOR THE DEFENDANT:    (continued)
1  Mr. David Perry
2  MAYNARD COOPER & GAYLE, PC
3  1901 6th Avenue North
4  2400 Regions Harbert Plaza
5  Birmingham, Alabama  35203-2618
6
7  Ms. Myung Kim
8  OGLETREE DEAKINS NASH SMOAK &
9  STEWART
10  10 Madison Avenue
11  Suite 402
12  Morristown, New Jersey  07960
13
14  ALSO PRESENT:
15  Hyoun Joo Song (interpreter)
16  Raymond K. Kim (interpreter)
17  In Chul Kim
18  Chris Whitehead
19  Robert Cyrus
20
21
22
23

Page 7

1      I, Sandra Peebles Daniel, a
2  Court Reporter of Birmingham,
3  Alabama, Notary Public, State at
4  Large, acting as Commissioner,
5  certify that on this date, as
6  provided by Rule 30 of the Alabama
7  Rules of Civil Procedure, and the
8  foregoing stipulation of counsel,
9  there came before me at the offices
10  of MAYNARD COOPER & GAYLE, PC, RSA
11  UNION BUILDING, 100 Union Street,
12  Suite 650, Montgomery, Alabama,
13  36104, on the 29th day of November,
14  2007, at or about 2:45 p.m., J. Y.
15  CHOI, witness in the above cause,
16  for oral examination, whereupon the
17  following proceedings were had:
18
19      THE COURT REPORTER: Ms.
20  Song, you are still under oath. And
1  Mr. Kim, you are still under oath.
22      Usual stipulations?
23      MR. BOSTICK: With the read

Page 8

1  and sign
2
3      J. Y. CHOI, witness,
4  having first been duly sworn
5  through Interpreter Song, was
6  examined and testified as follows:
7
8  EXAMINATION BY MR. STOCKHAM:
9      Q.    What's your name, please,
10  sir?
11      MS. SONG: (Translates
12  into Korean)
13      A.    (Witness speaks in Korean)
14      MS. SONG: Jong Yun Choi.
15      Q.    What is the English
16  spelling of your last name?
17      MS. SONG: (Translates
18  into Korean)
19      A.    C-h-o-i.
20      MS. SONG: C-h-o-i.
21      Q.    What -- where do you live?
22      MS. SONG: (Translates
23  into Korean)

Page 9

1      A.    (Witness speaks in Korean)
2      MS. SONG: Are you
3  referring to the company or my
4  house?
5      Q.    I'm referring to where do
6  you live in Montgomery, Alabama.
7      MS. SONG: (Translates
8  into Korean)
9      A.    (Witness speaks in Korean)
10      MS. SONG: ▮▮▮▮▮▮▮▮▮
11  ▮▮▮▮▮▮▮, Montgomery, Alabama
12  36117.
13      Q.    Is that a house?
14      MS. SONG: (Translates
15  into Korean)
16      A.    (Witness speaks in Korean)
17      MS. SONG: Yes.
18      Q.    Now, do you live there
19  alone?
20      MS. SONG: (Translates
21  into Korean)
22      A.    (Witness speaks in Korean)
23      MS. SONG: I live with my

Page 10

```
 1   family.
 2        Q.   Who is that?
 3             MS. SONG:  (Translates
 4   into Korean)
 5        A.   My wife.
 6             MS. SONG:  My wife.
 7        A.   (Witness speaks in Korean)
 8             MS. SONG:  My daughter.
 9        A.   (Witness speaks in Korean)
10             MS. SONG:  And a son.
11        Q.   How old are your children?
12             MS. SONG:  (Translates
13   into Korean)
14        A.   (Witness speaks in Korean)
15             MS. SONG:  My daughter is
16   eighteen.
17        A.   (Witness speaks in Korean)
18             MS. SONG:  My son is
19   fourteen years old.
20        Q.   Where is your daughter in
21   school?
22             MS. SONG:  (Translates
23   into Korean)
```

Page 11

```
 1        A.   Montgomery Academy.
 2             MS. SONG:  My daughter
 3   goes to Montgomery Academy.
 4        Q.   Your son?
 5             MS. SONG:  (Translates
 6   into Korean)
 7        A.   Baldwin Academy.
 8             MS. SONG:  My son goes to
 9   Baldwin Academy.
10        Q.   Now, how old are you?
11             MS. SONG:  (Translates
12   into Korean)
13        A.   (Witness speaks in Korean)
14             MS. SONG:  Forty-eight.
15        Q.   And when was the first
16   time you came to the United States?
17             MS. SONG:  (Translates
18   into Korean)
19        A.   (Witness speaks in Korean)
20             MS. SONG:  Are you asking
 1   me when I was on business trip or
22   when I got stationed out here?
23        A.   (Witness speaks in Korean)
```

Page 12

```
 1             MS. SONG:  First time
 2   ever.
 3             MS. SONG:  (Translates
 4   into Korean)
 5        A.   (Witness speaks in Korean)
 6             MS. SONG:  In 1989.
 7        Q.   And how long did you come
 8   in 1989?
 9             MS. SONG:  (Translates
10   into Korean)
11        A.   (Witness speaks in Korean)
12             MS. SONG:  It's not
13   accurate but --
14        A.   (Witness speaks in Korean)
15             MS. SONG:  -- about five
16   days.
17        Q.   When was the next time?
18             MS. SONG:  (Translates
19   into Korean)
20        A.   (Witness speaks in Korean)
21             MS. SONG:  Around 1991.
22        Q.   And how long did he stay?
23             MS. SONG:  (Translates
```

Page 13

```
 1   into Korean)
 2        A.   (Witness speaks in Korean)
 3             MS. SONG:  About five
 4   days.
 5        Q.   When was the next time?
 6             MS. SONG:  (Translates
 7   into Korean)
 8        A.   (Witness speaks in Korean)
 9             MS. SONG:  I was here on
10   business trips numerous times so I
11   cannot recall every time.
12        Q.   How many business trips
13   did he -- has he made to the United
14   States?
15             MS. SONG:  (Translates
16   into Korean)
17        A.   (Witness speaks in Korean)
18             MS. SONG:  About fifteen
19   times.
20        Q.   And how long were those
21   business trips on average?
22             MS. SONG:  (Translates
23   into Korean)
```

Page 14

```
 1      A.    (Witness speaks in Korean)
 2            MS. SONG:  Five, six days.
 3      Q.    Before he moved to
 4  Montgomery, Alabama has he ever
 5  lived anywhere else in the United
 6  States?
 7            MS. SONG:  (Translates
 8  into Korean)
 9      A.    (Witness speaks in Korean)
10            MS. SONG:  Yes.
11      Q.    Where?
12            MS. SONG:  (Translates
13  into Korean)
14      A.    Ann Arbor, Michigan.
15            MS. SONG:  In Ann Arbor,
16  Michigan.
17      Q.    How long did you live in
18  Ann Arbor?
19            MS. SONG:  (Translates
20  into Korean)
21      A.    (Witness speaks in Korean)
22            MS. SONG:  Four years and
23  ten months.
```

Page 15

```
 1      Q.    When was that?
 2            MS. SONG:  (Translates
 3  into Korean)
 4      A.    (Witness speaks in Korean)
 5            MS. SONG:  From October of
 6  1995 to --
 7      A.    (Witness speaks in Korean)
 8            MS. SONG:  2000, in
 9  September.
10      Q.    And did he live in the
11  United States any other time?
12            MS. SONG:  (Translates
13  into Korean)
14      A.    (Witness speaks in Korean)
15            MS. SONG:  Including
16  Montgomery or --
17      Q.    Yes.
18            MS. SONG:  (Translates
19  into Korean)
20      A.    (Witness speaks in Korean)
 1            MS. SONG:  I have been
22  living here for two years and three
23  months.
```

Page 16

```
 1      Q.    And by living here, you
 2  mean Montgomery?
 3            MS. SONG:  (Translates
 4  into Korean)
 5      A.    (Witness speaks in Korean)
 6            MS. SONG:  Yes.
 7      Q.    So you came to Montgomery
 8  when?
 9            MS. SONG:  (Translates
10  into Korean)
11      A.    (Witness speaks in Korean)
12            MS. SONG:  2005.
13      A.    (Witness speaks in Korean)
14            MS. SONG:  On August 11.
15      Q.    When you came in 2005 --
16            MS. SONG:  (Translates
17  into Korean)
18      Q.    -- where were you
19  immediately prior to that?
20            MS. SONG:  (Translates
21  into Korean)
22      A.    (Witness speaks in Korean)
23            MS. SONG:  In Seoul,
```

Page 17

```
 1  Korea.
 2      Q.    Where -- what were you
 3  doing in Seoul, Korea?
 4            MS. SONG:  (Translates
 5  into Korean)
 6      A.    (Witness speaks in Korean)
 7            MS. SONG:  I was the
 8  manager of the department of
 9  development for parts oversea at
10  Hyundai Motor Company.
11      Q.    Is that purchasing?
12            MS. SONG:  (Translates
13  into Korean)
14            MR. RAYMOND KIM:  (Speaks
15  in Korean)
16            MS. SONG:  (Translates
17  into Korean)
18      A.    (Witness speaks in Korean)
19            MS. SONG:  No.  Developing
20  parts.
21      Q.    That's different from
22  Procurement?
23            MS. SONG:  I'm sorry?
```

Page 18

1    Q.    Is that different from
2  procurement?
3            MS. SONG: (Translates
4  into Korean)
5            MR. RAYMOND KIM: Same as
6  purchasing. Procurement.
7            MS. SONG: (Translates
8  into Korean)
9    A.    (Witness speaks in Korean)
10            MS. SONG: It's similar.
11    A.    (Witness speaks in Korean)
12            MS. SONG: Purchasing is .
13  just buying.
14    A.    (Witness speaks in Korean)
15            MS. SONG: And developing
16  is --
17    A.    (Witness speaks in Korean)
18            MS. SONG: -- is making --
19  manufacturing what I need.
20    Q.    Now, when you came to
21  HMMA --
22            MS. SONG: (Translates
23  into Korean)

Page 19

1    Q.    -- I noticed in one of the
2  reports that you were in parts
3  development.
4            MS. SONG: (Translates
5  into Korean)
6    Q.    Was that the same thing?
7            MS. SONG: (Translates
8  into Korean)
9    A.    (Witness speaks in Korean)
10            MS. SONG: Yes.
11    Q.    Now, before I go any
12  further let me get some background
13  information.
14            MS. SONG: (Translates
15  into Korean)
16    Q.    About your education,
17  where did you go to college?
18            MS. SONG: (Translates
19  into Korean)
20    A.    (Witness speaks in Korean)
1            MS. SONG: I had gone to
22  Konkuk University in Seoul, Korea.
23    Q.    What degree did you get?

Page 20

1            MS. SONG: (Translates
2  into Korean)
3    A.    (Witness speaks in Korean)
4            MS. SONG: Bachelor's in
5  electrical engineering.
6    Q.    Did you get any
7  post-graduate education?
8            MS. SONG: (Translates
9  into Korean)
10    A.    (Witness speaks in Korean)
11            MS. SONG: No.
12    Q.    Are you on any medication
13  today?
14            MS. SONG: (Translates
15  into Korean)
16    A.    (Witness speaks in Korean)
17            MS. SONG: Yes.
18    Q.    What medication are you
19  on?
20            MS. SONG: (Translates
21  into Korean)
22    A.    (Witness speaks in Korean)
23            MS. SONG: For high blood

Page 21

1  pressure.
2    Q.    Anything else?
3            MS. SONG: (Translates
4  into Korean)
5    A.    (Witness speaks in Korean)
6            MS. SONG: Nothing else.
7    Q.    Have you ever testified in
8  a deposition before?
9            MS. SONG: (Translates
10  into Korean)
11    A.    (Witness speaks in Korean)
12            MS. SONG: No.
13    A.    (Witness speaks in Korean)
14            MS. SONG: This is my
15  first time.
16    Q.    Have you ever given sworn
17  testimony before?
18            MS. SONG: (Translates
19  into Korean)
20    A.    (Witness speaks in Korean)
21            MS. SONG: No.
22    A.    (Witness speaks in Korean)
23            MS. SONG: This is my

Page 22

1  first time.
2      Q.    Now, tell me what English
3  education you have had.
4          MS. SONG: (Translates
5  into Korean)
6      A.    (Witness speaks in Korean)
7          MS. SONG: When I started
8  middle school --
9      A.    (Witness speaks in Korean)
10         MS. SONG: -- I took
11  English two hours a week at school.
12     A.    (Witness speaks in Korean)
13         MS. SONG: And then that
14  continued for the high school. So
15  six years altogether.
16     Q.    Now, you speak English
17  somewhat, don't you?
18         MS. SONG: (Translates
19  into Korean)
20     A.    (Witness speaks in Korean)
21         MS. SONG: Yes.
22     Q.    And do you speak English
23  at work?

Page 23

1          MS. SONG: (Translates
2  into Korean)
3      A.    (Witness speaks in Korean)
4          MS. SONG: I use both
5  Korean and English.
6      Q.    And do you use English in
7  your daily life?
8          MS. SONG: (Translates
9  into Korean)
10     A.    (Witness speaks in Korean)
11         MS. SONG: Yes, I use it.
12     Q.    When you go to the store
13  do you use English?
14         MS. SONG: (Translates
15  into Korean)
16     A.    (Witness speaks in Korean)
17         MS. SONG: Yes.
18     Q.    And you can read the road
19  signs?
20         MS. SONG: (Translates
21  into Korean)
22     A.    (Witness speaks in Korean)
23         MS. SONG: Yes.

Page 24

1      Q.    I understand you -- we are
2  using the translator but do you
3  understand me directly?
4          MR. BOSTICK: Object to
5  the form.
6          MS. SONG: (Translates
7  into Korean)
8      A.    (Witness speaks in Korean)
9          MS. SONG: At times there
10  are places where I do not
11  understand you accurately. So --
12     A.    (Witness speaks in Korean)
13         MS. SONG: So I would have
14  peace of mind having an
15  interpreter.
16     Q.    Now, what have you done to
17  prepare for your deposition here
18  today?
19         MS. SONG: (Translates
20  into Korean)
21     A.    (Witness speaks in Korean)
22         MS. SONG: I reviewed the
23  statement that I wrote.

Page 25

1      Q.    Anything else?
2          MS. SONG: (Translates
3  into Korean)
4      A.    (Witness speaks in Korean)
5          MS. SONG: No.
6      Q.    Did you review any kind of
7  a video or film?
8          MS. SONG: (Translates
9  into Korean)
10     A.    (Witness speaks in Korean)
11         MS. SONG: I have seen a
12  video.
13     Q.    Was it in English?
14         MS. SONG: (Translates
15  into Korean)
16     A.    (Witness speaks in Korean)
17         MS. SONG: Yes.
18     Q.    And it described what the
19  process of a deposition was?
20         MS. SONG: (Translates
21  into Korean)
22     A.    (Witness speaks in Korean)
23         MS. SONG: Yes.

Page 26

```
 1      Q.    Have you discussed with
 2  anyone in preparation for your
 3  deposition today other than your
 4  lawyer?
 5          MS. SONG:  (Translates
 6  into Korean)
 7      A.    (Witness speaks in Korean)
 8          MS. SONG:  No.
 9      Q.    Now, before you came to
10  Montgomery --
11          MS. SONG:  (Translates
12  into Korean)
13      Q.    -- you worked for Hyundai
14  Motor Company in Korea; is that
15  correct?
16          MS. SONG:  (Translates
17  into Korean)
18      A.    (Witness speaks in Korean)
19          MS. SONG:  Yes.
20      Q.    What plant was that?
21          MS. SONG:  (Translates
22  into Korean)
23      A.    (Witness speaks in Korean)
```

Page 27

```
 1          MS. SONG:  It was the
 2  headquarters.
 3      Q.    And how long did you work
 4  at the headquarters?
 5          MS. SONG:  (Translates
 6  into Korean)
 7      A.    (Witness speaks in Korean)
 8          MS. SONG:  Are you
 9  referring to when I first became an
10  employee?
11      Q.    Well, when you were in the
12  -- the last time you were in Korea
13  before you came here your position
14  was in the headquarters in the
15  product development; is that
16  correct?
17          MS. SONG:  (Translates
18  into Korean)
19          MS. MYUNG KIM:  (Speaks in
20  Korean)
 1          MS. SONG:  (Translates
22  into Korean)
23          MR. CYRUS:  Parts
```

Page 28

```
 1  development.
 2      A.    (Witness speaks in Korean)
 3          MS. SONG:  Four and a half
 4  years.
 5      Q.    And -- I'm sorry.  I said
 6  product development.  I meant parts
 7  development.  That's different,
 8  isn't it?
 9          MS. SONG:  (Translates
10  into Korean)
11      A.    (Witness speaks in Korean)
12          MS. MYUNG KIM:  (Speaks in
13  Korean)
14          MS. SONG:  (Translates
15  into Korean)
16          MR. RAYMOND KIM:  (Speaks
17  in Korean)
18          MS. MYUNG KIM:  (Speaks in
19  Korean)
20          MS. SONG:  (Speaks in
21  Korean)
22          MS. MYUNG KIM:  (Speaks in
23  Korean)
```

Page 29

```
 1          MS. SONG:  Could you
 2  repeat the question one more time?
 3          MR. STOCKHAM:  Sure.
 4          MS. SONG:  I got confused.
 5      Q.    Parts development is
 6  different from product development,
 7  isn't it?
 8          MS. SONG:  (Translates
 9  into Korean)
10      A.    (Witness speaks in Korean)
11          MS. SONG:  Yes.
12      Q.    And you were in parts
13  development?
14          MS. SONG:  (Translates
15  into Korean)
16      A.    (Witness speaks in Korean)
17          MS. SONG:  Yes.
18      Q.    And you were the person
19  over that department at
20  headquarters?
21          MS. SONG:  (Translates
22  into Korean)
23      A.    (Witness speaks in Korean)
```

Page 30

1  MS. SONG: I was the
2  leader for the team that does the
3  parts development.
4  Q.  And who was your boss?
5  MS. SONG: (Translates
6  into Korean)
7  A.  (Witness speaks in Korean)
8  MS. SONG: Chon Han Kim
9  A.  (Witness speaks in Korean)
10  MS. SONG: CEO?
11  MR. RAYMOND KIM: No,
12  director.
13  MS. SONG: The director.
14  Director. Thank you.
15  Q.  And what was his title?
16  MS. SONG: (Translates
17  into Korean)
18  MR. BOSTICK: Whose?
19  MR. RAYMOND KIM: (Speaks
20  in Korean)
21  MR. STOCKHAM: Kim Chon
22  Han.
23  MS. SONG: I'm sorry.

Page 31

1  Okay.
2  (Translates into Korean)
3  A.  (Witness speaks in Korean)
4  MS. SONG: Manager of
5  purchasing from oversea.
6  MR. RAYMOND KIM: Imports.
7  MS. SONG: Imports.
8  MR. RAYMOND KIM: Imported
9  products.
10  MS. MYUNG KIM: Imports
11  purchase.
12  MS. SONG: Import manager.
13  MR. RAYMOND KIM: Imported
14  products.
15  MS. SONG: Imported
16  purchases.
17  Q.  Were you a buyer?
18  MS. SONG: (Translates
19  into Korean)
20  A.  (Witness speaks in Korean)
1  MS. SONG: I was a team
22  leader.
23  Q.  So you did not do

Page 32

1  purchasing?
2  MS. SONG: (Translates
3  into Korean)
4  A.  (Witness speaks in Korean)
5  MS. SONG: I'm sorry. I
6  need clarification.
7  (Speaks in Korean)
8  THE WITNESS: (Speaks in
9  Korean)
10  MS. SONG: I have many
11  buyers underneath me -- beneath me
12  and I make the final decisions.
13  Q.  When you say you make the
14  final decision do you actually do
15  the purchasing or do you have your
16  buyers who do the purchasing?
17  MS. SONG: (Translates
18  into Korean)
19  A.  (Witness speaks in Korean)
20  MS. SONG: The buyers.
21  Q.  And your boss, who did he
22  report to?
23  MS. SONG: (Translates

Page 33

1  into Korean)
2  A.  (Witness speaks in Korean)
3  MS. SONG: Han Soo Kim.
4  MR. RAYMOND KIM: General
5  manager.
6  MS. SONG: General
7  manager. Thank you.
8  Q.  Was he the head of the
9  factory?
10  MS. SONG: (Translates
11  into Korean)
12  A.  (Witness speaks in Korean)
13  MS. SONG: He worked at
14  the headquarter so --
15  A.  (Witness speaks in Korean)
16  MS. SONG: -- so it would
17  be irrelevant to the factory.
18  Q.  As -- who did the general
19  manager report to?
20  MS. SONG: (Translates
21  into Korean)
22  A.  (Witness speaks in Korean)
23  MR. RAYMOND KIM: (Speaks

Page 34

1  in Korean)
2      MS. SONG:  Are you
3  referring to currently or at the
4  time when I was in -- I was at the
5  headquarters?
6      Q.    When he was at the
7  headquarters.
8      MS. SONG:  (Translates
9  into Korean)
10      MR. RAYMOND KIM:  (Speaks
11  in Korean)
12      A..  (Witness speaks in Korean)
13      MS. SONG:  Chih Oon Kim.
14      A.    (Witness speaks in Korean)
15      MS. SONG:  Vice president.
16      Q.    Now, how many years were
17  you the team leader in the parts
18  development?
19      MS. SONG:  (Translates
20  into Korean)
21      A.    (Witness speaks in Korean)
22      MS. SONG:  Three years.
23      Q.    And who decided that you

Page 35

1  were going to come to Alabama?
2      MS. SONG:  (Translates
3  into Korean)
4      A.    (Witness speaks in Korean)
5      MS. SONG:  The vice
6  president, Chih Oon Kim.
7      Q.    And how did you find out
8  that you were going to come to
9  Alabama?
10      MS. SONG:  (Translates
11  into Korean)
12      A.    (Witness speaks in Korean)
13      MS. SONG:  Mr. Kim, the
14  vice president --
15      A.    (Witness speaks in Korean)
16      MS. SONG:  -- called me --
17      A.    (Witness speaks in Korean)
18      MS. SONG:  -- and told me
19  to go to Alabama.
20      Q.    Was that a promotion?
1      MS. SONG:  (Translates
22  into Korean)
23      A.    (Witness speaks in Korean)

Page 36

1      MS. SONG:  No.
2      Q.    Now, when you went to
3  Alabama --
4      MS. SONG:  (Translates
5  into Korean)
6      Q.    Let me back up a second.
7      What is your current
8  position?
9      MS. SONG:  (Translates
10  into Korean)
11      A.    Senior manager.
12      MS. SONG:  I'm a senior
13  manager.
14      Q.    And --
15      A.    And head of department.
16      MS. SONG:  And head of the
17  department.
18      Q.    And what department is
19  that?
20      MS. SONG:  (Translates
21  into Korean)
22      A.    (Witness speaks in Korean)
23      MS. SONG:  Part

Page 37

1  development at HMMA.
2      Q.    And who is your boss?
3      MS. SONG:  (Translates
4  into Korean)
5      A.    (Witness speaks in Korean)
6      MS. SONG:  Hyong Chu Hyun.
7      MR. RAYMOND KIM:  (Speaks
8  in Korean)
9      MS. SONG:  Another
10  director level?
11      MR. RAYMOND KIM:  Managing
12  director.
13      MS. SONG:  Managing
14  director.
15      THE WITNESS:  Senior
16  director.
17      MS. SONG:  Senior
18  director.  Thank you.
19      Q.    And what department is Mr.
20  Hyun over?
21      MS. SONG:  (Translates
22  into Korean)
23      A.    (Witness speaks in Korean)

Page 38

1    MS. SONG: He's at the
2  research center for parts
3  development at HMMA.
4    Q.    And who reports to you?
5  Who are your -- who do you direct?
6    MS. SONG: (Translates
7  into Korean)
8    A.    (Witness speaks in Korean)
9    MS. SONG: Do you want me
10 to name every single employee?
11   Q.    Are there many?
12   MS. SONG: (Translates
13 into Korean)
14   A.    (Witness speaks in Korean)
15   MS. SONG: We have
16 somewhere between thirty and
17 thirty-five.
18   Q.    How many of them are
19 directly under you?
20   MS. SONG: (Translates
21 into Korean)
22   A.    (Witness speaks in Korean)
23   MS. SONG: Are you

Page 39

1  including Koreans as well?
2    Q.    Including -- yes.
3    MS. SONG: (Translates
4  into Korean)
5    A.    (Witness speaks in Korean)
6    MS. SONG: Thirteen
7  people.
8    Q.    And who are they?
9    MS. SONG: (Translates
10 into Korean)
11   A.    (Witness speaks in Korean)
12   MS. SONG: I'm to name
13 names?
14   Q.    Yes.
15   MS. SONG: (Translates
16 into Korean)
17   A.    (Witness speaks in Korean)
18   MS. SONG: Sung Jin Choi
19 -- Cho. Sorry.
20   MR. RAYMOND KIM: Cho.
21   MS. SONG: Cho?
22   MR. RAMOND KIM: Uh-huh.
23   MS. SONG: I'm sorry.

Page 40

1  There's two ways to say it. Sung
2  Jin Cho --
3    THE WITNESS: Sung Jin
4  Cho.
5    Q.    Is that Steve Cho?
6    MS. SONG: (Translates
7  into Korean)
8    A.    (Witness speaks in Korean)
9    MS. SONG: His American
10 name is Steve Cho, yes.
11   Q.    Who else?
12   A.    (Witness speaks in Korean)
13   MS. SONG: Nak Hwan Kim.
14   A.    (Witness speaks in Korean)
15   MS. SONG: Duk Kyo Chung.
16   A.    (Witness speaks in Korean)
17   MS. SONG: Jae Hong Kim.
18   A.    (Witness speaks in Korean)
19   MS. SONG: Yi Jae Yoon.
20   A.    (Witness speaks in Korean)
21   MS. SONG: Hee Young Kim.
22   A.    (Witness speaks in Korean)
23   MS. SONG: Hyun Dal Hah.

Page 41

1    A.    (Witness speaks in Korean)
2    MS. SONG: Byun Tal Hwang.
3    A.    (Witness speaks in Korean)
4    MS. SONG: Gyu Suk Lee.
5    A.    (Witness speaks in Korean)
6    MS. SONG: Hung Min Ahn.
7    A.    (Witness speaks in Korean)
8    MS. SONG: Larry.
9    A.    (Witness speaks in Korean)
10   Q.    What's Larry's last name?
11   MS. SONG: (Translates
12 into Korean)
13   A.    (Witness speaks in Korean)
14   MS. SONG: Curry.
15   A.    C-u-r-r-y.
16   MS. SONG: C-u-r-r-y.
17   Q.    Okay.
18   A.    Craig Lindeman.
19   MS. SONG: Craig --
20   A.    Lindeman.
21   MS. SONG: -- Lindeman.
22   A.    Dave Mark.
23   MS. SONG: And then Dave

Page 42

```
 1   Mark.
 2        Q.   And do I understand that
 3   the remaining thirty-five are under
 4   those individuals?
 5             MS. SONG: (Translates
 6   into Korean)
 7        A.   (Witness speaks in Korean)
 8             MS. SONG: Yes.
 9        Q.   And you said that you
10   report directly to Mr. Hyun?
11             MS. SONG: (Translates
12   into Korean)
13        A.   (Witness speaks in Korean)
14             MS. SONG: Yes.
15        Q.   Who does Mr. Hyun report
16   to?
17             MS. SONG: (Translates
18   into Korean)
19        A.   (Witness speaks in Korean)
20             MS. SONG: Joo Soo Ahn for
21   HMMA.
22        Q.   Is that the president?
23             MS. SONG: (Translates
```

Page 43

```
 1   into Korean)
 2        A.   (Witness speaks in Korean)
 3             MS. SONG: Yes.
 4        Q.   So he doesn't report to
 5   any vice president, he reports
 6   directly to the president?
 7             MS. SONG: (Translates
 8   into Korean)
 9        A.   (Witness speaks in Korean)
10             MS. SONG: Under our tree
11   of reporting system there is no
12   vice president.
13        Q.   And the position where you
14   are -- in the placement you are is
15   exactly the position that Mr. Cyrus
16   was in before you, right?
17             MS. SONG: (Translates
18   into Korean)
19        A.   (Witness speaks in Korean)
20             MS. SONG: Currently?
 1        Q.   Yes.
22             MS. SONG: (Translates
23   into Korean)
```

Page 44

```
 1        A.   (Witness speaks in Korean)
 2             MS. SONG: Are you
 3   referring to the time line when Mr.
 4   Cyrus did not quit the job yet?
 5        Q.   Yes.
 6             MS. SONG: (Translates
 7   into Korean)
 8        A.   (Witness speaks in Korean)
 9             MS. SONG: There may be
10   differences.
11        A.   (Witness speaks in Korean)
12             MS. SONG: When Rob Cyrus
13   was at the company --
14        A.   (Witness speaks in Korean)
15             MS. SONG: -- there was
16   Min Ho Li --
17             MR. RAYMOND KIM: General
18   manager.
19             MS. SONG: General
20   manager. Thank you. Who was the
21   general manager.
22        A.   (Witness speaks in Korean)
23             MS. SONG: And then there
```

Page 45

```
 1   were senior manager underneath him.
 2        A.   (Witness speaks in Korean)
 3             MS. SONG: But for me --
 4        A.   (Witness speaks in Korean)
 5             MS. SONG: -- I don't know
 6   the exact position he was in in
 7   relation to the senior managers
 8   when Mr. Rob wasn't at the company.
 9        Q.   Well, Mr. Cyrus was
10   directly under Mr. Hyun, was he
11   not?
12             MS. SONG: (Translates
13   into Korean)
14        A.   (Witness speaks in Korean)
15             MS. SONG: It was not only
16   Mr. Cyrus who was directly
17   underneath Mr. Hyun.
18        A.   (Witness speaks in Korean)
19             MS. SONG: There were
20   several Korean senior managers as
21   well.
22        Q.   Who else was under Mr.
23   Hyun?
```

12 (Pages 42 to 45)

Page 46

```
 1          MS. SONG: (Translates
 2  into Korean)
 3      A.   (Witness speaks in Korean)
 4          MS. SONG: Wan Gi Yang.
 5      A.   (Witness speaks in Korean)
 6          MS. SONG: That's what I
 7  remember, I tell you.
 8      Q.   And you were under Mr.
 9  Hyun, were you not?
10          MS. SONG: (Translates
11  into Korean)
12      A.   (Witness speaks in Korean)
13          MS. SONG: When I came
14  over to United States I was under
15  Mr. Hyun.
16      Q.   And that was in August,
17  right?
18          MS. SONG: (Translates
19  into Korean)
20      A.   (Witness speaks in Korean)
21          MS. SONG: Yes.
22      Q.   Now, did you report to
23  anyone back into -- in Korea when
```

Page 48

```
 1          MS. MYUNG KIM: (Speaks in
 2  Korean)
 3          THE WITNESS: (Speaks in
 4  Korean) Senior manager.
 5          MR. RAYMOND KIM: Senior
 6  manager.
 7          MS. SONG: Senior manager?
 8  Okay. Senior manager.
 9      A.   (Witness speaks in Korean)
10          MS. SONG: Tae Ho Ro --
11  director?
12          MR. RAYMOND KIM: He's the
13  director.
14          MS. SONG: Director.
15          MR. RAYMOND KIM: He's the
16  director.
17      A.   (Witness speaks in Korean)
18          MS. SONG: Seung Hwan Ko
19  -- general director?
20          MR. RAYMOND KIM: General
21  manager.
22          MS. SONG: General
23  manager. General manager.
```

Page 47

```
 1  you were working for HMMA?
 2          MS. SONG: (Translates
 3  into Korean)
 4      A.   (Witness speaks in Korean)
 5          MS. SONG: Yes.
 6      Q.   Who did you report to in
 7  Korea?
 8          MS. SONG: (Translates
 9  into Korean)
10      A.   (Witness speaks in Korean)
11          MS. SONG: Do you want me
12  to include all names?
13      Q.   Yes.
14          MS. SONG: (Translates
15  into Korean)
16      A.   (Witness speaks in Korean)
17          MS. SONG: Chan Joo Cho --
18          MR. RAYMOND KIM: (Speaks
19  in Korean)
20          MS. MYUNG KIM: (Speaks in
 1  Korean)
22          MR. RAYMOND KIM: Division
23  head or division manager.
```

Page 49

```
 1      A.   (Witness speaks in Korean)
 2          MS. SONG: Seung Yeon Kim,
 3  vice president.
 4      Q.   Anyone else?
 5          MS. SONG: (Translates
 6  into Korean)
 7      A.   (Witness speaks in Korean)
 8          MS. SONG: Majority of the
 9  issues I would report to these
10  people.
11      Q.   And what company do they
12  work for?
13          MS. SONG: (Translates
14  into Korean)
15      A.   (Witness speaks in Korean)
16          MS. SONG: Working for
17  Hyundai Motors.
18      Q.   So you work both for HMMA
19  and Hyundai Motors?
20          MS. SONG: (Translates
21  into Korean)
22      A.   (Witness speaks in Korean)
23          MS. SONG: Yes.
```

13  (Pages 46 to 49)

Page 50

```
 1       Q.    Who pays your salary?
 2            MS. SONG: (Translates
 3   into Korean)
 4       A.    (Witness speaks in Korean)
 5            MS. SONG: HMMA pays
 6   salary.
 7       Q.    And how often do you
 8   report to Seoul?
 9            MR. BOSTICK: Object to
10   the form.
11       A.    (Witness speaks in Korean)
12            MS. SONG: Unless there is
13   any particular issue that needed to
14   be reported I normally do once a
15   week.
16       Q.    And has that always been
17   the case since you came to Alabama?
18            MS. SONG: (Translates
19   into Korean)
20       A.    (Witness speaks in Korean)
21            MS. SONG: Yes.
22       Q.    And do you report by
23   telephone or by e-mail?  How do you
```

Page 51

```
 1   report?
 2            MS. SONG: (Translates
 3   into Korean)
 4       A.    (Witness speaks in Korean)
 5            MS. SONG: Both.  I use
 6   both.
 7       Q.    And who do you usually
 8   make your report to?
 9            MS. SONG: (Translates
10   into Korean)
11       A.    (Witness speaks in Korean)
12            MS. SONG: Chan Joo Cho,
13   senior manager.
14       Q.    Now, I want to ask you
15   about the meeting on September
16   16th, 2005.
17            MS. SONG: (Translates
18   into Korean)
19            MR. STOCKHAM: But before
20   I do -- you said you had a --
 1            MR. BOSTICK: Go off the
22   record?
23            (Whereupon, an
```

Page 52

```
 1            off-the-record
 2            discussion was held.)
 3       Q.    (By Mr. Stockham)  Do you
 4   have a recollection of the meeting?
 5            MS. SONG: (Translates
 6   into Korean)
 7       A.    (Witness speaks in Korean)
 8            MS. SONG: Yes.
 9       Q.    Prior to the meeting --
10            MS. SONG: (Translates
11   into Korean)
12       Q.    -- did you have a meeting
13   with anybody?
14            MS. SONG: (Translates
15   into Korean)
16       A.    (Witness speaks in Korean)
17            MS. SONG: No.
18       Q.    When did you find out
19   about the meeting?
20            MS. SONG: (Translates
21   into Korean)
22       A.    (Witness speaks in Korean)
23            MS. SONG: Before
```

Page 53

```
 1   attending the meeting?
 2       A.    (Witness speaks in Korean)
 3            MS. SONG: There is going
 4   to be a meeting so --
 5       A.    (Witness speaks in Korean)
 6            MS. SONG: -- I was
 7   informed that I needed to be there.
 8       Q.    How long before the
 9   meeting were you informed that you
10   had to be there?
11            MS. SONG: (Translates
12   into Korean)
13       A.    (Witness speaks in Korean)
14            MS. SONG: Approximately
15   forty minutes beforehand.
16       Q.    Who told you?
17            MS. SONG: (Translates
18   into Korean)
19       A.    (Witness speaks in Korean)
20            MS. SONG: Byung Tal
21   Hwang, manager underneath me.
22       Q.    What did he tell you?
23            MS. SONG: (Translates
```

Page 54

1   into Korean)
2       A.   (Witness speaks in Korean)
3           MS. SONG: That there is
4   going to be a meeting on the
5   quality control.
6       A.   (Witness speaks in Korean)
7           MS. SONG: He said, let's
8   go.
9       Q.   What is his American name?
10          MS. SONG: (Translates
11  into Korean)
12      A.   Brian Hwang.
13          MS. SONG: Brian Hwang.
14      Q.   And let me ask you. The
15  night before this meeting there was
16  a team building bowling event. Did
17  you attend that?
18          MS. SONG: (Translates
19  into Korean)
20      A.   (Witness speaks in Korean)
21          MS. SONG: I don't
22  remember.
23      Q.   Before you attended this

Page 55

1   meeting --
2           MS. SONG: (Translates
3   into Korean)
4       Q.   -- on September 16th --
5           MS. SONG: (Translates
6   into Korean)
7       Q.   -- did you have any
8   conversation with anyone other than
9   Brian?
10          MS. SONG: (Translates
11  into Korean)
12      A.   (Witness speaks in Korean)
13          MS. SONG: Yes, there is.
14      Q.   Who?
15          MS. SONG: (Translates
16  into Korean)
17      A.   Rob Cyrus.
18          MS. SONG: Rob Cyrus.
19      Q.   Anyone else?
20      A.   (Witness speaks in Korean)
1           MS. SONG: No.
22      Q.   And where was your meeting
23  with Rob Cyrus?

Page 56

1           MR. BOSTICK: Object to
2   the form.
3           MS. SONG: (Translates
4   into Korean)
5       A.   (Witness speaks in Korean)
6           MS. SONG: On the way to
7   the meeting room.
8       A.   (Witness speaks in Korean)
9           MS. SONG: We walked side
10  by side.
11      Q.   And before you got to the
12  meeting did you know what the
13  meeting was about?
14          MS. SONG: (Translates
15  into Korean)
16      A.   (Witness speaks in Korean)
17          MS. SONG: Not in details,
18  no, I did not.
19      Q.   Did you have an agenda for
20  the meeting?
21          MS. SONG: (Translates
22  into Korean)
23      A.   (Witness speaks in Korean)

Page 57

1           MS. SONG: No, I did not.
2       Q.   Did you have a general
3   idea about what the meeting was
4   about?
5           MS. SONG: (Translates
6   into Korean)
7       A.   (Witness speaks in Korean)
8           MS. SONG: Yes. It was
9   regarding the quality control.
10      A.   (Witness speaks in Korean)
11          MS. SONG: That the
12  suppliers were to come.
13      A.   (Witness speaks in Korean)
14          MS. SONG: So that -- in
15  order to prevent the problems from
16  occurring again.
17      A.   (Witness speaks in Korean)
18          MS. SONG: It was
19  presentation for that purpose.
20      Q.   Was this the first meeting
21  that you are aware of of this kind?
22          MS. SONG: (Translates
23  into Korean)

Page 58

1    A.    (Witness speaks in Korean)
2        MS. SONG:  Yes.
3    Q.    And who attended this
4  meeting from your department?
5        MS. SONG:  (Translates
6  into Korean)
7    A.    (Witness speaks in Korean)
8        MS. SONG:  Myself.
9    A.    (Witness speaks in Korean)
10       MS. SONG:  Rob Cyrus.
11   A.    (Witness speaks in Korean)
12       MS. SONG:  Brian -- Hwang?
13   A.    Yeah, Hwang.
14       MS. SONG:  Brian Hwang.
15   A.    Chris McClain.
16       MS. SONG:  Chris McClain.
17   A.    (Witness speaks in Korean)
18       MS. SONG:  I remember that
19  these people went there together.
20   Q.    And you all walked over
21  together?
22       MS. SONG:  (Translates
23  into Korean)

Page 59

1    A.    (Witness speaks in Korean)
2        MS. SONG:  When you say,
3  walk together, are you referring to
4  walking together, together like
5  that?
6    A.    (Witness speaks in Korean)
7        MS. SONG:  Just -- I mean,
8  we were, you know, walking one, you
9  know, beforehand and one following
10  and so forth.
11   Q.    Did you all begin at one
12  place and end up at the same place?
13       MS. SONG:  (Translates
14  into Korean)
15   A.    (Witness speaks in Korean)
16       MS. SONG:  Yes.
17   Q.    Did you have any
18  conversation while you were
19  walking?
20       MS. SONG:  (Translates
1  into Korean)
22   A.    (Witness speaks in Korean)
23       MS. SONG:  With who?

Page 60

1    Q.    With anyone.
2        MS. SONG:  (Translates
3  into Korean)
4    A.    (Witness speaks in Korean)
5        MS. SONG:  I remember that
6  I was talking to Brian Hwang.
7    Q.    What was he saying?
8        MS. SONG:  (Translates
9  into Korean)
10   A.    (Witness speaks in Korean)
11       MS. SONG:  That Murakami
12  had short notice to attend the
13  meeting, at last minute.
14   A.    (Witness speaks in Korean)
15       MS. SONG:  That the supply
16  had a lot of scratches on them.
17   Q.    Anything else?
18       MS. SONG:  (Translates
19  into Korean)
20   A.    (Witness speaks in Korean)
21       MS. SONG:  That's all.
22   Q.    Did Brian tell you to talk
23  strongly to Mr. Kim to be fair to

Page 61

1  the supplier?
2        MS. SONG:  (Translates
3  into Korean)
4    A.    (Witness speaks in Korean)
5        MS. SONG:  Regarding the
6  scratch issue or problem?
7    A.    (Witness speaks in Korean)
8        MS. SONG:  It --
9        MS. MYUNG KIM:  (Speaks in
10  Korean)
11       THE WITNESS:  (Speaks in
12  Korean)
13       MS. SONG:  Brian Hwang
14  said to me that for the scratch
15  problem you can't hold Murakami for
16  their --
17       MS. MYUNG KIM:  Causing
18  the --
19       MS. SONG:  -- faults or
20  causes.
21   A.    (Witness speaks in Korean)
22       MS. SONG:  That it wasn't
23  Murakami's fault.

Page 62

```
 1        A.   (Witness speaks in Korean)
 2             MS. SONG:  But they claim
 3   -- or it is claimed that Murakami
 4   is at fault.  So --
 5        A.   (Witness speaks in Korean)
 6             MS. SONG:  So if it is
 7   mentioned --
 8        A.   (Witness speaks in Korean)
 9             MS. SONG:  That whenever
10   it's mentioned about Murakami then
11   it needs to be piggybacked or
12   helped.
13             MS. MYUNG KIM:  So if it
14   is mentioned during the meeting
15   that the Murakami is blamed for the
16   fault they didn't cause then Mr.
17   Hwang suggested we should explain
18   Murakami's position a little.
19             MR. STOCKHAM:  Is that
20   accurate?
21             MR. RAYMOND KIM:  Yes.
22        Q.   (By Mr. Stockham)  Did he
23   say anything else?
```

Page 63

```
 1             MS. SONG:  (Translates
 2   into Korean)
 3        A.   (Witness speaks in Korean)
 4             MS. SONG:  No.
 5        Q.   Did you talk with Mr. Rob
 6   Cyrus about this?
 7             MS. SONG:  (Translates
 8   into Korean)
 9        A.   (Witness speaks in Korean)
10             MS. SONG:  Yes.
11        Q.   What did you say to Mr.
12   Cyrus?
13             MS. SONG:  (Translates
14   into Korean)
15        A.   (Witness speaks in Korean)
16             MS. SONG:  That I said to
17   Mr. Cyrus --
18        A.   (Witness speaks in Korean)
19             MS. SONG:  -- regarding
20   the scratch problem --
21        A.   (Witness speaks in Korean)
22             MS. SONG:  -- if they
23   blame Murakami for the fault or
```

Page 64

```
 1   cause --
 2        A.   (Witness speaks in Korean)
 3             MS. SONG:  -- that
 4   Murakami's opinion needs to be
 5   supported.
 6        Q.   What did Mr. Cyrus say to
 7   you?
 8             MS. SONG:  (Translates
 9   into Korean)
10        A.   (Witness speaks in Korean)
11             MS. SONG:  He said, let's
12   do it.
13        Q.   Did you discuss with
14   anyone in that group that there had
15   been a pre-meeting?
16             MS. SONG:  I'm sorry?
17        Q.   That there had been a
18   pre-meeting.
19             MS. SONG:  (Translates
20   into Korean)
21        A.   (Witness speaks in Korean)
22             MS. SONG:  No.
23        Q.   Now, who is Mr. Kim?
```

Page 65

```
 1             MS. SONG:  (Translates
 2   into Korean)
 3             MR. BOSTICK:  Object to
 4   the form.
 5             MS. MYUNG KIM:  Which Mr.
 6   Kim?
 7             MR. BOSTICK:  That's
 8   probably --
 9        A.   (Witness speaks in Korean)
10             MS. SONG:  There is a lot
11   of Kims.
12        Q.   In the meeting on the 20
13   -- on September the 16th, 2005 --
14             MS. SONG:  (Translates
15   into Korean)
16        Q.   -- were there more than
17   one Mr. Kim?
18             MS. SONG:  (Translates
19   into Korean)
20        A.   (Witness speaks in Korean)
21             MS. SONG:  I don't
22   remember everyone who were there.
23        Q.   Well, do you remember H.I.
```

Page 66

1  Kim being in that meeting?
2          MS. SONG: (Translates
3  into Korean)
4      A.   (Witness speaks in Korean)
5          MS. SONG: Yes.
6      Q.   Do you remember any other
7  Mr. Kim being in that meeting?
8          MS. SONG: (Translates
9  into Korean)
10     A.   (Witness speaks in Korean)
11         MS. SONG: I don't recall.
12     Q.   Were you the only Mr. Choi
13  in that meeting?
14         MS. SONG: (Translates
15  into Korean)
16     A.   (Witness speaks in Korean)
17         MS. SONG: I don't know.
18     Q.   How many people were in
19  the meeting?
20         MS. SONG: (Translates
21  into Korean)
22     A.   (Witness speaks in Korean)
23         MS. SONG: Twenty-five to

Page 67

1  thirty people.
2      Q.   You've told me about the
3  four people who were in your
4  department.
5          MS. SONG: (Translates
6  into Korean)
7      A.   (Witness speaks in Korean)
8      Q.   Who were the other people?
9          MS. SONG: (Translates
10  into Korean)
11     A.   (Witness speaks in Korean)
12         MS. SONG: As far as I
13  remember --
14     A.   (Witness speaks in Korean)
15         MS. SONG: -- because at
16  that time I hadn't been in the
17  company for long time.
18     A.   (Witness speaks in Korean)
19         MS. SONG: So I don't know
20  -- I didn't know that many people
21  back then.
22     A.   (Witness speaks in Korean)
23         MS. SONG: I knew that

Page 68

1  H.I. Kim was the head of the
2  factory at HMMA.
3      A.   (Witness speaks in Korean)
4          MS. SONG: And across from
5  me there was Myung Su Sah and he
6  was senior manager.
7      A.   (Witness speaks in Korean)
8          MS. SONG: And there was
9  also a Seung Do Park, also a senior
10  manager.
11     A.   (Witness speaks in Korean)
12         MS. SONG: And there was
13  one Japanese person representing
14  Murakami.
15     A.   (Witness speaks in Korean)
16         MS. SONG: And then two
17  American people from Murakami.
18     A.   (Witness speaks in Korean)
19         MS. SONG: And the rest
20  people -- rest of them, I didn't
21  know who they were.
22     Q.   Now, when you arrived were
23  you given an agenda for the

Page 69

1  meeting?
2          MS. SONG: (Translates
3  into Korean)
4      A.   (Witness speaks in Korean)
5          MS. SONG: It was on
6  projection.
7      Q.   I show you what has been
8  marked Number One.
9          (Whereupon, an
10             off-the-record
11             discussion was held.)
12     Q.   (By Mr. Stockham) I show
13  you what was marked as Exhibit One
14  to the deposition of Mr. --
15         MS. SONG: (Translates
16  into Korean)
17     Q.   -- Mr. Kim. I'll ask you
18  if you have seen that document.
19         MS. SONG: (Translates
20  into Korean)
21     A.   (Witness speaks in Korean)
22         MS. SONG: Yes. It was
23  the agenda.

18 (Pages 66 to 69)

Page 70

1    Q.    So -- and this was also
2    projected up on the screen?
3         MS. SONG: (Translates
4    into Korean)
5    A.    (Witness speaks in Korean)
6         MS. SONG: Yes.
7    Q.    And this document shows
8    that the Murakami meeting and then
9    there was a Hwashin meeting; is
10   that correct?
11        MS. SONG: (Translates
12   into Korean)
13   A.    (Witness speaks in Korean)
14        MS. SONG: They were all
15   present at the same place or same
16   time.
17   Q.    So the individuals from
18   Murakami and the individuals from
19   Hwashin were all there?
20        MS. SONG: (Translates
21   into Korean)
22   A.    (Witness speaks in Korean)
23        MS. SONG: Yes, they were

Page 71

1    all present.
2         MR. BOSTICK: Richard, can
3    we take a quick break when you get
4    to a stopping point?
5         MR. STOCKHAM: Yeah. I'll
6    be there in a minute.
7         MR. BOSTICK: Okay. Thank
8    you.
9    Q.    (By Mr. Stockham) And the
10   -- it says the supplier name. And
11   then it's got the part name. And
12   then the non-conformity -- this is
13   the -- these are the headings; is
14   that correct?
15        MS. SONG: (Translates
16   into Korean)
17   A.    (Witness speaks in Korean)
18        MS. SONG: Yes.
19   Q.    Were you given a hard copy
20   of this when you got to the
1    meeting?
22        MS. SONG: (Translates
23   into Korean)

Page 72

1    A.    (Witness speaks in Korean)
2         MS. SONG: No.
3    Q.    Were there hard copies on
4    the table in front of people?
5         MS. SONG: (Translates
6    into Korean)
7    A.    (Witness speaks in Korean)
8         MS. SONG: I don't
9    remember.
10   A.    (Witness speaks in Korean)
11        MS. SONG: I want to say,
12   no, there was none.
13        MS. MYUNG KIM: He said, I
14   didn't have it.
15        MS. SONG: I'm sorry?
16        MS. MYUNG KIM: I don't
17   remember but I didn't have it.
18        MS. SONG: Could you say
19   it one more time?
20        THE WITNESS: Yes.
21        MS. SONG: (Speaks in
22   Korean)
23   A.    (Witness speaks in Korean)

Page 73

1         MS. SONG: I don't
2    remember clearly but --
3    A.    (Witness speaks in Korean)
4         MS. SONG: -- but I didn't
5    have one.
6    Q.    (By Mr. Stockham) Now,
7    the -- it lists under paint issues,
8    polishing marks, crater and
9    scratches.
10        MS. SONG: (Translates
11   into Korean) Crater. I'm sorry.
12   I don't know what the crater is.
13        MR. RAYMOND KIM: (Speaks
14   in Korean)
15        MS. SONG: (Speaks in
16   Korean)
17   A.    (Witness speaks in Korean)
18        MS. SONG: So those were
19   the issues, yes.
20   Q.    And the next thing under
21   the issue type it says, downtime
22   door line.
23        MS. SONG: (Translates

Page 74

1  into Korean)
2      A.   (Witness speaks in Korean)
3          MS. SONG: Yes.
4      Q.   Were these the things that
5  you were told were going to be the
6  issues before you got to the
7  meeting?
8          MS. SONG: (Translates
9  into Korean)
10     A.   (Witness speaks in Korean)
11         MS. SONG: No.
12     A.   (Witness speaks in Korean)
13         MS. SONG: No, I saw it
14 for the first time when I got
15 there.
16     Q.   Well, the scratches were
17 what you had been told about by Mr.
18 Brian before --
19         MS. SONG: (Translates
20 into Korean)
21     Q.   -- wasn't it?
22         MS. SONG: (Translates
23 into Korean)

Page 75

1      A.   (Witness speaks in Korean)
2          MS. SONG: Yes, I did hear
3  it from Brian. But --
4      A.   (Witness speaks in Korean)
5          MS. SONG: But I have
6  never heard that they would lay it
7  out like this.
8      Q.   So when you got to the
9  meeting that was the first time you
10 saw all three of those things?
11         MS. SONG: (Translates
12 into Korean)
13     A.   (Witness speaks in Korean)
14         MS. SONG: (Translates
15 into Korean)
16     A.   (Witness speaks in Korean)
17         MS. SONG: Yes.
18     Q.   And all of these things
19 refer to the downtime on the door
20 line?
21         MS. SONG: (Translates
22 into Korean)
23         MS. MYUNG KIM: (Speaks in

Page 76

1  Korean)
2          MS. SONG: (Speaks in
3  Korean)
4      A.   (Witness speaks in Korean)
5          MS. SONG: Yes.
6          MR. STOCKHAM: Okay. I
7  think that we are -- we can take a
8  brief break.
9          (Whereupon, a brief
10         recess was taken in
11         the deposition.)
12         MR. STOCKHAM: Mark this
13 as the first exhibit.
14         (Whereupon, Plaintiff's
15         Exhibit One
16         was marked for
17         identification.)
18     Q.   (By Mr. Stockham) Mr.
19 Choi --
20         MR. STOCKHAM: I don't
21 have the --
22         MR. BOSTICK: What's the
23 Bates number on it?

Page 77

1          MR. STOCKHAM: It's 252.
2          (Whereupon, an
3          off-the-record
4          discussion was held.)
5      Q.   (By Mr. Stockham) Mr.
6  Choi, I show you what's marked
7  Exhibit One.
8          MS. SONG: (Translates
9  into Korean)
10     Q.   Did you write this?
11         MS. SONG: (Translates
12 into Korean)
13     A.   (Witness speaks in Korean)
14         MS. SONG: Yes.
15     Q.   For purposes of expediting
16 this can you translate that for the
17 record? Just read what it says
18 into the record.
19         MS. SONG: (Translates
20 into Korean)
21     A.   (Witness speaks in Korean)
22         MS. SONG: September 16th.
23     A.   (Witness speaks in Korean)

Page 78

1          MS. SONG:  Incident during
2    the Murakami meeting.
3          A.    (Witness speaks in Korean)
4          MS. SONG:  Number one.
5          A.    (Witness speaks in Korean)
6          MS. SONG:  Date.
7          A.    (Witness speaks in Korean)
8          MS. SONG:  September 16th,
9    ten o'clock and --
10         A.    (Witness speaks in Korean)
11         MS. SONG:  -- number two.
12         A.    (Witness speaks in Korean)
13         MS. SONG:  Circumstances
14   during the meeting.
15         A.    (Witness speaks in Korean)
16         MS. SONG:  Substair number
17   one.
18         A.    (Witness speaks in Korean)
19         MS. SONG:  Early stage of
20   meeting.
21         A.    (Witness speaks in Korean)
22         MS. SONG:  Between
23   September 1st and September 13th --

Page 79

1          A.    (Witness speaks in Korean)
2          MS. SONG:  -- regarding
3    the situation with the quality
4    control from suppliers.
5          A.    (Witness speaks in Korean)
6          MS. SONG:  There was
7    preliminary meeting from the
8    quality control department of --
9          MS. MYUNG KIM:  That's a
10   preliminary explanation, not
11   meeting.
12         MS. SONG:  Oh, okay.
13   Preliminary explanation from
14   quality control department of HMMA.
15         A.    (Witness speaks in Korean)
16         MS. SONG:  Small number
17   two.
18         A.    (Witness speaks in Korean)
19         MS. SONG:  With the first
20   presentation from Murakami --
1          A.    (Witness speaks in Korean)
22         MS. SONG:  -- the meeting
23   started.

Page 80

1          A.    (Witness speaks in Korean)
2          MS. SONG:  Number three.
3          A.    (Witness speaks in Korean)
4          MS. SONG:  Murakami made a
5    presentation regarding the buff and
6    bag mark in order to -- a plan to
7    remodel or renew the buff and bag
8    mark.  And as well as address the
9    issue of NF container, which were
10   currently in use.
11         A.    (Witness speaks in Korean)
12         MS. SONG:  They explained
13   -- with the photographs to explain
14   the current container as MPL, which
15   is currently in use, along with
16   other suppliers' container to show
17   the differences.
18         A.    (Witness speaks in Korean)
19         MS. SONG:  Starting with
20   CM --
21         A.    (Witness speaks in Korean)
22         MS. SONG:  -- they used
23   the container in the format of --

Page 81

1    form of pallet.
2          A.    (Witness speaks in Korean)
3          MS. SONG:  And reported
4    the preliminary explanation or
5    discussion regarding the aspect of
6    the container from Glovis that
7    morning.
8          A.    (Witness speaks in Korean)
9          MS. SONG:  During the
10   presentation from the supplier --
11         A.    (Witness speaks in Korean)
12         MS. SONG:  -- Rob Cyrus --
13         A.    (Witness speaks in Korean)
14         MS. SONG:  -- among the
15   defected goods that had been
16   returned to the suppliers --
17         A.    (Witness speaks in Korean)
18         MS. MYUNG KIM:  (Speaks in
19   Korean)
20         MS. SONG:  (Speaks in
21   Korean)
22         A.    (Witness speaks in Korean)
23         MS. SONG:  Rob Cyrus

Page 82

1  complained using the photograph
2  that was presented from the
3  supplier in order to explain that
4  there had been defected goods
5  caused by the turnover of the
6  forklifter which were currently
7  used by Glovis.
8      MS. MYUNG KIM: Among.
9      MS. SONG: Among the
10  returned goods.
11     A.  (Witness speaks in Korean)
12     MS. SONG: Therefore --
13     A.  (Witness speaks in Korean)
14     MS. SONG: -- Mr. Kim --
15     A.  (Witness speaks in Korean)
16     MS. SONG: -- through the
17  translator --
18     A.  (Witness speaks in Korean)
19     MS. SONG: Mr. Kim ordered
20  for the first time that we are not
21  to mention what was outside of the
22  meeting's topic for that day.
23     A.  (Witness speaks in Korean)

Page 83

1      MS. SONG: Mr. Kim --
2      A.  (Witness speaks in Korean)
3      MS. SONG: Mr. Kim
4  additionally asked questions to
5  Murakami how long they had been
6  manufacturing the mirrors, which
7  were sixty years. And also asked
8  where they supplied them to. And
9  the answer to that would be Toyota,
10  Numi (phonetic spelling), Nissan.
11     A.  (Witness speaks in Korean)
12     MS. SONG: I'm sorry.
13  What's (Korean phrase)?
14     MR. RAYMOND KIM: It's a
15  coating. Coating.
16     MS. SONG: Coating? Oh,
17  okay.
18     Did you now find out that
19  we were to increase --
20     MS. MYUNG KIM: Now
1  realize that --
22     MS. SONG: I'm sorry. Did
23  you realize that now we need to

Page 84

1  increase the curing time for
2  coating?
3      A.  (Witness speaks in Korean)
4      MS. SONG: Why did you
5  wait until now to increase the
6  brightness of the packing place --
7  packing premise from thousand lucs
8  to twenty-five hundred lucs?
9      A.  (Witness speaks in Korean)
10     MS. SONG: It was scolded
11  that you could supply the decent
12  quality to other companies and it
13  is okay to supply the defected
14  goods to HMMA, that you should no
15  longer think that way.
16     A.  (Witness speaks in Korean)
17     MS. SONG: At that time
18  Rob Cyrus --
19     A.  (Witness speaks in Korean)
20     MS. SONG: -- he -- Rob
21  Cyrus mentioned that there has been
22  a request that was caused last
23  Tuesday --

Page 85

1      MS. MYUNG KIM: Or claim,
2  not --
3      MS. SONG: -- this past --
4      MS. MYUNG KIM: You said,
5  request?
6      MS. SONG: Request. Did I
7  say claim?
8      MS. MYUNG KIM: Claim was
9  submitted. Yeah, it --
10     MS. SONG: Claim was
11  submitted?
12     MS. MYUNG KIM: Yeah, I
13  think that's the right --
14     MR. STOCKHAM: Is that
15  correct, claim was submitted --
16     MS. SONG: (Speaks in
17  Korean)
18     MR. STOCKHAM: -- Mr. Kim?
19     MR. RAYMOND KIM: Yeah.
20     MS. MYUNG KIM: Claim was
21  submitted.
22     MS. SONG: Okay.
23     MS. MYUNG KIM: Due to --

Page 86

1    MS. SONG:  Due to the --
2    MR. RAYMOND KIM:  Which is
3  the same as requested.
4    MR. STOCKHAM:  Okay.
5    MS. SONG:  Because of the
6  defect that was happened last --
7  past Tuesday, that two hundred --
8    MS. MYUNG KIM:  Due to --
9    MS. SONG:  -- minutes
10  worth of --
11    MR. STOCKHAM:  I'm going
12  to object.  If you have --
13    MS. MYUNG KIM:  Sorry.
14    MR. STOCKHAM:  -- a
15  problem with her translation raise
16  your hand about it.
17    MS. MYUNG KIM:  Okay.
18    MR. STOCKHAM:  You're
19  translating for her and that's
20  not --
21    MR. BOSTICK:  Right.  I
22  agree.
23    MS. MYUNG KIM:  All right.

Page 87

1    MS. SONG:  That two
2  hundred minutes worth of l-i-l-e
3  stop claim was made.
4    MR. CYRUS:  That's line.
5    MR. RAYMOND KIM:  It's
6  just a misspelling of, line.
7    MS. SONG:  Line.  Oh,
8  okay.
9    MS. MYUNG KIM:  You're
10  omitting (Korean phrase).  You
11  didn't translate the part.
12    MS. SONG:  Because of the
13  defect that was caused last -- or
14  past Tuesday.
15    MR. CYRUS:  He needs to
16  verify it.
17    A.   (Witness speaks in Korean)
18    Q.   (By Mr. Stockham) Hold
19  on.  Before you go any further
20  let's try that again.  Because that
21  was a --
22    MR. BOSTICK:  Yeah.
23    Q.   -- sort of a --

Page 88

1    MR. BOSTICK:  Right.
2    Q.   -- mucked up answer.
3    Number nine.
4    MS. SONG:  Okay.
5    Q.   Would you --
6    MS. SONG:  Okay.  I'll
7  try.
8    Q.   And --
9    MS. SONG:  At that time
10  Rob Cyrus mentioned that claim has
11  been submitted due -- because of
12  the defect that had been caused
13  past Tuesday, that two hundred
14  minutes worth of line stopped.
15    A.   (Witness speaks in Korean)
16    MS. SONG:  That the major
17  issue was not buff mark but it's
18  scratch issue.
19    A.   (Witness speaks in Korean)
20    MS. SONG:  That he
21  addressed the problem of Glovis
22  handling, the procedure, and the
23  problem of welding QL -- welding

Page 89

1  called QLS at Glovis.
2    MS. MYUNG KIM:  No,
3  sub-contractors.
4    MR. RAYMOND KIM:  No.
5    MS. SONG:  Sub-contractor?
6    MR. RAYMOND KIM:  (Speaks
7  in Korean)
8    MS. MYUNG KIM:  (Speaks in
9  Korean)
10    MS. SONG:  Okay.
11    MR. RAYMOND KIM:  (Korean
12  phrase) is sub-contractor.
13    MS. SONG:  Sub-contractor.
14  I'm sorry.
15    MS. MYUNG KIM:  Can you
16  repeat that?
17    MS. SONG:  That the
18  problem was the handling procedure
19  at Glovis and the subcontractor
20  caused QLS at Glovis.
21    Q.   (By Mr. Stockham) Before
22  we go any further that was a very
23  difficult passage.  Do you agree

Page 90

1  with that?
2      MS. SONG: (Translates
3  into Korean)
4      A.   (Witness speaks in Korean)
5      MS. SONG: Which content?
6      Q.   Just the translation of
7  the paragraph. There have been
8  several people talking about it.
9      MS. SONG: (Translates
10 into Korean)
11     A.   (Witness speaks in Korean)
12     MS. SONG: I didn't
13 understand exactly how this was
14 interpreted into.
15     Q.   That's what I was wanting
16 to be sure.
17     MS. SONG: (Translates
18 into Korean)
19     Q.   Do I understand that what
20 you're saying in this paragraph is
21 that Rob Cyrus was talking about
22 two hundred minutes of downtime
23 claim issued because of an incident

Page 91

1  that occurred the previous Tuesday?
2      MS. SONG: (Translates
3  into Korean)
4      A.   (Witness speaks in Korean)
5      MS. SONG: At that time I
6  hadn't been with this company for
7  long so --
8      A.   (Witness speaks in Korean)
9      MS. SONG: -- that I was
10 not aware of the fact that this --
11 such thing happened.
12     A.   (Witness speaks in Korean)
13     MS. SONG: And what I
14 wrote down is what --
15     A.   (Witness speaks in Korean)
16     MS. SONG: -- Cyrus told
17 me.
18     Q.   Is that what he told you
19 or what you heard in the meeting?
20     MS. SONG: (Translates
21 into Korean)
22     A.   (Witness speaks in Korean)
23     MS. SONG: What I heard at

Page 92

1  the meeting.
2      Q.   Well, what he was saying
3  was in English, wasn't it?
4      MS. SONG: (Translates
5  into Korean)
6      A.   (Witness speaks in Korean)
7      MS. SONG: Yes, he said it
8  in English.
9      Q.   Did he say two hundred
10 minutes of line stoppage claim or
11 two hundred minutes of downtime
12 claim?
13     MS. SONG: (Translates
14 into Korean)
15     A.   (Witness speaks in Korean)
16     MS. SONG: I don't
17 remember clearly.
18     Q.   You chose to write the
19 term "line stoppage"?
20     MS. SONG: (Translates
21 into Korean)
22     A.   (Witness speaks in Korean)
23     MS. SONG: Yes.

Page 93

1      Q.   And --
2      MR. RAYMOND KIM: This is
3  stoppage.
4      MR. STOCKHAM: Okay.
5      Q.   That -- you were familiar
6  with the term "downtime" on the
7  agenda, though?
8      MS. SONG: (Translates
9  into Korean)
10     A.   (Witness speaks in Korean)
11     MS. SONG: Yes, line
12 stopped.
13     Q.   You understood that those
14 were the same thing?
15     MS. SONG: (Translates
16 into Korean)
17     A.   (Witness speaks in Korean)
18     MS. SONG: Yes.
19     Q.   And the rest of the
20 paragraph, just because I know it's
21 a difficult translation and I want
22 to make sure that we've got it
23 right, is that, according to this,

Page 94

1  Mr. Rob Cyrus said the problem was
2  not the buff marks but the
3  scratches caused by Glovis'
4  handling?
5      MS. SONG: (Translates
6  into Korean)
7      A.  (Witness speaks in Korean)
8      MS. SONG: Yes.
9      Q.  And that was what was on
10  the agenda under the scratches?
11     MR. BOSTICK: Object to
12  the form.
13     MS. SONG: (Translates
14  into Korean)
15     A.  (Witness speaks in Korean)
16     MS. SONG: Yes.
17     Q.  If you'll go on with
18  paragraph number ten.
19     MS. SONG: (Translates
20  into Korean)
21     A.  (Witness speaks in Korean)
22     MS. SONG: Mr. Kim ordered
23  for the second time that -- and

Page 95

1  called for Mr. Jen Ho Choi, who was
2  the senior manager at Glovis, and
3  also stated that that issue was
4  irrelevant to the meeting's topic,
5  that separately they -- separately
6  a meeting should be -- there should
7  be a meeting for that.
8      Q.  Just so I'm clear. Was
9  Mr. Choi the manager of Glovis in
10  the meeting?
11     MS. SONG: (Translates
12  into Korean)
13     A.  (Witness speaks in Korean)
14     MS. SONG: No, he was not
15  there.
16     Q.  So when you say, called
17  him, what does that mean?
18     MS. SONG: (Translates
19  into Korean)
20     A.  (Witness speaks in Korean)
21     MS. SONG: Since it was
22  claimed that it was Glovis'
23  fault --

Page 96

1      A.  (Witness speaks in Korean)
2      MS. SONG: -- he called
3  for -- he asked Mr. Choi from
4  Glovis to come.
5      A.  (Witness speaks in Korean)
6      MS. SONG: Since it was
7  irrelevant to the meeting --
8      A.  (Witness speaks in Korean)
9      MS. SONG: -- that they
10  should get together separately
11  later.
12     Q.  Who did he call?
13     MS. SONG: (Translates
14  into Korean)
15     A.  (Witness speaks in Korean)
16     MS. SONG: He ordered to
17  the person next to him.
18     Q.  Who was that?
19     MS. SONG: (Translates
20  into Korean)
21     A.  (Witness speaks in Korean)
22     MS. SONG: I don't
23  remember who that was.

Page 97

1      Q.  Go on with the
2  paragraph --
3      MS. SONG: (Translates
4  into Korean)
5      A.  (Witness speaks in Korean)
6      MS. SONG: Since that
7  meeting was related to a meeting on
8  the quality control --
9      A.  (Witness speaks in Korean)
10     MS. SONG: -- he ordered,
11  once again, for not to address the
12  scratch issue of Murakami again at
13  the meeting.
14     A.  (Witness speaks in Korean)
15     MS. SONG: In spite of
16  that Rob Cyrus complained that --
17     MS. MYUNG KIM: (Speaks in
18  Korean)
19     A.  Defective parts in there.
20     MS. MYUNG KIM: (Speaks in
21  Korean)
22     A.  Defective parts -- (Speaks
23  in Korean)

Page 98

```
 1          MS. SONG: Oh, okay. I'm
 2    sorry.
 3          Rob Cyrus complained that
 4    when they -- when the defected
 5    goods were not registered to the --
 6    registered back to the supplier.
 7    And asking them to contacting on
 8    Wednesday and asking them to attend
 9    the meeting on Friday, that that
10    was a problem.
11      Q.    And this is paragraph
12    twelve, correct?
13          MS. SONG: That's twelve.
14    (Translates into Korean)
15      A.    (Witness speaks in Korean)
16          MS. SONG: Yes.  And --
17    (Speaks in Korean)
18      A.    (Witness speaks in Korean)
19          MS. SONG: (Speaks in
20    Korean)
21      A.    (Witness speaks in Korean)
22          MS. SONG: (Speaks in
23    Korean)
```

Page 99

```
 1      A.    (Witness speaks in Korean)
 2          MS. SONG: (Speaks in
 3    Korean)
 4      A.    (Witness speaks in Korean)
 5          MS. SONG: Chong Yun Choi,
 6    senior manager, said to Myung Su
 7    Sah, another senior manager, saying
 8    that from now on at -- for such
 9    meetings we need to give notice in
10    advance regarding the safety
11    issue --
12          MS. MYUNG KIM: Agenda.
13          MS. SONG: -- agenda --
14          MS. MYUNG KIM: Meeting
15    agendas.
16          MS. SONG: Okay.  Meeting
17    agenda --
18          MR. STOCKHAM: I -- is
19    that --
20      A.    (Witness speaks in Korean)
.1          MS. SONG: -- and
22    suppliers --
23          MR. STOCKHAM: Did he say,
```

Page 100

```
 1    meeting agenda?
 2          MS. SONG: -- through
 3    cooperation negotiation so that we
 4    can have the meeting flow smoothly.
 5      A.    (Witness speaks in Korean)
 6          MS. SONG: In spite of
 7    that --
 8      A.    (Witness speaks in Korean)
 9          MS. SONG: -- Rob Cyrus
10    continued to address the problem.
11     . A.    (Witness speaks in Korean)
12          MS. SONG: He continued to
13    dispute with the American managers
14    in manufacturing department --
15    American manufacturing department
16    personnels at HMMA.
17      A.    (Witness speaks in Korean)
18          MS. SONG: At that time --
19      A.    (Witness speaks in Korean)
20          MS. SONG: -- an employee
21    from Murakami --
22      A.    (Witness speaking in
23    Korean)
```

Page 101

```
 1          MS. SONG: At that time an
 2    employee representing Murakami had
 3    the outside mirrors in their hand
 4    and banged against each other and
 5    made scratches.
 6      A.    (Witness speaks in Korean)
 7          MS. SONG: That the
 8    problem was the scratch --
 9      A.    (Witness speaks in Korean)
10          MS. SONG: -- and because
11    of that --
12      A.    (Witness speaks in Korean)
13          MS. SONG: -- that
14    Murakami was suffering from a lot
15    of damages.
16      A.    (Witness speaks in Korean)
17          MS. SONG: That the
18    scratch could have been made during
19    the procedure -- handling procedure
20    within HMMA and Glovis.
21      A.    (Witness speaks in Korean)
22          MS. SONG: And that
23    particular morning --
```

Page 102

1    A.    (Witness speaks in Korean)
2         MS. SONG: -- that after
3    looking into it themselves at
4    Glovis --
5    A.    (Witness speaks in Korean)
6         MS. SONG: -- that they
7    were stored -- next to each other?
8         MS. MYUNG KIM: On top of
9    each other.
10        MS. SONG: Oh, on top of
11   each other.
12   A.    (Witness speaks in Korean)
13        MS. SONG: And that
14   requests had been made numerous
15   times regarding that matter --
16   A.    (Witness speaks in Korean)
17        MS. SONG: -- to the
18   employees stationed at Glovis.
19   A.    (Witness speaks in Korean)
20        MS. SONG: That employees
21   from Murakami were stationed for
22   two weeks --
23   A.    (Witness speaks in Korean)

Page 103

1         MS. SONG: -- and trained
2    the employees at QLS.
3    A.    (Witness speaks in Korean)
4         MS. SONG: But as these
5    were part-time employees --
6    A.    (Witness speaks in Korean)
7         MS. SONG: -- that there
8    were --
9         MS. MYUNG KIM: Temps.
10        MS. SONG: Tempt?
11        MS. MYUNG KIM: (Speaks in
12   Korean)
13        MS. SONG: Oh, temp
14   positions.
15   A.    (Witness speaks in Korean)
16        MS. SONG: That there were
17   employee --
18        MS. MYUNG KIM:
19   Fluctuation.
20        MS. SONG: -- fluctuation
1    and --
22   A.    (Witness speaks in Korean)
23        MR. STOCKHAM: Is that

Page 104

1    correct?
2         MR. RAYMOND KIM:
3    (inaudible response)
4    A.    (Witness speaks in Korean)
5         MS. SONG: That he
6    complained that there were a lot of
7    problems relating to that because
8    Glovis was not contracted to hire
9    other self-contractors besides QLS.
10   A.    (Witness speaks in Korean)
11        MS. SONG: In addition to
12   that --
13   A.    (Witness speaks in Korean)
14        MS. SONG: -- quality
15   control personnel from Murakami --
16   A.    (Witness speaks in Korean)
17        MS. SONG: After going
18   through two hundred eighty pieces
19   that were returned from HMMA,
20   eighty-nine percent of them were
21   goods without defects, according to
22   their test results.
23   A.    (Witness speaks in Korean)

Page 105

1         MS. SONG: And the
2    remaining eleven percent --
3    A.    (Witness speaks in Korean)
4         MS. SONG: -- were due --
5    caused by the scratch.
6    A.    (Witness speaks in Korean)
7         MS. SONG: That they
8    complained aggressively.
9    A.    (Witness speaks in Korean)
10        MS. SONG: According to
11   that --
12   A.    (Witness speaks in Korean)
13        MS. SONG: -- Mr. Kim --
14   A.    (Witness speaks in Korean)
15        MS. SONG: -- called -- or
16   said, Rob, in a loud voice.
17   A.    (Witness speaks in Korean)
18        MS. SONG: Senior manger
19   Choi, Mr. Choi --
20   A.    (Witness speaks in Korean)
21        MS. SONG: -- Mr. Choi, I
22   had told you that regarding the
23   quality control issue, I said, we

Page 106

1  need -- it should be addressed
2  separately later on.
3        MS. MYUNG KIM: Can you
4  repeat that?
5        MS. SONG: Mr. Choi, I
6  have said that regarding the
7  quality control issue --
8        MS. MYUNG KIM: Regarding
9  the issue of going beyond quality
10 control, right?
11       MR. RAYMOND KIM:
12 Issues --
13       THE WITNESS: (Speaks in
14 Korean)
15       MS. MYUNG KIM: (Speaks in
16 Korean)
17       MS. SONG: So issue --
18       MS. MYUNG KIM: Just --
19 can you restart? Starting from Mr.
20 Choi?
21       MS. SONG: Mr. Choi, I
22 told you that issues that goes --
23 that's going out of quality control

Page 107

1  issue, we need -- that need to be
2  address separately at a later time.
3        A.   (Witness speaks in Korean)
4        MS. SONG: He was upset.
5        A.   (Witness speaks in Korean)
6        MS. SONG: That from now
7  the future meetings --
8        A.   (Witness speaks in Korean)
9        MS. SONG: -- should be
10 supervised from the quality control
11 department.
12       A.   (Witness speaks in Korean)
13       MS. SONG: And then he
14 left the room saying that they
15 should be -- they should be the one
16 supervising future meetings.
17       Q.   (By Mr. Stockham) Who
18 should be the ones supervising
19 future meetings?
20       MS. SONG: The department
21 from quality control.
22       A.   (Witness speaks in Korean)
23       MS. SONG: Afterwards --

Page 108

1        A.   (Witness speaks in Korean)
2        MS. SONG: --
3  approximately two minutes later --
4        A.   (Witness speaks in Korean)
5        MS. SONG: -- he came back
6  into the meeting room.
7        A.   (Witness speaks in Korean)
8        MS. SONG: Senior manager
9  Chong Yun Choi --
10       A.   (Witness speaks in Korean)
11       MS. SONG: -- for
12 purchasing department --
13       A.   (Witness speaks in Korean)
14       MS. SONG: -- and Seung Do
15 Park, the senior manager for
16 quality control --
17       A.   (Witness speaks in Korean)
18       MS. SONG: -- he told them
19 to follow him and went upstairs in
20 the office.
21       A.   (Witness speaks in Korean)
22       MS. SONG: Mr. Kim --
23       A.   (Witness speaks in Korean)

Page 109

1        MS. SONG: -- he stated
2  that he will never hold another
3  meeting for quality control.
4        A.   (Witness speaks in Korean)
5        MS. SONG: That he had
6  heard that he was being political
7  during the time when we're
8  discussing the problems regarding
9  PPG glass.
10       A.   (Witness speaks in Korean)
11       MS. SONG: And even after
12 the meeting regarding the issue
13 of --
14       A.   (Witness speaks in Korean)
15       MS. SONG: That there were
16 letters complaining.
17       A.   (Witness speaks in Korean)
18       MS. SONG: And also for
19 today, you know, when we're having
20 the meeting regarding Murakami.
21       A.   (Witness speaks in Korean)
22       MS. SONG: The suppliers
23 are complaining.

Page 110

```
 1      A.   (Witness speaks in Korean)
 2           MS. SONG: So I cannot
 3  hold meetings anymore like this.
 4      A.   (Witness speaks in Korean)
 5           MS. SONG: So after about
 6  twenty minutes of scolding --
 7      A.   (Witness speaks in Korean)
 8           MS. SONG: -- senior
 9  manager Park in purchase
10  department --
11           MS. MYUNG KIM: Choi.
12           MS. SONG: Choi. I'm
13  sorry.
14      A.   (Witness speaks in Korean)
15           MS. SONG: -- said, oh,
16  forgive me.
17      A.   (Witness speaks in Korean)
18           MS. SONG: Please don't be
19  upset.
20      A.   (Witness speaks in Korean)
21           MS. SONG: He bowed and
22  talked to him.
23      Q.   (By Mr. Stockham) Now,
```

Page 111

```
 1  let me ask you some specific
 2  questions about this.
 3           MS. SONG: (Translates
 4  into Korean)
 5      Q.   Under number three --
 6           MS. SONG: (Translates
 7  into Korean)
 8      Q.   -- you refer to
 9  photographs.
10           MS. SONG: (Translates
11  into Korean)
12      Q.   Were those photographs
13  that were projected on the screen
14  or project -- or photographs that
15  were passed around the table?
16           MS. SONG: (Translates
17  into Korean)
18      A.   (Witness speaks in Korean)
19           MS. SONG: It was the
20  image on the projection.
21      Q.   And under number four it
22  talks about photographs.
23           MS. SONG: (Translates
```

Page 112

```
 1  into Korean)
 2      Q.   Is that the same
 3  photographs?
 4           MS. SONG: (Translates
 5  into Korean)
 6      A.   (Witness speaks in Korean)
 7           MS. SONG: No.
 8      A.   (Witness speaks in Korean)
 9           MS. SONG: This was just a
10  printout, photograph.
11      Q.   It says there were
12  photographs that were submitted by
13  the vendor. So --
14           MS. SONG: (Translates
15  into Korean)
16      Q.   -- how did you know they
17  were photographs submitted by the
18  vendor?
19           MS. SONG: (Translates
20  into Korean)
21      A.   (Witness speaks in Korean)
22           MS. SONG: Rob Cyrus
23  brought it up -- or he brought it
```

Page 113

```
 1  out.
 2      A.   (Witness speaks in Korean)
 3           MS. SONG: I'm sorry?
 4      A.   (Witness speaks in Korean)
 5           MS. SONG: I had heard
 6  that he had been to Glovis that
 7  morning.
 8      A.   (Witness speaks in Korean)
 9           MS. SONG: So I --
10      A.   (Witness speaks in Korean)
11           MS. SONG: So it was my
12  assumption that somebody may have
13  taken those photos and had given it
14  to Rob Cyrus.
15      Q.   Why do you say that they
16  were vendor photographs?
17           MS. SONG: (Translates
18  into Korean)
19      A.   (Witness speaks in Korean)
20           MS. SONG: It was my
21  assumption that Rob Cyrus didn't
22  have a digital camera with him.
23      A.   (Witness speaks in Korean)
```

Page 114

1       MS. SONG: And he had the
2   photographs with him.
3       Q.   Had you seen the
4   photographs before the meeting?
5       MS. SONG: (Translates
6   into Korean)
7       A.   (Witness speaks in Korean)
8       MS. SONG: No.
9       Q.   And do I understand that
10  the photographs showed scratches
11  that were -- resulted from some
12  forklift damage to the mirrors?
13      MS. SONG: (Translates
14  into Korean)
15      A.   (Witness speaks in Korean)
16      MS. SONG: The picture
17  depicted mirrors just piled on top
18  of each other.
19      Q.   Did it depict scratches?
20      MS. SONG: (Translates
21  into Korean)
22      A.   (Witness speaks in Korean)
23      MS. SONG: Since it was

Page 115

1   piled up like that --
2       A.   (Witness speaks in Korean)
3       MS. SONG: It wasn't
4   organized.
5       A.   (Witness speaks in Korean)
6       MS. SONG: It was all
7   piled up on -- altogether.
8       A.   (Witness speaks in Korean)
9       MS. SONG: So it would
10  lead to scratches.
11      Q.   Scratches were on the
12  agenda?
13      MS. SONG: (Translates
14  into Korean)
15      A.   (Witness speaks in Korean)
16  (indicating)
17      MS. SONG: Yes, right
18  here.
19      Q.   So when Mr. Kim said about
20  not discussing matters that were
21  not on the agenda did that make any
22  sense?
23      MR. BOSTICK: Object to

Page 116

1   the form.
2       MS. SONG: (Translates
3   into Korean)
4       A.   (Witness speaks in Korean)
5       MS. SONG: At first it was
6   -- the issue was buff and bag mark.
7       Q.   But scratches were on the
8   agenda?
9       MS. SONG: (Translates
10  into Korean)
11      A.   (Witness speaks in Korean)
12      MS. SONG: Now that I see
13  it it's on the agenda.
14      A.   (Witness speaks in Korean)
15      MS. SONG: But at first --
16  at first we were just addressing
17  buff and bag marks only.
18      Q.   But the scratches were on
19  the agenda; is that --
20      MS. SONG: (Translates
21  into Korean)
22      A.   (Witness speaks in Korean)
23      MS. SONG: Yes. Yes, I

Page 117

1   see it. It's here.
2       Q.   And that's what Mr. Cyrus
3   was talking about?
4       MS. SONG: (Translates
5   into Korean)
6       A.   (Witness speaks in Korean)
7       MS. SONG: Well --
8       Q.   So did it make sense that
9   when Mr. Kim said in response to
10  Mr. Cyrus showing photographs of
11  scratch marks that we should stay
12  on the agenda?
13      MR. BOSTICK: Objection.
14  That's been asked and answered.
15      Q.   You can answer.
16      MS. SONG: (Translates
17  into Korean)
18      A.   (Witness speaks in Korean)
19      MS. SONG: The suppliers
20  was ready -- they were ready to
21  discuss the buff and bag marks at
22  first, at the beginning of the
23  meeting.

Page 118

1    A.    (Witness speaks in Korean)
2          MS. SONG: But that was
3    what -- that was the topic of the
4    presentation.
5    A.    (Witness speaks in Korean)
6          MS. SONG: That's what it
7    was.
8    Q.    Well, according to your
9    number five --
10         MS. SONG: (Translates
11   into Korean)
12   Q.    -- the director stated
13   through the interpreter --
14         MS. SONG: (Translates
15   into Korean)
16   Q.    -- that the subjects that
17   were not on the agenda should not
18   be discussed?
19         MS. SONG: (Translates
20   into Korean)
21         MR. BOSTICK: Object to
22   the form.
23         MS. SONG: (Translates

Page 119

1    into Korean)
2    A.    (Witness speaks in Korean)
3    Q.    Isn't that right?
4          MS. SONG: Yes.
5    A.    (Witness speaks in Korean)
6          MS. SONG: That's right.
7    Q.    But the scratches were on
8    the agenda?
9          MS. SONG: (Translates
10   into Korean)
11   A.    (Witness speaks in Korean)
12         MS. SONG: Yes.
13   Q.    So what Mr. Cyrus was
14   discussing was on the agenda,
15   wasn't it?
16         MS. SONG: (Translates
17   into Korean)
18   A.    (Witness speaks in Korean)
19         MS. SONG: Now that you
20   point it out like that you're
1    right.
22   Q.    And under number eight --
23         MS. SONG: (Translates

Page 120

1    into Korean)
2    Q.    -- you said that -- is
3    this a quote from Mr. Kim?
4          MS. SONG: (Translates
5    into Korean)
6    A.    (Witness speaks in Korean)
7          MS. SONG: Yes.
8    Q.    And you said he scolded
9    Murakami?
10         MS. SONG: (Translates
11   into Korean)
12   A.    (Witness speaks in Korean)
13         MS. SONG: Yes.
14   Q.    Did he raise his voice?
15         MS. SONG: (Translates
16   into Korean)
17   A.    (Witness speaks in Korean)
18         MS. SONG: He did not
19   raise his voice.
20   Q.    What do you mean by,
21   scolded?
22         MS. SONG: (Translates
23   into Korean)

Page 121

1    A.    (Witness speaks in Korean)
2          MS. SONG: He said, stop
3    thinking that you can supply the
4    decent ones to other companies and
5    make light of HMMA and supply the
6    detefected goods to Hyundai. Stop
7    thinking that way.
8    Q.    Did he say it in an
9    offensive way?
10         MS. SONG: (Translates
11   into Korean)
12   A.    (Witness speaks in Korean)
13         MS. SONG: It would be
14   different how a person sees that.
15   A.    (Witness speaks in Korean)
16         MS. SONG: I guess I could
17   say that if you were a Korean you
18   could take it as a warning.
19   Q.    Were you offended by it?
20         MS. SONG: (Translates
21   into Korean)
22   A.    (Witness speaks in Korean)
23         MS. SONG: No.

Page 122

1    Q.    Did the people from
2  Murakami take offense?
3          MS. SONG: (Translates
4  into Korean)
5          MR. BOSTICK: Object to
6  the form.
7     A.    (Witness speaks in Korean)
8          MS. SONG: In my opinion I
9  don't think so.
10    Q.    Now, under number nine --
11         MS. SONG: (Translates
12 into Korean)
13    Q.    -- the -- it says that Rob
14 Cyrus stated that the two hundred
15 minutes of line stoppage claim --
16         MS. SONG: (Translates
17 into Korean)
18    Q.    -- that was issued on the
19 Tuesday --
20         MS. SONG: (Translates
21 into Korean)
22    Q.    -- was Glovis' fault.
23         MS. SONG: (Translates

Page 123

1  into Korean)
2     Q.    Is that right?
3          MS. SONG: (Translates
4  into Korean)
5     A.    (Witness speaks in Korean)
6          MS. SONG: Rob said so.
7     Q.    And that was what was on
8  the agenda, wasn't it?
9          MS. SONG: (Translates
10 into Korean)
11         MR. BOSTICK: Object to
12 the form.
13    A.    (Witness speaks in Korean)
14         MS. SONG: Yes.
15    A.    (Witness speaks in Korean)
16         MS. SONG: Yes, I see it
17 here.
18    Q.    There was nothing wrong
19 with Mr. Cyrus saying that in the
20 meeting since it was on the agenda;
1  is that right?
22         MR. BOSTICK: Object to
23 the form.

Page 124

1          MS. SONG: (Translates
2  into Korean)
3     A.    (Witness speaks in Korean)
4          MS. SONG: It seems so.
5     Q.    Now, under number ten --
6          MS. SONG: (Translates
7  into Korean)
8     Q.    -- you don't remember who
9  Mr. Kim directed to call Glovis, do
10 you?
11         MS. SONG: (Translates
12 into Korean)
13    A.    (Witness speaks in Korean)
14         MS. SONG: I don't
15 remember.
16    Q.    Now, do you remember that
17 independently of your note?
18         MS. SONG: (Translates
19 into Korean)
20    A.    (Witness speaks in Korean)
21         MS. SONG: No.
22    Q.    You have to rely on your
23 note to remember that?

Page 125

1          MS. SONG: (Translates
2  into Korean)
3     A.    (Witness speaks in Korean)
4          MS. SONG: Yes.
5     Q.    And is that true with
6  everything else that's on here?
7          MS. SONG: (Translates
8  into Korean)
9     A.    (Witness speaks in Korean)
10         MS. SONG: Parts of it I
11 can recall without looking --
12    A.    (Witness speaks in Korean)
13         MS. SONG: -- and parts of
14 it I need to refer to the
15 documents.
16    Q.    Well, I will ask you --
17 the next one --
18         MS. SONG: (Translates
19 into Korean)
20    Q.    -- where Mr. Kim reminded
21 everyone that no one should raise
22 the subject again because it is not
23 part of the quality problem, who

32 (Pages 122 to 125)

Page 126

1  did Mr. Kim say that to?
2          MS. SONG: I'm sorry.
3  which number is that?
4          MR. STOCKHAM: Number
5  Eleven.
6          MS. SONG: (Translates
7  into Korean)
8      A.  (Witness speaks in Korean)
9          MS. SONG: Everyone --
10     A.  (Witness speaks in Korean)
11         MS. SONG: It seems that
12  everyone who was -- who were -- was
13  present at the meeting.
14     Q.  Did that make sense to you
15  when he said it?
16         MR. BOSTICK: Object to
17  the form.
18         MS. SONG: (Translates
19  into Korean)
20     A.  (Witness speaks in Korean)
21         MS. SONG: Yes.
22     Q.  Well, that issue was on
23  the agenda, wasn't it?

Page 127

1          MS. SONG: (Translates
2  into Korean)
3      A.  (Witness speaks in Korean)
4          MS. SONG: It was there
5  but --
6      A.  (Witness speaks in Korean)
7          MS. SONG: -- that we need
8  to move on in the meeting.
9      A.  (Witness speaks in Korean)
10         MS. SONG: That the
11  problem --
12     A.  (Witness speaks in Korean)
13         MS. SONG: That --
14  regarding --
15     A.  (Witness speaks in Korean)
16         MS. SONG: It was my
17  opinion that it was correct to move
18  on from the scratch issue because
19  of the manager from Glovis was
20  called for, that it was to be
21  discussed after the meeting at a
22  separate time. So it seemed that
23  way.

Page 128

1      Q.  Now, did you discuss that
2  with Mr. Cyrus that it was time to
3  move on about that?
4          MS. SONG: (Translates
5  into Korean)
6      A.  (Witness speaks in Korean)
7          MS. SONG: No, I did not.
8      Q.  Did Mr. Kim say that in
9  English?
10         MS. SONG: (Translates
11  into Korean)
12     A.  (Witness speaks in Korean)
13         MS. SONG: He did it in
14  Korean.
15     Q.  Did Mr. Kim say anything
16  in this meeting in English?
17         MS. SONG: (Translates
18  into Korean)
19     A.  (Witness speaks in Korean)
20         MS. SONG: No.
21     Q.  He didn't tell Murakami to
22  sit down and shut up?
23         MS. SONG: (Translates

Page 129

1  into Korean)
2      A.  (Witness speaks in Korean)
3          MS. SONG: He did not.
4      Q.  Now, have you heard Mr.
5  Kim speak English at the company?
6          MS. SONG: (Translates
7  into Korean)
8      A.  (Witness speaks in Korean)
9          MS. SONG: There was one
10  occasion.
11     Q.  Have you heard him give
12  speeches to employees in English?
13         MS. SONG: (Translates
14  into Korean)
15     A.  (Witness speaks in Korean)
16         MS. SONG: No.
17     Q.  What is the occasion you
18  heard him speaking in English?
19         MS. SONG: (Translates
20  into Korean)
21     A.  (Witness speaks in Korean)
22         MS. SONG: There was a
23  seminar where employees above

Page 130

1 manager level were to attend.
2     A.    (Witness speaks in Korean)
3         MS. SONG: Joo Soo Ahn --
4     A.    (Witness speaks in Korean)
5         MS. SONG: -- senior
6 manager --
7     A.    (Witness speaks in Korean)
8         MS. SONG: -- had to write
9 the speech or deliver the speech.
10    A.    (Witness speaks in Korean)
11        MS. SONG: But Joo Soo
12 Ahn, senior manager, was away --
13        MS. MYUNG KIM: No. He is
14 vice president.
15        MS. SONG: Oh.
16        MR. RAYMOND KIM: Vice
17 president.
18        MS. SONG: I'm sorry.
19        The vice president of the
20 company was out of town.
21    A.    (Witness speaks in Korean)
22        MS. SONG: So in lieu of
23 him --

Page 131

1     A.    (Witness speaks in Korean)
2         MS. SONG: -- H.I. Kim --
3     A.    (Witness speaks in Korean)
4         MS. SONG: I have
5 witnessed that one time where H.I.
6 Kim had to deliver the speech in a
7 way that was not accurate in
8 pronunciation and he delivered it
9 slow.
10    Q.    Now, under number
11 twelve --
12        MS. SONG: (Translates
13 into Korean)
14    Q.    -- does that refer to you?
15        MS. SONG: (Translates
16 into Korean)
17    A.    (Witness speaks in Korean)
18        MS. SONG: I just wrote
19 down what I witnessed.
20    Q.    But does that refer to you
21 making a comment under number
22 twelve?
23        MS. SONG: (Translates

Page 132

1 into Korean)
2     A.    (Witness speaks in Korean)
3         MS. SONG: No.
4     A.    (Witness speaks in Korean)
5         MS. SONG: In spite of
6 that it was Rob Cyrus who
7 complained that there is a problem,
8 asking them to attend the meeting
9 on Friday and contacting them on
10 Wednesday to be there who did not
11 even register the defected goods
12 back from the company.
13    Q.    And it says that J.Y. Choi
14 said something to Y. Seo that --
15 about future meetings being better
16 coordinated; is that correct?
17        MS. SONG: (Translates
18 into Korean)
19    A.    (Witness speaks in Korean)
20        MS. SONG: He said, let's
21 coordinate better next time.
22    Q.    And you were talking about
23 what Mr. Kim had told you not to

Page 133

1 talk about at that point?
2         MR. BOSTICK: Object to
3 the form. That mischaracterizes
4 earlier testimony.
5     Q.    You can answer.
6         MR. BOSTICK: I'd like my
7 objection read to him in English as
8 well.
9         MS. SONG: I'm sorry.
10        MR. BOSTICK: I mean, in
11 Korean.
12        MS. SONG: Okay. Could
13 you repeat --
14        MR. STOCKHAM: Yeah.
15        MS. SONG: -- that one
16 more time?
17    Q.    Number twelve, that refers
18 to a conversation that you had with
19 Mr. Y. Seo, right?
20        MS. SONG: (Translates
21 into Korean)
22    A.    (Witness speaks in Korean)
23        MS. SONG: The first part

Page 134

1  of twelve indicates what Rob Cyrus
2  had to say. The latter part of
3  twelve discussed what I said to
4  Myung Su Sah, the senior manager,
5  saying, from now on we need to
6  coordinate better and give a far --
7  advance notice to the suppliers so
8  that this won't happen again.
9      Q.   And that relates to what
10  Mr. Cyrus was talking about in the
11  first part of twelve, doesn't it?
12      MS. SONG: (Translates
13  into Korean)
14      A.   (Witness speaks in Korean)
15      MS. SONG: Rob Cyrus was
16  addressing everyone in the
17  conference room. And for me I was
18  just talking individually to Myung
19  Su Sah, the senior manager.
20      Q.   Where was Mr. Sah sitting?
21      MS. SONG: (Translates
22  into Korean)
23      A.   (Witness speaks in Korean)

Page 135

1      MS. SONG: Right across
2  from where I was seated.
3      Q.   I show you what's marked
4  as Exhibit Four.
5      MS. SONG: (Translates
6  into Korean)
7      Q.   And I'll show you where --
8  if Mr. Kim was here (indicating)
9  and you were here (indicating)
10  where was he sitting?
11      MS. SONG: (Translates
12  into Korean)
13      A.   (Indicating)
14      Q.   You were sitting next
15  to --
16      MR. BOSTICK: Object to
17  laying the proper foundation.
18      A.   (Witness speaks in Korean)
19  (indicating)
20      MS. SONG: I was sitting
1  right there (indicating).
22      A.   (Witness speaks in Korean)
23  (indicating)

Page 136

1      MS. SONG: And Rob Cyrus
2  next to me.
3      A.   (Witness speaks in Korean)
4  (indicating)
5      MS. SONG: And then -- and
6  Sah was seated right there
7  (indicating).
8      Q.   He was sitting next to
9  Chris Susock?
10      MS. SONG: I'm sorry.
11  Who?
12      MR. RAYMOND KIM) (Speaks
13  in Korean)
14      MS. SONG: (Translates
15  into Korean)
16      A.   (Witness speaks in Korean)
17      MS. SONG: I don't
18  remember in details.
19      A.   (Witness speaks in Korean)
20      MS. SONG: But he was
21  seated basically across from me.
22      A.   (Witness speaks in Korean)
23      MS. SONG: So it was --

Page 137

1  the distance was not long or far.
2      A.   (Witness speaks in Korean)
3      MS. SONG: That it was
4  easy to talk to.
5      Q.   Now, in number thirteen --
6      MS. SONG: (Translates
7  into Korean)
8      Q.   -- it says, Rob Cyrus
9  continued to discuss the problem,
10  even arguing with HMA American
11  production personnel. Who was he
12  arguing with?
13      MS. SONG: (Translates
14  into Korean)
15      A.   (Witness speaks in Korean)
16      MS. SONG: I don't recall.
17      A.   (Witness speaks in Korean)
18      MS. SONG: The first day
19  of employment was August 11.
20      A.   (Witness speaks in Korean)
21      MS. SONG: And prior to
22  this meeting I normally spent time
23  at the suppliers --

Page 138

1    A.    (Witness speaks in Korean)
2        MS. SONG:  So even the
3    personnels working for HMMA --
4    A.    (Witness speaks in Korean)
5        MS. SONG:  -- I didn't
6    know who was who within HMMA that
7    very -- you know, that much.
8    Q.    Well, how many people was
9    he -- Mr. Cyrus having a
10   conversation with among the
11   American production people?
12       MS. SONG:  (Translates
13   into Korean)
14   A.    (Witness speaks in Korean)
15       MS. SONG:  I don't
16   remember clearly.
17   A.    (Witness speaks in Korean)
18       MS. SONG:  But --
19   A.    (Witness speaks in Korean)
20       MS. SONG:  -- there was
21   somebody across the table and on
22   the opposite side as well.
23   A.    (Witness speaks in Korean)

Page 139

1        MS. SONG:  So same side as
2    well as the opposite side of the
3    table.
4    A.    (Witness speaks in Korean)
5        MS. SONG:  So they talked
6    very fast.
7    A.    (Witness speaks in Korean)
8        MS. SONG:  They conversed
9    a lot --
10   A.    (Witness speaks in Korean)
11       MS. SONG:  -- and I didn't
12   understand -- I couldn't make out
13   what they were saying.
14   Q.    How long did it last?
15       MS. SONG:  (Translates
16   into Korean)
17   A.    (Witness speaks in Korean)
18       MS. SONG:  I can't say in
19   terms of time line but --
20   A.    (Witness speaks in Korean)
1        MS. SONG:  -- but it
2    continued for a good while.
23   Q.    More than a minute?

Page 140

1        MS. SONG:  (Translates
2    into Korean)
3    A.    (Witness speaks in Korean)
4        MS. SONG:  I don't know.
5    But I would say, yes, approximately
6    that long.
7    Q.    Approximately a minute?
8        MS. SONG:  (Translates
9    into Korean)
10   A.    (Witness speaks in Korean)
11       MS. SONG:  I don't know in
12   detail.
13   A.    (Witness speaks in Korean)
14       MS. SONG:  But it went
15   back and forth and back and forth.
16   Q.    Was it a discussion?
17       MS. SONG:  (Translates
18   into Korean)
19   A.    (Witness speaks in Korean)
20       MS. SONG:  No.
21   A.    (Witness speaks in Korean)
22       MS. SONG:  What I felt
23   was --

Page 141

1    A.    (Witness speaks in Korean)
2        MS. MYUNG KIM:  (Speaks in
3    Korean)
4    A.    (Witness speaks in Korean)
5        MS. SONG:  They -- the way
6    they --
7        MR. STOCKHAM:  I would ask
8    you not to tell him the word.
9    A.    (Witness speaks in Korean)
10       MS. SONG:  I would say
11   that they were rather aggressive.
12   That I -- if you were to say it in
13   Korean maybe say something like
14   bickering.
15   Q.    All of them were?
16       MS. SONG:  (Translates
17   into Korean)
18   A.    (Witness speaks in Korean)
19       MS. SONG:  On both sides.
20   A.    (Witness speaks in Korean)
21       MS. SONG:  I mean, both in
22   here and there.
23   Q.    Now, that was interrupted

Page 142

1  when the Murakami salesman banged
2  two mirrors together? Is that what
3  your note says?
4        MS. SONG: (Translates
5  into Korean)
6     A.  (Witness speaks in Korean)
7        MS. SONG: While they're
8  talking aggressively a person from
9  Murakami brought two mirrors. And
10 at first they banged the mirrors
11 against each other first. And then
12 they hit it -- hit those on the
13 table.
14    Q.   When you say, they hit
15 them on the table, did they --
16        MS. SONG: (Translates
17 into Korean)
18    A.  (Witness speaks in Korean)
19 (demonstrating)
20        MS. SONG: And then --
21 they hit it like this against each
22 other and then they just put it
23 down like that (demonstrating).

Page 143

1     Q.   So they didn't throw it on
2  the table, they just put it on the
3  table?
4        MS. SONG: (Translates
5  into Korean)
6     A.  (Witness speaks in Korean)
7        MS. SONG: I mean, it was
8  with force, you know. You know,
9  bang it and then just set it
10 (demonstrating).
11    Q.   And who did that?
12        MS. SONG: (Translates
13 into Korean)
14    A.  (Witness speaks in Korean)
15        MS. SONG: I don't
16 remember.
17    Q.   Did anyone raise their
18 voice at that point?
19        MS. SONG: (Translates
20 into Korean)
1     A.  (Witness speaks in Korean)
2        MS. SONG: The person who
23 demonstrated or banged those

Page 144

1  mirrors together, he said, this is
2  how scratch is made. He said that.
3     Q.   Anybody else say anything
4  at that time?
5        MS. SONG: (Translates
6  into Korean)
7     A.  (Witness speaks in Korean)
8        MS. SONG: No.
9     Q.   What happened after he
10 banged the mirrors together and
11 said, this is how scratches are
12 formed?
13        MS. SONG: (Translates
14 into Korean)
15    A.  (Witness speaks in Korean)
16        MS. SONG: There was
17 silence.
18    Q.   How long did the silence
19 last?
20        MS. SONG: (Translates
21 into Korean)
22    A.  (Witness speaks in Korean)
23        MS. SONG: I don't

Page 145

1  remember.
2     A.  (Witness speaks in Korean)
3        MS. SONG: But it was a
4  while. It was quiet.
5     Q.   Was the first person to
6  speak after that the Murakami
7  employee who talked about the two
8  hundred and eighty return items?
9        MS. SONG: (Translates
10 into Korean)
11    A.  (Witness speaks in Korean)
12        MS. SONG: Yes.
13    Q.   Did he raise his voice
14 about that?
15        MS. SONG: (Translates
16 into Korean)
17    A.  (Witness speaks in Korean)
18        MS. SONG: A little bit
19 raised voice, yes.
20    A.  (Witness speaks in Korean)
21        MS. SONG: He complained
22 and explained.
23    Q.   And the next person to

Page 146

```
1   speak --
2         MS. SONG: (Translates
3   into Korean)
4      Q.    -- was the director; is
5   that correct?
6      A.    (Witness speaks in Korean)
7         MS. SONG: H.I. Kim, yes.
8      Q.    And he spoke in a raised
9   voice?
10        MS. SONG: (Translates
11  into Korean)
12     A.    (Witness speaks in Korean)
13        MS. SONG: Yes.
14     A.    (Witness speaks in Korean)
15        MS. SONG: At that time he
16  said, Rob.
17     A.    (Witness speaks in Korean)
18        MS. SONG: Rob.
19     A.    (Witness speaks in Korean)
20        MS. SONG: He called the
21  name twice.
22     Q.    And did he call your name
23  in a loud voice as well?
```

Page 147

```
1         MS. SONG: (Translates
2   into Korean)
3      A.    (Witness speaks in Korean)
4         MS. SONG: After calling
5   Rob's name twice in a raised voice
6   he couldn't continue his
7   conversation in English. So he
8   turned to me and said -- called me,
9   Mr. Choi.
10     Q.    Did he have -- did he
11  speak to you in a loud voice?
12        MS. SONG: (Translates
13  into Korean)
14     A.  · (Witness speaks in Korean)
15        MS. SONG: Yes.
16     A.    (Witness speaks in Korean)
17        MS. SONG: I said, the
18  issue outside of the quality
19  control should be discussed
20  separately at a later time. I told
21  you that.
22     Q.    That's what Mr. Kim said
23  to you?
```

Page 148

```
1         MS. SONG: (Translates
2   into Korean)
3      A.    (Witness speaks in Korean)
4         MS. SONG: Yes. Because
5   he couldn't say that in English to
6   Rob.
7      A.    (Witness speaks in Korean)
8         MS. SONG: So he told me.
9      Q.    He didn't say it for the
10  translator?
11        MS. SONG: (Translates
12  into Korean)
13     A.    (Witness speaks in Korean)
14        MS. SONG: He said this in
15  Korean.
16     A.    (Witness speaks in Korean)
17        MS. SONG: What I just
18  read about having to discuss it at
19  a later time, he said that in
20  Korean to me.
21     Q.    Did the -- did Mr. Kim
22  scold you at this point?
23        MS. SONG: (Translates
```

Page 149

```
1   into Korean)
2      A.    (Witness speaks in Korean)
3         MS. SONG: No.
4         MR. BOSTICK: Object to
5   the form.
6      Q.    Did Mr. Kim ask you if you
7   were defending the vendor?
8         MS. SONG: (Translates
9   into Korean)
10     A.    (Witness speaks in Korean)
11        MS. SONG: To me?
12     Q.    Yes.
13        MS. SONG: (Translates
14  into Korean)
15     A.    (Witness speaks in Korean)
16        MS. SONG: He did not say
17  that.
18     Q.    Did he -- Mr. Kim say to
19  you that he expected you to
20  understand what he told you?
21        MS. SONG: (Translates
22  into Korean)
23     A.    (Witness speaks in Korean)
```

Page 150

```
1          MS. SONG:  Could you
2   rephrase the question?
3       Q.   Did Mr. Kim say to you at
4   this point --
5          MS. SONG:  (Translates
6   into Korean)
7       Q.   -- that he expected you to
8   understand what he told you?
9          MS. SONG:  (Translates
10  into Korean)
11      A.   (Witness speaks in Korean)
12         MS. SONG:  What content?
13  What statement?
14      Q.   Did he state to you that
15  he expected you to understand what
16  he told you?
17         MR. BOSTICK:  Objection.
18         MS. SONG:  (Translates
19  into Korean)
20      A.   (Witness speaks in Korean)
21         MS. SONG:  I don't know
22  what you're saying.
23      Q.   So you don't have any
```

Page 151

```
1   recollection that Mr. Kim at this
2   point in the conversation said to
3   you that he expected that you would
4   understand what he told you; is
5   that correct?
6          MS. SONG:  (Translates
7   into Korean)
8       A.   (Witness speaks in Korean)
9          MS. SONG:  I don't know
10  what you're trying to tell me -- or
11  ask me.
12         MS. MYUNG KIM:  May I try?
13         MR. STOCKHAM:  No.
14         MS. MYUNG KIM:  No.  And
15  he can see if my translation --
16         MR. STOCKHAM:  Okay.
17         MS. MYUNG KIM:  (Speaks in
18  Korean)
19      A.   (Witness speaks in Korean)
20         MS. SONG:  I don't
21  remember.
22      Q.   (By Mr. Stockham)  Now,
23  the -- Mr. Cyrus didn't raise his
```

Page 152

```
1   voice in talking to Mr. Kim, did
2   he?
3          MS. SONG:  (Translates
4   into Korean)
5          MR. BOSTICK:  Object to
6   the form.
7       A.   (Witness speaks in Korean)
8          MS. SONG:  (Speaks in
9   Korean)
10      A.   (Witness speaks in Korean)
11         MS. SONG:  Did Mr. Cyrus
12  speak to Mr. Kim?
13      Q.   No, did he raise his
14  voice?
15         MS. SONG:  (Translates
16  into Korean)
17      A.   (Witness speaks in Korean)
18         MS. SONG:  The voice was a
19  little raised.
20      A.   (Witness speaks in Korean)
21         MS. SONG:  It was kind of
22  noisy.
23      A.   (Witness speaks in Korean)
```

Page 153

```
1          MS. SONG:  And, plus, you
2   know, when -- especially when he
3   was speaking across the table.
4       A.   (Witness speaks in Korean)
5          MS. SONG:  He was talking
6   very fast in English.
7       A.   (Witness speaks in Korean)
8          MS. SONG:  So if you were
9   to talk quiet or normally you can't
10  hear him.  So --
11      Q.   He wasn't raising it
12  abnormally loudly for the meeting,
13  then, was he?
14         MS. SONG:  (Translates
15  into Korean)
16         MR. BOSTICK:  Object to
17  the form.  He just answered that.
18         MR. STOCKHAM:  He can
19  answer.
20         MS. SONG:  (Translates
21  into Korean)
22      A.   (Witness speaks in Korean)
23         MS. SONG:  I don't
```

Page 154

1  remember clearly.
2      A.    (Witness speaks in Korean)
3          MS. SONG: But maybe it
4  was a little bit raised compared
5  with the normal tone.
6      Q.    Did you ever hear Mr.
7  Cyrus demand, who was going to pay
8  for Murakami coming down to
9  Alabama?
10         MS. SONG: I'm sorry.
11 Could you repeat that?
12     Q.    Did you ever hear Mr.
13 Cyrus say --
14         MR. STOCKHAM: Translate
15 that.
16         MS. SONG: (Translates
17 into Korean)
18     Q.    -- who is going to pay for
19 Murakami coming to Alabama?
20         MS. SONG: (Translates
21 into Korean)
22     A.    (Witness speaks in Korean)
23         MS. SONG: I don't

Page 155

1  remember.
2      Q.    Did you ever hear Mr.
3  Cyrus suggest that there was some
4  hidden reason for not talking about
5  the scratches?
6          MS. SONG: (Translates
7  into Korean)
8      A.    (Witness speaks in Korean)
9          MS. SONG: Could you
10 rephrase the question?
11     Q.    Did you ever hear Mr.
12 Cyrus say that there was a --
13         MS. SONG: (Translates
14 into Korean)
15     Q.    -- suspicious reason for
16 not talking about the scratches?
17         MS. SONG: (Translates
18 into Korean)
19     A.    (Witness speaks in Korean)
20         MS. SONG: No.
21     Q.    Now, what was the reason
22 that you wrote this document?
23         MS. SONG: (Translates

Page 156

1  into Korean)
2      A.    (Witness speaks in Korean)
3          MS. SONG: I'm sorry.
4  (Speaks in Korean)
5      A.    (Witness speaks in Korean)
6          MS. SONG: Through Hyung
7  Chu Hyun I received order from the
8  vice president Joo Soo Ahn of HMMA
9  that he wanted a synopsis of what
10 happened.
11     Q.    When did you receive that
12 order?
13         MS. SONG: (Translates
14 into Korean)
15     A.    (Witness speaks in Korean)
16         MS. SONG: I don't
17 remember the exact date.
18     A.    (Witness speaks in Korean)
19         MS. SONG: It was after
20 the meeting.
21     Q.    Does your document have a
22 reflected date that it was done?
23         MS. SONG: (Translates

Page 157

1  into Korean)
2      A.    (Witness speaks in Korean)
3          MS. SONG: No.
4      A.    (Witness speaks in Korean)
5          MS. SONG: What I -- the
6  date that I remember and the date
7  that I wrote it down are two
8  different dates.
9      Q.    So you didn't write it
10 down on the same day that the
11 meeting occurred?
12         MS. SONG: (Translates
13 into Korean)
14     A.    (Witness speaks in Korean)
15         MS. SONG: I don't think I
16 could have written that on the same
17 day.
18     Q.    Why do you say you don't
19 think it could have happened on the
20 same day?
21         MS. SONG: (Translates
22 into Korean)
23     A.    (Witness speaks in Korean)

Page 158

```
 1          MS. SONG:  I'm not sure if
 2  the order came to me on the same
 3  day or the next day.  I'm not sure
 4  when it was.
 5      A.    (Witness speaks in Korean)
 6          MS. SONG:  And then it was
 7  my conclusion that such incident
 8  was serious.  So --
 9      A.    (Witness speaks in Korean)
10          MS. SONG:  I was nervous
11  at the time.
12      Q.    Well, did you stay for the
13  remainder of the meeting?
14          MS. SONG:  (Translates
15  into Korean)
16      A.   (Witness speaks in Korean)
17          MS. SONG:  Mr. Kim had
18  left the room and then came back
19  into the room about two minutes
20  later.
21      A.    (Witness speaks in Korean)
22          MS. SONG:  (Speaks in
23  Korean)
```

Page 159

```
 1      A.    (Witness speaks in Korean)
 2          MS. SONG:  Seung Do Park
 3  and --
 4      A.    (Witness speaks in Korean)
 5          MS. SONG:  -- Jeong Yeon
 6  Kim --
 7      A.    (Witness speaks in Korean)
 8          MS. SONG:  Jeong Yeon
 9  Choi.  I'm sorry.  Jeong Yeon Choi.
10      A.    (Witness speaks in Korean)
11          MS. SONG:  And H.I. Kim.
12      A.    (Witness speaks in Korean)
13          MS. SONG:  These three
14  people --
15      A.    (Witness speaks in Korean)
16          MS. SONG:  -- went up to
17  the second floor.
18      A.    (Witness speaks in Korean)
19          MS. SONG:  There was a
20  small conference room up there.
 1      A.    (Witness speaks in Korean)
22          MS. SONG:  Did you stay
23  for the rest of the Hwashin meeting
```

Page 160

```
 1  before you went up with Mr. Kim?
 2          MS. SONG:  (Translates
 3  into Korean)
 4      A.    (Witness speaks in Korean)
 5          MS. SONG:  No.
 6      A.    (Witness speaks in Korean)
 7          MS. SONG:  After that
 8  incident it just came to an end.
 9      A.    (Witness speaks in Korean)
10          MS. SONG:  It just -- that
11  was -- that's when I finished.
12      A.    (Witness speaks in Korean)
13          MS. SONG:  I'm not sure if
14  the meeting continued on afterwards
15  or not.
16      Q.    Why did you go up to the
17  conference room with Mr. Kim?
18          MS. SONG:  (Translates
19  into Korean)
20      A.    (Witness speaks in Korean)
21          MS. SONG:  Mr. Kim asked
22  me to come with him.
23      Q.    Of all the Koreans in the
```

Page 161

```
 1  room why did he pick you?
 2          MS. SONG:  (Translates
 3  into Korean)
 4          MR. BOSTICK:  Object to
 5  the form.
 6          MS. SONG:  (Translates
 7  into Korean)
 8      A.    (Witness speaks in Korean)
 9          MS. SONG:  I don't know.
10      Q.    Did he say?
11          MS. SONG:  (Translates
12  into Korean)
13      A.    (Witness speaks in Korean)
14          MS. SONG:  No.
15      Q.    When he took you up to the
16  conference room --
17          MS. SONG:  (Translates
18  into Korean)
19      Q.    -- did he tell you that he
20  was going to terminate your
21  employment?
22          MS. SONG:  (Translates
23  into Korean)
```

Page 162

```
1      A.   (Witness speaks in Korean)
2           MS. SONG:  No, he did not.
3      Q.   Did he tell you that he
4  was going to terminate Mr. Cyrus'
5  employment?
6           MS. SONG:  (Translates
7  into Korean)
8      A.   (Witness speaks in Korean)
9           MS. SONG:  He did not say
10 that.
11     A.   (Witness speaks in Korean)
12     .    MS. SONG:  Who is Rob
13 Cyrus, he said that.
14     Q.   Did you call Mr. Cyrus
15 that afternoon and tell him that
16 you were concerned that you and he
17 may be going home early that
18 afternoon?
19          MS. SONG:  (Translates
20 into Korean)
21     A.   (Witness speaks in Korean)
22          MS. SONG:  I'm not sure if
23 I made the call or if I received
```

Page 163

```
1  the call.
2      A.   (Witness speaks in Korean)
3           MS. SONG:  But the reason
4  why I said it may be better for us
5  to go home early today is
6  because --
7      A.   (Witness speaks in Korean)
8           MS. SONG:  -- this
9  particular situation --
10     A.   (Witness speaks in Korean)
11          MS. SONG:  -- was so
12 serious, so severe that --
13     A.   (Witness speaks in Korean)
14          MS. SONG:  -- that I
15 myself was very nervous.  I was not
16 calm.
17     A.   (Witness speaks in Korean)
18          MS. SONG:  So I was in the
19 -- I was not in the mood to
20 continue working in that afternoon.
`1     Q.   You told Mr. Cyrus that
₂2 you were afraid that you were going
23 to be terminated along with him,
```

Page 164

```
1  didn't you?
2           MS. SONG:  (Translates
3  into Korean)
4      A.   (Witness speaks in Korean)
5           MS. SONG:  The meaning of
6  that --
7      A.   (Witness speaks in Korean)
8           MS. SONG:  -- is that --
9  the meaning of that is that I was
10 only trying to convey that this
11 incident is really serious here.
12     Q.   You're saying you did not
13 tell him that you were afraid you
14 were going to be terminated?
15          MS. SONG:  (Translates
16 into Korean)
17     A.   (Witness speaks in Korean)
18          MS. SONG:  That's right.
19     Q.   You did not tell him that
20 you thought that you and he were
21 going to be terminated?
22          MS. SONG:  (Translates
23 into Korean)
```

Page 165

```
1      A.   (Witness speaks in Korean)
2           MS. SONG:  That's right.
3      Q.   Now, you went with Mr.
4  Cyrus to Mr. Huan, didn't you?
5           MS. SONG:  I'm sorry?
6      Q.   You went with Mr. Cyrus to
7  Mr. Huan, your boss, didn't you?
8           MS. SONG:  (Translates
9  into Korean)
10     A.   (Witness speaks in Korean)
11          MS. SONG:  At the time Mr.
12 Hyun was on a business trip.
13     A.   (Witness speaks in Korean)
14          MS. SONG:  That he came
15 back around three or four o'clock
16 in the afternoon.
17     A.   (Witness speaks in Korean)
18          MS. SONG:  I do remember
19 telling Mr. Hyun as to what had
20 happened that morning.
21     A.   (Witness speaks in Korean)
22          MS. SONG:  I'm not sure on
23 the -- I'm not sure if Mr. Cyrus
```

Page 166

1   was with me at that time or not.
2       Q.    You also went with Mr.
3   Cyrus to speak with Mr. Jason Lee,
4   didn't you?
5           MS. SONG:  (Translates
6   into Korean)
7       A.    (Witness speaks in Korean)
8           MS. SONG:  I don't
9   remember.
10      A.    (Witness speaks in Korean)
11          MS. SONG:  But I was
12  really nervous.
13      A.    (Witness speaks in Korean)
14          MS. SONG:  I was so
15  nervous at the time that I can't
16  recall as to what had happened.
17      Q.    In fact you --
18          MS. SONG:  -- all of it.
19      Q.    In fact you cried in front
20  of Mr. Lee saying that you were
21  afraid that you and Mr. Cyrus were
22  going to be fired and you had done
23  nothing wrong?

Page 167

1           MS. SONG:  (Translates
2   into Korean)
3       A.    (Witness speaks in Korean)
4           MS. SONG:  I did not cry.
5       Q.    And you told Mr. Hyun in
6   front of Mr. Cyrus that neither of
7   you had done anything wrong, didn't
8   you?
9           MS. SONG:  (Translates
10  into Korean)
11      A.    (Witness speaks in Korean)
12          MS. SONG:  I think I did.
13      Q.    And you told Mr. Lee that
14  neither of you or Mr. Cyrus had
15  done anything wrong, didn't you?
16          MS. SONG:  (Translates
17  into Korean)
18      A.    (Witness speaks in Korean)
19          MS. SONG:  I don't
20  remember that part.
21      Q.    And, in fact, you told Mr.
22  Lee that --
23          (Whereupon, an

Page 168

1           off-the-record
2           discussion was held.)
3       Q.    (By Mr. Graham)  You told
4   Mr. Lee that Mr. Cyrus and you had
5   done nothing wrong and it was Mr.
6   Kim who should apologize, didn't
7   you?
8           MS. SONG:  (Translates
9   into Korean)
10      A.    (Witness speaks in Korean)
11          MS. SONG:  I don't
12  remember that.
13      A.    (Witness speaks in Korean)
14          MS. SONG:  I was not
15  stable at the time.
16      Q.    And you asked Mr. McClain
17  to send you a statement about what
18  happened in the meeting, didn't
19  you?
20          MS. SONG:  (Translates
21  into Korean)
22      A.    (Witness speaks in Korean)
23          MS. SONG:  I don't

Page 169

1   remember.
2           MR. STOCKHAM:  Mark this
3   as the next exhibit, 373 and 374,
4   please.
5           (Whereupon, Plaintiff's
6           Exhibit Two
7           was marked for
8           identification.)
9           MS. SONG:  (Speaks in
10  Korean)
11      Q.    I show you what I've
12  marked as Exhibit Two.
13          MS. SONG:  (Translates
14  into Korean)
15      A.    (Witness speaks in Korean)
16      Q.    And this is -- the lower
17  part, this is an e-mail --
18          MS. SONG:  (Translates
19  into Korean)
20      A.    (Witness speaks in Korean)
21          MS. SONG:  Yes.
22      Q.    -- that Mr. Christopher
23  McClain sent to you.

Page 170

```
 1        MS. SONG: (Translates
 2   into Korean)
 3      A.   (Witness speaks in Korean)
 4        MS. SONG: Yes.
 5      Q.   And it shows that it was
 6   sent to you Friday, September 16th
 7   at three twenty-seven in the
 8   afternoon.
 9        MS. SONG: (Translates
10   into Korean)
11      A.   (Witness speaks in Korean)
12        MS. SONG: Yes.
13      Q.   And you had this statement
14   from Mr. McClain before you wrote
15   Exhibit One, didn't you?
16        MS. SONG: Translates
17   into Korean)
18      A.   (Witness speaks in Korean)
19        MS. SONG: It says,
20   September 16th.
21      A.   (Witness speaks in Korean)
22        MS. SONG: It seems so.
23      Q.   And this was something
```

Page 171

```
 1   that you asked Mr. McClain to send
 2   to you?
 3        MS. SONG: (Translates
 4   into Korean)
 5      A.   (Witness speaks in Korean)
 6        MS. SONG: I don't
 7   remember.
 8      A.   (Witness speaks in Korean)
 9        MS. SONG: But according
10   to the first sentence here --
11      A.   (Witness speaks in Korean)
12        MS. SONG: -- it seems
13   that I requested it.
14      Q.   Why did you request it?
15        MS. SONG: (Translates
16   into Korean)
17      A.   (Witness speaks in Korean)
18        MS. SONG: I wanted to
19   know how he perceived the incident.
20      Q.   And where did he sit in
21   relation to you at the meeting?
22        MS. SONG: (Translates
23   into Korean)
```

Page 172

```
 1      A.   (Witness speaks in Korean)
 2        MS. SONG: I don't
 3   remember.
 4      A.   (Witness speaks in Korean)
 5        MS. SONG: Because there
 6   were people seated around the table
 7   and then there were people sitting
 8   in the back side as well.
 9      A.   (Witness speaks in Korean)
10        MS. SONG: Toward --
11   closer to the wall.
12      Q.   Well, was he sitting
13   around the table or closer to the
14   wall?
15        MS. SONG: (Translates
16   into Korean)
17      A.   (Witness speaks in Korean)
18        MS. SONG: Perhaps closer
19   to the wall.
20      Q.   Do you know?
21        MS. SONG: (Translates
22   into Korean)
23      A.   (Witness speaks in Korean)
```

Page 173

```
 1        MS. SONG: I don't know,
 2   I --
 3      A.   (Witness speaks in Korean)
 4        MS. SONG: I don't think I
 5   had seen him around the table.
 6      Q.   Now, look at the last
 7   arrow point on the e-mail.
 8        MS. SONG: (Translates
 9   into Korean)
10      Q.   Would you read that,
11   please, sir?
12        MS. SONG: (Translates
13   into Korean)
14      A.   At not time were
15   purchasing staff disrespectable
16   during the meeting.  They were
17   trying to do the right thing by
18   addressing real issues which was
19   supposed to be the reason for
20   having the meeting.
21      Q.   And Mr. McClain worked for
22   you; is that right?
23        MS. SONG: (Translates
```

Page 174

```
1    into Korean)
2         A.    (Witness speaks in Korean)
3              MS. SONG:  Yes.
4         Q.    And that's why you asked
5    him to write this?
6              MS. SONG:  (Translates
7    into Korean)
8         A.    (Witness speaks in Korean)
9              MS. SONG:  Yes.
10        Q.    And did you agree with
11   that last bullet point?
12             MS. SONG:  (Translates
13   into Korean)
14             MR. BOSTICK:  Object to
15   the form.
16        A.    (Witness speaks in Korean)
17             MS. SONG:  There is a part
18   that I do not agree with.
19        Q.    What part do you not agree
20   with?
21             MS. SONG:  (Translates
22   into Korean)
23        A.    (Witness speaks in Korean)
```

Page 175

```
1              MS. SONG:  Over two
2    different occasions H.I. Kim had
3    said to stop.
4         A.    (Witness speaks in Korean)
5              MS. SONG:  I believe --
6    it's my belief that at that time we
7    should have stopped talking about
8    it.
9         A.    (Witness speaks in Korean)
10             MS. SONG:  But Rob
11   insisted -- continued to talk --
12        A.    (Witness speaks in Korean)
13             MS. SONG:  -- and he
14   disputed with Americans who were
15   there.
16        A.    (Witness speaks in Korean)
17             MS. SONG:  They were
18   bickering with each other --
19        A.    (Witness speaks in Korean)
20             MS. SONG:  -- at that
21   time.  When the second warning came
22   I just stayed put.  I didn't do
23   anything.
```

Page 176

```
1         A.    (Witness speaks in Korean)
2              MS. SONG:  But, you know,
3    Rob continued to do what he was
4    doing.
5         A.    (Witness speaks in Korean)
6              MS. SONG:  And I believe
7    that's what caused the
8    representatives from Murakami to
9    come and bang those mirrors against
10   each other.
11        A.    (Witness speaks in Korean)
12             MS. SONG:  So the
13   meeting --
14        A.    (Witness speaks in Korean)
15             MS. SONG:  -- became
16   chaotic.
17        A.    (Witness speaks in Korean)
18             MS. SONG:  And then H.I.
19   Kim called his name twice in loud
20   voice, Rob, Rob.
21        A.    (Witness speaks in Korean)
22             MS. SONG:  But since he
23   couldn't say in English any further
```

Page 177

```
1    that's why he turned to me and
2    said, Mr. Choi, in Korean.
3         A.    (Witness speaks in Korean)
4              MS. SONG:  So I don't
5    agree to that -- that bullet point.
6         Q.    Now, you said that Mr. Kim
7    said not to -- to stop two times.
8    Did he say it in English?
9              MS. SONG:  (Translates
10   into Korean)
11        A.    (Witness speaks in Korean)
12             MS. SONG:  No, he did that
13   in Korean.
14        A.    (Witness speaks in Korean)
15             MS. SONG:  Through the
16   interpreter.
17        Q.    Did you tell Mr. Cyrus
18   that Mr. Kim had said, stop?
19             MS. SONG:  (Translates
20   into Korean)
21        A.    (Witness speaks in Korean)
22             MS. SONG:  That was not
23   necessary because --
```

Page 178

```
1        A.    (Witness speaks in Korean)
2             MS. SONG: -- because
3    interpreter said that, just that.
4        Q.    Now, you had a phone
5    conversation with Mr. Cyrus, didn't
6    you?
7             MS. SONG: (Translates
8    into Korean)
9             MR. BOSTICK: Object to --
10            MS. SONG: (Translates
11   into Korean)
12            MR. BOSTICK: Object to
13   foundation.
14       A.    (Witness speaks in Korean)
15            MS. SONG: When? What
16   time?
17       Q.    In October --
18            MS. SONG: (Translates
19   into Korean)
20       Q.    -- where Mr. Cyrus
21   discussed with you the incidents of
22   this meeting and asked you if you
23   were afraid that you were going to
```

Page 179

```
1    be -- going to lose your job.
2             MS. SONG: (Translates
3    into Korean)
4        A.    (Witness speaks in Korean)
5             MS. SONG: When are we
6    talking about? What time line?
7        Q.    It would be -- the date
8    would be --
9             MS. SONG: (Translates
10   into Korean)
11       Q.    -- October 24th.
12            MS. SONG: (Translates
13   into Korean)
14       A.    (Witness speaks in Korean)
15            MS. SONG: So let's go
16   back. On October 24th what
17   happened?
18       Q.    Mr. Cyrus --
19            MS. SONG: (Translates
20   into Korean)
21       Q.    -- spoke with you --
22            MS. SONG: (Translates
23   into Korean)
```

Page 180

```
1        Q.    -- didn't he?
2             MS. SONG: (Translates
3    into Korean)
4        A.    (Witness speaks in Korean)
5             MS. SONG: I don't
6    remember in detail as to --
7        A.    (Witness speaks in Korean)
8             MS. SONG: -- to when.
9    But I do remember quite a bit of
10   time had passed by and then I
11   received a call from him, yes.
12       Q.    And in that telephone
13   call --
14            MS. SONG: (Translates
15   into Korean)
16       Q.    -- Mr. Cyrus spoke with
17   you --
18            MS. SONG: (Translates
19   into Korean)
20       Q.    -- and asked you --
21            MS. SONG: (Translates
22   into Korean)
23       Q.    -- if you were afraid that
```

Page 181

```
1    --
2             MS. SONG: (Translates
3    into Korean)
4        Q.    -- you were going to lose
5    your job --
6             MS. SONG: (Translates
7    into Korean)
8        Q.    -- didn't he?
9             MS. SONG: (Translates
10   into Korean)
11       A.    (Witness speaks in Korean)
12            MS. SONG: You mean Rob
13   asked me that?
14       Q.    Yes.
15            MS. SONG: (Translates
16   into Korean)
17       A.    (Witness speaks in Korean)
18            MS. SONG: I don't
19   remember but --
20       A.    (Witness speaks in Korean)
21            MS. SONG: I don't
22   remember.
23       A.    (Witness speaks in Korean)
```

Page 182

1        MS. SONG: I do -- I do
2  agree that we had a phone
3  conversation.
4        A.    (Witness speaks in Korean)
5        MS. SONG: But I don't
6  remember if that was part of our
7  conversation.
8        Q.    Well, have you seen the
9  transcript of your conversation?
10       MS. SONG: (Translates
11 into Korean)
12       A.    (Witness speaks in Korean)
13       MS. SONG: No.
14       Q.    Have you listened to the
15 tape recording of your
16 conversation?
17       MS. SONG: (Translates
18 into Korean)
19       A.    (Witness speaks in Korean)
20       MS. SONG: How did we
21 record the phone conversation?
22       Q.    Well, I'm just asking you,
23 have you heard the conversation on

Page 183

1  the tape recorder?
2        MS. SONG: (Translates
3  into Korean)
4        A.    (Witness speaks in Korean)
5        MS. SONG: No, I did not.
6        Q.    Do you recall telling Mr.
7  Cyrus that --
8        MS. SONG: (Translates
9  into Korean)
10       Q.    -- that you were not
11 afraid of Mr. Kim's causing you to
12 lose your job because you had a
13 different boss?
14       MS. SONG: (Translates
15 into Korean)
16       A.    (Witness speaks in Korean)
17       MS. SONG: I probably had
18 said that.
19       Q.    And who is the different
20 boss that you were referring to?
1        MS. SONG: (Translates
22 into Korean)
23       A.    (Witness speaks in Korean)

Page 184

1        MS. SONG: H.I. Kim
2  belonged to the production line.
3        A.    (Witness speaks in Korean)
4        MS. SONG: And I was in
5  the line of purchasing.
6        A.    (Witness speaks in Korean)
7        MS. SONG: So these are
8  two separate organizations.
9        A.    (Witness speaks in Korean)
10       MS. SONG: So --
11       A.    (Witness speaks in Korean)
12       MS. SONG: And I didn't do
13 anything wrong to Mr. H.I. Kim.
14       A.    (Witness speaks in Korean)
15       MS. SONG: How can he --
16       A.    (Witness speaks in Korean)
17       MS. SONG: How can he fire
18 me?
19       Q.    So you're saying that your
20 boss -- when you said that you had
21 a different boss, was someone at
22 HMMA?
23       MS. SONG: (Translates

Page 185

1  into Korean)
2        A.    (Witness speaks in Korean)
3        MS. SONG: Yes.
4        Q.    So you weren't referring
5  to someone who was controlled by
6  the head office?
7        MS. SONG: (Translates
8  into Korean)
9        A.    (Witness speaks in Korean)
10       MS. SONG: No, that's not
11 it.
12       Q.    So you didn't tell Mr.
13 Cyrus that the reason you didn't
14 mind Mr. Kim's opinion was because
15 your boss was controlled by someone
16 in the head office?
17       MS. SONG: (Translates
18 into Korean)
19       A.    (Witness speaks in Korean)
20       MS. SONG: Could you
21 repeat the question?
22       Q.    Yes. So you didn't tell
23 Mr. Cyrus --

Page 186

```
 1          MS. SONG: (Translates
 2  into Korean)
 3      Q.    -- that the reason you
 4  didn't mind Mr. Kim's opinion was
 5  because your boss was controlled by
 6  the head office?
 7          MS. SONG: (Translates
 8  into Korean)
 9      A.    (Witness speaks in Korean)
10          MS. SONG: I didn't say
11  that.
12      A.    (Witness speaks in Korean)
13          MS. SONG: But my boss was
14  Mr. Huan?
15      A.    (Witness speaks in Korean)
16          MS. SONG: And in
17  addition, if I did something wrong
18  that we need to look into what was
19  wrong.
20      A.    (Witness speaks in Korean)
21          MS. SONG: But --
22      A.    (Witness speaks in Korean)
23          MS. SONG: But when Mr.
```

Page 187

```
 1  Kim said --
 2      A.    (Witness speaks in Korean)
 3          MS. SONG: -- quit or be
 4  upset with me, I didn't do anything
 5  wrong. There is no reason for him
 6  to get upset with me for.
 7      Q.    Well, you said he scolded
 8  you for twenty minutes.
 9          MS. SONG: (Translates
10  into Korean)
11      A.    (Witness speaks in Korean)
12          MS. SONG: When he was
13  scolding I wasn't the target.
14      A.    (Witness speaks in Korean)
15          MS. SONG: Put it's just
16  that the purchasing department was
17  siding with the --
18      A.    (Witness speaks in Korean)
19          MS. SONG: -- supplier
20  side --
`1      A.    (Witness speaks in Korean)
22          MS. SONG: -- to the
23  extent that --
```

Page 188

```
 1      A.    (Witness speaks in Korean)
 2          MS. SONG: -- that he just
 3  said, don't do that.
 4      A.    (Witness speaks in Korean)
 5          MS. SONG: He was not
 6  aiming me when he said that.
 7      Q.    Well, if he wasn't aiming
 8  you why did you beg his
 9  forgiveness?
10          MS. SONG: (Translates
11  into Korean)
12      A.    (Witness speaks in Korean)
13          MS. SONG: In Korea --
14      A.    (Witness speaks in Korean)
15          MS. SONG: -- when you
16  have to deal with --
17      A.    (Witness speaks in Korean)
18          MS. SONG: -- somebody who
19  is senior to you, even it's totally
20  irrelevant to --
21      A.    (Witness speaks in Korean)
22          MS. SONG: -- me, we say,
23  oh, please don't be upset. That's
```

Page 189

```
 1  a customary thing.
 2      Q.    Did you tell Mr. Cyrus
 3  that he should say that?
 4          MS. SONG: (Translates
 5  into Korean)
 6      A.    (Witness speaks in Korean)
 7          MS. SONG: No.
 8      Q.    Why not?
 9          MS. SONG: (Translates
10  into Korean)
11      A.    (Witness speaks in Korean)
12          MS. SONG: Why should I?
13  Why should I say that?
14      Q.    Well, he was your
15  colleague, wasn't he?
16          MS. SONG: (Translates
17  into Korean)
18      A.    (Witness speaks in Korean)
19          MS. SONG: Well, after Mr.
20  Kim had called out Rob, Rob twice
21  he left. So I couldn't see him
22  anymore.
23      A.    (Witness speaks in Korean)
```

48 (Pages 186 to 189)

Page 190

```
1          MS. SONG:  And then he
2   came back in and then I followed
3   him upstairs.
4     Q.    Did you follow him or did
5   he tell you to go upstairs?
6          MS. SONG:  (Translates
7   into Korean)
8     A.    (Witness speaks in Korean)
9          MS. SONG:  He told me to
10  come with him.
11    Q.    Now, when you -- I want to
12  make sure that I understand.  You're
13  saying that --
14         MS. SONG:  (Translates
15  into Korean)
16    Q.    You never told Mr. Cyrus
17  that you didn't mind Mr. Kim's
18  opinion because your boss was
19  controlled by the head office?
20         MS. SONG:  (Translates
21  into Korean)
22    A.    (Witness speaks in Korean)
23         MS. SONG:  I don't
```

Page 191

```
1   remember.
2     Q.    And just so I'm clear,
3   where is the head office?
4          MS. SONG:  (Translates
5   into Korean)
6     A.    (Witness speaks in Korean)
7          MS. SONG:  In Seoul,
8   Korea.
9     Q.    And who is the boss who is
10  controlled by the head office?
11         MS. SONG:  (Translates
12  into Korean)
13    A.    (Witness speaks in Korean)
14         MS. SONG:  At that time?
15    Q.    Yes.
16         MS. SONG:  (Translates
17  into Korean)
18    A.    (Witness speaks in Korean)
19         MS. SONG:  Jae Hong Kim,
20  vice president.
1     A.    (Witness speaks in Korean)
22         MS. SONG:  Seung Hwan Ko,
23  general manager.
```

Page 192

```
1     Q.    Did you ever hear during
2   the meeting Mr. Kim say that the
3   repair that was being performed by
4   HMMA on the buffing marks should be
5   charged to Murakami?
6          MS. SONG:  (Translates
7   into Korean)
8     A.    (Witness speaks in Korean)
9          MS. SONG:  I don't
10  remember.
11    Q.    Do you recall Mr. Kim
12  saying that the meeting was to
13  discuss the fundamental and
14  systemic quality issues?
15         MS. SONG:  (Translates
16  into Korean)
17    A.    (Witness speaks in Korean)
18         MS. SONG:  I don't
19  remember.
20    A.    (Witness speaks in Korean)
21         MS. SONG:  It's been over
22  two years and --
23    A.    (Witness speaks in Korean)
```

Page 193

```
1          MS. SONG:  And at that
2   time I had been there only one
3   month.
4     A.    (Witness speaks in Korean)
5          MS. SONG:  And everything
6   seemed still strange to me at that
7   time.
8     A.    (Witness speaks in Korean)
9          MS. SONG:  I can't recall
10  all the little detail by detail.
11    Q.    Did you ever hear Mr. Rob
12  Cyrus saying that the accurate
13  downtime was the main or root issue
14  to be discussed?
15         MS. SONG:  (Translates
16  into Korean)
17    A.    (Witness speaks in Korean)
18         MS. SONG:  I don't
19  remember.
20    Q.    That was the issue listed
21  on the agenda, wasn't it?
22         MS. SONG:  (Translates
23  into Korean)
```

Page 194

```
1           MR. BOSTICK: Objection.
2    Asked and answered.
3       Q.    You can answer.
4           MS. SONG: (Translates
5    into Korean)
6           MR. BOSTICK: This is the
7    last time about what --
8           MS. SONG: (Translates
9    into Korean)
10          MR. BOSTICK: -- the
11   agenda says.
12          MS. SONG: (Translates
13   into Korean)
14          MR. BOSTICK: I mean,
15   that's like the eighth time.
16      Q.    He can answer.
17          MS. SONG: (Translates
18   into Korean)
19      A.    (Witness speaks in Korean)
20          MS. SONG: Could you
21   repeat the question?
22      Q.    The issue listed on the
23   agenda --
```

Page 196

```
1    meeting.
2           MS. SONG: (Translates
3    into Korean)
4       A.    (Witness speaks in Korean)
5           MS. SONG: Which memo
6    about the meeting?
7       Q.    Well, you wrote this
8    Exhibit Number One --
9           MS. SONG: (Translates
10   into Korean)
11      A.    (Witness speaks in Korean)
12          MS. SONG: This one
13   (indicating)?
14      Q.    Yes.
15          MS. SONG: (Translates
16   into Korean)
17      A.    (Witness speaks in Korean)
18          MS. SONG: What about this
19   one?
20      Q.    Did you discuss with
21   anyone else that they were asked to
22   write minutes?
23          MS. SONG: (Translates
```

Page 195

```
1           MS. SONG: (Translates
2    into Korean)
3       Q.    -- is downtime?
4           MS. SONG: (Translates
5    into Korean)
6       A.    (Witness speaks in Korean)
7           MS. SONG: Yes.
8       Q.    Did Mr. Kim tell you that
9    he was going to make notes or
10   report about the meeting?
11          MS. SONG: (Translates
12   into Korean)
13      A.    (Witness speaks in Korean)
14          MS. SONG: No.
15      Q.    Did you discuss with
16   anyone else the writing of notes?
17          MS. SONG: (Translates
18   into Korean)
19          MR. BOSTICK: Object to
20   the form.
`1      A.    (Witness speaks in Korean)
22          MS. SONG: Which memo?
23      Q.    Writing of notes about the
```

Page 197

```
1    into Korean)
2       A.    (Witness speaks in Korean)
3           MR. RAYMOND KIM: No.
4    (Speaks in Korean)
5       A.    (Witness speaks in Korean)
6           MS. SONG: No.
7       A.    (Witness speaks in Korean)
8           MS. SONG: I just -- I
9    heard it, just me.
10      A.    (Witness speaks in Korean)
11          MS. SONG: Through Mr.
12   Hyung, vice president Joo Soo Ahn
13   told me to write a memo on the
14   meeting.
15      Q.    Did you ever discuss with
16   Rob Cyrus --
17          MS. SONG: (Translates
18   into Korean)
19      Q.    -- that he had been asked
20   to write a report about the
21   meeting?
22          MS. SONG: (Translates
23   into Korean)
```

Page 198

```
 1      A.   (Witness speaks in Korean)
 2           MS. SONG: I don't
 3  remember.
 4      Q.   Did you ever discuss with
 5  Mr. Jason Chi whether he had been
 6  asked to write minutes about the
 7  meeting?
 8           MS. SONG: (Translates
 9  into Korean)
10      A.   (Witness speaks in Korean)
11           MS. SONG: No.
12      A.   (Witness speaks in Korean)
13           MS. SONG: No, I didn't
14  hear anything.
15      A.   (Witness speaks in Korean)
16           MS. SONG: I just know
17  what I was ordered to do.
18      A.   (Witness speaks in Korean)
19           MS. SONG: So I wrote mine
20  up and then I delivered it.
21      Q.   And who did you deliver it
22  to?
23           MS. SONG: (Translates
```

Page 200

```
 1  HMMA then he is CEO.
 2      Q.   So he has a position in
 3  HMC as a vice president but in HMMA
 4  he's president; is that correct?
 5           MS. SONG: (Translates
 6  into Korean)
 7      A.   (Witness speaks in Korean)
 8           MS. SONG: Yes.
 9      Q.   And do you understand that
10  Mr. Kim is a vice president of
11  HMMA?
12           MS. SONG: (Translates
13  into Korean)
14      A.   (Witness speaks in Korean)
15           MS. SONG: All I know is I
16  know him as COO.
17      Q.   And what is his position
18  in HMC?
19           MS. SONG: (Translates
20  into Korean)
21      A.   (Witness speaks in Korean)
22           MS. SONG: I don't know
23  what that means.
```

Page 199

```
 1  into Korean)
 2      A.   (Witness speaks in Korean)
 3           MS. SONG: To the vice
 4  president. I hand-delivered it
 5  myself oto the vice president Mr.
 6  Ahn.
 7      Q.   And that would be Mr. Ahn?
 8           MS. SONG: (Translates
 9  into Korean)
10      A.   (Witness speaks in Korean)
11           MS. SONG: Mr. Ahn. Yes,
12  J.S. Ahn.
13           MR. CYRUS: He's
14  president, not the vice president.
15      Q.   Is he the president or the
16  vice president?
17           MS. SONG: (Translates
18  into Korean)
19      A.   (Witness speaks in Korean)
20           MS. SONG: His title seen
21  from Korea is vice president.
22      A.   (Witness speaks in Korean)
23           MS. SONG: But seen from
```

Page 201

```
 1      A.   Senior director.
 2           MS. SONG: Senior director
 3  perhaps.
 4           MR. STOCKHAM: Just a
 5  minute. We may be through.
 6           (Whereupon, a brief
 7           recess was taken in
 8           the deposition.)
 9           (Whereupon, an
10           off-the-record
11           discussion was held.)
12           MR. RAYMOND KIM: Are you
13  done?
14           MR. STOCKHAM: Done, done,
15  done.
16
17      FURTHER THE DEPONENT SAITH NOT
18
19
20
21
22
23
```

Page 202

```
 1        C E R T I F I C A T E
 2
 3   STATE OF ALABAMA    )
 4   JEFFERSON COUNTY    )
 5
 6        I hereby certify that the above
 7   and foregoing deposition was taken
 8   down by me in stenotype, and the
 9   questions and answers thereto were
10   reduced to typewriting under my
11   supervision, and that the foregoing
12   represents a true and correct
13   transcript of the deposition given
14   by said witness upon said hearing.
15        I further certify that I am
16   neither of counsel nor kin to the
17   parties to the action, nor am I in
18   anywise interested in the result of
19   said cause.
20
21        _____
22        Sandra Peebles Daniel
23        Commissioner
```

Page 204

```
 1   According to the Rules of Civil
 2   Procedure, you will have thirty
 3   (30) days from the date you receive
 4   this deposition in which to read,
 5   sign, and return your deposition to
 6   the above office.  If you fail to
 7   do so, you automatically waive your
 8   right to make any corrections to
 9   your deposition.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 203

```
 1      INSTRUCTIONS TO THE WITNESS
 2        Please read your deposition
 3   over carefully before you sign it.
 4   You should make all your changes to
 5   the attached errata sheet.  Please
 6   do not mark on the original
 7   deposition.
 8
 9        After making any changes which
10   you have noted on the attached
11   errata sheet, sign your name on the
12   errata sheet and date it, then sign
13   your deposition at the end of your
14   testimony in the space provided.
15   You are signing it subject to the
16   changes you have made on the errata
17   sheet, which will be attached to
18   the deposition.
19
20        Return the original errata
21   sheet and transcript to Daniel
22   Court Reporting, 1310 32nd Street
23   South, Birmingham, Alabama, 35202.
```

Page 205

```
 1       SIGNATURE PAGE OF
 2          J. Y. CHOI
 3
 4        I hereby do acknowledge that I
 5   have read the foregoing deposition
 6   and that the same is a true and
 7   correct transcription of the
 8   answers given by me to the
 9   questions propounded, except for
10   the changes, if any, noted on the
11   attached errata sheet.
12
13
14   WITNESS: _____
15
16   DATE: _____
17
18
19
20
21
22
23
```

52 (Pages 202 to 205)

Page 206

```
 1   PAGE   LINE      EXPLANATION
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20   _____
21        J. Y. Choi
22   _____
23        DATE
```

#10

구매 최정연 부장

9/16 무라카미 회의시 발생상황

1. 일자 : 9/16 10:00 ~

2. 회의상황

1) 회의초기 9/1~9/13 사이 발생된 업체별 품질문제 현황에 대한 HMMA QC측의 사전 설명있었음.

2) 무라카미의 첫번째로 발표로 회의가 진행 시작함

3) 무라카미는 BUFF & BAG MARK에 대한 개선 대책과 현재 사용중인 NF 납품용기 문제점 개선대책발표

   -현재 사용중인 용기 SMPL과 타사 납품용기차이점을 사진을 가지고 설명

   -CM부터는 PALLET 형태의 용기 사용을 금일 아침 글로비스에서 용기 관련 사항을 사전 협의하였음 보고

4) 업체 발표 도중 ROB CYRUS가 업체로 반송된 불량중 현재 글로비스가 사용중인 포크리프터의 전복으로 손상된 부품도 있다며 업체가 제시한 사진으로 이의 제기하였음.

5) 이에, 강이사님이 통역을 통해 금일 회의 주제에 벗어나는 사항은 언급치 말라고 첫번째 지시함.

6) 강이사님이 무라카미에 몇년동안 이러를 만들었는지(60년 공급이력), 공급업체가 어디인지(토요타/누미/니산) 추가 질문하심.

7) 도장 CURING TIME 늘려야 되는것을 이제 알았느냐? 포장장소의 밝기가 1000LUX->2500LUX로 늘리는 것을 왜 이제야 하느냐?

9) 타사에는 양품을 공급하고 HMMA는 현대라서 불량품을 납품해도 된다는 생각을 버려라라고 추가로 야단치심.

9) 이에 ROB SYRUS가 금주 화요일 발생된 불량 때문에 200분의 LILE정지 CLAIM이 업체로 청구되었고 주 문제는 BUFF MARK가 아닌

   SCRATCH 문제라며 글로비스의 HANDL'G 과정상의 문제점과 글로비스에 있는 QLS라는 용역사의 문제점을 제기함

10) 강이사님이 글로비스 최진호부장을 호출하시면서 본건은 회의 주제와 관련이 없으니 별도 실무 회의를 하라고 2차 지시함

11) 본 회의는 품질문제 관련 회의이나 더 이상 무라카미의 SCRATCH 문제는 본회의에서 재기하지 말라고 다시 지시하셨습니다

12) 그럼에도 ROB CYRUS가 불량 고품을 접수받은 업체에게 수요일날 연락해서 금요일 회의에 참석하라고 하는건 문제가 있다고

    이의 제기하였고, 최정연부장이 서양수부장에게 차기 회의부터는 사전 안건조율/업체와 합의를 통해 회의가 진행될 수 있도록 요청함

13) 그럼에도 불구하고 ROB CYRUS 가 계속 문제 제기를 하며 HMMA의 미국인 생산안당자들과 논박을 계속함.

14) 그순간 무라카미 영업 직원이 O/S MIRROR를 양손으로 들고 치면서 SCRATCH를 냄. 문제는 SCRATCH이라 하로 인하여 무라카미는

    많은 손해를 보고 있고, SCRATCH는 글로비스와 HMMA 내부 HANDL'G 과정상에서도 발생할 수도 있으며

    금일 아침에 본인들이 글로비스에서 확인해본 결과 투입전 제품이 포개진 상태로 적재 되어 있었고, 이에 대한 수차례 개선요청

    글로비스 현지직원에게 요청하였으며, 무라카미 직원이 2주간 상주하면서 QLS 직원을 교육을 시켰으나

    일용직원에 따라 인원 변동및 QLS 외에는 타 용역업체를 글로비스에서 접수받는 관계로 문제가 많다고 불만을 제기하였음

15) 추가로 무라카미 품질 직원이 어제 HMMA로부터 반송된 제품 280개중 89%가 자신들 검사결과 양품이고 나머지 11%는

    SCRATCH에 의한 불량이라고 격한 행동으로 항의함

    1에 강희의 이사님이 "ROB" 이름을 큰소리로 부르다가 "최부장, 내가 품질문제 본론에서 벗어나는 안건을 나중에 별도 협의하려

    고 했잖아~" 라고 화을 내시면서 차기 회의는 품질본부에서 주관해서 업무회의를 하라고 하시고는 회의장을 나가셨습니다

0252

17) 이후 약 2분위에 다시 회의실로 들어오셔서 "구매회장연부장" "품질박성도부장"을 따라오라고 하시여 2층 회의실로 갔습니다

18) 김이사께서는 나는 다시는 품질회의를 하시지 않겠다고 하시고 "PPG GLASS건 문제때도 정치적이라는 이야기를 들었고" "LEAR시트 문제 회의후에도 항의성 편지가 오고" "금일 우라까마 회의때도 업체가 반발"하는데 이렇게 해서는 더 이상 회의를 할수 없다

19) 약 20여분간 심한 질책을 듣고 구매회부장이 "용서해 주십시요" "노여움 푸십시요"라고 머리를 조아리고 말씀을 드렸습니다.

**Cyrus, Robert C HMMA/Part Development**

| | |
|---|---|
| **From:** | McClain, Christopher C HMMA/Parts Development |
| **Sent:** | Monday, October 03, 2005 9:50 AM |
| **To:** | Cyrus, Robert C HMMA/Part Development |
| **Subject:** | FW: C.O.O. Meeting Observation |
| **Importance:** | High |

FYI, you were copied too...

## Chris McClain

*Buyer - Parts Development*
**Hyundai Motor Manufacturing Alabama, LLC**
PHONE: (334) 387-8172
FAX:    (334) 387-8298
Email: chrismcclain@hmmausa.com
www.hmmausa.com

 



*WARNING:*
*The information contained in this communication is confidential, may be Hyundai-Supplier priviledged, and is intended only for the addressee. Unauthorized use, disclosure, or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you receive this communication in error, please notify us immediately by return e-mail or by calling the number above, and destroy this communication and all copies therof, including all attachments.*

----Original Message----
**From:** McClain, Christopher C HMMA/Parts Development
**Sent:** Friday, September 16, 2005 3:27 PM
**To:** Choi, Jung Yun HMMA/Parts Development
**Cc:** Cyrus, Robert C HMMA/Part Development
**Subject:** C.O.O. Meeting Observation

Hello Mr. Choi...below is a summary of what I observed in the meeting this morning.

> Our mirror supplier, Murakami was called in and asked to do a short presentation regarding an issue that occurred earlier this week
> Murakami had not received the parts in question to do root cause analysis and requested that they be allowed to attend next Friday's meeting
> In an effort to comply with HMMA's request, the supplier's quality general manager, sales general manager and VP of manufacturing re-arranged their schedules to attend this meeting
> After beginning the presentation, it became clear that Murakmi would not be allowed to address the real cause of the rejected parts although they were listed on HMMA's agenda
> Murakmi personnel became upset that after driving 8 hours to be here, they were not being allowed to speak
> Parts development staff attempted to explain the supplier's position, they were told that the meeting was not the place to discuss these issues.
> The suppliers point of view is that if they were not to speak, there was not reason for them to come to HMMA on such short notice
> Staff from other departments made negative non-factual comments about the supplier's parts...again, purchasing staff intervened in an attempt to stick to facts and be fair.
> Neither purchasing, nor the supplier denies that there was an issue on a sample of parts, but the real

0373

10/3/2005

consensual root cause was not able to be discussed.

➢  At not time, were purchasing staff disrespectful during the meeting. They were trying to do the right thing by addressing real issues which was supposed to be the reason for having the meeting.

## Chris McClain
Buyer - Parts Development
**Hyundai Motor Manufacturing Alabama, LLC**
PHONE: (334) 387-8172
FAX:    (334) 387-8298
Email: chrismcclain@hmmausa.com
www.hmmausa.com

**HYUNDAI**

WARNING:
*The information contained in this communication is confidential, may be Hyundai-Supplier priviledged, and is intended only for the addressee. Unauthorized use, disclosure, or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you receive this communication in error, please notify us immediately by return e-mail or by calling the number above, and destroy this communication and all copies therof, including all attachments.*

10/3/2005

0374

# Exhibit C

IN THE UNITED STATES DISTRICT COURT FOR

THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

| | | |
|---|---|---|
| ROBERT CYRUS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. |
| | ) | 2:07-cv-144-ID |
| | ) | |
| HYUNDAI MOTOR | ) | |
| MANUFACTURING | ) | |
| OF ALABAMA LLC, | ) | |
| | ) | |
| Defendant. | ) | |

DEPOSITION OF HOEA IL KIM


S T I P U L A T I O N S


IT IS STIPULATED AND AGREED,

by and between the parties through

| Page 2 | |
|---|---|
| 1 | their respective counsel, that the |
| 2 | deposition of HOEA IL KIM may be |
| 3 | taken before Sandra Peebles Daniel, |
| 4 | Commissioner, Notary Public, State |
| 5 | at Large, at the offices of MAYNARD |
| 6 | COOPER & GAYLE, PC, RSA UNION |
| 7 | BUILDING, 100 Union Street, Suite |
| 8 | 650, Montgomery, Alabama, 36104, on |
| 9 | the 29th day of November, 2007, |
| 10 | beginning at approximately 9:30 a.m. |
| 11 | IT IS FURTHER STIPULATED AND |
| 12 | AGREED that the reading of and |
| 13 | signature to the deposition by the |
| 14 | witness is not waived, the |
| 15 | deposition to have the same force |
| 16 | and effect as if full compliance had |
| 17 | been had with all laws and rules of |
| 18 | Court relating to the taking of |
| 19 | depositions. |
| 20 | IT IS FURTHER STIPULATED AND |
| 21 | AGREED that it shall not be |
| 22 | necessary for any objections to be |
| 23 | made by counsel to any questions, |

| Page 3 | |
|---|---|
| 1 | except as to form or leading |
| 2 | questions, and that counsel for the |
| 3 | parties may make objections and |
| 4 | assign grounds at the time of the |
| 5 | trial, or at the time said |
| 6 | deposition is offered in evidence, |
| 7 | or prior thereto. |
| 8 | IT IS FURTHER STIPULATED AND |
| 9 | AGREED that notice of filing of the |
| 10 | deposition by the Commissioner is |
| 11 | waived. |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |

| Page 4 | |
|---|---|
| 1 | INDEX |
| 2 | EXAMINATION BY:          PAGE: |
| 3 | Mr. Stockham .................. 10 |
| 4 | |
| 5 | |
| 6 | |
| 7 | EXHIBITS |
| 8 | FOR THE PLAINTIFF:          PAGE: |
| 9 | Exhibit 1 ..................... 40 |
| 10 | (presentation topics for |
| 11 | week of 9-16-2005) |
| 12 | Exhibit 2 ..................... 50 |
| 13 | (document in Korean) |
| 14 | Exhibit 3 ..................... 60 |
| 15 | (document in Korean) |
| 16 | Exhibit 4 ..................... 208 |
| 17 | (diagram) |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |

| Page 5 | |
|---|---|
| 1 | APPEARANCES |
| 2 | |
| 3 | BEFORE: |
| 4 | Sandra Peebles Daniel, |
| 5 | Commissioner, Notary Public |
| 6 | |
| 7 | FOR THE PLAINTIFF: |
| 8 | Mr. Richard J. Stockham |
| 9 | STOCKHAM, CARROLL & SMITH, P.C. |
| 10 | 2204 Lakeshore Drive |
| 11 | Suite 114 |
| 12 | Birmingham, Alabama  35209 |
| 13 | |
| 14 | FOR THE DEFENDANT: |
| 15 | Mr. Brian R. Bostick |
| 16 | OGLETREE, DEAKINS, NASH, |
| 17 | SMOAK & STEWART, P.C. |
| 18 | One Federal Place |
| 19 | Suite 1000 |
| 20 | 1819 5th Avenue North |
| 21 | Birmingham, Alabama  35203 |
| 22 | |
| 23 | |

Page 6

1  FOR THE DEFENDANT:    (continued)
2  Mr. David Perry
3  MAYNARD COOPER & GAYLE PC
4  1901 6th Avenue North
5  2400 Regions Harbert Plaza
6  Birmingham, Alabama  35203-2618
7
8  Ms. Myung Kim
9  OGLETREE DEAKINS NASH SMOAK &
10  STEWART
11  10 Madison Avenue
12  Suite 402
13  Morristown, New Jersey  07960
14
15  ALSO PRESENT:
16  Hyoun Joo Song (interpreter)
17  Raymond K. Kim (interpreter)
18  In Chul Kim
19  Richard E. Neal
20  Robert Cyrus
21
22
23

Page 7

1      I, Sandra Peebles Daniel, a
2  Court Reporter of Birmingham,
3  Alabama, Notary Public, State at
4  Large, acting as Commissioner,
5  certify that on this date, as
6  provided by Rule 30 of the Alabama
7  Rules of Civil Procedure, and the
8  foregoing stipulation of counsel,
9  there came before me at the offices
10  of MAYNARD COOPER & GAYLE, PC, RSA
11  UNION BUILDING, 100 Union Street,
12  Suite 650, Montgomery, Alabama,
13  36104, on the 29th day of November,
14  2007, at or about 9:30 a.m., HOEA IL
15  KIM, witness in the above cause, for
16  oral examination, whereupon the
17  following proceedings were had:
18
19      THE COURT REPORTER:  Usual
20  stipulations?
21      MR. BOSTICK:  I think he --
22  we may want to contemplate the idea
23  of reading and signing.  How that

Page 8

1  will be done is another question but
2  I'm going to reserve that right.
3
4      HYOUN JOO SONG, interpreter,
5  having first been duly sworn, was
6  examined and testified as follows:
7
8      RAYMOND K. KIM, interpreter,
9  having first been duly sworn, was
10  examined and testified as follows:
11
12.    HOEA IL KIM, witness,
13  having first been duly sworn
14  through Interpreter Song, was
15  examined and testified as follows:
16
17      MR. STOCKHAM:  All right.
18  Before we begin if we would go
19  around and identify all the parties
20  and individuals present.  Rob
21  Cyrus, the plaintiff, is to my
22  left.  I am Richard Stockham.  To
23  my right is Mr. Raymond Kim.  He is

Page 9

1  a translator.
2      MS. SONG:  And then Hyoun
3  Joo Song as an interpreter.
4      MR. BOSTICK:  H.I. Kim
5  with -- HMMA's witness today.
6  Brian Bostick and Myung Kim from
7  Ogletree Deakins.
8      MR. PERRY:  David Perry
9  from Maynard Cooper on behalf of
10  HMA.
11      MR. NEAL:  And Rick Neal,
12  vice president, legal and general
13  counsel for HMMA.
14      MR. I.C. KIM:  I.C. Kim,
15  legal coordinator of HMMA.
16      THE COURT REPORTER: I'm
17  sorry? Legal?
18      MR. I.C. KIM:  Legal
19  coordinator.
20      MR. BOSTICK:  Coordinator.
21      MR. I.C. KIM:
22  Coordinator.
23

Page 10

1    EXAMINATION BY MR. STOCKHAM:
2        Q.    (By Mr. Stockham)  State
3    your name for the record, please,
4    sir.
5            MS. SONG:  (Translates
6    into Korean)
7        A.    (Witness speaks in Korean)
8            MS. SONG:  Hoea Il Kim.
9        Q.    Mr. Kim, have you ever
10   given a deposition?
11           MS. SONG:  (Translates
12   into Korean)
13       A.    (Witness speaks in Korean)
14           MS. SONG:  I don't
15   understand -- I don't know the
16   meaning of, deposition.
17       Q.    Have you ever given sworn
18   testimony?
19           MS. SONG:  (Translates
20   into Korean)
21       A.    (Witness speaks in Korean)
22           MS. SONG:  This is my
23   first time.

Page 11

1        Q.    The rules of the
2    deposition.
3            MS. SONG:  (Translates
4    into Korean)
5        Q.    I will ask you a question.
6            MS. SONG:  (Translates
7    into Korean)
8        Q.    If you don't understand
9    the question --
10           MS. SONG:  (Translates
11   into Korean)
12       Q.    -- let me know and I'll
13   rephrase it.
14           MS. SONG:  (Translates
15   into Korean)
16       Q.    Otherwise --
17           MS. SONG:  (Translates
18   into Korean)
19       Q.    -- your answer will be
20   assumed to be correct.
21           MS. SONG:  (Translates
22   into Korean)
23       Q.    Okay?

Page 12

1        A.    (Witness speaks in Korean)
2            MS. SONG:  Yes.
3        Q.    Do you speak English?
4            MS. SONG:  (Translates
5    into Korean)
6        A.    (Witness speaks in Korean)
7            MS. SONG:  Not very well.
8        Q.    Can you understand me?
9            MS. SONG:  (Translates
10   into Korean)
11       A.    (Witness speaks in Korean)
12           MS. SONG:  No.
13       Q.    Tell me your -- I want to
14   ask some background information.
15           MS. SONG:  (Translates
16   into Korean)
17       Q.    Are you on any medication
18   today?
19           MS. SONG:  (Translates
20   into Korean)
21       A.    (Witness speaks in Korean)
22           MS. SONG:  No.
23       Q.    Have you ever been

Page 13

1    arrested?
2            MS. SONG:  (Translates
3    into Korean)
4        A.    (Witness speaks in Korean)
5            MS. SONG:  No.
6        Q.    Have you ever pled guilty
7    to a crime?
8            MS. SONG:  (Translates
9    into Korean)
10       A.    (Witness speaks in Korean)
11           MS. SONG:  No.
12       Q.    Have you reviewed anything
13   in preparation for your deposition
14   today?
15           MS. SONG:  (Translates
16   into Korean)
17       A.    (Witness speaks in Korean)
18           MS. SONG:  No.
19       Q.    Have you talked to anyone
20   other than your lawyer in
21   preparation for the deposition
22   today?
23           MS. SONG:  (Translates

Page 14

```
 1   into Korean)
 2      A.    (Witness speaks in Korean)
 3            MS. SONG:  No.
 4      Q.    Where do you live?
 5            MS. SONG:  (Translates
 6   into Korean)
 7      A.    (Witness speaks in Korean)
 8            MS. SONG:  Are you asking
 9   my current address or are you
10   asking -- I'm not understanding you
11   correctly.  I'm not sure if you're
12   asking for my current home address .
13   or the company address.
14      Q.    Home address.
15            MS. SONG:  (Translates
16   into Korean)
17      A.    (Witness speaks in Korean)
18            MS. SONG:  I live within
19   Montgomery city.
20      Q.    How long have you lived
21   there?
22            MS. SONG:  (Translates
23   into Korean)
```

Page 15

```
 1      A.    (Witness speaks in Korean)
 2            MS. SONG:  Around two
 3   years and two months.
 4      Q.    Do you live in a house or
 5   apartment?
 6            MS. SONG:  (Translates
 7   into Korean)
 8      A.    (Witness speaks in Korean)
 9            MS. SONG:  I don't know.
10   When you say, house, I'm not sure
11   if you're asking a residential
12   house or an apartment.  I'm not
13   sure what you're referring to.
14      Q.    Do you live in an
15   apartment?
16            MS. SONG:  (Translates
17   into Korean)
18      A.    (Witness speaks in Korean)
19            MS. SONG:  No.
20      Q.    Do you live in a
21   condominium?
22            MS. SONG:  (Translates
23   into Korean)
```

Page 16

```
 1      A.    (Witness speaks in Korean)
 2            MS. SONG:  No.
 3      Q.    Do you live in a house?
 4            MS. SONG:  (Translates
 5   into Korean)
 6      A.    (Witness speaks in Korean)
 7            MS. SONG:  When you say,
 8   house, do you refer to single
 9   family house?
10      Q.    Yes.
11            MS. SONG:  (Translates
12   into Korean)
13      A.    (Witness speaks in Korean)
14            MS. SONG:  Yes.
15      Q.    Do you live alone?
16            MS. SONG:  (Translates
17   into Korean)
18      A.    (Witness speaks in Korean)
19            MS. SONG:  I have my
20   family who lives with me.
21      Q.    Who?
22            MS. SONG:  (Translates
23   into Korean)
```

Page 17

```
 1      A.    (Witness speaks in Korean)
 2            MS. SONG:  My wife and my
 3   son.
 4      Q.    How old is his son?
 5            MS. SONG:  (Translates
 6   into Korean)
 7      A.    (Witness speaks in Korean)
 8            MS. SONG:  It would be
 9   thirteen years old.
10      Q.    Is he in school?
11            MS. SONG:  (Translates
12   into Korean)
13      A.    (Witness speaks in Korean)
14            MS. SONG:  Yes.
15      Q.    Where?
16            MS. SONG:  (Translates
17   into Korean)
18      A.    (Witness speaks in Korean)
19            MS. SONG:  Montgomery
20   Academy.
21      Q.    Does his -- does your wife
22   work?
23            MS. SONG:  (Translates
```

Page 18

```
 1    into Korean)
 2         A.    (Witness speaks in Korean)
 3              MS. SONG:  No.
 4         Q.    I want to ask you about
 5    your education.
 6              MS. SONG:  (Translates
 7    into Korean)
 8         Q.    Do you have a degree from
 9    a university?
10              MS. SONG:  (Translates
11    into Korean)
12         A.    (Witness speaks in Korean)
13              MS. SONG:  Yes.
14         Q.    Where?
15              MS. SONG:  (Translates
16    into Korean)
17         A.    (Witness speaks in Korean)
18              MS. SONG:  In Korea.
19         Q.    Which university?
20              MS. SONG:  (Translates
21    into Korean)
22         A.    (Witness speaks in Korean)
23              MS. SONG:  Ulsan
```

Page 19

```
 1    University.
 2         Q.    Where is that?
 3              MS. SONG:  (Translates
 4    into Korean)
 5         A.    (Witness speaks in Korean)
 6              MS. SONG:  In Ulsan.
 7         Q.    What degree?
 8              MS. SONG:  (Translates
 9    into Korean)
10         A.    (Witness speaks in Korean)
11              MS. SONG:  In metal
12    engineering.
13         Q.    When did you get it?
14              MS. SONG:  (Translates
15    into Korean)
16         A.    (Witness speaks in Korean)
17              MS. SONG:  1978, in March.
18         Q.    Do you have any
19    post-graduate degree?
20              MS. SONG:  (Translates
21    into Korean)
22         A.    (Witness speaks in Korean)
23              MS. SONG:  No.
```

Page 20

```
 1         Q.    How old are you?
 2              MS. SONG:  (Translates
 3    into Korean)
 4         A.    (Witness speaks in Korean)
 5              MS. SONG:  Fifty-four.
 6         Q.    Do you have any English
 7    education?
 8              MS. SONG:  (Translates
 9    into Korean)
10         A.    (Witness speaks in Korean)
11              MS. SONG:  I don't
12    understand your question.
13         Q.    Did you go to school to
14    learn English?
15              MS. SONG:  (Translates
16    into Korean)
17         A.    (Witness speaks in Korean)
18              MS. SONG:  Yes.
19         Q.    When?
20              MS. SONG:  (Translates
21    into Korean)
22         A.    (Witness speaks in Korean)
23              MS. SONG:  In middle
```

Page 21

```
 1    school and high school.
 2         Q.    Did you have any special
 3    education in English after college?
 4              MS. SONG:  (Translates
 5    into Korean)
 6         A.    (Witness speaks in Korean)
 7              MS. SONG:  No.
 8         Q.    Before you came to
 9    Montgomery have you ever lived in
10    the United Stats?
11              MS. SONG:  (Translates
12    into Korean)
13         A.    (Witness speaks in Korean)
14              MS. SONG:  Are you
15    referring --
16         A.    (Witness speaks in Korean)
17              MS. SONG:  What do you
18    mean when you say, elsewhere in the
19    United States?
20         Q.    Anywhere.
21         A.    (Witness speaks in Korean)
22              MS. SONG:  (Translates
23    into Korean)
```

Page 22

```
 1      A.    (Witness speaks in Korean)
 2           MS. SONG:  I was in Korea
 3  before.
 4      Q.    You've never lived
 5  anywhere in the United States
 6  before coming to Montgomery,
 7  Alabama?
 8           MS. SONG:  (Translates
 9  into Korean)
10      A.    (Witness speaks in Korean)
11           MS. SONG:  Yes, that's
12  right.
13      Q.    When you came to
14  Montgomery, Alabama do you remember
15  the date?
16           MS. SONG:  (Translates
17  into Korean)
18      A.    (Witness speaks in Korean)
19           MS. SONG:  May 31st of
20  2005.
21      Q.    What position did you come
22  to Montgomery, Alabama in?
23           MS. SONG:  (Translates
```

Page 23

```
 1  into Korean)
 2      A.    (Witness speaks in Korean)
 3           MS. SONG:  Chief operating
 4  officer.
 5      Q.    Chief operating officer of
 6  what company?
 7           MS. SONG:  (Translates
 8  into Korean)
 9           MR. BOSTICK:  Can we go
10  off the record?
11           MR. STOCKHAM:  Sure.
12           (Whereupon, an
13            off-the-record
14            discussion was held.)
15      Q.    (By Mr. Stockham)  Head of
16  factory of what company?
17           MS. SONG:  (Translates
18  into Korean)
19      A.    (Witness speaks in Korean)
20           MS. SONG:  Hyundai Motor
21  America.
22      Q.    Who was your boss?
23           MS. SONG:  (Translates
```

Page 24

```
 1  into Korean)
 2      A.    (Witness speaks in Korean)
 3           MS. SONG:  Joo Soo Ahn.
 4      A.    (Witness speaks in Korean)
 5           MS. SONG:  President.
 6      Q.    Before you came to
 7  Montgomery where did you work?
 8           MS. SONG:  (Translates
 9  into Korean)
10      A.    (Witness speaks in Korean)
11           MS. SONG:  Hyundai Motor
12  factory in Asan factory.
13      A.    (Witness speaks in Korean)
14           MS. SONG:  In Korea.
15      Q.    Where is that?  What town
16  is that located in?
17           MS. SONG:  (Translates
18  into Korean)
19      A.    (Witness speaks in Korean)
20           MS. SONG:  In province of
21  South Chungcheong, in city of Asan.
22  Perhaps county of Inchu.
23      Q.    In what position were you
```

Page 25

```
 1  working before you came to
 2  Montgomery?
 3           MS. SONG:  (Translates
 4  into Korean)
 5      A.    (Witness speaks in Korean)
 6           MS. SONG:  Head of the --
 7           MS. MYUNG KIM:
 8  Manufacturing.
 9           MS. SONG:  --
10  manufacturing.  Thank you.
11      Q.    Is that the same position
12  that you held when you came to
13  Montgomery?
14           MS. SONG:  (Translates
15  into Korean)
16      A.    (Witness speaks in Korean)
17           MS. SONG:  It would have
18  been different in Asan factory.
19      Q.    What's the difference?
20           MS. SONG:  (Translates
21  into Korean)
22      A.    (Witness speaks in Korean)
23           MS. SONG:  In Asan factory
```

Page 26

1  I was the head of the
2  manufacturing.  But when I came
3  over to Montgomery I was the head
4  of the factory.
5      Q.    I'm confused.  What's the
6  difference?
7          MS. SONG:  (Translates
8  into Korean)
9      A.    (Witness speaks in Korean)
10         MS. SONG:  When I was in
11 Asan factory.  The factory was just
12 one division of the Hyundai
13 company.
14     A.    (Witness speaks in Korean)
15         MS. SONG:  And the factory
16 in the United States --
17     A.    (Witness speaks in Korean)
18         MS. SONG:  Hyundai Motor
19 America is a small -- small company
20 of Hyundai itself.
21     Q.    Are your duties different?
22         MR. BOSTICK:  Object to
23 the form.

Page 27

1          MS. SONG:  (Translates
2  into Korean)
3      A.    (Witness speaks in Korean)
4          MS. SONG:  Yes, it is
5  different.
6      Q.    How are your duties
7  different?
8          MS. SONG:  (Translates
9  into Korean)
10     A.    (Witness speaks in Korean)
11         MS. SONG:  When I was in
12 Asan factory the engineering part
13 was not under my supervision.
14     A.    (Witness speaks in Korean)
15         MR. RAYMOND KIM:  I have a
16 problem.
17         MS. SONG:  I'm sorry.
18         MR. RAYMOND KIM:  He
19 mentioned that -- engine division.
20         MS. SONG:  Engine
21 division, okay.
22         MR. RAYMOND KIM:  That's
23 the division that --

Page 28

1          MS. SONG:  Sorry.
2          MR. RAYMOND KIM:  --
3  manufactures engine.  Not
4  engineering.
5          MS. SONG:  Engine
6  division.
7          MS. MYUNG KIM:  I'm with
8  him.
9          MR. STOCKHAM:  Okay.
10     Q.    (By Mr. Stockham)  So the
11 correct translation would be that
12 in Korea --
13         MR. RAYMOND KIM:  In Asan
14 the engineering division was not --
15         MS. MYUNG KIM:  No, not
16 engineering.
17         MR. RAYMOND KIM:  -- in
18 his jurisdiction.
19         MR. STOCKHAM:  The engine
20 division.
21         MS. MYUNG KIM:  Engine
22 division.
23         MS. SONG:  Engine

Page 29

1  division.
2          MR. RAYMOND KIM:  Engine
3  division was not in his
4  jurisdiction.
5          MR. STOCKHAM:  I see.
6  Okay.
7      A.    (Witness speaks in Korean)
8          MS. SONG:  And then --
9      A.    (Witness speaks in Korean)
10         MS. SONG:  So the safety
11 issues and the architectural field
12 was not part of my responsibilities
13 in Asan factory.  But whereas here
14 it was all included.
15     Q.    (By Mr. Stockham)  How
16 long were you head of manufacturing
17 in Korea?
18         MS. SONG:  (Translates
19 into Korean)
20     A.    (Witness speaks in Korean)
21         MS. SONG:  Approximately
22 three years and six months.
23     Q.    What position did you hold

1  before that?
2          MS. SONG:  (Translates
3  into Korean)
4      A.    (Witness speaks in Korean)
5          MS. MYUNG KIM:  Manager --
6  can I step in?  Manager of
7  manufacturing.
8          MR. STOCKHAM:  Is that
9  okay?
10         MR. RAYMOND KIM:  Yeah.
11     Q.    Manager of --
12     A.  . Manufacture control
13 department.
14         MS. MYUNG KIM:
15 Manufacture --
16         MS. SONG:  Manufacture --
17     Q.    Manufacturing control
18 department?
19     A.    Yeah.
20     Q.    Manufacturing control
21 department in Asan?
22         MS. SONG:  (Translates
23 into Korean)

1      A.    (Witness speaks in Korean)
2          MS. SONG:  Yes.
3      Q.    How long were you in that
4  position?
5          MS. SONG:  (Translates
6  into Korean)
7      A.    (Witness speaks in Korean)
8          MS. SONG:  I cannot recall
9  accurately but approximately three
10 years.
11     Q.    And before that?
12         MS. SONG:  (Translates
13 into Korean)
14     A.    (Witness speaks in Korean)
15         MS. MYUNG KIM:  Auto body.
16         MS. SONG:  Auto body.
17     A.    (Witness speaks in Korean)
18         MS. SONG:  Welding?
19     A.    Welding department.
20         MS. SONG:  Welding
21 department.
22     Q.    Welding department?
23         Were you a manager in that

1  department?
2          MS. SONG:  (Translates
3  into Korean)
4      A.    Yeah.
5          MS. SONG:  Yes.
6      Q.    So you went from manager
7  in the welding department to
8  manager of manufacturing?
9          MR. RAYMOND KIM:
10 Manufacturing --
11         MS. MYUNG KIM:  Control.
12         MR. RAYMOND KIM:  --
13 control.
14     Q.    Manufacturing control?
15         MS. SONG:  (Translates
16 into Korean)
17     A.    (Witness nods head
18 affirmatively.)
19     Q.    Who promoted you?
20         MS. SONG:  (Translates
21 into Korean)
22         MR. BOSTICK:  Object to
23 the form.

1      A.    (Witness speaks in Korean)
2          MR. BOSTICK:  Which
3  position are you talking about?
4      Q.    I'm sorry. From the
5  welding --
6      A.    (Witness speaks in Korean)
7          MS. SONG:  I don't know
8  what you mean, who promoted you,
9  because the company itself promotes
10 you, not certain person.
11     Q.    You don't know whether a
12 particular boss recommended your
13 promotion?
14         MR. BOSTICK:  Object to
15 the form.
16         MS. SONG:  (Translates
17 into Korean)
18     A.    (Witness speaks in Korean)
19         MS. SONG:  We have a
20 policy within the company.  There
21 is three individuals within the
22 human resources who get to decide,
23 but not certain individual who gets

Page 34

```
 1   to decide that.
 2       Q.   Who decided that you would
 3   leave Korea and come to America?
 4           MS. SONG: (Translates
 5   into Korean)
 6       A.   (Witness speaks in Korean)
 7           MS. SONG: I wouldn't know
 8   that.
 9       A.   (Witness speaks in Korean)
10           MS. SONG: I just followed
11   the company's order.
12       Q.   Was that a promotion?
13           MS. SONG: (Translates
14   into Korean)
15           MR. BOSTICK: Object to
16   the form.
17           MS. SONG: (Translates
18   into Korean)
19       A.   (Witness speaks in Korean)
20           MS. SONG: I don't know
21   the meaning of, promotion. I mean,
22   it was a transfer.
23       Q.   Did you have an increase
```

Page 35

```
 1   in pay?
 2           MS. SONG: (Translates
 3   into Korean)
 4       A.   (Witness speaks in Korean)
 5           MS. SONG: I don't know
 6   what to tell you, whether it was an
 7   increase in pay or not. Because
 8   the pay system within Korea is
 9   different from that in United
10   States.
11       A.   (Witness speaks in Korean)
12           MS. SONG: Oversea.
13       Q.   Was it a higher title?
14   Was it an increase in title?
15           MS. SONG: (Translates
16   into Korean)
17           MS. MYUNG KIM: (Speaks in
18   Korean.)
19           MS. SONG: I'm sorry?
20           MS. MYUNG KIM: (Speaks in
21   Korean)
22           MS. SONG: (Speaks in
23   Korean)
```

Page 36

```
 1       A.   (Witness speaks in Korean)
 2           MS. SONG: Are you asking
 3   me about the pay or the position,
 4   the level --
 5       Q.   Level --
 6           MS. SONG: -- of rank?
 7       Q.   Asking about the level.
 8           MS. SONG: (Translates
 9   into Korean)
10       A.   (Witness speaks in Korean)
11           MS. SONG: I guess you
12   could consider that there was an
13   increase in level since I became
14   the head of the factory.
15       Q.   Do you have a visa?
16           MS. SONG: (Translates
17   into Korean)
18       A.   (Witness speaks in Korean)
19           MS. SONG: Are you
20   referring to US visa?
21       Q.   Yes.
22           MS. SONG: (Translates
23   into Korean)
```

Page 37

```
 1       A.   (Witness speaks in Korean)
 2           MS. SONG: Yes, I have it.
 3       Q.   How long is your visa for?
 4           MS. SONG: (Translates
 5   into Korean)
 6       A.   (Witness speaks in Korean)
 7           MS. SONG: I cannot recall
 8   accurately.
 9       Q.   I understand you are
10   returning to Korea in December?
11           MS. SONG: (Translates
12   into Korean)
13       A.   (Witness speaks in Korean)
14           MS. SONG: For employees
15   who are staying oversea, not only
16   limited to United State, but who
17   are oversea, they are required to
18   go back to the headquarter each
19   year.
20       A.   (Witness speaks in Korean)
21           MS. SONG: So all
22   employees who are stationed oversea
23   is required to go back to Korea for
```

Page 38

1   a week at the end of the year to
2   get education.
3       Q.    Is this a company
4   requirement?
5           MS. SONG:  (Translates
6   into Korean)
7       A.    (Witness speaks in Korean)
8           MS. SONG:  Yes, that's
9   right.
10      Q.    Will you be coming back
11  after that?
12          MS. SONG:  (Translates
13  into Korean)
14      A.    (Witness speaks in Korean)
15          MS. SONG:  Yes, that's
16  right.
17      Q.    Do you know how long your
18  time in America will be when you
19  come back?
20          MS. SONG:  (Translates
21  into Korean)
22      A.    (Witness speaks in Korean)
23          MS. SONG:  I wouldn't know

Page 39

1   that.
2       Q.    Have you applied for a
3   green card?
4           MS. SONG:  (Translates
5   into Korean)
6       A.    (Witness speaks in Korean)
7           MS. SONG:  No, I did not.
8       Q.    I now want to discuss the
9   events of the Murakami meeting in
10  September 16th, 2005.
11          MS. SONG:  (Translates
12  into Korean)
13          MS. MYUNG KIM:  (Speaks in
14  Korean)
15          MS. SONG:  (Translates
16  into Korean)
17      A.    Yeah.
18      Q.    Do you recall the events
19  of that meeting?
20          MS. SONG:  (Translates
21  into Korean)
22      A.    (Witness speaks in Korean)
23          MS. SONG:  Not in details.

Page 40

1       Q.    Was that a meeting that
2   you called?
3           MS. SONG:  (Translates
4   into Korean)
5       A.    (Witness speaks in Korean)
6           MS. SONG:  Yes.
7           (Whereupon, Plaintiff's
8           Exhibit One
9           was marked for
10          identification.)
11      Q.    Is this (indicating) the
12  agenda that was prepared for that
13  meeting?
14          MS. SONG:  (Translates
15  into Korean)
16      A.    (Witness speaks in Korean)
17          MS. SONG:  I've never seen
18  this before.
19      Q.    Did you have an agenda
20  prepared for that meeting?
21          MS. SONG:  (Translates
22  into Korean)
23      A.    (Witness speaks in Korean)

Page 41

1           MS. SONG:  Yes.
2       Q.    Was it in English or
3   Korean?
4           MS. SONG:  (Translates
5   into Korean)
6       A.    (Witness speaks in Korean)
7           MS. SONG:  There was
8   nothing prepared so I wouldn't know
9   that.
10      A.    (Witness speaks in Korean)
11          MS. SONG:  I did not make
12  an agenda myself.
13      Q.    Did you ever see an
14  agenda?
15          MS. SONG:  (Translates
16  into Korean)
17      A.    (Witness speaks in Korean)
18          MS. SONG:  No.
19      Q.    So you don't know whether
20  an agenda was prepared by someone
21  at the plant?
22          MR. BOSTICK:  Object to
23  the form.

Page 42

1      MS. SONG: (Translates
2  into Korean)
3      A.   (Witness speaks in Korean)
4      MS. SONG: Since --
5  ultimately, since there were many
6  defected goods I ordered that we
7  summon the companies that were
8  making a lot of defected goods that
9  we could have a meeting with them.
10     Q.   Did you direct anyone to
11 prepare an agenda?
12     MS. SONG: (Translates
13 into Korean)
14     MR. BOSTICK: Object to
15 the form. Can you clarify -- are
16 you talking about an agenda
17 document?
18     MR. STOCKHAM: Yes.
19     MR. BOSTICK: Okay. Can
20 you clarify that? I think that may
21 help.
22     Q.   Did you direct anyone to
23 prepare an agenda document?

Page 43

1      MS. SONG: (Translates
2  into Korean)
3      MS. MYUNG KIM: (Speaks in
4  Korean)
5      A.   (Witness speaks in Korean)
6      MR. STOCKHAM: I'm sorry?
7  What --
8      MS. MYUNG KIM: (Speaks in
9  Korean)
10     She keeps using the word
11 "agenda". That's (Korean word) in
12 Korean. So I just clarify that.
13     MR. STOCKHAM: Well, I --
14     MR. BOSTICK: Don't pass
15 notes or anything.
16     A.   (Witness speaks in Korean)
17     MS. SONG: Could you
18 rephrase your question, please?
19     Q.   Yes. Exhibit One --
20     MS. SONG: (Translates
21 into Korean)
22     Q.   -- this is what I'm
23 talking about. Was something like

Page 44

1  this ever prepared at your
2  direction?
3      MR. BOSTICK: Object to
4  the form.
5      MS. SONG: (Translates
6  into Korean)
7      A.   (Witness speaks in Korean)
8      MS. SONG: I wouldn't know
9  that.
10     A.   (Witness speaks in Korean)
11     MS. SONG: I've seen this
12 the first time.
13     Q.   Have you ever seen any
14 document like this prepared at your
15 direction?
16     MR. BOSTICK: Object to
17 the form.
18     MS. SONG: (Translates
19 into Korean)
20     A.   (Witness speaks in Korean)
21     MS. SONG: No.
22     Q.   Have you ever seen a
23 document like this but in Korean?

Page 45

1      MS. SONG: (Translates
2  into Korean)
3      A.   (Witness speaks in Korean)
4      MS. SONG: No.
5      Q.   Now, did you ever meet
6  with anyone at Hyundai before the
7  meeting to prepare for it?
8      MS. SONG: (Translates
9  into Korean)
10     A.   (Witness speaks in Korean)
11     MS. SONG: Could you
12 rephrase the question? Do you mean
13 prior to the meeting?
14     Q.   Prior to the meeting.
15     MS. SONG: (Translates
16 into Korean)
17     A.   (Witness speaks in Korean)
18     MS. SONG: The only thing
19 I did is direct someone to summon
20 the companies that were producing
21 defected goods so we can have a
22 meeting. So I did direct that.
23     Q.   Who did you direct to do

Page 46

1  that?
2         MS. SONG:  (Translates
3  into Korean)
4      A.   (Witness speaks in Korean)
5         MS. SONG:  If I directed
6  it would have been -- Kushie?
7      A.   (Witness speaks in Korean)
8         MS. SONG:  Kushie?
9         MS. MYUNG KIM:  (Speaks in
10 Korean)
11     A.   Quality control.
12        MR. RAYMOND KIM:  QC, QC.
13        MS. SONG:  Oh, QC.
14        MR. RAYMOND KIM:  Quality
15 control.
16        MS. SONG:  Quality
17 control --
18     Q.   Okay.
19        MS. SONG:  -- person.
20     Q.   You directed the quality
21 control person to summon the
22 company?
23        MS. SONG:  (Translates

Page 47

1  into Korean)
2      A.   (Witness speaks in Korean)
3         MS. SONG:  Yes.
4      Q.   Who in quality control did
5  you direct to summon Murakami?
6         MS. SONG:  (Translates
7  into Korean)
8      A.   (Witness speaks in Korean)
9         MS. SONG:  I did not
10 specify that Murakami needed to
11 come.
12     A.   (Witness speaks in Korean)
13        MS. SONG:  I said, summon
14 the companies that were producing
15 defected goods so that we can have
16 a meeting.
17     Q.   And who did you tell to do
18 that?
19        MS. SONG:  (Translates
20 into Korean)
21     A.   (Witness speaks in Korean)
22        MS. SONG:  I don't
23 remember accurately but perhaps it

Page 48

1  would have been the manager of the
2  quality control department.
3      Q.   American or Korean?
4         MS. SONG:  (Translates
5  into Korean)
6      A.   (Witness speaks in Korean)
7         MS. SONG:  Korean.
8      Q.   Mr. Kwak?
9         MS. SONG:  (Translates
10 into Korean)
11     A.   (Witness speaks in Korean)
12        MS. SONG:  I'm not sure
13 whether it was Mr. Kwak or Mr.
14 Choi.
15     Q.   Mr. Choi?
16        MS. SONG:  Choi.
17        MR. BOSTICK:  Which
18 Choi --
19        MS. SONG:  (Translates
20 into Korean)
21     A.   (Witness speaks in Korean)
22        MS. SONG:  J.S. Choi.
23        MS. MYUNG KIM:  Chae.

Page 49

1         MR. IN CHUL KIM:  Not
2  Choi.
3         MS. MYUNG KIM:  It's Chae.
4         THE WITNESS:  Chae.
5         MR. IN CHUL KIM:  C-h-a-e.
6         MS. SONG:  Oh.
7         MS. MYUNG KIM:  It's not
8  Choi.  It's Chae.
9         THE WITNESS:  (Speaks in
10 Korean)
11        MR. IN CHUL KIM:  Chae,
12 Chae, Chae.
13        MS. MYUNG KIM:  Chae,
14 Chae.
15        THE WITNESS:  Chae.
16        MR. IN CHUL KIM:  (Speaks
17 in Korean)
18        MS. MYUNG KIM:  Chae, not
19 Choi.
20        MS. SONG:  Oh.
21        MR. IN CHUL KIM:  Chae.
22        MS. SONG:  Chae, C-h-a-i.
23        THE WITNESS:  C-h-o-i.

Page 50

```
 1   (Speaks in Korean)
 2          MR. IN CHUL KIM:  (Speaks
 3   in Korean)
 4          MS. MYUNG KIM:  (Speaks in
 5   Korean)
 6          THE WITNESS:  Chae, Chae.
 7          MR. STOCKHAM:  Mark
 8   this --
 9          MS. MYUNG KIM:  C-h-a-e,
10   Chae.
11          MS. SONG:  Chae.
12          THE WITNESS:  A-e, Chae.
13          MR. STOCKHAM:  Mark this
14   as Exhibit Two.
15          (Whereupon, Plaintiff's
16          Exhibit Two
17          was marked for
18          identification.)
19      Q.    (By Mr. Stockham)  I'm
20   going to show you what I've marked
21   as Exhibit Two.
22          MS. SONG:  (Translates
23   into Korean)
```

Page 51

```
 1      Q.    Is the individual's name
 2   on that list?
 3          MS. SONG:  (Translates
 4   into Korean)
 5      A.    (Witness speaks in Korean)
 6          MS. MYUNG KIM:  (Speaks in
 7   Korean)
 8          MR. RAYMOND KIM:  (Speaks
 9   in Korean)
10          MS. SONG:  I'm sorry.
11          MR. RAYMOND KIM:  (Speaks
12   in Korean)
13          MS. SONG:  (Translates
14   into Korean)
15      A.    (Witness speaks in Korean)
16          MS. SONG:  No.
17      Q.    No, he's not on this list.
18          (Whereupon, an
19          off-the-record
20          discussion was held.)
21      Q.    (By Mr. Stockham)  So --
22   same last name as number seven?
23          MS. SONG:  (Translates
```

Page 52

```
 1   into Korean)
 2      A.    (Witness speaks in Korean)
 3          MS. SONG:  No.
 4      Q.    Same last name as anyone
 5   on this list?
 6          MS. SONG:  (Translates
 7   into Korean)
 8      A.    (Witness speaks in Korean)
 9          MS. SONG:  No.
10      Q.    Now, did you meet with Mr.
11   Whang, number eleven?
12          MS. SONG:  (Translates
13   into Korean)
14      A.    (Witness speaks in Korean)
15          MS. SONG:  No.
16      Q.    Did you meet with Mr.
17   Cyrus before this meeting?
18          MS. SONG:  (Translates
19   into Korean)
20      A.    (Witness speaks in Korean)
21          MS. SONG:  Within the
22   company I ran into him a couple
23   times.
```

Page 53

```
 1      Q.    Did you talk with Mr.
 2   Cyrus about this meeting before the
 3   meeting?
 4          MS. SONG:  (Translates
 5   into Korean)
 6      A.    (Witness speaks in Korean)
 7          MS. SONG:  No.
 8      Q.    Did you preside at the
 9   meeting?
10          MS. SONG:  (Translates
11   into Korean)
12      A.    (Witness speaks in Korean)
13          MS. SONG:  Yes.
14      Q.    Did you have a translator
15   at the meeting?
16          MS. SONG:  (Translates
17   into Korean)
18      A.    (Witness speaks in Korean)
19          MS. SONG:  Yes.
20      Q.    Who was the translator?
21          MS. SONG:  (Translates
22   into Korean)
23      A.    Number eleven --
```

Page 54

```
 1          MS. SONG:  Number --
 2     A.    Number Seven.
 3          MS. SONG:  Number seven.
 4     A.    Jason Chi.
 5     Q.    Jason Chi.  And what was
 6  Mr. Chi's position?
 7          MS. SONG:  (Translates
 8  into Korean)
 9     A.    (Witness speaks in Korean)
10          MS. SONG:  I'm not sure at
11  that time if he was assistant
12  manager or manager.
13     Q.    Now, did you speak English
14  during that meeting?
15          MS. SONG:  (Translates
16  into Korean)
17     A.    (Witness speaks in Korean)
18          MS. SONG:  No, in Korean.
19     Q.    So in the meeting you
20  would make a statement and Mr. Chi
21  would translate it?
22          MS. SONG:  (Translates
23  into Korean)
```

Page 55

```
 1     A.    (Witness speaks in Korean)
 2          MS. SONG:  Yes.
 3     Q.    Did you make any notes
 4  during the meeting?
 5          MS. SONG:  (Translates
 6  into Korean)
 7     A.    (Witness speaks in Korean)
 8          MS. SONG:  No.
 9     Q.    Did you bring any notes
10  with you to the meeting?
11          MS. SONG:  (Translates
12  into Korean)
13     A.    (Witness speaks in Korean)
14          MS. SONG:  No.
15     Q.    Did you bring any papers
16  with you to the meeting?
17          MS. SONG:  (Translates
18  into Korean)
19     A.    (Witness speaks in Korean)
20          MS. SONG:  Nothing that I
21  brought myself.  But there were
22  documents that was prepared by the
23  quality control.
```

Page 56

```
 1     Q.    What documents were
 2  prepared by the quality control?
 3          MS. SONG:  (Translates
 4  into Korean)
 5     A.    (Witness speaks in Korean)
 6          MS. SONG:  I didn't look
 7  at it so I didn't know.  I don't
 8  know.  But I looked at the
 9  projection in front of me.
10     Q.    There was a projection?
11          MS. SONG:  (Translates
12  into Korean)
13     A.    (Witness speaks in Korean)
14          MS. SONG:  Yes, that's
15  right.
16     Q.    Was that a Powerpoint?
17          MS. SONG:  (Translates
18  into Korean)
19     A.    (Witness speaks in Korean)
20          MS. SONG:  Yes.
21     Q.    Was there also a hard copy
22  of the Powerpoint?
23          MS. SONG:  (Translates
```

Page 57

```
 1  into Korean)
 2          MS. MYUNG KIM:  (Speaks in
 3  Korean)
 4          THE WITNESS:  (Speaks in
 5  Korean)
 6          MS. MYUNG KIM:  Hard copy.
 7          MS. SONG:  Oh, hard copy.
 8  I'm sorry.
 9          (Translates into Korean)
10     A.    (Witness speaks in Korean)
11          MS. SONG:  Perhaps that
12  may have been what was on the
13  table.
14     A.    (Witness speaks in Korean)
15          MS. SONG:  I'm not sure.
16  I don't remember clearly.
17     A.    (Witness speaks in Korean)
18          MS. SONG:  I think that
19  was -- that's what it was.
20     Q.    But you didn't look at it?
21          MS. SONG:  (Translates
22  into Korean)
23     A.    (Witness speaks in Korean)
```

1          MS. SONG:  I didn't look
2  at it.  I was looking at the screen
3  in front of me.
4      Q.    Now, do you know who
5  prepared the Powerpoint?
6          MS. SONG:  (Translates
7  into Korean)
8      A.    (Witness speaks in Korean)
9          MS. SONG:  No, I don't
10  know.
11     Q.    Do you know whether it was
12  prepared by Hyundai employees?
13         MS. SONG:  (Translates
14  into Korean)
15     A.    (Witness speaks in Korean)
16         MS. SONG:  I don't know.
17     Q.    Do you know whether it was
18  prepared by a Murakami employee?
19         MS. SONG:  (Translates
20  into Korean)
21     A.    (Witness speaks in Korean)
22         MS. SONG:  I don't know.
23     Q.    Looking at what is marked

1  as Exhibit Two --
2          MS. SONG:  (Translates
3  into Korean)
4      Q.    -- have you ever seen that
5  document before?
6          MS. SONG:  (Translates
7  into Korean)
8      A.    (Witness speaks in Korean)
9          MS. SONG:  No.
10     Q.    Is his name -- is your
11  name on this list?
12         MS. SONG:  (Translates
13  into Korean)
14     A.    (Witness speaks in Korean)
15         MS. SONG:  Yes.
16     Q.    Which number?
17         MS. SONG:  (Translates
18  into Korean)
19     A.    (Witness speaks in Korean)
20         MS. SONG:  One.
21     Q.    Number one.
22         MR. STOCKHAM:  Mark this
23  as the next exhibit.

1          (Whereupon, Plaintiff's
2          Exhibit Three
3          was marked for
4          identification.)
5      Q.    I've shown you what is
6  marked as Exhibit Three.
7          MS. SONG:  (Translates
8  into Korean)
9      Q.    Did you prepare this
10  five-page document?
11         MS. SONG:  (Translates
12  into Korean)
13     A.    (Witness speaks in Korean)
14         MS. SONG:  Yes.
15     Q.    Did you sign it?
16         MS. SONG:  (Translates
17  into Korean)
18     A.    (Witness speaks in Korean)
19         MS. SONG:  I don't know
20  regarding the signature.  I'm not
21  sure.
22     Q.    When did you make these
23  notes?

1          MS. SONG:  (Translates
2  into Korean)
3      A.    (Witness speaks in Korean)
4          MS. SONG:  On September
5  16th.  When the meeting fell apart
6  I went up to my office and wrote
7  it.
8      Q.    Have you ever done a
9  report like this before this time?
10         MR. BOSTICK:  Object to
11  the form.
12         MS. SONG:  (Translates
13  into Korean)
14     A.    (Witness speaks in Korean)
15         MS. SONG:  I hand wrote
16  mine and somebody obviously went to
17  the computer and, you know, used
18  the word processor.  But I hand
19  wrote my notes.
20     Q.    Do you have those notes to
21  this day?
22         MS. SONG:  (Translates
23  into Korean)

Page 62

```
 1      A.   (Witness speaks in Korean)
 2          MS. SONG:  I wouldn't
 3   know.  I just gave it to the person
 4   to do it.  So --
 5      Q.   Who did you give it to?
 6          MS. SONG:  (Translates
 7   into Korean)
 8      A.   (Witness speaks in Korean)
 9          MS. SONG:  At that time we
10   couldn't find -- we couldn't fill
11   in the secretary position.  So I'm
12   not sure who it was but it was
13   somebody who was around.
14      Q.   Did you review the typed
15   copy after you -- after it was
16   typed up?
17          MS. SONG:  (Translates
18   into Korean)
19      A.   Yeah.
20          MS. SONG:  Yes.
21      Q.   Why did you have it typed
22   -- have your handwritten notes
23   typed up?
```

Page 63

```
 1          MS. SONG:  (Translates
 2   into Korean)
 3      A.   (Witness speaks in Korean)
 4          MS. SONG:  Because I have
 5   bad handwriting.
 6      Q.   Why did you want to have
 7   it put in readable printing format?
 8          MR. BOSTICK:  Object to
 9   the form.
10          MS. SONG:  (Translates
11   into Korean)
12      A.   (Witness speaks in Korean)
13          MS. SONG:  So that I could
14   tell my seniors -- or boss.
15      Q.   Who would that be?
16          MS. SONG:  (Translates
17   into Korean)
18      A.   (Witness speaks in Korean)
19          MS. SONG:  Joo Soo Ahn,
20   the president, who is my boss.
21      Q.   Anyone else?
22          MS. SONG:  (Translates
23   into Korean)
```

Page 64

```
 1      A.   (Witness speaks in Korean)
 2          MS. SONG:  No.
 3      Q.   Have you ever had notes of
 4   yours typed up like this for your
 5   boss before?
 6          MS. SONG:  (Translates
 7   into Korean)
 8      A.   (Witness speaks in Korean)
 9          MS. SONG:  No.
10      Q.   Have you ever had notes
11   like this typed up since this
12   occasion?
13          MS. SONG:  (Translates
14   into Korean)
15      A.   (Witness speaks in Korean)
16          MS. SONG:  No.
17          MR. BOSTICK:  Object to
18   the form.
19      Q.   And you made sure that
20   your notes were properly
21   transcribed; is that correct?
22          MS. SONG:  (Translates
23   into Korean)
```

Page 65

```
 1          MR. BOSTICK:  Object to
 2   the form.
 3          MS. SONG:  (Translates
 4   into Korean)
 5      A.   (Witness speaks in Korean)
 6          MS. SONG:  That's right.
 7      Q.   Did you have these notes
 8   made immediately after the meeting
 9   or sometime later the day?
10          MS. SONG:  (Translates
11   into Korean)
12      A.   (Witness speaks in Korean)
13          MS. SONG:  I don't
14   remember clearly but I think right
15   after the meeting I came up to my
16   office and got started on it.
17      Q.   Did you have anyone come
18   with you when you went up to your
19   office to work on these notes?
20          MS. SONG:  (Translates
21   into Korean)
22      A.   (Witness speaks in Korean)
23          MS. SONG:  I don't
```

Page 66

1  remember clearly at that time.
2       Q.    Do you remember anyone in
3  the meeting coming with you up to
4  your office?
5           MS. SONG:  (Translates
6  into Korean)
7       A.    (Witness speaks in Korean)
8           MS. SONG:  I don't
9  remember the details but --
10      A.    (Witness speaks in Korean)
11          MS. SONG:  I don't
12  remember the details but perhaps
13  the manager in quality control
14  department or Chon Yong Choi, who
15  is another manager, may have come
16  up with me to apologize for the
17  meeting that didn't actually
18  happen.
19      Q.    Now, did you make the
20  notes that we have here as Exhibit
21  Three while they were present?
22          MS. SONG:  (Translates
23  into Korean)

Page 67

1       A.    (Witness speaks in Korean)
2           MS. SONG:  No.
3       Q.    Did you direct them to
4  make notes?
5           MS. SONG:  (Translates
6  into Korean)
7       A.    (Witness speaks in Korean)
8           MS. SONG:  No.
9       Q.    Did you direct anyone to
10  make notes?
11          MS. SONG:  (Translates
12  into Korean)
13      A.    (Witness speaks in Korean)
14          MS. SONG:  No.
15      Q.    Have you reviewed notes by
16  anyone else from that meeting?
17          MS. SONG:  (Translates
18  into Korean)
19      A.    (Witness speaks in Korean)
20          MS. SONG:  No.
21      Q.    Now, looking at Exhibit
22  Three --
23          MS. SONG:  (Translates

Page 68

1  into Korean)
2       Q.    -- the top, across, that
3  says, report.
4           MS. SONG:  (Translates
5  into Korean)
6       A.    (Witness speaks in Korean)
7           MS. SONG:  Yes.
8       Q.    And the first block on the
9  left-hand side.
10          MS. SONG:  (Translates
11  into Korean)
12      Q.    That's your name?
13          MS. SONG:  (Translates
14  into Korean)
15      A.    (Witness speaks in Korean)
16          MS. SONG:  Yes, that's
17  right.
18      Q.    The top line says,
19  organization is HMMA?
20          MS. SONG:  (Translates
21  into Korean)
22      A.    (Witness speaks in Korean)
23          MS. SONG:  Yes.

Page 69

1       Q.    So at the time of this
2  report you worked for HMMA?
3           MS. SONG:  (Translates
4  into Korean)
5       A.    (Witness speaks in Korean)
6           MS. SONG:  That's right.
7       Q.    You also worked for HMA at
8  the time?
9           MS. SONG:  (Translates
10  into Korean)
11          MR. BOSTICK:  Object to
12  the form.
13      A.    (Witness speaks in Korean)
14          MS. SONG:  No.
15      Q.    Did you come over as an
16  employee from HMA and then become
17  an employee of HMMA?
18          MR. BOSTICK:  Object to
19  the form.
20          MS. SONG:  (Translates
21  into Korean)
22      A.    (Witness speaks in Korean)
23          MS. SONG:  No.

Page 70

```
 1      Q.    Have you ever been an
 2 employee of HMA?
 3           MS. SONG:  (Translates
 4 into Korean)
 5      A.    (Witness speaks in Korean)
 6           MS. SONG:  No.
 7      Q.    Have you ever been an
 8 employee of HMC?
 9           MS. SONG:  (Translates
10 into Korean)
11      A.    (Witness speaks in Korean)
12           MS. SONG:  Yes.
13      Q.    Are you still an employee
14 of HMC?
15           MS. SONG:  (Translates
16 into Korean)
17      A.    (Witness speaks in Korean)
18           MS. SONG:  Currently I am
19 an employee of HMMA.
20      Q.    Do you -- are you paid by
21 HMMA?
22           MS. SONG:  (Translates
23 into Korean)
```

Page 71

```
 1      A.    (Witness speaks in Korean)
 2           MS. SONG:  That's right.
 3      Q.    Are you paid in American
 4 dollars?
 5           MS. SONG:  (Translates
 6 into Korean)
 7      A.    (Witness speaks in Korean)
 8           MS. SONG:  That's right.
 9      Q.    And do you have a bank
10 account here?
11           MS. SONG:  (Translates
12 into Korean)
13      A.    (Witness speaks in Korean)
14           MS. SONG:  At Wachovia
15 Bank.
16      Q.    Now, looking at this
17 exhibit --
18           MS. SONG:  (Translates
19 into Korean)
20      Q.    -- the line right here
21 (indicating) --
22           MS. SONG:  (Translates
23 into Korean)
```

Page 72

```
 1      Q.    -- that says, items.
 2           MS. SONG:  (Translates
 3 into Korean)
 4      A.    (Witness speaks in Korean)
 5           MS. SONG:  Where do you
 6 mean by, items?
 7      Q.    This line right here
 8 (indicating).
 9           MS. SONG:  (Translates
10 into Korean)
11      A.    (Witness speaks in Korean)
12           MS. SONG:· It means,
13 following.
14      Q.    Following.  And what do
15 you mean by, following?
16           MS. SONG:  (Translates
17 into Korean)
18           MS. MYUNG KIM:  Not
19 following, but below.
20           MS. SONG:  Below.
21      Q.    What do you mean by that
22 phrase?
23           MS. SONG:  (Translates
```

Page 73

```
 1 into Korean)
 2      A.    (Witness speaks in Korean)
 3           MS. SONG:  I explained in
 4 details regarding the contents.
 5      Q.    Now, looking at the first
 6 paragraph --
 7           MS. SONG:  (Translates
 8 into Korean)
 9      Q.    -- what does that say with
10 regard to downtime?
11           MS. SONG:  (Translates
12 into Korean)
13      A.    (Witness speaks in Korean)
14           MS. SONG:  I don't
15 understand your question.
16      Q.    This paragraph --
17           MS. SONG:  (Translates
18 into Korean)
19           MR. BOSTICK:  Are you
20 talking about below, below?
21           MR. STOCKHAM:  Yes.
22           MR. BOSTICK:  Okay.
23      Q.    This paragraph right here
```

Page 74

```
 1  (indicating).
 2          MS. SONG:  (Translates
 3  into Korean)
 4      Q.    What are you referring to
 5  about downtime in that paragraph?
 6          MS. SONG:  (Translates
 7  into Korean)
 8      A.    (Witness speaks in Korean)
 9          MS. SONG:  When I referred
10  to downtime it means at a factory
11  we need to be manufacturing.  But
12  when we cannot manufacture we're
13  referring to that period.
14      Q.    And who made the statement
15  regarding downtime?
16          MS. SONG:  (Translates
17  into Korean)
18      A.    (Witness speaks in Korean)
19          MS. SONG:  I don't
20  understand your question.
21      Q.    Your paragraph here
22  (indicating).
23          MS. SONG:  (Translates
```

Page 75

```
 1  into Korean)
 2      A.    Yeah.
 3      Q.    It says someone made a
 4  statement regarding downtime.
 5          MS. SONG:  (Translates
 6  into Korean)
 7      A.    Yeah.
 8          MS. SONG:  Yes.
 9      Q.    Who?
10          MS. SONG:  (Translates
11  into Korean)
12      A.    (Witness speaks in Korean)
13          MS. SONG:  As you can tell
14  in the sentence it was manager Chi
15  who referred to it.
16      Q.    And who is he?
17          MS. SONG:  (Translates
18  into Korean)
19      A.    Jason Chi.
20          MS. SONG:  Jason Chi.
21      A.    Number seven.
22          MS. SONG:  Number seven.
23      Q.    Number seven.  Okay.
```

Page 76

```
 1          And he made a statement
 2  concerning downtime due to
 3  substandard parts; is that correct?
 4          MS. SONG:  (Translates
 5  into Korean)
 6      A.    (Witness speaks in Korean)
 7          MS. SONG:  Yes, that's
 8  right.
 9      A.    (Witness speaks in Korean)
10          MS. SONG:  He made a
11  statement that -- due to the
12  defected goods he made a statement
13  that downtime was this amount.
14      Q.    What amount?
15          MS. SONG:  (Translates
16  into Korean)
17      A.    (Witness speaks in Korean)
18          MS. SONG:  I don't recall
19  clearly.
20      Q.    The note doesn't reflect?
21          MS. SONG:  (Translates
22  into Korean)
23      A.    (Witness speaks in Korean)
```

Page 77

```
 1          MS. SONG:  It's not on the
 2  report.
 3      Q.    Now, this is the same Mr.
 4  Chi who was your translator?
 5          MS. SONG:  (Translates
 6  into Korean)
 7      A.    (Witness speaks in Korean)
 8          MS. SONG:  Yes.
 9      Q.    Now, after Mr. Chi made a
10  statement --
11  into Korean)
12      Q.    -- it says, first Murakami
13  company made a report.
14          MS. SONG:  (Translates
15  into Korean)
16          MS. MYUNG KIM:  (Speaks in
17  Korean)  Briefing.
18          MS. SONG:  Briefing.
19  (Translates into Korean)
20      A.    (Witness speaks in Korean)
21          MS. SONG:  Yes.
22      Q.    And who made the report
```

Page 78

1  for Murakami company?
2        MS. SONG: (Translates
3  into Korean)
4     A.   (Witness speaks in Korean)
5        MS. SONG: Produce what?
6        MR. RAYMOND KIM:
7  Presentation.
8        MS. SONG: (Translates
9  into Korean)
10     A.   (Witness speaks in Korean)
11        MS. SONG: From Murakami.
12     Q.   Who from Murakami?
13        MS. SONG: (Translates
14  into Korean)
15     A.   (Witness speaks in Korean)
16        MS. SONG: I don't know.
17     Q.   How many individuals were
18  there from Murakami?
19        MS. SONG: (Translates
20  into Korean)
21     A.   (Witness speaks in Korean)
22        MS. SONG: I'm not sure.
23  I know that there was a vice

Page 79

1  president and the one who actually
2  did the briefing. But I don't know
3  who else were there. I can't
4  remember.
5     Q.   Was the -- was one
6  Japanese person there?
7        MS. SONG: (Translates
8  into Korean)
9     A.   (Witness speaks in Korean)
10        MS. SONG: I don't know.
11     A.   (Witness speaks in Korean)
12        MS. SONG: I know that the
13  vice president was Japanese.
14     Q.   Do you know whether there
15  was more than two people there from
16  Murakami?
17        MS. SONG: (Translates
18  into Korean)
19     A.   (Witness speaks in Korean)
20        MS. SONG: I wouldn't know
21  that.
22     A.   (Witness speaks in Korean)
23        MS. SONG: I'm not sure.

Page 80

1  I know that there were at least
2  two.
3     Q.   This line says that he
4  made a brief -- made a briefing
5  using attachment one.
6        MS. SONG: (Translates
7  into Korean)
8     Q.   What attachment?
9        MS. SONG: (Translates
10  into Korean)
11     A.   (Witness speaks in Korean)
12        MS. SONG: It was resources
13  that was prepared by the Murakami
14  which was in front of the screen.
15     Q.   So that would have been
16  projected up on the screen?
17        MS. SONG: (Translates
18  into Korean)
19     A.   (Witness speaks in Korean)
20        MS. SONG: Right, the
21  briefing material that was on the
22  screen.
23     Q.   You attached it to this

Page 81

1  with a hard copy?
2        MS. SONG: (Translates
3  into Korean)
4     A.   (Witness speaks in Korean)
5        MS. SONG: It's not here.
6     Q.   I understand that. But
7  when you prepared the report you
8  attached a hard copy; is that
9  correct?
10        MS. SONG: (Translates
11  into Korean)
12     A.   (Witness speaks in Korean)
13        MS. SONG: If it's on
14  here, yes, I did attach it.
15     Q.   That's what this says; is
16  that not right?
17        MS. SONG: (Translates
18  into Korean)
19     A.   (Witness speaks in Korean)
20        MS. SONG: Yes. If it's
21  on here I did attach it.
22     A.   (Witness speaks in Korean)
23        MS. SONG: Because I was

Page 82

1   about to present this to my boss.
2   So, sure.
3       Q.   Do you remember what was
4   in the attachment?
5           MS. SONG:  (Translates
6   into Korean)
7       A.   (Witness speaks in Korean)
8           MS. SONG:  No, I don't
9   remember.
10      Q.   Do you know whether
11  Exhibit One was part of the
12  attachment?
13          MS. SONG:  (Translates
14  into Korean)
15      A.   (Witness speaks in Korean)
16          MS. SONG:  I wouldn't know
17  that.
18      Q.   Now, the entry on line
19  one, two, three up from the
20  bottom --
21          MS. SONG:  (Translates
22  into Korean)
23      Q.   -- that refers to --

Page 83

1           MR. BOSTICK:  Richard?
2   Not to -- I know it's your
3   deposition.  Would it be helpful if
4   we numbered his exhibit one through
5   whatever so --
6           MR. STOCKHAM:  Sure.
7           MR. BOSTICK:  -- for
8   purposes of --
9           MR. STOCKHAM:  That would
10  be great.
11          MR. BOSTICK:  -- referring
12  to the --
13          MR. STOCKHAM:  No problem
14  with that.  Makes life easier for
15  me.
16          (Whereupon, an
17          off-the-record
18          discussion was held.)
19          (Whereupon, a brief
20          recess was taken in
21          the deposition.)
22      Q.   (By Mr. Stockham) On
23  Exhibit Three --

Page 84

1           MS. SONG:  (Translates
2   into Korean)
3       Q.   If you will look at it,
4   please, sir.  I have numbered --
5           MS. SONG:  (Translates
6   into Korean)
7       Q.   -- out to the -- in the
8   left-hand margin --
9           MS. SONG:  (Translates
10  into Korean)
11      Q.   -- several entries where I
12  have numbered them.  Is that --
13  that word in brackets, is that
14  superintendent?
15          MS. SONG:  (Translates
16  into Korean)
17      A.   (Witness speaks in Korean)
18          MS. SONG:  I don't know
19  when you say, superintendent.  What
20  do you mean by that?
21      Q.   Well, when you see the
22  little number one --
23          MS. SONG:  (Translates

Page 85

1   into Korean)
2       Q.   -- the word in brackets --
3           MS. SONG:  (Translates
4   into Korean)
5       Q.   -- what word is that?
6           MS. SONG:  (Translates
7   into Korean)
8       A.   (Witness speaks in Korean)
9           MS. SONG:  Head of the
10  factory.
11      Q.   Head of the factory.  Does
12  that refer to you?
13          MS. SONG:  (Translates
14  into Korean)
15      A.   (Witness speaks in Korean)
16          MS. SONG:  Yes.
17      Q.   And every location that I
18  have numbered, one --
19          MS. SONG:  (Translates
20  into Korean)
21      Q.   -- one through --
22          MS. SONG:  (Translates
23  into Korean)

Page 86

```
 1      Q.   -- I think nine, are those
 2  all referring to you?
 3          MS. SONG:  (Translates
 4  into Korean)
 5      A.   (Witness speaks in Korean)
 6          MS. SONG:  Yes, that's
 7  right.
 8      Q.    And do I understand that
 9  the way you have organized your
10  document --
11          MS. SONG:  (Translates
12  into Korean)
13      Q.    -- the part out to the
14  right of where you have the word
15  "head of factory", that's what you
16  said?
17          MS. SONG:  (Translates
18  into Korean)
19      A.   (Witness speaks in Korean)
20          MS. SONG:  Yes.
21      Q.    And so in the -- in this
22  first line where I have number
23  one --
```

Page 87

```
 1          MS. SONG:  (Translates
 2  into Korean)
 3      Q.    -- you are asking about
 4  Murakami's extent of production
 5  experience with mirrors?
 6          MS. SONG:  (Translates
 7  into Korean)
 8          I'm sorry.  Could you
 9  repeat the question one more time?
10      Q.    Number one refers to your
11  question of Murakami, doesn't it?
12          MS. SONG:  (Translates
13  into Korean)
14          MR. BOSTICK:  Object to
15  the form.
16          MS. SONG:  (Translates
17  into Korean)
18      A.   (Witness speaks in Korean)
19          MS. SONG:  Yes, that's
20  right.
21      Q.    And you're asking Murakami
22  what their extent of production
23  experience with outside mirrors is?
```

Page 88

```
 1          MS. SONG:  (Translates
 2  into Korean)
 3          MS. MYUNG KIM:  No.
 4  Outside mirrors, not --
 5          MS. SONG:  Outside
 6  mirrors.  I'm sorry.
 7          (Translates into Korean)
 8      A.   (Witness speaks in Korean)
 9          MS. SONG:  How long have
10  you been manufacturing the side
11  mirrors.  And then --
12      A.   (Witness speaks in Korean)
13          MS. SONG:  And then as to
14  which company they supplied.
15      Q.    And the person that he
16  indicates underneath that is the
17  vice president of Murakami who
18  responded; is that correct?
19          MS. SONG:  (Translates
20  into Korean)
21      A.   (Witness speaks in Korean)
22          MS. SONG:  Yes, that's
23  right.
```

Page 89

```
 1      Q.    And he tells you that he
 2  supplies to approximately ten
 3  Toyota plants?
 4          MS. SONG:  (Translates
 5  into Korean)
 6          MS. MYUNG KIM:  (Speaks in
 7  Korean)
 8          MS. SONG:  I'm sorry.
 9          MS. MYUNG KIM:  It's
10  ten --
11          MR. RAYMOND KIM:  Ten
12  users.
13          MS. SONG:  Ten users?
14          MR. RAYMOND KIM:  Yeah.
15          MS. MYUNG KIM:  Some
16  Toyota.  Not --
17          MS. SONG:  I'm sorry.
18          MR. RAYMOND KIM:  They
19  supply side mirrors to companies
20  like Hyundai --
21          MS. SONG:  To --
22          MR. RAYMOND KIM:  They are
23  the users.  And they supply these
```

Page 90

```
 1    mirrors to other companies --
 2         MS. MYUNG KIM:  To other
 3    affiliates.
 4         MR. RAYMOND KIM:  -- like
 5    Hyundai.
 6         MS. SONG:  Okay.
 7         MS. MYUNG KIM:
 8    Approximately ten.
 9         MR. RAYMOND KIM:  Like
10    Toyota --
11         MS. SONG:  Okay.
12         MR. RAYMOND KIM:  -- or
13    Nissan or --
14         MS. SONG:  (Translates
15    into Korean)
16    A.    (Witness speaks in Korean)
17         MS. SONG:  I don't
18    understand your question.  Could
19    you repeat that one more time?
20    Q.    (By Mr. Stockham)  What do
21    you reflect the vice president of
22    Murakami said --
23         MS. SONG:  (Translates
```

Page 91

```
 1    into Korean)
 2    A.    (Witness speaks in Korean)
 3         MS. SONG:  I don't
 4    remember clearly but he said what's
 5    stated on the report.
 6    Q.    And what does your report
 7    say?
 8         MS. SONG:  (Translates
 9    into Korean)
10    A.    (Witness speaks in Korean)
11         MS. SONG:  They have been
12    manufacturing the outside mirrors
13    for sixty years.
14    A.    (Witness speaks in Korean)
15         MS. SONG:  And then --
16    A.    (Witness speaks in Korean)
17         MS. SONG:  Then to Toyota
18    affiliates within the United
19    States, majority of them United
20    States.
21         MS. MYUNG KIM:  Uh-uh.
22    Not majority.  Most of --
23         MS. SONG:  Most.
```

Page 92

```
 1    A.    Toyota plant.
 2         MS. SONG:  To Toyota
 3    plants.
 4    A.    Ten Toyota plants.
 5         MS. SONG:  Ten Toyota
 6    plants.
 7    A.    (Witness speaks in Korean)
 8         MS. SONG:  That they were
 9    supplying to those.
10    A.    (Witness speaks in Korean)
11         MS. SONG:  And then they
12    listed various companies.
13    Q.    (By Mr. Stockham)  Now,
14    how do you know that's what the
15    vice president of Murakami said?
16         MS. SONG:  (Translates
17    into Korean)
18    A.    (Witness speaks in Korean)
19         MS. SONG:  When I posed
20    the question --
21    A.    (Witness speaks in Korean)
22         MS. SONG:  When the
23    briefing was being made --
```

Page 93

```
 1    A.    (Witness speaks in Korean)
 2         MS. SONG:  -- I posed the
 3    question for how long had you been
 4    manufacturing the mirror, and to
 5    which plants are you supplying to.
 6    A.    (Witness speaks in Korean)
 7         MS. SONG:  And then the
 8    vice president of Murakami said --
 9    A.    (Witness speaks in Korean)
10         MS. SONG:  It's been sixty
11    years that we supply to about ten
12    different companies.
13    Q.    How do you know that's
14    what he said if you don't speak
15    English very well?
16         MS. SONG:  (Translates
17    into Korean)
18    A.    (Witness speaks in Korean)
19         MS. SONG:  My translator
20    explained it to me.  He was sitting
21    next to me.
22    Q.    Mr. Jason Chi?
23    A.    Yeah.
```

Page 94

```
1          MS. SONG: (Translates
2    into Korean)
3          Yes.
4      Q.    And so you would have to
5    wait for him to translate?
6          MS. SONG: (Translates
7    into Korean)
8      A.    (Witness speaks in Korean)
9          MS. SONG: Yes.
10     Q.    And then how would you
11   respond to the Murakami vice
12   president?
13         MS. SONG: (Translates
14   into Korean)
15     A.    (Witness speaks in Korean)
16         MS. SONG: I don't know
17   what you're asking me.
18     Q.    Would you speak directly
19   to Mr. --
20         MS. SONG: (Translates
21   into Korean)
22     Q.    -- to the vice president
23   of Murakami or would you speak to
```

Page 95

```
1    the translator?
2          MS. SONG: (Translates
3    into Korean)
4      A.    (Witness speaks in Korean)
5          MS. SONG: Through the
6    interpreter.
7      Q.    The next page.
8          MS. SONG: (Translates
9    into Korean)
10     Q.    Right at the very top
11   line.
12         MS. SONG: (Translates
13   into Korean)
14     Q.    It refers to the Murakami
15   presenter.
16         MS. SONG: (Translates
17   into Korean)
18     Q.    Was that a different
19   person than the vice president?
20         MS. SONG: (Translates
21   into Korean)
22     A.    (Witness speaks in Korean)
23         MS. SONG: Yes.
```

Page 96

```
1      Q.    Do you know whether that
2    person was the -- was American or a
3    Japanese person?
4          MS. SONG: (Translates
5    into Korean)
6      A.    (Witness speaks in Korean)
7          MS. SONG: I can't recall
8    clearly.
9      Q.    Looking on number -- where
10   -- it's number three.
11         MS. SONG: (Translates
12   into Korean)
13     Q.    You're referring to cure
14   time.
15         MS. SONG: (Translates
16   into Korean)
17     A.    (Witness speaks in Korean)
18         MS. SONG: Yes.
19     Q.    And was that a question
20   that you asked of the Murakami
21   presenter?
22         MS. SONG: (Translates
23   into Korean)
```

Page 97

```
1      A.    (Witness speaks in Korean)
2          MS. SONG: Yes.
3      Q.    And this was after the
4    Murakami presenter had made their
5    briefing?
6          MS. SONG: (Translates
7    into Korean)
8      A.    (Witness speaks in Korean)
9          MS. SONG: I believe the
10   question was posed during the
11   presentation, during the briefing.
12     Q.    And while the slides were
13   up you were asking him questions
14   during the presentation?
15         MS. SONG: (Translates
16   into Korean)
17     A.    (Witness speaks in Korean)
18         MS. SONG: I remember it
19   be that, yes.
20     Q.    And your next -- under
21   number three --
22         MS. SONG: (Translates
23   into Korean)
```

Page 98

```
1      Q.    -- it says that he
2    addressed the scratch problem
3    without explaining the --
4          MS. SONG:  Could you
5    segmentize that for me?
6          MR. STOCKHAM:  Sure.
7      Q.    You make reference to the
8    Murakami presenter --
9          MS. SONG:  (Translates
10   into Korean)
11     Q.    -- making reference to
12   scratch problems --.
13         MS. SONG:  (Translates
14   into Korean)
15     Q.    -- without addressing the
16   other problems.
17         MS. SONG:  (Translates
18   into Korean)
19     A.    (Witness speaks in Korean)
20         MS. SONG:  I don't know
21   what you're saying.
22     Q.    Okay.
23     A.    (Witness speaks in Korean)
```

Page 99

```
1          MS. SONG:  We never
2    discussed the problem on scratch.
3      Q.    Well, what do you -- if
4    you will read what you have under
5    -- for the -- what the Murakami
6    presenter said in that line.
7          MS. SONG:  (Translates
8    into Korean)
9      A.    (Witness speaks in Korean)
10         MS. SONG:  Without the
11   explanation on buffing.
12     Q.    What is the next thing you
13   say?
14     A.    (Witness speaks in Korean)
15         MS. SONG:  It was caused
16   by the container issue, which was
17   approved by HMMA.
18     A.    (Witness speaks in Korean)
19         MS. SONG:  Also they
20   stated that the problem was caused
21   -- the scratch problem was caused
22   by mishandling Glovis -- on Glovis'
23   part.
```

Page 100

```
1      Q.    So there was some
2    discussion of scratching?
3          MS. SONG:  (Translates
4    into Korean)
5      A.    (Witness speaks in Korean)
6          MS. SONG:  I would say
7    that the question on scratch itself
8    is wrong.
9      Q.    Well, you wrote down about
10   scratching.
11         MS. SONG:  (Translates
12   into Korean)
13     A.    (Witness speaks in Korean)
14         MS. SONG:  When I asked --
15     A.    (Witness speaks in Korean)
16         MS. SONG:  Under the
17   number three they -- you have
18   numbered --
19     A.    (Witness speaks in Korean)
20         MS. SONG:  When I
21   questioned --
22     A.    (Witness speaks in Korean)
23         MS. SONG:  I said that in
```

Page 101

```
1    spite of the fact that it takes
2    about four hours for cure time --
3      A.    (Witness speaks in Korean)
4          MS. SONG:  -- they did not
5    keep the time line.
6      A.    (Witness speaks in Korean)
7          MS. SONG:  Is that why
8    buffing happened?  That was my
9    question.
10     A.    (Witness speaks in Korean)
11         MS. SONG:  That was my
12   question.
13     A.    (Witness speaks in Korean)
14         MS. SONG:  But they
15   answered it something totally out
16   of the context.
17     Q.    They brought up the issue
18   of scratching?
19         MS. SONG:  (Translates
20   into Korean)
21     A.    (Witness speaks in Korean)
22         MS. SONG:  Yes.
23     Q.    Under number four --
```

1          MS. SONG:  (Translates
2  into Korean)
3      Q.    -- do you respond to their
4  comment about scratching?
5          MS. SONG:  (Translates
6  into Korean)
7      A.    (Witness speaks in Korean)
8          MS. SONG:  What response?
9      Q.    Well, right above that
10 they made reference to the
11 scratching problem.
12         MS. SONG:  (Translates
13 into Korean)
14     A.    Yeah.
15         MS. SONG:  Yes.
16     Q.    And they said that that
17 problem was caused by Glovis
18 handling.
19         MS. SONG:  (Translates
20 into Korean)
21     A.    (Witness speaks in Korean)
22         MS. SONG:  What was stated
23 is --

1      A.    (Witness speaks in Korean)
2          MS. SONG:  -- is the
3  answer that the presenter was
4  giving, which was not in context to
5  my question.
6          MR. BOSTICK:  --
7  responsive.
8          MS. MYUNG KIM:  Yeah.
9          MR. BOSTICK:  Well, say
10 that.  That's --
11         MS. MYUNG KIM:  It was not
12 responsive to Mr. Kim's question.
13         MS. SONG:  Okay.
14         MR. STOCKHAM:  Is that
15 accurate?
16         MR. RAYMOND KIM:  (Nods
17 head affirmatively.)
18     Q.    (By Mr. Stockham)  Now,
19 under number four --
20         MS. SONG:  (Translates
21 into Korean)
22     Q.    -- you are addressing the
23 problem again about the curing

1  time; is that correct?
2          MS. SONG:  (Translates
3  into Korean)
4      A.    (Witness speaks in Korean)
5          MS. SONG:  When you are
6  asking, you're addressing the
7  problem, what do you mean by that?
8          MS. MYUNG KIM:  (Speaks in
9  Korean)
10         MS. SONG:  (Speaks in
11 Korean)
12         MS. MYUNG KIM:  (Speaks in
13 Korean)
14         MS. SONG:  (Speaks in
15 Korean)
16         MR. RAYMOND KIM:  Bringing
17 up the subject.
18         MS. SONG:  (Speaks in
19 Korean)
20         MS. MYUNG KIM:  (Speaks in
21 Korean)
22         MS. SONG:  (Speaks in
23 Korean)

1          MR. BOSTICK:  What was our
2  discussion there?
3      A.    (Witness speaks in Korean)
4          MS. MYUNG KIM:  The way
5  she translated about addressing the
6  problem, she said it -- raised the
7  problem.
8          MR. BOSTICK:  Okay.
9          MS. MYUNG KIM:  He didn't
10 raise it.  So that's why he was
11 confused about why plaintiff's
12 attorney is asking me about raising
13 the scratching problem.  He didn't
14 raise it.
15         MR. BOSTICK:  Okay.
16         MS. MYUNG KIM:  And the
17 reason under the number four Mr.
18 Kim addressed scratch problem at
19 all is because the Murakami's
20 presenter gave answer
21 non-responsive to Mr. Kim's
22 question.
23         MR. BOSTICK:  All right.

Page 106

```
1          MS. MYUNG KIM:  That's
2   what he's saying.
3          MR. BOSTICK:  Let's just
4   -- let's start back over with our
5   question.  Sorry.
6          MS. SONG:  Okay.  Sorry.
7    Q.     (By Mr. Stockham) Let me
8   do this short -- see if I can short
9   circuit.
10         What do you say your
11  response is under number four?
12    .    MS. SONG:  (Translates
13  into Korean)
14    A.     (Witness speaks in Korean)
15         MS. SONG:  That I would
16  agree with what's written on the
17  report.
18    Q.    What do you have written
19  on the report?
20         MS. SONG:  (Translates
21  into Korean)
22    Q.    Let's take it one sentence
23  at a time.
```

Page 107

```
1          MS. SONG:  (Translates
2   into Korean)
3    A.     (Witness speaks in Korean)
4          MS. SONG:  The
5   container --
6    A.     (Witness speaks in Korean)
7          MS. SONG:  The container
8   that supplies the mirror --
9    A.     (Witness speaks in Korean)
10         MS. SONG:  -- and --
11  regardless to the shape --
12    A.     (Witness speaks in Korean)
13         MS. SONG:  -- if you had
14  kept the cure time there wouldn't
15  have been a problem relating to
16  buffing.
17    Q.    Now --
18    A.     (Witness speaks in Korean)
19         MS. SONG:  And then?
20    Q.    No.  Before you go on to
21  the next question.  Did anyone
22  discuss that question that you
23  raised before you went on to the
```

Page 108

```
1   next?
2          MS. SONG:  (Translates
3   into Korean)
4    A.     (Witness speaks in Korean)
5          MS. SONG:  No.
6    Q.    What was your next
7   question?
8          MS. SONG:  (Translates
9   into Korean)
10    A.     (Witness speaks in Korean)
11         MS. SONG:  So considering
12  all these things, including the
13  presentation from Murakami --
14    A.     (Witness speaks in Korean)
15         MS. SONG:  -- you have
16  such extensive experiences --
17    A.     (Witness speaks in Korean)
18         MS. SONG:  -- you know,
19  your company which supplies to
20  various Toyota affiliates within
21  the United States and other
22  companies --
23    A.     (Witness speaks in Korean)
```

Page 109

```
1          MS. SONG:  -- Murakami,
2   you did not keep the basic
3   fundamentals in manufacturing.
4    A.     (Witness speaks in Korean)
5          MS. SONG:  So regarding
6   the quality of Hyundai --
7    A.     (Witness speaks in Korean)
8          MS. SONG:  -- either you
9   didn't care --
10         MS. MYUNG KIM:  Pay
11  attention.
12         MS. SONG:  -- pay
13  attention or care --
14    A.     (Witness speaks in Korean)
15         MS. SONG:  Or wouldn't --
16  there may be a problem within the
17  Murakami system regarding the
18  quality.
19    Q.    And did you say that to
20  the translator?
21         MS. SONG:  (Translates
22  into Korean)
23    A.     (Witness speaks in Korean)
```

Page 110

```
1        MS. SONG:  Yes.
2    Q.    And the translator
3  translated what you said?
4        MS. SONG:  (Translates
5  into Korean)
6    A.    (Witness speaks in Korean)
7        MS. SONG:  I would think
8  so.
9    Q.    Now, you next show that
10 Rob responded.
11       MS. SONG:  (Translates
12 into Korean)
13   Q.    Is that correct?
14   A.    Yeah.
15       MS. SONG:  Yes.
16   Q.    Who is Rob?
17       MS. SONG:  (Translates
18 into Korean)
19   A.    (Witness speaks in Korean)
20       MS. SONG:  At the time --
21   A.    (Witness speaks in Korean)
22       MS. SONG:  -- he was an
23 employee at my company who was in
```

Page 111

```
1  charge of the --
2        MS. MYUNG KIM:  Executive
3  in charge of --
4        MS. SONG:  -- executive --
5        MS. MYUNG KIM:  --
6  purchasing.
7        MS. SONG:  -- executive --
8        MS. MYUNG KIM:  In charge
9  of --
10       MS. SONG:  -- charge of
11 the purchases --
12       MS. MYUNG KIM:  --
13 purchasing.
14       MS. SONG:  -- purchases.
15   Q.    Is that this gentleman
16 here (indicating)?
17   A.    (Witness speaks in Korean)
18       MS. SONG:  I think so.
19   Q.    Why did you refer to him
20 as Rob?
21       MS. SONG:  (Translates
22 into Korean)
23   A.    (Witness speaks in Korean)
```

Page 112

```
1        MS. SONG:  That's the only
2  name I know.
3    A.    (Witness speaks in Korean)
4        MS. SONG:  I don't know
5  his full name.
6    Q.    Now, you wrote down there
7  that he described the problem.
8        MS. SONG:  (Translates
9  into Korean)
10       MR. BOSTICK:  Object to
11 the form.
12   Q.    Is that correct?
13       MS. SONG:  (Translates
14 into Korean)
15   A.    (Witness speaks in Korean)
16       MS. SONG:  Could you
17 rephrase the question?
18   Q.    Well, then -- tell me what
19 you say in this statement.
20       MS. SONG:  (Translates
21 into Korean)
22   A.    (Witness speaks in Korean)
23       MS. SONG:  Because of the
```

Page 113

```
1  scratch problem on side mirrors --
2    A.    (Witness speaks in Korean)
3        MS. SONG:  -- regarding
4  the issue of HMMA rejecting --
5    A.    (Witness speaks in Korean)
6        MS. SONG:  -- talking
7  about that --
8    A.    (Witness speaks in Korean)
9        MS. SONG:  -- they printed
10 and passed around --
11       MS. MYUNG KIM:  Objection.
12 Not they.
13       MS. SONG:  -- the
14 photographs --
15       MS. MYUNG KIM:  They?  Who
16 is they?
17       MS. SONG:  I don't know.
18       MS. MYUNG KIM:  He.
19       MS. SONG:  He.  Okay.  I'm
20 sorry.
21       MR. STOCKHAM:  Is that
22 correct?
23       MR. RAYMOND KIM:  I don't
```

Page 114

```
 1   quite follow.  Number -- Rob --
 2   somebody is distributing the
 3   photographs.
 4        Q.    (By Mr. Stockham)  Does it
 5   indicate who is distributing the
 6   photographs?
 7            MS. SONG:  (Translates
 8   into Korean)
 9        A.    (Witness speaks in Korean)
10            MS. SONG:  I'm saying that
11   Rob printed out and passed --
12        A.    (Witness speaks in Korean)
13            MS. SONG:  -- passed the
14   photographs.  I don't know the
15   exact details but according to this
16   that's what it says.
17        Q.    He printed out and passed
18   the photographs?
19            MS. SONG:  (Translates
20   into Korean)
21        A.    (Witness speaks in Korean)
22            MS. SONG:  That's what it
23   says, yes.
```

Page 115

```
 1        Q.    So he went to a printer
 2   and printed them out?
 3            MS. SONG:  (Translates
 4   into Korean)
 5        A.    (Witness speaks in Korean)
 6            MS. SONG:  No.
 7        A.    (Witness speaks in Korean)
 8            MS. SONG:  I'm just --
 9        A.    (Witness speaks in Korean)
10            MS. SONG:  He already had
11   the printouts and he passed them
12   out.
13        Q.    And the -- it says the --
14   he distributed the photographs.
15   And what does it say about the
16   photographs?
17            MS. SONG:  (Translates
18   into Korean)
19        A.    (Witness speaks in Korean)
20            MS. SONG:  I don't know.
21        Q.    Well, what does your note
22   say about the photographs?
23            MS. SONG:  (Translates
```

Page 116

```
 1   into Korean)
 2        A.    (Witness speaks in Korean)
 3            MS. SONG:  While they
 4   were --
 5            MS. MYUNG KIM:  Who is
 6   they?
 7            MS. SONG:  I don't know.
 8            While -- I need a subject
 9   and it's not in there.
10            MS. MYUNG KIM:  Here
11   (indicating).  Glovis say so --
12            MS. SONG:  Okay.  While
13   Glovis was carrying on the --
14        A.    (Witness speaks in Korean)
15            MS. SONG:  --
16   forklifter --
17        A.    (Witness speaks in Korean)
18            MS. SONG:  While they were
19   carrying it --
20        A.    (Witness speaks in Korean)
21            MS. SONG:  -- by mistake
22   they spilled it on the floor.
23        A.    (Witness speaks in Korean)
```

Page 117

```
 1            MS. SONG:  So that's how
 2   the scratching -- the problem
 3   regarding scratch happened.
 4        A.    (Witness speaks in Korean)
 5            MS. SONG:  So we rejected
 6   and returned those products.
 7        A.    (Witness speaks in Korean)
 8            MS. SONG:  And also we
 9   consider that as downtime.
10        A.    (Witness speaks in Korean)
11            MS. SONG:  So they
12   complained about it.
13        Q.    Does it say anything about
14   someone feeling it was --
15            MS. MYUNG KIM:  They
16   consider is as the cause of
17   downtime.  You just said you --
18   they consider it as downtime.
19            MS. SONG:  Okay.
20            MS. MYUNG KIM:  You
21   considered it as the cause of
22   downtime.  That's what he said and
23   what is written there.
```

Page 118

```
 1        MS. SONG: Okay.  I was
 2  just reading the report.
 3      Q.   (By Mr. Stockham) Now,
 4  who considered it the cause of
 5  downtime, according to your note?
 6        MS. SONG: (Translates
 7  into Korean)
 8      A.   (Witness speaks in Korean)
 9        MS. SONG: I don't know
10  what you're saying.
11      A.   (Witness speaks in Korean)
12        MS. SONG: I don't
13  understand your question.
14      Q.   Well, the sentence which
15  you just read me --
16        MS. SONG: (Translates
17  into Korean)
18      Q.   -- who considered the
19  scratches from being spilled on the
20  floor the cause of downtime?
21        MR. BOSTICK: Object to
22  the form.
23        MS. SONG: (Translates
```

Page 119

```
 1  into Korean)
 2      A.   (Witness speaks in Korean)
 3        MS. MYUNG KIM: (Speaks in
 4  Korean) Listen to me.  I'm going
 5  to translate your question.
 6  (Speaks in Korean)
 7      A.   (Witness speaks in Korean)
 8        MS. SONG: Rob said that.
 9      A.   (Witness speaks in Korean)
10        MS. SONG: I mean, you
11  just told me to read what Rob said,
12  so that's what I did.
13      Q.   This is your note,
14  correct?
15        MS. SONG: (Translates
16  into Korean)
17      A.   (Witness speaks in Korean)
18        MS. SONG: Yes.
19      Q.   And you said, according to
20  your note --
21        MS. SONG: (Translates
22  into Korean)
23      Q.   -- that Rob said --
```

Page 120

```
 1        MS. SONG: (Translates
 2  into Korean)
 3      Q.   -- that the photographs
 4  showed that --
 5        MS. SONG: (Translates
 6  into Korean)
 7      Q.   -- the scratches on the
 8  mirrors were caused by the
 9  forklift.
10        MS. SONG: (Translates
11  into Korean)
12      Q.   Is that right?
13        MS. SONG: (Translates
14  into Korean)
15      A.   (Witness speaks in Korean)
16        MS. SONG: It's all
17  written on here and you keep asking
18  me the question.  So it's confusing
19  me.
20      A.   (Witness speaks in Korean)
21        MS. SONG: When you look
22  at the note --
23      A.   (Witness speaks in Korean)
```

Page 121

```
 1        MS. SONG: -- on the
 2  second line --
 3      A.   (Witness speaks in Korean)
 4        MS. SONG: -- while Glovis
 5  was carrying it on the forklift --
 6      A.   (Witness speaks in Korean)
 7        MS. SONG: -- by
 8  mistake --
 9      A.   (Witness speaks in Korean)
10        MS. SONG: -- they spilled
11  it on the floor.
12      A.   (Witness speaks in Korean)
13        MS. SONG: So that's how
14  the scratches are made.
15      A.   (Witness speaks in Korean)
16        MS. SONG: So we rejected
17  these and returned them also.
18      A.   (Witness speaks in Korean)
19        MS. SONG: And then
20  considering that as downtime --
21      A.   (Witness speaks in Korean)
22        MS. SONG: -- we
23  complained -- or --
```

Page 122

```
 1        MS. MYUNG KIM:  No.  He
 2  complained.
 3        MS. SONG:  -- he
 4  complained.
 5    Q.    Who complained?
 6        MS. SONG:  (Translates
 7  into Korean)
 8    A.    (Witness indicating)
 9        MR. RAYMOND KIM:  Rob.
10        MS. SONG:  Rob.
11        MR. BOSTICK:  He needs
12  to --
13        MS. MYUNG KIM:  You need
14  to answer it.
15        MR. BOSTICK:  Just answer
16  it.
17        MS. MYUNG KIM:  Say it.
18    Q.    Who complained?
19        MS. SONG:  (Translates
20  into Korean)
21        THE WITNESS:  Huh?
22        MS. SONG:  (Translates
23  into Korean)
```

Page 123

```
 1        MS. MYUNG KIM:  (Speaks in
 2  Korean)
 3        THE WITNESS:  (Speaks in
 4  Korean)
 5        MS. MYUNG KIM:  Rob?
 6    A.    Rob.
 7        MS. SONG:  Rob.
 8    Q.    He complained that it was
 9  -- what was he complaining about?
10        MS. SONG:  (Translates
11  into Korean)
12    A.    (Witness speaks in Korean)
13        MS. SONG:  When you look
14  here --
15    A.    (Witness speaks in Korean)
16        MS. SONG:  Since scratches
17  were made --
18    A.    (Witness speaks in Korean)
19        MS. SONG:  -- we rechecked
20  the items.
21    A.    (Witness speaks in Korean)
22        MS. SONG:  And we
23  considered that as part of
```

Page 124

```
 1  downtime.  So he --
 2    A.    (Witness speaks in Korean)
 3        MS. SONG:  -- complain
 4  about us considering that downtime.
 5        MS. MYUNG KIM:  No.  What
 6  he's saying is that Rob complained
 7  about the fact that -- the fact
 8  that Hyundai rejected and returned
 9  a product because of scratch which
10  was caused by careless handling of
11  Glovis and including them in
12  downtime.  That's what he's saying.
13  And -- is it correct?  Are you
14  agreeing with me?
15        MR. RAYMOND KIM:  Yeah,
16  that is correct.
17        MR. BOSTICK:  Just -- off
18  the record.
19        (Whereupon, an
20        off-the-record
21        discussion was held.)
22        MR. STOCKHAM:  Back on the
23  record.
```

Page 125

```
 1    Q.    (By Mr. Stockham)  When
 2  you're referring to complaining
 3  about downtime --
 4        MS. SONG:  (Translates
 5  into Korean)
 6        MS. MYUNG KIM:  Who?
 7    Q.    Reading here about what
 8  Rob said that he complained about
 9  downtime --
10        MS. SONG:  (Translates
11  into Korean)
12    Q.    -- is he complaining that
13  it's unfair?
14        MS. SONG:  (Translates
15  into Korean)
16    A.    (Witness speaks in Korean)
17        MS. MYUNG KIM:  Are you
18  asking him about what is stated
19  here or what he remembers about the
20  event?
21        MR. STOCKHAM:  What he
22  remembers.
23        MS. MYUNG KIM:  (Speaks in
```

Page 126

```
 1   Korean)
 2        MS. SONG:  (Translates
 3   into Korean)
 4        A.   (Witness speaks in Korean)
 5        MS. SONG:  No.
 6        A.   (Witness speaks in Korean)
 7        MS. SONG:  No.
 8        A.   (Witness speaks in Korean)
 9        MS. SONG:  I don't
10   remember in details.  But according
11   to this, no.
12        Q.    (By Mr. Stockham)  Do you
13   recall whether this was referring
14   to downtime being charged against
15   Murakami?
16        MS. SONG:  (Translates
17   into Korean)
18        MS. MYUNG KIM:  (Speaks in
19   Korean)
20        MS. SONG:  (Translates
21   into Korean)
22        A.   (Witness speaks in Korean)
23        MS. SONG:  I don't know.
```

Page 127

```
 1        Q.    Under number five --
 2        MS. SONG:  (Translates
 3   into Korean)
 4        Q.    -- is that your response
 5   to Rob's question?
 6        MS. SONG:  (Translates
 7   into Korean)
 8        A.   (Witness speaks in Korean)
 9        MS. SONG:  I wouldn't say
10   this is the answer to the question.
11   But --
12        A.   (Witness speaks in Korean)
13        MS. SONG:  -- since
14   complaint is made during the
15   meeting --
16        A.   (Witness speaks in Korean)
17        MS. SONG:  -- I said it.
18        Q.    And you're -- what you
19   tell -- is this particular
20   statement that you made under
21   number five --
22        MS. SONG:  (Translates
23   into Korean)
```

Page 128

```
 1        Q.    -- who is that addressed
 2   to?
 3        MS. SONG:  (Translates
 4   into Korean)
 5        A.   (Witness speaks in Korean)
 6        MS. SONG:  I was
 7   addressing to Rob Cyrus.
 8        Q.    And what you told him --
 9        MS. SONG:  (Translates
10   into Korean)
11        Q.    -- is that if there were
12   conflicting assessments --
13        MS. SONG:  (Translates
14   into Korean)
15        Q.    -- the persons in the
16   respective areas --
17        MS. SONG:  (Translates
18   into Korean)
19        Q.    -- of the company --
20        MS. SONG:  (Translates
21   into Korean)
22        Q.    -- should get together --
23        MS. SONG:  (Translates
```

Page 129

```
 1   into Korean)
 2        Q.    -- after the meeting?
 3        MS. SONG:  (Translates
 4   into Korean)
 5        MS. MYUNG KIM:  (Speaks in
 6   Korean)
 7        MS. SONG:  (Translates
 8   into Korean)
 9        A.   (Witness speaks in Korean)
10        MS. SONG:  Could you
11   repeat the question, please?
12        Q.    Sure.  Well, first of all,
13   so we'll have the -- what you said
14   out on the table, why don't you
15   tell me what it says.  Then I can
16   ask you questions about it.
17        MS. SONG:  (Translates
18   into Korean)
19        A.   (Witness speaks in Korean)
20        MS. SONG:  I'm addressing
21   what was said before.  So if there
22   are certain problems like that --
23        A.   (Witness speaks in Korean)
```

Page 130

```
 1        MS. SONG:  -- after the
 2  meeting --
 3     A.    (Witness speaks in Korean)
 4        MS. SONG:  -- we can
 5  coordinate with the employees
 6  that's responsible or --
 7        MS. MYUNG KIM:  In charge.
 8     A.    (Witness speaks in Korean)
 9        MS. SONG:  -- in
10  charge.  Thank you.  In charge.
11  And we can -- negotiate?
12        MS. MYUNG KIM:  No, adjust
13  and --
14        MS. SONG:  Adjust.
15        MS. MYUNG KIM:  Yeah,
16  discuss about it.
17        MS. SONG:  Discuss.  Thank
18  you.
19     A.    (Witness speaks in Korean)
20        MS. SONG:  If it's
21  Hyundai's fault --
22     A.    (Witness speaks in Korean)
23        MS. SONG:  -- or if it's
```

Page 131

```
 1  Glovis' fault --
 2     A.    (Witness speaks in Korean)
 3        MS. SONG:  -- of course,
 4  it wouldn't be responsible for
 5  Murakami, so --
 6     A.    (Witness speaks in Korean)
 7        MS. SONG:  -- don't --
 8  don't worry.
 9        MS. MYUNG KIM:  No.
10  Murakami wouldn't be responsible
11  for the problem.  You switched it.
12        MR. STOCKHAM:  Is that
13  right?
14        MR. RAYMOND KIM:  (Nods
15  head affirmatively)
16        MS. MYUNG KIM:  So don't
17  worry about it.
18     A.    (Witness speaks in Korean)
19        MS. SONG:  So let's
20  continue with the meeting.
21     Q.    (By Mr. Stockham)  Now,
22  when you said that people will get
23  together after the meeting --
```

Page 132

```
 1        MS. SONG:  (Translates
 2  into Korean)
 3     Q.    -- who are you referring
 4  to getting together?
 5        MS. SONG:  (Translates
 6  into Korean)
 7     A.    (Witness speaks in Korean)
 8        MS. SONG:  I will repeat
 9  the question one more time.
10     A.    (Witness speaks in Korean)
11        MS. SONG:  I want to ask
12  you if you're asking the person in
13  charge.
14     A.    (Witness speaks in Korean)
15        MS. SONG:  Oh, oh.  I want
16  his point of view when you say,
17  person in charge.
18        MS. MYUNG KIM:  Yeah.  He
19  is referring to who you referred to
20  when you meant the person in charge
21  in this statement.
22     Q.    Well, it says that people
23  will get together after -- from the
```

Page 133

```
 1  different areas will get together
 2  after the meeting.  Who are you
 3  referring to?
 4        MS. SONG:  (Translates
 5  into Korean)
 6     A.    (Witness speaks in Korean)
 7        MS. SONG:  My --
 8        MR. RAYMOND KIM:  (Speaks
 9  in Korean)
10        THE WITNESS:  (Speaks in
11  Korean)
12        MR. RAYMOND KIM:  (Speaks
13  in Korean)
14        THE WITNESS:  (Speaks in
15  Korean)
16        MR. RAYMOND KIM:  (Speaks
17  in Korean)
18     A.    (Witness speaks in Korean)
19        MR. RAYMOND KIM:  Ms. Song
20  --    MS. SONG:  Okay.  So when
21  I say, person in charge, I was
22  referring to the person from
23  Murakami, person from Glovis,
```

34  (Pages 130 to 133)

Page 134

1  person from Hyundai who would be in
2  charge.
3      Q.    Now, did you understand
4  that there was notice to the
5  attendees at the meeting that
6  that's what they were there for, to
7  discuss --
8          MR. BOSTICK:  Object to
9  the form.
10         MS. SONG:  (Translates
11 into Korean)
12         MS. MYUNG KIM:  (Speaks in
13 Korean)
14         THE WITNESS:  (Speaks in
15 Korean)
16         MR. RAYMOND KIM:  I don't
17 -- I'm caught between --
18         MS. MYUNG KIM:  Yeah.  Can
19 you repeat the question?
20         MR. RAYMOND KIM:  I don't
21 know whether I should answer in
22 Korean or English.
23         MR. STOCKHAM:  Well, tell

Page 135

1  me what he was saying, please, sir.
2          MR. RAYMOND KIM:  Well, I
3  -- may I suggest that you --
4          MR. STOCKHAM:  Sure.
5          MR. RAYMOND KIM:  -- ask
6  that -- repeat that question again?
7          MR. STOCKHAM:  Sure.
8          MR. RAYMOND KIM:  And --
9  restart it.
10     Q.    (By Mr. Stockham)  Did you
11 understand --
12         MS. SONG:  (Translates
13 into Korean)
14     A.    (Witness speaks in Korean)
15         MR. RAYMOND KIM:  (Speaks
16 in Korean)
17     Q.    Did you understand that
18 the people who were told to attend
19 the meeting --
20         MS. SONG:  (Translates
21 into Korean)
22     Q.    -- were told that the
23 reason to attend was --

Page 136

1          MS. SONG:  (Translates
2  into Korean)
3      Q.    -- to discuss the
4  conflicting assessments --
5          MS. SONG:  (Translates
6  into Korean)
7          MS. MYUNG KIM:  (Speaks in
8  Korean)
9          THE WITNESS:  (Speaks in
10 Korean)
11         MS. MYUNG KIM:  (Speaks in
12 Korean)
13         THE WITNESS:  (Speaks in
14 Korean)
15         MS. MYUNG KIM:  (Speaks in
16 Korean)
17         THE WITNESS:  (Speaks in
18 Korean)
19         MS. MYUNG KIM:  (Speaks in
20 Korean)
21         MS. SONG:  That's wrong.
22         MS. MYUNG KIM:  (Speaks in
23 Korean)

Page 137

1          THE WITNESS:  (Speaks in
2  Korean)
3          MS. MYUNG KIM:  Are you
4  agreeing with my translation?
5          MR. RAYMOND KIM:  Yes.
6  Yeah.
7          THE WITNESS:  (Speaks in
8  Korean)
9          MR. RAYMOND KIM:  (Speaks
10 in Korean)  Could we go off the
11 record?
12         MR. STOCKHAM:  Sure.
13         (Whereupon, an
14          off-the-record
15          discussion was held.)
16         (Whereupon, a brief
17          recess was taken in
18          the deposition.)
19         MR. STOCKHAM:  Back on the
20 record, please.
21     Q.    (By Mr. Stockham)  What
22 we're going to do is I'm going to
23 go through and have you read your

Page 138

1  statement into the record.
2      MS. SONG: (Translates
3  into Korean)
4      Q.    Then I will come back and
5  ask you specific questions about
6  parts of it.
7      MS. SONG: (Translates
8  into Korean)
9      Q.    Beginning with, I think,
10 right after number five.
11     MS. SONG: (Translates
12 into Korean)
13     A.    (Witness speaks in Korean)
14     MS. SONG: Starting five?
15     Q.    Sure.
16     MS. SONG: (Translates
17 into Korean)
18     A.    (Witness speaks in Korean)
19     MS. SONG: Head of the
20 factory.
21     A.    (Witness speaks in Korean)
22     MS. SONG: If there are
23 such problems --

Page 139

1      A.    (Witness speaks in Korean)
2      MS. SONG: -- after the
3  meeting --
4      A.    (Witness speaks in Korean)
5      MS. SONG: -- we can
6  discuss with the person in charge
7  and adjust --
8      A.    (Witness speaks in Korean)
9      MS. MYUNG KIM: No. We
10 can -- not we can -- we can and go.
11 (Speaks in Korean) The person in
12 charge would be able to have a
13 chance to discuss and resolve the
14 conflict about the issue. That's
15 what it said. There is no "we"
16 here.
17     MS. SONG: Right.
18     MS. MYUNG KIM: Do you
19 agree?
20     MR. STOCKHAM: Do you
21 agree?
22     MR. RAYMOND KIM: Yes.
23 But I don't know whether it's -- as

Page 140

1  you say, it will make the
2  distinction in such strong manner.
3  Mr. Kim is asking everybody in the
4  meeting to discuss the matter after
5  the meeting and resolve it among
6  yourselves.
7      MS. MYUNG KIM: So when he
8  explained before when we talk off
9  the record he said that, why don't
10 you -- if there is a problem why
11 don't you go and solve this problem
12 after this meeting. That's what he
13 said, right?
14     MR. RAYMOND KIM: That was
15 his intent. I guess everybody
16 understood it as such.
17     MS. MYUNG KIM: Yeah. I
18 mean, there is no "we", by the way.
19 Yeah. I got it.
20     Q.    Please go ahead.
21     A.    (Witness speaks in Korean)
22     MS. SONG: If it's
23 Hyundai's fault --

Page 141

1      A.    (Witness speaks in Korean)
2      MS. SONG: -- or if it's
3  Glovis' fault --
4      A.    (Witness speaks in Korean)
5      MS. SONG: -- of course,
6  Murakami would not be responsible.
7      A.    (Witness speaks in Korean)
8      MS. SONG: Do not worry.
9      A.    (Witness speaks in Korean)
10     MS. SONG: Let's resume
11 with the meeting.
12     MR. RAYMOND KIM:
13 That's --
14     Q.    Please go ahead.
15     MR. RAYMOND KIM: That's
16 it.
17     A.    (Witness speaks in Korean)
18     MS. SONG: Mr. Choi and
19 Rob --
20     A.    (Witness speaks in Korean)
21     MS. SONG: -- addressing
22 the issue above they mentioned
23 again.

Page 142

```
 1      A.    (Witness speaks in Korean)
 2           MS. SONG:  They delayed
 3  the meeting procedure.
 4      A.    (Witness speaks in Korean)
 5           MS. SONG:  At that time
 6  John Kalson --
 7      A.    (Witness speaks in Korean)
 8           MS. SONG:  -- Chris, who
 9  is in quality control --
10      A.    (Witness speaks in Korean)
11           MS. SONG:  -- said
12  something to Rob.
13      A.    (Witness speaks in Korean)
14           MS. SONG:  There were some
15  sort of dispute.
16      A.    (Witness speaks in Korean)
17           MS. SONG:  But I stopped
18  them.
19      A.    (Witness speaks in Korean)
20           MS. SONG:  Head of the
21  factory.
22      A.    (Witness speaks in Korean)
23           MS. SONG:  Okay.
```

Page 143

```
 1      A.    (Witness speaks in Korean)
 2           MS. SONG:  I'll summon Mr.
 3  Chae from Glovis --
 4      A.    (Witness speaks in Korean)
 5           MS. SONG:  -- and we'll
 6  look into it.
 7      A.    (Witness speaks in Korean)
 8           MS. SONG:  And if there
 9  are certain problems --
10      A.    (Witness speaks in Korean)
11           MS. SONG:  -- we can
12  discuss --
13      A.    (Witness speaks in Korean)
14           MS. SONG:  -- then there
15  shouldn't be any problem.
16      A.    (Witness speaks in Korean)
17           MS. SONG:  Let's resume
18  with the meeting.
19      Q.    Please go ahead.
20           MS. SONG:  (Translates
21  into Korean)
22      A.    (Witness speaks in Korean)
23           MS. SONG:  Rob.
```

Page 144

```
 1      A.    (Witness speaks in Korean)
 2           MS. SONG:  Addressing the
 3  scratch problem again --
 4      A.    (Witness speaks in Korean)
 5           MS. SONG:  -- said --
 6  asked if there is any other
 7  intentions.
 8      A.    (Witness speaks in Korean)
 9           MS. SONG:  And the meeting
10  got delayed.
11      A.    (Witness speaks in Korean)
12           MS. SONG:  The head of the
13  factory --
14      A.    (Witness speaks in Korean)
15           MS. SONG:  -- showing the
16  -- today's agenda.
17      A.    (Witness speaks in Korean)
18           MS. SONG:  What's not on
19  the content of the agenda for
20  today's meeting.
21      A.    (Witness speaks in Korean)
22           MS. SONG:  After the
23  meeting --
```

Page 145

```
 1      A.    (Witness speaks in Korean)
 2           MS. SONG:  -- in my
 3  presence --
 4      A.    (Witness speaks in Korean)
 5           MS. SONG:  -- we can
 6  discuss again. So --
 7      A.    (Witness speaks in Korean)
 8           MS. SONG:  -- we'll resume
 9  with the meeting --
10      A.    (Witness speaks in Korean)
11           MS. SONG:  -- and I'll
12  address it again.
13      A.    (Witness speaks in Korean)
14           MS. SONG:  The purpose of
15  the meeting --
16      A.    (Witness speaks in Korean)
17           MS. SONG:  -- is to say
18  that HMMA factory is not in
19  operation --
20      A.    (Witness speaks in Korean)
21           MS. SONG:  I'm sorry.
22      A.    (Witness speaks in Korean)
23           MS. SONG:  And
```

Page 146

```
1   currently --
2        A.    (Witness speaks in Korean)
3            MS. SONG:  -- after
4   analyzing --
5        A.    (Witness speaks in Korean)
6            MS. SONG:  -- after
7   analyzing the downtime's main
8   reason, main cause --
9        A.    (Witness speaks in Korean)
10           MS. SONG:  -- equipment
11  problems --
12       A.    (Witness speaks in Korean)
13           MS. SONG:  -- shortage --
14       A.    (Witness speaks in Korean)
15           MS. SONG:  -- defected
16  goods --
17       A.    (Witness speaks in Korean)
18           MS. SONG:  -- et cetera,
19  those show about the same ratio.
20       A.    (Witness speaks in Korean)
21           MS. SONG:  Those are the
22  big factors.
23       A.    (Witness speaks in Korean)
```

Page 148

```
1        A.    (Witness speaks in Korean)
2            MS. SONG:  -- to --
3        A.    (Witness speaks in Korean)
4            MS. SONG:  -- to pursue
5   what's Hyundai's --
6        A.    (Witness speaks in Korean)
7            MS. SONG:  -- in order to
8   manufacture the high quality car
9   that the Hyundai company is
10  pursuing.
11       A.    (Witness speaks in Korean)
12           MS. SONG:  It's not to
13  blame any particular supplier --
14       A.    (Witness speaks in Korean)
15           MS. SONG:  -- or to scold
16  them.
17       A.    (Witness speaks in Korean)
18           MS. SONG:  I wanted to
19  address that again --
20       A.    (Witness speaks in Korean)
21           MS. SONG:  -- and resume
22  with the meeting.
23       Q.    Next.
```

Page 147

```
1            MS. SONG:  So --
2        A.    (Witness speaks in Korean)
3            MS. SONG:  -- starting the
4   second week of September --
5        A.    (Witness speaks in Korean)
6            MS. SONG:  -- we came to
7   have this meeting --
8        A.    (Witness speaks in Korean)
9            MS. SONG:  -- and the
10  purpose of it is, as I have
11  addressed earlier --
12       A.    (Witness speaks in Korean)
13           MS. SONG:  -- first is to
14  have this to --
15           MS. MYUNG KIM:  Reduce the
16  downtime.
17           MS. SONG:  -- reduce the
18  downtime.  Thank you.
19       Q.    Okay.
20           MR. BOSTICK:  Eliminate
21  it?
22       A.    (Witness speaks in Korean)
23           MS. SONG:  And secondly --
```

Page 149

```
1        A.    (Witness speaks in Korean)
2            MS. SONG:  Rob.
3        A.    (Witness speaks in Korean)
4            MS. SONG:  Rob discussed
5   briefly with the business manager
6   from Murakami.
7        A.    (Witness speaks in Korean)
8            MS. SONG:  And addressed
9   again regarding the scratch issue
10  problem.
11       A.    (Witness speaks in Korean)
12           MS. SONG:  The business
13  manager from Murakami --
14       A.    (Witness speaks in Korean)
15           MS. SONG:  -- suddenly got
16  up from his seat.
17       A.    (Witness speaks in Korean)
18           MS. SONG:  He brought two
19  side mirrors from the back --
20       A.    (Witness speaks in Korean)
21           MS. SONG:  -- raised his
22  voice --
23       A.    (Witness speaks in Korean)
```

Page 150

```
 1          MS. SONG:  -- and then
 2  he --
 3      A.    (Witness speaks in Korean)
 4          MR. RAYMOND KIM:  Bang,
 5  banged against each other.
 6          MS. SONG:  He banged
 7  against those two together.
 8      A.    (Witness speaks in Korean)
 9          MS. SONG:  And then he
10  threw it on the meeting table.
11          Continue?
12          MR. STOCKHAM:  Go ahead.
13          MS. SONG:  (Translates
14  into Korean)
15      A.    (Witness speaks in Korean)
16          MS. SONG:  Head of the
17  factory.
18      A.    (Witness speaks in Korean)
19          MS. SONG:  I asked to see
20  those mirrors --
21      A.    (Witness speaks in Korean)
22          MS. SONG:  -- as looking
23  at those --
```

Page 151

```
 1      A.    (Witness speaks in Korean)
 2          MS. SONG:  -- the scratch
 3  problem is --
 4      A.    (Witness speaks in Korean)
 5          MS. SONG:  -- after this
 6  meeting.
 7      A.    (Witness speaks in Korean)
 8          MS. SONG:  Since we
 9  summoned Mr. Chae from Glovis --
10      A.    (Witness speaks in Korean)
11          MS. SONG:  -- we can
12  discuss it then.
13      A.    (Witness speaks in Korean)
14          MS. SONG:  We'll resume
15  with the meeting.
16      Q.    Go ahead.
17      A.    (Witness speaks in Korean)
18          MS. SONG:  At that time --
19      A.    (Witness speaks in Korean)
20          MS. SONG:  -- a manager,
21  Mr. --
22          MS. MYUNG KIM:  (Speaks in
23  Korean)
```

Page 152

```
 1          THE WITNESS:  (Speaks in
 2  Korean)
 3          MS. MYUNG KIM:  (Speaks in
 4  Korean)
 5          MR. RAYMOND KIM:  (Speaks
 6  in Korean)
 7          MS. SONG:  -- manager of
 8  purchasing department?
 9          MR. RAYMOND KIM:  This was
10  a misinterpretation of the -- here
11  it's called development.  They are
12  actually the purchasing department.
13          MR. STOCKHAM:  Okay.
14      Q.    Go ahead.
15      A.    (Witness speaks in Korean)
16          MS. SONG:  Rob.
17      A.    (Witness speaks in Korean)
18          MS. SONG:  Rob addressed
19  the scratch problem once again.
20      Q.    I'm sorry.  We
21  interrupted.  Would you begin at
22  the beginning of that --
23          MR. RAYMOND KIM:  (Speaks
```

Page 153

```
 1  in Korean)
 2          MS. SONG:  (Speaks in
 3  Korean)
 4      A.    (Witness speaks in Korean)
 5          MS. SONG:  At that time --
 6      A.    (Witness speaks in Korean)
 7          MS. SONG:  -- Mr. Chae
 8  from the purchase department --
 9      A.    (Witness speaks in Korean)
10          MS. SONG:  -- and Rob --
11      A.    (Witness speaks in Korean)
12          MS. SONG:  -- addressed
13  the scratch problem once again.
14      A.    (Witness speaks in Korean)
15          MS. SONG:  Rob says --
16      A.    (Witness speaks in Korean)
17          MS. SONG:  -- here people
18  from Murakami for this meeting --
19      A.    (Witness speaks in Korean)
20          MS. SONG:  -- they arrived
21  here yesterday.
22      A.    (Witness speaks in Korean)
23          MS. SONG:  They spent
```

Page 154

1  about five thousand dollars in
2  expense.
3      A.    (Witness speaks in Korean)
4          MS. SONG:  Who will be
5  responsible for that.
6      A.    (Witness speaks in Korean)
7          MS. SONG:  And he raised
8  his voice.
9      Q.    Go ahead.
10     A.    (Witness speaks in Korean)
11         MS. SONG:  Head of the
12 factory.
13     A.    (Witness speaks in Korean)
14         MS. SONG:  Mr. Choi --
15     A.    (Witness speaks in Korean)
16         MS. SONG:  -- I have
17 mentioned several times --
18     A.    (Witness speaks in Korean)
19         MS. SONG:  -- the purpose
20 of this meeting --
21     A.    (Witness speaks in Korean)
22         MS. SONG:  -- and the
23 topic of today's meeting --

Page 155

1      A.    (Witness speaks in Korean)
2          MS. SONG:  I have
3  mentioned it several times.
4      A.    (Witness speaks in Korean)
5          MS. SONG:  Why are you
6  doing what you're doing?
7      A.    (Witness speaks in Korean)
8          MS. SONG:  My voice was
9  rather a little bit raised.
10     A.    (Witness speaks in Korean)
11         MS. SONG:  Are you trying
12 -- did you come here to --
13         MR. RAYMOND KIM:  Defend
14 your --
15         MS. SONG:  -- defend your
16 company or supplier?
17     A.    (Witness speaks in Korean)
18         MS. SONG:  If I had --
19     A.    (Witness speaks in Korean)
20         MS. SONG:  If I had said
21 it this much then you should
22 understand.
23     A.    (Witness speaks in Korean)

Page 156

1          MS. SONG:  Under these
2  circumstances --
3      A.    (Witness speaks in Korean)
4          MS. SONG:  -- we cannot
5  continue with the meeting.  So
6  we'll just --
7          MS. MYUNG KIM:  Adjourn.
8          MS. SONG:  -- adjourn
9  here.
10     A.    (Witness speaks in Korean)
11         MS. SONG:  Afterwards the
12 meeting on the quality control --
13     A.    (Witness speaks in Korean)
14         MS. SONG:  -- either
15 manager Mr. Park in quality control
16 can supervise it --
17     A.    (Witness speaks in Korean)
18         MS. SONG:  -- or the
19 department of quality control --
20         MR. RAYMOND KIM:
21 Division.
22         MS. SONG:  -- division.
23     A.    (Witness speaks in Korean)

Page 157

1          MS. SONG:  I would like
2  them to take care of this issue.
3      A.    (Witness speaks in Korean)
4          MS. SONG:  So I closed up
5  the meeting file.
6      A.    (Witness speaks in Korean)
7          MS. SONG:  So at that time
8  we had a little bit of bang from
9  the table.
10     A.    (Witness speaks in Korean)
11         MS. SONG:  I got up from
12 my seat and went out of the
13 conference room.
14     A.    (Witness speaks in Korean)
15         MS. SONG:  What -- the
16 above has been the briefing.
17     Q.    On the next page, if you
18 will read that for me, please, sir.
19         MS. SONG:  (Translates
20 into Korean)
21     Q.    But before I go on to
22 that.  What date did you put on
23 the --

Page 158

1        MS. SONG: (Translates
2  into Korean)
3     A.    (Witness speaks in Korean)
4        MS. SONG: September 17th,
5  2005.
6     Q.    And that was the date that
7  you wrote this?
8        MS. SONG: (Translates
9  into Korean)
10    A.    (Witness speaks in Korean)
11       MS. SONG: I wrote it
12 right after the meeting.
13    A.    (Witness speaks in Korean)
14       MS. SONG: So probably
15 whoever typed this up --
16    A.    (Witness speaks in Korean)
17       MS. SONG: -- maybe it was
18 a day after.
19    A.    (Witness speaks in Korean)
20       MS. SONG: I don't know
21 exactly.
22    Q.    And that's your name right
23 underneath that?

Page 159

1        MS. SONG: (Translates
2  into Korean)
3     A.    Yeah.
4        MS. SONG: Yes.
5     Q.    Now, moving on to the next
6  page.
7        MS. SONG: (Translates
8  into Korean)
9     Q.    Would you read the top
10 line?
11       MS. SONG: (Translates
12 into Korean)
13    A.    (Witness speaks in Korean)
14       MS. SONG: My opinion.
15    A.    (Witness speaks in Korean)
16       MS. SONG: Number one.
17    A.    (Witness speaks in Korean)
18       MS. SONG: The meeting
19 regarding the quality control --
20    A.    (Witness speaks in Korean)
21       MS. SONG: -- monthly it
22 is managed by the head of the
23 quality control --

Page 160

1        MS. MYUNG KIM: Division.
2        MS. SONG: -- division.
3        MR. RAYMOND KIM: Division
4  head.
5        MS. SONG: Division.
6        MR. RAYMOND KIM: Head.
7  (Speaks in Korean)
8        MS. MYUNG KIM: (Speaks in
9  Korean)
10       MS. SONG: Head of the
11 quality control division.
12    A.    (Witness speaks in Korean)
13       MS. SONG: Supervised by.
14    A.    (Witness speaks in Korean)
15       MS. SONG: It is done at
16 each factory respectively but --
17    A.    (Witness speaks in Korean)
18       MS. SONG: -- in the case
19 of HMMA --
20    A.    (Witness speaks in Korean)
21       MS. SONG: -- as the main
22 factor to influence the --
23    A.    (Witness speaks in Korean)

Page 161

1        MS. MYUNG KIM: Main
2  factor contributing to downtime.
3        MS. SONG: Okay.
4        THE WITNESS: (Speaks in
5  Korean)
6        MS. SONG: (Speaks in
7  Korean)
8     A.    (Witness speaks in Korean)
9        MS. SONG: Starting in
10 September --
11    A.    (Witness speaks in Korean)
12       MS. SONG: -- it will be
13 done on every Friday --
14       MS. MYUNG KIM: No. It
15 has been done.
16       MS. SONG: (Speaks in
17 Korean) Past?
18       MS. MYUNG KIM: (Speaks in
19 Korean) Starting in September it
20 has been, yeah, held. The meeting
21 has been held every Friday.
22       MS. SONG: Okay.
23    A.    (Witness speaks in Korean)

Page 162

1      MS. MYUNG KIM: (Speaks in
2  Korean)
3      MS. SONG: (Speaks in
4  Korean)
5  A.    (Witness speaks in Korean)
6      MS. SONG: So that the
7  detail will be accurately notified
8  to the companies --
9      MR. RAYMOND KIM: Upper
10  management --
11      MS. SONG: -- upper
12  management --
13      MR. RAYMOND KIM: -- the
14  vendors.
15      MS. SONG: -- vendors
16  upper management --
17  A.    (Witness speaks in Korean)
18      MS. SONG: -- in order to
19  better the quality of the parts.
20  A.    (Witness speaks in Korean)
21      MS. SONG: And the
22  personnel in charge from each
23  respective companies or suppliers.

Page 163

1  A.    (Witness speaks in Korean)
2      MS. SONG: They do not
3  recognize the purpose of it.
4  A.    (Witness speaks in Korean)
5      MS. SONG: That they don't
6  recognize the purpose.
7      MR. RAYMOND KIM: There's
8  one problem with (Korean phrase).
9      MS. MYUNG KIM: Yeah.
10      MR. RAYMOND KIM: (Korean
11  phrase) is his company.
12      MS. SONG: Oh, okay. Oh,
13  I'm sorry.
14      MR. RAYMOND KIM: Yeah.
15      MS. MYUNG KIM: So can you
16  rephrase it since he's just reading
17  off of the report and you read this
18  and restructure your translation?
19      MS. SONG: Okay. I'll
20  try.
21      MS. MYUNG KIM: Because it
22  doesn't -- I don't think it flows
23  right.

Page 164

1      THE WITNESS: (Speaks in
2  Korean)
3      MS. SONG: Okay.
4  Regarding the suppliers meeting on
5  the quality control. Supervised
6  under the head of quality control
7  department every month, it will be
8  done at their factory respectively.
9  But in the case of HMMA as the
10  major factor for the downtime,
11  starting in September it has been
12  done every Friday, that we have
13  notified or -- notified the
14  circumstances to the upper
15  management in each suppliers in
16  order to better the quality of the
17  parts. But it doesn't seem to be
18  the fact that we see or
19  recognize --
20      MS. MYUNG KIM: Our
21  purchasing.
22      MS. SONG: -- our
23  purchasing --

Page 165

1      MS. MYUNG KIM: The people
2  in --
3      MS. SONG: -- people in --
4      MS. MYUNG KIM: --
5  purchasing.
6      MS. SONG: -- purchasing
7  department --
8      MS. MYUNG KIM: Does
9  not --
10      MS. SONG: -- does not
11  seem to recognize the purpose
12  accurately.
13      MS. MYUNG KIM: Can you
14  read it? Can you read what she
15  just said?
16      (Whereupon, an
17      off-the-record
18      discussion was held.)
19      (Whereupon, Ms. Song's
20  translation was repeated.)
21  Q.    (By Mr. Stockham) Okay.
22  Number two.
23  A.    (Witness speaks in Korean)

Page 166

```
1        MS. SONG:  During the
2   meeting the head of the factory --
3        A.    (Witness speaks in Korean)
4        MS. SONG:  -- explained
5   the same situation several times --
6        A.    (Witness speaks in Korean)
7        MS. SONG:  -- and
8   requested to refrain --
9        A.    (Witness speaks in Korean)
10       MS. SONG:  -- but
11  continued to act as a deputy --
12       A.    (Witness speaks in Korean)
13       MS. SONG:  -- and delayed
14  the meeting.
15       MS. MYUNG KIM:  As a
16  deputy of the supplier.
17       MS. SONG:  Of the
18  suppliers.
19       MS. MYUNG KIM:  Continue?
20       Q.   Go ahead.
21       A.    (Witness speaks in Korean)
22       MS. SONG:  In front of my
23  employees and suppliers --
```

Page 167

```
1        A.    (Witness speaks in Korean)
2        MS. SONG:  -- the image of
3   the company --
4        A.    (Witness speaks in Korean)
5        MS. SONG:  -- and the
6   image of the head of the factory
7   got damaged.
8        Q.   Go ahead.
9        A.    (Witness speaks in Korean)
10       MS. SONG:  Number four.
11       A.    (Witness speaks in Korean)
12       MS. SONG:  This is the
13  second meeting.
14       A.    (Witness speaks in Korean)
15       MS. SONG:  In -- from now
16  on during the claim meeting of the
17  suppliers --
18       A.    (Witness speaks in Korean)
19       MS. SONG:  -- it will have
20  great impact on it.
21       A.    (Witness speaks in Korean)
22       MS. SONG:  Also
23  afterwards.
```

Page 168

```
1        A.    (Witness speaks in Korean)
2        MS. SONG:  It seems as if
3   it will be difficult for me to be
4   in charge of meetings from now on.
5        Q.   Okay.  Now, I have some
6   questions I want to ask you about
7   the document.
8        MS. MYUNG KIM:  There is a
9   last line.
10       MR. STOCKHAM:  Okay.  I'm
11  sorry.  I thought we'd ask -- go
12  ahead and read the last line.
13       A.    (Witness speaks in Korean)
14       MS. SONG:  As is the case
15  with HMC.
16       A.    (Witness speaks in Korean)
17       MS. SONG:  Supervised by
18  the head of the quality control.
19       A.    (Witness speaks in Korean)
20       MS. SONG:  We conclude
21  that it would be recommended to
22  have a meeting on the quality
23  control --
```

Page 169

```
1        MS. MYUNG KIM:  Let me
2   clarify.  (Speaks in Korean)
3        THE WITNESS:  (Speaks in
4   Korean)
5        MS. MYUNG KIM:  (Speaks in
6   Korean)
7        THE WITNESS:  (Speaks in
8   Korean)
9        MS. MYUNG KIM:  (Speaks in
10  Korean)  Okay.  Yeah.
11       THE WITNESS:  (Speaks in
12  Korean)
13       MS. MYUNG KIM:  She got
14  that right.
15       MR. STOCKHAM:  So that as
16  correct?
17       MR. RAYMOND KIM:  Yeah, it
18  was.
19       Q.    (By Mr. Stockham)  Now, I
20  have some questions I want to ask
21  you.  If you will, look on page two
22  where it refers to, manager Choi
23  and Rob.
```

Page 170

```
 1        MS. SONG:  (Translates
 2   into Korean)
 3        Q.    It speaks about, they
 4   continued with the discussion.
 5        MS. SONG:  (Translates
 6   into Korean)
 7        Q.    Does that refer to the
 8   continuing discussion of the
 9   scratches?
10        MS. SONG:  (Translates
11   into Korean)
12        A.    (Witness speaks in Korean)
13        MS. SONG:  Yes, that's
14   right.
15        Q.    And both Chae and Rob were
16   talking about the scratches?
17        MS. SONG:  (Translates
18   into Korean)
19        A.    (Witness speaks in Korean)
20        MS. SONG:  Rob was leading
21   the conversation.
22        A.    (Witness speaks in Korean)
23        MS. SONG:  And Mr. Chae
```

Page 171

```
 1   was just --
 2        A.    (Witness speaks in Korean)
 3        MS. SONG:  -- agreeing,
 4   basically, with him.
 5        Q.    Was Mr. Chae speaking in
 6   English or in Korean?
 7        MS. SONG:  (Translates
 8   into Korean)
 9        A.    (Witness speaks in Korean)
10        MS. SONG:  I don't
11   remember.
12        Q.    And it said that at that
13   point John Kalson and Chris from
14   Quality Control said something to
15   Rob.
16        MS. SONG:  (Translates
17   into Korean)
18        Q.    Do you know what they
19   said?
20        MS. SONG:  (Translates
21   into Korean)
22        A.    (Witness speaks in Korean)
23        MS. SONG:  They said
```

Page 172

```
 1   something in English so I wouldn't
 2   know.
 3        Q.    Was it translated to you
 4   what they said?
 5        MS. SONG:  (Translates
 6   into Korean)
 7        A.    (Witness speaks in Korean)
 8        MS. SONG:  No.
 9        Q.    It said that they had a
10   discussion.  Did they raise their
11   voices?
12        MS. SONG:  (Translates
13   into Korean)
14        A.    (Witness speaks in Korean)
15        MS. SONG:  Whose voice are
16   you referring to?
17        Q.    Any voice.
18        MS. SONG:  (Translates
19   into Korean)
20        A.    (Witness speaks in Korean)
21        MS. SONG:  I would say
22   both of them were rather a little
23   bit raised.
```

Page 173

```
 1        Q.    Both of whom?
 2        MS. SONG:  (Translates
 3   into Korean)
 4        A.    (Witness speaks in Korean)
 5        MS. MYUNG KIM:  (Speaks in
 6   Korean)
 7        A.    (Witness speaks in Korean)
 8        MS. SONG:  I don't know.
 9   I don't remember clearly.  I don't
10   know.
11        Q.    You don't know whether --
12   who raised their voice?
13        MS. SONG:  (Translates
14   into Korean)
15        A.    (Witness speaks in Korean)
16        MS. SONG:  Rob and --
17        A.    (Witness speaks in Korean)
18        MS. SONG:  Rob.
19        Q.    Did Mr. Kalson raise his
20   voice?
21        MS. SONG:  (Translates
22   into Korean)
23        A.    (Witness speaks in Korean)
```

Page 174

```
1          MS. SONG: No.
2     A.    (Witness speaks in Korean)
3          MS. SONG: No, he was
4  talking in regular tone but I don't
5  know what he said.
6     Q.    Did Chris raise his voice?
7          MS. SONG: (Translates
8  into Korean)
9     A.    (Witness speaks in Korean)
10         MS. SONG: No.
11    Q.    Well, a second ago --
12         MS. SONG: (Translates
13 into Korean)
14    Q.    -- you said both of them.
15         MS. SONG: (Translates
16 into Korean)
17    A.    (Witness speaks in Korean)
18         MS. SONG: I misunderstood
19 you.
20    Q.    Now, how long did that
21 conversation go on?
22         MS. SONG: (Translates
23 into Korean)
```

Page 175

```
1     A.    (Witness speaks in Korean)
2          MS. SONG: I don't
3  remember clearly.
4     A.    (Witness speaks in Korean)
5          MS. SONG: Within the one
6  minute span.
7     Q.    Were Mr. Kalson and Chris
8  and Rob all talking together?
9          MS. SONG: (Translates
10 into Korean)
11    A.    Yeah.
12         MS. SONG: Yes.
13    Q.    And that all took place in
14 one minute?
15         MS. SONG: (Translates
16 into Korean)
17    A.    (Witness speaks in Korean)
18         MS. SONG: Yes.
19    A.    (Witness speaks in Korean)
20         MS. SONG: That's what I
21 remember it to be.
22    Q.    And were they sitting
23 beside each other?
```

Page 176

```
1          MS. SONG: (Translates
2  into Korean)
3     A.    (Witness speaks in Korean)
4          MS. SONG: Who?
5     Q.    Chris and John Kalson and
6  Rob.
7          MS. SONG: (Translates
8  into Korean)
9     A.    (Witness speaks in Korean)
10         MS. SONG: Rob was on the
11 opposite side from me.
12    A.    (Witness speaks in Korean)
13         MS. SONG: And Kalson and
14 Chris were sitting next to each
15 other across from Rob.
16    Q.    Across the table?
17         MS. SONG: (Translates
18 into Korean)
19    A.    (Witness speaks in Korean)
20         MS. SONG: Yes, across the
21 table.
22    Q.    And you were at the head
23 of the table?
```

Page 177

```
1          MS. SONG: (Translates
2  into Korean)
3     A.    (Witness indicates)
4          MS. SONG: Right here.
5     Q.    So you were equal distance
6  from Rob and from Chris?
7          MS. SONG: (Translates
8  into Korean)
9     A.    (Witness speaks in Korean)
10         MS. SONG: Rob was a
11 little bit more further away from
12 me.
13    A.    (Witness speaks in Korean)
14         MS. SONG: And Kalson and
15 Chris was seated -- they were
16 seated a little bit closer to me.
17    Q.    Did you interrupt their
18 discussion?
19         MS. SONG: (Translates
20 into Korean)
21    A.    (Witness speaks in Korean)
22         MS. SONG: Yes. They were
23 talking. So yes.
```

Page 178

```
 1      Q.   How did you interrupt
 2 their discussion?
 3           MS. SONG: (Translates
 4 into Korean)
 5      A.   (Witness speaks in Korean)
 6           MS. SONG: Like I said
 7 right here on the memo.
 8      Q.   What did you say?
 9           MS. SONG: (Translates
10 into Korean)
11      Q.   No. I'm sorry. Not in
12 the memo. But --
13           MS. SONG: (Translates
14 into Korean)
15      Q.   -- did you say something
16 directly to them?
17           MS. SONG: (Translates
18 into Korean)
19      A.   (Witness speaks in Korean)
20           MS. SONG: I don't
21 remember. So I need to refer to
22 this --
23      Q.   Okay.
```

Page 180

```
 1           MS. SONG: (Translates
 2 into Korean)
 3      A.   (Witness speaks in Korean)
 4           MS. SONG: Okay.
 5      A.   (Witness speaks in Korean)
 6           MS. SONG: We'll summon
 7 the Mr. Chae from Glovis.
 8      A.   (Witness speaks in Korean)
 9           MS. SONG: And we'll look
10 into this.
11      A.   (Witness speaks in Korean)
12           MS. SONG: And if there is
13 a problem --
14      A.   (Witness speaks in Korean)
15           MS. SONG: -- we can --
16      A.   (Witness speaks in Korean)
17           MS. SONG: -- after
18 discussing --
19      A.   (Witness speaks in Korean)
20           MS. SONG: -- there
21 wouldn't be any problem.
22      A.   (Witness speaks in Korean)
23           MS. SONG: Let's resume
```

Page 179

```
 1           MS. SONG: -- in order to
 2 tell you.
 3      Q.   Did you speak directly to
 4 the individuals or did you talk
 5 through the translator?
 6           MS. SONG: (Translates
 7 into Korean)
 8      A.   (Witness speaks in Korean)
 9           MS. SONG: I don't
10 remember.
11      Q.   And do you recall what you
12 said?
13           MS. SONG: (Translates
14 into Korean)
15      A.   (Witness speaks in Korean)
16           MS. SONG: I don't
17 remember either.
18      A.   (Witness speaks in Korean)
19           MS. SONG: But if you
20 refer to this then that's what I
21 said.
22      Q.   And this just says --
23 what?
```

Page 181

```
 1 with the meeting.
 2      Q.   So that's what you told
 3 them to get them to stop?
 4           MS. SONG: (Translates
 5 into Korean)
 6      A.   (Witness speaks in Korean)
 7           MS. SONG: Yes, that's
 8 right.
 9      Q.   That -- next it says that
10 Rob raised the scratch problem
11 again.
12           MS. SONG: (Translates
13 into Korean)
14      Q.   What did you mean by --
15 that he was suggesting something --
16           MS. SONG: (Translates
17 into Korean)
18      A.   (Witness speaks in Korean)
19           MS. SONG: That's not what
20 I said.
21      Q.   Well, what do you say?
22           MS. SONG: (Translates
23 into Korean)
```

Page 182

1    A.    (Witness speaks in Korean)
2         MS. SONG:  That's what Rob
3    said.
4    Q.    But what did he say,
5    that --
6         MS. SONG:  (Translates
7    into Korean)
8    A.    (Witness speaks in Korean)
9         MS. SONG:  He brought up
10   the scratching problem again.
11   A.    (Witness speaks in Korean)
12        MS. SONG:  He said, is
13   there any other intentions.
14   A.    (Witness speaks in Korean)
15        MS. SONG:  The meeting got
16   delayed.
17   Q.    What did you mean, any
18   other intentions?
19        MS. SONG:  (Translates
20   into Korean)
21        MR. BOSTICK:  Object to
22   the form.
23   A.    (Witness speaks in Korean)

Page 183

1         MS. SONG:  I do not know.
2    You ask himself, who said it.
3    Q.    Who did he ask the -- ask
4    that question to about other
5    intentions?
6         MS. SONG:  I'm sorry.  I
7    need to know when you say, he.
8    Q.    Who did Rob ask the
9    question to about other intentions?
10        MS. SONG:  (Translates
11   into Korean)
12   A.    (Witness speaks in Korean)
13        MS. SONG:  It wasn't in
14   the form of a question.  He just
15   said there may be some sort of
16   intentions here.
17   Q.    How do you know that's
18   what he said?
19        MS. SONG:  (Translates
20   into Korean)
21   A.    (Witness speaks in Korean)
22        MS. SONG:  My translator.
23   Q.    Now, the next line, it

Page 184

1    says, you displayed the meeting
2    agenda.
3         MS. SONG:  (Translates
4    into Korean)
5    Q.    What were you referring to
6    there?
7         MS. SONG:  (Translates
8    into Korean)
9    A.    (Witness speaks in Korean)
10        MS. SONG:  Perhaps what
11   was placed in front of me.
12   Q.    The slide presentation by
13   the -- by Murakami?
14        MS. SONG:  (Translates
15   into Korean)
16   A.    (Witness speaks in Korean)
17        MS. SONG:  No.
18   Q.    Well, that's what you told
19   me was before you.  What do you say
20   that you were displaying?
21        MS. SONG:  (Translates
22   into Korean)
23   A.    (Witness speaks in Korean)

Page 185

1         MS. SONG:  In front of my
2    desk there is briefing materials
3    for each suppliers.  And then there
4    is -- the title of it on the very
5    top.
6    A.    (Witness speaks in Korean)
7         MS. MYUNG KIM:  (Speaks in
8    Korean)
9         THE WITNESS:  (Speaks in
10   Korean)
11        MR. STOCKHAM:  I'm going
12   to object to --
13        THE WITNESS:  (Speaks in
14   Korean)
15        MR. STOCKHAM:  -- talking
16   during --
17        THE WITNESS:  (Speaks in
18   Korean)
19        MR. BOSTICK:  Yeah.
20        MR. STOCKHAM:  There's not
21   a -- there wasn't a point to be
22   clarified.
23        MR. BOSTICK:  Okay.

Page 186

```
 1            MR. STOCKHAM:  I'm going
 2   to object to her --
 3            MR. BOSTICK:  Clarify --
 4   that's fine.  If you've got a
 5   question with the translation --
 6   but don't be --
 7            MS. MYUNG KIM:  Okay.
 8            MR. BOSTICK:  -- helping
 9   him with the answering.
10            MS. SONG:  There will be a
11   list of the outlines on very top.
12   And then there will be lists of the
13   things underneath to go in order
14   for the meeting.
15       Q.   Like Exhibit Number One?
16            MS. SONG:  (Translates
17   into Korean)
18       A.   (Witness speaks in Korean)
19            MS. SONG:  I wouldn't
20   know --
21       A.   (Witness speaks in Korean)
22            MS. SONG:  I wouldn't know
23   the contents of this.  But there is
```

Page 187

```
 1   a pile of documents like this in a
 2   binder.
 3       A.   (Witness speaks in Korean)
 4            MS. SONG:  And then I was
 5   just -- I just had this in my hand.
 6       Q.   It says under this number
 7   seven that the -- the items that
 8   were not included in the agenda can
 9   be discussed at another meeting
10   presided by you, doesn't it?
11            MS. SONG:  (Translates
12   into Korean)
13       A.   (Witness speaks in Korean)
14            MS. SONG:  Yes, that's
15   right.
16       Q.   So, at least according to
17   your notes, you had an agenda in
18   front of you?
19            MS. SONG:  (Translates
20   into Korean)
21            MR. BOSTICK:  Object to
22   the form.
23       A.   (Witness speaks in Korean)
```

Page 188

```
 1            MS. SONG:  Yes, there was
 2   a sheet.
 3       Q.   Do you think that there --
 4   that you had a different agenda
 5   from what was presented to every
 6   other Hyundai employee at the
 7   meeting?
 8            MR. BOSTICK:  Object to
 9   the form.
10            MS. SONG:  (Translates
11   into Korean)
12       A.   (Witness speaks in Korean)
13            MS. SONG:  No.
14       Q.   If the agenda from Mr.
15   Cyrus -- strike that.
16            Was there an HMC quality
17   manager there?
18            MS. SONG:  (Translates
19   into Korean)
20       A.   (Witness speaks in Korean)
21            MS. SONG:  Yes.
22       Q.   His name was Mr. Park?
23            MS. SONG:  (Translates
```

Page 189

```
 1   into Korean)
 2       A.   Yeah.
 3            MS. SONG:  Yes.
 4       Q.   If Mr. Park had Exhibit
 5   One as the agenda do you think that
 6   that would be different from the
 7   agenda that you would have?
 8            MS. SONG:  (Translates
 9   into Korean)
10       A.   (Witness speaks in Korean)
11            MS. SONG:  I don't know.
12       Q.   Now, looking at -- right
13   below number seven --
14            MS. SONG:  (Translates
15   into Korean)
16       Q.   -- where it says, Rob.
17            MS. SONG:  (Translates
18   into Korean)
19       Q.   It said, the sales manager
20   went to the back of the room and
21   came back with mirrors.
22            MS. SONG:  (Translates
23   into Korean)
```

Page 190

1    Q.    And refers to someone
2  raising their voice.
3        MS. SONG:  (Translates
4  into Korean)
5      A.    (Witness speaks in Korean)
6        MS. SONG:  Yes.
7    Q.    Who raised their voice?
8        MS. SONG:  (Translates
9  into Korean)
10     A.    (Witness speaks in Korean)
11       MS. SONG:  Rob raised his
12 voice.
13    Q.    Rob --
14     A.    (Witness speaks in Korean)
15       MS. SONG:  It was the
16 supplier -- the personnel from
17 supplier who actually banged the
18 mirrors together.
19    Q.    And you say Rob raised his
20 voice?
21       MS. SONG:  (Translates
22 into Korean)
23     A.    (Witness nods head

Page 191

1  affirmatively.)
2        MS. SONG:  Yes.
3    Q.    Did Rob raise his voice
4  before or after the person from
5  supply banged the mirrors together?
6        MS. SONG:  (Translates
7  into Korean)
8        MS. MYUNG KIM:  (Speaks in
9  Korean)
10       MS. SONG:  (Translates
11 into Korean)
12     A.    (Witness speaks in Korean)
13       MS. SONG:  Afterwards.
14    Q.    What did he say when he
15 raised his voice?
16       MS. SONG:  (Translates
17 into Korean)
18     A.    (Witness speaks in Korean)
19       MS. SONG:  I don't know.
20    Q.    Who did he raise his
21 voice --
22       MS. SONG:  (Translates
23 into Korean)  I'm sorry?

Page 192

1    Q.    To whom did he raise his
2  voice?
3        MS. SONG:  (Translates
4  into Korean)
5      A.    (Witness speaks in Korean)
6        MS. SONG:  I don't know.
7      A.    (Witness speaks in Korean)
8        MS. SONG:  But I --
9  wouldn't have been me.  Who was,
10 you know, in charge of the meeting.
11    Q.    So he wasn't addressing
12 you when he raised his voice?
13       MS. SONG:  I'm sorry?
14    Q.    Is that what you're
15 saying?
16       MS. MYUNG KIM:  No.  She
17 should have said, it would have
18 been me, is that she --
19       MS. SONG:  It wouldn't
20 have been me.  I said --
21       MS. MYUNG KIM:  Would have
22 been --
23       MS. SONG:  Didn't he say

Page 193

1  in question form?
2        MS. MYUNG KIM:  (Speaks in
3  Korean)
4        THE WITNESS:  (Speaks in
5  Korean)
6        MS. MYUNG KIM:  (Speaks in
7  Korean)
8        MR. STOCKHAM:  Mr. Kim?
9        MR. RAYMOND KIM:  I'm
10 sorry.  I didn't follow.
11       MS. MYUNG KIM:  (Speaks in
12 Korean)
13       MR. RAYMOND KIM:
14 Repeat --
15       MS. MYUNG KIM:  (Speaks in
16 Korean)
17    Q.    (By Mr. Stockham)  Let me
18 rephrase the question because --
19       MS. SONG:  (Speaks in
20 Korean)
21    Q.    Mr. Kim, who did Mr. Cyrus
22 raise his voice to?
23       MS. SONG:  (Translates

Page 194

1    into Korean)
2        A.    (Witness speaks in Korean)
3            MS. SONG:  He looked at my
4    side, so it would have been me.
5        Q.    But you don't know what he
6    said?
7            MS. SONG:  (Translates
8    into Korean)
9        A.    (Witness speaks in Korean)
10            MS. SONG:  I don't know.
11        Q.    Translator didn't tell
12    you?
13            MS. SONG:  (Translates
14    into Korean)
15        A.    (Witness speaks in Korean)
16            MS. SONG:  No.
17        Q.    You didn't respond?
18            MS. SONG:  (Translates
19    into Korean)
20        A.    (Witness speaks in Korean)
21            MS. SONG:  No.
22        Q.    And after that --
23            MS. SONG:  (Translates

Page 195

1    into Korean)
2        Q.    -- Mr. Choi and Rob
3    continued to discuss the scratch
4    problem?
5            MR. BOSTICK:  Object to
6    the form.
7            MS. SONG:  (Translates
8    into Korean)
9        A.    (Witness speaks in Korean)
10            MS. SONG:  Can you ask me
11    one more time, please?
12        Q.    It was after Mr. Cyrus
13    raised his voice to you --
14            MS. SONG:  (Translates
15    into Korean)
16        Q.    -- according to your
17    note --
18            MS. SONG:  (Translates
19    into Korean)
20        Q.    -- that Mr. Choi and Mr.
21    Rob continued to discuss --
22            MS. SONG:  (Translates
23    into Korean)

Page 196

1        Q.    -- the scratch problem?
2            MR. BOSTICK:  Object to
3    the form.
4            MS. SONG:  (Translates
5    into Korean)
6            MR. BOSTICK:  It's a
7    statement.  It's not a question.
8            MS. SONG:  (Translates
9    into Korean)
10        A.    (Witness speaks in Korean)
11            MS. SONG:  No.  I don't
12    know what Mr. Chae and Rob said
13    among themselves.
14        A.    (Witness speaks in Korean)
15            MS. SONG:  But --
16        A.    (Witness speaks in Korean)
17            MS. SONG:  -- when Rob
18    said this --
19        A.    (Witness speaks in Korean)
20            MS. SONG:  -- when he was
21    raising his voice --
22        A.    (Witness speaks in Korean)
23            MS. SONG:  -- and when he

Page 197

1    hit the table with it --
2        A.    (Witness speaks in Korean)
3            MS. SONG:  -- I asked to
4    see the mirrors.
5        A.    (Witness speaks in Korean)
6            MS. SONG:  So I was
7    looking at the mirrors --
8        A.    (Witness speaks in Korean)
9            MS. SONG:  -- in relation
10    to the scratch problem --
11        A.    (Witness speaks in Korean)
12            MS. SONG:  -- after the
13    meeting --
14        A.    (Witness speaks in Korean)
15            MS. SONG:  -- since I
16    summoned Mr. Chae from Glovis.
17        A.    (Witness speaks in Korean)
18            MS. SONG:  This can be --
19        A.    (Witness speaks in Korean)
20            MS. SONG:  That can be
21    discussed at that time and let's
22    resume with the meeting.
23        A.    (Witness speaks in Korean)

Page 198

```
 1          MS. SONG:  At that time --
 2     A.   (Witness speaks in Korean)
 3          MS. SONG:  -- Mr. Chae and
 4  Rob addressed that scratch problem
 5  again.
 6     Q.    And how long did they
 7  continue to talk about the scratch
 8  problem?
 9          MS. SONG:  (Translates
10  into Korean)
11     A.   (Witness speaks in Korean)
12          MS. SONG:  I don't know.
13  Anyway --
14     A.   (Witness speaks in Korean)
15          MS. SONG:  -- Rob said
16  something.
17     A.   (Witness speaks in Korean)
18          MS. SONG:  And then Mr.
19  Chae piggybacked on him.
20     Q.   What did Mr. -- well,
21  first of all, who did Mr. Chae
22  address?
23          MS. SONG:  (Translates
```

Page 199

```
 1  into Korean)
 2     A.   (Witness speaks in Korean)
 3          MS. SONG:  To me and -- I
 4  mean, he was facing me.
 5     Q.    Mr.  Chae was addressing
 6  you?
 7          MS. SONG:  (Translates
 8  into Korean)
 9     A.   (Witness speaks in Korean)
10          MS. SONG:  Because of the
11  way we're --
12     A.   (Witness speaks in Korean)
13          MS. SONG:  The way we're
14  seated the quality control --
15     A.   (Witness speaks in Korean)
16          MS. SONG:  And in my side
17  is the side that they were facing.
18     Q.    And was Mr. Choi speaking
19  English or Korean?
20          MS. SONG:  (Translates
21  into Korean)
22          MR. BOSTICK:  Objection.
23          MS. SONG:  (Translates
```

Page 200

```
 1  into Korean)
 2     A.   (Witness speaks in Korean)
 3          MS. SONG:  In Korean I
 4  would think.
 5     Q.    Do you know whether he was
 6  speaking any English?
 7          MS. SONG:  (Translates
 8  into Korean)
 9     A.   (Witness speaks in Korean)
10          MS. SONG:  I guess a
11  little but I don't know if he
12  speaks well.
13     Q.    But at that particular
14  time do you know whether he was
15  speaking Korean or English?
16          MS. SONG:  (Translates
17  into Korean)
18     A.   (Witness speaks in Korean)
19          MS. SONG:  Anyway, I
20  remember --
21     A.   (Witness speaks in Korean)
22          MS. SONG:  I don't
23  remember clearly but I would think
```

Page 201

```
 1  that he said it in Korean.
 2     Q.    Do you know whether he was
 3  addressing the people from Murakami
 4  or not?
 5          MS. SONG:  (Translates
 6  into Korean)
 7     A.   (Witness speaks in Korean)
 8          MS. SONG:  Could you
 9  rephrase the question one more
10  time?
11     Q.    Do you know whether or not
12  Mr. Choi was addressing the people
13  form Murakami at this time?
14          MS. SONG:  (Translates
15  into Korean)
16     A.   (Witness speaks in Korean)
17          MS. SONG:  I don't
18  remember clearly --
19     A.   (Witness speaks in Korean)
20          MS. SONG:  -- as I have
21  mentioned before.
22     A.   (Witness speaks in Korean)
23          MS. SONG:  But as he was
```

Page 202

```
 1  talking across the table then
 2  apparently he was talking to the
 3  people across the table.
 4      Q.    Well, you were at the end
 5  of the table, weren't you?
 6      MS. SONG:  (Translates
 7  into Korean)
 8      A.    (Witness speaks in Korean)
 9      MS. SONG:  I was sitting
10  right there (indicating).
11      A.    (Witness speaks in Korean)
12      MS. SONG:  There was the
13  interpreter and then John Kalson.
14      A.    (Witness speaks in Korean)
15      MS. SONG:  And then Chris.
16      A.    (Witness speaks in Korean)
17      MS. SONG:  So --
18      A.    (Witness speaks in Korean)
19      Q.    Well, let me ask you.
20  Identify where you were sitting,
21  please, sir.
22      MS. SONG:  (Translates
23  into Korean)
```

Page 203

```
 1      A.    (Witness speaks in Korean)
 2  (indicating)
 3      MS. SONG:  Right here
 4  (indicating).
 5      Q.    And where was -- and put a
 6  K.
 7      MS. SONG:  (Translates
 8  into Korean)
 9      (Witness complies)
10      Q.    And put where the
11  interpreter sat.
12      MS. SONG:  (Translates
13  into Korean)
14      A.    (Witness speaks in Korean)
15      (Witness complies)
16      Q.    And where did Mr. Choi
17  sit?
18      MS. SONG:  (Translates
19  into Korean)
20      A.    (Indicating)
21      Q.    And where did Mr. -- Rob
22  sit?
23      MS. SONG:  (Translates
```

Page 204

```
 1  into Korean)
 2      A.    (Indicating)
 3      Q.    And who sat on the other
 4  side toward you from Mr. Choi?
 5      MS. SONG:  I'm sorry.
 6      MR. STOCKHAM:  Yes, go
 7  ahead.
 8      MS. SONG:  This one
 9  (indicating)?
10      MR. BOSTICK:  Uh-uh.
11      MS. SONG:  This one.
12  (indicating)?
13      MR. STOCKHAM:  No, up here
14  (indicating).
15      MR. BOSTICK:  Who was next
16  to here (indicating).
17      MS. SONG:  (Translates
18  into Korean)
19      A.    (Witness speaks in Korean)
20      MS. SONG:  I don't know.
21      Q.    Where did Mr. -- Chris
22  sit?
23      MS. SONG:  (Translates
```

Page 205

```
 1  into Korean)
 2      A.    (Indicating)
 3      Q.    And where did Mr. -- John
 4  sit?
 5      MS. SONG:  (Translates
 6  into Korean)
 7      A.    (Indicating)
 8      Q.    So let me just get you, if
 9  you will -- am I correct that
10  that's (indicating) where you sat?
11      MS. SONG:  (Translates
12  into Korean)
13      A.    Yeah.
14      Q.    And this (indicating) is
15  where Mr. Chae sat?
16      MS. SONG:  (Translates
17  into Korean)
18      A.    (Witness nods head
19  affirmatively.)
20      Q.    And this (indicating) is
21  where Mr. Kalson sat?
22      MS. SONG:  (Translates
23  into Korean)
```

Page 206

1      A.    (Witness speaks in Korean)
2           MS. SONG:  I don't
3    remember clearly.
4      A.    (Witness speaks in Korean)
5           MS. SONG:  But what I
6    remember, I think that's where he
7    was.
8      Q.    And next to him --
9           MS. SONG:  (Translates
10   into Korean)
11     Q.    -- sat?
12          MS. SONG:  (Translates
13   into Korean)
14     A.    (Witness speaks in Korean)
15          MS. SONG:  Chris.  I think
16   it was Chris.
17     Q.    And who sat next to Mr.
18   Chris?
19          MS. SONG:  (Translates
20   into Korean)
21     A.    (Witness shakes head
22   negatively.)
23          MS. SONG:  I don't know.

Page 207

1      Q.    He doesn't remember.
2           Do you remember where the
3    Murakami individuals sat?
4           MS. SONG:  (Translates
5    into Korean)
6      A.    Mr. Choi (indicating).
7           MS. SONG:  Mr. Choi.
8      A.    Rob.
9           MS. SONG:  Rob.
10     A.    (Witness speaks in Korean)
11   (indicating)
12          MS. SONG:  And then --
13   that was Rob.  And then vice
14   president from Murakami.
15     Q.    And the other individual
16   from Murakami sat next to him?
17     A.    (Witness speaks in Korean)
18          MS. SONG:  Yes.
19     Q.    All three of the Murakami
20   individuals sat side by side?
21          MS. SONG:  (Translates
22   into Korean)
23     A.    (Witness speaks in Korean)

Page 208

1           MS. SONG:  I don't know
2    how many.  Three or others, I don't
3    know.
4           MR. STOCKHAM:  Mark this
5    as the next exhibit.
6           (Whereupon, Plaintiff's
7            Exhibit Four
8            was marked for
9            identification.)
10     Q.    Now, looking under number
11   nine.
12          MS. SONG:  (Translates
13   into Korean)
14     Q.    Is that a quotation from
15   you?
16          MS. SONG:  (Translates
17   into Korean)
18     A.    (Witness speaks in Korean)
19          MS. SONG:  (Speaks in
20   Korean)
21     A.    (Witness speaks in Korean)
22          MS. SONG:  Yes.
23     A.    (Witness speaks in Korean)

Page 209

1           MS. SONG:  At that time,
2    yes, and what I said.
3      Q.    And what you said was
4    addressed to Mr. Choi?
5           MS. SONG:  (Translates
6    into Korean)
7      A.    (Witness speaks in Korean)
8           MS. SONG:  Yes.
9      Q.    And you asked him what the
10   matter was?
11          MS. SONG:  (Translates
12   into Korean)
13     A.    (Witness speaks in Korean)
14          MS. SONG:  I basically
15   scolded him.
16     Q.    You scolded him in front
17   of everyone?
18          MS. SONG:  (Translates
19   into Korean)
20     A.    (Witness speaks in Korean)
21          MS. SONG:  No, to Mr.
22   Choi.
23     Q.    But in front of everyone?

Page 210

```
 1        MS. SONG:  (Translates
 2   into Korean)
 3        A.    (Witness speaks in Korean)
 4        MS. SONG:  Yes.  Everyone
 5   was present.
 6        Q.    Did you raise your voice
 7   when you scolded him?
 8        MS. SONG:  (Translates
 9   into Korean)
10        A.    (Witness speaks in Korean)
11        MS. SONG:  A little bit.
12        Q.    How loud was your voice?
13        MS. SONG:  (Translates
14   into Korean)
15        A.    (Witness speaks in Korean)
16        MS. SONG:  I don't know
17   how to describe that.
18        Q.    Well, was it as loud as --
19        A.    (Witness speaks in Korean)
20        MS. SONG:  As I have just
21   said.  It's not my normal voice,
22   but what I just showed you.
23        Q.    Now, you asked him if he
```

Page 211

```
 1   was here to defend his company?
 2        MR. BOSTICK:  Object to
 3   the form.
 4        MS. SONG:  (Translates
 5   into Korean)
 6        A.    (Witness speaks in Korean)
 7        MS. SONG:  To who, what
 8   did I ask?
 9        Q.    Did you ask Mr. Choi if he
10   was there to defend his company?
11        MS. SONG:  (Translates
12   into Korean)
13        MS. MYUNG KIM:  (Speaks in
14   Korean)
15        MS. SONG:  (Translates
16   into Korean)
17        MS. MYUNG KIM:  (Speaks in
18   Korean)
19        MS. SONG:  The company?
20        MS. MYUNG KIM:  (Speaks in
21   Korean)
22        MS. SONG:  (Speaks in
23   Korean)
```

Page 212

```
 1        A.    (Witness speaks in Korean)
 2        MS. SONG:  I just --
 3        A.    (Witness speaks in Korean)
 4        MS. SONG:  It's not in the
 5   form of a question.  I scolded him
 6   and said, are you here to -- you
 7   know, to --
 8        MR. RAYMOND KIM:  Defend
 9   the vendors.
10        MS. SONG:  -- defend the
11   vendors.  Thank you.
12        A.    (Witness speaks in Korean)
13        MS. SONG:  It's not in the
14   form of a question.  It was just a
15   scolding.
16        Q.    And you directed that to
17   Mr. Choi?
18        MS. SONG:  (Translates
19   into Korean)
20        A.    (Witness speaks in Korean)
21        MS. SONG:  Yes.
22        Q.    Now, it says you folded
23   the papers you were reading.
```

Page 213

```
 1        MS. SONG:  (Translates
 2   into Korean)
 3        Q.    Is that the same papers as
 4   the agenda you were telling me
 5   about?
 6        MS. SONG:  (Translates
 7   into Korean)
 8        A.    (Witness speaks in Korean)
 9   (indicating)
10        MS. SONG:  So, like this
11   file --
12        A.    (Witness speaks in Korean)
13        MS. SONG:  -- looks like
14   my file.  You -- there is documents
15   here.  So I just closed up my file
16   (demonstrating).
17        Q.    Now, did you ever say in
18   the meeting --
19        MS. SONG:  (Translates
20   into Korean)
21        Q.    -- that you would like to
22   charge back the cost of all the
23   repairs to Murakami?
```

Page 214

1          MS. SONG: (Translates
2    into Korean)
3          A.    (Witness speaks in Korean)
4          MS. SONG: No.
5          Q.    Did you ever say that all
6    the repairs that HMA members were
7    making, that you would like to
8    charge back all those repairs to
9    Murakami?
10         MS. SONG: (Translates
11   into Korean)
12         MR. BOSTICK: HMMA.
13         MS. MYUNG KIM: HMM --
14         MS. SONG: MM --
15         MS. MYUNG KIM: MMA.
16         MR. STOCKHAM: Yeah.
17         MS. SONG: (Translates
18   into Korean)
19         A.    (Witness speaks in Korean)
20         MS. SONG: I don't
21   understand --
22         MS. MYUNG KIM: (Speaks in
23   Korean)

Page 215

1          A.    (Witness speaks in Korean)
2          MS. SONG: I don't
3    understand.
4          Q.    Well, did you ever state
5    that you're concerned only with the
6    buffings on the mirrors?
7          MS. SONG: (Translates
8    into Korean)
9          A.    (Witness speaks in Korean)
10         MS. SONG: No, I did not
11   say that.
12         Q.    Did you ever say in the
13   meeting that the buffing requires
14   extensive repairs by HMMA members?
15         MS. SONG: (Translates
16   into Korean)
17         A.    (Witness speaks in Korean)
18         MS. SONG: I don't know.
19         Q.    Did you ever say that,
20   therefore I want to charge back all
21   costs incurred for those repairs to
22   Murakami?
23         MS. SONG: (Translates

Page 216

1    into Korean)
2          A.    (Witness speaks in Korean)
3          MS. SONG: I don't know.
4          A.    (Witness speaks in Korean)
5          MS. SONG: Anything
6    outside of these -- this note here
7    I don't remember. I mean, it
8    happened more than two years ago.
9    I don't retain much outside of
10   this.
11         Q.    Well, if -- did you ever
12   hear Mr. Rob Cyrus say that the
13   issue to be discussed was two
14   hundred minutes of downtime charged
15   to Murakami?
16         MS. SONG: (Translates
17   into Korean)
18         A.    (Witness shakes head
19   negatively.)
20         MS. SONG: No. (Speaks in
21   Korean)
22         A.    (Witness speaks in Korean)
23         MS. SONG: No, I don't

Page 217

1    know.
2          Q.    You don't know?
3          MS. SONG: I don't know.
4          A.    (Witness speaks in Korean)
5          MS. SONG: I don't
6    remember.
7          Q.    Did you ever hear anyone
8    -- or excuse me -- Mr. Cyrus say
9    that it's not accurate to charge
10   all the downtime to Murakami?
11         MS. SONG: (Translates
12   into Korean)
13         MS. MYUNG KIM: (Speaks in
14   Korean)
15         MS. SONG: (Translates
16   into Korean)
17         MS. MYUNG KIM: (Speaks in
18   Korean)
19         A.    (Witness speaks in Korean)
20         MS. SONG: Well, since --
21         A.    (Witness speaks in Korean)
22         MS. SONG: Since things
23   were said in English if my

Page 218

```
 1    translator did not convey it to me
 2    then I don't know what had been
 3    said outside of this.
 4        Q.    Did the translator ever
 5    tell you that?
 6            MS. SONG:  (Translates
 7    into Korean)
 8        A.    (Witness speaks in Korean)
 9            MS. SONG:  What?
10        Q.    That Mr. Cyrus said that
11    charging two hundred minutes of
12    downtime to Murakami was not
13    accurate?
14            MS. SONG:  (Translates
15    into Korean)
16            MS. MYUNG KIM:  (Speaks in
17    Korean)  Can you repeat the
18    question once again?
19            MR. STOCKHAM:  Yes.
20        Q.    Did your translator ever
21    say to you that Mr. Cyrus claimed
22    that two hundred minutes of
23    downtime charged to Murakami was
```

Page 219

```
 1    not accurate?
 2            MS. SONG:  (Translates
 3    into Korean)
 4        A.    (Witness speaks in Korean)
 5            MS. SONG:  I did not hear
 6    that.
 7        Q.    Did you ever say that
 8    there could be some errors in the
 9    calculation of downtime?
10            MS. SONG:  (Translates
11    into Korean)
12        A.    (Witness speaks in Korean)
13            MS. SONG:  What do you
14    mean by miscalculating?
15        A.    (Witness speaks in Korean)
16            MS. SONG:  Can you
17    rephrase the question --
18        Q.    Yes.
19            MS. SONG:  -- one more
20    time?
21        Q.    Did you ever make the
22    statement in this meeting --
23            MS. SONG:  (Translates
```

Page 220

```
 1    into Korean)
 2        Q.    -- that there can be some
 3    calculation errors on the downtime?
 4            MS. SONG:  (Translates
 5    into Korean)
 6        A.    (Witness speaks in Korean)
 7            MS. SONG:  No.
 8        Q.    Did Mr. Cyrus ever say
 9    that the accurate downtime was the
10    root issue of the meeting?
11            MS. SONG:  (Translates
12    into Korean)
13        A.    (Witness speaks in Korean)
14            MS. SONG:  I did not hear
15    that.
16        Q.    Did your translator tell
17    you that Mr. Cyrus said that?
18            MS. SONG:  (Translates
19    into Korean)
20        A.    (Witness speaks in Korean)
21            MS. SONG:  I did not hear
22    that.
23        Q.    Did the translator ever
```

Page 221

```
 1    tell you that Mr. Cyrus used the
 2    term, bullshit?
 3            MS. SONG:  (Translates
 4    into Korean)
 5        A.    (Witness speaks in Korean)
 6            MS. MYUNG KIM:  Bullshit.
 7        A.    (Witness speaks in Korean)
 8            MS. SONG:  What's
 9    bullshit?
10            MS. MYUNG KIM:  (Speaks in
11    Korean)
12        A.    (Witness speaks in Korean)
13            MR. RAYMOND KIM:  (Speaks
14    in Korean)
15        A.    (Witness peaks in Korean)
16            MS. SONG:  I did hear it
17    at the end.
18        Q.    You heard it at the end?
19            MS. SONG:  At the end.
20        Q.    You heard Mr. Cyrus say
21    it?
22            MS. SONG:  (Translates
23    into Korean)
```

Page 222

```
1      A.     (Witness speaks in Korean)
2           MS. SONG:  I didn't hear
3   the word "bullshit" but --
4      A.     (Witness speaks in Korean)
5           MS. SONG:  -- afterwards
6   -- people told me afterwards that
7   they -- he used the word
8   "bullshit".  I don't know English
9   so I don't know what that meant at
10  first.
11     A.     (Witness speaks in Korean)
12          MS. SONG:  But other
13  people told me so I found out later
14  on.
15     Q.     Who told you?
16          MS. SONG:  (Translates
17  into Korean)
18     A.     (Witness speaks in Korean)
19          MS. SONG:  I don't know.
20     A.     (Witness speaks in Korean)
21          MS. SONG:  I don't
22  remember.
23     A.     (Witness speaks in Korean)
```

Page 224

```
1           MS. SONG:  Could you --
2           MS. MYUNG KIM:
3   Fundamental and systematic quality.
4   (Speaks in Korean)
5      A.     (Witness speaks in Korean)
6           MS. SONG:  I have
7   addressed --
8      A.     (Witness speaks in Korean)
9           MS. SONG:  -- several
10  times the purpose of this meeting
11  and the content here describes it
12  very well.
13     Q.     (By Mr. Stockham)  Did you
14  ever say that the purpose of the
15  meeting was to discuss fundamental
16  and systematic major quality
17  issues?
18          MS. SONG:  (Translates
19  into Korean)
20     A.     (Witness speaks in Korean)
21          MS. SONG:  If it's not on
22  here I don't remember.
23     Q.     Well, I didn't see it
```

Page 223

```
1           MS. SONG:  But there were
2   numerous people there.
3      Q.     Do you -- you don't recall
4   anyone who told you?
5           MS. SONG:  (Translates
6   into Korean)
7      A.     (Witness speaks in Korean)
8           MS. SONG:  No, I don't
9   know.
10     Q.     Now -- did you ever say in
11  the meeting that the point of the
12  meeting was to address -- find the
13  right word -- fundamental and
14  systematic major quality issues?
15          MS. SONG:  (Translates
16  into Korean)
17          MS. MYUNG KIM:  (Speaks in
18  Korean)
19          MS. SONG:  (Translates
20  into Korean)
21     A.     (Witness speaks in Korean)
22          MS. SONG:  I'm sorry.
23     A.     (Witness speaks in Korean)
```

Page 225

```
1   discussed on there.  That's why I'm
2   asking.
3           MS. SONG:  (Translates
4   into Korean)
5      A.     (Witness speaks in Korean)
6           MS. SONG:  Then I don't
7   know.
8           MR. BOSTICK:  Can we take
9   a quick restroom break?
10          (Whereupon, a brief
11          recess was taken in
12          the deposition.)
13          MR. STOCKHAM:  Back on the
14  record.
15     Q.     (By Mr. Stockham)  In the
16  meeting on September 16th, 2005 did
17  you call the manager for Glovis to
18  come forward?
19          MR. BOSTICK:  Object to
20  the form.
21          MS. SONG:  (Translates
22  into Korean)
23     A.     (Witness speaks in Korean)
```

Page 226

```
 1          MS. SONG:  I told someone
 2   to call --
 3      A.    (Witness speaks in Korean)
 4          MS. SONG:  I directed
 5   someone to call him.
 6      Q.    Was the person from Glovis
 7   not in the meeting?
 8          MS. SONG:  (Translates
 9   into Korean)
10      A.    (Witness speaks in Korean)
11          MS. SONG:  He was not
12   present.  That's why after the
13   meeting he wanted the people in
14   charge to discuss it later after
15   the meeting.
16      Q.    So that would be Mr. Jin
17   Ho Choi?
18          MS. SONG:  (Translates
19   into Korean)
20      A.    (Witness speaks in Korean)
21          MS. SONG:  Yes.
22      Q.    But you didn't speak to
23   Mr. Jin Ho Choi in the meeting?
```

Page 227

```
 1          MS. SONG:  (Translates
 2   into Korean)
 3      A.    (Witness speaks in Korean)
 4          MS. SONG:  He was not
 5   there.
 6      Q.    So you did not tell Mr.
 7   Jin Ho Choi that you would not
 8   discuss matters concerning Glovis
 9   in the meeting; is that correct?
10          MS. SONG:  (Translates
11   into Korean)
12      A.    Yeah.
13          MS. SONG:  Yes, that's
14   right.
15      Q.    Now, scratches caused by
16   Glovis would be a quality problem
17   would they -- would it not?
18          MS. SONG:  (Translates
19   into Korean)
20      A.    (Witness speaks in Korean)
21          MS. SONG:  I don't know --
22      A.    (Witness speaks in Korean)
23          MS. SONG:  I didn't know
```

Page 228

```
 1   -- at that time I didn't know where
 2   the scratches came from, whether it
 3   was from Glovis or elsewhere.  We
 4   needed to look into that
 5   afterwards, later.
 6      Q.    Now, you left the room at
 7   one point and then came back, did
 8   you not?
 9          MS. SONG:  (Translates
10   into Korean)
11      A.    (Witness speaks in Korean)
12          MS. SONG:  I don't
13   remember clearly but I think so.
14      Q.    Your notes don't reflect
15   that, though, do they?
16          MS. SONG:  (Translates
17   into Korean)
18      A.    (Witness speaks in Korean)
19          MS. SONG:  Yes, that's
20   right.
21      Q.    Why do your notes not
22   reflect that you left the room and
23   then came back?
```

Page 229

```
 1          MS. SONG:  (Translates
 2   into Korean)
 3      A.    (Witness speaks in Korean)
 4          MS. SONG:  What does me
 5   leaving the room and coming back
 6   has anything to do with the report?
 7          MR. BOSTICK:  Just answer
 8   the question.
 9          MS. SONG:  (Translates
10   into Korean)
11          MR. BOSTICK:  He can't ask
12   questions.
13          MS. SONG:  (Translates
14   into Korean)
15      A.    (Witness speaks in Korean)
16          MS. SONG:  Could you
17   repeat the question?
18      Q.    (By Mr. Stockham)  Why
19   does your report not reflect that
20   you left the room and came back?
21          MS. SONG:  (Translates
22   into Korean)
23      A.    (Witness speaks in Korean)
```

Page 230

```
 1          MS. SONG:  Because it's
 2   irrelevant to the report.  So I did
 3   not put it in there.
 4      Q.    How long were you out of
 5   the room?
 6          MS. SONG:  (Translates
 7   into Korean)
 8      A.    (Witness speaks in Korean)
 9          MS. SONG:  One minute or
10   even less than one minute.  I don't
11   know.
12      Q.    Was that before or after
13   you told Mr. Choi -- or that you
14   reprimanded Mr. Choi?
15          MS. SONG:  (Translates
16   into Korean)
17          MR. BOSTICK:  Object to
18   the form.
19      A.    (Witness speaks in Korean)
20          MS. SONG:  It was
21   afterwards, after the meeting was
22   over.
23      Q.    You left the room after
```

Page 231

```
 1   the meeting was over?
 2          MS. SONG:  (Translates
 3   into Korean)
 4      A.    (Witness speaks in Korean)
 5          MS. SONG:  I said I was
 6   going to call it quits and then
 7   left the room and then came back
 8   in.
 9      Q.    My question was:  Did you
10   leave the room before or after you
11   reprimanded Mr. Choi?
12          MR. BOSTICK:  Object to
13   the form.
14          MS. SONG:  (Translates
15   into Korean)
16      A.    (Witness speaks in Korean)
17          MS. SONG:  After scolding.
18      Q.    You came back into the
19   room.  And how long were you in the
20   room?
21          MS. SONG:  (Translates
22   into Korean)
23      A.    (Witness speaks in Korean)
```

Page 232

```
 1          MS. SONG:  About one
 2   minute.  It was very brief.
 3      Q.    What -- why did you come
 4   back into the room?
 5          MS. SONG:  (Translates
 6   into Korean)
 7      A.    (Witness speaks in Korean)
 8          MS. SONG:  I was just a
 9   little upset.
10      A.    (Witness speaks in Korean)
11          MS. SONG:  Because the
12   meeting fell apart.  So --
13      A.    (Witness speaks in Korean)
14          MS. SONG:  So I had to
15   come back in again and then I just
16   went out again.
17      Q.    Why did you come back in
18   the room?
19          MS. SONG:  (Translates
20   into Korean)
21      A.    (Witness speaks in Korean)
22          MS. SONG:  I don't know.
23      A.    (Witness speaks in Korean)
```

Page 233

```
 1          MS. SONG:  I don't know
 2   why I did.
 3      A.    (Witness speaks in Korean)
 4          MS. SONG:  I don't know
 5   why.
 6      Q.    And how long did you stay
 7   -- did you say anything when you
 8   came back in?
 9          MS. SONG:  (Translates
10   into Korean)
11      A.    (Witness speaks in Korean)
12          MS. SONG:  I don't know.
13   I don't remember.
14      Q.    The meeting didn't go on
15   for another twenty minutes after
16   you left the room?
17          MR. CYRUS:  The first
18   time.
19      Q.    The first time?
20          MS. SONG:  (Translates
21   into Korean)
22      A.    (Witness speaks in Korean)
23          MS. SONG:  I don't know.
```

1        A.    (Witness speaks in Korean)
2            MS. SONG:  I left the room
3    so I don't know.
4        Q.    But when you came back in
5    the room the meeting --
6            MS. SONG:  (Translates
7    into Korean)
8        Q.    -- the meeting continued
9    for another twenty minutes, didn't
10   it?
11           MR. BOSTICK:  Object to
12   the form.  That's not a question.
13           MS. SONG:  (Translates
14   into Korean)
15       A.    (Witness speaks in Korean)
16           MS. SONG:  No, I don't
17   know.
18       A.    (Witness speaks in Korean)
19           MS. SONG:  We were all
20   standing so --
21       A.    (Witness speaks in Korean)
22           MS. SONG:  I mean, I
23   called it quit, folded the binder

1    and I called it quits.
2        A.    (Witness speaks in Korean)
3            MS. SONG:  Maybe they were
4    just lingering --
5        A.    (Witness speaks in Korean)
6            MS. SONG:  -- those people
7    were lingering after the meeting,
8    just talking.
9        Q.    After you came back in the
10   room the first time --
11           MS. SONG:  (Translates
12   into Korean)
13       Q.    -- the meeting went on for
14   another twenty minutes before you
15   left, didn't it?
16           MS. SONG:  (Translates
17   into Korean)
18       A.    (Witness speaks in Korean)
19           MS. SONG:  I don't know.
20       Q.    You don't know that you
21   were there for another twenty
22   minutes?
23           MS. SONG:  (Translates

1    into Korean)
2        A.    (Witness speaks in Korean)
3            MS. SONG:  No.
4        Q.    Now, after you left the
5    second time --
6            MS. SONG:  (Translates
7    into Korean)
8        Q.    -- did you take Mr. Choi
9    up to your office?
10           MS. SONG:  (Translates
11   into Korean)
12       A.    (Witness speaks in Korean)
13           MS. SONG:  I don't
14   remember.
15       Q.    Did you scold him for
16   another twenty minutes in your
17   office?
18           MS. SONG:  (Translates
19   into Korean)
20           MR. BOSTICK:  Object to
21   the form.
22       A.    (Witness speaks in Korean)
23           MS. SONG:  I don't

1    remember that either.  But --
2        A.    (Witness speaks in Korean)
3            MS. SONG:  Anyway if he
4    were to follow me then I probably
5    would have scolded him some more.
6            MR. BOSTICK:  Are we
7    picking up Mr. Cyrus' comments?
8    Because if he's going to keep
9    making comments I want them put on
10   the record.  Or otherwise he can
11   make notes --
12           MR. STOCKHAM:  Just make
13   notes and show them to me.
14       Q.    (By Mr. Stockham)  Now,
15   did you tell Mr. Choi that you were
16   going to fire him?
17           MS. SONG:  (Translates
18   into Korean)
19       A.    (Witness speaks in Korean)
20           MS. SONG:  No.
21       Q.    Did you tell Mr. Choi that
22   he was going to have to go home?
23           MS. SONG:  (Translates

Page 238

```
 1   into home?
 2       A.   (Witness speaks in Korean)
 3          MS. SONG:  No.
 4       Q.   Did you tell Mr. Choi that
 5   you were going to have Mr. Cyrus
 6   fired?
 7          MS. SONG:  (Translates
 8   into Korean)
 9       A.   (Witness speaks in Korean)
10          MS. SONG:  I don't know.
11       Q.   Excuse me?
12        · MS. SONG:  I don't know.
13       Q.   You don't know whether you
14   told him that or not?
15          MS. SONG:  (Translates
16   into Korean)
17       A.   (Witness speaks in Korean)
18          MS. SONG:  Anything
19   outside of this memo I don't
20   remember.
21       A.   (Witness speaks in Korean)
22          MS. SONG:  Because I was a
23   little bit upset.
```

Page 239

```
 1       A.   (Witness speaks in Korean)
 2          MS. SONG:  So beyond this
 3   I don't remember.
 4       A.   (Witness speaks in Korean)
 5          MS. SONG:  I mean, under
 6   those circumstances what can you
 7   think?
 8       Q.   Had you had any other
 9   incident involving Mr. Choi or Mr.
10   Cyrus that was upsetting to you?
11          MS. SONG:  (Translates
12   into Korean)
13          MR. BOSTICK:  Object to
14   the form.
15       A.   (Witness speaks in Korean)
16          MS. SONG:  Outside of
17   this, again, I don't know.
18       Q.   Did you speak to the
19   president about Mr. Choi and Mr.
20   Cyrus?
21          MR. BOSTICK:  Object to
22   the form.
23          MS. SONG:  (Translates
```

Page 240

```
 1   into Korean)
 2       A.   (Witness speaks in Korean)
 3          MS. SONG:  No.
 4       Q.   Did you call anyone in the
 5   home office about Mr. Choi or Mr
 6   Cyrus?
 7          MS. SONG:  (Translates
 8   into Korean)
 9       A.   (Witness speaks in Korean)
10          MS. SONG:  No.
11       Q.   Who was responsible for
12   putting all of these reports
13   together under the Exhibit Number
14   Two cover sheet?
15          MS. SONG:  (Translates
16   into Korean)
17       A.   (Witness speaks in Korean)
18          MS. SONG:  I --
19          MS. MYUNG KIM:  (Speaks in
20   Korean)  Can you repeat the
21   question?
22          MS. SONG:  Could you
23   repeat the question?
```

Page 241

```
 1          MR. STOCKHAM:  Sure.
 2       Q.   Who was responsible for
 3   putting all the reports together
 4   under that cover sheet which is
 5   Exhibit Number Two?
 6          MS. SONG:  Thank you.
 7          (Translates into Korean)
 8       A.   (Witness speaks in Korean)
 9          MS. SONG:  I don't know.
10       A.   (Witness speaks in Korean)
11          MS. SONG:  How would I
12   know that.  I don't know.
13       Q.   You didn't direct it to be
14   done?
15          MS. SONG:  (Translates
16   into Korean)
17       A.   (Witness speaks in Korean)
18          MS. SONG:  No, I did not
19   do that.
20       Q.   Did you direct the
21   individuals who wrote the reports
22   that are listed in Exhibit Number
23   Two to write the reports?
```

Page 242

1      MS. SONG: (Translates
2  into Korean)
3      A.   (Witness speaks in Korean)
4      MS. SONG: No.
5      Q.   Did you ask anyone to see
6  that that was done?
7      MS. SONG: (Translates
8  into Korean)
9      A.   (Witness speaks in Korean)
10      MS. SONG: I don't know.
11      Q.   Do you know how that came
12 . to be?
13      MS. SONG: (Translates
14  into Korean)
15      A.   (Witness speaks in Korean)
16      MS. SONG: I don't know.
17          (Whereupon, an
18          off-the-record
19          discussion was held.)
20      Q.   (By Mr. Stockham) So you
21  did not tell Mr. Chase that he
22  needed to write the meeting minute?
23      MS. SONG: I'm sorry.

Page 243

1  Would you --
2      Q.   You did not have to -- you
3  did not tell Mr. Harry Chase to
4  write the report?
5      MS. SONG: (Translates
6  into Korean)
7      A.   (Witness speaks in Korean)
8      MS. SONG: Who is Harry
9  Chase?
10      Q.   He's listed on this cover
11  sheet.
12      MS. SONG: (Translates
13  into Korean)
14      A.   (Witness speaks in Korean)
15      MS. SONG: Where does it
16  say? I don't know.
17      MR. BOSTICK: Here it is
18  (indicating).
19      MS. SONG: I don't recall.
20      Q.   He worked under you,
21  didn't he?
22      MS. SONG: (Translates
23  into Korean)

Page 244

1      MR. BOSTICK: Object to
2  the form.
3      A.   (Witness speaks in Korean)
4      MS. SONG: It was -- at
5  first I don't know if Harry Chase
6  was working under me. I don't even
7  know his face.
8      MS. MYUNG KIM: Because
9  it's been only one month.
10      MS. SONG: It's been only
11  one month.
12      Q.   What do you mean it's only
13  been one month?
14      MS. SONG: (Translates
15  into Korean)
16      A.   (Witness speaks in Korean)
17      MS. SONG: It has been
18  only two and a half months since I
19  worked here.
20      A.   (Witness speaks in Korean)
21      MS. SONG: So I didn't
22  know who were working for me,
23  managers like this.

Page 245

1      Q.   So it was only two and a
2  half months when you had this
3  meeting?
4      MS. SONG: (Translates
5  into Korean)
6      A.   (Witness speaks in Korean)
7      MS. SONG: I got --
8      A.   (Witness speaks in Korean)
9      MS. SONG: The notice came
10  on May 30th of 2005 and I was to be
11  transferred as of June the 1st.
12      A.   (Witness speaks in Korean)
13      MS. SONG: May 31st. I
14  arrived here on May 31st.
15      A.   (Witness speaks in Korean)
16      MS. SONG: And the person
17  hand over the title to me or -- it
18  was handed over the very next day
19  on June 1st.
20      MR. STOCKHAM: I think
21  that's it.
22          (Whereupon, an
23          off-the-record

Page 246

```
1        discussion was held.)
2      (Whereupon, a brief
3       recess was taken in
4       the deposition.)
5        MR. BOSTICK:  I don't have
6   any questions.
7
8      FURTHER THE DEPONENT SAITH NOT
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 248

```
1      INSTRUCTIONS TO THE WITNESS
2        Please read your deposition
3   over carefully before you sign it.
4   You should make all your changes to
5   the attached errata sheet.  Please
6   do not mark on the original
7   deposition.
8
9        After making any changes which
10  you have noted on the attached
11  errata sheet, sign your name on the
12  errata sheet and date it, then sign
13  your deposition at the end of your
14  testimony in the space provided.
15  You are signing it subject to the
16  changes you have made on the errata
17  sheet, which will be attached to
18  the deposition.
19
20       Return the original errata
21  sheet and transcript to Daniel
22  Court Reporting, 1310 32nd Street
23  South, Birmingham, Alabama, 35202.
```

Page 247

```
1        C E R T I F I C A T E
2
3   STATE OF ALABAMA    )
4   JEFFERSON COUNTY    )
5
6        I hereby certify that the above
7   and foregoing deposition was taken
8   down by me in stenotype, and the
9   questions and answers thereto were
10  reduced to typewriting under my
11  supervision, and that the foregoing
12  represents a true and correct
13  transcript of the deposition given
14  by said witness upon said hearing.
15       I further certify that I am
16  neither of counsel nor kin to the
17  parties to the action, nor am I in
18  anywise interested in the result of
19  said cause.
20
21  _____
22  Sandra Peebles Daniel
23  Commissioner
```

Page 249

```
1   According to the Rules of Civil
2   Procedure, you will have thirty
3   (30) days from the date you receive
4   this deposition in which to read,
5   sign, and return your deposition to
6   the above office.  If you fail to
7   do so, you automatically waive your
8   right to make any corrections to
9   your deposition.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 250

```
 1        SIGNATURE PAGE OF
 2          HOEA IL KIM
 3
 4        I hereby do acknowledge that I
 5   have read the foregoing deposition
 6   and that the same is a true and
 7   correct transcription of the
 8   answers given by me to the
 9   questions propounded, except for
10   the changes, if any, noted on the
11   attached errata sheet.
12
13
14   WITNESS: _____
15
16   DATE: _____
17
18
19
20
21
22
23
```

Page 251

```
 1   PAGE    LINE       EXPLANATION
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20   _____
21        HOEA IL KIM
22   _____
23        DATE
```

0218

PLAINTIFF'S EXHIBIT

# ■ Presentation Topics for the week of 9/16/2005

| Supplier | Part Name | Nonconformity | Occurrence | Issue Type | Presentation Time |
|---|---|---|---|---|---|
| Murakami | Outside mirror | Paint issues (Polishing mark, Crater, Scratches) | 341 | Downtime (Door line) | 20 Min. |
| | | Poor heat staking of inside bush nut (Wind noise) | 2 | Test track | |
| Hwashin | Package tray panel | Oil contamination (Crater) | 100 % | Paint shop | 20 Min. |
| | | Stamping Split | 6 | Body shop | |
| | | Subwoofer weldnuts misaligned | 25 | GA (T3) | 10 Min. |

## 2005년 9월 16일 회의 관련 참석자 진술서(보고서) 목록

| 번호 | 소속 | 진술자 | 직책 | 비고 |
|---|---|---|---|---|
| 1 | 생산 | 김회일 | 공장장 | 한글 |
| 2 | = | 조동관 | 생산 담당 이사 | 한글 |
| 3 | = | 존 칼슨(John Kalson) | 생산 담당 이사 | 한글 |
| 4 | = | 해리 체이스(Harry Chase) | 생산 관리 과장 | 영문 및 번역본 |
| 5 | 품질 | 박승도 | 품질부문 부장(HMC) | = |
| 6 | = | 곽석구 | 품질 담당 이사(HMMA) | 한글 |
| 7 | = | 제이슨 지(Jason Chi) | 부품 품질 담당 과장 | 영문 및 번역본 |
| 8 | = | 크리스 수석(Chris Susock) | 부품 품질 담당 부장 | = |
| 9 | = | 개럴드 혼(Gerald Horn) | 부품 품질 담당 대리 | = |
| 10 | 개발 | 최정열 | 개발 관리 담당 부장 | 한글 |
| 11 | = | 황별달 | 부품 개발 담당 과장 | = |
| 12 | = | 밥 사이러스(Bob Cyrus) | 부품 개발 담당 이사 | 영문 및 번역본 |



PLAINTIFF'S EXHIBIT



PLAINTIFF'S EXHIBIT
M.J Kim

# 보 고 서

보고자 소속 : HMMA
　　　직 책 : 공장장
　　　성 명 : 김 희일

## [보고 내용]

2005년 9월 16일 금요일 10시 HMMA 의장사무동 1층 Alabama Room에서 HMMA 품질관리팀 주관 협력업체 Claim 회의 주관중 발생한 상황에 대하여 아래와 같이 보고 및 의견을 말씀 드립니다.

– 아　　래 –

회의 처음 시작은 05년 8~9月 협력업체의 부품 불량으로 인한 당사 완성차 생산 Line의 Down Time 현황에 대해 부품검수 담당 지(Chi) 과장의 설명 뒤이어 본의가 시작됨.

첫번째로 사이드 미러 생산업체인 무라카미에서 유첨(#1) 보고서로 Briefing 하였음.

<공장장> 무라카미의 아웃사이드 미러 생산경험이 얼마나 되었고 또한 어느 업체에 납품한 실적이 있느냐?

<무라카미 부사장> 60년 되었고 미국내 거의 대부분의 TOYOTA 계열사와 10개 정도에 납품하고 있다고 여러회사 이름을 대면서 예기함.

<공장장> 왜 전등의 밝기를 1000LUX → 2500LUX로 바꾸었느냐?

②

〈무라카미 발표자〉 포장장의 진동 발기가 잘 안보여 1000LUX → 2500LUX로 바꾸었다.

3 〈공장장〉 제품의 Cure Time이 4시간 정도 가져야 함에도 불구하고 규정된 시간을 지키지 않았기 때문에

〈무라카미 발표자〉 "Bup'g에 대한 설명없이"

적금 부분의로 스크래치 문제가 발생되었다고 애기함.

4 〈공장장〉 Container[미러 공급 용기]의 영상 유무에 관계없이 Cure Time만 정확히 지켰어도

Bup'g 문제는 일어나지 않았지 않느냐?

요의 여러 정황으로 미루어 보아 그렇게 경험이 않고 미국내 도요타 계열사 및 여러업체에 납품하는

무라카미가 제품 생산의 기본도 지키지 않는 것으로 보아 현대의 품질에 대하여 아예 신경도

쓰지 않았거나 아니면 무라카미 품질 시스템상의 문제가 있는것 아니냐?

〈Rob〉 샤이드 미러의 스크래치 문제로 HMMA가 Reject 시킨 문제에 대하여 애기하며 사진를 Print하여

돌리면서 Glovis에서 지개차 운반 도중 실수로 바닥에 얼질러 스크래치가 발생한 문제로서 이것들을

Reject하여 반품하고 모든 Down Time으로 잡은 것에 대하여 불만을 토로함.

5 〈공장장〉 그러한 잘못된 문제가 있다면 이 회의가 끝난후 실무자끼리 협의하여 조정하면 될 것이다.

현대가 잘못했거나 Glovis가 잘못했을시는 당연히 무라카미에게는 책임이 없으니 염려하지 않다.

〈최부장 & Rob〉 상기의 문제를 다시 애기하며 회의 진행을 지연시킴.

이때 John Calson 및 통길당당 Chris가 무라라고 Rob에게 애기하며 서로간의 약간의

뿔전이 있었으나 제가 제지 시키며,

0197

③

6 〈공장장〉 알았다! Glovis의 최부장을 오라고 하여 진상 확인을 하여 잘못된 점이 있다면 서로 협의하면 아무런 문제가 없을 것이다.

〈Rob〉 다시 스크래치 문제를 거론합시다!

7 〈공장장〉 오늘의 의제를 보여주며 회의 의제 내용에 없는 것은 이 회의가 끝난후 본인(공장장) 참석하에 재협의 하면 될 것이므로 회의를 속개하겠다.
그리고 다시 말하지만 이 회의의 목적은 HMMA 공장이 아직 정상 가동이 안되고 있으며 현 상황에서 비가동 주요인을 분석해 본 결과 설비문제, 결품, 부품불량 등이 비슷한 비율로 가장 큰 저해 요인으로 나타나고 있다.
그래서 9月 2째주 부터 이 회의를 진행하게 되었고 그 목적은 조전에 말씀 드린바와 같이 첫째는 가동율 향상을 위해서 둘째는 현대가 지향하는 고품질의 자를 만들기 위함이지 어느 특정업체를 닷차거나 나무람을 위함이 아님을 다시 한번 말씀드리고 회의를 계속 하겠다.

〈Rob〉 Rob이 무라카미 영업 Manager와 참시 얘기를 나누고도 다시 스크래치 문제를 거론할때 무라카미 영업Manager가 갑자기 자리에서 일어나 뒤쪽에서 사이드 미러 2개를 가져와 언성을 높이면서 2개를 '탁탁' 부딪치고는 회의용 탁자에다 던짐.

8 〈공장장〉 그 미러를 보자고 하여 보면서 스크래치 문제는 이회의 끝난후 Glovis 최부장을 오라고 하였으니 그때 논의하기로 하고 회의 속개하겠다.
"이때 개발 최정연 부장외 Rob이 다시 스크래치 문제를 얘기하며"

④

〈Rob〉 여기 무라카미 사람들이 이 회의때문에 이제 여기에 도착하였으며 5000달러 정도의 경비가 들었다.

누가 책임질 것이냐 며 언성을 높임.

〈공장장〉 좌부장 내가 수차례에 걸쳐 이회의의 목적과 오늘 회의 주제에 대하여 얘기 하였는데 당신 왜 그래!

[언성이 약간 높았음] 당신네들 일제 대변하려 여기온 것이냐!

그만큼 얘기 했으며 알아 들어야지!

이런 상태로는 회의 진행이 불가하여 오늘 회의 끝낸다 향후 품질회의는 품질본부 박승도 부장이

주관하던가 품질본부에서 해결 바란다며 보고 있던 회의 파일을 접으면서[이때 탁자에서 약간의

몸소리가 남 자리에서 일어나서 회의장 밖으로 나감.

이상 상황대로 보고 드립니다.

2005. 9. 17

공장장 이사 김 회일

0199

⑤

〈본인 의견〉

1. 염재 품질회의는 매월 품질본부장 주관 각 공장에서 실시하나, HMMA의 경우 공장가동이 주 지해요소로서 9月 부터 매주 금요일 실시하여, 염재 생존부에 그 상황을 정확히 인지시켜 부품 품질의 향상을 유도하기 위함이나 당사 지재 담당자들이 그 목적을 정확히 인지 못하고 있는 것으로 사료됨.

2. 공장장이 회의 주관시 몇번의 독려는 상황 설명, 지재할 것을 요청하였으나 계속 염재의 대변자 역할을 하며 회의 지연시킴.

3. 부품염재 및 당사 직원들 앞에서 회사의 이미지 및 공장장 이미지 실추시킴.

4. 금번이 2번째 회의로서 향후 부품염재 Claim 회의시 상당한 영향이 우려되며, 또한 향후 본인의 회의 주관이 어려울 것으로 사료됨. HMC와 같이 품질본부장 주관 부품 품질확보 회의가 바람직 할 것으로 사료됨.

- 끝 -

0200



# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ROBERT CYRUS,

     Plaintiff,

vs.

HYUNDAI MOTOR MANUFACTURING
ALABAMA, LLC,

     Defendants.

CIVIL ACTION NO.:

2:07-cv-00144-ID-TFM

## DECLARATION OF M. KEITH DUCKWORTH

1.     My name is M. Keith Duckworth. I am over eighteen (18) years of age, and I have personal knowledge regarding the information contained in this Declaration.

2.     I presently work as the Executive Vice President of General Affairs for Hyundai Motor America ("HMA"). I have held that position since August of 2007. I have been employed by HMA for over 18 years. During that time, I was temporarily assigned to work at Hyundai Motor Manufacturing Alabama, LLC ("HMMA") in the capacity of Deputy President and Chief Administrative Officer for a period of two years. I held that position from August 2005 until August 2007. I was involved in Robert Cyrus' initial hiring with HMMA in that I was his American contact, spoke with him about benefits and sent him a letter explaining the terms of his employment. I was not involved in the decision to hire Mr. Cyrus.

3.     In October of 2005, I attended a meeting with President J. S. Ahn. The purpose of the meeting was to discuss concerns that President Ahn had with Robert Cyrus' performance and attitude. In particular, President Ahn had recently received a complaint from Mr. H.I. Kim, Chief Operating Officer, about a meeting that took place on September 16, 2005, between

5396902-1          1

HMMA officials and officials from Murakami Manufacturing Company, an outside supplier of parts to HMMA.

4.    Mr. Cyrus came to me on the day of the Murakami meeting and expressed concern that he was worried that his job was in jeopardy. At that time, there had been no reports made regarding the incidents at the meeting. I spoke briefly with Mr. Cyrus and told him that I was not aware of any complaints at that time, and I tried to calm him down because he seemed agitated and nervous. I later learned through my meeting with Mr. Ahn of reports of poor judgment and inappropriate behavior exhibited by Mr. Cyrus at the meeting.

5.    It was my understanding that during the meeting, Mr. Cyrus argued with officials from the Quality Assurance Department in front of the outside supplier as to the correctness of their action in assessing a downtime penalty against the supplier. Based on Mr. Cyrus' position and level of experience, I would expect him to have been aware that if there are disagreements between he and members of another department within the organization, that it would not be appropriate to express those disagreements in the presence of the outside vendor. I was told that Mr. Cyrus, a member of executive management, took a position in support of the vendor and against other HMMA team members from Quality Assurance at the meeting. Additionally, it is my understanding that Mr. Cyrus made several inappropriate comments at the meeting, including telling one of his co-workers (Chris Susock) "that's bull shit" in response to Mr. Susock's statement on a particular point. He also made a remark to another executive (John Kalson, Director of Production) comparing the manufacturing process of Hyundai to Toyota which was an apparent challenge to the competency of Mr. Kalson's knowledge of production systems, even though Mr. Kalson was the Director of Production. I was also told that Mr. Cyrus directly questioned the judgment of and embarrassed H.I. Kim, Vice President of Manufacturing, who

was in charge of Messrs. Kalson and Susock.  As a result, Mr. Kim temporarily left the meeting (and returned) several times.

6.     In addition, I became aware of other problems with Mr. Cyrus' behavior in recent months.  I received reports of deterioration in his relationships with members of his staff in the Purchasing Department.  In particular, there were reports from employees within the department of Mr. Cyrus engaging in adversarial or antagonistic behavior in the department.  Also, I was present during an incident at an executive directors meeting in which Mr. Cyrus verbally berated and attempted to embarrass a fellow executive named Kenny Song.  Mr. Song was in charge of Production Control.

7.     In my meeting with President Ahn, it was determined that Mr. Cyrus' behavior could not continue and some action should be taken.  I recommended to President Ahn that I meet with Mr. Cyrus regarding management's concerns about his behavior at which time I would attempt to determine whether the working relationship could be improved.  President Ahn accepted my recommendation and requested I set up a meeting with Mr. Cyrus to discuss these issues. President Ahn left it to me to determine whether Mr. Cyrus should be discharged.

8.     Mr. Cyrus was away from work on paid medical leave during most of September and October 2005.  After several attempts, I reached him at home and asked him to meet me for dinner.  We met at the City Grill in Montgomery, Alabama, on the night of Saturday, October 22, 2005.  Upon my arrival at the restaurant, I met Mr. Cyrus and we sat together at a table.  We were almost immediately met by a man named Michael Hansford, who I did not previously know, but who greeted Mr. Cyrus in a friendly manner.  Mr. Hansford told me that he was a former HMMA employee who was discharged after the company learned that he falsified information on his employment application regarding his educational background.  For

5396902-1                                3                            

approximately the next one hour, Mr. Hansford criticized HMMA's relationship with it suppliers and complained about his termination.

9.    When Mr. Hansford departed, I addressed Mr. Cyrus's performance issues. I advised Mr. Cyrus there was concern over his attitude and the adversarial and antagonistic way in which he had conducted himself recently. I asked Mr. Cyrus what he thought about these issues, and Mr. Cyrus refused to acknowledge that there were any issues. He began arguing that there was a conspiracy to terminate him. Mr. Cyrus refused to accept any responsibility for his actions during the Murakami meeting and denied any wrongdoing whatsoever. This was inconsistent with the report given to me by President Ahn and with my own observation described above. Mr. Cyrus contended he was an exemplary employee and had no attitude problems at all. It was clear that he was not willing to accept any form of correction or even consider the possibility that his behavior needed improvement. Therefore, during our conversation, I made the decision to terminate Mr. Cyrus' employment, and I told Mr. Cyrus that, based on his responses, the only appropriate step to take at that point was to sever his ties with HMMA. I told him to take some time to consider what he felt would be a reasonable severance package, and to contact me at a later point in time.

10.    Attached to this Declaration as Exhibit 1 is a true and correct copy of my letter dated December 6, 2005, in which I formally notified Mr. Cyrus in writing of his termination. Consistent with our general practice, we offered Mr. Cyrus a severance package, which he declined. He made a verbal counter-offer requesting severance pay in the amount of his salary for a four-year period, which we rejected as unreasonable.

11.    Mr. Cyrus never made any complaints of discrimination or harassment to me during our conversations about the Murakami meeting on the day of the meeting or during our

5396902-1                                                    4

meeting on Saturday, October 22, 2005. He did not express any concern that he felt he was being discriminated against on the basis of his National Origin or in retaliation for some types of complaints of discrimination. The only concern raised by Mr. Cyrus with respect to H.I. Kim was the belief that Mr. Kim was a "prima donna" with a bad temper, and that Mr. Kim did not like the fact that Mr. Cyrus had questioned his judgment.

12.     In the summer of 2005, shortly after I began work at HMMA, I made it a practice to meet with all of the directors at the facility to discuss any pertinent issues. I met with Mr. Cyrus, as well as all other Directors, as part of this process. Mr. Cyrus never made any specific complaints about his own personal situation or any contention that he felt he was being discriminated against on the basis of his national origin or retaliated against during any of these meetings. We would merely discuss issues throughout the plant that needed to be addressed. Further, Mr. Cyrus never made any mention to me that he felt he was being discriminated against because of his national origin. I am currently not aware of Mr. Cyrus' national origin.

13.     Neither Mr. Cyrus' race nor his national origin was a factor in his termination. Mr. Cyrus provided me with a letter entitled "Formal Complaint" on November 10, 2005, a true and correct copy of which is attached hereto as Exhibit 2. This was the first time that Mr. Cyrus had made any complaints of discrimination or retaliation to me. I forwarded the letter to the legal department for them to review and determine if any of the issues therein needed to be addressed. Mr. Cyrus had not previously raised any supposed comparison between his behavior and Mr. Choi's behavior at the Murakami meeting prior to my receipt of this letter. I was not aware, and still am not aware of, any accusation that Mr. Choi directed profanity at a co-worker, challenged the professional judgment of another Hyundai executive in front of an outside supplier, or engaged in any other unprofessional behavior such as that attributed to Mr. Cyrus.



Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing information contained in this Declaration is true and correct.

Executed on this the 15 day of January, 2008.

M. KEITH DUCKWORTH

 **HYUNDAI** | Hyundai Motor Manufacturing Alabama, LLC
700 Hyundai Boulevard, Montgomery, AL 36105
TEL: 334-387-8000 FAX: 334-387-8999
www.hmmausa.com

 **COPY**

Via Federal Express and Certified Mail, Return Receipt Requested

December 6, 2005

Mr. Rob Cyrus
~~████████████~~
Montgomery, AL  36117

Dear Rob,

Hyundai Motor Manufacturing Alabama, LLC ("HMMA") is exercising its rights under Alabama's employment-at-will doctrine to end your employment with the company at the close of business on December 7, 2005. HMMA will pay your salary and furnish your company car through that date and continue your existing health insurance through December 31, 2005. As you know, your letter of engagement dated May 16, 2002 specifically states that your employment with HMMA is "at will" and may be terminated by either party at any time.

It is with regret that this action is necessary.

In order to help you transition to other employment or endeavors of your choice, HMMA is prepared to offer you a payment equal to twenty-four (24) weeks of your gross salary (minus appropriate legally-required state and federal deductions and tax withholdings) subject to your execution of the attached Separation Agreement and Release, and on the terms set forth therein. Additionally, HMMA will pay you a lump sum amount equal to the current amount of your health insurance premiums for a period of twenty-four (24) weeks. This offer will remain open (subject to the following paragraph) for 21 days in accordance with current law, but may be accepted prior to the expiration of that time. Additionally, by law, you have 7 days within which to revoke your acceptance.

Regardless of your decision, please be advised that HMMA will vigorously enforce the terms and provisions of the Confidentiality Agreement you executed on August 12, 2003, and will pursue its legal remedies in the event of any breach of that agreement. Any violations of that agreement that become known to HMMA prior to your acceptance of the Separation Agreement shall void this offer. Any violations of that agreement after your acceptance of the Separation Agreement shall entitle HMMA to recover any amounts paid to you thereunder.

**EXHIBIT**

1

CYRUS   829

As of the effective date of your separation from employment, you are no longer an authorized operator of HMMA's company-provided vehicle. Please make immediate arrangements to return your car to HMMA by contacting David Colmans in the Vehicle Services Department. Additionally, we will need to promptly collect from you all other HMMA-issued property.

You are encouraged to review this offer with legal counsel of your own choice and at your own expense. Should your legal counsel have questions about this matter, they should be addressed to Mr. Rick Neal, General Counsel, HMMA at 700 Hyundai Blvd, Montgomery, AL 36105, telephone 334-387-8043. If you have any questions, you may direct them to my attention.

I regret that your employment with HMMA was not in concert with your expectations but I sincerely wish you the greatest success in the future.

Sincerely,

M. Keith Duckworth
Deputy President and Chief Executive Officer

CYRUS    830

Nov 10 05 04.24p    Rob Cyrus                                334-215-1967              p.1

# FAX COVERSHEET  –

Date: November 10, 2005

*To: Mr. Keith Duckworth*

*From: Robert C. Cyrus C.P.M.*

## Topic: Formal Complaint

Pages not including coversheet: 21

EXHIBIT

2

0041

November 6, 2005

Mr. Ahn
President and CEO HMMA

Mr. Keith Duckworth
Deputy President HMMA /
Vice President Human Resources and Administration Services

Mr. B.K. Kim
Senior Director of Human Resources and Public Relations

Mr. Greg Kimble
Director of Human Resources HMMA

Subject: Formal complaint for racial discrimination and retaliation

I wish to file a complaint that the demand for my resignation violates company policies that protect employees from discrimination based on race. I am American and was forced to resign and my Korean peer Mr. J.Y. Choi (Korean) who did the same thing as I did and was not forced to resign. I also believe my termination was in retaliation for my reporting sexual harassment, race discrimination and safety policy violations.

Mr. Duckworth requested a dinner meeting with me on October 22, 2005 he said it as to check on how I was doing (health wise), and to see if he could be of any help. I brought my medical documentation for you to review. I had over 100 pages of documentation.

Upon arrival at the restaurant I ran into Mr. Michael Hansford. Mr. Hansford said he would like to meet Mr. Duckworth and joined us at our table maybe 10 minutes after I arrived. While Mr. Hansford was present, Mr. Duckworth asked us about what we knew about serious ongoing problems at HMMA. Specifically he asked us if ▮▮▮▮▮ was still sleeping with ▮▮▮▮. He asked us of other concerns he had heard of such as "kick-backs". Then Mr. Hansford left.

Mr. Duckworth then said the executive management at Hyundai was upset with me and would like me to resign. I was flabbergasted. I said I wasn't aware of any performance, demeanor or relationships issues. I asked Mr. Duckworth specifically who is "executive management". He said the President, Mr. Ahn, Mr. H.I. Kim and Mr. Rick Neal.

I told Mr. Duckworth the President Ahn has only been at HMMA a few months and speaks very limited English. Our conversations have been "hello" in the hallways and bathroom. He has never expressed any dissatisfaction with me directly or through any Korean colleagues. I As far as Mr. H.I. Kim is concerned. I had a meeting with Mr. H.I. Kim was regarding the supplier Murakami who traveled 500+ miles to come down to HMMA to address a problem concerning their outside mirrors. The meeting was September 16th at HMMA at 10:00 in the Pearl Room.



PAGE 1 OF 21

I provided meeting minutes to the President, Mr. Ahn via Mr. H.J. Hyun. I am endorsing a copy of these.

As the meeting minutes show Mr. H.I. Kim was upset over our efforts to have the supplier Murakami address the quality concerns and related line stoppage. This was specifically what Murakami was asked to come down for. It was on the agenda for the meeting, all parties attending had copies and in fact Mr. H.I. Kim's department wrote the agenda and Mr. H.I. Kim presided over the meeting.

As my meeting minutes indicate Mr. H.I. Kim became enraged at Murakami, Mr. J.Y Choi (Director of HMMA Purchasing) and me (Director of HMMA Purchasing / Parts Development). I could feel his anger even though he only spoke in Korean. Mr. J.Y. Choi and I spoke as one voice with the same inflection to simply try to allow Murakami to make their presentation. As Mr. Choi and I later that afternoon discussed our surprised reaction from the C.O.O. Mr. H.I. Kim to Mr. Jason (Jae Rok) Lee, Mr. J.Y. Choi repeatedly stated in English to Mr. Jason Lee in my presence that we (Purchasing), (Choi and Cyrus), did absolutely nothing wrong, Mr. Choi was very upset almost crying. We both spoke to H.I. Kim calmly and with respect.

Later on September 16th 2005 I received a call from Mr. Choi at approximately 1:30pm. He said "Rob, you and I may be going home early today". He said Mr. H.I. Kim has gone to President Ahn to complain about the Murakami meeting. I said Kim is the one that acted unprofessionally. Mr. Choi said and agreed that we did nothing wrong.   Mr. Choi said Mr. Kim should actually apologize to HMMA staff and Murakami.

Mr. Choi told me come to my desk immediately.  When I arrived he said Mr. H.I. Kim had demanded that Mr. Choi and I write meeting minutes to cover what occurred in the Murakami meeting.

I asked why we had to write meeting minutes. There were 30+ people in the meeting along with the two suppliers, (Murakami and Hwashin), everyone knew what happened. I told him that I had many critical things to finish that and this seemed like an unreasonable priority. In the three plus years I have been with Hyundai I had never has such a request.

At this point I went to Mr. Duckworth's office and met with him to discuss this. I explained what had occurred. He stated "don't worry about it. It's just the Korean's style". I said I don't want a black mark next to my name because of this meeting. He said "don't give it another thought, everyone knows your good standing at Hyundai". I specifically told him that this was a very hostile environment and was surprised that the now third set of Executive management sent over from HMMA was acting in such a hostile fashion. He said again "don't give it another thought your reputation and standing in the company were excellent". I then went back to my desk.



As I continued to work on my scheduled activities for that afternoon I was again called over to Mr. Choi's desk. Mr. Hyun then joined us. Mr. Choi updated me and told me that now Mr. H.I. Kim phoned President Mr. Seo in Korea about this meeting. I discussed this new escalating factor with Mr. Hyun and Mr. Choi. They both agreed that we acted in the proper fashion in the meeting and that the thing to do was let his anger try to blow over.

Late in the afternoon of September 16, I again went over to see Mr. Duckworth. I explained the latest developments and my concern about Mr. H.I. Kim. Mr. Duckworth said "don't give it another thought; I haven't heard anything about this meeting". I then specifically stated that "I don't want any negative repercussions or retaliation from Mr. H.I.Kim". Mr. Duckworth then again reassured me that "I had nothing to worry about and to forget about it and have a nice weekend".

Between the September 16, 2005 and my dinner meeting with Mr. Duckworth I had no further meetings with Mr. Kim or Mr. Ahn. A few weeks prior to that however, I met with Mr. Duckworth and reported among other things, about executive involved in sexual harassment and about misconduct with employees about safety issues because workers were not following safety policies and the discriminatory treatment given to American managers and workers who were treated less favorably then the Korean managers I am enclosing a copy of the minutes of that meeting.

On the 24th of October 2005 I phoned Mr. J.Y. Choi my peer as Director of Purchasing – Administration. I asked him what ever happened with the H.I. Kim Murakami situation. He said "nothing happened, it is done". I reminded him of his call to me the day of the meeting when he said "Rob, you and I may be going home early today". He and acknowledged the conversation. I asked him if he was or will be penalized in any way. He said nothing happened to him.

Please investigate these matters and get back to me. I have sacrificed much and worked hard for this company. Terminating me is unfair.

Sincerely,
Robert C. Cyrus C.P.M.
HMMA Director of Purchasing Parts Development

21
3/画

**CONFIDENTIAL**

**Murakami Manufacturing U.S.A. Inc. (MMUS), Quality Meeting**

**ORIGINAL**

Date:            October 2, 2005

Subject:         Murakami Manufacturing U.S.A. Inc. (MMUS), Quality Meeting

Date of Meeting: September 16, 2005 (Friday)

Time:            10:00 am

Location:        HMMA Pearl Room

Attendees from MMUS:  Mr. Toru Komatsu        Senior Vice President
                      Mr. Mark McDonald       General Manager – Quality
                      Mr. Glen Roberts        General Manager – Sales

**Events of September 15/16, 2005**

On Thursday September 15, 2005 I was approached by Mr. B.D. ("Brian") Hwang, Manager – Parts Development, Exterior Plastics. Mr. Hwang has been with Hyundai for 11 years. Mr. Hwang stated Mr. H.I. Kim had requested Murakami to join the "quality review meeting" scheduled for the next morning at 10:00 am. I told Mr. Hwang I would support him and asked the main purpose of the meeting. He stated Q.C. has some serious concerns regarding cosmetic defects (scratches, buff marks and other damage). He specifically asked me as a Director to strongly defend the Supplier based on actual facts. He felt he could not speak freely to the C.O.O. since he is only at the level of Manager (This was a hierarchy issue, not personal). I told him I would gather the facts and take a neutral position in the meeting tomorrow.

On the morning of September 16, 2005 I went to investigate the situation prior to the meeting and arranged a pre-meeting with Murakami at 9:30 am to clearly understand their position. I spoke with actual HMMA team member who receives the Murakami parts line side and installs them. She stated "there really hasn't been much of any difficulty with the mirrors" and "the only thing that has been occurring is occasional severe gouges or scratches all the way down to the plastic raw material, not superficial light scratches". Meaning most of the defects identified at line side are handling issues from Glovis to HMMA, not Murakami in the vast majority of the cases.

4/21

0045

We started the pre-meeting around 9:30 am in the Quality Department. *Attendees were:*

Ms. Paula Gonsalves     HMMA Parts Quality
Mr. B.D. Huang          Parts Development
Mr. Chris McClain       Parts Development
Mr. Rob Cyrus           Parts Development

Murakami brought in actual examples of the suspect parts. There were significant "gouge like" defects not likely to be shipped to any OEM customer; too obvious. Murakami explained they had visited Glovis this morning and observed how Glovis is removing the mirrors from the HMMA approved packaging and stacking them haphazardly in non-approved totes. This is where the deep gouging is taking place. The three mounting studs are contacting the mirror housing painted surfaces when handled in this fashion.

After the review we and Murakami attended the Quality Meeting hosted by Mr. H.I. Kim. Two suppliers were in attendance for this meeting (*Murakami first, followed by Huashin*). Murakami brought defect samples and started to explain that these defects (*gouges*) were caused by handling issues between Glovis and HMMA based on their root cause analysis. This item was identified as the first discussion agenda item HMMA provided to Murakami (see attached). Mr. H.I. Kim seemed upset that Murakami was bringing up this topic and said via translator (Mr. Jason Chi) that he did not want to discuss this matter.

Murakami seemed a little taken aback. Why did they have three individuals come down to HMMA at significant time and cost and yet are not permitted to discuss and defend their position? HMMA QC wanted to charge back 163 minutes of down time to Murakami. This would equate to 163 minutes x $843.50/minute (GA) = $137,490.

The facts presented in the pre-meeting with HMMA Quality and Parts Development showed of the 282 mirrors returned as defective, 251 (89%) were good and acknowledged so by HMMA QC. The remaining 31 parts were either handling damage by Glovis or defects caused by Murakami's packaging format previously approved by HMMA Production Control in writing. Murakami also received parts returned from HMMA that had been dropped and run over by our tuggers and we were trying to charge *them* back.

Murakami and Parts Development attempted to intervene to clarify the facts with an open dialogue but Mr. H.I. Kim got visibly upset. He was yelling at various attendees and threw his papers on the table in disgust. He abruptly turned and walked out of room. All attendees were surprised, confused and felt uncomfortable.

**5/21**

He later returned and we tried to continue with an open dialogue approach to allow for a fair and productive meeting. Mr. Glen Roberts from Murakami asked why they were asked to drop everything immediately and come down to HMMA at significant cost and time if no one will listen. He then held up two new mirror assemblies and struck them together to replicate the damage being seen at HMMA line side by Glovis mishandling issues.

We attempted to discussed this matter and the related cost impact again, Mr. H.I. Kim seemed even further infuriated and yelled very loudly at both HMMA team members and the supplier Murakami with other supplier present. He again left the room again without any discussion or reason and never returned even though we had another supplier that was to present (Hwashin).

I was later called by my colleague Mr. J.Y. Choi and informed that Mr. H.I. Kim was very upset with Mr. Choi and me based on the Murakami meeting. Mr Choi told me "to leave my present meeting and join him at once, as he and I may have the rest of the day off" Insinuating that we may be fired.

In addition I later learned that after our Murakami meeting that Mr. Jason Chi had a separate meeting with Murakami and told Mr. Glen Roberts to "shut up and sit down". He will address his comments to Mr. Komatsu. He told Mr. Komatsu that Mr. Roberts was to cancel his trip back today and insisted that he stay here at HMMA.

Attached for back up are my actual meeting notes from the 16th, along with the Agenda we sent Murakami and Murakami's presentation.

Please feel free to contact me if you have any questions or concerns.

Mr. Robert Cyrus
Director of Parts Development

6/21

Nov 10 05 04:25p    Rob Cyrus                334-215-1967        p.8

# Weekly Parts Quality Review Meeting

## 2005. 9. 16.

## HMMA QC Department

7/21

# ■ Schedule and Structure of the Meeting

◆ **When:**    10:00 AM to 11:30 AM, Every Friday

◆ **Where:**    Alabama Room (1st floor of GA shop office building)

◆ **Chaired by:**    H.I. Kim, COO

◆ **Attendees:**    B.G. Cho, Senior director of Manufacturing
John Kalson, Director of Manufacturing
Simon Sung, Sr. Manger of Parts Development
Rob Cyrus, Director of Parts Management
Chuck Knowles, Manager of Parts Management
Chris Susock, Sr. Manager of Quality Control
Richard Chai, Sr. Manager of Line Inspection
Dave Choi, Sr. Manager of GA shop
Danny Seo, Sr. Manager of Parts Quality, and Related people

◆ **Presenters:**    CEO, COO and Quality Manager of Supplier

Suppliers that caused line-stoppage at HMMA
Suppliers that caused major shipping and field Quality issues.

◆ **Format:**    HMMA Corrective Action Request Form (Powerpoint format)
(Presentation file to be submitted to HMMA PQ one day in advance)

◆ **Prepared by:**    Jason Chi, Parts Quality Manager

8/21

0049

# ■Presentation Topics for the week of 9/16/2005

| Supplier | Part Name | Nonconformity | Occurrence | Issue Type | Presentation Time |
|---|---|---|---|---|---|
| Lear | Seat | Rear head rest not locked, high effort | 5 % | Quality Audit | 15 Min. |
| | | Seat back rubbing noise | 1 | | |
| | | Too much wrinkles and folds (Leather) | 10 % | | |
| Murakami | Outside mirror | Paint issues (Polishing mark, Crater, Scratches) | | Downtime VPC inspection | 15 Min. |
| | | Poor heat staking of Inside bush nut (Wind noise) | 2 | Test track | |
| Hwashin | Package tray panel | Oil contamination (Crater) | 100 % | Paint shop | 15 Min. |
| | | Stamping Split | 6 | Body shop | |
| | | Subwoofer weldnuts misaligned | 25 | GA T3 | |
| Dongwon | Door frame | Weld spatter | 27 | QA line | 15 Min. |
| | | Channel too wide at upper corner (Wind noise) | 100 % | Test track | |

9/21

Nov 10 05 04:26p    Rob Cyrus    334-215-1967    p.11

1/7

# NF Outer Mirror Assembly
## Countermeasure Report

**DATE REPORTED : 09/16/2005**

MMUS

*Murakami Manufacturing USA, Inc.*
*Campbellsville, KY*

10/21

0051

2/7

# Buff Marks

## DESCRIPTION OF PROBLEM :
Parts with paint buff marks found at HMMA assembly line.

## ROOT CAUSE OF NON-CONFORMANCE :
Uncompleted buff finishing was performed under insufficient lightening (1,000 lux).

## COUNTERMEASURE :

- Additional lighting installed (2,500 lux) into buff area
- Lighting check sheet created
- Check before operation on 1st and 2nd shifts using lighting meter
- Lighting criteria : more than 2,500 lux
- Effective date : Sep 14, 2005

## METHOD OF COUNTERMEASURE EFFECT (RESULT) :
100 % Inspection of all assemblies prior to shipping to HMMA.

## REFLECTION TO NEW MODEL :
The countermeasure is included in CM process launched in April, 2006

11/21

0052

Nov 10 05 04:26p    Rob Cyrus    334-215-1567    p.13



Lighting Status

After

Before

2,500 Lux

1,000 Lux

12/21

4/7

# Bag Marks

**DESCRIPTION OF PROBLEM :**

Parts with paint bag marks found at HMMA assembly line.

**ROOT CAUSE OF NON-CONFORMANCE :**

The paint bag mark is caused by protective bag being imprinted into the paint after leaving MMUS (dark colors only).

Root cause:
1. Insufficient paint cure time (2–4 hrs – after EC change to Housing).
2. Container design (vertical position & rough dunnage).

**COUNTERMEASURES IMPLEMENTED :**

- Stabilized curing time (7/25/05)
- New type of protective bag (8/7/05)
- Currently packaging all dark colors outside of the dunnage and protecting part with bubble wrap (extra time & cost).

**REFLECTION TO NEW MODEL :**

For CM program, different type of part container / dunnage will be proposed.

13/21

0054

Nov 10 05 04:27p     Rob Cyrus                                      334-215-1967          p.15

# Bag Mark

<u>Permanent countermeasure :</u>

- Container & Dunnage should be modified.



Container & Dunnage currently
used by another customer

Current NF Container & Dunnage

5/7

r4/21

Nov 10 05 04:27p    Rob Cyrus    334-215-1967    p.16

# Poor Heat Staking of Inside Bush Nut

\* <u>Root cause of non-conformance:</u>

1) Machine malfunction  2) Miss-operation (human error)

\* <u>Temporary Countermeasure :</u>

1) Operator verification – Mark a <u>Dot</u> on cover-base to ensure the heat stake process is complete
   - First the operator at heat stake process marks a dot on cover-base after the process then the next operator verifies the heat stake condition is acceptable and marks the part ( on cover-base) (1st operator 8/15/05) (2nd / audit operator 9/15/05)

2) Machine check – Increased frequency of machine function check
   - Check 2 times a day ( start & end of shift) (9/14/05)

\* <u>Permanent countermeasure :</u>
   - Heat Staking Process to be eliminated by introducing the elimination of Bracket and Bracket A (Engineering Change).

15/21

Nov 10 '05 04:27p    Rob Cyrus    334-215-1967    p.17

# Poor Heat Staking

### Permanent Countermeasure:

Engineering Change to eliminate heat staking process



16/21

**Cyrus, Robert C HMMA/Part Development**

| | |
|---|---|
| **From:** | McClain, Christopher C HMMA/Parts Development |
| **Sent:** | Monday, October 03, 2005 9:50 AM |
| **To:** | Cyrus, Robert C HMMA/Part Development |
| **Subject:** | FW: C.O.O. Meeting Observation |
| **Importance:** | High |

FYI, you were copied too...

**Chris McClain**
*Buyer - Parts Development*
**Hyundai Motor Manufacturing Alabama, LLC**
PHONE: (334) 387-8172
FAX:    (334) 387-8298
Email: chrismcclain@hmmausa.com
www.hmmausa.com

**HYUNDAI**

WARNING:
*The information contained in this communication is confidential, may be Hyundai-Supplier priviledged, and is intended only for the addressee. Unauthorized use, disclosure, or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you receive this communication in error, please notify us immediately by return e-mail or by calling the number above, and destroy this communication and all copies therof, including all attachments.*

-----Original Message-----
**From:** McClain, Christopher C HMMA/Parts Development
**Sent:** Friday, September 16, 2005 3:27 PM
**To:** Choi, Jung Yun HMMA/Parts Development
**Cc:** Cyrus, Robert C HMMA/Part Development
**Subject:** C.O.O. Meeting Observation

Hello Mr. Choi...below is a summary of what I observed in the meeting this morning:

➢ Our mirror supplier, Murakami was called in and asked to do a short presentation regarding an issue that occurred earlier this week
➢ Murakami had not received the parts in question to do root cause analysis and requested that they be allowed to attend next Friday's meeting
➢ In an effort to comply with HMMA's request, the supplier's quality general manager, sales general manager and VP of manufacturing re-arranged their schedules to attend this meeting
➢ After beginning the presentation, it became clear that Murakami would not be allowed to address the real cause of the rejected parts although they were listed on HMMA's agenda
➢ Murakmi personnel became upset that after driving 8 hours to be here, they were not being allowed to speak
➢ Parts development staff attempted to explain the supplier's position, they were told that the meeting was not the place to discuss these issues.
➢ The suppliers point of view is that if they were not to speak, there was not reason for them to come to HMMA on such short notice
➢ Staff from other departments made negative non-factual comments about the supplier's parts...again, purchasing staff intervened in an attempt to stick to facts and be fair.
➢ Neither purchasing, nor the supplier denies that there was an issue on a sample of parts, but the real

10/3/2005                                                    **17/21**

0058

Nov 10 05 04:28p    Rob Cyrus    334-215-1967    p.19
Page 2 of 2

consensual root cause was not able to be discussed.
➢   At not time, were purchasing staff disrespectful during the meeting. They were trying to do the right
    thing by addressing real issues which was supposed to be the reason for having the meeting.

Chris McClain
*Buyer - Parts Development*
**Hyundai Motor Manufacturing Alabama, LLC**
PHONE: (334) 387-8172
FAX:  (334) 387-8298
Email: chrismcclain@hmmausa.com
www.hmmausa.com



WARNING:
The Information contained in this communication is confidential, may be Hyundai-Supplier priviledged, and is
intended only for the addressee. Unauthorized use, disclosure, or copying of this communication or any part
thereof is strictly prohibited and may be unlawful. If you receive this communication in error, please notify us
immediately by return e-mail or by calling the number above, and destroy this communication and all copies
thereof, including all attachments.

10/3/2005

18/21

Meeting with Mr. Duckworth.

List of issues

- Supervisors were not familiar using SAP to record workers' overtime which will get annoyed. There shouldn't be any mistakes on the pay.
  - Extra help is required to entering those data.
- Communication with employee. Currently, there is no way to communicate with employees. It is very difficult to put people together in the meeting.
  - We need to invest some money to put CCTV in the plant, so the president can talk to workers at same time. Cafeteria is also good place. It is budged for 2006.
- Plant objectives. Employees do not understand plant objective other than making cars.
  - We need let workers know that objectives are more than building cars. Quality, quantity, and providing jobs to support their family are also objective. And those plant goal as well
- Executive management needs some strategic plan in coordinated operation.
- Bonus was budged but nothing paid other than blanket.
- Vehicle lease program
- Internal investigation will be done for wrong–doing on executive side. If the rumors (financial payment being made by supplier or other sexual service may be provided) are true, the action must take now.
  - Mitsubishi lost 15 million dollar as well as company reputation over public. We must cut it really fast.
- Managements are not able to get approve regiment expenses. Mostly, it is turn down. This is showing the Company tried to limit the expense by cutting down the benefits.
- Holiday party plan. There was some concern that we may not have holiday party because of budget issue.
- Employee protection demand. There is impression that safety policy secondary in the plant. It is perception issue. To American workers some of the Korean workers are not following the policy even though Korean worker knows what he is doing and this gives impression that supervisor doesn't care about safety. UAW can attack on these issues.
- American manage complains that they have limited authority. They (Director, Senior Manager) say that their signature means nothing. One of the director

19/21

couldn't send out federal express mail with getting approval by Korean manager.
- ■ We need to work on these
- Hyundai Culture must be developed.
  - ■ We need to build sense of Unity.
- Team unification.
  - ■ A team needs to work, think and eat together. They need spend more time together.
- Family enrichment program.
  - ■ Family picture at the plant. Hyundai jacket, because in Alabama wearing cloth with where they belong is very important.
- Plant friendly.
  - ■ We need to put benches around the plant, so workers can rest. Sports centers such as Softball field and basketball fields. Korean and/or American management must tell workers that we will do these after we make profit. Average workers don't understand when we are going to start making profits. UAW will use this to attack us.
- Flue shot for all employee
  - ■ This shows workers that we care and it also helps good attendance.
- Making productive place than fighting against UAW. If we just fight with UVW, we will just end up spending so much money.
  - ■ We need integrated program. Give confidence and direction to workers. Care the team member family. Care suppliers because UVW will attack because they are weaker. We must work together and get support from City and State. We need to show that we are here.
- Majority can be solved we act soon. We are still in honeymoon period.
- Food price is too high.
  - ■ We need to force vendors to keep price low.
- Enforce rules equally. → REALLY MAINLY FAIRLY !
  - ■ Workers don't understand if some Korean/American executive park inside of the plant.
- Amount Money to invest.
  - ■ We need much to show that we care.
- Salary is currently acceptable at least 2 — 3 years.
  - ■ Pay is the last reason for workers join the Union. Lack of simple programs such as family program is what force workers to join the Union.
- Bonus is the name we want use. Appreciation is more proper work to use.

20/21

- ■ Workers don't understand if line is down because of robotic problem or any machinery problem.
- 401k.
  - ■ We need to meet current industry standard. ?
- Do it partially over the period of time.
- Mr. Ahn needs to be more visible to workers and all employees. He needs to become like father of the plant.
- Ay negative issue must come from American management side. They must be able say. They need to have authority and responsibility. With strong responsibility, they must take care of their own people.
- HR must coordinate and all others such as HMA, HAC, Mobis, Glovis and etc.

21/21

# Exhibit E

1

**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1

2

3

4    TAPE RECORDED TELEPHONE CONVERSATIONS

5    RE: Cyrus v. Hyundai, 6363.31

6    Tape 1

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21    TRANSCRIBED BY:    Stacy L. Lovin,

22    Court Reporter and

23    Notary Public

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  <u>Telephone conversation No. 1</u>

2           ROB CYRUS:  Calling Greg

3  Kimball, director of human resources

4  (*inaudible*).  Today is October 23rd, 3:15

5  p.m.

6           (Phone ringing.)

7           GREG KIMBALL:  Hello.

8           ROB CYRUS:  Hey, Greg.

9           GREG KIMBALL:  Hey.

10          ROB CYRUS:  Hey.  It's Rob.

11          GREG KIMBALL:  Hey, Rob.

12          ROB CYRUS:  How are you?

13          GREG KIMBALL:  I'm doing

14  pretty good.  How about you?

15          ROB CYRUS:  I'm still feeling

16  not so well.  Hey, this Family Medical

17  Leave Act stuff, what do I need to do on

18  this?

19          GREG KIMBALL:  Did you get it

20  completed?

21          ROB CYRUS:  You know, I took

22  it to Melanie on Thursday, and she wasn't

23  there.  And the other lady said, you know,

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    one day won't matter, bring it back.

2              GREG KIMBALL:  Oh, but, I

3    mean, did you get the doctor -- remember

4    that day when we were talking you were

5    going to get the doctor to complete it.

6              ROB CYRUS:  Right.  Yeah, he's

7    working on that.

8              GREG KIMBALL:  Okay.  When he

9    gets it completed, we just need it back

10   in.

11             ROB CYRUS:  But some portion I

12   fill out, right, and some portion he fills

13   out?

14             GREG KIMBALL:  The front page

15   you do.  The second page is for the

16   doctor.

17             ROB CYRUS:  And then what does

18   that do for me, you know?  What does the

19   Family Medical Leave Act -- what's it do?

20             GREG KIMBALL:  The only thing

21   it does is if you're needing intermediate

22   time out or something like that, that

23   keeps you covered.  That's all it does.

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1      ROB CYRUS:  Covered?  What do

2   you mean covered?

3      GREG KIMBALL:  You remember

4   when you were out with the coronary?

5      ROB CYRUS:  Yeah.

6      GREG KIMBALL:  You had the

7   family medical leave?

8      ROB CYRUS:  Right.

9      GREG KIMBALL:  Okay.  That's

10  what you needed for this -- this leave.

11  Because you've been out and then you came

12  back a couple of times.

13      ROB CYRUS:  Right.

14      GREG KIMBALL:  But just little

15  doctors' excuses doesn't really keep you

16  covered.

17      ROB CYRUS:  Okay.  I mean,

18  covered from what?  I mean, what am I

19  trying to cover?

20      GREG KIMBALL:  Well, the

21  family medical leave, it just basically

22  insures you that you're from a -- the FMLA

23  law that you're covered as far as your job

# TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  is concerned.  That's what it is.

2          ROB CYRUS:  Okay.  Okay.  Have

3  you heard any feedback from anybody?  Are

4  they upset that I've been sick or what's

5  going on?

6          GREG KIMBALL:  I didn't hear

7  anything from Hill.  And I talked to him

8  the other day, you know, and said okay.

9  And that was the extent of his

10  conversation.

11          ROB CYRUS:  He said okay?

12          GREG KIMBALL:  Yeah.

13  Whenever, you know, you had me to go over

14  there --

15          ROB CYRUS:  Yeah.

16          GREG KIMBALL:  (Inaudible).

17          ROB CYRUS:  Yeah.

18          GREG KIMBALL:  But he said --

19  I guess Lauren must have already told him

20  anyway.

21          ROB CYRUS:  Yeah, she did.

22          GREG KIMBALL:  He said he

23  already knew.

# TYLER EATON
## TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1      ROB CYRUS:  Yeah.  I mean --
2  so he hasn't had any problems with
3  anything?
4      GREG KIMBALL:  No, he hasn't
5  talked to me about any problems.
6      ROB CYRUS:  Okay.  All righty.
7  Well, tomorrow I'm going to Dr. Rodriguez,
8  an infectious medicine disease doctor that
9  my GP recommended.
10     GREG KIMBALL:  Where is he at?
11     ROB CYRUS:  In Montgomery.
12 Yeah.
13     GREG KIMBALL:  (Inaudible).
14     ROB CYRUS:  Yeah.  So I --
15 I'll get this documentation to you and,
16 you know --
17     GREG KIMBALL:  Okay.
18     ROB CYRUS:  I don't know why,
19 you know, I just feel defensive now.  I
20 don't want to feel defensive.  What's
21 going on, you know, I mean, on the medical
22 leave act stuff?
23     GREG KIMBALL:  What's going

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  on.  Just waiting on you to get it in.

2  Remember that was the only thing I was

3  telling you and Dave a few weeks ago, just

4  to get it in.  That's all I was --

5          ROB CYRUS:  Dave.

6          GREG KIMBALL:  -- asking.

7  Remember Dave was the (*inaudible*).  All he

8  brought by was doctors' excuses that they

9  wanted --

10          ROB CYRUS:  Right.  Right.

11  Yeah.

12          GREG KIMBALL:  Which was not

13  the family medical leave stuff.  See, I --

14          ROB CYRUS:  I didn't get any

15  indication of the Family Medical Leave Act

16  until I got it in the mail.  And no one

17  called me.  It's like, what is this, you

18  know --

19          GREG KIMBALL:  Well, she was

20  trying to get ahold of you in that -- we

21  thought you had went ahead and filled one

22  out.  I did.  I didn't know you hadn't.

23  Then Melanie said no, all I have is

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  doctors' excuses.

2          ROB CYRUS:  I didn't know I

3  needed to.  No one spoke to me about it.

4          GREG KIMBALL:  Any time you're

5  out for extended period of time --

6          ROB CYRUS:  I didn't do it

7  with the coronary situation, I didn't fill

8  out any paperwork, so --

9          GREG KIMBALL:  Who did that

10  for you because we --

11          ROB CYRUS:  I don't know.  I

12  don't know.  That's what I'm saying, there

13  is a precedence already, you know.  I

14  mean, I didn't have to do it before and

15  now I got to fill out all this paperwork.

16  It's sort of unusual.

17          GREG KIMBALL:  Okay.  That's

18  weird because she's got documentation with

19  your -- maybe that was with Chad and Laura

20  helping you out before because they had

21  documentation showing you on family

22  medical leave.

23          ROB CYRUS:  I mean, I signed

# TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   the paper, but I didn't fill out any

2   paperwork at all.  And I didn't ever --

3           GREG KIMBALL:  You're supposed

4   to ask the doctor to complete it.  That's

5   probably what happened.

6           ROB CYRUS:  All right.  Well,

7   you know, please let everybody know, you

8   know, that --

9           GREG KIMBALL:  Feeling any

10  better?

11          ROB CYRUS:  No.

12          GREG KIMBALL:  You sound like

13  you're stuffy.

14          ROB CYRUS:  Yeah, I'm sick.

15          GREG KIMBALL:  My cousin is in

16  town.  They're evacuated down in south

17  Florida.

18          ROB CYRUS:  Yeah.

19          GREG KIMBALL:  But she had the

20  same -- some of the same problems with her

21  heart, and they took her off of that

22  Lipitor.

23          ROB CYRUS:  Yeah.

# TLE TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1      GREG KIMBALL:  Because it gave
2   her flu-like symptoms all the time.  She
3   stayed sick on Lipitor.  And they kept her
4   off.  I told her, I said my friend has
5   been on it --
6         ROB CYRUS:  Yeah.
7      GREG KIMBALL:  Took him off
8   for three days to see.  She said they had
9   to take me off for two weeks.
10         ROB CYRUS:  Really?  Two
11   weeks?
12      GREG KIMBALL:  What the deal
13   was.
14      ROB CYRUS:  Huh.  Well, maybe
15   I'll try that.  I'll talk to my doctor and
16   see what he thinks.
17      GREG KIMBALL:  They put her on
18   a different medicine, and it just made the
19   world of difference she said.
20      ROB CYRUS:  Well, great.  I
21   hope that's all it is.
22      GREG KIMBALL:  Yeah.  I pray
23   that that's all it is too.

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1          ROB CYRUS:  All right, Greg.
2    Well, thanks for helping me on this.  And
3    I'll get this paperwork to you as soon as
4    I can.
5          GREG KIMBALL:  Okay, Rob.
6          ROB CYRUS:  Okay.  Thanks.
7          GREG KIMBALL:  Hope you feel
8    better.
9          ROB CYRUS:  Okay.  Bye.
10
11   Phone conversation No. 2
12          ROB CYRUS:  Melanie McCormick.
13   October 24th.  12:06.
14          (Phone ringing.)
15          (Voice mail greeting.)
16          ROB CYRUS:  Hey, Melanie.
17   This is Rob Cyrus.  Hey, I tried to get
18   with you last week.  I came over to your
19   desk on last Thursday, the 20th, and give
20   you my documentation.  And I had a few
21   questions on the Family Medical Leave Act,
22   but you weren't there, and your colleague
23   said that it would be okay to give it to

# TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  you a few days later.  I'm trying to get

2  all the documentation complete.  I'm a

3  little confused because when I had the

4  cardio issues, you know, I did not fill

5  out anything or make a request.  I think

6  you did that.  So I don't know why it's

7  different this time.  But can you please

8  call me back.  I'm still out sick.  My

9  home number is 215-1967.  Thanks.

10

11  Phone conversation No. 3

12                  ROB CYRUS:  (*Inaudible*).

13  October 24th.  12:25.

14                  (Phone ringing.)

15                  MARY COLE:  Mary Cole.

16                  ROB CYRUS:  Hey, Mary Cole.

17  This is Rob.

18                  MARY COLE:  Hey.

19                  ROB CYRUS:  Hey.  I talked to

20  Sidney, and we're on the same page.  So if

21  you can go back to her at seven eleven

22  five with five thousand earnest money and

23  then a closing date at the end of

**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  November.

2           MARY COLE:  Okay.

3           ROB CYRUS:  That's acceptable

4  to us.

5           MARY COLE:  Okay.

6           ROB CYRUS:  Is that all right?

7           MARY COLE:  All right.

8           ROB CYRUS:  If you get, you

9  know, some documentation, if you can give

10  me a copy of it.

11          MARY COLE:  You want what I

12  have now?

13          ROB CYRUS:  Well, I mean --

14          MARY COLE:  Or wait till she

15  does this?

16          ROB CYRUS:  Let's wait till

17  she does this.  But I need --

18          MARY COLE:  Okay.

19          ROB CYRUS:  -- a copy if I

20  could, please.

21          MARY COLE:  Oh, yes.

22          ROB CYRUS:  When do you expect

23  to talk to her?

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    MARY COLE:  I'll call her
2  right now.
3    ROB CYRUS:  Okay.  All right.
4  Thanks for your help.  Bye-bye.
5    MARY COLE:  Bye.
6
7  Phone conversation No. 4
8    ROB CYRUS:  Calling Greg
9  Kimball.  October 24th, 12:51.  Cell
10  phone.
11    (Phone ringing.)
12    GREG KIMBALL:  Hello.
13    ROB CYRUS:  Hey, Greg.  This
14  is Rob.
15    GREG KIMBALL:  Hey, Rob.
16    ROB CYRUS:  How are you doing?
17    GREG KIMBALL:  I'm pretty
18  good.  How about you?
19    ROB CYRUS:  All right.  Hey,
20  can you talk a second?
21    GREG KIMBALL:  Well, I'm in a
22  meeting with Wendy, but you want me to
23  call you back?

15

# ⅂Ⅼ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    ROB CYRUS:  Yeah, I need to

2  talk to you.  I talked to my doctor today

3  about the Lipitor, my cardiologist's

4  nurse, and she agrees that, you know, this

5  illness may be driven from the Lipitor.

6  And she said it will take, you know, at

7  least a couple weeks to get out of my

8  system.

9    GREG KIMBALL:  See.  That's

10  what I was thinking after she told me the

11  same thing.  Oh, man, that's weird.

12    ROB CYRUS:  Was it your

13  relative that had that --

14    GREG KIMBALL:  My first

15  cousin.  She's heading out.  She's one of

16  the evacuees from Florida.  And the exact

17  same thing.

18    ROB CYRUS:  All right.  I

19  called Melanie McCormick.  I'm trying to

20  get that family medical leave information

21  tidied up and to her.

22    GREG KIMBALL:  Uh-huh.

23    ROB CYRUS:  And --

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1      GREG KIMBALL:  Hold on one
2  second.  Is she over in orientation,
3  Melanie?
4      UNIDENTIFIED SPEAKER:  Right
5  there.
6      GREG KIMBALL:  Oh, she's over
7  here.  She's at her desk.  Do you want me
8  to have her to call you?
9      ROB CYRUS:  Yeah, when she
10 gets a chance.  But, you know, the thing I
11 didn't understand, you know, when I had
12 the cardio problems, I never filled out
13 any paperwork, and now, you know, I got
14 this letter in the mail, fill out the
15 paperwork.  So why is it different this
16 time?
17     GREG KIMBALL:  Remember I told
18 you last night they went ahead and helped
19 you out on that.  They tried to get
20 everything squared away for you,
21 especially since you had been
22 hospitalized.  This time you're not, so
23 they're needing you to get the stuff done.

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    ROB CYRUS: Okay. So it says
2  I have until November 10th on the letter
3  here.
4    GREG KIMBALL: Yeah.
5    ROB CYRUS: So I've got to
6  call into my new internal medicine guy,
7  and I'm going to take this stuff over to
8  them. But call me when you get a chance.
9  I'm hearing some weird rumors about me
10  being fired because of being sick.
11    GREG KIMBALL: You're kidding?
12    ROB CYRUS: No. Are you aware
13  of anything like that or any performance
14  issues?
15    GREG KIMBALL: Nobody has told
16  me anything.
17    ROB CYRUS: Have you heard
18  anything performance-wise from me?
19    GREG KIMBALL: You know, the
20  usual wolf chatter over there about --
21  with some of your (inaudible). That's the
22  only real comments that I've heard.
23    ROB CYRUS: But nothing for

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  me?

2             GREG KIMBALL:  No.

3             ROB CYRUS:  Okay.  All right,

4  Greg.  Call me when you get a chance.  You

5  know, this has got me worried.

6             GREG KIMBALL:  Okay.

7             ROB CYRUS:  All right.

8  Thanks.  Bye.

9

10  Phone conversation No. 5

11             ROB CYRUS:  Hello.

12             LAURA:  Hey.  It's Laura.

13             ROB CYRUS:  Hey.

14             LAURA:  Mr. (*Inaudible*), the

15  desk number is ███.

16             ROB CYRUS:  ███.

17             LAURA:  His cell is ███.

18             ROB CYRUS:  ███.

19             LAURA:  ███.

20             ROB CYRUS:  ███.    And then

21  (*inaudible*).

22             LAURA:  (*Inaudible*) is -- his

23  desk number is ███.

## TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
 1          ROB CYRUS:    ██████.
 2          LAURA:    ████.
 3          ROB CYRUS:  Okay.
 4          LAURA:    ██████.
 5          ROB CYRUS:    ██████.
 6          LAURA:  Yeah.
 7          ROB CYRUS:   Okay.
 8
 9   Telephone conversation No. 6
10          ROB CYRUS:   (Inaudible).  Now
11   1:36 p.m. on October 24th.
12          (Phone ringing.)
13          (Voice mail greeting.)
14          ROB CYRUS:  Hey, Melanie.
15   It's Rob Cyrus.  It's about 1:40 on
16   Monday, the 24th.  Hey, I got your letter
17   dated October 18th about the Family
18   Medical Leave Act.  You know, I spoke with
19   my cardiologist's nurse today, and she's
20   in consultation with my cardiologist.  And
21   they feel that the illness that I'm having
22   now is related directly to the drug they
23   put me on for my cardio, you know, when I
```

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    had the balloon angioplasty. So to me
2    this would be a continuation of the
3    original family medical leave situation.
4              You know, first they diagnosed
5    me with mono. That was later found out to
6    be, depending on who you talk to,
7    incorrect. And again, had to modify my
8    drugs. They think Lipitor is suspect.
9    They told me to go off of it today for at
10   least two weeks. And the nurse says it's
11   very common to have flu-like symptoms, and
12   that's what I've been experiencing. So I
13   need clarification on this.
14             Again, it's October 24th, about
15   1:40. Please call me today. You know,
16   I'm getting a little concerned about this,
17   and I don't understand why a second set of
18   documents is required. But call me at
19   home if you would at ▬▬▬▬. ▬▬▬▬.
20   Thanks for your help. Bye.
21
22   Telephone conversation No. 7
23             ROB CYRUS: Calling Mr. Choi,

# TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
 1    director of purchasing.  Involved HI Kim
 2    meeting with Murakami.
 3              MR. CHOI:  (Inaudible).
 4              ROB CYRUS:  Mr. Choi.
 5              MR. CHOI:  Speaking.
 6              ROB CYRUS:  Hey.  This is Rob.
 7              MR. CHOI:  Hi.
 8              ROB CYRUS:  Hey, how are you?
 9              MR. CHOI:  Fine.  How are you?
10              ROB CYRUS:  Not doing too
11    well.  I'm still --
12              MR. CHOI:  You okay?
13              ROB CYRUS:  Yeah, the doctors
14    think now it's the medication for my heart
15    that is giving me problems.
16              MR. CHOI:  Uh-huh.
17              ROB CYRUS:  Hey, the reason I
18    was calling is, you know, the HI Kim
19    meeting with Murakami.
20              MR. CHOI:  Uh-huh.
21              ROB CYRUS:  Whatever happened
22    to that situation?
23              MR. CHOI:  Nothing -- nothing
```

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    happened.  It's done.  That's all.

2              ROB CYRUS:  It's done.

3              MR. CHOI:  Yeah, it's done.

4    Nothing to happen.

5              ROB CYRUS:  So you gave your

6    meeting minutes to President Ahn.

7              MR. CHOI:  Yes, I gave -- I

8    gave the whole statement.

9              ROB CYRUS:  And I gave mine to

10   Mr. Heron, and he gave them to Ahn.  But

11   you -- did you get any feedback?  Are they

12   --

13             MR. CHOI:  No, nothing.

14   Nothing feedback.

15             ROB CYRUS:  They're not upset

16   or anything?

17             MR. CHOI:  No.

18             ROB CYRUS:  Remember when you

19   called me that first day and you said, you

20   know, Rob, you and I may have the

21   afternoon off early, HI Kim is very upset?

22   So did they -- are you scared you're going

23   to lose your job, or did they say anything

# TE TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   about that?

2           MR. CHOI:  No, I don't

3   think -- because (*inaudible*).

4           ROB CYRUS:  So, I mean, there

5   has been -- you know, is he upset with you

6   now or --

7           MR. CHOI:  I don't mind about

8   his opinion.  (*Inaudible*).

9           ROB CYRUS:  I mean, in your

10  opinion, you know, did you think we did

11  anything wrong?

12          MR. CHOI:  I do my job.  I did

13  my best.  (*Inaudible*).

14          ROB CYRUS:  Yeah.

15          MR. CHOI:  I did my job, so

16  therefore, I don't care about (*inaudible*).

17          ROB CYRUS:  Okay.  So they're

18  not going to penalize you or --

19          MR. CHOI:  Nothing happened.

20  Nothing happened.

21          ROB CYRUS:  Okay.  All right.

22          MR. CHOI:  All right.  Thank

23  you.

# TYLER EATON
## TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1        ROB CYRUS:  Thank you.
2    Bye-bye.
3        MR. CHOI:  Bye.
4
5    Telephone conversation No. 8
6        ROB CYRUS:  Calling
7    cardiologist, Dr. Moore.  October 24th,
8    2:23 p.m.
9        (Phone ringing.)
10        UNIDENTIFIED SPEAKER:
11    Montgomery Cardiovascular.
12        ROB CYRUS:  Yes, I need to set
13    up an appointment with Dr. Moore.  I'm a
14    current patient.
15        UNIDENTIFIED SPEAKER:  One
16    moment.
17        ROB CYRUS:  Thank you.
18        (Phone ringing.)
19        (Voice mail greeting.)
20        ROB CYRUS:  Hi, Jacqueline.
21    This is Robert Cyrus, C-Y-R-U-S.  I'm a
22    current patient of Dr. Moore's.  Hey, I'm
23    having some severe side effects from a

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  heart medication or medications.  Lipitor
2  is what everybody is thinking it is, and I
3  needed to get in and see Dr. Moore about
4  this situation and also about a work
5  excuse through Family Medical Leave Act.
6  I've been out for a couple weeks because
7  of these symptoms.  Can you please call me
8  back.  It's fairly urgent.  At ▓▓▓▓▓▓.
9  Again, ▓▓▓▓▓▓.  Again, this is Robert
10 Cyrus, C-Y-R-U-S.  Thanks for your help.
11 Bye-bye.

12
13 <u>Telephone conversation No. 9</u>
14         ROB CYRUS:  Calling Melanie
15 McCormick again.  (*Inaudible*).  387.  2:25
16 p.m.  October 24th.
17         (Phone ringing.)
18         (Voice mail greeting.)
19         ROB CYRUS:  Hey, Melanie.
20 This is Rob Cyrus again.  October 24th,
21 about 2:30.  I just wanted to get a
22 response from you guys on the questions I
23 have about this Family Medical Leave Act

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1  request.  Again, I'm trying to get up with

2  you guys.  Please give me a call at

3  ████████.  Thank you.

4

5  Phone conversation No. 10

6           ROB CYRUS:  Calling Greg

7  Kimball, human resources director HMMA.

8  October 24th.  2:29 p.m.

9           (Phone ringing.)

10          (Voice mail greeting.)

11          ROB CYRUS:  Hey, Greg.  This

12  is Rob.  It's 2:29 on October 24th.  Hey,

13  I've called Melanie McCormick twice now

14  and left detailed requests for her to call

15  me back about this FMLA situation and

16  update her on my continuing heart

17  condition.  Can you call me.  I can't get

18  a response.  I'm at home, ██████████, and my

19  cell is ████████.  Thanks, Greg.

20

21  Phone conversation No. 11

22          UNIDENTIFIED SPEAKER:

23  (*Inaudible*).  Can I help you?

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    ROB CYRUS: Hey. This is Rob

2    Cyrus from upstairs.

3    UNIDENTIFIED SPEAKER: Hi.

4    ROB CYRUS: Hey, how you

5    doing?

6    UNIDENTIFIED SPEAKER: I'm

7    fine. Who you need now?

8    ROB CYRUS: I'm sorry to keep

9    bugging you.

10    UNIDENTIFIED SPEAKER: You're

11    not.

12    ROB CYRUS: Rick Neal. I need

13    his desk number and cell if possible.

14    UNIDENTIFIED SPEAKER: Okay.

15    I don't know his cell, so I got to look

16    that one up.

17    ROB CYRUS: Okay. How is your

18    day?

19    UNIDENTIFIED SPEAKER: It's

20    going pretty good.

21    ROB CYRUS: Good.

22    UNIDENTIFIED SPEAKER: Okay.

23    Rick Neil's extension is ███.

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    ROB CYRUS:    ▇▇▇.

2    UNIDENTIFIED SPEAKER:  Cell

3    phone ▇▇▇▇▇▇.

4    ROB CYRUS:    ▇▇▇.

5    UNIDENTIFIED SPEAKER:  Uh-huh.

6    ROB CYRUS:  All right.  Thanks

7    again for your help.

8    UNIDENTIFIED SPEAKER:  Uh-huh.

9    Bye-bye.

10    ROB CYRUS:  Bye-bye.

11

12    <u>Phone conversation No. 12</u>

13    ROB CYRUS:  Calling Rick Neal,

14    general counsel HMMA.

15    (Voice mail greeting.)

16    ROB CYRUS:  Hey, Rick.  It's

17    Rob Cyrus.  It's about 2:30 on Monday.  I

18    need to talk to you about some issues with

19    rumors I'm hearing.  Remember when I sat

20    you and Greg down and made formal notice

21    that I had been treated differently, felt

22    that I was treated differently because of

23    my medical conditions with my heart.  You

1  know, now I feel that this is coming to

2  fruition. So I need you to give me a call

3  back. Fairly urgent. My number again is

4  ▮▮▮▮▮▮. And cell is ▮▮▮▮▮▮. Thanks

5  for your help. Bye.

6

7  <u>Phone conversation No. 13</u>

8         ROB CYRUS: Calling Rick

9  Neil's desk. 2:32 p.m. October 24th.

10         GINGER: Good afternoon. Rick

11  Neil's office.

12         ROB CYRUS: Hey, Ginger.

13         GINGER: Hey.

14         ROB CYRUS: Hey, it's Rob.

15         GINGER: Hey, Rob.

16         ROB CYRUS: How are you?

17         GINGER: I'm all right. How

18  are you?

19         ROB CYRUS: I'm still feeling

20  fairly ill.

21         GINGER: Bless your heart.

22  What's wrong?

23         ROB CYRUS: You know, I talked

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  to my cardiologist today, and they feel

2  it's medication, heart medication,

3  reactions, so they took me off the

4  Lipitor.  They indicated to me today it

5  would take two weeks to get out of my

6  system, so, you know, I'm feeling rotten.

7  I just hope that's what it is.

8         GINGER:  Bless your heart.

9  Well, yeah, because if it's not, then you

10  just spend another two weeks without

11  Lipitor which is --

12         ROB CYRUS:  Yeah, I know.  I

13  should be able to survive that.

14         GINGER:  Not so great.

15         ROB CYRUS:  Hey, I need to

16  talk to Rick.

17         GINGER:  Yeah.  You want me to

18  have him call you?  He's still in his

19  director's meeting.

20         ROB CYRUS:  Oh, okay.  Yeah,

21  have him call me if you would, please.

22         GINGER:  Yeah.  You me to call

23  him --

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    ROB CYRUS:  My home number is

2    ▬▬ --

3    GINGER:  Uh-huh.

4    ROB CYRUS:  -- ▬▬.

5    GINGER:  Okay.

6    ROB CYRUS:  And my cell

7    ▬▬.  Is Greg in that meeting also

8    or --

9    GINGER:  Yeah, I think -- I

10   think.  The director's meeting hasn't let

11   out yet.  Yeah, no, they're still all in

12   there.

13   ROB CYRUS:  Huh.  That starts

14   at nine o'clock usually.

15   GINGER:  Uh-uh.  One.

16   ROB CYRUS:  One.  Okay.  That

17   director's meeting.  Okay.

18   GINGER:  Yeah.  Yeah.

19   ROB CYRUS:  All right.  If you

20   could have him call me, please.

21   GINGER:  All right, honey.

22   Feel better.

23   ROB CYRUS:  All right.

# TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    Thanks.  Bye.

2              GINGER:  Bye.

3

4    Telephone conversation No. 14

5              ROB CYRUS:  (*Inaudible*).  2:34

6    p.m.

7              (Phone ringing.)

8              (Voice mail greeting.)

9              ROB CYRUS:  Hey, HJ.  It's

10   Rob.  It's Monday, October 24th, about

11   2:30.  Hey, I needed to talk to you.  If

12   you could please give me a call at

13   ▬▬▬▬ or my home is ▬▬▬▬.  I spoke

14   with my cardiologist today, and they think

15   the illness is due to, you know, a

16   continuation from my heart problem and a

17   medicine adjustment is needed.

18              But I needed to speak with you.

19   I'm hearing rumors about me getting

20   terminated for missing work on a heart

21   related issue.  I'm a little surprised and

22   concerned.  So give me a call if you

23   would, please.  Thanks.

One Federal Place  •  Suite 1020  •  1819 Fifth Avenue North  •  Birmingham, Alabama 35203
(205) 252-9152  •  Toll-Free (800) 458-6031  •  Fax (205) 252-0196  •  www.TylerEaton.com

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1

2   Phone conversation No. 15

3          ROB CYRUS:  Hello.

4          UNIDENTIFIED SPEAKER:  Hey.

5          ROB CYRUS:  Hey.

6          UNIDENTIFIED SPEAKER:  I got

7   your message.

8          ROB CYRUS:  Okay.

9          UNIDENTIFIED SPEAKER:  So you

10  just want a phone list?

11         ROB CYRUS:  Yeah, just a phone

12  list.

13         UNIDENTIFIED SPEAKER:  Okay.

14         ROB CYRUS:  And who else's

15  number do I need?  That's it I guess.

16         UNIDENTIFIED SPEAKER:  Okay.

17         ROB CYRUS:  All right.

18  Thanks.  Bye.

19

20  Phone conversation No. 16

21         ROB CYRUS:  Mr. Heron at his

22  desk.  ███████ -- 02, sorry.

23         (Phone ringing.)

**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1       MR. HERON:  Hello.

2       ROB CYRUS:  Mr. Heron.

3       MR. HERON:  Yeah.  How you

4  doing?

5       ROB CYRUS:  Hey.  Not feeling

6  too good.  How are you?  How are you?

7       MR. HERON:  Yeah, fine.  Thank

8  you.

9       ROB CYRUS:  Did you --

10       MR. HERON:  (*Inaudible*).

11       ROB CYRUS:  Yeah, you know, I

12  talked to my cardiologist today, so they

13  think it's medication they've been giving

14  me, you know, in relation to my heart

15  problem, so.  I -- I've been -- I left you

16  a message.  Did you get my message?

17       MR. HERON:  No.  Not yet.

18  (*Inaudible*) meeting.

19       ROB CYRUS:  Okay.  I'm hearing

20  rumors that my job may be in jeopardy

21  because of being out sick so much.  What's

22  going on there?

23       MR. HERON:  I don't have any

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1   idea about it.
2           ROB CYRUS:  So are you unhappy
3   with me because of my ailment or?
4           MR. HERON:  That's not the
5   case.
6           ROB CYRUS:  Huh?
7           MR. HERON:  That's not the
8   case.
9           ROB CYRUS:  I mean, do you
10  have a problem with my performance or
11  anything or -- I mean, I'm a little
12  worried here.
13          MR. HERON:  Okay.  When do you
14  think you can be here?
15          ROB CYRUS:  You know, as soon
16  as I feel better.  I talked to the
17  cardiologist today, and he changed my
18  medication.
19          MR. HERON:  Uh-huh.
20          ROB CYRUS:  So, you know, I
21  don't want to be sick.  I don't want to
22  sit in this house by myself.  You know, my
23  parents are coming down again, you know,

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1  five hundred miles away to take care of

2  me.  I mean, do you have a performance

3  issue with me or is there a problem --

4         MR. HERON:  I think when

5  (*inaudible*) get over and you're here at

6  the office and I talk about some of the

7  issues you're talking.

8         ROB CYRUS:  What issues?  You

9  know, I'm alone here at home, and I have

10  to worry about that until I return to

11  work?  You can't tell me what's going on?

12         MR. HERON:  I don't know

13  exactly what's going on.

14         ROB CYRUS:  You know, I talked

15  to Mr. Choi and he said --

16         MR. HERON:  Who is Mr. Choi?

17         ROB CYRUS:  You know, the

18  gentleman that sits next to me in parts

19  development.

20         MR. HERON:  Uh-huh.

21  (*Inaudible*).

22         ROB CYRUS:  Yeah.  I asked him

23  about what happened with the HI Kim

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
 1   situation.  He said --
 2           MR. HERON:  HI Kim?
 3           ROB CYRUS:  Remember the
 4   Murakami issue where he was upset?
 5           MR. HERON:  Uh-huh.
 6           ROB CYRUS:  And he said
 7   nothing.  You know, that everything was
 8   okay.  And I asked him, you know, was he
 9   penalized or any problems with him, and he
10   said no, not at all.
11           MR. HERON:  Yeah.  I don't
12   have any ideas what's going with the case.
13   Everything is (inaudible).  (Inaudible) as
14   far as I know.
15           ROB CYRUS:  What I'm hearing
16   is that the executive management is upset
17   with me.
18           MR. HERON:  Where did you
19   heard about that?
20           ROB CYRUS:  Keith Duckworth.
21           MR. HERON:  Keith.
22           ROB CYRUS:  Yeah.  He
23   mentioned --
```

38

# ℡ TYLER EATON
## TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1      MR. HERON:   (*Inaudible*).

2      ROB CYRUS:   -- Rick Neal.   And

3  he said --

4      MR. HERON:   (*Inaudible*).

5      ROB CYRUS:   So Keith hasn't

6  talked to you?

7      MR. HERON:   Yeah.   No.

8      ROB CYRUS:   I mean, are you

9  aware that Mr. Ahn is upset with me?   I've

10 never talked to him.   He doesn't speak

11 English very well.

12     MR. HERON:   Who?

13     ROB CYRUS:   President Ahn.

14 It's unusual he would be upset with me

15 when he doesn't know me.

16     MR. HERON:   I don't know.   I

17 don't know at all what's going on.

18     ROB CYRUS:   Okay.

19     MR. HERON:   Okay.

20     ROB CYRUS:   All right.

21 Thanks, HJ.   Okay.   Bye.

22

23 Phone conversation No. 17

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    ROB CYRUS:  Calling Rick Neal,
2    Hyundai's general counsel.  (*Inaudible*).
3    What's his number here?  ████.
4         (Phone ringing.)
5         RICK NEAL:  Rick Neal.
6         ROB CYRUS:  Hey, Rick.  It's
7    Rob.
8         RICK NEAL:  Hey, Rob.
9         ROB CYRUS:  Hey.  What's going
10   on?
11        RICK NEAL:  I'm in a meeting
12   right now.
13        ROB CYRUS:  Did you get my
14   message earlier?
15        RICK NEAL:  Yeah, I just got
16   it.  We had a long director's meeting
17   today.
18        ROB CYRUS:  Oh.  Sounds like
19   fun.  I need to talk to you about the
20   conversation I had with Keith Duckworth
21   where he mentions you specifically having
22   a performance issue with me.  The
23   executive management who he named is HI

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   Kim, Mr. Ahn, and you.  So I don't know

2   why he's dragging you into this, but I

3   need to know what's going on here.

4            RICK NEAL:  Okay.

5            ROB CYRUS:  So.

6            RICK NEAL:  When I'm finished

7   with my meeting, I'll give you a call.

8            ROB CYRUS:  All right.  I need

9   to talk to you about it quickly.  All

10  right?

11           RICK NEAL:  Okay.

12           ROB CYRUS:  Okay.  Bye.

13           RICK NEAL:  Bye.

14

15  Phone conversation No. 18

16           ROB CYRUS:  Calling Greg

17  Kimball.  3:07 p.m.  October 24th.  Human

18  resources director.

19           (Phone ringing.)

20           (Voice mail greeting.)

21           ROB CYRUS:  Hey, Greg.  This

22  is Rob again.  It's about 3:10 on Monday,

23  the 24th.  Hey, I need you to call me.

# TLE TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   This is fairly urgent, affecting me and my

2   family directly.  Some issues going on.

3   Please call me.  Again, it's very urgent.

4   At -- either at home, ▬▬▬▬▬, or my cell

5   is ▬▬▬▬▬.  Thank you.

6

7   Phone conversation No. 19

8           ROB CYRUS:  Calling Greg

9   Kimball again.  3:13.  10/24.  Desk phone,

10  ▬▬.

11          (Phone ringing.)

12          (Voice mail greeting.)

13          ROB CYRUS:  Hey, Greg.  It's

14  Rob.  It's about 3:15 on Monday.  Hey,

15  I've been trying to reach you.  It's

16  urgent that I speak with you about some

17  issues and accusations that are going on.

18  Again, this is Rob.  Please call me at

19  ▬▬▬▬▬ or my cell is ▬▬▬▬▬.  Thank

20  you.  Bye.

21

22  Phone conversation No. 20

23          ROB CYRUS:  Calling Greg

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   Kimball via his secretary Denise

2   (*inaudible*).  3:14.  10/24.

3                     (Phone ringing.)

4                     (Voice mail greeting.)

5                     ROB CYRUS:  Hey, Denise.  It's

6   Rob.  It's about 3:15 on Monday, the 24th.

7   I'm trying to reach Greg.  If you could

8   please have him call me.  It's fairly

9   urgent if you can find him and have him

10  call me.  Thank you so much.  Bye-bye.

11

12

13

14

15

16

17

18

19

20

21

22

23

43

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
 1              C E R T I F I C A T E
 2
 3    STATE OF ALABAMA)
 4    JEFFERSON COUNTY)
 5
 6          I hereby certify that the
 7    above and foregoing recordings were taken
 8    down by me in stenotypy, and the questions
 9    and answers thereto were reduced to
10    typewriting under my supervision, and that
11    the foregoing represents a true and
12    correct transcript of the recordings given
13    by said parties upon said hearing.
14          I further certify that I am
15    neither of counsel nor of kin to the
16    parties to the action, nor am I in anywise
17    interested in the result of said cause.
18
19
20
21
22
23            COMMISSIONER - NOTARY PUBLIC
              ACCR NO. 445
```

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1
2
3
4    TAPE RECORDED TELEPHONE CONVERSATIONS
5        RE: Cyrus v. Hyundai, 6363.31
6                Tape 2
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21    TRANSCRIBED BY:    Stacy L. Lovin,
22                      Court Reporter and
23                      Notary Public

One Federal Place  •  Suite 1020  •  1819 Fifth Avenue North  •  Birmingham, Alabama 35203
(205) 252-9152  •  Toll-Free (800) 458-6031  •  Fax (205) 252-0196  •  www.TylerEaton.com

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  <u>Telephone conversation No. 1</u>

2              ROB CYRUS: Calling Melanie

3  McCormick. *(Inaudible)*.

4              (Phone ringing.)

5              (Voice mail greeting.)

6              ROB CYRUS: Hey, Melanie.

7  This is Rob. It's -- Rob Cyrus. It's

8  2:59, about three o'clock on Tuesday.

9  Hey, I got a voice mail on my home

10  answering machine last night from Maylene

11  at Dr. Paul Moore, my cardiologist's

12  office, and she indicated to me that she

13  had sent the FMLA documentation to you

14  already. So I'm a little confused. I

15  don't know if that's the original one or

16  the second one. Can you please call me at

17  ████████ or ████████ and let me know if

18  you have received what you need. I don't

19  want to fall down here because of the

20  communication gap here. But please call

21  me. I need to know today so I can call

22  them back if it's not what you need.

23  Thank you so much. Bye-bye.

One Federal Place  •  Suite 1020  •  1819 Fifth Avenue North  •  Birmingham, Alabama 35203
(205) 252-9152  •  Toll-Free (800) 458-6031  •  Fax (205) 252-0196  •  www.TylerEaton.com

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    <u>Telephone conversation No. 2</u>

2                ROB CYRUS:  Calling Maylene,

3    Dr. Paul Moore, cardiologist.  10/25.

4    3:05 p.m.

5                (Phone ringing.)

6                UNIDENTIFIED SPEAKER:

7    Montgomery Cardiovascular.

8                ROB CYRUS:  Yes.  May I speak

9    to Maylene.

10               UNIDENTIFIED SPEAKER:  I can

11   take a message and have her return your

12   call.

13               ROB CYRUS:  Okay.  If you

14   would please.  This is -- I'm a patient of

15   Dr. Moore.  It's Robert Cyrus, C-Y-R-U-S.

16   And she called me last night about some

17   documentation for Family Medical Leave

18   Act, and I need to confirm the situation

19   on that.

20               UNIDENTIFIED SPEAKER:  Okay.

21   What number can she call you back?

22               ROB CYRUS:  Yes.  It's

23   ▓▓▓▓▓▓ or my home is ▓▓▓▓▓▓.

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1    UNIDENTIFIED SPEAKER:  That's

2  area code 334?

3    ROB CYRUS:  Yes, ma'am.  It's

4  here in Montgomery.  And I also needed to

5  get in this week and talk to Dr. Moore.

6  They've indicated for me to go off the

7  Lipitor because of the side effects I'm

8  having, and I need to speak with him about

9  that and about a legal issue.

10    UNIDENTIFIED SPEAKER:  Okay.

11    ROB CYRUS:  So is there any

12  appointment time I could get in to see

13  him?  I know he's booked, but this is an

14  emergency.

15    UNIDENTIFIED SPEAKER:  Let me

16  connect you to that scheduling.

17    ROB CYRUS:  Okay.  Thank you

18  so much.

19    (Phone ringing.)

20    JACKY:  Scheduling.  This is

21  Jacky.  Hold, please.

22    ROB CYRUS:  Sure.  Hello.

23    JACKY:  Thank you for holding.

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   May I help you.

2            ROB CYRUS:  Yes, ma'am.  This

3   is Robert Cyrus.  I'm a patient of

4   Dr. Moore's.  And I need to get in and see

5   him this week.  I'm having a reaction to

6   some of the medications he's prescribed,

7   and I also have a FMLA legal issue with

8   work.

9            JACKY:  Okay.  What's the

10  name?

11           ROB CYRUS:  Robert Cyrus.

12  It's C-Y-R-U-S.

13           JACKY:  Okay.  I have sent a

14  message to Dr. Moore's nurse.  Has she not

15  called you?

16           ROB CYRUS:  She called back

17  yesterday evening and said that she had

18  sent the proper documentation to my

19  employer, but I don't know if that was

20  from April when I had heart stints put in

21  or if that was this week.  So if she can

22  call and clarify that.  And then I need to

23  know what is the time of the FMLA.  You

# ⅡⅬ TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
 1   know, does it expire 10/31 or 11/15?
 2            JACKY:  Okay.  She's going to
 3   have to call you with all of that --
 4            ROB CYRUS:  Okay.
 5            JACKY:  -- because, I mean,
 6   all I do is schedule.  I don't have any of
 7   the other --
 8            ROB CYRUS:  All right, ma'am.
 9   I think I'm getting a call from her now.
10   Let me take this.  I'm sorry.  Thank you.
11            JACKY:  Okay.
12            ROB CYRUS:  Bye.
13            JACKY:  Bye.
14
15   Telephone conversation No. 3
16            ROB CYRUS:  Yes, ma'am.
17            UNIDENTIFIED SPEAKER:
18   (Inaudible).
19            ROB CYRUS:  Can you call me
20   back on the ████████.  My phone is dying.
21   I apologize.
22            UNIDENTIFIED SPEAKER:
23   (Inaudible).
```

# TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    ROB CYRUS: Yeah, I was on the
2    line with your scheduling. 21 -- okay.
3    Thank you. Bye.
4
5    Telephone conversation No. 4
6    ROB CYRUS: Hello.
7    UNIDENTIFIED SPEAKER: Hey.
8    ROB CYRUS: Hey.
9    UNIDENTIFIED SPEAKER: I
10   called you yesterday and left you a
11   message. Is that what you were calling
12   about?
13   ROB CYRUS: Yes, ma'am, I got
14   that. You know, I know you guys provided
15   the FMLA documentation, you know, for my
16   heart stint procedure back in April, May
17   time frame.
18   UNIDENTIFIED SPEAKER: Okay.
19   ROB CYRUS: Did you send one
20   this week?
21   UNIDENTIFIED SPEAKER: They're
22   supposed to be faxing it. I had one
23   from -- I don't know. It got buried under

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  some of my stuff, but it was from August,

2  June or August that I had.

3          ROB CYRUS:  Okay.

4          UNIDENTIFIED SPEAKER:  And

5  they were -- they're supposed to be faxing

6  it from my office now -- I mean this week.

7  It's been filled out.

8          ROB CYRUS:  I mean, you're

9  going to send it to Melanie McCormick --

10          UNIDENTIFIED SPEAKER:  Yes.

11          ROB CYRUS:  -- at Hyundai this

12  week?

13          UNIDENTIFIED SPEAKER:  Yes.

14          ROB CYRUS:  Okay.  And then

15  what is the time period that runs through?

16  You know, when I am I covered until?

17  That's why I was going to --

18          UNIDENTIFIED SPEAKER:  It's

19  kind of indefinite.  I don't put -- we

20  don't put any dates on that.

21          ROB CYRUS:  Okay.

22          UNIDENTIFIED SPEAKER:  Because

23  we don't -- we don't have -- I mean, this

# TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    is a continuing thing, and I don't --

2         ROB CYRUS: Yes, ma'am.

3         UNIDENTIFIED SPEAKER: I don't

4    give an end date or a -- you know, it's

5    like when you need to come in, you know,

6    if it wasn't in that time frame, you know.

7    I just never -- I always say indefinitely.

8         ROB CYRUS: Okay.

9         UNIDENTIFIED SPEAKER: For any

10    kind of testing or returns or anything.

11         ROB CYRUS: Okay. You know, I

12    stopped taking the Lipitor --

13         UNIDENTIFIED SPEAKER: Right.

14         ROB CYRUS: -- you know, based

15    on your direction --

16         UNIDENTIFIED SPEAKER: Right.

17         ROB CYRUS: -- on the 24th.

18    And you said it may take 14 days to get

19    out of my system.

20         UNIDENTIFIED SPEAKER: Yeah.

21         ROB CYRUS: So I'm still

22    feeling horrible, and, you know, I just

23    want to make sure that I'm covered.

# ⊥⊢ TYLER EATON

### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    UNIDENTIFIED SPEAKER: It's

2  not going to happen over -- that you're

3  covered for what?

4    ROB CYRUS: For FMLA for my

5  employer.

6    UNIDENTIFIED SPEAKER: You

7  mean like to take off or something?

8    ROB CYRUS: Yeah. I'm out of

9  work. I've been out of work off and on

10  since the 19th of September.

11    UNIDENTIFIED SPEAKER: Well, I

12  didn't know that. I have not been told

13  that.

14    ROB CYRUS: I went to an

15  internal medicine doctor, Dr. Kirby

16  Parker.

17    UNIDENTIFIED SPEAKER: Okay.

18    ROB CYRUS: And he told me

19  that, you know, he was going to be the

20  quarterback and talk to my ENT and talk to

21  my GP and talk to --

22    UNIDENTIFIED SPEAKER: He

23  needs to be getting those kind of forms

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1  and fill them out since he's doing all
2  that.

3           ROB CYRUS:  Well, you know,
4  since it's cardio related, I thought you
5  guys would do it.

6           UNIDENTIFIED SPEAKER:  It's
7  not cardio.  It's drug related.  But if
8  he --

9           ROB CYRUS:  But you-all --
10  you-all prescribed that, right?

11           UNIDENTIFIED SPEAKER:  That's
12  right.  But we didn't tell you to take off
13  because of it.

14           ROB CYRUS:  Okay.  I'm
15  confused.  I mean --

16           UNIDENTIFIED SPEAKER:  I
17  didn't tell you to take off work because
18  of it.  I just told you to stop it.

19           ROB CYRUS:  Right.  Right.
20  But I've been off work because I've been
21  feeling so sick and, you know --

22           UNIDENTIFIED SPEAKER:  But we
23  haven't seen you since that time.

12

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    ROB CYRUS:  That's why I was

2    asking if I can come in this week.

3        UNIDENTIFIED SPEAKER:  I don't

4    -- I don't have anything, and he's off.

5    He's on vacation this week.

6        ROB CYRUS:  This is -- this is

7    getting to the point where it's a legal

8    issue.  I'm going through a divorce.  I

9    could lose my children.  You know, it's

10   imperative that I -- you know, I'm able to

11   see somebody.

12       UNIDENTIFIED SPEAKER:  I

13   can't -- I don't have a doctor for you to

14   see.  Dr. Moore is on vacation.

15       ROB CYRUS:  There is no other

16   one in the practice that could see me?

17       UNIDENTIFIED SPEAKER:  They

18   don't need to see you for flu-like

19   symptoms.  You have to -- how long has

20   this been going on?  I just heard about it

21   yesterday?

22       ROB CYRUS:  Right.  Because

23   I've been going through -- I switched from

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  Daniel Moore and went to an internal
2  medicine doctor because no one could come
3  to the -- all right.  All right.  So
4  you're just saying --
5          UNIDENTIFIED SPEAKER:  I'm
6  just saying you've been -- you've been
7  dealing with this through another doctor.
8  You called me yesterday.  He seems to
9  think it might be the medicine.  I just
10 okayed that you could stop it because he
11 thought it was causing it.
12         ROB CYRUS:  Right.  And I
13 agree with you.
14         UNIDENTIFIED SPEAKER:  Okay.
15 But I don't -- a doctor doesn't need to
16 see you because of this.  It takes a
17 couple of weeks for this to get out of
18 your system and to see if your symptoms
19 subside.  Did Dr. Parker do any lab work
20 on you?
21         ROB CYRUS:  Oh, yeah.  I mean,
22 I've had ultrasounds, lab work.
23         UNIDENTIFIED SPEAKER:  He's

# ⅡE TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  checked your cholesterol, he's checked

2  your liver test, he's done all that?

3          ROB CYRUS: Yes, ma'am. I

4  mean, a plethora. I had probably, you

5  know, 20 different prescriptions. So.

6          UNIDENTIFIED SPEAKER: All I'm

7  saying is we can't be responsible for all

8  of that.

9          ROB CYRUS: I understand that.

10  I understand. I just thought since, you

11  know, the Lipitor was coming from you I

12  should contact you guys.

13          UNIDENTIFIED SPEAKER: That's

14  fine that you did. And I'm telling you to

15  stop it. But we don't see someone, you

16  know --

17          ROB CYRUS: At this period.

18          UNIDENTIFIED SPEAKER: No.

19          ROB CYRUS: Okay. That's

20  fine. I'll call --

21          UNIDENTIFIED SPEAKER: If it's

22  continuing after two weeks off the

23  medicine, then it's probably something

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    else.

2              ROB CYRUS:  Right.  But I've

3    been -- you know, I've had seven or eight

4    different doctors' appointments and

5    ultrasounds and X-rays and everything.  I

6    mean, so it's the point of everything is

7    normal, but I'm still feeling horrible.

8    But the side effects --

9              UNIDENTIFIED SPEAKER:  You

10   need to give this time.  Okay?

11             ROB CYRUS:  Yes, ma'am.

12             UNIDENTIFIED SPEAKER:  And if

13   all your lab works were fine --

14             ROB CYRUS:  Yes.

15             UNIDENTIFIED SPEAKER:  -- and

16   you had been on the Lipitor for a while

17   before you started having --

18             ROB CYRUS:  Right.  But --

19             UNIDENTIFIED SPEAKER:  Since

20   May.

21             ROB CYRUS:  Right.

22             UNIDENTIFIED SPEAKER:  Yeah.

23   So it's going to take several days for

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

 1 | that to get out of your system.

 2 |         ROB CYRUS:  Okay.  Okay.

 3 |         UNIDENTIFIED SPEAKER:  Okay.

 4 |         ROB CYRUS:  All right.

 5 |         UNIDENTIFIED SPEAKER:  And

 6 | then if it -- if you're -- like I told you

 7 | yesterday, if you're feeling better in two

 8 | weeks and your symptoms have gone away,

 9 | then we know, yeah, it had to have been

10 | the Lipitor and we can try you on

11 | something else.

12 |         ROB CYRUS:  Okay.  That's

13 | fine.

14 |         UNIDENTIFIED SPEAKER:  If

15 | you're still feeling that bad, then you

16 | need to go back to see Dr. Parker.

17 |         ROB CYRUS:  Yeah.  Okay.

18 |         UNIDENTIFIED SPEAKER:  Okay?

19 |         ROB CYRUS:  All right.

20 |         UNIDENTIFIED SPEAKER:  Okay.

21 |         ROB CYRUS:  Yes, ma'am.  Thank

22 | you so much.  Bye-bye.

23 |         UNIDENTIFIED SPEAKER:

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    Bye-bye.

2

3    Telephone conversation No. 5

4              ROB CYRUS:  Calling Melanie

5    McCormick.  3:20 p.m., October 25th.

6    Follow-up on documentation.

7              (Phone ringing.)

8              MELANIE MCCORMICK:  Benefits.

9    Melanie.

10             ROB CYRUS:  Hey, Melanie.

11   It's Rob.

12             MELANIE MCCORMICK:  Hey.

13             ROB CYRUS:  Hey.  How are you?

14             MELANIE MCCORMICK:  I'm good.

15   How are you?

16             ROB CYRUS:  I'm okay.  Hey,

17   did you get my message?

18             MELANIE MCCORMICK:  Today?

19             ROB CYRUS:  Yes, ma'am.

20             MELANIE MCCORMICK:  When did

21   you leave it?

22             ROB CYRUS:  Just about 20, 30

23   minutes ago.

**TYLER EATON**

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    MELANIE MCCORMICK:  No.
2  Uh-uh, not yet.
3    ROB CYRUS:  I got a call from
4  Maylene.  She's the nurse for Dr. Paul —
5  Moore, the cardiologist, and she left a
6  message last night about five, and she
7  said that she had received the forms and
8  sent the documentation to you.
9    MELANIE MCCORMICK:  Uh-huh.
10    ROB CYRUS:  Do you have that?
11    MELANIE MCCORMICK:  Yeah, I
12  got a fax from her.  But the thing is is
13  on here it doesn't say anything about you
14  being out.  It just says that -- I mean,
15  it says will it be necessary for employee
16  to take work early intermittent leave.
17  Says no.  It says is it chronic condition.
18  It's a chronic condition.  State whether
19  patient is presently incapacitated.  It
20  says no.  So --
21    ROB CYRUS:  But I haven't met
22  with her in -- that was months.  I've been
23  going to Kirby Parker, an internal

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   medicine doctor.  My brother-in-law is an

2   ear, nose, and throat doctor, plus he was

3   a pharmacist for eight years prior to

4   that, and he said -- you know, I was going

5   to a general practitioner, Daniel Moore,

6   and he said I needed somebody a little

7   more cerebral to grasp everything and pull

8   together what's really going on since this

9   is going on so long.  So I switched over

10  to Kirby Parker, and, you know, he was the

11  quarterback to talk to the cardiologist.

12  And that's who I've been seeing lately.

13  So do I need to get the documentation from

14  him?

15          MELANIE MCCORMICK:  Well,

16  whoever has you out.

17          ROB CYRUS:  Okay.

18          MELANIE MCCORMICK:  Whoever

19  has you out on a leave right now or, you

20  know, has -- currently has you out on this

21  leave, that's who I need to complete this

22  information.

23          ROB CYRUS:  Okay.  I'll give

# TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  him a call and get that rolling.

2       MELANIE MCCORMICK: Okay. If

3  you need me to fax something else to him,

4  just let me know.

5       ROB CYRUS: Okay. I mean,

6  what do you need me to fill out? That's

7  why I was confused. Because the first

8  time I didn't --

9       MELANIE MCCORMICK: The leave

10 of absence form that I sent you.

11      ROB CYRUS: I didn't -- I

12 didn't do that the first time. Why are we

13 doing that now?

14      MELANIE MCCORMICK: It's a

15 standard form every time.

16      ROB CYRUS: No, you didn't --

17 you had me sign something, but you didn't

18 -- I didn't fill anything out.

19      MELANIE MCCORMICK: Remember I

20 sent you about your paperwork and you said

21 you never got it.

22      ROB CYRUS: That's because I,

23 you know, went through a divorce. I had a

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  rental house.

2      MELANIE MCCORMICK:  But --

3      ROB CYRUS:  But I was on

4  family medical leave.  I came back to

5  medical.  They checked me out.  Said yeah,

6  you're good to go back to work, so

7  apparently everything was, you know,

8  kosher.

9      MELANIE MCCORMICK:  That's a

10 standard thing.  You must never have just

11 turned it in because I send those out

12 every --

13     ROB CYRUS:  I was at your desk

14 and I signed some family medical leave.

15 If you can look through your papers --

16     MELANIE MCCORMICK:  I'm

17 looking through right now.

18     ROB CYRUS:  Okay.

19     MELANIE MCCORMICK:  And I

20 don't see the leave of absence form.  I

21 don't see the leave of absence form.

22     ROB CYRUS:  You know, this

23 isn't my specialty.  So I had no idea that

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  I would be on -- I didn't know really any
2  details of Family Medical Leave Act, and I
3  didn't know, you know, having balloon
4  angioplasty would, you know, fall under
5  Family Medical Leave Act, so --
6           MELANIE MCCORMICK:  Well --
7           ROB CYRUS:  -- you have to
8  guide me through this.
9           MELANIE MCCORMICK:  Well, it
10  doesn't matter.  It's not my -- I'm not
11  the one that says okay, we'll send out
12  FMLA.  If you're qualified, if you've been
13  here and we get (*inaudible*) we send the
14  paperwork out.
15           ROB CYRUS:  Okay.
16           MELANIE MCCORMICK:  And then
17  when we get it back, we review it.  And if
18  it's considered a serious health condition
19  and, you know, it justifies all the facts,
20  then that's when we either approve it.  If
21  it doesn't, we deny it.
22           ROB CYRUS:  Okay.
23           MELANIE MCCORMICK:  But

# ⊫ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  anybody who's qualified and is out for

2  something -- you know, I mean, if you're

3  just out with a cold for a couple of

4  days --

5          ROB CYRUS: Well, this isn't a

6  cold. This is a reaction to a medication.

7          MELANIE MCCORMICK: I'm not

8  saying that. I'm just saying that if

9  somebody was, we wouldn't send it out for

10  that because it's not --

11          ROB CYRUS: Sure. I

12  understand.

13          MELANIE MCCORMICK: So those

14  leave of absence forms, those are the

15  standard ones that -- and I send it with

16  all the packets.

17          ROB CYRUS: Okay. So it's

18  just one page. I have that paperwork in

19  front of me. There is just one page that

20  I fill out, is that correct? That's the

21  doctor to complete and return to Hyundai

22  benefits. This is the one certification

23  of health care provider. And there is a

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  Family Medical Leave Act application.  Is

2  that me?

3          MELANIE MCCORMICK:  Yes.  And

4  it's front and back.

5          ROB CYRUS:  Front and back.

6  And that is two pages.  And then I got

7  your letter dated October 18th.  And then

8  I have another one here, Authorization For

9  Release of Protected Health Information.

10         MELANIE MCCORMICK:  When

11 the -- some of the doctors, for HIPAA

12 reasons, want you to state specifically

13 who the information can be released to.

14 And that's the form that, if they request

15 it, you need to turn it into them and they

16 know it comes to the benefits department.

17         ROB CYRUS:  So would I take

18 this to the doctor's office?  I fill this

19 out and release them to release

20 information.

21         MELANIE MCCORMICK:  Right.

22 (Inaudible).

23         ROB CYRUS:  Okay.  All right.

# ⊥E TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    There is a handwritten note on here from
2    you it looks like. (*Inaudible*) complete
3    and give to doctor with certification of
4    health care provider. And then the final
5    document I have, The Family Medical Leave
6    Policy.
7              MELANIE MCCORMICK:  That's
8    just for your --
9              ROB CYRUS:  Yes.  F00013.
10   Okay.  That's just (*inaudible*) to do
11   anything with that.  All right.  I'll
12   contact my internal medicine guy and get
13   that rolling for you.
14             MELANIE MCCORMICK:  Okay.
15             ROB CYRUS:  All right.  Thanks
16   for your help.  Bye-bye.
17             MELANIE MCCORMICK:  Bye.
18
19   Telephone conversation No. 6
20             ROB CYRUS:  (*Inaudible*).
21             (Phone ringing.)
22             DELORES:  Internal Medicine
23   Associates.  This is Delores.

# TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
1              ROB CYRUS:  Hi, Delores.  This
2    is Robert Cyrus.  I'm a patient of
3    Dr. Parker's.
4              DELORES:  Uh-huh.
5              ROB CYRUS:  I needed to get in
6    and meet with him this week if possible.
7    I'm having some reaction to a medication
8    and my blood pressure is really elevated.
9              DELORES:  Okay.  You want to
10   come at 11 o'clock tomorrow?
11             ROB CYRUS:  That would be
12   great.  Do you have anything later?  I
13   have a 12:45 appointment.  That's cutting
14   it close.
15             DELORES:  Okay.  You want a
16   2:15?
17             ROB CYRUS:  That would be
18   fantastic.
19             DELORES:  Okay.  You said
20   Robert Cyrus?
21             ROB CYRUS:  Yes, ma'am.
22   C-Y-R-U-S.  So that's at 2:15 on the 26th.
23             DELORES:  Uh-huh.
```

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    ROB CYRUS: Okay. All right.

2    Thank you so much. I appreciate it.

3    Bye-bye.

4    DELORES: Bye-bye.

5

6    Telephone conversation No. 7

7    ROB CYRUS: Rick Neal, general

8    counsel.

9    (Phone ringing.)

10    ROB CYRUS: 2:42 on October

11    25th.

12    GINGER: Good afternoon, Rick

13    Neal's office.

14    ROB CYRUS: Hey, Ginger. It's

15    Rob.

16    GINGER: Hey.

17    ROB CYRUS: Hey. How are you?

18    GINGER: I'm good. How are

19    you?

20    ROB CYRUS: I'm doing okay.

21    I've felt better, but.

22    GINGER: I'm so sorry.

23    ROB CYRUS: That's all right.

28

# TE TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    Hey, is Rick in?

2              GINGER:  He's not.  He had the

3    pro am today.

4              ROB CYRUS:  What's that, a

5    golf tournament?

6              GINGER:  Yeah.

7              ROB CYRUS:  Oh, really?

8              GINGER:  Yeah.  The nationwide

9    golf tournament.

10             ROB CYRUS:  Where is that

11   being played?

12             GINGER:  Robert Trent Jones.

13             ROB CYRUS:  Oh, okay.  In

14   Birmingham?

15             GINGER:  No.  Down here.

16             ROB CYRUS:  In Prattville?

17             GINGER:  Yeah.

18             ROB CYRUS:  All righty.  Can

19   you give a message to him to have him call

20   me.  I spoke to him last night and he was

21   going to call me back, but he never did.

22             GINGER:  Oh, shoot.  Okay.

23   Yeah.  No problem.

# ⅡΕ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1          ROB CYRUS:  Okay.  Thank you

2  so much.

3          GINGER:  Hope you feel better.

4          ROB CYRUS:  Thank you.

5  Bye-bye.

6          GINGER:  You're welcome.  Bye.

7

8  Telephone conversation No. 8

9          ROB CYRUS:  (*Inaudible*).

10  October 25th.  (*Inaudible*).

11          (Phone ringing.)

12          (Voice mail greeting.)

13          ROB CYRUS:  Hey, Rick.  It's

14  Rob.  It's 3:45 on Tuesday, the 25th.

15  Hey, didn't hear back from you last night.

16  Please give me a call, and, you know, I

17  need to discuss some serious issues at

18  either my home ████████ or my cell is

19  ████████.  I'll be in all day tomorrow.  I

20  have two doctors' appointments, one with

21  internal medicine, the other with another

22  doctor.  But I need to speak with you and

23  hear what's going on.  Thanks.

# ⊓Ɛ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  <u>Telephone conversation No. 9</u>

2  　　　　ROB CYRUS:  (*Inaudible*).

3  October 25th.

4  　　　　(Phone ringing.)

5  　　　　UNIDENTIFIED SPEAKER:

6  McPhillips, Shinbaum.

7  　　　　ROB CYRUS:  Yes.  My name is

8  Robert Cyrus.  I'm the director of

9  purchasing at the Hyundai plant.  I was

10  given your name by Janet Olson.  She was a

11  general counsel at Mercedes.  I'd like to

12  set up an appointment with Mr. McPhillips

13  regarding a possible case.

14  　　　　UNIDENTIFIED SPEAKER:  Okay.

15  What type of (*inaudible*)?  Employment

16  or --

17  　　　　ROB CYRUS:  Employment.

18  　　　　UNIDENTIFIED SPEAKER:  Okay.

19  Let's see what we have.

20  　　　　ROB CYRUS:  It's fairly

21  urgent.

22  　　　　UNIDENTIFIED SPEAKER:  Okay.

23  Hold on.

# TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    ROB CYRUS:  Okay.  Thank you.

2    UNIDENTIFIED SPEAKER:  Okay,

3    sir.  I can get you in one o'clock

4    Thursday.

5    ROB CYRUS:  Thursday.  That's

6    the 27th?

7    UNIDENTIFIED SPEAKER:  It is.

8    ROB CYRUS:  Okay.  Where are

9    you located?

10    UNIDENTIFIED SPEAKER:  ▬▬

11    ▬▬▬▬▬▬▬▬▬

12    ROB CYRUS:  516 South Perry.

13    That's downtown?

14    UNIDENTIFIED SPEAKER:  It is.

15    ROB CYRUS:  Okay.  Where do

16    you -- what's that near?  I'm not familiar

17    with Montgomery.

18    UNIDENTIFIED SPEAKER:  Do you

19    know where ▬▬▬▬▬▬ is?

20    ROB CYRUS:  I know where the

21    Capital City Club is and the RSA building.

22    UNIDENTIFIED SPEAKER:  Okay.

23    I'm trying to think.  Do you know where --

**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    we're way back up from that.

2              ROB CYRUS:  Okay.  What exit

3    would I get off of on -- is it 65 or 85 I

4    guess?

5              UNIDENTIFIED SPEAKER:  We're

6    on 85.

7              ROB CYRUS:  Okay.

8              UNIDENTIFIED SPEAKER:  Where

9    are you coming from?

10             ROB CYRUS:  Near Wynlakes.

11             UNIDENTIFIED SPEAKER:  Okay.

12   If you're coming down 85 towards

13   Birmingham.

14             ROB CYRUS:  Yes.

15             UNIDENTIFIED SPEAKER:  You're

16   going to take the ▮▮▮▮▮▮▮▮▮▮▮▮.

17             ROB CYRUS:  ▮▮▮▮▮▮▮▮▮▮t

18   Okay.

19             UNIDENTIFIED SPEAKER:  Stay in

20   the middle lane of the service road.

21             ROB CYRUS:  Okay.

22             UNIDENTIFIED SPEAKER:  All the

23   way to the top of the hill.

# ⊤Ⴖ TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    ROB CYRUS:  Okay.

2    UNIDENTIFIED SPEAKER:  Turn

3    right on to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

4    ▓▓▓▓.

5    ROB CYRUS:  Top of the hill

6    turn right.  Colonial Bank.  Okay.

7    UNIDENTIFIED SPEAKER:  And

8    once you turn right at the Colonial Bank,

9    we're next to the last building before the

10   first red light.

11   ROB CYRUS:  Okay.  Fantastic.

12   UNIDENTIFIED SPEAKER:  Hold

13   on.  I need to schedule your appointment.

14   Hold on.

15   ROB CYRUS:  Okay.

16   UNIDENTIFIED SPEAKER:  Okay.

17   And what's your name?

18   ROB CYRUS:  Robert Cyrus.

19   It's C-Y-R-U-S.

20   UNIDENTIFIED SPEAKER:

21   C-Y-R-U-S.

22   ROB CYRUS:  I'm the American

23   employee at Hyundai.

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
 1            UNIDENTIFIED SPEAKER:  Okay.
 2   What's your phone number?
 3            ROB CYRUS:  ████████ is my
 4   cell.  That's the best way to reach me.
 5   My home is ██████.
 6            UNIDENTIFIED SPEAKER:  Okay.
 7   We will see you then at one o'clock on
 8   Thursday.
 9            ROB CYRUS:  Okay.  Fantastic.
10   Thank you.
11
12   Telephone conversation No. 10
13            ROB CYRUS:  Hello.
14            UNIDENTIFIED SPEAKER:
15   (Inaudible).
16            ROB CYRUS:  Hey.
17            UNIDENTIFIED SPEAKER:  What's
18   going on?
19            ROB CYRUS:  I've been on the
20   phone all day, you know, again.
21            UNIDENTIFIED SPEAKER:  Who you
22   been talking to?
23            ROB CYRUS:  I've been talking
```

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   to my cardiologist and my internal

2   medicine guy and work and I got two

3   attorneys names from Janet Olson, who was

4   the general counsel at Mercedes.

5           UNIDENTIFIED SPEAKER:  What

6   are you going to do with that?

7           ROB CYRUS:  I just got off the

8   phone with the first one.  I've got an

9   appointment at one o'clock.  I want to

10  fill out the documentation correctly and

11  take their advice.

12          UNIDENTIFIED SPEAKER:  What

13  about the cardiologist?  What did he say?

14          ROB CYRUS:  I talked to the

15  nurse and she sent in some paperwork to

16  Hyundai.  But, you know, I haven't seen

17  him for some time so I really, you know,

18  need this -- the excuse of absence, I need

19  to get that from Kirby Parker, my internal

20  medicine guy.

21          UNIDENTIFIED SPEAKER:  And did

22  you get ahold of him?

23          ROB CYRUS:  Let's see.  I've

1  got an appointment with him tomorrow at

2  2:15.  So.

3             UNIDENTIFIED SPEAKER:  This is

4  in regard to your paperwork --

5             ROB CYRUS:  The paperwork and

6  then, you know, just continue to --

7             UNIDENTIFIED SPEAKER:

8  Disability.

9             ROB CYRUS:  Not disability.

10  Just Family Medical Leave Act.  Just

11  feeling like crap and my blood pressure --

12  I took it five times.

13             UNIDENTIFIED SPEAKER:  What is

14  it?

15             ROB CYRUS:  172 over 119.  157

16  over 121.  163 over 122.  160 over 123.

17             UNIDENTIFIED SPEAKER:  You got

18  to get that down.

19             ROB CYRUS:  I know.  That's

20  really high.  And he's already increased

21  my -- I'm sorry?

22             UNIDENTIFIED SPEAKER:  You

23  could have a stroke, you know that.

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1      ROB CYRUS:  Well, I'm -- I'm

2  taking additional Altace, which he

3  indicated because he thought that would

4  bring it down, so that's why I'm going in

5  to him tomorrow.  You know, I'm as

6  frustrated as everybody else, plus I'm

7  stuck in this house feeling like crap.

8      UNIDENTIFIED SPEAKER:  You

9  still feeling just as bad as you did --

10      ROB CYRUS:  Yeah.  I mean,

11  terrible.  Last night I woke up, and, I

12  mean, I just felt horrible.  Couldn't even

13  sleep.

14      UNIDENTIFIED SPEAKER:  I'm

15  sorry.

16      ROB CYRUS:  That's all right.

17  I mean.

18      UNIDENTIFIED SPEAKER:  What

19  can I do for you?

20      ROB CYRUS:  Nothing.  Just sit

21  tight and let me meet with these attorneys

22  and see what they say to do.  And, you

23  know, I've called --

# TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   UNIDENTIFIED SPEAKER:  What
2   are your thoughts, or what do you think
3   you want to do?
4   ROB CYRUS:  Well, I want to
5   gather facts and, you know, be intelligent
6   on how to respond to this out of the blue
7   we'd like you to resign, you know.  So
8   I've called the general counsel at
9   Hyundai, and he won't return my calls.
10  And they're all -- I'm sure they did a
11  little powwow, got together and, you know,
12  how to avoid talking to me.  So that's
13  okay.
14  UNIDENTIFIED SPEAKER:  You
15  haven't heard anything else from them?
16  ROB CYRUS:  No.
17  UNIDENTIFIED SPEAKER:  I know
18  that's stressful, and you just got to calm
19  down if you can.
20  ROB CYRUS:  I am.  You know,
21  it just makes me furious what they've
22  done.  You know, this is ridiculous.  You
23  know, I've been a --

39

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1      UNIDENTIFIED SPEAKER:
2  (Inaudible).
3      ROB CYRUS:  -- stellar
4  employee, you know, covered their butts a
5  thousand times.  Huh?
6      UNIDENTIFIED SPEAKER:  I know
7  that.  You just need to calm down.  It's
8  not going to do you any good to have a
9  stroke.
10      ROB CYRUS:  I'm okay.
11      UNIDENTIFIED SPEAKER:  Life
12  will go on.
13      ROB CYRUS:  I know it.  I know
14  it.  It's just rotten, you know, what
15  they're doing.  It's just really
16  underhanded, ruthless what they're doing,
17  but I've seen them do it to 20 other
18  people.
19      UNIDENTIFIED SPEAKER:  Okay.
20  You know you're not the only one.
21      ROB CYRUS:  I know it.
22      UNIDENTIFIED SPEAKER:  Doesn't
23  make it any easier, but just have to

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  relax, take a deep breath and just do the

2  best you can do and just take your time

3  and keep your blood pressure down.

4          ROB CYRUS:  I'm trying.  I

5  need to call this other attorney before

6  they leave.  So I don't know anything

7  else.  I'll call you guys later on here.

8          UNIDENTIFIED SPEAKER:  Okay.

9          ROB CYRUS:  Okay, dad.  I

10  mean, I'm working towards everything.  So

11  I mean, I haven't stopped.

12          UNIDENTIFIED SPEAKER:

13  (Inaudible).

14          ROB CYRUS:  Nothing.  I mean,

15  your support is all I need.

16          UNIDENTIFIED SPEAKER:  All

17  right.  You got it.

18          ROB CYRUS:  Okay.  Thank you.

19  Bye.

20

21  Telephone conversation No. 11

22          ROB CYRUS:  Calling Greg

23  Kimball, human resource director.  3:55 on

# ⅡⅬ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    the 25th of October.  Getting tired of

2    documenting everything.

3                  (Phone ringing.)

4                  ROB CYRUS:  Desk phone.

5                  (Phone ringing.)

6                  ROB CYRUS:  That's unusual.

7    No voice mail.  Let me try again here.

8

9    Telephone conversation No. 12

10                 ROB CYRUS:  3:56.

11                 (Phone ringing.)

12                 (Voice mail greeting.)

13                 ROB CYRUS:  Hi, Greg.  This is

14   Rob.  It's almost 4 p.m. on Tuesday.  Hey,

15   trying to touch base with you discussions

16   last week or yesterday, I'm sorry.  And

17   call me.  If you feel uncomfortable

18   talking at work, call me from home.

19   Thanks.  Bye.

20

21   Telephone conversation No. 13

22                 ROB CYRUS:  Hello.

23                 MOM:  Hey, honey.

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
1              ROB CYRUS:  Hey.

2              MOM:  Can you talk one second?

3              ROB CYRUS:  Sure.

4              MOM:  Okay.  Dad told me your

5    blood pressure was extremely high.

6              ROB CYRUS:  Right.

7              MOM:  Would you tell me what

8    they are.  Tell me the truth.

9              ROB CYRUS:  I will.

10             MOM:  Okay.

11             ROB CYRUS:  I took it six

12   times so I would have a good sample.

13             MOM:  All right.

14             ROB CYRUS:  First time was 172

15   over 119.

16             MOM:  Okay.

17             ROB CYRUS:  Then 157 over 121.

18             MOM:  Okay.

19             ROB CYRUS:  Then 163 over 123

20   was the third one.

21             MOM:  Okay.

22             ROB CYRUS:  160 over 123 was

23   the fourth one.
```

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    MOM:  Okay.

2    ROB CYRUS:  156 over 121 was

3  the fifth one.

4    MOM:  Okay.

5    ROB CYRUS:  And the last one,

6  167 over 123.  So I called my internal

7  medicine guy, you know, and I've got an

8  appointment with him tomorrow.  And told

9  the I don't know if it's the nurse or the

10  receptionist that my blood pressure was

11  high and I'm, you know, still following

12  his regimen to increase the Altace, which

13  is supposed to take care of that.  So.

14    MOM:  Right.  And what did she

15  say?

16    ROB CYRUS:  She said we'll see

17  you tomorrow at --

18    MOM:  Do you think you ought

19  to go to the hospital, Robby?

20    ROB CYRUS:  No, not at this

21  point.  You know, if I go there, it's

22  going to be, you know, sitting there for

23  three or four hours.  I don't feel good at

# TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    all.  I'll be okay till tomorrow.

2              MOM:  I mean, I hope so.

3              ROB CYRUS:  I will.

4              MOM:  Okay.  This is extremely

5    high, Robby.

6              ROB CYRUS:  I agree.  I mean,

7    I haven't eaten anything today.  I haven't

8    had any caffeine.

9              MOM:  Why haven't you?

10             ROB CYRUS:  You know, I don't

11   have any appetite.  And I'm a little

12   disturbed over this out of the blue crap

13   from Hyundai.

14             MOM:  I know it, honey.  You

15   know what they're like, Robby.  They've

16   done this since day one.  They're a bunch

17   of horrible, horrible human beings, if you

18   can call them human beings.  But don't be

19   surprised by it.  You've done a wonderful

20   job.  You're the first employee.  You've

21   got everything going for you.  You know.

22   They're just bastards.

23             ROB CYRUS:  Just the betrayal,

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   you know, is just --

2           MOM:  I know.

3           ROB CYRUS:  Cowardly --

4   cowardly crap.  You know, at least have

5   the kahunas to sit down and talk to me

6   about specifics.  Oh, you have an attitude

7   problem and you missed too much work.

8   What does that mean?  Attitude problem.

9   I'm no different than I was day one when

10  you guys hired me and said we recruited

11  you because of your fantastic reputation.

12          MOM:  Right.  You need to --

13  you know, you need a chance to say that.

14  But if you can't do it, then you need to

15  get the best damn package you can get.

16          ROB CYRUS:  I agree.  That's

17  why I'm meeting with attorneys tomorrow.

18          MOM:  Just like this

19  conversation right now.  I'm afraid this

20  gets you more riled up and gets your blood

21  pressure more up.

22          ROB CYRUS:  I'm not trying to.

23          MOM:  I know you're not,

# ⅡⅬⅇ TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    Robby.

2              ROB CYRUS:  It's a volatile

3    subject when somebody out of the blue

4    calls you and says I want to meet with you

5    and talk about -- concerned about your

6    health and in the last ten minutes of the

7    meal said, oh, you know, executive

8    management is upset with you, we would

9    like your resignation.

10             MOM:  (Inaudible).  I know.

11             ROB CYRUS:  I was in shock.

12             MOM:  I know you were in

13   shock, honey.

14             ROB CYRUS:  Plus he pumped us

15   for information, pumped me and Michael

16   Hansford, you know, what's going on with

17   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

18   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

19             MOM:  Was Michael with you?

20             ROB CYRUS:  He -- you know,

21   when I went to the place, I'm walking in

22   with my notebook and my medication list

23   and everything, and he -- he was out

# TE TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    front.  He was at the club or the

2    restaurant called Next Door.  And he's

3    like, hey, you never call me, you never

4    see me.  And I said, you know, I haven't

5    felt good.  And he goes, what are you

6    doing here?  And I said, I'm meeting with

7    Keith Duckworth.  And he's like, what's

8    that all about?  And I said, he just wants

9    to, you know, see how I'm doing and what's

10   going on with me medically.  And then he

11   came in later on and introduced himself

12   and sat down, you know, for a while.

13   That's fine.  You know, he was treated

14   really, really, really crappily.

15             MOM:  Did you tell him that?

16             ROB CYRUS:  Yeah.

17             MOM:  Okay.

18             ROB CYRUS:  So, I mean, Keith,

19   you know, not only dismissed me at the

20   last minute, but he -- first he pumped us

21   for information.

22             MOM:  Yeah, he did.

23             ROB CYRUS:  Yeah.

48

# TE TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1          MOM:  What's he going to do

2    with that information?

3          ROB CYRUS:  I guess -- I don't

4    know.  I don't know.

5          MOM:  What do you suppose?

6          ROB CYRUS:  I -- you know, I

7    have no idea.

8          MOM:  Okay.  Okay.  Look, try

9    to think -- try to think of the fact that

10   you got rid of the house.  That's a

11   wonderful thing.  Okay?

12          ROB CYRUS:  Yeah.

13          MOM:  You got, you know, a

14   wonderful record, and you won't have any

15   trouble getting a job.  You really won't,

16   Robby.  If you're going to have this

17   happen, it couldn't have happened at a

18   better time.  You're going to, you know --

19   you don't have to end up buying a house in

20   Montgomery and Cindy buying a house in

21   Montgomery.

22          ROB CYRUS:  I know.

23          MOM:  (Inaudible) all of that.

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  Okay?

2          ROB CYRUS:  It's just, you

3  know, awkward and embarrassing --

4          MOM:  I know.

5          ROB CYRUS:  I've never had a

6  gap in my resume.  And I've never even

7  looked for a job.  Everybody has recruited

8  me.

9          MOM:  You know what?  That's

10  what you just have to tell the people.

11  You just have to tell them what they're

12  like, and people will understand, Robby.

13  Honest, honey.  When they look at what you

14  have accomplished, not at one little bump

15  in the road when you got sick and they

16  screwed you, then they'll understand.

17          ROB CYRUS:  Yeah.  I think so.

18          MOM:  With your resume, you

19  can get any kind -- (inaudible) was

20  naming, you know, all these big companies

21  in Lexington that she used to deal with

22  where the purchasing guys make all kinds

23  of money, like Super America and, you

# TYLER EATON

### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   know, like she said hospitals, everybody

2   has to have somebody in purchasing.

3         ROB CYRUS:  Yeah, I know it.

4   I know it.  I just wanted -- you know, if

5   I wanted to leave, I wanted it to be on my

6   terms.

7         MOM:  I know you did.

8         ROB CYRUS:  Because, you know,

9   I've done a great service, and this is

10   what they do to me.

11         MOM:  Absolutely.  Absolutely.

12         ROB CYRUS:  And I've gotten

13   their children in school.  I've gotten

14   them help in car wrecks.  I've gotten them

15   help when they, you know, wrecked a car

16   and parked it there with the police.  You

17   know, I've done so much for them.

18         MOM:  I know it.

19         ROB CYRUS:  And then, you

20   know, cowards don't even talk to me.

21         MOM:  Well, it's just that one

22   probably nasty son of a bitch who wants to

23   get rid of you, the one you had the words

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    with.  Isn't it?

2             ROB CYRUS:  Yeah.  The one

3    that lied to me and admitted he lied to

4    me.  And I said yesterday you told me X,

5    Y, Z.  He goes, I changed my mind.

6             MOM:  Yeah.

7             ROB CYRUS:  I said, what?

8             MOM:  Everybody knows what

9    they're like, Robby.

10            ROB CYRUS:  There is just no,

11   no -- they're just ruthless.  No, there's

12   no rules.

13            MOM:  No.  And you've known

14   that all along and you've wanted out --

15            ROB CYRUS:  And I've

16   discovered it, yeah.

17            MOM:  And you know what?  If

18   you can get out with a package.  If you

19   just quit, you wouldn't get anything.  But

20   if you can get out -- you're the first

21   director, the first employee.  That's got

22   to stand for something to get you some --

23   you know, something good to go on.

# ⊫ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    ROB CYRUS:  I know it.  I know
2  it.  I've got to call this attorney friend
3  before they close.  I'm all right.  I'm
4  all right.  I'm okay.
5    MOM:  I'm probably going to
6  call Steve.
7    ROB CYRUS:  All right.
8    MOM:  Need to get back with
9  you.
10    ROB CYRUS:  All right.  Don't
11  freak out.  All right.
12    MOM:  All right.
13    ROB CYRUS:  All right.  Bye.
14
15  <u>Telephone conversation No. 14</u>
16    ROB CYRUS:  (*Inaudible*).
17    (Phone ringing.)
18    UNIDENTIFIED SPEAKER:  Good
19  afternoon.  Thomas, Means, Gillis, and
20  Seay.
21    ROB CYRUS:  Hello.  My name is
22  Robert Cyrus.  I'm an employee of --
23  director of purchasing with the Hyundai

# ⅠⅬ TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    plant here in Montgomery.

2              UNIDENTIFIED SPEAKER:  Uh-huh.

3              ROB CYRUS:  And I wanted -- I

4    got your name from Janet Olson, who was

5    the general counsel at Mercedes, and I'm

6    having an employment issue and I needed

7    somebody to represent me.  I wanted to see

8    if I could come in and have an initial

9    discussion with somebody.

10             UNIDENTIFIED SPEAKER:  Okay.

11   Hold on just a minute.

12             ROB CYRUS:  Thank you so much.

13             UNIDENTIFIED SPEAKER:  Your

14   name again?

15             ROB CYRUS:  Robert Cyrus,

16   C-Y-R-U-S.

17             UNIDENTIFIED SPEAKER:  Okay.

18   Hold on just a minute.

19             ROB CYRUS:  Okay.  Thank you.

20             UNIDENTIFIED SPEAKER:  Okay.

21   Mr. Cyrus.

22             ROB CYRUS:  Yes, ma'am.

23             UNIDENTIFIED SPEAKER:  I'm

# TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   going to put you through to Ms. White.
2   Okay?
3                  ROB CYRUS:   Sure.
4                  MS. WHITE:   Tonya White
5   speaking.   May I help you.
6                  ROB CYRUS:   Yes.   This is
7   Robert Cyrus.
8                  MS. WHITE:   Yes.
9                  ROB CYRUS:   This is my initial
10  call to you.   I'm the director of
11  purchasing at the Hyundai plant in
12  Montgomery.
13                 MS. WHITE:   Okay.
14                 ROB CYRUS:   Actually, I'm the
15  first American hired.
16                 MS. WHITE:   Okay.
17                 ROB CYRUS:   And I want to talk
18  to somebody about a wrongful termination
19  suit.
20                 MS. WHITE:   Okay.   And let me
21  first tell you I am a paralegal and what I
22  do is get the information from the caller.
23                 ROB CYRUS:   Okay.

# TE TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   MS. WHITE:  And I give it to
2   the attorney to review.
3   ROB CYRUS:  Okay.
4   MS. WHITE:  And then the
5   attorney will review that information and
6   determine what we can do to help.
7   ROB CYRUS:  I got your name
8   from Janet Olson who -- she's the -- she
9   was the head counsel for Mercedes Benz for
10  eight years.
11  MS. WHITE:  Okay.
12  ROB CYRUS:  So she knows you
13  and she knows me and she's recommended you
14  guys, so I'm not somebody out of the blue
15  here.
16  MS. WHITE:  Okay.  You said
17  Janet Olson?
18  ROB CYRUS:  Yes.
19  MS. WHITE:  Oh, okay.  All
20  right.  And you were the director of
21  purchasing.
22  ROB CYRUS:  I still am.
23  MS. WHITE:  Okay.

# ⅢⅣ TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    ROB CYRUS:  I had heart stints

2  put in in April of this year.

3    MS. WHITE:  Okay.

4    ROB CYRUS:  And I had a

5  difficult time with that.  They did the

6  balloon angioplasty, and then I was out

7  for a while.  Went back to work.

8    MS. WHITE:  Okay.

9    ROB CYRUS:  And then they

10  changed my heart medication numerous

11  times, and I'm having some side effects.

12  I've been to internal medicine doctors.

13  I've been through a general practitioner,

14  an ENT, my cardiologist.  And now they've

15  come to the conclusion they think it's a

16  reaction to Lipitor.

17    MS. WHITE:  Okay.

18    ROB CYRUS:  And I went off

19  that medication on 10/24.

20    MS. WHITE:  Okay.

21    ROB CYRUS:  And this past

22  Saturday the executive vice president or

23  he's the No. 2 in command out at Hyundai

# TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  calls me to dinner and he says he wants to
2  check on my health and how I'm doing, and
3  in the last ten minutes of the
4  conversation he said, well, Rob, the
5  executive management at Hyundai is
6  uncomfortable with your attitude and we
7  would like to ask you to resign.  And I
8  was flabbergasted.  I've had, you know,
9  tremendous accolades and done well.  And
10  they recruited me from Mercedes Benz.  So
11  I mean, this was a shock.  And I think
12  it's due to the fact that I've been out.
13  You know, I've got a history of never
14  missing work.  And they recruited me.
15  They said, you know, we picked you based
16  on your excellent reputation.
17          MS. WHITE:  Okay.
18          ROB CYRUS:  The son-in-law of
19  the chairman is who hired me, along with
20  Mr. Duckworth.  So this is just out of the
21  blue.  And he left it at when I feel
22  better and can come back into work that
23  they want to sit down and work on a

58

**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  severance package or, you know, fire me.

2  I don't know what the alternative is.

3  I've never -- never been fired.

4          MS. WHITE:  Okay.

5          ROB CYRUS:  I've never had a

6  gap in my employment.  I've started up

7  Toyota.  I've started up Mercedes.  I've

8  started up this Hyundai plant.

9          MS. WHITE:  Okay.

10          ROB CYRUS:  And now, you know,

11  I've bent over backwards and done above

12  and beyond for these gentlemen and now

13  they're --

14          MS. WHITE:  How much time have

15  you missed from work?

16          ROB CYRUS:  On 9/19 I started

17  feeling really bad flu like and body ache

18  symptoms and just fatigue.  And then I've

19  been back and forth intermittently.  And I

20  went back last Thursday and, you know,

21  just still felt horrible, but I just put

22  in my mind, you know, I'm going to trudge

23  through the day and see if I can get back

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   in a routine.  And by the end of the day I
2   felt so horrible.
3                And I went to my internal
4   medicine guy the next day, and I'm in
5   conversations with my cardiologist,
6   Dr. Paul Moore.  And he's taking me off of
7   the Lipitor, and he said it's going to
8   take 14 days to get out of my system.
9                MS. WHITE:  Okay.
10               ROB CYRUS:  So.
11               MS. WHITE:  And Hyundai has
12  been aware of this, and your doctors have
13  been able to provide written
14  documentation --
15               ROB CYRUS:  They've given me
16  work (inaudible) and such.  And now, you
17  know, the Family Medical Leave Act.  I got
18  a letter from Hyundai on October 18th,
19  please fill these documents out.  And when
20  I had my first heart stint procedure and
21  was out, they did all the paperwork for me
22  and there was no issue.  And so it's, you
23  know, unusual.  They set a precedence and

# TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    then now they're (tape ends).

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1                    C E R T I F I C A T E

2

3    STATE OF ALABAMA)

4    JEFFERSON COUNTY)

5

6            I hereby certify that the

7    above and foregoing recordings were taken

8    down by me in stenotypy, and the questions

9    and answers thereto were reduced to

10   typewriting under my supervision, and that

11   the foregoing represents a true and

12   correct transcript of the recordings given

13   by said parties upon said hearing.

14           I further certify that I am

15   neither of counsel nor of kin to the

16   parties to the action, nor am I in anywise

17   interested in the result of said cause.

18

19

20

21           _Stacy L. Lowe_

22

23           COMMISSIONER - NOTARY PUBLIC
             ACCR NO. 445

One Federal Place  •  Suite 1020  •  1819 Fifth Avenue North  •  Birmingham, Alabama 35203
(205) 252-9152  •  Toll-Free (800) 458-6031  •  Fax (205) 252-0196  •  www.TylerEaton.com

# ▉ TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1

2

3

4      T A P E   R E C O R D E D   T E L E P H O N E   C O N V E R S A T I O N S

5           R E :   C y r u s   v .   H y u n d a i ,   6 3 6 3 . 3 1

6                          T a p e   3

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   T R A N S C R I B E D   B Y :    S t a c y   L .   L o v i n ,

22                          C o u r t   R e p o r t e r   a n d

23                          N o t a r y   P u b l i c

ORIGINAL

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  Telephone conversation No. 1

2          ROB CYRUS:  Calling Greg

3  Kimball.  October 28th.  10:47.

4          (Phone ringing.)

5          (Operator recording.)

6

7  Telephone conversation No. 2

8          ROB CYRUS:  10:47 a.m.,

9  Friday.  Feeling like absolute crap.

10  Didn't sleep last night.

11          (Phone ringing.)

12          (Voice mail greeting.)

13

14  Telephone conversation No. 3

15          (Phone ringing.)

16          ROB CYRUS:  Calling Greg's

17  secretary, Denise (inaudible).  10:48.

18  October 28th.

19          (Phone ringing.)

20          (Operator recording.)

21

22  Telephone conversation No. 4

23          (Phone ringing.)

# TLE TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1       (Voice mail greeting.)

2       ROB CYRUS:  Hey, Denise.  It's

3   Rob Cyrus.  It's ten till eleven on

4   Friday.  Hey, I spoke with Greg a couple

5   days ago and told him, you know, I will be

6   out until further notice.  I'm still under

7   doctor's care with a change of medication

8   from my cardiologist and my internal

9   medicine guy.  I'm just calling to CYA

10  that, you know, I'm out today and I'll be

11  out Monday and until things subside with

12  this medication or they can find a

13  problem.  So please indicate to Greg, you

14  know, that I called and the situation.

15  I'm at home.  I know I'm boring you to

16  death.  But please take care of me on

17  that.  To let him know that I called.  And

18  this is in addition to calling him either

19  Wednesday and Thursday and said, you know,

20  I'll be out until further notice until

21  this medication gets stabilized.  But

22  thanks so much for your help.  If you need

23  to reach me, ████████.  Have a good

# TE TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  weekend.  Thanks.

2

3  Telephone conversation No. 5

4          GREG KIMBALL:  Feeling better?

5          ROB CYRUS:  Not good at all.

6  How are you?

7          GREG KIMBALL:  I'm doing

8  pretty good.  Hold on a second.

9          ROB CYRUS:  Okay.  You there?

10          GREG KIMBALL:  Yeah, I'm here.

11  Trying to get up with you.  Yesterday Mary

12  hadn't felt well at all.

13          ROB CYRUS:  I'm sorry.  You're

14  kidding.  What happened?

15          GREG KIMBALL:  Oh, man.  We

16  don't know how that happened, but she

17  broke her collar bone.  So we

18  (inaudible) --

19          ROB CYRUS:  I'm sorry.

20          GREG KIMBALL:  With her all

21  day.

22          ROB CYRUS:  I'm sorry.

23          GREG KIMBALL:  But I was

# TE TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   trying to get up with you to see when you

2   want me to drop by with your envelope.

3              ROB CYRUS:  My parents are

4   here.  They drove down so.

5              GREG KIMBALL:  Oh, okay.

6              ROB CYRUS:  I'm going to go to

7   the doctor tomorrow.  And if they can't

8   find out what's going on, I'm going to go

9   into the hospital.  So.

10              GREG KIMBALL:  Is 30, 45

11   minutes from now okay?

12              ROB CYRUS:  Yeah.  Yeah.

13              GREG KIMBALL:  I don't know

14   how to get to your place.

15              ROB CYRUS:  You know where

16   exit 11 is?

17              GREG KIMBALL:  That's past

18   Taylor Road?

19              ROB CYRUS:  Yeah, that's that

20   Mitylene exit.

21              GREG KIMBALL:  Yeah.

22              ROB CYRUS:  When you go -- you

23   know where Dean Fain park is, that

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  baseball park?

2        GREG KIMBALL:  No.  I know to

3  turn that exit, but after that, I'm not

4  familiar with anything except for that

5  hotel back there.

6        ROB CYRUS:  Just call me from

7  your car, Greg, and I'll lead you in.

8        GREG KIMBALL:  Okay.  Okay.

9        ROB CYRUS:  Okay, man.

10        GREG KIMBALL:  I'll stop at

11  that gas station and call you.

12        ROB CYRUS:  Or just call me

13  with your cell phone, whatever you want to

14  do.

15        GREG KIMBALL:  Okay.

16        ROB CYRUS:  Okay, Greg.

17  Thanks.  Bye.

18

19  Telephone conversation No. 6

20        ROB CYRUS:  Yeah.

21        GREG KIMBALL:  First left

22  turn?

23        ROB CYRUS:  Yeah.

# ⊏Ξ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1          GREG KIMBALL:  Okay.  That

2  must be past the Home Depot.

3          ROB CYRUS:  No.  You're going

4  to go, you know, in front of Bruno's like

5  you're going to Target.

6          GREG KIMBALL:  Oh, okay.

7  Okay.  Okay.  That's easier now.  Man,

8  y'all got everything out here.

9          ROB CYRUS:  It's expanding,

10  isn't it?

11          GREG KIMBALL:  Yeah.  I didn't

12  realize they had so much stuff out here.

13  Nice.  Okay.

14          ROB CYRUS:  Do you see

15  (inaudible) Road?

16          GREG KIMBALL:  Yeah.

17          ROB CYRUS:  Okay.

18          GREG KIMBALL:  I overshot.  I

19  see it.  Getting ready to turn right now.

20          ROB CYRUS:  Okay.

21          GREG KIMBALL:  I got my dad

22  with me.

23          ROB CYRUS:  Okay.  How is Mary

8

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   doing?

2           GREG KIMBALL:  She's doing a

3   little better.  She woke up, said she's

4   going to go try to soak her shoulder a

5   little bit.

6           ROB CYRUS:  Oh, man.

7           GREG KIMBALL:  (*Inaudible*).

8           ROB CYRUS:  That's terrible.

9           GREG KIMBALL:  I'm serious,

10  man.  You never know.  Just never know.

11  Okay.  I've got Minnie --

12          ROB CYRUS:  Go up ▬▬▬▬▬▬

13  ▬▬▬.  And then on the first neighborhood

14  on the right, it's called ▬▬▬▬▬.

15          GREG KIMBALL:  ▬▬▬▬▬.

16  Okay.

17          ROB CYRUS:  Okay.  Turn in

18  there.  It's before you get to ▬▬▬▬▬.

19          GREG KIMBALL:  Okay.  Yeah, I

20  didn't know all this was out here.

21          ROB CYRUS:  You see ▬▬▬▬▬?

22          GREG KIMBALL:  It doesn't

23  have -- yeah.  Yeah, I see it.

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    ROB CYRUS:  Okay.  Turn in

2    there and then take the ███████ █████, and

3    I'm the ██████ house on the ██████.

4    GREG KIMBALL:  ███████████████

5    ████████████ on the --

6    ROB CYRUS:  Yeah, I'll be

7    standing in the front yard.  Okay.

8    GREG KIMBALL:  Okay.

9    ROB CYRUS:  Thanks, Greg.

10   Bye.

11

12   Telephone conversation No. 7

13   ROB CYRUS:  (Inaudible). .

14   November 2nd.  2:30 p.m.  (Inaudible).

15   (Phone ringing.)

16   (BellSouth operator.)

17   ROB CYRUS:  No.

18   (BellSouth operator.)

19   ROB CYRUS:  What time is it?

20   3:33.  Just update on my condition.

21   Severe headache today, extreme fatigue,

22   just, you know, same symptoms, no relief

23   from Lipitor discontinuation so far.  Face

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   is very flushed.  Hands and feet are cold.

2           WALTER ARTHUR:  Thank you for

3   bearing with us.  This is Walter Arthur.

4   How may I help you?

5           ROB CYRUS:  Yes.  My name is

6   Robert Cyrus, C-Y-R-U-S.  Do you need my

7   phone number?

8           WALTER ARTHUR:  Please.

9           ROB CYRUS:  ▅▅▅▅▅▅▅▅▅▅.

10          WALTER ARTHUR:  And how can we

11  help you, Mr. Cyrus?

12          ROB CYRUS:  You do area for

13  service, you know where people would come

14  out and such?

15          WALTER ARTHUR:  I'm -- you

16  have the repair department.

17          ROB CYRUS:  I was walking

18  around my yard the other day and noticed

19  that my telephone -- you know, the box on

20  the outside of the house had been opened

21  and was left open, and I didn't do it and

22  I didn't know if you had been out here or

23  -- can you see if there has been --

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1      WALTER ARTHUR:  I can't tell

2  that any techs were out there.  But I can

3  get someone to go out there and take a

4  look at that and get that straightened out

5  for you.

6      ROB CYRUS:  I mean, I just

7  shut it.  But it's kind of strange that --

8  actually my parents noticed it and didn't

9  know, you know, why somebody would be

10  tampering with my land phone line.

11      WALTER ARTHUR:  Right.

12      ROB CYRUS:  I mean, can you

13  look on your records and see if there has

14  been a service call or --

15      WALTER ARTHUR:  No, there is

16  no service calls on this number.

17      ROB CYRUS:  Okay.  So you

18  haven't had anything in the last 14 days

19  or anything?

20      WALTER ARTHUR:  No, sir.

21      ROB CYRUS:  Okay.

22      WALTER ARTHUR:  All right.

23      ROB CYRUS:  All righty, sir.

# ⅡE TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  The phone seems to be working okay.  I
2  appreciate your help.
3              WALTER ARTHUR:  No problem.
4              ROB CYRUS:  Thank you.
5              WALTER ARTHUR:  Thank you.
6              ROB CYRUS:  Bye-bye.
7
8  Telephone conversation No. 8
9              ROB CYRUS:  Greg Kimball.
10 November 2nd.  (*Inaudible*).
11              (Phone ringing.)
12              (Voice mail greeting.)
13              ROB CYRUS:  Hey, Greg.  It's
14 Rob.  It's 3:45 on Wednesday.  Just
15 checking in with you.  Give me a call when
16 you get a moment.  I have a quick question
17 for you.  My home number is ▉▉▉▉▉ and
18 cell is ▉▉▉▉.  Thank you.  Bye.
19
20 Telephone conversation No. 9
21              ROB CYRUS:  Calling Greg
22 Kimball.  (*Inaudible*).
23              (Phone ringing.)

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1          GREG KIMBALL:  Hey, Rob.

2          ROB CYRUS:  Hey, what are you

3    doing, man?

4          GREG KIMBALL:  Oh, this is the

5    other Rob.  Both names only shows up Rob

6    C., so I'm not sure whether it's Rob

7    (inaudible) or you.

8          ROB CYRUS:  How you doing?

9          GREG KIMBALL:  Doing pretty

10   good.  How about with you?

11         ROB CYRUS:  Still feeling

12   pretty run down.

13         GREG KIMBALL:  Did they ever

14   find out for sure.

15         ROB CYRUS:  They said it's

16   going to take 14 to 30 days to get that

17   Lipitor out of my system.

18         GREG KIMBALL:  Okay.  Okay.

19         ROB CYRUS:  And I did get the

20   Family Medical Leave Act documents signed

21   by my doctor.  I'm going to mail that off

22   to you tomorrow.  I think it's due by the

23   tenth, so we should be in good shape

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  there.

2          Hey, remember when I discussed

3  with you about HI Kim and that Murakami

4  meeting and how he got so flustered?

5          GREG KIMBALL:  Yeah, you told

6  me about that.

7          ROB CYRUS:  Yeah, you know, he

8  left the room twice and screamed and, you

9  know, slammed papers on the desk and told

10  the supplier to behave themselves and

11  later told them to shut up and sit down

12  and all that kind of crazy stuff.  And I

13  went to Keith that day after that happened

14  because Mr. Choi called me.  You know,

15  he's that director with me in the

16  purchasing department, same level.  And I

17  was at a different quality meeting that

18  same day.  And he calls me and says, oh,

19  Rob, you need to come back to your desk

20  immediately.  I said, what's going on?  He

21  said, you know, you and I may be going

22  home early today.  And I said, what?  Like

23  losing your job?  And he said, yeah.  So,

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  you know, I came back, and they said, oh,

2  he's very upset. He's already talked to

3  the president here in Alabama. He's

4  called Korea to the president -- Mr. Soh,

5  president of quality. And like, wow, this

6  is getting out of line.

7          So I went to talk to Duckworth,

8  you know, when I heard that first thing.

9  I said, you know, Keith, I said, you know,

10 this is what happened. Mr. Choi, you

11 know, agreed with me emphatically in front

12 of Jason Lee that, you know, we did

13 nothing wrong. It was HI Kim that got hot

14 headed and, you know, acted kind of

15 foolish. And Keith said to me, you know,

16 oh, don't worry about it. That's just the

17 way they are. That's just the way they

18 are as far as, you know, being aggressive

19 in meetings. And I said, you know, there

20 were other suppliers in the room, 35

21 people, and it was very embarrassing. And

22 he said, ah, don't worry about it, you

23 know, you're in very good standings and

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    don't worry about it.  And I said, well, I

2    don't want to be, you know, black listed

3    because I'm trying to take, you know, a

4    fair position on an issue for charge back

5    in excess of a hundred thousand dollars.

6    So, you know, he said again, don't worry

7    about it.

8              And then I kept hearing more

9    and more about, you know, oh, I have to

10   write meeting minutes and what happened

11   and, you know, people were calling me.

12   Harry Chase called me and said, man, I've

13   been asked to write meeting minutes for

14   this meeting that we were in.  And I said,

15   you got to be kidding, you know, why is

16   this getting so elevated for such a silly

17   thing.

18             And so I went to Keith again.

19   I talked to his secretary.  You know, she

20   found him and then we went in the room

21   again.  And I said Keith, you know, this

22   seems like it's getting blown up.  And

23   again he said, don't you worry about it.

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
1   You have a nice weekend.  I said, you
2   know, I'm just worried about retaliation,
3   if this guy is a hot head, which his
4   reputation seems to be from Korean
5   colleagues I've spoken to, you know.  Then
6   he reassured me again, you know, oh,
7   you're in good standing, don't worry about
8   it, that's just the way they are.  And so,
9   I mean, have you heard any more about that
10  or has Keith ever discussed that with you?
11          GREG KIMBALL:  Uh-uh.
12          ROB CYRUS:  Do you remember me
13  talking to you about it?
14          GREG KIMBALL:  I remember you
15  telling me about it, but I haven't heard
16  anymore --
17          ROB CYRUS:  You know, so it's
18  whacky.  So anything else going on on that
19  front?
20          GREG KIMBALL:  Not one other
21  thing has been mentioned, not one thing.
22  You know, I told you after I got
23  (inaudible) and then I did mention that I
```

One Federal Place  •  Suite 1020  •  1819 Fifth Avenue North  •  Birmingham, Alabama 35203
(205) 252-9152  •  Toll-Free (800) 458-6031  •  Fax (205) 252-0196  •  www.TylerEaton.com

**TYLER EATON**

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  gave you the letter because, you know, he

2  never called back or anything.

3           ROB CYRUS:  Yeah.

4           GREG KIMBALL:  And after that,

5  I have heard no more.

6           ROB CYRUS:  He told you there

7  is just some things you don't need to know

8  about, right?

9           GREG KIMBALL:  No.  He just

10  said that I'm not privy to give you that

11  information, to share that information

12  with you.

13           ROB CYRUS:  But when I asked

14  you originally, you said you didn't know

15  anything about it.

16           GREG KIMBALL:  Remember I

17  asked him after you told me that.

18           ROB CYRUS:  Right.  Right.

19  Right.  And he said, you know, Greg, there

20  is some things you don't need to know

21  about.

22           GREG KIMBALL:  Right.  Right.

23           ROB CYRUS:  So, but, I mean,

# TE TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  you know, I don't want to be in fear of my
2  job and my family and, you know, going
3  through a divorce, and if I lose my job,
4  then she'll be able to move to wherever
5  she wants to, you know, I can't support
6  the kids.
7       GREG KIMBALL:  I think when
8  you get well you need to seriously come
9  out and talk and explain everything to
10  them.  I really think that's what needs to
11  happen.  I just really feel like if that
12  happens, that's going to help you.
13       ROB CYRUS:  Well, I mean, he
14  told me when I get well to come back in
15  and come immediately to his office and
16  that I would be asked to resign and for me
17  to come up with what I felt was a fair
18  severance package, which I've never been
19  fired in my life, so I don't know how that
20  works, or they would just fire me.  And
21  that's when --
22       GREG KIMBALL:  I'll be there
23  in just a second.

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    ROB CYRUS:  That's when I

2    said, you know, well, who is upset?  And

3    he said executive management.  And I said,

4    who would that be?  And he said, President

5    Ahn.  And I said, you know, the gentleman

6    seems nice.  I've said three or four words

7    to him.  He doesn't speak English very

8    well, and I've never, you know, heard any

9    negative things from him.  And I said, who

10   else?  And he said, HI Kim.  You know, and

11   HI Kim I've had the run-ins on the

12   Murakami issue where he got upset that we

13   covered an item on the agenda and he

14   didn't want to listen to it, and that's

15   what he got all upset about.

16        GREG KIMBALL:  Uh-huh.

17        ROB CYRUS:  So, you know, it's

18   just hard living this way where I don't

19   know, you know, if I'm going to be working

20   here.

21        GREG KIMBALL:  Yeah.  That's

22   why when you get better I think you just

23   need to come over and talk to them and

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   explain everything.  I really do.  I think

2   that would help.

3           ROB CYRUS:  I mean, what's it

4   mean to you when he says, you know, you'll

5   either be fired or you come up -- he asked

6   me to come up with a severance package

7   that I felt was reasonable.  So what --

8   what does that -- that sounds like I'm

9   being fired to me.

10          GREG KIMBALL:  I think

11   conversations help.  I really do.  I

12   really think that's what you ought to do.

13   That's just me.

14          ROB CYRUS:  Yeah, I know it.

15   And the other executive management that

16   was upset was Rick Neal he said.  And I

17   said, Rick Neal?  I said, Rick and I have

18   a wonderful rapport and, you know, and I

19   help him and he helps me.  I said, well,

20   let's call --

21          GREG KIMBALL:  I did take the

22   liberty to ask him about that.  He said

23   I -- he says if he tells you not to talk

# TE TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    about it, that's fine.  He said, but I

2    didn't know that there was any kind of a

3    problem between us, so.  I said okay.

4              ROB CYRUS:  Between Rick Neal

5    and me?

6              GREG KIMBALL:  Yeah.

7              ROB CYRUS:  Me either.  I

8    mean, Rick and I have been buddies, and

9    I've helped him because he doesn't have

10   any automotive experience and --

11             GREG KIMBALL:  Exactly.

12             ROB CYRUS:  And he's helped me

13   on legal opinions.

14             GREG KIMBALL:  Yeah.

15             ROB CYRUS:  So I said let's

16   call Rick right now.  I'd like to

17   understand what he's upset about.  He

18   goes, no, no, we can't do that.  Anyway, I

19   mean, he was very cold and just, you know.

20   After he grilled me and Hansford for forty

21   minutes on is ████████████████████████

22   ████████ and, you know, do you know of

23   ████████████████████.  So for forty

# ▉ TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  minutes he talked about trying to get

2  information out of us.  And then I told

3  Mike, I said, you know, can you excuse us.

4  Because Mike just happened to be there and

5  wanted to introduce himself.  I said, I

6  need to speak to Keith in private.

7         GREG KIMBALL:  Rob, I hate to

8  do this.  I'm going to have to call you

9  back.

10        ROB CYRUS:  Okay.

11        GREG KIMBALL:  I'm supposed to

12  be at a work force (*inaudible*) meeting.

13        ROB CYRUS:  No problem, sir.

14        GREG KIMBALL:  Okay.  I'll

15  call you back.

16        ROB CYRUS:  Okay.  Bye.

17

18  Telephone conversation No. 10

19         (Phone ringing.)

20         ROB CYRUS:  November 3rd.

21  1:07 p.m.  Calling Melanie McCormick,

22  Hyundai benefits, regarding correspondence

23  I received via mail dated October 28,

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    2005.

2              (Voice mail greeting.)

3              ROB CYRUS: Hey, Melanie.

4    This is Rob Cyrus. It is November 3rd.

5    1:07 p.m. Hey, I got your correspondence

6    dated October 28th. The FMLA data that I

7    was going to send you was from my internal

8    medicine doctor. He is the quarterback

9    managing my health care, including an ENT,

10   a -- the cardiologist obviously, and my

11   general practitioner. So the FMLA

12   documentation from the cardiologist is not

13   the correct one. I have the one. It's

14   actually dated and filled out by my

15   physician, Dr. Kirby Parker, internal

16   medicine doctor. I got his name from Todd

17   Strange. You know who he is. And so I'm

18   going to fax this to you right now.

19   Again, now is 1:08 p.m. on the third. So

20   to me this is in dispute. There is an

21   error on Hyundai's part or there is a

22   miscommunication. So, you know, this

23   letter is not valid, and it's based on

**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    incorrect data.  So again, I'm going to
2    send this information to you.  I'm also
3    going to call Greg Kimball and a number of
4    other people and let them know what the
5    situation is on this.  I appreciate your
6    help.  Please call me back if you have any
7    questions.  Thank you.
8
9    Telephone conversation No. 11
10             ROB CYRUS:  (*Inaudible*) Greg
11   Kimball, human resources director for
12   Hyundai Manufacturing Alabama.
13   (*Inaudible*).  It is November 3rd.  1:10
14   p.m.
15             (Phone ringing.)
16             GREG KIMBALL:  Hey, Rob.
17             ROB CYRUS:  Hey.  How are you,
18   man?
19             GREG KIMBALL:  Not so good.
20   ███ went to the doctor, and they did some
21   ████████.  They're finding -- ██████████
22   ██████████, so she's real upset.
23   So --

# ℡ TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    ROB CYRUS:  Like can -- like

2    ~~~~~~~~~~ or?

3    GREG KIMBALL:  Well, they

4    don't know.

5    ROB CYRUS:  Ah, Greg, I'm

6    really sorry.  What can I do to help you?

7    GREG KIMBALL:  I wish there

8    was.  Just say some prayers for us.

9    ROB CYRUS:  I will.  I will.

10   Hey, just one second.  I don't want to

11   keep you.  I know you got more significant

12   issues.  I got a letter from Melanie

13   McCormick.  She got some FMLA

14   documentation from my cardiologist.  And

15   that's not the correct doctor.  It's my

16   internal medicine doctor.

17   GREG KIMBALL:  Oh, so they

18   sent the wrong doctor --

19   ROB CYRUS:  She got it from

20   the wrong doctor.  You know, I got

21   Dr. Kirby Parker that Todd Strange

22   recommended.  And he's the quarterback

23   managing my ENT, my GP, and my

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  cardiologist.  And he filled that out on
2  November 1st.  I'm going to fax it to
3  Melanie right now.  But she's out this
4  afternoon.  So, you know, it's in dispute
5  according to me.
6          GREG KIMBALL:  Just send it to
7  Carla.  If Melanie is not there, just send
8  it to Carla.
9          ROB CYRUS:  Okay.  Is she in
10 benefits department also?
11         GREG KIMBALL:  Yeah.  She's a
12 contract person.  They won't let us hire
13 anybody else.  She's been having to help
14 out as much as she can.
15         ROB CYRUS:  Okay.  All right.
16 Well, Greg, please call me if there is
17 anything I can do for you.
18         GREG KIMBALL:  I appreciate
19 it, Rob.  I pray that everything is going
20 better for you as far as feeling better.
21         ROB CYRUS:  I feel horrible
22 today.
23         GREG KIMBALL:  Just not

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   feeling no better?

2           ROB CYRUS:  Ah, man, I'm dying

3   today.  It's really hard.

4           GREG KIMBALL:  I'm sorry.

5           ROB CYRUS:  So if there is

6   anything I can do.  If you need physician

7   references or anything, let me know.  And

8   I'll join you in prayer for her.

9           GREG KIMBALL:  I appreciate

10  it.  We've got a meeting at the ▇▇▇▇▇▇

11  ▇▇▇▇▇▇ tomorrow to discuss -- they're not

12  saying ▇▇▇▇▇▇▇▇, but they are saying to

13  find out more about these suspicious

14  ▇▇▇▇▇.

15          ROB CYRUS:  Well, my

16  brother-in-law, he's a -- he's a doctor.

17  If you need any second opinions or

18  anything I can help you with, I'll be glad

19  to clarify it for you.

20          GREG KIMBALL:  Okay.

21          ROB CYRUS:  Okay.  Sorry,

22  Greg.

23          GREG KIMBALL:  Thanks, Rob.

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1        ROB CYRUS:  Sorry to bother

2   you.  Okay.  Bye.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1           C E R T I F I C A T E

2

3     STATE OF ALABAMA)

4     JEFFERSON COUNTY)

5

6           I hereby certify that the

7     above and foregoing recordings were taken

8     down by me in stenotypy, and the questions

9     and answers thereto were reduced to

10    typewriting under my supervision, and that

11    the foregoing represents a true and

12    correct transcript of the recordings given

13    by said parties upon said hearing.

14          I further certify that I am

15    neither of counsel nor of kin to the

16    parties to the action, nor am I in anywise

17    interested in the result of said cause.

18

19

20

21          *Stacy L. Lowe*

22

23    COMMISSIONER - NOTARY PUBLIC
      ACCR NO. 445

1

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1
2
3
4      TAPE RECORDED TELEPHONE CONVERSATIONS
5         RE: Cyrus v. Hyundai, 6363.31
6                  Tape 4
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21   TRANSCRIBED BY:   Stacy L. Lovin,
22                    Court Reporter and
23                    Notary Public

ORIGINAL

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    <u>Telephone conversation No. 1</u>

2                ROB CYRUS:    10/26.    12:20 p.m.

3    (*inaudible*).

4                (Phone ringing.)

5                UNIDENTIFIED SPEAKER:    Good

6    afternoon.    Thomas, Means, Gillis, and

7    Seay.

8                ROB CYRUS:    Yes.    Extension

9    436, please.

10                UNIDENTIFIED SPEAKER:    Hold

11    on.

12                MS. WHITE:    Tanya White

13    speaking.    May I help you.

14                ROB CYRUS:    Hey, Tonya.    This

15    is Rob Cyrus.

16                MS. WHITE:    Hey.

17                ROB CYRUS:    We spoke

18    yesterday.

19                MS. WHITE:    Yes.    How are you

20    doing?

21                ROB CYRUS:    I'm okay.    How are

22    you?

23                MS. WHITE:    I'm doing good.

# TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   Thank you.  Wanted to get back with you

2   and let you know what I found out about

3   your case.

4              ROB CYRUS:  Okay.

5              MS. WHITE:  What I have been

6   advised is that we have a conflict of

7   interest in this matter.

8              ROB CYRUS:  Okay.

9              MS. WHITE:  So we wouldn't be

10  able to represent you against Hyundai.

11             ROB CYRUS:  Okay.

12             MS. WHITE:  However, I did get

13  a name and number of another attorney that

14  you could call who may be able to help

15  you.

16             ROB CYRUS:  All right.

17             MS. WHITE:  If you would like

18  her name and number.

19             ROB CYRUS:  Sure.

20             MS. WHITE:  Okay.  It is

21  Karen.

22             ROB CYRUS:  Karen.

23             MS. WHITE:  With a K.

4

# TYLER EATON
## TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1       ROB CYRUS:   Uh-huh.

2       MS. WHITE:   Mastin,

3   M-A-S-T-I-N.

4       ROB CYRUS:   Okay.

5       MS. WHITE:   And her number --

6   she's here in Montgomery.

7       ROB CYRUS:   Okay.

8       MS. WHITE:   It is ████.

9       ROB CYRUS:   All right.

10      MS. WHITE:   ████.

11      ROB CYRUS:   ████.

12      MS. WHITE:   And you can let

13  her know we referred you over to her.

14      ROB CYRUS:   Karen Mastin.

15      MS. WHITE:   Yes.

16      ROB CYRUS:   All right.  Well,

17  thank you so much.  I appreciate it.

18      MS. WHITE:   Let us know if you

19  need anything else.  Okay?

20      ROB CYRUS:   Okay.  Thank you.

21  Bye-bye.

22      MS. WHITE:   Bye-bye.

23

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  Telephone conversation No. 2

2          ROB CYRUS:  (*Inaudible*).

3  Laura Stone.  10/27.  4:41.

4          (Phone ringing.)

5          ROB CYRUS:  I don't like this

6  poop.

7          (Voice mail greeting.)

8          ROB CYRUS:  Hey, Laura.  It's

9  Rob.  It's 4:42 on Thursday.  Hey, I got

10  your message.  Please call me at home.

11  ██████████.  I'll be home all night.

12  Thanks.

13

14  Telephone conversation No. 3

15          ROB CYRUS:  Hello.

16          UNIDENTIFIED SPEAKER:  Hey.

17  What are you doing?

18          ROB CYRUS:  Just getting up

19  from a nap.  What are you doing?

20          UNIDENTIFIED SPEAKER:

21  Cleaning my backyard.

22          ROB CYRUS:  Oh, are you?

23          UNIDENTIFIED SPEAKER:  Yeah.

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
1              ROB CYRUS:  Okay.
2              UNIDENTIFIED SPEAKER:  Needs
3    water.
4              ROB CYRUS:  There you go.  I
5    like that.
6              UNIDENTIFIED SPEAKER:  What's
7    going on with you, man?
8              ROB CYRUS:  Nothing.  I met
9    with an attorney today.
10             UNIDENTIFIED SPEAKER:  What
11   did they say?
12             ROB CYRUS:  I didn't care for
13   him.  I got three more I'm going to talk
14   to tomorrow.
15             UNIDENTIFIED SPEAKER:  What
16   did he actually tell you?
17             ROB CYRUS:  He said it can be
18   reverse nationality discrimination.  You
19   know how they treat the Koreans different
20   than the Americans?  They fired that ████
21   girl less than two or three weeks ago for
22   sleeping.  And the Koreans sleep at their
23   desk or in the conference room, you know,
```

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  every week.

2         UNIDENTIFIED SPEAKER:  Yeah.

3  I saw (*inaudible*) sleeping at his desk.

4  You know who they fired today?

5         ROB CYRUS:  Who?

6         UNIDENTIFIED SPEAKER:  Oh, you

7  didn't get the news?

8         ROB CYRUS:  I don't want to

9  talk to anybody.  Who?

10        UNIDENTIFIED SPEAKER:  Mike

11  called me when I was at dinner because,

12  you know, we had that weekly -- anyway,

13  ████████████.

14        ROB CYRUS:  They fired ████?

15        UNIDENTIFIED SPEAKER:  Yeah.

16        ROB CYRUS:  Huh.  On what

17  grounds?

18        UNIDENTIFIED SPEAKER:  The

19  grounds that, you know, that hundred

20  dollar bonus check you get every month?

21        ROB CYRUS:  Yeah, perfect

22  attendance.

23        UNIDENTIFIED SPEAKER:  They

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
 1   went through the records, and they found
 2   out that she wasn't entitled to it.
 3            ROB CYRUS:  What's her title?
 4   I mean, wasn't that their error for paying
 5   her?
 6            UNIDENTIFIED SPEAKER:  That's
 7   what she said.
 8            ROB CYRUS:  I mean, she's
 9   supposed to police their own policies that
10   don't even exist.  They still don't even
11   have their employee manual together after
12   three years.  Huh.
13            UNIDENTIFIED SPEAKER:
14   (Inaudible) you know what she told
15   (inaudible) you know there is more -- you
16   don't even look at it.  She said, you know
17   that's not the reason.
18            ROB CYRUS:  What is the
19   reason?
20            UNIDENTIFIED SPEAKER:
21   (Inaudible) didn't like her.
22            ROB CYRUS:  I mean, it's not a
23   popularity contest, is it?  If she's doing
```

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  her job correctly and fulfilling what she

2  needs to do, then -- I think that's why --

3  everybody is different.  There is no right

4  or wrong.  You know, that -- that's just

5  another excuse.

6          UNIDENTIFIED SPEAKER:  I know

7  it.  I'm telling you --

8          ROB CYRUS:  Incredible.

9          UNIDENTIFIED SPEAKER:  -- at

10  dinner (*inaudible*) out there smoking, and

11  they said, well, how is Rob doing.  I

12  said, you know, Mr. Choi was there and all

13  those guys.

14          ROB CYRUS:  At Macaroni Grill?

15  One of those things?

16          UNIDENTIFIED SPEAKER:  Yeah.

17  (*Inaudible*).  It was (*inaudible*) HK,

18  myself, and Choi smoking.

19          ROB CYRUS:  Yeah.

20          UNIDENTIFIED SPEAKER:  They

21  asked me how you were doing.  I said,

22  well, he had a reaction to that Lipitor.

23  They said, well, give him our best, all

# TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
1   three of them.
2              ROB CYRUS:  I'll give them by
3   best.  Okay.  Since they don't show up at
4   my staff meetings, which, you know, stops
5   my ability to be able to control and do my
6   job correctly.  Bastards.
7              UNIDENTIFIED SPEAKER:  You
8   know Choi has got to know what's going on.
9              ROB CYRUS:  I called HJ, you
10  know, and confronted him.  I said, are you
11  unhappy with my performance.  And he said,
12  (inaudible) around.  And he said, when are
13  you coming back.  And I said, well, my
14  internal medicine doctor and my
15  cardiologist said these symptoms sound
16  like a reaction to Lipitor.  You know, my
17  brother-in-law was a pharmacist for, I
18  don't know, five to eight years and now
19  he's a doctor, ear, nose, and throat.  And
20  he said, you know, it can hit you day one
21  that you take it or a year from now, you
22  know.  So it's not like, you know, it's
23  unusual to hit now.
```

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1       Well, anyway, I talked to HJ,
2   and I said, you know, are you -- you know,
3   I know you're disappointed that I'm
4   missing work, but, you know, I'm really
5   sick and I've got a stack of doctors
6   things an inch tall now.  And he goes, we
7   will talk when you come back.  So that
8   tells me that, you know, he's in on it.
9       UNIDENTIFIED SPEAKER:  If he's
10  in on it, you know that Choi is in on it
11  because he wouldn't make a (inaudible)
12  without it.
13      ROB CYRUS:  Choi works for me.
14      UNIDENTIFIED SPEAKER:  Okay.
15      ROB CYRUS:  I agree he may be
16  in on it.  I think -- I think HI Kim is
17  the one who did it because they made me
18  write the meeting minutes.  I told them I
19  didn't want to.  I went to Heron.  I
20  said -- you know, Mr. Heron is very
21  strange.  He's the one that acted childish
22  and screamed at a supplier and said shut
23  up and sit down, you know, to grown men.

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  And I said, what do you want me to write.

2  He said, just write -- just write it.  I

3  said, just write it factually, you know.

4  He goes, yeah:  I said, okay.  So I did,

5  you know, verbatim.  And I'm sure he got

6  that and the president got that.

7         You know, HI Kim only asked for

8  meeting minutes from the people that work

9  directly from him.  So like 12 people

10  wrote meeting minutes, myself and Choi in

11  addition to that, but there were 35 people

12  in the room, including another supplier.

13  So I think that just, you know -- he's a

14  prima donna, and he's not used to be

15  questioned, even though he tried to charge

16  a supplier -- Japanese supplier back in

17  excess of one hundred thousand dollars.

18         And it was on the agenda, and

19  he wouldn't address it.  We were simply

20  trying to -- they didn't want to come

21  down.  It was after a hurricane.  They had

22  to drive.  They had their new president of

23  Murakami come in and say, you know, it's

**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    very awkward, you know, for the top
2    gentleman to miss and not greet the new
3    president.  He begged not to come down.
4    He and that Jason gentleman.  Whose Jason?
5    What's his last name?  Choi or --
6              UNIDENTIFIED SPEAKER:  Chi.
7              ROB CYRUS:  Chi.  He had a
8    meeting with him after I had a meeting,
9    which I wasn't aware of or invited to.
10   And that's when he told them, you know,
11   you shut up and sit down.  I want to talk
12   to the Japanese colleague.  The Murakami
13   people were livid.  Nobody needs to be
14   treated that way.
15             UNIDENTIFIED SPEAKER:  What
16   else did this guy say?  Reverse
17   international discrimination.
18             ROB CYRUS:  Disability is the
19   big thing, you know.  Because, you know, I
20   had a heart attack or a heart condition,
21   I'm being penalized.  I think -- and, you
22   know, being over 40, and, you know, I'm --
23   my descent is Iranian.  I mean, Iranians

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    are very popular right now, you know.

2    Even though my family has been in the

3    states for, you know, 150 years with

4    impeccable reputations.

5                 UNIDENTIFIED SPEAKER:  Where

6    was this guy based out of?

7                 ROB CYRUS:  Which one?

8                 UNIDENTIFIED SPEAKER:  The one

9    you saw today.

10                ROB CYRUS:  Montgomery.  I

11   didn't like him.

12                UNIDENTIFIED SPEAKER:

13   (Inaudible).

14                ROB CYRUS:  I got three more

15   names I'm going to call tomorrow morning.

16                UNIDENTIFIED SPEAKER:  Are

17   they all in Montgomery?

18                ROB CYRUS:  One is in

19   Birmingham.  I want, you know, somebody

20   who's not afraid of them, not afraid of

21   retaliation.  This is just wrong.  I

22   didn't do anything.  You know, when --

23   when that one guy -- what was his name?

15

# ℡ TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  ~~[redacted]~~

2  you know, I had to get involved in that,

3  try to straighten that out.

4  　　　　　UNIDENTIFIED SPEAKER:  Oh.

5  　　　　　ROB CYRUS:  Remember that?

6  　　　　　UNIDENTIFIED SPEAKER:  Yeah.

7  　　　　　ROB CYRUS:  And ~~[redacted]~~

8  ~~[redacted]~~

9  ~~[redacted]~~

10  ~~[redacted]~~

11  ~~[redacted]~~

12  ~~[redacted]~~

13  ~~[redacted]~~

14  ~~[redacted]~~

15  　　　　　UNIDENTIFIED SPEAKER:  Was he

16  drinking?

17  　　　　　ROB CYRUS:  Oh, yeah.  He was

18  drunk.  And then ~~[redacted]~~, you know,

19  ~~[redacted]~~, he was so offensive, she said,

20  you know, I'm not meeting with this guy

21  anymore, even though she was the head

22  person to deal with Hyundai.  She said,

23  you know, he's too abusive and too crazy.

# ⅡΕ TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   And I had to arrange a lunch and try to

2   smooth that shit out.

3         And I helped ████████ when he

4   tried to get -- when he was getting

5   screwed by Hyundai.  They wanted to give

6   him a thousand dollars.  He had forty

7   thousand dollars in medical expenses.

8   Just like I took care of you at the

9   hospital.  I took him magazines.  I took

10  him food.  You know, I -- you know, I got

11  HJ's kid in school.  I tried -- ████████

12  pressured me to try to get, you know, his

13  boss, ████████ daughter into the

14  University of Alabama.  I spent hours

15  talking to Carl Ferguson trying to do

16  that.  And she didn't qualify.  And, you

17  know, just, you know, above and beyond --

18         UNIDENTIFIED SPEAKER:  When

19  did ████████ do this shit?

20         ROB CYRUS:  Oh, man.  Back at

21  the Halcyon office.  He hit one of those

22  poles, you know, that are those real nice

23  metal ones.

One Federal Place  •  Suite 1020  •  1819 Fifth Avenue North  •  Birmingham, Alabama 35203
(205) 252-9152  •  Toll-Free (800) 458-6031  •  Fax (205) 252-0196  •  www.TylerEaton.com

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    UNIDENTIFIED SPEAKER:  Yeah.

2    ROB CYRUS:  Around that loop.

3    UNIDENTIFIED SPEAKER:  Yeah.

4    ROB CYRUS:  Yeah.

5    UNIDENTIFIED SPEAKER:  Oh,

6    man.  I never heard about that.

7    ROB CYRUS:  Well, that's

8    because I didn't tell anybody.

9    UNIDENTIFIED SPEAKER:  Yeah.

10    So how did you straighten that one out?

11    ROB CYRUS:  You know, I don't

12    even know.  I met with them, and I had to

13    get called in to ▓▓▓▓ and, you know,

14    (inaudible) was there.  I think

15    (inaudible) was the ▓▓▓▓▓▓▓ at that

16    time.

17    UNIDENTIFIED SPEAKER:  Up here

18    in Halcyon (inaudible).

19    ROB CYRUS:  Yeah.  So I mean,

20    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

21    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

22    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

23    was very upset, almost cried, you know, in

**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  the meeting.
2              So ████ is gone, huh?
3              UNIDENTIFIED SPEAKER:  Yeah.
4              ROB CYRUS:  Nice.
5              UNIDENTIFIED SPEAKER:  What
6  shocked me -- it just shocked me.  I just
7  sat there at dinner and Mr. Choi looked at
8  me like what's wrong.  Your wife?
9              ROB CYRUS:  What do you mean?
10 What do you mean?
11             UNIDENTIFIED SPEAKER:  I just
12 was in -- I mean, I was just in awe.
13             ROB CYRUS:  Of what?  Oh,
14 ████.
15             UNIDENTIFIED SPEAKER:  Yeah, I
16 mean, it was just like -- you know, it was
17 like I'm sitting at dinner with them, you
18 know what I'm saying?
19             ROB CYRUS:  She's been treated
20 like crap from ████ from day one for some
21 reason.  I don't know why.  He got mad
22 because she would order breakfast from
23 Chappy's.

19

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

 1      You know, ████ and ████, they
 2  both get glee -- they get a gleam in their
 3  eye and they're happy every time they can
 4  fire somebody.  They're like let's fire
 5  them.  I mean, how many people can you
 6  recall at seven years, for you, at
 7  Mercedes being fired?  ████████████.  I
 8  can't even think of anybody else.
 9          UNIDENTIFIED SPEAKER:  Maybe
10  five, and that was it, if there was five.
11          ROB CYRUS:  Yeah.  I mean, but
12  they gave them, okay, you know, you're
13  having a problem.  This is your warning.
14  If you do it again, you know, you may be
15  released.
16          UNIDENTIFIED SPEAKER:  You
17  know, and the other thing, you know, is
18  like that guy that had to go fix his car,
19  was stuck in park and (inaudible) job
20  back.
21          ROB CYRUS:  Yeah.  This guy --
22  you know, ████████████ is the biggest
23  full of shit whatever, and he's got HI Kim

One Federal Place  •  Suite 1020  •  1819 Fifth Avenue North  •  Birmingham, Alabama 35203
(205) 252-9152  •  Toll-Free (800) 458-6031  •  Fax (205) 252-0196  •  www.TylerEaton.com

**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   on his side, you know.  When I was at

2   dinner with Duckworth, he asked me about,

3   you know, do you think ███████████]

4   ████████████████████████████ or

5   whatever.  And Hansford was at dinner with

6   us.  Did I tell you that?

7              UNIDENTIFIED SPEAKER:  Yeah.

8              ROB CYRUS:  And, you know, he

9   spoke up, and he said, oh, definitely, you

10  know, I have proof.  And I said, you know,

11  I -- just what I hear.  I don't know.  And

12  the thing, they asked me to sign an

13  affidavit of what ██████ told me.  And if I

14  did, then he would be fired.  But, you

15  know, I have a conscience and said, you

16  know, he's got ████████ and he's ████████

17  and I don't want to screw somebody's life

18  up.

19              UNIDENTIFIED SPEAKER:  Then he

20  turns around and he wants to fire your

21  ass.

22              ROB CYRUS:  Well, it's funny,

23  he grilled Mike and I, is anybody taking

**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    kickbacks, you know, blah, blah, blah,
2    blah, you know, all kinds of that stuff.
3    And then during the dessert, I said, Mike,
4    you know, Keith and I need to speak
5    privately for a minute.  Then, you know,
6    he said, well, when you're better, you
7    come back and you come straight to my
8    office.  You know, the executive
9    management is unhappy with my attitude.
10   What does attitude mean?  You know, I said
11   who is executive management?  And he said,
12   well, HI Kim and President Ahn.  I said,
13   you know, I said five words to president
14   on because he doesn't speak English.  And
15   HI Kim, the situation with Murakami, I
16   came to you that day, twice.  First time I
17   said hostile environment, and the second
18   time I said I don't want any retaliation.
19   And he said, oh, that's just the Korean
20   style.  Don't worry about it at all.  You
21   have a nice weekend.  We know -- we know
22   you're on good standings.
23            So -- and then he mentioned

One Federal Place  •  Suite 1020  •  1819 Fifth Avenue North  •  Birmingham, Alabama 35203
(205) 252-9152  •  Toll-Free (800) 458-6031  •  Fax (205) 252-0196  •  www.TylerEaton.com

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  Rick Neal, which was a little stupid,
2  because now he's not immune from being
3  pulled into a lawsuit.  I said, Rick Neal.
4  I said, let's call him right now.  I said,
5  Rick and I, you know, have a good
6  relationship, and I'm unaware, you know,
7  of anything that Rick could possibly be
8  upset with me about.  He knows nothing
9  about automotive.  I hold his hand more
10 than he helps me.  You know?
11         UNIDENTIFIED SPEAKER:  So you
12 thought Rick was a friend.
13         ROB CYRUS:  Four plants.  You
14 know, he worked for a sports team.  That's
15 ludicrous.  You know, it's a veiled thing.
16 Attitude.  You know, what is attitude?
17 It's simply because I've been sick and
18 they don't like it.  Even though when
19 I was even going to cardio rehab, which my
20 doctor demanded, you know, Choi --
21 remember when they would take the
22 documents and not get my signature?  And
23 his response, well, you are never here.  I

# TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
 1   said Mr. Choi, I'm just in the mornings at
 2   cardio rehab.  I'm not at Palm Beach
 3   laying in a lounge chair.  You are never
 4   here.  Well, yes, I am.  When he admitted
 5   to that.  I haven't called Yong because I
 6   don't want to get him into it, but I
 7   talked to HJ and I talked to Choi.  I
 8   talked to Rick Neal.  I talked to Greg
 9   Kimball for a long time last night.
10              UNIDENTIFIED SPEAKER:  Greg
11   last night?
12              ROB CYRUS:  Yeah.  Because he
13   came to me -- you know, about six weeks
14   after my heart stint thing, you know,
15   after that signature ordeal where they
16   weren't using the proper chain of command,
17   I pulled Greg and Rick in the conference
18   room and I said, look, gentlemen, I'm
19   seeing a distinctly different treatment
20   since I had a heart condition.  I said,
21   you know, I want to formalize it.  I want
22   to make it known.
23              UNIDENTIFIED SPEAKER:  Did you
```

24

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    (inaudible)?

2         ROB CYRUS:  I wrote it on my

3    calendar.  And they were both there.  And

4    I talked to Greg on the phone about it:

5    And he said, yeah, I remember.  He called

6    me over to his area one day and he said, I

7    know what you mean now about them giving

8    you a hard time for rehabilitation.  I

9    hurt my knee, and they won't let me go,

10   you know, to rehab, physical therapy.  You

11   know, they're making him feel guilty or

12   pressuring him.  And I said, you know,

13   that's what they did to me.

14        UNIDENTIFIED SPEAKER:  When

15   Keith was talking, did he talk about

16   anybody in our group?

17        ROB CYRUS:  No.  That's the

18   first I've ever heard executive management

19   is upset with me.  They've only been here

20   two months.  I've only had two

21   interactions with HI Kim and none with the

22   president, and Rick Neal and I get along

23   great.

# TE TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1          UNIDENTIFIED SPEAKER:  Or you
2     thought you did.
3          ROB CYRUS:  Well, that's fine.
4     I mean, if he -- what I think happened is
5     HI Kim got upset from those meeting
6     minutes.  And, you know, he is, you know,
7     in charge of the entire plant in Seoul,
8     and he's not used to being questioned.
9     That's why Brian Wong told me the night
10    before -- the night we were bowling, he
11    said, you know, Murakami is coming in,
12    they didn't want to, they're losing money
13    on the business.  You know, they had to
14    drive down because of the hurricane.  And
15    he goes, I need you to, you know, just be
16    fair and neutral and speak up for what's
17    right.  And I said, yeah, I will.  I even
18    e-mailed that back, you know.  I'm not
19    going to take Murakami's side.  I went to
20    the line that morning before the meeting
21    to do my homework.  I actually met with
22    the operators.  I talked to -- I tried to
23    reach (*inaudible*).  He wouldn't call me

# ⊏Ε TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  back.  I talked to Ashley Frye.  I talked
2  to Paula and to Job.  And, you know, of
3  the three hundred suspect mirrors,
4  whatever the number was, 285 we already
5  agreed were -- were acceptable.  And the
6  other ones were mishandling by our
7  (*inaudible*).  And it was on the agenda.
8  And when they tried to speak to it, he got
9  livid, childish.  He threw down his books
10  and walked out of the room.  And the
11  second time he got Murakami, was like why
12  did we come down here if we're not going
13  to talk about this.  I mean, they were
14  trying to charge him back in excess of a
15  hundred thousand dollars.
16          UNIDENTIFIED SPEAKER:  Yeah, I
17  know it.  I helped you.  I don't know.
18          ROB CYRUS:  I mean, this is --
19          UNIDENTIFIED SPEAKER:  I mean,
20  I walk in to work -- I mean, (*inaudible*) I
21  walk into work --
22          ROB CYRUS:  Hold on one
23  second, Dave.  I'm going to get my Diet

# TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    Coke here.  Okay.

2                UNIDENTIFIED SPEAKER:

3    (Inaudible) Monday.  I want to know why --

4                ROB CYRUS:  Yeah.

5                UNIDENTIFIED SPEAKER:  And

6    then I sit there and (inaudible) was

7    like --

8                ROB CYRUS:  You know me.  How

9    many times did I have to go to HR at

10   Mercedes?

11               UNIDENTIFIED SPEAKER:  None.

12               ROB CYRUS:  Zero.  Eight

13   years, zero.  Toyota, zero.  I was named

14   one of two people out of two thousand

15   employees that were ranked as unlimited

16   potential.  And that was from Germany and

17   the U.S.  Because Bob Birch called me one

18   day and said HR wants to see you.  And I

19   was like whoa, that's weird.  You know,

20   what did I do?  You know, and it was all

21   positive.  Unbelievable.

22               UNIDENTIFIED SPEAKER:

23   (Inaudible).

28

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    ROB CYRUS:  We'd be treated --
2  you know, American business practices.
3  These guys are just trying to run it
4  like -- I don't know what they're trying
5  to run it like.
6    UNIDENTIFIED SPEAKER:  You
7  think they'll just send you a certified
8  letter?
9    ROB CYRUS:  They sent me a
10  letter already.  Yesterday I got it.  All
11  this stuff you need to keep between you
12  and I.  And it said, you know, since this
13  case is pending -- I don't know if case
14  was the word -- you know, you are -- your
15  badge has been deactivated, you are not to
16  represent Hyundai in a business manner,
17  you know, blah, blah, blah.
18    (*Inaudible*) that I've gone is
19  just, you know, if they're going to give
20  me a severance or if they're just going to
21  fire me or if I'm going to sue them.  You
22  know, so.
23    UNIDENTIFIED SPEAKER:  Wait a

29

# TE TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  minute.  You got a letter from -- who

2  signed it?

3          ROB CYRUS:  Duckworth only.

4  And I asked Greg.  He said, you know, when

5  I talked to him that next day he went to

6  Keith, and Keith said, well, there is just

7  some things you don't need to know about.

8          UNIDENTIFIED SPEAKER:  So what

9  else does it say in their letter?

10         ROB CYRUS:  There were four

11 bullet points, and I got to pull the

12 letter out.  I spent all last night

13 getting my ducks in a row and filing

14 stuff.  I got all my calendars.  You know,

15 I don't have any confidential stuff.  I

16 don't have any Hyundai documents.

17         I do have a copy of an e-mail

18 that Ted sent to me.  Ted Jones

19 (*inaudible*) over a year beyond when I

20 started.  And, you know, he said, I'm so

21 happy to hear you're doing so well at

22 Hyundai and your reputation is very good.

23         UNIDENTIFIED SPEAKER:  Have

30

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    you tried going in, logging in to your

2    computer?

3              ROB CYRUS:  I tried today, and

4    it wouldn't let me do it.  Access denied.

5    Which I've never done from my house ever.

6    You know my computer capabilities.

7              UNIDENTIFIED SPEAKER:  I put

8    that link on there, and I did it the other

9    day.

10             ROB CYRUS:  It doesn't work.

11   I had Jamie come over because I bought a

12   printer, and he helped me.  But don't tell

13   him that I told you he was over here.  I

14   didn't tell him anything.

15             UNIDENTIFIED SPEAKER:  Does he

16   know what's going on?

17             ROB CYRUS:  No.  You and

18   Laura.  You and Laura and Greg and

19   (inaudible) and Neal and Ahn and Kim.

20             UNIDENTIFIED SPEAKER:  They

21   know what's going on.

22             ROB CYRUS:  You know, that's

23   what they do, when they don't want any

# ℡ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  push back, just like they did with ████
2  ████, just like they did with Hansford.
3  You know, Keith Hancock called me that
4  day. He said, why did you fire Hansford.
5  I said, what. You know, I thought he got
6  mad and threw stuff or did something. I
7  had not a clue about that. You know?
8      UNIDENTIFIED SPEAKER: He
9  called you today --
10     ROB CYRUS: No, no, no. That
11  was when Hansford was fired. Mark Lee
12  didn't even know apparently. I don't
13  know. He's a pretty good liar I think.
14     UNIDENTIFIED SPEAKER: So they
15  sent you -- and it has four bullet points?
16     ROB CYRUS: Uh-huh.
17     UNIDENTIFIED SPEAKER: What
18  did it say?
19     ROB CYRUS: You know, my badge
20  doesn't work, I'm not to represent myself
21  as a Hyundai employee, and -- you know,
22  when I was at dinner with him, you know,
23  he looked at my medical stuff. That's

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  what really upset me because he called me

2  all sweet, you know, how you doing, I'm

3  worried about your health, and let's get

4  together and talk about it.  I took all my

5  medical bills.  I even took my pills.  You

6  know I have them in my weekly thing?

7         UNIDENTIFIED SPEAKER:  Right.

8         ROB CYRUS:  You know, to show

9  him.  And I showed Greg the day before,

10  and he goes, Rob, we don't doubt you, you

11  know.  You've got a great reputation here,

12  don't worry.  And then, you know, he was

13  real nonchalant.  He looked at it.  And

14  then he goes, well, the executive

15  management is upset with you.  And then I

16  started questioning him.  He goes, well,

17  it's not me.  It's not me.  I'm not upset

18  with you.  It's like you big pussy.

19         UNIDENTIFIED SPEAKER:  So are

20  they still paying you?

21         ROB CYRUS:  They better be.

22  As far as I know.  I still have my car.

23  I'm waiting any day for them to take that

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  away.

2  UNIDENTIFIED SPEAKER:  What

3  did they say in their -- what else did the

4  letter say?  It had four bullet points,

5  don't represent, your badge is

6  deactivated --

7  ROB CYRUS:  I can't remember,

8  Dave.  It's somewhere in my pile.

9  UNIDENTIFIED SPEAKER:  Yeah,

10  but --

11  ROB CYRUS:  They would be very

12  foolish to take away my pay and take away

13  my car that I'm paying for out of a lease

14  until, you know, this gets settled.  I

15  mean, HJ -- I remember him talking to me

16  when (inaudible) had a heart attack, how

17  can we get rid of him.  I said, well, HJ,

18  you know, it has to be performance based.

19  If you want to document things he's not

20  getting done or -- but I mean, you can't

21  discriminate based on a disability.  You

22  know, they just don't get it.  I guess

23  they just --

# ⅡⅬ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1      UNIDENTIFIED SPEAKER:  Did

2   they send it to you in regular mail or

3   certified?

4      ROB CYRUS:  Regular mail.  But

5   my letter will be certified.

6      UNIDENTIFIED SPEAKER:  From

7   who, your attorney?

8      ROB CYRUS:  I'm going to meet

9   with my attorney and see how to approach

10   it.

11      UNIDENTIFIED SPEAKER:  Do you

12   have to pay for an attorney up front?

13      ROB CYRUS:  Sure.  My parents

14   are livid.  I've been working since I was

15   14.

16      UNIDENTIFIED SPEAKER:  Right.

17   Man.  Rob, Rob, Rob, Rob.

18      ROB CYRUS:  I mean, you know,

19   Ahn doesn't know me.  HI Kim doesn't know

20   me, and Duckworth doesn't know me.  And

21   they're --

22      UNIDENTIFIED SPEAKER:  I'm

23   just wondering --

**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1       ROB CYRUS:  They're messing
2  with the wrong person.  You know, I've
3  been loyal as hell, helped them above and
4  beyond what my job description was.  Got
5  them out of the venture shit on the
6  bankruptcy, you know.
7       UNIDENTIFIED SPEAKER:  Yeah.
8       ROB CYRUS:  Cindy doesn't
9  know, so don't -- you know, she could say,
10  well, you don't have a job, I'll move back
11  to Kentucky.  You know, that's the other
12  thing.  It affects me, my ability to feed
13  my children, my ability to support my wife
14  and children, ex-wife.  You know, this is
15  far reaching.  And they wanted me to come
16  up with the severance package.  It's like
17  what?  I said, Keith, I've never done a
18  severance package.  I've never been fired.
19  I don't know what to do.  So I'm going to
20  talk to an attorney and see what to do.
21  It's ludicrous.  It's just astonishing.
22       You know, all I told Keith was,
23  you know, I'm shocked.  I've had nothing

# ⚎ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    but praise.  I told him, you know, I got
2    little jabs and little remarks after I got
3    back from heart surgery.  And, you know,
4    Rick Neal called me stint boy numerous
5    times in the director's meeting in front
6    of everybody.  So when I called him on the
7    phone, I said, this is stint boy that you
8    affectionately referred to me as in the
9    director's meeting.  I taped that.  I'm on
10   my third tape.
11                UNIDENTIFIED SPEAKER:  Does --
12   what's his name?  Does Greg know you got
13   that letter?
14                ROB CYRUS:  It was signed by
15   Keith.  Who knows.
16                UNIDENTIFIED SPEAKER:  I just
17   wondered who typed it.
18                ROB CYRUS:  There is just
19   something you don't need to know.  His
20   secretary I'm sure.
21                UNIDENTIFIED SPEAKER:  Who's
22   his secretary?
23                ROB CYRUS:  Karen Powers,

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  something like that.  You know, today I
2  went to an attorney and stuff.  I got
3  back.  I felt so horrible.  I told you I
4  just took a nap.
5           UNIDENTIFIED SPEAKER:  Yeah.
6        ROB CYRUS:  Something is
7  wrong, you know.  You think I want to sit
8  alone in the house by myself?
9           UNIDENTIFIED SPEAKER:  Badge
10  was deactivated.  They didn't tell you to
11  turn your car in or anything, did they?
12        ROB CYRUS:  Uh-uh.  That's
13  fine.  I don't want to go back.  They've
14  already tarnished me.  You know, they've
15  already labeled me.  How could I go back
16  and feel comfortable?  What do I tell my
17  next employer?  Why did you leave Hyundai?
18  Well.  You know, one thing I can say and
19  they have done is ask me numerous times to
20  do unethical things.  And then when I give
21  them, you know, we can't do that, then
22  they get upset.
23           ████████  I remember -- we had

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  that purchasing trainee from (inaudible),

2  and he was really good and had a nice book

3  that he wrote.  And I said, you know,

4  let's get some of these and we'll train

5  the people.  And I said, you know, it's

6  copyrighted.  It's going to be a couple

7  hundred bucks a book.  He said, oh, no,

8  ignore that.  Just make copies at Kinko's.

9  I didn't do it.  You know, there's things

10  you don't do in life.  It's called

11  integrity and character.  And these guys

12  don't have any grasp of that.

13        UNIDENTIFIED SPEAKER:  I just

14  wonder if I'm next.

15        ROB CYRUS:  I have no idea.

16  I'd lay low.

17        UNIDENTIFIED SPEAKER:  No

18  shit.  (Inaudible).

19        ROB CYRUS:  No.  I haven't

20  done a thing.  I'm not -- you know.

21        UNIDENTIFIED SPEAKER:  When

22  are you selling your house?

23        ROB CYRUS:  I got a contract

# ⊨ TYLER EATON

**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1    on it already.

2            UNIDENTIFIED SPEAKER:  Yeah,

3    but when is the closing date?

4            ROB CYRUS:  End of November.

5            UNIDENTIFIED SPEAKER:  End of

6    November.

7            ROB CYRUS:  Yeah.

8            UNIDENTIFIED SPEAKER:  God, I

9    hope that doesn't fall through.

10           ROB CYRUS:  I got five

11   thousand dollars earnest money for doing

12   it.  If it doesn't, they can pay for my

13   house, you know.  And they can pay for a

14   car for me.  And they can pay for me to

15   move, and they can pay for my wife to

16   move.  And they can give me a per diem,

17   you know.  I can understand something if

18   they'd taken me in a room and said, Rob

19   (tape ends).

20

21

22

23

40

# ⅼⅬ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1                    C E R T I F I C A T E

2

3    STATE OF ALABAMA)

4    JEFFERSON COUNTY)

5

6            I hereby certify that the

7    above and foregoing recordings were taken

8    down by me in stenotypy, and the questions

9    and answers thereto were reduced to

10   typewriting under my supervision, and that

11   the foregoing represents a true and

12   correct transcript of the recordings given

13   by said parties upon said hearing.

14           I further certify that I am

15   neither of counsel nor of kin to the

16   parties to the action, nor am I in anywise

17   interested in the result of said cause.

18

19

20           *Stacy L. Lowe*

21

22           COMMISSIONER - NOTARY PUBLIC
             ACCR NO. 445
23

# Exhibit F

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ROBERT CYRUS,

     Plaintiff,

vs.

HYUNDAI MOTOR MANUFACTURING
ALABAMA, LLC,

     Defendant.

CIVIL ACTION NO.:

2:07-cv-00144-ID-TFM

## DECLARATION OF EUI HWAN JIN

    1.    My name is Eui Hwan Jin. I am over the age of 19 years and otherwise competent to give this declaration. The facts contained in this declaration are based upon my personal knowledge.

    2.    In September of 2005 I was employed as a Senior Manager with Hyundai Motor Manufacturing Alabama, LLC ("HMMA"). In my position, I was one of the employees designated to have access to certain files, records, and data of the company and had personal knowledge of how such documents were maintained and stored by HMMA.

    3.    Attached to this Declaration as Exhibit 1 is a true and correct copy of the reports that were prepared for President & CEO J.S. Ahn and maintained by HMMA as a result of the meeting between representatives of Murakami Manufacturing Company and HMMA representatives in September of 2005. Some of the statements were made in English and some were made in Korean.

    I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED ON THIS _____ DAY OF JANUARY, 2008.

                                                        _____

                                                           Eui Hwan Jin

1

## 2005년 9월 16일 회의 관련 참석자 진술서(보고서) 목록

| 번호 | 소속 | 진술자 | 직책 | 비고 |
|---|---|---|---|---|
| 1 | 생산 | 김 홍일 | 공장장 | 한글 |
| 2 | 〃 | 조 봉관 | 생산 담당 이사 | 한글 |
| 3 | 〃 | 존 칼슨(John Kalson) | 생산 담당 이사 | 영문 및 번역본 |
| 4 | 〃 | 해리 체이스(Harry Chase) | 생산 관리 과장 | 영문 및 번역본 |
| 5 | 품질 | 박 승도 | 품질보증 부공장(HMC) | 한글 |
| 6 | 〃 | 박 석구 | 품질 담당 이사 (HMMA) | 한글 |
| 7 | 〃 | 제이슨 지 (Jason Chi) | 품품 품질 담당 과장 | 영문 및 번역본 |
| 8 | 〃 | 크리스 수석(Chris Susock) | 품품 품질 담당 부장 | 한글 |
| 9 | 〃 | 제랄드 혼(Gerald Horn) | 품품 품질 담당 대리 | 〃 |
| 10 | 개발 | 최 정열 | 개발 관리 담당 부장 | 〃 |
| 11 | 〃 | 황 용달 | 부품 개발 담당 과장 | 한글 |
| 12 | 〃 | 밥 사이러스(Bob Cyrus) | 부품 개발 담당 이사 | 영문 및 번역본 |


EXHIBIT
1

# 보 고 서

/ #

보고자 소 속 : HMMA
　　　직 책 : 공장장
　　　성 명 : 김 의일

## [보고 내용]

2005년 9월 16일 금요일 10시 HMMA 의장사무부 1층 Alabama Room에서 HMMA 품질관리팀 주관 협력업체 Claim 회의 주관중 발생한 상황에 대하여 아래와 같이 보고 및 의견을 말씀 드립니다.

－ 아　　　　래 －

회의 처음 시작은 05년 8～9月 협력업체의 부품 불량으로 인한 당사 완성차 생산 Line의 Down Time 현황에 대해 부품검수 담당 지(Chii) 과장의 설명에 뒤이어 본의의가 시작됨.

첫번째로 사이드 미러 생산업체인 무라카미에서 유점(#1) 보고서로 Briefing 하였음.

〈공장장〉 무라카미의 아웃사이드 미러 생산경험이 얼마나 되었고 또한 어느 업체에 납품한 실적이 있느냐?
〈무라카미 부사장〉 60년 되었고 미국내 거의 대부분의 TOYOTA 계열사(약 10개 정도)에 납품하고 있다고 여러차시 이름을 대면서 얘기함.
〈공장장〉 왜 전등의 밝기를 1000LUX → 2500LUX로 바꾸었느냐?

〈무라카미 발표자〉 포장장의 전등 밝기가 잘 안보여 1000LUX → 2500LUX로 바꾸었다.

〈공장장〉 제품의 Cure Time이 4시간 정도 가져야 함에도 불구하고 규정된 시간을 지키지 않았기 때문에 Bup'g이 일어난 것 아니냐?

〈무라카미 발표자〉 "Bup'g에 대한 설명없이" HMMA에서 승인한 Container 문제로 일어났으며 또한 Glovis의 처금 부주의로 스크래치 문제가 발생했다고 얘기함.

〈공장장〉 Container따라 공급 용기의 형상 유무에 문제없이 Cure Time만 정확히 지켰어도 Bup'g 문제는 일어나지 않았지 않느냐?

앞의 여러 정황으로 미루어 보아 그렇게 경험이 않고 미국내 도요타 계열사 및 여러업체에 납품하는 무라카미가 제품 생산의 기본도 지키지 않는 것으로 보아 현대의 품질에 대하여 아예 신경도 쓰지 않았거나 아니면 무라카미 품질 시스템상의 문제가 있다는 것이 아니냐?

〈Rob〉 사이드 미러의 스크래치 문제로 HMMA가 Reject 시킨 문제에 대하여 얘기하며 사진을 Print하여 돌리면서 Glovis에서 지게차 운반 도중 실수로 바닥에 엎질러 스크래치가 발생한 문제로서 이것들을 Reject하여 반품하고 또한 Down Time으로 잡은 것에 대하여 불만을 토로함.

〈공장장〉 그대한 잘못된 문제가 있다면 이 회의가 끝난후 실무자끼리 협의하여 조정하면 될 것이다.

현대가 잘못했거나 Glovis가 잘못했을시는 당연히 무라카미에게는 책임이 없으니 염려하지 말라.

회의 계속합시다!

〈최부장 & Rob〉 상기의 문제를 다시 얘기하며 회의 진행을 지연시킴.

이때 John Calson 및 품질담당 Chris가 무어라고 Rob에게 얘기하며 서로간의 약간의 활전이 있었으나 재가 재지 제지함.

0197

〈공장장〉 알았다! Glovis의 최부장을 오라고 하여 진상 확인을 하여 잘못된 점이 있다면 서로 협의하면 아무런 문제가 없을 것이다.

회의 속개합시다!

〈Rob〉 다시 스크래치 문제를 거론하며 무슨 다른 차이가 있는 것 아니냐며 회의를 지연시킴.

〈공장장〉 오늘의 의제를 모여주며 회의 의제 내용에 없는 것은 이 회의가 끝난후 훈인(공장장)참석하에 재형의 하면 될 것이므로 회의를 속개하겠다.

그리고 다시 말하지만 이 회의의 목적은 HMMA 공장이 아직 정상 가동이 안되고 있으며 현 상황에서 비가동 주요인을 분석해 본 결과 설비문제, 결품, 부품불량 등이 비슷한 비율로 가장 큰 저해 요인으로 나타나고 있다.

그래서 9月 2째주 부터 이 회의를 진행하게 되었고 그 목적은 종전에 많은 드린바와 같이 첫째는 가동을 향상을 위해서 둘째는 현내가 지향하는 고품질의 차를 만들기 위함이지 어느 특정업체를 뜻하거나 나무람을 위함이 아님을 다시 한번 말씀드리고 회의를 제속 하겠다.

〈Rob〉 Rob이 무라카미 영업 Manager와 잠시 얘기를 나누고는 다시 스크래치 문제를 거론할때 무라카미 영업Manager가 갑자기 자리에서 일어나 뒤쪽에서 사이드 미러 2개를 가져와 인성을 높이면서 2개를 '탁탁' 부딪치고는 회의용 탁자에다 던짐.

〈공장장〉 그 미러를 보자고 하여 보면서 스크래치 문제는 이회의 끝내고 속개하겠다.

그때 논하기로 하고 공장과 Rob이 다시 스크래치 문제를 얘기하며

"이때 개발 최정인 부장외 Glovis 최부장을 오라고 하였으니"

0198

<Rob> 여기 무라카미 사람들이 이 회의때문에 어제 여기에 도착하였으며 5000달러 정도의 경비가 들었다.
누가 책임질 것이나! 며 언성을 높임.
<공장장> 최부장 내가 수차례에 걸쳐 이회의의 목적과 오늘 회의 주제에 대하여 얘기 하였는데 당신 왜 그래!
[언성이 약간 높았음] 당신네들 일체 대변하려 여기온 것이나!
그만큼 얘기 했으며 알아 들어야지!
이런 상태로는 회의 진행이 불가하여 오늘 회의 끈낸다 향후 품질회의는 품질본부 박소두 부장이
주관하던가 품질본부에서 애들 바란다며 보고 있던 회의 파일을 접은면서이때 박소두 부장의 악간의
몸소리가 남 자리에서 일어나서 회의장 밖으로 나감.

이상 상황대로 보고 드립니다.

2005. 9. 17

공장장 이사 김 희일

0199

〈본인 의견〉

1. 업체 품질회의는 매월 품질본부장 주관 각 공장에서 실시하나, HMMA의 경우 공장가동의 주 지해요소로서 9月 부터 매주 금요일 실시하여, 업체 상층부에 그 상황을 정확히 인지시켜 부품 품질의 향상을 유도하기 위함이나 당사 자재 담당자들이 그 목적을 정확히 인지 못하고 있는 것으로 사료됨.

2. 공장장이 회의 주관시 몇번의 목적은 상황 설명, 자재할 것을 요청하였으나 계속 업체의 대변자 역할을 하며 회의 지연시킴.

3. 부품업체 및 당사 직원들 앞에서 회사의 이미지 및 공장장 이미지 실추시킴.

4. 금번의 2번째 회의로서 향후 부품업체 Claim 회의시 상당한 영향이 우려되며, 또한 향후 본인의 회의 주관이 어려울 것으로 사료됨.
HMC와 같이 품질본부장 주관 부품 품질확보 회의가 바람직 할 것으로 사료됨.

## 9월 16일(금) 10:00 업체품질회의에서 발생한 사건

본인이 품질회의에 들어갔을 때는
O/S Mirror의 버핑문제에 대해 무라카미에서 대책발표를 거의 끝내고 있었음.

업체에서 버핑에 대한 원인 및 대책을 발표하고 난뒤
김회일이사님께서 무라카미의 회사경력, 납품처등을 질문하자
무라카미 일본직원이 영어를 잘 못 알아들어 엉뚱한 대답을 하자
개발부에 최정연부장이 일본말로 통역였는데
회사는 60년 역사를 가지고 있고, 미국에서 토요타, 니산, 혼다공장에 납품하고 있고
품질문제는 거의 없었다고 대답함.
김회일이사님께서 왜 HMMA에는 기본품질도 못 지키느냐고 질책을 했음.

그러자 무라카미에서는 스크래치문제는 무라카미 귀책이 아니고
글로비스가 서열작업중 발생시킨 문제라고 주장함.
김회일이사님께서 버핑문제에 대해서만 대책을 발표하고 재발방지를 약속하고
스크래치문제는 안건에 포함되지않은 문제이니
이 회의가 끝난 뒤 별도의 실무자회의를 통해서 해결할 것을 지시함.

그래도 무라카미직원중 한명이 미러 두개를 쾅쾅 마주 부딪치며
(감정이 약간 실려있다는 느낌을 느낄 정도로)
이렇게 글로비스에서 다루는데 스크래치가 나지않을 수 없다고 주장하며
미러를 테이블 위로 툭 던졌음.
(한국사람의 눈에는 고의적으로 기분 나쁘다는 표현으로 느껴졌음)

김회일이사님께서 스크래치문제는 안건과 별개의 문제라고 다시 한 번 더 강조하고
이 회의가 끝난 뒤 별도의 실무자회의를 통해서 해결할 것을 재차 지시함.
또 글로비스 최진호부장을 호출해서 함께 실무회의할 것을 지시함.
그리고 업체품질회의의 목적에 대해서 설명하면서
양산라인에 무결점의 부품을 공급하기위한 대책을 발표하는 자리에서
업체간 발생한 문제를 이 회의에서 논의하는 것은
관련없는 업체, 담당자들까지 시간을 낭비하므로
이 회의가 끝난 뒤 별도의 실무자회의를 통해서 해결하는 것이 타당하다고 설명함.

0202

랍 사이러스가 스크래치문제도 안건통보시 포함되어있었고
이것때문에 여러명이 2~3일간 몽고메리에 출장와서
문제점을 조사하느라 몇 천불의 비용이 발생했고,
그 원인이 글로비스에 있는데 왜 발표를 하지않느냐라고 말하며
업체를 두둔하는 듯한 모습을 보여주었음

김회일이사님께서는 개발 최정연부장에게 "품질회의의 목적을 설명했고
업체에서는 자기 잘못에 대해 대책만을 발표하고
스크래치 문제는 별도의 실무회의에서 소명할 기회를 준다고 해도
이런 식으로 개발에서 업체 편들기 하면 품질회의를 진행시킬 수 없다"고 말하고
무라카미 발표 건은 중지시킴.

그래도 랍 사이러스가 스크래치문제도 안건통보시 포함되어있었고
왜 발표를 못 하느냐, 그러면 안건이 잘못 통보된 것이 아니냐,
그것때문에 무라카미의 여러 엔지니어가 남의 문제를 조사하느라
시간과 돈을 소모했다고 계속 주장함.

곧 글로비스 최진호 부장이 도착하고
스크래치문제는 별도 실무회의를 즉시 하기로 하고 다른 회의실로
무라카미,개발부 최정연부장,최진호부장,품질관리부 직원등 옮겨갔음.

2005.9.16    조 봉관

# 3

**From:** Kalson, John HMMA/Production Sub_Div
**Sent:** Saturday, September 17, 2005 8:02 AM
**To:** Kalson, John HMMA/Production Sub_Div
**Subject:** Weekly Part Quality Meeting Events - 9/16/2005

The following is a sequence of events that occurred during the Weekly Parts Quality Meeting held at HMMA on 9/16/2005.

1.  Side mirror supplier Murakami was invited to present the status of defects that have been affecting quality at HMMA.
2.  The meeting was attended by HMMA members, HMC members, Murakami representatives, and another supplier who was also scheduled to present status.
3.  The meeting began with Mr. Mark McDonald (Murakami Quality Manager) presenting status of "buff" marks on the outer surface of the mirror assemblies.
4.  Mr. McDonald stated that low light levels were the root cause of the buff marks since the operators could not see buff marks and scratches and fix them during their operations. He also stated that the light levels were increased to solve the problem.
5.  Mr. McDonald then proceed to go to the next issue which he reported that was a packaging issue and lack of proper cure time (bar marks were being left on the mirrors, and he believed these were the root causes).
6.  At some point during these discussions, Mr. H.I. Kim (COO - HMMA) asked the Murakami representatives how long they had been in business. The answer was given as 60 years. Mr. Kim then asked how come the light levels were not correct at the start. The question was stated as that Murakami has been in business so long; that he wanted to know how a basic quality system item could have not been correct.
7.  During this part of the conversation, it was stated by Mr. R. Cyrus (Director Purchasing – HMMA) that all defects were not caused by Murakami, and that Glovis was the problem with the mirror defects.
8.  Mr. Cyrus also then defended the packaging concerns that Murakami was facing and stated that HMMA accepted it and that Murakami did not do any other packaging like that for any of its other customers.
9.  During this part of the conversation, Mr. Kim again stated the purpose of the meeting was to review the basic quality problems that were the responsibility of Murakami, and what they were doing about that. Mr. Kim also stated that a meeting between the parties (HMMA, Glovis, and Murakami) would be necessary to discuss and solve the issues that were stated by Mr. Cyrus.
10.  Mr. Cyrus then stated something to the effect that "how can we ask a supplier to come and present the issues when we (HMMA) don't even have any data?" He also stated that we are in the process of charging Murakami with "over 200 minutes of downtime" and they are not responsible for that.
11.  At some point in these discussions Mr. Cyrus was very outraged and said that "Murakami has spent 2,3,4 thousand dollars coming here to present their issues and that we need to let them speak"
12.  Some time during this exchange, Mr. Glen Roberts (Assistant General Manager – Murakami) went over and picked up two mirrors violently hit them together to cause a scratch, said that this is what Glovis does, and threw the mirrors in the middle of the table.
13.  Mr. Roberts then said something to the effect of "HMMA has asked us to come here and speak, and we are going to speak about what we want to speak about"
14.  Mr. Kim again re-emphasized the fact that a separate meeting needed to be had by the parties to discuss the scratches and that it was not the intent of the meeting to discuss those items at this point.

15.     At some point Mr. Chris Susock, stated that the concerns with the mirrors were causing HMMA downtime and repairs and that Murakami has a responsibility for that. Mr. Cyrus at some point here said "that's Bullshit".

16.     I (John Kalson) interjected that "I expect the parts to be "good" out of the box and it is the responsibility of the supplier to make sure they are, and if the parts are not good, we must repair". Mr. Cyrus then said that "the operator should find the defects before the parts are installed". I said to Mr. Cyrus that "the job of the operator is not to inspect parts, that is the responsibility of the supplier, if the operators does see a defect, he will not put the part on, otherwise we have inspection process downstream that find defects, and when we find defects we must fix them". Mr. Cyrus then stated to me "that's not how Toyota does it, and let me teach you something about production systems".

17.     At some point during theses ongoing exchanges (which had been going on a while now), Mr. Kim stated that this meeting cannot go on like this and ended this session immediately.

In my opinion Murakami did not act as a respectful supplier. All of the Murakami representatives did represent themselves in a professional manner. They were confrontational and could not accept that they were indeed causing issues at HMMA.

Also, I was very embarrassed at how our purchasing team acted. It seemed like they were working for the supplier. In my opinion, no matter if HMMA is right or wrong; we need to always stick together.

Finally I respect how Mr. H. I. Kim conducted the meeting in the face of the "battle". He was calm. He tried to get the supplier on track and speaking about their issues several times. Finally when there was no hope for further discussion, he ended that portion of the meeting.

**J. G. Kalson**
**Director - Production**
**Hyundai Motor Manufacturing Alabama**
**(334) 387- 8564**

0204

## Kalson, John HMMA/Production Sub_Div

**From:**    Kalson, John HMMA/Production Sub_Div
**Sent:**    Saturday, September 17, 2005 8:02 AM
**To:**    Kalson, John HMMA/Production Sub_Div
**Subject:** Weekly Part Quality Meeting Events - 9/16/2005

The following is a sequence of events that occurred during the Weekly Parts Quality Meeting held at HMMA on 9/16/2005.

1.  Side mirror supplier Murakami was invited to present the status of defects that have been affecting quality at HMMA.
2.  The meeting was attended by HMMA members, HMC members, Murakami representatives, and another supplier who was also scheduled to present status.
3.  The meeting began with Mr. Mark McDonald (Murakami Quality Manager) presenting status of "buff" marks on the outer surface of the mirror assemblies.
4.  Mr. McDonald stated that low light levels were the root cause of the buff marks since the operators could not see buff marks and scratches and fix them during their operations. He also stated that the light levels were increased to solve the problem.
5.  Mr. McDonald then proceed to go to the next issue which he reported that was a packaging issue and lack of proper cure time (bar marks were being left on the mirrors, and he believed these were the root causes).
6.  At some point during these discussions, Mr. H.I. Kim (COO - HMMA) asked the Murakami representatives how long they had been in business. The answer was given as 60 years. Mr. Kim then asked how come the light levels were not correct at the start. The question was stated as that Murakami has been in business so long; that he wanted to know how a basic quality system item could have not been correct.
7.  During this part of the conversation, it was stated by Mr. R. Cyrus (Director Purchasing – HMMA) that all defects were not caused by Murakami, and that Glovis was the problem with the mirror defects.
8.  Mr. Cyrus also then defended the packaging concerns that Murakami was facing and stated that HMMA accepted it and that Murakami did not do any other packaging like that for any of its other customers.
9.  During this part of the conversation, Mr. Kim again stated the purpose of the meeting was to review the basic quality problems that were the responsibility of Murakami, and what they were doing about that. Mr. Kim also stated that a meeting between the parties (HMMA, Glovis, and Murakami) would be necessary to discuss and solve the issues that were stated by Mr. Cyrus.
10. Mr. Cyrus then stated something to the effect that "how can we ask a supplier to come and present the issues when we (HMMA) don't even have any data?" He also stated that we are in the process of charging Murakami with "over 200 minutes of downtime" and they are not responsible for that.
11. At some point in these discussions Mr. Cyrus was very outraged and said that "Murakami has spent 2,3,4 thousand dollars coming here to present their issues and that we need to let them speak"
12. Some time during this exchange, Mr. Glen Roberts (Assistant General Manager – Murakami) went over and picked up two mirrors violently hit them together to cause a scratch, said that this is what Glovis does, and threw the mirrors in the middle of the table.
13. Mr. Roberts then said something to the effect of "HMMA has asked us to come here and speak, and we are going to speak about what we want to speak about"
14. Mr. Kim again re-emphasized the fact that a separate meeting needed to be had by the parties to discuss the scratches and that it was not the intent of the meeting to discuss those items at this point.
15. At some point Mr. Chris Susock, stated that the concerns with the mirrors were causing HMMA downtime and repairs and that Murakami has a responsibility for that. Mr. Cyrus at some point here said "that's Bullshit".
16. I (John Kalson) interjected that "I expect the parts to be "good" out of the box and it is the responsibility of the supplier to make sure they are, and if the parts are not good, we must repair". Mr. Cyrus then said that "the operator should find the defects before the parts are installed". I said to Mr. Cyrus that "the job of the operator is not to inspect parts, that is the responsibility of the supplier, if the operators does see a defect, he will not put the part on, otherwise we have inspection process downstream that find defects, and when we find defects we must fix them". Mr. Cyrus then stated to me "that's not how Toyota does it, and let me teach you something about production systems".
17. At some point during theses ongoing exchanges (which had been going on a while now), Mr. Kim stated that this meeting cannot go on like this and ended this session immediately.

9/17/2005

0205

J. G. Kalson
Director - Production
Hyundai Motor Manufacturing Alabama
(334) 387- 8564

9/17/2005

# John Kalson 확인서

1. HMMA 품질에 영향을 주고 있는 불량 대책 발표를 위하여 미러 공급업체인 무라카미가 당사를 방문하였다.

2. HMMA 인원, HMC 인원, 무라카미 인원 및 다른 회사 인원이 회의를 참석하였다.

3. 무라카미 품질관리 부장인 Mark McDonald씨가 미러 표면의 버핑 마크 문제를 설명하면서 회의가 시작되었다.

4. McDonald씨는 작업자가 작업중 버핑 마크나 스크래치를 보기 어렵기 때문에 근본 원인이 조명이 부족하다고 설명했다. 또한 이 문제점을 개선하기 위하여 조명을 높였다고 말했다.

5. McDonald씨는 다음으로 포장 문제 및 적합하지 않은 건조 시간 부족을 설명했다. (미러 표면에 마크가 남아 있어 근본원인으로 생각하고 있었다)

6. 이 문제 협의 과정중에 김희일 공장장께서 무라카미 대표차에게 얼마동안 이 비즈니스를 하고 있느냐고 물었다. 답은 '60년'이었다. 김 공장장께서는 어떻게 처음부터 조명 레벨이 맞지 않았느냐고 물었다. 무라카미가 그렇게 오랫동안 이 비즈니스를 하고 있는데도 불구하고 어떻게 이러한 기초적인 품질 시스템 항목이 간과될수 있느냐고 질문하셨다.

7. 이 토의 과정에서 구매 담당 이사인 Cyrus씨가 모든 불량은 무라카미에 의해서 발생되지 않고 글로비스에 의해서 발생되었다고 언급하였다.

8. Cyrus씨는 무라카미가 직면하고 있는 포장 문제에 대해서 변호하면서 타 자동차회사에서는 사용한 적이 없는 포장 사양을 HMMA가 승인했다고 언급하였다.

9. 이 과정중에 김 공장장께서는 이 회의의 목적이 무라카미가 책임이 있는 기초 품질 문제와 대응방안에 대하여 검토하는 것이라고 언급하셨다. 또한 Cyrus씨가 언급한 문제에 대해서는 관련 부문간(HMMA, 글로비스, 무라카미) 별도 회의가 필요하다고 언급하셨다.

10. Cyrus씨는 데이터가 없는데 어떻게 협력업체를 불러서 발표를 시킬 수가 있냐고 하였다. 또한 무라카미에게 200분 이상의 라인정지 크레임을 부가하는 중이나 무라카미가 책임이 없다고 하였다.

11. 이 협의 과정중에 Cyrus씨는 격앙하여 무라카미는 이 문제를 발표하기 위하여 이 곳에 오기 위하여 2,3,4천 달러를 소비하였다고 하였다.

12. 이 과정중에 무라카미 세일즈 부장인 Glen Roberts씨가 두개의 미러를 심하게 쳐서 스크래치를 만들고서는 이 것이 글로비스가 하고 있는 상황이다고 하면서 테이블 중앙에 미러를 던졌습니다.

13. Roberts씨는 HMMA가 우리를 여기에 오게 해서 발표를 시켰기 때문에 우리가 말하고 싶은 것을 이야기하는 것이라는 식으로 무엇인가를 말하였다.

14. 김 공장장께서는 스크래치에 대한 별도의 회의의 필요성과 이 시점에서 이 문제를 거론하는 것은 회의의 의도가 아니라고 재 강조하셨다.

15. Chris Susock씨가 미러 불량으로 인한 라인정지 및 리페어 문제점을 거론하면서 무라카미의 책임이라고 하였다. Cyrus씨는 그 말에 답하기를 개소리(Bullshit) 라고 하였다.

16. 나(John Kalson)는 납품박스의 제품이 양품이어야 하며 그것을 보증하는 것이 업체의 책임이며, 불량일 경우에는 우리가 리페어해야 한다고 하였다. Cyrus씨는 작업자가 장착 전에 결함을 수정해야 한다고 말했다. 나는 Cyrus씨에게 작업자의 업무는 부품을 검사하는 것이 아니고 부품 품질 책임은 업체에게 있다고 하면서, 작업자가 결함을 발견하면 장착을 하지 않지만, 그렇지 않을 경우 검사공정에서 결함을 발견해서 리페어를 한다고 하였다. Cyrus씨는 나에게 그것은 토요타 방식이 아니며, 내가 생산시스템에 대하여 가르쳐 주고 싶다고 하였다.

17. 계속되는 말싸움 과정에, 김 공장장께서 이런 상태로는 더 이상 회의를 진행할 수 없어 즉시 종결한다고 말씀하셨다.

즌 갈은 보시
(번 역)

## 주간 부품 품질 회의 시 사건 (2005년 9월 1

다음은 05년 9월 16일 HMMA 주간품질회의 시 발생한 일련의 상황입니다.

1. 사이드 미러 납품업체인 무라카미는 HMMA에 출석하여 그 품질 불량에 대해 설명하라고 요청 됨.

2. 품질회의에는 HMMA, HMC, 무라카미 그리고 타 업체 관계 자들이 출석.

3. 품질 회의 첫번째로 무라카미 품질과장인 마크 맥도날드씨가 미러 외면의 "buff mark"에 대해 설명.

4. 그는 작업자들이 조명이 어두워서 스크랫치나 buff mark를 발견하지 못했으니 조명이 근본 원인이라고 말함. 이 문제를 해결하고자 조명을 더 밝게 했다고 설명.

5. 맥도날드씨는 다음 이슈로 팩킹 문제와 페인트가 마를 적절 한 시간(cure time)이 없다는 문제를 거론했으며 이런 이유 로 미러에 막대 모양 자국이 남는다고 설명.

6. 이런 토의 과정 중에 김희일 이사가 무라카미는 얼마나 오랫동안 이 비지니스를 했느냐고 질문. 60년이라고 답변. 그러자 김 이사는 왜 처음부터 조명이 적절하지 못했냐고 문의. 질문의 요점은 무라카미가 그렇게 오랫동안 사업을 했으면서도 왜 그런 기본적인 품질 확보 시스템도 없었느냐는 것이었음.

7. 이런 일련의 토의 와중에 랍 사이러스는 미러 불량의 원인은 무라카미에 있는 것이 아니라 글로비스에 있다고 말함.

8. 랍은 팩킹 문제에 대해 무라카미를 옹호했으며 HMMA가 그런 팩킹을 인정했기에 다른 납품처에 하는 것과 같은 팩킹을 하지 않았다고 말함.

9. 토의 중에 김 이사는 이 회의의 목적은 무라카미가 책임져야 하는 근본적인 품질 문제를 검토하는 것이라고 말함. 또 그는 랍이 제기한 문제에 대해서는 HMMA, 글로비스 그리고 무라카미가 별도로 모여 회의를 하자고 말함.

10. 그러자 랍은 "HMMA가 확실한 데이타도 없이 업체를 불러 품질 문제를 설명하라고 요구할 수 가 있느냐?"라고 말함. 그는 또한 우리는 지금 무라카미에게 무려 200분 이상

의 시간을 비생산적인 활동에 허비하게 만들고 있으며 이에

대해 무라카미는 책임이 없다고 말함.

11.     이런 토론 중에 랍은 격분하여 " 무라카미는 여기 오

는 데 무려 2,3,4천달러를 소비하고 있으므로 그들이 이야기

하고 싶은 것을 말하도록 기회를 줘야 한다"고 말함.

12.     이런 토론 중에 무라카미의 차장인 글렌 로버트는 두

개의 미러를 집어서 난폭하게 부딪혀 스크랫치를 내고 이

것이 글로비스가 하는 일이라고 말하고 미러를 탁자 중앙에

던짐.

13.     그러고서 글렌 로버트는 HMMA가 우리를 여기에 오

라 해서 왔으니 할 말을 해야겠다고 말함.

14.     김 이사는 스크랫치 문제는 이번 회의의 의제가 아니

니 당사자간 별도 회의를 가져야 한다고 다시 강조.

15.     토의 중에 크리스 수석은 미러의 품질 문제 때문에

HMMA가 조업 중단되고 리페어하게 있으므로 무라카미가

책임져야 한다고 말함. 랍 사이러스는 여기서 "그것은

bullshit(과장된 헛소리)하고 말함.

16.     본인(존 칼슨)은 이 대목에서 "나는 미러를 포장 상자

에서 꺼낼 때 온전한 상태여야 하며 온전치 못하다면 무라카미가 책임을 지고 수리해야 한다"라고 말함. 이에 랍은 "작업자가 정착 전에 미러를 검사해야 하고 만약 불량품이 있으면 장착하지 말아야 한다. 또 후속 검사 과정이 있으니 그때 불량을 발견하면 수리하면 된다"라고 말함. 그러면서 랍은 생산에 대해 나에게 한 수 가르쳐 준다면서 도요다에서는 그런 방식으로 한다고 말함.

17.     이런 한동안 계속되었던 일련의 토의를 지켜보던 김 이사는 이런 식으로는 회의가 안된다면서 즉시 회의 종료를 선언.


제 의견은 무라카미가 공손히 행동하지는 않았다는 것임. 모든 무라카미 측 참석자들은 프로페셔날하게 자신을 옹호했음. 그들은 그들이 HMMA에 문제를 야기하고 있다는 점을 인정하지 않았음.

또한 HMMA구매팀의 행동에 대해서도 당혹했음. 그들은 마치 서플라이어를 위해 일하는 것 같음. 제 생각은 우리 HMMA가 옳든 그르든 간에 우리는 항상 하나로 뭉쳐야 한다는 것임.

마지막으로 그런 전쟁과 같은 회의에서 김 이사의 행동에 대해 존경함. 그는 침착했고 무라카미가 제 위치로 돌아가 말할 수 있도록 하기 위해 여러 번 시도 했음. 그러나 최종적으로 더 이상 희망이 없다고 판단되자 그는 즉시 회의를 종료 시켰음.

존 칼슨

# 4

| | Mgr | Sr. Mgr | HOD |
|---|---|---|---|
| | 9/16/05 | | |

**Production Control Team**

**Inter Office Memo**

PAGE 1 OF 1

| **Murakami Meeting - September 16th** | Date:    9/16/2005 |
|---|---|

A meeting was convened with Murakami to discuss current quality issues. There had recently been a large number of rejects which had caused 200 minutes of downtime on the door line. Murakami had flown down with three representatives from the plant, Senior vice president, Sales Manager and Quality Manager.

The meeting began by Murakami explaining there curing process and the problem with packaging with the part had not fully cured. This has been creating a bag mark on the parts. The cause they believed is the packaging which touches the A class visible surface. It was requested that they change the pack from a vertical tote that contains 5 parts to either a rack which holds 48 or a tote that holds 3 parts in an horizontal alignment. Due to sequencing space concerns Harry Chase rejected the rack in favor of the pack containing 3 parts which is currently being utilized by Toyota.

The meeting was then redirected to comment on the experience of Murakami by Mr. Kim. Murakami explained that they had 60 years experience with Japanese companies and many transplants in the States. There was minor discussion on the lighting levels at Murakami in the packing area.

The direction of the meeting changed when Murakami insisted that the recent rejection of parts was not caused by them but by handling at Glovis which provides sequencing for HMMA. It was also commented that 89% of the rejected mirrors being rejected, by Glovis subcontractor QLS, were of satisfactory quality. Mr. Kim asked that the topic of the meeting be discussed and not other external factors. He requested that Murakami explain there quality system and how they were addressing their issues that were creating problems at HMMA. At this juncture the Sales Manager requested that the reason was not Murakami but Glovis and wanted the Quality Manager to finish. Mr. Kim requested that we focus on the issue and a meeting could be held later with operational staff to resolve these issues. Murakami became irate and the sales manger raised his voice in an unprofessional manner and began to protest. He grabbed 2 mirrors to demonstrate how they could be damaged. Mr. Kim again requested that Murakami focus on their issues and not other topics. Parts development became involved and believed that Murakami should be able to explain their side as this was the reason for them being charged 200 minutes of down time. They pointed out that they had spent 3 to 4 thousands dollars to come to HMMA and should be able to explain. Again Mr. Kim insisted that they remain on the task.

The meeting ended at the request of Mr. Kim after heated discussion between Parts Development, Quality and Production.

# 주간 납품업체 회의 기록

Harry Chase, PC Manager

9/16/05

이 회의는 Murakami의 현 품질 문제를 협의 하기 위한 것이었다. 최근에 약 200분의 라인정지를 야기시킨 문제가 발생했고 Murakami은 새사람의 고위 간부가 비행기로 날라왔다.

이 회의는 포장문제에 관한 조사를 설명하는 것으로 시작됐다. 원인은 포장이 미러를 터치하는 것으로 규정됐고 정량을 5개 에서 48개의 팩이든지 아니면 3개짜리로 바꾸도록 요청되었으나 서열 상의 문제로 본인 Harry는 거절했다.

회의는 Murakami의 전등에 관한 문제와 관련된 공정관리 경험의 문제로 공장장님에 의해 재 조명됐다.

이 회의의 방향은 Murakami의 잘못이 없고 Glovis의 잘못이라는 주장으로 다른 곳으로 가버렸다. Murakami는 Glovis의 3자 용역업자인 QLS의 미러 불량품 중 89%가 사실은 합격품이다라고 했다. 공장장님은 이 회의의 본의는 불량품의 공정상의 원인과 재발 방지 대책의 협의에 있으며 상기 언급사항은 추후 별도 실무자와의 협의를 통해 해결하고자 상기 시켰을 때 Murakami의 간부는 분노해서 언성을 높였으며 비 전문가적인 행태로 항의 했다. 상기 Murakami 간부는 미러 2개를 집어 들고 긁힘이 어떻게 생기는지를 보여주었다.

공장장님은 본회의의 주제를 재삼 상기시켰다. 구매는 이에 가담해서 Murakami 의 의견을 들어 주어야 한다고 했다. Murakami 는 3 에서 4천불의 경비를 들여 현대에 왔기에 가기 의견을 발표 해야 한다고 했다. 공장장님은 회의 안건에 주목하길 요청하셨다.

이 회의는 구매와 품질과 생산의 격앙된 회의 끝에 끝났다.

#5

# 9월 2차 품질회의 시(9월16일 10:00~) 발생 상황 보고

(품질회의 품질회의시 ,2005.9.16, 발생된 상황입니다. 품질보증 박승도 부장)

## 1. 문제 내용

이웃 사이드 미리 하우징 바깥 마그/크레이타/스크래치 문제로 생산 자질 및 품질 문제 발생

## 2. 품질 문제 개선 대책 발표

부품 품질회의 8,9월 부품 불량으로 인한 생산 라인 중단 활동을 부품 검수에서 발표하고 분회의 의 제인 이웃사이드 미리 열제인 무라까미의 상기 문제에 대한 대책 발표가 시작되었음

1) 무라까미 현지인(발표자:품질담당 매니저)
청삼 및 대책 설명 중 스크래치 문제는 품질보증의 시 발생된 문제임을 참조

2) 공장장(김성일 이사)
무라까미가 아웃사이드 미리 생산 경험과 타 업체 납품 실적 질문

3) 무라까미 일본인
60년 되었고 미국의 도요타 및 닛산에 납품하고 있다고 답변

4) 공장장(김성일 이사)
생산 경험이 많고 도요타 등 타 업체에 납품한다면서 왜 현대 부품에는 품질관리를 소흘히 했거나
업체의 품질 시스템에 문제가 있지 않느냐고 질문

5) HMMA 구매 담당 이사(ROB)
부담한다고 품질보스가 지켜지고서 발생된 소크래치 발생품의 사진을
들리면서 무라까미에게 현재로 부당성과 문제점의 무급의를 주장

6) 공장장(김효일 이사)
반제 문제와 같은 문제로 부품은 품질회의 후 별도로 할 수 있으며 함리적으로 처리할 예정이니
업체가 발생시킨 품질문제에 전념하고 회의 속개를 지시

7) HMMA 구매 담당 이사(ROB)
계속 스크랩을 문제로 인을 한다면서 무리까지가 대책 발표함은 부담하며, 업체에서
회의 주선을 위해 수준 높이 교통비를 소요하면서 참석했다고 업체 입장 대변

8) 구매 주재원(조영은 부장)
품질회의 안건에 대한 부담을 설명 및 추후 안건 선정 통보 시 좀더 구체적인 분석을 요청

9) 공장장(김효일 이사)
하의 업체 입장 옹호

10) 공장장(김효일 이사)
다시 한번 품질회의의 취지를 설명하고 분회의의 목적은 공장 가동을 함한과 품질확보를
위한 회의이므로 품질문제에 충실하고 호소

11) 무라까미 현지인(세일지 메니저)
구매담당 이사의 ROB과 대화 후 미리 두개를 들고 소리치면서 타 업체의 핸들을
과정에서 발생되는 스크래치 발생 상황을 재연하면서 회의 탁자에 무례하게 쿵 소리가
나도록 놓으면서 회의분위기가 상당히 이수선하여 회의 진행이 어려움

공장장(김효일 이사)
HMMA 구매 책무장에게 언성을 높이면서 수 차례 회의를 자제를 요청하여 회의를 진행하고자
했으나 ROB과 담신은 업체 대변하라 있느냐며 이와 같은 분위기에서는 품질회의 더 이상
진행이 불가하므로 회의 중단 선언 후 보고 있던 품질회의 파일을 탁자에 세게 집어 중 소리가
나면서 퇴장

0217

0218

# ■ Presentation Topics for the week of 9/16/2005

| Supplier | Part Name | Nonconformity | Occurrence | Issue Type | Presentation Time |
|---|---|---|---|---|---|
| Murakami | Outside mirror | Paint issues (Polishing mark, Crater, Scratches) | 341 | Downtime (Door line) | 20 Min. |
| | | Poor heat staking of inside bush nut (Wind noise) | 2 | Test track | |
| Hwashin | Package tray panel | Oil contamination (Crater) | 100 % | Paint shop | 20 Min. |
| | | Stamping Split | 6 | Body shop | |
| | | Subwoofer weldnuts misaligned | 25 | GA (T3) | 10 Min. |



MMUS

Murakami Manufacturing USA, Inc.
Campbellsville, KY

# NF Outer Mirror Assembly Countermeasure Report

DATE REPORTED : 09/16/2005

# Buff Marks

**DESCRIPTION OF PROBLEM :**

Parts with paint buff marks found at HMMA assembly line.

**ROOT CAUSE OF NON-CONFORMANCE :**

Uncompleted buff finishing was performed under insufficient lightening (1,000 lux)

**COUNTERMEASURE :**

- Additional lighting installed (2,500 lux) into buff area
  Lighting check sheet created
- Check before operation on 1st and 2nd shifts using lighting meter
- Lighting criteria : more than 2,500 lux
- Effective date : Sep.14, 2005

**METHOD OF COUNTERMESURE EFFECT (RESULT) :**

100 % Inspection of all assemblies prior to shipping to HMMA.

**REFLECTION TO NEW MODEL :**

The countermeasure is included in CM process launched in April, 2006

0220



0221

0222

4/7

# Bag Marks

## DESCRIPTION OF PROBLEM :

Parts with paint bag marks found at HMMA assembly line.

## ROOT CAUSE OF NON-CONFORMANCE :

The paint bag mark is caused by protective bag being imprinted into the paint after leaving MMUS (dark colors only).

Root cause:

1. Insufficient paint cure time (2~4 hrs – after EC change to Housing).
2. Container design (vertical position & rough dunnage).

## COUNTERMEASURES IMPLEMENTED :

- Stabilized curing time (7/25/05)
- New type of protective bag (8/7/05)
- Currently packaging all dark colors outside of the dunnage and protecting part with bubble wrap (extra time & cost).

## REFLECTION TO NEW MODEL :

For CM program, different type of part container / dunnage will be proposed.

0223

# Bag Mark

## Permanent countermeasure :

- Container & Dunnage should be modified.



Container & Dunnage currently used by another customer



Current NF Container & Dunnage

5/7

0224

# Poor Heat Staking

## Permanent Countermeasure:

Engineering Change to eliminate heat staking process



0225

# Poor Heat Staking of Inside Bush Nut

* Root cause of non-conformance:
  1) Machine malfunction  2) Miss-operation (human error)

* Temporary Countermeasure :

1) Operator verification – Mark a Dot on cover-base to ensure the heat stake process is complete
   - First the operator at heat stake process marks a dot on cover-base after the process then the next operator verifies the heat stake condition is acceptable and marks the part ( on cover-base) (1st operator 8/15/05) (2nd / audit operator 9/15/05)

2) Machine check – Increased frequency of machine function check
   - Check 2 times a day ( start & end of shift) (9/14/05)

* Permanent countermeasure :
   - Heat Staking Process to be eliminated by introducing the elimination of Bracket and Bracket A (Engineering Change).

6/7

0226

# Package Tray Oil Current Status

**1. Current Production**
Parts are cleaned with HMMA provided alcohol before assembly.

**2. Further Analysis Sample**

1) Package Tray Assembly samples
  -. 4 samples were submitted to HMMA Paint shop on 9/14/05.
  (1 made-up too much oil, 1 with no wipe out, 2 completely clean)

2) Antirust Oil
  -. Oil specification: VP 101 (Bumwoo)
  -. Couldn't get sample from Korea: Prohibited for shipping.
  Asked HMC help for analysis.

0227

**Nature of cracks in the past (August production)**







0228

# Hwashin Package Tray Center Production-September 9, 2005

❑ Package Tray Center production was made on September 9 at Hwashin. Hwashin and HMC Stamping Engineers adjusted die to cope with present neck and crack issue since there was no other blanks were available.

❑ Blank Lot No: S05800969A
❑ Coil Lot No: CSNF300BA and AB
❑ Total production at 13:30: 1,573 sheets
❑ Total failure: 48 (36 near speaker hole, 12 other side)



All of these form area were adjusted by HMC and Hwashin On September 7, 2005

No necks or cracks at the upper form area.
This area had cracks at last production.
(Refer to the attached for the past issues.)



36 failures happened at same locations as shown.
12 failures happened at the other side with wave.

# NF Corrective Action Report

## HMMA Part Quality

| Quality Issues | Action Plan |
|---|---|
| | Temporary:24 hrs, Permanent:5 business days |

**Picture:**



2nd Bolt Tight

1ST Bolt 2/3 Tight

Problem: Cross Threading Weld Nuts During Bolt Installation for Subwoofer Speakers

**Quantity: 25 times in 2 nights Repeat issue**

Date: 09/15/2005

Part Name: Rear Package Tray

Supplier: Hwashin/Glovis/Delphi

**Nut location:**
Weld nuts are in correct hole pattern alignment

**Root Cause:** Current Bolt has a flat end with no lead in threads or no centering or thread/paint cutting capabilities.

**Countermeasure:**
Temporary: Use 11251-06203 thread/paint cutting bolt 8mm for subwoofer speaker only. Approve Management Deviation NF-PQ-09-001

**Permanent:** Change to 11251-06203 for both subwoofer speaker and plastic cover. Request change to clearance holes in subwoofer gasket

Effective Date: Upon receipt of additional inventory

Part No./EO No./Lot No 11293-06203

Prepared by: David Blackburn

0280



Prior to Bolt Installation – Subwoofer sits flat

0231



After 1st Bolt Installed – Subwoofer angled

0232



Starting Bolt Installation – Driver not perpendicular

0233

In an effort to make the subwoofer installation easier to align, it has been requested that the bolt on the right replace the bolt on the left to aid in the starting of the threads



Recommended Bolt 11251-0603

Current Bolt (11293-06203)



Subwoofer gasket shadowing hole.

# Management Deviation(MD) Form

| Process/Part Name | 8mm Bolt for subwoofer assembly to package tray T3 01L | | Prepared By | David Blackburn | | | Manager | Director | Managing Director |
|---|---|---|---|---|---|---|---|---|---|
| Process/Part No. | 11293-06203 | | Prepared Date | 9/15/2005 | Preparer's : | | / / | / / | / / |
| Car Model | NF | | Supplier | Glovis | Concerned Vehicle Quantity | Criticality | / / | / / | / / |

Application Term for M/D part / process

Current Model: From 09.15.2005, To

New Model: From . . To .

T1, T2, M1(Preliminary Production), M2, Initial MP(Mass Production)

**Issue:**  Operator is crossthreading/stripping the weldnut when installing subwoofer to the rear package tray

**Reason for Deviation:**  Elimination of damage to subwoofer weldnut in package tray

**Improvement Plan:**  Change BOM and process sheets to change of from current 8mm bolt(11293-06203) to PN 11251-06203 thread cutting bolt.
Elimination of part number.
Elimination of downtime for damaged weld nuts.

**Temporary action before regular part/process application:**  Use PN 11251-06203

**Action for After-sales service:**  No after sales service is required.

| | Initial Approval | | | Checked | | | Final Approval | |
|---|---|---|---|---|---|---|---|---|
| Approval | Quality Control Sr. Manager | PQ Mgr. (Parts) or QA Mgr. (Process) | Assembly Process Owner Sr. Mgr. | Process Engineering | R&D Manager or Director | Director Production | Director, Quality |
| | ☐ Approved ☐ Rejected | ☐ Approved ☐ Rejected | ☐ Approved ☐ Rejected | ☐ Approved ☐ Rejected | ☐ Approved ☐ Rejected | ☐ Approved ☐ Rejected | ☐ Approved ☐ Rejected |
| Sign | | | | | | | |
| Reason for approval or reject | | | | | | | |

Criticality: ☐ Safety ☐ Complaint ☐ Customer ☐ Critical  X Other

Control No.   MD - NF - 09 - PQ - 001

1. Use additional paper for different parts with the same issue
2. Design Director's review needed for the part manufactured by X-drawing.
3. Obtain a sequential Control No. from a Part Quality AM (part issues) or QA AM (process/equipment issues)
Note:  Assign the number after reviewing with Part Quality or Quality Assurance Assistant Manager

0235

# 6

## 9월 3주차 부품 품질회의 상황 보고서

일시:2005년 9월 16일 10:00~11;00AM
장소:HMMA 의장동 1층 알라바룸
보고자:HMMA 품질관리팀 부장 곽석구  *A. Kwak*
상황:HMMA 9월 3주차 부품 품질회의시 비정상적인 상황발생

내용
1.  상기 일시, 장소에서 HMMA 품질관리팀(부품검사과)주관 정례 품질회의인 9월3주차 정기 부품 품질회의가 진행되고 있었는데 본인은 9시부터 진행된 신입사원 채용 인터뷰가 있어 약15분 가량 늦은시각에 참석함.

2.  당시, 첫번째 안건인 무라카미사 아웃사이드 미러의 Scratch문제중 Bag Mark에 대한 대책 발표가 진행되고 있었는데 스크레치에 관한 개선사항으로 전용 용기에 담아 운송하고 있다는 내용을 발표하면서 '글로비스에서 취급상 부주의한 점'을 강하게 불만하는 발언이 있었으며 회의 주관자인 김회일 공장장이 '그런 문제가 있을 수도 있지만 본 회의의 근본 목적이 ①양산공장의 가동을 저해요인 제거, ②완성차의 완벽품질을 위한 부품 품질 향상인 바 주제에 맞는 큰 틀의 방향에 대한 협의를 하고 마이너한 문제 즉, 취급 부주의한 문제 등은 실무자간 별도 협의를 하여 해결토록 하자는 제언으로 회의 속개 됨.

3.  다시 본론으로 들어가 무라카미사의 전등 밝기 문제를 거론하는 과정에 2,500Lux로 바뀐 장소가 작업장이 아닌 제품 상차장이라는 설명이 있었고 다시 스크레치 관련 문제점이 거론 되면서 글로비스의 지게차 실수로 인한 핸들링 잘못이 화제에 올랐으며 구매부문의 랍 사이러스가 강하게 불만함.

4.  이에 김회일 공장장이 글로비스CC 책임자를 회의에 참석하도록 지시하였고 이에 글로비스 직원이 급히 최부장에게 연락을 취하러 밖으로 나감. 이어 김회일 공장장이 본 회의의 목적 및 추진 방향(즉 가동율 향상으로 생산성을 올려야 하는 HMMA의 입장, 부품 품질의 향상을 위하여 전 부품업체가 협력해주길 바라는 목적에서 문제 발생분에 대한 Review 차원의 본 회의 취지)에 대하여 재삼 강조함.

5.  이때 정 중앙에 앉아있던 무라카미사의 한 담당자가 포장된 아웃사이드 미러(신품)를 회의실 뒤편에서 가지고 나와 2개를 꺼내어 모든 회중이 보는 앞에서 날카로운 장착볼트 부위와 아웃사이드 미러 베이스면을 두들겨(소리도 컸지만 외관이 날카로운 볼트에 찍혀)심하게 손상이 발생토록하는 항의성 Performance가 있어 회의실에 있던 많은 사람이 당황하게 됨.

6.  김회일 공장장이 차분한 목소리로 '무슨 행동이냐?'고 묻고 무라카미측에서는 '정성껏 철저히 포장하여 납품해도 방금 본것 처럼 취급한다면 어떻게 좋은제품을 공급할 수 있겠느냐'고 항의하는 답변이 있었음. 이에 다시 본 회의의 목적과 부품 품질 향상에 대한 대책 수립에 초점을 맞추도록 하자는 김회일 공장장의 설명으로 회의는 다시 속개 됨.

7. 이때 랍 사이러스가 '무라카미사의 담당자들은 본 회의에 참석하기 위하여 수천 달러의 비용을 들여 이곳 몽고메리에 왔고 숙박하며 회의에 참석했는데 그 비용은 누구 책임이냐?'며 '안건선정의 문제'를 항의하는 상황으로 이어지게 되었음.

8. 계속하여 구매부문의 최부장과 랍 사이러스, 무라카미사의 참석자 간 내부 협의가 계속되고안건 선정에 대한 불만 내용이 표출되어 회의 진행 어려워 짐.

9  본인은 오후 1시에 계획되어 있는 HMMA주간 품질회의 준비상태 확인을 위하여 잠시 2층 사무실에 올라와 담당자와 회의 준비상태를 점검하던 중 김회일 공장장과 구매부문 최정연부장이 같이 올라오는 것을 목격(1층에서 진행되던 부품품질회의가 비정상적인 상황으로 이어지게 되었음을 감지)하고 계속하여 HMMA주간 품질회의 준비를 하느라 이후 상황은 정확히 감지 어려움.                =끝=


상황 진술자 : 품질관리팀 부장 곽석구.
            2005년 9월 16일

#7

---

# INTEROFFICE MEMORANDUM

---

TO:      COO MR. H. I. KIM

FROM:    JASON CHI /MANAGER, PARTS QUALITY          서경순

SUBJECT: ACCOUNTS ON WEEKLY PARTS QUALITY REVIEW MEETING OF 9/16/05

DATE:    9/17/2005

         [ENGLISH/한글 VERSION]

---

## Background

The Weekly Parts Quality Review Meeting was initiated by COO Mr. Kim on 9/7/05 in an effort to resolve major quality problems from suppliers that had resulted in to HMMA line downtime with repeated occurrence.

| | |
|---|---|
| When: | 10:00 AM to 11:30 AM Every Friday |
| Where: | Alabama Room |
| Chaired by: | H.I. Kim, COO |
| Regular Attendees: | John Kalson, Director of Manufacturing |
| | Simon Sung, Sr. Manager of Parts Development |
| | Rob Cyrus, Director of Parts Management |
| | Chuck Knowles, Manager of Parts Management |
| | Chris Susock, Sr. Manager of Quality Control |
| | Danny Seo, Sr. Manager of Parts Quality. |

The parts quality issues are notified to suppliers immediately at the occurrence of the issues using Corrective Action Request form which requires a temporary countermeasure reply within 24 hours followed by permanent countermeasure reply. The request to attend the review meeting is typically notified no later than 48 hours prior the meeting.

For the week of 9/16, Murakami on Side Mirror Paint Issues and Hwashin on Package Tray Oil Contamination and Split were requested to attend the meeting. The quality

30   issues of both suppliers were repeated and pending over 4 weeks.

31

32

## The Retrospect Minutes of the Meeting

34

35   The weekly meeting was started as normal. All HMMA executives and the suppliers'
36   representatives were arrived on time. First, Pareto analysis of overall downtime and
37   repeated problems by suppliers for the month of August and first two weeks of
38   September was reviewed. Then, the issues of Murakami were discussed.

39

40   COO Kim asked Sr. Vice President of Murakami, Komatsu-san, why Murakami such a
41   supplier with over 60 years of experience of mirror business could make defects like buff
42   marks and bag marks? These are fundamental quality system issues.

43

44   Rob interjected and stated that all defects are not created by Murakami and in fact,
45   Glovis made many defects such as scratches on the mirror by handling mistakes.
46   Rob also stated to Harry Chase, PC Manager that HMMA PC accepted Murakami's
47   packaging design and now PC says the design is No Good (exchanged with Harry for
48   more statements defending Murakami).

49

50   COO Kim reminded that the purpose of this meeting is to review the major supplier's
51   quality problems and counter-measure not to repeat the problems. COO Kim asked again
52   to Komatsu-san how and why Murakami did not know that a simple insufficient lightening
53   at packaging causes buff marks and cure time is required more than 3 hours before
54   shipping the mirrors.

55

56   Rob again interjected the questions from COO and stated that 200 minutes of downtime
57   charged to Murakami is not accurate and much of time should have been charged to
58   Glovis.

59

60   COO Kim reminded the participants that the purpose of the meeting is to review the
61   major quality issues created by suppliers and their counter measure plan. There can be

0239

62  some calculation errors on downtime. Those errors can be worked out in working level
63  discussion. This meeting is to discuss more fundamental and systemic major quality
64  issues.
65

66  Rob stated that accurate downtime is the root of the issue. Murakami has right to speak
67  what they want and PQ should have been clear on downtime of Glovis and Murakami.
68

69  Chris Susock, Sr. Manager of QC stated to Rob that PQ has already calculated down time
70  to the best of ability and Buffing marks issue is real and we need to stick to the issue and
71  200 minutes down time is irrelevant at this point.
72

73  Rob sated back to Chris "Bull Sh__s!"
74

75  COO Kim reminded again the purpose of this meeting. At this point, Glenn Roberts,
76  General Manager in Sales of Murakami, stand up without permission from his chair in
77  agitated mode and grabbed two mirror samples from parts container and threw onto the
78  meeting table and banged each other and stated "I'll talk and discuss what I want to
79  discuss and that's reason for that I came down here." He went on to explain how many
80  scratched mirrors that he is getting from Hyundai.
81

82  COO Kim stated that scratches on the mirror are not that I'm concerned about today with
83  Murakami. As far as scratches on the mirrors are concerned, I would like to resolve in
84  working level after this meeting. The concern that I have today is the buffing on the
85  mirrors. This requires an extensive repair by HMMA members and therefore, I would like
86  to charge back to all incurred cost of repairs by HMMA members to Murakami.
87

88  Rob interjected by saying "That too is case by case. I don't believe HMMA is repairing
89  the mirrors since many mirror are being returned to Murakami."
90

91  John Kalson, Director of production, stated that the repair is either being done on-line or
92  off-line. Rob stated "Is this Toyota way to pass on the defects to next customers?"
93

0240

94   John Kalson stated "Toyota way or not, it is the fact we have to repair them all by HMMA
95   members."
96
97   COO Mr. Kim, at this point, ended the review meeting stating in Korean "How can I run
98   this meeting when our own Purchasing is siding with suppliers on the quality problems?"
99
100  As COO Mr. Kim left the room, John Kalson chaired the rest of review meeting with
101  Hwashin to end.
102
103

104                                    Personal Opinion
105
106  I think Rob could have discussed the downtime issue against Murakami mirrors directly
107  with COO Kim before or after the meeting. This is the reason that well-prepared meeting
108  had to be ended in disrupted manner.   The behavior of Glenn Roberts of Murakami was
109  not acceptable as a supplier that supplied the defective parts HMMA line and came to
110  review the problem. As a result of the disrupted meeting, HMMA had lost chance to
111  discuss and plan to resolve the issues of NF side mirror buffing, heat staking, and scratch
112  related downtime.
113

114

115                                          배경
116
117  주간 부품 품질 점검 회의는 HMMA 생산 효율에 지대한 영향을 미치는 부품 불량률을 향상 시키
118  고자 하는 취지에서 공장장, 김 이사님의 지시에 의거 9월 7일부터 첫 회의가 시작됐고 공장장님
119  이 직접 회의를 주제 해 오셨다.
120
121                              [구체적 회의 구성은 영문판 참조]
122
123  불량 부품의 업체 통보는 CAR를 사용 발생 즉시 전송되며, 업체는 24시간 내로 임시 대책서와
124  영구 대책서의 계획을 부품 검수과에 제출할 의무를 갖는다. 회의 참석 요망 업체는 회의 당일로
125  부터 최소 48시간 이전에 통보되고 있다.
126
127  9월 16 일의 회의에 참석한 업체로 Murakami와 화신으로 결정되었고 이 업체의 불량 부품문제
128  는 다수의 재발과 영구적인 대책의 부재가 그 결정 이유였다.
129

0241

130
131                              회고적 회의록
132
133   회의는 정상적으로 시작되었다. 참석 예정인 현대의 간부 사원들과 업체 직원 들이 모두 참석했
134   다. 우선, 업체 별 불량률과 불량에 의한 라인정지 현황이 보고 됐다.
135
136   공장장께서 Murakami 부사장에게 60년의 경험을 갖은 회사가 buffing 이나 bag mark와 같은
137   기본적인 품질체계의 문제를 야기시키는가라는 질문을 던졌다.
138
139   Rob은 이 질문을 가로 채서 언급된 불량품 모두가 Murakami의 잘못은 아니다. Glovis가 상당량
140   의 긁힘 불량의 책임이 있다. Rob은 PC 의 manager 인 Harry 에게 PC 가 Murakami의 포장 설
141   계를 승인 했으나 이제 와서 재 설계를 요청하고 있다. (Rob과 Harry는 좀더 의견을 주고 받음).
142
143   공장장님은 본 회의의 주 목적은 주요 불량 부품의 조사 자료 검토와 재발 방지를 위한 대책 수립
144   에 있음을 상기 시켰다. 공장장님은 Murakami 부사장에게 어떻게 해서 포장 실내의 전등의 밝기
145   와 도장의 경화가 3 시간 넘게 걸린다는 극히 기본적인 것이 문제가 돼서 불량품을 낼 수 있는가
146   라고 질문을 했다.
147
148   Rob은 또 질문을 가로채서 200 분으로 되어있는 라인정지는 정확하지 않고 상당 분은 Glovis에
149   분할되어야 한다 라고 언급했다.
150
151   공장장님은 본회의의 취지를 재차 상기 시켰다. 라인정지 시간의 계산시 얼마간의 오차가 날 수
152   있고 그 것은 실무진 선에서 의논 해결 하길 바란다고 했다.
153
154   Rob은 정확한 라인정지 계산이 근본적인 문제이다. Murakami는 이 문제를 의논할 권리가 있고
155   부품 검수부는 라인 정지 시간을 정확히 계산 했어야 했다.
156
157   Chris 는 이에 검수부는 주어진 자료로 최선을 다해 라인 정지 시간을 계산 했고 Buffing 이 진정
158   한 문제이고 이 문제에 회의의 초점을 맞추어야 하고 라인 정지 시간은 본회의의 주제와는 무관
159   하다고 말했다.
160
161   Rob은 Chris에게 "그 것은 개소리, Bull shits"
162
163   공장장님은 회의 취지를 재차 상기 시켰다. 이 때 Murakami의 부장이 상기된 모습으로 자리에서
164   일어나 미러 2개를 들어 공중에서 심하게 부딪치고는 공장장님 앞 탁자에 던지다시피 올리면서
165   이래서 긁힘이 발생하고 Glovis에서 대량으로 미러가 회수되고 있다고 했다.
166
167   공장장님은 미러의 긁힘은 이 회의의 주요 안건은 아니다. 이 회의 이후 별도의 실무진의 회의를
168   통해 해결 하길 바라고 Buffing으로 인한 수리가 엄청나고 이에 들어간 수리 비용을 Murakami에
169   청구 하고 싶다.
170
171   Rob은 이 질문을 가로채서 "그 것도 경우에 따라서 틀리다. HMMA 가 그토록 많은 양의 미러를
172   수리 한다고 볼 수는 없다. 왜냐 하면, 아직도 많은 양의 미러가 Murakami로 회수되고 있다.
173
174   John Kalson은 미러 수리는 현재 온라인 오프라인에서 진행되고 있는 것이 사실이다. Rob 은 그
175   것이 도요타 방식인가? 불량품을 다음 라인으로 넘기는 것이? John 은 도요타 방식이든 아니든,
176   HMMA는 수리를 해야 한다고 했다.

0242

177
178  이 시점에서 공장장님은 한국어로 이렇게 구매에서 업체 편을 들어주면 어떻게 이 회의를 진행
179  할 수 있는가라고 하시고 회의장을 떠나셨다. 이 후 회의는 John 이 끝까지 진행했다.
180
181

## 개인의견

182
183
184  Rob은 라인정지 시간에 관한 의견 점을 회의 이 후, 별도의 회의로서 (회의 전 Murakami 부장에
185  게 라인정지 시간에 관한 별도의 회의를 통보했음). 그의 계속적인 회의 주제에서 어긋난 질문과
186  문란한 언사로 인해 미러 Buffing 과 미러 장착부의 열 부착 처리 불량에 관한 조사 및 대책에 대
187  한 회의가 불가했다. Murakami 부장의 행태는 불량을 낸 납품업체의 관련 직원으로서 미국 품질
188  관련 업체간의 관례에 크게 위배되었다고 본다.
189
190
191

0243

*Chris Susock,*
*Sr. Mgr. QC*
*# β*

September 16, 2005

Weekly Supplier Quality Meeting:

Observational account of the facts of this event:

This meeting was hosted by the Part Quality team of the Quality Control department and was chaired by COO Mr. H.I. Kim.

HMMA executive management attendees were Production Director John Kalson, Purchasing Director Rob Cyrus, and Quality Director S.G. Kwak. Several other HMMA salaried members were also in attendance along with other supplier representatives.

The meeting opened with the Murakami Manufacturing Company to discuss the quality issue of Buff Marks on the outside mirror commodity that they supply to HMMA.

Murakami Quality Control Manager began to discuss the issue of the Buff Marks and explain the reasons of which they believe may have caused this issue.

Rob Cyrus interjected and stated that he had a pre-meeting with Murakami and that they concluded that due to an EO change that limited there curing time to 3 hours was insufficient and that the designed packaging caused the buff marks to the product. He also concluded that the packaging should be changed.

Harry Chase, Manager of Production Control department stated that the packaging was designed by Murakami and that they were responsible for the results.

Rob Cyrus stated that that may have been true, but it now needs to be changed.

Harry reiterated that that is still a Murakami issue they own the packaging design but we will work with them.

Mr. Kim interjected and inquired by asking the Sr. VP of Murakami Mr. Komatsu-san how many years has Murakami been in business and who some of there other customers that they provided for. He had also asked that with 60 years of experience that they had, how could they have such basic quality issues like Buff Marks to be supplied to HMMA? This is a basic quality system issue.

Rob Cyrus replied for Mr. Komatsu-san and stated that Murakami was not the problem for all the issues that cause 200 minutes of downtime in General Assembly and that much of the mirror problems are caused by Glovis handling.

At this time Mr. Kim attempted to get the meeting back on track and stated that the purpose of this meeting is to review major supplier problems identified and for the supplier to address those problems that they can control and that we can be assured they

0244

will not repeat. Mr. Kim had also inquire to Mr. Komatsu-san how Murakami could not know that insufficient lighting, curing time and packaging could cause these types of quality issues and not be detected or tested adequately in their quality system.

Rob Cyrus then interrupted by stating that there is much more on today's agenda to discuss then the buff marks, that why don't we discuss the 200 minutes of downtime that Murakami is being blamed for and there is insufficient data to substantiate that they are the major source of the problem that GA is experiencing with the mirrors.

I myself then interceded by telling Rob that the Buffing Marks quality issue is real and that we need to stick to this issue, the 200 minutes of downtime is irrelevant at this point and that the Buffing Mark quality issue is real.

Rob stated that this is "Bullshit" and that Murakami was forced to come down here to address and issue that is irrelevant compared to other issues with Glovis.

Mr. Kim at this point stressed again that the purpose of this meeting was to address the basic quality system issues of the supplier and that the other issues being raised by Rob Cyrus should be addressed outside of this meeting at the engineering working level. At this point Mr. Kim was interrupted by the Assistant General Manager Murakami Glen Roberts by standing up walking over and grabbing two sample mirrors tossing them on the table and banging them against each other so that he could demonstrate how he believes damage occurs at Glovis stating to the effect that "this is why I came down here let's talk about how these mirrors are being damaged."

Mr. Kim stated that the scratches are a matter that must be addressed at a working level after this meeting. The purpose today is to discuss the buffing mark issue from Murakami. This is a repair that is being performed by HMMA and that they should be charged back to Murakami.

Rob Cyrus then stated that this should be a case to case basis and that he does not believe that HMMA is repairing these at all because they are continuously returned to Murakami.

John Kalson then stated that these issues were being repaired by HMMA members both on line in system and off line in QA.

Rob Cyrus replied to John Kalson by stating "is this the Toyota Production System way to pass on the defects to next customers?"

John replied he doesn't know what the Toyota Production system is and that it is a fact that we have to repair them with HMMA members.

Mr. Kim at this point ended the discussion with the Murakami presentation.

Note: It is of my opinion that the meeting began as being controlled and well structured with professionalism as Mr. Kim had requested by addressing the real problems that the suppliers are accountable for controlling and that any other issue should be addressed outside and separate from this forum. This however was disrupted several times by the continuous contesting and disregard of Mr. Kim's intentions and direction.

/cs

# 주간 납품업체 회의 기록

Chris Susock, QC Sr. Manager

9/16/05

이 회의는 부품검수부의 주최로 열렸으며 공장장, 김이사님이 회의 진행을 맡으셨다.

현대의 간부 참석자는 John Kalson, Rob Cyrus, SG Kwak등 실무 관계자가 참석했고 납품 업체 직원들도 참석했다.

회의는 Murakami의 품질 문제인 미러의 buffing의 토의로 시작되었다. Murakami는 왜 이 러한 문제가 발생했는지에 대한 설명을 시작했다.

Rob는 진행을 가로채서 murakami와 회의 전 개인적인 회의를 가졌고 EO때문에 3시간의 도장경화가 충분하지 않았고 포장에도 잘못이 있으니 포장도 바뀌어야 한다고 했다.

Harry Chase 는 포장은 murakami에 의해 설계 됐고 murakami 가 책임 져야 한다.

Rob은 사실이나 지금은 바뀌어야 한다.

Harry 는 현재도 Murakami의 책임이다 그 들이 설계를 했기 때문에 .

공장장님은 murakami 의 부사장에게 60년 이상의 경험의 회사가 어째서 그와 같은 기본적 인 문제를 야기 시킬 수 있는가로 물었다.

Rob은 이 질문을 가로채서 Murakami는 200 분의 라인정지 분 모두에 책임은 없다. 상당 분은 Glovis의 목이다.

이 시점에서 공장장님은 회의의 진행을 본연의 의도한 바로 진행하기 위해 회의 주최의도는 부품품질에 관한 근본적인 문제를 협의하고 재발 방지를 위한 대책 수립에 있음을 상기시켰 다. 고장장님은 어떻게 해서 Murakami가 포장실의 전등 밝기, Cure time의 부적절함, 포 장 등의 문제가 사전 실험 없이 검수가 안되었는가 라고 질문했다.

0247

Rob 은 가로채서 오늘 의제의 buff보다 더 중요한 문제가 있다. 200분 라인정지에 관한 의논을 합시다. 모두 Murakami의 책임이라는 충분한 자료가 없다.

이 시점에서 Chris Susock은 buff 는 진정한 문제이고 회의의 원 주제로 돌아가고 200 분의 라인정지 문제는 본건과 무관하다.

Rob 은 그 말은 "개소리, bull Shits" 라고 했다.

공장장님은 회의의 취지를 재 상기 시켰다. 공장장님은 라인정지 건에 과한 의논은 이 회의 이후에 실무진과 별도의 협의를 하라고 했다. 이 시점에서 Murakami의 Glen Roberts는 자리를 박차고 일어나 미러 두 개를 심하게 공중에서 부딪치며 테이블 위에 던지마 시피 놓았다. 그리고선 내가 여기 내려온 것은 이 때문이고 이렇게 미러가 망가지는 것이다.

미러 긁힘은 따고 실무진에서 별도의 회의를 통해 협의하고 본회의의 주제를 재 삼 상기시키고 buffing 으로 발생한 수리비를 Murakami에 청구 코자 한다.

Rob 은 상당량의 미러가 회수 되고 있는 것으로 봐서 현대가 수리 하고 있다는 점을 믿을 수 없다고 했다.

John 은 현재 현대는 on-line and off-line에서 수리하고 있다.

Rob은 그것이 도요타 식 운영방식이냐? 고 했다.

John은 도요타식이 뭐지 몰라고 수리는 사실이다.

공장장님은 이 시점에서 Murakami와의 회의를 종식시켰다.

# 개인의견

잘 준비되고 진행되었던 회의가 공장장님의 의도와는 다르게 수 차례에 거처서 혼선을 비쳤다. 공장장님의 의견처럼 지엽적인 문제 들은 별도의 회의를 통해 토의 됐어야 했는데 계속적인 방해와 의견 제기로서 그렇게 돼지 못했다.

#9

## Weekly Parts Quality Review Meeting – Murakami
### 9/16/05

The meeting started as usual at about 10:00 am. Murakami was giving their presentation and countermeasures regarding shipping and cloth marks.

During the course of the presentation Rob Cyrus asked several questions regarding the presentation and then asked about the scratches and downtime charged to Murakami. Murakami objected to the Downtime charged to them.

Rob Cyrus then commenced to talking about the downtime and scratches on the OSRV mirrors. At about this time COO Kim informed Murakami and Rob that the meeting was meant to resolve systematic quality issues and not specific issues.

Murakami stayed on the subject of downtime and scratches – going so far as to hit two mirrors together to show how some of the scratches. Again COO Kim stated that this meeting was to resolve systematic problems, and that the issue of downtime and scratches could be addressed later.

Rob Cyrus stated that not all of the downtime was attributable to Murakami. COO Kim wanted to move on with the meeting; COO Kim reiterated that the matter of downtime and scratches would be addressed later today. Glen Roberts of Murakami said "you wanted to have a meeting, so let's have a meeting", which is when he hit the two mirrors together.

Again, several people tried to move the meeting into the next slide, but Rob Cyrus said "you brought them all the ways down here, at least hear what they have to say".

Again, the amount of downtime charged to Murakami was raised – Chris Susock stated that PQ has already calculated the downtime to the best of their ability – to which Rob said "Bull s _ _ t!"

Rob asked if the team members were required to inspect the parts before putting them on. John Kalson responded that that is not a part of their job. Rob then asked if that is the Toyota way – to pass defects on to the customer.

At this time Chris Susock tried to get the meeting back on track by stating that the reason for the meeting was to resolve the buff mark issue – to which Rob said the accurate reporting of downtime is the issue.

COO Kim, clearly very agitated by the actions of the supplier, got out of his seat and walked out of the conference room. He came back in a short time later and requested Murakami meet with some other members of HMMA staff.

Gerald Horn, AM – Parts Quality, Trim Exterior

*[signature]*

0249

# Gerald Horn 확인서

회의는 10시에 시작되었다. 무라카미는 운송 및 포장 마크에 대한 대책을 설명하고 있었다.

설명 도중, Rob Cyrus씨가 설명에 대하여 여러가지 질문을 하면서 무라카미에게 부가된 스크래치 문제로 인한 라인정지에 대해 질문하고는 무라카미는 라인정지에 책임이 없다고 하였다.

Cyrus씨는 아웃사이드 미러 라인정지 및 스크래치에 대해 다시 언급하기 시작하였다. 이 때 김 공장장께서 무라카미와 Cyrus씨에게 회의의 목적은 시스템적인 품질 문제를 해결하는 하는 것이지 지엽적인 문제를 다루는 것이 아니다라고 하였다.

무라카미는 계속적으로 라인정지 및 스크래치 문제에 대해 언급하면서 두 미러를 서로 쳐서 스크래치가 어떻게 발생하는지 보여주었다. 다시 한번 김 공장장께서 시스템 문제를 해결하는 것이 이 회의의 목적이므로 라인정지 및 스크래치 문제는 나중에 별도로 협의하라고 하셨다.

Cyrus씨는 라인정지 전체에 대하여 무라카미의 책임이 없다고 하였다. 김 공장장께서는 회의 진행을 원하셔서 라인정지 및 스크래치 문제는 오늘 나중에 별도로 협의하라고 재차 강조하셨다. 무라카미 Glen Roberts씨는 HMMA가 회의를 하자고 했으니 지금 하자고 했다.

다시 몇 사람이 발표 자료를 다음으로 넘어가려고 했지만 Cyrus씨는 HMMA가 무라카미 사람들을 이 곳에 오게 했으니 그들이 말하고자 하는 것을 들어야 한다고 했다.

또 다시 무라카미에게 부가된 라인정지 금액에 대해 거론이 되었고, Chris Susock씨가 부품 품질 담당자가 이미 최대한의 능력으로 라인정지 시간을 계산하였다고 하였다. 이에 Cyrus씨는 개소리(Bullshit)이라고 반박했다.

Cyrus씨는 작업자가 장착하기 전에 부품을 검사해야 하는 것이 아니냐고 질문했다. John Kalson씨는 그것은 작업자의 업무가 아니라고 답변했다. Cyrus씨는 고객에게 결함을 넘기는 것이 토요타 방법이냐고 물었다.

이 때 Chris Susock씨가 회의를 바른 궤도에 올려 놓기 위하여 이 회의의 목적은 버핑 마크 문제를 해결하는 것이라고 언급하였으나, Cyrus씨는 정확한 라인정지 리포팅이 문제라고 하였다.

김 공장장께서는 협력업체의 행동에 더 이상 견딜 수 없어 자리에서 일어나 회의실을 나가셨다. 잠시후에 돌아와서 무라카미는 HMMA 스탭과 별도로 만나 협의하라고 지시하셨다.

Gerlad Horn (부품품질 트림 담당 대리)

#10

구매 최정연 부장

9/16 무라카미 회의시 발생상황

1. 일자 : 9/16 10:00 ~

2. 회의상황

1) 회의초기 9/1~9/13 사이 발생된 업체별 품질문제 현황에 대한 HMMA QC측의 사전 설명있었슴.

2) 무라카미의 첫번재로 발표로 회의가 진행 시작함

3) 무라카미는 BUFF & BAG MARK에 대한 개선 대책과 현재 사용중인 NF 납품용기 문제점 개선대책발표

　　-현재 사용중인 용기 SMPL과 타사 납품용기차이점을 사진을 가지고 설명

　　-CM부터는 PALLET 형태의 용기 사용을 금일 아침 글로비스에서 용기 관련 사항을 사전 협의함을 보고

4) 업체 발표 도중 ROB CYRUS가 업체로 반송된 불량중 현재 글로비스가 사용중인 포크리프터의 전복으로 손상된 부품도 있다며

　　업체가 제시한 사진으로 이의 제기를 함.

5) 이에, 김이사님이 통역을 통해 금일 회의 주제에 벗어나는 사항은 언급치 말라고 첫번째 지시함.

6) 김이사님이 무라카미에 몇년동안 미러를 만들었는지(60년 공급이력), 공급업체가 어디인지(토요다/누이/니산) 추가 질문하심.

7) 도장 CURING TIME 늘려야 되는것을 이제 알았느냐? 포장장소의 밝기가 1000LUX->2500LUX로 늘리는 것을 왜 이제야 하느냐?

8) 타사에는 양품을 공급하고 HMMA는 현대라서 불량품도 납품해도 된다는 생각을 버려라라고 추가로 야단치심.

9) 이때 ROB SYRUS가 금주 화요일 발생된 불량 때문에 200분의 LILE정지 CLAIM이 업체로 청구되었고 주 문제는 BUFF MARK가 아닌

　　SCRATCH 문제라며 글로비스의 HANDL'G 과정상의 문제점과 글로비스에 있는 QLS라는 용역사의 문제점을 제기함

10) 김이사님이 글로비스 최진호부장을 호출하시면서 본건은 회의 주제와 관련이 없으니 별도 실무 회의를 하라고 2차 지시함

11) 본 회의는 품질문제 관련 회의이니 더 이상 무라카미에 SCRATCH 문제는 본회의에서 제기하치 말라고 다시 지시하셨습니다

12) 그럼에도 ROB CYRUS가 불량 고품도 접수못한 업체에게 수요일날 연락해서 금요일 회의에 참석하라고 하는건 문제가 있다고

　　이의 제기하였고, 최정연부장이 서명수부장에게 차기 회의부터는 사전 안건조율/업체와 협의를 통해 회의가 진행될 수 있도록 요청함

13) 그럼에도 불구하고 ROB CYRUS 가 계속 문제 제기를 하며 HMMA의 미국인 생산담당자들과 논박을 계속함.

14) 그순간 무라카미 영업 직원이 O/S MIRROR를 양손으로 들고 치면서 SCRATCH를 냄. 문제는 SCRATCH이며 이로 인하여 무라카미는

　　많은 손해를 보고 있고, SCRATCH는 글로비스와 HMMA 내부 HANDL'G 과정상에서도 발생할 수도 있으며

　　금일 아침에 본인들이 글로비스에서 확인해본 결과 투입전 제품이 포개진 상태로 적재 되어 있고, 이에 대한 수차례 개선요청

　　글로비스 현지직원에게 요청하였으며, 무라카미 직원이 2주간 상주하면서 QLS 직원을 교육을 시켰으나

　　임용직임에 따라 인원 변동/QLS 외에는 타 용역업체를 글로비스에서 쓸수없는 관계로 문제가 많다고 불만을 제기하였음

15) 추가로 무라카미 품질 직원이 어제 HMMA로부터 반송된 제품 280개중 89%가 자신들 검사결과 양품이고 나머지 11%는

　　SCRATCH에 의한 불량이라고 격한 행동으로 항의함

16) 이에 김회일 이사님이 "ROB" 이름을 큰소리로 부르다가 "최부장, 내가 품질문제 본론에서 벗어나는 안건을 나중에 별도 협의하

　　고 했잖아~" 라고 화를 내시면서 차기 회의는 품질본부에서 주관해서 업무회의를 하라고 하시고는 회의장을 나가셨습니다

0252

17) 이후 약 2분뒤에 다시 회의실로 들어오셔서 "구매최정연부장" "품질박성도부장"을 따라오라고 하시어 2층 회의실로 갔습니다

18) 김이사께서는 나는 다시는 품질회의를 하시지 않겠다고 하시고 "PPG GLASS건 문제때도 정치적이라는 이야기를 들었고" "LEAR시트 문제 회의후에도 항의성 편지가 오고" "금일 우라까미 회의때도 업체가 반발"하는데  이렇게 해서는 더 이상 회의를 할수 없다

19) 약 20여분간 심한 질책을 듣고 구매최부장이 "용서해 주십시요" "노여움 푸십시요"라고 머리를 조아리고 말씀을 드렸습니다.

#11

9/16 무라카미 회의시 발생상황 보고

1.일자 : 9/16 10:00 ~

2.회의상황

금일 회의시 9/1~9/13 사이 발생된 업체별 결품 현황에 대한 QC측의 사전 설명으로 시작되었으며

무라카미의 첫번째로 발표로 회의가 진행되었습니다

무라카미는 기존에 발생된 BUFF & BAG MARK에 대한 개선 대책과 현재 사용중인 NF 납품용기의

문제점이 있음을 현재 사용중인 용기 SMPL과 타사 용기사진을 가지고 설명하였고 이런 운반 과정상의 품질 문제 개선을 위해

CM부터는 PALLET 형태의 용기 사용을 위해 금일 아침 글로비스에서 용기 관련 사항을 사전 협의하였음을 보고하였습니다

업체 발표 도중 ROB CYRUS가 업체로 반송된 불량중 현재 글로비스가 사용중인 달리의 전복으로 손상된 부품도 있다며

업체가 제시한 사진과 함께 이의 제기를 하였고, HMMA IN-LINE 조립작업자의 품질판정이 옳은지도 질문하는 과정에

HMMA 직원간 상호 이견이 발생했고, 이에 김이사님이 통역을 통해 금일 회의 주제에 벗어나는 사항은 언급치 말라고

지시 하시면서 무라카미에 몇가지 질문을 하셨고, 최정연 부장님이 일본인 부사장에게 일본어로 질문/답변을 대신하였습니다

답변을 들으신후 타사에는 양품을 공급하고 HMMA에 품질문제를 일으키는게 맞이 않읺다며 질책하셨고, 이에 ROB CYRUS가

금주 화요일 발생된 불량 때문에 200분의 LILE장치 CLAIM이 업체로 청구되었고 주 문제는 BUFF MARK가 아닌 SCRATCH라고 말하며

글로비스의 HANDL'G 과정상의 문제점과 글로비스에 있는 QLS라는 용역사의 문제점을 제기하였습니다.

김이사님이 글로비스 최부장을 호출하시면서 본건은 회의 주제와 관련이 없으니 별도 실무 회의를 하라고 2차 지시하였고

본회의는 품질문제 관련 회의이니 더 이상 무라카미에 그런 별개 문제는 본회의에서 제기하지 말라고 지시하셨습니다

그럼에도 ROB CYRUS가 불량 고품도 접수못한 업체에게 수요일날 연락해서 금요일 회의에 참석하라고 하는건 문제가 있다고

이의 제기하였고 최정연 부장님이 서명수 부장에게 차기 회의부터는 사전 안건 조율 및 업체와 협의를 통해 회의가 진행될 수 있도록

요청하였으며 이후 추가로 ROB CYRUS 가 계속 문제 제기를 하며 눈박이 계속되었고 긴급한 호출에 7시간에 걸쳐 차들.몰고 켄터키로부터

온 자신들에게 의견 피력의 기회를 주지않자 충분한 무라카미 영업 직원이 양손에 두개의 O/S MIRROR를 들고 한편의 MIRROR STUD BOLT로

반대편의 MIRROR 하우징에 SCRATCH를 내면서 이번 주 문제는 SCRATCH이며 이로 인하여 무라카미는 많은 손해를

보고 있고. SCRATCH는 글로비스와 HMMA 내부 HANDL'G 과정상에서도 발생할 수도 있으며

금일 아침에 본인들이 글로비스에서 확인 결과 서열 달리에 투입전 제품이 포개진 상태로 적재 되어 있었고, 이에 대한

개선을 수차례 글로비스 현지직원에게 요청하였으며,  무라카미 직원이 2주간 상주하면서 QLS 직원을 교육을 시켰으나

잦은직임에 따라 인원 변동및 QLS 외에는 타 용역업체를 글로비스에서 쓸수없는 관계로 문제가 많다고 불만을 제기하였음

추가로 무라카미 품질 직원이 어제 HMMA로부터 반송된 제품 280개중 89%가 자신들 검사결과 양품이고 나머지 11%는

SCRATCH에 의한 불량이라고 설명하였습니다

이에 김희일 이사님이 화를 내시며 최정연 부장에게 버럭 소리를 질렀고 더 이상 회의를 진행할 수 없으니 차기 회의부터 품질회의는

품질본부에서 주관하라며 서명수 부장쪽을 향해 소리치고 회의장을 나가셨습니다

황 영글 과장 /수어

0254

# 12

# 무라카미 관련 품질 회의

작성일: 2005년 10월 2일
작성자: 랍 사이러스 (부품 개발 담당 이사)
품질 회의 일시: 2005년 9월 16일(금) 10:00 ~
회의 장소: HMMA 펄 룸
무라카미 측 참석자:

1.  Toru Komatsu: Senior Vice President
2.  Mark McDonald: GM, Quality
3.  Glen Roberts: GM, Sales

## 2005년 9월 15일, 16일의 사건들

2005년 9월 15일 화요일 플라스틱 개발 담당 황병달 과장이 저에게 와서 "내일 아침 10시에 품질 점검 회의가 있고 거기에 무라카미가 참석하도록 김희일 이사가 요청했다"고 말했습니다. 황과장은 현대에서 11년간 일해왔습니다. 저는 그를 도와 주겠다고 말했고 품질 회의의 주 안건이 무엇이냐고 물었습니다. 그는 QC가 경미한 결함 예컨데 스크랫치, buff mark 등을 심각하게 생각하고 있다고 말했습니다. 그는 나에게 개발 담당 이사로서 사실에 기초하여 우리의 업체를 강력하게 방어해 줄것을 특별히 요청했습니다. 그는 과장에 불과하기 때문에 공장장(COO)에게 자유로이 말 할 수 없다고 말했습니다. 이것은 개인적인 문제가 아니라 하이라키 상의 문제입니다. 저는 사실을 조사하고 내일 회의에서는 중립적인 입장을 취하겠다고 말했습니다.

9월 16일 아침, 무라카미의 입장을 충분히 이해하기 위해 품질 회의전 예비 회의를 9시 30분으로 잡고 상황을 조사하러 나갔습니다. 저는 무라카미 제품을 라인 사이드에서 직접 수령하고 장착하는 HMMA 담당자를 만나 이야기 했습니다. 그녀는 "나는 미러 때문에 곤란을 격지는 않는다. 단지, 가끔 플라스틱 부위에 심한 긁힘 자국이나 패인 자국이 있는 데 그것은 가벼운 표면상의 스크랫치가 아니다"라고 말했습니다. 그것은 곧 라인 사이드에서 발견하는 결함은 대부분 무라카미의 잘못이 아니라 글로비스에서 HMMA로 오는 도중의 취급상 결함을 의미하는 것입니다. 우리는 09시 30분 QC에서 예비 회의

를 시작했고 그 참석자는 다음과 같습니다.

Ms. Paula Gonsalves: HMMMA Parts Quality
황 병달 과장: 부품 개발
Mr. Chris McClain: 부품 개발
랍 사이러스: 부품 개발

무라카미는 결함있는 실제 부품을 샘플로 가져왔습니다. 거기에는 실제로 패인 자국 같은 것(gouge like)이 있었는 데, 그것은 명백히 그런 상태로 OEM 에게 공급 될 만한 것은 아니었습니다. 무라카미 직원들은 그날 아침 글로비스를 방문하여 어떻게 취급, 운반 하는지 조사했다고 말했습니다. 글로비스가 하는 방법은 HMMA 가 인정한 취급 방법이 아닙니다. 여기에서 깊게 패인 자국이 생깁니다. 글로비스의 취급 과정에서 미러 하우징이 세개의 기둥에 부딪힙니다. 이런 것을 본 후에 우리는 김 이사가 주관하는 품질 회의에 참석했습니다. 업체로는 무라카미와 화신이 참석했습니다. 무라카미는 결함 발생의 근본적인 원인을 조사한 결과를 근거로 그 결함(패인 자국)은 글로비스의 취급 잘못에서 기인한 것이라고 설명했습니다. 이 건은 품질 회의의 첫번째 안건으로 잡혀있었습니다 (첨부: 안건). 김 이사는 무라카미가 이 안건을 이야기하니 당황해하는 것처럼 보였으며 통역(제이슨 지)을 통해 그는 이 안건을 토론하고 싶지 않다고 말했습니다. 무라카미는 약간 당황하는 것 같았습니다. 왜 지금처럼 중대한 시기에 3명씩이나 HMMA에 오라고 했는지 그리고 왜 그들에게 자신들의 입장을 밝힐 기회도 안주는 것인지 의문이었습니다. HMMA QC는 163분 가동 정지 관련 무라카미에 배상 청구하려고 합니다. 이것을 금액으로 환산하면 $137,490 (163 x $843.5/분당 의장공장 손실)입니다.

하자있는 것으로 반품된 282개의 미러 중 89퍼센트인 251개는 이상이 없는 것으로 HMMA QC가 인정을 했다는 것이 HMMA QC와 개발팀과의 예비 회의에서 나온 사실입니다. 나머지 31개의 하자는 글로비스의 취급 잘못으로 생긴 것이거나 HMMA가 문서로 승인한 포장 방법에 기인하는 것입니다.

무라카미에 반품된 것은 HMMA 에서 떨어트린 것이거나 취급 중 잘못된 것이고 HMMA는 무라카미에 변상 요구하려고 추진 중입니다. 무라카미와 개발팀은 이 문제를 대화를 통해 중재하고자 했으나 김이사는 확연히 싫어하는 것 같았습니다. 그는 회의 참석자 여러 사람들에게 소리질렀고 역겹게 그의 서류를 탁자 위에 집어 던졌습니다. 그는 퉁명스럽게 고개를 돌리고 걸어나갔습니다. 모든 참석자들이 놀랐고 혼란스러워했으며 불편해했습니다.

후에 그는 다시 돌아와 공정하고 생산적인 회의를 open된 대화로서 계속하려고 노력했습니다. 무라카미의 글렌 로버트는 어떤 비용이 들더라도 만사 제치고 여기 HMMA에 오라고 했으면서 왜 우리 말을 안들으려고 하는지 모르겠다고 말했습니다. 그는 두개의 새 미러를 집고 같이 부딪혀서 글로비스가 잘못 핸들링해서 만든 것과 같은 데미지를 만들어 보였습니다.

우리는 다시 이 문제를 협의하고 코스트 임팩에 대해 이야기 하려 했는 데 김 이사는 더 화가 난 것 같았고 HMMA직원 뿐만 아니라 무라카미 직원 그리고 다른 업체 직원들에게도 큰 소리를 질렀습니다. 그는 또다시 아무런 대화, 이유없이 나가서는 화신이 프리젠테이션 할려고 대기하고 있었지만 다시는 회의장에 안들어왔습니다.

나중에 최정연 부장이 내게 전화해서 김 이사가 무라카미 관련, 최부장과 저에 대해 매우 업셋되었었다고 말해주었습니다. 최부장은 우리는 해고 될 것 같다는 암시를 주면서 당장 회의석상에서 나와 자기를 만나라고 말했습니다.

추가로 나중에 안 사실이지만, 무라카미 회의 이후 제이슨 지가 무라카미와 별도 회의를 가지면서, 무라카미의 글렌 로버트에게 "입다물고 조용히 있어라"라고 말했답니다. 글렌은 제이슨 지의 코멘트를 Mr. Komatsu에게 전할 것입니다. 그는 Mr. Komatsu에게 글렌 로버트는 오늘 돌아 갈 수 없고 여기 HMMA에 있어야 한다고 말했습니다.

첨부는 9월 16일 저의 회의 기록 노트와 우리가 무라카미에 보낸 안건 그리고 무라카미의 프리젠테이션 자료입니다.

의문이 있으시면 언제든지 저를 컨택해 주시기 바랍니다

로버트 사이러스
부품 개발 담당 이사

## CONFIDENTIAL

Date:                 October 2, 2005

Subject:         **Murakami Manufacturing U.S.A. Inc. (MMUS), Quality Meeting**

Date of Meeting:    September 16, 2005 (Friday)

Time:                 10:00 am

Location:          HMMA Pearl Room

Attendees from MMUS:    Mr. Toru Komatsu      Senior Vice President
                                      Mr. Mark McDonald    General Manager – Quality
                                      Mr. Glen Roberts      General Manager – Sales

### Events of September 15/16, 2005

On Thursday September 15, 2005 I was approached by Mr. B.D. ("Brian") Hwang, Manager – Parts Development, Exterior Plastics. Mr. Hwang has been with Hyundai for 11 years. Mr. Hwang stated Mr. H.I. Kim had requested Murakami to join the "quality review meeting" scheduled for the next morning at 10:00 am. I told Mr. Hwang I would support him and asked the main purpose of the meeting. He stated Q.C. has some serious concerns regarding cosmetic defects (scratches, buff marks and other damage). He specifically asked me as a Director to strongly defend the Supplier based on actual facts. He felt he could not speak freely to the C.O.O. since he is only at the level of Manager (*This was a hierarchy issue, not personal*). I told him I would gather the facts and take a neutral position in the meeting tomorrow.

On the morning of September 16, 2005 I went to investigate the situation prior to the meeting and arranged a pre-meeting with Murakami at 9:30 am to clearly understand their position. I spoke with actual HMMA team member who receives the Murakami parts line side and installs them. She stated "there really hasn't been much of any difficulty with the mirrors" and "the only thing that has been occurring is occasional severe gouges or scratches all the way down to the plastic raw material, not superficial light scratches". Meaning most of the defects identified at line side are handling issues from Glovis to HMMA, not Murakami in the vast majority of the cases.

0258

We started the pre-meeting around 9:30 am in the Quality Department. _Attendees were:_

| | |
|---|---|
| _Ms. Paula Gonsalves_ | _HMMA Parts Quality_ |
| _Mr. B.D. Hwang_ | _Parts Development_ |
| _Mr. Chris McClain_ | _Parts Development_ |
| _Mr. Rob Cyrus_ | _Parts Development_ |

Murakami brought in actual examples of the suspect parts. There were significant "gouge like" defects not likely to be shipped to any OEM customer; too obvious. Murakami explained they had visited Glovis this morning and observed how Glovis is removing the mirrors from the HMMA approved packaging and stacking them haphazardly in non-approved totes. This is where the deep gouging is taking place. The three mounting studs are contacting the mirror housing painted surfaces when handled in this fashion.

After the review we and Murakami attended the Quality Meeting hosted by Mr. H.I. Kim. Two suppliers were in attendance for this meeting (_Murakami first, followed by Hwashin_). Murakami brought defect samples and started to explain that these defects (_gouges_) were caused by handling issues between Glovis and HMMA based on their root cause analysis. This item was identified as the first discussion agenda item HMMA provided to Murakami (see attached). Mr. H.I. Kim seemed upset that Murakami was bringing up this topic and said via translator (Mr. Jason Chi) that he did not want to discuss this matter.

Murakami seemed a little taken aback. Why did they have three individuals come down to HMMA at significant time and cost and yet are not permitted to discuss and defend their position? HMMA QC wanted to charge back 163 minutes of down time to Murakami. **This would equate to 163 minutes x $843.50/minute (GA) = $137,490.**

The facts presented in the pre-meeting with HMMA Quality and Parts Development showed of the 282 mirrors returned as defective, 251 (89%) were good and acknowledged so by HMMA QC. The remaining 31 parts were either handling damage by Glovis or defects caused by Murakami's packaging format previously approved by HMMA Production Control in writing. Murakami also received parts returned from HMMA that had been dropped and run over by our tuggers and we were trying to charge _them_ back.

Murakami and Parts Development attempted to intervene to clarify the facts with an open dialogue but Mr. H.I. Kim got visibly upset. He was yelling at various attendees and threw his papers on the table in disgust. He abruptly turned and walked out of room. All attendees were surprised, confused and felt uncomfortable.

He later returned and we tried to continue with an open dialogue approach to allow for a fair and productive meeting. Mr. Glen Roberts from Murakami asked why they were asked to drop everything immediately and come down to HMMA at significant cost and time, if no one will listen. He then held up two new mirror assemblies and struck them together to replicate the damage being seen at HMMA line side by Glovis mishandling issues.

We attempted to discussed this matter and the related cost impact again, Mr. H.I. Kim seemed even further infuriated and yelled very loudly at both HMMA team members and the supplier Murakami with other supplier present. He again left the room again without any discussion or reason and never returned even though we had another supplier that was to present (Hwashin).

I was later called by my colleague Mr. J.Y. Choi and informed that Mr. H.I. Kim was very upset with Mr. Choi and me based on the Murakami meeting. Mr Choi told me "to leave my present meeting and join him at once, as he and I may have the rest of the day off" insinuating that we may be fired.

In addition I later learned that after our Murakami meeting that Mr. Jason Chi had a separate meeting with Murakami and told Mr. Glen Roberts to "shut up and sit down". He will address his comments to Mr Komatsu. He told Mr. Komatsu that Mr. Roberts was to cancel his trip back today and insisted that he stay here at HMMA.

Attached for back up are my actual meeting notes from the 16th, along with the Agenda we sent Murakami and Murakami's presentation.

Please feel free to contact me if you have any questions or concerns.

Mr. Robert Cyrus
Director of Parts Development

# Weekly Parts Quality Review Meeting

**2005. 9. 16.**

**HMMA QC Department**

0261

# ■ Schedule and Structure of the Meeting

❖ **When:** 10:00 AM to 11:30 AM, Every Friday

❖ **Where:** Alabama Room (1st floor of GA shop office building)

❖ **Chaired by:** H. I. Kim, COO

❖ **Attendees:**
B.G. Cho, Senior director of Manufacturing
John Kalson, Director of Manufacturing
Simon Sung, Sr. Manger of Parts Development
Rob Cyrus, Director of Parts Management
Chuck Knowles, Manager of Parts Management
Chris Susock, Sr. Manager of Quality Control
Richard Chai, Sr. Manager of Line Inspection
Dave Choi, Sr. Manager of GA shop
Danny Seo, Sr. Manager of Parts Quality, and Related people

❖ **Presenters:**
CEO, COO and Quality Manager of Supplier
Suppliers that caused line-stoppage at HMMA
Suppliers that caused major shipping and field Quality issues.

❖ **Format:**
HMMA Corrective Action Request Form (Powerpoint format)
(Presentation file to be submitted to HMMA PQ one day in advance)

❖ **Prepared by:** Jason Chi, Parts Quality Manager

# ■ Presentation Topics for the week of 9/16/2005

| Supplier | Part Name | Nonconformity | Occurrence | Issue Type | Presentation Time |
|---|---|---|---|---|---|
| Lear | Seat | Rear head rest not locked, high effort | 5 % | Quality Audit | 15 Min. |
| | | Seat back rubbing noise | 1 | | |
| Murakami | Outside mirror | Too much wrinkles and folds (Leather) | 10 % | Downtime VPC inspection | 15 Min. |
| | | Paint issues (Polishing mark, Crater, Scratches) | 2 | Test track | |
| | | Poor heat staking of inside bush nut (Wind noise) | | | |
| | | Oil contamination (Crater) | 100 % | Paint shop | |
| Hwashin | Package tray panel | Subwoofer weldnuts misaligned | 6 | Body shop | 15 Min. |
| | | Stamping Split | 25 | GA T3 | |
| | | Weld spatter | 27 | QA line | |
| Dongwon | Door frame | Channel too wide at upper corner (Wind noise) | 100 % | Test track | 15 Min. |

0263

*Murakami Manufacturing USA, Inc.*
*Campbellsville, KY*

MMUS

# NF Outer Mirror Assembly
## Countermeasure Report

DATE REPORTED : 09/16/2005

1/7

0264

# Buff Marks

**DESCRIPTION OF PROBLEM :**

Parts with paint buff marks found at HMMA assembly line.

**ROOT CAUSE OF NON-CONFORMANCE :**

Uncompleted buff finishing was performed under insufficient lightening (1,000 lux).

**COUNTERMEASURE :**

- Additional lighting installed (2,500 lux) into buff area
- Lighting check sheet created
- Check before operation on 1st and 2nd shifts using lighting meter
- Lighting criteria : more than 2,500 lux
- Effective date : Sep 14, 2005

**METHOD OF COUNTERMEASURE EFFECT (RESULT) :**

100 % Inspection of all assemblies prior to shipping to HMMA.

**REFLECTION TO NEW MODEL :**

The countermeasure is included in CM process launched in April, 2006

2/7

0265



Lighting Status

Before

After

1,000 Lux

2,500 Lux

3/7

0266

# Bag Marks

## DESCRIPTION OF PROBLEM :

Parts with paint bag marks found at HMMA assembly line.

## ROOT CAUSE OF NON-CONFORMANCE :

The paint bag mark is caused by protective bag being imprinted into the paint after leaving MMUS (dark colors only).

Root cause:

1. Insufficient paint cure time (2~4 hrs – after EC change to Housing).
2. Container design (vertical position & rough dunnage).

## COUNTERMEASURES IMPLEMENTED :

- Stabilized curing time (7/25/05)
- New type of protective bag (8/7/05)
- Currently packaging all dark colors outside of the dunnage and protecting part with bubble wrap (extra time & cost).

## REFLECTION TO NEW MODEL :

For CM program, different type of part container / dunnage will be proposed.

4/7

0267

# Bag Mark

<u>Permanent countermeasure :</u>

- Container & Dunnage should be modified.



Current NF Container & Dunnage



Container & Dunnage currently
used by another customer

5/7

# Poor Heat Staking of Inside Bush Nut

* <u>Root cause of non-conformance:</u>
  1) Machine malfunction   2) Miss-operation (human error)

* <u>Temporary Countermeasure</u> :

1) Operator verification – Mark a <u>Dot</u> on cover-base to ensure the heat stake process is complete
   - First the operator at heat stake process marks a dot on cover-base after the process then the next operator verifies the heat stake condition is acceptable and marks the part ( on cover-base) (1ˢᵗ operator 8/15/05) (2ⁿᵈ / audit operator 9/15/05)

2) Machine check – Increased frequency of machine function check
   - Check 2 times a day ( start & end of shift) (9/14/05)

* <u>Permanent countermeasure</u> :

   - Heat Staking Process to be eliminated by introducing the elimination of Bracket and Bracket A (Engineering Change).

0269

# Poor Heat Staking

## Permanent Countermeasure:

Engineering Change to eliminate heat staking process



Current

spot melting

bracket

bracket A

New

add rib 9pcs b/w

9/16/05

⊕ HYUNDAI

H.I. KIM / JASON CHAI

▷ QUALITY [MTG] + MURAKAMI / WASHN

10:00 MTG                                   W/OIL

(FTA) ⟶ ADD TO SCHEDULE PERMANENT

        ON BRIAN TSLO + CHAI "TO TALK STRONGLY

— DOWN-TIME 9/1 — 9/3 TO H.I. KIM TO BE

                            FAIR TO SUPPLIER"

MURAKAMI ( 18 OCCURENCES | 12 OCCURENCES
          ( 47 MINUTES   | 116 MINUTES )

G/M QC. MARK MACDONALD

• BUFF MARKS. = REALLY "BAG" MARKS

CAUSED BY DUNNAGE STYLE = NEED TO Δ

LIGHTING = ALREADY FIXED.

   1,000 LUX ⟹ 2,500 LUX ✓

282 PARTS RETURNED TO MURAKAMI

251 AGREED OKAY, BY HMMA ⊘

H.I. KIM YELLING & THROWING PAPER

↳ VERY UNPROFESSIONAL — EVERYONE

UNCOMFORTABLE. H.I. KIM YELLED @ M.

www.hyundai-motor.com

0271

Daily Plan

"_TO BEHAVE THEMSCANES_"

° ELVIS WILL COME TO MEETING NOW
TO ADDRESS.

° M. 11:3 NOW REPEATEDLY SLAMMING ITEMS
ON TABLE, GOT UP AND AND LEFT.

—EMBARRASING—

HWASHON

0272

0273



**MMUS**
*Murakami Manufacturing U.S.A. Inc.*

Toru Komatsu
小松　徹
Senior Vice President

575 Water Tower Bypass
P.O. Box 484
Campbellsville, KY 42718-8693

TEL: 270-469-3939 ext. 237
FAX: 270-469-4772
tkomatsu@murakami-usa.com

**MMUS**
*Murakami Manufacturing U.S.A. Inc.*

Glen Roberts
グレン　ロバーツ
General Manager
Sales

575 Water Tower Bypass
Campbellsville, KY 42718-8693
groberts@murakami-usa.com

TEL: 270-469-3939 ext. 223
CELL: 270-566-1833
FAX: 270-469-4772

**MMUS**
*Murakami Manufacturing U.S.A. Inc.*

Mark McDonald
マーク・マクドナルド
General Manager · Quality

575 Water Tower Bypass
Campbellsville, KY 42718
mmcdonald@murakami-usa.com

TEL: 270-469-3939 ext. 206
FAX: 270-469-4772

# Exhibit G

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ROBERT CYRUS,

     Plaintiff,

vs.

HYUNDAI MOTOR MANUFACTURING
ALABAMA, LLC,

     Defendant.

CIVIL ACTION NO.:

2:07-cv-00144-ID-TFM

## DECLARATION OF IHN HWAN CHU

1.     My name is Ihn Hwan Chu. I am over the age of 19 years and otherwise competent to give this declaration. The facts contained in this declaration are based upon my personal knowledge.

2.     I am currently employed as a Team Relations Specialist with Hyundai Motor Manufacturing Alabama, LLC ("HMMA").

3.     I am fluent in both the English and Korean languages. In connection with my employment at HMMA, I am often called upon to translate communications between Koreans and Americans.

3.     Attached to this Declaration as Exhibit 1 is a true and correct copy of statements that were brought to me regarding a meeting between representatives of Murakami Manufacturing Company and HMMA representatives in September of 2005. The statements set forth in Exhibit 1 are made in Korean, and I was requested to translate these statements into English. Attached to this Declaration as Exhibit 2 are the English translated versions of the statements set forth in Exhibit 1. I do hereby certify that these translations are accurate and complete to the best of my ability.

1

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED ON THIS _18_ DAY OF JANUARY, 2008.

Ihn Hwan Chu

2005년 9월 16일 회의 관련 참석자 진술서(보고서) 목록

| 번호 | 소속 | 진술자 | 직책 | 비고 |
|------|------|--------|------|------|
| 1 | 생산 | 김희일 | 공장장 | 한글 |
| 2 | = | 조봉관 | 생산 담당 이사 | 한글 |
| 3 | = | 존 칼슨(John Kalson) | 생산 담당 이사 | 한글 |
| 4 | = | 해리 체이스(Harry Chase) | 생산 관리 과장 | 없음 및 번역본 |
| 5 | 품질 | 박승도 | 품질보증 부부장(HMC) | 없음 및 번역본 |
| 6 | = | 곽석구 | 품질 담당 이사 (HMMA) | 한글 |
| 7 | = | 제이슨 지 (Jason Chi) | 품질 품질 담당 과장 | 한글 |
| 8 | = | 크리스 수석(Chris Susock) | 부품 품질 담당 부장 | 없음 및 번역본 |
| 9 | = | 제럴드 혼 (Gerald Horn) | 부품 품질 담당 대리 | = |
| 10 | 개발 | 최정엽 | 개발 관리 담당 부장 | = |
| 11 | = | 황병달 | 부품 개발 담당 과장 | = |
| 12 | = | 밥 사이러스(Bob Cyrus) | 부품 개발 담당 이사 | 없음 및 번역본 |



EXHIBIT

0195

# 보 고 서

**보고자 소속 : HMMA**
**직  책 : 공장장**
**성  명 : 김 희일**

## [보고 내용]

2005년 9월 16일 금요일 10시 HMMA 의장사무동 1층 Alabama Room에서 HMMA 품질관리팀 주관 협력업체 Claim 회의 주관중 발생한 상황에 대하여 아래와 같이 보고 및 의견을 말씀 드립니다.

– 아 래 –

회의 처음 시작은 05년 8~9月 협력업체의 부품 불량으로 인한 당사 완성차 생산 Line의 Down Time 현황에 대해 부품검수 담당 지(Chi) 과장의 설명에 뒤이어 본회의가 시작됨.

첫번째로 사이드 미러 생산업체인 무라카미에서 유점(#11 보고서로 Briefing 하였음.

〈공장장〉 무라카미의 아웃사이드 미러 생산경험이 얼마나 되었고 또한 어느 업체에 납품한 실적이 있느냐?
〈무라카미 부사장〉 60년 되었고 미국내 거의 대부분의 TOYOTA 계열사와 10개 정도에 납품하고 있다고 여러회사 이름을 대면서 얘기함.
〈공장장〉 왜 전등의 밝기를 1000LUX → 2500LUX로 바꾸었느냐?

〈무라카미 발표자〉 포장장의 전등 밝기가 잘 안보여 1000LUX → 2500LUX로 바꾸었다.

〈공장장〉 제품의 Cure Time이 4시간 정도 가져야 함에도 불구하고 규정된 시간을 지키지 않았기 때문에 Bup'g이 일어난 것 아니냐?

〈무라카미 발표자〉 "Bup'g에 대한 설명없이" HMMA에서 승인한 Container 문제로 일어났으며 또한 Glovis의 처음 부주의로 스크래치 문제가 발생했다고 얘기함.

〈공장장〉 Container미라 공급 용기의 영상 유무에 관계없이 Cure Time만 정확히 지켰어도 Bup'g 문제는 일어나지 않았지 않느냐?
앞의 여러 정황으로 미루어 보아 그렇게 경험이 않고 미국내 도요타 계열사 및 여러업체에 납품하는 무라카미가 제품 생산의 기본도 지키지 않는 것으로 보아 현대의 품질에 대하여 아예 신경도 쓰지 않았거나 아니면 무라카미 품질 시스템상의 문제가 있는것 아니냐?

〈Rob〉 사이드 미러의 스크래치 문제로 HMMA가 Reject 시킨 문제에 대하여 얘기하며 Print하여 돌리면서 Glovis에서 지게차 운반 도중 실수도 있수도 바닥에 열칠라 스크래치가 발생한 문제로서 이것들을 Reject하여 반품하고 또한 Down Time으로 잡은 것에 대하여 불만을 토로함.

〈공장장〉 그러한 잘못된 문제가 있다면 이 회의가 끝난후 실무자끼리 협의하여 조정하면 될 것이다.
현대가 잘못했거나 Glovis가 잘못했을시는 당연히 무라카미에게는 책임이 없으니 염려하지 말라.

〈최부부장 & Rob〉 상기의 문제를 다시 얘기하며 회의 진행을 지연시킴.
이때 John Calson 및 품질담당 Chris가 무라리고 Rob에게 얘기하며 서로간의 약간의 활전이 있었으나 제가 제지 시키며,

0197

〈공장장〉 알았다! Glovis의 최부장을 오라고 하여 진상 확인을 하여 잘못된 점이 있다면 서로 협의하면 아무런 문제가 없을 것이다. 회의 속개합시다!

〈Rob〉 다시 스크래치 문제를 거론하며 무슨 다른 차이가 있는 것 아니냐며 회의를 지연시킴.

〈공장장〉 오늘의 의제를 보여주며 회의 의제 내용에 없는 것은 이 회의가 끝난후 본인(공장장)과 참석하에 회의 하겠소.

재협의 하면 될 것이므로 회의를 속개하겠다.

그리고 다시 말하지만 이 회의의 목적은 HMMA 공장이 아직 정상 가동이 안되고 있으며 현 상황에서 비가동 주요인을 분석해 본 결과 설비문제, 결품, 부품결함 등이 비슷한 비율로 가장 큰 지해 요인으로 나타나고 있다.

그래서 9月 2째주 부터 이 회의를 진행하게 되었고 그 목적은 중전에 말씀 드린바와 같이 첫째는 가동을 향상을 위해서 둘째는 현재가 지향하는 고품질의 차를 만들기 위함이지 어느 특정업체를 닺하거나 나무람을 위함이 아님을 다시 말씀드리고 회의를 계속 하겠다.

〈Rob〉 무라가미 Rob이 무라가미 영업 Manager와 잠시 얘기를 나누고는 다시 스크래치 문제를 거론할때 무라가미 영업Manager가 갑자기 자리에서 일어나 뒤쪽에서 사이드 미러 2개를 가져와 인성을 높이면서 2개를 '탁탁' 부딛치고는 회의을 탁자에다 던짐.

〈공장장〉 그 미러를 보자고 하여 보면서 이번시 스크래치 문제는 이회의 끝난후 Glovis 최부장을 오라고 하였으니 그때 논하기로 하고 회의 속개하겠다.

"이때 개발 최정연 부장이 Rob이 다시 부장과 스크래치 문제를 얘기하며"

0198

〈Rob〉 여기 무라카미 사람들이 이 회의때문에 어제 여기에 도착하였으며 5000달러 정도의 장비가 들었다. 누가 책임질 것이냐! 며 언성을 높음.

〈공장장〉 최부장 내가 수차례에 걸쳐 이회의의 목적과 오늘 회의 주제에 대하여 얘기 하였는데 당신 왜 그래! [인성이 약간 높았음] 당신네들 일체 대변하라 여기온 것이냐!

그만큼 얘기 했으면 알아 들어야지!

이런 상태로는 회의 진행이 불가하여 오늘 회의 끝내다 향후 품질회의는 품질본부 박승두 부장이 주관하던가 품질본부에서 해결 바란다며 보고 있던 회의 파일을 집으면서[이때 탁자에서서 약간의 쿵소리가 남 자리에서 일어나서 회의장 밖으로 나감.

이상 상황대로 보고 드립니다.

2005. 9. 17

공장장 이사 김 회일

0199

〈본인 의견〉

1. 업체 품질회의는 매월 품질본부장 주관 각 공장에서 실시하나, HMMA의 경우 공장가동이 주 저해요소로서 9月 부터 매주 금요일 실시하여, 업체 생존부에 그 상황을 정확히 인지시켜 부품 품질의 향상을 유도하기 위함이나 당사 자재 담당자들이 그 목적을 정확히 인지 못하고 있는 것으로 사료됨.

2. 공장장이 회의 주관시 주변의 똑같은 상황 설명, 지재할 것을 요청하였으나 계속 업체의 대변자 역할을 하며 회의 지연시킴.

3. 부품업체 및 당사 직원들 앞에서 회사의 이미지 및 공장장 이미지 실추시킴.

4. 금번이 2번째 회의로서 향후 부품업체 Claim 회의시 상당한 영향이 우려되며, 또한 향후 본인의 회의 주관이 어려울 것으로 사료됨. HMC와 같이 품질본부장 주관 부품 품질확보 회의가 바람직 할 것으로 사료됨.

— 끝 —

0201

#2

# 9월 16일(금) 10:00 업체품질회의에서 발생한 사건

본인이 품질회의에 들어갔을 때는
O/S Mirror의 버핑문제에 대해 무라카미에서 대책발표를 거의 끝내고 있었음.

업체에서 버핑에 대한 원인 및 대책을 발표하고 난뒤
김회일이사님께서 무라카미의 회사경력,납품처등을 질문하자
무라카미 일본직원이 영어를 잘 못 알아들어 엉뚱한 대답을 하자
개발부에 최정연부장이 일본말로 통역였는데
회사는 60년 역사를 가지고 있고,미국에서 토요타,니산,혼다공장에 납품하고 있고,
품질문제는 거의 없었다고 대답함.
김회일이사님께서 왜 HMMA에는 기본품질도 못 지키는냐고 질책을 했음.

그러자 무라카미에서는 스크래치문제는 무라카미 귀책이 아니고
글로비스가 서열작업중 발생시킨 문제라고 주장함.
김회일이사님께서 버핑문제에 대해서만 대책을 발표하고 재발방지를 약속하고
스크래치문제는 안건에 포함되지않은 문제이니
이 회의가 끝난 뒤 별도의 실무자회의를 통해서 해결할 것을 지시함.

그래도 무라카미직원중 한명이 미러 두개를 쾅쾅 마주 부딪치며
(감정이 약간 실려있다는 느낌을 느낄 정도로)
이렇게 글로비스에서 다루는데 스크래치가 나지않을 수 없다고 주장하며
미러를 테이블 위로 툭 던졌음.
(한국사람의 눈에는 고의적으로 기분 나쁘다는 표현으로 느껴졌음)

김회일이사님께서 스크래치문제는 안건과 별개의 문제라고 다시 한 번 더 강조하고
이 회의가 끝난 뒤 별도의 실무자회의를 통해서 해결할 것을 재차 지시함.
또 글로비스 최진호부장을 호출해서 함께 실무회의할 것을 지시함.
그리고 업체품질회의의 목적에 대해서 설명하면서
양산라인에 무결점의 부품을 공급하기위한 대책을 발표하는 자리에서
업체간 발생한 문제를 이 회의에서 논의하는 것은
관련없는 업체,담당자들까지 시간을 낭비하므로
이 회의가 끝난 뒤 별도의 실무자회의를 통해서 해결하는 것이 타당하다고 설명함.

0202

랍 사이러스가 스크래치문제도 안건통보시 포함되어있었고
이것때문에 여러명이 2~3일간 몽고메리에 출장와서
문제점을 조사하느라 몇 천불의 비용이 발생했고,
그 원인이 글로비스에 있는데 왜 발표를 하지않느냐고 말하며
업체를 두둔하는 듯한 모습을 보여주었음

김회일이사님께서는 개발 최정연부장에게 "품질회의의 목적을 설명했고
업체에서는 자기 잘못에 대해 대책만을 발표하고
스크래치 문제는 별도의 실무회의에서 소명할 기회를 준다고 해도
이런 식으로 개발에서 업체 편들기 하면 품질회의를 진행시킬 수 없다"고 말하고
무라카미 발표 건은 중지시킴.

그래도 랍 사이러스가 스크래치문제도 안건통보시 포함되어있었고
왜 발표를 못 하느냐, 그러면 안건이 잘못 통보된 것이 아니냐,
그것때문에 무라카미의 여러 엔지니어가 남의 문제를 조사하느라
시간과 돈을 소모했다고 계속 주장함.

곧 글로비스 최진호 부장이 도착하고
스크래치문제는 별도 실무회의를 즉시 하기로 하고 다른 회의실로
무라카미,개발부 최정연부장,최진호부장,품질관리부 직원등 옮겨갔음.

                                      2005.9.16    조 봉관

\#5

# 9월 2차 품질회의 시(9월16일 10:00~) 발생 상황 보고

(품질회의 품질회의시 ,2005.9.16. 발생된 상황입니다. 품질발송 박송도 부장)

## 1. 문제 내용

아웃 사이드 미러 하우징 버핑 마크/크레이터/스크래치 생산 지점 및 품질 문제 발생
이제인 아웃사이드 미러 이제인 무라까미의 상기 문제에 대한 발생가 시작되었음

## 2. 품질 문제 개선 대책 발표

부품 품질 일제일 8월 부품 불량으로 인한 생산 라인 중단 출불을 부품검수에서 발표하고 분업의

1) 무라까미 현지인(발표자:품질담당 매니저)
품질 및 대책 설명 중 스크래치 문제는 풀링비스의 핸들링 시 발생된 문제일 것조

2) 공장장(김회을 이사)
무라까미가 아웃사이드 미러 생산 경험과 타 업체 납품 실적 질문

3) 무라까미 일본인
60년 되었고 미국의 도요타 및 닛산에 납품하고 있다고 답변

4) 공장장(김회을 이사)
생산 경험이 많고 도요타 등 타 업체에 납품하면서 왜 출대 부품에는 품질문제를 소홀히 했거나

5) HMMA 구매 담당 이사(ROB)
타 업체(풀링비스)가 핸들링 시 발생시킨 스크래치 문제를 무라까미 업체에 떠넘기는 것은
부당하다고 풀링비스가 지게차로 운반도중 바닥에 떨어지면서 발생된 스크래치 발생품의 사진을
돌리면서 무라까미에게 변제될 부당성과 문제점의 부당의를 주장

6) 공장장(김회일 이사)
반제 문제외 결과된 부분은 품질회의 후 별도로 협의하여 합리적으로 처리할 예정이니 일체가 발생시킨 품질문제에 적당하자고 회의 속개를 지시

7) HMMA 구매담당 이사(ROB)
계속 스크래치 문제를 언급하면서 무리까끼가 대책 받표를 부담하며, 일체에서 회의 속개를 위해 수 천분의 교통비를 소요한다면서 중석했다고 일정 대변

8) 구매 주제련(초 정연 부장)
품질의 안건에 대한 부담 설명 및 추후 안건 선정 발표 시 중다 구체적인 부석을 요청

9) 공장장(김회일 이사)
한 안일 일체 일정 운용

10) 무라까미 품질인이로 품질문제 본질에 충실하자고 호소
위한 회의이므로 취지를 살려야고 본회의의 목적은 공정 가동률 향상과 품질활발물
구매담당 이사인 ROB과 대면 후 미리 두개를 들고 소리치면서 부릇치며 타 일체의 핸들림 과정에서 발생되는 스크래치 발생 재언한아며 회의 목지에 무리하까 두 소리라

11) 공장장(김회일 이사)
HMMA구에 초부장에게 연설을 돌이면서 수 차례 회의 의제에 충실하여 회의를 진행하자고
했는데 ROB과 담신은 일체 대면한라 있느나대 이와 같은 분위기에서는 품질문제의 더 이상
진행이 불가하므로 회의 중단 선연 후 보고 있던 품질회의 파일을 투지에 세게 적어 중 소리라
나면서 퇴장

# 6

## 9월 3주차 부품 품질회의 상황 보고서

일시:2005년 9월 16일 10:00~11:00AM
장소:HMMA 의장동 1층 알라바마룸
보고자:HMMA 품질관리팀 부장 곽석구    *A. Kwak*
상황:HMMA 9월 3주차 부품 품질회의시 비정상적인 상황발생

내용
1. 상기 일시, 장소에서 HMMA 품질관리팀(부품검사과)주관 정례 품질회의인 9월3주차 정기 부품 품질회의가 진행되고 있었는데 본인은 9시부터 진행된 신입사원 채용 인터뷰가 있어 약15분 가량 늦은시각에 참석함.

2. 당시, 첫번째 안건인 무라카미사 아웃사이드 미러의 Scratch문제중 Bag Mark에 대한 대책 발표가 진행되고 있었는데 스크레치에 관한 개선사항으로 전용 용기에 담아 운송하고 있다는 내용을 발표하면서 '글로비스에서 취급상 부주의한 점'을 강하게 불만하는 발언이 있었으며 회의 주관자인 김회일 공장장이 '그런 문제가 있을 수도 있지만 본 회의의 근본 목적이 ①양산공장의 가동을 저해요인 제거, ②완성차의 완벽품질을 위한 부품 품질 향상인 바 주제에 맞는 큰 틀의 방향에 대한 협의를 하고 마이너한 문제 즉, 취급 부주의한 문제 등은 실무자간 별도 협의를 하여 해결토록 하자는 제언으로 회의 속개 됨.

3. 다시 본론으로 들어가 무라카미사의 전등 밝기 문제를 거론하는 과정에 2,500Lux로 바뀐 장소가 작업장이 아닌 제품 상차장이라는 설명이 있었고 다시 스크레치 관련 문제점이 거론 되면서 글로비스의 지게차 실수로 인한 핸들링 잘못이 화제에 올랐으며 구매부문의 랍 사이러스가 강하게 불만함.

4. 이에 김회일 공장장이 글로비스CC 책임자를 회의에 참석하도록 지시하였고 이에 글로비스 직원이 급히 최부장에게 연락을 취하러 밖으로 나감. 이어 김회일 공장장이 본 회의의 목적 및 추진 방향(즉 가동율 향상으로 생산성을 올려야 하는 HMMA의 입장, 부품 품질의 향상을 위하여 전 부품업체가 협력해주길 바라는 목적에서 문제 발생분에 대한 Review 차원의 본 회의 취지)에 대하여 재삼 강조함.

5. 이때 정 중앙에 앉아있던 무라카미사의 한 담당자가 포장된 아웃사이드 미러(신품)를 회의실 뒤편에서 가지고 나와 2개를 꺼내어 모든 회중이 보는 앞에서 날카로운 장착볼트 부위와 아웃사이드 미러 베이스면을 두들겨(소리도 컸지만 외관이 날카로운 볼트에 찍혀)심하게 손상이 발생토록하는 항의성 Performance가 있어 회의실에 있던 많은 사람이 당황하게 됨.

6. 김회일 공장장이 차분한 목소리로 '무슨 행동이냐?'고 묻고 무라카미측에서는 '정성껏 철저히 포장하여 납품해도 방금 본것 처럼 취급한다면 어떻게 좋은제품을 공급할 수 있겠느냐'고 항의하는 답변이 있었음. 이에 다시 본 회의의 목적과 부품 품질 향상에 대한 대책 수립에 초점을 맞추도록 하자는 김회일 공장장의 설명으로 회의는 다시 속개 됨.

0236

7. 이때 랍 사이러스가 '무라카미사의 담당자들은 본 회의에 참석하기 위하여 수천 달러의 비용을 몰여 이곳 몽고메리에 왔고 숙박하며 회의에 참석했는데 그 비용은 누구 책임이냐?'며 '안건선정의 문제'를 항의하는 상황으로 이어지게 되었음.

8. 계속하여 구매부문의 최부장과 랍 사이러스, 무라카미사의 참석자 간 내부 협의가 계속되고안건 선정에 대한 불만 내용이 표출되어 회의 진행 어려워 짐.

9  본인은 오후 1시에 계획되어 있는 HMMA주간 품질회의 준비상태 확인을 위하여 잠시 2층 사무실에 올라와 담당자와 회의 준비상태를 점검하던 중 김회일 공장장과 구매부문 최정연부장이 같이 올라오는 것을 목격(1층에서 진행되던 부품품질회의가 비정상적인 상황으로 이어지게 되었음을 감지)하고 계속하여 HMMA주간 품질회의 준비를 하느라 이후 상황은 정확히 감지 어려움.                =끝=


상황 진술자 : 품질관리팀 부장 곽석구.
            2005년 9월 16일

구매 최정연 부장                    # 10

9/16 무라카미 회의시 발생상황

1. 일자 : 9/16 10:00 ~

2. 회의상황

1) 회의초기 9/1~9/13 사이 발생된 업체별 품질문제 현황에 대한 HMMA QC측의 사전 설명있었슴.

2) 무라카미의 첫번재로 발표로 회의가 진행 시작함

3) 무라카미는 BUFF & BAG MARK에 대한 개선 대책과 현재 사용중인 NF 납품용기 문제점 개선대책발표

   -현재 사용중인 용기 SMPL과 타사 납품용기차이점을 사진을 가지고 설명

   -CM부터는 PALLET 형태의 용기 사용을 금일 아침 글로비스에서 용기 관련 사항을 사전 협의함을 보고

4) 업체 발표 도중 ROB CYRUS가 업체로 반송된 불량중 현재 글로비스가 사용중인 포크리프터의 전복으로 손상된 부품도 있다며
   업체가 제시한 사진으로 이의 제기를 함,

5) 이에, 김이사님이 통역을 통해 금일 회의 주제에 벗어나는 사항은 언급치 말라고 첫번째 지시함.

6) 김이사님이 무라카미에 몇년동안 미러를 만들었는지(60년 공급이력), 공급업체가 어디인지(토요다/누미/니산) 추가 질문하심.

7) 도장 CURING TIME 늘려야 되는것을 이제 알았느냐? 포장장소의 밝기가 1000LUX로 2500LUX로 늘리는 것을 왜 이제야 하느냐?

8) 타사에는 양품을 공급하고 HMMA는 현대라서 불량품을 납품해도 된다는 생각을 버려라라고 추가로 야단치심.

9) 이때 ROB SYRUS가 금주 화요일 발생된 불량 때문에 200분의 LILE정지 CLAIM이 업체로 청구되었고 주 문제는 BUFF MARK가 아닌
   SCRATCH 문제라며 글로비스의 HANDL'G 과정상의 문제점과 글로비스에 있는 QLS라는 용역사의 문제점을 제기함

10) 김이사님이 글로비스 최진호부장을 호출하시면서 본건은 회의 주제와 관련이 없으니 별도 실무 회의를 하라고 2차 지시함

11) 본 회의는 품질문제 관련 회의이니 더 이상 무라카미에 SCRATCH 문제는 본회의에서 제기하지 말라고 다시 지시하셨습니다

12) 그럼에도 ROB CYRUS가 불량 고품도 접수못한 업체에게 수요일날 연락해서 금요일 회의에 참석하라고 하는건 문제가 있다고
    이의 제기하였고, 최정연부장이 서명수부장에게 차기 회의부터는 사전 안건조율/업체와 협의를 통해 회의가 진행될 수 있도록 요청함

13) 그럼에도 불구하고 ROB CYRUS 가 계속 문제 제기를 하며 HMMA의 미국인 생산담당자들과 논박을 계속함.

14) 그순간 무라카미 영업 직원이 O/S MIRROR를 양손으로 들고 치면서 SCRATCH를 냄. 문제는 SCRATCH이며 이로 인하여 무라카미는
    많은 손해를 보고 있고, SCRATCH는 글로비스와 HMMA 내부 HANDL'G 과정상에서도 발생할 수도 있으며
    금일 아침에 본인들이 글로비스에서 확인해본 결과 투입전 제품이 포개진 상태로 적재 되어 있었고, 이에 대한 수차례 개선요청
    글로비스 현지직원에게 요청하였으며, 무라카미 직원이 2주간 상주하면서 QLS 직원을 교육을 시켰으나
    일용직임에 따라 인원 변동및 QLS 외에는 타 용역업체를 글로비스에서 쓸수없는 관계로 문제가 많다고 불만을 제기하였음

15) 추가로 무라카미 품질 직원이 어제 HMMA로부터 반송된 제품 280개중 89%가 자신이 검사결과 양품이고 나머지 11%는
    SCRATCH에 의한 불량이라고 격한 행동으로 항의함

6) 이에 김회일 이사님이 "ROB" 이름을 큰소리로 부르다가 "최부장, 내가 품질문제 본론에서 벗어나는 안건을 나중에 별도 협의하라
   고 했잖아~" 라고 화를 내시면서 차기 회의는 품질본부에서 주관해서 업무회의를 하라고 하시고는 회의장을 나가셨습니다

17) 이후 약 2분뒤에 다시 회의실로 들어오셔서 "구매최정연부장" "품질박성도부장"을 따라오라고 하시어 2층 회의실로 갔습니다

18) 김이사께서는 나는 다시는 품질회의를 하시지 않겠다고 하시고 "PPG GLASS건 문제때도 정치적이라는 이야기를 들었고" "LEAR시트
    문제 회의후에도 항의성 편지가 오고" "금일 무라까미 회의때도 업체가 반발"하는데  이렇게 해서는 더 이상 회의를 할수 없다

19) 약 20여분간 심한 질책을 듣고 구매최부장이 "용서해 주십시요" "노여웅 푸십시요"라고 머리를 조아리고 말씀을 드렸습니다.

#11

9/16 무라카미 회의시 발생상황 보고

1.일자 : 9/16 10:00 ~

2.회의상황

금일 회의시 9/1~9/13 사이 발생된 업체별 결품 현황에 대한 QC측의 사전 설명으로 시작되었으며

무라카미의 첫번재로 발표로 회의가 진행되었습니다

무라카미는 기존에 발생된 BUFF & BAG MARK에 대한 개선 대책과 현재 사용중인 NF 납품용기의

문제점이 있음을 현재 사용중인 용기 SMPL과 타사 용기사진을 가지고 설명하였고 이런 운반 과정상의 품질 문제 개선을 위해

CM부터는 PALLET 형태의 용기 사용을 위해 금일 아침 글로비스에서 용기 관련 사항을 사전 협의하였슴을 보고하였습니다

업체 발표 도중 ROB CYRUS가 업체로 반송된 불량중 현재 글로비스가 사용중인 달리의 전복으로 손상된 부품도 있다며

업체가 제시한 사진과 함께 이의 제기를 하였고, HMMA IN-LINE 조립작업자의 품질판정이 옳은지도 질문하는 과정에

HMMA 직원간 상호 이견이 발생했으며, 이에 김이사님이 용역을 통해 금일 회의 주제에 벗어나는 사항은 언급하지 말라고

지시 하시면서 무라카미에 몇가지 질문을 하셨고, 최정연 부장님이 일본인 부사장에게 일본어로 질문/답변을 대신하였습니다

답변을 들으신후 타사에는 양품을 공급하고 HMMA에 품질문제를 일으키는게 말이 안된다며 질책하셨고, 이에 ROB CYRUS가

금주 화요일 발생된 불량 때문에 200분의 LILE쟁지 CLAIM이 업체로 청구되었고 주 문제는 BUFF MARK가 아닌 SCRATCH라고 말하며

글로비스의 HANDL'G 과정상의 문제점과 글로비스에 있는 QLS라는 용역사의 문제점을 제기하였습니다.

김이사님이 글로비스 최부장을 호출하시면서 본건은 회의 주제와 관련이 없으니 별도 실무 회의를 하라고 2차 지시하였고

본회의는 품질문제 관련 회의이니 더 이상 무라카미 그런 별개 문제는 본회의에서 제기하지 말라고 지시하셨습니다

그럼에도 ROB CYRUS가 불량 고품도 접수못한 업체에게 수요일날 연락해서 금요일 회의에 참석하라고 하는건 문제가 있다고

이의 제기하였고 최정연 부장님이 서영수 부장에게 차기 회의부터는 사전 안건 조율 및 업체와 협의를 통해 회의가 진행될 수 있도록

요청하였으며 이후 추가로 ROB CYRUS 가 계속 문제 제기를 하며 논박이 계속되었고 긴급한 호출에 7시간에 걸쳐 차를 몰고 켄터키로부터

온 자신들에게 의견 피력의 기회를 주지않자 흥분한 무라카미 영업 직원이 양손에 두개의 O/S MIRROR를 들고 한편의 MIRROR STUD BOLT로

반대편의 MIRROR 하우징에 SCRATCH을 내면서 이번 주 문제는 SCRATCH이며 이로 인하여 무라카미는 많은 손해를

보고 있고, SCRATCH는 글로비스와 HMMA 내부 HANDL'G 과정상에서도 발생할 수도 있으며

금일 아침에 본인들이 글로비스에서 확인 결과 서열 달리에 투입전 제품이 포개진 상태로 적재 되어 있었고, 이에 대한

개선을 수차례 글로비스 현지직원에게 요청하였으며, 무라카미 직원이 2주간 상주하면서 QLS 직원을 교육을 시켰으나

비용작업임에 따라 인원 변동및 QLS 외에는 타 용역업체를 글로비스에서 쓸수없는 관계로 문제가 않다고 불만을 제기하였음

추가로 무라카미 품질 직원이 어제 HMMA로부터 반송된 제품 280개중 89%가 자신들 검사결과 양품이고 나머지 11%는

SCRATCH에 의한 불량이라고 설명하였습니다

이에 김회일 이사님이 화를 내시며 최정연 부장에게 버럭 소리를 질렀고 더 이상 회의를 진행할 수 없으니 차기 회의부터 품질회의는

일본부에서 주관하라며 서영수 부장쪽을 향해 소리치시고 회의장을 나가셨습니다



tabbies

EXHIBIT
2

Date and Time: September 16, 2005, 10:00 AM ~ 11:00 AM
Location: HMMA General Assembly, Alabama Room
Reporter: S.K. Kwak, Sr. Manager of Quality Control, HMMA
Content of Report: Unordinary situation that transpired during a quality control meeting

1.  On the above mentioned date and location, HMMA Quality Control department hosted a meeting.   However, I was attending an interview for a potential new Team Member and was late to the meeting about 15 minutes.

2.  At the time I arrived, there was a presentation of solutions for the bag mark issue related to the outside mirror scratch problem.   Murakami representatives mentioned that the mirrors were being transported in specially designed containers and that the defects were due to the negligent handling by Glovis. The host of the meeting, H.I. Kim, stated that "it could be so, but the purpose of this meeting is to ① e liminate factors that impede the plant productivity and to ② get the big picture on how to improve parts quality in order to produce the perfect quality vehicles.   H.I. Kim also stated that minor issues, such as mishandling of parts, should be discussed in another meeting and to get back on the main topic of the meeting.

3.  The meeting was back on the main topic and we discussed the brightness of the lighting system being changed to 2,500 Lux in the loading dock, not in the work area.   In the process of this discussion, the scratch issue was again brought up and Rob Cyrus presented a strong complaint that the problem was due to improper handling by Glovis.

4.  In response to this, H.I. Kim called for the responsible personnel at Glovis CC to attend the meeting and the Glovis representative left the meeting to summon Sr. Manager Choi.   H.I. Kim proceeded to emphasize the main purpose of the meeting and HMMA's position, which was to enhance productivity of the plant by increasing our efficiency and to ask for cooperation from all suppliers to enhance parts quality.

5.  At this time, the Murakami representative sitting in the middle proceeded to go to the back of the room and retrieve two new outside mirrors out of a box.   He then hit the mirrors together, causing the mounting bolt of one mirror to hit the base face of the other mirror, causing a loud noise and serious damage to the part.   This action made the attendees perturbed and uncomfortable.

6.  H.I. Kim asked in a calm voice "What is this action? (What are you doing?)" Murakami representative answered "even if we package the parts the best we

00988  Cyrus v Huyundai

can, how can we supply good quality parts if the parts are handled the way you just witnessed?" H.I. Kim once again reiterated the main purpose of the meeting and asked everybody to focus on the main topic. The meeting continued.

7. At this time, Rob Cyrus asked "Murakami representatives spent thousands of dollars to come to Montgomery for this meeting and for lodging. Who will be responsible for the travel costs?" The situation became where Rob Cyrus questioned the selection of meeting topics.

8. It became difficult to continue the meeting when a discussion among Rob Cyrus, the Murakami representative and Sr. Manager Choi continued.

9. I left the meeting and went upstairs to prepare for another meeting scheduled for 1 PM. At this time, I saw H.I. Kim and J.Y. Choi come upstairs (I sensed that the meeting had gone awry) and I continued to prepare for the weekly HMMA quality meeting. Thus I was not able to apprehend what had transpired from this point on.

September 16, 2005
Sr. Manager Kwak
Quality Control, HMMA

Incident report of 9/16 meeting with Murakami

Statement by J.Y. Choi of Purchasing

A.  Time and date : September 16, 10:00 AM ~
B.  Circumstances
   1.  HMMA Quality Control gave an overview of the quality problems at each vendor that occurred between September 1 and September 13.
   2.  Meeting started off with a presentation by Murakami.
   3.  Murakami presented a plan to improve the "buff and bag mark" issue and the problem with the container currently in use for NF parts.
      i.  Explained with photos the differences between the current containers manufactured by SMPL and containers manufactured by another company.
      ii.  Reported that Murakami had consulted with Glovis that morning regarding the use of pallet style containers for CM parts.
   4.  During Murakami's presentation, Rob Cyrus protested that some of the parts sent back to the supplier due to defect were caused by a fork lift capsize.
   5.  H.I. Kim directed via translator not to deviate from the main topic of the meeting.
   6.  In addition, H.I. Kim asked Murakami how long they have been manufacturing mirrors (60-year history of supplying mirrors) and to whom they supply the mirrors (Toyota/NUMMI/Nissan).
   7.  Do you just now realize that we need to lengthen the curing time for paint? Why are you just now increasing the light output from 1,000 LUX to 2,500 LUX in the packaging area?
   8.  Berated Murakami that they need to lose the notion that they can supply quality parts to other companies but send defective parts to HMMA because it's Hyundai.
   9.  At this time, Rob Cyrus stated that the supplier has been billed for the 200 minutes of line stop time due to defect on Tuesday that week.  He protested that the main problem was scratches, not buff marks, caused during the handling process at Glovis by the service contractor QLS at Glovis.
   10. H.I. Kim summoned Sr. Manager Jin-Ho Choi of Glovis.  H.I. Kim directed for the second time to get back to the main topic of the meeting, and to arrange a separate meeting regarding the scratch issue.
   11. H.I. Kim stated once again that today's meeting was regarding quality issues. He directed everyone to not bring up the scratch issue any more.

12. Rob Cyrus protested that there is a problem with calling a vendor on Wednesday and requesting them to attend a meeting on Friday when the vendor has not had a chance to receive the defective parts.  Jung-Yun Choi of Purchasing requested Myung-Su Seo to have a discussion with the vendor prior to meeting with them from now on.

13. However, Rob Cyrus continued to protest and confuted with the American personnel from the production division.

14. At that moment, the representative from Murakami-held the outside mirrors in his hands and smashed them together, thus scratching the parts.  He proceeded to protest that the problem lies with scratches and that Murakami is suffering a lot of losses because of this issue.  He also stated that the parts could have very well been scratched during the handling process at Glovis and at HMMA.  He stated that based on his own observation at Glovis that morning, he witnessed the parts were stacked on top of another.  He stated that numerous requests were made to improve the situation at Glovis and Murakami had a representative onsite at Glovis for 2 weeks to train the QLS employees but experienced problems because the parts handlers are temporary positions and Glovis is unable to use any other service contractors besides QLS.

15. Additionally, the Murakami representative protested in a heated manner that of the 280 parts sent back to Murakami, 89% were up to specification and the other 11% was defective due to scratches.

16. H.I. Kim called out Rob's name in a loud voice then said "Sr. Manager Choi, I told you to discuss non-quality related topics at a later meeting" then exited the conference room.

17. About two minutes later, H.I. Kim entered the conference room again and told Sr. Manager Jung-Yun Choi of Purchasing and Sung-Do Park of Quality Assurance to follow him to a conference room on the second floor.

18. H.I. Kim stated that he will not attend another vendor quality meeting and stated that he cannot hold meetings when he is accused of being political when the PPG glass issue was discussed, and a protest letter was delivered after a meeting with Lear regarding the seats, and now Murakami openly protested in a meeting today.

19. After being criticized for about 20 minutes, Sr. Manager Jung-Yun Choi bowed his head and asked H.I. Kim for forgiveness and to appease his anger.

Situation Report of September Quality Control Meeting #2 (September 16, 10 AM ~ )
Statement by Seung-Do Park of Quality Assurance

1.  Description of problem
    Production setbacks and quality control issues due to buffing marks, craters and scratches on the outside mirror housing.

2.  Plans to improve quality issues
    Presentation by the mirror supplier, Murakami, to improve the quality problem and discussion of production setback situation due to the part defects in August and September.
    1)  Murakami representative (American, Manager of Quality Control)
        Emphasized that the scratch problem is caused during the handling process by Glovis.
    2)  H.I. Kim
        Inquired about Murakami's experience and background in mirror manufacturing and which other OEMs they supply parts to.
    3)  Murakami representative (Japanese)
        60 years of experience in manufacturing mirrors and currently supplying to Toyota and Nissan.
    4)  H.I. Kim
        If Murakami's experience and background are so plentiful and supply parts to Toyota then why neglect quality control in parts supplied to Hyundai, or perhaps there exists a problem in Murakami's quality control process.
    5)  Rob Cyrus (American, HMMA Purchasing)
        Stated that placing blame on Murakami for scratches caused by Glovis is unreasonable and passed around photos of the scratches that occurred when they fell off a forklift during transportation at Glovis.
    6)  H.I. Kim
        Stated that the scratch problem will be discussed and taken care of in a rational manner at a later date.  Asked everyone to stay on topic for today's meeting.
    7)  Rob Cyrus
        Continued to mention the scratch issue and stated that it was unreasonable for Murakami to present a countermeasure.  Defended Murakami that they spent thousands of dollars to travel to attend this meeting.

8) Jung-Yun Choi (Coordinator, Purchasing)

Explained the unreasonableness of the vendor quality meeting agenda, and requested that for future meetings the agenda be communicated more clearly, thus advocating the vendor.

9) H.I. Kim

Once again restated the main topic of today's meeting which is to enhance production efficiency and ensure quality.

10) Murakami representative (American)

After a discussion with Rob Cyrus, the American representative from Murakami held two mirrors in his hands and smashed them together, reenacting a scenario of how scratches occur during the handling process by another vendor. Then he proceeded to put down the mirrors on the table in a rude manner, making a loud noise. This caused a disorder in the meeting and it became difficult to carry on the conference.

11) H.I. Kim

Spoke to J.Y. Choi of Purchasing in a loud voice that despite numerous requests to stay on topic for the meeting, they have deviated. H.I. Kim asked if they were in attendance to defend the vendor and that it is not possible to carry on the meeting in this manner. He declared the meeting adjourned and closed the file folder on the table in a forceful manner, making a loud noise; he then exited the conference room.

Situation report on vendor quality meeting with Murakami on September 16, 2005 at 10 AM in Alabama Room hosted by HMMA.

By H.I. Kim

The topic of the meeting was downtime caused by defective parts in August and September of 2005. The meeting started off with a presentation by Quality Control Manager Jason Chi.

The mirror manufacturer Murakami briefed the meeting attendees with a report.

<H.I. Kim>
What is your length of experience in manufacturing the outside mirrors and have you supplied mirrors to other companies?

<Vice President of Murakami>
Sixty years and we supply to approximately 10 Toyota affiliate companies.

<H.I. Kim>
Why did you change the light output from 1,000LUX to 2,500LUX?

<Murakami Representative>
It was due to bad visibility in the packaging area.

<H.I. Kim>
Was the cause of "Bup'g" not due to your failure to adhere to the proper cure time of 4 hours?

<Murakami Representative>
(Without explanation for Bup'g) The problem occurred because of containers that were approved by HMMA and scratches occurred because of negligence during the handling process by Glovis.

<H.I. Kim>
Regardless of the containers, couldn't the "Bup'g" problem be avoided if you had adhered to the proper cure time?

If you have so much experience and supply parts to several OEMs then perhaps you do

00994  Cyrus v Huyundai

not care so much about parts supplied to Hyundai or there is a problem in your quality control system.

<Rob Cyrus>

Rob Cyrus mentioned that it was a problem when HMMA rejected the mirrors due to scratches. He then passed around printed photos of scratched mirrors that occurred when a forklift dropped the parts during transporation at Glovis. Complained that HMMA is wrongfully rejecting these scratched parts and that HMMA considered this downtime.

<H.I. Kim>

The appropriate personnel can meet together after this meeting to discuss those issues. If the fault lies with Hyundai or Glovis, then Murakami should bear no responsibility so do not be concerned. Let us continue with the meeting.

<J.Y. Choi and Rob Cyrus>

Both continued to mention the scratch issue and delayed the continuation of the meeting.

※ At this point, there was a discussion among Rob Cyrus and John Kalson & Chris from Quality Control. I (H.I. Kim) stopped the conversation and stated;

<H.I. Kim>

I understand. Call for Sr. Manager Choi at Glovis and we will confirm the facts. If there is something wrong, then we will discuss it and there will not be a problem. Let's proceed with the meeting.

<Rob Cyrus>

He once again mentioned the scratch problem and questioned if there was another agenda, thus further delaying the meeting.

<H.I. Kim>

Showed him the main topic of the meeting and stated that other topics will be discussed in a different meeting afterwards with H.I. Kim in attendance.

Stated once again that HMMA has not achieved normal production and upon analysis of the contributing factors, equipment issues, shortage of parts and defective parts were identified as the biggest impeding factors, all of similar magnitude. This is why we

have been holding the vendor quality meetings since the second week of September and the first objective is to enhance the plant productivity and second, to build high quality vehicles that Hyundai aims to manufacture.   We are not here to place blame on any particular vendor.   Continue with the meeting.

<Rob Cyrus>
He spoke briefly with the manager of Murakami and once again mentioned the scratch issue.   At this time, the Murakami manager stood up and picked up two mirrors from the back of the room, spoke in an elevated voice, hit the two mirrors together and threw them down on the conference table.

<H.I. Kim>
Examined the mirrors and stated that Sr. Manager Choi of Glovis has been summoned and that we will discuss the scratch issue when he arrived.   Once again asked to continue with the meeting.

 ※  At this time, J.Y. Choi and Rob Cyrus mentioned the scratch issue once again.

<Rob Cyrus>
(In a loud voice) The Murakami people arrived here yesterday to attend this meeting and it has cost them 5,000 dollars to be here.   Who will take responsibility for that?

<H.I. Kim>
(Elevated voice) Sr. Manager Choi, I have repeatedly stated the main objective and topic of today's meeting and asked to stay on topic.   Are you here to defend the supplier?   You should understand after I've told you so much.
Stated that it is not possible to continue the conference under the circumstances and asked S.D. Park of Quality Assurance to host future quality meetings.   Closed the file folder on the table (making a slightly loud noise in the process) and exited the room.

Personal Opinion

1.  Vendor quality meetings are held each month, hosted by the head of Quality Control at each plant.   However, in HMMA's case, we host a quality control meeting every Friday, starting in September.   Our objective is to identify the impeding factors of production and point them out to the upper management of

the vendors in order to induce enhancement of the parts quality.  But it seems that our own personnel here at HMMA do not understand the purpose.

2.  Despite repeated explanations of the meeting objective and several requests to stay on topic, they continued to take a defensive position on behalf of the vendor and delayed the meeting.

3.  Damaged HMMA's image and the plant superintendent's image in front of vendor personnel and HMMA personnel.

4.  This was our second meeting and there is a concern about how much influence this could have on future meetings for parts supplier claims.  Simultaneously, it is deemed difficult for the plant superintendent (H.I. Kim) to host future meetings.  It would be more appropriate for the quality control HOD to host these meetings, as is the case at HMC.

Incident report for September 16th vendor quality meeting
By B.G. Cho

By the time I arrived for the conference, Murakami was almost finished with their countermeasure presentation for the outside mirror buffing problem.

After the vendor was finished presenting the cause of the problem and the countermeasure, H.I. Kim asked the Murakami personnel their experience and background in the industry along with the companies they supply parts to.

Murakami's Japanese representative misunderstood H.I. Kim's question and gave an irrelevant answer. Jung-Yun Choi of Purchasing translated in Japanese and the Murakami personnel answered that they have a 60-year history and supply parts to Toyota, Nissan and Honda and that they have had hardly any quality issues. H.I. Kim reprimanded them on why they could not adhere to basic quality standards for parts supplied to HMMA.

Murakami's response was that the scratch problem is not their fault and insisted that it happens during the handling process at Glovis. H.I. Kim directed that the purpose of this meeting was to discuss the buffing issue, not the scratches. He stated that the scratch issue will be discussed in a separate meeting following this meeting.

One of Murakami's representatives smashed two mirrors together (almost gave us the impression that he was emotionally-charged) and insisted that scratches are unavoidable when Glovis handles the parts in such a manner. He then proceeded to throw them onto the conference table. (From the Korean cultural perspective, it was a deliberate act of showing that they were unhappy.)

H.I. Kim once again emphasized that the scratch issue is not the main topic of the meeting and gave a directive to hold a separate meeting later to find a resolution. Also he called for Sr. Manager Jin-Ho Choi of Glovis to attend that meeting.

H.I. Kim explained the purpose of the vendor quality meetings. He stated that it is a waste of time for the involved personnel and also for vendors who are not involved to discuss issues that occurred between vendors, and that this is a place for discussion of supplying quality parts that are free of defect to a mass production line. It would be

reasonable to have a separate meeting regarding the scratch issue with all involved personnel in attendance.

Rob Cyrus stated that the scratch issue was included as part of the agenda and that several people travelled to Montgomery for 2-3 days to inspect this problem, incurring thousands of dollars in the process. He gave the impression of defending the vendor, stating that the problem lied with Glovis and why we were not make this known.

H.I. Kim then stated to Jung-Yun Choi of Purchasing, "I have explained the objective of the vendor quality meeting, and I have said that the vendor only has to make a presentation on defects they are responsible for and that the scratch issue will be addressed at a later time. We cannot continue the meeting if you keep defending the vendor in this manner." H.I. Kim then adjourned the meeting.

Rob Cyrus continued to insist that the scratch issue was indeed included in the agenda, and questioned why we could not address the problem, and that Murakami spent a lot of time and money to have their engineers inspect someone else's problem.

Sr. Manager Jin-Ho Choi of Glovis soon arrived. They decided to have a separate meeting regarding the scratch issue immediately and proceeded to relocate to another conference room with the Murakami personnel, Jung-Yun Choi of Purchasing, Jin-Ho Choi of Glovis and the Quality Control personnel.

Incident report during 9/16 meeting with Murakami

By B.D. Hwang

1.  Date and time : September 16, 10:00 AM ~

2.  Meeting situation

    The meeting began with an explanation by HMMA Quality Control regarding the parts defects situation between September 1 and September 13.

    The meeting proceeded with an initial presentation by Murakami.

    Murakami presented a plan to improve the "buff and bag mark" issue and the problem with the container currently in use for NF parts.

    Murakami representative explained with photos the differences between the current containers manufactured by SMPL and containers manufactured by another company.

    He reported that Murakami had consulted with Glovis that morning regarding the use of pallet style containers for CM parts.

    During Murakami's presentation, Rob Cyrus protested that among the defective parts sent back to the vendor, a portion of them were damaged when a dolly tipped over. He also questioned whether the line assembler's decision on the part defect was correct, which caused a conflict among HMMA personnel in attendance.

    H.I. Kim directed via translator to not deviate from the main topic of today's meeting and proceeded to ask a few questions to the Murakami personnel. Jung-Yun Choi of Purchasing translated in Japanese for H.I. Kim and the Japanese Vice President of Murakami.

    Upon hearing the VP's response, H.I. Kim reprimanded them for supplying quality parts to other companies but cause a quality issue to HMMA.

    Rob Cyrus protested that the 200 minutes of line stoppage on Tuesday that week has been billed to the vendor and that it was due to scratches, not buff marks. He stated that the problems lies with the handling process at Glovis, and the service contractor company called QLS at Glovis.

    H.I. Kim summoned Sr. Manager Choi of Glovis and directed for the second time to

01000  Cyrus v Huyundai

stay on topic for the meeting.

However, Rob Cyrus continued to protest, stating that contacting the vendor on Wednesday and telling them attend a meeting on Friday poses a problem, especially when they have not had a chance to receive the defective parts sent back to them. Jung-Yun Choi requested Myung-Su Seo to speak with the vendors prior to the meeting.

Rob Cyrus continued to protest and confuted.  Murakami representative became upset when he felt that he was not given the appropriate opportunity to explain their position after driving 7 hours from Kentucky.  He proceeded to hold a pair of mirror housings in his hands and hit them together.  He scratched one housing with another housing's mirror stud bolt and stated that this week's problem is scratches and that Murakami is suffering a lot of loss.  He claimed that the scratch problem could very well occur during the handling process at Glovis and HMMA, and that upon his inspection that morning at Glovis, he noticed parts were stacked on top of another.  He also stated that Murakami had made numerous requests to Glovis to improve the situation and a Murakami representative stayed onsite for 2 weeks to train the QLS employees.  But because the parts handlers are temporary positions and due to attrition and the fact that Glovis could not use any other service company other than QLS produced problems.

Additionally, Murakami representative said that among the 280 parts that HMMA sent back to them, 89% of them were up to specification, and the other 11% was defective due to scratches.

H.I. Kim became angry and yelled at Jung-Yun Choi.  He yelled to Myung-Su Seo that future vendor quality meetings will be hosted by the quality control department and that it is not possible to continue the meeting under the circumstances.  H.I. Kim then exited the conference room.