IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ROBERT CYRUS,                    )
                                 )
          Plaintiff,             )
                                 )
vs.                              )          Civil Action No.: 2:07-cv-144-ID
                                 )
HYUNDAI MOTOR                    )
MANUFACTURING OF                 )
ALABAMA LLC,                     )
                                 )
          Defendant.             )


**PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Richard J. Stockham, III
Attorney for the Plaintiff
Stockham, Carroll & Smith, P.C.
2204 Lakeshore Drive, Suite 114
Birmingham, Alabama 35209
Telephone (205) 879-9954
Fax: (205) 879-9990
E-Mail: rjs@stockhampc.com

## TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II. STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    Choi Similarly Situated to Cyrus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    Nobody at HMMA Complained about Cyrus Before September 16 . . . . . . . . . . . . . . . . 6

    The Pre-meeting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    The Murakami Meeting on September 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    Choi Contradicts Kim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    Choi Told Cyrus That Kim Wanted to Fire Them . . . . . . . . . . . . . . . . . . . . . . . . 11

    Cyrus Tells Duckworth about the Murakami Meeting . . . . . . . . . . . . . . . . . . . . . . 11

    Choi Told Cyrus about Kim's Anger Escalating . . . . . . . . . . . . . . . . . . . . . . . . . 12

    Kim Has His Employees Write Meeting Notes . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    Cyrus Did Not Say "Bullshit"to Susock or Challenge Kalson about
        Toyota's Production . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    Jason Chi Berates Murakami Representative . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    Cyrus Worked about a Week Between September 16 and October 22 . . . . . . . . . . . . 17

    Duckworth Call to Meet Cyrus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    Meeting at the City Grill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    Choi Tells Cyrus He Is Not Concerned about Kim Because
        He Has a Different Boss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    Cyrus Reported Discriminatory Conduct to Duckworth . . . . . . . . . . . . . . . . . . . . 21

    Duckworth's Claim That Cyrus Had a Bad Attitude Is Contradicted . . . . . . . . . . . . . 23

    Cyrus Was Replaced by Choi . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

2

III. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

DISCRIMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

PLAINTIFF SATISFIES THE PRIMA FACIE CASE FOR DISCRIMINATION . . . . . 26

PRETEXT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

RETALIATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

PRETEXT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Comes now the Plaintiff, Robert Cyrus, and submits this Opposition to the Motion for Summary Judgment filed by Defendant.

## INTRODUCTION

Plaintiff offers substantial evidence to establish his case of race discrimination and national origin discrimination under 42 U.S.C. §2000(e) and 42 U.S.C. §1981. He also offers substantial evidence to establish his claim of retaliatory discharge under 42 U.S.C. §2000(e) and 42 U.S.C. §1981a. He also offers substantial evidence that the reason offered by the Defendant for terminating the Plaintiff is not true and, thus, a pretext for discrimination and retaliation.

## STATEMENT OF FACTS

1.      Robert Cyrus is a white American. (EEOC Charge Ex.21, Cyrus Depo). He was hired to be the top American in purchasing at Hyundai's Montgomery, Alabama facility. (Cyrus depo. pg. 34:6-9). He began work at the Montgomery facility in June, 2002. (Cyrus depo. pg. 26:12-17). His title when he arrived at the Montgomery facility - which later became Hyundai Motor Manufacturing Alabama, LLC ("HMMA") - was Director of Purchasing, Parts Development. (Cyrus depo. pg. 31:13-16).

2.      When he began Cyrus reported to Ted Chung, the son-in-law of the chairman of Hyundai Motor Company. He also reported to a Korean named Mark Lee who was Vice President over the Department of Purchasing and Parts Development at the Montgomery facility. (Cyrus depo. pg. 31:22-pg.33:13). There were approximately fifty people in the purchasing department, twenty-five from Korea and twenty-five hired in Montgomery, Alabama. (Cyrus depo. pg. 35:10-21).

3.      During the course of Cyrus' employment as Director of Purchasing and Parts

4

Development, H.J. Hyun initially reported to him, then became an equal director with him as Director of Indirect Purchasing. (Cyrus depo. pg. 36:20-37:5). Hyun then became a senior director and was Cyrus' boss. (Cyrus depo. pg. 183:20, pg. 263:1-5).

### Choi Similarly Situated to Cyrus

4.      J.Y. Choi came from Korea to HMMA on August 11, 2005. (Choi depo. pg. 16:7-14). Prior to that he lived in the United States for only four years and ten months in Ann Arbor, Michigan, in the 1990's. (Choi depo. pg. 14:3-25). Immediately prior to coming to Alabama, Choi's position had been the Manager of the Department of Development for Parts Overseas at Hyundai Motor Company. (Choi depo. pg. 16:15-pg.17:10). There Choi was team leader over the Parts Development Department at headquarters in Seoul, Korea. (Choi depo. pg. 29:18-pg. 30:3).

5.      When Choi came to HMMA he worked in the Purchasing and Parts Development Department. (Choi depo. pg. 18:20-pg. 19:3). He reported directly to Hyun. (Choi depo. pg. 45:15-pg. 46:15). Cyrus also reported directly to Hyun at this time. (Choi depo. pg. 45:15-17, Cyrus depo. pg.183:20). Cyrus was not Choi's boss; they were peers at the same level: Cyrus was over Parts Development and Choi was over Purchasing. (Cyrus depo. pg. 303:4-23).

6.      On September 16, 2005, Choi acted in tandem and as a peer to Mr. Cyrus. For instance, Choi acted as a head in the department by directing Chris McClain, an employee in the Purchasing and Parts Development Department, to prepare a statement about what occurred in a meeting that day with Murakami, a product supplier. (Choi depo. pg. 169:12-pg. 174:9).

7.      Murakami was a mirror supplier to HMMA. On September 16, 2005, representatives from Murakami came to HMMA to address some issues with the mirrors it was

supplying.   Choi attended the meeting with Murakami and addressed the issues in lockstep with

Cyrus. (Cyrus depo. pg. 142:10-pg. 143:10).

8.      HMMA's EEOC response to Plaintiff's charge of discrimination identifies Choi

as "Director of Purchasing Procurement." (HMMA's EEOC response pg. 4, bates stamp 384,

Plaintiff's Ex. 4).

### Nobody at HMMA Complained about Cyrus Before September 16

9.      At the time that Cyrus came to work for HMMA in Montgomery in 2002 until

September 16, 2005, no one had ever indicated to him that anyone, at any level, had any

problems with him. (Cyrus depo. pg. 216:17-19).  On the afternoon on September 16, 2005, after

the Murakami meeting, Cyrus went to speak to Keith Duckworth, Deputy President and Chief

Administrative Officer of HMMA.  Duckworth told him that he was not aware of any complaints

from anybody at HMMA, that Cyrus was doing an excellent job, and that everyone at HMMA

thought the world of Cyrus. (Cyrus Declaration ¶ 5, Plaintiff's Ex. 2).

### The Pre-meeting

10.      The night before the meeting with Murakami, Cyrus was at a team building

function at a bowling alley in Montgomery when Brian Hwang, one of Mr. Cyrus' direct reports,

told him about the Murakami meeting and that he needed Cyrus' support in a meeting with H. I.

Kim, the COO of HMMA. Hwang told Cyrus that he needed his support to be fair and to

represent the supplier side.  Cyrus said he would remain neutral and strictly present the facts.

(Cyrus depo. pg. 54:7-11).

11.      This was the first Mr. Cyrus ever heard about the Murakami meeting or the

Murakami defect issues. (Cyrus depo. pg. 53:7-pg. 54:6).  Before the meeting with Murakami

there was a pre-meeting where several employees went into the plant. There were several Murakami quality issues identified, these included buff marks on the mirrors, bag marks on the mirrors, scratches and craters on the mirrors and wind noise. (Cyrus depo. pg. 73:9-14). There were some 280 parts involved, 250 of these were deemed to be acceptable. (Cyrus depo. pg. 74:15-20). The remaining ones were typically scratch marks with gouges all the way down to the raw material. (Cyrus depo. pg. 74:21-pg. 75:6).

12.     The HMMA people, together with the supplier's representatives, agreed that the scratch marks were a Glovis handling issue, (Cyrus depo. pg. 75:16-19), but the buff marks and bad marks were happening at the Murakami plant. (Cyrus depo. pg. 75:22-pg. 76:5).

13.     The group interviewed a person on the line who put the parts on the vehicle. She said there really had not been very much difficulty with the mirrors and the only thing that had been occurring was the occasionally severe gouges and scratches. She said Murakami was generally a good supplier, that the only thing that the people on the line saw were severe gouges and scratches. (Cyrus depo. pg. 80:1-18).

14.     One of the issues Murakami raised in the pre-meeting was that parts had been returned to them that had been run over by a forklift. (Cyrus depo. pg. 85:12-pg. 86:7).

15.     After the determination was made in the pre-meeting that there were three problems - buff marks, bag marks and scratches - the group informed Chris Susock, who was head of Quality, and he concurred that the scratches were an internal Hyundai handling issue with Glovis. (Cyrus depo. pg. 93:8-19).

16.     One of the things that came out at the pre-meeting was that of the 282 mirrors returned as defective, 251 of those were good. This was a determination made by Susock's

department, HMMA QC. (Cyrus depo. pg. 94:18-pg. 95:1).

17.    Murakami identified the problems on Murakami's end in the pre-meeting. These were improper curing time, improper lighting, and improper packaging which resulted in buff marks and bag marks.  (Cyrus depo. pg. 99:20-pg. 100:1).

### The Murakami Meeting on September 16

18.    At the meeting with Murakami there was an agenda that was printed and also projected on the overhead screen.  (Cyrus depo. pg. 72:7-15; Choi depo. pg. 68:22- pg. 69:23; Kim depo. ex 1).  The agenda identified one of the nonconforming things to be "polishing mark, crater, scratches" and issues to be "downtime (door like)."  (Kim depo. ex. 1; Choi depo. pg. 68:22-pg. 69:23).

19     At the meeting, representatives from both Murakami and the supplier Hwashin were present. (Choi depo. pg. 70:7-16).  During the meeting Cyrus took notes of what was going on. (Cyrus depo. pg. 58:7-11, Cyrus depo. ex. 6).

20.    H.I. Kim was hosting the meeting.  (Cyrus depo. Ex. 5, Bates Stamp 358). Translating for Kim was Jason Chi (Cyrus depo. Ex. 5, bates stamp 358).

21.    The meeting opened with Murakami's representative discussing the quality issue of buff marks on the mirrors that they supply. (Cyrus depo. pg. 108:22-pg. 109:2).  All three members from Murakami spoke during the meeting.  (Cyrus depo. pg. 127:1-4).  First the buff mark issue and the low light level were discussed. (Cyrus depo. pg. 127:4-12).  Next the presenter discussed the packaging issue and the lack of proper cure time. (Cyrus depo. pg. 127:12-17).    Kim then asked the Murakami representatives how long they had been in business. (Cyrus depo. pg. 127:18-21).

8

22.    Choi and Cyrus spoke pretty much in lockstep during the meeting. The contents of what they said was the same; there was nothing of substantial difference between what Choi said in English and what Cyrus said. (Cyrus depo. pg. 142:10- pg. 143:10). Choi and Cyrus both indicated at some point in the meeting that the downtime was multifaceted and had a number of different group causes. (Cyrus depo. pg. 141:6-8). Choi and Cyrus also said that they wanted to give Murakami the opportunity to review their data that they produced in their presentation. (Cyrus depo. pg. 142:3-7). Choi and Cyrus brought up the handling issues with Glovis with regard to downtime and the scratches caused by Glovis. (Cyrus depo pg. 114:10- pg. 115:2)

23.    Defendant alleges that Cyrus made a statement to Kalson about comparing HMMA production to Toyota production systems. Cyrus denies this. John Kalson, Director of Production, had a conversation with Cyrus about passing on defects to the next process. (Cyrus depo. pg. 124:12-17). Both Cyrus and Choi talked about how in Hyundai's production system they do not pass on defects to the next operator. (Cyrus depo. pg. 134:11-22).

24.    Cyrus did not compare Hyundai production system to Toyota's production system or did he say he would teach Kalson about production systems. (Cyrus depo. pg. 135:11-21). He did not mention "Toyota" at all because "Toyota" is a taboo word at Hyundai. (Cyrus depo. pg. 136:4-8).

25.    Nor did Cyrus say "bullshit" to Susock in the meeting in response to some comment Susock made to him. (Cyrus depo. pg. 118:22-pg. 119:5). Susock did not make any comment to Cyrus during the meeting. (Cyrus depo pg. 118:20-21).

26.    Kim became visibly upset, yelling at various attendees, and threw papers on the

table in disgust. (Cyrus depo. ex. 5, bates stamp 358). Kim abruptly turned and walked out of the

room. (Cyrus depo. ex. 5, bates stamp 358). Kim returned and Roberts from Murakami raised

his voice and asked why they were required to come to HMMA at significant cost if no one will

listen. (Cyrus depo. ex. 5, Bates Stamp 359).

27.     Roberts took two mirrors and struck them together. (Cyrus depo. pg. 120:16-

pg.121:2). One of the representatives from Murakami said that they had spent thousands of

dollars to come and they would like to present their issues. (Cyrus depo. pg. 131:11-15).

28.     At this Kim appeared further infuriated and yelled very loudly at HMMA team

members and Murakami. (Cyrus depo. Ex. 5, bates Stamp 359). Mr. Kim scolded Murakami

telling them to behave themselves.  (Cyrus depo. Ex. 6, Bates Stamp 271-272).

29.     In front of the suppliers and all of the attendees in the room, Kim scolded Choi,

raising his voice. (Kim depo. pg. 209:3-pg. 210:5). Kim said to Choi "are you here to defend the

vendors." (Kim depo. pg. 211:9- pg. 212:22). Kim then repeatedly slammed items on the table

then got up and left. (Cyrus depo. ex. 6, Bates Stamp 272).

**<u>Choi Contradicts Kim</u>**

30.     Kim claims that Cyrus made the statement during the meeting that Kim had some

suspicious reason or hidden agenda for not discussing the scratches.  (Kim depo. pg. 143:23- pg.

144:7, pg. 182:9-pg. 183:16, Defendant Ex. G, bates stamp 995).  However, Choi denies that

Cyrus ever made such a statement. (Choi depo. pg. 155:11-20).

31.     Kim says that in conjunction with Roberts' banging the mirrors together that

Cyrus raised his voice and directed his comments to Kim. (Kim depo. pg. 189:19-pg. 194:4).

Choi, on the other hand, states that immediately after Roberts banged the mirrors together that

10

there was silence that lasted for quite a while and the first person to speak after the silence was

the person from Murakami who raised his voice. (Choi depo. pg. 144:9-pg. 145:19).

32     Choi says that when Kim spoke to him he was not scolding him but he was merely

addressing him because he could not say the same thing to Cyrus in English.  (Choi depo. pg.

147:4-pg. 149:3), but Kim says he scolded Choi in front of everyone. (Kim depo. pg. 208:10-pg.

210:5).

### Choi Told Cyrus That Kim Wanted to Fire Them

33.     After the meeting, at approximately 1:45 p.m., Choi called Cyrus on his cell

phone and told him that they both may be going home early.  He said Kim was very upset with

them and he needed to meet him at his desk. (Cyrus depo. pg. 152:6-10).  Cyrus understood from

the way Choi said it that both of them may be fired. (Cyrus depo. ex. 5 bates stamp 359).  When

Cyrus met with Choi, Choi again told him that Kim was very upset, that he has talked to

President Ahn and that he has talked to the President of Quality in Korea.  (Cyrus depo. pg.

179:11-pg. 180:7).

### Cyrus Tells Duckworth about the Murakami Meeting

34.     After his conversation with Choi, Cyrus went and spoke to Duckworth who was

Deputy President.  Cyrus told Duckworth that Choi told him that Kim was angry and indicated

that the two of them were going to be fired.  Cyrus told Duckworth that he and Choi had done

nothing wrong.  Cyrus described at length what had occurred in the meeting. (Cyrus Declaration

¶ 2, Plaintiff's Ex. 2).

35.     Cyrus told Duckworth that he considered the environment to be very hostile

because of the yelling and throwing things that Kim had done. Cyrus told Duckworth that he was

concerned because he had heard of Kim's reputation for vindictiveness. (Cyrus Declaration ¶ 3, Plaintiff's Ex. 2).

36.    Duckworth told Cyrus that everyone at HMMA thought the world of him, that he was doing an excellent job, and that he had not heard of any complaints from anyone about him. Duckworth assured Cyrus that his job was secure. (Cyrus Declaration ¶ 3, Plaintiff's Ex. 2).

### Choi Told Cyrus about Kim's Anger Escalating

37.    Cyrus again met with Choi. Choi told Cyrus that Kim had not only complained to Ahn and called the President in Korea, but that they were now required to write meeting notes. Choi and Cyrus went and met with their boss, Hyun. (Cyrus depo. pg. 183:16-20). Hyun wanted to know what happened and the two of them told Hyun that they did not understand why Kim got so angry. At this point Hyun told them that they had to write meeting notes. (Cyrus depo. pg.184:1-9).

38.    Then Choi and Cyrus went and met with Jason Lee, the Chief Financial Officer for HMMA and explained to him what happened. Mr. Choi cried in that meeting telling Mr. Lee that they had done nothing wrong and that it was Mr. Kim who should apologize. Mr. Lee at that point said he was going directly to discuss the matter with President Ahn. (Cyrus Declaration ¶ 3, Plaintiff's Ex. 2; Cyrus depo pg. 180:18- pg. 181:23).

39.    After that Cyrus went back to meet again with Duckworth. He told all of the things that had occurred since the earlier meeting, telling him that things appeared to be escalating and that he was concerned about retaliation from Kim because of his reputation. (Cyrus Declaration ¶ 3, Plaintiff's Ex. 2; Cyrus depo. ex. 15). Cyrus had been told by his boss, Hyun, that Kim was unreasonable, vindictive, and had a bad temper. (Cyrus depo. pg. 155:16-

23).  Duckworth again reassured that nothing would come of the matter that this was just

Hyundai's style.   (Cyrus Declaration ¶ 3, Plaintiff's Ex. 2).

### Kim Has His Employees Write Meeting Notes.

40.     Kim left the Murakami meeting and went to his office and wrote notes about

what occurred in the meeting. (Kim depo. pg. 158:6-12).  Kim denies that he directed individuals

to do write ups about the Murakami meeting. (Kim depo. pg. 241:13-pg. 242:10).  However, the

night of September 16, Harry Chase called Cyrus about 7:00 p.m., and said he was still at work

because Kim had ordered all his employees in the Murakami meeting (approximately twelve

people) to make meeting minutes of what had occurred. (Cyrus depo. pg. 191:15-23).

41.      During the three years that Cyrus had worked for HMMA he had never been

required to write meeting minutes.  (Cyrus depo. pg. 56:19-22).  Kim likewise, admits that this

was the first and only time he had ever had his notes typed up for his boss.  (Kim depo. pg. 63:6-

pg. 64:16).

42.     According to Kim's notes, both Cyrus and Choi spoke about the scratch issue on

several occasions.  (Defendant's Ex. F, bates stamp 995-996).  At the end of this Kim raised his

voice to Choi and said that he repeatedly had stated the main objective of the meeting and asked

him to stay on topic, asking if he was here to defend the supplier. (Kim depo. pg. 154:11-pg.

155:23, pg. 211:9-pg. 212:21).

43.     Kim denied that there was any agenda present for the meeting. (Kim depo. pg.

40:14-pg. 41:18).  Kim denied that the agenda, attached to his deposition as Exhibit 1, was the

agenda for the meeting. (Kim depo. pg. 43:19-pg. 45:4).  Kim's note reflects that there was an

agenda, and that he shook  it in the meeting. (Kim depo. pg. 187:6-pg. 188:13).  Choi also says

that there was an agenda for the meeting and it was Exhibit 1 to Kim's deposition. (Choi depo. pg. 69:7-23).  Exhibit 1 to Mr. Kim's deposition reflects that the scratches were listed on the agenda.

44.    Twelve sets of notes about the meeting were collected. (Defendant's Ex. F, Bates stamp 196-273; translations of the Korean notes defendant's Ex. G, Bates stamp 988-1001).

45.    However, there were some thirty people at the meeting.  (Cyrus depo. pg. 191:17-23).  This included several senior members of management.  For example, according to the notes of Jason Chi, (Defendant's Ex. F, bates stamp 238), attendees at the meeting included, Simon Sung, Senior Manager of Parts Development, Chuck Knowles, Manager of Parts Management, Danny Seo, Senior Management of Parts Quality. There are no statements from these individuals.

46.    Similarly, a favorable statement supporting the position that Cyrus and Choi did nothing wrong was not included in the stack of statements.  Choi had obtained meeting notes from Chris McClain. (Choi depo. pg. 169:11-pg. 171:19, Choi depo. ex. 2). McClain's notes say that purchasing staff was not disrespectful during the meeting. (Choi depo. pg. 173:6- pg. 174:3, Choi depo. ex. 2).

**Cyrus Did Not Say "Bullshit" to Susock or Challenge Kalson about Toyota's Production**

47.    There are many contradictions between the twelve written statements.  For example, only four mention that Cyrus said "bullshit" in response to a statement by Susock. These were Susock's, Horn's, Kalson's and Chi's.  However, they contradict each other about when it was said and the context in which it was said.

Susock says that he told Cyrus:

"that the Buffing Marks quality issue is real and that we need to stick to this

14

issue, the 200 minutes of downtime is irrelevant at this point..." Rob stated that this is "Bullshit" and that Murakami was forced to come down here to address and, [sic] issue that is irrelevant compared to other issues with Glovis."

(Defendant's Ex. F, Bates Stamp 245)

48.     Horn's notes say again the amount of downtime charged to Murakami was raised. Chris Susock stated that PQ has already calculated the downtime to the best of their ability - to which Rob said "Bullshit!"          (Defendant's Ex. F, Bates Stamp 249)

49.     In Susock's version, Cyrus is commenting on the meeting being focused on the buff marks and says "this is Bullshit". In Horn's version Cyrus is challenging Susock's claim that the downtime has already been calculated to the best of PQ's ability. In Susock's version the 200 minutes of downtime is irrelevant, in Horn's version the calculated downtime is not irrelevant and is the point.

50.     Kalson also states Susock:

"stated that the concern with the mirrors were causing HMMA downtime and repairs and that Murakami had a responsibility for that. Mr. Cyrus at some point here said "that's bullshit."          (Defendant's Ex. F, Bates Stamp 204)

51.     So Kalson's version is different from Susock's and Horn's because according to him Cyrus' comment of "bullshit" was neither challenging the specific calculation or commenting on the status of the meeting, but, instead, was denying that Murakami had a responsibility for downtime and repairs at all.

52.     The statements that claim Cyrus said "bullshit" to Susock also differ as to when in the meeting they claim Cyrus said it in the meeting. Susock claims Cyrus said it before Roberts banged two mirrors together and threw them on the table. (Defendant's Ex. F, Bates Stamp 245). Horn claims it occurred after Roberts struck the mirrors together. (Defendant's Ex.

15

F, Bates Stamp 249).

53.     Kalson's statement places it at some point after Roberts struck the mirrors together and in conjunction with his conversation with Cyrus where he says Cyrus said "that's not how Toyota does it and let me teach you something about production systems." (Defendant's Ex. F, Bates Stamp 204).

54.     Susock's statement, however, says the conversation between Cyrus and Kalson was not in conjunction with the "bullshit" statement.  That conversation occurred after Roberts struck the mirrors together.

55.     According to Susock's statement, Cyrus told Kalson "is this the Toyota production system way to pass on the defects to next customers." (Defendant's Ex. F, bates stamped 245).

56.     Jason Chi's note says Cyrus said "bullshit" before Roberts struck the mirrors together.  (Defendant's Ex. F, Bates Stamp 240).  Chi's note says Cyrus spoke to Kalson after the mirrors were struck together.

57.     Horn puts the statement by Cyrus to Susock and the statement by Cyrus to Kalson together after the mirrors were struck.

58.     Horn's note says Cyrus "then asked if that is the Toyota way - to pass defects on to the customer." (Defendant's Ex. F, bates stamped 249).

59.     Passing on defects to "next customers" as Susock's note says, though an unusual phraseology,  suggests an internal "customer" further on down the assembly line.  This is in marked contrast to the phrase used by Horn "to pass defects on to the customer" which clearly means to pass on to defects ultimate retail purchase.

16

60.    Cyrus denies that he ever used the word "bullshit" in response to Susock during the Murakami meeting. (Cyrus depo. pg. 118:22-pg. 119:9).

61.    He also denies that he ever made any statement to Kalson that made any reference to the Toyota way or the Toyota production system.  He never used the word Toyota. (Cyrus depo. pg. 124:18-pg.125:12).

62.    Cyrus denies that he ever told Kalson "that's not how Toyota does it and let me teach you something about production systems." (Cyrus depo. pg. 135:17-21).  Toyota was a taboo word around Hyundai. (Cyrus depo. pg. 136:4-8).

63.    None of the other eight statements make any reference to Mr. Cyrus saying "bullshit" to Mr. Susock or saying anything about the Toyota way or Toyota Production System.  All of them make reference to Mr. Roberts striking the mirrors together. (Defendant's Ex. F, Bates Stamp 195-279; Defendant's Ex G, Bates Stamp 988-1001).

64.     Kim himself did not hear these things in the meeting.  Though he claims Cyrus, Kalson, and Susock spoke together, the conversation was not translated, calling into question whether the alleged significant statments were made. (Kim depo. pg. 171:12-pg. 172:10).

### Jason Chi Berates Murakami Representative

65.    After the meeting with Murakami, Chi had a separate meeting with Murakami and told Roberts to "shut up and sit down."  (Cyrus depo. ex. 5, Bates Stamp 359).

### Cyrus Worked about a Week Between September 16 and October 22

66.    Mr. Cyrus had problems with his medication being properly adjusted and so he was off work between September 16, 2005 and October 22, 2005, except for about a week, the week of October 3 through October 7.  (Cyrus Declaration ¶ 5, Cyrus depo ex. 13).

### Duckworth Call to Meet Cyrus

67.     On Saturday, October 22, 2005, Duckworth called Cyrus and asked him to meet

him for dinner. (Cyrus depo. pg. 185:4-14, pg.199:10-pg.200:8).  Duckworth said that he was

concerned about Cyrus' health and wanted to check on him, so the dinner was under the pretense

of seeing how Cyrus was doing health wise.  (Cyrus depo. pg. 199:10-pg. 200:8).

68.      This contradicts Hyundai's claim that  Duckworth called Cyrus and advised him

that HMMA was concerned about the deterioration of his work performance as attributable to his

attitude and to ask if they could meet for dinner to discuss their company's concern. (Cyrus depo.

Ex. HMMA's EEOC response pg. 5, Bates Stamp 385).

### Meeting at the City Grill

69.     Cyrus met Duckworth and Mike Hansford, a former employee who joined them

for dinner. (Cyrus depo. pg. 200:9-22). Duckworth quizzed both Hansford and Cyrus for forty-

five minutes.  These questions included whether Kalson was still sleeping with staff and other

matters that went on at HMMA. (Cyrus depo. pg. 202:10-22).  Duckworth grilled Cyrus and

Hansford under the false pretense that they were all trying to make the company better.  (Cyrus

depo. pg. 209:5-15).  Hansford did most of the talking about 95% of the time because Mr. Cyrus

wasn't feeling well. (Cyrus depo. pg. 209:15-16).  One thing Cyrus recalled mentioning was

about a Korean hitting and kicking both Koreans and American. (Cyrus depo. pg. 210:11-21).

70.     After Hansford left, Duckworth only spent about thirty seconds looking at all of

the medical information that Cyrus had brought to the meeting. (Cyrus depo. pg. 216:3-7).

71.     After dessert Duckworth told Cyrus that the executive management at Hyundai

was unhappy with him and they wanted him to resign.  This was the first indication from the

18

company at any level of any problems other than what occurred on September 16, 2005.  (Cyrus depo. pg. 216:3-19).

72.     Contrary to what Duckworth states in his Declaration, he said nothing about Cyrus having conducted himself in any adversarial or antagonistic way.  Nor did he ask Cyrus to comment on these issues. (Cyrus Declaration ¶ 8, Plaintiff's Ex. 2).  Duckworth did not mention Cyrus' performance or any issues regarding his performance during the meeting contrary to what Duckworh states in his Declaration.   (Cyrus Declaration ¶ 8, Plaintiff's Ex. 2).

73.     Duckworth told Cyrus that the people in executive management who wanted him to resign were H.I. Kim, President Ahn, and Rick Neal.  Cyrus told him that he could call Neal right then because Neal was a friend.  Duckworth then said it was not Neal.  This left only Ahn and Kim.  So, based on what Duckworth told Cyrus, Kim and Ahn made the decision to terminate him.  (Cyrus Declaration ¶ 8, Plaintiff's Ex. 2).

74.     Contrary to Duckworth's Declaration Cyrus asked him if there was anything he could do.  Duckworth said no.  (Cyrus Declaration ¶ 8, Plaintiff's Ex. 2).  Duckworth told him that the decision had been made already and that, he, Duckworth, had nothing to do with it. (Cyrus Declaration ¶ 8, Plaintiff's Ex. 2).  This contradicts Duckworth's assertion in his Declaration that he was the one who made the decision to terminate Cyrus.

75.     Duckworth says in his Declaration that he was present during an incident at an executive director's meeting in which Cyrus verbally berated and attempted to embarrass fellow executive Kenny Song.  (Duckworth Declaration ¶ 6, Plaintiff's Ex. 2).  Cyrus denies this.  The only conversation that Cyrus had with  Song in an executive meeting related to Song not using the SAP system. Cyrus requested that  Song put his requests in using the SAP system.  Cyrus was

19

very polite in doing so. Song agreed and said he would comply.   (Cyrus Declaration ¶ 6, Plaintiff's Ex. 2).

76.     After that meeting Cyrus met with Duckworth about problems with Song's failure to use the SAP system and problems it caused for his department. (Cyrus Declaration ¶ 6, Plaintiff's Ex. 2).  Duckworth did not mention that there was anything wrong with the way he acted regarding Song.  Duckworth did not mention that there was any embarrassment expressed by Song or that he observed anything that was wrong.  On the contrary, on the afternoon of September 16, Duckworth told Cyrus that everyone at HMMA thought the world of him and that he was doing an excellent job and that he had not heard of any complaints from anyone.  (Cyrus Declaration ¶ 5-6, Plaintiff's Ex. 2).

77.     Likewise, Duckworth's statements in his Declaration that he was receiving reports of deteriorating relationships between Mr. Cyrus and members of his staff and that he was engaged in adversarial or antagonistic behavior in his department is contradicted what Duckworth told Cyrus on September 16.  (Cyrus Declaration ¶ 5, Plaintiff's Ex. 2).

**Choi Tells Cyrus He Is Not Concerned about Kim Because He Has a Different Boss**

78.     After Duckworth told Cyrus that Kim and Ahn wanted his resignation.  Cyrus called Choi and recorded the conversation.  Cyrus asked Choi if he was scared that he was going to lose his job over the fact that Kim was very upset about the Murakami meeting.  Choi told him he wasn't scared because he had a different boss and that he was not worried about Kim's opinions because his boss was controlled by the head office.  (Cyrus supplemented Declaration¶ 4, Plaintiff's Ex. 3).

## Cyrus Reported Discriminatory Conduct to Duckworth

79.     Back in the summer, a few weeks prior to September 16, Cyrus reported to Duckworth about several discriminatory acts that he had observed and also had been made aware of. (Cyrus depo. pg. 221:13-pg. 222:12).

80.     Cyrus told Duckworth that they, he and the Americans, were being treated less favorably than the Koreans.  He told him that it was a major problem between the Koreans and the Americans that he and the Americans were being treated as if they were on a separate team from the Koreans. (Cyrus depo. pg. 233:1-4).

81.     Cyrus told Duckworth that he and the Americans were not included in meetings with the Koreans that they needed a go to in person to be able to conduct their jobs correctly. (Cyrus depo. pg. 233:4-6).  Cyrus told Duckworth that he and the Americans were repeatedly asking Korean management to include them in meetings but they were continually being put off and not included.  He told Duckworth that he and the Americans had been told that they would be included in the launch, then, when that didn't happen, that they would be included in January, then, when that didn't happen they would be included in May.  (Cyrus depo. pg. 233:7-13).

82.     Cyrus told Duckworth that the Koreans told him and the Americans that it would take too long to go through the meetings if they had to do them in English.  (Cyrus depo. pg. 233:13-16).

83.     Cyrus told Duckworth that the Koreans wanted to conduct business the way they did it in Korea both on the ethical and the cultural fashions and that the Americans, hired locally, wanted to do it the same way that Ford or GM or Toyota would do it so that was a problem. (Cyrus depo. pg. 233:17-pg. 234:3).

84.     Cyrus told Duckworth that the American employees' expense reports were treated differently and was favoring the Korean employees' expense reports.  He said that they were scrutinized and that it would take two to four weeks for the Americans to get their money while the Koreans would have their money in two or three days.  Cyrus told Duckworth that it felt like there was a lack of trust. (Cyrus depo. pg. 243:21-pg. 244:6).

85.     Cyrus told Duckworth that when the cars came out for the lease car pool, which was part of the compensation of Hyundai employees, that the Americans got their cars last and sometimes there was not a vehicle available, but all of the Koreans would have a new car as soon as they needed it. (Cyrus depo. pg. 244:10-15).

86.     Cyrus told Duckworth about a Korean named Soo Young, who when he was firing an American woman, Melinda Henderson, told her she could either work out the last two weeks and he would pay her or she could take off two weeks and sleep with him.  Cyrus told Duckworth that Soo Young was sent back to Korea, but it was known that he was still working at Hyundai.  (Cyrus depo. pg. 247:19-pg. 248:9).

87.     Cyrus described to Duckworth the situation with Martha Harper who was assistant manager in indirect purchasing.  She reported to Hyun and when her boss would go out of town would put a Korean man in charge because he couldn't leave a woman in charge even though she was this man's boss.  She came in and talked to Cyrus repeatedly about this. Cyrus talked to Hyun and Kimball at HR about this and to the individual who was over Harper,  Y.D. Cho, and this eventually stopped. (Cyrus depo. pg. 248:14-pg. 250:8).

88.     Cyrus told Duckworth about Kalson sleeping with staff. (Cyrus depo. pg. 246:17-pg. 247:5).

89.     Cyrus also reported that Korean employees were not complying with safety rules in the plant and acted as if those rules did not apply to them. (Cyrus depo. pg. 245:13- pg. 246:8).

90.     Cyrus told Duckworth that with regard to the work that Americans were being treated differently than the Koreans. (Cyrus depo. pg. 246).

91.     Cyrus told Duckworth of how one of his employees was kicked by Vice President Lee until he was in a fetal position in the conference room.  The fight began in a cubicle and went into a conference room where Lee kicked the employee until he laid on the ground in front of a female American employee Kelly Walb. (Cyrus depo. pg. 234:4-pg. 235:4).   Cyrus did not witness this, several of his employees came to him concerned about it.  He reported this to team relations but was not aware that anything happened. (Cyrus depo. pg. 235:10-pg. 236:23).

92.     Cyrus also reported to Duckworth that in a meeting with representatives from KPMG one of the Korean employee reached across and punched one of the KPMG representatives in the face, then followed the KPMG representative down the hall and tackled him.  The President of HMMA  just asked KPMG not to bring that individual back. (Cyrus depo. pg. 238:2-pg.239:10).

93.     After Cyrus reported this to Duckworth, and after Duckworth had been at HMMA for a month or so, an attorney came from Korea and Cyrus was asked by Duckworth to repeat this information to them which he did.  (Cyrus depo. pg. 222:4-12, pg. 227:9-pg. 228:22).

**Duckworth's Claim That Cyrus Had a Bad Attitude Is Contradicted**

94.     In Duckworth's Declaration he states that he became aware of problems with Cyrus' behavior in recent months. (Duckworth Declaration ¶ 6, Defendant's Ex. D).  Duckworth describes this as an attitude problem. (Duckworth Declaration ¶ 9, Defendant's Ex. D).  This

contradicts what he told Mr. Cyrus on September 16, which was he had not heard any complaints from anyone that everyone at HMMA thought the world of him. (Cyrus Declaration ¶ 5,Plaintiff's Ex. 2).

### Cyrus Was Replaced by Choi

95.    After Cyrus was terminated he was replaced by Choi.  Choi testified that he is currently head of the Department of Production and Parts Development at HMMA and that Hyun is his boss.  (Choi depo. pg. 36:7-pg. 37:18).  Choi is in the exact position that Cyrus was before he was terminated.  (Choi depo. pg. 43:13-21).  Previously, Cyrus had been over Parts Development and Choi had been over purchasing. (Cyrus depo. pg. 303:5-23).

### ARGUMENT

Plaintiff, Robert Cyrus submits that for the reasons set out below Summary Judgment is not appropriate in this case.  Plaintiff has sued Defendant for discrimination and retaliation which resulted in his termination.  Plaintiff, a white American, was terminated and replaced by a Korean.  The facts about who decided to terminate the Plaintiff are contested, as so consequently are the reasons for termination.  The conduct that Plaintiff engaged in at the September 16, meeting, was almost identical to conduct by the similarly situated Korean, J.Y. Choi, the other facts are disputed as a whole.  Additionally, Plaintiff had complained about discriminatory treatment toward himself and fellow American employees by Koreans as recently as seven weeks prior to his termination.  Plaintiff submits that based on the evidence that he has established there is sufficient evidence to submit both claims to a jury.

### STANDARD OF REVIEW

Defendant has moved this Court to enter Summary Judgment in this case.  Summary

Judgment may be granted only when there are no genuine issues as to material facts and Summary Judgment is appropriate as a matter of law. Fed. R. Civ. P. 56( c). In ruling on Motions for Summary Judgment the Court must view all evidence and all factual inferences in the light most favorable to the Plaintiff. *Miller v King*, 384 F.3d 1248, 1258-59 (11th Cir. 2004).

Issues of credibility and the weight to be afforded evidence are determinations that are only appropriate for the fact finder and are not for a court to decide on Summary Judgment. *Miller* at 1259. Summary Judgment should only be granted if pleadings, depositions, answers to interrogatories, and admissions, together with affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to Summary Judgment as a matter of law. *Miller* at 1259.

The Eleventh Circuit recently in *Felder v Howerton*, 240 Fed. App. 440, 2007 WL2669505 (11th Cir. 2007) reaffirmed that in addressing Summary Judgment the Plaintiff's version must be believed. At Summary Judgment it is not the Court's role to weigh conflicting evidence or make credibility determinations. *Mize v Jefferson County Board of Education*, 93 F.3d 739, 742 (11th Cir. 1996).

Moreover, under Eleventh Circuit precedent, if the fact finder concluded that a witness had testified falsely to a material fact in the case then the fact finder might disregard all of the witness' testimony or consider only part of the testimony to be true. *Mason v. U.S.*, 95 F.2d 612 (5th Cir. 1938). At the Summary Judgment stage, then, Plaintiff is entitled to the same inference, otherwise the Court intrudes upon the providence of the fact finder. So for instance, where Plaintiff provides evidence that Defendant's Deputy President, Duckworth, intentionally misrepresented that he was the one who made the decision to terminate the Plaintiff by producing

evidence that Duckworth had previously told the Plaintiff that he did not have anything to do with that decision, then the Plaintiff would be entitled to a further inference that all of Duckworth's testimony could be disbelieved by a jury and therefore not be sufficient basis to support Summary Judgment.

## DISCRIMINATION

Plaintiff's claim that he was discriminated against because he is white, and his national origin is American, does not require any different treatment under the anti-discrimination laws than the treatment of non-whites. Discrimination is discrimination no matter what the race, color, religion, sex, or national origin of the victim. Title VII prohibits discrimination against whites, as well as non-whites and the constitution does not distinguish between races. *Bass v Board of County Commissioners Orange County, Florida*, 256 F.3d 1095, 1102 (11th Cir. 2001).

To evaluate discrimination claims based on circumstantial evidence Plaintiffs may use the prima facie case frame work established by *McDonnell Douglas Corp., v Green*, 411 U.S. 792 (1973). The McDonnell Douglas frame applies to both Title VII claims and 42 U.S.C. §1981 claims. See *Turnes v AmSouth Bank*, 36 F.3d 1057, 1060 (11th Cir. 1994). Here Plaintiff brings his claim for race and national origin in discrimination pursuant to both Title VII and 42 U.S.C. §1981. (See Plaintiff's Complaint Count I).

## PLAINTIFF SATISFIES THE PRIMA FACIE CASE FOR DISCRIMINATION

The prima facie case for race discrimination claims under the *McDonnell Douglas* framework requires the following: 1) that he is a member of a particular race or national origin; 2) that he was qualified for his job; 3) that he was terminated; and 4) that he was replaced by someone of another race or national origin. See *Cooper-Houston v Southern Railway Company*,

37 F.3d 603, 605, (11ᵗʰ Cir. 1994). Here Plaintiff satisfies the prima facie case. First, he is white and American. Second he was qualified for his job as the head of the Parts Development Department at HMMA. Third he had served in his position since the company began which was about three years. Under Eleventh Circuit precedent where a person has held a position for a significant period of time qualifications for that position sufficient to satisfy a prima facie case can be inferred. *Clark v Coast & Clark, Inc.*, 990 F.2d 1217, 1227 (11ᵗʰ Cir. 1993), *Pace v Southern Railroad System*, 701 F.2d 1383, 1386 n.7 (11ᵗʰ Cir. 1983). *Damon v Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1360 (11ᵗʰ Cir. 1999). It is undisputed that Plaintiff was terminated. Finally, according to Choi, he took Plaintiff's place as the head of the Parts Development Department. It is an undisputed fact that Choi is Korean. Thus, Plaintiff has satisfied his prima facie case. The Eleventh Circuit has noted that demonstrated a prima facie case is not onerous; it requires only that the Plaintiff establish facts adequate to permit an inference of discrimination. *Holifield v Reno*, 115 F.3d 1555,1562 (11ᵗʰ Cir. 1997).

### PRETEXT

Once a Plaintiff has made out a prima facie case the burden of production then shifts to the Defendant to articulate a non-discriminatory reason for the Plaintiff's termination. *Cooper-Houston v Southern Railway Company*, 37 F.3d 603, 605 (11ᵗʰ Cir. 1994)(citing *St. Mary's Honor Center v Hicks*, 509 U.S. 502, 113 S. Ct. 2742 (1993)). Here Defendant offers for its legitimate nondiscriminatory reason the Declaration by Duckworth that the decision to terminate Cyrus on October 22 was his decision that he made after meeting with Cyrus on October 22.

Duckworth says that it had been reported to him that on September 16, in the Murakami meeting, that Cyrus argued with officials from the Quality Assurance Department in front of

27

outside suppliers (Duckworth Declaration ¶ 5, Defendant's Ex. D),  that Cyrus had made

inappropriate comments to co-worker Susock, saying "that's bullshit" in response to a statement

by Susock,(Duckworth Declaration ¶ 5, Defendant's Ex. D), that Cyrus had made a remark to

another executive, John Kalson, comparing Hyundai's manufacturing process to Toyota's, as a

challenge to Kalson's competency (Duckworth Declaration ¶ 5, Defendant's Ex. D), and that

Cyrus had directly questioned the judgment of Kim and embarrassed him. (Duckworth

Declaration ¶ 5, Defendant's Ex. D).  Duckworth also said that, in recent months, he had

received reports of deterioration in Cyrus' relationship with members of his staff in the

purchasing department and that he was engaging in adversarial and antagonistic behavior in the

department. Duckworth also says that he observed Cyrus verbally berating Kenny Song at a

directors meeting.  Duckworth says he met with Cyrus to discuss these matters on October 22,

and when Cyrus denied that he had any attitude problem and was not willing to accept any form

of correction that he, Duckworth, decided to terminate Cyrus. (Duckworth Declaration ¶ 9,

Defendant's Ex. D).

     Plaintiff's evidence is that Duckworth told him at the meeting on October 22 that the

people who asked for his resignation were Kim and Ahn, that it was not Duckworth's decision,

and that the decision had already been made.  Because this directly contradicts Duckworth's

assertion that he was the one who made the termination decision and did so at that time, Plaintiff

has sufficiently established pretext.

     Further, Duckworth's alleged basis for terminating Cyrus is that his assertion that he had

complaints by Plaintiff's co-workers in his department over the last several months.  This

assertion is contradicted by the fact that on September 16, five weeks prior to his meeting on

October 22, Duckworth told Cyrus that there were no complaints by anyone at HMMA about him, that he was doing an excellent job and everyone thought the world of him. Further, in the five weeks between September 16, and October 22, Cyrus was only at work the week of October 3 to 7.

Duckworth's assertion that he observed Mr. Cyrus berating and attempting to embarrass Kenny Song in an executive meeting is likewise contradicted by Cyrus' testifying that he behaved in a polite manner in his discussion with Song, that he subsequently spoke with Duckworth about Song not using the company acquired SAP program and Duckworth did not mention any problems about how Cyrus had behaved toward Song.

Plaintiff denies that he did the things in the September 16 Murakami meeting that Duckworth claims he did. Though Cyrus has established a prima facie case of discrimination and has shown that there is sufficient evidence that the Defendant's reason for this is called into question, he goes further and offers evidence that he did not violate any work rules, or that he acted in the same way as his peer, Choi, did. Because Choi was not terminated it was discrimination to terminate Cyrus. [1]

---

[1] Defendant argues that comparing Plaintiff's conduct to the conduct of Choi was part of Plaintiff's prima Facie case, citing, *Manicca v Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) (Defendant's brief pg. 19-20). Here, Plaintiff has already established a prima facie case. The Eleventh Circuit in *Cooper-Houston v Southern Railway Company*, 37 F.3d 603, 605 (11th Cir. 1994), held that showing that employees outside of the protected class engaged in similar conduct and were treated less severely is not part of the prima facie case. The *Cooper-Houston* court said that such a showing applies only to cases in which a Plaintiff has not been terminated and therefore cannot show that he was replaced by a person outside of the protected class. *Cooper-Houston* at 605 Fn 4. On Summary Judgment the Eleventh Circuit has held that the "work rule" defense is pretextual when a Plaintiff offers evidence that 1) he did not violate the work rule; or 2) that if he did violate the work rule, that other employees outside of the protected class who engaged in similar acts were not similarly treated. *Damon v Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1360 (11th Cir. 1999).

Defendant says its decision maker, Duckworth, had a good faith basis to believe what he had been told, citing *Jones v Gerwens*, 874 F.2d 1534, 1450 (11th Cir. 1989). However, according to what Duckworth told Cyrus, the decision makers were Kim and Ahn. Kim was present at the September 16, 2005, meeting and so Kim does not have such a good faith basis for believing what was told to Duckworth about what occurred.

Kim admitted raising his voice and scolding Choi in front of everyone in the meeting including representatives from the suppliers Hwashin and Murakami. The Eleventh Circuit has held that evidence demonstrating that the decision maker engaged in the same policy violation that was the reason given as the basis for the employee's termination is "especially compelling" evidence of pre-text. *Damon v Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1366, (11th Cir. 1999)(citing *Ross v Rhodes Furniture Inc.*, 146 F.3d 1286, 1391 (11th Cir. 1998)).

Nor can Defendant rely on the fact that President Ahn was not present at the September 16 meeting. The Eleventh Circuit has held that where one with discriminatory animus manipulates the decision maker by providing false information the defendant is still liable for violating the discrimination laws. This is what is described as a "cat's paw" theory of liability for discrimination. See, *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998); *Wright v Southland Corp*, 187 F.3d 1287, 1304, Fn 20 (11th Cir. 1999); *Williams v Alabama Department of Transportation*, 509 F. Supp. 2d 1046, 1062 (N.D. Ala. 2007).

Moreover, Kim was not aware of Cyrus using the term "bullshit" and was only told about this later (by whom he could not say). (Kim depo. pg. 221:23-pg. 223:4). With respect to what the discussion was Mr. Cyrus, Kalson, and Susock, Kim claims he didn't understand what they said and it wasn't significant enough for the translator to have translated

30

for him.  Kim also changed his story about comments between Cyrus, Kalson and Susock.  First he said that they both raised their voices a little bit, but then he changed his story and said only Cyrus raised his voice. (Kim depo. pg. 171:12-pg. 175:18). This calls into question Kim's version.

Cyrus denies saying "bullshit" to Susock or challenging Kalson about comparing "the Toyota way" with HMMA's production process.  Cyrus says that he and Choi spoke in lockstep during the meeting and that each of them addressed points about the scratches with people in production and in the meeting.  Cyrus has offered evidence that he and Choi both stuck to the agenda topic regarding the scratches and that Choi told both of their boss, Mr. Hyun, that neither of them, Choi or Cyrus, had done anything wrong in the Murakami meeting. [2]

Kim, however, displayed different treatment between Cyrus and Choi.  He told Choi to come with him after the meeting and did not include Cyrus in that meeting.  (Choi notes, Defendant's Ex.G Bates Stamp 991).  According to Choi's statement he berated Choi for twenty minutes, a must less severe punishment than the termination that Plaintiff received.

---

[2] Defendant argues that Plaintiff offers no explanation why Susock, Kalson, and Horn would report that Cyrus engaged in unprofessional behavior. (Defendant's brief pg. 23).  An answer can be found in the false note and overly solicited tone of Mr. Kalson's comments. He says "Also, I was very embarrassed at how our purchasing team acted.  It seemed like they were working for the supplier.  In my opinion, no matter if HMMA is right or wrong we need to always stick together.  Finally, I respect how Mr. H.I. Kim conducted the meeting in the fact of the "battle." He was calm.  He tried to get the supplier on track and speaking about their issues several times.  Finally, when there was no hope for further discussion, he ended that portion of the meeting." (Kalson statement, Defendant's Ex. F, bates stamped 204).  These were drafted it may be inferred, to create a false image of what occurred. By Kim's own statement he was not calm in the meeting.  Moreover, reading between the lines, Kalson suggests that HMMA was indeed wrong - or else why would he say "right or wrong we need to always stick together?"  Here the jury could infer that Kalson and the other minute writers chose to stick together and draft a false account of what occurred for the purpose of flattening their vengeful boss.

31

Defendant argues that Cyrus and Choi were not similarly situated because Choi was in a lesser job position than Cyrus. However, the evidence is that both of them were directors in the Purchasing and Parts Development Department; that Cyrus was the director over parts development and Choi was the director over purchasing; and that both of them reported to Hyun at the time of the meeting. So for purposes of the meeting they were similarly situated. For these reasons Plaintiff submits that he has offered sufficient evidence to establish that Defendant's reason is a pretext for discrimination.

## **RETALIATION**

To make out a claim of retaliatory discharge with circumstantial evidence, Plaintiff must establish a prima facie case by showing 1) statutory protected expression; 2) an adverse employment action; and 3) a causal link between the protected expression and the adverse action. *Hairston v Gainsville Sun Publishing, Co.*, 9 F.3d 913, 919 (11th Cir. 1993).

Here Plaintiff complained about a number of issues to Duckworth, in the latter part of August, and to Duckworth and a Korean lawyer in early September. [3]

Defendant argues that Plaintiff does not satisfy the requirement in engaging in protected activity when he complained about other employees. However, Plaintiff complained about several matters with regard to his own situation, as well as other American employees regarding how they were treated differently than the Korean employees of HMMA. He complained about matters of compensation, saying that it was harder for Americans to get

---

[3] Cyrus testified that the meeting with Duckworth occurred in summer a few weeks before September 16. (Cyrus depo. pg. 221:3-pg. 222:2). This would place it in the last week of August. He testified, also, that the Korean lawyer came after Duckworth had been there approximately a month or so. (Cyrus depo. pg. 222:4-10) Duckworth says he came in August so it would have been in early September that Cyrus spoke to Duckworth and the Korean lawyer.

reimbursed for expenses and access to lease cars was not as favorable or in the same timely manner as for the Koreans. He complained about work conditions. He complained that he and other Americans were not included in important meetings that they needed to do their jobs. He reported that they were not provided a go-to person that they needed in order to conduct their jobs.

The Eleventh Circuit Court has held that matters that are objectively serious and tangible enough to alter a Plaintiff's compensation, terms, conditions, or privileges of employment, or that deprived him of employment opportunities or adversely effect his status as an employee were an adverse employment action. *Gupta v Florida Board of Regents*, 212 F.3d 571, 588 (11th Cir. 2000). The Eleventh Circuit has held that adverse employment actions include, for example: 1) depriving someone of work assignments; 2) requiring one to perform duties usually supervised by less senior persons; 3) denying one opportunities to earn over-time pay, or on call pay, 4) transferring one to a less favorable position, 5) ordering one to take tests while other are not required to, *Bass v Board of County Commissioners Orange County Florida*, 256 F.3d 1095, 1117 (11th Cir. 2001). The issues Plaintiff reported regarding himself and others were therefore adverse employment actions and so reporting them was protected activity.

Additionally, Plaintiff reported that a Korean male who had fired an American woman had offered to pay her two weeks and she could either work it off or sleep with him. The company sent the man back to Korea but it was known that the individual had not been terminated, that he still worked for Hyundai. Cyrus also reported that Marsha Harper was not allowed to move up into her bosses position when her boss was out of town. Instead a Korean male, her subordinate, was moved over her and placed in that position. Harper had complained

about it repeatedly to Cyrus.

Plaintiff also reported Kalson was sleeping with company staff. Though Defendant characterizes this particular item as something that occurred in the past, Duckworth asked Cyrus and Hansford about it the night of October 22, 2005, when Duckworth asked for Cyrus' resignation, so it was still an active concern for the company. (Cyrus depo. pg. 202:15-20).

Cyrus also reported to Duckworth that Korean employees kicked a Korean employee until he was in a fetal position in front of a female American employee, employee Kelly Walb, who told Cyrus about it. (Cyrus depo. pg. 234:4-pg. 237:3). Cyrus reported on another occasion a Korean employee punched a KPMG representative in the face and then ran down the hall and tackled him. The president of the company, in responding to this, said the appropriate response was to keep the KPMG person from coming to the company. This was reported to Cyrus the head of the project for KPMG. (Cyrus depo. pg. 238:2-pg. 239:10). Cyrus reported to Duckworth that Korean employees were not following safety rules and acting like those rules did not apply to them. (Cyrus depo. pg. 245:13-pg. 246:13). Cyrus told Duckworth that there were differences with regard to work and the treatment between the Americans and Koreans. (Cyrus depo. pg. 246:9-13).

All of these instances were objectively serious and tangible enough to impact on working conditions. They are matters that affected the terms and conditions of the American employees' jobs. If Korean employees don't follow safety rules they run risk of injuring themselves and thereby putting other employees at risk. Likewise, when they are engaging workplace violence, they create a hostile environment that adversely effects the American employees' job status.

Finally, Plaintiff reported the events of the Murakami meeting on September 16 to Duckworth and told him that he had heard that Kim was seeking to have him terminated and that he was fearful of retaliation.

Defendant argues that Plaintiff's complaints were not specific enough and that they were merely conclusory allegations of discrimination. For this the only case Defendant cites from the Eleventh Circuit is *Coutu v. Martin County Board of Commissioners*, 47 F.3d 1068, 1074 (11th Cir. 1995) (Defendant's brief pg. 26). *Coutu* is not a good case for Defendant's position. *Coutu* says that "although Coutu's written grievance contained a conclusory allegation of racial discrimination, her attorney specifically waived this allegation at the grievance hearing." *Coutu* at 1074. The clear import of this is exactly the opposite of what Defendant cites it for. In other words, had Coutu's attorney not waived the allegations of race discrimination at the grievance hearing the conclusory allegation would have been sufficient. The *Coutu* Court goes on and considers her retaliation claim for complaints she made on behalf of other employees. *Coutu* at 1074.

Defendant argues that Plaintiff cannot be engaged in protected activity by merely reporting discriminatory conduct that others have been subjected to, citing *Hamm v Members of Board of Regents of State of Florida*, 708 F.2d 647 (11th Cir. 1983). This is not what Hamm held. *Hamm* did not hold that Plaintiff failed to engage in protected activity because she reported discriminatory complaints of others. Rather, *Hamm* held that "An employer may remove an employee from a position similar to that at issue here [Hamm' duties included investigating alleged incidents of discrimination, filing written reports of her findings and recommending action] without violating Title VII based on the manner in which the employee undertakes his or

35

her duties." *Hamm* at 654.

It was not the fact that Hamm was making complaints for other individuals, but the fact that Hamm was repeatedly choosing to work outside the frame-work the employer was attempting to establish to deal with discrimination cases that caused the court to say she was not engaged in protected activity. *Hamm* at 654. This is made certain by the fact that the *Hamm* Court cites *Whately v Metropolitan Atlanta Rapid Transit Authority*, 632 F.2d 1325, 1329 (11th Cir. 1980) as authority for that position. *Whately* at 1329, said "failing to follow prescribed administrative procedure is not a statutorily protected activity. Title VII cannot be held to immunize an employee from consequences of his behavior merely because part of his job happens to require the handling of discriminating complaints."

Defendant concedes that Plaintiff established the second element of prima facie case: that he did suffer an adverse action when he was terminated.

Defendant is wrong when it asserts that there is no evidence of a causal link between the termination and the protected activity. To establish a causal link between the two is not a difficult thing. The Eleventh Circuit has held that a causal link in a retaliatory discharge case is not some sort of logical connection. It has held that the Plaintiff establishes the causal connection when he shows "that the protected activity in the adverse action were not wholly unrelated." *Hairston v Gainsville Sun Publishing, Co.*, 9 F.3d 913, 920 (11th Cir. 1993).

Plaintiff satisfies the causal connection simply by the temporal relationship between his complaint and his termination. The Eleventh Circuit held in *Farley v Nationwide Mutual Insurance*, 197 F.3d 1322, 1337 (11th Cir. 1999) that the period of seven weeks between Plaintiff's complaint and termination satisfies the causal connection prong for purposes of a

Prima Facie case. The *Farley* court held "we have plainly held that a plaintiff satisfies this element if he provides sufficient evidence that the decision maker became aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action." *Farley* at 1337. Here, Plaintiff reported the matter to Duckworth at the end of August, 2005, and reported the same matters again to the Korean attorney in early September, 2005. Plaintiff was requested to resign on October 22, 2005, after having been out all but about five days between September 16, and October 22. So there was approximately seven weeks between reporting these discriminating claims to the Korean attorney and Plaintiff's termination.

Plaintiff has offered additional evidence from which a jury could conclude that there was a connection between Plaintiff's protected activity and Plaintiff's termination. Duckworth claims that he became aware of problems with Cyrus behavior "in recent months." (Duckworth Declaration ¶ 6, Defendant's Ex. D). Though Duckworth purports to assign those problems to be reports of deterioration in relationship with his staff, Cyrus has sufficiently rebutted those particulars, showing that Duckworth had told him on September 16 that no one had complained about him and he was doing an excellent job. A jury could conclude that the only "problems" with Cyrus' behavior in recent months were Cyrus' reports of discriminatory treatment of himself and other American employees compared to Korean employees, since that corresponds with the same time-frame.

## PRETEXT

Plaintiff has established his prima facie case and, as with the race discrimination case, he has sufficiently rebutted the reason offered for his termination. That is, contrary to Duckworth's assertion that he made the decision at the meeting on October 22, he told Cyrus on

that date that he did not make the decision to terminate him, that it was already made, and indicated that it was Kim's and Ahn's decision. Further, the reasons Duckworth cited in support of his alleged decision were false and knowingly false to Duckworth to Duckworth with regard to his allegations about complaints by Cyrus' staff and allegations that Cyrus verbally berated Song. Cyrus offers evidence rebutting this. Moreover, Kim, one of the decision makers identified by Duckworth, was aware Cyrus had acted in the same manner as Choi in the Murakami meeting. The evidence permits an inference that Kim orchestrated the meeting notes to justify his discriminatorily harsh treatment of Cyrus when he knew Cyrus and Choi acted in the same manner. For these reasons, Plaintiff submits he entitled to submit his retaliation claim to a jury.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff submits that Summary Judgment is not appropriate on either of Plaintiff's race discrimination and national origin discrimination claim and it is not appropriate on his retaliation claims. For these reasons, Plaintiff submits that the court should deny Defendant's Motion for Summary Judgment.

Respectfully submitted,

<u>s/Richard J. Stockham III</u>
ASB-5599-k43r
Attorney for the Plaintiff
Stockham, Carroll & Smith, P.C.
2204 Lakeshore Drive, Suite 114
Birmingham, Alabama 35209
Telephone (205) 879-9954
Fax: (205) 879-9990
E-Mail: rjs@stockhampc.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

ROBERT CYRUS,                       )
                                    )
        Plaintiff,                  )
                                    )
vs.                                 )        Civil Action No.: 2:07-cv-144-ID
                                    )
HYUNDAI MOTOR COMPANY,              )
et al.,                             )
                                    )
        Defendants.                 )

## CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2008, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification to the following attorneys of record:

Timothy A. Palmer
J. Trent Scofield
Brian R. Bostick
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
One Federal Place
1819 Fifth Avenue North, Suite 1000
Birmingham, AL 35209-2118
Email: brian.bostick@odness.com
Email: trent.scofield@odness.com
Email: timothy.palmer@odness.com

                                    s/Richard J. Stockham III
                                    ASB-5599-k43r
                                    Attorney for the Plaintiff
                                    Stockham, Carroll & Smith, P.C.
                                    2204 Lakeshore Drive, Suite 114
                                    Birmingham, Alabama 35209
                                    Telephone (205) 879-9954
                                    Fax: (205) 879-9990
                                    E-Mail: rjs@stockhampc.com