IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ROBERT CYRUS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No.: 2:07-cv-144-ID |
| | ) | |
| HYUNDAI MOTOR | ) | |
| MANUFACTURING OF | ) | |
| ALABAMA LLC, | ) | |
| | ) | |
| Defendant. | ) | |

PLAINTIFF'S EVIDENTIARY SUBMISSION IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Comes now Plaintiff, Robert Cyrus in the above-styled cause, and submits the following

Evidentiary Materials in support of its Opposition to Defendant's Motion for Summary

Judgment:

1.    Deposition of Robert Cyrus and all Exhibits thereto.

2.    Declaration of Robert Cyrus.

3.    Supplemental Declaration of Robert Cyrus.

4.    HMMA's Response to Plaintiff's EEOC Charge dated June 15, 2006.

Respectfully submitted,


s/Richard J. Stockham III
ASB-5599-k43r
Attorney for the Plaintiff
Stockham, Carroll & Smith, P.C.
2204 Lakeshore Drive, Suite 114
Birmingham, Alabama 35209
Telephone (205) 879-9954
Fax: (205) 879-9990
E-Mail: rjs@stockhampc.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | | |
|---|---|---|
| ROBERT CYRUS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No.: 2:07-cv-144-ID |
| | ) | |
| HYUNDAI MOTOR COMPANY, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2008, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification to the following attorneys of record:

Timothy A. Palmer
J. Trent Scofield
Brian R. Bostick
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
One Federal Place
1819 Fifth Avenue North, Suite 1000
Birmingham, AL 35209-2118
Email: brian.bostick@odness.com
Email: trent.scofield@odness.com
Email: timothy.palmer@odness.com

.:/Richard J. Stockham III
ASB-5599-k43r
Attorney for the Plaintiff
Stockham, Carroll & Smith, P.C.
2204 Lakeshore Drive, Suite 114
Birmingham, Alabama 35209
Telephone (205) 879-9954
Fax: (205) 879-9990
E-Mail: rjs@stockhampc.com

# CYRUS DEPOSITION
# PART I

## Page 1

1  IN THE DISTRICT COURT OF THE UNITED STATES
2      FOR THE MIDDLE DISTRICT OF ALABAMA
3          NORTHERN DIVISION
4
5  ROBERT CYRUS,
6      Plaintiff,
7  vs.          CASE NO. 2:07cv144-ID
8  HYUNDAI MOTOR
9  MANUFACTURING OF
10 ALABAMA, LLC,
11     Defendant.
12 _____
13          * * * * * *
14          DEPOSITION
15          OF
16          ROBERT CYRUS,
17 taken pursuant to notice and stipulation on
18 behalf of the Defendants, at the Offices of
19 MAYNARD COOPER & GALE, PC, RSA Union Building,
20 100 North Union Street, Suite 650, Montgomery,
21 Alabama 36104, before DAWN A. GOODMAN,
22 Certified Shorthand Reporter and Notary Public
23 in and for the State of Alabama at Large, on

## Page 2

1  Tuesday, November 27, 2007, commencing at 10:09
2  o'clock a.m.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

## Page 3

1          APPEARANCES
2
3  FOR THE PLAINTIFF:
4      RICHARD J. STOCKHAM, III, Esquire
5      STOCKHAM, CARROLL & SMITH, P.C.
6      2204 Lakeshore Drive
7      Suite 114
8      Birmingham, Alabama 35209
9
10 FOR THE DEFENDANTS:
11     BRIAN R. BOSTICK, Esquire
12     OGLETREE, DEAKINS, NASH, SMOAK &
13     STEWART, P.C.
14     One Federal Place
15     1819 5th Avenue North
16     Suite 100
17     Birmingham, Alabama 35203
18
19
20
21
22
23

## Page 4

1  CO-COUNSEL FOR THE DEFENDANTS:
2      JEFFREY A. LEE, Esquire
3      MAYNARD COOPER & GALE, PC
4      1901 Sixth Avenue North
5      2400 AmSouth/Harbert Plaza
6      Birmingham, Alabama 35203-2618
7
8  ALSO PRESENT:
9      RICHARD E. NEAL, Esquire
10     HYUNDAI MOTOR MANUFACTURING
11     ALABAMA, LLC
12     700 Hyundai Boulevard
13     Montgomery, Alabama 36106
14
15     KYLE McKINNON, Videographer
16
17
18
19
20
21
22
23

Page 5

1              I N D E X
2          E X A M I N A T I O N
3                  Page
4  Examination by Mr. Bostick          11
5              E X H I B I T S
6  For the Defendants:
7  No.                        Page
8  1   Three-page document, dated May      14
9      9, 2006, from Matthias
10     Erdmannsdorfer and
11     Herbert J. Buder to
12     Robert Clay Cyrus
13 2   Two-page document, dated      16
14     October 26, 2006, from
15     Herbert J. Buder to
16     Robert Cyrus
17 3   Three-page document,          22
18     undated, resume of Robert
19     Clay Cyrus, C.P.M.
20 4   Two-page document, dated May      41
21     4, 2005, from Melanie L.
22     McCormick to Rob Cyrus
23

Page 6

1  No.                        Page
2  5   Thirteen-page document,       56
3      dated October 2, 2005,
4      Murakami Meeting document,
5      with attachments
6  6   Two-page document, dated       57
7      September 16, 2005,
8      handwritten notes
9  7   Three-page document,          107
10     dated September 16, 2005,
11     notes of Chris Susock
12     entitled Weekly Supplier
13     Quality Meeting
14 8   Two-page document, dated      126
15     September 17, 2007, e-mail
16     notes of John Kalson entitled
17     Weekly Part Quality Meeting
18     Events
19
20
21
22
23

Page 7

1  No.                        Page
2  9   One-page document, dated      136
3      September 16, 2005,
4      notes of Gerald Horn
5      entitled Weekly Parts
6      Quality Review Meeting -
7      Murakami
8  10  Three-page document, dated     152
9      November 6, 2005, handwritten
10     notes of Robert Cyrus entitled
11     Chronological Events H.I. Kim
12     Retaliation
13 11  Four-page document, dated      165
14     September 17, 2005,
15     interoffice memorandum from
16     Jason Chi to Mr. H.I. Kim, COO
17 12  Two-page document, dated October  168
18     31, 2007, Progress Note of
19     Robert C. Cyrus by
20     Paul B. Moore, M.D.
21
22
23

Page 8

1  No.                        Page
2  13  One-page document, dated      173
3      October 13, 2005, e-mail from
4      Laura L. Stone to Melanie L.
5      McCormick
6  14  One-page document, dated      174
7      October 18, 2005, entitled
8      Report Approval
9  15  Three-page document, dated     185
10     October 22, 2005, handwritten
11     notes
12 16  Multi-page document, first page  196
13     dated November 10, 2005, from
14     Robert C. Cyrus, C.P.M. to
15     Mr. Keith Duckworth
16 17  Two-page document, undated,    272
17     entitled Concern in upper
18     left-hand corner
19 18  One-page document, dated      314
20     October 24, 2005, from
21     M. Keith Duckworth to
22     Mr. Rob Cyrus
23

Page 9

| No. | Page |
|-----|------|
| 19 | Two-page document, dated 315 |
| | December 6, 2005, from |
| | M. Keith Duckworth to |
| | Mr. Rob Cyrus |
| 20 | Three-page document, dated 315 |
| | November 6, 2005, from |
| | Robert C. Cyrus, C.P.M to |
| | Mr. Keith Duckworth |
| 21 | One-page document, dated 318 |
| | March 2, 2006, entitled |
| | Charge of Discrimination |

1 No.                    Page
2 19 Two-page document, dated        315
3    December 6, 2005, from
4    M. Keith Duckworth to
5    Mr. Rob Cyrus
6 20 Three-page document, dated      315
7    November 6, 2005, from
8    Robert C. Cyrus, C.P.M to
9    Mr. Keith Duckworth
10 21 One-page document, dated       318
11    March 2, 2006, entitled
12    Charge of Discrimination
13
14
15
16
17
18
19
20
21
22
23

Page 10

1  P R O C E E D I N G S
2      THE VIDEOGRAPHER:  This is the
3      beginning of Tape No. 1 in
4      the deposition of Robert
5      Cyrus in the matter of Robert
6      Cyrus versus Hyundai Motor
7      Manufacturing of Alabama,
8      Case No. 2:07cv144-ID.
9  We're on the record at 10:09 a.m.
10     on Tuesday, November 27th,
11     2007.  This deposition is
12     taking place at Maynard
13     Cooper & Gale, located at 100
14     Union Street, Suite 650,
15     Birmingham, Alabama 36104.
16  The court reporter is Dawn
17     Goodman, and the videographer
18     is Kyle McKinnon.
19  Would counsel please yourself
20     yourselves, after which the
21     court reporter will swear in
22     the witness.
23     MR. STOCKHAM:  I'm Richard

Page 11

1      Stockham.  I represent the
2      plaintiff.
3      MR. BOSTICK:  Brian Bostick, I
4      represent Hyundai Motor
5      Manufacturing Alabama, LLC.
6      MR. LEE:  Jeff Lee.  I represent
7      Hyundai Motor America.
8      MR. BOSTICK:  We also have Rick
9      Neal, who's corporate counsel
10     for HMMA.
11     (ROBERT CYRUS, of lawful age,
12     having been duly sworn,
13     testified as follows:)
14     EXAMINATION
15 (BY MR. BOSTICK:)
16 Q.  Good afternoon.  I will be asking you the
17     questions today, Mr. Cyrus.  My name's
18     Brian Bostick.  I'm attorney for HMMA.
19          Can you state your full name
20     for me, please.
21 A.  Robert Clay Cyrus.
22 Q.  And what's your current address?
23 A.  1084 Bay Colony Drive, Richmond, Kentucky

Page 12

1      40475.
2  Q.  How long have you lived at that
3      address?
4  A.  Since March of 2007.
5  Q.  Where'd you live prior to that address?
6  A.  Chrystal Lake, Illinois.
7  Q.  And prior to the time you lived in
8      Illinois, where did you live?
9  A.  Montgomery, Alabama.
10 Q.  When did you move from Montgomery?
11 A.  I moved from Montgomery in -- let's see
12     here.  May of 2005.  Yeah, that's right.
13 Q.  I think you're --
14 A.  2006.
15 Q.  Okay.  Have you given a deposition
16     before?
17 A.  Yes.
18 Q.  Okay.  How many times have you been
19     deposed?
20 A.  Once.
21 Q.  Okay.  What kind of case was that in?
22 A.  It was a case involving Hyundai and
23     a company that was going to provide

Page 13

1    bumper fascias to the company.
2  **Q.**  A supplier?
3  **A.**  Yes.
4  **Q.**  Okay. Was the litigation between HMMA
5    and the supplier?
6  **A.**  Yes.
7  **Q.**  What was the name of the supplier?
8  **A.**  Venture.
9  **Q.**  What was your testimony regarding?
10  **A.**  Their ability to execute the contract.
11  **Q.**  There was an allegation the supplier
12    breached the contract?
13  **A.**  Yes.
14  **Q.**  When did that testimony take place?
15  **A.**  I couldn't tell you the exact date. In
16    2000 -- probably 2003.
17  **Q.**  Okay. Were you based in Montgomery at
18    the time?
19  **A.**  Yes.
20  **Q.**  Okay. Are you presently employed?
21  **A.**  No.
22  **Q.**  Who was your last employer?
23  **A.**  Eisenmann Corporation.

Page 14

1  **Q.**  And were you let go there as a result of
2    a reduction in force?
3  **A.**  The company shut down operations and
4    moved to Stuttgart, Germany where their
5    headquarters resides. There was an
6    entire shut down of the office,
7    300-and-some people.
8        (The referred-to document was
9        marked for identification as
10        Defendants' Exhibit No. 1)
11  **Q.**  (By Mr. Bostick) Can you identify
12    Exhibit 1 for me?
13  **A.**  It looks like an offer letter from
14    Eisenmann.
15  **Q.**  Did -- did you accept this offer
16    letter?
17  **A.**  Yes.
18  **Q.**  And were you making a salary of $125,000
19    there?
20  **A.**  Yes.
21  **Q.**  Any other additional income that you'd
22    received in relation to bonuses or other
23    income in addition to that 125,000 a

Page 15

1    year?
2  **A.**  As indicated in Point 4, there was a
3    signing bonus for $20,000.
4  **Q.**  Okay. Did -- did that loan ultimately --
5    was it forgiven for --
6  **A.**  Yes.
7  **Q.**  -- your work there? You never had to pay
8    any of it back?
9  **A.**  That's correct.
10  **Q.**  Do -- I guess, let's just go over a
11    little bit of the rules for the
12    deposition today. I'll be asking you
13    questions about your lawsuit. If
14    something about my question is unclear,
15    feel free to ask me to rephrase it or
16    clarify it for you. But if you answer
17    it, we'll work under the understanding
18    that you were able to understand the
19    question and answered it clearly. Is
20    that fair?
21  **A.**  Yes.
22        MR. BOSTICK: I'll show you what I
23        marked as Exhibit 2.

Page 16

1        (The referred-to document was
2        marked for identification as
3        Defendants' Exhibit No. 2)
4  **Q.**  (By Mr. Bostick) Do you recall receiving
5    this letter?
6  **A.**  Yes.
7  **Q.**  And is that consistent with your
8    recollection that the layoff occurred on
9    December 31st, 2006?
10  **A.**  Yes.
11  **Q.**  Or it says with 13 days -- 14 days
12    thereafter?
13  **A.**  Yes.
14  **Q.**  Where all have you applied for jobs since
15    leaving Eisenmann in December of 2006?
16  **A.**  I provided you a list of all of the
17    employment efforts. You should have
18    that. It's numerous. Hundreds.
19  **Q.**  Who all have you had a face-to-face
20    interview with?
21  **A.**  Ostal Company (sic) in Mobile, Alabama;
22    Thyssen-Krupp in Mobile, Alabama area;
23    Whirlpool Corporation in Benton Harbor,

| Page 17 | Page 19 |
|---|---|
| 1  Michigan; Zedeff Bosche Corporation in | 1  **A.** Yes. |
| 2  Cincinnati, Ohio, Northern Kentucky area; | 2  **Q.** Are either of them above the age of 18? |
| 3  Boise Cascade in Boise, Idaho.  That's | 3  **A.** No. |
| 4  all for face-to-face. | 4  **Q.** Is that why you moved to Kentucky to be |
| 5  **Q.** Have you received any offers of | 5  near -- |
| 6  employment since -- from any entities | 6  **A.** I moved back to Kentucky to be near my |
| 7  since leaving Eisenmann? | 7  children while seeking employment. |
| 8  **A.** No. | 8  **Q.** Did you have any contacts with Kentucky |
| 9  **Q.** Do you have any sources of income for | 9  prior to coming to Alabama or -- |
| 10  2007? | 10  **A.** What do you mean "contacts"? |
| 11  **A.** No. | 11  **Q.** I mean, had you lived there before? |
| 12  **Q.** Are you receiving unemployment? | 12  **A.** Yes. |
| 13  **A.** I received it until I reached a threshold | 13  **Q.** Does your wife have family there or -- |
| 14  in which they -- my benefits ran out. | 14  **A.** She does. |
| 15  **Q.** And what -- what state are you receiving | 15  **Q.** Okay.  Did she move there with the |
| 16  unemployment benefits -- or were? | 16  children after y'all got divorced in |
| 17  **A.** I was from Illinois, but it was Alabama | 17  2005? |
| 18  prior to that. | 18  **A.** She did.  After I was terminated from |
| 19  **Q.** Okay.  Do you currently have any | 19  Hyundai and she was no longer -- she no |
| 20  prospects for face-to-face interviews or | 20  longer had to remain within a 60-mile |
| 21  job offers as we sit here today? | 21  perimeter, since I was no longer |
| 22  **A.** I am in constant discussion with | 22  employed, which also pulled my kids away |
| 23  potential employers, yes.  I spoke to one | 23  from me when I was terminated. |

| Page 18 | Page 20 |
|---|---|
| 1  on the phone on the way up here, | 1  **Q.** Well, y'all had a divorce decree entered |
| 2  actually.  But I don't have anything | 2  that set the terms. |
| 3  scheduled. | 3  **A.** And the terms were a 60-mile radius of |
| 4  **Q.** Okay.  Are you -- are you primarily | 4  Montgomery, Alabama. |
| 5  looking for jobs in -- purchasing-type | 5  **Q.** It looked like you had initially claimed |
| 6  jobs or -- | 6  that she had -- the initial petition that |
| 7  **A.** Mainly, since that's my career background | 7  you filed asserted that she had a |
| 8  for 18, 20 years, yes. | 8  drinking problem and irrational and |
| 9  **Q.** Okay.  Now, you were previously married; | 9  abusive behavior.  And then there was an |
| 10  correct? | 10  amended petition. |
| 11  **A.** That's correct. | 11  Did you ever seek to have -- |
| 12  **Q.** And then you were divorced in, it looked | 12  it looked like you had requested |
| 13  like, October of 2005? | 13  counseling as part of the settlement. |
| 14  **A.** That sounds about right.  Trying to get | 14  Was that resolved where she would engage |
| 15  it exactly. | 15  in that counseling? |
| 16  **Q.** The petition was filed on October 17th, | 16  **A.** We came to an agreement with the parties |
| 17  '05. | 17  involved. |
| 18  **A.** Okay. | 18  **Q.** Okay.  So, was the -- when you say you |
| 19  **Q.** Does your wife live in Kentucky now? | 19  lost your job at Hyundai and whatnot -- |
| 20  **A.** She does. | 20  **A.** I said I was terminated from Hyundai. |
| 21  **Q.** What is her name? | 21  **Q.** -- the -- did you have a term that y'all |
| 22  **A.** Cynthia Carol Cyrus. | 22  negotiated for in the decree that said as |
| 23  **Q.** And then you have two children? | 23  long as you worked there she would stay |

Page 21

1    there or what --
2  **A.**  No.
3  **Q.**  -- specific provision required her to
4    stay there?
5  **A.**  Alabama state law.
6  **Q.**  That you have a job?
7  **A.**  That for the interest of the children, my
8    understanding, that they are not allowed
9    to move within -- beyond a 60-mile radius
10    without the permission of both parents.
11  **Q.**  Okay.  And so you did give the permission
12    at that time?
13  **A.**  At which time?
14  **Q.**  When they moved further than 60 miles
15    away?
16  **A.**  Uh-huh.  After termination.
17  **Q.**  You didn't go to court and seek some kind
18    of petition to hold her in contempt;
19    correct?
20  **A.**  I don't understand.  Why would I do that?
21  **Q.**  Okay.  Well, I guess you're telling the
22    law is she's got to stay here unless she
23    has your permission.

Page 22

1  **A.**  Right.
2  **Q.**  So either she had your permission or she
3    didn't.
4  **A.**  After I was terminated, she had my
5    permission to move to Kentucky, since she
6    had no reason to stay here and I am
7    terminated in Montgomery, Alabama where
8    Hyundai is founded.  The likelihood of me
9    finding a job in Montgomery would be
10    questionable.
11        (The referred-to document was
12        marked for identification as
13        Defendants' Exhibit No. 3)
14  **Q.**  (By Mr. Bostick) Can you identify
15    Exhibit 3 for me?
16  **A.**  It's a resume.
17  **Q.**  It looks like there may be a fourth page
18    that I don't have on here.
19        Do you know --
20        MR. STOCKHAM:  Do you happen to
21        have another copy?
22        MR. BOSTICK:  Oh, I'm sorry.
23        MR. LEE:  I've got one.

Page 23

1  **Q.**  (By Mr. Bostick) Is this a correct
2    statement of your work experience through
3    the time you were with HMMA?
4  **A.**  Yes, it is.
5  **Q.**  And do you understand, Mr. Cyrus, you
6    have two separate lawsuits against HMMA:
7    one in state court and one in federal
8    court?
9  **A.**  Yes, I do.
10  **Q.**  In discussions with your attorney, we
11    agreed to focus today's deposition on
12    events that occurred during the time you
13    were actually in Montgomery.
14        Do you recall what -- when
15    it was that you actually arrived in
16    Montgomery to start working for HMMA?
17  **A.**  I started with Hyundai in May of 2002.  I
18    think the official date was May 22nd.
19    The first 24 days were spent in Korea and
20    Orange County, Hyundai Motor America
21    Corporation, in California.  So I had
22    seven days in -- six to seven days, as I
23    recall, in California, and 24 days in

Page 24

1    Korea, Seoul, Korea.  After that, I moved
2    to Montgomery.
3  **Q.**  Okay.  It looked like there was some
4    discussion about you possibly working in
5    Detroit for another Hyundai entity for a
6    period of time.  Did that ever come to
7    fruition?
8  **A.**  No.  I mean, the original intent, and in
9    Ted Chung's handwriting, is that you will
10    work for the "V" project, which is the
11    Alabama project, from Day One.  The
12    determination of the actual plant had not
13    even been determined at that point.  The
14    finalists were Kentucky and Alabama.
15    Later on we determined it would be
16    Alabama.
17        The discussion focused,
18    is it going to be in Southfield, Michigan
19    in the development office for a period of
20    time, or is it going to be in Montgomery,
21    Alabama from the onset.  It turned out to
22    be the determination by Ted Chung to be
23    in Montgomery, Alabama.

Page 25

1 Q. So, when did you actually arrive in
2    Montgomery?
3 A. Shortly after -- I couldn't give you an
4    exact date -- shortly after returning
5    from Korea. I lived in Birmingham at
6    that time, and I got a rental house paid
7    for by Hyundai Motor America of
8    California.
9 Q. It looked like there was an offer letter
10   of HMMA in around September of 2002. I
11   think your initial negotiations with
12   Chung were around May. Would that be
13   consistent with your recollection?
14 A. There's -- the original offer for the
15   Alabama project, the "V" project, from
16   Keith Duckworth through Jerry Peterson
17   and Duck- -- Chung, Ted Chung, and at
18   that point, Hyundai Motor Manufacturing
19   Alabama was not a formed entity, so I had
20   to go under Hyundai Motor America out of
21   California until the actual corporation
22   entity was in place in Alabama.
23       That's why, in September,

Page 26

1    HMMA was at a point which they were
2    incorporated an entity within the
3    state. I had to switch over to HMMA.
4    But at no time was -- you know, it was
5    always the Alabama project. I didn't
6    work in the sales department in
7    California.
8 Q. I got a lot there, but I don't know did I
9    get, when did you move? Was it September
10   of 2002?
11 A. When did I move?
12 Q. When did you move to Montgomery was my
13   question and nothing else.
14 A. I mentioned to you earlier that that was
15   shortly after I returned from Korea. So
16   that would probably be in the June time
17   frame.
18 Q. Okay.
19 A. June, July. I have a lease.
20 Q. Do you have -- are you on any medications
21   today?
22 A. Yes.
23 Q. What are you -- what are you on?

Page 27

1 A. Altace, Atenolol, baby aspirin, a
2    multi-vitamin, Tonocard, Cymbalta, Zetia
3    and that's it.
4 Q. What is -- what do you take the Altace
5    for?
6 A. My cardiologist gave it to me for my
7    heart.
8 Q. And how often do you take it?
9 A. Daily.
10 Q. Did you take it this morning?
11 A. I did.
12 Q. And then, I can't read my -- At- --
13 A. Atenolol.
14 Q. Atenolol. How often do you take that?
15 A. Daily.
16 Q. And what is it prescribed for?
17 A. Heart also.
18 Q. And?
19 A. Baby aspirin?
20 Q. Yeah, baby aspirin. You take that once a
21   day?
22 A. That's recommended by my cardiologist
23   also.

Page 28

1 Q. And the multi-vitamin as well?
2 A. Yes.
3 Q. How about the next one. It looks like it
4    starts with an O?
5 A. Tonocard?
6 Q. Yeah.
7 A. It's a triglyceride reducer for
8    cholesterol control.
9 Q. Okay. Cymbalt (sic), is that what the
10   next --
11 A. Cymbalta.
12 Q. What is that?
13 A. It is an anti-depressant.
14 Q. Okay. Who has prescribed that; which
15   doctor?
16 A. My general practitioner.
17 Q. How long have you been taking that?
18 A. Probably three years.
19 Q. Who was the first doctor who prescribed
20   you that?
21 A. A gentleman in Montgomery, Alabama. I
22   can get you his name.
23 Q. Is he a general practitioner?

Page 29

1  **A.**  No. He's a psychiatrist.
2  **Q.**  Okay. What period of time were you going
3      to see the psychiatrist in Montgomery?
4  **A.**  I'd have to look back. I provided that
5      to you already, on the dates, when we did
6      the discovery phase.
7  **Q.**  Do you know what -- what group he's with
8      or what entity?
9  **A.**  It's provided in the documentation we
10     gave you. I don't recall.
11 **Q.**  I'm just asking what's your name -- what
12     you recall; do you know?
13 **A.**  What the name of his group is?
14 **Q.**  Practice was.
15 **A.**  No.
16 **Q.**  Not what his name is.
17         Have you been consistently
18     taking that anti-depressant for the last
19     three years?
20 **A.**  Yes.
21 **Q.**  How about the Zetia?
22 **A.**  Zetia's a cholesterol medication.
23 **Q.**  And how long have you been prescribed

Page 30

1      that?
2  **A.**  Since the -- I have been on a number of
3      cholesterol medications since the
4      coronary artery disease discovery. It's
5      prescribed by my cardiologist.
6  **Q.**  Did you look -- one of the documents we
7      requested was your credit card records
8      during the period of time, I believe it
9      was, July through October of 2005. Did
10     you check and see if you had copies of
11     those records?
12 **A.**  I don't have copies of them, no.
13 **Q.**  Okay. What --
14 **A.**  I don't keep copies of them.
15 **Q.**  Do you have an online account that can
16     check past records?
17 **A.**  No.
18 **Q.**  What -- who is your credit card through,
19     at that time, that you were using?
20 **A.**  The bank, you mean?
21 **Q.**  Um-hum.
22 **A.**  Wachovia, American Express.
23 **Q.**  Did you have a bank account with

Page 31

1      Wachovia?
2  **A.**  Yes, I did.
3  **Q.**  Okay. And was your credit card a Visa or
4      MasterCard through Wachovia?
5  **A.**  Yes.
6  **Q.**  Any other credit cards other than the
7      American Express?
8  **A.**  At the period of time through employment
9      with Hyundai they were?
10 **Q.**  Yeah.
11 **A.**  I don't believe so. I mean, I don't know
12     if I have a gas card anymore.
13 **Q.**  What was your title when you -- when you
14     arrived in Montgomery?
15 **A.**  Director of purchasing, parts
16     development.
17 **Q.**  And who -- who -- who did you report to
18     when you first arrived?
19 **A.**  When I first arrived physically or
20     through organizational charts?
21 **Q.**  Both.
22 **A.**  Well, as indicated in the handwritten
23     notes from Ted Chung, I reported directly

Page 32

1      to Ted Chung, the chairman's son-in-law.
2      And then Mr. Min Ho Lee, Mark Lee, was
3      assigned to the Alabama project. I met
4      him in Korea during my 24-day -- but when
5      I first arrived, the gentleman was J.B.
6      Lee.
7         It was later determined by
8      Mr. Ted Chung that he was going to put
9      Mr. Mark Lee in there. He said that he
10     was looking at two individuals, one very
11     nice and one very mean. And he said, I
12     think I will choose the mean one. And
13     that was Mark Lee he chose.
14 **Q.**  So had Mark Lee arrived in Montgomery at
15     the time that you first arrived?
16 **A.**  No.
17 **Q.**  Okay.
18 **A.**  But within 30 days of my departure from
19     Korea, he arrived.
20 **Q.**  And then so, J.B. Lee was -- what was his
21     title when you arrived in Montgomery?
22 **A.**  You have that documentation. I couldn't
23     tell you exactly. He's probably vice

Page 33

1    president of purchasing.  But there is
2    many different divisions and vice
3    presidents in purchasing in Korea.
4  Q.  Was he in purchasing or --
5  A.  Purchasing, yes, sir.  Parts
6    development.
7  Q.  When did Mr. Ahn arrive at the plant?
8  A.  Which Mr. Ahn?
9  Q.  The president, Mr. Ahn.
10  A.  He was the second president or third set
11    of executive management.  I couldn't tell
12    you the day.  It was in 2005.
13  Q.  Okay.  Who was the president prior to his
14    arrival?
15  A.  Y.S. Kim.
16  Q.  Who was in the -- tell me a little bit
17    about the organizational structure there
18    in the production department.
19  A.  You have the -- you have the
20    organizational charts.  What do you mean?
21  Q.  You were director?
22  A.  Director of purchasing.
23  Q.  Director of purchasing.

Page 34

1  A.  Correct.
2  Q.  Would -- say, at the time of Mr. Lee's
3    arrival, would you have been considered
4    the head of the purchasing department, or
5    would he have been considered the head?
6  A.  You know, in my offer letter, or in my
7    discussions with Ted Chung, he said I
8    would be the top American in purchasing
9    always.  He indicated that a vice
10    president would join me for two years.
11    And at the time of his departure, I would
12    be promoted to vice president.
13        So Mr. Mark Lee was the vice
14    president that came over from Korea.  He
15    totally --
16  Q.  So, the answer to my question is, he is
17    the vice president.  So you reported to
18    him?
19  A.  Yes.
20  Q.  Correct?
21  A.  Yes.  Right.  And also to Ted Chung.
22  Q.  I know you've got a lot of stories that
23    you want to tell on your case.  But it

Page 35

1    will make our deposition go a lot
2    smoother today if you listen to the
3    question that I ask and answer that
4    question and try and be responsive to
5    that.
6  A.  All right.  Yes, sir.
7  Q.  It seems like we're getting a lot of
8    liturgy of history to get to the point of
9    the specific question.
10        Who were your direct reports
11    in the purchasing department?
12  A.  My direct reports?  How do you want to
13    define "direct reports"?
14  Q.  People that reported to you directly.
15  A.  I had -- in the beginning, we had a
16    structure of 50 people.  Okay.  These
17    were not all direct reports, but they are
18    not structured typically like a company
19    that operates in America.  I had 25
20    colleagues from Korea.  And we were to
21    bring on 25 local employees.
22        Now, these colleagues from
23    Korea, they would be -- they weren't

Page 36

1    buyers or beginning purchasing people.
2    They were all at the assistant manager or
3    manager or senior manager level.  So they
4    also all had buying-in-commodity
5    responsibility with us, which is not
6    typical in a U.S. business culture.
7        So when we had direct
8    reporting or staff meetings, I had to
9    have all 25 of the Korean colleagues in
10    there.  And then I hired four managers in
11    the purchasing department from local --
12    local hires.  And then I hired one
13    manager for supplier development which
14    oversees the suppliers' capabilities and
15    quality aspects as far as their internal
16    production.  I had that responsibility
17    also.  That was on the direct side, which
18    is anything that is a part that leaves on
19    the vehicle, which is parts development.
20        At that time also, Mr. H.J.
21    Hyun reported to me.  He later became my
22    equal as a director.  And his
23    responsibilities -- he had indirect

Page 37

1   purchasing, which is anything that is
2   purchased that does not leave on a
3   vehicle. And he also construction,
4   capital equipment and these
5   responsibilities.
6   Q.  So it sounds like you identified, in
7   response to my question, five direct
8   reports: four managers; and one manager
9   of over support development or supplier
10  development?
11  A.  That's not -- that's not correct. I
12  identified in the initial statement that
13  the 25 individuals that came over from
14  Korea reported to me directly also.
15  Q.  Okay. Who were the four -- the five
16  managers you identified that you were
17  involved in the hiring?
18  A.  Dave Mark, Lin Sullivan, Craig
19  Lindemann -- who else did we have --
20  Chuck Knowles. We had two assistant
21  managers, which were Warren Gappa and
22  Roger Licht, L-I-C-H-T, on the indirect
23  side.

Page 38

1   Q.  Did you have the ability to hire or
2   fire?
3   A.  Yes.
4   Q.  Okay. Well, let me rephrase that.
5       You know, I had the ability
6   to hire. I never encountered a situation
7   where firing became a point of
8   discussion. So I really don't know if I
9   had the ability to fire. I would assume
10  so. But that would always be in
11  conjunction with human resources.
12  Q.  Have you ever been a party to a lawsuit
13  other than this action here and -- and
14  excluding your divorce?
15  A.  No, sir.
16  Q.  Ever been arrested?
17  A.  No, sir.
18  Q.  Ever filed for bankruptcy?
19  A.  No, sir.
20  Q.  Ever sought Social Security disability
21  benefits?
22  A.  No, sir.
23  Q.  Have you ever sought long-term disability

Page 39

1   benefits?
2   A.  I don't know the real definition. The
3   only thing I've ever been involved with
4   is the Family Medical Leave Act at
5   Hyundai.
6   Q.  Okay.
7   A.  Not long-term disability.
8   Q.  I think you received salary continuation
9   benefits there.
10  A.  FMLA. Whatever that is. Family Medical
11  Leave Act. However that's classified,
12  I'm not sure.
13  Q.  Do you know -- do you know what a salary
14  continuation benefit is?
15  A.  Not specifically, no.
16  Q.  Do you know what the FMLA entitles you
17  to?
18  A.  Some portions of it. I'm not a human
19  resource expert.
20  Q.  Are you aware to -- you received 12 weeks
21  of unpaid leave while you were unable to
22  work; is that correct?
23  A.  Well, I received -- you know, according

Page 40

1   to Greg Kimble, I was under -- covered
2   under the Family Medical Leave Act. So
3   if that's the same thing.
4   Q.  But do you know if you were still
5   receiving some form of compensation
6   during the time that you were out from
7   work while you were at Hyundai?
8   A.  Yes, I was.
9   Q.  But you don't know what.
10  A.  According to Greg Kimble, the
11  continuation was for Family Medical Leave
12  Act. I had to file two different sets of
13  documentation. Actually, the first one
14  was filed for me after the heart attack.
15  And the second time, after the reaction
16  to medication, they asked me to fill out
17  another form. "They" being human
18  resources, Kimble and Ms. Melanie
19  McCormick.
20      THE COURT REPORTER: Excuse me.
21      didn't hear that. Kimble
22      and --
23      THE WITNESS: I'm sorry. Ms.

Page 41

1          Melanie McCormick.
2  **Q.** (By Mr. Bostick) Did your -- did your job
3      title stay the same throughout the time
4      you worked at HMMA?
5  **A.** Yes, sir.
6          MR. BOSTICK: Am I on Exhibit 4?
7          MR. LEE: Yes.
8          (The referred-to document was
9              marked for identification as
10             Defendants' Exhibit No. 4)
11 **Q.** (By Mr. Bostick) Can you identify Exhibit
12     4 for me, please?
13 **A.** This is -- appears to be a letter from
14     Melanie McCormick regarding paperwork
15     required for Family Medical Leave Act.
16 **Q.** And you mentioned earlier there were, it
17     sounded like, two stints where you had
18     time away from work due to your heart
19     condition. Does May 4th, 2005 -- is that
20     consistent with your recollection as --
21     as to when you had your first time away
22     from work?
23 **A.** When I had the stents placed in?

Page 42

1  **Q.** Tell me what -- what -- what caused the
2      onset of your issue and what medical
3      treatment you had during that period of
4      time focusing on May 2005.
5  **A.** Okay. Sure. All right.
6          I was having shortness of
7      breath and difficulty walking, you know,
8      marked by difficulty breathing, and I had
9      chest pain. And I called my family
10     practitioner, and he said, Go to the
11     emergency room right now. And I went to
12     the emergency room, and they discovered
13     that I had a partial blockage in a
14     coronary artery. And the next morning
15     they put me under surgery, through a
16     balloon angioplasty, for the placement of
17     two stents in one of my coronary
18     arteries.
19 **Q.** And approximately how -- how much time
20     did you miss from work after the
21     surgery?
22 **A.** I don't know. I'd have to look back at
23     the documentation.

Page 43

1  **Q.** I mean, a couple a weeks, a month, I mean
2      roughly?
3  **A.** I need to look back. I mean, I've got a
4      letter from Melanie McCormick that
5      indicates every date I was out. And I
6      think it was two to four weeks.
7  **Q.** Okay. And so your doctor releases you
8      back to work. And it sounds like there
9      was a period of time where you were
10     having rehabilitation therapy?
11 **A.** Yes.
12 **Q.** What was your -- what was the therapy you
13     were undertaking?
14 **A.** Cardio rehab.
15 **Q.** Which entails what?
16 **A.** It was physical activity at the cardio
17     hospital. I can't remember the name of
18     it. Saint -- it was the -- you know,
19     connected to the hospital where I had my
20     surgery, and it was -- it was exercise
21     and cardio rehabilitation.
22 **Q.** Are you -- I mean, just on a treadmill
23     and that type thing?

Page 44

1  **A.** Yes. Treadmill.
2  **Q.** What was your -- how often during the
3      week would you go to that? Was it once a
4      week, or how many times --
5  **A.** It was, I think, three to four days a
6      week, depending on when they had
7      availability. I had to fit into their
8      program.
9  **Q.** How long a period of time did that go
10     forward that you were doing the
11     therapy?
12 **A.** I don't recall, but it is what my doctor
13     prescribed. I think it was -- I don't
14     recall. Six weeks, maybe, in that range.
15     And that was just, you know, a few hours
16     in the morning. It wasn't an all-day
17     activity, obviously.
18 **Q.** And I think I saw that you had moved out
19     of the -- your primary residence around
20     May of 2005?
21 **A.** Around then. I couldn't tell you
22     exactly. Yeah, after the divorce
23     situation started.

Page 45

1  Q.  Do you recall whether or not you had
2      moved out of the house before you had the
3      surgical procedure on your heart?
4  A.  I was still in my house with my wife when
5      I had the procedure on my heart.
6  Q.  Okay.  Do you -- when's your best
7      estimate as to when you moved out of the
8      house?
9  A.  I can look at my lease.  I couldn't tell
10     you.  I think you have a copy of that.
11 Q.  Do you know if it was during the period
12     of time you were going to the rehab?
13 A.  I'm sorry.  Was I in the original house
14     with my wife, or was I in the other
15     house?
16 Q.  Where did you move -- I guess when you
17     separated, did you buy a separate
18     house?
19 A.  I rented a house, you know, within one
20     mile of my other house --
21 Q.  Okay.
22 A.  -- to be near my kids.
23 Q.  Do you have a best estimate as to when

Page 46

1      that took place?
2  A.  Like I said, I've got a lease.  I think
3      you guys have that document.  I'd have to
4      look at it.
5          MR. BOSTICK:  Why don't we take a
6          break and let me go grab all
7          of these documents.  And
8          we'll just throw 4,000
9          documents out in front of him
10         and we will just take the
11         time to pin all this down.
12         MR. STOCKHAM:  Sure.
13         MR. BOSTICK:  Let me get those.
14         We will need to get specific
15         about this.
16         THE VIDEOGRAPHER:  We are going
17         off the record at 10:46 a.m.
18         (Short recess)
19         THE VIDEOGRAPHER:  We are back on
20         the record at 11:10 a.m.
21 Q.  (By Mr. Bostick)  Mr.Cyrus, I think we
22     discussed while we were off the record
23     that you'd found a document that helped

Page 47

1      refresh your recollection when it was
2      that you moved out of the house or
3      approximately.
4  A.  Yes.
5  Q.  When -- when was your best recollection
6      that you moved out of the house?
7  A.  End of May, June time frame, beginning of
8      June, perhaps.
9  Q.  Now, I want to get us to the point of
10     discussing the Murakami meeting in
11     September of 2005.
12         Prior to that time, when was
13     your understanding as to when Mr. H.I.
14     Kim arrived at the plant in Montgomery?
15 A.  My guess would be four to eight weeks
16     prior to that.
17 Q.  Okay.  And what was his title?
18 A.  He was chief operating officer, COO.
19 Q.  And would you report to him either
20     directly or indirectly, or how would your
21     position link to his?
22 A.  My -- you know, I didn't report to him
23     directly.

Page 48

1  Q.  Okay.  Prior to the September Murakami
2      meeting, had you had any interaction with
3      H.I. Kim?
4  A.  Yes.
5  Q.  Okay.  Tell me about your interactions
6      with him prior to that time.
7  A.  We had a weekly directors' meeting in
8      which I was a participant.  We had one
9      other specific meeting with H.I. Kim.  My
10     Korean manager brought me a document
11     written in Korean that expressed that
12     production, which H.I. Kim was in charge
13     of, had some difficulties with the
14     supplier PPG regarding incorrect
15     sequencing activities.  And I had to take
16     it up to Mr. Choi with my other
17     Korean manager and say, What is this?
18     Because I don't speak Korean or read
19     Korean.  And he said, Mr. Choi, it's a
20     formal report that he is having
21     difficulty with the supplier and their
22     sequencing activities.
23         So we went -- I went with

Page 49

1   Choi and my manager, my Korean manager,
2   we talked to Mr. Choi -- I'm sorry -- we
3   talked to H.I. Kim, and the appropriate
4   actions that needed to be taken was to
5   call PPG in.
6          We had their top executive
7   that dealt with the Hyundai account, we
8   had the local Alabama sequencing quality
9   manager and plant manager come in.  We
10  held the meeting, and we went over root
11  cause analysis and corrective action to
12  keep this from happening in the future.
13  That was it.  At that time, he had an
14  interpreter also.
15  Q.  Okay.  Did you have any other interaction
16      with Mr. H.I. Kim prior to the Murakami
17      meeting?
18  A.  No.
19  Q.  Any of those interactions with Mr. Kim
20      where you and he had any type of
21      disagreements or any reason for him to
22      not get along with you?
23  A.  No.

Page 50

1   Q.  Okay.  At any point during the time that
2       you worked at HMMA, or since leaving,
3       have you ever heard of Mr. Kim, H.I. Kim,
4       making any derogatory comments towards
5       Americans because of their nationality?
6   A.  No.
7   Q.  What was J.Y. Choi's title at Hyundai?
8   A.  Director of purchasing, parts
9       development.
10  Q.  Did he report to you?
11  A.  No.
12  Q.  All right.  Did -- have you ever told
13      anybody that he reported to you?
14  A.  No, I don't believe so.
15  Q.  When did Mr. Choi come to -- arrive at
16      the plant?
17  A.  We probably worked together, prior to the
18      Murakami in September, probably, what,
19      four to five, six months, perhaps.
20  Q.  And how was he -- what were his -- what
21      were his job responsibilities there in
22      the purchasing department?
23  A.  He was also a director of purchasing for

Page 51

1   parts development, and he was almost a
2   mirror of my function in that he tried to
3   focus on issues that he could help out as
4   a liaison between Seoul and Montgomery.
5   So he brought that to the table.
6   Q.  So, what would be the interaction between
7       your position and his position?
8   A.  Well, we -- you know, most things were
9       management by consensus by -- there were
10      sign-off boxes.  So we had to concur in
11      every direction, sourcing activities.
12      You know, we interfaced on a daily basis.
13      A lot of documentation we would get would
14      be in Korean, and he would help with that
15      activity, obviously, with me.
16  Q.  So, what -- was this -- the meeting with
17      Murakami, there was another supplier that
18      was on the agenda that day as well?
19  A.  Yes, sir.
20  Q.  Tell me a little bit about what was
21      the -- how -- it looks like these were
22      weekly meetings that were taking place.
23  A.  This was the first meeting of this type

Page 52

1   ever that I was aware of.
2   Q.  What was your understanding about how --
3       what was going to be the process in these
4       meetings or how it was coming about.  Was
5       it your understanding they were going to
6       be on the weekly basis?  And what was
7       going to be the purpose of the meeting?
8   A.  Not until the meeting itself.  And the
9       purpose of the meeting was to go over
10      supplier issues regarding quality or any
11      other activity:  commercial issues,
12      vehicle-related issues, line stoppage.
13  Q.  And so it would be with the suppliers or
14      could -- explain to me a little bit about
15      how -- it's my understanding there's
16      suppliers and then distributors.  Is
17      that --
18  A.  No.
19  Q.  Tell me --
20  A.  This is H.I. Kim's meeting and his
21      brainchild, so this isn't something we
22      had in place prior to him arriving.  So
23      you'd have to ask him what his intent

Page 53

1    was. But my understanding of the one
2    meeting that did occur was to review, per
3    his agenda, quality concerns that the
4    factory had realized within the past week
5    or month, and the suppliers to come in
6    and give a presentation to address the
7    root cause analysis, and, you know, to
8    say what happened and what the cause was
9    and how we could prevent it from
10    occurring again.
11   Q.  And so Mr. Kim was going to be heading
12        the meeting up?
13   A.  He did, yes.
14   Q.  Okay. Did you -- how -- how did you
15        first become aware that the meeting was
16        going to take place?
17   A.  We had a team-building activity with my
18        group at a bowling alley in Montgomery.
19        And Mr. Brian Hwang, who's one of my
20        direct report managers in charge of
21        plastic injection molding that would
22        encompass outside mirrors, came to me and
23        said, Rob, I need your support in a

Page 54

1    meeting with H.I. Kim. He is too high
2    up. I cannot speak to him. I need your
3    support to be fair and represent the
4    supplier's side in the Murakami defect.
5    That's the first I had ever heard of any
6    Murakami defect issues.
7            So I told him that I would
8    be glad to support it. And I told him,
9    and I actually wrote an e-mail, that, you
10   know, my role in this was to be neutral
11   and present strictly the facts. And he
12   said that's all he expected.
13   Q.  What was his position again?
14   A.  Manager, purchasing manager.
15   Q.  Purchasing?
16   A.  Purchasing manager, parts development.
17        And again, you know, the 25 Koreans,
18        probably 15 of them are managers. So it
19        doesn't mean that they manage people.
20   Q.  So, what was your -- I guess, who were
21        the different departments that were going
22        to be represented at this meeting in
23        terms of HMMA?

Page 55

1    A.  Again, I didn't call the meeting; but
2        what I observed there was quality,
3        production, production control and
4        purchasing, parts development.
5    Q.  Okay. And -- and then you had the
6        Murakami representatives there as well?
7    A.  Yes, sir.
8    Q.  And there weren't -- were there any
9        representatives from Glovis?
10   A.  Yes.
11   Q.  Who was Glovis?
12   A.  Who is Glovis?
13   Q.  Yes.
14   A.  Glovis is Hyundai Glovis. It's a company
15        corporation-owned by Hyundai. It's a
16        third party involved in internal material
17        handling of goods within the plant.
18        That's one of their capacities. They do
19        many different things.
20   Q.  Who was the representative there for
21        Glovis?
22   A.  I couldn't tell you.
23   Q.  Okay. Was he the person that was called

Page 56

1    to coming to the meeting at a later point
2    in the meeting?
3    A.  I believe he was there from the
4        beginning. You know, we had a large
5        table, like this, that probably 25 people
6        could sit at. And on the outskirts of
7        the walls another 20 people could sit.
8        And he was on the wall portion, because
9        he didn't -- he didn't speak until later
10       on when we talked about Glovis causing
11       potential problems. I wasn't aware he
12       was in there until then. He wasn't
13       introduced. He wasn't on the agenda.
14            (The referred-to document was
15              marked for identification as
16              Defendants' Exhibit No. 5)
17   Q.  (By Mr. Bostick) I ask you to identify
18        Exhibit 5 for me, if you will.
19   A.  These are meeting minutes that I was
20        requested to make, demanded to make, for
21        the first time ever being there three and
22        a half years. And these are the actual
23        presentation materials and agenda -- one

Page 57

1   of the agendas, because there's another
2   one, for the quality meeting.
3       MR. STOCKHAM:  There's something
4       missing here from this
5       document.  I don't know if
6       you have got it elsewhere.
7       If you look at the last
8       sentence on it, it says it
9       attaches the actual meeting
10      notes.  And that was the last
11      thing which you produced
12      right behind this, three
13      pages of handwritten notes.
14      MR. BOSTICK:  Okay.  Is it these
15      right here?
16      MR. STOCKHAM:  Yeah.
17  Q.  (By Mr. Bostick) Let's go through what
18      we've got, and then we'll get to these in
19      a second.  I think a lot of these are
20      restated.  So I'm clear, I'll go ahead
21      and mark this as an exhibit.
22          (The referred-to document was
23          marked for identification as

Page 58

1           Defendants' Exhibit No. 6)
2       MR. STOCKHAM:  That should be part
3       of 5.  You might just call it
4       5-A.
5   Q.  (By Mr. Bostick) Can you identify
6       Exhibit 6 for me, please?
7   A.  These are my actual minutes in my diary
8       that I wrote as the meeting was
9       occurring.
10  Q.  The meeting with Murakami?
11  A.  Yes, sir.
12  Q.  Okay.  So looking at Exhibit 6 --
13  A.  Um-hum.
14  Q.  -- you say, I'm looking at what Brian
15      told.  What is the symbol there?
16  A.  Key.
17  Q.  What?
18  A.  It's a key.  Like the key point.
19  Q.  Oh, okay.  Tell me what that little --
20  A.  Brian Hwang told myself and Mr. Choi to
21      talk strongly to H.I. Kim to be fair to
22      the supplier.
23  Q.  Okay.  Was that said during the meeting,

Page 59

1   or was that in a conversation prior to
2   the meeting?
3   A.  A conversation prior to the meeting.
4   Q.  Okay.  Now, I notice some discussion in
5       your notes about you had gone out into
6       the plant.
7   A.  Um-hum.
8   Q.  Was that the morning before the
9       meeting?
10  A.  Yes.
11  Q.  Who did you -- who all did you speak with
12      prior to that time.  Not necessarily the
13      substance of what you said, but who all
14      did you talk to?
15  A.  Who did we take in the pre-meeting?
16  Q.  Yes.
17  A.  Paula Gonzales -- Gonsalves, Brian Hwang,
18      Chris McClain, myself, the actual line
19      workers that put the parts on the
20      vehicle.  I didn't get their names.  I
21      also talked to Ashley Frye, the head of
22      assembly.  I talked to Chris Susock, the
23      head of quality.  I talked to Choi.

Page 60

1   Q.  Now, looking at Exhibit 5 --
2   A.  Um-hum.
3   Q.  -- do you see the Bates number in the
4       corner of the documents?
5   A.  Yes.
6   Q.  Can you identify this for me, by the
7       Bates-number pages, the documents that
8       were prepared by Murakami for their
9       presentation during the meeting?
10  A.  Their letterhead is on here.  It would be
11      Bates No. 363, Page 1 through 7, as
12      indicated in their page marks.  That
13      appears -- that appears to be their
14      presentation.
15  Q.  Okay.  And then was -- was this presented
16      in the form of a PowerPoint, or how was
17      it presented to --
18  A.  I can't recall if it was a slide or a
19      PowerPoint.  I think it was a PowerPoint.
20  Q.  How did you get this actual printout?
21      Was there a handout as well?
22  A.  Yes.
23  Q.  Okay.  Now, the first Page 2 of their

## Page 61

1     presentation, Document 364, discusses
2     paint buff marks.
3  **A.**  Um-hum.
4  **Q.**  And it lists the description of the
5     problem, cause of the problem and
6     countermeasure.
7        Okay.  It looks like on the
8     buff mark issues they say there was
9     insufficient lighting in the Murakami
10    plant.  Tell me which discussion you
11    recall about the insufficient lighting in
12    the plant.
13 **A.**  I don't speak about insufficient
14    lighting.  This was a presentation by
15    Murakami to identify how they would think
16    that a -- a defect got out of their
17    plant.
18 **Q.**  Okay.  What specifically did -- who -- do
19    you recall what the name of the person
20    from Murakami who was giving the
21    presentation was?
22 **A.**  Let me look back to the notes here.  I
23    know there were three individuals there:

## Page 62

1     Toru Komatsu, Mark McDonald and Glen
2     Roberts.  I believe Mark McDonald and
3     Glen Roberts; it was one of the American
4     colleagues.
5  **Q.**  Okay.  Who was actually giving the
6     presentation?
7  **A.**  Yeah, together.  One was quality, and one
8     was the account rep or sales
9     individual.
10 **Q.**  Do you recall if Mr. Komatsu spoke in
11    English, or was there --
12 **A.**  He spoke in English, yes.
13 **Q.**  Okay.  Was there any translation going on
14    between what was being said by Murakami
15    representatives at the presentation?
16 **A.**  Murakami to Murakami?
17 **Q.**  Or was anybody translating to anybody
18    during the meeting?
19 **A.**  Translating, no.
20 **Q.**  Okay.
21 **A.**  You know --
22 **Q.**  Was someone translating so Mr. Kim could
23    understand what was being translating

## Page 63

1     from English to Korean?
2  **A.**  In some cases, yes.
3  **Q.**  Okay.  Who was the person doing the
4     translating?
5  **A.**  Jason Chi.
6  **Q.**  Okay.  And what was Jason Chi's title?
7  **A.**  He was new to the organization.  We later
8     found out that he was a quality
9     manager.
10 **Q.**  Okay.
11 **A.**  I don't know if he's senior manager or
12    manager.  He came from Toyota.
13 **Q.**  Okay.  So, what do you recall the
14    Murakami representative saying about
15    insufficient lighting in their plant and
16    the steps to improve that?
17 **A.**  Nothing more than what's indicated here;
18    that they needed to improve the
19    lighting.
20 **Q.**  Do you recall them saying -- it looks
21    like they're saying they are -- that they
22    did install additional lighting?
23 **A.**  I believe that's correct.  There's a

## Page 64

1     picture somewhere before and after.
2  **Q.**  Do you recall if there was any discussion
3     by Mr. Kim about this lighting issue?
4  **A.**  He made a comment about how long they had
5     been in business providing mirrors, and
6     shouldn't -- shouldn't lighting be a
7     fundamental requirement to -- for an
8     effective product or good product.
9        THE VIDEOGRAPHER:  Two minutes
10       left on tape.
11 **Q.**  (By Mr. Bostick) And then what was the
12    response from the Murakami representative
13    at that point or that question?
14 **A.**  They agreed.
15 **Q.**  Well, and Mr. Kim's point, as I
16    understand it, was, this a basic quality
17    issue to have insufficient lighting in
18    the plant.  And the question was, how can
19    you be in business for 60 years with a
20    basic quality issue like that.  Is that
21    just his general point he was making?
22 **A.**  Yes, sir.
23 **Q.**  And what response, if any, did they

Page 65

1   provide to that?
2 **A.** They -- like I said, they agreed that
3       that was a fundamental, and they had put
4       a countermeasure in place to correct
5       it.
6 **Q.** Okay. And so the buff marks, you know, I
7       understand you got insufficient lighting.
8       What exactly is a buff mark?
9 **A.** You know, I'm not a paint engineer. A
10      buff mark, to my novice understanding,
11      would be after paint process, there's a
12      blemish that would be deemed to be
13      repairable in Murakami, so they would
14      buff the mirror to get it within the
15      inspection parameters agreed to by
16      Hyundai and Murakami in the contract.
17 **Q.** Okay. But clearly, Murakami is saying
18      this is an issue at our manufacturing
19      plant that we're working to resolve;
20      right?
21 **A.** That was one of the -- his feelings at
22      the time.
23 **Q.** The buff marks?

Page 66

1 **A.** Right.
2 **Q.** There's nothing in regards to the buff
3       marks that says there is any issue with
4       Glovis; correct?
5 **A.** I don't believe so.
6       MR. BOSTICK: Okay. Why don't we
7           change tapes now.
8       THE VIDEOGRAPHER: All right.
9           This in the end of the Tape
10          No. 1 in the deposition of
11          Robert Cyrus to be continued
12          on Tape No. 2. We're going
13          off the record at 11:33 a.m.
14          (Short recess)
15      THE VIDEOGRAPHER: This is the
16          beginning of Tape No. 2 in
17          the deposition of Robert
18          Cyrus. We're going on the
19          record at 11:37 a.m.
20 **Q.** (By Mr. Bostick) We'd just finished
21      looking at the first point on the
22      Murakami presentation of the buff marks
23      which they'd identified the need for

Page 67

1   additional lighting in their
2   manufacturing facility. Do you have any
3   knowledge as to where that manufacturing
4   facility was located?
5 **A.** I believe it's in Kentucky.
6 **Q.** Okay. Then the second point, Bates No.
7       366, or Page 407 on the Murakami
8       presentation, is bag marks.
9 **A.** Um-hum.
10 **Q.** Do you recall there being some discussion
11      about there being insufficient cure time
12      for the parts at that point in the
13      discussion?
14 **A.** Yes.
15 **Q.** Okay. Explain to me what cure time is.
16 **A.** It's just like with the spray-paint can.
17      It's the time it takes for the paint to
18      harden to a handable (sic) -- if that's a
19      word -- form which would be appropriate
20      in which they could place in it
21      returnable package.
22 **Q.** Okay.
23 **A.** That's to dry basically.

Page 68

1 **Q.** And so this is -- my understanding is the
2       paint not sufficiently hardened because
3       of an insufficient cure time, and it's
4       being placed in some form of packaging,
5       and the packaging and the packaging is
6       causing the marks because the paint is
7       not properly cured. Is that your
8       understanding of what the problem was?
9 **A.** Yes, sir.
10 **Q.** Okay. And what does -- what does this
11      mean -- what do they propose when they
12      say the countermeasure was stabilizing
13      cure time?
14 **A.** I'm not really sure. You know, one of
15      the reasons they have the cure time
16      difficulty, from my understanding of the
17      explanation in talking to Harry Chase,
18      who was the production control manager --
19      he's the one that would indicate to them
20      the schedule and how frequently they
21      needed to deliver line side into the
22      plant. We changed our production
23      schedule in a dramatic fashion above and

Page 69

1   beyond what we'd given to them in
2   writing.
3           So this new cure time had to
4   be -- the cure time problems occurred
5   when they rechanged the schedule and
6   didn't allow for their process to keep
7   pace, so they had to -- they couldn't
8   allow them to cure appropriately.
9   Q.  So, where -- where is that referenced in
10      their countermeasures?
11  A.  I don't think it's referenced in their
12      countermeasures.
13  Q.  Murakami didn't -- did Murakami
14      identify --
15  A.  That's not a countermeasure; that's one
16      of the causes of why they're running into
17      shipping parts that aren't fully cured,
18      because we changed the schedule on
19      them.
20  Q.  Did Murakami identify that as one of the
21      causes in the root cause?
22  A.  They identified it in the meeting.
23  Q.  Under the document, the presentation?

Page 70

1   A.  I don't see it in writing, no, sir.
2   Q.  But let me -- I'll ask it again:  Along
3       with the buff marks we saw earlier, this
4       is a problem with cure time that's
5       occurring in the manufacturing plant of
6       Murakami; correct?
7   A.  Yes, sir.
8   Q.  And so, there's a picture of the
9       container, and dunnage should be
10      modified.  That's Bates No. 367.
11  A.  Um-hum.
12  Q.  Do you recall what discussion there was
13      about modifying the container and
14      dunnage?
15  A.  There was discussion to take it to the
16      three-mirror format from the five-mirror
17      format.  That's the only thing that we --
18      that we -- that's all we talked about,
19      you know.  We didn't think either one of
20      the formats would be acceptable.  The bag
21      mark was caused from putting the shipping
22      bag on the mirror before it cured
23      properly and completely.

Page 71

1   Q.  Okay.  And then the next point listed is
2       poor heat staking of inside bush nut.
3           What do you recall being
4       discussed on that point?
5   A.  I don't think we got to that point.
6   Q.  Did Mr. Kim end the meeting prior to that
7       time?
8   A.  He walked out of the meeting after saying
9       something -- screaming in Korean twice.
10  Q.  Again, this looks to be a presentation on
11      some, in this case, machine malfunction
12      or human error there at the Murakami
13      Manufacturing Plant.  Is that your
14      understanding?
15  A.  I don't have an understanding of it
16      because they didn't go over it.
17  Q.  So you're not able to read this document
18      and, with your experience in the
19      automotive industry, gain an
20      understanding and opinion as to whether
21      or not they were referring to a problem
22      there in their own plant?
23  A.  I would agree with you that this would be

Page 72

1       a problem within their own plant, yes.
2   Q.  So, have we looked over the complete
3       documents that Murakami represented and
4       prepared for their presentation at the
5       meeting?
6   A.  As far as I'm aware.
7   Q.  Okay.  And nowhere in those documents do
8       they address this issue of scratch marks
9       being caused at Glovis; correct?
10  A.  Well, on the agenda right there, it says,
11      Scratches, and it says downtime.  This
12      was sent to Murakami:  Be prepared to
13      discuss these issues.
14  Q.  Tell me what document are you --
15  A.  362.
16  Q.  Okay.  And this is not a document
17      prepared by Murakami?
18  A.  No, it's not.
19  Q.  My question is this:  We just looked at
20      Murakami's presentation.  Take your time
21      and look over it, and tell me if there is
22      a single word anywhere in their
23      presentation about scratch marks caused

Page 73

1    at Glovis.
2 **A.** Scratch marks caused at Glovis?
3 **Q.** Yes.
4 **A.** No.
5 **Q.** Okay. Now, the issue that Mr. Hwang
6    spoke to you about was downtime that had
7    been caused in the plant previously; is
8    that correct?
9 **A.** I wouldn't identify it at that point. It
10    was a number of Murakami quality issues.
11 **Q.** Okay. And --
12 **A.** Including the three indicated buff marks,
13    bag marks, scratches, craters and wind
14    noise.
15 **Q.** So, when you went out in the plant and
16    talked to the team members, did you
17    determine -- did you see for yourself
18    some of these items that had buff marks
19    or bag marks?
20 **A.** No. Those were in a quarantine area.
21 **Q.** Okay. Do you know how many of those
22    items there were?
23 **A.** How many of which items?

Page 74

1 **Q.** First, how many defective products had
2    been sent with buff marks.
3 **A.** I don't know specifically with the buff
4    marks.
5 **Q.** Okay. Do you know with regard to bag
6    marks?
7 **A.** No.
8 **Q.** Do you know with regard to scratch
9    marks?
10 **A.** No.
11 **Q.** Okay. So, what do you know about the
12    composition of the defective products
13    that you were looking at the morning in
14    the pre-meeting?
15 **A.** There were 280-some parts involved.
16    250-some were deemed to be acceptable.
17    So the operators pulled them off saying,
18    This is suspect. But when the final
19    determination was made, it was, These
20    were acceptable to go on the vehicle.
21       The other remaining ones
22    were typically the scratch marks, which
23    were gouges. I mean, all the way down to

Page 75

1    the raw material. So these were not in
2    the same category. These were products
3    that I don't feel any supplier would ship
4    in that -- that flagrant-type defect.
5 **Q.** Okay. And what was your understanding
6    about how the scratches were occurring?
7 **A.** We went through the process from receipt
8    of goods into the plant from the Murakami
9    truck or our prescribed trucking. They
10    were taken out of the returnable
11    packaging indicated on Bates No. 367, and
12    Glovis was taking them and stacking them
13    in an empty tote, like a milk crate, on
14    top of each other.
15 **Q.** Okay. So --
16 **A.** So in the pre-meeting, quality agreed,
17    production agreed, purchasing agreed, Mr.
18    Choi and I and Hwang and the supplier,
19    that this was a Glovis handling issue.
20 **Q.** The scratch marks.
21 **A.** Yes. Yes.
22 **Q.** Okay. So -- so I'm clear, the buff
23    marks, the bag marks are issues that are

Page 76

1    happening either at the Murakami plant in
2    the manufacturing process or in the
3    placement into the container; correct?
4 **A.** Yes, all at the Murakami -- that's all
5    their responsibility, yes.
6 **Q.** Then the scratch mark is an issue that's
7    happening once the items are shipped from
8    the plant to Glovis and they're being
9    removed by Glovis employees at that
10    point; is that correct?
11 **A.** Well, they're handled by a number of
12    employees. I mean, I don't know the
13    specific details, but they come in to our
14    plant. I don't know if a Hyundai person
15    receives it or a Glovis person receives
16    it. They go from returnable packaging,
17    and they're supposed to be sequenced,
18    like I need a red one, and a green one
19    and a blue one to match the vehicles
20    coming down the line. Glovis'
21    responsibility was that sequencing
22    activity.
23       So they were taking them out

Page 77

1  of the returnable packaging and getting
2  them lined up for the cars coming down
3  the line correctly and stacking them
4  inappropriately in their own admission.
5  Q.  So there's -- so I'm clear, there's not
6  an intermediary Glovis facility where the
7  items are shipped.
8  A.  No, sir.  It's just Glovis employees in
9  the Hyundai plant.
10  Q.  Okay.  But there is a Glovis facility
11  here in Montgomery that's located near
12  the plant?
13  A.  Yes.
14  Q.  But these Glovis employees would actually
15  work on site at Hyundai?
16  A.  Yes.
17  Q.  Okay.
18  A.  Both.
19  Q.  Okay.  Do you recall if the Murakami
20  mirrors would be shipped first to that
21  Glovis facility, or would they be shipped
22  directly to Hyundai?
23  A.  I don't know.  I believe direct.

Page 78

1  Q.  Okay.
2  A.  I don't know.
3  Q.  Okay.  So you say, the last sentence on
4  Page 357, you say -- well, I guess
5  you're -- let's look at the last two
6  sentences.
7  A.  Okay.
8  Q.  You say:  She stated there really hasn't
9  been much of any difficulty with the
10  mirrors and the only thing that has been
11  occurring is occasional severe gouges or
12  scratches all the way down to the plastic
13  raw material, not light scratches.
14  A.  Um-hum.
15  Q.  Do you recall the name of this HMMA team
16  member who told you this?
17  A.  No.
18  Q.  I mean, do you know what her job or title
19  would be?
20  A.  Her job is -- her title is team member,
21  and her job is to put parts on the
22  vehicle in assembly.  She may be rotated.
23  She may -- my job is not to interrogate

Page 79

1  her.  She was very helpful.
2  Q.  Right.  Did you ask her about buff marks
3  or bag marks?
4  A.  I asked her in general what quality
5  defects she'd seen from Murakami.
6  Q.  I mean, prior to your pre-meeting, I
7  guess you had had this -- would you have
8  had the agenda we listed as 362?
9  A.  I may have.  I couldn't tell you for
10  sure.  I know there's another one that
11  shows occurrence -- it says 341.  So
12  that's why I'm saying this is not the
13  complete documentation.  I've seen that
14  yesterday when we reviewed documents.
15  Q.  What is -- what are you referring to?
16  A.  There's a document that's also an agenda
17  for the H.I. Kim quality meeting which
18  says, Murakami Downtime; and it's also,
19  under an Occurrence heading, says 341.
20  Q.  Some specific number of items?
21  A.  Right.
22  Q.  Okay.
23  A.  Yes.

Page 80

1  Q.  So, do you know -- my understanding is
2  you talked to some of these people on the
3  line and gained an understanding about
4  these scratch mark issues.  I mean, what
5  investigation, if any, did you do to look
6  into how big a problem the buff marks or
7  the bag marks were?
8  A.  Well, that's kind of misstated there.  We
9  went there to find out what the defects
10  were.  And at that point, we didn't know
11  if they were scratch, buff or bag.
12  Q.  Okay.  So --
13  A.  I asked her, what -- what -- how's
14  Murakami doing?  You know, what type of
15  supplier?  Then she indicates, They're --
16  as stated here, They're generally a good
17  supplier.  The only thing we see is
18  severe gouges and scratches all the way
19  down to the plastic raw material.
20      So you need to understand
21  also that there's another party involved
22  in the sequence called QLS, which Chris
23  Susock is responsible for, in the

Page 81

1    quality, which he's aware prior to the
2    meeting that this is an internal issue.
3    QLS, I believe, is the party that
4    rejected the mirrors as an interim
5    inspection stage.
6  **Q.**  Okay.
7  **A.**  So --
8  **Q.**  So the parts come in, and QLS will review
9    the parts before they get sent --
10 **A.**  Case by case, depending on quality's
11   direction.
12 **Q.**  What do you mean "case by case"?
13 **A.**  I mean, we have 2,000 SKU's, or part
14   numbers, that come in and items for 1,375
15   vehicles a day.  So it's not practical to
16   run an assembly plant looking at every
17   part. Suppliers provide parts that meet
18   our specifications and no inspection's
19   required.
20     If quality has had
21   experience in the past with a specific
22   problem, they may assign like a third
23   party, like QLS.  They will see some lug

Page 82

1    nuts with corrosion.  Let's -- let's
2    inspect those for a period of time.  But
3    that's up to Susock's discretion or his
4    department or Kwak or Jason Lee, and
5    they're all aware of that at the
6    pre-meeting.
7  **Q.**  Did -- did Mr. Susock attend the
8    pre-meeting?
9  **A.**  No.  No, but we spoke to him afterwards,
10   the quality people with us.
11 **Q.**  Who from quality control attended the
12   pre-meeting?
13 **A.**  Paula Gonsalves.
14 **Q.**  Was that two names, or is that --
15 **A.**  I'm sorry.  It's right here.  It's on
16   Bates No. 358.  HMMA parts quality, Ms.
17   Paula Gonsalves.
18 **Q.**  What did Ms. Gonsalves tell you about her
19   understanding about rejected Murakami
20   parts?
21 **A.**  She'd had conversations with Murakami.
22   They wanted to address all of the
23   defects.  I mean, we all went on this

Page 83

1    investigation together, this discovery
2    phase.
3  **Q.**  I guess, did she say anything about buff
4    marks or bag marks during your
5    discussions with her in the pre-meeting
6    phase?
7  **A.**  The pre-meetings were, you know, at
8    the -- at the line side.  The
9    pre-meetings, we went to the conference
10   room and we talked about the issues and
11   then we went to the line side.
12 **Q.**  Well, I guess if a quality -- if QLS
13   reviews a case with mirrors --
14 **A.**  Um-hum.
15 **Q.**  -- and finds that every mirror in the
16   case has a buff mark on it and is not
17   usable, would the person who's sitting on
18   the line, the team member, ever have any
19   knowledge that that had even happened?
20 **A.**  That -- I'm sorry.  That it had gone to
21   QLS?
22 **Q.**  They would know it had to Q --
23 **A.**  No, they wouldn't know.  They wouldn't

Page 84

1    know if it had gone to QLS.
2  **Q.**  So the team member has no idea on --
3  **A.**  Typically it's not required for parts to
4    go through an interim inspection.  That's
5    a double handling.
6  **Q.**  Well, but the team member on -- on -- on
7    the line --
8  **A.**  Um-hum.
9  **Q.**  -- doesn't know what parts are being
10   pulled out upstream for defective issues;
11   correct?
12 **A.**  Right.
13 **Q.**  Okay.
14 **A.**  Typically.  I'm not the quality person.
15 **Q.**  Okay.
16 **A.**  That would be my thought on that issue.
17 **Q.**  Okay.  So you can't really rely on just
18   what the team member on the line is
19   telling you about the concerns with the
20   parts as much as you need to figure out
21   what quality the QLS is seeing?
22 **A.**  That's why quality is involved.  They're
23   -- they're -- they're involved in the

Page 85

1    interface to QLS.  They trigger QLS, and
2    they stop QLS.
3  Q.  Well, that's my question is, did Paula
4    Gonsalves, at any point in y'all's
5    pre-meeting, talk about buff marks or bag
6    marks and what was being pulled out of
7    the pool for those two issues?
8  A.  No.  Not specifically.
9  Q.  Did you ask her about those?
10  A.  No.  We talked about buff marks and bag
11    marks and scratches in general.
12  Q.  Do you have any idea why you sit here
13    today -- as you sit here today, why the
14    Murakami representatives preparing their
15    presentation had nothing in their agenda
16    to discuss the scratch mark issues?
17  A.  No.  They were involved with us the
18    meeting -- the morning of the meeting,
19    and that's -- you know, we talked about
20    scratch marks with them at that point
21    also.
22        They talked about that we
23    had returned parts to them that had been

Page 86

1    run over by a fork truck and tried to
2    charge them for them.  So they were
3    flagrant returns that could not have
4    occurred at Murakami, and they -- they
5    didn't want to be penalized for that, for
6    line stoppage on a part that we had run
7    over with a forklift.
8  Q.  And you had no reason why that was not a
9    slide presented as part of their
10    presentation in the meeting.
11  A.  I had no idea.  I had not seen the
12    materials prior to that.
13  Q.  Okay.  So, what Murakami representatives,
14    if any, were involved in this -- this
15    pre-meeting that you had?
16  A.  We had Glen Roberts.
17  Q.  Okay.  Did he tell you anything about bag
18    marks or buff marks?
19  A.  We talked about all three categories.
20  Q.  What did he tell you about bag marks?
21  A.  One of the discussions was, every party
22    was unclear at that point if they were
23    truly buff marks or they were bag marks.

Page 87

1    Because they can appear the same,
2    apparently.
3  Q.  Did -- did he -- did you and he have any
4    discussion specifically about this
5    downtime charge?
6  A.  Yes.
7  Q.  Tell me what that discussion was.
8  A.  That discussion was simply that they were
9    to address the downtime in the meeting.
10    That's why it was on the agenda, H.I.
11    Kim's agenda.  And they didn't feel that
12    the -- the majority of the problems were
13    not Murakami's fault.  And they wanted
14    fair and ample time just to present their
15    facts.
16  Q.  If -- if -- if -- my understanding is
17    that there is -- what you have in here
18    is, you know, you have 163 minutes, and
19    there is a dollar amount sign.  Who is
20    the person or entity within HMMA that
21    draws the conclusion that a supplier
22    should be assessed that charge for
23    downtime?

Page 88

1  A.  Operations.
2  Q.  How would -- would QLS be involved in
3    that as well?
4  A.  No, not to my knowledge.
5  Q.  I mean, I assume that when you say
6    operations, are you talking about, for
7    example, Mr. Kim being chief of
8    operations?
9  A.  Kim and Kalson.
10  Q.  Okay.  And so --
11  A.  Probably Susock also since it's a quality
12    problem.
13  Q.  Well, that's what I am wondering is, is
14    there a standard process for -- you know,
15    obviously the line shuts down, you know
16    that.  And then if it's a quality parts
17    issue, I guess Susock is going to be the
18    one who is first alerted to that issue?
19  A.  He or members within his team.
20  Q.  Okay.  And so, will they then make a
21    report to say, Here is what we found is
22    the cause of this downtime, and then, you
23    know, there will be some kind of

Page 89

1      determination made on that end?
2  A.  He, along with operations, because
3      operations tracks the downtime. That's
4      their baby.
5  Q.  Would you -- would you have any
6      involvement in the entire process of
7      examining the downtime issue and making
8      an assessment of downtime penalty or, for
9      lack of a better word --
10 A.  I just get the facts as represented from
11     Hyundai.
12 Q.  Okay. So, but you don't make that
13     determination, you don't go review the
14     parts that are --
15 A.  Case by case.
16 Q.  You do?
17 A.  Case by case, if needed.
18 Q.  If needed?
19 A.  I wasn't asked to do it in this case.
20 Q.  After the downtime penalty -- I'm asking
21     as the downtime issue was addressed in
22     the initial process.
23 A.  Purchasing is the window to the supplier.

Page 90

1      So if there's any commercial activities
2      that have to take place between Hyundai
3      Motor Manufacturing of Alabama and the
4      supplier, it has to go through
5      purchasing.
6  Q.  And here you had a downtime assessment
7      that a supplier spoke to you about and
8      said we're not happy with; correct?
9  A.  I didn't say they weren't happy with it.
10     They said they wanted to review the facts
11     on the table.
12 Q.  And that was your first involvement in
13     this downtime issue.
14 A.  No; my first involvement was Brian Hwang
15     at the bowling alley telling me, I need
16     you to go and support me in this meeting
17     tomorrow.
18 Q.  Okay. And -- and Brian Hwang is not in
19     QLS; correct?
20 A.  No, he works for me. Parts development.
21 Q.  Okay. So parts development -- were you
22     ever aware of a situation where parts
23     development assessed a penalty for

Page 91

1      downtime in the plant?
2  A.  Yes.
3  Q.  Who did they make that assessment with?
4  A.  Smart, the company. Shin Junk (sic);
5      it's done in Korea.
6  Q.  What was -- what was that related to?
7  A.  They provide metal stamping components,
8      like floors and fire wall and other
9      various components. One case I can
10     remember, they -- they had to put on weld
11     studs that help us secure the parts on
12     the vehicle. And we had a missing weld
13     studs issue. We had cold welds also with
14     them. So when the parts arrive at line
15     side and the workers are ready to put
16     them on and they can't see what they
17     build because of the parts quality,
18     that's -- purchasing gets a call
19     typically immediately.
20 Q.  So, but your -- but your first knowledge
21     on this particular instance, you were
22     bowling with Mr. Hwang the night
23     before?

Page 92

1  A.  I was bowling with the whole team. It's
2      a team-building activity.
3  Q.  Okay. The whole parts development
4      team?
5  A.  Yes.
6  Q.  Okay.
7  A.  And supplier development. My whole
8      group.
9  Q.  Okay. Approximately how many people
10     would have been there?
11 A.  There is 50 in the department, including
12     myself and Mr. Lee and Mr. Hyun. And I
13     couldn't tell you -- 35 people were
14     there?
15 Q.  Okay. So --
16 A.  40?
17 Q.  And I think you said your explanation to
18     him was you would look into it the next
19     morning, and then you would take a
20     neutral stance during the meeting?
21 A.  Absolutely.
22 Q.  Okay. Now, who coordinated this
23     pre-meeting, for lack of a better word?

Page 93

1　A.　Brian Hwang and Chris McClain.
2　Q.　Okay.  What is Chris McClain's title?
3　A.　He's assistant of purchasing, parts
4　　　development.
5　Q.　Who contacted Paula Gonsalves to
6　　　attend?
7　A.　I think Chris and Hwang.
8　Q.　Okay.  Do you know if anybody called
9　　　Chris Susock to see if he could
10　　　participate?
11　A.　I don't know.  He was informed after the
12　　　determination was made.
13　Q.　What determination was made?
14　A.　That we thought we had three problems:
15　　　buff marks, bag marks and scratches.
16　Q.　Okay.
17　A.　And he concurred that the scratches were
18　　　an internal Hyundai handling issue with
19　　　Glovis.
20　Q.　He said, Facts presented in the
21　　　pre-meeting with HMMA quality and parts
22　　　development showed of the 282 mirrors
23　　　returned -- I'm sorry.  I'm looking at

Page 94

1　　　Page 358.
2　A.　Okay.
3　Q.　So, of the 282 mirror that were returned,
4　　　251, 80 percent, were good and
5　　　acknowledged so by HMMA QC.
6　A.　Uh-hum.
7　Q.　How did you come to that understanding?
8　A.　That was presented in the meeting.
9　Q.　The pre-meeting?
10　A.　No, in the meeting.
11　Q.　It says this was the facts presented in
12　　　the pre-meeting.
13　A.　Well, you know, let me read this again.
14　　　The facts presented in the pre-meeting
15　　　with HMMA Quality and Parts Development
16　　　showed of the 282 mirrors returned as
17　　　defective, 251 were good and acknowledged
18　　　so by HMMA QC.
19　　　　　　Yeah, that's correct.
20　Q.　I mean, what were you looking at to make
21　　　that determination?
22　A.　I didn't make that determination.
23　　　Susock's department made that

Page 95

1　　　determination.
2　Q.　Okay.
3　A.　He and Kwak.
4　Q.　How did you learn --
5　A.　And Chi.
6　Q.　-- that Chi -- is Chris Susock a
7　　　female?
8　A.　No.
9　Q.　How -- what information was conveyed to
10　　　you to lead you to put this in the
11　　　statement is what I'm asking?  Was it --
12　　　did Paula Gonsalves tell you this?
13　A.　I don't remember who told me.  You know,
14　　　we had that internally as parts that were
15　　　quarantined, and of the parts that were
16　　　quarantined, which ones were deemed to be
17　　　acceptable.
18　Q.　Did you look at any documentation on
19　　　this?
20　A.　No, I don't recall that.
21　Q.　So this is -- your basis for this
22　　　statement is word of mouth?
23　A.　No, it's based on factual -- you know,

Page 96

1　　　you don't come up with a number like 282
2　　　from an arbitrary word of mouth.  This is
3　　　based on defect material tags.
4　Q.　I mean, so -- well, that's what I asked.
5　　　Was there some specific documentation
6　　　that you reviewed to get you these
7　　　numbers?
8　A.　I don't recall looking at 282 defect
9　　　material tags.  I -- probably
10　　　Ms. Gonsalves told us the count.  That's
11　　　her responsibility.
12　Q.　And so you heard it word of mouth from
13　　　Ms. Gonsalves.  You didn't see any
14　　　reports or specific document that gave
15　　　you these numbers; is that correct?
16　A.　Well, we saw the actual parts and the
17　　　defective material tags.
18　Q.　Did you see a report that listed out a
19　　　classification?
20　A.　I don't recall.
21　Q.　Okay.  It says, The remaining 31 parts
22　　　were either were either handling damage
23　　　caused by Glovis or defects caused by

Page 97

1     Murakami's packaging format previously
2     approved by HMMA Production Control in
3     writing.
4           What was the issue with the
5     packaging format?
6 **A.** That's the bag mark issue again.
7 **Q.** So the bag mark issue by Murakami's
8     representative's representation is being
9     caused by the incorrect curing time;
10    right?
11 **A.** Yes.
12 **Q.** Okay. Who is telling you that it's the
13    packaging format?
14 **A.** Who's telling me that it's the packaging
15    format?
16 **Q.** Yes. I mean, where did you gain this
17    knowledge that that was an issue with the
18    remaining -- some of the remaining 31
19    parts?
20 **A.** The -- from my recollection, there was
21    two bags. There was a plastic bag, like
22    a Ziploc bag. And then it went to a
23    tie-back-type bag. That was a format

Page 98

1     change in the packaging.
2 **Q.** Did anybody during this pre-meeting
3    mention incorrect curing time as an
4    issue?
5 **A.** I don't recall.
6 **Q.** Okay. Did you have any discussions in
7    the pre-meeting about the improper
8    lighting?
9 **A.** I don't -- I don't believe so.
10 **Q.** Okay.
11 **A.** I don't recall.
12 **Q.** You say Mr. Roberts was in this meeting
13    from Murakami?
14 **A.** Uh-huh.
15 **Q.** Did he make mention of any of the points
16    during this pre-meeting that are
17    identified in the Murakami presentation
18    that we looked at previously?
19 **A.** Say that again, please.
20 **Q.** Yeah. The Murakami -- we looked at the
21    Murakami --
22 **A.** Presentation.
23 **Q.** -- presentation that had buff marks, bag

Page 99

1     marks and something with the nut that
2     y'all didn't get to --
3 **A.** (Witness nods head)
4 **Q.** -- the countermeasures of lighting and
5    then the countermeasures of correcting
6    the cure time and also proposing a
7    different packaging. Were any of those
8    items brought up by Mr. Roberts in the
9    pre-meeting as concerns with some of the
10   defective products?
11 **A.** I think so.
12 **Q.** Okay. Would you agree with me that your
13   statement that the packaging formatting
14   was causing the problem is inconsistent
15   with Mr. -- with the Murakami
16   presentation statement that those buff
17   marks were being caused by improper
18   curing?
19 **A.** Can you say that again, please.
20 **Q.** Yeah. The problems that Murakami
21   identified on their end in the plant
22   were, one, improper cure time; and two,
23   improper lighting.

Page 100

1 **A.** And packaging.
2 **Q.** Well, the issue with the packaging, as
3   they explained, was because there was
4   improper cure time when it's being placed
5   in the package that was causing --
6 **A.** There's two animals: One was the plastic
7   bag, and one was a tie-back bag, and one
8   was that, with either bag, that the cure
9   time hasn't been reaching beyond that
10   sticking problem.
11 **Q.** Okay. So, is there anything about the
12   packaging format that you could have
13   changed that would have solved the
14   problem of the cure time issue?
15 **A.** No.
16 **Q.** Okay. So, you -- did you -- did you draw
17   any conclusions prior to going in the
18   meeting that led you to decide to take a
19   different position than just remaining
20   neutral, as you had said earlier?
21 **A.** No. I mean, in the meeting, the only
22   approach was to present the facts.
23   That's the intent of the meeting.

Page 101

1        If the facts are that it's a
2    bag issue or a cure issue, the facts
3    present themselves, and are concurred
4    with with quality, production, production
5    control that, yes, we agree, and the
6    scratches we agree, I mean, that's the
7    facts that we know at that point through
8    root cause analysis concurred by parties
9    in the meeting.
10  Q.  So is there anywhere in your memorandum
11    that we're looking at, Exhibit 5 -- is
12    there anywhere in your memorandum where
13    you identify any statements that Mr. Choi
14    made during the meeting?
15  A.  On Bates No. 358, last paragraph, first
16    line:  Murakami and Parts Development --
17    Choi and myself -- attempted to intervene
18    to clarify the facts with an open
19    dialogue.
20  Q.  Did you just -- you added in the words
21    "Choi" and "myself."  Do you mention Mr.
22    Choi in the document?
23  A.  I don't mention myself either.

Page 102

1  Q.  Okay.  My question is simply:  Did you
2    identify in this document anywhere where
3    you attribute any statement made by Mr.
4    Choi?
5  A.  Yeah.  Parts development is Choi.
6  Q.  Mr. Choi by name.  How many people did
7    you tell me earlier are in parts
8    development?
9  A.  How many are in parts development?
10  Q.  Didn't you say it's more than 50?
11  A.  No, it's about 40.
12  Q.  Okay.
13  A.  Ten of them are in supplier -- quality
14    supplier development, under me, but it's
15    a different area.  Parts development in
16    this meeting in conversations were Choi
17    and myself and Mr. Hwang and
18    Mr. McClain.
19        MR. BOSTICK:  Can you read back my
20        question?  I don't think that
21        that got answered.
22        THE COURT REPORTER:  Before didn't
23        you say it's more than 50.

Page 103

1        MR. BOSTICK:  No, the one before
2        that about Mr. Choi.
3        (Record read as follows:
4        "Question: Did you - you added
5        in the words 'Choi' and
6        'myself.'  Do you mention Mr.
7        Choi in the document?")
8        THE WITNESS:  Mr. Choi isn't
9        mentioned in the document.
10  Q.  (By Mr. Bostick) I guess my more specific
11    question is, is there anywhere in your
12    memorandum, that we labeled as Exhibit 5,
13    where you specifically attribute any
14    statement in the Murakami meeting to J.Y.
15    Choi?
16  A.  No.  Nobody's mentioned specifically from
17    parts development in this, in Exhibit
18    5.
19  Q.  I ask the same question with regard to
20    Exhibit 6.
21  A.  Exhibit 6.
22        I'm sorry.  Do you have a
23    question with Exhibit 6?

Page 104

1  Q.  My question is:  Is there anywhere in
2    Exhibit 6 where you make a notation where
3    you specifically identify made -- a
4    comment made by Mr. Choi at the Murakami
5    meeting?
6  A.  No.
7  Q.  Okay.
8        At the bottom, can you read
9    for me what -- what your notation is?  It
10    looks like you say, H.I. Kim yelling and
11    throwing paper.
12        Do you see that?
13  A.  Uh-huh.
14  Q.  And it says, Very unprofessional.
15    Everyone uncomfortable.  Is that, H.I.
16    Kim yelled at me?
17  A.  At Murakami -- "M" is Murakami -- to
18    behave themselves.
19  Q.  And it says, Glovis will come to meeting
20    now to address.
21  A.  Um-hum.
22  Q.  Does your refresh your recollection about
23    whether or not there was a Glovis

Page 105

1    representative there?
2  **A.**  Glovis was, like I mentioned to you, they
3    were in the meeting, but they were not
4    sitting at the presentation table.
5    They were along the wall.  So I don't
6    know if somebody called them at the
7    beginning of the discussion or if they
8    had been sitting in the room with 50, 35,
9    whatever, the whole time.
10  **Q.**  I mean, do you recall that there was some
11    discussion to call a Glovis
12    representative to come to the meeting?
13  **A.**  Yes.  Glovis will come to meeting now to
14    address.
15  **Q.**  But it's your testimony, to the best of
16    your recollection, that there were Glovis
17    representatives already in the meeting
18    prior to --
19  **A.**  I don't know if they were already in
20    there or when they showed up.  You know,
21    people come and go from two- or
22    three-hour meetings all the time.
23  **Q.**  Did you -- who did you provide Exhibit

Page 106

1    5 -- I think you said Exhibit 6.  Who did
2    you actually provide that to back at the
3    time?
4  **A.**  Five, I provided to Mr. Hyun.
5  **Q.**  And what was his title?
6  **A.**  He was a senior, I believe -- it's on the
7    chart -- senior director of parts
8    development, purchasing.
9  **Q.**  And what was your understanding as to who
10    he had requested statements from?
11  **A.**  Who he requested statements from?
12  **Q.**  Yes.
13  **A.**  To myself and Mr. Choi.
14    (Vibrating sound).
15    THE WITNESS:  Sorry.  That's
16    Germany calling.
17  **Q.**  (By Mr. Bostick)  The -- were there --
18    was it your understanding that the
19    statements had been requested by
20    Mr. Ahn?
21  **A.**  Let me -- let me clarify that.  People
22    within parts development is Choi, myself,
23    McClain and Hwang.

Page 107

1  **Q.**  Okay.
2  **A.**  All right.
3  **Q.**  Were -- did you -- was it your
4    understanding that the statements had
5    been requested by Mr. Ahn?
6  **A.**  My understanding it was from H.I. Kim.
7    But I knew that H.I. Kim -- well, we'll
8    speak to that.
9    (The referred-to document was
10    marked for identification as
11    Defendants' Exhibit No. 7)
12  **Q.**  Do you -- do you speak any Korean?
13  **A.**  Hello.  That's about it.  No.
14  **Q.**  Have you reviewed what I've marked as
15    Exhibit 7 prior to the deposition?
16  **A.**  Yesterday.
17  **Q.**  Okay.  Now, Mr. Susock states that the
18    executive management attendees were John
19    Kalson, Rob Cyrus and S.G. Kwak.  Was
20    that consistent with your recollection?
21  **A.**  You know, I didn't take meeting minutes,
22    you know, in the meeting and go through a
23    head count because, like I said, after

Page 108

1    being the first employee there and being
2    there three and a half years, we'd never
3    written meeting minutes ever or since.
4    So I didn't go in there and do a head
5    count.
6  **Q.**  All right.  Do you agree with me that
7    each of those three people --
8  **A.**  Yes.
9  **Q.**  -- identified are members of executive
10    management?
11  **A.**  Kwak is not.  Well, he is a quality
12    director.  I guess it depends on what you
13    define executive management.
14  **Q.**  So is Mr. Choi not a member of executive
15    management?
16  **A.**  Yes, he is, yeah.  Well, he's a director,
17    so it would be under the same logic.
18  **Q.**  Do you agree with his statement that the
19    Murakami representatives began discussing
20    the issue of buff marks?
21  **A.**  The meeting opened with Murakami
22    Manufacturing Company to discuss the
23    quality issues of buff marks on the

Page 109

1    outside mirror commodity that they
2    supply.
3         I don't know what was the
4    sequence of the pages in Exhibit 5.
5    Yes.
6  Q. Okay. He says you interjected at that
7    point. Stated -- and you stated that you
8    had pre-meeting with Murakami and that
9    they concluded that due to an EO
10   change --
11 A. Where are you?
12 Q. Sorry. I'm looking at -- see the, Rob
13   Cyrus interjected. Do you see that
14   paragraph?
15 A. Yes.
16 Q. Read that paragraph and tell -- you can
17   just read it silently, but tell me if you
18   agree or disagree with what he says in
19   that paragraph.
20 A. You know, I don't know if I interjected
21   at that point. I think Choi and I made
22   it a point at that point. I don't even
23   know at what point that Choi and I

Page 110

1    discussed this.
2  Q. What specifically did you say about -- I
3    guess, first, what is an EO change?
4  A. Engineering order.
5  Q. Okay. What do you recall stating at the
6    meeting about an EO change?
7  A. We said -- we addressed that the curing
8    time was affecting the buff -- was
9    affecting the bag marks. Choi and I said
10   that. Because he got the EO information
11   from a Korean, Mr. Kwak.
12 Q. We'll talk in a second about what Mr.
13   Choi said at the meeting. I want to talk
14   about what specifically you said.
15        Did you -- did you say that
16   this engineering order change was causing
17   problems with the cure time, or did you
18   not?
19 A. I don't recall saying that.
20 Q. Okay. Do you recall if Harry Chase made
21   this response that he refers to in the
22   next paragraph?
23 A. Harry Chase, manager of production

Page 111

1    control department, stated that the
2    packaging was -- I don't recall verbatim,
3    but there was discussion on that. That's
4    a standard practice.
5  Q. Okay.
6  A. The suppliers provide the packaging, but
7    Hyundai approves the packaging. So it
8    can't be one-sided. Both parties have to
9    concur.
10 Q. Then he identifies, after this back and
11   forth with Chase, that Mr. Kim
12   interjected and inquired how many years
13   has Murakami been in the business and who
14   were some of their customers that they
15   provided for. Expressing concern over
16   basic quality issues. I'm paraphrasing.
17 A. Um-him.
18 Q. I mean, do you recall him making that
19   point?
20 A. Yes.
21 Q. Okay. And next says, Rob Cyrus replied
22   for Mr. Komatsu-San and stated that
23   Murakami was not the problem for all the

Page 112

1    issues that caused 200 minutes of
2    downtime in general assembly, that much
3    of the mirror problems are caused by
4    Glovis handling.
5  A. That's not true.
6  Q. What did you say?
7  A. That's not true. I didn't reply for
8    Murakami at any point.
9  Q. Did you make a statement during the
10   meeting about the downtime?
11 A. About the downtime -- the meeting was
12   about the downtime.
13 Q. Did you make a statement during the
14   meeting that Murakami was being
15   improperly charged for downtime?
16 A. No. I made a fact -- a statement of the
17   facts that the downtime was caused by
18   "X," and "X" was identified as whatever
19   it was factually.
20 Q. Tell me specifically, the best you can
21   recall, what you said about this downtime
22   issue during the meeting.
23 A. I didn't say anything about it other than

Page 113

1    that we concurred with quality and
2    production control and production that a
3    number of the -- of the defects seemed to
4    be, you know, related to internal
5    handling issues. Choi and I stated
6    that.
7  Q. Did Mr. Kim at some point say that the
8    purpose of the meeting was to -- it says
9    here, review major supply problems
10   identified and the supplier to address
11   those problems?
12 A. No.
13 Q. I mean, did Mr. Kim make the point that
14   he was wanting to focus on the specific
15   issues -- that -- the quality issues that
16   were occurring in the Murakami plant?
17 A. No. I mean, he wanted to cover
18   everything was the understanding per his
19   agenda.
20 Q. I'm not talking about what it says in his
21   agenda. What he specifically said in the
22   meeting.
23 A. We covered all issues on the agenda in

Page 114

1    the meeting: Myself, Choi, Kim, Kwak,
2    Kalson, Susock.
3  Q. Did Mr. Kim, at some point in the
4    meeting, say that he wanted to focus on
5    the quality issues that were occurring at
6    the Murakami plant or words to that
7    effect?
8  A. That's one topic that he wanted to
9    discuss of multiple.
10 Q. When you brought up the issue of downtime
11   and the handling issues with Glovis, did
12   Mr. Kim say to you words to the effect
13   of, I don't want to talk about that
14   issue; I want to focus on the issues that
15   were occurring at the Murakami plant?
16 A. First of all, I didn't bring it up. Choi
17   and I brought it up together. And we
18   said that we would like to allow the
19   supplier to address all of the issues.
20   They understood that the downtime was one
21   of the major reasons they brought their
22   vice president in, because of this in
23   excess of $100,000 chargeback that they

Page 115

1    didn't feel was correctly assigned to
2    them.
3  Q. So you deny, then, that Mr. Kim made a
4    comment to you trying to redirect the
5    focus of the meeting from the point that
6    you were raising?
7  A. He made a comment to myself and Choi and
8    the table that, you know, when we started
9    talking about scratches and chargeback
10   and root cause determination, he appeared
11   like he didn't like the answer. He
12   didn't like the outcome, and that's when
13   he started to get upset.
14 Q. What specifically did he say?
15 A. I don't remember. A lot of it was in
16   Korean.
17 Q. Well, I guess -- I mean, we'll lead to
18   documents earlier. You were concerned
19   enough about what happened in this
20   meeting to go to Mr. Duckworth; weren't
21   you?
22 A. After the meeting.
23 Q. I mean, what specifically did Mr. Kim say

Page 116

1    to you in the meeting that caused you to
2    go track Mr. Duckworth?
3  A. That's not the case at all. What caused
4    me is, Mr. Choi calling me that afternoon
5    about 1:45 on my cell phone and saying,
6    Rob, you and I may be going home early
7    today. Mr. Kim is very upset with us.
8    That's how I went to Duckworth.
9  Q. So --
10 A. Because that was so flabbergasting.
11 Q. So when you walked out of the meeting,
12   you did not know that Mr. --
13 A. I didn't walk out of the meeting.
14 Q. When the meeting ended --
15 A. And everybody walked out.
16 Q. And it's your testimony as you sit here
17   today, when that meeting ended, at that
18   time, you did not know what -- that
19   Mr. Kim was upset with you?
20 A. No. I knew that he was upset --
21 Q. Just answer my question.
22 A. -- and acting childish.
23 Q. That's all I need to know.

Page 117

1  A.  That's indicated there.
2  Q.  So -- let me be clear on this.  Is it
3      your testimony that if you wrote a note
4      back at the time that it's supposed to be
5      accepted as true as we sit here today?
6  A.  Is it supposed to be accepted as true?
7  Q.  Yeah.
8  A.  I mean, whose determination is that?
9  Q.  Well, I guess, you've seen from reviewing
10     these statements there's several versions
11     of what happened in that meeting.
12 A.  Uh-huh.
13 Q.  You know, is it your position in this
14     lawsuit that only your version is the
15     true version in the meeting?
16 A.  I can only speak for my version.  You
17     know, I wrote these minutes -- I even
18     wrote the time, 11:00 o'clock, H.I. Kim
19     now repeatedly slamming items on tables.
20     Got up and left.  Embarrassing.
21          So, I mean, that was
22     occurring at the time.  Those are my
23     specific notes.  You can look at my

Page 118

1      previous diary entries, and that's
2      something that I do.
3  Q.  Okay.  Did you tell Mr. Kim during the
4      meeting that Murakami was being blamed
5      for downtime and that there was
6      insufficient data to substantiate that
7      assessment?
8  A.  No.
9  Q.  Did Mr. Susock tell you at some point
10     during the meeting that the buffing (sic)
11     marks quality issue was the primary issue
12     being addressed in the meeting?
13 A.  No.
14 Q.  What did Mr. Susock tell you during the
15     meeting?
16 A.  It's not his meeting.  He's an attendee.
17 Q.  I'm not asking whose meeting.  What
18     specifically do you recall Mr. Susock
19     saying to you in the Murakami meeting?
20 A.  I don't recall him saying anything to me
21     specifically in the meeting.
22 Q.  Did you tell Mr. Susock "That's bullshit"
23     during the meeting?

Page 119

1  A.  Absolutely not.  Those words were never
2      uttered.
3  Q.  Did you ever use the word "bullshit"
4      during that meeting?
5  A.  Absolutely not.
6  Q.  You realize that's what Mr. Susock
7      represented happened in the meeting.
8  A.  Yeah, I was kind of surprised to see
9      that.
10 Q.  Because you had never had any problems
11     with him prior to this time; correct?
12 A.  No.
13 Q.  And that would be unprofessional
14     behavior.
15 A.  I didn't have problems with him in the
16     meeting.  There was no prior to.
17 Q.  And you -- but you would acknowledge that
18     telling someone "That's bullshit" in this
19     meeting would have been unprofessional?
20 A.  Absolutely.
21 Q.  Mr. Cyr- -- I'm sorry.  Mr. Susock's
22     recollection, then, is that Mr. Kim, for
23     a second time, tries to say, I want to

Page 120

1      focus on the quality issues with the
2      supplier.
3          MR. STOCKHAM:  I'm going to
4          object.
5  Q.  (By Mr. Bostick) I'm paraphrasing.
6          Do you recall there being
7      some statement by Mr. Kim, a second time,
8      trying to say, Let's focus on the issues
9      with regard to the supplier as opposed to
10     these with the Glovis issue?
11 A.  No.  They're all about the supplier as
12     Murakami.  That's why they were asked to
13     drive 575 miles with one day's notice to
14     present and defend their position.
15     Glovis is not on the agenda.
16 Q.  What do you recall about Mr. Roberts
17     taking the two mirrors and smacking them
18     together?  To the best of your
19     recollection, how did that unfold?
20 A.  He took the mirrors and wanted to show
21     that the placement of the mirrors in a
22     milk-carton-type tote were causing the
23     weld studs to hit the plastic painted

Page 121

1  surface and showing the defects, the deep
2  gouges.  So he was demonstrating how this
3  would occur.  I mean, they were -- you
4  could see that they were like threaded
5  scratches, like if you took a screw and
6  scraped it up against a plastic part.
7  THE VIDEOGRAPHER:  We have five
8  minutes left on tape.
9  Q.  (By Mr. Bostick) Did you -- did Mr. Kim
10  ever bring up the issue of addressing the
11  scratching issue in a working meeting
12  separately?
13  A.  No.
14  Q.  I guess Mr. Kim -- is he speaking in
15  Korean at the meeting and then
16  someone's -- Mr. Lee or Mr. Choi -- who's
17  translating?
18  A.  Chi.
19  Q.  Chi?
20  A.  Jason Chi.
21  Q.  Jason Chi.  Did you ever make any
22  statements in the meeting that the --
23  about the buff mark issue being a

Page 122

1  concern, that HMMA was not repairing the
2  problems, but just sending them back to
3  Murakami?
4  A.  Can you say that again, please.
5  Q.  Yeah.  In Mr. Susock's statement, he said
6  Mr. Kim said the scratches are a matter
7  for a working level meeting or words to
8  those effect.  I'm paraphrasing.
9  MR. STOCKHAM:  Where are you?
10  Q.  (By Mr. Bostick) I am on 245, fifth full
11  paragraph down.  The purpose today is to
12  discuss the buffing mark issue.  This is
13  a repair that is being performed by HMMA
14  and that they should be charged back to
15  Murakami.
16  And then Mr. Susock says
17  that you said, Rob Cyrus then stated that
18  this should be a case-by-case basis and
19  that he does not believe that HMMA is
20  repairing these at all because they are
21  continuously returned to Murakami.
22  Do you recall any of that
23  discussion?

Page 123

1  A.  Let me read this again, please.  The
2  comment on 245, Bates number:  Mr. Kim
3  stated the scratches are a matter that
4  must be addressed at a working level
5  after this meeting.
6  That -- that did not happen.
7  That comment did not happen.
8  The purpose today is to
9  discuss the buffing mark issue from
10  Murakami.
11  That statement did not
12  happen.  The discussion was all defects.
13  And the repair discussion is contrary to
14  our production philosophy.  You know, if
15  we have a defect part, it goes back to
16  the supplier.  We don't have the
17  capabilities in the assembly shop to do
18  paint repairs.
19  THE VIDEOGRAPHER:  You lost your
20  microphone.
21  THE WITNESS:  I'm sorry.
22  A.  So that, you know, doesn't sit correctly
23  with our production process.  We don't do

Page 124

1  paint repairs in the assembly shop.  So
2  this doesn't make sense.
3  Q.  (By Mr. Bostick) So you didn't say
4  anything to that effect?
5  A.  No.
6  Q.  Do you recall any conversations between
7  you and John Kalson --
8  MR. BOSTICK:  How much have we got
9  left?
10  THE VIDEOGRAPHER:  Less than two
11  minutes.
12  Q.  (By Mr. Bostick) Do you recall any
13  conversation with John Kalson during the
14  meeting between you and Kalson
15  directly?
16  A.  We had conversations about passing on
17  defects to the next process.
18  Q.  Did -- did Mr. Kalson say that the items
19  were being prepared by HMMA team members
20  on the line and off line in QA?
21  A.  I don't recall that.  That would be
22  contrary to what we do -- what we did, so
23  --

Page 125

1  Q.  My question is:  Did he say that in the
2      meeting?
3  A.  As I said, I don't recall him saying
4      that.
5  Q.  Do you recall saying to him -- something
6      to him about the Toyota way or the Toyota
7      production system?
8  A.  No.  I talked about the production
9      systems, that we don't act on detects.
10 Q.  Did you use the word "Toyota" at any
11     point --
12 A.  No.
13 Q.  -- in the meeting.
14         Why don't we go ahead and
15     switch the tape.
16         THE VIDEOGRAPHER:  All right.
17         This is the end of Tape No. 2
18         in the deposition of Robert
19         Cyrus to be continued on Tape
20         No. 3.  We are going off the
21         record at 12:38 p.m.
22         MR. STOCKHAM:  It's 12:30.  Let's
23         take a lunch break.

Page 126

1      (Whereupon, the luncheon recess was
2      taken at 12:40 o'clock p.m. to 1:26
3      o'clock p.m.)
4         (The referred-to document was
5         marked for identification as
6         Defendants' Exhibit No. 8)
7         THE VIDEOGRAPHER:  This is the
8         beginning of Tape No. 3 in
9         the deposition of Robert
10        Cyrus.  We're on the record
11        at 1:26 p.m.
12 Q.  (By Mr. Bostick) We've just taken a lunch
13     break, Mr. Cyrus.  And I wanted to ask
14     you next about Exhibit 8.
15 A.  Okay.
16 Q.  Did you review this prior to the
17     deposition today?
18 A.  Yesterday, yes, sir.
19 Q.  Okay.  Had you had any difficulties with
20     Mr. Kalson prior to the Murakami
21     meeting?
22 A.  No.
23 Q.  Okay.  In his recollection, he's saying

Page 127

1      Mr. McDonald is the person making the
2      presentation for Murakami.  Do you agree
3      or disagree with that?
4  A.  I mean, they all spoke.  So I don't know
5      what "making the presentation" indicates.
6      All three of the members from Murakami
7      spoke in the meeting, made a
8      presentation.
9  Q.  He says McDonald spoke first to the
10     buff-marks issue and low light levels.
11     It was raised at that point.
12 A.  Okay.
13 Q.  And then he says he went on to the
14     packaging issue and lack of proper cure
15     time.  Is that consistent with your
16     recollection?
17 A.  Yes.
18 Q.  Okay.  Talked about the question about
19     Mr. Kim asking about how long they'd been
20     in business.  Do you remember that?
21 A.  Yes.
22 Q.  Now, he says next that it was stated by
23     Mr. Cyrus that all defects were not

Page 128

1      caused by Murakami, and that Glovis was
2      the problem with the mirror defects.  Do
3      you recall him saying words to that
4      effect?
5  A.  No.
6  Q.  Okay.  He says that you then defended
7      the packaging concerns that Murakami was
8      facing and stated that HMMA accepted it
9      and that Murakami did not do any other
10     packaging like that for any of its other
11     customers.
12 A.  Absolutely not.
13 Q.  You did not say that.
14 A.  That's not consistent with anything.
15 Q.  Okay.  He says, Mr. Kim stated the
16     purpose of the meeting was to review the
17     basic quality of problems that were the
18     responsibility of Murakami.  Do you agree
19     or disagree with that?
20 A.  Can you repeat it again, please?
21 Q.  Yeah.  Mr. Kim is saying the purpose of
22     the meeting was to review basic quality
23     problems that were the responsibility of

Page 129

```
 1        Murakami.
 2   A.   I agree that the purpose was to discuss
 3        quality problems, and the responsibility
 4        has yet to have been determined.
 5   Q.   But did Mr. Kim say he wanted to focus on
 6        the quality problems that Murakami would
 7        have control over?
 8   A.   Not specifically, unless he said it in
 9        Korean.
10   Q.   Okay.  Do you recall Mr. Kim saying
11        something about having a separate meeting
12        with HMMA, Glovis and Murakami to discuss
13        the issues that you raised?
14   A.   No.
15   Q.   Okay.  He gives a -- quote by you.  It
16        says, How can we ask a supplier to come
17        and present the issues when we don't even
18        have any data.
19   A.   Where?  I'm sorry.
20   Q.   Paragraph 10.
21   A.   Something to the effect.  I don't recall
22        that.
23   Q.   Do you recall --
```

Page 130

```
 1   A.   That didn't happen, I should say.
 2   Q.   Are you -- do you recall saying something
 3        to the effect that HMMA was charging
 4        Murakami for over 200 minutes of downtime
 5        that they were not responsible for?
 6   A.   Nope.  I would have it my meeting
 7        minutes.  It's 116 and 47 minutes.  And
 8        the determination and the purpose of the
 9        meeting was to determine whose
10        responsibility was what.
11   Q.   Well, did you say that at some point
12        during the meeting that the downtime
13        charge was not the responsibility of
14        Murakami?
15   A.   No.  Mr. Choi and I both indicated that
16        the downtime was shared responsibility
17        based on what caused it.  If they had bag
18        marks, then they were responsible to take
19        care of that situation and the downtime.
20        If the chargeback on the portions that we
21        controlled internally had caused the
22        defect, then they shouldn't be
23        responsible for it, as with any supplier.
```

Page 131

```
 1   Q.   He says in Paragraph 11, Mr. Cyrus was
 2        very outraged.  Would you agree with that
 3        statement?
 4   A.   Absolutely not.
 5   Q.   It says that you said, "Murakami has
 6        spent 2-, 3-, $4,000 coming here to
 7        present their issues and that we need to
 8        let them speak."
 9   A.   Nope.
10   Q.   You did not say anything --
11   A.   Murakami said -- Murakami said themselves
12        that they had spent thousands of dollars
13        to come down here and they would like an
14        opportunity to present their issues, but
15        it didn't come from me.
16   Q.   We had mentioned that Glen Roberts with
17        the issue with the mirrors; do you
18        remember Mr. Roberts saying something to
19        the effect of what's mentioned in
20        Paragraph 13 here in quotes?
21   A.   Let me read it, please.  "Mr. Roberts"
22        said -- "then said something to the
23        effect of HMMA has asked us to come here
```

Page 132

```
 1        and speak and we are going to speak about
 2        what we want to speak about."
 3            I remember that Mr. Roberts
 4        raised his voice, and he was frustrated.
 5        That was, you know, a Murakami -- it was
 6        his own personal decision to act in that
 7        manner.  But he was a little
 8        flabbergasted on why they were requested
 9        to come down in writing to address
10        specific issues, including downtime, and
11        then they weren't allowed to -- didn't
12        appear to be -- wanting to be discussed
13        by H.I. Kim.
14   Q.   Did Mr. Kim say again that there should
15        be a separate meeting on this issue of
16        the scratches and that -- that that was
17        not the purpose of this meeting?
18   A.   No.  Unless he said it in Korean.
19   Q.   Was it ever translated to you that that's
20        what he said?
21   A.   No, no.
22   Q.   Is it possible that you were over --
23        talking over the translator so you didn't
```

Page 133

1    hear what was being said by Mr. Kim?
2 A.  Absolutely not.
3 Q.  Do you recall Mr. Susock stating that the
4    concerns were causing HMMA downtime in
5    Paragraph 15 and repairs, that Murakami
6    was responsible for that?
7 A.  I'm sorry.  Say your question again.
8 Q.  Do you recall Chris Susock saying that
9    the concerns with the mirrors were
10    causing downtime and that Murakami was
11    responsible for that?
12 A.  Not specifically.  You know, they were
13    responsible for the portion of the
14    defects that they caused, and we were
15    responsible for the portion of the
16    defects that we caused.  Mr. Choi and I
17    said on that issue.
18 Q.  Mr. Kalson says -- again, he says at some
19    point he said "That's bullshit"; you deny
20    that?
21 A.  That is ludicrous.  That is not correct.
22    I have a stronger vocabulary than that.
23 Q.  Did he say, I expect the parts to be good

Page 134

1    out of the box, and it's the
2    responsibility of the supplier to make
3    sure they are?
4 A.  Yes.
5 Q.  He did say that?
6 A.  Uh-huh.
7 Q.  And if parts are not good, we must repair
8    them.  Did he say that?
9 A.  I don't remember him saying that because
10    we don't do that.
11 Q.  Okay.  Did you say the operator should
12    find the defects before the parts are
13    installed?
14 A.  No. I indicated when Choi and I talked
15    about that we are not -- you know,
16    Hyundai production system is not to pass
17    on the defects to the next operator.  So
18    the line operator does have the
19    responsibility, if they notice the
20    defect, to not pass it on down to be
21    repaired at a later time.  That's not the
22    Hyundai production system.
23 Q.  Did he say words to the effect of what he

Page 135

1    says in 16, that the job of the operator
2    is not to inspect parts?
3 A.  Did he say that?
4 Q.  Yes.
5 A.  He may have.  I don't recall exactly.
6 Q.  He's saying, that's the responsibility of
7    the supplier, if the operator does see a
8    defect, he will not put the part on;
9    otherwise we have an inspection process
10    downstream that finds defects; and when
11    we find defects, we must fix them.
12 A.  I don't recall ever if he said that.  He
13    doesn't really understand what the
14    production system is about --
15 Q.  Okay.
16 A.  -- according to our procedures.
17 Q.  He says then you said, Mr. Cyrus then
18    said to me, "That's not how Toyota does
19    it, and let me teach you something about
20    production systems."
21 A.  That's not true at all.
22 Q.  Had you worked for Toyota previously?
23 A.  Yes.  Me and many, many other Hyundai

Page 136

1    employees.
2 Q.  Had Mr. Kalson ever worked for Toyota?
3 A.  Nope.
4 Q.  But your recollection was you didn't say
5    anything about Toyota or their systems
6    during the meeting?
7 A.  That's correct.  That was a taboo word at
8    Hyundai.
9 Q.  Why would that be taboo?
10 A.  Because Hyundai feels that they can do it
11    better themselves with their own
12    system.
13 Q.  Who is Gerald Horn?
14 A.  He was a quality team member or engineer
15    or assistant manager.  He quit, like most
16    of the people under Jason Chi.
17       THE VIDEOGRAPHER:  You lost your
18    microphone.
19       THE WITNESS:  He went to Nissan.
20       (The referred-to document was
21       marked for identification as
22       Defendants' Exhibit No. 9)
23 Q.  (By Mr. Bostick) Did you see Mr. Horn's

Page 137

1  statement?
2  A. Yes, yesterday.
3  Q. Defendants' Exhibit 9? Did you speak --
4  I don't want to know about any
5  conversations in which your attorney was
6  involved in. Did you have a conversation
7  with Mr. Horn that led to him providing
8  an affidavit when your charge was at the
9  EEOC stage?
10 A. We called him, you know, to talk about
11 the events of that day, Richard and I.
12 Q. Did -- did Mr. Horn tell you during that
13 telephone conversation that he had given
14 a statement previously?
15 A. No. He had to write meeting minutes for
16 the first time ever.
17 Q. Is that his signature at the bottom?
18 A. I couldn't tell ya.
19 Q. Now, Mr. Horn, in his statement, says
20 that you asked several questions
21 regarding the presentation and then asked
22 about scratches and downtime charged to
23 Murakami. Is that true?

Page 138

1  A. Murakami asked about scratches and
2  downtime.
3  Q. So you deny that you said that?
4  A. We had conversations about scratches and
5  downtime, but I didn't ever bring it up.
6  That was, you know, in their points.
7  Q. But you commented on -- it says you --
8  Rob Cyrus then commenced to talking about
9  the downtime and scratches on the OSRV
10 mirrors; is that true?
11 A. In a sequence of what? During the course
12 of the presentation? No, that didn't
13 occur. This -- this was, you know, stifling of
14 systematic quality problems only.
15 Q. Mr. Kim did not say that to you that
16 --where you tried --
17 A. No, that wasn't the intention of the
18 meeting. And we were covering all of the
19 quality issues.
20 Q. Well, there's a little bit of a
21 difference here between what your
22 perception of the meeting is, what's in
23 the document itself and what Mr. Kim's

Page 139

1  comments are at the meeting. And I've
2  asked you several times about whether
3  Mr. Kim said this or not. And I keep
4  getting the response to the effect of
5  that was not the limited purpose of the
6  meeting. So I want to be clear here.
7  Did Mr. Kim twice direct to you and/or
8  Murakami that he wanted to focus on the
9  meeting only on issues related to --
10 A. No.
11 Q. -- the Murakami plant? You deny that?
12 A. Excuse me.
13 Q. You deny that.
14 A. If he said it, he said it in Korean,
15 perhaps to Mr. Choi, but he did not
16 address me with this or anyone within my
17 parts development staff.
18 Q. So Mr. Horn, Mr. Susock and Mr. Kalson
19 are all incorrect when they each state in
20 their statements that there were --
21 Mr. Kim twice made the comments that he
22 wanted to redirect the focus of the
23 meeting.

Page 140

1  A. Yes.
2  Q. Okay.
3  A. Mr. Kim pulled them in a room and asked
4  them -- made them write meeting minutes
5  before they could leave on a Friday
6  night.
7  Q. Because he was very upset; wasn't he?
8  A. He may have been. I don't know how his
9  attitude is typically.
10 Q. Well, you learned later that he was
11 upset.
12 A. Yes, we both did, Choi and I, when I got
13 the call from Choi saying, We may be
14 going home.
15     When I talked to Duckworth
16 twice and he said, Don't give it another
17 thought, I haven't heard anything about
18 it. That's just that Koreans are
19 typically aggressive in meetings.
20 Q. Are you reading that in this statement?
21 A. No, I am telling you what happened.
22 Q. So you deny again coming back and saying,
23 Rob Cyrus stated that not all of the

Page 141

1    downtime was not attributable to
2    Murakami?
3  A.  I'm not denying that.  But we haven't
4    talked about that one yet.
5  Q.  Tell me what -- what you said.
6  A.  No.  Choi and I indicated that the
7    downtime was multi-faceted and had a
8    number of different root causes.
9  Q.  Do you have any explanation as to why
10    none of these statements make any mention
11    of any comments made by Choi in the
12    meeting, including your own?
13  A.  Do I have any what?  Can you repeat that,
14    please.
15  Q.  Yeah.  Do you have any opinion why this
16    statement by Mr. Horn, Mr. Kalson, Mr.
17    Susock and your own statements do not
18    make any mention of any specific comments
19    by Mr. Choi being made in the meeting?
20  A.  I couldn't -- you know, it doesn't make
21    sense for me to guess at that; does it?
22  Q.  Okay.  Mr. Horn says, You brought them
23    all the way down here; at least hear what

Page 142

1    they have to say.  Do you remember saying
2    anything to that effect?
3  A.  I did say that we want to give Murakami
4    the opportunity -- Choi and I said, we
5    want to give Murakami the opportunity to
6    review their data that they produced to
7    go over their presentation.
8  Q.  What did you specifically say?
9  A.  I just told you.
10  Q.  No, you told me what you and Choi.  There
11    is two different mouths at this meeting;
12    correct?
13  A.  Well, we both pretty much spoke in
14    lockstep since we had the pre-meeting,
15    and we were of the same opinion on
16    everything.
17  Q.  So it's your testimony that every word
18    that came out of your mouth was exactly
19    mimicked by Mr. Choi; is that --
20  A.  But that's not very realistic; is it?
21  Q.  No, it's not.  But that's what I've heard
22    your testimony -- every time I've asked
23    you a question about what you said in

Page 143

1    this meeting, you tried to answer it by
2    you and Choi said the exact same thing.
3    Now, you agree with me that that is not a
4    realistic answer; correct?
5  A.  In -- in content, it was the same
6    thing.
7  Q.  You're saying there is nothing in
8    substance different from what you said
9    from what Mr. Choi said.
10  A.  Absolutely not.
11  Q.  Did Mr. Choi speak in English the entire
12    time?
13  A.  No.
14  Q.  So you already testified you don't know
15    what he would have said in Korean.
16  A.  Right.
17  Q.  Okay.  So as you're sitting here today,
18    you don't know what Mr. Choi said to
19    Mr. Kim; correct?
20  A.  In Korean, you mean?
21  Q.  Right.
22  A.  Well, yes, that's correct.
23  Q.  You don't know what Mr. Kim said to Mr.

Page 144

1    Choi; correct?
2  A.  That's correct.
3  Q.  So do you have any knowledge as to
4    whether or not Mr. Kim directed a comment
5    to Mr. Choi himself to be quiet at the
6    meeting?
7  A.  Do I -- I'm sorry.  Can you rephrase
8    that?
9  Q.  Do you know if Mr. Kim directed a comment
10    to Mr. Choi in Korean at the meeting to
11    be quiet?
12  A.  I don't know.  I didn't pick up on
13    Korean.
14  Q.  Did Mr. --
15  A.  My mic just came off.  I'm sorry.
16  Q.  Did Mr. Choi tell you at some point later
17    that he had been directed to be quiet
18    by --
19  A.  It's stuck in the wheel here.
20  Q.  -- Mr. Kim.
21  A.  Yes, he did tell me that.
22  Q.  Okay.  Did Mr. -- did Mr. Kim at some
23    point in the meeting scream out your

Page 145

1    name?
2  A.  No.
3  Q.  He never said, Rob, more than one time?
4  A.  No.  They don't use first names anyway,
5      so that wouldn't be very consistent;
6      would it?
7  Q.  So it's your testimony that he never made
8      any direction to you, either directly or
9      through a translator, to get off of one
10     subject and move on to another?
11 A.  Not at me directly, no.
12 Q.  Again, Mr. Horn says that Chris Susock
13     stated that -- that he says PQ said
14     they'd already calculated the downtime to
15     the best of their ability and that you
16     responded "That's bullshit."  Do you
17     agree or disagree with that?
18 A.  I emphatically disagree.
19 Q.  Did you ask if the team members were
20     required to inspect the parts before
21     putting them on?
22 A.  Did I ask them?
23 Q.  Yes.

Page 146

1  A.  No.  Why would I ask them?
2  Q.  And then this is John Kalson's response:
3      That's not part of their job.
4  A.  I don't -- you know, I didn't ask if
5      they were required to inspect the part
6      before putting them on.
7  Q.  Again, you said you never mentioned
8      anything about Toyota during the
9      meeting?
10 A.  No.
11 Q.  Did this conversation happen between you
12     and Susock about what was the appropriate
13     reason for the meeting take place?
14 A.  No, absolutely not.  This was a new
15     meeting for everybody.  So Chris didn't
16     know what to expect anyway.  This is the
17     first time this meeting occurred.
18 Q.  The -- so what all do you recall Mr. Choi
19     saying in English at this meeting?
20 A.  What did Choi say?
21 Q.  Yeah.
22 A.  Choi said that we want to get to the root
23     cause.  Choi said that we had a

Page 147

1    pre-meeting; and we feel that some of the
2    defects are caused by Murakami; and some
3    of them are caused by our internal
4    company, ourselves and Glovis; and that
5    the chargebacks should be calculated
6    accordingly.  What else did he say?
7  Q.  And he's saying all of this in English,
8      according to your testimony?
9  A.  Yes.  How would I know it otherwise?
10 Q.  Was Mr. Kim -- Mr. Choi involved in this
11     conversation where you mentioned in your
12     notes the request to speak out at the
13     meeting?
14 A.  I don't know what you're talking about
15     there.
16 Q.  Talked strongly to H.I. Kim to be fair to
17     supplier.
18 A.  Does he know about that?
19 Q.  Yes.
20 A.  Yes, he does.
21 Q.  He was at that same --
22 A.  We had the pre-meeting, and that was
23     Brian Hwang told myself and Choi, plus

Page 148

1    told me and Choi to talk strongly to H.I.
2    Kim to be fair to supplier.  Not take the
3    supplier's side, to be fair to supplier,
4    like we always have been.
5  Q.  But it's your position that -- that you
6      were neutral in the meeting?
7  A.  Absolutely.
8  Q.  Okay.
9  A.  No, not even neutral.  I was taking
10     Hyundai's best interest, as we had done
11     from the beginning since I started up the
12     department with Mr. Lee.  It was a
13     long-term mutually beneficial
14     relationships with suppliers.  It's not
15     something you just toss out the window
16     when you choose another supplier.
17 Q.  Well, would you agree with me that --
18 A.  We needed them as much as they needed us.
19     That's our only supplier for mirrors.  If
20     you want to change suppliers, it's going
21     to take you a year at least.
22 Q.  Would you agree with me that someone
23     within HMMA telling another member of

Page 149

1    HMMA that his opinion on a subject is
2    "bullshit" in front of an outside
3    supplier could be cause for concern?
4  A.  Absolutely.  I've never done that in my
5    20 years in purchasing.
6  Q.  Well, you know, your supplier does work
7    with you in -- in obviously providing
8    your parts, but this is an arm's-length
9    transaction; correct?
10 A.  What do you mean?
11 Q.  Well, I mean, this is not an HMMA entity;
12    correct?
13 A.  It's an outside independent supplier.
14 Q.  Right.  And so if -- if an HMMA
15    department has gone to them and said,
16    We're charging you for these errors --
17 A.  Um-hum.
18 Q.  -- would you agree with me that it might
19    not be in Hyundai -- in HMMA's best
20    interest to have another member of HMMA
21    arguing, or challenging that decision, in
22    a meeting in front of the supplier?
23 A.  There's no challenging there.

Page 150

1  Q.  I agree you took a neutral position.
2  A.  No, I presented the facts.  You know, I
3    took care of Hyundai's interest.
4  Q.  So but --
5  A.  But in a fair and honest manner.
6  Q.  Did you, in that meeting, say anything
7    that questioned whether or not a correct
8    decision had been made by quality QLS
9    earlier?
10 A.  QLS didn't speak in the meeting.
11 Q.  Earlier.  I mean, did you say anything to
12    challenge this decision?
13 A.  There is no challenge.  The determination
14    from 282 parts to 251 was made by QLS and
15    quality.
16 Q.  Right.
17 A.  Purchasing was not involved.
18 Q.  Okay.  Who -- who made the decision on
19    the chargeback?
20 A.  I don't know.  Somebody -- who makes on
21    the decision on the quality or the
22    chargeback?
23 Q.  The chargeback.

Page 151

1  A.  That's recommended by operations and
2    quality.
3  Q.  Did you, at any point during that
4    meeting, say that it was wrong for
5    Murakami to be charged for that
6    $100,000?
7  A.  No, I didn't say anything in that manner.
8    I said that we need to determine the root
9    cause of the defects and assign
10    responsibility both financially as a
11    chargeback to the appropriate parties.
12 Q.  Did you -- tell me about what Mr. Kim
13    said at the end of the meeting, or how
14    did the meeting end?
15 A.  Well, as I indicated in Exhibit 6, 272
16    Bates Number, 11:00 o'clock, this is on
17    9-16: H.I. now repeatedly slamming items
18    on table.  Got up mad and left.  And I
19    wrote embarrassing after that.  That's
20    how the meeting ended.
21 Q.  Okay.
22 A.  That was written as it happened.
23 Q.  And then what did you -- what did you do

Page 152

1    after the meeting ended?
2  A.  What did I do after the meeting ended?  I
3    went to another meeting.
4  Q.  Do you recall what that meeting was?
5  A.  It was a supplier quality meeting at 1:00
6    o'clock.  And I got a call from Mr. Choi
7    at 1:45 saying, Rob, you and I may be
8    going home early today.  H.I. Kim is very
9    upset with us.  So he asked me to come to
10    my desk immediately.
11          We were asked to write
12    meeting minutes for the first time in our
13    career with Hyundai.
14          (The referred-to document was
15          marked for identification as
16          Defendants' Exhibit No. 10)
17 Q.  (By Mr. Bostick) Are the meeting notes
18    that you prepared and submitted Exhibit 5
19    that we looked at earlier?
20 A.  Yes.
21 Q.  If you were asked on that September 16th,
22    why is this dated October 2nd?
23 A.  Where's October 2nd on here?

Page 153

1 Q. On Exhibit 5.
2 A. Because I didn't write up the formal
3    meeting minutes until October 2nd.
4 Q. Why was there a --
5 A. Because I was out sick on FMLA as
6    indicated by Melanie McCormick in human
7    resources.
8 Q. So you weren't at work any from the day
9    of the meeting until --
10 A. We reviewed that yesterday. I think
11    after the meeting -- I have to look at
12    the documents here.
13 Q. But there wasn't apparently enough time
14    for you to prepare this memorandum until
15    October 2nd?
16 A. That's correct.
17 Q. Okay. This Exhibit 10 has 11-6 up in the
18    upper right-hand corner. Is that the
19    date this was prepared?
20 A. 11-6. It may have been, but I can't -- I
21    wasn't even at work then. Looks like
22    terminated on 10-26.
23 Q. You have the line here, it says, Pull

Page 154

1    notes. Do you see that?
2 A. Um-hum.
3 Q. Is that -- is that referring to your
4    notes from the actual meeting?
5 A. It could be those or other, you know,
6    calendar -- I don't know.
7 Q. And here you're -- I'm sorry.
8 A. I'm sorry. Go ahead.
9 Q. Here you're saying, They specifically
10    requested me to, quote, talk strongly to
11    H.I. Kim to assure the supplier was
12    treated fairly.
13 A. Right. In quotation marks. That's their
14    English, broken English, of what they
15    said to me.
16 Q. So it's Choi and Hwang making that
17    request of you; correct?
18 A. That's what this says.
19 Q. Is that consistent with your
20    recollection?
21 A. I remember Hwang talking to me that
22    night. But, you know, we spoke that
23    morning of the meeting with Choi also.

Page 155

1 Q. Well, at least at the time you wrote this
2    on November 6, you were indicating in
3    this document that it was both of them
4    making that request; correct?
5 A. Yes.
6       The bottom's cut off on 324. Do
7       you know what that says?
8    MR. STOCKHAM: Mine is not
9       cut off.
10    THE WITNESS: H.I. Kim.
11 Q. (By Mr. Bostick) I see Mr. Choi and --
12 A. Hwang said thank you for your help. They
13    are afraid to speak to COO, H.I. Kim, due
14    to his unreasonable and vindictive
15    working style. That's what it says.
16 Q. So you -- had you -- had anybody else
17    before you, before this conversation,
18    told you that Mr. Kim had a temper or
19    words to that effect?
20 A. Mr. Hyun had.
21 Q. Okay.
22 A. Let me think who else. Mr. Youn had.
23    Juan D. Youn. And most of the Koreans

Page 156

1    that had been with the company for a
2    number of years understood who he was.
3       THE VIDEOGRAPHER: Could you raise
4       your microphone a little bit.
5       It's pressing against the
6       papers.
7    MR. BOSTICK: Sorry.
8       THE VIDEOGRAPHER: Thanks.
9 Q. (By Mr. Bostick) And Bates No. 325 looks
10    like a listing of what you did in the
11    pre-meeting; is that right?
12 A. I haven't seen this document in years.
13 Q. I'm looking on page Bates No. 325. Do
14    you have --
15 A. I'd like to read this so I understand the
16    content and context of the comments.
17 Q. Sure. Just tell me when you're done.
18 A. Sure.
19       Okay.
20 Q. Okay. It appears from these notes that
21    the statement about what number of the
22    mirrors -- I'm looking at the paragraph
23    that starts, I asked her about the recent

Page 157

1   line stoppage and the 282 mirrors sent
2   back to Murakami as rejects.
3 **A.**  Um-hum.
4 **Q.**  Her under- -- this is a team member
5   that's working on the line that you are
6   talking to; correct?
7 **A.**  Yes.
8 **Q.**  Her understanding was that the vast
9   majority of -- what's that word?
10 **A.**  The parts.
11 **Q.**  -- the parts sent back were --
12 **A.**  Borderline defective.
13 **Q.**  -- and 251 of the 282 parts were later
14   agreed to be a quality miscall on HMMA's
15   behalf.
16 **A.**  Right.
17 **Q.**  Then you said, is there any documentation
18   to support that?  And she said --
19 **A.**  No.  I said is there any documentation
20   that says how do you identify when a part
21   is  acceptable or within our acceptable
22   boundaries or not.  She said there is
23   nothing like that that exists.

Page 158

1 **Q.**  Okay.  Then it says on the next page --
2   do you need to read that?
3 **A.**  No, I've read that.  Go ahead.
4 **Q.**  Who is Michael Kirk?
5 **A.**  He is Paula Gonsalves' boss as a manager
6   within plastic quality, exterior parts
7   and interior parts.  He quit also.
8 **Q.**  And then you say you met with Murakami to
9   get their side of the situation, and they
10   too were in agreement with us.
11 **A.**  Where do you see that?  I want to see the
12   actual words instead of paraphrasing.
13 **Q.**  You see the dash, we then meet with.
14 **A.**  We then met with the three gentlemen from
15   Murakami to get their side of the
16   situation and they were too in agreement
17   with us.  Plus they had already, this
18   morning, gone over to the Glovis
19   sequencing operation to clearly
20   understand how parts were being
21   handled.
22 **Q.**  What are you saying they were in
23   agreement with you on at that point?

Page 159

1 **A.**  They're in agreement that they are
2   meeting our requirements, and the lack of
3   line side inspection is why 89 percent of
4   the parts that were indicated to be
5   defective were later found to be okay.
6 **Q.**  So at this point, you're no longer
7   sticking with your initial position that
8   you'll be neutral?
9 **A.**  This is fact-finding.  This is with
10   Hyundai people; this is listening to the
11   supplier and talking about how these
12   problems occurred.  This is not neutral.
13   This is fact-finding.
14 **Q.**  So when someone --
15 **A.**  Something happened to the mirrors.  It
16   wasn't fairies that came down.
17 **Q.**  Well, let me clarify.  Let's talk about
18   what fact-finding is.
19 **A.**  Okay.
20 **Q.**  You didn't review a single mirror that
21   morning; did you?
22 **A.**  Review a sing- -- yes, I did.
23 **Q.**  Did you look at the actual defects?

Page 160

1 **A.**  Yes.
2 **Q.**  Okay.  How many did you look at?
3 **A.**  Of the scratch and buff marks, probably
4   two to three.  I saw the bags, the
5   previous design, the current design, saw
6   probably seven to ten examples of the
7   gouge marks, scratch marks.
8 **Q.**  Okay.  Now, but there wasn't any
9   documentation to review that would
10   confirm this team member's, you know,
11   estimate as to the number of products
12   that she is telling you about?
13 **A.**  I didn't ask her.  That was from quality.
14   Those numbers were from quality, not from
15   the team member.
16 **Q.**  But do you -- do you --
17 **A.**  I asked her --
18 **Q.**  Are you saying that what she told you is
19   an absolute and unquestioned truth, or
20   was she stating an opinion?
21 **A.**  She has no reason to make any comment
22   other than what happened.  I wanted to
23   talk to them to see if they were

# CYRUS DEPOSITION
# PART II

Page 161

1  misapplying the parts or mishandling
2  them. We watched them put it on, and
3  then we went and spoke with them.
4  Q. Was she telling you a fact or an
5     opinion?
6  A. A fact.
7  Q. And these three guys, when they say --
8     I'm sorry. The quality --
9  A. Uh-huh.
10 Q. -- people, they had the same feeling?
11    Are you saying that their feelings are
12    facts?
13 A. You can mince the words how you wish.
14    They had the same opinion of the facts.
15 Q. So what is your understanding of the
16    difference between an opinion and a
17    fact?
18    MR. STOCKHAM: I'm going to
19       object; that's arguing with
20       the witness.
21    THE WITNESS: That's crazy.
22 Q. (By Mr. Bostick) No. I'm just trying to
23    get clarification as best you can tell

Page 162

1  me.
2  A. There is no reason that we did an
3     investigation looking for suspect
4     comments from people on the line that
5     they were going to -- what reason would
6     they have to tell us anything but what
7     they knew? Typically when management
8     comes down to the line, the people are
9     very polite, very cooperative, probably
10    somewhat intimidated. They're not going
11    to lie. You know, oh, they have been
12    terrible, but I am going to say they are
13    a good supplier.
14 Q. Well, obviously Mr. Susock had a
15    different opinion on this issue than what
16    you reached from your pre-inspection;
17    correct?
18 A. No.
19 Q. Did he not say during the meeting that
20    Murakami was going to be responsible?
21 A. He knew prior to the meeting that 89
22    percent of the defects were our problem.
23    I stated that earlier.

Page 163

1  Q. Did he say anything in the meeting to the
2     effect that Murakami should be
3     responsible for the defects that they had
4     caused?
5  A. Well, he may have. I mean, that's a
6     correct statement, and I agree with
7     him.
8  Q. Okay.
9  A. If they caused problems, then they should
10    be responsible for those problems. If
11    they didn't, then we need to get the
12    facts straight.
13 Q. So you knew going -- I'm sorry.
14 A. I'm sorry. I was trying to finish,
15    but --
16 Q. Go ahead.
17 A. Just be fair and factual.
18 Q. So you knew going into the meeting that
19    there was at least a certain percentage
20    of downtime that Murakami was responsible
21    for; correct?
22 A. We didn't know if it was 11 percent or
23    100 percent.

Page 164

1  Q. Did you make any attempt to determine
2     that number before going into the
3     meeting?
4  A. No.
5  Q. Why not?
6  A. No, it was not possible, because we
7     didn't have the data. I mean, that's
8     what the meeting was for, for Murakami to
9     make their presentation.
10 Q. So did you ever make any suggestion that
11    Murakami -- that the amount be reduced by
12    a certain percentage, or were you saying
13    they shouldn't be charge at all, or did
14    you just not state any opinion
15    whatsoever?
16 A. You know, those -- those comments weren't
17    made by myself or Choi.
18 Q. Whether or not the comments were made,
19    did you have any thought process about
20    how you would go about determining what
21    had --
22 A. Yeah. I had a thought process from the
23    initial concept when I said, I am going

Page 165

1    to go gather facts, be neutral and
2    represent Hyundai and the supplier in a
3    fair and equitable manner, like we did
4    all relationships.
5         That's how I got recruited
6    to Hyundai; that's how I was named one of
7    the best employees in all of Mercedes,
8    not by doing underhanded things.
9  Q. So what was the plan to designate a
10    certain percentage to?
11  A. There was no plan to designate any
12    percentage.
13         (The referred-to document was
14          marked for identification as
15          Defendants' Exhibit No. 11)
16  Q. (By Mr. Bostick) Have you reviewed
17    Exhibit 11 prior to preparing for this
18    deposition?
19  A. I haven't seen this one. Richard went
20    over some things, but I didn't look at
21    this one. He and I discussed it
22    yesterday.
23  Q. I don't want to know what y'all talked

Page 166

1    about.
2  A. Okay. Excuse me.
3  Q. Have you had a chance to review it?
4  A. Yes.
5  Q. Do you agree or disagree with his
6    contention that you twice interjected to
7    bring up the issue of downtime being
8    charged to Murakami?
9  A. I disagree that it was interjected at
10    inappropriate times. It was a topic of
11    discussion for the meeting that was
12    discussed by Choi and myself.
13  Q. Now, he says here, Kim twice reminded
14    that the purpose of the meeting is to
15    review the supplier's quality problems
16    and countermeasures. Do you agree with
17    that statement?
18         MR. STOCKHAM: Where is that?
19  Q. (By Mr. Bostick) I'm looking at the
20    first, Line 50; second, Line 60.
21  A. No, that wasn't stated in that fashion.
22  Q. And you deny telling Chris Susock
23    "bullshit" or words to that effect?

Page 167

1  A. Absolutely, once again.
2  Q. You deny that Kim said that he wanted the
3    scratching issue to be resolved on a
4    working-level meeting?
5  A. That didn't happen, unless he said it in
6    Korean.
7  Q. Do you recall Mr. Kim -- did you have any
8    conversations with Jason Chi at any
9    point? He states a personal opinion at
10    the end of this. He says, I think Rob
11    could have discussed the downtime issue
12    against Murakami mirrors directly with
13    COO Kim before or after the meeting.
14    This is the reason that well-prepared
15    meeting had to end -- had to be ended in
16    this disruptive manner.
17         Did he ever tell you that at
18    any point that that was his opinion?
19  A. No.
20  Q. Did you have any conversations with
21    Mr. Chi after the Murakami meeting?
22  A. No.
23  Q. Did you ever have any prior disagreements

Page 168

1    or any reason for Mr. Chi to dislike you
2    prior to this Murakami meeting?
3  A. No. Why is Choi not indicated on any of
4    these meeting minutes as an attendee?
5         MR. STOCKHAM: Let him ask the
6    questions.
7         THE WITNESS: Okay.
8  Q. (By Mr. Bostick) I don't know. If you
9    remember, I tried to ask why you didn't
10    think about Choi in there earlier. I
11    don't know that you responded to that
12    question.
13         (The referred-to document was
14          marked for identification as
15          Defendants' Exhibit No. 12)
16  Q. (By Mr. Bostick) Have you seen this
17    document before?
18  A. No.
19  Q. This looks like an office visit on
20    September 13th, two days prior to the
21    Murakami meeting.
22  A. Okay.
23  Q. Is that consistent with your

Page 169

1  recollection, that you visited them at
2  that time?
3      MR. STOCKHAM: The one I've got is
4      October 31.
5      THE WITNESS: Yeah. Which one is
6      it?
7  Q. (By Mr. Bostick) That's the date it was
8      printed off to be produced, I believe.
9      See down -- Robert Cyrus it has 9-13
10     office visit, progress notes?
11  A. It says date 9-13, yeah. 9:59.
12     So what is your question,
13     sir?
14  Q. Do you recall going to the doctor on or
15     about September 13th?
16  A. I guess so.
17  Q. Okay. And this is your cardiovascular
18     doctor?
19  A. No.
20  Q. Who is this?
21  A. It says Paul Moore; doesn't it? Paul B.
22     Moore.
23  Q. Who is that?

Page 170

1  A. He's a family practitioner. Paul Moore.
2     Hold on a second. There's Daniel Moore,
3     and there is Paul Moore.
4  Q. This says Montgomery Cardiovascular.
5  A. Yeah. Hold on, please.
6     There -- Paul Moore, M.D.
7     Daniel Moore was my family practitioner,
8     general practitioner. And then Moore --
9     I don't have the other guy's name;
10     there's two people. There's two people
11     in the cardio-, you know, -vascular
12     operations that I saw.
13  Q. Okay.
14  A. I would have to look it up. It's on my
15     calendar. Probably.
16  Q. I mean, is this consistent with your
17     recollection of going to the doctor on
18     September 13th and complaining of
19     shortness of breath?
20  A. I mean, I've been to the doctor so many
21     times over the last year, yeah. I went
22     to the doctor. I can't remember exactly
23     if it's -- I don't -- I don't doubt that

Page 171

1  this date is correct.
2  Q. What -- what do you recall telling him
3     about being under a great deal of social
4     stress?
5  A. Well, I am under a great deal of stress.
6     He asks that typically --
7  Q. What was your --
8  A. -- with a heart situation.
9  Q. And it says he is going through a
10     divorce. Do you recall if you talked to
11     him about your divorce?
12  A. I'm sure I talked to him about
13     everything.
14  Q. I guess, as of September 13th, what were
15     the stressors that you had in your
16     life?
17  A. At September 13th, going through a
18     divorce; Hyundai was very stressful to
19     almost everybody there. You know, the
20     Americans were treated distinctly
21     different than the Korean colleagues. We
22     were two distinct teams, two silos. You
23     know, much of the time my local employees

Page 172

1  complained about, we don't get any
2  information; we're not included in the
3  meetings; we don't get the build
4  schedule.
5      You know, I had to deal with
6  that on an everyday basis. Rick and I
7  had been in meetings to talk about the
8  stress-inducing problems at Hyundai.
9  Greg Kimble and I have been in meetings
10  with that.
11  Q. Did you tell your doctor anything other
12     than the fact that you had a large
13     backlog of work at Hyundai?
14  A. I don't recall.
15  Q. Do you remember telling your doctor you
16     had a large backlog?
17  A. I don't recall really, you know.
18  Q. Do you remember telling --
19  A. I had no reason to make something up.
20  Q. Do you recall any conversations about
21     feeling dizzy while you played golf
22     earlier in the week?
23  A. That's probably why I went there, yeah.

| Page 173 |
|---|

1    I didn't go for a social visit. At this
2    time, you know, we were still doing
3    management of my medications.
4        (The referred-to document was
5        marked for identification as
6        Defendants' Exhibit No. 13)
7    MR. BOSTICK: 13?
8    THE WITNESS: Yeah.
9    THE VIDEOGRAPHER: We have about
10       six minutes left on this
11       tape.
12    MR. BOSTICK: Okay.
13    MR. STOCKHAM: Do you have another
14       copy?
15    MR. BOSTICK: I'm sorry. Yes,
16       I've got an extra one.
17  **Q.** (By Mr. Bostick) Who's Laura Stone?
18  **A.** She is assistant staff within parts
19       development.
20  **Q.** Is this -- her -- she's identifying
21       when -- when you had been in attendance
22       and in absence. Are the weeks she
23       identifies consistent with your

| Page 174 |
|---|

1    recollection?
2  **A.** I have no idea. I have never seen this
3       document.
4        (The referred-to document was
5        marked for identification as
6        Defendants' Exhibit No. 14)
7  **Q.** (By Mr. Bostick) Do you know who Mike
8       Youn is?
9  **A.** "Youn."
10  **Q.** "Youn"?
11  **A.** Yeah.
12  **Q.** Do you recall running into him at a --
13    MR. STOCKHAM: Is that Exhibit 18?
14    MR. BOSTICK: 14.
15  **Q.** (By Mr. Bostick) Do you recall running
16       into him at the Red Star Tavern while you
17       were out on FMLA leave?
18  **A.** Yes.
19  **Q.** Who were you with at the Tavern?
20  **A.** Who was I with?
21  **Q.** Yes.
22  **A.** I don't know. I may have met Dave Mark
23       probably. It was called having dinner.

| Page 175 |
|---|

1  **Q.** Did you tell him not to tell anyone that
2       you saw him?
3  **A.** Let me -- let me read this if I could,
4       please. Sorry.
5  **Q.** Okay.
6  **A.** Within the gathering, there were females.
7       Reason why Rob showed up. Okay.
8  **Q.** Okay. Do you recall telling Mr. Youn, do
9       not tell anybody you saw me here?
10  **A.** Absolutely not.
11  **Q.** Tell me what in this statement you recall
12       this happening and what you say is
13       accurate.
14  **A.** I don't think any of this is true, other
15       than me sitting down outside on the
16       patio. I'm not trying to hide in the
17       restaurant. And I had dinner.
18  **Q.** Did you have any drinks?
19  **A.** Probably.
20  **Q.** Were there any females there?
21  **A.** Not at our table.
22  **Q.** Who -- who is your recollection that you
23       were sitting with?

| Page 176 |
|---|

1  **A.** Like I said, I think it was Dave Mark.
2  **Q.** Anybody else?
3  **A.** I don't recall anybody else.
4  **Q.** You deny saying, I'll fire you if you do
5       or words to that effect?
6  **A.** Absolutely not.
7  **Q.** Did he work within the purchasing
8       department?
9  **A.** He worked under Mr. Hyun --
10  **Q.** Okay.
11  **A.** -- in the purchasing department for
12       indirect purchasing.
13  **Q.** Had you had any problems with him prior
14       to this time?
15  **A.** Never did have any problems with him.
16  **Q.** Did -- did you have any conversations
17       with anybody about this statement prior
18       to today, other than your attorney?
19  **A.** No.
20    MR. BOSTICK: Do you want to take
21       a break there.
22    THE VIDEOGRAPHER: Sure. All
23       right. This is the end of

Page 177

1      Tape No. 3 in the deposition
2      of Robert Cyrus to be
3      continued on Tape No. 4.  We
4      are going off the record at
5      2:25 p.m.
6      (Short recess)
7      THE VIDEOGRAPHER:  This is the
8      beginning of Tape No. 4 in
9      the deposition of Robert
10     Cyrus.  We are on the record
11     at 2:36 p.m.
12  Q. (By Mr. Bostick) Mr. Cyrus, I'm trying to
13     move us forward a little bit more quickly
14     to our next subject, which is --
15  A. Excuse me.
16  Q. -- your conversation that you had at
17     dinner with Mr. Duckworth.  Okay?
18  A. Yes.
19  Q. Now, before we get there, we'll make sure
20     that we kind of properly cover -- to the
21     best of your recollection, have you told
22     me what you recall about conversations
23     you had during the pre-meeting meeting

Page 178

1      with -- before the Murakami meeting?
2   A. Just the pre-meeting, or that and the
3      Murakami?
4   Q. Just the pre-meeting.
5   A. Yes, sir.
6   Q. The same question for the Murakami
7      meeting.  Have you told me what you
8      recall?
9   A. Yes, sir.
10  Q. Were there any -- to your knowledge, did
11     Mr. Choi engage in any -- make any
12     derogatory statements during the meeting
13     with Murakami?
14  A. No.
15  Q. You didn't hear him say any curse words
16     in English; correct?
17  A. No.
18  Q. And to your knowledge, he didn't argue
19     with any other Hyundai executives at the
20     meeting; correct?
21  A. No.  Neither of us did.
22  Q. You had mentioned having the conversation
23     with Mr. Choi after the Murakami meeting.

Page 179

1   A. Um-hum.
2   Q. There was a conversation where you said
3      he called you and said, get back to your
4      desk.
5   A. Well, he called and said, Rob, where are
6      you?  I said, I am in a quality meeting.
7      He said, You and I may be going home
8      early today.  H.I. Kim is very upset.
9      And at that point, he told me to come
10     back to my desk, and I did.
11  Q. Okay.  Did you have a conversation with
12     him again when you came back to your
13     desk?
14  A. Oh, absolutely, yes.
15  Q. Tell me about that conversation.
16  A. Well, we talked about, you know, what --
17     what was going on, why -- what does he
18     mean that we may be going home early
19     today.
20  Q. And what did he say?
21  A. He said, H.I. Kim is very upset, and he's
22     talking to President Ahn, and he's
23     talking to the president of quality in

Page 180

1      Korea, Mr. Seo.  I think S-E-U or S-E-O
2      or S-U-H.
3   Q. Other than saying he was angry,
4      did he say what exactly Mr. Kim -- what
5      was his understanding Mr. Kim was mad
6      about?
7   A. Not at all.
8   Q. Okay.  Is that the best that you can
9      recall took place in that conversation?
10  A. I went to Duckworth twice after that
11     call, two separate occasions, and then --
12  Q. I'm just trying to make sure I talked to
13     you about the Choi conversation here.  We
14     can talk about the Duckworth in a second.
15  A. This is the Choi conversation.
16  Q. Okay.
17  A. And at the end of the day, after Keith
18     had assured me that I was in good
19     standing and not to give it another
20     thought, we talked to Jason Lee.  I
21     initiated a meeting with the CFO because
22     he understood Western business practices.
23     He went to the University of Michigan.

Page 181

1    Jason and I had a good rapport. We got
2    along well.
3        And I pulled Choi and myself
4    in the room, and we discussed the events
5    of the meeting. And at that time, Choi
6    cried and said, Jason, Rob and I did
7    nothing wrong. It's H.I. Kim that should
8    apologize. So we went over the whole
9    spiel with what happened in the meetings.
10   He went over and talked to President
11   Ahn.
12 **Q.** Who went over and talked to President
13   Ahn?
14 **A.** Jason Lee.
15 **Q.** Did you sit in on any --
16 **A.** Jae Rok Lee.
17 **Q.** Did you sit in on any meeting between Mr.
18   Lee and Mr. Ahn?
19 **A.** No.
20 **Q.** How do you know whether he spoke with
21   Mr. Ahn or not?
22 **A.** Because we left his conference room, and
23   he said he was going to go talk to the

Page 182

1    president.
2 **Q.** But you don't have any personal knowledge
3    as to whether or not he did, in fact,
4    speak to Mr. Ahn or not?
5 **A.** No, sir, I do not.
6 **Q.** Okay. Was Mr. Lee in attendance at the
7    Murakami meeting?
8 **A.** Jason Lee?
9 **Q.** Yes.
10 **A.** CFO? No, sir.
11 **Q.** I notice there was a telephone
12   conversation between you and Mr. Choi
13   that you recorded.
14 **A.** Um-hum.
15 **Q.** Other than that conversation, did you
16   have any other conversations with Mr.
17   Choi after the Murakami meeting other
18   than what you mentioned to me today?
19 **A.** I don't believe so, no, sir.
20 **Q.** Who -- who was it that told you that
21   there was a request to stay late and
22   prepare --
23 **A.** Harry Chase.

Page 183

1 **Q.** Okay. Did he ask you to do the same, to
2    prepare a statement too?
3 **A.** Harry Chase, I called him Friday night,
4    and he was still at work. And he was
5    kind of like, you know, I can't believe
6    you are still here. Well, what are you
7    doing? He said, I'm writing meeting
8    minutes. They won't let us leave until
9    we finish the meeting minutes.
10       I mean, H.I. Kim instructed
11   him to do it. He reported to H.I. Kim.
12   H.I. Kim only asked his direct reports
13   and myself and Choi and one other -- two
14   team members in parts development to
15   write meeting minutes.
16 **Q.** Okay. How -- how did you learn of the
17   request by H.I. Kim?
18 **A.** Mr. -- Mr. Choi told me about it through
19   Mr. Hyun. When we came back, we met with
20   Hyun and Mr. Choi. H.J. Hyun, my boss.
21 **Q.** Okay. That -- was that the afternoon
22   after the meeting?
23 **A.** Yes.

Page 184

1 **Q.** What do you recall Mr. Hyun saying in
2    that meeting?
3 **A.** He wanted to understand what happened,
4    and we told him, you know, that we didn't
5    understand why he got so adamant, that
6    all parties involved in the meeting
7    understood what the -- the -- what the
8    status of the parts were. And he said,
9    Well, you need to write meeting minutes.
10   That was the main message.
11 **Q.** Okay. Did he give you any indication
12   about Mr. Kim was upset?
13 **A.** I don't -- I think he had talked to
14   somebody, but I don't -- I can't really
15   tell you if he gave me an indication. I
16   think that he felt that Mr. Kim was
17   upset.
18 **Q.** Okay. You don't remember exactly what
19   was said, but he conveyed that?
20 **A.** Yeah. I mean, that's why we were -- I
21   had to get back to my desk right now.
22 **Q.** So why did you not draft your statement
23   up that night?

Page 185

1   A.  Because I was in multiple meetings and,
2       you know, I did it as soon as I had the
3       opportunity to do it.
4   Q.  Okay.  Do you recall when it was that you
5       met with Mr. Duckworth at the -- I'm
6       sorry -- at the --
7   A.  City Grill?
8   Q.  Yes.
9   A.  When did he request the meeting?  It was
10      on Saturday.  It was on the 22nd.  I
11      don't have my calendar in front of me.
12  Q.  Of October?
13  A.  The 22nd?  I'm sorry.  I believe so.  Is
14      that a Saturday?
15  Q.  Okay.
16  A.  Is that a Saturday?  I'm sorry.
17              MR. BOSTICK:  Let me show you your
18          actual notes.  What was our
19          last -- 14.
20              MR. STOCKHAM:  14.
21          (The referred-to document was
22          marked for identification as
23          Defendants' Exhibit No. 15)

Page 186

1   Q.  (By Mr. Bostick) Can you identify Exhibit
2       15 for me?
3   A.  I have to read it.  I haven't seen this.
4       Okay.
5   Q.  Tell me -- tell me what this document is.
6   A.  It just looks like notes.  It starts out
7       with, Received call from Keith Duckworth
8       at 3:31 p.m.  No. 1, received call from
9       Keith's cell.
10  Q.  What does that say, took BP 9:15?
11  A.  Blood pressure.
12  Q.  Okay.  Who is Judy's cell?
13  A.  She's an attorney.
14  Q.  Does she work with Kay Dickey?
15  A.  I think she's just an acquaintance.  Judy
16      Bargainnear (sic), she did my divorce.
17      She was my attorney representing me.
18  Q.  Is that saying that you called her?
19  A.  I telephoned Judy, 8:05.  She will
20      telephone tomorrow.  Kay, Kathleen, she
21      will telephone tomorrow.  Kay, Kathleen
22      Dickey, 462-0835.  Jimmie Jacobs -- that
23      must be another partner or somebody I

Page 187

1       never spoke to.  I don't think I spoke to
2       Mr. Jacobs.
3   Q.  What's this say, restless, astonished?
4   A.  Uh-huh.
5   Q.  Severe headache?
6   A.  Um-hum.
7   Q.  What does that mean?
8   A.  How I felt.
9   Q.  Okay.
10  A.  You've got to remember: I'm doing --
11      having my blood pressure medication
12      changed with my doctor and the other
13      Lipitor stuff, and 162 over 121 is not --
14      not good.
15  Q.  I notice in the -- in the tape-recorded
16      conversations, it sounds like the first
17      suggestion, that there may be problems
18      with Lipitor.  In the tapes, at least,
19      there's a conversation with Greg Kimble
20      talking about --
21  A.  Um-hum.
22  Q.  -- his sister-in-law.  Is that what
23      prompted you to go inquire of your doctor

Page 188

1       if that was a possibility, or had you
2       already discussed that?
3   A.  No.  I'd already discussed it with him.
4       It's a statin drug, Crestor and Lipitor,
5       and that's one of the main side effects
6       is flu-like symptoms.
7   Q.  Did you ever get diagnosed with mono
8       during that period of time?
9   A.  I think one doctor felt that it might be,
10      but I think the mono test came back
11      negative.
12  Q.  So, let's look at the next paragraph.
13      Can you read this for me --
14  A.  Yeah.
15  Q.  Starting with H.I. --
16  A.  Yes.  When H.I. threw his fit and went to
17      Keith Duckworth, Keith D., and explained
18      the situation and threats of firing from
19      Mr. Choi, he said, Don't give it another
20      thought.  Nothing will come of it.  Told
21      him specifically the work environment was
22      hostile.
23  Q.  Okay.  So this is -- I guess, are you

Page 189

1    talking about your first conversation
2    with Duckworth after the meeting?
3  A.  Yes.
4  Q.  What -- what specifically did you tell
5    Keith about this?
6  A.  I went to him and said that -- told him
7    about the meeting and told him that
8    things seemed to be, you know,
9    escalating.  And I got the call from Choi
10    about he and I going home early.  And
11    Keith reassured me, I haven't heard a
12    thing.  And, you know, Don't give it
13    another thought.  Kind of just blew it
14    off.
15  Q.  Okay.  Anything else you recall telling
16    him?
17  A.  Telling him?
18  Q.  Yes.
19  A.  No.  Just the facts of what happened that
20    day.
21  Q.  When you say, I told him specifically the
22    work environment was hostile, what
23    specifically did you tell him?

Page 190

1  A.  Well, I mean, this meeting with H.I. Kim
2    was very hostile and very, you know,
3    throwing papers, and grown men doing that
4    and walking out of the room twice.  And
5    it was very embarrassing and not the
6    environment that I'm used to in my
7    past -- past employers.  And, you know,
8    it was a hostile environment.
9  Q.  Okay.
10  A.  Especially with someone calling you
11    saying you will probably be fired
12    today.
13  Q.  And then read the next --
14  A.  The second time after Choi requested me
15    to write meeting minutes for Murakami
16    meeting, I again went to Keith Duckworth,
17    Keith D. and told him, to my surprise,
18    things seemed to be escalating.  Told him
19    that Choi, Jason Lee -- he's the CFO --
20    and all in meeting thought nothing was
21    wrong or inappropriate except for H.I.
22    Kim's rage and two tantrums.  I told him
23    I was worried about retaliation from H.I.

Page 191

1    Kim since his reputation is vengeful.  He
2    again reassured me that nothing would
3    come of it.  It's just the Hyundai style
4    way of operating.  He said, Don't worry
5    at all and have a nice weekend.
6  Q.  Okay.
7  A.  Okay.
8  Q.  Anything else that you recall in your
9    second conversation with Duckworth other
10    than -- than what you put there?
11  A.  Nope.
12  Q.  Okay.  Next looks like Harry --
13  A.  Yeah.
14  Q.  -- Chase.
15  A.  Harry Chase phoned me approximately 7:00
16    p.m.  Said he was still at work, because
17    H.I. Kim ordered his direct reports to
18    make meeting minutes of what occurred in
19    Murakami meeting.  Approximately 12 team
20    members.  He did not request other
21    attendees except for Choi and myself to
22    knowledge approximately -- approximately
23    30 people in attendance.  Told Dave Mark

Page 192

1    of all occurrences, including two
2    meetings with Keith Duckworth and about
3    hostility and retaliation.
4  Q.  Who's Dave Mark?
5  A.  He's one of my managers.  Was.
6  Q.  You called Dave Mark, and you say -- you
7    say you told him about two meetings --
8  A.  Um-hum.
9  Q.  -- with Duckworth.
10  A.  Um-hum.
11  Q.  And what did you say specifically about
12    hostile and retaliations?
13  A.  Well, you know, the first -- I wanted to
14    make it clear and have somebody else
15    aware that what I had indicated to
16    Duckworth about the hostility of the
17    meeting and the fear of retaliation.
18  Q.  Other than -- other than saying you were
19    concerned about retaliation from Mr. Kim,
20    did you tell Mr. Mark anything else on
21    that subject?
22  A.  No, he was aware.  I told him what
23    occurred in the meeting.

Page 193

1  Q.  I guess you said you'd heard that he had
2     a vengeful personality or words to that
3     effect?
4  A.  I don't think I told that to Dave.  I
5     think, you know, that's what we had been,
6     you know, convinced to fear this
7     gentleman from my Korean staff.
8  Q.  And then what -- on the third page, what
9     are these?
10 A.  Telephone Judy, 2:13 p.m.  There's the
11    number for the Dickey, McClanahan --
12    McClendan?  Complete the application --
13    these are, like, things to do.  Complete
14    the application for medical leave, FMLA.
15    Go ahead and post office this.  10-24,
16    telephone 11:18, left message, voicemail,
17    FMLA, telephone cardiologist, telephone
18    Ted Chung.  Assured me it's just their
19    style.  That was a Keith comment.  At the
20    bottom of the list is telephone Laura.
21 Q.  Who's Laura?
22 A.  She's one of the assistant staff we
23    talked about earlier in parts

Page 194

1     development.
2  Q.  Did you actually speak to Ted Chung?
3  A.  No, I did.
4  Q.  What -- what was your intent in calling
5     him?
6  A.  Because he's the one who hired me.  He
7     was the one I was to report to.  And I
8     didn't know if he was going to talk --
9     discuss the situation with him.
10 Q.  Now, I notice in the telephone
11    conversation there was some back and
12    forth between you and Ms. McCormick over
13    the FMLA paperwork.
14 A.  Um-hum.
15 Q.  But it looks from that that there was
16    some lack of request for different
17    documentation or whatnot, and that -- but
18    ultimately you get your FMLA approved; is
19    that right?
20 A.  Yes, sir.
21 Q.  Okay.  I mean, and then it looks like --
22    do you dispute that you received all of
23    the FMLA leave you were entitled to?

Page 195

1  A.  No.
2  Q.  Okay.  You contend you were entitled to
3     additional FMLA?
4  A.  No.
5  Q.  Okay.  I may have --
6         MR. LEE:  I'm sorry.  I'm sorry
7         You said "Do you dispute."
8  Q.  (By Mr. Bostick) I'm sorry.  So you --
9     you -- you agree that once the issue was
10    resolved, you got all the FMLA leave you
11    were entitled to?
12 A.  Yes, sir.
13 Q.  Okay.  And you had written a letter in, I
14    think, saying that you disputed some of
15    the days that she had identified you
16    being absent.  And I believe
17    Mr. Duckworth sends a letter back saying,
18    We're going to give you ten days of
19    vacation.  Is that --
20 A.  Well, I don't think it was a ten-day
21    vacation gift.  It was, These areas are
22    gray, so to err on the safe side, we will
23    make it "X."

Page 196

1  Q.  I mean --
2  A.  That's okay.
3  Q.  Are you -- you don't have any claim in
4     this case of unpaid vacation that you
5     claim you are entitled to?
6  A.  No.
7  Q.  I'm trying to speed the process and
8     trying to figure out what we really are
9     here about.
10 A.  No.
11 Q.  I think for simplicity's sake, we might
12    want to just -- I realize you meet with
13    Mr. Duckworth on about the 22nd;
14    correct?
15 A.  Right.
16         (The referred-to document was
17         marked for identification as
18         Defendants' Exhibit No. 16)
19         MR. BOSTICK:  Did I give you one?
20         MR. STOCKHAM:  No.
21 Q.  (By Mr. Bostick) Can you identify Exhibit
22    16 for me, please.
23 A.  It's titled Formal Complaint.

Page 197

1   Q.  Did -- did you fax this to Duckworth?
2   A.  Yes.
3   Q.  Okay.
4   A.  Well, I faxed it to Ahn, Duckworth, Kim
5       and Kimble.
6   Q.  Okay.  Did you prepare this by
7       yourself?
8   A.  In conjunction with Rick -- Richard, my
9       attorney.  It was at his direction.
10  Q.  Okay.  I'm looking at the second full
11      paragraph.  You say that Mr. Duckworth
12      requested a dinner meeting with you.
13      When you say you had over 100 pages of
14      documentation, was this relating to your
15      medical condition?
16  A.  Um-hum.
17  Q.  What -- what specific type of
18      documentation?
19  A.  Releases from my angioplasty surgery,
20      medication, follow-up visits with
21      cardiologists, general practitioners.  I
22      had a whole notebook full of just, you
23      know, my health stuff.

Page 198

1   Q.  Did you -- I mean, is this documents you
2       provided, since, to your attorney?
3   A.  Yeah, I think so.
4   Q.  Okay.  Who is Michael Hansford?
5   A.  He was the HMMA employee.  He was a
6       manager of FTZ, foreign trade zone, and
7       logistics.
8   Q.  Do you know what the circumstances were
9       that led to him leaving?
10  A.  Not until he was fired.  He was my
11      employee, and I didn't even know why he
12      was fired.
13  Q.  Why was he fired?
14  A.  He was fired because he said he had a
15      degree from a university, and he did
16      not.
17  Q.  What university did he say he had a
18      degree from?
19  A.  I have no idea.  In the Virgin Islands or
20      something.
21  Q.  What level degree was it that he said he
22      had?
23  A.  I have no idea.

Page 199

1   Q.  Had he represented to you during the time
2       he was at HMMA that he had that degree?
3   A.  Yes.
4   Q.  And then prior --
5   A.  I'm sorry.
6   Q.  Prior to the meeting, tell me about your
7       conversation with Mr. Duckworth on the
8       phone and what he said to you about the
9       meeting.
10  A.  He called me out of the blue, first time
11      ever, you know, in like a -- I didn't get
12      calls from Keith Duckworth.  And he said
13      that he was concerned about my health and
14      how I was doing, and he just wanted to
15      check on me.  And, you know, let's go to
16      dinner tonight.  And, you know, I was
17      feeling very poorly that day.  And I was
18      just like, Well, what's going on here.
19      And he suggested we go to Cracker Barrel.
20          And I said, Well, if we're
21      going to discuss my medical issues, I'd
22      rather someplace a little more
23      private.  So that's how we ended up at

Page 200

1       City Grill.  So, that's how -- you know,
2       it was purely under the pretense of, I
3       want to see how you are doing
4       healthwise.
5   Q.  Was there any discussion about possible
6       performance concerns during the telephone
7       call?
8   A.  No.
9   Q.  Okay.  And then, tell me about your
10      conversation with Mr. Hansford before you
11      meet with Mr. Duckworth.
12  A.  There was no conversation with Mr.
13      Hansford before I meet with Mr.
14      Duckworth.
15  Q.  Did you see him in the parking lot?
16  A.  I saw him smoking outside City Grill.
17      There is a bar next called Next Door, and
18      that's what he was doing.  He was with --
19      having dinner with his wife.
20  Q.  He says that he asked you to meet
21      Mr. Duckworth?
22  A.  Yes.
23  Q.  And what specifically did he say --

Page 201

1  A.  I think he was a little --
2  Q.  -- he wanted to talk to him about?
3  A.  I'm sorry.  I think he was a little
4       frustrated about being terminated.
5  Q.  And --
6  A.  He wanted to talk about his treatment
7       from Wendy Warner, who was the HR
8       manager.  I asked her about Mike's firing
9       and background check when -- after it
10      occurred.  And she said, Well, we check
11      everybody's background.  We call all
12      their universities.  And that would put
13      it at hundreds, if not thousands, of
14      people.
15           They had a dispute when he
16      sold his house and bought his house.  And
17      I think that they had sour grapes between
18      them from that point on.  I honestly
19      think it was a, you know, witch hunt.
20  Q.  He and Wendy Warner had problems?
21  A.  Yes.  Uh-huh.  So there's no reason that
22      he would be singled out.  Let's check his
23      credentials.  He worked at Toyota.  He

Page 202

1       worked at Mercedes.  He worked -- he's
2       older generation.  He has 30 years
3       experience.  He set up the FTZ for
4       Hyundai.
5  Q.  So, you say that Duckworth asked us what
6       you-all knew about serious problems going
7       on at HMMA.
8            Then there's this mention
9       about Kalson sleeping with his staff.
10      What -- what do you recall the discussion
11      being with regard to that?
12  A.  He asked us specifically if John Kalson's
13      still sleeping with staff.
14  Q.  What was your response?
15  A.  And Mike -- I didn't respond.  Mike is
16      the one that -- John was sleeping with
17      the receptionist, who was 20 or 21, whose
18      father works for Hyundai, works for John.
19      So not only is it somewhat awkward that
20      he's sleeping with the receptionist, but
21      her father works for John.  So he asked
22      if that was still occurring.  When that
23      occurred in the parking lot in his

Page 203

1       company car of a bar, Michael Hansford
2       had firsthand knowledge of it.  I did
3       not.  I let him speak to it.
4  Q.  Did you have any prior involvement in any
5       investigations into whether Mr. Kalson
6       was engaged in any inappropriate
7       behavior?
8  A.  Yes, with Rick Neal.  He asked me about
9       it.
10  Q.  Who -- who was the employee that was
11      involved with that?
12  A.  With what?  I'm sorry.
13  Q.  With Mr. Kalson.
14  A.  Who was the employee involved?
15  Q.  Was there a female employee that was
16      involved in that incident?  Who was that
17      person be?
18  A.  Nikki, his secretary.  I don't know her
19      last name.  And I don't know the
20      receptionist's name.
21  Q.  Approximately when did that investigation
22      take place?
23  A.  I couldn't tell you.  I mean, that was

Page 204

1       probably -- probably a year prior to my
2       termination date.
3  Q.  Okay.  Do you know what the result of
4       that investigation was?
5  A.  The res- --- I mean, the result -- Rick
6       asked me if I would sign an affidavit on
7       when I heard from Kelly Walb and Michael
8       Hansford that John Kalson would be
9       gone.
10  Q.  What -- what had you said that you had
11      heard?
12  A.  I had heard that there were a number of
13      Hyundai employees at a bar, club,
14      whatever, and they were dancing and
15      drinking.  And John took the receptionist
16      out in his car.  And they drove somewhere
17      else, so I don't know where the sex
18      occurred, at the first bar or in the
19      parking lot of the second bar.  He left
20      at that point.  Her clothes were still in
21      his vehicle.  She went into the bar and
22      bragged about, Well, I just slept with
23      the plant manager.

Page 205

1  Q.  So you weren't -- didn't have any
2      personal knowledge that night about
3      this?
4  A.  No, I was home.
5  Q.  But you had heard that from Hansford?
6  A.  I heard that from Hansford, from Kisha
7      Morris, from Richetta Echols, from Kelly
8      Walb -- I mean there -- I don't know the
9      total number, but there were probably 10
10     to 15 Hyundai employees.
11 Q.  And then --
12 A.  And then she comes back in bragging about
13     her sexual endeavors.
14 Q.  And then Rick asked you to provide an
15     affidavit?
16 A.  To sign the affidavit.
17 Q.  Did you sign the affidavit?
18 A.  No.
19 Q.  Is that when you said words to the effect
20     of, Kalson's got a family, and you don't
21     want to cause him to lose his job.
22 A.  I didn't -- I did say that, but I didn't
23     have direct knowledge of it.  And when --

Page 206

1      it even was brought up to my Korean
2      colleague, Mr. Hwang, who was also a
3      general manager in purchasing.  And he
4      said, Rob, you know, what do you think
5      about it?
6          And then he said -- I said,
7      I don't know.  What do you think about
8      it?  He said, Oh, good strong man.  So
9      the Koreans were proud that he was
10     sleeping with the extra women.
11 Q.  That's what your interpretation was from
12     Keith?
13 A.  No, he told me directly.
14 Q.  Who said that?
15 A.  Won Ghee Yang, Y-a-n-g.
16 Q.  That's a little bit racist, isn't it, to
17     assume that every Korean that works in
18     that plant has the same --
19 A.  Well, that's -- that's --
20 Q.  Is that your testimony that what one
21     Korean person told you in that plant is
22     the collective mentality of every Korean
23     there?

Page 207

1  A.  Absolutely not.
2  Q.  Okay.  Did I not just hear you say that,
3      that that was the Korean -- I'm just
4      going to --
5  A.  No.  He said, Good strong man.
6  Q.  Okay.  So you have one person telling you
7      that.
8  A.  That's not a Korean.  It's his own
9      opinion.
10 Q.  Okay.  Okay.  Did you ever have any
11     conversations with Mr. Ahn or Mr. Kim
12     about any of these issues with John
13     Kalson?
14 A.  There weren't there at the time.
15 Q.  Did you ever have any conversations with
16     John Kalson about the fact that you'd
17     been asked to give an affidavit?
18 A.  No.  But he did tell me after all of the
19     things settled down that he was going to
20     have to go to Birmingham next time
21     because Montgomery was too small of a
22     town, and he couldn't get away with, you
23     know, sleeping with other women in

Page 208

1      Montgomery.  So he apparently wasn't too
2      distracted by the actions from Hyundai or
3      lack of action.
4  Q.  But you don't know what specific action
5      was taken?
6  A.  I mean -- no.
7  Q.  Okay.  Did there -- was there any --
8      next, he says he asked you about other
9      concerns, such as kickbacks.  What do you
10     recall the conversation being with regard
11     to kickbacks?
12 A.  He mentioned specifically about -- I
13     think it's J.H. Kim -- were we aware of
14     any kickbacks taking place between
15     construction suppliers and J.H. or H.J.,
16     J.H. Kim.  And I'd never heard that from
17     anybody.  So --
18 Q.  Okay.  You didn't have any personal
19     knowledge about kickbacks?
20 A.  I never heard anything about that, no.  I
21     never heard anything.
22 Q.  Had you ever, prior to November 6th, gone
23     and reported some possible kickbacks or

Page 209

1    financial --
2  A.  No.
3  Q.  -- improprieties?
4  A.  Not at all.
5  Q.  Okay.  Any other issues that you recall
6      being discussed while Mr. Hansford was
7      still there in the meeting?
8  A.  Keith really grilled us for 45 minutes,
9      you know, and he did it under the false
10      pretense of We're going to make this
11      company better, and -- you know, trying
12      to get all the information out, and we're
13      going to correct these things.  And we
14      agreed that a lot of the things were
15      unacceptable behavior.  So Mike talked,
16      I'd say, 95 percent of the time.
17  Q.  Okay.
18  A.  I wasn't feeling well.  I just wanted to
19      get on with the evening.
20  Q.  And so, I mean, did Mr. Hansford take the
21      opportunity to complain about his own
22      personal situation, his termination?
23  A.  Yes.

Page 210

1  Q.  Okay.  And what was his complaint in that
2      regard?
3  A.  That he was witch-hunted.
4  Q.  By Wendy Warner?
5  A.  Yes, sir.
6  Q.  Did he admit to Mr. Duckworth, though,
7      that what he had represented on his
8      resume was not true?
9  A.  Yes.
10  Q.  Okay.  You said he -- Mr. Hansford
11      mentioned about 95 percent of the issues
12      and you about five percent.  Just tell me
13      what specific issues you recall bringing
14      up, if any.
15  A.  I don't think I brought up any issues.
16      We brought up -- like the only thing I
17      remember bringing up was the workplace
18      violence where Korean colleagues were
19      hitting and kicking other Korean
20      colleagues and the American colleagues
21      without any repercussions --
22  Q.  What --
23  A.  -- and other suppliers.

Page 211

1  Q.  What specific incidents were you
2      referring to on that?
3  A.  There was a Korean gentleman in the plant
4      who kicked a team member, an Alabama
5      employee.  I don't know where he's from.
6      And the gentleman went to human
7      resources, and he didn't retaliate.  And
8      they said, Yes, that's inappropriate
9      behavior.  And they pretended to send the
10      guy back to Korea.  They took him to the
11      airport, gave him a suitcase, and then he
12      went back in the car and went to a sister
13      supplier, Mobis.
14  Q.  Who is the person who was allegedly sent
15      back to Korea?  What's his name?
16  A.  I don't have his name.  I can get it.
17  Q.  Did he work in your department?
18  A.  No, nothing to do with that.
19  Q.  Did you have any personal knowledge
20      regarding that situation?
21  A.  No.
22  Q.  Okay.  At what period of time did that
23      incident occur?

Page 212

1  A.  I don't know.  I mean, I can look at -- I
2      don't have a copy.  I don't think I wrote
3      it down.  It was just what we heard that
4      had happened.  And then the guy did show
5      up at the supplier, you know.  We found
6      him out at the supplier's, at Mobis,
7      which is owned by Hyundai.
8  Q.  Is this -- do you think it's more or less
9      than a year prior to your termination?
10  A.  Probably more than a year.
11  Q.  Okay.  So we don't know that person's
12      name, though?
13  A.  I'm sure human resources has that.
14  Q.  But you personally don't recall?
15  A.  No, sir.
16  Q.  And then, were you interviewed by human
17      resources as part of any of that
18      investigation?
19  A.  No.  There was an investigation.  There
20      was a general meeting with Keith when he
21      came to Alabama as a deputy president.
22      And again, it was what difficulties he
23      had been reported in Alabama, you know,

Page 213

```
1      what can we make improvements on.
2           There was also a meeting
3      with the Korean colleagues that came over
4      from the legal staff and also interviewed
5      all the directors and other team members,
6      you know, about this type of workplace
7      violence events.
8  Q.  These are meetings that you're involved
9      with personally?
10 A.  Yes.
11 Q.  Okay.  My question is:  Other than when
12     you met with Rick Neal with regard to the
13     John Kalson situation, was there another
14     investigation conducted by human
15     resources or Team Relations where you
16     were interviewed?
17 A.  No.
18 Q.  Okay.  Were there other instances of
19     workplace violence that you brought up
20     with Mr. Duckworth during your meeting?
21 A.  Not in that meeting.  But there were
22     subsequent to that -- or prior to that.
23     I'm sorry.  Prior to that.  Prior to the
```

Page 214

```
1      City Grill dinner, we discussed about
2      workplace violence issues -
3  Q.  Okay.
4  A.  -- on a one-on-one basis.
5  Q.  Other than this one incident you've
6      referred to, is that the only one that
7      you recall being discussed in the
8      specific meeting that you had on October
9      22nd?
10 A.  On the 22nd?
11 Q.  Right.
12 A.  No, like I said, the other ones were
13     discussed prior to that.
14 Q.  Okay.  That was the only one you
15     mentioned on the 22nd.
16 A.  Yes.
17 Q.  Any other workplace violence issues you
18     brought up?
19 A.  Ever?  Or during the meeting?
20 Q.  During the 22nd.  I'm focusing on that
21     right now.
22 A.  No.  I don't think so.  No.
23 Q.  Then, were there any other issues that
```

Page 215

```
1      you brought up at the plant other than
2      that workplace violence issue during the
3      October 22nd meeting?
4  A.  Like I said, I wasn't feeling well.  I
5      didn't speak hardly at all.  I thought we
6      were there to go over my medical stuff.
7           MR. STOCKHAM:  Did you ask him at
8           the plant or at the meeting?
9           MR. BOSTICK:  In the meeting on
10          the 22nd.
11          MR. STOCKHAM:  So the -- your
12          question is on the meeting on
13          the 22nd?
14          MR. BOSTICK:  Yes.
15          MR. LEE:  He said any issues at
16          the plant that he discussed
17          with him in the meeting.
18          THE WITNESS:  That's okay.
19          MR. STOCKHAM:  I just want to make
20          sure it was not just limited
21          to what was in the meeting on
22          the 22nd.
23 Q.  (By Mr. Bostick) I'm just trying to pin
```

Page 216

```
1      down what exactly you communicated with
2      Duckworth on this meeting on the 22nd.
3  A.  You know, my -- my whole dinner
4      experience with Duckworth, you know,
5      nothing came up about anything other than
6      30 seconds of him looking at my medical
7      information to him at the meeting.  I
8      remember he said, Rob, do you want
9      dessert?  And I said, No, thank you.  I
10     don't care for dessert.  He said, Go
11     ahead; get a dessert.  And I said, Okay.
12     And I got something, and he got
13     something.
14          And when dessert came, he
15     said, Well, Rob, the executive management
16     at Hyundai is unhappy with you and they'd
17     like you to resign.  That was the first
18     indication ever from the company period
19     at any level of any problems.
20          And I said, Who is executive
21     management?  And he stumbled around, and
22     he said, President Ahn.  I said, You
23     know, I've only spoken to that gentleman,
```

Page 217

1    hi, bye, to the bathroom and in the
2    hallway.
3         And I said, we -- You're
4    aware of the H.I. Kim situation, and you
5    said, Don't worry about it. That's just
6    the behavior that we see in Hyundai's
7    management style.
8         And then he stumbled around,
9    and he said, and -- and -- and Rick Neal.
10   I said, Rick Neal? I said, Rick and I
11   have a great rapport. We work together.
12   We help each other. We like each other.
13        I said, Let's call Rick
14   right now. And he says, No, no, no, not
15   Rick Neal, not Rick. He retracted that
16   statement.
17        And then by the end of the
18   dinner, by the end of the conversation, I
19   said, Well, this is just surreal to me,
20   you know. I said, Is there anything we
21   can do? And, you know, This is the first
22   I've heard of anything. He goes, It's --
23   it's done.

Page 218

1         And he -- I walked out to my
2    car and drove home to my rental house
3    with no job now and going through a
4    divorce and heart problems. And, I mean,
5    it was just a stellar evening.
6    Q.  Did Mr. --
7    A.  Oh, let me -- let me say one more thing.
8         Oh, he said at the end -- he said, Well,
9         Rob, it's not me. When I said, you know,
10        Who is executive management? What -- is
11        there any recourse? He's like, It's not
12        me, you know. He -- he's being directed.
13   Q.  Well --
14   A.  And it's not Rick Neal, and it's not Ahn,
15        because I didn't speak to him. So it
16        must be H.I. Kim.
17   Q.  Well --
18   A.  Even though I went to him twice and he
19        said, Oh, don't give it another
20        thought.
21   Q.  That's going to Duckworth?
22   A.  Right. This is Duckworth in the
23        meeting.

Page 219

1    Q.  You never went to Mr. Kim and spoke to
2         him after the meeting; is that correct?
3    A.  No.
4    Q.  Okay. After the Murakami meeting, you
5         never spoke with him?
6    A.  No, sir.
7    Q.  Did Mr. Duckworth say specifically what
8         Mr. Kim was upset about?
9    A.  Not at all.
10   Q.  Did he mention the Murakami --
11   A.  He said, the executive --
12   Q.  -- meeting?
13   A.  No. He said, the executive management at
14        Hyundai is upset with you, and they would
15        like you to resign.
16        Believe me, I have said this
17        statement in my interviews when they ask,
18        Why did you leave Hyundai? So I know the
19        story very well. It's a tremendous black
20        mark on my career in which I have never
21        had a blemish.
22   Q.  Did Mr. Duckworth bring up the idea of a
23        severance package in that meeting?

Page 220

1    A.  He did.
2    Q.  What was discussed about that?
3    A.  He said that it was already a done deal
4         and for me to go home and think of a -- I
5         don't know if he said compensation or
6         severance -- my head was kind of swimming
7         at that point -- severance package and
8         then we'll talk again. I can't remember
9         the date.
10        But I received a letter, I
11        believe, a few days afterwards,
12        indicating not to come to the plant and
13        so forth, not to represent myself as a
14        Hyundai employee.
15   Q.  Look for me, if you would, on Page Bates
16        No. 44.
17   A.  Okay.
18   Q.  You say, Between -- do you see the
19        paragraph that says, Between the
20        September 16th, 2005 -- I guess that's
21        the meeting -- dinner meeting with Mr.
22        Duckworth -- I had no further meetings
23        with Mr. Kim or Mr. Ahn. Is that a true

Page 221

1    statement?
2  A.  Um-hum, yes.
3  Q.  You said, A few weeks prior to that,
4     however -- are you saying a few weeks
5     prior to your meeting with Duckworth or a
6     few weeks prior to the September 16th
7     meeting?
8  A.  One second, please.  This was prior to
9     the Murakami meeting.
10 Q.  Okay.
11 A.  Like I said earlier, when they brought
12    people in from Korea and when Duckworth
13    arrived in Alabama and wanted to meet
14    with the directors individually to
15    verify, correct, the improprieties that
16    they had heard were occurring at
17    Hyundai.
18 Q.  So this was an issue Mr. Duckworth
19    requested?
20 A.  Yes.
21 Q.  Okay.  Approximately when did that
22    meeting take place?
23 A.  Well, I don't know when Keith came here

Page 222

1     as deputy president.  I think it was the
2     summer of 2005.
3  Q.  Okay.
4  A.  So then -- and then, after he'd been
5     here, I would say, a month or so, the
6     individuals came in from Korea, the
7     attorneys and some other -- I can't
8     remember their title.  But they spoke
9     English very well, and they wanted to
10    hear exactly what had been happening.
11    And that's how, I think, this list was
12    generated.
13 Q.  Okay.  And I'm looking at Bates No. Page
14    60 through 62.
15 A.  Um-hum.
16 Q.  Is that a document you prepared?
17 A.  No.
18 Q.  Who prepared that?
19 A.  I have no idea.  It was in my in-box.
20 Q.  Okay.
21 A.  It's written -- it seems to me it's
22    written in Korean and English.  It
23    doesn't sound -- you know, I can only

Page 223

1     guess.
2  Q.  Do you know whose handwriting this is?
3  A.  That's my handwriting.
4  Q.  In the black pen?
5  A.  That's my handwriting.
6  Q.  Who all was in attendance at this
7     meeting?
8  A.  Which meeting?
9  Q.  This one we've got the minutes from.
10 A.  I have no idea what these meeting minutes
11    are from.
12 Q.  You don't know?
13 A.  No.  They appeared in my box.
14 Q.  Well, you attached this as --
15 A.  I showed it to Richard when we had the
16    consultation, and he draft- -- told me
17    to --
18        MR. STOCKHAM:  Don't -- don't --
19    (By Mr. Bostick) Don't tell me what he
20    said.
21 A.  Okay.
22 Q.  So is that an incorrect statement in the
23    letter when you say, The minutes of this

Page 224

1     meeting are attached?
2  A.  The meeting of the minutes is the
3     Murakami minutes pages.  They're Murakami
4     meeting minutes.
5  Q.  So you don't know what meeting is being
6     referred to when it talks about a meeting
7     with Duckworth?
8  A.  Where are you, sir?
9  Q.  I'm -- I'm back on Bates No. 44.
10 A.  Okay.
11 Q.  This paragraph refers to a meeting.
12 A.  Which paragraph?
13 Q.  It says, Between the September 16th,
14    2005.
15 A.  A few weeks prior to that, however, I met
16    with Mr. Duckworth and reported, among
17    other things, about executives involved
18    in sexual harassment and other
19    misconduct.
20        What's your question?  When
21    was it did this occur or --
22 Q.  Keep reading the whole paragraph.
23 A.  Okay. -- and misconduct with employees

Page 225

1    about safety issues, because workers were
2    not following safety policies, and the
3    discriminatory treatment given to
4    American managers and workers who were
5    treated less favorably than the Korean
6    managers. I am enclosing a copy of the
7    meetings of that -- minutes of that
8    meeting.
9              These meeting minutes, I
10   don't feel, were ever intended to be
11   distributed to anybody but between
12   Duckworth and Korea. So how they ended
13   up in my box, I have no idea.
14   Q.  Do you know how --
15   A.  But some of the --
16   Q.  -- they got attached to your letter?
17   That's my question.
18   A.  I'm sorry?
19   Q.  Do you know how they got attached to your
20   letter here?
21   A.  Because I showed Richard documents that I
22   had about this case, and this is the one
23   that he suggested.

Page 226

1              MR. STOCKHAM: Don't tell him what
2         we talked about.
3              THE WITNESS: Okay. Well, then I
4         can't tell you then.
5    Q.  (By Mr. Bostick) So do you know if these
6    meeting minutes, Bates No. 60 through
7    62 --
8    A.  Um-hum.
9    Q.  -- are minutes of a meeting you're
10   referring to in this paragraph on 44?
11   A.  The elements within these meeting
12   minutes, the bullet points and the topics
13   discussed, were discussed with myself,
14   Keith Duckworth and the gentleman from
15   Korea that came over. Some of these
16   were. Some of these weren't ever talked
17   about.
18   Q.  Okay.
19   A.  So I think this is a compilation of all
20   directors' inputs on -- this is my
21   guess -- after the meetings with
22   Duckworth and the Korean colleagues on
23   things that we needed to correct.

Page 227

1    Q.  Okay. When -- looking at Paragraph 44,
2    you are saying you had a meeting with
3    Duckworth.
4    A.  Yes.
5    Q.  Okay. And you're saying here that's
6    sometime before the Murakami meeting;
7    right?
8    A.  Yes.
9    Q.  Tell me by name who you specifically
10   recall being in that meeting other than
11   you and Keith Duckworth.
12   A.  That's it.
13   Q.  Okay.
14   A.  He then said -- there were two meetings.
15   The Duckworth when he arrived in
16   Alabama.
17   Q.  Okay.
18   A.  Then there was a meeting where -- a
19   Duckworth meeting, and then he referred
20   me to the Korean colleagues that were
21   invisible that wanted to be updated
22   directly on this.
23   Q.  Okay.

Page 228

1    A.  So when we had -- I had the meeting with
2    the Korean colleagues, it went from,
3    Okay, Rob, you go from this conference
4    room to this conference room where Mr. X
5    from Korea is residing. So there was
6    never a time where all three of us worked
7    together.
8    Q.  So the second meeting Mr. Duckworth is
9    not involved in.
10   A.  He's involved in the first part.
11   Q.  The first meeting?
12   A.  He's involved in the second -- there's
13   two meetings with Duckworth.
14   Q.  Okay.
15   A.  And then Keith's like, Well, this is
16   interesting what you had to say. I'd
17   like you to tell our Korean colleagues
18   this also.
19   Q.  Okay.
20   A.  So he walked me to the room, and he said,
21   This is Mr. X, Y, Z. He walked -- he
22   introduced me, and he walked away.
23   Q.  Okay. Do you know what that person's

Page 229

1     name is, or job title?
2  A.  He was an attorney for Hyundai --
3  Q.  Okay.
4  A.  -- my understanding, from Korea.  He was
5     a Korean colleague.  He spoke in
6     exceptional English.  He did a good
7     job.
8  Q.  So the meeting minutes -- or notes that
9     are attached are not notes that you
10    prepared?
11 A.  Absolutely not.
12 Q.  And you don't know if these relate to the
13    first meeting or the second meeting;
14    right?
15 A.  Or a meeting with me, with Kalson, with
16    Greg Kimble, with Rick Neal, or all four
17    or some part thereof.
18 Q.  Okay.  So, the Duckworth meeting was with
19    directors from all areas when he gets
20    there?
21 A.  Um-hum.
22 Q.  Okay.  So there was a similar meeting
23    between he and you and who else?

Page 230

1  A.  All four directors, again.
2  Q.  Tell me who those are.
3  A.  Rick Neal.  There's only four directors.
4  Q.  And Rick Neal is over what?
5  A.  Legal.
6  Q.  Okay.
7  A.  And IT, I think, at the end.
8  Q.  Greg Kimble?
9  A.  Is over human resources.
10 Q.  John Kalson?
11 A.  He's over production.
12 Q.  Okay.
13 A.  And myself over purchasing.
14 Q.  You mentioned earlier John Kalson -- you
15    said that he must not understand
16    Hyundai's production system, and he was
17    the head of the production department?
18 A.  He was.
19 Q.  I mean, did you feel like you had
20    superior knowledge than him about the
21    production operation there?
22 A.  Not superior.  Just perhaps different
23    approaches.  Just different ways to get

Page 231

1     from A to B.
2  Q.  But, I guess, if there's a production
3     issues, that's going to be a decision for
4     him to make and not you?
5  A.  If there's a production issue?
6  Q.  Yeah.
7  A.  Typically, yes; that's correct.  We --
8     you need to understand --
9  Q.  Go ahead.
10 A.  -- we have written policies and
11    procedures how production is to take
12    place.  So, all parties should be aware
13    of that.
14 Q.  Look -- let's look at these meeting
15    notes, Bates No. 60.
16 A.  Okay.
17 Q.  It says, Internal investigation will be
18    done for wrongdoing with the executive
19    side.  If the rumors (financial payment
20    being made by supplier or other sexual
21    services may be provided) are true, the
22    action must take now.
23       Do you know what that is

Page 232

1     referring to?  I notice you got John
2     Kalson written down.
3  A.  Yeah, you know, it sounded to me the only
4     sexual indiscretion I was aware of at the
5     company was with Mr. Kalson.  And that
6     was to notify Richard.  These are notes
7     for Richard.
8  Q.  Okay.  And then, Really mainly barely.
9  A.  Yes, that's what I said.  Sorry.
10       We need to force vendors to
11    keep price low.  Enforce rules equally.
12       I really can't tell you what
13    that was: Really mainly fairly.  That
14    doesn't make sense to me, but that is my
15    writing.
16 Q.  So what do you -- what do you recall
17    telling Mr. Duckworth during your meeting
18    with him when and -- he arrives at the
19    plant and he's trying to figure out what
20    the issues are?
21 A.  We talked about -- That is, the ones that
22    I can recall as of today.  I don't think
23    I'm going to encompass them all.

Page 233

1    We talked about there's a
2    major problem with the Korean colleagues
3    and the American colleagues being on two
4    separate teams; that we're not included
5    in meetings; that we need a go-to to
6    conduct our jobs correctly.
7    We were asking repeatedly to
8    Korean management, please include us.
9    We'd always hear, We will start this, you
10   know, at the next launch.  We'll start
11   this in January.  We'll start including
12   you in May.  You know, these type of
13   push-offs, or the excuse would be, It
14   would take us too long to go through the
15   meetings if we have to do them in
16   English.
17   So we had really two
18   distinct teams:  You know, the Korean
19   colleague team that wanted to conduct
20   business the way they did it in Korea
21   both on the ethical business cultural
22   fashion; and then people that understood
23   American business practices that we hired

Page 234

1    locally that wanted to do it the same way
2    Ford or GM or Toyota would do it.  So
3    that -- that was a problem.
4    We talked about the violence
5    in the workplace.  I mentioned the
6    kicking of the line worker.  One of my
7    employees was kicked by my -- Min Ho Lee,
8    my vice president, until he was in the
9    fetal position in the conference room.
10   And that was in front of my American
11   colleagues.  So they were a little
12   disconcerted (sic) with Mr. Lee's
13   behavior.  That was to J. Won Park.
14   Let's see.
15 Q.  Who was the kicker, and who was the
16   kickee?
17 A.  Min Ho Lee, my vice president, the one
18   that Ted Chung said, I may bring on, the
19   very mean one.  That one.
20 Q.  And who was kicked?
21 A.  J. Won Park.  He worked for Mr. Hansford.
22   He was an equal with Mr. Hansford.  They
23   were both -- the fight started in the

Page 235

1    cubicle and then went into a conference
2    room where he proceeded to kick him until
3    he laid on the ground in front of Kelly
4    Walb.
5    And let's see.  KPMG, we
6    gave them approximately $10 million to
7    conduct a contract for SAP system
8    orientation.
9 Q.  Before you move on that.  Let me just --
10   you know, did you personally witness any
11   of this incident with Mr. Lee?
12 A.  I did not.
13 Q.  Okay.
14 A.  But my people came to me with concern
15   and, What is going on here?  Is this what
16   we're to expect, you know.
17 Q.  Did you -- did you report that on to Team
18   Relations?
19 A.  I reported that on to Team Relations and
20   to Greg Kimble.
21 Q.  And do you know if there was an
22   investigation on it?
23 A.  I don't know.

Page 236

1 Q.  Okay.  Do you know if anything happened
2    to Mr. Lee after that?
3 A.  I don't know.  I mean, he's very high
4    up.
5 Q.  Okay.
6 A.  Like H.I. Kim.  You don't question him.
7 Q.  But you know Mr. Kimble --
8 A.  Was aware of it, was advised.
9 Q.  And to your knowledge, it was
10   investigated by Team Relations?
11 A.  They said they would take care of it,
12   yes.
13 Q.  Okay.  Were you ever interviewed?
14 A.  No.
15 Q.  But you didn't personally witness any of
16   this?
17 A.  No, sir.
18 Q.  Do you know if any of the people that you
19   said had witnessed it spoke to Team
20   Relations?
21 A.  I don't know.  I mean, the only one that
22   I know that witnessed it personally was
23   Kelly Walb, W-a-l-b.  And she worked for

Page 237

1    J. Won Park.  So she saw her boss get
2    kicked, you know, down to the fetal
3    position.
4 Q.  Do you know if she was interviewed?
5 A.  I don't know.
6 Q.  Did she speak to anybody in Team
7    Relations?
8 A.  I don't know.
9        THE VIDEOGRAPHER:  You have three
10           minutes on this tape.
11 Q.  (By Mr. Bostick) Did you prepare any
12    documentation for your meeting with Mr.
13    Duckworth?
14 A.  No.
15 Q.  Okay.  You said the next item you were
16    talking about was the SAP issue.
17 A.  Yes.  We had a contract with KPMG, who
18    later became BearingPoint, a consulting
19    firm, and they had a meeting with -- an
20    update meeting with the Korean colleagues
21    on the IT framework.  And this was
22    reported to me by the BearingPoint's
23    project manager.

Page 238

1        And she said that they were
2    in discussions.  One of the Korean
3    colleagues didn't like one of the status
4    reports, and they reached across the
5    conference table and punched the one of
6    the BearingPoint gentleman in the face.
7    He got up and walked down the hall, and
8    the Korean gentleman, the Hyundai
9    gentleman, ran down the hall and tackled
10    him in the hall.
11        So they were a little
12    alarmed at this behavior, so they went to
13    the president -- Y.S. Kim at that time --
14    and said, This is not appropriate
15    behavior in America.  And his solution
16    was, Don't bring this guy back from
17    BearingPoint again.
18 Q.  Okay.  And this -- who was the person who
19    did the punching?
20 A.  I don't have their name.
21 Q.  Was it a man?
22 A.  Yes.
23 Q.  And was the subordinate a man?

Page 239

1 A.  It wasn't a subordinate.  It was somebody
2    from a consultant firm, KPMG.
3 Q.  Was that a man as well?
4 A.  A man.
5 Q.  Both men.  Any other interaction you
6    talked about?
7 A.  No, I mean, the lady -- there was a Mary
8    Miran; she was the head of the project
9    for KPMG, BearingPoint.  She's the one
10    that told me about the activity.
11 Q.  No, but I'm talking about Mr. Lee and
12    then the person that he was involved
13    with.  That was a man that he kicked?
14 A.  Yes.
15 Q.  Okay.  Any other points you remember
16    bringing up with Mr. Duckworth?
17 A.  Duckworth?  I mean, we talked about that
18    there's no master schedule in the
19    company; there's no way to communicate to
20    our suppliers; that we're going to build
21    1,375 vehicles a day, and then we build
22    500, and then we build 800.  And then we
23    change the schedule to 2,000.  And

Page 240

1    then -- so we -- we needed clarity and
2    everybody to be on the same page within
3    the organization so our suppliers can
4    react.
5        THE VIDEOGRAPHER:  You have two
6           minutes.
7        THE WITNESS:  So, you know, it was
8    of importance for the company
9    for us to be on the same page
10    on what the production
11    schedule was going to be so
12    we can communicate to our
13    suppliers so they know what
14    parts to provide so we can
15    build the vehicles.  But
16    Mr. Kenny Song, who was in
17    production control, refused
18    to use our SAP system, which
19    we paid $10 million for.  He
20    thought it would be best just
21    to send the supplier Excel
22    spreadsheets telling them
23    what we thought we were going

Page 241

1    to build.
2    So that went on for a good year.
3    And the suppliers are used to
4    dealing with GM, Ford,
5    Toyota, everybody. And, you
6    know, you get a release for
7    the parts you need, and
8    Mr. Song wanted to just send
9    an Excel spreadsheet or just
10   give them a call and say, I
11   know we told you we needed
12   1,375 vehicle sets of tires
13   and wheels today, but we're
14   only going to do 900. And
15   leave voice mails. So if we
16   were trying to get -- if you
17   want to be one of the big
18   boys, you need to do things
19   professionally and
20   appropriately. That was one
21   of the communication issues
22   we talked about.
23   MR. BOSTICK: Why don't we stop

Page 242

1    here.
2    THE VIDEOGRAPHER: Okay. All
3    right. This is end of Tape
4    No. 4 in the deposition of
5    Robert Cyrus to be continued
6    on Tape No. 5. We are going
7    off the record at 3:38 p.m.
8    (Short recess)
9    THE VIDEOGRAPHER: This is the
10   beginning of Tape No. 5 in the
11   deposition of Robert Cyrus.
12   We're on the record at 3:50
13   p.m.
14 Q. (By Mr. Bostick) Mr. Cyrus, we were
15   talking about your prior meeting with Mr.
16   Duckworth and all of the issues that you
17   raised with him. Any other issues, other
18   than those that you've already discussed,
19   that you recall specifically
20   discussing?
21 A. I'm sorry to interrupt you there. We
22   talked about discrimination issues as far
23   as a couple of different instances.

Page 243

1    For example, I had a woman
2    we hired, Marsha Harper. She was the
3    assistant manager in indirect purchasing,
4    and she reported directly up to the
5    chain, not directly, but eventually to
6    Mr. Hyun. And she probably had 25 years
7    experience, a very talented lady from
8    Alabama.
9    And when her boss would go
10   out of town, Mr. Hyun would put the
11   Korean-American colleague in charge,
12   because he couldn't leave a woman in
13   charge, even though she was his boss. So
14   we talked about these issues. So when
15   their boss would go out of town, he would
16   be in charge, because he was Korean and a
17   man. So she came to me numerous times
18   about this type of behavior, and we
19   talked to Mr. Hyun about it, and he
20   continued to act in the same fashion.
21   As far as the way American
22   colleagues and Korean colleagues or HMC
23   colleagues were treated, our expense

Page 244

1    reports, for example, were scrutinized,
2    and it would take two to four weeks to
3    get our money back. The Koreans would
4    have their money back in two or three
5    days. So there was -- I don't know if it
6    was a lack of trust or what. It was
7    definitely different -- different
8    handling of the same type of procedure in
9    Alabama.
10   Again, you know, when cars
11   would come out, many of our members had
12   leased car programs. The Americans would
13   get their cars last. They are not
14   available, but all of the Koreans would
15   have a new car as soon as they needed it.
16   We talked about the promises
17   of yearly reviews and compensation and
18   raises in bonuses being put into place.
19   You know, I was there three and a half
20   years, and we still -- HR never did come
21   up with a performance review process.
22   They would give employees an
23   across-the-board rate increase. So when

Page 245

1  I had employees that were doing
2  exceptionally well, for example, they
3  would get a five-percent raise. And the
4  ones that were barely squeaking by would
5  get a five-percent raise. So we -- we
6  talked to Keith -- I talked to Keith
7  about this, you know, continually. It's
8  a moral issue.
9  Q. What are you looking at?
10 A. I made some notes. You're welcome to
11    have a copy of it if you would like.
12 Q. Go ahead.
13 A. You know, there were -- there were safety
14    issues in the plant and at the suppliers
15    where the Koreans colleagues or HMC
16    colleagues didn't feel that those rules
17    applied to them, you know, as far as
18    safety shoes.
19           Or stepping inside, I
20    remember a supplier Shin Young Smart --
21    these are, you know, 4,000-ton presses
22    that make stamped parts. You are not
23    even supposed to be near them when

Page 246

1  they're operating. There are safety
2  gates, safety curtains, lock-out tags.
3  They were sitting in the press and
4  hand-feeding blanks in there because they
5  couldn't get the Robots to work. So we
6  talked to the safety manager there. And
7  again, you know, the rules didn't apply
8  to the Korean colleagues.
9           You know, there were a lot
10    of indiscretions. Like the work: We
11    talked about the differences in treatment
12    between the American colleagues and the
13    Korean colleagues.
14 Q. Are these all you can specifically
15    recall?
16 A. Right now.
17 Q. And I know these are your lawyer's words
18    more so than you when you say you
19    discussed sexual harassment. Is that
20    something we already talked about?
21 A. Well, we talked about the Kalson thing.
22    We talked about --
23 Q. Did you discuss the Kalson issue with

Page 247

1  Duckworth in this meeting -- in this
2  meeting in the summer?
3  A. Yeah.
4  Q. Okay.
5  A. Yes.
6  Q. And we've already covered your extent of
7  your knowledge with regard to that?
8  A. Right.
9           There is another -- we had a
10    Korean colleague in finance. What's his
11    name? Soo Young. He went to school in
12    America. I think he went to Boston
13    College. I think he has his master's
14    degree. He was firing Malinda Henderson.
15    And he said, quid pro quo, You can either
16    work the two weeks out and we'll pay you,
17    or you can take the two weeks off, if you
18    sleep with me. So, you know, that was a
19    pure quid pro quo. He was sent back to
20    Korea, still employed with Hyundai. But,
21    you know, we talked about that issue
22    also.
23 Q. He was sent back --

Page 248

1  A. He was my boss --
2  Q. -- as a result of that issue?
3  A. I'm sorry?
4  Q. He was sent back to Korea as a result of
5    that issue?
6  A. Yes.
7  Q. When did that take place?
8  A. I would say the last five months that I
9    was employed with Hyundai.
10 Q. Okay. And was that -- what department
11    did Mr. Young work in?
12 A. Finance, right next to me in purchasing.
13    She worked as -- the lady in question
14    worked in finance also.
15 Q. Did you have any personal knowledge of
16    any of this going on during the time it
17    was happening?
18 A. No.
19 Q. Okay. And the question -- Ms. Harper, is
20    that what you said the lady's name was?
21 A. Yes. Marsha Harper.
22 Q. Was that -- How was that issue
23    resolved?

Page 249

1   **A.**  Again, it was discussed with Mr. Hyun and
2        with Greg Kimble, and Team Relations was
3        supposed to talk to Hyun about it.  I
4        don't know if that occurred or not.
5   **Q.**  Okay.  Do you know, did she come back to
6        you at some point and say it had been
7        resolved?
8   **A.**  When she came back to me, you know, it
9        had not been.  No improvement, you know.
10  **Q.**  What period of time are we talking about
11       for this?
12  **A.**  You know, I probably -- this is in the
13       latter -- in the last nine months to six
14       months or nine months before my
15       termination.
16  **Q.**  And then did you follow up after that
17       when she said it hadn't be resolved?
18  **A.**  I talked to Hyun again, and I talked to
19       Kimble again.  And, you know, he talked
20       to who was over Marsha, Y.D. Cho.  He
21       talked to him about, you know, When you
22       go out of town, you need to put the next
23       individual by rank, you know, by her

Page 250

1        position in charge, not a Korean
2        colleague because he is male and
3        Korean.
4   **Q.**  I mean, did --
5   **A.**  So that stopped.
6   **Q.**  You're telling me that it stopped at that
7        point?
8   **A.**  Yes.
9   **Q.**  I mean, do you have any personal
10       knowledge, other than what Ms. Harper is
11       saying to you, that that was his reason
12       for not putting her in charge?
13  **A.**  That's what she felt.
14  **Q.**  That's what she felt?
15  **A.**  That's what she told me.
16  **Q.**  Did she tell you that somebody had
17       specifically told her that was the
18       reason?
19  **A.**  No.
20  **Q.**  Okay.
21  **A.**  He put out a memo saying, While I'm gone,
22       Mr. X is in charge, even while she is
23       there.

Page 251

1   **Q.**  Well, part of it -- it could be he had
2        concerns about her performance?
3   **A.**  Quite possibly.
4   **Q.**  Or there could have been other legitimate
5        non-discriminatory reasons as to why he
6        wasn't putting her in charge?
7   **A.**  That's possible, yes.
8   **Q.**  As far as you know, you don't have any
9        personal knowledge of why he wasn't
10       putting her in charge?
11  **A.**  That's possible, yes.
12  **Q.**  As far as you know, you don't have any
13       personal knowledge one way or the other?
14  **A.**  Just her coming to me and saying, you
15       know, This is not typical, and it's very
16       offensive.
17  **Q.**  And you did -- you followed Hyundai's
18       policies and reported it on to Team
19       Relations; and to the best of your
20       knowledge, it was investigated from there
21       and resolved?
22  **A.**  Yes.
23  **Q.**  Okay.  Any other specific instances when

Page 252

1        you say you mentioned sexual harassment
2        or differences in treatment of Americans
3        and Koreans that you can recall?
4   **A.**  Not at this point.
5   **Q.**  Okay.  Other than -- now, that was the
6        meeting with Mr. Duckworth.  Did you go
7        into all these subjects in your meeting
8        with the Korean attorney?
9   **A.**  Yes.
10  **Q.**  Okay.  Did you have notes or anything?
11  **A.**  I don't think I had notes.  I don't think
12       there was anything in writing.  If I did,
13       it would have been in my log or journal
14       or diary or whatever.
15  **Q.**  Were there any specific points that you
16       brought up with the Korean attorney that
17       you hadn't spoken about with
18       Mr. Duckworth?
19  **A.**  No.
20  **Q.**  Okay.  Other than that meeting that you
21       have referred to in the letter, were
22       there any other meetings with Mr.
23       Duckworth prior to the Murakami meeting

Page 253

1    where you complained that you thought you
2    were being treated unfairly?
3  A.  Did I meet with him and say I was being
4    treated unfairly?
5  Q.  Yes.
6  A.  With Duckworth?
7  Q.  Yes.
8  A.  Other than the points addressed?
9  Q.  No.  Any other meetings, other than that
10    at that time prior to the Murakami
11    meeting?
12  A.  No, I had a meeting with Rick Neal and
13    with Greg Kimble after I started going to
14    cardio rehab for, I think it was, an hour
15    three days a week.
16  Q.  We will get to that.  I just want to make
17    sure.  I'm trying to do all the
18    conversations.
19  A.  I informed the executive management that
20    I was being treated differently because
21    of my cardio.
22  Q.  I understand about that.  Mr.
23    Duckworth -- I don't want -- you

Page 254

1    understand the reason I am asking this,
2    is that I don't want to get in trial a
3    year from now and have you say, Well, I
4    met with Mr. Duckworth four times,
5    whereas I only told you one time before.
6    So I'm making clear:  We had one
7    conversation in the summer that was in
8    relation to the gentleman arriving from
9    Korea?
10  A.  And one previous to that --
11  Q.  Okay.
12  A.  -- when he arrived in Alabama.
13  Q.  Okay.  Have we fully discussed the
14    substance of those meetings?
15  A.  To my knowledge at this point, yes, my
16    recollection at this point.
17        Now, I had meetings with
18    Keith every Monday when we had the
19    directors' meetings.
20  Q.  As far as your complaints to him about
21    your treatment there at Hyundai?
22  A.  It really wasn't -- it was concerns for
23    the benefit of the company, the things

Page 255

1    that we need to rectify.
2  Q.  I understand.
3  A.  Okay.
4  Q.  Okay.
5  A.  It wasn't personal complaints.  I did
6    meet with him about one other issue at a
7    different time about the promise to me to
8    become a vice president after two years
9    after Mark Lee went back.  And --
10        THE COURT REPORTER:  Excuse me.
11        Who went back?
12        THE WITNESS:  Mark Lee.  Min Ho
13        Lee.
14  Q.  (By Mr. Bostick)  I understand that's an
15    allegation in your Complaint in your
16    state court about the fraud.
17  A.  Yes.  I want to make it clear that's
18    another separate discussion that we
19    had.
20  Q.  We will discuss that tomorrow.
21  A.  Okay.
22  Q.  I think that would be more appropriate.
23    But that was in the conversation, you

Page 256

1    know, when you're identifying for me the
2    meetings where you complained to Mr.
3    Duckworth about wrongful treatment.
4  A.  You know, these -- I mean, I already
5    clarified my position on that.
6  Q.  Okay.  Now, you also mentioned, I've seen
7    that you talked to Mr. Neal and to
8    Mr. Kimble when you came back from
9    your --
10  A.  Heart stent procedure.
11  Q.  -- heart procedure.
12  A.  Uh-huh.
13  Q.  And you expressed concern to them that
14    you felt like you had been treated
15    differently after you had come back from
16    the procedure?
17  A.  Yes.
18  Q.  Okay.  Tell me first when these
19    conversations took place.  Is there just
20    one conversation you had with both, or
21    are we talking about --
22  A.  No, there was one conversation I had with
23    both --

Page 257

1  Q.  Okay.
2  A.  -- in a conference room by Rick's
3      cubicle.
4  Q.  Okay.
5  A.  And Greg's area also.
6  Q.  Okay.  And then did you have other
7      conversations other than that one with
8      them separately, or are we just talking
9      about this one conversation?
10 A.  I am just mentioning this one
11     conversation that I had about being
12     treated differently after I returned from
13     the cardio situation.
14 Q.  Okay.  And I think, in your tape, you
15     called Mr. Kimble and mentioned the
16     conversation.
17 A.  Yes.
18 Q.  And why don't we look at that.
19 A.  Yes.
20 Q.  While I am looking at that, do you
21     remember there being an executive meeting
22     where you got in a discussion with --
23     over the use of the SAP system versus the

Page 258

1      spreadsheets?
2  A.  In the executive meeting?
3  Q.  Yes.
4  A.  I mean, we talked about topics such as
5      that in the directors' meetings on, you
6      know, an as-need basis.
7  Q.  Who -- who was the executive you said was
8      having real reservations about using SAP?
9  A.  Kenny Song, S-O-N-G.
10 Q.  I mean, do you remember having any
11     disagreements with him in an executive
12     meeting about the use of SAP?
13 A.  No.  We had a polite request: that, you
14     know, in order to function correctly, we
15     need to do this based on the $10 million
16     system that we need paid for and not an
17     Excel spreadsheet and not leaving
18     messages, Oh, by the way, this is
19     Hyundai.  Stock production from 1,375 to
20     800.  That's not how you -- you know, we
21     can't operate that way.
22 Q.  That was something that you said during
23     the meeting?

Page 259

1  A.  I said and -- yes, I said it.
2  Q.  What was Mr. Song's response to that?
3  A.  He -- he agreed and said that he would,
4      you know, go with the system that we paid
5      for, the SAP system that we would -- he
6      would utilize it, but he didn't.
7  Q.  We won't make this an exhibit.
8          Look on Page 28 of this.
9  A.  Okay.
10 Q.  Do you see down at the bottom it's a
11     voice-mail message?
12 A.  Um-hum.
13 Q.  I need to talk to you about some issues
14     with rumors I'm hearing.  Remember when I
15     sat you and Greg down and made formal
16     notice that I had been treated
17     differently, felt that I was treated
18     differently because of my medical
19     condition with my heart.  Do you know now
20     if they -- this is coming to fruition?
21 A.  Um-hum.
22 Q.  Do you recall approximately when this
23     conversation took place -- this voice

Page 260

1      mail was left?  It says 2:30 on Monday.
2  A.  You mean, does the tape not indicate
3      that?
4  Q.  Well, the date -- it says October 24th.
5  A.  That's what I'm thinking.
6  Q.  But --
7  A.  I think it -- you know, it's either
8      Sunday the 23rd or Monday the 23rd.  It's
9      probably Monday the 24th since it's -- I
10     don't know if it's voice mail on his cell
11     phone or voice mail.
12 Q.  And then following -- this is following
13     the meeting you had Saturday night,
14     though.
15 A.  Yes.
16 Q.  Okay.  So --
17 A.  Well, let me see, yeah.
18 Q.  Okay.  And here you're referring to this
19     earlier conversation you had with --
20         MR. STOCKHAM:  Greg and --
21         THE WITNESS:  Greg and Rick.
22 Q.  (By Mr. Bostick)  Greg and Rick.  Tell me
23     what you told them about why you felt you

Page 261

1   were being treated differently because of
2   your medical condition.
3   A.  Specifically, when we make major
4   decisions, a sourcing decision or a
5   movement of personnel, it requires my
6   signature in a consensus form where you
7   have a signature block where it would go
8   from the author to their boss, to their
9   boss, to their boss, to the director, to
10  the vice president.  And depending on the
11  importance of it, it may go to the
12  president of the company and so forth.
13          So, even though I'm just at
14  a cardio rehab from 8:00 in the morning
15  until 9:30 in Montgomery, Alabama.  You
16  were never here; I heard those comments
17  many times.  I am never here from Choi
18  and Juan Young.  And that's why they said
19  they would avoid my signature and take
20  actions without even consulting me on
21  issues that were required -- that
22  required my signature.
23          For one example, we had a

Page 262

1   lady -- Yumi Chong -- who worked for us
2   in parts development.  She was an
3   assistant staff.  She was an excellent
4   worker, very intelligent.  I think she
5   had a master's degree.  Mark Lee treated
6   her like a waitress:  Get me coffee, get
7   me -- you know, she was a woman, so she
8   really wasn't -- this is my perception --
9   in his eyes -- in Korea, there are very
10  limited -- or I didn't see any women in a
11  professional manner there other than only
12  secretaries.
13          So she was doing well.  I
14  had conversations that, We need to make
15  her a buyer.  She already her degree,
16  which was a requirement.  When I was
17  gone, I wanted her to be in my group.
18  They pushed through a signature approval
19  to move her to a different area without
20  my agreement.  So I discussed that with
21  them.  You know they changed --
22  Q.  Who's "they"?
23  A.  Mr. Won Gee Yang, who is general manager

Page 263

1   of purchasing administration, and Mr.
2   Hyun, H.J. Hyun, who was my boss.  I
3   think his title at that point is senior
4   director of purchasing, parts
5   development.
6   Q.  And what was Yumi Chong?
7   A.  Yumi.  Yumi Chong.
8   Q.  Was she promoted as part of that move?
9   A.  Yes.  And that's what I wanted, but I
10  wanted her to go in a specific area where
11  she would have some leadership and
12  guidance.  You know, she was new to this
13  area.  We needed somebody who had strong
14  managerial capabilities.  And they just
15  tossed her is an area, you know, where I
16  didn't think it was appropriate.
17  Q.  Did you specifically mention that when
18  you talked to --
19  A.  Yes, I took the document with me.  Okay?
20  Q.  And -- and so your -- your thing with
21  that was that your signature should have
22  been on the document?
23  A.  Well, they're making decisions in my

Page 264

1   department about my employees without
2   even notifying me of it.  She was going
3   to go back to Korea.  They gave her the
4   job unbeknownst to me.  We already had a
5   going-away party for her.  And it's like,
6   Well, Yumi, you're still here.  Oh, yeah,
7   Mr. Hyun moved me.
8   Q.  And do you know when the move was for
9   her?
10  A.  The documents should be available.  You
11  know, that was within the last nine
12  months of my employment.
13  Q.  Were you --
14  A.  It mean, it was after my heart condition,
15  so that was in April, May.  So it was
16  probably the summer of 2005.
17  Q.  But I guess was the move done at a time
18  when you were out on FMLA leave, or were
19  you actively back at work?
20  A.  Both.  I mean, I'd come back to work, and
21  then I had medication reaction.  So --
22  Q.  But, I guess, was her promotion decision
23  made at a time when you were out on

Page 265

1    leave?
2  A.  I couldn't tell you.  I'd have to look at
3      Melanie McCormick's documentation.
4  Q.  Do you know what date --
5  A.  You know, most of it wasn't because it
6      was a complaint about the, Why do I have
7      to go to cardio rehab?  And Kimble was
8      complaining the same time that he had
9      hurt his knee and he needed to go to
10     rehab, and the Korean colleagues wouldn't
11     allow him to leave.
12 Q.  Well, you -- my question is that, you
13     know, a promotion is a discreet decision
14     that's made.  I'm just wondering, was
15     that discreet decision to promote
16     Ms. Chong done while you were actively at
17     work or not?
18 A.  I was -- I was in cardio rehab for, you
19     know, less than half of the first portion
20     of the morning.
21 Q.  Okay.  So you were not out still
22     recovering from surgery at that point is
23     your testimony.

Page 266

1  A.  No.  No, sir.
2  Q.  Why was she going to go back to Korea?
3  A.  Well, she wasn't happy, you know, getting
4      her master's degree and being very
5      talented and asked to be a secretary.
6          She -- you know, I had to
7      attend these meetings.  This is another
8      issue on different treatment.
9          I had to attend a meeting
10     from 5:30 to 7:30 or 8:00 p.m., 9:00,
11     o'clock every night.  It was a quality
12     audit vehicle review.  It was 100 percent
13     in Korean language, written and spoken.
14     So I had to go; Mr. Kalson had to go;
15     typically Susock was there; Chuck
16     Knowles, my supplier -- supplier
17     development manager.
18         And, you know, after a week
19     or two, I went back to Min Ho Lee.  I
20     said, Mr. Lee, these meetings aren't in
21     English at all, nothing written, nothing
22     spoken.  You know, can I get a
23     translator?

Page 267

1          That's when, you know, he
2      wouldn't get us a translator, but he
3      would send Yumi Chong there.  So she
4      didn't -- she wasn't hired to be a
5      translator.  She didn't get her master's
6      degree to be a translator.  So she, out
7      of the kindness of her heart, did these
8      meetings for, I'd say, a month or so.
9      And then she says, You know, I have a
10     life.  I want to get out of here and, you
11     know, enjoy whatever she wants to enjoy.
12         So I went back to Mr. Lee.
13     He would assign other individuals to go,
14     other Korean colleagues in my department.
15     They'd be very resentful.  They wanted to
16     go to the meetings, but they didn't want
17     to translate.  So us Americans are
18     standing around for hours on end without
19     one word in English.
20         So when I come back to Mark
21     Lee again, he said to me repeatedly, If
22     you do not go to these meetings, I cannot
23     guarantee your neck.  So he's saying

Page 268

1      unless you go to these meetings, even
2      though he agrees there is probably no
3      benefit to them, then, you know, you will
4      lose your job.
5          So -- and when we went to
6      these meetings, the three top guys --
7      Mr. Mon He Lee, who was the COO before
8      H.I. Kim -- they would push a chair up to
9      him, so he sat during until the entire
10     three-hour daily meeting.  And if Y.S.
11     Kim was there -- the top three Koreans
12     were all pushed up a chair like they were
13     royalty while everybody else stood around
14     for three hours and we listened to
15     Korean.  And so that was very
16     enlightening.
17 Q.  Is -- is that something you raised with
18     Rick and Greg?
19 A.  Oh, yeah.
20 Q.  Okay.
21 A.  I talked to them.  I talked to Duckworth
22     about it.
23 Q.  My question is trying to finish out what

Page 269

1    did you tell Kimble and Rick in this
2    meeting?
3  **A.**  The meeting that I had was to talk about
4    the signature and going around my back to
5    make decisions.
6  **Q.**  Okay.
7  **A.**  Not that issue. I'm sorry if I strayed
8    there.
9  **Q.**  That's all right. So you -- so you
10    mentioned -- well, it sounds like the --
11    with that that you were saying you felt
12    like you --
13  **A.**  Well, Yumi -- I'm sorry. That's how we
14    connected there. I mean, she was --
15  **Q.**  That was about a signature?
16  **A.**  She had had it. You know, she wasn't
17    moving up in the company. She was going
18    above and beyond. She was an excellent
19    employee. Then all of a sudden she's
20    leaving and going back to Korea.
21        And then I come back to
22    work, and she's still there. And we had
23    a going-away party and, you know, Mr.

Page 270

1    Hyun and Mr. Young did all that without
2    telling me, advising me. It's very, you
3    know, awkward.
4  **Q.**  Okay. So have you told me fully what you
5    told Mr. -- excuse me -- Kimble and
6    Mr. Neal during this meeting?
7  **A.**  That I was being treated distinctly
8    different after --
9  **Q.**  Coming back from your heart procedure.
10  **A.**  Yes, sir.
11  **Q.**  Okay. Was there any response taken with
12    regard to the signature issue after
13    that?
14  **A.**  None that I could tell.
15  **Q.**  Okay. What was -- what was the response
16    in the meeting?
17  **A.**  They -- they listened, you know,
18    concerningly.
19  **Q.**  And you'd always gotten along with
20    Mr. Kimble and Mr. Neal prior to that
21    time.
22  **A.**  Oh, absolutely.
23  **Q.**  Okay. Look on Page 32. I guess, did you

Page 271

1    have any other meetings other -- other
2    than the one we just talked about with
3    Mr. Neal or Mr. Kimble?
4  **A.**  You know, I can go back through my
5    calendar and see if there's ever a
6    meeting I had with them. I mean, I can't
7    tell you exclusively I never spoke to
8    them ever again.
9  **Q.**  I'm talking about where you had a
10    specific complaint of, I'm being treated
11    differently since I've gotten back from
12    my --
13  **A.**  Regarding the heart situation?
14  **Q.**  Right.
15  **A.**  No, I don't believe there was a set
16    --another meeting.
17  **Q.**  I mean, any other specific meetings where
18    you can recall going back and saying, I'm
19    being treated differently because I'm an
20    American?
21  **A.**  Now, that's a different issue. We had
22    those discussions. You know, Rick and I
23    and Greg Kimble, and Kalson was supposed

Page 272

1    to attend, but he dodged out of the
2    meeting. But we put together a list of
3    concerns with the company and things that
4    we needed to level up to be a real
5    automotive company. So we had numerous
6    meetings throughout my tenure. Rick was
7    in the meeting. Greg was in the meeting.
8    John promised to come, but John's a very
9    snaky individual in my personal
10    opinion.
11        MR. LEE: He didn't mark the last
12        one.
13        MR. BOSTICK: What's my --
14        MR. STOCKHAM: 16 is the last one,
15        so --
16        MR. BOSTICK: 17.
17        MR. STOCKHAM: -- 17 would be the
18        next one. You did not mark
19        that --
20        MR. BOSTICK: I didn't mark that
21        document.
22        MR. STOCKHAM: Tape 1.
23        (The referred-to document was

Page 273

```
 1              marked for identification as
 2          Defendants' Exhibit No. 17)
 3   Q.  (By Mr. Bostick) Is that the document you
 4       are referring to?
 5   A.  No.  Huh-huh.
 6              Let me look at this.  I
 7       don't even know if I've even seen it.
 8       Control issues are creating an
 9       us-and-them environment.
10              MR. STOCKHAM:  Do you have one for
11          me?
12   Q.  (By Mr. Bostick)  Oh, I'm sorry.
13   A.  I have no idea who generated this, but
14       not me.
15   Q.  So, I guess I'd like to distinguish
16       between -- there's a difference between
17       you going to Mr. Kimble or Mr. Neal about
18       a specific incident related to your
19       situation.  You know, you went --
20   A.  My heart situation?
21   Q.  Right.  You went to them and said, I am
22       being treated differently, I feel,
23       because of my heart situation.
```

Page 274

```
 1   A.  Right.  That's one distinct issue.
 2   Q.  Now, I understand that there were
 3       meetings you had where y'all are talking
 4       about collective issues there at the
 5       plant.
 6   A.  Yes.
 7   Q.  These type things.
 8   A.  That's correct.
 9   Q.  I mean, my question is:  Do you recall
10       specific meetings that you had with
11       Mr. Neal or Mr. Kimble other than the one
12       we talked about when you went and
13       addressed a specific issue --
14   A.  Yes.
15   Q.  -- relating to you.
16   A.  Yes.  I'm sorry to cut you off there.
17   Q.  Okay.  You do recall other meetings.
18   A.  Um-hum.
19   Q.  Tell me about them.
20   A.  Well, the meeting that's -- it's
21       handwritten from a Panaboard to a copy
22       board.  And I started out taking the
23       notes.  It's my handwriting, but it's not
```

Page 275

```
 1       all of my opinions.  And then, at the
 2       end, either Greg wrote the end of it.
 3       It's one of the documents we provided to
 4       you.  And there's a list probably -- it's
 5       three columns -- probably a list of 40
 6       things that are concerns.
 7              This was early on when we
 8       were kind of astonished at the Hyundai
 9       style, and, Wow, you know, what have we
10       gotten ourselves into?
11   Q.  I mean, what was the nature of this
12       meeting?
13   A.  Improvement.  You know, what we needed to
14       improve.  You know, Greg Kimble's the one
15       that called this meeting, initiated this
16       meeting, and I think he felt handcuffed.
17       He wasn't able to conduct his business.
18       His people certainly didn't listen to him
19       or give him any authority.  His
20       manager -- he's a director -- scoffed
21       him.  They did whatever the heck they
22       wanted, whenever they wanted.
23   Q.  I guess my question is:  Was there an
```

Page 276

```
 1       incident -- we'll talk about this meeting
 2       later -- a specific meeting where you
 3       went to Kimble or Neal, other than the
 4       one incident upon your return, where you
 5       said, I have a particular issue I need
 6       addressed with how I'm being treated
 7       personally.
 8   A.  Not other than the Murakami meetings
 9       we've talked about in excruciating
10       detail.
11   Q.  Okay.  And then the -- the earlier
12       meeting about, Am I being treated
13       differently since I have had my heart
14       surgery; right?
15   A.  That's -- that meeting occurred.
16   Q.  That's an issue:  I am being treated
17       differently because of my heart.
18   A.  Yes.
19   Q.  Over here, you got:  I feel like I'm
20       being treated unfairly as a result of
21       this Murakami meeting.
22   A.  Right.
23   Q.  Other than that, is there any other
```

Page 277

1    meetings with Kimble or Neal or
2    Duckworth -- both of them -- where you
3    said I've got to --
4  A.  Let's keep that separate.
5  Q.  Okay.
6  A.  Not -- I'm sorry.  I cut you off.
7  Q.  -- where you're going and saying -- I
8    mean, that we've talked about already
9    where you're saying to Kimble and Neal or
10    Duckworth, I am being treated
11    differently.
12  A.  Well, we're changing it here.  You said
13    Kimble and Neal, and now we are doing
14    Kimble, Neal and Duckworth.
15  Q.  Okay.  We can take --
16  A.  The Duckworth one -- I am trying to
17    cooperate here.
18  Q.  Okay.  Let's talk -- okay, this is
19    different:  Mr. Kimble -- have you told
20    me every conversation you had with
21    Mr. Kimble where you went to him and
22    said, I feel like I'm being personally
23    treated differently.

Page 278

1  A.  The ones I told you about; that's it.
2  Q.  Okay.
3  A.  Now, we may have had conversations about
4    problems with the company 50 different
5    times.
6  Q.  Right.  Okay.  Now, but you had a
7    conversation with him when you returned
8    from your stent surgery.
9  A.  Yes.
10  Q.  We've got that one.  And we've seen some
11    phone conversations you had with him.
12  A.  Right.
13  Q.  Other than that, you're not aware of any
14    other specific --
15  A.  Where I went for a specific Rob Cyrus
16    concern?
17  Q.  Right.
18  A.  About treated differently?
19  Q.  Right.
20  A.  No.
21  Q.  Okay.
22  A.  It did not occur at the time.  Didn't
23    happen.

Page 279

1  Q.  Rick Neal:  You had with meeting with he
2    and Mr. --
3  A.  Kimble.
4  Q.  -- Kimble -
5  A.  Yes.
6  Q.  -- after you returned from stent surgery.
7  A.  This is -- right.  During the rehab
8    period, yes.
9  Q.  Right.  You had a voice mail -- I didn't
10    see from the tapes where you had -- ever
11    had a conversation with him after the
12    Murakami meeting; is that right?
13  A.  With -- with Rick?
14  Q.  With Rick Neal.
15  A.  No, I called him, but I don't think I was
16    able to reach him.  I did talk to Rick
17    one time about I had to get salary
18    information on my last salary for a
19    prospective employer, because I didn't
20    want to tell them an incorrect last
21    salary.  And he was nice enough to call
22    payroll, and he called me back.  He
23    didn't want me talking to anybody else at

Page 280

1    Hyundai but himself.
2  Q.  But other than a complaint to him about
3    your personal situation, other than the
4    meeting after you returned from surgery,
5    that's it?
6  A.  That's it.  Sorry.
7  Q.  Okay.  And then with Mr. Duckworth, you
8    talked about the general meeting when he
9    arrives at the plant.  There's the
10    follow-up meeting when the attorney
11    arrives.  And then you have the meetings
12    with him immediately following the
13    Murakami meeting.
14  A.  Um-hum.
15  Q.  And then, I guess, the later -- the
16    dinner meeting?
17  A.  And then we had a meeting about not
18    coming to fruition the commitments from
19    Ted Chung and from Keith Duckworth about
20    me being promoted to vice president
21    within two years after Mark Lee leaves.
22    There was an extensive -- numerous
23    discussions about that -- correspondence

Page 281

1    and actual meetings.
2  Q.  Okay.
3  A.  And there's actually discussions with
4    Keith about --
5        MR. STOCKHAM:  We can talk about
6        that tomorrow.
7        THE WITNESS:  I mean I --
8  Q.  (By Mr. Bostick) But -- and we'll discuss
9    those.
10 A.  I'm not saying that's the last -- I
11   apologize.  I'm not saying that's the
12   only time I ever talked to Keith is what
13   I'm trying to get across.
14 Q.  I'm talking about the particular
15   complaints, other than -- you know, I
16   guess, other than, Hey, I think I should
17   have gotten a vice president promotion.
18   Were there any --
19 A.  No, it wasn't, Hey, I think I should
20   have.  It was in writing, and that was
21   part of the inducement to get me away
22   from Mercedes Benz.
23 Q.  Right.  Other than discussions over that

Page 282

1    issue --
2  A.  We had other discussion besides that
3    also.
4        MR. STOCKHAM:  Yeah, what he's
5        asking you is, were there any
6        complaints you had about the
7        way you were treated as
8        opposed to the Koreans with
9        Mr. Duckworth.
10       THE WITNESS:  I remember one
11       specific conversation in the
12       stairway down to the lower
13       level lobby, and we were
14       talking about -- I don't
15       remember what we were talking
16       about.  We were talking about
17       some Korean colleague
18       behavior.
19       And I was surprised because he
20       said to me, Well, Rob, you
21       can't make a cat a dog,
22       meaning, the Korean
23       colleagues will do their

Page 283

1    business in this nature.  In
2    Korea you can't make a cat a
3    dog.  You cannot -- they were
4    not going to effectively
5    adapt to American business
6    practices.
7        And I was shocked at that comment.
8    I mean, that's like giving
9    up.  And when we know that
10   things aren't done
11   appropriately in America --
12   it may work in Korea, but it
13   doesn't work here, that his
14   comment was, Well, you can't
15   make a cat a dog.
16 Q.  (By Mr. Bostick) Was -- do you recall
17   what the specific --
18 A.  I'm sorry, I don't.
19 Q.  -- comment was?
20 A.  I just remember that comment.  It's like,
21   Whoa.
22 Q.  Other than that, do you remember a
23   specif- -- any other specific

Page 284

1    conversations with Mr. Duckworth about
2    your individual treatment as compared to
3    your Korean co-workers?
4  A.  I can't recall any at this time.
5  Q.  Okay.  Did you ever make any complaints
6    to Mr. H.I. Kim about the way you were
7    treated during the time you were there?
8  A.  No.
9  Q.  Did you ever make any complaints to Mr.
10   Ahn, other than the letter you wrote in
11   early November, about the way you were
12   treated?
13 A.  No.
14 Q.  Did Mr. -- in -- in looking on Page 32 of
15   the Transcript 1 that we were looking at
16   earlier, it says, But I -- this looks
17   like you are talking H.J. --
18 A.  32?
19 Q.  Yeah.
20 A.  It goes up to -- Okay.
21 Q.  It says -- look at the paragraph: But I
22   needed to speak with you.  I'm hearing
23   rumors about me getting terminated for

Page 285

1    missing work on a heart-related issue.
2  **A.** Um-hum.
3  **Q.** Who --
4  **A.** Let me look.
5  **Q.** Yeah, sure.
6  **A.** Let me, please, understand the
7    conversation here.
8         All right. I'm sorry. What
9    was your question?
10 **Q.** Yeah, my question is: Had you heard a
11   rumor that you were being terminated for
12   a heart-related --
13 **A.** No.
14 **Q.** -- condition prior to that time?
15 **A.** No.
16 **Q.** Why did you make that statement, or do
17   you --
18 **A.** Well, I mean, I was -- I didn't -- didn't
19   know why anything had happened that
20   happened with --
21 **Q.** Did you leave this voice mail at a point
22   in time after you had your dinner with
23   Mr. Duckworth?

Page 286

1  **A.** Yes.
2  **Q.** Okay. Mr. Duckworth had said the concern
3    was over your attitude; right?
4  **A.** He never mentioned the word "attitude"
5    ever. He only said, Rob, the executive
6    management at Hyundai is unhappy with
7    you, and they would like you to resign.
8    That's why it was so strange and surreal.
9    What? Never was a mention of the word
10   anything other than that.
11        If Keith had had an attitude
12   problem with me, he wouldn't say, Rob,
13   it's not me.
14 **Q.** Let's look on Page 39. There's this
15   reference where you say, you know, I've
16   cover their butts.
17       MR. STOCKHAM: Yes. This is 32.
18       MR. BOSTICK: Yeah, I just put in
19         excerpts of this instead of
20         the full thing.
21       MR. STOCKHAM: The last page you
22         got was 32. Oh, did you just
23         put it in?

Page 287

1       MR. BOSTICK: I just went over to
2         the next one.
3       MR. STOCKHAM: Okay.
4       MR. BOSTICK: Sorry.
5       MR. STOCKHAM: 39, you say?
6       MR. BOSTICK: Yeah, 39.
7  **Q.** (By Mr. Bostick) Do you see that
8    statement at the top saying, I am a
9    stellar employee. It says, You know, I
10   covered their butts a thousand times.
11        I mean, who -- we see you
12   kind of go through a listing a little
13   bit. What specifically were you
14   referring to there in talking about
15   covering people's butts?
16 **A.** Let's see. I got us to launch the plan
17   on time by recovering -- our bumper
18   supplier was pushed on us by Mr. Lee. I
19   indicated to him in writing, and verbally
20   many times, this -- this supplier you are
21   forcing us to use is rumored to be in
22   financial straights and will be filing
23   bankruptcy. He made us use them anyway.

Page 288

1    They did file bankruptcy. They could not
2    secure financing. They could not
3    complete the contract.
4         Rick and I had numerous,
5    numerous meetings with their executive
6    management. We went to court up in
7    Detroit. We finally rescued them by
8    bringing on another supplier by very
9    creative means by using the bankrupt
10   supplier's equipment suppliers to -- if
11   we hadn't done this, the plant wouldn't
12   have launched. That's one -- one of the
13   issues I was referring to.
14        Other ones could be, when
15   they wrecked their cars and called their
16   wives to come pick them up because they
17   were drunk and left the scene of an
18   accident. You know, I didn't really
19   cover their butts that way, but, I mean,
20   that kind of -- that's not a good
21   example.
22 **Q.** Well, let me -- look on Page 50. I'm
23   curious about --

Page 289

1   A.  Page what?
2   Q.  -- what you actually did.
3   A.  50?
4   Q.  Yeah. -- what you did in regard to this
5       car wreck.
6   A.  50?
7   Q.  Yeah.
8   A.  Which car wreck?  The one last month?
9   Q.  Page 50, you say -- this is the
10      conversation with your mother.
11  A.  Uh-huh.
12  Q.  Midway saying, Because, you know, I have
13      done a great service.
14  A.  I need to find out where you're at.
15      Okay.
16  Q.  Because I've done a great service, and
17      this is what they do to me.  And you say,
18      I've gotten their children in school.
19          Let's start with that first.
20      Who have you gotten in school?
21  A.  Mr. Park failed to apply for school for
22      his children in the appropriate time.  So
23      I got with Jean Charbonneau, who was on

Page 290

1       loan from us from the state, to see if we
2       could get his children into school.  I
3       think it was a magnet school or one of
4       the schools.
5   A.  So, you know, I spent hours with the
6       school, with Jean Charbonneau, going
7       above and beyond my purchasing
8       requirements to try to help out my Korean
9       colleagues.  Because if I was in Korea, I
10      would need help that -- I mean, I'm just
11      trying to do the right thing and help
12      them out where they need help.
13          I had their gas turned on.
14      I had -- you know, numerous countless
15      things.
16  Q.  What did you do in regard to this car
17      wreck?
18  A.  Let's see.  Actually, I didn't -- you
19      know, the car wreck, there's one with a
20      Mr. Greg Lee where he left our second
21      office, which was the Halcyon office.
22      He -- oh, this is about Won Ghee Yang.
23      No, that's not it.  There's so many

Page 291

1       different wrecks.
2           He went to dinner.  This is
3       according to him.  He got drunk, came
4       back to work, drove his car out of the
5       parking lot and ran over a telephone
6       pole, knocked it down.  He calls his
7       wife.  He drives ov- -- no, let's see.
8       He calls his wife.  She walked over.  I'd
9       say it was a mile or two, at least.
10          When the police got there --
11      all -- their newborn baby, his wife and
12      Greg were standing there.  And he said,
13      She wrecked the car, because he was
14      drunk.  So I didn't really help out
15      anything.  I just listened.  The State
16      Police came the next day, and Rick was in
17      the meeting.  I mean, really I didn't
18      aid -- do anything really.
19  Q.  Okay.
20  A.  Let's see.  I got -- go ahead.
21  Q.  You didn't drive the car from one spot to
22      another?
23  A.  Me?  I wasn't even --

Page 292

1   Q.  I mean, you seem to be bragging about
2       some great service you've done.  Is this
3       just hyperbole here?
4   A.  This is -- that's -- I didn't do anything
5       with driving the car or anything.
6   Q.  So you're -- you're taking claims for
7       things you didn't do to your mother in
8       the conversation.  Is that what's going
9       on here?
10  A.  Yeah.  It sounds like it, yeah.
11  Q.  Okay.  So your Mom says, Well, it's just
12      that one probably nasty son of a bitch
13      who wants to get rid of you, the one you
14      had the words with, isn't it?
15          And your response is, Yeah,
16      the one that lied to me and admitted he
17      lied to me.  And I said yesterday you
18      told me X, Y, Z.  He goes, I changed my
19      mind.
20  A.  Oh, that was --
21  Q.  Can you tell me who this is referring
22      to?
23  A.  Yeah, it's Mr. Hyun.

Page 293

1  **Q.**  What had he said to you that he then
2      changed?
3  **A.**  He -- this was in regards to the stand-up
4      meeting on the concrete for three hours
5      every night, Monday through Friday. He
6      told me that Mr. Simon -- San Shin Young
7      was his name, He would go to the
8      meetings, and he would report back to me
9      because they were not in English.
10         So I went to Song and said,
11     I need the meeting minutes from
12     yesterday's meeting; and he said, I am
13     not your translator. I am not your
14     secretary. So I went back to Hyun, and
15     Hyun just bold-faced lied to me and said
16     that he told Song to do it. And then when
17     I talked to Song, he said, He never told
18     me to do that.
19         And then H.J. said, Yeah,
20     yeah. I lied to you. So that was our --
21     our leader in the department now.
22  **Q.**  Well, she -- she says down here, They're
23     just ruthless. There's no rules. And

Page 294

1      then she says, And you've known that all
2      along, and you've wanted out. But then I
3      guess the tape breaks off. I mean, had
4      you told your mother prior to this time
5      that all this stuff happened with
6      Murakami that you wanted to get out of
7      there?
8  **A.**  It's not -- you know, get out of there
9      would be -- you know, not only the
10     Murakami situation, but all of the things
11     that were promised that didn't come to
12     fruition. The two different teams.
13         You know, mainly everything
14     that was promised: This is going to be
15     just like any other American company.
16     This is going -- your future is X, Y, Z,
17     in writing, and nothing comes to
18     fruition.
19  **Q.**  I guess, prior to the Murakami incident,
20     were you displeased enough with your work
21     there at HMMA where you had started to
22     look for work elsewhere?
23  **A.**  No, I never did, no.

Page 295

1  **Q.**  Were you displeased with your working
2      environment there?
3  **A.**  At Hyundai?
4  **Q.**  Yeah.
5  **A.**  I was disappointed.
6  **Q.**  I mean, were you having thoughts of --
7  **A.**  Everybody was disappointed there.
8  **Q.**  I mean, were you -- were you looking at
9      the possibility of -- of getting another
10     job?
11  **A.**  No. I've never left a job without having
12     a job. That's not very intelligent.
13  **Q.**  Look at 56 through 57. This is a
14     conversation with Ms. White, I believe,
15     at Thomas, Means & Gillis firm.
16  **A.**  Um-hum.
17  **Q.**  I'm looking at the very bottom of 56. It
18     says, And this past Saturday, the
19     executive vice president, or he's the No.
20     2 in command out at Hyundai -- I assume
21     that's Duckworth?
22  **A.**  Well, let's go on. Okay.
23  **Q.**  -- calls me to dinner and he says he

Page 296

1      wants to check on my health and how I'm
2      doing. And in the last ten minutes of
3      the conversation, he said, Well, Rob, the
4      executive management at Hyundai is
5      uncomfortable with your attitude, and we
6      would like to ask you to resign.
7          Does that refresh your
8      recollection that he did tell you in that
9      meeting at dinner that the management was
10     unhappy with your attitude?
11  **A.**  No. That's a misspeak on my behalf at
12     that point.
13  **Q.**  Okay. So this is just your words
14     being -- you just misspoke?
15  **A.**  Yes. I mean, in content -- like I said
16     the third time now, he said, The
17     executive management at Hyundai is
18     unhappy with you, and they would like you
19     to resign.
20  **Q.**  But your testimony is, as you sit here
21     today, he never said anything about your
22     attitude; correct?
23  **A.**  Absolutely not. Why would he say, Rob,

Page 297

1    it's not me, if he had any ability to
2    change anything, or if I had an attitude
3    issue that he could affect.
4  Q.  What -- what kind of device were you
5    using to record these conversations?
6  A.  Device?  A tape recorder?  What do you
7    mean?
8  Q.  I mean, was it just a typical tape
9    recorder or something that you had hooked
10    into the phone?
11  A.  It's from Wal-Mart or Radio Shack.  I
12    think I got it at Radio Shack.
13  Q.  Is it -- what type of size tape does it
14    use?
15  A.  It uses a standard tape, and there's one
16    that uses a little tape.
17  Q.  It's Tape 3 we'll look at next.  Do you
18    recall calling BellSouth on November 2nd
19    and asking somebody if there had been
20    tampering with your --
21  A.  I do.
22  Q.  What was that about?
23  A.  Well, I walked down beside my house when

Page 298

1    I cut my grass, and there's a utility box
2    out there which typically has a wire tie
3    on it.  And it was gone, and the box was
4    ajar.  So I called them and said, Have
5    you guys been out here?  And they said,
6    No.  I said, Well, that's unusual.  And
7    that's it.
8  Q.  Anything else you did, I mean, other than
9    that?
10  A.  What's that mean?
11  Q.  I mean, did you ever have any suspicions
12    that someone from Hyundai was
13    tampering?
14  A.  I have no idea.  I didn't know who would
15    be in the utility box.
16  Q.  Look for me -- I want to ask you about a
17    comment up at the top of Page 16.  I
18    think this is an extended discussion
19    between you and Mr. Kimble.
20  A.  Um-hum.
21  Q.  There was a comment on there that says --
22    it looks like on the top of 16 you are
23    referring to a conversation you had with

Page 299

1    Duckworth.  When you say --
2  A.  Well, let me -- let me --
3  Q.  Read as much as you need to.
4  A.  Thank you.
5        Okay.  What's your question,
6    please?
7  Q.  My question is:  At top of Page 16, it
8    looks like you're talking about a
9    question with Duckworth.  And you say --
10  A.  It's a conversation with Kimble.
11  Q.  The conversation is with Kimble --
12  A.  Yes.
13  Q.  -- and you're talking about a prior
14    conversation you had with Duckworth, I
15    believe.
16  A.  Yes.
17  Q.  And you say, And I said, Well, I don't
18    know -- I'm sorry.  Well, I don't want to
19    be, you know, blacklisted because I'm
20    trying to take, you know, a fair position
21    on an issue for chargeback in excess of
22    $100,000.
23        Did you tell Mr. Kimble

Page 300

1    that?
2  A.  Yes.
3  Q.  What was the position you were taking on
4    chargebacks?
5  A.  That's the scratch issue, the buff issue,
6    the bag issue on the Murakami meeting to
7    take a fair position on an issue for
8    chargeback.  Chargeback is downtime.
9    Downtime is on the agenda.
10  Q.  So did you take a position --
11  A.  A fair position.
12  Q.  -- on that issue, or did you remain
13    neutral?
14  A.  No, I took a fair position as indicated
15    on here.
16  Q.  Okay.  What was your -- who -- who
17    determined it was a fair position?  Was
18    that you -- is that you stating your
19    opinion?
20  A.  You know, I've done this for 20 years.  I
21    have an excellent reputation.  I'm
22    featured in magazines of what happened to
23    the superstars at Toyota.  You know, I

Page 301

1    didn't get to where I am by making poor
2    decisions. So, in my opinion, the
3    position was based on purely factual,
4    non-emotional issues, period.
5  Q.  Okay. So -- so are you revising your
6    testimony now that you remained neutral
7    during the meeting?
8  A.  No, it's the same thing.
9  Q.  Okay. You took a neutral, but fair,
10   position --
11 A.  Neutral and fair.
12 Q.  -- based on your experience in the
13   industry. Is that your testimony?
14 A.  Yes.
15 Q.  Okay.
16      THE VIDEOGRAPHER: We've got six
17   minutes left on this tape.
18 Q.  (By Mr. Bostick) Do -- this is -- I am
19   looking on Page 11. Do you know -- and
20   we can get the full transcript out. Can
21   you tell who this conversation is you're
22   having with?
23 A.  One second, please.

Page 302

1      I can't tell, based on the
2    middle of Page 11.
3  Q.  Okay. Let's see if I can get a full copy
4    of the transcript.
5  A.  It's with Dave Mark.
6  Q.  What is his -- was he an HMMA employee --
7  A.  Yes.
8  Q.  -- or is he still?
9  A.  He is.
10 Q.  What -- what area was he working in?
11 A.  He worked for me as a manager of parts
12   development of purchasing.
13 Q.  Look on Page 11.
14 A.  Uh-huh.
15 Q.  It says inaudible. But it's halfway down
16   the page. Dave was saying, If he's in on
17   it -- I think it's talking about H.J.
18 A.  Uh-huh.
19 Q.  -- you know that Choi is in on it,
20   because he wouldn't make a -- do you know
21   what he said there?
22 A.  No.
23 Q.  But it says you say, Choi works for me.

Page 303

1  A.  Um-hum.
2  Q.  Was that your response?
3  A.  Um-hum.
4  Q.  Did Choi work for you?
5  A.  He was the same level as a director,
6    because he was a director in Korea. But
7    as far as handling parts development,
8    that was my responsibility as indicated
9    by Mr. Hyun and Mr. Mark Lee, Min Ho Lee.
10   Because I remember when he started, the
11   comment from Mark Lee and Mr. Hyun and
12   Mr. Choi were, Don't worry. I will not
13   get in your way. That's what Choi said
14   to me.
15 Q.  So, but according to this statement,
16   you're saying he worked for you; correct?
17   He was subordinate to you.
18 A.  I -- I'm in charge of parts development,
19   not Mr. Choi.
20 Q.  Okay. So he was your subordinate;
21   correct?
22 A.  Well, not really. No, he's my equal and
23   peer. He's a director of purchasing.

Page 304

1  Q.  So why did you say, He works for me?
2  A.  Because, like on these signature blocks
3    for approvals, he has to sign it; then I
4    have to sign it; then the VP has to sign
5    it; then the president has to sign it.
6  Q.  So is it your testimony that any equal at
7    Hyundai works for you?
8  A.  No. H's in parts development.
9  Q.  What did you mean by "works for me"?
10 A.  I just told you.
11 Q.  But you -- you don't claim that he's your
12   subordinate now.
13 A.  I -- I ex--- I just explained that to
14   you. Did you want me to say it again?
15 Q.  Yeah. I didn't -- if that's your full
16   answer on that --
17 A.  Okay.
18 Q.  -- that's fine.
19      Look on Page 12.
20 A.  Um-hum.
21 Q.  I'm looking at, You know, H.I. Kim --
22   starting that paragraph.
23 A.  Uh-huh.

Page 305

1  Q.  You say, He's a prima donna.
2        Are you referring to H.I.
3     Kim there?
4  A.  Um-hum.
5  Q.  He's not used to being questioned, even
6     though he tried to charge a supplier, a
7     Japanese supplier, back in excess of
8     $100,000.
9  A.  Um-hum.
10 Q.  Is that true?
11 A.  Um-hum.
12 Q.  My question is:  What did you do to
13    question Mr. Kim?
14 A.  What do you mean what did I do to
15    question Mr. Kim?
16 Q.  You say, He's not used to being
17    questioned.  Did you do something to
18    question his --
19 A.  Not questioned.  He's questioned with the
20    facts.  H's not questioned.  Murakami
21    questioned him.
22 Q.  And it was on the addenda, and he
23    wouldn't address it.  We were simply

Page 306

1     trying to -- and you say, they didn't
2     want to come down.  It was after a
3     hurricane.
4  A.  Uh-huh.
5  Q.  So your testimony is you didn't do
6     anything to question Mr. Kim during the
7     meeting?
8  A.  No, I did not confront Mr. Kim during the
9     meeting.  Choi and I had discussions
10    about all other points --
11 Q.  Okay.  Look on --
12 A.  -- but not directly to Mr. Kim.
13 Q.  Look at Page 13 at the bottom.
14 A.  Absolutely not.
15       Uh-huh.
16 Q.  Did you tell this state person that you
17    felt part of the reason you were being
18    discriminated against was because you
19    were of Iranian descent?
20 A.  I did.
21 Q.  How -- just tell me if this -- It says,
22    Disability is the big thing, you know.
23       I guess that's referring to

Page 307

1     returning from your heart condition.
2  A.  It says that; doesn't it?
3  Q.  You are over 40.  How old are you?
4  A.  45.
5  Q.  What's your date of birth?
6  A.  January 4th, '62.
7  Q.  My descent is Iranian?
8  A.  Um-hum.
9  Q.  You say your family has been in the
10    United States for 150 years with
11    impeccable reputations.
12       Is that true?
13 A.  Yes.
14 Q.  Did you, in any of the documents you
15    completed at HMMA, ever identify yourself
16    as being of Iranian descent?
17 A.  No.
18 Q.  I mean, did you --
19 A.  But Mark Lee asked me what my name meant.
20    And individuals in Korea always ask you,
21    What does your name mean.
22 Q.  Did you --
23 A.  Not at other companies.

Page 308

1  Q.  Did you --
2  A.  Not at regular American companies.
3  Q.  Did you have any conversations with Mr.
4     Ahn or Mr. Cyrus -- I'm sorry.  Mr. Ahn.
5     It's a long day -- Mr. Ahn or H.I. Kim
6     where you discuss your Iranian descent?
7  A.  No.
8  Q.  Any conversations with J.Y. Choi?
9  A.  I don't believe so.
10 Q.  Okay.
11 A.  About that, no.
12       THE VIDEOGRAPHER:  You have about
13    a minute left.
14       MR. BOSTICK:  Okay.  Let's go
15    ahead and switch out tapes.
16    I think we're getting pretty
17    close.
18       THE VIDEOGRAPHER:  Okay.  This is
19    the end of Tape No. 5 in the
20    deposition of Robert Cyrus to
21    be continued on Tape No. 6.
22    We're going off the record at
23    4:51 p.m.

Page 309

```
 1            (Short recess)
 2        THE VIDEOGRAPHER:  This is the
 3        beginning of Tape No. 6 in
 4        the deposition of Robert
 5        Cyrus.  We're on the record
 6        at 4:56 p.m.
 7        THE WITNESS:  May I -- May I go
 8        back to one additional
 9        comment --
10  Q.  (By Mr. Bostick)  Sure.
11  A.  -- based on the last -- I want to say
12      Page 11 -- about that Iranian comment?
13  Q.  Um-hum.
14  A.  When we were doing -- I was doing initial
15      hiring of staff in the department, we
16      received resumes from human resources.
17            And Greg Kimble came over
18      one day and, you know, he was looking at
19      the resumes.  And there was a gentleman
20      there who had a name Mohammad or
21      something like that.  And he said to me,
22      he goes, We don't want to hire any Arabs.
23      And that was striking to me.  It's like,
```

Page 310

```
 1      Uh, okay.
 2            So when you -- the
 3      sensitivity to the Iranian thing is --
 4      you know, that's part of it also.  I
 5      thought that was a very unusual comment.
 6      I didn't say anything.  But I was like,
 7      All right.
 8  Q.  Did you tell Greg Kimble that you were of
 9      Iranian descent?
10  A.  No.
11  Q.  Do you know if he ever knew that?
12  A.  No.  I doubt he did since he made that
13      comment.
14  Q.  Did Mr. Duckworth ever know you were of
15      Iranian descent?
16  A.  No.  I have no idea.
17  Q.  Look on Page 21 for me.
18  A.  Tape 4?
19  Q.  Yes.  If you need to look in context by
20      looking at Tape 4, I'm just looking
21      at the -- I'm just looking at the -- it
22      looks like a relay of your conversation
23      with Mr. Duckworth again.
```

Page 311

```
 1  A.  Is this the same speaker?  Dave or --
 2  Q.  This may be with Kimble.
 3  A.  It says, Unidentified speaker.
 4  Q.  Or it may be part of that same.
 5  A.  Okay.  I think this is Dave Mark.
 6  Q.  Okay.  I'm just -- about a third of the
 7      way down, there's a statement, You know,
 8      the executive management is unhappy with
 9      my attitude.
10  A.  Where's that?
11  Q.  On Page 21.
12  A.  I'm sorry.
13        MR. LEE:  Line 5.
14        THE WITNESS:  Okay.
15  Q.  (By Mr. Bostick) Are you telling him what
16      Duckworth told you during the meeting
17      then?
18  A.  Yes.
19  Q.  Okay.  Does that refresh your
20      recollection that Mr. Duckworth did tell
21      you that there was a concern with your
22      attitude?
23  A.  I don't honestly remember saying attitude
```

Page 312

```
 1      or hearing attitude.  But that's on the
 2      tape; I agree with you.
 3  Q.  Well, that's two instances now that were
 4      a lot more closer in time --
 5  A.  You're right.
 6  Q.  -- to these events.
 7            So, I guess, are you saying,
 8      No, it didn't happen; or you don't
 9      recollect it, and it could have
10      happened?
11  A.  I don't recollect it, and it could have
12      happened, but --
13  Q.  You certainly mentioned it twice back at
14      the time as it having happened.
15            Look back at Tape 3, and
16      we'll be done with the transcripts.
17  A.  Okay.
18  Q.  Look on Page 20.
19  A.  Okay.
20  Q.  This is you and Kimble talking.
21  A.  Um-hum.
22  Q.  I'm just looking about starting on Line
23      10:  You know, and H.I. Kim and I had the
```

Page 313

```
 1      run-ins on the Murakami issue where he
 2      got upset that we covered an item on the
 3      agenda, and he didn't want to listen to
 4      it, and that's what he got all upset
 5      about.
 6  A.  Um-hum.
 7  Q.  What was the item on the agenda?  I mean,
 8      what did you mean by "run-in" there?
 9  A.  "Run-in" is him acting the way he acted
10      in the meeting.  He got upset for no
11      reason.
12  Q.  Did he get upset with you?
13  A.  No, he got upset in general.  I don't
14      know what he got upset about.
15  Q.  So you didn't mean to say that you and he
16      had a run-in in this comment?
17  A.  Well, this means the meeting that we had
18      with Murakami.  Me and Choi and --
19  Q.  35 other people?
20  A.  Right.  Well, mainly Choi.  Yes, that's
21      what we covered.
22          MR. BOSTICK:  What was my last
23              exhibit number?
```

Page 314

```
 1          MR. LEE:  17, I think.
 2          (The referred-to document was
 3              marked for identification as
 4              Defendants' Exhibit No. 18)
 5  Q.  (By Mr. Bostick) I don't have a sticker
 6      on it.  But we'll call that 18.
 7  A.  Is this my copy?  Is that 4?
 8  Q.  Do you recall receiving Exhibit 18?
 9  A.  Yes.
10  Q.  And this -- was this the letter you
11      referred to earlier saying to report back
12      to the plant and not represent yourself
13      as a --
14  A.  I think it states it in there; doesn't
15      it.  B says during your work absence from
16      HMMA you are not to represent the company
17      in any business, negotiations or conduct
18      any company business on behalf of HMMA.
19  Q.  And then, did you have any telephone
20      conversations with Mr. Duckworth between
21      the meeting you had with him and the
22      dinner and the time you got your
23      termination notice from him?
```

Page 315

```
 1  A.  I think the dinner was the 22nd; correct?
 2  Q.  Yes.
 3  A.  And this is the 24th.
 4  Q.  I'm talking about conversations.
 5  A.  I'm -- yeah, I'm just trying to get the
 6      time frame straight.  No, I didn't speak
 7      with him.
 8          (The referred-to document was
 9              marked for identification as
10              Defendants' Exhibit No. 19)
11  Q.  (By Mr. Bostick) Is Exhibit 19 a correct
12      copy of the termination notice you
13      received?
14  A.  I'm sorry.  What's your question again?
15      Is this the termination notice I
16      received?
17  Q.  Yes.
18  A.  Yes, it is.  It appears to be.
19          (The referred-to document was
20              marked for identification as
21              Defendants' Exhibit No. 20)
22  Q.  (By Mr. Bostick) Can you identify Exhibit
23      20 for me?
```

Page 316

```
 1  A.  It's a letter to Keith Duckworth.
 2  Q.  Did you mail this letter?
 3  A.  I don't know if it was mailed or faxed.
 4      I think it was faxed.
 5  Q.  Why -- why did you do a separate letter
 6      to Mr. Duckworth and then the letter to
 7      Mr. Ahn?
 8  A.  You mean the letter to Ahn and Kim and --
 9      the four-recipient letter?
10  Q.  Right.
11  A.  Because my attorney instructed me to do
12      so.
13  Q.  Did you -- was Duckworth listed on the
14      multiple-recipient letter as well?
15  A.  I would have to look at that.  Yes.
16  Q.  Okay.  What is the notations HRAR?  Are
17      those specifics policies you are
18      referencing?
19  A.  Where are you?  I'm sorry.
20  Q.  I'm on the first page of Exhibit 20 in
21      the subject line.
22  A.  Subject line.  Yes.
23  Q.  Okay.
```

Page 317

1    **A.**   I don't know what they stand for. I
2      would imagine Human Resource Alabama. I
3      don't know. They look like policy
4      procedure numbers.
5    **Q.**   But you don't know what the specific
6      policies being referenced are?
7    **A.**   These are the ones my attorney advised me
8      to obtain.
9        MR. STOCKHAM: Don't tell him what
10        I -- what we talked about.
11        THE WITNESS: Okay. I wasn't
12        Supposed to answer that.
13    **Q.**   (By Mr. Bostick) So you don't know
14      personally what policies those are that
15      are being referenced?
16    **A.**   They're provided to you in the discovery
17      phase. I don't recall the name of it.
18    **Q.**   I'm just asking what your -- I'm talking
19      about what's your personal knowledge
20      versus what was manufactured by your
21      attorney in the drafting of this letter.
22    **A.**   What's my personal -- restate that, if
23      you would.

Page 318

1    **Q.**   Do you know personally what those two
2      policies are that are being referred
3      to?
4    **A.**   At the time of authoring the letter?
5      Yes.
6    **Q.**   Okay. But as you sit here today, you're
7      not sure?
8    **A.**   Well, I think one is discrimination, and
9      I'm not sure what the other one is.
10      Harassment.
11        (The referred-to document was
12        marked for identification as
13        Defendants' Exhibit No. 21)
14    **Q.**   (By Mr. Bostick) Can you identify Exhibit
15      21 for me1?
16    **A.**   Charge of discrimination.
17    **Q.**   Did you -- did you sign this?
18    **A.**   Yes.
19    **Q.**   Okay. And just so I'm clear, you got
20      date of most recent discrimination is
21      December 6, 2005. That's the date you
22      were notified of your termination; is
23      that correct?

Page 319

1    **A.**   Um-hum.
2    **Q.**   And just summarizing this, you know, one
3      of the questions is, what is -- what are
4      the employment actions that your lawsuit
5      is based upon? And my understanding,
6      just so we're clear is, your contention
7      is that your termination was
8      discriminatory, because of your
9      contention that Mr. Choi engaged in the
10      same behavior you did but was not
11      terminated; is that correct?
12    **A.**   That's correct. And retaliation is
13      another element.
14    **Q.**   Okay. Based on your complaints that you
15      say that you were retaliated against for
16      complaints earlier?
17    **A.**   Yes, sir.
18    **Q.**   And have we fully talked about all of
19      your complaints that you've made that you
20      base your retaliation claim on today?
21    **A.**   As I stated, as I can recall at this
22      point in time.
23    **Q.**   Okay. Is there anything in your

Page 320

1      documents that would refresh your
2      recollection on that point?
3    **A.**   Not that I'm aware of.
4    **Q.**   Okay. Anything in the documents, because
5      we could hold the deposition. You're
6      going to be tomorrow anyway. If you want
7      to have time to look through your notes
8      and go through and look and see if
9      there's any other point, we'll be glad to
10      do that.
11    **A.**   I don't get -- point for what? Can you
12      please elaborate on that?
13    **Q.**   What you are saying is, you were
14      retaliated against for complaints. I'm
15      asking if we talked fully about whatever
16      complaints you have made.
17    **A.**   Right. To my knowledge now, I mean, as
18      we talked about it in excruciating detail
19      about my discussions with Keith
20      Duckworth.
21    **Q.**   Okay.
22    **A.**   That's honest and full disclosure at this
23      point.

# CYRUS DEPOSITION
# PART III

Page 321

```
 1  Q.  Okay.  Now, in this point, the second
 2      sentence of the charge says, In September
 3      I had met with Mr. Duckworth and reported
 4      issues of Korean's discriminating against
 5      Americans, sexual harassment and Korean's
 6      involved in workplace violence.
 7          Is that September date
 8      incorrect to where you're talking about
 9      the meeting you had with him when he got
10      there in the summer?
11  A.  Let's see here.
12          This is probably when we met
13      when the Korean colleagues came over.  So
14      I had the meeting with Duckworth, and
15      then he introduced me to the Korean
16      colleagues to reiterate what I just told
17      him.
18  Q.  Okay.  But I thought you said that was
19      closer in time to June or July.
20  A.  Whenever Duckworth came over is the first
21      occurrence.  And when the Korean
22      colleagues came over in number, that's
23      the second occurrence.
```

Page 322

```
 1  Q.  Okay.  When --
 2  A.  I don't have the dates.  I mean, there
 3      should be some --
 4  Q.  What's your best recollection about when
 5      Duckworth came over?
 6  A.  The summer of 2005.  I really couldn't
 7      tell you, sir.  I'm sure Hyundai knows
 8      when he came over.  I mean, that really
 9      wasn't of importance to me where I made a
10      note of it.
11  Q.  Did you understand you were signing this
12      under penalty of perjury?
13  A.  Yes.
14  Q.  Just so I am clear, I know that you --
15      you contend that you were made promises
16      about a promotion.  But as it relates to
17      your federal court lawsuit where you're
18      talking about being treated differently
19      than Korean counterparts, are there any
20      promotions, reprimands or other
21      employment actions, other than your
22      termination, that you contend that you
23      were treated differently than?
```

Page 323

```
 1  A.  There were -- there were no reviews, so
 2      there couldn't have been any review
 3      data.
 4  Q.  You were never suspended.
 5  A.  Never.
 6  Q.  You were never demoted.
 7  A.  Nothing.  Nothing.  I was given letters
 8      from the chairman's son and handwritten
 9      notes from the president about how good a
10      job I'm doing.  Nothing derogatory in the
11      least.
12  Q.  So other than your termination, there's
13      not an employment action that happened
14      somewhere other --
15  A.  Not at all.
16  Q.  -- along the way that you are bringing a
17      suit over.
18  A.  Not in my career at any company.
19          MR. BOSTICK:  Why don't we go off
20      the record for a second.
21          THE VIDEOGRAPHER:  We are going
22      off the record at 5:14 p.m.
23          (Discussion off the record)
```

Page 324

```
 1          THE VIDEOGRAPHER:  We're back on
 2      the record at 5:21 p.m.
 3          MR. BOSTICK:  We had a discussion
 4      trying to get this wrapped
 5      up.  Just off the record, I
 6      had given a copy of a consent
 7      form regarding some medical
 8      records that we requested.
 9      And I think we jointly agreed
10      to leave the deposition open
11      for the limited purpose of if
12      we need to come back with
13      regard to anything in the
14      medical records we receive
15      down the road.
16          MR. STOCKHAM:  That's fine.
17          MR. BOSTICK:  Is that fine?
18          MR. STOCKHAM:  We will review.  If
19      there is no issue, we will.
20  Q.  (By Mr. Bostick) For purposes of our
21      deposition tomorrow, you mentioned there
22      being some type of written correspondence
23      between you and Mr. Duckworth that
```

Page 325

1    related to the vice president issue and
2    some type of written promise.
3  **A.**  Um-hum.
4           MR. BOSTICK:  Can you see if you
5           can locate that document.
6           MR. STOCKHAM:  Sure.
7           MR. BOSTICK:  That might speed the
8           questions along.
9  **Q.**  (By Mr. Bostick) Finally, I just wanted
10   to ask you some questions about damages
11   in this case and what do you -- how do
12   you contend --
13          MR. STOCKHAM:  I tell you what, to
14          short-circuit that part, at
15          least with regard to the --
16          to the back pay and benefits
17          issue and lost future earning
18          potential, we -- we can
19          provide you that in just --
20          MR. BOSTICK:  Well, It was
21          supposed to be provided in
22          the initial disclosures,
23          which I haven't received yet.

Page 326

1           So --
2           MR. STOCKHAM:  Well, the back pay
3           and benefits are just
4           depending on -- you know,
5           it's an ongoing thing until
6           we get to the time of
7           trial.
8           MR. BOSTICK:  Right.  Well, I
9           guess if we want to reserve
10          on those issues keeping that
11          open to see what you've
12          got.
13          I guess, back pay, that's fine
14          with me.  It's, the documents
15          are what they are.
16          MR. STOCKHAM:  Sure.
17  **Q.**  (By Mr. Bostick)  Are there any
18   out-of-pocket expenses, i.e., like moving
19   from here to Illinois that you incurred
20   that you would claim that Hyundai is
21   responsible for?
22  **A.**  No.  I mean, specifically about that, my
23   move was paid for my Eisenmann

Page 327

1    Corporation.
2  **Q.**  Okay.  Were there any -- you had already
3    sold your house.  Were there any issues
4    with foreclosure or any type of loans
5    that went bad and you didn't file
6    bankruptcy or any kind of debts
7    outstanding that you say you were unable
8    to pay because of a period of
9    unemployment?
10  **A.**  I am racking up expenses from borrowed
11   money from my father in the tune of
12   $8,000 every month. That's net.
13  **Q.**  Okay.  Have you repaid him yet?
14  **A.**  I have no means to repay him.
15  **Q.**  Okay.
16  **A.**  He is retired.  They are both 70.  It's
17   wonderful to ask for $8,000 from your
18   parents every month.
19  **Q.**  Did you -- when did you start asking for
20   that money?
21  **A.**   After I was -- Eisenmann shut up shop in
22   the States.  Well, prior to that also.
23  **Q.**  I mean, had you asked for any money from

Page 328

1    them during the period of time between
2    when you worked for Hyundai and --
3  **A.**  Absolutely.
4  **Q.**  How much did you receive per month
5    then?
6  **A.**  I couldn't tell you on a monthly basis.
7  **Q.**  Approximately what was the total amount
8    you received?
9  **A.**  You know, I had to pay my COBRA, which is
10   $1,000 a month.  My life insurance was
11   $406 a month.  My alimony and child
12   support, which was 3,084 a month.  My
13   rent on my house, which was about 1,200 a
14   month.  Utilities, food, shelter.  Just
15   the basic necessities.  Food, gasoline.
16  **Q.**  And so we are -- between the time you got
17   the job at Eisenmann, we are talking
18   about approximately January, February,
19   March, April and maybe part of May?
20  **A.**  Yes.
21  **Q.**  Okay.  So what's your best estimate as to
22   the amount of money you borrowed from
23   your dad in that five-month period?

1 **A.** Close to 100,000 -- oh, from this point
2    on during --
3 **Q.** No, just that period of time.
4 **A.** Oh, you know, I would have to guess.  I
5    don't know.  15- to $30,000.
6       MR. STOCKHAM:  We can get you the
7       specifics about it.
8 **Q.** (By Mr. Bostick) Okay.  But you don't
9    make any contention in this lawsuit that
10    Hyundai had anything to do with you
11    losing your job at Eisenmann; do you?
12 **A.** No, they shut down.  They didn't
13    really -- I mean, yes, you can phrase it
14    that way, I guess.
15 **Q.** Tell me about how you contend, you know,
16    one of the claims is emotional distress
17    damages.  Tell me how you suffered any
18    emotional distress, if any, as a result
19    of being terminated.
20 **A.** How about sitting in the house 40 hours a
21    week trying to find a job.  My flawless
22    resume and background is marred by a
23    termination from Hyundai as a director of

1    purchasing.  Every interview is, Well,
2    why did you leave Hyundai?  And I have to
3    tell them exactly what happened.  And I
4    do.
5       And they are like, Well, you
6    know -- Well, there are other candidates
7    that don't have this suspicious
8    background.  And, you know, if Hyundai
9    indicates to a prospective employer that
10    I am involved in a litigation, which I
11    believe has happened a number of times,
12    that sabotages me.
13       So not only are my children
14    away from me, I am not able to pay for
15    anything.  I don't have any camaraderie.
16    I don't have any interaction with any
17    human other than looking for jobs.
18 **Q.** What -- what is --
19 **A.** I have been to numerous psychiatrists
20    about this, counselors, to talk about the
21    grief and how to handle this.  I've never
22    had to ask for a penny from anybody in my
23    life.  I have been working since I was 15

1    years old.  This is a change for me.
2 **Q.** What -- what do you base this belief on
3    that somebody from Hyundai has advised
4    current or prospective --
5 **A.** Well, let's see.  I talked to a steel
6    corporation in Virginia Beach, had a
7    phone screen.  They were ready to -- they
8    were talking to -- trying to convince me
9    to -- you will love the area.  Come on
10    down.  The next thing I know, they said
11    that they spoke to Hyundai and I just
12    wasn't the right fit at this point.
13       So I called Richard and
14    said, Hey, I have reason to believe --
15       MR. STOCKHAM:  Don't discuss --
16       THE WITNESS:  Okay.  All right.
17       MR. STOCKHAM:  -- what we talked
18       about.
19 **Q.** (By Mr. Bostick) You are not talking Rick
20    Neal; are you?  You're talking about your
21    attorney?  Okay.  Go ahead.
22 **A.** Richard.
23       I applied for a job.  I was

1    actually contacted by a recruiter for a
2    job with ThyssenKrupp.  I had a phone
3    screen.  The guy flies down to
4    Louisville, flew up from Atlanta.  We had
5    a meeting.  This is a recruiter.  I
6    passed that hurdle.
7       They flew me to Mobile.  I
8    met with the chief financial officer, Dr.
9    Marcus Boning.  He would be my boss.  He
10    calls me later that week and says, Rob, I
11    have good news for you.  We want you to
12    join our team.  You are perfect.  They
13    wanted somebody that had lived in
14    Alabama, had worked for a German company,
15    and had done plant start-ups.
16       This is $4.5 billion project
17    in Mobile.  Then two weeks later all I
18    have to do is meet with the president for
19    basically a hello meeting and then to
20    formalize it.  So between the time of Dr.
21    Boning saying, Rob, I have good news for
22    you, I want you to join the team, I meet
23    with Bob Sulliey, who is the president of

Page 333

1    ThyssenKrupp, carbon division, and he was
2    as cold as ice to me as if something
3    occurred. I mean --
4  Q.  But do you know of any specific
5    communications between Hyundai and any
6    Hyundai official and any official of
7    those companies?
8  A.  The recruiter, Mr. Michael Ladd, out of
9    the Atlanta, the Harvard Group, contacted
10   my references. So I don't know if he
11   contacted Hyundai or not.
12 Q.  Is he your person -- does he represent
13   you?
14 A.  He represents the company. You know, he
15   is a recruiter under the services of
16   ThyssenKrupp.
17 Q.  I mean, other than speculation, do you
18   have any personal knowledge that somebody
19   from Hyundai said something to anybody --
20 A.  No, but I have personal knowledge that in
21   my past I have never interviewed for a
22   job that I have not gotten. So this is
23   very unusual to go from, Welcome to the

Page 334

1    team to this situation. You know, the
2    key person working with ThyssenKrupp is
3    Todd Strange, the same gentleman who got
4    Hyundai to Alabama. So I am pretty
5    sure.
6  Q.  Do you know of any specific
7    conversations --
8  A.  It's a small -- it's a small community.
9  Q.  -- between any steel corporation
10   employees and Hyundai?
11 A.  They said that they talked to individuals
12   at Hyundai.
13 Q.  Who did they say they spoke to?
14 A.  They didn't know.
15 Q.  Did they say what they were told?
16 A.  No.
17 Q.  Did they say anything about if they were
18   told you had a lawsuit or anything to
19   that effect?
20 A.  No.
21 Q.  Okay. Do you know anything more than
22   that comment?
23 A.  No.

Page 335

1  Q.  Did they tell you they talked to other
2    past employers other than Hyundai as
3    well?
4  A.  No.
5  Q.  Who are -- can you give me the
6    identification of these doctors you say
7    you have spoken to about --
8  A.  You have the --
9  Q.  The emotional distress?
10 A.  I mean, Steven Shaffer is the one in
11   Chicago. Gerald Ivy's the counselor at
12   the firm. I can't remember in
13   Montgomery, but he is not a psychiatrist,
14   but I met with both of the individuals.
15   Who else?
16 Q.  Anybody in Kentucky?
17 A.  The guy in Kentucky. Yep. Perry Sutton
18   and Craig Congulton.
19 Q.  Do you know anybody else that you can
20   think of?
21 A.  No.
22 Q.  Did you lose any weight during the period
23   of time or have any physical

Page 336

1    manifestations of your anxiety over
2    losing the job after --
3  A.  Did I lose weight?
4  Q.  Yes.
5  A.  I mean, that's not really -- that's one
6    indication. Gaining weight could be
7    another indication.
8  Q.  I am asking you, have you had that
9    indication?
10 A.  Has my weight fluctuated? I have gained
11   weight, and I have lost weight.
12 Q.  Okay.
13 A.  So I don't think that's an indicator.
14 Q.  No specific weight. Did you have any --
15 A.  I didn't say no specific weight.
16 Q.  -- problem with sleep?
17 A.  Yeah. I have had sleep studies done,
18   sleep apnea studies, two of them.
19 Q.  When did you first have sleep apnea
20   issues?
21 A.  I did that in Chicago.
22 Q.  Okay. Did you ever go to anybody here
23   while you were in Alabama?

Page 337

1  A.  For sleep apnea?
2  Q.  Sleep apnea?
3  A.  No.
4  Q.  Ever go -- have any issues with crying?
5  A.  Crying?
6  Q.  Yes.
7  A.  No.  Crying?  I mean, what's the
8      question?  Issues with crying?  What does
9      that mean?
10 Q.  Bouts of crying as a -- I'm asking you
11     about physical manifestations of this
12     supposed --
13 A.  Bouts of crying?
14 Q.  -- emotional distress that you are
15     telling me.
16 A.  No, no bouts of crying.
17 Q.  But we've already established you're
18     going through a pretty nasty divorce
19     during this same period of time?
20 A.  I divorced her, you know.
21 Q.  Yeah, but I mean --
22 A.  It's not nasty, really.
23 Q.  Okay.

Page 338

1  A.  We are still friends.
2  Q.  So that was an easy divorce for you?
3  A.  I mean, you can say what you would like
4      to say.  I didn't say that.
5  Q.  Is it your testimony that your divorce
6      didn't cause you any stress in your life
7      during that period of time?
8  A.  My marriage caused me stress because of
9      my wife's drinking problem.
10 Q.  Okay.  But you know --
11 A.  The divorce caused stress.
12 Q.  Was that something you were talking to
13     your counselor about as well?
14 A.  I talked to my boss.  Did I tell you
15     about talking to my boss about possibly
16     getting a divorce?  Mr. Min Ho Lee.  And
17     he said, Rob, that would be very bad for
18     your career.  This was the day or two
19     before our 4th of July picnic at the
20     amusement park in Birmingham -- Bessemer.
21         So he -- I explained that,
22     you know, we were going through --
23     through some difficult times, and I

Page 339

1      thought I was going to file for divorce.
2      And he proceeded to tell me how he
3      handled his wife by beating her and asked
4      me if I was not the king of my castle.
5      So he spent probably an hour and a half
6      telling me about the first unfortunate
7      time he hit his wife.  This second
8      unfortunate time he hit beat wife he got
9      her bloody because he beat her.  So, you
10     know, his advice to me is it will affect
11     your career negatively, and perhaps you
12     should beat your wife.
13 Q.  Okay.
14 A.  When I went to HR after I got a divorce,
15     Kisha Morris didn't want to change my
16     address in the system to my rental house
17     because everybody would know I was
18     getting divorced.
19 Q.  So is it your contention now that you
20     were terminated from Hyundai because you
21     got a divorce?
22 A.  I didn't say that.
23 Q.  Okay.  Any other physical

Page 340

1      manifestations --
2  A.  Depression.
3  Q.  -- of any anxiety that you had during the
4      time you were here in Montgomery after
5      you were terminated?
6  A.  You know, you would have to talk to the
7      medical experts on that.  I mean,
8      depression obviously.
9  Q.  Okay.  And I'm asking what manifestations
10     you had physically.  I mean, if you don't
11     know --
12 A.  Headaches, depression, sleeplessness, too
13     much sleep.  You know, incredible
14     depression.  As far as, you know, my life
15     was very good, solid and on track; and
16     now it's in this situation because of
17     Hyundai.
18 Q.  Have you talked to anybody about being a
19     potential witness in your case?
20 A.  Anybody about being a potential witness
21     in my case?
22 Q.  Yes.
23 A.  Can you elaborate on that, please.

Page 341

1  Q.  Did you have a call with someone and say,
2      I would like for you to be a witness in
3      my case?
4  A.  No.
5  Q.  You never talked to Mike Hansford about
6      that?
7  A.  About, Will you be a witness in my case?
8  Q.  Yes.
9  A.  No, not a witness in my case. I've
10     talked to him about items that have
11     occurred. I haven't asked anybody to be
12     a witness.
13 Q.  Since you first consulted your attorney,
14     who have you spoken with about your
15     potential claims there at Hyundai?
16 A.  Dave Mark, Gerald Horn, Will Caldwell,
17     Chuck Knowles, Chris McClain. Did I say
18     him already?
19 Q.  Huh-huh.
20 A.  Who have I discussed the lawsuit with?
21     Kimble. I mean, other than the obvious,
22     Neal and Kimble. If I had an org chart I
23     could tell you more definitely. Let's

Page 342

1      see. Harry Chase. I mean, there is more
2      people.
3  Q.  What did you talk to Will Caldwell
4      about?
5  A.  I talked to him about the Murakami
6      meeting.
7  Q.  Was he in attendance?
8  A.  He was in attendance. I talked to him.
9      He went to dinner. I don't know if I
10     should -- I need to ask my attorney
11     something.
12          THE WITNESS: Can we discuss the
13     dinner?
14          MR. STOCKHAM: Sure.
15          THE WITNESS: We had a dinner with
16     myself and Richard and talked
17     about their recollection of
18     the -- of the meeting and
19     activities at Hyundai. And
20     that was with Dave and Harry
21     and Will Caldwell. And who
22     else was there? I think
23     that's it.

Page 343

1  Q.  (By Mr. Bostick) Did Will Caldwell or
2      Harry give any kind of affidavit to
3      you?
4  A.  We got one from -- do we need to discuss
5      this?
6          MR. STOCKHAM: No.
7          THE WITNESS: Don't discuss it?
8          MR. STOCKHAM: Just tell him.
9          THE WITNESS: Gerald Horn. I
10         think we got one from him.
11 Q.  (By Mr. Bostick) And Michael Hansford?
12 A.  And Hansford; that's correct.
13 Q.  Do you know if there was an affidavits
14     from anyone else?
15 A.  I don't think so.
16 Q.  Was Chuck Knowles at this meeting as
17     well?
18 A.  Yes, he was.
19 Q.  Did any of the people meeting in that
20     meeting say that they heard you use the
21     word "bullshit"?
22 A.  No.
23 Q.  Okay. Did any of them say they felt you

Page 344

1      acted inappropriately or ignored Mr.
2      Kim's instructions to refocus the
3      subject?
4  A.  No. Ginger Loy was one, Bill Lang. Greg
5      Kimble told me that Bill Lang was fired
6      by Mr. Ahn because he felt that he was
7      gay. He told me that himself.
8  Q.  When did that conversation take place?
9  A.  Shortly after Bill was terminated, after
10     Mr. Ahn was the one who hired him. This
11     is a different Mr. Ahn than President
12     Ahn. This is B.M. Ahn. He was executive
13     vice president in charge of human
14     resources prior to --
15 Q.  Who is Ginger Loy?
16 A.  Rick's secretary.
17 Q.  What did you talk to her about?
18 A.  The case.
19 Q.  When did you talk to her?
20 A.  I would say within 30 to 90 days after
21     the termination.
22 Q.  Is that one of the recorded
23     conversations, or was it --

Page 345

1  A.  I think it is.  I'm not sure.  I can look
2      back at that.
3  Q.  Did you --
4  A.  Yeah, I think it is.  Well, I'm not sure.
5      I think it's about her because we talked
6      about Chappy's.
7  Q.  Did -- did you ever hear Mr. Duck- -- did
8      Mr. Duckworth ever say anything about --
9      did he ever say that you were being fired
10     for -- in retaliation for any kind of
11     complaints?
12 A.  Did he ever say that?
13 Q.  Yeah.
14 A.  No, he did not.
15 Q.  I take it Mr. Kim or Mr. Ahn never said
16     that to you?
17 A.  I never spoke to them after the
18     meeting.
19 Q.  Okay.  I mean, is there anybody that
20     works at HMMA that told you that they had
21     heard you were fired for making
22     complaints?
23 A.  No.

Page 346

1  Q.  Okay.  Has anybody expressed that opinion
2      to you?
3  A.  Yes.
4  Q.  Who expressed that opinion to you?
5  A.  Let's see.  Will Caldwell, Dave Mark,
6      Hansford, Harry Chase.  Probably those
7      people.
8  Q.  Those people that expressed their
9      opinion --
10 A.  Retaliation, you know -- let's clarify.
11     Retaliation or Murakami; which one?  I
12     know you said "retaliation."
13 Q.  They suspect you were terminated because
14     of the events at the Murakami meeting.
15 A.  Dave thinks that and retaliation.
16     Hansford thinks that and retaliation.
17 Q.  Okay.
18 A.  The other ones think it's Murakami.  I
19     would say Caldwell thinks it's
20     retaliation too.
21 Q.  But any -- did any of these people, when
22     they told you their opinions, say that
23     they were basing that on something that

Page 347

1      they were told by Duckworth, Ahn or H.I.
2      Kim?
3  A.  No.
4  Q.  Okay.  Just so I am clear, from the time
5      you got the termination letter from Mr.
6      Duckworth, did you have any meetings or
7      conversations with him after that point
8      in time?
9  A.  I had to go back in the day that my
10     Family Medical Leave expired and report
11     to work.  And I did that in my uniform
12     and said, I am ready to go to my desk.
13     And he advised me that I am not to do
14     that.  That was the last meeting I had --
15     discussion I had with him.
16 Q.  Okay.  You know it looks like the
17     termination letter had a severance
18     package discussion.  I mean, did you ever
19     call him back to talk about that or to
20     say that, I am not going to take this,
21     or, I'll take it if I can get more, or
22     anything like that?
23 A.  We talked about that in the face-to-face

Page 348

1      meeting down by the security office in
2      the Hyundai building in Montgomery.
3  Q.  Okay.  And what was your response to the
4      severance package?
5  A.  My response that 24 weeks was not
6      adequate for the damage that it had
7      caused me through no result of my own
8      actions.
9  Q.  Did you make any kind of counteroffer?
10 A.  Yeah, I did.
11 Q.  What was your counterproposal?
12 A.  Four years.
13 Q.  Did you get a response to that?
14 A.  He said -- I believe, he said, No way.
15 Q.  Was that the end of the back and forth
16     with regard to the severance package?
17 A.  Yes.
18        MR. BOSTICK:  Do you want to take
19        a break?
20        MR. NEAL:  I have nothing.
21        MR. BOSTICK:  I think we are done
22        subject to leaving open the
23        points earlier.

Page 349

```
 1        THE VIDEOGRAPHER:  All right.
 2    This is the end of Tape No. 6
 3    and concludes today's portion
 4    of the deposition of Robert
 5    Cyrus taken on November 27th,
 6    2007.  We're going off the
 7    record at 5:44 p.m.
 8  (Whereupon, the proceedings adjourned
 9  at 5:44 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

## A

**ability** 13:10 38:1
38:5,9 145:15
297:1
**able** 15:18 71:17
275:17 279:16
330:14
**absence** 173:22
314:15
**absent** 195:16
**absolute** 160:19
**absolutely** 92:21
119:1,5,20
128:12 131:4
133:2 143:10
146:14 148:7
149:4 167:1
175:10 176:6
179:14 207:1
229:11 270:22
296:23 306:14
328:3
**abusive** 20:9
**accept** 14:15
**acceptable** 70:20
74:16,20 95:17
157:21,21
**accepted** 117:5,6
128:8
**accident** 288:18
**account** 30:15,23
49:7 62:8
**accurate** 175:13
**acknowledge**
119:17
**acknowledged**
94:5,17
**acquaintance**
186:15
**across-the-board**
244:23
**act** 39:4,11 40:2,12
41:15 125:9
132:6 243:20

**acted** 313:9 344:1
**acting** 116:22
313:9
**action** 38:13 49:11
208:3,4 231:22
323:13
**actions** 49:4 208:2
261:20 319:4
322:21 348:8
**actively** 264:19
265:16
**activities** 48:15,22
51:11 90:1
342:19
**activity** 43:16
44:17 51:15
52:11 53:17
76:22 92:2
239:10
**actual** 24:12 25:21
56:22 57:9 58:7
59:18 60:20
96:16 154:4
158:12 159:23
185:18 281:1
**adamant** 184:5
**adapt** 283:5
**added** 101:20
103:4
**addenda** 305:22
**addition** 14:23
**additional** 14:21
63:22 67:1 195:3
309:8
**address** 11:22 12:3
12:5 53:6 72:8
82:22 87:9
104:20 105:14
113:10 114:19
132:9 139:16
305:23 339:16
**addressed** 89:21
110:7 118:12
123:4 253:8

274:13 276:6
**addressing** 121:10
**adequate** 348:6
**adjourned** 349:8
**administration**
263:1
**admission** 77:4
**admit** 210:6
**admitted** 292:16
**advice** 339:10
**advised** 236:8
317:7 331:3
347:13
**advising** 270:2
**affect** 297:3 339:10
**affidavit** 137:8
204:6 205:15,16
205:17 207:17
343:2
**affidavits** 343:13
**afraid** 155:13
**afternoon** 11:16
116:4 183:21
**age** 11:11 19:2
**agenda** 51:18 53:3
56:13,23 72:10
79:8,16 85:15
87:10,11 113:19
113:21,23 120:15
300:9 313:3,7
**agendas** 57:1
**aggressive** 140:19
**agree** 71:23 99:12
101:5,6 108:6,18
109:18 127:2
128:18 129:2
131:2 143:3
145:17 148:17,22
149:18 150:1
163:6 166:5,16
195:9 312:2
**agreed** 23:11 64:14
65:2,15 75:16,17
75:17 157:14

209:14 259:3
324:9
**agreement** 20:16
158:10,16,23
159:1 262:20
**agrees** 268:2
**ahead** 57:20
125:14 154:8
158:3 163:16
193:15 216:11
231:9 245:12
291:20 308:15
331:21
**Ahn** 33:7,8,9
106:20 107:5
179:22 181:11,13
181:18,21 182:4
197:4 207:1
216:22 218:14
220:23 284:10
308:4,4,5 316:7,8
344:6,10,11,12
344:12 345:15
347:1
**aid** 291:18
**airport** 211:11
**ajar** 298:4
**Alabama** 1:2,10,21
1:23 3:8,17 4:6
4:11,13 10:7,15
11:5 12:9 16:21
16:22 17:17 19:9
20:4 21:5 22:7
24:11,14,16,21
24:23 25:15,19
25:22 26:5 28:21
32:3 49:8 90:3
211:4 212:21,23
221:13 227:16
243:8 244:9
254:12 261:15
317:2 332:14
334:4 336:23
**alarmed** 238:12

**alerted** 88:18
**alimony** 328:11
**allegation** 13:11
255:15
**allegedly** 211:14
**alley** 53:18 90:15
**allow** 69:6,8
114:18 265:11
**allowed** 21:8
132:11
**all-day** 44:16
**Altace** 27:1,4
**amended** 20:10
**America** 11:7
23:20 25:7,20
35:19 238:15
247:12 283:11
**American** 30:22
31:7 34:8 62:3
210:20 225:4
233:3,23 234:10
243:21 246:12
271:20 283:5
294:15 308:2
**Americans** 50:5
171:20 244:12
252:2 267:17
321:5
**amount** 87:19
164:11 328:7,22
**ample** 87:14
**AmSouth/Harbert**
4:5
**amusement** 338:20
**analysis** 49:11 53:7
101:8
**and/or** 139:7
**angioplasty** 42:16
197:19
**angry** 180:3
**animals** 100:6
**answer** 15:16
34:16 35:3
115:11 116:21

143:1,4 304:16
317:12
**answered** 15:19
102:21
**anti-depressant**
28:13 29:18
**anxiety** 336:1
340:3
**anybody** 50:13
62:17,17 93:8
98:2 155:16
175:9 176:2,3,17
208:17 225:11
237:6 279:23
330:22 333:19
335:16,19 336:22
340:18,20 341:11
345:19 346:1
**anymore** 31:12
**anyway** 145:4
146:16 287:23
320:6
**apnea** 336:18,19
337:1,2
**apologize** 181:8
281:11
**apparently** 87:2
153:13 208:1
**appear** 87:1
132:12
**APPEARANCES**
3:1
**appeared** 115:10
223:13
**appears** 41:13
60:13,13 156:20
315:18
**application** 193:12
193:14
**applied** 16:14
245:17 331:23
**apply** 246:7 289:21
**approach** 100:22
**approaches** 230:23

**appropriate** 49:3
67:19 146:12
151:11 238:14
255:22 263:16
289:22
**appropriately** 69:8
241:20 283:11
**approval** 8:8
262:18
**approvals** 304:3
**approved** 97:2
194:18
**approves** 111:7
**approximately**
42:19 47:3 92:9
191:15,19,22,22
203:21 221:21
235:6 259:22
328:7,18
**April** 264:15
328:19
**Arabs** 309:22
**arbitrary** 96:2
**area** 16:22 17:2
73:20 102:15
257:5 262:19
263:10,13,15
302:10 331:9
**areas** 195:21
229:19
**argue** 178:18
**arguing** 149:21
161:19
**arm's-length** 149:8
**arrested** 38:16
**arrival** 33:14 34:3
**arrive** 25:1 33:7
50:15 91:14
**arrived** 23:15
31:14,18,19 32:5
32:14,15,19,21
47:14 221:13
227:15 254:12
**arrives** 232:18

280:9,11
**arriving** 52:22
254:8
**arteries** 42:18
**artery** 30:4 42:14
**Ashley** 59:21
**asked** 40:16 79:4
80:13 89:19 96:4
120:12 131:23
137:20,21 138:1
139:2 140:3
142:22 152:9,11
152:21 156:23
160:17 183:12
200:20 201:8
202:5,12,21
203:8 204:6
205:14 207:17
208:8 266:5
307:19 327:23
339:3 341:11
**asking** 11:16 15:12
29:11 89:20
95:11 118:17
127:19 233:7
254:1 282:5
297:19 317:18
320:15 327:19
336:8 337:10
340:9
**asks** 171:6
**aspects** 36:15
**aspirin** 27:1,19,20
**assembly** 59:22
78:22 81:16
112:2 123:17
124:1
**asserted** 20:7
**assessed** 87:22
90:23
**assessment** 89:8
90:6 91:3 118:7
**assign** 81:22 151:9
267:13

**assigned** 32:3
115:1
**assistant** 36:2
37:20 93:3
136:15 173:18
193:22 243:3
262:3
**assume** 38:9 88:5
206:17 295:20
**assure** 154:11
**assured** 180:18
193:18
**astonished** 187:3
275:8
**as-need** 258:6
**Atenolol** 27:1,13
27:14
**Atlanta** 332:4
333:9
**attached** 223:14
224:1 225:16,19
229:9
**attaches** 57:9
**attachments** 6:5
**attack** 40:14
**attempt** 164:1
**attempted** 101:17
**attend** 82:7 93:6
266:7,9 272:1
**attendance** 173:21
182:6 191:23
223:6 342:7,8
**attended** 82:11
**attendee** 118:16
168:4
**attendees** 107:18
191:21
**attitude** 140:9
286:3,4,11 296:5
296:10,22 297:2
311:9,22,23
312:1
**attorney** 11:18
23:10 137:5

176:18 186:13,17
197:9 198:2
229:2 252:8,16
280:10 316:11
317:7,21 331:21
341:13 342:10
**attorneys** 222:7
**attributable** 141:1
**attribute** 102:3
103:13
**audit** 266:12
**author** 261:8
**authoring** 318:4
**authority** 275:19
**automotive** 71:19
272:5
**availability** 44:7
**available** 244:14
264:10
**Avenue** 3:15 4:4
**avoid** 261:19
**aware** 39:20 52:1
53:15 56:11 72:6
81:1 82:5 90:22
192:15,22 208:13
217:4 231:12
232:4 236:8
278:13 320:3
**awkward** 202:19
270:3
**a.m** 2:2 10:9 46:17
46:20 66:13,19

────────────

**B**

**B** 5:5 7:20 169:21
231:1 314:15
**baby** 27:1,19,20
89:4 291:11
**back** 15:8 19:6
29:4 42:22 43:3,8
46:19 61:22
102:19 106:2
111:10 117:4
122:2,14 123:15

140:22 157:2,11
179:3,10,12
183:19 184:21
188:10 194:11
195:17 205:12
211:10,12,15
224:9 238:16
244:3,4 247:19
247:23 248:4
249:5,8 255:9,11
256:8,15 264:3
264:19,20 266:2
266:19 267:12,20
269:4,20,21
270:9 271:4,11
271:18 279:22
291:4 293:8,14
305:7 309:8
312:13,15 314:11
324:1,12 325:11
326:2,13 345:2
347:9,19 348:15
**background** 18:7
201:9,11 329:22
330:8
**backlog** 172:13,16
**bad** 327:5 338:17
**bag** 67:8 70:20,22
73:13,19 74:5
75:23 79:3 80:7
80:11 83:4 85:5
85:10 86:17,20
86:23 93:15 97:6
97:7,21,22,23
98:23 100:7,7,8
101:2 110:9
130:17 300:6
**bags** 97:21 160:4
**balloon** 42:16
**bank** 30:20,23
**bankrupt** 288:9
**bankruptcy** 38:18
287:23 288:1
327:6

**bar** 200:17 203:1
204:13,18,19,21
**barely** 232:8 245:4
**Bargainnear**
186:16
**Barrel** 199:19
**base** 319:20 331:2
**based** 13:17 95:23
96:3 130:17
258:15 301:3,12
302:1 309:11
319:5,14
**basic** 64:16,20
111:16 128:17,22
328:15
**basically** 67:23
332:19
**basing** 346:23
**basis** 51:12 52:6
95:21 122:18
172:6 214:4
258:6 328:6
**Bates** 60:3,11 67:6
70:10 75:11
82:16 101:15
123:2 151:16
156:9,13 220:15
222:13 224:9
226:6 231:15
**Bates-number**
60:7
**bathroom** 217:1
**Bay** 11:23
**Beach** 331:6
**BearingPoint**
237:18 238:6,17
239:9
**BearingPoint's**
237:22
**beat** 339:8,9,12
**beating** 339:3
**began** 108:19
**beginning** 10:3
35:15 36:1 47:7

56:4 66:16 105:7
126:8 148:11
177:8 242:10
309:3
**behalf** 1:18 157:15
296:11 314:18
**behave** 104:18
**behavior** 20:9
119:14 203:7
209:15 211:9
217:6 234:13
238:12,15 243:18
282:18 319:10
**belief** 331:2
**believe** 30:8 31:11
50:14 56:3 62:2
63:23 66:5 67:5
77:23 81:3 98:9
106:6 122:19
169:8 182:19
183:5 185:13
195:16 219:16
220:11 271:15
295:14 299:15
308:9 330:11
331:14 348:14
**BellSouth** 297:18
**beneficial** 148:13
**benefit** 39:14
254:23 268:3
**benefits** 17:14,16
38:21 39:1,9
325:16 326:3
**Benton** 16:23
**Benz** 281:22
**Bessemer** 338:20
**best** 45:6,23 47:5
105:15 112:20
120:18 145:15
148:10 149:19
161:23 165:7
177:21 180:8
240:20 251:19
322:4 328:21

**better** 89:9 92:23
136:11 209:11
**beyond** 21:9 69:1
100:9 269:18
290:7
**big** 80:6 241:17
306:22
**Bill** 344:4,5,9
**billion** 332:16
**Birmingham** 3:8
3:17 4:6 10:15
25:5 207:20
338:20
**birth** 307:5
**bit** 15:11 33:16
51:20 52:14
138:20 156:4
177:13 206:16
287:13
**bitch** 292:12
**black** 219:19 223:4
**blacklisted** 299:19
**blamed** 118:4
**blanks** 246:4
**blemish** 65:12
219:21
**blew** 189:13
**block** 261:7
**blockage** 42:13
**blocks** 304:2
**blood** 186:11
187:11
**bloody** 339:9
**blue** 76:19 199:10
**board** 274:22
**Bob** 332:23
**Boise** 17:3,3
**bold-faced** 293:15
**Boning** 332:9,21
**bonus** 15:3
**bonuses** 14:22
244:18
**Borderline** 157:12
**borrowed** 327:10

328:22
**Bosche** 17:1
**boss** 158:5 183:20
237:1 243:9,13
243:15 248:1
261:8,9,9 263:2
332:9 338:14,15
**Bostick** 3:11 5:4
11:3,3,8,15,18
14:11 15:22 16:4
22:14,22 23:1
41:2,6,11 46:5,13
46:21 56:17
57:14,17 58:5
64:11 66:6,20
102:19 103:1,10
106:17 120:5
121:9 122:10
124:3,8,12
126:12 136:23
152:17 155:11
156:7,9 161:22
165:16 166:19
168:8,16 169:7
173:7,12,15,17
174:7,14,15
176:20 177:12
185:17 186:1
195:8 196:19,21
215:9,14,23
223:19 226:5
237:11 241:23
242:14 255:14
260:22 272:13,16
272:20 273:3,12
281:8 283:16
286:18 287:1,4,6
287:7 301:18
308:14 309:10
311:15 313:22
314:5 315:11,22
317:13 318:14
323:19 324:3,17
324:20 325:4,7,9

325:20 326:8,17 329:8 331:19 343:1,11 348:18 348:21
**Boston** 247:12
**bottom** 104:8 137:17 193:20 259:10 295:17 306:13
**bottom'is** 155:6
**bought** 201:16
**Boulevard** 4:12
**boundaries** 157:22
**bouts** 337:10,13,16
**bowling** 53:18 90:15 91:22 92:1
**box** 134:1 223:13 225:13 298:1,3 298:15
**boxes** 51:10
**boys** 241:18
**BP** 186:10
**bragged** 204:22
**bragging** 205:12 292:1
**brainchild** 52:21
**breached** 13:12
**break** 46:6 125:23 126:13 176:21 348:19
**breaks** 294:3
**breath** 42:7 170:19
**breathing** 42:8
**Brian** 3:11 11:3,18 53:19 58:14,20 59:17 90:14,18 93:1 147:23
**bring** 35:21 114:16 121:10 138:5 166:7 219:22 234:18 238:16
**bringing** 210:13,17 239:16 288:8 323:16

**broken** 154:14
**brought** 48:10 51:5 99:8 114:10 114:17,21 141:22 206:1 210:15,16 213:19 214:18 215:1 221:11 252:16
**Buder** 5:11,15
**buff** 61:2,8 65:6,8 65:10,14,23 66:2 66:22 70:3 73:12 73:18 74:2,3 75:22 79:2 80:6 80:11 83:3,16 85:5,10 86:18,23 93:15 98:23 99:16 108:20,23 110:8 121:23 160:3 300:5
**buffing** 118:10 122:12 123:9
**buff-marks** 127:10
**build** 91:17 172:3 239:20,21,22 240:15 241:1
**building** 1:19 348:2
**bullet** 226:12
**bullshit** 118:22 119:3,18 133:19 145:16 149:2 166:23 343:21
**bumper** 13:1 287:17
**bush** 71:2
**business** 36:6 64:5 64:19 111:13 127:20 180:22 233:20,21,23 275:17 283:1,5 314:17,18
**butts** 286:16 287:10,15 288:19

**buy** 45:17
**buyer** 262:15
**buyers** 36:1
**buying-in-comm...** 36:4
**bye** 217:1
**B.M** 344:12

## C

**C** 7:19 8:14 9:8 10:1
**calculated** 145:14 147:5
**Caldwell** 341:16 342:3,21 343:1 346:5,19
**calendar** 154:6 170:15 185:11 271:5
**California** 23:21 23:23 25:8,21 26:7
**call** 49:5 55:1 58:3 91:18 105:11 140:13 152:6 180:11 186:7,8 189:9 200:7 201:11 217:13 241:10 279:21 314:6 341:1 347:19
**called** 42:9 55:23 80:22 93:8 105:6 137:10 174:23 179:3,5 183:3 186:18 192:6 199:10 200:17 257:15 275:15 279:15,22 288:15 298:4 331:13
**calling** 106:16 116:4 190:10 194:4 297:18
**calls** 199:12 291:6

291:8 295:23 332:10
**camaraderie** 330:15
**candidates** 330:6
**capabilities** 36:14 123:17 263:14
**capacities** 55:18
**capital** 37:4
**car** 203:1 204:16 211:12 218:2 244:12,15 289:5 289:8 290:16,19 291:4,13,21 292:5
**carbon** 333:1
**card** 30:7,18 31:3 31:12
**cardio** 43:14,16,21 170:11 253:14,21 257:13 261:14 265:7,18
**cardiologist** 27:6 27:22 30:5 193:17
**cardiologists** 197:21
**cardiovascular** 169:17 170:4
**cards** 31:6
**care** 130:19 150:3 216:10 236:11
**career** 18:7 152:13 219:20 323:18 338:18 339:11
**Carol** 18:22
**CARROLL** 3:5
**cars** 77:2 244:10 244:13 288:15
**Cascade** 17:3
**case** 1:7 10:8 12:21 12:22 34:23 71:11 81:10,10 81:12,12 83:13

83:16 89:15,15 89:17,17,19 91:9 116:3 196:4 225:22 325:11 340:19,21 341:3 341:7,9 344:18
**cases** 63:2
**case-by-case** 122:18
**castle** 339:4
**cat** 282:21 283:2 283:15
**categories** 86:19
**category** 75:2
**cause** 49:11 53:7,8 61:5 69:21 88:22 101:8 115:10 146:23 149:3 151:9 205:21 338:6
**caused** 42:1 70:21 72:9,23 73:2,7 96:23,23 97:9 99:17 112:1,3,17 116:1,3 128:1 130:17,21 133:14 133:16 147:2,3 163:4,9 338:8,11 348:7
**causes** 69:16,21 141:8
**causing** 56:10 68:6 99:14 100:5 110:16 120:22 133:4,10
**cell** 116:5 186:9,12 260:10
**certain** 163:19 164:12 165:10
**certainly** 275:18 312:13
**Certified** 1:22
**CFO** 180:21 182:10 190:19

**chain** 243:5
**chair** 268:8,12
**chairman's** 32:1
  323:8
**challenge** 150:12
  150:13
**challenging** 149:21
  149:23
**chance** 166:3
**change** 66:7 98:1
  109:10 110:3,6
  110:16 148:20
  239:23 297:2
  331:1 339:15
**changed** 68:22
  69:18 100:13
  187:12 262:21
  292:18 293:2
**changing** 277:12
**Chappy's** 345:6
**Charbonneau**
  289:23 290:6
**charge** 9:12 48:12
  53:20 86:2 87:5
  87:22 130:13
  137:8 164:13
  243:11,13,16
  250:1,12,22
  251:6,10 303:18
  305:6 318:16
  321:2 344:13
**chargeback** 114:23
  115:9 130:20
  150:19,22,23
  151:11 299:21
  300:8,8
**chargebacks** 147:5
  300:4
**charged** 112:15
  122:14 137:22
  151:5 166:8
**charging** 130:3
  149:16
**chart** 106:7 341:22

**charts** 31:20 33:20
**Chase** 68:17
  110:20,23 111:11
  182:23 183:3
  191:14,15 342:1
  346:6
**check** 30:10,16
  199:15 201:9,10
  201:22 296:1
**chest** 42:9
**Chi** 7:16 63:5 95:5
  95:6 121:18,19
  121:20,21 136:16
  167:8,21 168:1
**Chicago** 335:11
  336:21
**chief** 47:18 88:7
  332:8
**child** 328:11
**childish** 116:22
**children** 18:23
  19:7,16 21:7
  289:18,22 290:2
  330:13
**Chi's** 63:6
**Cho** 249:20
**Choi** 48:16,19 49:1
  49:2 50:15 58:20
  59:23 75:18
  101:13,17,21,22
  102:4,5,6,16
  103:2,5,7,8,15
  104:4 106:13,22
  108:14 109:21,23
  110:9,13 113:5
  114:1,16 115:7
  116:4 121:16
  130:15 133:16
  134:14 139:15
  140:12,13 141:6
  141:11,19 142:4
  142:10,19 143:2
  143:9,11,18
  144:1,5,10,16

146:18,20,22,23
  147:10,23 148:1
  152:6 154:16,23
  155:11 164:17
  166:12 168:3,10
  178:11,23 180:13
  180:15 181:3,5
  182:12,17 183:13
  183:18,20 188:19
  189:9 190:14,19
  191:21 261:17
  302:19,23 303:4
  303:12,13,19
  306:9 308:8
  313:18,20 319:9
**Choi's** 50:7
**cholesterol** 28:8
  29:22 30:3
**Chong** 262:1 263:6
  263:7 265:16
  267:3
**choose** 32:12
  148:16
**chose** 32:13
**Chris** 6:11 59:18
  59:22 80:22 93:1
  93:2,7,9 95:6
  133:8 145:12
  146:15 166:22
  341:17
**Chronological**
  7:11
**Chrystal** 12:6
**Chuck** 37:20
  266:15 341:17
  343:16
**Chung** 24:22 25:12
  25:17,17 31:23
  32:1,8 34:7,21
  193:18 194:2
  234:18 280:19
**Chung's** 24:9
**Cincinnati** 17:2
**circumstances**

198:8
**City** 185:7 200:1
  200:16 214:1
**claim** 196:3,5
  304:11 319:20
  326:20
**claimed** 20:5
**claims** 292:6
  329:16 341:15
**clarification**
  161:23
**clarified** 256:5
**clarify** 15:16
  101:18 106:21
  159:17 346:10
**clarity** 240:1
**classification**
  96:19
**classified** 39:11
**Clay** 5:12,19 11:21
**clear** 57:20 75:22
  77:5 117:2 139:6
  192:14 254:6
  255:17 318:19
  319:6 322:14
  347:4
**clearly** 15:19 65:17
  158:19
**close** 308:17 329:1
**closer** 312:4
  321:19
**clothes** 204:20
**club** 204:13
**COBRA** 328:9
**coffee** 262:6
**cold** 91:13 333:2
**colleague** 206:2
  229:5 233:19
  243:11 247:10
  250:2 282:17
**colleagues** 35:20
  35:22 36:9 62:4
  171:21 210:18,20
  210:20 213:3

226:22 227:20
  228:2,17 233:2,3
  234:11 237:20
  238:3 243:22,22
  243:23 245:15,16
  246:8,12,13
  265:10 267:14
  282:23 290:9
  321:13,16,22
**collective** 206:22
  274:4
**College** 247:13
**Colony** 11:23
**columns** 275:5
**come** 24:6 49:9
  50:15 53:5 76:13
  81:8,14 94:7 96:1
  104:19 105:12,13
  105:21 129:16
  131:13,15,23
  132:9 152:9
  179:9 188:20
  191:3 220:12
  244:11,20 249:5
  256:15 264:20
  267:20 269:21
  272:8 288:16
  294:11 306:2
  324:12 331:9
**comes** 162:8
  205:12 294:17
**coming** 19:9 52:4
  56:1 76:20 77:2
  131:6 140:22
  251:14 259:20
  270:9 280:18
**command** 295:20
**commenced** 138:8
**commencing** 2:1
**comment** 64:4
  104:4 115:4,7
  123:2,7 144:4,9
  160:21 193:19
  283:7,14,19,20

298:17,21 303:11
309:9,12 310:5
310:13 313:16
334:22
**commented** 138:7
**comments** 50:4
139:1,21 141:11
141:18 156:16
162:4 164:16,18
261:16
**commercial** 52:11
90:1
**commitments**
280:18
**commodity** 109:1
**communicate**
239:19 240:12
**communicated**
216:1
**communication**
241:21
**communications**
333:5
**community** 334:8
**companies** 307:23
308:2 333:7
**company** 12:23
13:1 14:3 16:21
35:18 55:14 91:4
108:22 147:4
156:1 203:1
209:11 216:18
232:5 239:19
240:8 254:23
261:12 269:17
272:3,5 278:4
294:15 314:16,18
323:18 332:14
333:14
**compared** 284:2
**compensation** 40:5
220:5 244:17
**compilation**
226:19

**complain** 209:21
**complained** 172:1
253:1 256:2
**complaining**
170:18 265:8
**complaint** 196:23
210:1 255:15
265:6 271:10
280:2
**complaints** 254:20
255:5 281:15
282:6 284:5,9
319:14,16,19
320:14,16 345:11
345:22
**complete** 72:2
79:13 193:12,13
288:3
**completed** 307:15
**completely** 70:23
**components** 91:7,9
**composition** 74:12
**concept** 164:23
**concern** 8:17
111:15 122:1
149:3 235:14
256:13 278:16
286:2 311:21
**concerned** 115:18
192:19 199:13
**concerningly**
270:18
**concerns** 53:3
84:19 99:9 128:7
133:4,9 200:6
208:9 251:2
254:22 272:3
275:6
**concluded** 109:9
**concludes** 349:3
**conclusion** 87:21
**conclusions** 100:17
**concrete** 293:4
**concur** 51:10

111:9
**concurred** 93:17
101:3,8 113:1
**condition** 41:19
197:15 259:19
261:2 264:14
285:14 307:1
**conduct** 233:6,19
235:7 275:17
314:17
**conducted** 213:14
**conference** 83:9
181:22 228:3,4
234:9 235:1
238:5 257:2
**confirm** 160:10
**confront** 306:8
**Congulton** 335:18
**conjunction** 38:11
197:8
**connected** 43:19
269:14
**consensus** 51:9
261:6
**consent** 324:6
**considered** 34:3,5
**consistent** 16:7
25:13 41:20
107:20 127:15
128:14 145:5
154:19 168:23
170:16 173:23
**consistently** 29:17
**constant** 17:22
**construction** 37:3
208:15
**consultant** 239:2
**consultation**
223:16
**consulted** 341:13
**consulting** 237:18
261:20
**contacted** 93:5
332:1 333:9,11

**contacts** 19:8,10
**container** 70:9,13
76:3
**contempt** 21:18
**contend** 195:2
322:15,22 325:12
329:15
**content** 143:5
156:16 296:15
**contention** 166:6
319:6,9 329:9
339:19
**context** 156:16
310:19
**continually** 245:7
**continuation** 39:8
39:14 40:11
**continued** 66:11
125:19 177:3
242:5 243:20
308:21
**continuously**
122:21
**contract** 13:10,12
65:16 235:7
237:17 288:3
**contrary** 123:13
124:22
**control** 28:8 55:3
68:18 82:11 97:2
101:5 111:1
113:2 129:7
240:17 273:8
**controlled** 130:21
**conversation** 59:1
59:3 124:13
137:6,13 146:11
147:11 155:17
177:16 178:22
179:2,11,15
180:9,13,15
182:12,15 187:19
189:1 191:9
194:11 199:7

200:10,12 208:10
217:18 254:7
255:23 256:20,22
257:9,11,16
259:23 260:19
277:20 278:7
279:11 282:11
285:7 289:10
292:8 295:14
296:3 298:23
299:10,11,14
301:21 310:22
344:8
**conversations**
82:21 102:16
124:6,16 137:5
138:4 167:8,20
172:20 176:16
177:22 182:16
187:16 207:11,15
253:18 256:19
257:7 262:14
278:3,11 284:1
297:5 308:3,8
314:20 315:4
334:7 344:23
347:7
**conveyed** 95:9
184:19
**convince** 331:8
**convinced** 193:6
**COO** 7:16 47:18
155:13 167:13
268:7
**Cooper** 1:19 4:3
10:13
**cooperate** 277:17
**cooperative** 162:9
**coordinated** 92:22
**copies** 30:10,12,14
**copy** 22:21 45:10
173:14 212:2
225:6 245:11
274:21 302:3

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

314:7 315:12
324:6
**corner** 8:18 60:4
153:18
**coronary** 30:4
42:14,17
**corporate** 11:9
**corporation** 13:23
16:23 17:1 23:21
25:21 327:1
331:6 334:9
**corporation-ow...**
55:15
**correct** 15:9 18:10
18:11 21:19 23:1
34:1,20 37:11
39:22 63:23 65:4
66:4 70:6 72:9
73:8 76:3,10
84:11 90:8,19
94:19 96:15
119:11 133:21
136:7 142:12
143:4,19,22
144:1,2 149:9,12
150:7 153:16
154:17 155:4
157:6 162:17
163:6,21 171:1
178:16,20 196:14
209:13 219:2
221:15 226:23
231:7 274:8
296:22 303:16,21
315:1,11 318:23
319:11,12 343:12
**correcting** 99:5
**corrective** 49:11
**correctly** 77:3
115:1 123:22
233:6 258:14
**correspondence**
280:23 324:22
**corrosion** 82:1

**counsel** 10:19 11:9
**counseling** 20:13
20:15
**counselor** 335:11
338:13
**counselors** 330:20
**count** 96:10 107:23
108:5
**countermeasure**
61:6 65:4 68:12
69:15
**countermeasures**
69:10,12 99:4,5
166:16
**counteroffer** 348:9
**counterparts**
322:19
**counterproposal**
348:11
**countless** 290:14
**County** 23:20
**couple** 43:1 242:23
**course** 138:12
**court** 1:1 10:16,21
21:17 23:7,8
40:20 102:22
255:10,16 288:6
322:17
**cover** 113:17
177:20 286:16
288:19
**covered** 40:1
113:23 247:6
287:10 313:2,21
**covering** 138:18
287:15
**CO-COUNSEL**
4:1
**co-workers** 284:3
**Cracker** 199:19
**Craig** 37:18
335:18
**crate** 75:13
**craters** 73:13

**crazy** 161:21
**creating** 273:8
**creative** 288:9
**credentials** 201:23
**credit** 30:7,18 31:3
31:6
**Crestor** 188:4
**cried** 181:6
**crying** 337:4,5,7,8
337:10,13,16
**cubicle** 235:1
257:3
**cultural** 233:21
**culture** 36:6
**cure** 67:11,15 68:3
68:13,15 69:3,4,8
70:4 99:6,22
100:4,8,14 101:2
110:17 127:14
**cured** 68:7 69:17
70:22
**curing** 97:9 98:3
99:18 110:7
**curious** 288:23
**current** 11:22
160:5 331:4
**currently** 17:19
**curse** 178:15
**curtains** 246:2
**customers** 111:14
128:11
**cut** 155:6,9 274:16
277:6 298:1
**Cymbalt** 28:9
**Cymbalta** 27:2
28:11
**Cynthia** 18:22
**Cyr** 119:21
**Cyrus** 1:5,16 5:12
5:16,19,22 7:10
7:19 8:14,22 9:5
9:8 10:5,6 11:11
11:17,21 18:22
23:5 66:11,18

107:19 109:13
111:21 122:17
125:19 126:10,13
127:23 131:1
135:17 138:8
140:23 169:9
177:2,10,12
242:5,11,14
278:15 308:4,20
309:5 349:5
**C.P.M** 5:19 8:14
9:8

---

## D

**D** 5:1 10:1 155:23
188:17 190:17
**dad** 328:23
**daily** 27:9,15 51:12
268:10
**damage** 96:22
348:6
**damages** 325:10
329:17
**dancing** 204:14
**Daniel** 170:2,7
**dash** 158:13
**data** 118:6 129:18
142:6 164:7
323:3
**date** 13:15 23:18
25:4 43:5 153:19
169:7,11 171:1
204:2 220:9
260:4 265:4
307:5 318:20,21
321:7
**dated** 5:8,13,20 6:3
6:6,10,14 7:2,8
7:13,17 8:2,6,9
8:13,19 9:2,6,10
152:22
**dates** 29:5 322:2
**Dave** 37:18 174:22
176:1 191:23

192:4,6 193:4
302:5,16 311:1,5
341:16 342:20
346:5,15
**Dawn** 1:21 10:16
**day** 24:11 27:21
33:12 51:18
81:15 137:11
153:8 180:17
189:20 199:17
239:21 291:16
308:5 309:18
338:18 347:9
**days** 16:11,11
23:19,22,22,23
32:18 44:5
168:20 195:15,18
220:11 244:5
253:15 344:20
**day's** 120:13
**DEAKINS** 3:12
**deal** 171:3,5 172:5
220:3
**dealing** 241:4
**dealt** 49:7
**debts** 327:6
**December** 9:3 16:9
16:15 318:21
**decide** 100:18
**decision** 132:6
149:21 150:8,12
150:18,21 231:3
261:4 264:22
265:13,15
**decisions** 261:4
263:23 269:5
301:2
**decree** 20:1,22
**deemed** 65:12
74:16 95:16
**deep** 121:1
**defect** 54:4,6 61:16
75:4 96:3,8
123:15 130:22

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

134:20 135:8
**defective** 74:1,12
84:10 94:17
96:17 99:10
157:12 159:5
**defects** 79:5 80:9
82:23 96:23
113:3 121:1
123:12 124:17
127:23 128:2
133:14,16 134:12
134:17 135:10,11
147:2 151:9
159:23 162:22
163:3
**defend** 120:14
**Defendant** 1:11
**Defendants** 1:18
3:10 4:1 5:6
14:10 16:3 22:13
41:10 56:16 58:1
107:11 126:6
136:22 137:3
152:16 165:15
168:15 173:6
174:6 185:23
196:18 273:2
314:4 315:10,21
318:13
**defended** 128:6
**define** 35:13
108:13
**definitely** 244:7
341:23
**definition** 39:2
**degree** 198:15,18
198:21 199:2
247:14 262:5,15
266:4 267:6
**deliver** 68:21
**demanded** 56:20
**demonstrating**
121:2
**demoted** 323:6

**deny** 115:3 133:19
138:3 139:11,13
140:22 166:22
167:2 176:4
**denying** 141:3
**department** 26:6
33:18 34:4 35:11
36:11 50:22 82:4
92:11 94:23
111:1 148:12
149:15 176:8,11
211:17 230:17
248:10 264:1
267:14 293:21
309:15
**departments** 54:21
**departure** 32:18
34:11
**depending** 44:6
81:10 261:10
326:4
**depends** 108:12
**deposed** 12:19
**deposition** 1:14
10:4,11 12:15
15:12 23:11 35:1
66:10,17 107:15
125:18 126:9,17
165:18 177:1,9
242:4,11 308:20
309:4 320:5
324:10,21 349:4
**depression** 340:2,8
340:12,14
**deputy** 212:21
222:1
**derogatory** 50:4
178:12 323:10
**descent** 306:19
307:7,16 308:6
310:9,15
**description** 61:4
**design** 160:5,5
**designate** 165:9,11

**desk** 152:10 179:4
179:10,13 184:21
347:12
**dessert** 216:9,10
216:11,14
**detail** 276:10
320:18
**details** 76:13
**detects** 125:9
**determination**
24:12,22 74:19
89:1,13 93:12,13
94:21,22 95:1
115:10 117:8
130:8 150:13
**determine** 73:17
130:9 151:8
164:1
**determined** 24:13
24:15 32:7 129:4
300:17
**determining**
164:20
**Detroit** 24:5 288:7
**development** 24:19
31:16 33:6 36:13
36:19 37:9,10
50:9 51:1 54:16
55:4 90:20,21,23
92:3,7 93:4,22
94:15 101:16
102:5,8,9,14,15
103:17 106:8,22
139:17 173:19
183:14 194:1
262:2 263:5
266:17 302:12
303:7,18 304:8
**device** 297:4,6
**diagnosed** 188:7
**dialogue** 101:19
**diary** 58:7 118:1
252:14
**Dickey** 186:14,22

193:11
**difference** 138:21
161:16 273:16
**differences** 246:11
252:2
**different** 33:2
40:12 54:21
55:19 99:7
100:19 102:15
141:8 142:11
143:8 162:15
171:21 194:16
230:22,23 242:23
244:7,7 255:7
262:19 266:8
270:8 271:21
277:19 278:4
291:1 294:12
344:11
**differently** 253:20
256:15 257:12
259:17,18 261:1
271:11,19 273:22
276:13,17 277:11
277:23 278:18
322:18,23
**difficult** 338:23
**difficulties** 48:13
126:19 212:22
**difficulty** 42:7,8
48:21 68:16 78:9
**dinner** 174:23
175:17 177:17
197:12 199:16
200:19 214:1
216:3 217:18
220:21 280:16
285:22 291:2
295:23 296:9
314:22 315:1
342:9,13,15
**direct** 35:10,12,13
35:17 36:7,17
37:7 53:20 77:23

139:7 183:12
191:17 205:23
**directed** 144:4,9
144:17 218:12
**direction** 51:11
81:11 145:8
197:9
**directly** 31:23
35:14 37:14
47:20,23 77:22
124:15 145:8,11
167:12 206:13
227:22 243:4,5
306:12
**director** 31:15
33:21,22,23
36:22 50:8,23
106:7 108:12,16
261:9 263:4
275:20 303:5,6
303:23 329:23
**directors** 48:7
213:5 221:14
226:20 229:19
230:1,3 254:19
258:5
**disability** 38:20,23
39:7 306:22
**disagree** 109:18
127:3 128:19
145:17,18 166:5
166:9
**disagreements**
49:21 167:23
258:11
**disappointed**
295:5,7
**disclosure** 320:22
**disclosures** 325:22
**disconcerned**
234:12
**discovered** 42:12
**discovery** 29:6
30:4 83:1 317:16

discreet 265:13,15
discretion 82:3
discriminated
  306:18
discriminating
  321:4
discrimination
  9:12 242:22
  318:8,16,20
discriminatory
  225:3 319:8
discuss 72:13
  85:16 108:22
  114:9 122:12
  123:9 129:2,12
  194:9 199:21
  246:23 255:20
  281:8 308:6
  331:15 342:12
  343:4,7
discussed 46:22
  71:4 110:1
  132:12 165:21
  166:12 167:11
  181:4 188:2,3
  209:6 214:1,7,13
  215:16 220:2
  226:13,13 242:18
  246:19 249:1
  254:13 262:20
  341:20
discusses 61:1
discussing 47:10
  108:19 242:20
discussion 17:22
  24:4,17 38:8 59:4
  61:10 64:2 67:10
  67:13 70:12,15
  87:4,7,8 105:7,11
  111:3 122:23
  123:12,13 166:11
  200:5 202:10
  255:18 257:22
  282:2 298:18

323:23 324:3
347:15,18
discussions 23:10
  34:7 83:5 86:21
  98:6 238:2
  271:22 280:23
  281:3,23 306:9
  320:19
disease 30:4
dislike 168:1
displeased 294:20
  295:1
dispute 194:22
  195:7 201:15
disputed 195:14
disruptive 167:16
distinct 171:22
  233:18 274:1
distinctly 171:20
  270:7
distinguish 273:15
distracted 208:2
distress 329:16,18
  335:9 337:14
distributed 225:11
distributors 52:16
DISTRICT 1:1,2
division 1:3 333:1
divisions 33:2
divorce 20:1 38:14
  44:22 171:10,11
  171:18 186:16
  218:4 337:18
  338:2,5,11,16
  339:1,14,21
divorced 18:12
  19:16 337:20
  339:18
dizzy 172:21
doctor 28:15,19
  43:7 44:12
  169:14,18 170:17
  170:20,22 172:11
  172:15 187:12,23

188:9
doctors 335:6
document 5:8,13
  5:17,20 6:2,4,6,9
  6:14 7:2,8,13,17
  8:2,6,9,12,16,19
  9:2,6,10 14:8
  16:1 22:11 41:8
  46:3,23 48:10
  56:14 57:5,22
  61:1 69:23 71:17
  72:14,16 79:16
  96:14 101:22
  102:2 103:7,9
  107:9 126:4
  136:20 138:23
  152:14 155:3
  156:12 165:13
  168:13,17 173:4
  174:3,4 185:21
  186:5 196:16
  222:16 263:19,22
  272:21,23 273:3
  314:2 315:8,19
  318:11 325:5
documentation
  29:9 32:22 40:13
  42:23 51:13
  79:13 95:18 96:5
  157:17,19 160:9
  194:17 197:14,18
  237:12 265:3
documents 30:6
  46:7,9 60:4,7
  72:3,7 79:14
  115:18 153:12
  198:1 225:21
  264:10 275:3
  307:14 320:1,4
  326:14
dodged 272:1
dog 282:21 283:3
  283:15
doing 44:10 63:3

80:14 165:8
173:2 183:7
187:10 190:3
199:14 200:3,18
245:1 262:13
277:13 296:2
309:14,14 323:10
dollar 87:19
dollars 131:12
donna 305:1
Door 200:17
double 84:5
doubt 170:23
  310:12
downstream
  135:10
downtime 72:11
  73:6 79:18 87:5,9
  87:23 88:22 89:3
  89:7,8,20,21 90:6
  90:13 91:1 112:2
  112:10,11,12,15
  112:17,21 114:10
  114:20 118:5
  130:4,12,16,19
  132:10 133:4,10
  137:22 138:2,5,9
  141:1,7 145:14
  163:20 166:7
  167:11 300:8,9
Dr 332:8,20
draft 184:22
  223:16
drafting 317:21
dramatic 68:23
draw 100:16
draws 87:21
drinking 20:8
  204:15 338:9
drinks 175:18
drive 3:6 11:23
  120:13 291:21
drives 291:7
driving 292:5

drove 204:16
  218:2 291:4
drug 188:4
drunk 288:17
  291:3,14
dry 67:23
Duck 25:17 345:7
Duckworth 8:15
  8:21 9:4,9 25:16
  115:20 116:2,8
  140:15 177:17
  180:10,14 185:5
  186:7 188:17
  189:2 190:16
  191:9 192:2,9,16
  195:17 196:13
  197:1,4,11 199:7
  199:12 200:11,14
  200:21 202:5
  210:6 213:20
  216:2,4 218:21
  218:22 219:7,22
  220:22 221:5,12
  221:18 224:7,16
  225:12 226:14,22
  227:3,11,15,19
  228:8,13 229:18
  232:17 237:13
  239:16,17 242:16
  247:1 252:6,18
  252:23 253:6,23
  254:4 256:3
  268:21 277:2,10
  277:14,16 280:7
  280:19 282:9
  284:1 285:23
  286:2 295:21
  299:1,9,14
  310:14,23 311:16
  311:20 314:20
  316:1,6,13
  320:20 321:3,14
  321:20 322:5
  324:23 345:8

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

347:1,6
**due** 41:18 109:9
155:13
**duly** 11:12
**dunnage** 70:9,14

**E**

E 4:9 5:1,2,5 10:1
10:1
**earlier** 26:14 41:16
70:3 100:20
102:7 115:18
150:9,11 152:19
162:23 168:10
172:22 193:23
221:11 230:14
260:19 276:11
284:16 314:11
319:16 348:23
**early** 116:6 152:8
179:8,18 189:10
275:7 284:11
**earning** 325:17
**easy** 338:2
**Echols** 205:7
**EEOC** 137:9
**effect** 114:7,12
122:8 124:4
128:4 129:21
130:3 131:19,23
134:23 139:4
142:2 155:19
163:2 166:23
176:5 193:3
205:19 334:19
**effective** 64:8
**effectively** 283:4
**effects** 188:5
**efforts** 16:17
**eight** 47:15
**Eisenmann** 13:23
14:14 16:15 17:7
326:23 327:21
328:17 329:11

**either** 19:2 22:2
47:19 70:19 76:1
96:22,22 100:8
101:23 145:8
247:15 260:7
275:2
**elaborate** 320:12
340:23
**element** 319:13
**elements** 226:11
**embarrassing**
117:20 151:19
190:5
**emergency** 42:11
42:12
**emotional** 329:16
329:18 335:9
337:14
**emphatically**
145:18
**employed** 13:20
19:22 247:20
248:9
**employee** 108:1
198:5,11 203:10
203:14,15 211:5
220:14 269:19
287:9 302:6
**employees** 35:21
76:9,12 77:8,14
136:1 165:7
171:23 204:13
205:10 224:23
234:7 244:22
245:1 264:1
334:10
**employer** 13:22
279:19 330:9
**employers** 17:23
190:7 335:2
**employment** 16:17
17:6 19:7 31:8
264:12 319:4
322:21 323:13

**empty** 75:13
**enclosing** 225:6
**encompass** 53:22
232:23
**encountered** 38:6
**endeavors** 205:13
**ended** 116:14,17
151:20 152:1,2
167:15 199:23
225:12
**Enforce** 232:11
**engage** 20:14
178:11
**engaged** 203:6
319:9
**engineer** 65:9
136:14
**engineering** 110:4
110:16
**English** 62:11,12
63:1 143:11
146:19 147:7
154:14,14 178:16
222:9,22 229:6
233:16 266:21
267:19 293:9
**enjoy** 267:11,11
**enlightening**
268:16
**entails** 43:15
**entered** 20:1
**entire** 14:6 89:6
143:11 268:9
**entities** 17:6
**entitled** 6:12,16
7:5,10 8:7,17
9:11 194:23
195:2,11 196:5
**entitles** 39:16
**entity** 24:5 25:19
25:22 26:2 29:8
87:20 149:11
**entries** 118:1
**environment**

188:21 189:22
190:6,8 273:9
295:2
**EO** 109:9 110:3,6
110:10
**equal** 36:22 234:22
303:22 304:6
**equally** 232:11
**equipment** 37:4
288:10
**equitable** 165:3
**Erdmannsdorfer**
5:10
**err** 195:22
**error** 71:12
**errors** 149:16
**escalating** 189:9
190:18
**Especially** 190:10
**Esquire** 3:4,11 4:2
4:9
**established** 337:17
**estimate** 45:7,23
160:11 328:21
**ethical** 233:21
**evening** 209:19
218:5
**events** 6:18 7:11
23:12 137:11
181:4 213:7
312:6 346:14
**eventually** 243:5
**everybody** 116:15
146:15 171:19
240:2 241:5
268:13 295:7
339:17
**everybody's**
201:11
**everyday** 172:6
**ex** 304:13
**exact** 13:15 25:4
143:2
**exactly** 18:15

32:23 44:22 65:8
135:5 142:18
170:22 180:4
184:18 216:1
222:10 330:3
**Examination** 5:4
11:14
**examining** 89:7
**example** 88:7
243:1 244:1
245:2 261:23
288:21
**examples** 160:6
**Excel** 240:21 241:9
258:17
**excellent** 262:3
269:18 300:21
**exceptional** 229:6
**exceptionally**
245:2
**excerpts** 286:19
**excess** 114:23
299:21 305:7
**excluding** 38:14
**exclusively** 271:7
**excruciating** 276:9
320:18
**excuse** 40:20
139:12 166:2
177:15 233:13
255:10 270:5
**execute** 13:10
**executive** 33:11
49:6 107:18
108:9,13,14
216:15,20 218:10
219:11,13 231:18
253:19 257:21
258:2,7,11 286:5
288:5 295:19
296:4,17 311:8
344:12
**executives** 178:19
224:17

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

exercise 43:20
exhibit 14:10,12
  15:23 16:3 22:13
  22:15 41:6,10,11
  56:16,18 57:21
  58:1,6,12 60:1
  101:11 103:12,17
  103:20,21,23
  104:2 105:23
  106:1 107:11,15
  109:4 126:6,14
  136:22 137:3
  151:15 152:16,18
  153:1,17 165:15
  165:17 168:15
  173:6 174:6,13
  185:23 186:1
  196:18,21 259:7
  273:2 313:23
  314:4,8 315:10
  315:11,21,22
  316:20 318:13,14
exists 157:23
expect 133:23
  146:16 235:16
expected 54:12
expense 243:23
expenses 326:18
  327:10
experience 23:2
  71:18 81:21
  202:3 216:4
  243:7 301:12
expert 39:19
experts 340:7
expired 347:10
explain 52:14
  67:15
explained 100:3
  188:17 304:13
  338:21
explanation 68:17
  92:17 141:9
Express 30:22 31:7

expressed 48:11
  256:13 346:1,4,8
Expressing 111:15
extended 298:18
extensive 280:22
extent 247:6
exterior 158:6
extra 173:16
  206:10
eyes 262:9
e-mail 6:15 8:3
  54:9

_____
          F
_____

face 238:6
face-to-face 16:19
  17:4,20 347:23
facility 67:2,4 77:6
  77:10,21
facing 128:8
fact 112:16 161:4,6
  161:17 172:12
  182:3 207:16
factory 53:4
facts 54:11 87:15
  89:10 90:10
  93:20 94:11,14
  100:22 101:1,2,7
  101:18 112:17
  150:2 161:12,14
  163:12 165:1
  189:19 305:20
factual 95:23
  163:17 301:3
factually 112:19
fact-finding 159:9
  159:13,18
failed 289:21
fair 15:20 54:3
  58:21 87:14
  147:16 148:2,3
  150:5 163:17
  165:3 299:20
  300:7,11,14,17

301:9,11
fairies 159:16
fairly 154:12
  232:13
false 209:9
family 19:13 39:4
  39:10 40:2,11
  41:15 42:9 170:1
  170:7 205:20
  307:9 347:10
far 36:15 72:6
  242:22 243:21
  245:17 251:8,12
  254:20 303:7
  340:14
fascias 13:1
fashion 68:23
  166:21 233:22
  243:20
father 202:18,21
  327:11
fault 87:13
favorably 225:5
fax 197:1
faxed 197:4 316:3
  316:4
fear 192:17 193:6
featured 300:22
February 328:18
federal 3:14 23:7
  322:17
feel 15:15 75:3
  87:11 115:1
  147:1 225:10
  230:19 245:16
  273:22 276:19
  277:22
feeling 161:10
  172:21 199:17
  209:18 215:4
feelings 65:21
  161:11
feels 136:10
felt 184:16 187:8

188:9 250:13,14
  256:14 259:17
  260:23 269:11
  275:16 306:17
  343:23 344:6
female 95:7 203:15
females 175:6,20
fetal 234:9 237:2
fifth 122:10
fight 234:23
figure 84:20 196:8
  232:19
file 40:12 288:1
  327:5 339:1
filed 18:16 20:7
  38:18 40:14
filing 287:22
fill 40:16
final 74:18
finalists 24:14
finally 288:7 325:9
finance 247:10
  248:12,14
financial 209:1
  231:19 287:22
  332:8
financially 151:10
financing 288:2
find 80:9 134:12
  135:11 289:14
  329:21
finding 22:9
finds 83:15 135:10
fine 304:18 324:16
  324:17 326:13
finish 163:14 183:9
  268:23
finished 66:20
fire 38:2,9 91:8
  176:4
fired 190:11
  198:10,12,13,14
  344:5 345:9,21
firing 38:7 188:18

201:8 247:14
firm 237:19 239:2
  295:15 335:12
first 8:12 23:19
  28:19 31:18,19
  32:5,15 40:13
  41:21 51:23
  53:15 54:5 56:21
  60:23 66:21 74:1
  77:20 88:18
  90:12,14 91:20
  101:15 108:1
  110:3 114:16
  127:9 137:16
  145:4 146:17
  152:12 166:20
  187:16 189:1
  192:13 199:10
  204:18 216:17
  217:21 228:10,11
  229:13 256:18
  265:19 289:19
  316:20 321:20
  336:19 339:6
  341:13
firsthand 203:2
fit 44:7 188:16
  331:12
five 37:7,15 50:19
  106:4 121:7
  210:12 248:8
five-mirror 70:16
five-month 328:23
five-percent 245:3
  245:5
fix 135:11
flabbergasted
  132:8
flabbergasting
  116:10
flagrant 86:3
flagrant-type 75:4
flawless 329:21
flew 332:4,7

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

flies 332:3
floors 91:8
fluctuated 336:10
flu-like 188:6
FMLA 39:10,16
  153:5 174:17
  193:14,17 194:13
  194:18,23 195:3
  195:10 264:18
focus 23:11 51:3
  113:14 114:4,14
  115:5 120:1,8
  129:5 139:8,22
focused 24:17
focusing 42:4
  214:20
follow 249:16
followed 251:17
following 225:2
  260:12,12 280:12
follows 11:13
  103:3
follow-up 197:20
  280:10
food 328:14,15
force 14:2 232:10
forcing 287:21
Ford 234:2 241:4
foreclosure 327:4
foreign 198:6
forgiven 15:5
fork 86:1
forklift 86:7
form 40:5,17 60:16
  67:19 68:4 261:6
  324:7
formal 48:20 153:2
  196:23 259:15
formalize 332:20
format 70:16,17
  97:1,5,13,15,23
  100:12
formats 70:20
formatting 99:13

formed 25:19
forth 111:11
  194:12 220:13
  261:12 348:15
forward 44:10
  177:13
found 46:23 63:8
  88:21 159:5
  212:5
founded 22:8
four 36:10 37:8,15
  43:6 44:5 47:15
  50:19 229:16
  230:1,3 244:2
  254:4 348:12
fourth 22:17
Four-page 7:13
four-recipient
  316:9
frame 26:17 47:7
  315:6
framework 237:21
fraud 255:16
free 15:15
frequently 68:20
Friday 140:5 183:3
  293:5
friends 338:1
front 46:9 149:2,22
  185:11 234:10
  235:3
fruition 24:7
  259:20 280:18
  294:12,18
frustrated 132:4
  201:4
Frye 59:21
FTZ 198:6 202:3
full 11:19 122:10
  197:10,22 286:20
  301:20 302:3
  304:15 320:22
fully 69:17 254:13
  270:4 319:18

320:15
function 51:2
  258:14
fundamental 64:7
  65:3
further 21:14
  220:22
future 49:12
  294:16 325:17

**G**

gain 71:19 97:16
gained 80:3 336:10
Gaining 336:6
Gale 1:19 4:3
  10:13
Gappa 37:21
gas 31:12 290:13
gasoline 328:15
gates 246:2
gather 165:1
gathering 175:6
gay 344:7
Gee 262:23
general 28:16,23
  64:21 79:4 85:11
  112:2 170:8
  197:21 206:3
  212:20 262:23
  280:8 313:13
generally 80:16
generated 222:12
  273:13
generation 202:2
gentleman 28:21
  32:5 193:7 211:3
  211:6 216:23
  226:14 238:6,8,9
  254:8 309:19
  334:3
gentlemen 158:14
Gerald 7:4 136:13
  335:11 341:16
  343:9

German 332:14
Germany 14:4
  106:16
getting 35:7 77:1
  139:4 266:3
  284:23 295:9
  308:16 338:16
  339:18
Ghee 206:15
  290:22
gift 195:21
Gillis 295:15
Ginger 344:4,15
give 21:11 25:3
  53:6 140:16
  142:3,5 180:19
  184:11 188:19
  189:12 195:18
  196:19 207:17
  218:19 241:10
  244:22 275:19
  335:5 343:2
given 12:15 69:1
  137:13 225:3
  323:7 324:6
gives 129:15
giving 61:20 62:5
  283:8
glad 54:8 320:9
Glen 62:1,3 86:16
  131:16
Glovis 55:9,11,12
  55:14,14,21
  56:10 66:4 72:9
  73:1,2 75:12,19
  76:8,9,15,20 77:6
  77:8,10,14,21
  93:19 96:23
  104:19,23 105:2
  105:11,13,16
  112:4 114:11
  120:10,15 128:1
  129:12 147:4
  158:18

GM 234:2 241:4
go 14:1 15:10
  21:17 25:20 35:1
  42:10 44:3,9 46:6
  52:9 57:17,20
  71:16 74:20
  76:16 84:4 89:13
  90:4,16 105:21
  107:22 108:4
  115:20 116:2
  125:14 142:7
  154:8 158:3
  163:16 164:20
  165:1 173:1
  181:23 187:23
  193:15 199:15,19
  199:22 207:20
  215:6 216:10
  220:4 228:3
  231:9 233:14
  243:9,15 245:12
  249:22 252:6
  259:4 261:7,11
  263:10 264:3
  265:7,9 266:2,14
  266:14 267:13,16
  267:22 268:1
  271:4 287:12
  291:20 293:7
  295:22 308:14
  309:7 320:8
  323:19 331:21
  333:23 336:22
  337:4 347:9,12
goes 123:15 217:22
  284:20 292:18
  309:22
going 12:23 24:18
  24:20 29:2 32:8
  45:12 46:16 52:3
  52:5,7 53:11,16
  54:21 62:13
  66:12,18 88:17
  100:17 116:6

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

120:3 125:20
132:1 140:14
148:20 152:8
161:18 162:5,10
162:12,20 163:13
163:18 164:2,23
169:14 170:17
171:9,17 177:4
179:7,17,18
181:23 189:10
194:8 195:18
199:18,21 202:6
207:4,19 209:10
209:13 218:3,21
231:3 232:23
235:15 239:20
240:11,23 241:14
242:6 248:16
253:13 264:2
266:2 269:4,17
269:20 271:18
273:17 277:7
283:4 290:6
292:8 294:14,16
308:22 320:6
323:21 337:18
338:22 339:1
347:20 349:6
**going-away** 264:5
269:23
**golf** 172:21
**Gonsalves** 59:17
82:13,17,18 85:4
93:5 95:12 96:10
96:13 158:5
**Gonzales** 59:17
**good** 11:16 64:8
80:16 94:4,17
133:23 134:7
162:13 180:18
181:1 187:14
206:8 207:5
229:6 241:2
288:20 323:9

332:11,21 340:15
**Goodman** 1:21
10:17
**goods** 55:17 75:8
**gotten** 270:19
271:11 275:10
281:17 289:18,20
333:22
**gouge** 160:7
**gouges** 74:23 78:11
80:18 121:2
**go-to** 233:5
**grab** 46:6
**grapes** 201:17
**grass** 298:1
**gray** 195:22
**great** 171:3,5
217:11 289:13,16
292:2
**green** 76:18
**Greg** 40:1,10 172:9
187:19 229:16
230:8 235:20
249:2 253:13
259:15 260:20,21
260:22 268:18
271:23 272:7
275:2,14 290:20
291:12 309:17
310:8 344:4
**Greg's** 257:5
**grief** 330:21
**Grill** 185:7 200:1
200:16 214:1
**grilled** 209:8
**ground** 235:3
**group** 29:7,13
53:18 92:8
262:17 333:9
**grown** 190:3
**GS** 10:1
**guarantee** 267:23
**guess** 15:10 21:21
45:16 47:15

54:20 78:4 79:7
83:3,12 88:17
103:10 108:12
110:3 115:17
117:9 121:14
141:21 169:16
171:14 188:23
193:1 220:20
223:1 226:21
231:2 264:17,22
270:23 273:15
275:23 280:15
281:16 294:3,19
306:23 312:7
326:9,13 329:4
329:14
**guidance** 263:12
**guy** 211:10 212:4
238:16 332:3
335:17
**guys** 46:3 161:7
268:6 298:5
**guy's** 170:9

_____
**H**
_____

**H** 5:5
**Halcyon** 290:21
**half** 56:22 108:2
244:19 265:19
339:5
**halfway** 302:15
**hall** 238:7,9,10
**hallway** 217:2
**handable** 67:18
**handcuffed** 275:16
**handle** 330:21
**handled** 76:11
158:21 339:3
**handling** 55:17
75:19 84:5 93:18
96:22 112:4
113:5 114:11
244:8 303:7
**handout** 60:21

**handwriting** 24:9
223:2,3,5 274:23
**handwritten** 6:8
7:9 8:10 31:22
57:13 274:21
323:8
**hand-feeding**
246:4
**Hansford** 198:4
200:10,13 203:1
204:8 205:5,6
209:6,20 210:10
234:21,22 341:5
343:11,12 346:6
346:16
**happen** 22:20
123:6,7,12 130:1
146:11 167:5
278:23 312:8
**happened** 53:8
83:19 115:19
117:11 119:7
140:21 151:22
159:15 160:22
181:9 184:3
189:19 212:4
236:1 285:19,20
294:5 300:22
312:10,12,14
323:13 330:3,11
**happening** 49:12
76:1,7 175:12
222:10 248:17
**happy** 90:8,9
266:3
**harassment** 224:18
246:19 252:1
318:10 321:5
**Harbor** 16:23
**harden** 67:18
**hardened** 68:2
**Harper** 243:2
248:19,21 250:10
**Harry** 68:17

110:20,23 182:23
183:3 191:12,15
342:1,20 343:2
346:6
**Harvard** 333:9
**head** 34:4,5 59:21
59:23 99:3
107:23 108:4
220:6 230:17
239:8
**headache** 187:5
**Headaches** 340:12
**heading** 53:11
79:19
**headquarters** 14:5
**health** 197:23
199:13 296:1
**healthwise** 200:4
**hear** 40:21 133:1
141:23 178:15
207:2 222:10
233:9 345:7
**heard** 50:3 54:5
96:12 140:17
142:21 189:11
193:1 204:7,11
204:12 205:5,6
208:16,20,21
212:3 217:22
221:16 261:16
285:10 343:20
345:21
**hearing** 259:14
284:22 312:1
**heart** 27:7,17
40:14 41:18 45:3
45:5 171:8 218:4
256:10,11 259:19
264:14 267:7
270:9 271:13
273:20,23 276:13
276:17 307:1
**heart-related**
285:1,12

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

**heat** 71:2
**heck** 275:21
**held** 49:10
**hello** 107:13
332:19
**help** 51:3,14 91:11
155:12 217:12
290:8,10,11,12
291:14
**helped** 46:23
**helpful** 79:1
**Henderson** 247:14
**Herbert** 5:11,15
**Hey** 281:16,19
331:14
**hi** 217:1
**hide** 175:16
**high** 54:1 236:3
**hire** 38:1,6 309:22
**hired** 36:10,12
194:6 233:23
243:2 267:4
344:10
**hires** 36:12
**hiring** 37:17
309:15
**history** 35:8
**hit** 120:23 339:7,8
**hitting** 210:19
**HMC** 243:22
245:15
**HMMA** 11:10,18
13:4 23:3,6,16
25:10 26:1,3 41:4
50:2 54:23 78:15
82:16 87:20
93:21 94:5,15,18
97:2 122:1,13,19
124:19 128:8
129:12 130:3
131:23 133:4
148:23 149:1,11
149:14,20 198:5
199:2 202:7

294:21 302:6
307:15 314:16,18
345:20
**HMMA's** 149:19
157:14
**Ho** 32:2 234:7,17
255:12 266:19
303:9 338:16
**hold** 21:18 170:2,5
320:5
**home** 116:6 140:14
152:8 179:7,18
189:10 205:4
218:2 220:4
**honest** 150:5
320:22
**honestly** 201:18
311:23
**hooked** 297:9
**Horn** 7:4 136:13
137:7,12,19
139:18 141:16,22
145:12 341:16
343:9
**Horn's** 136:23
**hospital** 43:17,19
**hostile** 188:22
189:22 190:2,8
192:12
**hostility** 192:3,16
**hour** 253:14 339:5
**hours** 44:15
267:18 268:14
290:5 293:4
329:20
**house** 25:6 45:2,4
45:8,13,15,18,19
45:20 47:2,6
201:16,16 218:2
297:23 327:3
328:13 329:20
339:16
**how's** 80:13
**HR** 201:7 244:20

339:14
**HRAR** 316:16
**Huh-huh** 273:5
341:19
**human** 38:11
39:18 40:17
71:12 153:6
211:6 212:13,16
213:14 230:9
309:16 317:2
330:17 344:13
**hundreds** 16:18
201:13
**hunt** 201:19
**hurdle** 332:6
**hurricane** 306:3
**hurt** 265:9
**Hwang** 53:19
58:20 59:17 73:5
75:18 90:14,18
91:22 93:1,7
102:17 106:23
147:23 154:16,21
155:12 206:2
**hyperbole** 292:3
**Hyun** 36:21 92:12
106:4 155:20
176:9 183:19,20
183:20 184:1
243:6,10,19
249:1,3,18 263:2
263:2 264:7
270:1 292:23
293:14,15 303:9
303:11
**Hyundai** 1:8 4:10
4:12 10:6 11:4,7
12:22 19:19
20:19,20 22:8
23:17,20 24:5
25:7,18,20 31:9
39:5 40:7 49:7
50:7 55:14,15
65:16 76:14 77:9

77:15,22 89:11
90:2 93:18 111:7
134:16,22 135:23
136:8,10 149:19
152:13 159:10
165:2,6 171:18
172:8,13 178:19
191:3 202:4,18
204:13 205:10
208:2 212:7
216:16 219:14,18
220:14 221:17
229:2 238:8
247:20 248:9
254:21 258:19
275:8 280:1
286:6 295:3,20
296:4,17 298:12
304:7 322:7
326:20 328:2
329:10,23 330:2
330:8 331:3,11
333:5,6,11,19
334:4,10,12
335:2 339:20
340:17 341:15
342:19 348:2
**Hyundai's** 148:10
150:3 217:6
230:16 251:17
**H's** 304:8 305:20
**H.I** 7:11,16 47:13
48:3,9,12 49:3,16
50:3 52:20 54:1
58:21 79:17
87:10 104:10,15
107:6,7 117:18
132:13 147:16
148:1 151:17
152:8 154:11
155:10,13 179:8
179:21 181:7
183:10,11,12,17
188:15,16 190:1

190:21,23 191:17
217:4 218:16
236:6 268:8
284:6 304:21
305:2 308:5
312:23 347:1
**H.J** 36:20 183:20
208:15 263:2
284:17 293:19
302:17

---
**I**

**ice** 333:2
**Idaho** 17:3
**idea** 84:2 85:12
86:11 174:2
198:19,23 219:22
222:19 223:10
225:13 273:13
298:14 310:16
**identification** 14:9
16:2 22:12 41:9
56:15 57:23
107:10 126:5
136:21 152:15
165:14 168:14
173:5 174:5
185:22 196:17
273:1 314:3
315:9,20 318:12
335:6
**identified** 37:6,12
37:16 66:23
69:22 98:17
99:21 108:9
112:18 113:10
195:15
**identifies** 111:10
173:23
**identify** 14:11
22:14 41:11
56:17 58:5 60:6
61:15 69:14,20
73:9 101:13

Case 2:07-cv-00144-TFM     Document 31-4     Filed 02/15/2008     Page 24 of 29
MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 15

102:2 104:3
157:20 186:1
196:21 307:15
315:22 318:14
**identifying** 173:20
256:1
**ignored** 344:1
**III** 3:4
**Illinois** 12:6,8
17:17 326:19
**imagine** 317:2
**immediately** 91:19
152:10 280:12
**impeccable** 307:11
**importance** 240:8
261:11 322:9
**improper** 98:7
99:17,22,23
100:4
**improperly** 112:15
**improprieties**
209:3 221:15
**improve** 63:16,18
275:14
**improvement**
249:9 275:13
**improvements**
213:1
**inappropriate**
166:10 190:21
203:6 211:8
**inappropriately**
77:4 344:1
**inaudible** 302:15
**incident** 203:16
211:23 214:5
235:11 273:18
276:1,4 294:19
**incidents** 211:1
**include** 233:8
**included** 172:2
233:4
**including** 73:12
92:11 132:10

141:12 192:1
233:11
**income** 14:21,23
17:9
**inconsistent** 99:14
**incorporated** 26:2
**incorrect** 48:14
97:9 98:3 139:19
223:22 279:20
321:8
**increase** 244:23
**incredible** 340:13
**incurred** 326:19
**independent**
149:13
**indicate** 68:19
260:2
**indicated** 15:2
31:22 34:9 60:12
63:17 73:12
75:11 117:1
130:15 134:14
141:6 151:15
153:6 159:4
168:3 192:15
287:19 300:14
303:8
**indicates** 43:5
80:15 127:5
330:9
**indicating** 155:2
220:12
**indication** 184:11
184:15 216:18
336:6,7,9
**indicator** 336:13
**indirect** 36:23
37:22 176:12
243:3
**indirectly** 47:20
**indiscretion** 232:4
**indiscretions**
246:10
**individual** 62:9

249:23 272:9
284:2
**individually**
221:14
**individuals** 32:10
37:13 61:23
222:6 267:13
307:20 334:11
335:14
**inducement**
281:21
**industry** 71:19
301:13
**information** 95:9
110:10 172:2
209:12 216:7
279:18
**informed** 93:11
253:19
**initial** 20:6 25:11
37:12 89:22
159:7 164:23
309:14 325:22
**initially** 20:5
**initiated** 180:21
275:15
**injection** 53:21
**inputs** 226:20
**inquire** 187:23
**inquired** 111:12
**inside** 71:2 245:19
**inspect** 82:2 135:2
145:20 146:5
**inspection** 65:15
81:5 84:4 135:9
159:3
**inspection's** 81:18
**install** 63:22
**installed** 134:13
**instance** 91:21
**instances** 213:18
242:23 251:23
312:3
**instructed** 183:10

316:11
**instructions** 344:2
**insufficient** 61:9
61:11,13 63:15
64:17 65:7 67:11
68:3 118:6
**insurance** 328:10
**intelligent** 262:4
295:12
**intended** 225:10
**intent** 24:8 52:23
100:23 194:4
**intention** 138:17
**interaction** 48:2
49:15 51:6 239:5
330:16
**interactions** 48:5
49:19
**interest** 21:7
148:10 149:20
150:3
**interesting** 228:16
**interface** 85:1
**interfaced** 51:12
**interim** 81:4 84:4
**interior** 158:7
**interjected** 109:6
109:13,20 111:12
166:6,9
**intermediary** 77:6
**internal** 36:15
55:16 81:2 93:18
113:4 147:3
231:17
**internally** 95:14
130:21
**interoffice** 7:15
**interpretation**
206:11
**interpreter** 49:14
**interrogate** 78:23
**interrupt** 242:21
**intervene** 101:17
**interview** 16:20

330:1
**interviewed**
212:16 213:4,16
236:13 237:4
333:21
**interviews** 17:20
219:17
**intimidated** 162:10
**introduced** 56:13
228:22 321:15
**investigated**
236:10 251:20
**investigation** 80:5
83:1 162:3
203:21 204:4
212:18,19 213:14
231:17 235:22
**investigations**
203:5
**invisible** 227:21
**involved** 20:17
37:17 39:3 55:16
74:15 80:21
84:22,23 85:17
86:14 88:2 137:6
147:10 150:17
184:6 203:11,14
203:16 213:8
224:17 228:9,10
228:12 239:12
321:6 330:10
**involvement** 89:6
90:12,14 203:4
**involving** 12:22
**in-box** 222:19
**Iranian** 306:19
307:7,16 308:6
309:12 310:3,9
310:15
**irrational** 20:8
**Islands** 198:19
**issue** 42:2 64:3,17
64:20 65:18 66:3
72:8 73:5 75:19

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

76:6 81:2 84:16
88:17,18 89:7,21
90:13 91:13
93:18 97:4,6,7,17
98:4 100:2,14
101:2,2 108:20
112:22 114:10,14
118:11,11 120:10
121:10,11,23
122:12 123:9
127:10,14 131:17
132:15 133:17
162:15 166:7
167:3,11 195:9
215:2 221:18
231:5 237:16
245:8 246:23
247:21 248:2,5
248:22 255:6
266:8 269:7
270:12 271:21
274:1,13 276:5
276:16 282:1
285:1 297:3
299:21 300:5,5,6
300:7,12 313:1
324:19 325:1,17
**issues** 51:3 52:10
52:11,12 54:6
61:8 72:13 73:10
75:23 80:4 83:10
84:10 85:7,16
108:23 111:16
112:1 113:5,15
113:15,23 114:5
114:11,14,19
120:1,8 129:13
129:17 131:7,14
132:10 138:19
139:9 199:21
207:12 209:5
210:11,13,15
214:2,17,23
215:15 225:1

231:3 232:20
241:21 242:16,17
242:22 243:14
245:14 259:13
261:21 273:8
274:4 288:13
301:4 321:4
326:10 327:3
336:20 337:4,8
**item** 237:15 313:2
313:7
**items** 73:18,22,23
76:7 77:7 79:20
81:14 99:8
117:19 124:18
151:17 341:10
**Ivy's** 335:11
**i.e** 326:18

---

## J

**J** 3:4 5:11,15
234:13,21 237:1
**Jacobs** 186:22
187:2
**Jae** 181:16
**January** 233:11
307:6 328:18
**Japanese** 305:7
**Jason** 7:16 63:5,6
82:4 121:20,21
136:16 167:8
180:20 181:1,6
181:14 182:8
190:19
**Jean** 289:23 290:6
**Jeff** 11:6
**JEFFREY** 4:2
**Jerry** 25:16
**Jimmie** 186:22
**job** 17:21 20:19
21:6 22:9 41:2
50:21 78:18,20
78:21,23 135:1
146:3 205:21

218:3 229:1,7
264:4 268:4
295:10,11,12
323:10 328:17
329:11,21 331:23
332:2 333:22
336:2
**jobs** 16:14 18:5,6
233:6 330:17
**John** 6:16 107:18
124:7,13 146:2
202:12,16,18,21
204:8,15 207:12
207:16 213:13
230:10,14 232:1
272:8
**John's** 272:8
**join** 34:10 332:12
332:22
**jointly** 324:9
**journal** 252:13
**Juan** 155:23
261:18
**Judy** 186:15,19
193:10
**Judy's** 186:12
**July** 26:19 30:9
321:19 338:19
**June** 26:16,19 47:7
47:8 321:19
**Junk** 91:4
**J.B** 32:5,20
**J.H** 208:13,15,16
**J.Y** 50:7 103:14
308:8

---

## K

**Kalson** 6:16 88:9
107:19 114:2
124:7,13,14,18
126:20 133:18
136:2 139:18
141:16 202:9
203:5,13 204:8

207:13,16 213:13
229:15 230:10,14
232:2,5 246:21
246:23 266:14
271:23
**Kalson's** 146:2
202:12 205:20
**Kathleen** 186:20
186:21
**Kay** 186:14,20,21
**keep** 30:14 49:12
69:6 139:3
224:22 232:11
277:4
**keeping** 326:10
**Keith** 8:15,21 9:4,9
25:16 180:17
186:7 188:17,17
189:5,11 190:16
190:17 192:2
193:19 199:12
206:12 209:8
212:20 221:23
226:14 227:11
245:6,6 254:18
280:19 281:4,12
286:11 316:1
320:19
**Keith's** 186:9
228:15
**Kelly** 204:7 205:7
235:3 236:23
**Kenny** 240:16
258:9
**Kentucky** 11:23
17:2 18:19 19:4,6
19:8 22:5 24:14
67:5 335:16,17
**key** 58:16,18,18
334:2
**kick** 235:2
**kickbacks** 208:9
208:11,14,19,23
**kicked** 211:4 234:7

234:20 237:2
239:13
**kickee** 234:16
**kicker** 234:15
**kicking** 210:19
234:6
**kids** 19:22 45:22
**Kim** 7:11,16 33:15
47:14 48:3,9,12
49:3,16,19 50:3,3
53:11 54:1 58:21
62:22 64:3 71:6
79:17 88:7,9
104:10,16 107:6
107:7 111:11
113:7,13 114:1,3
114:12 115:3,23
116:7,19 117:18
118:3 119:22
120:7 121:9,14
122:6 123:2
127:19 128:15,21
129:5,10 132:13
132:14 133:1
138:15 139:3,7
139:21 140:3
143:19,23 144:4
144:9,20,22
147:10,16 148:2
151:12 152:8
154:11 155:10,13
155:18 166:13
167:2,7,13 179:8
179:21 180:4,5
181:7 183:10,11
183:12,17 184:12
184:16 190:1
191:1,17 192:19
197:4 207:11
208:13,16 217:4
218:16 219:1,8
220:23 236:6
238:13 268:8,11
284:6 304:21

---

MERRILL LEGAL SOULTIONS

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

305:3,13,15
306:6,8,12 308:5
312:23 316:8
345:15 347:2
**Kimble** 40:1,10,18
40:21 172:9
187:19 197:5
229:16 230:8
235:20 236:7
249:2,19 253:13
256:8 257:15
265:7 269:1
270:5,20 271:3
271:23 273:17
274:11 276:3
277:1,9,13,14,19
277:21 279:3,4
298:19 299:10,11
299:23 309:17
310:8 311:2
312:20 341:21,22
344:5
**Kimble's** 275:14
**Kim's** 52:20 64:15
87:11 138:23
190:22 344:2
**kind** 12:21 21:17
80:8 88:23 119:8
177:20 183:5
189:13 220:6
275:8 287:12
288:20 297:4
327:6 343:2
345:10 348:9
**kindness** 267:7
**king** 339:4
**Kirk** 158:4
**Kisha** 205:6
339:15
**knee** 265:9
**knew** 107:7 116:20
162:7,21 163:13
163:18 202:6
310:11

**knocked** 291:6
**know** 22:19 26:4,8
29:7,12 31:11
34:6,22 38:5,8
39:2,13,13,16,23
40:4,9 42:7,22
43:18 44:15
45:11,19 47:22
51:8,12 53:7
54:10,17 56:4
57:5 61:23 62:21
63:11 65:6,9
68:14 70:19
73:21 74:3,5,8,11
76:12,14 77:23
78:2,18 79:10
80:1,10,14 83:7
83:22,23 84:1,9
85:19 87:18
88:14,15,23 93:8
93:11 94:13
95:13,23 101:7
105:6,19,20
107:21,22 109:3
109:20,20,23
113:4 115:8
116:12,18,23
117:13,17 123:14
123:22 127:4
132:5 133:12
134:15 137:4,10
138:6,13 140:8
141:20 143:14,18
143:23 144:9,12
146:4,16 147:9
147:14,18 149:6
150:2,20 154:5,6
154:22 155:7
160:10 162:11
163:22 164:16
165:23 168:8,11
170:11 171:19,23
172:5,17 173:2
174:7,22 179:16

181:20 183:5
184:4 185:2
189:8,12 190:2,7
192:13 193:5,6
194:8 197:23
198:8,11 199:11
199:15,16 200:1
201:19 203:18,19
204:3,17 205:8
206:4,7 207:23
208:4 209:9,11
211:5 212:1,5,11
212:23 213:6
216:3,4,23
217:20,21 218:9
218:12 219:18
220:5 221:23
222:23 223:2,12
224:5 225:14,19
226:5 228:23
229:12 231:23
232:3 233:10,12
233:18 235:10,16
235:21,23 236:1
236:3,7,18,21,22
237:2,4,5,8 240:7
240:13 241:6,11
244:5,10,19
245:7,13,17,21
246:7,9,17
247:18,21 249:4
249:5,8,9,12,19
249:21,23 251:8
251:12,15 256:1
256:4 258:6,14
258:20 259:4,19
260:7,10 262:7
262:21 263:12,15
264:8,11 265:4,5
265:13,19 266:3
266:6,18,22
267:1,9,11 268:3
269:16,23 270:3
270:17 271:4,22

273:7,19 275:9
275:13,14 281:15
283:9 285:19
286:15 287:9
288:18 289:12
290:5,14,19
294:8,9,13
298:14 299:18,19
299:20 300:20,23
301:19 302:19,20
304:21 306:22
309:18 310:4,11
310:14 311:7
312:23 313:14
316:3 317:1,3,5
317:13 318:1
319:2 322:14
326:4 328:9
329:4,5,15 330:6
330:8 331:10
333:4,10,14
334:1,6,14,21
335:19 337:20
338:10,22 339:10
339:17 340:6,11
340:13,14 342:9
343:13 346:10,12
347:16
**knowledge** 67:3
83:19 88:4 91:20
97:17 144:3
178:10,18 182:2
191:22 203:2
205:2,23 208:19
211:19 230:20
236:9 247:7
248:15 250:10
251:9,13,20
254:15 317:19
320:17 333:18,20
**Knowles** 37:20
266:16 341:17
343:16
**known** 294:1

**knows** 322:7
**Komatsu** 62:1,10
**Komatsu-San**
111:22
**Korea** 23:19 24:1,1
25:5 26:15 32:4
32:19 33:3 34:14
35:20,23 37:14
91:5 180:1
211:10,15 221:12
222:6 225:12
226:15 228:5
229:4 233:20
247:20 248:4
254:9 262:9
264:3 266:2
269:20 283:2,12
290:9 303:6
307:20
**Korean** 36:9 48:10
48:11,17,18,19
49:1 51:14 63:1
71:9 107:12
110:11 115:16
121:15 129:9
132:18 139:14
143:15,20 144:10
144:13 167:6
171:21 193:7
206:1,17,21,22
207:3,8 210:18
210:19 211:3
213:3 222:22
225:5 226:22
227:20 228:2,17
229:5 233:2,8,18
237:20 238:2,8
243:16,22 246:8
246:13 247:10
250:1,3 252:8,16
265:10 266:13
267:14 268:15
282:17,22 284:3
290:8 321:13,15

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 18

321:21 322:19
**Koreans** 54:17
140:18 155:23
206:9 244:3,14
245:15 252:3
268:11 282:8
**Korean's** 321:4,5
**Korean-American**
243:11
**KPMG** 235:5
237:17 239:2,9
**Kwak** 82:4 95:3
107:19 108:11
110:11 114:1
**Kyle** 4:15 10:18

**L**

**L** 5:21 8:4,4
**labeled** 103:12
**lack** 89:9 92:23
127:14 159:2
194:16 208:3
244:6
**Ladd** 333:8
**lady** 239:7 243:7
248:13 262:1
**lady's** 248:20
**laid** 235:3
**Lake** 12:6
**Lakeshore** 3:6
**Lang** 344:4,5
**language** 266:13
**large** 1:23 56:4
172:12,16
**late** 182:21
**launch** 233:10
287:16
**launched** 288:12
**Laura** 8:4 173:17
193:20,21
**law** 21:5,22
**lawful** 11:11
**lawsuit** 15:13
38:12 117:14

319:4 322:17
329:9 334:18
341:20
**lawsuits** 23:6
**lawyer's** 246:17
**layoff** 16:8
**lead** 95:10 115:17
**leader** 293:21
**leadership** 263:11
**learn** 95:4 183:16
**learned** 140:10
**lease** 26:19 45:9
46:2
**leased** 244:12
**leave** 37:2 39:4,11
39:21 40:2,11
41:15 140:5
174:17 183:8
193:14 194:23
195:10 219:18
241:15 243:12
264:18 265:1,11
285:21 324:10
330:2 347:10
**leaves** 36:18
280:21
**leaving** 16:15 17:7
50:2 198:9
258:17 269:20
348:22
**led** 100:18 137:7
198:9
**Lee** 4:2 11:6,6
22:23 32:2,2,6,9
32:13,14,20
34:13 41:7 82:4
92:12 121:16
148:12 180:20
181:14,16,18
182:6,8 190:19
195:6 215:15
234:7,17 235:11
236:2 239:11
255:9,12,13

262:5 266:19,20
267:12,21 268:7
272:11 280:21
287:18 290:20
303:9,9,11
307:19 311:13
314:1 338:16
**Lee's** 34:2 234:12
**left** 64:10 117:20
121:8 124:9
151:18 173:10
181:22 193:16
204:19 260:1
288:17 290:20
295:11 301:17
308:13
**left-hand** 8:18
**legal** 213:4 230:5
**legitimate** 251:4
**letter** 14:13,16
16:5 25:9 34:6
41:13 43:4
195:13,17 220:10
223:23 225:16,20
252:21 284:10
314:10 316:1,2,5
316:6,8,9,14
317:21 318:4
347:5,17
**letterhead** 60:10
**letters** 323:7
**let's** 12:11 15:10
57:17 78:5 82:1,1
120:8 125:22
159:17 188:12
199:15 201:22
217:13 231:14
234:14 235:5
277:4,18 286:14
287:16 289:19
290:18 291:7,20
295:22 302:3
308:14 321:11
331:5 341:23

346:5,10
**level** 36:3 122:7
123:4 198:21
216:19 272:4
282:13 303:5
**levels** 127:10
**liaison** 51:4
**Licht** 37:22
**lie** 162:11
**lied** 292:16,17
293:15,20
**life** 171:16 267:10
328:10 330:23
338:6 340:14
**light** 78:13 127:10
**lighting** 61:9,11,14
63:15,19,22 64:3
64:6,17 65:7 67:1
98:8 99:4,23
**likelihood** 22:8
**limited** 139:5
215:20 262:10
324:11
**Lin** 37:18
**Lindemann** 37:19
**line** 52:12 59:18
68:21 76:20 77:3
80:3 83:8,11,18
84:7,18 86:6
88:15 91:14
101:16 124:20,20
134:18 153:23
157:1,5 159:3
162:4,8 166:20
166:20 234:6
311:13 312:22
316:21,22
**lined** 77:2
**link** 47:21
**Lipitor** 187:13,18
188:4
**list** 16:16 193:20
222:11 272:2
275:4,5

**listed** 71:1 79:8
96:18 316:13
**listen** 35:2 275:18
313:3
**listened** 268:14
270:17 291:15
**listening** 159:10
**listing** 156:10
287:12
**lists** 61:4
**litigation** 13:4
330:10
**little** 15:11 33:16
51:20 52:14
58:19 132:7
138:20 156:4
177:13 199:22
201:1,3 206:16
234:11 238:11
287:12 297:16
**liturgy** 35:8
**live** 12:5,8 18:19
**lived** 12:2,7 19:11
25:5 332:13
**LLC** 1:10 4:11
11:5
**loan** 15:4 290:1
**loans** 327:4
**lobby** 282:13
**local** 35:21 36:11
36:12 49:8
171:23
**locally** 234:1
**locate** 325:5
**located** 10:13 67:4
77:11
**lockstep** 142:14
**lock-out** 246:2
**log** 252:13
**logic** 108:17
**logistics** 198:7
**long** 12:2 20:23
28:17 29:23 44:9
64:4 127:19

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

233:14 308:5
longer 19:19,20,21
159:6
long-term 38:23
39:7 148:13
look 29:4 30:6
42:22 43:3 45:9
46:4 57:7 61:22
72:21 78:5 80:5
92:18 95:18
117:23 153:11
159:23 160:2
165:20 170:14
188:12 212:1
220:15 231:14,14
257:18 259:8
265:2 270:23
273:6 284:21
285:4 286:14
288:22 294:22
295:13 297:17
298:16 302:13
304:19 306:11,13
310:17,19 312:15
312:18 316:15
317:3 320:7,8
345:1
looked 18:12 20:5
20:12 24:3 25:9
72:2,19 98:18,20
152:19
looking 18:5 32:10
58:12,14 60:1
66:21 74:13
81:16 93:23
94:20 96:8
101:11 109:12
156:13,22 162:3
166:19 197:10
216:6 222:13
227:1 245:9
257:20 284:14,15
295:8,17 301:19
304:21 309:18

310:20,20,21
312:22 330:17
looks 14:13 22:17
28:3 51:21 61:7
63:20 71:10
104:10 153:21
156:9 168:19
186:6 191:12
194:15,21 284:16
298:22 299:8
310:22 347:16
lose 205:21 268:4
335:22 336:3
losing 329:11
336:2
lost 20:19 123:19
136:17 325:17
336:11
lot 26:8 34:22 35:1
35:7 51:13 57:19
115:15 200:15
202:23 204:19
209:14 246:9
291:5 312:4
Louisville 332:4
love 331:9
low 127:10 232:11
lower 282:12
Loy 344:4,15
ludicrous 133:21
lug 81:23
lunch 125:23
126:12
luncheon 126:1
L-I-C-H-T 37:22

        M
M 5:2 8:21 9:4
104:17
machine 71:11
mad 151:18 180:5
magazines 300:22
magnet 290:3
mail 260:1,10,11

279:9 285:21
316:2
mailed 316:3
mails 241:15
main 184:10 188:5
major 113:9
114:21 233:2
261:3
majority 87:12
157:9
making 14:18 50:4
64:21 89:7
111:18 127:1,5
154:16 155:4
254:6 263:23
301:1 345:21
male 250:2
malfunction 71:11
Malinda 247:14
man 206:8 207:5
238:21,23 239:3
239:4,13 243:17
manage 54:19
management
33:11 51:9
107:18 108:10,13
108:15 162:7
173:3 216:15,21
217:7 218:10
219:13 233:8
253:19 286:6
288:6 296:4,9,17
311:8
manager 36:2,3,3
36:13 37:8 48:10
48:17 49:1,1,9,9
54:14,14,16 63:9
63:11,12 68:18
110:23 136:15
158:5 198:6
201:8 204:23
206:3 237:23
243:3 246:6
262:23 266:17

275:20 302:11
managerial 263:14
managers 36:10
37:8,16,21 53:20
54:18 192:5
225:4,6
manifestations
336:1 337:11
340:1,9
manner 132:7
150:5 151:7
165:3 167:16
262:11
manufactured
317:20
manufacturing 1:9
4:10 10:7 11:5
25:18 65:18 67:2
67:3 70:5 71:13
76:2 90:3 108:22
March 9:11 12:4
328:19
Marcus 332:9
mark 32:2,9,13,14
34:13 37:18
57:21 61:8 62:1,2
65:8,10 70:21
76:6 80:4 83:16
85:16 97:6,7
121:23 122:12
123:9 174:22
176:1 191:23
192:4,6,20
219:20 255:9,12
262:5 267:20
272:11,18,20
280:21 302:5
303:9,11 307:19
311:5 341:16
346:5
marked 14:9 15:23
16:2 22:12 41:9
42:8 56:15 57:23
107:10,14 126:5

136:21 152:15
165:14 168:14
173:5 174:5
185:22 196:17
273:1 314:3
315:9,20 318:12
marks 60:12 61:2
65:6,23 66:3,22
67:8 68:6 70:3
72:8,23 73:2,12
73:13,18,19 74:2
74:4,6,9,22 75:20
75:23,23 79:2,3
80:6,7 83:4,4
85:5,6,10,11,20
86:18,18,20,23
86:23 93:15,15
98:23 99:1,17
108:20,23 110:9
118:11 130:18
154:13 160:3,7,7
marred 329:22
marriage 338:8
married 18:9
Marsha 243:2
248:21 249:20
Mary 239:7
master 239:18
MasterCard 31:4
master's 247:13
262:5 266:4
267:5
match 76:19
material 55:16
75:1 78:13 80:19
96:3,9,17
materials 56:23
86:12
matter 10:5 122:6
123:3
Matthias 5:9
Maynard 1:19 4:3
10:12
McClain 59:18

| | | | | |
|---|---|---|---|---|
| 93:1 102:18 | 256:4 258:4,10 | 332:18,22 | 149:22 150:6,10 | 268:10 269:2,3 |
| 106:23 341:17 | 260:2 264:14,20 | **meeting** 6:4,13,17 | 151:4,13,14,20 | 270:6,16 271:6 |
| **McClain's** 93:2 | 269:14 271:6,17 | 7:6 47:10 48:2,7 | 152:1,2,3,4,5,12 | 271:16 272:2,7,7 |
| **McClanahan** | 274:9 275:11 | 48:9 49:10,17 | 152:17 153:3,9 | 274:20 275:12,15 |
| 193:11 | 277:8 281:7 | 51:16,23 52:7,8,9 | 153:11 154:4,23 | 275:16 276:1,2 |
| **McClendan** | 283:8 285:18 | 52:20 53:2,12,15 | 159:2 162:19,21 | 276:12,15,21 |
| 193:12 | 287:11 288:19 | 54:1,22 55:1 56:1 | 163:1,18 164:3,8 | 279:1,12 280:4,8 |
| **McCormick** 5:22 | 290:10 291:17 | 56:2,19 57:2,9 | 166:11,14 167:4 | 280:10,13,16,17 |
| 8:5 40:19 41:1,14 | 292:1 294:3 | 58:8,10,23 59:2,3 | 167:13,15,21 | 291:17 293:4,11 |
| 43:4 153:6 | 295:6,8 296:15 | 59:9 60:9 62:18 | 168:2,4,21 | 293:12 296:9 |
| 194:12 | 297:7,8 298:8,10 | 69:22 71:6,8 72:5 | 177:23 178:1,7 | 300:6 301:7 |
| **McCormick's** | 298:11 304:9 | 79:17 81:2 85:18 | 178:12,20,23 | 306:7,9 311:16 |
| 265:3 | 305:14 307:18,21 | 85:18 86:10 87:9 | 179:6 180:21 | 313:10,17 314:21 |
| **McDonald** 62:1,2 | 313:7,8,15 316:8 | 90:16 92:20 94:8 | 181:5,17 182:7 | 321:9,14 332:5 |
| 127:1,9 | 320:17 322:2,8 | 94:10 98:12 | 182:17 183:7,9 | 332:19 342:6,18 |
| **McKINNON** 4:15 | 326:22 327:23 | 100:18,21,23 | 183:15,22 184:2 | 343:16,19,20 |
| 10:18 | 329:13 333:3,17 | 101:9,14 102:16 | 184:6,9 185:9 | 345:18 346:14 |
| **mean** 19:10,11 | 335:10 336:5 | 103:14 104:5,19 | 189:2,7 190:1,15 | 347:14 348:1 |
| 24:8 30:20 31:11 | 337:7,9,21 338:3 | 105:3,12,13,17 | 190:16,20 191:18 | **meetings** 36:8 |
| 32:11,12 33:20 | 340:7,10 341:21 | 107:21,22 108:3 | 191:19 192:17,23 | 51:22 52:4 |
| 43:1,1,3,22 54:19 | 342:1 345:19 | 108:21 110:6,13 | 197:12 199:6,9 | 105:22 140:19 |
| 68:11 74:23 | 347:18 | 112:10,11,14,22 | 209:7 212:20 | 172:3,7,9 181:9 |
| 76:12 78:18 79:6 | **meaning** 282:22 | 113:8,22 114:1,4 | 213:2,20,21 | 185:1 192:2,7 |
| 80:4 81:12,13 | **means** 288:9 | 115:5,20,22 | 214:8,19 215:3,8 | 213:8 220:22 |
| 82:23 88:5 94:20 | 295:15 313:17 | 116:1,11,13,14 | 215:9,12,17,21 | 225:7 226:21 |
| 96:4 97:16 | 327:14 | 116:17 117:11,15 | 216:2,7 218:23 | 227:14 228:13 |
| 100:21 101:6 | **meant** 307:19 | 118:4,10,12,15 | 219:2,4,12,23 | 233:5,15 252:22 |
| 105:10 111:18 | **medical** 39:4,10 | 118:16,17,19,21 | 220:21,21 221:5 | 253:9 254:14,17 |
| 113:13,17 115:17 | 40:2,11 41:15 | 118:23 119:4,7 | 221:7,9,22 223:7 | 254:19 256:2 |
| 115:23 117:8,21 | 42:2 193:14 | 119:16,19 121:11 | 223:8,10 224:1,2 | 258:5 266:7,20 |
| 121:3 127:4 | 197:15 199:21 | 121:15,22 122:7 | 224:4,5,6,11 | 267:8,16,22 |
| 143:20 149:10,11 | 215:6 216:6 | 123:5 124:14 | 225:8,9 226:6,9 | 268:1,6 271:1,17 |
| 150:11 163:5 | 259:18 261:2 | 125:2,13 126:21 | 226:11 227:2,6 | 272:6 274:3,10 |
| 164:7 170:16,20 | 324:7,14 340:7 | 127:7 128:16,22 | 227:10,18,19 | 274:17 276:8 |
| 179:18 183:10 | 347:10 | 129:11 130:6,9 | 228:1,8,11 229:8 | 277:1 280:11 |
| 184:20 187:7 | **medication** 29:22 | 130:12 132:15,17 | 229:13,15,18 | 281:1 288:5 |
| 190:1 194:21 | 40:16 187:11 | 136:6 137:15 | 229:22 231:14 | 293:8 347:6 |
| 196:1 198:1 | 197:20 264:21 | 138:18,22 139:1 | 232:17 237:12,19 | **Melanie** 5:21 8:4 |
| 203:23 204:5 | **medications** 26:20 | 139:6,9,23 140:4 | 237:20 242:15 | 40:18 41:1,14 |
| 205:8 208:6 | 30:3 173:3 | 141:12,19 142:11 | 247:1,2 252:6,7 | 43:4 153:6 265:3 |
| 209:20 212:1 | **meet** 81:17 158:13 | 143:1 144:6,10 | 252:20,23 253:11 | **member** 78:16,20 |
| 218:4 230:19 | 196:12 200:11,13 | 144:23 146:9,13 | 253:12 257:21 | 83:18 84:2,6,18 |
| 234:19 236:3,21 | 200:20 221:13 | 146:15,17,19 | 258:2,12,23 | 108:14 136:14 |
| 239:7,17 250:4,9 | 253:3 255:6 | 147:13 148:6 | 260:13 266:9 | 148:23 149:20 |

# CYRUS DEPOSITION
# PART IV

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| | | | | |
|---|---|---|---|---|
| 157:4 160:15 211:4 | me1 318:15 | 223:23 224:2,3,4 225:7,9 226:6,9 | 327:11,20,23 328:22 | move 12:10 19:15 21:9 22:5 26:9,11 |
| members 73:16 88:19 108:9 124:19 127:6 145:19 183:14 191:20 213:5 244:11 | mic 144:15 Michael 158:4 198:4 203:1 204:7 333:8 343:11 | 226:12 229:8 237:10 240:6 293:11 296:2 301:17 | mono 188:7,10 Montgomery 1:20 4:13 12:9,10,11 13:17 20:4 22:7,9 23:13,16 24:2,20 | 26:12 45:16 145:10 177:13 235:9 262:19 263:8 264:8,17 326:23 |
| member's 160:10 memo 250:21 memorandum 7:15 101:10,12 103:12 153:14 | Michigan 17:1 24:18 180:23 microphone 123:20 136:18 156:4 | Miran 239:8 mirror 51:2 65:14 70:22 83:15 94:3 109:1 112:3 128:2 159:20 | 24:23 25:2 26:12 28:21 29:3 31:14 32:14,21 47:14 51:4 53:18 77:11 170:4 207:21 | moved 12:11 14:4 19:4,6 21:14 24:1 44:18 45:2,7 47:2 47:6 264:7 movement 261:5 moving 269:17 |
| men 190:3 239:5 mentality 206:22 mention 98:3,15 101:21,23 103:6 141:10,18 202:8 219:10 263:17 286:9 | middle 1:2 302:2 Midway 289:12 Mike 174:7 202:15 202:15 209:15 341:5 Mike's 201:8 | mirrors 53:22 64:5 77:20 78:10 81:4 83:13 93:22 94:16 120:17,20 120:21 131:17 133:9 138:10 | 208:1 261:15 335:13 340:4 348:2 month 43:1 53:5 222:5 267:8 289:8 327:12,18 | 326:18 Mr.Cyrus 46:21 multiple 114:9 185:1 multiple-recipient 316:14 multi-faceted |
| mentioned 26:14 41:16 103:9,16 105:2 131:16,19 146:7 147:11 178:22 182:18 208:12 210:11 214:15 230:14 234:5 252:1 256:6 257:15 269:10 286:4 312:13 324:21 | mile 45:20 291:9 miles 21:14 120:13 milk 75:13 milk-carton-type 120:22 million 235:6 240:19 258:15 mimicked 142:19 Min 32:2 234:7,17 255:12 266:19 303:9 338:16 | 148:19 156:22 157:1 159:15 167:12 misapplying 161:1 miscall 157:14 misconduct 224:19 224:23 mishandling 161:1 missing 57:4 91:12 285:1 | 328:4,10,11,12 328:14 monthly 328:6 months 50:19 248:8 249:13,14 249:14 264:12 Moore 7:20 169:21 169:22 170:1,2,3 170:6,7,8 moral 245:8 morning 27:10 | 141:7 Multi-page 8:12 multi-vitamin 27:2 28:1 Murakami 6:4 7:7 47:10 48:1 49:16 50:18 51:17 54:4 54:6 55:6 58:10 60:8 61:9,15,20 62:14,16,16 63:14 64:12 |
| mentioning 257:10 Mercedes 165:7 202:1 281:22 message 184:10 193:16 259:11 messages 258:18 met 32:3 158:8,14 174:22 183:19 185:5 213:12 224:15 254:4 321:3,12 332:8 335:14 metal 91:7 | mince 161:13 mind 292:19 Mine 155:8 minute 308:13 minutes 56:19 58:7 64:9 87:18 107:21 108:3 112:1 117:17 121:8 124:11 130:4,7,7 137:15 140:4 152:12 153:3 168:4 173:10 183:8,9 183:15 184:9 190:15 191:18 209:8 223:9,10 | misspeak 296:11 misspoke 296:14 misstated 80:8 Mobile 16:21,22 332:7,17 Mobis 211:13 212:6 modified 70:10 modifying 70:13 Mohammad 309:20 molding 53:21 Mom 292:11 Mon 268:7 Monday 254:18 260:1,8,9 293:5 money 244:3,4 | 42:14 44:16 59:8 74:13 85:18 92:19 154:23 158:18 159:21 261:14 265:20 Morris 205:7 339:15 mother 289:10 292:7 294:4 Motor 1:8 4:10 10:6 11:4,7 23:20 25:7,18,20 90:3 mouth 95:22 96:2 96:12 142:18 mouths 142:11 | 65:13,16,17 66:22 67:7 69:13 69:13,20 70:6 71:12 72:3,12,17 73:10 75:8 76:1,4 77:19 79:5,18 80:14 82:19,21 85:14 86:4,13 98:13,17,20,21 99:15,20 101:16 103:14 104:4,17 104:17 108:19,21 109:8 111:13,23 |

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| | | | | |
|---|---|---|---|---|
| 112:8,14 113:16 | 211:16 212:12 | 289:14 290:10,12 | 279:21 | 259:16 314:23 |
| 114:6,15 118:4 | 227:9 229:1 | 293:11 299:3 | **night** 91:22 140:6 | 315:12,15 |
| 118:19 120:12 | 238:20 247:11 | 310:19 324:12 | 154:22 183:3 | **notified** 318:22 |
| 122:3,15,21 | 248:20 293:7 | 342:10 343:4 | 184:23 205:2 | **notify** 232:6 |
| 123:10 126:20 | 307:19,21 309:20 | **needed** 49:4 63:18 | 260:13 266:11 | **notifying** 264:2 |
| 127:2,6 128:1,7,9 | 317:17 | 68:21 89:17,18 | 293:5 | **November** 2:1 7:9 |
| 128:18 129:1,6 | **named** 165:6 | 148:18,18 226:23 | **Nikki** 203:18 | 8:13 9:7 10:10 |
| 129:12 130:4,14 | **names** 59:20 82:14 | 240:1 241:11 | **nine** 249:13,14 | 155:2 208:22 |
| 131:5,11,11 | 145:4 | 244:15 263:13 | 264:11 | 284:11 297:18 |
| 132:5 133:5,10 | **name's** 11:17 | 265:9 272:4 | **Nissan** 136:19 | 349:5 |
| 137:23 138:1 | **NASH** 3:12 | 275:13 284:22 | **Nobody's** 103:16 | **novice** 65:10 |
| 139:8,11 141:2 | **nasty** 292:12 | **negative** 188:11 | **nods** 99:3 | **number** 30:2 60:3 |
| 142:3,5 147:2 | 337:18,22 | **negatively** 339:11 | **noise** 73:14 | 73:10 76:11 |
| 151:5 157:2 | **nationality** 50:5 | **negotiated** 20:22 | **non-discriminat...** | 79:20 96:1 113:3 |
| 158:8,15 162:20 | **nature** 275:11 | **negotiations** 25:11 | 251:5 | 123:2 141:8 |
| 163:2,20 164:8 | 283:1 | 314:17 | **non-emotional** | 151:16 156:2,21 |
| 164:11 166:8 | **Neal** 4:9 11:9 | **Neither** 178:21 | 301:4 | 160:11 164:2 |
| 167:12,21 168:2 | 203:8 213:12 | **net** 327:12 | **Nope** 130:6 131:9 | 193:11 204:12 |
| 168:21 178:1,3,6 | 217:9,10,15 | **neutral** 54:10 | 136:3 191:11 | 205:9 313:23 |
| 178:13,23 182:7 | 218:14 229:16 | 92:20 100:20 | **North** 1:20 3:15 | 321:22 330:11 |
| 182:17 190:15 | 230:3,4 253:12 | 148:6,9 150:1 | 4:4 | **numbers** 81:14 |
| 191:19 219:4,10 | 256:7 270:6,20 | 159:8,12 165:1 | **Northern** 1:3 17:2 | 96:7,15 160:14 |
| 221:9 224:3,3 | 271:3 273:17 | 300:13 301:6,9 | **Notary** 1:22 | 317:4 |
| 227:6 252:23 | 274:11 276:3 | 301:11 | **notation** 104:2,9 | **numerous** 16:18 |
| 253:10 276:8,21 | 277:1,9,13,14 | **never** 15:7 38:6 | **notations** 316:16 | 243:17 272:5 |
| 279:12 280:13 | 279:1,14 331:20 | 108:2 119:1,10 | **note** 7:18 117:3 | 280:22 288:4,5 |
| 294:6,10,19 | 341:22 348:20 | 145:3,7 146:7 | 322:10 | 290:14 330:19 |
| 300:6 305:20 | **near** 19:5,6 45:22 | 149:4 174:2 | **notebook** 197:22 | **nut** 71:2 99:1 |
| 313:1,18 342:5 | 77:11 245:23 | 176:15 187:1 | **notes** 6:8,11,16 7:4 | **nuts** 82:1 |
| 346:11,14,18 | **necessarily** 59:12 | 208:16,20,21 | 7:10 8:11 31:23 | |
| **Murakami's** 72:20 | **necessities** 328:15 | 219:1,5,20 228:6 | 57:10,13 59:5 | |
| 87:13 97:1,7 | **neck** 267:23 | 244:20 261:16,17 | 61:22 117:23 | **O** |
| **mutually** 148:13 | **need** 43:3 46:14 | 271:7 286:4,9 | 147:12 152:17 | **O** 5:2 10:1 28:4 |
| **M.D** 7:20 170:6 | 53:23 54:2 66:23 | 293:17 294:23 | 154:1,4 156:20 | **object** 120:4 |
| | 76:18 80:20 | 295:11 296:21 | 169:10 185:18 | 161:19 |
| **N** | 84:20 90:15 | 323:4,5,6 330:21 | 186:6 229:8,9 | **observed** 55:2 |
| **N** 5:1,2,2 10:1 | 116:23 131:7 | 333:21 341:5 | 231:15 232:6 | **obtain** 317:8 |
| **name** 11:19 13:7 | 151:8 158:2 | 345:15,17 | 245:10 252:10,11 | **obvious** 341:21 |
| 18:21 28:22 | 163:11 184:9 | **new** 63:7 69:3 | 274:23 320:7 | **obviously** 44:17 |
| 29:11,13,16 | 231:8 232:10 | 146:14 244:15 | 323:9 | 51:15 88:15 |
| 43:17 61:19 | 233:5 241:7,18 | 263:12 | **notice** 1:17 59:4 | 149:7 162:14 |
| 78:15 102:6 | 249:22 255:1 | **newborn** 291:11 | 120:13 134:19 | 340:8 |
| 145:1 170:9 | 258:15,16 259:13 | **news** 332:11,21 | 182:11 187:15 | **occasional** 78:11 |
| 203:19,20 211:15 | 262:14 276:5 | **nice** 32:11 191:5 | 194:10 232:1 | **occasions** 180:11 |
| | | | | **occur** 53:2 121:3 |

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

138:13 211:23
224:21 278:22
**occurred** 16:8
23:12 69:4 86:4
146:17 159:12
191:18 192:23
201:10 202:23
204:18 249:4
276:15 333:3
341:11
**occurrence** 79:11
79:19 321:21,23
**occurrences** 192:1
**occurring** 53:10
58:9 70:5 75:6
78:11 113:16
114:5,15 117:22
202:22 221:16
**October** 5:14 6:3
7:17 8:3,7,10,20
18:13,16 30:9
152:22,23 153:3
153:15 169:4
185:12 214:8
215:3 260:4
**offensive** 251:16
**offer** 14:13,15 25:9
25:14 34:6
**offers** 17:5,21
**office** 14:6 24:19
168:19 169:10
193:15 290:21,21
348:1
**officer** 47:18 332:8
**Offices** 1:18
**official** 23:18
333:6,6
**OGLETREE** 3:12
**oh** 22:22 58:19
162:11 179:14
206:8 218:7,8,19
258:18 264:6
268:19 270:22
273:12 286:22

290:22 292:20
329:1,4
**Ohio** 17:2
**okay** 12:15,18,21
13:4,17,20 15:4
17:19 18:4,9,18
19:15 20:18
21:11,21 24:3
26:18 28:9,14
29:2 30:13 31:3
32:17 33:13
35:16 37:15 38:4
39:6 42:5 43:7
45:6,21 47:17
48:1,5 49:15 50:1
53:14 55:5,23
57:14 58:12,19
58:23 59:4 60:15
60:23 61:7,18
62:5,13,20 63:3,6
63:10,13 65:6,17
66:6 67:6,15,22
68:10 71:1 72:7
72:16 73:5,11,21
74:5,11 75:5,15
75:22 77:10,17
77:19 78:1,3,7
79:22 80:12 81:6
84:13,15,17
86:13,17 88:10
88:20 89:12
90:18,21 92:3,6,9
92:15,22 93:2,8
93:16 94:2 95:2
96:21 97:12 98:6
98:10 99:12
100:11,16 102:1
102:12 104:7
107:1,17 109:6
110:5,20 111:5
111:21 118:3
126:15,19,23
127:12,18 128:6
128:15 129:10,15

134:11 135:15
140:2 141:22
143:17 144:22
148:8 150:18
151:21 153:17
155:21 156:19,20
158:1 159:5,19
160:2,8 163:8
166:2 168:7,22
169:17 170:13
173:12 175:5,7,8
176:10 177:17
179:11 180:8,16
182:6 183:1,16
183:21 184:11,18
185:4,15 186:4
186:12 187:9
188:23 189:15
190:9 191:6,7,12
194:21 195:2,5
195:13 196:2
197:3,6,10 198:4
200:9 204:3
207:2,6,10,10
208:7,18 209:5
209:17 210:1,10
211:22 212:11
213:11,18 214:3
214:14 215:18
216:11 219:4
220:17 221:10,21
222:3,13,20
223:21 224:10,23
226:3,18 227:1,5
227:13,17,23
228:3,14,19,23
229:3,18,22
230:6,12 231:16
232:8 235:13
237:15 238:18
239:15 242:2
247:4 248:10,19
249:5 250:20

251:23 252:5,10
252:20 254:11,13
255:3,4,21 256:6
256:18 257:1,4,6
257:14 259:9
260:16,18 263:19
265:21 268:20
269:6 270:4,11
270:15,23 274:17
276:11 277:5,15
277:18,18 278:2
278:6,21 280:7
281:2 284:5,20
286:2 287:3
289:15 291:19
292:11 295:22
296:13 299:5
300:16 301:5,9
301:15 302:3
303:20 304:17
306:11 308:10,14
308:18 310:1
311:5,6,14,19
312:17,19 316:16
316:23 317:11
318:6,19 319:14
319:23 320:4,21
321:1,18 322:1
327:2,13,15
328:21 329:8
331:16,21 334:21
336:12,22 337:23
338:10 339:13,23
340:9 343:23
345:19 346:1,17
347:4,16 348:3
**old** 307:3 331:1
**older** 202:2
**once** 12:20 27:20
44:3 76:7 167:1
195:9
**ones** 74:21 95:16
214:12 232:21
245:4 278:1

288:14 317:7
346:18
**one-on-one** 214:4
**One-page** 7:2 8:2,6
8:19 9:10
**one-sided** 111:8
**ongoing** 326:5
**online** 30:15
**onset** 24:21 42:2
**open** 101:18
324:10 326:11
348:22
**opened** 108:21
**operate** 258:21
**operates** 35:19
**operating** 47:18
191:4 246:1
**operation** 158:19
230:21
**operations** 14:3
88:1,6,8 89:2,3
151:1 170:12
**operator** 134:11
134:17,18 135:1
135:7
**operators** 74:17
**opinion** 71:20
141:15 142:15
149:1 160:20
161:5,14,16
162:15 164:14
167:9,18 207:9
272:10 300:19
301:2 346:1,4,9
**opinions** 275:1
346:22
**opportunity**
131:14 142:4,5
185:3 209:21
**opposed** 120:9
282:8
**Orange** 23:20
**order** 110:4,16
258:14

**ordered** 191:17
**org** 341:22
**organization** 63:7
240:3
**organizational**
31:20 33:17,20
**orientation** 235:8
**original** 24:8 25:14
45:13
**OSRV** 138:9
**Ostal** 16:21
**outcome** 115:12
**outraged** 131:2
**outside** 53:22
109:1 149:2,13
175:15 200:16
**outskirts** 56:6
**outstanding** 327:7
**out-of-pocket**
326:18
**ov** 291:7
**oversees** 36:14
**owned** 212:7
**o'clock** 2:2 117:18
126:2,3 151:16
152:6 266:11

**P**

**P** 10:1
**pace** 69:7
**package** 67:21
100:5 219:23
220:7 347:18
348:4,16
**packaging** 68:4,5,5
75:11 76:16 77:1
97:1,5,13,14 98:1
99:7,13 100:1,2
100:12 111:2,6,7
127:14 128:7,10
**page** 5:3,7 6:1 7:1
8:1,12 9:1 22:17
60:11,12,23 67:7
78:4 94:1 156:13

158:1 193:8
220:15 222:13
240:2,9 259:8
270:23 284:14
286:14,21 288:22
289:1,9 298:17
299:7 301:19
302:2,13,16
304:19 306:13
309:12 310:17
311:11 312:18
316:20
**pages** 57:13 60:7
109:4 197:13
224:3
**paid** 25:6 240:19
258:16 259:4
326:23
**pain** 42:9
**paint** 61:2 65:9,11
67:17 68:2,6
123:18 124:1
**painted** 120:23
**Panaboard** 274:21
**paper** 104:11
**papers** 156:6 190:3
**paperwork** 41:14
194:13
**paragraph** 101:15
109:14,16,19
110:22 122:11
129:20 131:1,20
133:5 156:22
188:12 197:11
220:19 224:11,12
224:22 226:10
227:1 284:21
304:22
**parameters** 65:15
**paraphrasing**
111:16 120:5
122:8 158:12
**parents** 21:10
327:18

**park** 234:13,21
237:1 289:21
338:20
**parking** 200:15
202:23 204:19
291:5
**part** 6:17 20:13
36:18 58:2 81:13
81:17 86:6,9
121:6 123:15
135:8 146:3,5
157:20 212:17
228:10 229:17
251:1 263:8
281:21 306:17
310:4 311:4
325:14 328:19
**partial** 42:13
**participant** 48:8
**participate** 93:10
**particular** 91:21
276:5 281:14
**parties** 20:16
101:8 111:8
151:11 184:6
231:12
**partner** 186:23
**parts** 7:5 31:15
33:5 36:19 50:8
51:1 54:16 55:4
59:19 67:12
69:17 74:15
78:21 81:8,9,17
82:16,20 84:3,9
84:20 85:23
88:16 89:14
90:20,21,22
91:11,14,17 92:3
93:3,21 94:15
95:14,15 96:16
96:21 97:19
101:16 102:5,7,9
102:15 103:17
106:7,22 133:23

134:7,12 135:2
139:17 145:20
149:8 150:14
157:10,11,13
158:6,7,20 159:4
161:1 173:18
183:14 184:8
193:23 240:14
241:7 245:22
262:2 263:4
302:11 303:7,18
304:8
**party** 38:12 55:16
80:21 81:3,23
86:21 264:5
269:23
**pass** 134:16,20
**passed** 332:6
**passing** 124:16
**patio** 175:16
**Paul** 7:20 169:21
169:21 170:1,3,6
**Paula** 59:17 82:13
82:17 85:3 93:5
95:12 158:5
**pay** 15:7 247:16
325:16 326:2,13
327:8 328:9
330:14
**payment** 231:19
**payroll** 279:22
**PC** 1:19 4:3
**peer** 303:23
**pen** 223:4
**penalized** 86:5
**penalty** 89:8,20
90:23 322:12
**penny** 330:22
**people** 14:7 35:14
35:16 36:1 54:19
56:5,7 80:2 82:10
92:9,13 102:6
105:21 106:21
108:7 136:16

159:10 161:10
162:4,8 170:10
170:10 191:23
201:14 221:12
233:22 235:14
236:18 275:18
313:19 342:2
343:19 346:7,8
346:21
**people's** 287:15
**percent** 94:4 159:3
162:22 163:22,23
209:16 210:11,12
266:12
**percentage** 163:19
164:12 165:10,12
**perception** 138:22
262:8
**perfect** 332:12
**performance**
200:6 244:21
251:2
**performed** 122:13
**perimeter** 19:21
**period** 24:6,19
29:2 30:8 31:8
42:3 43:9 44:9
45:11 82:2 188:8
211:22 216:18
249:10 279:8
301:4 327:8
328:1,23 329:3
335:22 337:19
338:7
**perjury** 322:12
**permission** 21:10
21:11,23 22:2,5
**Perry** 335:17
**person** 55:23 61:19
63:3 76:14,15
83:17 84:14
87:20 127:1
203:17 206:21
207:6 211:14

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| | | | | |
|---|---|---|---|---|
| 238:18 239:12 | 51:22 52:22 | 131:21 141:14 | **policy** 317:3 | 197:21 |
| 306:16 333:12 | 53:16 65:4 67:20 | 170:5 175:4 | **polite** 162:9 258:13 | **prepare** 153:14 |
| 334:2 | 90:2 146:13 | 196:22 221:8 | **pool** 85:7 | 182:22 183:2 |
| **personal** 132:6 | 180:9 203:22 | 233:8 285:6 | **poor** 71:2 301:1 | 197:6 237:11 |
| 167:9 182:2 | 208:14 221:22 | 299:6 301:23 | **poorly** 199:17 | **prepared** 60:8 |
| 205:2 208:18 | 231:12 244:18 | 320:12 340:23 | **portion** 56:8 | 72:4,12,17 |
| 209:22 211:19 | 248:7 256:19 | **plus** 147:23 158:17 | 133:13,15 265:19 | 124:19 152:18 |
| 248:15 250:9 | 259:23 344:8 | **point** 15:2 24:13 | 349:3 | 153:19 222:16,18 |
| 251:9,13 255:5 | **placed** 41:23 68:4 | 25:18 26:1 35:8 | **portions** 39:18 | 229:10 |
| 272:9 280:3 | 100:4 | 38:7 47:9 50:1 | 130:20 | **preparing** 85:14 |
| 317:19,22 333:18 | **placement** 42:16 | 56:1 58:18 64:13 | **position** 47:21 51:7 | 165:17 |
| 333:20 | 76:3 120:21 | 64:15,21 66:21 | 51:7 54:13 | **prescribed** 27:16 |
| **personality** 193:2 | **plaintiff** 1:6 3:3 | 67:6,12 71:1,4,5 | 100:19 117:13 | 28:14,19 29:23 |
| **personally** 212:14 | 11:2 | 73:9 76:10 80:10 | 120:14 148:5 | 30:5 44:13 75:9 |
| 213:9 235:10 | **plan** 165:9,11 | 85:4,20 86:22 | 150:1 159:7 | **present** 4:8 54:11 |
| 236:15,22 276:7 | 287:16 | 101:7 109:7,21 | 234:9 237:3 | 87:14 100:22 |
| 277:22 317:14 | **plant** 24:12 33:7 | 109:22,22,23 | 250:1 256:5 | 101:3 120:14 |
| 318:1 | 47:14 49:9 50:16 | 111:19 112:8 | 299:20 300:3,7 | 129:17 131:7,14 |
| **personnel** 261:5 | 55:17 59:6 61:10 | 113:7,13 114:3 | 300:10,11,14,17 | **presentation** 53:6 |
| **person's** 212:11 | 61:12,17 63:15 | 115:5 118:9 | 301:3,10 | 56:23 60:9,14 |
| 228:23 | 64:18 65:19 | 125:11 127:11 | **possibility** 188:1 | 61:1,14,21 62:6 |
| **Peterson** 25:16 | 68:22 70:5 71:13 | 130:11 133:19 | 295:9 | 62:15 66:22 67:8 |
| **petition** 18:16 20:6 | 71:22 72:1 73:7 | 144:16,23 151:3 | **possible** 132:22 | 69:23 71:10 72:4 |
| 20:10 21:18 | 73:15 75:8 76:1,8 | 158:23 159:6 | 164:6 200:5 | 72:20,23 85:15 |
| **phase** 29:6 83:2,6 | 76:14 77:9,12 | 167:9,18 179:9 | 208:23 251:7,11 | 86:10 98:17,22 |
| 317:17 | 81:16 91:1 99:21 | 201:18 204:20 | **possibly** 24:4 | 98:23 99:16 |
| **philosophy** 123:14 | 113:16 114:6,15 | 220:7 249:6 | 251:3 338:15 | 105:4 127:2,5,8 |
| **phone** 18:1 116:5 | 139:11 204:23 | 250:7 252:4 | **post** 193:15 | 137:21 138:12 |
| 199:8 260:11 | 206:18,21 211:3 | 254:15,16 263:3 | **potential** 17:23 | 142:7 164:9 |
| 278:11 297:10 | 215:1,8,16 | 265:22 285:21 | 56:11 325:18 | **presented** 60:15,17 |
| 331:7 332:2 | 220:12 232:19 | 296:12 319:22 | 340:19,20 341:15 | 86:9 93:20 94:8 |
| **phoned** 191:15 | 245:14 274:5 | 320:2,9,11,23 | **PowerPoint** 60:16 | 94:11,14 150:2 |
| **phrase** 329:13 | 280:9 288:11 | 321:1 329:1 | 60:19,19 | **presently** 13:20 |
| **physical** 43:16 | 314:12 332:15 | 331:12 347:7 | **PPG** 48:14 49:5 | **president** 33:1,9 |
| 335:23 337:11 | **plastic** 53:21 78:12 | **points** 98:15 138:6 | **PQ** 145:13 | 33:10,13 34:10 |
| 339:23 | 80:19 97:21 | 226:12 239:15 | **practical** 81:15 | 34:12,14,17 |
| **physically** 31:19 | 100:6 120:23 | 252:15 253:8 | **practice** 29:14 | 114:22 179:22,23 |
| 340:10 | 121:6 158:6 | 306:10 348:23 | 111:4 | 181:10,12 182:1 |
| **pick** 144:12 288:16 | **played** 172:21 | **pole** 291:6 | **practices** 180:22 | 212:21 216:22 |
| **picnic** 338:19 | **Plaza** 4:5 | **police** 291:10,16 | 233:23 283:6 | 222:1 234:8,17 |
| **picture** 64:1 70:8 | **please** 10:19 11:20 | **policies** 225:2 | **practitioner** 28:16 | 238:13 255:8 |
| **pin** 46:11 215:23 | 41:12 58:6 98:19 | 231:10 251:18 | 28:23 42:10 | 261:10,12 280:20 |
| **place** 3:14 10:12 | 99:19 122:4 | 316:17 317:6,14 | 170:1,7,8 | 281:17 295:19 |
| 13:14 25:22 46:1 | 123:1 128:20 | 318:2 | **practitioners** | 304:5 323:9 |

325:1 332:18,23
344:11,13
**presidents** 33:3
**press** 246:3
**presses** 245:21
**pressing** 156:5
**pressure** 186:11
187:11
**pretended** 211:9
**pretense** 200:2
209:10
**pretty** 142:13
308:16 334:4
337:18
**prevent** 53:9
**previous** 118:1
160:5 254:10
**previously** 18:9
73:7 97:1 98:18
135:22 137:14
**pre-inspection**
162:16
**pre-meeting** 59:15
74:14 75:16 79:6
82:6,8,12 83:5
85:5 86:15 92:23
93:21 94:9,12,14
98:2,7,16 99:9
109:8 142:14
147:1,22 156:11
177:23 178:2,4
**pre-meetings** 83:7
83:9
**price** 232:11
**prima** 305:1
**primarily** 18:4
**primary** 44:19
118:11
**printed** 169:8
**printout** 60:20
**prior** 12:5,7 17:18
19:9 33:13 47:12
47:16 48:1,6
49:16 50:17

52:22 59:1,3,12
71:6 79:6 81:1
86:12 100:17
105:18 107:15
119:11,16 126:16
126:20 162:21
165:17 167:23
168:2,20 176:13
176:17 199:4,6
203:4 204:1
208:22 212:9
213:22,23,23
214:13 221:3,5,6
221:8 224:15
242:15 252:23
253:10 270:20
285:14 294:4,19
299:13 327:22
344:14
**private** 199:23
**pro** 247:15,19
**probably** 13:16
26:16 28:18
32:23 50:17,18
54:18 56:5 88:11
96:9 160:3,6
162:9 170:15
172:23 174:23
175:19 190:11
204:1,1 205:9
212:10 243:6
249:12 260:9
264:16 268:2
275:4,5 292:12
321:12 339:5
346:6
**problem** 20:8 61:5
61:5 68:8 70:4
71:21 72:1 80:6
81:22 88:12
99:14 100:10,14
111:23 128:2
162:22 233:2
234:3 286:12

336:16 338:9
**problems** 56:11
69:4 87:12 93:14
99:20 110:17
112:3 113:9,11
119:10,15 122:2
128:17,23 129:3
129:6 138:14
159:12 163:9,10
166:15 172:8
176:13,15 187:17
201:20 202:6
216:19 218:4
278:4
**procedure** 45:3,5
244:8 256:10,11
256:16 270:9
317:4
**procedures** 135:16
231:11
**proceeded** 235:2
339:2
**proceedings** 349:8
**process** 52:3 65:11
69:6 75:7 76:2
88:14 89:6,22
123:23 124:17
135:9 164:19,22
196:7 244:21
**produced** 57:11
142:6 169:8
**product** 64:8,8
**production** 33:18
36:16 48:12 55:3
55:3 68:18,22
75:17 97:2 101:4
101:4 110:23
113:2,2 123:14
123:23 125:7,8
134:16,22 135:14
135:20 230:11,16
230:17,21 231:2
231:5,11 240:10
240:17 258:19

**products** 74:1,12
75:2 99:10
160:11
**professional**
262:11
**professionally**
241:19
**program** 44:8
**programs** 244:12
**progress** 7:18
169:10
**project** 24:10,11
25:15,15 26:5
32:3 237:23
239:8 332:16
**promise** 255:7
325:2
**promised** 272:8
294:11,14
**promises** 244:16
322:15
**promote** 265:15
**promoted** 34:12
263:8 280:20
**promotion** 264:22
265:13 281:17
322:16
**promotions** 322:20
**prompted** 187:23
**proper** 127:14
**properly** 68:7
70:23 177:20
**propose** 68:11
**proposing** 99:6
**prospective** 279:19
330:9 331:4
**prospects** 17:20
**proud** 206:9
**provide** 12:23 65:1
81:17 91:7
105:23 106:2
111:6 205:14
240:14 325:19
**provided** 16:16

29:4,9 106:4
111:15 198:2
231:21 275:3
317:16 325:21
**providing** 64:5
137:7 149:7
**provision** 21:3
**psychiatrist** 29:1,3
335:13
**psychiatrists**
330:19
**Public** 1:22
**Pull** 153:23
**pulled** 19:22 74:17
84:10 85:6 140:3
181:3
**punched** 238:5
**punching** 238:19
**purchased** 37:2
**purchasing** 31:15
33:1,3,4,5,22,23
34:4,8 35:11 36:1
36:11 37:1 50:8
50:22,23 54:14
54:15,16 55:4
75:17 89:23 90:5
91:18 93:3 106:8
149:5 150:17
176:7,11,12
206:3 230:13
243:3 248:12
263:1,4 290:7
302:12 303:23
330:1
**purchasing-type**
18:5
**pure** 247:19
**purely** 200:2 301:3
**purpose** 52:7,9
113:8 122:11
123:8 128:16,21
129:2 130:8
132:17 139:5
166:14 324:11

purposes 324:20
pursuant 1:17
push 268:8
pushed 262:18
  268:12 287:18
push-offs 233:13
put 32:8 42:15
  59:19 65:3 78:21
  91:10,15 95:10
  135:8 161:2
  191:10 201:12
  243:10 244:18
  249:22 250:21
  272:2 286:18,23
putting 70:21
  145:21 146:6
  250:12 251:6,10
P.C 3:5,13
p.m 125:21 126:2,3
  126:11 177:5,11
  186:8 191:16
  193:10 242:7,13
  266:10 308:23
  309:6 323:22
  324:2 349:7,9

## Q

QA 124:20
QC 94:5,18
QLS 80:22 81:3,8
  81:23 83:12,21
  84:1,21 85:1,1,2
  88:2 90:19 150:8
  150:10,14
quality 6:13,17 7:6
  36:15 49:8 52:10
  53:3 55:2 57:2
  59:23 62:7 63:8
  64:16,20 73:10
  75:16 79:4,17
  81:1,20 82:10,11
  82:16 83:12
  84:14,21,22
  88:11,16 91:17

93:21 94:15
101:4 102:13
108:11,23 111:16
113:1,15 114:5
118:11 120:1
128:17,22 129:3
129:6 136:14
138:14,19 150:8
150:15,21 151:2
152:5 157:14
158:6 160:13,14
161:8 166:15
179:6,23 266:11
quality's 81:10
quarantine 73:20
quarantined 95:15
  95:16
question 15:14,19
  26:13 34:16 35:3
  35:4,9 37:7 64:13
  64:18 72:19 85:3
  102:1,20 103:4
  103:11,19,23
  104:1 116:21
  125:1 127:18
  133:7 142:23
  168:12 169:12
  178:6 213:11
  215:12 224:20
  225:17 236:6
  248:13,19 265:12
  268:23 274:9
  275:23 285:9,10
  299:5,7,9 305:12
  305:13,15,18
  306:6 315:14
  337:8
questionable 22:10
questioned 150:7
  305:5,17,19,19
  305:20,21
questions 11:17
  15:13 137:20
  168:6 319:3

325:8,10
quickly 177:13
quid 247:15,19
quiet 144:5,11,17
quit 136:15 158:7
Quite 251:3
quo 247:15,19
quotation 154:13
quote 129:15
  154:10
quotes 131:20

## R

R 3:11 10:1
racist 206:16
racking 327:10
Radio 297:11,12
radius 20:3 21:9
rage 190:22
raise 156:3 245:3,5
raised 127:11
  129:13 132:4
  242:17 268:17
raises 244:18
raising 115:6
ran 17:14 238:9
  291:5
range 44:14
rank 249:23
rapport 181:1
  217:11
rate 244:23
raw 75:1 78:13
  80:19
reach 279:16
reached 17:13
  162:16 238:4
reaching 100:9
react 240:4
reaction 40:15
  264:21
read 27:12 48:18
  71:17 94:13
  102:19 103:3

104:8 109:16,17
123:1 131:21
156:15 158:2,3
175:3 186:3
188:13 190:13
299:3
reading 140:20
  224:22
ready 91:15 331:7
  347:12
real 39:2 258:8
  272:4
realistic 142:20
  143:4
realize 119:6
  196:12
realized 53:4
really 38:8 68:14
  78:8 84:17
  135:13 172:17
  184:14 196:8
  209:8 232:8,12
  232:13 233:17
  254:22 262:8
  288:18 291:14,17
  291:18 303:22
  322:6,8 329:13
  336:5 337:22
reason 22:6 49:21
  86:8 146:13
  160:21 162:2,5
  167:14 168:1
  172:19 175:7
  201:21 250:11,18
  254:1 306:17
  313:11 331:14
reasons 68:15
  114:21 251:5
reassured 189:11
  191:2
recall 16:4 23:14
  23:23 29:10,12
  44:12,14 45:1
  60:18 61:11,19

62:10 63:13,20
64:2 67:10 70:12
71:3 77:19 78:15
95:20 96:8,20
98:5,11 105:10
110:5,19,20
111:2,18 112:21
118:18,20 120:6
120:16 122:22
124:6,12,21
125:3,5 128:3
129:10,21,23
130:2 133:3,8
135:5,12 146:18
152:4 167:7
169:14 171:2,10
172:14,17,20
174:12,15 175:8
175:11 176:3
177:22 178:8
180:9 184:1
185:4 189:15
191:8 202:10
208:10 209:5
210:13 212:14
214:7 227:10
232:16,22 242:19
246:15 252:3
259:22 271:18
274:9,17 283:16
284:4 297:18
314:8 317:17
319:21
receipt 75:7
receive 324:14
  328:4
received 14:22
  17:5,13 39:8,20
  39:23 186:7,8
  194:22 220:10
  309:16 315:13,16
  325:23 328:8
receives 76:15,15
receiving 16:4

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 28

17:12,15 40:5
314:8
**receptionist**
202:17,20 204:15
**receptionist's**
203:20
**recess** 46:18 66:14
126:1 177:6
242:8 309:1
**rechanged** 69:5
**recollect** 312:9,11
**recollection** 16:8
25:13 41:20 47:1
47:5 97:20
104:22 105:16
107:20 119:22
120:19 126:23
127:16 136:4
154:20 169:1
170:17 174:1
175:22 177:21
254:16 296:8
311:20 320:2
322:4 342:17
**recommended**
27:22 151:1
**record** 10:9 46:17
46:20,22 66:13
66:19 103:3
125:21 126:10
177:4,10 242:7
242:12 297:5
308:22 309:5
323:20,22,23
324:2,5 349:7
**recorded** 182:13
344:22
**recorder** 297:6,9
**records** 30:7,11,16
324:8,14
**recourse** 218:11
**recovering** 265:22
287:17
**recruited** 165:5

**recruiter** 332:1,5
333:8,15
**rectify** 255:1
**red** 76:18 174:16
**redirect** 115:4
139:22
**reduced** 164:11
**reducer** 28:7
**reduction** 14:2
**reference** 286:15
**referenced** 69:9,11
317:6,15
**references** 333:10
**referencing** 316:18
**referred** 214:6
224:6 227:19
252:21 314:11
318:2
**referred-to** 14:8
16:1 22:11 41:8
56:14 57:22
107:9 126:4
136:20 152:14
165:13 168:13
173:4 174:4
185:21 196:16
272:23 314:2
315:8,19 318:11
**referring** 71:21
79:15 154:3
211:2 226:10
232:1 260:18
273:4 287:14
288:13 292:21
298:23 305:2
306:23
**refers** 110:21
224:11
**refocus** 344:2
**refresh** 47:1
104:22 296:7
311:19 320:1
**refused** 240:17
**regard** 74:5,8

103:19 120:9
202:11 208:10
210:2 213:12
247:7 270:12
289:4 290:16
324:13 325:15
348:16
**regarding** 13:9
41:14 48:14
52:10 137:21
211:20 271:13
324:7
**regards** 66:2 293:3
**regular** 308:2
**rehab** 43:14 45:12
253:14 261:14
265:7,10,18
279:7
**rehabilitation**
43:10,21
**reiterate** 321:16
**rejected** 81:4 82:19
**rejects** 157:2
**relate** 229:12
**related** 91:6 113:4
139:9 273:18
325:1
**relates** 322:16
**relating** 197:14
274:15
**relation** 14:22
254:8
**Relations** 213:15
235:18,19 236:10
236:20 237:7
249:2 251:19
**relationships**
148:14 165:4
**relay** 310:22
**release** 241:6
**releases** 43:7
197:19
**rely** 84:17
**remain** 19:20

300:12
**remained** 301:6
**remaining** 74:21
96:21 97:18,18
100:19
**remember** 43:17
91:10 95:13
115:15 127:20
131:18 132:3
134:9 142:1
154:21 168:9
170:22 172:15,18
184:18 187:10
210:17 216:8
220:8 222:8
239:15 245:20
257:21 258:10
259:14 282:10,15
283:20,22 303:10
311:23 335:12
**reminded** 166:13
**removed** 76:9
**rent** 328:13
**rental** 25:6 218:2
339:16
**rented** 45:19
**rep** 62:8
**repaid** 327:13
**repair** 122:13
123:13 134:7
**repairable** 65:13
**repaired** 134:21
**repairing** 122:1,20
**repairs** 123:18
124:1 133:5
**repay** 327:14
**repeat** 128:20
141:13
**repeatedly** 117:19
151:17 233:7
267:21
**repercussions**
210:21
**rephrase** 15:15

38:4 144:7
**replied** 111:21
**reply** 112:7
**report** 8:8 31:17
47:19,22 48:20
50:10 53:20
88:21 96:18
194:7 235:17
293:8 314:11
347:10
**reported** 31:23
34:17 35:14
36:21 37:14
50:13 183:11
208:23 212:23
224:16 235:19
237:22 243:4
251:18 321:3
**reporter** 1:22
10:16,21 40:20
102:22 255:10
**reporting** 36:8
**reports** 35:10,12
35:13,17 37:8
96:14 183:12
191:17 238:4
244:1
**represent** 11:1,4,6
54:3 165:2
220:13 314:12,16
333:12
**representation**
97:8
**representative**
55:20 63:14
64:12 105:1,12
**representatives**
55:6,9 62:15
85:14 86:13
105:17 108:19
**representative's**
97:8
**represented** 54:22
72:3 89:10 119:7

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

199:1 210:7
**representing**
186:17
**represents** 333:14
**reprimands**
322:20
**reputation** 191:1
300:21
**reputations** 307:11
**request** 147:12
154:17 155:4
182:21 183:17
185:9 191:20
194:16 258:13
**requested** 20:12
30:7 56:20
106:10,11,19
107:5 132:8
154:10 190:14
197:12 221:19
324:8
**required** 21:3
41:15 81:19 84:3
145:20 146:5
261:21,22
**requirement** 64:7
262:16
**requirements**
159:2 290:8
**requires** 261:5
**res** 204:5
**rescued** 288:7
**resentful** 267:15
**reservations** 258:8
**reserve** 326:9
**residence** 44:19
**resides** 14:5
**residing** 228:5
**resign** 216:17
219:15 286:7
296:6,19
**resolve** 65:19
**resolved** 20:14
167:3 195:10

248:23 249:7,17
251:21
**resource** 39:19
317:2
**resources** 38:11
40:18 153:7
211:7 212:13,17
213:15 230:9
309:16 344:14
**respond** 202:15
**responded** 145:16
168:11
**response** 37:7
64:12,23 110:21
139:4 146:2
202:14 259:2
270:11,15 292:15
303:2 348:3,5,13
**responsibilities**
36:23 37:5 50:21
**responsibility** 36:5
36:16 76:5,21
96:11 128:18,23
129:3 130:10,13
130:16 134:2,19
135:6 151:10
303:8
**responsible** 80:23
130:5,18,23
133:6,11,13,15
162:20 163:3,10
163:20 326:21
**responsive** 35:4
**restate** 317:22
**restated** 57:20
**restaurant** 175:17
**restless** 187:3
**result** 14:1 204:3,5
248:2,4 276:20
329:18 348:7
**resume** 5:18 22:16
210:8 329:22
**resumes** 309:16,19
**retaliate** 211:7

**retaliated** 319:15
320:14
**retaliation** 7:12
190:23 192:3,17
192:19 319:12,20
345:10 346:10,11
346:12,15,16,20
**retaliations** 192:12
**retired** 327:16
**retracted** 217:15
**return** 276:4
**returnable** 67:21
75:10 76:16 77:1
**returned** 26:15
85:23 93:23 94:3
94:16 122:21
257:12 278:7
279:6 280:4
**returning** 25:4
307:1
**returns** 86:3
**review** 7:6 53:2
81:8 89:13 90:10
113:9 126:16
128:16,22 142:6
159:20,22 160:9
166:3,15 244:21
266:12 323:2
324:18
**reviewed** 79:14
96:6 107:14
153:10 165:16
**reviewing** 117:9
**reviews** 83:13
244:17 323:1
**revising** 301:5
**Richard** 3:4 4:9
10:23 137:11
165:19 197:8
223:15 225:21
232:6,7 331:13
331:22 342:16
**Richetta** 205:7
**Richmond** 11:23

**Rick** 11:8 172:6
197:8 203:8
204:5 205:14
213:12 217:9,10
217:10,13,15,15
218:14 229:16
230:3,4 253:12
260:21,22 268:18
269:1 271:22
272:6 279:1,13
279:14,16 288:4
291:16 331:19
**Rick's** 257:2
344:16
**rid** 292:13
**right** 12:12 18:14
22:1 34:21 35:6
42:5,11 50:12
57:12,15 65:20
66:1,8 72:10 79:2
79:21 82:15
84:12 97:10
107:2 108:6
125:16 143:16,21
149:14 150:16
154:13 156:11
157:16 176:23
184:21 194:19
196:15 214:11,21
217:14 218:22
227:7 229:14
242:3 246:16
247:8 248:12
269:9 271:14
273:21 274:1
276:14,22 278:6
278:12,17,19
279:7,9,12
281:23 285:8
286:3 290:11
310:7 312:5
313:20 316:10
320:17 326:8
331:12,16 349:1

**right-hand** 153:18
**road** 324:15
**Rob** 5:22 8:22 9:5
53:23 107:19
109:12 111:21
116:6 122:17
138:8 140:23
145:3 152:7
167:10 175:7
179:5 181:6
206:4 216:8,15
218:9 228:3
278:15 282:20
286:5,12 296:3
296:23 332:10,21
338:17
**Robert** 1:5,16 5:12
5:16,18 7:10,19
8:14 9:8 10:4,5
11:11,21 66:11
66:17 125:18
126:9 169:9
177:2,9 242:5,11
308:20 309:4
349:4
**Roberts** 62:2,3
86:16 98:12 99:8
120:16 131:16,18
131:21 132:3
**Robots** 246:5
**Roger** 37:22
**Rok** 181:16
**role** 54:10
**room** 42:11,12
83:10 105:8
140:3 181:4,22
190:4 228:4,4,20
234:9 235:2
257:2
**root** 49:10 53:7
69:21 101:8
115:10 141:8
146:22 151:8
**rotated** 78:22

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

**roughly** 43:2
**royalty** 268:13
**RSA** 1:19
**rules** 15:11 232:11
 245:16 246:7
 293:23
**rumor** 285:11
**rumored** 287:21
**rumors** 231:19
 259:14 284:23
**run** 81:16 86:1,6
**running** 69:16
 174:12,15
**run-in** 313:8,9,16
**run-ins** 313:1
**ruthless** 293:23

---

**S**

**S** 5:5
**sabotages** 330:12
**safe** 195:22
**safety** 251:1,2
 245:13,18 246:1
 246:2,6
**Saint** 43:18
**sake** 196:11
**salary** 14:18 39:8
 39:13 279:17,18
 279:21
**sales** 26:6 62:8
**San** 293:6
**SAP** 235:7 237:16
 240:18 257:23
 258:8,12 259:5
**sat** 259:15 268:9
**Saturday** 185:10
 185:14,16 260:13
 295:18
**saw** 44:18 70:3
 96:16 160:4,5
 170:12 175:2,9
 200:16 237:1
**saying** 63:14,20,21
 65:17 71:8 74:17

79:12 110:19
116:5 118:19,20
125:3,5 126:23
128:3,21 129:10
130:2 131:18
133:8 134:9
135:6 140:13,22
142:1 143:7
146:19 147:7
152:7 154:9
158:22 160:18
161:11 164:12
176:4 180:3
184:1 186:18
190:11 192:18
195:14,17 221:4
227:2,5 250:11
250:21 251:14
267:23 269:11
271:18 277:7,9
281:10,11 287:8
289:12 302:16
303:16 311:23
312:7 314:11
320:13 332:21
**says** 16:11 57:8
66:3 72:10,11
79:11,18,19
94:11 96:21
104:14,19 109:6
109:18 111:21
113:8,20 122:16
127:9,13,22
128:6,15 129:16
131:1,5 133:18
133:18 135:1,17
137:19 138:7
141:22 145:12,13
153:23 154:18
155:7,15 157:20
158:1 166:13
167:10 169:11,21
170:4 171:9
200:20 208:8

217:14 220:19
224:13 231:17
260:1,4 267:9
284:16,21 287:9
292:11 293:22
294:1 295:18,23
298:21 302:15,23
306:21 307:2
311:3 314:15
321:2 332:10
**scene** 288:17
**schedule** 68:20,23
69:5,18 172:4
239:18,23 240:11
**scheduled** 18:3
**school** 247:11
289:18,20,21
290:2,3,6
**schools** 290:4
**scoffed** 275:20
**scraped** 121:6
**scratch** 72:8,23
73:2 74:8,22
75:20 76:6 80:4
80:11 85:16,20
160:3,7 300:5
**scratches** 72:11
73:13 75:6 78:12
78:13 80:18
85:11 93:15,17
101:6 115:9
121:5 122:6
123:3 132:16
137:22 138:1,4,9
**scratching** 121:11
167:3
**scream** 144:23
**screaming** 71:9
**screen** 331:7 332:3
**screw** 121:5
**scrutinized** 244:1
**second** 33:10 40:15
57:19 67:6
110:12 119:23

120:7 166:20
170:2 180:14
190:14 191:9
197:10 204:19
221:8 228:8,12
229:13 290:20
301:23 321:1,23
323:20 339:7
**seconds** 216:6
**secretaries** 262:12
**secretary** 203:18
266:5 293:14
344:16
**secure** 91:11 288:2
**security** 38:20
348:1
**see** 12:11 29:3
30:10 60:3 70:1
73:17 80:17
81:23 91:16 93:9
96:13,18 104:12
109:12,13 119:8
121:4 135:7
136:23 154:1
155:11 158:11,11
158:13 160:23
169:9 200:3,15
217:6 220:18
234:14 235:5
259:10 260:17
262:10 271:5
279:10 287:7,11
287:16 290:1,18
291:7,20 302:3
320:8 321:11
325:4 326:11
331:5 342:1
346:5
**seeing** 84:21
**seek** 20:11 21:17
**seeking** 19:7
**seen** 79:5,13 86:11
117:9 156:12
165:19 168:16

174:2 186:3
256:6 273:7
278:10
**send** 211:9 240:21
241:8 267:3
**sending** 122:2
**sends** 195:17
**senior** 36:3 63:11
106:6,7 263:3
**sense** 124:2 141:21
232:14
**sensitivity** 310:3
**sent** 72:12 74:2
81:9 157:1,11
211:14 247:19,23
248:4
**sentence** 57:8 78:3
321:2
**sentences** 78:6
**Seo** 180:1
**Seoul** 24:1 51:4
**separate** 23:6
45:17 129:11
132:15 180:11
233:4 255:18
277:4 316:5
**separated** 45:17
**separately** 121:12
257:8
**September** 6:7,10
6:15 7:3,14 25:10
25:23 26:9 47:11
48:1 50:18
152:21 168:20
169:15 170:18
171:14,17 220:20
221:6 224:13
321:2,7
**sequence** 80:22
109:4 138:11
**sequenced** 76:17
**sequencing** 48:15
48:22 49:8 76:21
158:19

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

serious 202:6
service 289:13,16
  292:2
services 231:21
  333:15
set 20:2 33:10
  202:3 271:15
sets 40:12 241:12
settled 207:19
settlement 20:13
seven 23:22,22
  160:6
severance 219:23
  220:6,7 347:17
  348:4,16
severe 78:11 80:18
  187:5
sex 204:17
sexual 205:13
  224:18 231:20
  232:4 246:19
  252:1 321:5
Shack 297:11,12
Shaffer 335:10
shared 130:16
shelter 328:14
she'd 79:5 82:21
Shin 91:4 245:20
  293:6
ship 75:3
shipped 76:7 77:7
  77:20,21
shipping 69:17
  70:21
shocked 283:7
shoes 245:18
shop 123:17 124:1
  327:21
Short 46:18 66:14
  177:6 242:8
  309:1
Shorthand 1:22
shortly 25:3,4
  26:15 344:9

shortness 42:6
  170:19
short-circuit
  325:14
show 15:22 120:20
  185:17 212:4
showed 93:22
  94:16 105:20
  175:7 223:15
  225:21
showing 121:1
shows 79:11
shut 14:3,6 327:21
  329:12
shuts 88:15
sic 16:21 28:9
  67:18 91:4
  118:10 186:16
  234:12
sick 153:5
side 36:17 37:23
  54:4 68:21 83:8
  83:11 91:15
  148:3 158:9,15
  159:3 188:5
  195:22 231:19
sign 87:19 204:6
  205:16,17 304:3
  304:4,4,5 318:17
signature 137:17
  261:6,7,19,22
  262:18 263:21
  269:4,15 270:12
  304:2
signing 15:3
  322:11
sign-off 51:10
silently 109:17
silos 171:22
similar 229:22
Simon 293:6
simplicity's 196:11
simply 87:8 102:1
  305:23

sing 159:22
single 72:22
  159:20
singled 201:22
sir 33:5 35:6 38:15
  38:17,19,22 41:5
  51:19 55:7 58:11
  64:22 68:9 70:1,7
  77:8 126:18
  169:13 178:5,9
  182:5,10,19
  194:20 195:12
  210:5 212:15
  219:6 224:8
  236:17 266:1
  270:10 319:17
  322:7
sister 211:12
sister-in-law
  187:22
sit 17:21 56:6,7
  85:12,13 116:16
  117:5 123:22
  181:15,17 296:20
  318:6
site 77:15
sitting 83:17 105:4
  105:8 143:17
  175:15,23 246:3
  329:20
situation 38:6
  44:23 90:22
  130:19 158:9,16
  171:8 188:18
  194:9 209:22
  211:20 213:13
  217:4 257:13
  271:13 273:19,20
  273:23 280:3
  294:10 334:1
  340:16
six 23:22 44:14
  50:19 173:10
  249:13 301:16

Sixth 4:4
size 297:13
SKU's 81:13
slamming 117:19
  151:17
sleep 247:18
  336:16,17,18,19
  337:1,2 340:13
sleeping 202:9,13
  202:16,20 206:10
  207:23
sleeplessness
  340:12
slept 204:22
slide 60:18 86:9
smacking 120:17
small 207:21 334:8
  334:8
Smart 91:4 245:20
SMITH 3:5
SMOAK 3:12
smoking 200:16
smoother 35:2
snaky 272:9
social 38:20 171:3
  173:1
sold 201:16 327:3
solid 340:15
solution 238:15
solved 100:13
somebody 105:6
  150:20 184:14
  186:23 192:14
  239:1 250:16
  263:13 297:19
  331:3 332:13
  333:18
someone's 121:16
someplace 199:22
somewhat 162:10
  202:19
son 292:12 323:8
Song 240:16 241:8
  258:9 293:10,16

293:17
Song's 259:2
son-in-law 32:1
Soo 247:11
soon 185:2 244:15
sorry 22:22 40:23
  45:13 49:2 82:15
  83:20 93:23
  103:22 106:15
  109:12 119:21
  123:21 129:19
  133:7 144:7,15
  154:7,8 156:7
  161:8 163:13,14
  173:15 175:4
  185:6,13,16
  195:6,6,8 199:5
  201:3 203:12
  213:23 225:18
  232:9 242:21
  248:3 269:7,13
  273:12 274:16
  277:6 280:6
  283:18 285:8
  287:4 299:18
  308:4 311:12
  315:14 316:19
sought 38:20,23
sound 106:14
  222:23
sounded 41:17
  232:3
sounds 18:14 37:6
  43:8 187:16
  269:10 292:10
sour 201:17
sources 17:9
sourcing 51:11
  261:4
Southfield 24:18
speak 48:18 54:2
  56:9 59:11 61:13
  107:8,12 117:16
  131:8 132:1,1,2

137:3 143:11
147:12 150:10
155:13 182:4
194:2 203:3
215:5 218:15
237:6 284:22
315:6
**speaker** 311:1,3
**speaking** 121:14
**specif** 283:23
**specific** 21:3 35:9
46:14 48:9 76:13
79:20 81:21 96:5
96:14 103:10
113:14 117:23
132:10 141:18
197:17 208:4
210:13 211:1
214:8 251:23
252:15 263:10
271:10,17 273:18
274:10,13 276:2
278:14,15 282:11
283:17,23 317:5
333:4 334:6
336:14,15
**specifically** 39:15
61:18 74:3 85:8
87:4 103:13,16
104:3 110:2,14
112:20 113:21
115:14,23 118:18
118:21 129:8
133:12 142:8
154:9 188:21
189:4,21,23
192:11 200:23
202:12 208:12
219:7 227:9
242:19 246:14
250:17 261:3
263:17 287:13
326:22
**specifications**

81:18
**specifics** 316:17
329:7
**speculation** 333:17
**speed** 196:7 325:7
**spent** 23:19 131:6
131:12 290:5
339:5
**spiel** 181:9
**spoke** 17:23 62:10
62:12 73:6 82:9
90:7 127:4,7,9
142:13 154:22
161:3 181:20
187:1,1 219:1,5
222:8 229:5
236:19 271:7
331:11 334:13
345:17
**spoken** 216:23
252:17 266:13,22
335:7 341:14
**spot** 291:21
**spray-paint** 67:16
**spreadsheet** 241:9
258:17
**spreadsheets**
240:22 258:1
**squeaking** 245:4
**stabilizing** 68:12
**stacking** 75:12
77:3
**staff** 36:8 139:17
173:18 193:7,22
202:9,13 213:4
262:3 309:15
**stage** 81:5 137:9
**stairway** 282:12
**staking** 71:2
**stamped** 245:22
**stamping** 91:7
**stance** 92:20
**stand** 317:1
**standard** 88:14

111:4 297:15
**standing** 180:19
267:18 291:12
**stand-up** 293:3
**Star** 174:16
**start** 23:16 233:9
233:10,11 289:19
327:19
**started** 23:17
44:23 115:8,13
148:11 234:23
253:13 274:22
294:21 303:10
**starting** 188:15
304:22 312:22
**starts** 28:4 156:23
186:6
**start-ups** 332:15
**state** 1:23 11:19
17:15 21:5 23:7
26:3 139:19
164:14 255:16
290:1 291:15
306:16
**stated** 78:8 80:16
109:7,7 111:1,22
113:5 122:17
123:3 127:22
128:8,15 140:23
145:13 162:23
166:21 319:21
**statement** 23:2
37:12 95:11,22
99:13,16 102:3
103:14 108:18
112:9,13,16
120:7 122:5
123:11 131:3
137:1,14,19
140:20 141:16
156:21 163:6
166:17 175:11
176:17 183:2
184:22 217:16

219:17 221:1
223:22 285:16
287:8 303:15
311:7
**statements** 101:13
106:10,11,19
107:4 117:10
121:22 139:20
141:10,17 178:12
**states** 1:1 107:17
167:9 307:10
314:14 327:22
**statin** 188:4
**stating** 110:5 133:3
160:20 300:18
**status** 184:8 238:3
**stay** 20:23 21:4,22
22:6 41:3 300:22
**steel** 331:5 334:9
**stellar** 218:5 287:9
**stent** 256:10 278:8
279:6
**stents** 41:23 42:17
**stepping** 245:19
**steps** 63:16
**Steven** 335:10
**STEWART** 3:13
**sticker** 314:5
**sticking** 100:10
159:7
**stifling** 138:13
**stints** 41:17
**stipulation** 1:17
**Stock** 258:19
**Stockham** 3:4,5
10:23 11:1 22:20
46:12 57:3,16
58:2 120:3 122:9
125:22 155:8
161:18 166:18
168:5 169:3
173:13 174:13
185:20 196:20
215:7,11,19

223:18 226:1
260:20 272:14,17
272:22 273:10
281:5 282:4
286:17,21 287:3
287:5 317:9
324:16,18 325:6
325:13 326:2,16
329:6 331:15,17
342:14 343:6,8
**Stone** 8:4 173:17
**stood** 268:13
**stop** 85:2 241:23
**stoppage** 52:12
86:6 157:1
**stopped** 250:5,6
**stories** 34:22
**story** 219:19
**straight** 163:12
315:6
**straights** 287:22
**strange** 286:8
334:3
**strayed** 269:7
**Street** 1:20 10:14
**stress** 171:4,5
338:6,8,11
**stressful** 171:18
**stressors** 171:15
**stress-inducing**
172:8
**strictly** 54:11
**striking** 309:23
**strong** 206:8 207:5
263:13
**stronger** 133:22
**strongly** 58:21
147:16 148:1
154:10
**structure** 33:17
35:16
**structured** 35:18
**stuck** 144:19
**studies** 336:17,18

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

**studs** 91:11,13
120:23
**stuff** 187:13
197:23 215:6
294:5
**stumbled** 216:21
217:8
**Stuttgart** 14:4
**style** 155:15 191:3
193:19 217:7
275:9
**subject** 145:10
149:1 177:14
192:21 316:21,22
344:3 348:22
**subjects** 252:7
**submitted** 152:18
**subordinate**
238:23 239:1
303:17,20 304:12
**subsequent** 213:22
**substance** 59:13
143:8 254:14
**substantiate** 118:6
**sudden** 269:19
**suffered** 329:17
**sufficiently** 68:2
**suggested** 199:19
225:23
**suggestion** 164:10
187:17
**suit** 323:17
**suitcase** 211:11
**Suite** 1:20 3:7,16
10:14
**Sulliey** 332:23
**Sullivan** 37:18
**summarizing**
319:2
**summer** 222:2
247:2 254:7
264:16 321:10
322:6
**Sunday** 260:8

**superior** 230:20,22
**superstars** 300:23
**supplier** 6:12 13:2
13:5,7,11 36:13
37:9 48:14,21
51:17 52:10
58:22 75:3,18
80:15,17 87:21
89:23 90:4,7 92:7
102:13,14 113:10
114:19 120:2,9
120:11 123:16
129:16 130:23
134:2 135:7
147:17 148:2,3
148:16,19 149:3
149:6,13,22
152:5 154:11
159:11 162:13
165:2 211:13
212:5 231:20
240:21 245:20
266:16,16 287:18
287:20 288:8
305:6,7
**suppliers** 36:14
52:13,16 53:5
81:17 111:6
148:14,20 208:15
210:23 239:20
240:3,13 241:3
245:14 288:10
**supplier's** 54:4
148:3 166:15
212:6 288:10
**supply** 109:2 113:9
**support** 37:9 53:23
54:3,8 90:16
157:18 328:12
**supposed** 76:17
117:4,6 245:23
249:3 271:23
317:12 325:21
337:12

**sure** 39:12 42:5
46:12 68:14
79:10 134:3
156:17,18 171:12
176:22 177:19
180:12 212:13
215:20 253:17
285:5 309:10
318:7,9 322:7
325:6 326:16
334:5 342:14
345:1,4
**surface** 121:1
**surgery** 42:15,21
43:20 197:19
265:22 276:14
278:8 279:6
280:4
**surgical** 45:3
**surprise** 190:17
**surprised** 119:8
282:19
**surreal** 217:19
286:8
**Susock** 6:11 59:22
80:23 82:7 88:11
88:17 93:9 95:6
107:17 114:2
118:9,14,18,22
119:6 122:16
133:3,8 139:18
141:17 145:12
146:12 162:14
166:22 266:15
**Susock's** 82:3
94:23 119:21
122:5
**suspect** 74:18
162:3 346:13
**suspended** 323:4
**suspicions** 298:11
**suspicious** 330:7
**Sutton** 335:17
**swear** 10:21

**swimming** 220:6
**switch** 26:3 125:15
308:15
**sworn** 11:12
**symbol** 58:15
**symptoms** 188:6
**system** 125:7
134:16,22 135:14
136:12 230:16
235:7 240:18
257:23 258:16
259:4,5 339:16
**systematic** 138:14
**systems** 125:9
135:20 136:5
**S-E-O** 180:1
**S-E-U** 180:1
**S-O-N-G** 258:9
**S-U-H** 180:2
**S.G** 107:19

---

**T**

**T** 5:2,5
**table** 51:5 56:5
90:11 105:4
115:8 151:18
175:21 238:5
**tables** 117:19
**taboo** 136:7,9
**tackled** 238:9
**tags** 96:3,9,17
246:2
**take** 13:14 27:4,8
27:10,14,20 46:5
46:10 48:15
53:16 59:15
70:15 72:20 90:2
92:19 100:18
107:21 125:23
130:18 146:13
148:2,21 176:20
203:22 209:20
221:22 231:11,22
233:14 236:11

244:2 247:17
248:7 261:19
277:15 299:20
300:7,10 344:8
345:15 347:20,21
348:18
**taken** 1:17 49:4
75:10 126:2,12
208:5 270:11
349:5
**takes** 67:17
**talented** 243:7
**talk** 58:21 59:14
85:5 110:12,13
114:13 137:10
148:1 154:10
159:17 160:23
172:7 180:14
181:23 194:8
201:2,6 220:8
249:3 259:13
269:3 276:1
277:18 279:16
281:5 330:20
340:6 342:3
344:17,19 347:19
**talked** 49:2,3 56:10
59:21,22,23
70:18 73:16 80:2
83:10 85:10,19
85:22 86:19
125:8 127:18
134:14 140:15
141:4 147:16
165:23 171:10,12
179:16 180:12,20
181:10,12 184:13
193:23 209:15
226:2,16 232:21
233:1 234:4
239:6,17 241:22
242:22 243:14,19
244:16 245:6,6

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| | | | | |
|---|---|---|---|---|
| 246:6,11,20,21 | 257:14 260:2 | 48:5 51:20 52:19 | 240:22 250:6 | **they'd** 66:23 |
| 246:22 247:21 | 272:22 294:3 | 55:22 58:19 | 270:2 311:15 | 127:19 145:14 |
| 249:18,18,19,21 | 297:6,8,13,15,16 | 61:10 72:14,21 | 337:15 339:6 | 216:16 267:15 |
| 256:7 258:4 | 297:17 301:17 | 79:9 82:18 86:17 | **temper** 155:18 | **thing** 39:3 40:3 |
| 263:18 268:21,21 | 308:19,21 309:3 | 86:20 87:7 92:13 | **ten** 102:13 160:6 | 43:23 57:11 |
| 271:2 274:12 | 310:18,20 312:2 | 95:12 102:7 | 195:18 296:2 | 70:17 78:10 |
| 276:9 277:8 | 312:15 349:2 | 109:16,17 112:20 | **tenure** 272:6 | 80:17 143:2,6 |
| 280:8 281:12 | **tapes** 66:7 187:18 | 118:3,9,14,22 | **ten-day** 195:20 | 189:12 210:16 |
| 293:17 317:10 | 279:10 308:15 | 137:12,18 141:5 | **term** 20:21 | 218:7 246:21 |
| 319:18 320:15,18 | **tape-recorded** | 144:16,21 151:12 | **terminated** 19:18 | 263:20 286:20 |
| 331:5,17 334:11 | 187:15 | 156:17 161:23 | 19:23 20:20 22:4 | 290:11 301:8 |
| 335:1 338:14 | **Tavern** 174:16,19 | 162:6 167:17 | 22:7 153:22 | 306:22 310:3 |
| 340:18 341:5,10 | **teach** 135:19 | 172:11 175:1,1,9 | 201:4 284:23 | 326:5 331:10 |
| 342:5,8,16 345:5 | **team** 73:16 78:15 | 175:11 179:15 | 285:11 319:11 | **things** 51:8 55:19 |
| 347:23 | 78:20 83:18 84:2 | 184:15 186:5,5 | 329:19 339:20 | 165:8,20 189:8 |
| **talking** 68:17 88:6 | 84:6,18 88:19 | 189:4,23 192:20 | 340:5 344:9 | 190:18 193:13 |
| 113:20 115:9 | 92:1,4 124:19 | 199:6 200:9 | 346:13 | 207:19 209:13,14 |
| 132:23 138:8 | 136:14 145:19 | 203:23 207:18 | **termination** 21:16 | 224:17 226:23 |
| 147:14 154:21 | 157:4 160:10,15 | 210:12 223:19 | 204:2 209:22 | 241:18 254:23 |
| 157:6 159:11 | 183:14 191:19 | 226:1,4 227:9 | 212:9 249:15 | 272:3 274:7 |
| 179:22,23 187:20 | 211:4 213:5,15 | 228:17 230:2 | 314:23 315:12,15 | 275:6 283:10 |
| 189:1 237:16 | 233:19 235:17,19 | 232:12 250:16 | 318:22 319:7 | 290:15 292:7 |
| 239:11 242:15 | 236:10,19 237:6 | 256:18 260:22 | 322:22 323:12 | 294:10 |
| 249:10 256:21 | 249:2 251:18 | 265:2 269:1 | 329:23 344:21 | **think** 12:13 23:18 |
| 257:8 271:9 | 332:12,22 334:1 | 270:14 271:7 | 347:5,17 | 25:11 32:12 39:8 |
| 274:3 279:23 | **teams** 171:22 | 274:19 279:20 | **terms** 20:2,3 54:23 | 43:6 44:5,13,18 |
| 281:14 282:14,15 | 233:4,18 294:12 | 292:21 296:8 | **terrible** 162:12 | 45:10 46:2,21 |
| 282:16 284:17 | **team-building** | 299:23 301:21 | **test** 188:10 | 57:19 60:19 |
| 287:14 299:8,13 | 53:17 92:2 | 302:1 306:16,21 | **testified** 11:13 | 61:15 69:11 |
| 302:17 312:20 | **Ted** 24:9,22 25:17 | 310:8 311:20 | 143:14 | 70:19 71:5 92:17 |
| 315:4 317:18 | 31:23 32:1,8 34:7 | 317:9 322:7 | **testimony** 13:9,14 | 93:7 99:11 |
| 321:8 322:18 | 34:21 193:18 | 325:13 328:6 | 105:15 116:16 | 102:20 106:1 |
| 328:17 331:8,19 | 194:2 234:18 | 329:15,17 330:3 | 117:3 142:17,22 | 109:21 153:10 |
| 331:20 338:12,15 | 280:19 | 335:1 338:14 | 145:7 147:8 | 155:22 167:10 |
| **talks** 224:6 | **telephone** 137:13 | 339:2 341:23 | 206:20 265:23 | 168:10 175:14 |
| **tampering** 297:20 | 182:11 186:20,21 | 343:8 | 296:20 301:6,13 | 176:1 180:1 |
| 298:13 | 193:10,16,17,17 | **telling** 21:21 84:19 | 304:6 306:5 | 184:13,16 186:15 |
| **tantrums** 190:22 | 193:20 194:10 | 90:15 97:12,14 | 338:5 | 187:1 188:9,10 |
| **tape** 10:3 64:10 | 200:6 291:5 | 119:18 140:21 | **thank** 155:12 | 193:4,5 195:14 |
| 66:9,12,16 121:8 | 314:19 | 148:23 160:12 | 216:9 299:4 | 195:20 196:11 |
| 125:15,17,19 | **telephoned** 186:19 | 161:4 166:22 | **Thanks** 156:8 | 198:3 201:1,3,17 |
| 126:8 173:11 | **tell** 13:15 32:23 | 171:2 172:15,18 | **therapy** 43:10,12 | 201:19 206:4,7 |
| 177:1,3,8 237:10 | 33:11,16 34:23 | 175:8 189:15,17 | 44:11 | 208:13 210:15 |
| 242:3,6,10 | 42:1 44:21 45:9 | 207:6 232:17 | **thereof** 229:17 | 212:2,8 214:22 |

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

| | | | |
|---|---|---|---|
| 220:4 222:1,11 | 108:2,7 127:6 | 100:4,9,14 105:9 | 93:2 106:5 222:8 | 324:21 |
| 226:19 230:7 | 158:14 160:4 | 105:22 106:3 | 229:1 263:3 | **tonight** 199:16 |
| 232:22 247:12,13 | 161:7 228:6 | 110:8,17 116:18 | **titled** 196:23 | **Tonocard** 27:2 |
| 252:11,11 253:14 | 237:9 244:4,19 | 117:4,18,22 | **today** 11:17 15:12 | 28:5 |
| 255:22 257:14 | 253:15 268:6,11 | 119:11,23 120:7 | 17:21 26:21 35:2 | **top** 34:8 49:6 75:14 |
| 260:7 262:4 | 268:14 275:5 | 127:15 134:21 | 85:13,13 116:7 | 268:6,11 287:8 |
| 263:3,16 275:16 | 293:4 | 137:16 142:22 | 116:17 117:5 | 298:17,22 299:7 |
| 279:15 281:16,19 | **three-hour** 105:22 | 143:12 145:3 | 122:11 123:8 | **topic** 114:8 166:10 |
| 290:3 297:12 | 268:10 | 146:17 152:12 | 126:17 143:17 | **topics** 226:12 |
| 298:18 302:17 | **three-mirror** | 153:13 155:1 | 152:8 176:18 | 258:4 |
| 308:16 311:5 | 70:16 | 169:2 171:23 | 179:8,19 182:18 | **Toru** 62:1 |
| 314:1,14 315:1 | **Three-page** 5:8,17 | 173:2 176:14 | 190:12 232:22 | **toss** 148:15 |
| 316:4 318:8 | 6:9 7:8 8:9 9:6 | 181:5 188:8 | 241:13 296:21 | **tossed** 263:15 |
| 324:9 335:20 | **threshold** 17:13 | 190:14 199:1,10 | 318:6 319:20 | **total** 205:9 328:7 |
| 336:13 342:22 | **threw** 188:16 | 207:14,20 209:16 | **today's** 23:11 | **totally** 34:15 |
| 343:10,15 345:1 | **throw** 46:8 | 211:22 228:6 | 349:3 | **tote** 75:13 120:22 |
| 345:4,5 346:18 | **throwing** 104:11 | 238:13 248:16 | **Todd** 334:3 | **town** 207:22 |
| 348:21 | 190:3 | 249:10 253:10 | **told** 50:12 54:7,8 | 243:10,15 249:22 |
| **thinking** 260:5 | **ThyssenKrupp** | 254:5 255:7 | 58:15,20 78:16 | **Toyota** 63:12 |
| **thinks** 346:15,16 | 332:2 333:1,16 | 264:17,23 265:8 | 95:13 96:10 | 125:6,6,10 |
| 346:19 | 334:2 | 270:21 278:22 | 142:9,10 147:23 | 135:18,22 136:2 |
| **third** 33:10 55:16 | **Thyssen-Krupp** | 279:17 281:12 | 148:1 155:18 | 136:5 146:8 |
| 81:22 193:8 | 16:22 | 284:4,7 285:14 | 160:18 177:21 | 201:23 234:2 |
| 296:16 311:6 | **tie** 298:2 | 285:22 287:17 | 178:7 179:9 | 241:5 300:23 |
| **Thirteen-page** 6:2 | **tie-back** 100:7 | 289:22 294:4 | 182:20 183:18 | **track** 116:2 340:15 |
| **Thomas** 295:15 | **tie-back-type** | 296:16 312:4,14 | 184:4 188:20 | **tracks** 89:3 |
| **thought** 84:16 | 97:23 | 314:22 315:6 | 189:6,7,21 | **trade** 198:6 |
| 93:14 140:17 | **time** 12:7 13:18 | 318:4 319:22 | 190:17,18,22 | **transaction** 149:9 |
| 164:19,22 180:20 | 21:12,13 23:3,12 | 320:7 321:19 | 191:23 192:7,22 | **transcript** 284:15 |
| 188:20 189:13 | 24:6,20 25:6 26:4 | 326:6 328:1,16 | 193:4 206:13,21 | 301:20 302:4 |
| 190:20 215:5 | 26:16 29:2 30:8 | 329:3 332:20 | 223:16 239:10 | **transcripts** 312:16 |
| 218:20 240:20,23 | 30:19 31:8 32:15 | 335:23 337:19 | 241:11 250:15,17 | **translate** 267:17 |
| 253:1 310:5 | 34:2,11 36:20 | 338:7 339:7,8 | 254:5 260:23 | **translated** 132:19 |
| 321:18 339:1 | 40:6,15 41:3,18 | 340:4 347:4,8 | 270:4,5 277:19 | **translating** 62:17 |
| **thoughts** 295:6 | 41:21 42:4,19 | **times** 12:18 44:4 | 278:1 292:18 | 62:19,22,23 63:4 |
| **thousand** 287:10 | 43:9 44:9 45:12 | 139:2 166:10 | 293:6,16,17 | 121:17 |
| **thousands** 131:12 | 46:11 47:7,12 | 170:21 243:17 | 294:4 304:10 | **translation** 62:13 |
| 201:13 | 48:6 49:13 50:1 | 254:4 261:17 | 311:16 321:16 | **translator** 132:23 |
| **threaded** 121:4 | 56:21 59:12 | 278:5 287:10,20 | 334:15,18 344:5 | 145:9 266:23 |
| **threats** 188:18 | 65:22 67:11,15 | 330:11 338:23 | 344:7 345:20 | 267:2,5,6 293:13 |
| **three** 28:18 29:19 | 67:17 68:3,13,15 | **tires** 241:12 | 346:22 347:1 | **treadmill** 43:22 |
| 44:5 56:21 57:12 | 69:3,4 70:4 71:7 | **title** 31:13 32:21 | **tomorrow** 90:17 | 44:1 |
| 61:23 73:12 | 72:20 82:2 87:14 | 41:3 47:17 50:7 | 186:20,21 255:20 | **treated** 154:12 |
| 86:19 93:14 | 97:9 98:3 99:6,22 | 63:6 78:18,20 | 281:6 320:6 | 171:20 225:5 |

243:23 253:2,4
253:20 256:14
257:12 259:16,17
261:1 262:5
270:7 271:10,19
273:22 276:6,12
276:16,20 277:10
277:23 278:18
282:7 284:7,12
322:18,23
**treatment** 42:3
201:6 225:3
246:11 252:2
254:21 256:3
266:8 284:2
**tremendous**
219:19
**trial** 254:2 326:7
**tried** 51:2 86:1
138:16 143:1
168:9 305:6
**tries** 119:23
**trigger** 85:1
**triglyceride** 28:7
**truck** 75:9 86:1
**trucking** 75:9
**true** 112:5,7 117:5
117:6,15 135:21
137:23 138:10
175:14 210:8
220:23 231:21
305:10 307:12
**truly** 86:23
**trust** 244:6
**truth** 160:19
**try** 35:4 290:8
**trying** 18:14 115:4
120:8 161:22
163:14 175:16
177:12 180:12
196:7,8 209:11
215:23 232:19
241:16 253:17
268:23 277:16

281:13 290:11
299:20 306:1
315:5 324:4
329:21 331:8
**Tuesday** 2:1 10:10
**tune** 327:11
**turned** 24:21
290:13
**twice** 71:9 139:7
139:21 140:16
166:6,13 180:10
190:4 218:18
312:13
**two** 18:23 23:6
32:10 34:10
37:20 40:12
41:17 42:17 43:6
64:9 78:5 82:14
85:7 97:21 99:22
100:6 105:21
120:17 124:10
142:11 160:4
168:20 170:10,10
171:22,22 180:11
183:13 190:22
192:1,7 227:14
228:13 233:3,17
240:5 244:2,4
247:16,17 255:8
266:19 280:21
291:9 294:12
312:3 318:1
332:17 336:18
338:18
**Two-page** 5:13,20
6:6,14 7:17 8:16
9:2
**type** 43:23 49:20
51:23 80:14
197:17 213:6
233:12 243:18
244:8 274:7
297:13 324:22
325:2 327:4

**typical** 36:6 251:15
297:8
**typically** 35:18
74:22 84:3,14
91:19 140:9,19
162:7 171:6
231:7 266:15
298:2

---

## U

**Uh** 310:1
**Uh-huh** 21:16
98:14 104:13
117:12 134:6
161:9 187:4
201:21 256:12
289:11 302:14,18
304:23 306:4,15
**Uh-hum** 94:6
**ultimately** 15:4
194:18
**Um-him** 111:17
**Um-hum** 30:21
58:13 59:7 60:2
61:3 67:9 70:11
78:14 83:14 84:8
104:21 149:17
154:2 157:3
179:1 182:14
187:6,21 192:8
192:10 194:14
197:16 221:2
222:15 226:8
229:21 259:12,21
274:18 280:14
285:2 295:16
298:20 303:1,3
304:20 305:4,9
305:11 307:8
309:13 312:21
313:6 319:1
325:3
**unable** 39:21 327:7
**unacceptable**

209:15
**unbeknownst**
264:4
**unclear** 15:14
86:22
**uncomfortable**
104:15 296:5
**undated** 5:18 8:16
**underhanded**
165:8
**understand** 15:18
21:20 23:5 62:23
64:16 65:7 80:20
135:13 156:15
158:20 184:3,5
230:15 231:8
253:22 254:1
255:2,14 274:2
285:6 322:11
**understanding**
15:17 21:8 47:13
52:2,5,15 53:1
65:10 68:1,8,16
71:14,15,20 75:5
80:1,3 82:19
87:16 94:7 106:9
106:18 107:4,6
113:18 157:8
161:15 180:5
229:4 319:5
**understood** 114:20
156:2 180:22
184:7 233:22
**undertaking** 43:13
**unemployment**
17:12,16 327:9
**unfairly** 253:2,4
276:20
**unfold** 120:19
**unfortunate** 339:6
339:8
**unhappy** 216:16
286:6 296:10,18
311:8

**Unidentified** 311:3
**uniform** 347:11
**Union** 1:19,20
10:14
**United** 1:1 307:10
**universities** 201:12
**university** 180:23
198:15,17
**unpaid** 39:21
196:4
**unprofessional**
104:14 119:13,19
**unquestioned**
160:19
**unreasonable**
155:14
**unusual** 298:6
310:5 333:23
**update** 237:20
**updated** 227:21
**upper** 8:17 153:18
**upset** 115:13 116:7
116:19,20 140:7
140:11 152:9
179:8,21 184:12
184:17 219:8,14
313:2,4,10,12,13
313:14
**upstream** 84:10
**usable** 83:17
**use** 119:3 125:10
145:4 240:18
257:23 258:12
287:21,23 297:14
343:20
**uses** 297:15,16
**us-and-them** 273:9
**Utilities** 328:14
**utility** 298:1,15
**utilize** 259:6
**uttered** 119:2
**U.S** 36:6

---

## V

**V** 24:10 25:15
**vacation** 195:19,21
   196:4
**various** 91:9
**vascular** 170:11
**vast** 157:8
**vehicle** 36:19 37:3
   59:20 74:20
   78:22 91:12
   204:21 241:12
   266:12
**vehicles** 76:19
   81:15 239:21
   240:15
**vehicle-related**
   52:12
**vendors** 232:10
**vengeful** 191:1
   193:2
**Venture** 13:8
**verbally** 287:19
**verbatim** 111:2
**verify** 221:15
**version** 117:14,15
   117:16
**versions** 117:10
**versus** 10:6 257:23
   317:20
**Vibrating** 106:14
**vice** 32:23 33:2
   34:9,12,13,17
   114:22 234:8,17
   255:8 261:10
   280:20 281:17
   295:19 325:1
   344:13
**videographer** 4:15
   10:2,17 46:16,19
   64:9 66:8,15
   121:7 123:19
   124:10 125:16
   126:7 136:17
   156:3,8 173:9
   176:22 177:7

237:9 240:5
242:2,9 301:16
308:12,18 309:2
323:21 324:1
349:1
**vindictive** 155:14
**violence** 210:18
   213:7,19 214:2
   214:17 215:2
   234:4 321:6
**Virgin** 198:19
**Virginia** 331:6
**Visa** 31:3
**visit** 168:19 169:10
   173:1
**visited** 169:1
**visits** 197:20
**vocabulary** 133:22
**voice** 132:4 241:15
   259:23 260:10,11
   279:9 285:21
**voicemail** 193:16
**voice-mail** 259:11
**VP** 304:4
**vs** 1:7

_____
**W**
**Wachovia** 30:22
   31:1,4
**waitress** 262:6
**Walb** 204:7 205:8
   235:4 236:23
**walk** 116:13
**walked** 71:8
   116:11,15 218:1
   228:20,21,22
   238:7 291:8
   297:23
**walking** 42:7 190:4
**wall** 56:8 91:8
   105:5
**walls** 56:7
**Wal-Mart** 297:11
**want** 34:23 35:12

47:9 86:5 110:13
114:13,14 119:23
132:2 137:4
139:6 142:3,5
146:22 148:20
158:11 165:23
176:20 196:12
200:3 205:21
215:19 216:8
241:17 253:16,23
254:2 255:17
267:10,16 279:20
279:23 298:16
299:18 304:14
306:2 309:11,22
313:3 320:6
326:9 332:11,22
339:15 348:18
**wanted** 82:22
   87:13 90:10
   113:17 114:4,8
   120:20 126:13
   129:5 139:8,22
   160:22 167:2
   184:3 192:13
   199:14 201:2,6
   209:18 221:13
   222:9 227:21
   233:19 234:1
   241:8 262:17
   263:9,10 267:15
   275:22,22 294:2
   294:6 325:9
   332:13
**wanting** 113:14
   132:12
**wants** 267:11
   292:13 296:1
**Warner** 201:7,20
   210:4
**Warren** 37:21
**wasn't** 44:16 56:11
   56:12,13 89:19
   138:17 140:7

153:13,21 159:16
160:8 166:21
208:1 209:18
215:4 239:1
251:6,9 254:22
255:5 262:8
265:5 266:3
267:4 269:16
275:17 281:19
291:23 317:11
322:9 331:12
**watched** 161:2
**way** 18:1 74:23
   78:12 80:18
   125:6 141:23
   191:4 233:20
   234:1 239:19
   243:21 251:13
   258:18,21 282:7
   284:6,11 288:19
   303:13 311:7
   313:9 323:16
   329:14 348:14
**ways** 230:23
**week** 44:3,4,6 53:4
   172:22 253:15
   266:18 329:21
   332:10
**weekend** 191:5
**weekly** 6:12,17 7:5
   48:7 51:22 52:6
**weeks** 39:20 43:1,6
   44:14 47:15
   173:22 221:3,4,6
   224:15 244:2
   247:16,17 332:17
   348:5
**weight** 335:22
   336:3,6,10,11,11
   336:14,15
**welcome** 245:10
   333:23
**weld** 91:10,12
   120:23

**welds** 91:13
**well-prepared**
   167:14
**Wendy** 201:7,20
   210:4
**went** 42:11 48:23
   48:23 49:10
   73:15 75:7 80:9
   82:23 83:9,11
   97:22 116:8
   127:13 136:19
   152:3 161:3
   165:19 170:21
   172:23 180:10,23
   181:8,10,12
   188:16 189:6
   190:16 204:21
   211:6,12,12
   218:18 219:1
   228:2 235:1
   238:12 241:2
   247:11,12 255:9
   255:11 266:19
   267:12 268:5
   273:19,21 274:12
   276:3 277:21
   278:15 287:1
   288:6 291:2
   293:10,14 327:5
   339:14 342:9
**weren't** 35:23 55:8
   90:9 115:20
   132:11 153:8
   164:16 205:1
   207:14 226:16
**Western** 180:22
**we'll** 15:17 46:8
   57:18 107:7
   110:12 115:17
   177:19 220:8
   233:10,11 247:16
   276:1 281:8
   297:17 312:16
   314:6 320:9

| | | | | |
|---|---|---|---|---|
| **we're** 10:9 35:7 | 161:20,21 168:7 | 40:7 41:18,22 | **worried** 190:23 | 112:18 195:23 |
| 65:19 66:12,18 | 169:5 173:8 | 42:20 43:8 77:15 | **worry** 191:4 217:5 | 228:4,21 250:22 |
| 90:8 101:11 | 215:18 226:3 | 149:6 153:8,21 | 303:12 | 292:18 294:16 |
| 126:10 149:16 | 235:10 236:15 | 172:13 176:7 | **wouldn't** 73:9 | |
| 172:2 195:18 | 240:7 255:12 | 183:4 186:14 | 83:23,23 145:5 | **Y** |
| 199:20 209:10,12 | 260:21 281:7 | 188:21 189:22 | 265:10 267:2 | **Y** 228:21 292:18 |
| 233:4 235:16 | 282:10 309:7 | 191:16 211:17 | 286:12 288:11 | 294:16 |
| 239:20 241:13 | 311:14 317:11 | 217:11 246:5,10 | 302:20 305:23 | **ya** 137:18 |
| 242:12 277:12 | 331:16 340:19,20 | 247:16 248:11 | **Wow** 275:9 | **Yang** 206:15 |
| 308:16,22 309:5 | 341:2,7,9,12 | 264:19,20 265:17 | **wrapped** 324:4 | 262:23 290:22 |
| 319:6 324:1 | 342:12,15 343:7 | 269:22 283:12,13 | **wreck** 289:5,8 | **yeah** 12:12 27:20 |
| 349:6 | 343:9 | 285:1 291:4 | 290:17,19 | 28:6 31:10 44:22 |
| **we've** 57:18 126:12 | **witnessed** 236:19 | 294:20,22 303:4 | **wrecked** 288:15 | 57:16 62:7 94:19 |
| 223:9 247:6 | 236:22 | 314:15 347:11 | 291:13 | 98:20 99:20 |
| 276:9 277:8 | **wives** 288:16 | **worked** 20:23 41:4 | **wrecks** 291:1 | 102:5 108:16 |
| 278:10,10 301:16 | **woman** 243:1,12 | 50:2,17 135:22 | **write** 137:15 140:4 | 117:7 119:8 |
| 337:17 | 262:7 | 136:2 176:9 | 152:11 153:2 | 122:5 128:21 |
| **whatnot** 20:19 | **women** 206:10 | 201:23 202:1,1 | 183:15 184:9 | 141:15 146:21 |
| 194:17 | 207:23 262:10 | 228:6 234:21 | 190:15 | 164:22 169:5,11 |
| **whatsoever** 164:15 | **Won** 206:15 | 236:23 248:13,14 | **writing** 69:2 70:1 | 170:5,21 172:23 |
| **wheel** 144:19 | 234:13,21 237:1 | 262:1 302:11 | 97:3 132:9 183:7 | 173:8 174:11 |
| **wheels** 241:13 | 262:23 290:22 | 303:16 328:2 | 232:15 252:12 | 184:20 188:14 |
| **when's** 45:6 | **wonderful** 327:17 | 332:14 | 281:20 287:19 | 191:13 198:3 |
| **Where'd** 12:5 | **wondering** 88:13 | **worker** 234:6 | 294:17 | 231:6 232:3 |
| **Whirlpool** 16:23 | 265:14 | 262:4 | **written** 48:11 | 247:3 260:17 |
| **White** 295:14 | **word** 67:19 72:22 | **workers** 59:19 | 108:3 151:22 | 264:6 268:19 |
| **Whoa** 283:21 | 89:9 92:23 95:22 | 91:15 225:1,4 | 195:13 222:21,22 | 282:4 284:19 |
| **wife** 18:19 19:13 | 96:2,12 119:3 | **working** 23:16 | 231:10 232:2 | 285:5,10 286:18 |
| 45:4,14 200:19 | 125:10 136:7 | 24:4 65:19 | 266:13,21 324:22 | 287:6 289:4,7 |
| 291:7,8,11 339:3 | 142:17 157:9 | 121:11 122:7 | 325:2 | 292:10,10,15,23 |
| 339:7,8,12 | 267:19 286:4,9 | 123:4 155:15 | **wrong** 151:4 181:7 | 293:19,20 295:4 |
| **wife's** 338:9 | 343:21 | 157:5 295:1 | 190:21 | 304:15 315:5 |
| **wind** 73:13 | **words** 101:20 | 302:10 330:23 | **wrongdoing** | 336:17 337:21 |
| **window** 89:23 | 103:5 114:6,12 | 334:2 | 231:18 | 345:4,13 348:10 |
| 148:15 | 119:1 122:7 | **working-level** | **wrongful** 256:3 | **year** 15:1 148:21 |
| **wire** 298:2 | 128:3 134:23 | 167:4 | **wrote** 54:9 58:8 | 170:21 204:1 |
| **wish** 161:13 | 155:19 158:12 | **workplace** 210:17 | 117:3,17,18 | 212:9,10 241:2 |
| **witch** 201:19 | 161:13 166:23 | 213:6,19 214:2 | 151:19 155:1 | 254:3 |
| **witch-hunted** | 176:5 178:15 | 214:17 215:2 | 212:2 275:2 | **yearly** 244:17 |
| 210:3 | 193:2 205:19 | 234:5 321:6 | 284:10 | **years** 18:8 28:18 |
| **witness** 10:22 | 246:17 292:14 | **works** 90:20 | **W-a-l-b** 236:23 | 29:19 34:10 |
| 40:23 99:3 103:8 | 296:13 | 202:18,18,21 | | 56:22 64:19 |
| 106:15 123:21 | **work** 15:7,17 23:2 | 206:17 302:23 | **X** | 108:2 111:12 |
| 136:19 155:10 | 24:10 26:6 39:22 | 304:1,7,9 345:20 | **X** 5:1,2,5 112:18 | 149:5 156:2,12 |

202:2 243:6
244:20 255:8
280:21 300:20
307:10 331:1
348:12
**yelled** 104:16
**yelling** 104:10
**Yep** 335:17
**yesterday** 79:14
107:16 126:18
137:2 153:10
165:22 292:17
**yesterday's** 293:12
**Youn** 155:22,23
174:8,9,10 175:8
**Young** 245:20
247:11 248:11
261:18 270:1
293:6
**you-all** 202:6
**Yumi** 262:1 263:6
263:7,7 264:6
267:3 269:13
**y'all** 19:16 20:1,21
99:2 165:23
274:3
**y'all's** 85:4
**Y-a-n-g** 206:15
**Y.D** 249:20
**Y.S** 33:15 238:13
268:10

--- **Z** ---

**Z** 228:21 292:18
294:16
**Zedeff** 17:1
**Zetia** 27:2 29:21
**Zetia's** 29:22
**Ziploc** 97:22
**zone** 198:6

--- **$** ---

**$1,000** 328:10
**$10** 235:6 240:19

258:15
**$100,000** 114:23
151:6 299:22
305:8
**$125,000** 14:18
**$20,000** 15:3
**$30,000** 329:5
**$4,000** 131:6
**$4.5** 332:16
**$406** 328:11
**$8,000** 327:12,17

--- **0** ---

**05** 18:17

--- **1** ---

**1** 5:8 10:3 14:10,12
60:11 66:10
186:8 272:22
284:15
**1,200** 328:13
**1,375** 81:14 239:21
241:12 258:19
**1:00** 152:5
**1:26** 126:2,11
**1:45** 116:5 152:7
**10** 7:8 8:13 129:20
152:16 153:17
205:9 312:23
**10-24** 193:15
**10-26** 153:22
**10:09** 2:1 10:9
**10:46** 46:17
**100** 1:20 3:16
10:13 163:23
197:13 266:12
**100,000** 329:1
**107** 6:9
**1084** 11:23
**11** 5:4 7:13 131:1
163:22 165:15,17
301:19 302:2,13
309:12
**11-6** 153:17,20

**11:00** 117:18
151:16
**11:10** 46:20
**11:18** 193:16
**11:33** 66:13
**11:37** 66:19
**114** 3:7
**116** 130:7
**12** 7:17 39:20
168:15 191:19
304:19
**12:30** 125:22
**12:38** 125:21
**12:40** 126:2
**121** 187:13
**125,000** 14:23
**126** 6:14
**13** 8:2,3 16:11
131:20 173:6,7
306:13
**13th** 168:20 169:15
170:18 171:14,17
**136** 7:2
**14** 5:8 8:6 16:11
174:6,14 185:19
185:20
**15** 8:9 54:18 133:5
185:23 186:2
205:10 329:5
330:23
**150** 307:10
**152** 7:8
**16** 5:13 6:7,10 7:3
8:12 135:1
196:18,22 272:14
298:17,22 299:7
**16th** 152:21 220:20
221:6 224:13
**162** 187:13
**163** 87:18
**165** 7:13
**168** 7:17
**17** 6:15 7:14 8:16
272:16,17 273:2

314:1
**17th** 18:16
**173** 8:2
**174** 8:6
**18** 8:7,19 18:8 19:2
174:13 314:4,6,8
**1819** 3:15
**185** 8:9
**19** 9:2 315:10,11
**1901** 4:4
**196** 8:12

--- **2** ---

**2** 5:13 6:3 9:11
15:23 16:3 60:23
66:12,16 125:17
131:6 295:20
**2nd** 152:22,23
153:3,15 297:18
**2,000** 81:13 239:23
**2:07cv144-ID** 1:7
10:8
**2:13** 193:10
**2:25** 177:5
**2:30** 260:1
**2:36** 177:11
**20** 9:6 18:8 56:7
149:5 202:17
300:20 312:18
315:21,23 316:20
**200** 112:1 130:4
**2000** 13:16
**2002** 23:17 25:10
26:10
**2003** 13:16
**2005** 5:21 6:3,7,10
7:3,9,14 8:3,7,10
8:13,20 9:3,7
12:12 18:13
19:17 30:9 33:12
41:19 42:4 44:20
47:11 220:20
222:2 224:14
264:16 318:21

322:6
**2006** 5:9,14 9:11
12:14 16:9,15
**2007** 2:1 6:15 7:18
10:11 12:4 17:10
349:6
**21** 9:10 202:17
310:17 311:11
318:13,15
**22** 5:17 8:10
**22nd** 23:18 185:10
185:13 196:13
214:9,10,15,20
215:3,10,13,22
216:2 315:1
**2204** 3:6
**23rd** 260:8,8
**24** 8:20 23:19,23
348:5
**24th** 260:4,9 315:3
**24-day** 32:4
**2400** 4:5
**245** 122:10 123:2
**25** 35:19,21 36:9
37:13 54:17 56:5
243:6
**250-some** 74:16
**251** 94:4,17 150:14
157:13
**26** 5:14
**27** 2:1
**27th** 10:10 349:5
**272** 8:16 151:15
**28** 259:8
**280-some** 74:15
**282** 93:22 94:3,16
96:1,8 150:14
157:1,13

--- **3** ---

**3** 5:17 22:13,15
125:20 126:8
131:6 177:1
297:17 312:15

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 40

**3,084** 328:12
**3:31** 186:8
**3:38** 242:7
**3:50** 242:12
**30** 32:18 191:23
    202:2 216:6
    344:20
**300-and-some** 14:7
**31** 7:18 96:21
    97:18 169:4
**31st** 16:9
**314** 8:19
**315** 9:2,6
**318** 9:10
**32** 270:23 284:14
    284:18 286:17,22
**324** 155:6
**325** 156:9,13
**341** 79:11,19
**35** 92:13 105:8
    313:19
**35203** 3:17
**35203-2618** 4:6
**35209** 3:8
**357** 78:4
**358** 82:16 94:1
    101:15
**36104** 1:21 10:15
**36106** 4:13
**362** 72:15 79:8
**363** 60:11
**364** 61:1
**366** 67:7
**367** 70:10 75:11
**39** 286:14 287:5,6

_____
**4**
**4** 5:20,21 15:2 41:6
    41:10,12 177:3,8
    242:4 310:18,20
    314:7
**4th** 41:19 307:6
    338:19
**4,000** 46:8

**4,000-ton** 245:21
**4:51** 308:23
**4:56** 309:6
**40** 92:16 102:11
    275:5 307:3
    329:20
**40475** 12:1
**407** 67:7
**41** 5:20
**44** 220:16 224:9
    226:10 227:1
**45** 209:8 307:4
**462-0835** 186:22
**47** 130:7

_____
**5**
**5** 6:2 56:16,18 58:3
    60:1 101:11
    103:12,18 106:1
    109:4 152:18
    153:1 242:6,10
    308:19 311:13
**5th** 3:15
**5-A** 58:4
**5:14** 323:22
**5:21** 324:2
**5:30** 266:10
**5:44** 349:7,9
**50** 35:16 92:11
    102:10,23 105:8
    166:20 278:4
    288:22 289:3,6,9
**500** 239:22
**56** 6:2 295:13,17
**57** 6:6 295:13
**575** 120:13

_____
**6**
**6** 6:6 7:9 9:3,7 58:1
    58:6,12 103:20
    103:21,23 104:2
    106:1 151:15
    155:2 308:21
    309:3 318:21

349:2
**6th** 208:22
**60** 21:14 64:19
    166:20 222:14
    226:6 231:15
**60-mile** 19:20 20:3
    21:9
**62** 222:14 226:7
    307:6
**650** 1:20 10:14

_____
**7**
**7** 6:9 60:11 107:11
    107:15
**7:00** 191:15
**7:30** 266:10
**70** 327:16
**700** 4:12

_____
**8**
**8** 6:14 126:6,14
**8:00** 261:14 266:10
**8:05** 186:19
**80** 94:4
**800** 239:22 258:20
**89** 159:3 162:21

_____
**9**
**9** 5:9 7:2 136:22
    137:3
**9-13** 169:9,11
**9-16** 151:17
**9:00** 266:10
**9:15** 186:10
**9:30** 261:15
**9:59** 169:11
**90** 344:20
**900** 241:14
**95** 209:16 210:11

# CYRUS DEPOSITION EXHIBITS
# PART I

# EISENMANN

## Corporation

May 9, 2006

Mr. Robert Clay Cyrus
7030 Heathermoore Loop
Montgomery, AL 36117

Dear Mr Cyrus:

### Subject: Your Employment with EISENMANN CORPORATION

We are delighted that you have decided to join EISENMANN on or about May 15, 2006; however, your employment is conditioned upon you passing the required pre-employment drug test.

An employee manual providing you with general information and guidelines about EISENMANN is attached; however, for the sake of good order, we would like to outline the terms of your employment below:

1.  As the General Manager, Procurement you will report to the President, who will advise you of your duties. These duties may change from time to time during your employment.

2.  You will receive an annual salary of **$ 125,000.00**, payable in monthly installments. Your performance and salary will be reviewed on an annual basis, usually at the end of the calendar year, with any adjustments becoming effective the beginning of the following year.

3.  You will earn twenty (20) days of vacation per year, which will be prorated during the first year.

4.  EISENMANN CORPORATION agrees to pay you, upon joining the company, a sum of **$20,000.00** in the form of a "forgivable loan"; specifically, the loan shall be considered repaid upon your second anniversary of employment.

5.  Should you decide to move into the Crystal Lake area within one year of, and during your employment at EISENMANN CORPORATION, we agree to reimburse your direct moving expenses.

> **EXHIBIT**
> tabbies
> _1_

**EISENMANN Corporation**
150 East Dartmoor Drive · Crystal Lake, Illinois 60014
Phone: (815) 455-4100 · Fax: (815) 455-1018
www.eisenmann.com

**Divisions of EISENMANN:**
Finishing Systems · Application Systems · Material Handling · Ceramic Kilns
Environmental Protection · Porcelain Enamel Systems · Wood Technology

Mr. Cyrus
May 9, 2006
Page 2

6.  You will be eligible for a one bedroom corporate apartment up to a period of six months. For a period of one year, you will receive family medical coverage and the total cost will be paid by EISENMANN.

7.  You shall be entitled to participate in any benefit programs offered by EISENMANN from time to time to similarly situated employees so long as you meet the eligibility requirements, including such things as reimbursement of expenses, fringe benefits, group health insurance plans, life insurance and incentive savings/profit sharing plan.

8.  You agree to promptly disclose and grant to EISENMANN any title and interest in and to any inventions, patents, trademarks, copyrights, and applications therefore, trade secrets, technical information, customer lists, supplier sources and all other related matters made, conceived, developed, and/or acquired by you solely or jointly with others during your employment with EISENMANN and for a period of six (6) months thereafter, which relate to the business and affairs of EISENMANN and thereafter to sign such assignments and other papers and documents, and perform such acts as may be necessary or convenient to effectuate the provisions under this paragraph as from time to time requested by EISENMANN. This provision does not apply to any invention for which no equipment, supplies facilities, or trade secret information of EISENMANN was used and which was developed entirely on your own time unless (a) the invention relates (i) to the business of EISENMANN, or (ii) to EISENMANN's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by you for or at EISENMANN.

9.  As a result of your employment, you will have access to and learn certain confidential business information regarding EISENMANN, including but not limited to specific customer information and proprietary technical data. All such information is the sole and exclusive property of EISENMANN, and its unauthorized use and/or disclosure by you could cause serious and irreparable damage to EISENMANN. Therefore you agree that you will not, either during your employment with EISENMANN or at any time thereafter, reveal to any person or use without EISENMANN's specific written authorization any confidential information pertaining to the business and affairs of EISENMANN which has not theretofore been disclosed to the public by EISENMANN or some other authorized source. All such information is considered confidential unless it is available from a published source, provided that publication was not effected in violation of this agreement or any other obligation.

10. Your employment is for an indefinite period of time, and it may be terminated by you or EISENMANN at any time by giving thirty (30) days' written notice. EISENMANN may in its discretion elect to pay you thirty (30) days' pay in lieu of notice.

11. This Agreement shall be construed in accordance with the laws of the State of Illinois. Any claim or controversy that arises out of or relates to this Agreement or the validity, interpretation, enforceability or breach thereof, which is not settled by agreement between the parties, will be filed within (60) days and settled by arbitration in Chicago, Illinois, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The parties may agree on the selection of a single arbitrator, but if they cannot so agree, each party shall select an arbitrator and the two selected arbitrators shall select a third arbitrator. The award by the arbitrators shall be final, and judgment upon the award rendered may be entered in any court having jurisdiction

Mr. Cyrus
May 9, 2006
Page 3

thereof.  Each party shall bear its own expenses (including without limitation, legal fees, costs and other expenses) in connection with any such arbitration.  If a single arbitrator is involved, the parties shall share equally any costs related thereto; provided that if three arbitrators are involved, each party shall bear the costs for the arbitrator which it individually selects and share the costs for the third arbitrator.

The above is personal and must be kept confidential.

Please indicate your agreement with the above by signing on the line provided below.

EISENMANN CORPORATION


_____          _____
Matthias Erdmannsdörfer               Herbert J. Byder
President                             Vice President



_____          _____
Robert Clay Cyrus                     Date

V:\HR\Employees

# EISENMANN

**Corporation**

October 26, 2006

Dear Robert Cyrus:

We are submitting this notice of mass layoff in compliance with the federal Worker Adjustment and Retraining Notification Act (WARN) and the Illinois Worker Adjustment and Retraining Notification Act.

**1.      Nature of Planned Action**

The planned action is a mass layoff and is expected to be permanent.

**2.      Expected Date of the Mass Layoff**

The mass layoff is expected to occur on December 31, 2006, or within 14 days thereafter. Your current pay and benefits will be continued though December 31, 2006 but you will only be required to come to work between October 26 and December 21 as directed by the company.

**3.      Applicable Bumping Rights**

There are no job displacement procedures established for employees in your job category.

**4.      Name and Telephone Number of Company Officials to Contact for Further Information**

Herbert J. Buder (815-477-5314) or Donna Waller (815-477-5702).

We will contact you if there are any changes in the situation.

Sincerely,

EISENMANN CORPORATION

*Herbert J. Buder*

Herbert J. Buder
Vice President
Finance and Administration

**EXHIBIT**

2

tabbies

**EISENMANN Corporation**
150 East Dartmoor Drive • Crystal Lake, Illinois 60014
Phone: (815) 455-4100 • Fax: (815) 455-1018
www.eisenmann.com

**Divisions of EISENMANN:**
Finishing Systems • Application Systems • Material Handling • Ceramic Kilns
Environmental Protection • Porcelain Enamel Systems • Wood Technology

CYRUS   218

# EISENMANN

Corporation

October 26, 2006

Robert Cyrus
1566-2 Skyridge DR
Crystal Lake IL  60014

Dear Robert Cyrus:

In line with the W.A.R.N. act, this letter serves as your 60 day notice of our mass layoff.  Your employment will be terminated effective December 31, 2006.  We regret having to take this action, but as you are aware, the company has to re-direct its business focus on the profitable process system products to remain viable.

You will be paid through December 31, 2006, and your November and December pay checks will be issued on the regularly scheduled pay dates in each of those months.  All unused vacation days will be paid out along with the December pay.

To assist you in finding new employment we waive our right to have you report to work; you are free to leave after you have taken care of any open business.  Please, coordinate your departure with your supervisor.

Your life and health insurance will continue through December 31, 2006.  Enclosed in this packet you will find information regarding your 401(k) plan, continuation of the health coverage, as well as information regarding an outplacement seminar scheduled for November 1, 2006 at the Holiday Inn for Eisenmann employees.  If you have any questions regarding these matters, please phone Donna Waller in the Human Resources Department.

If you have any outstanding expenses, we ask that you submit them for reimbursement to the Accounting Department as soon as possible.  All laptops, phones, phone cards, keys or other company equipment must be returned to Michael Wood before you leave.  Specific needs and questions should be directed to Herbert J. Buder (477-5314) or Donna Waller (477-5702).

Please remember that all EISENMANN industrial and intellectual property must remain with the company.  We expect you to honor our right of ownership.

We wish you much success in your future endeavors.

Sincerely yours,

EISENMANN CORPORATION

Mark West
President

Herbert J. Buder
Vice President

EISENMANN Corporation
150 East Dartmoor Drive • Crystal Lake, Illinois 60014
Phone: (815) 455-4100 • Fax: (815) 455-1018
www.eisenmann.com

Divisions of EISENMANN:
Finishing Systems • Application Systems • Material Handling • Ceramic Kilns
Environmental Protection • Porcelain Enamel Systems • Wood Technology



EXHIBIT
tabbies
3

# Robert Clay Cyrus, C.P.M.

7030 Heathermoore Loop
Montgomery, AL 36117
*Home Phone: (334) 215-1967*
*Cell Phone: (334) 324-5146*

## Executive Summary

- Extensive Manufacturing and Plant Start-up experience
  - ➢ **Toyota** Motor Manufacturing Plant #1 and #2, Georgetown, Kentucky
  - ➢ **Mercedes Benz** U.S. International, Vance Alabama
  - ➢ Mercedes-Benz M-Class CKD Operation, Graz, Austria *(SFT **Steyer Daimler Puch**)*
  - ➢ **Hyundai** Motor Manufacturing Alabama, Montgomery, Alabama
- Diverse International Business Development Experience.
- Strong Leadership, Strategic Development and Negotiation Skills.
- Hands on knowledge of "Toyota Production System".

## Employment History



**HYUNDAI Motor Manufacturing Alabama, LLC**          **May 2002 to Dec 2005**

**Director of Purchasing (Parts Development)**
- Recruited as first American hired (badge #1) for Hyundai's first U.S. Automotive Manufacturing Plant with investments of over $1.3 Billion USD, 2 Million+ square feet.
- Recruited, hired and developed entire Direct Purchasing department staff (50+).
- Developed HMMA's overall purchasing long term sourcing strategy for Sonata and Santa Fe models (300,000 / year) plus Lambda Engine Plant (200,000 / year).
- Selected, negotiated and developed HMMA's supply base with annual buy in excess of $4.5 Billion (USD).
- Achieved world class material costs, with continuing emphasis on lean manufacturing.
- Work as a team with (15) Greenfield suppliers to establish manufacturing in Alabama.
- Full responsibility for Supplier Development Group (Engineering and Supplier Quality)
- Industry leading Minority Content achieved from" Job 1". (Excess of 8%)

Robert C. Cyrus, C.P.M.                                        Page 2 of 4



Mercedes-Benz

## MERCEDES-BENZ U.S. International Inc.          **May 1994 to May 2002**

- Named as one of two individuals within MB as having "Unlimited Potential". *(From MB Stuttgart Executive Assessment Division).*

### Project Manager
- Responsible for M-Class successor and new model (R-Class) sourcing.
- Accountable for new Plant #2 construction and equipment contracts.
- Project Manager for M-Class manufacturing in Graz, Austria.
- Coordinated and led activities for CKD operation for MBUSI.
- Successfully launched production of M-Class in Austria (30,000 units annually).

### Assistant Manager of Purchasing
- Supervise staff of six including buyers in Stuttgart, Germany.
- Responsible for buys in excess of $750 million annually.
- Work extensively in Germany and Austria,
- Leader for Globalization and "Parts Sharing Studies" of Chassis, Electrical and Raw Materials.
- Leader of "SMG"-Supplier Management Group for all Electrical systems.

### Buyer
- First production Buyer hired *(Recruited from Toyota, Georgetown, KY).*
- Responsible for procurement of all Chassis, Electrical, Fuel, Audio systems, and all Raw Materials.
- Developed MBUSI's Chemical Handling System. *(MSDS)*
- Exceeded aggressive cost target levels.



TOYOTA

## TOYOTA Motor Manufacturing USA          **April 1989 to May 1994**

### Purchasing Buyer

- Responsible for procurement of production raw materials with annual expenditure exceeding $75 million.
- Accountable for Steel, Plastics, Paint, Lubricants, Adhesives and MRO commodities.
- Extensive knowledge and application of the Toyota Production System.
- Developed / implemented "CPS" Centralized Purchasing System" for Tier One steel buys.

CYRUS V HMMA 0466  SUBPOENAED DOCS

Robert C. Cyrus, C.P.M.



## BANK ONE (First Security Bank)                                    1988-1989

### Financial Analyst

- Responsible for financial analysis and auditing of unsecured lines of credit.
- Customer Account Representative for delinquencies.

## GKN Automotive, Inc.                                              1986-1987

### Sales Representative

- Responsible for account development and sales coverage over a three state area.
- Worked closely with buyers and purchasing agents to negotiate contracts and develop annual pricing strategies.

# *Activities and Honors*

- ☐ Board Member Alabama Automobile Manufacturers Association (AAMA).
- ☐ Board Member South Regions Minority Supplier Development Council.
- ☐ Currently featured on the cover of Automotive Logistics magazine. 11/05
- ☐ **Featured in numerous Automotive News issues.** *(see attached)*
- ☐ Member of the International Chamber of Commerce.
- ☐ Member of the Birmingham, and Montgomery Chambers of Commerce.

# *Education*

## MARSHALL UNIVERSITY

- ☐ Bachelor of Business Administration (Graduated 1985)
- ☐ Dean's List

# *Professional Certification*

- ☐ Certified Purchasing Manager (C.P.M.) - Institute of Supply Management, Tempe, AZ
- ☐ Certified Driver - Fittapaldi Driving School
- ☐ Certified VDA Auditor

CYRUS V HMMA 0467  SUBPOENAED DOCS

**Hyundai Motor Manufacturing Alabama, LLC**
700 Hyundai Boulevard, Montgomery, AL 36105
TEL: 334-387-8000 FAX: 334-387-8999
www.hmmausa.com

May 4, 2005

Rob Cyrus
7016 Old Southwick Place
Montgomery, AL 36117

Rob,

I hope you are recovering well from your recent illness. I spoke briefly with your wife regarding your need for a medical leave of absence. You have been employed by Hyundai since May 22, 2002 and are eligible to request salary continuation and Family Medical Leave. Please complete the enclosed paperwork and return it to me as soon as possible. This letter is to state that your salary continuation and FMLA are provisionally approved, but we are awaiting the necessary completed paperwork for final determination.

Salaried Team Members are eligible to request salary continuation for a personal illness on the first day of employment. If a Team Member is out for a personal illness and is under a doctor's care, he/she may qualify for salary continuation. If you qualify for a medical leave of absence, your salary continuation will take effect and your pay at 100% of your hourly wage will continue until the doctor releases you to come back to work. If you are out longer than 26 consecutive weeks, you must qualify for Long Term Disability with Jefferson Pilot at that time to continue any type of salary payment. Long Term Disability pays 60% of a Team Member's monthly salary.

You have a right under the Family and Medical Leave Act (FMLA) for up to twelve (12) weeks of unpaid leave in a twelve (12) month period for the reason stated above, if eligible. As referenced in our FMLA policy, a Team Member must use all paid vacation and personal days prior to being eligible for unpaid leave. If your salary continuation is approved, it will run concurrently with your FMLA and you will not be required to use all paid time off until Salary Continuation ran out or if it is not approved.

You are required to furnish medical certification of a serious health condition. The doctor's certification must be completed and returned no later than Thursday, May 26, 2005 to the Benefits Department. Once this completed certification is received, a determination will be made. If the completed certification submitted does not support your request, or if you fail to provide the requested documentation, the leave will not be approved as Family and Medical Leave and Hyundai's policies and procedures covering absences will be applied.

Your health benefits will be maintained under the same condition. You will receive a final determination letter confirming approval or denial of your request for salary continuation and the Family and Medical Leave Act once you return the completed paperwork. Also, please refer to the enclosed Family and Medical Leave Policy.

You must make an appointment with the Medical Center's Clinic Manager prior to your release date. The Medical Center's number is (334) 387-8240. In order to return to work, the Medical Center requests a doctor's statement from your treating physician stating the following information:

- Specific dates of illness
- Detailed diagnosis of illness
- Medical release return to work date
- Details of any related restrictions and/or medications



EXHIBIT
4

0169

If you have any questions, please let me know. I hope all goes well and wish you a speedy recovery.

Sincerely,


Melanie L. McCormick
Human Resources-Benefits Specialist
(334) 387-8115
(334) 387-8162 fax

0170

**CONFIDENTIAL**

Date:            October 2, 2005

Subject:         **Murakami Manufacturing U.S.A. Inc. (MMUS), Quality Meeting**

Date of Meeting:  September 16, 2005 (*Friday*)

Time:            10:00 am

Location:        HMMA Pearl Room

Attendees from MMUS:   Mr. Toru Komatsu      Senior Vice President
                       Mr. Mark McDonald     General Manager – Quality
                       Mr. Glen Roberts      General Manager – Sales

**ORIGINAL**

**Events of September 15/16, 2005**

On Thursday September 15, 2005 I was approached by Mr. B.D. ("Brian") Hwang, Manager – Parts Development, Exterior Plastics. Mr. Hwang has been with Hyundai for 11 years. Mr. Hwang stated Mr. H.I. Kim had requested Murakami to join the "quality review meeting" scheduled for the next morning at 10:00 am. I told Mr. Hwang I would support him and asked the main purpose of the meeting. He stated Q.C. has some serious concerns regarding cosmetic defects (scratches, buff marks and other damage). He specifically asked me as a Director to strongly defend the Supplier based on actual facts. He felt he could not speak freely to the C.O.O. since he is only at the level of Manager (*This was a hierarchy issue, not personal*). I told him I would gather the facts and take a neutral position in the meeting tomorrow.

On the morning of September 16, 2005 I went to investigate the situation prior to the meeting and arranged a pre-meeting with Murakami at 9:30 am to clearly understand their position. I spoke with actual HMMA team member who receives the Murakami parts line side and installs them. She stated "there really hasn't been much of any difficulty with the mirrors" and "the only thing that has been occurring is occasional severe gouges or scratches all the way down to the plastic raw material, not superficial light scratches". Meaning most of the defects identified at line side are handling issues from Glovis to HMMA, not Murakami in the vast majority of the cases.

EXHIBIT

5

CYRUS  357

We started the pre-meeting around 9:30 am in the Quality Department. *Attendees were:*

| | |
|---|---|
| *Ms. Paula Gonsalves* | *HMMA Parts Quality* |
| *Mr. B.D. Huang* | *Parts Development* |
| *Mr. Chris McClain* | *Parts Development* |
| *Mr. Rob Cyrus* | *Parts Development* |

Murakami brought in actual examples of the suspect parts. There were significant "gouge like" defects not likely to be shipped to any OEM customer; too obvious. Murakami explained they had visited Glovis this morning and observed how Glovis is removing the mirrors from the HMMA approved packaging and stacking them haphazardly in non-approved totes. This is where the deep gouging is taking place. The three mounting studs are contacting the mirror housing painted surfaces when handled in this fashion.

After the review we and Murakami attended the Quality Meeting hosted by Mr. H.I. Kim. Two suppliers were in attendance for this meeting (*Murakami first, followed by Hwashin*). Murakami brought defect samples and started to explain that these defects (*gouges*) were caused by handling issues between Glovis and HMMA based on their root cause analysis. This item was identified as the first discussion agenda item HMMA provided to Murakami (see attached). Mr. H.I. Kim seemed upset that Murakami was bringing up this topic and said via translator (Mr. Jason Chi) that he did not want to discuss this matter.

Murakami seemed a little taken aback. Why did they have three individuals come down to HMMA at significant time and cost and yet are not permitted to discuss and defend their position? HMMA QC wanted to charge back 163 minutes of down time to Murakami. **This would equate to 163 minutes x $8.43.50/minute (GA) = $1,37,490.**

The facts presented in the pre-meeting with HMMA Quality and Parts Development showed of the 282 mirrors returned as defective, 251 (89%) were good and acknowledged so by HMMA QC. The remaining 31 parts were either handling damage by Glovis or defects caused by Murakami's packaging format previously approved by HMMA Production Control in writing. Murakami also received parts returned from HMMA that had been dropped and run over by our tuggers and we were trying to charge *them* back.

Murakami and Parts Development attempted to intervene to clarify the facts with an open dialogue but Mr. H.I. Kim got visibly upset. He was yelling at various attendees and threw his papers on the table in disgust. He abruptly turned and walked out of room. All attendees were surprised, confused and felt uncomfortable.

He later returned and we tried to continue with an open dialogue approach to allow for a fair and productive meeting. Mr. Glen Roberts from Murakami asked why they were asked to drop everything immediately and come down to HMMA at significant cost and time if no one will listen. He then held up two new mirror assemblies and struck them together to replicate the damage being seen at HMMA line side by Glovis mishandling issues.

We attempted to discussed this matter and the related cost impact again, Mr. H.I. Kim seemed even further infuriated and yelled very loudly at both HMMA team members and the supplier Murakami with other supplier present. He again left the room again without any discussion or reason and never returned even though we had another supplier that was to present (Hwashin).

I was later called by my colleague Mr. J.Y. Choi and informed that Mr. H.I. Kim was very upset with Mr. Choi and me based on the Murakami meeting. Mr Choi told me "to leave my present meeting and join him at once, as he and I may have the rest of the day off" insinuating that we may be fired.

In addition I later learned that after our Murakami meeting that Mr. Jason Chi had a separate meeting with Murakami and told Mr. Glen Roberts to "shut up and sit down". He will address his comments to Mr Komatsu. He told Mr. Komatsu that Mr. Roberts was to cancel his trip back today and insisted that he stay here at HMMA.

Attached for back up are my actual meeting notes from the 16th, along with the Agenda we sent Murakami and Murakami's presentation.

Please feel free to contact me if you have any questions or concerns.

Mr. Robert Cyrus
Director of Parts Development

# Weekly Parts Quality Review Meeting

## 2005. 9. 16.

## HMMA QC Department

CYRUS    360

# ■Schedule and Structure of the Meeting

◆**When:** 10:00 AM to 11:30 AM, Every Friday

◆**Where:** Alabama Room (1st floor of GA shop office building)

◆**Chaired by:** H. I. Kim, COO

◆**Attendees:**
B.G. Cho, Senior director of Manufacturing
John Kalson, Director of Manufacturing
Simon Sung, Sr. Manger of Parts Development
Rob Cyrus, Director of Parts Management
Chuck Knowles, Manager of Parts Management
Chris Susock, Sr. Manager of Quality Control
Richard Chai, Sr. Manager of Line Inspection
Dave Choi, Sr. Manager of GA shop
Danny Seo, Sr. Manager of Parts Quality, and Related people

◆**Presenters:**
CEO, COO and Quality Manager of Supplier
Suppliers that caused line-stoppage at HMMA
Suppliers that caused major shipping and field Quality issues.

◆**Format:**
HMMA Corrective Action Request Form (Powerpoint format)
(Presentation file to be submitted to HMMA PQ one day in advance)

◆**Prepared by:** Jason Chi, Parts Quality Manager

# Presentation Topics for the week of 9/16/2005

| Supplier | Part Name | Nonconformity | Occurrence | Issue Type | Presentation Time |
|---|---|---|---|---|---|
| | | Rear head rest not locked, high effort | 5 % | Quality Audit | 15 Min. |
| Lear | Seat | Seat back rubbing noise | 1 | | |
| | | Too much wrinkles and folds (Leather) | 10 % | | |
| Murakami | Outside mirror | Paint issues (Polishing mark, Crater, Scratches) | | Downtime VPC inspection | |
| | | Poor heat staking of Inside bush nut (Wind noise) | 2 | Test track | 15 Min. |
| | | Oil contamination (Crater) | 100 % | Paint shop | |
| Hwashin | Package tray panel | Subwoofer weldnuts misaligned | 25 | GA T3 | |
| | | Stamping Split | 6 | Body shop | 15 Min. |
| | | Weld spatter | 27 | QA line | |
| Dongwon | Door frame | Channel too wide at upper corner (Wind noise) | 100 % | Test track | 15 Min. |

CYRUS   362

MMUS

*Murakami Manufacturing USA, Inc.*
*Campbellsville, KY*

# NF Outer Mirror Assembly
## Countermeasure Report

DATE REPORTED : 09/16/2005

1/7

CYRUS   363

# Buff Marks

**DESCRIPTION OF PROBLEM :**

Parts with paint buff marks found at HMMA assembly line.

**ROOT CAUSE OF NON-CONFORMANCE :**

Uncompleted buff finishing was performed under insufficient lightening (1,000 lux).

**COUNTERMEASURE :**

- Additional lighting installed (2,500 lux) into buff area
- Lighting check sheet created
- Check before operation on 1st and 2nd shifts using lighting meter
- Lighting criteria : more than 2,500 lux
- Effective date : Sep 14, 2005

**METHOD OF COUNTERMESURE EFFECT (RESULT) :**

100 % Inspection of all assemblies prior to shipping to HMMA.

**REFLECTION TO NEW MODEL :**

The countermeasure is included in CM process launched in April, 2006

2/7

# Lighting Status

## Before



1,000 Lux

## After



2,500 Lux

3/7

# Bag Marks

**DESCRIPTION OF PROBLEM :**

Parts with paint bag marks found at HMMA assembly line.

**ROOT CAUSE OF NON-CONFORMANCE :**

The paint bag mark is caused by protective bag being imprinted into the paint after leaving MMUS (dark colors only).

Root cause:

1. Insufficient paint cure time (2~4 hrs – after EC change to Housing).
2. Container design (vertical position & rough dunnage).

**COUNTERMEASURES IMPLEMENTED :**

- Stabilized curing time (7/25/05)
- New type of protective bag (8/7/05)
- Currently packaging all dark colors outside of the dunnage and protecting part with bubble wrap (extra time & cost).

**REFLECTION TO NEW MODEL :**

For CM program, different type of part container / dunnage will be proposed.

4/7

CYRUS   366

# Bag Mark

## Permanent countermeasure :

- Container & Dunnage should be modified.



Current NF Container & Dunnage

Container & Dunnage currently
used by another customer

5/7

# Poor Heat Staking of Inside Bush Nut

* <u>Root cause of non-conformance:</u>
  1) Machine malfunction  2) Miss-operation (human error)

* <u>Temporary Countermeasure :</u>

1) **Operator verification – Mark a <u>Dot</u> on cover-base to ensure the heat stake process is complete**
   - **First the operator at heat stake process marks a dot on cover-base after the process then the next operator verifies the heat stake condition is acceptable and marks the part ( on cover-base) (1st operator 8/15/05) (2nd / audit operator 9/15/05)**

2) Machine check – Increased frequency of machine function check
   - Check 2 times a day ( start & end of shift) (9/14/05)

* <u>Permanent countermeasure :</u>
  - Heat Staking Process to be eliminated by introducing the elimination of Bracket and Bracket A (Engineering Change).

6/7

CYRUS    368

# Poor Heat Staking

## Permanent Countermeasure:

Engineering Change to eliminate heat staking process



7/7



9/16/05

HYUNDAI

H.I. KIM / JASON CHOI

▶ QUALITY [MFG] + MURAKAMI/HWASHIN

10:00 MTG

~ ADD TO SCHEDULE PERMANENT

OT BRIAN TSLA + CHOI TO "TALK STRONGLY

- DOWN-TIME  9/1 - 9/3  TO H.I. KIM TO BE
                                    FAIR TO SUPPLIER."

MURAMI  ( 18 OCCURENCES  |  12 OCCURENCES )
        ( 47 MINUTES      |  116 MINUTES )

C/M  QC  MARK MACDONALD

• BUFF MARKS = REALLY "BAG" MARKS
CAUSED BY DUNRAGE STYLE = NEED TO △

LIGHTING = NO ALREADY FIXED
1,000 LUX ⇒ 2,500 LUX ✓

282 PARTS RETURNED TO MURAKAMI
251 FLAGGED OKAY BY HMMA

H.I. KIM YELLING & THROWING PAPER
⟶ VERY UNPROFESSIONAL - EVERYONE
UNCOMFORTABLE. H.I. KIM YELLED @ M.

www.hyundai-motor.com

EXHIBIT
6

0271



**Daily Plan**

"TO BEHAVE THEMSEALVES."

° ELANIS WILL COME TO MEETING NOW
  TO ADDRESS.

° HE [[...]] A NEW REPEATIVELY SLAMMING ITEMS
  ON TABLE, GOT UP AND HO LEFT.

—EMBARRASING—

[ HUMASHIN ]

0272

*Chris Susock ,*
*Sr Mgr. QC*
*# ♪*

September 16, 2005

Weekly Supplier Quality Meeting:

Observational account of the facts of this event:

This meeting was hosted by the Part Quality team of the Quality Control department and was chaired by COO Mr. H.I. Kim.

HMMA executive management attendees were Production Director John Kalson, Purchasing Director Rob Cyrus, and Quality Director S.G. Kwak. Several other HMMA salaried members were also in attendance along with other supplier representatives.

The meeting opened with the Murakami Manufacturing Company to discuss the quality issue of Buff Marks on the outside mirror commodity that they supply to HMMA.

Murakami Quality Control Manager began to discuss the issue of the Buff Marks and explain the reasons of which they believe may have caused this issue.

Rob Cyrus interjected and stated that he had a pre-meeting with Murakami and that they concluded that due to an EO change that limited there curing time to 3 hours was insufficient and that the designed packaging caused the buff marks to the product. He also concluded that the packaging should be changed.

Harry Chase, Manager of Production Control department stated that the packaging was designed by Murakami and that they were responsible for the results.

Rob Cyrus stated that that may have been true, but it now needs to be changed.

Harry reiterated that that is still a Murakami issue they own the packaging design but we will work with them.

Mr. Kim interjected and inquired by asking the Sr. VP of Murakami Mr. Komatsu-san how many years has Murakami been in business and who some of there other customers that they provided for. He had also asked that with 60 years of experience that they had, how could they have such basic quality issues like Buff Marks to be supplied to HMMA? This is a basic quality system issue.

Rob Cyrus replied for Mr. Komatsu-san and stated that Murakami was not the problem for all the issues that cause 200 minutes of downtime in General Assembly and that much of the mirror problems are caused by Glovis handling.

At this time Mr. Kim attempted to get the meeting back on track and stated that the purpose of this meeting is to review major supplier problems identified and for the supplier to address those problems that they can control and that we can be assured they



**EXHIBIT**
**7**

0244

will not repeat. Mr. Kim had also inquire to Mr. Komatsu-san how Murakami could not know that insufficient lighting, curing time and packaging could cause these types of quality issues and not be detected or tested adequately in their quality system.

Rob Cyrus then interrupted by stating that there is much more on today's agenda to discuss then the buff marks, that why don't we discuss the 200 minutes of downtime that Murakami is being blamed for and there is insufficient data to substantiate that they are the major source of the problem that GA is experiencing with the mirrors.

I myself then interceded by telling Rob that the Buffing Marks quality issue is real and that we need to stick to this issue, the 200 minutes of downtime is irrelevant at this point and that the Buffing Mark quality issue is real.

Rob stated that this is "Bullshit" and that Murakami was forced to come down here to address and issue that is irrelevant compared to other issues with Glovis.

Mr. Kim at this point stressed again that the purpose of this meeting was to address the basic quality system issues of the supplier and that the other issues being raised by Rob Cyrus should be addressed outside of this meeting at the engineering working level. At this point Mr. Kim was interrupted by the Assistant General Manager Murakami Glen Roberts by standing up walking over and grabbing two sample mirrors tossing them on the table and banging them against each other so that he could demonstrate how he believes damage occurs at Glovis stating to the effect that "this is why I came down here let's talk about how these mirrors are being damaged."

Mr. Kim stated that the scratches are a matter that must be addressed at a working level after this meeting. The purpose today is to discuss the buffing mark issue from Murakami. This is a repair that is being performed by HMMA and that they should be charged back to Murakami.

Rob Cyrus then stated that this should be a case to case basis and that he does not believe that HMMA is repairing these at all because they are continuously returned to Murakami.

John Kalson then stated that these issues were being repaired by HMMA members both on line in system and off line in QA.

Rob Cyrus replied to John Kalson by stating "is this the Toyota Production System way to pass on the defects to next customers?"

John replied he doesn't know what the Toyota Production system is and that it is a fact that we have to repair them with HMMA members.

Mr. Kim at this point ended the discussion with the Murakami presentation.

0245

Note: It is of my opinion that the meeting began as being controlled and well structured with professionalism as Mr. Kim had requested by addressing the real problems that the suppliers are accountable for controlling and that any other issue should be addressed outside and separate from this forum. This however was disrupted several times by the continuous contesting and disregard of Mr. Kim's intentions and direction.

/cs

# 3

**From:** Kalson, John HMMA/Production Sub_Div
**Sent:** Saturday, September 17, 2005 8:02 AM
**To:** Kalson, John HMMA/Production Sub_Div
**Subject:** Weekly Part Quality Meeting Events - 9/16/2005

The following is a sequence of events that occurred during the Weekly Parts Quality Meeting held at HMMA on 9/16/2005.

1.  Side mirror supplier Murakami was invited to present the status of defects that have been affecting quality at HMMA.
2.  The meeting was attended by HMMA members, HMC members, Murakami representatives, and another supplier who was also scheduled to present status.
3.  The meeting began with Mr. Mark McDonald (Murakami Quality Manager) presenting status of "buff" marks on the outer surface of the mirror assemblies.
4.  Mr. McDonald stated that low light levels were the root cause of the buff marks since the operators could not see buff marks and scratches and fix them during their operations. He also stated that the light levels were increased to solve the problem.
5.  Mr. McDonald then proceed to go to the next issue which he reported was a packaging issue and lack of proper cure time (bar marks were being left on the mirrors, and he believed these were the root causes).
6.  At some point during these discussions, Mr. H.I. Kim (COO - HMMA) asked the Murakami representatives how long they had been in business. The answer was given as 60 years. Mr. Kim then asked how come the light levels were not correct at the start. The question was stated as that Murakami has been in business so long; that he wanted to know how a basic quality system item could have not been correct.
7.  During this part of the conversation, it was stated by Mr. R. Cyrus (Director Purchasing – HMMA) that all defects were not caused by Murakami, and that Glovis was the problem with the mirror defects.
8.  Mr. Cyrus also then defended the packaging concerns that Murakami was facing and stated that HMMA accepted it and that Murakami did not do any other packaging like that for any of its other customers.
9.  During this part of the conversation, Mr. Kim again stated the purpose of the meeting was to review the basic quality problems that were the responsibility of Murakami, and what they were doing about that. Mr. Kim also stated that a meeting between the parties (HMMA, Glovis, and Murakami) would be necessary to discuss and solve the issues that were stated by Mr. Cyrus.
10. Mr. Cyrus then stated something to the effect that "how can we ask a supplier to come and present the issues when we (HMMA) don't even have any data?" He also stated that we are in the process of charging Murakami with "over 200 minutes of downtime" and they are not responsible for that.
11. At some point in these discussions Mr. Cyrus was very outraged and said that "Murakami has spent 2,3,4 thousand dollars coming here to present their issues and that we need to let them speak"
12. Some time during this exchange, Mr. Glen Roberts (Assistant General Manager – Murakami) went over and picked up two mirrors violently hit them together to cause a scratch, said that this is what Glovis does, and threw the mirrors in the middle of the table.
13. Mr. Roberts then said something to the effect of "HMMA has asked us to come here and speak, and we are going to speak about what we want to speak about"
14. Mr. Kim again re-emphasized the fact that a separate meeting needed to be had by the parties to discuss the scratches and that it was not the intent of the meeting to discuss those items at this point.



EXHIBIT

9

0203

15.     At some point Mr. Chris Susock, stated that the concerns with the mirrors were causing HMMA downtime and repairs and that Murakami has a responsibility for that. Mr. Cyrus at some point here said "that's Bullshit".

16.     I (John Kalson) interjected that "I expect the parts to be "good" out of the box and it is the responsibility of the supplier to make sure they are, and if the parts are not good, we must repair". Mr. Cyrus then said that "the operator should find the defects before the parts are installed". I said to Mr. Cyrus that "the job of the operator is not to inspect parts, that is the responsibility of the supplier, if the operators does see a defect, he will not put the part on, otherwise we have inspection process downstream that find defects, and when we find defects we must fix them". Mr. Cyrus then stated to me "that's not how Toyota does it, and let me teach you something about production systems".

17.     At some point during theses ongoing exchanges (which had been going on a while now), Mr. Kim stated that this meeting cannot go on like this and ended this session immediately.


In my opinion Murakami did not act as a respectful supplier. All of the Murakami representatives did represent themselves in a professional manner. They were confrontational and could not accept that they were indeed causing issues at HMMA.

Also, I was very embarrassed at how our purchasing team acted. It seemed like they were working for the supplier. In my opinion, no matter if HMMA is right or wrong, we need to always stick together.

Finally I respect how Mr. H. I. Kim conducted the meeting in the face of the "battle". He was calm. He tried to get the supplier on track and speaking about their issues several times. Finally when there was no hope for further discussion, he ended that portion of the meeting.


**J. G. Kalson**
**Director - Production**
**Hyundai Motor Manufacturing Alabama**
**(334) 387- 8564**

0204

#9

Weekly Parts Quality Review Meeting – Murakami
9/16/05

The meeting started as usual at about 10:00 am. Murakami was giving their presentation and countermeasures regarding shipping and cloth marks.

During the course of the presentation Rob Cyrus asked several questions regarding the presentation and then asked about the scratches and downtime charged to Murakami. Murakami objected to the Downtime charged to them.

Rob Cyrus then commenced to talking about the downtime and scratches on the OSRV mirrors. At about this time COO Kim informed Murakami and Rob that the meeting was meant to resolve systematic quality issues and not specific issues.

Murakami stayed on the subject of downtime and scratches – going so far as to hit two mirrors together to show how some of the scratches. Again COO Kim stated that this meeting was to resolve systematic problems, and that the issue of downtime and scratches could be addressed later.

Rob Cyrus stated that not all of the downtime was attributable to Murakami. COO Kim wanted to move on with the meeting; COO Kim reiterated that the matter of downtime and scratches would be addressed later today. Glen Roberts of Murakami said "you wanted to have a meeting, so let's have a meeting", which is when he hit the two mirrors together.

Again, several people tried to move the meeting into the next slide, but Rob Cyrus said "you brought them all the ways down here, at least hear what they have to say".

Again, the amount of downtime charged to Murakami was raised – Chris Susock stated that PQ has already calculated the downtime to the best of their ability – to which Rob said "Bull s _ _ t!"

Rob asked if the team members were required to inspect the parts before putting them on. John Kalson responded that that is not a part of their job. Rob then asked if that is the Toyota way – to pass defects on to the customer.

At this time Chris Susock tried to get the meeting back on track by stating that the reason for the meeting was to resolve the buff mark issue – to which Rob said the accurate reporting of downtime is the issue.

COO Kim, clearly very agitated by the actions of the supplier, got out of his seat and walked out of the conference room. He came back in a short time later and requested Murakami meet with some other members of HMMA staff.

Gerald Horn, AM – Parts Quality, Trim Exterior



EXHIBIT
9

0249

EXHIBIT

10

11/6

CHRONOLOGICAL EVENTS H.I. KIM RETALIATION

RE: ~~INTERACTION~~

9/15/05

BYUNG-DALL

° APPROACHED BY MR. B.D. HWANG - PARTS DEVELOPMENT MANAGER & MR. J.Y. CHOI MY FELLOW DIRECTOR WITHIN PURCHASING - PURCHASING ADMINISTRATION. ~~HWANG & CHOI~~ A THEY BOTH SAID THAT THEY NEED MY HELP IN THE QUALITY REVIEW MEETING @ TOMORROW 9/16/05 TO DEFEND MURAKAMI, BOTH MURAKAMI & HMMA AGREED THAT THE TOPIC OF THIS UPCOMING MEETING HAD ALREADY BEEN SOLVED. H.I. KIM WANTED TO CHARGE MURAKAMI FOR A LINE STOPPAGE EVENT.

⟶ PULL NOTES

THEY SPECIFICALLY REQUESTED ME TO "TALK STRONGLY TO H.I. KIM (COO) TO ASSURE THE SUPPLIER WAS TREATED FAIRLY" — I TOLD THEM I WILL CONDUCT AN INVESTIGATION PRIOR TO THE ACTUAL H.I. KIM TO GATHER FACTS AND THEN TAKE A NEUTRAL POSITION BASED ON FACT PRESENTED FROM BOTH MURAMI AND OURSELVES (HMMA).

— MR. CHOI & HWANG SAID THANK YOU FOR YOUR HELP. THEY ARE AFRAID TO SPEAK TO C.O.O. H.I. KIM DUE TO HIS UNREASONABLE AND VINDICTIVE WORKING STYLE.

CYRUS 324

9-16-05 (Am)

- Knowing our meeting was at 10:00 AM the first thing I did that morning was to go gather facts rather than emotion.

① I went to the actual line side and spent 5-10 minutes talking to the T/M who installs Murakami's outside mirrors everyday.

  - She said frankly Murakami has been one of better suppliers — no real issues.

  - I asked her about the recent line stoppage and the 282 mirrors sent back to Murakami as rejects.

  - Her understanding was that the vast majority of parts sent back were borderline defective and 251 of the 282 parts were later agreed to be a quality mis-call on HMMA's behalf.

  - I asked her if she would please show me what inspection documentation was used by her and her colleagues. She said well we really don't have any set standards or boundary samples. In her opinion this is why many parts have initially been judged NG - later to be validated okay.

  - I thanked her for her time and frank honesty.

CYRUS   325

- MY NEXT STEP WAS TO MEET WITH OUR HMMA INTERNAL PARTS QUALITY T/Ms, MR GERALD HORN, MS. PAUL GONSALVES AND MR. MICHAEL KIRK,

THEY HAD THE SAME FEELINGS ABOUT THE FACT THAT MURAKAMI IS MEETING OUR REQUIRE-MENTS & THE LACK OF LINESIDE INSPECTION STANDARDS AND BOUNDARY SAMPLES CAUSED THIS SITUATION. NOT MURAKAMI'S ISSUE.

- WE THEN MEET w/ THE 3 GENTLEMEN FROM MURAKAMI TO GET THEIR SIDE OF THE SITUATION AND THEY TOO WERE IN AGREEMENT WITH US PLUS THEY HAD ALREADY THIS MORNING GONE OVER TO THE GLOVIS SEQUENCING OPERATION TO CLEARLY UNDERSTAND HOW PARTS WERE/ARE BEING HANDLED,

- THEY OBSERVED THE GLOVIS WORKERS WERE TAKING THE MIRRORS OUT OF THEIR PROTECTIVE PACKAGING AND HAPHAZARDLY STACKING THE MIRRORS IN A PILE, THIS PRACTICE WAS CAUSING EXTREME SCRATCHES AND GOUGES. THIS MISHANDLING SITUATION ACCOUNTED FOR THE 31 OTHER PARTS OF THE ORIGINAL 282 OF 251,

SO PRIOR TO THE ACTUAL MEETING ALL HMMA & MURAKAMI PERSONNEL WERE ON THE SAME PAGE.

CYRUS   326

#7

---

### INTEROFFICE MEMORANDUM

---

**TO:**    COO MR. H. I. KIM

**FROM:**    JASON CHI /MANAGER, PARTS QUALITY

**SUBJECT:**    ACCOUNTS ON WEEKLY PARTS QUALITY REVIEW MEETING OF 9/16/05

**DATE:**    9/17/2005

[ENGLISH/ 한글 VERSION]

---

## Background

The Weekly Parts Quality Review Meeting was initiated by COO Mr. Kim on 9/7/05 in an effort to resolve major quality problems from suppliers that had resulted in to HMMA line downtime with repeated occurrence.

| | |
|---|---|
| When: | 10:00 AM to 11:30 AM Every Friday |
| Where: | Alabama Room |
| Chaired by: | H.I. Kim, COO |
| Regular Attendees: | John Kalson, Director of Manufacturing |
| | Simon Sung, Sr. Manager of Parts Development |
| | Rob Cyrus, Director of Parts Management |
| | Chuck Knowles, Manager of Parts Management |
| | Chris Susock, Sr. Manager of Quality Control |
| | Danny Seo, Sr. Manager of Parts Quality. |

The parts quality issues are notified to suppliers immediately at the occurrence of the issues using Corrective Action Request form which requires a temporary countermeasure reply within 24 hours followed by permanent countermeasure reply. The request to attend the review meeting is typically notified no later than 48 hours prior the meeting.

For the week of 9/16, Murakami on Side Mirror Paint Issues and Hwashin on Package Tray Oil Contamination and Split were requested to attend the meeting. The quality



0238

30    issues of both suppliers were repeated and pending over 4 weeks.

31

32

33                    The Retrospect Minutes of the Meeting

34

35    The weekly meeting was started as normal. All HMMA executives and the suppliers'

36    representatives were arrived on time. First, Pareto analysis of overall downtime and

37    repeated problems by suppliers for the month of August and first two weeks of

38    September was reviewed. Then, the issues of Murakami were discussed.

39

40    COO Kim asked Sr. Vice President of Murakami, Komatsu-san, why Murakami such a

41    supplier with over 60 years of experience of mirror business could make defects like buff

42    marks and bag marks? These are fundamental quality system issues.

43

44    Rob interjected and stated that all defects are not created by Murakami and in fact,

45    Glovis made many defects such as scratches on the mirror by handling mistakes.

46    Rob also stated to Harry Chase, PC Manager that HMMA PC accepted Murakami's

47    packaging design and now PC says the design is No Good (exchanged with Harry for

48    more statements defending Murakami).

49

50    COO Kim reminded that the purpose of this meeting is to review the major supplier's

51    quality problems and counter-measure not to repeat the problems. COO Kim asked again

52    to Komatsu-san how and why Murakami did not know that a simple insufficient lightening

53    at packaging causes buff marks and cure time is required more than 3 hours before

54    shipping the mirrors.

55

56    Rob again interjected the questions from COO and stated that 200 minutes of downtime

57    charged to Murakami is not accurate and much of time should have been charged to

58    Glovis.

59

60    COO Kim reminded the participants that the purpose of the meeting is to review the

61    major quality issues created by suppliers and their counter measure plan. There can be

0239

62   some calculation errors on downtime. Those errors can be worked out in working level
63   discussion. This meeting is to discuss more fundamental and systemic major quality
64   issues.
65
66   Rob stated that accurate downtime is the root of the issue. Murakami has right to speak
67   what they want and PQ should have been clear on downtime of Glovis and Murakami.
68
69   Chris Susock, Sr. Manager of QC stated to Rob that PQ has already calculated down time
70   to the best of ability and Buffing marks issue is real and we need to stick to the issue and
71   200 minutes down time is irrelevant at this point.
72
73   Rob sated back to Chris "Bull Sh__s!"
74
75   COO Kim reminded again the purpose of this meeting. At this point, Glenn Roberts,
76   General Manager in Sales of Murakami, stand up without permission from his chair in
77   agitated mode and grabbed two mirror samples from parts container and threw onto the
78   meeting table and banged each other and stated "I'll talk and discuss what I want to
79   discuss and that's reason for that I came down here." He went on to explain how many
80   scratched mirrors that he is getting from Hyundai.
81
82   COO Kim stated that scratches on the mirror are not that I'm concerned about today with
83   Murakami. As far as scratches on the mirrors are concerned, I would like to resolve in
84   working level after this meeting. The concern that I have today is the buffing on the
85   mirrors. This requires an extensive repair by HMMA members and therefore, I would like
86   to charge back to all incurred cost of repairs by HMMA members to Murakami.
87
88   Rob interjected by saying "That too is case by case. I don't believe HMMA is repairing
89   the mirrors since many mirror are being returned to Murakami."
90
91   John Kalson, Director of production, stated that the repair is either being done on-line or
92   off-line. Rob stated "Is this Toyota way to pass on the defects to next customers?"
93

0240

94   John Kalson stated "Toyota way or not, it is the fact we have to repair them all by HMMA
95   members."
96
97   COO Mr. Kim, at this point, ended the review meeting stating in Korean "How can I run
98   this meeting when our own Purchasing is siding with suppliers on the quality problems?"
99
100  As COO Mr. Kim left the room, John Kalson chaired the rest of review meeting with
101  Hwashin to end.
102
103

### Personal Opinion

104
105
106  I think Rob could have discussed the downtime issue against Murakami mirrors directly
107  with COO Kim before or after the meeting. This is the reason that well-prepared meeting
108  had to be ended in disrupted manner.  The behavior of Glenn Roberts of Murakami was
109  not acceptable as a supplier that supplied the defective parts HMMA line and came to
110  review the problem. As a result of the disrupted meeting, HMMA had lost chance to
111  discuss and plan to resolve the issues of NF side mirror buffing, heat staking, and scratch
112  related downtime.
113
114

### 배경

115
116
117  주간 부품 품질 점검 회의는 HMMA 생산 효율에 지대한 영향을 미치는 부품 불량률을 향상 시키
118  고자 하는 취지에서 공장장, 김 이사님의 지시에 의거 9월 7일부터 첫 회의가 시작됐고 공장장님
119  이 직접 회의를 주체 해 오셨다.
120
121            [구체적 회의 구성은 영문판 참조]
122
123  불량 부품의 업체 통보는 CAR를 사용 발생 즉시 전송되며, 업체는 24시간 내로 임시 대책서와
124  영구 대책서의 계획을 부품 검수과에 제출할 의무를 갖는다. 회의 참석 요망 업체는 회의 당일로
125  부터 최소 48시간 이전에 통보되고 있다.
126
127  9월 16 일의 회의에 참석할 업체로 Murakami와 화신으로 결정되었고 이 업체의 불량 부품문제
128  는 다수의 재발과 영구적인 대책의 부재가 그 결정 이유였다.
129

0241

**Montgomery Cardiovascular Associates, P.C.**
273 Winton Blount Loop  Montgomery, AL 36117
(334)280-1500  Fax: (334)280-1600

*October 31, 2007*
Page 1
Chart Document

| ROBERT C CYRUS | Home: (334)296-0506 Office: (334)296-0506 |
|---|---|
| Male  DOB:01/04/1962                     56300 | Ins: B/C OF A (1) Grp: 48584 |

**09/13/2005 ~ Office Visit: Progress Note**
**Provider: PAUL B MOORE MD**
**Location of Care: Montgomery Cardiovascular Associates, P.C.**

<u>PROGRESS NOTE</u>

| | |
|---|---|
| **NAME:** | CYRUS, ROBERT C |
| **MCA CHART NO.:** | 107106-1-mc |
| **D.O.B.:** | 01/04/1962 |
| **DATE:** | 09/13/2005 9:59 AM |
| **PHYSICIAN:** | PAUL B. MOORE |
| **REFERRING M.D.:** | DANIEL MOORE |

**PROBLEMS:**

CARDIOVASCULAR DISEASE (ICD-429.2)
    ANGINA PECTORIS (ICD-413.9)
    ABNORMAL TGXT 4/28/05 (ICD-794.30)
HYPERLIPIDEMIA (ICD-272.4)
SHORTNESS OF BREATH (ICD-786.05)
HYPERTENSION UNSPECIFIED (ICD-401.9)

**ALLERGIES:  This patient has no known allergies.**

**CURRENT MEDICATIONS:**

LIPITOR TAB 20MG (ATORVASTATIN CALCIUM) Q HS
CYMBALTA 60 MG CPEP (DULOXETINE HCL) QD
FIORICET 50-325-40 MG TABS (BUTALBITAL-APAP-CAFFEINE) PRN
XANAX 0.5 MG TABS (ALPRAZOLAM) prn
PLAVIX TAB 75MG (CLOPIDOGREL BISULFATE) QD
ASPIRIN 81 MG TABS (ASPIRIN) qd
NITROGLYCERIN 0.4 MG SUBL (NITROGLYCERIN) prn

**INTERIM HISTORY:**  Mr. Cyrus called the office this morning saying that he had shortness of breath.  He tells me that he has been feeling pretty well up until recently.  He is still under a great deal of social stress. He is going through a divorce.  He just went back to work at the Hyundai plant about two weeks ago and has a large backlog of work to do.  He tells me that this weekend he was playing golf.  He became nauseated and "dizzy".  He thinks he may have been dehydrated.  Of course, it was very hot as well. Since then he has been fatigued.

This morning he felt short of breath just walking across the parking lot.  He also noticed that he felt "dizzy" when he got up from his desk.  He had his blood pressure taken in the health clinic and it was noted to be elevated.  He called the office and this appointment was made.

**VITAL SIGNS:**
**Weight (lbs): 191**
**Pulse rate: 80**

EXHIBIT
12

CYRUS V HMMA 0520  SUBPOENAED DOCS

**Montgomery Cardiovascular Associates, P.C.**
273 Winton Blount Loop  Montgomery, AL 36117
(334)280-1500  Fax: (334)280-1600

*October 31, 2007*
Page 2
Chart Document

| **ROBERT C CYRUS** | Home: (334)296-0506 Office: (334)296-0506 |
|---|---|
| Male  DOB:01/04/1962 | 56300 | Ins: B/C OF A (1) Grp: 48584 |

**Respirations:** 14, unlabored
**Blood Pressure:** 136/100, **right arm;** 132/100, **left arm**

**PHYSICAL EXAM:** Well developed, well nourished, somewhat anxious, middle aged white male in no acute distress.
CHEST EXAM: Clear lung fields. No wheezes or rales. Normal respiratory effort.
CV EXAM: No JVD at 45 degrees. PMI is not displaced. First and second heart sounds are normal. There are no murmurs, rubs, or gallops audible.
ABDOMINAL EXAM: Soft. Bowel sounds are present. No tenderness or masses appreciated.

**DATA:**

EKG: Sinus rhythm. Normal axis. Normal intervals. Otherwise, normal EKG.

**ASSESSMENT:**

| 1.0 | Cardiovascular. |
| | 1.1    CAD. Seems stable. |
| 2.0 | Shortness of breath. I believe that his shortness of breath is related to stress and some degree of anxiety. His blood pressure may be playing a role as well. I do not think that he has significant residual coronary ischemia. His stress test back in June looked okay. |
| 3.0 | Hypertension. Diastolic blood pressure has crept up. He finished the cardiac rehab program about two weeks ago, but he has not exercised since then. |

**PLAN/SUGGEST:**

| 1. | Altace 5 mg daily. |
| 2. | Continue other therapy as is. |
| 3. | I have strongly encouraged him to go back to regular exercises he was doing with the cardiac rehabilitation program for stress relief, nonpharmacologic control of his blood pressure, etc. |
| 4. | Return to see me in six months. |
| 5. | I have advised him to continue with his efforts at behavior modification and stress relief. |
| 6. | Routine follow up with Daniel Moore. |

Paul B. Moore, M.D.

PBM/lw

Manual Fax to:

Dr. Daniel L. Moore
8190 Seaton Place
P. O. Box 240369
Montgomery, Alabama 36124
Phone: 396-9100
Fax: 396-9110

Job ID: 220251
DD:    09/13/2005
DT:    09/14/2005

## McCormick, Melanie L HMMA/HR

**From:**    Stone, Laura L HMMA/Parts Development
**Sent:**    Thursday, October 13, 2005 10:14 AM
**To:**      McCormick, Melanie L HMMA/HR
**Subject:** RE: Help

The week of 10/3 - 10/7 he was here. He was out (9/20 - 9/23) and out the following week (9/26 - 9/30) and out all this week.

-----Original Message-----
**From:** McCormick, Melanie L HMMA/HR
**Sent:** Thursday, October 13, 2005 9:48 AM
**To:** Stone, Laura L HMMA/Parts Development
**Subject:** Help

Laura, I am trying to make sure I have Rob's time in correctly in the system since he is out on a medical leave. Please let me know when he has been out. I know he is out this week. Did he miss all of last week? What about the week prior?

*Melanie L. McCormick*
Hyundai Motor Manufacturing Alabama, LLC
HR Benefits Specialist
(334) 387-8115
(334) 387-8162 fax
mmccormick@hmmausa.com

EXHIBIT
_13_

0135

10/18/2005

| ☐REPORT ■APPROVAL | | | | | Conservation Pd. (    ) years | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Enforceable under approval of (    ) | | | |
| Date | 10/18/2005 | R E P O R T | Prepared | Manager | Sr. Director | Exec VP | President |
| Team in Charge | General Purchasing | | Mike Youg 10/18/2005 | / / | / / | / / | / / |
| Cooperation | | | | | | | | |
| **Subject :** Rob Cyrus incident 10/11/05 | | | | | | | | |

Mr Hyun,

This information is confidential and only for your viewing.

On 10/11/2005 evening at Red Star Tavern restaurant, I saw Rob Cyrus joining two other Hyundai employees to have a social drink. Within the gathering there were females there which I think that was the reason why Rob Cyrus showed up. Rob was not at work that week due to illness and still have not come into work week of 10/17/2005.

When I saw Rob Cyrus there, Rob had said to me "DO NOT TELL ANYONE YOU SAW ME HERE". I didn't know what that meant. Why can't someone come out and have a drink on a week day? Well I told him I would not say anything to anyone but when I was about to leave, he yelled out "I'm serious, do not tell anyone" and said "I'll fire you if you do". I know he said that jokingly but I did not take that as a joke since he was dishonest about not coming to work and wanted to let the girls know who was the boss. I didn't take that comment too well and thought that I should report this to management. I feel that Rob Cyrus using Hyundai and don't feel right he should be working at Hyundai especially at a director position.

10/18/05

HMMA 0001                                          H.M.M.A                                          000mm×000mm



EXHIBIT
14

0038

9:11
10:22

10/22/05    4/5

2 REC'D
CALL FROM
KPD 3:31 AM    TOOK BP 9:15    HR  S 156    9:16
                                  110  D 105    MEASURE
                                                #2

MET W/ KEITH AT CITY HALL.    HR  S 162
                              118  D 121

① REC'D
CALL FROM KEITH CELL

- ⊕ JUDY'S CELL (8:05) SHE WILL ⊕ TOMORROW
  ("KAY")
- KATHRYN DIXMEY → 462-0935 *
- JIMMIE TARDOS.
  IN SHOCK
- RESTLESS, ASTONISHED, SEVERE HEADACHE

- WHEN H.J. THREW HIS FIT I WENT TO
  KEITH J. AND EXPLAINED SITUATION AND
  THREATS OF FIRING FROM MR CHEE. HE SAID
  DON'T GIVE IT ANOTHER THOUGHT - NOTHING WILL
  COME OF IT. TOLD HIS SPECIFICALLY THE WORK
  ENVIRONMENT WAS HOSTILE.
- 2ND TIME AFTER CHEE REQUESTED ME TO
  ALTER MTG MINUTES FROM MANAGEMENT MTG
  I AGAIN WENT TO K.J. AND TOLD HIM TO
  MY SURPRISE THINGS SEEM TO BE ESCALATING,
  TOLD HIM THAT CHEE TASH LEE AND ME IN
  MEETING THOUGHT NOTHING WAS WRONG OR
  INAPPROPRIATE EXCEPT FOR H.J. KIM'S PAGE
  AND TWO TARDINESS.
  I TOLD HIM I WAS WORRIED ABOUT ~~REBUTTAL~~ RETALIATION
  FROM H.J. KIM SINCE HIS REPUTATION IS
  VENEFUL. HE AGAIN REASSURED ME THAT
  NOTHING WOULD COME OF IT - IT'S JUST THE



EXHIBIT
15
tabbies.

CYRUS    315

2/3

HYUNDAI STYLE - WAY OF OPERATING. HE
SAID DON'T WORRY AT AT ALL AND TO
HAVE A NICE WEEKEND,

- HARRY CAABLED PHONED MY ~ 7PM SAID
HE WAS STILL AT WORK BECAUSE H. I. KIM
ORDERING HIS DIRECT REPORTS TO MAKE
MEETING MINUTES OF WHAT OCCURRED
IN MARKANI NTG, (FEB 7/M/S) HE DID
NOT REQUEST OTHER ATTENDEES EXCEPT
FOR CHOI & MYSELF TO MY KNOWLEDGE,
(APPROXIMATELY 30 PEOPLE IN ATTENDANCE),

— TOLD ONE MARK OF ALL OCCURRENCES
INCLUDING 2 MEETINGS W/ K.O, HOSTILE ①
    RETALIATION ②

CYRUS    316

3/3

10/23 ② JUDY (2:13)

OFFICE
262-0720

• PIGGLY WIGGLY MGR
ALABAMA ST.

• COMPLETE THE APPLICATION
FOR FAMILY MEDICAL
LEAVE

FMLA
GO AHEAD AND DO
THIS.

10/24
① 11:15
LMVM.

① TED CHAVIS

FMLA

① CANDID

ASSURED ME
ITS JUST THEIR
STYLE

OBAMA

**CYRUS   317**

Nov 10 05 04.24p    Rob Cyrus                    334-215-1967              p.1

# FAX COVERSHEET

Date: November 10, 2005

*To: Mr. Keith Duckworth*

*From: Robert C. Cyrus C.P.M.*

## Topic: Formal Complaint

Pages not including coversheet: 21

EXHIBIT
16

0041

November 6, 2005

Mr. Ahn
President and CEO HMMA

Mr. Keith Duckworth
Deputy President HMMA /
Vice President Human Resources and Administration Services

Mr. B.K. Kim
Senior Director of Human Resources and Public Relations

Mr. Greg Kimble
Director of Human Resources HMMA

Subject: Formal complaint for racial discrimination and retaliation

I wish to file a complaint that the demand for my resignation violates company policies that protect employees from discrimination based on race. I am American and was forced to resign and my Korean peer Mr. J.Y. Choi (Korean) who did the same thing as I did and was not forced to resign. I also believe my termination was in retaliation for my reporting sexual harassment, race discrimination and safety policy violations.

Mr. Duckworth requested a dinner meeting with me on October 22, 2005 he said it as to check on how I was doing (health wise), and to see if he could be of any help. I brought my medical documentation for you to review. I had over 100 pages of documentation.

Upon arrival at the restaurant I ran into Mr. Michael Hansford. Mr. Hansford said he would like to meet Mr. Duckworth and joined us at our table maybe 10 minutes after I arrived. While Mr. Hansford was present, Mr. Duckworth asked us about what we knew about serious ongoing problems at HMMA. Specifically he asked us if Mr. John Kalson was still sleeping with Staff. He asked us of other concerns he had heard of such as "kick-backs". Then Mr. Hansford left.

Mr. Duckworth then said the executive management at Hyundai was upset with me and would like me to resign. I was flabbergasted. I said I wasn't aware of any performance, demeanor or relationships issues. I asked Mr. Duckworth specifically who is "executive management". He said the President, Mr. Ahn, Mr. H.I. Kim and Mr. Rick Neal.

I told Mr. Duckworth the President Ahn has only been at HMMA a few months and speaks very limited English. Our conversations have been "hello" in the hallways and bathroom. He has never expressed any dissatisfaction with me directly or through any Korean colleagues. I As far as Mr. H.I. Kim is concerned. I had a meeting with Mr. H.I. Kim was regarding the supplier Murakami who traveled 500+ miles to come down to HMMA to address a problem concerning their outside mirrors. The meeting was September 16th at HMMA at 10:00 in the Pearl Room.



PAGE 1 OF 21

I provided meeting minutes to the President, Mr. Ahn via Mr. H.J. Hyun. I am endorsing a copy of these.

As the meeting minutes show Mr. H.I. Kim was upset over our efforts to have the supplier Murakami address the quality concerns and related line stoppage. This was specifically what Murakami was asked to come down for. It was on the agenda for the meeting, all parties attending had copies and in fact Mr. H.I. Kim's department wrote the agenda and Mr. H.I. Kim presided over the meeting.

As my meeting minutes indicate Mr. H.I. Kim became enraged at Murakami, Mr. J.Y Choi (Director of HMMA Purchasing) and me (Director of HMMA Purchasing / Parts Development). I could feel his anger even though he only spoke in Korean. Mr. J.Y. Choi and I spoke as one voice with the same inflection to simply try to allow Murakami to make their presentation. As Mr. Choi and I later that afternoon discussed our surprised reaction from the C.O.O. Mr. H.I. Kim to Mr. Jason (Jae Rok) Lee, Mr. J.Y. Choi repeatedly stated in English to Mr. Jason Lee in my presence that we (Purchasing), (Choi and Cyrus), did absolutely nothing wrong, Mr. Choi was very upset almost crying. We both spoke to H.I. Kim calmly and with respect.

Later on September 16th 2005 I received a call from Mr. Choi at approximately 1:30pm. He said "Rob, you and I may be going home early today". He said Mr. H.I. Kim has gone to President Ahn to complain about the Murakami meeting. I said Kim is the one that acted unprofessionally. Mr. Choi said and agreed that we did nothing wrong.   Mr. Choi said Mr. Kim should actually apologize to HMMA staff and Murakami.

Mr. Choi told me come to my desk immediately.  When I arrived he said Mr. H.I. Kim had demanded that Mr. Choi and I write meeting minutes to cover what occurred in the Murakami meeting.

I asked why we had to write meeting minutes. There were 30+ people in the meeting along with the two suppliers, (Murakami and Hwashin), everyone knew what happened. I told him that I had many critical things to finish that and this seemed like an unreasonable priority. In the three plus years I have been with Hyundai I had never has such a request.

At this point I went to Mr. Duckworth's office and met with him to discuss this. I explained what had occurred. He stated "don't worry about it. It's just the Korean's style". I said I don't want a black mark next to my name because of this meeting. He said "don't give it another thought; everyone knows your good standing at Hyundai". I specifically told him that this was a very hostile environment and was surprised that the now third set of Executive management sent over from HMMA was acting in such a hostile fashion. He said again "don't give it another thought your reputation and standing in the company were excellent". I then went back to my desk.



As I continued to work on my scheduled activities for that afternoon I was again called over to Mr. Choi's desk. Mr. Hyun then joined us. Mr. Choi updated me and told me that now Mr. H.I. Kim phoned President Mr. Seo in Korea about this meeting. I discussed this new escalating factor with Mr. Hyun and Mr. Choi. They both agreed that we acted in the proper fashion in the meeting and that the thing to do was let his anger try to blow over.

Late in the afternoon of September 16, I again went over to see Mr. Duckworth. I explained the latest developments and my concern about Mr. H.I. Kim. Mr. Duckworth said "don't give it another thought; I haven't heard anything about this meeting". I then specifically stated that "I don't want any negative repercussions or retaliation from Mr. H.I.Kim". Mr. Duckworth then again reassured me that "I had nothing to worry about and to forget about it and have a nice weekend".

Between the September 16, 2005 and my dinner meeting with Mr. Duckworth I had no further meetings with Mr. Kim or Mr. Ahn. A few weeks prior to that however, I met with Mr. Duckworth and reported among other things, about executive involved in sexual harassment and about misconduct with employees about safety issues because workers were not following safety policies and the discriminatory treatment given to American managers and workers who were treated less favorably then the Korean managers I am enclosing a copy of the minutes of that meeting.

On the 24th of October 2005 I phoned Mr. J.Y. Choi my peer as Director of Purchasing – Administration. I asked him what ever happened with the H.I. Kim Murakami situation. He said "nothing happened, it is done". I reminded him of his call to me the day of the meeting when he said "Rob, you and I may be going home early today". He and acknowledged the conversation. I asked him if he was or will be penalized in any way. He said nothing happened to him.

Please investigate these matters and get back to me. I have sacrificed much and worked hard for this company. Terminating me is unfair.

Sincerely,
Robert C. Cyrus C.P.M.
HMMA Director of Purchasing Parts Development



*21*
*3/*

0044

# CYRUS DEPOSITION EXHIBITS
# PART II

Nov 10 05 04:24p     Rob Cyrus     334-215-1967     p.5

CONFIDENTIAL

ORIGINAL

Date:          October 2, 2005

Subject:       Murakami Manufacturing U.S.A. Inc. (MMUS) Quality Meeting

Date of Meeting:   September 16, 2005 (Friday)

Time:          10:00 am

Location:      HMMA Pearl Room

Attendees from MMUS:   Mr. Toru Komatsu     Senior Vice President
                       Mr. Mark McDonald    General Manager – Quality
                       Mr. Glen Roberts     General Manager – Sales

Events of September 15/16, 2005

On Thursday September 15, 2005 I was approached by Mr. B.D. ("Brian") Hwang, Manager – Parts Development, Exterior Plastics. Mr. Hwang has been with Hyundai for 11 years. Mr. Hwang stated Mr. H.I. Kim had requested Murakami to join the "quality review meeting" scheduled for the next morning at 10:00 am. I told Mr. Hwang I would support him and asked the main purpose of the meeting. He stated Q.C. has some serious concerns regarding cosmetic defects (scratches, buff marks and other damage). He specifically asked me as a Director to strongly defend the Supplier based on actual facts. He felt he could not speak freely to the C.O.O. since he is only at the level of Manager (This was a hierarchy issue, not personal), I told him I would gather the facts and take a neutral position in the meeting tomorrow.

On the morning of September 16, 2005 I went to investigate the situation prior to the meeting and arranged a pre-meeting with Murakami at 9:30 am to clearly understand their position. I spoke with actual HMMA team member who receives the Murakami parts line side and installs them. She stated "there really hasn't been much of any difficulty with the mirrors" and "the only thing that has been occurring is occasional severe gouges or scratches all the way down to the plastic raw material, not superficial light scratches". Meaning most of the defects identified at line side are handling issues from Glovis to HMMA, not Murakami in the vast majority of the cases.

4/21

0045

We started the pre-meeting around 9:30 am in the Quality Department. *Attendees were:*

| | |
|---|---|
| Ms. Paula Gonzales | *HMMA Parts Quality* |
| Mr. B.D. Huang | *Parts Development* |
| Mr. Chris McClain | *Parts Development* |
| Mr. Rob Cyrus | *Parts Development* |

Murakami brought in actual examples of the suspect parts. There were significant "gouge like" defects not likely to be shipped to any OEM customer; too obvious. Murakami explained they had visited Glovis this morning and observed how Glovis is removing the mirrors from the HMMA approved packaging and stacking them haphazardly in non-approved totes. This is where the deep gouging is taking place. The three mounting studs are contacting the mirror housing painted surfaces when handled in this fashion.

After the review we and Murakami attended the Quality Meeting hosted by Mr. H.I. Kim. Two suppliers were in attendance for this meeting (*Murakami first, followed by Huashin*). Murakami brought defect samples and started to explain that these defects (*gouges*) were caused by handling issues between Glovis and HMMA based on their root cause analysis. This item was identified as the first discussion agenda item HMMA provided to Murakami (see attached). Mr. H.I. Kim seemed upset that Murakami was bringing up this topic and said via translator (Mr. Jason Chi) that he did not want to discuss this matter.

Murakami seemed a little taken aback. Why did they have three individuals come down to HMMA at significant time and cost and yet are not permitted to discuss and defend their position? HMMA QC wanted to charge back 163 minutes of down time to Murakami. This would equate to 163 minutes x $843.50/minute (GA) = $137,490.

The facts presented in the pre-meeting with HMMA Quality and Parts Development showed of the 282 mirrors returned as defective, 251 (89%) were good and acknowledged so by HMMA QC. The remaining 31 parts were either handling damage by Glovis or defects caused by Murakami's packaging format previously approved by HMMA Production Control in writing. Murakami also received parts returned from HMMA that had been dropped and run over by our tuggers and we were trying to charge *them* back.

Murakami and Parts Development attempted to intervene to clarify the facts with an open dialogue but Mr. H.I. Kim got visibly upset. He was yelling at various attendees and threw his papers on the table in disgust. He abruptly turned and walked out of room. All attendees were surprised, confused and felt uncomfortable.

5/21

He later returned and we tried to continue with an open dialogue approach to allow for a fair and productive meeting. Mr. Glen Roberts from Murakami asked why they were asked to drop everything immediately and come down to HMMA at significant cost and time if no one will listen. He then held up two new mirror assemblies and struck them together to replicate the damage being seen at HMMA the side by Glovis mishandling issues.

We attempted to discussed this matter and the related cost impact again, Mr. H.I. Kim seemed even further infuriated and yelled very loudly at both HMMA team members and the supplier Murakami with other supplier present. He again left the room again without any discussion or reason and never returned even though we had another supplier that was to present (Hwashin).

I was later called by my colleague Mr. J.Y. Choi and informed that Mr. H.I. Kim was very upset with Mr. Choi and me based on the Murakami meeting. Mr Choi told me "to leave my present meeting and join him at once, as he and I may have the rest of the day off" insinuating that we may be fired.

In addition I later learned that after our Murakami meeting that Mr. Jason Chi had a separate meeting with Murakami and told Mr. Glen Roberts to "shut up and sit down". He will address his comments to Mr Komatsu. He told Mr. Komatsu that Mr. Roberts was to cancel his trip back today and insisted that he stay here at HMMA.

Attached for back up are my actual meeting notes from the 16th, along with the Agenda we sent Murakami and Murakami's presentation.

Please feel free to contact me if you have any questions or concerns.

Mr. Robert Cyrus
Director of Parts Development

6/21

0047

Nov 10 05 04:25p    Rob Cyrus    334-215-1967    p.8

# Weekly Parts Quality Review Meeting

2005. 9. 16.

HMMA QC Department

7/21

Nov 10 05 04:25p    Rob Cyrus    334-215-1967    p.9

# ■ Schedule and Structure of the Meeting

**◆ When:** 10:00 AM to 11:30 AM, Every Friday

**◆ Where:** Alabama Room (1st floor of GA shop office building)

**◆ Chaired by:** H. I. Kim, COO

**◆ Attendees:**
B.G. Cho, Senior director of Manufacturing
John Kalson, Director of Manufacturing
Simon Sung, Sr. Manger of Parts Development
Rob Cyrus, Director of Parts Management
Chuck Knowles, Manager of Parts Management
Chris Susock, Sr. Manager of Quality Control
Richard Chai, Sr. Manager of Line Inspection
Dave Choi, Sr. Manager of GA shop
Danny Seo, Sr. Manager of Parts Quality, and Related people

**◆ Presenters:** CEO, COO and Quality Manager of Supplier
Suppliers that caused line-stoppage at HMMA
Suppliers that caused major shipping and field Quality issues.

**◆ Format:** HMMA Corrective Action Request Form (Powerpoint format)
(Presentation file to be submitted to HMMA PQ one day in advance)

**◆ Prepared by:** Jason Chi, Parts Quality Manager

8/21

0049

■ **Presentation Topics for the week of 9/16/2005**

| Supplier | Part Name | Nonconformity | Occurrence | Issue Type | Presentation Time |
|---|---|---|---|---|---|
| Lear | Seat | Rear head rest not locked, high effort | 5 % | Quality Audit | 15 Min. |
| | | Seat back rubbing noise | 1 | | |
| | | Too much wrinkles and folds (Leather) | 10 % | | |
| Murakami | Outside mirror | Paint issues (Polishing mark, Crater, Scratches) | | Downtime VPC inspection | 15 Min. |
| | | Poor heat staking of inside bush nut (Wind noise) | 2 | Test track | |
| Hwashin | Package tray panel | Oil contamination (Crater) | 100 % | Paint shop | 15 Min. |
| | | Stamping Split | 6 | Body shop | |
| | | Subwoofer weldnuts misaligned | 25 | GA T3 | |
| Dongwon | Door frame | Weld spatter | 27 | QA line | 15 Min. |
| | | Channel too wide at upper corner (Wind noise) | 100 % | Test track | |

9/21

0050

1/7

MMUS

Murakami Manufacturing USA, Inc.
Campbellsville, KY

# NF Outer Mirror Assembly Countermeasure Report

DATE REPORTED : 09/16/2005

10/21

Nov 10 05 04:26p     Rob Cyrus                    334-215-1967              p.12

2/7

# Buff Marks

**DESCRIPTION OF PROBLEM :**
Parts with paint buff marks found at HMMA assembly line.

**ROOT CAUSE OF NON-CONFORMANCE :**
Uncompleted buff finishing was performed under insufficient lightening (1,000 lux).

**COUNTERMEASURE :**

- Additional lighting installed (2,500 lux) into buff area
- Lighting check sheet created
- Check before operation on 1st and 2nd shifts using lighting meter
- Lighting criteria : more than 2,500 lux
- Effective date : Sep 14, 2005

**METHOD OF COUNTERMESURE EFFECT (RESULT) :**
100 % Inspection of all assemblies prior to shipping to HMMA.

**REFLECTION TO NEW MODEL :**
The countermeasure is included in CM process launched in April, 2006

11/21

0052

Lighting Status

After

Before

2,500 Lux

1,000 Lux

12/21

0053

4/7

# Bag Marks

## DESCRIPTION OF PROBLEM :

Parts with paint bag marks found at HMMA assembly line.

## ROOT CAUSE OF NON-CONFORMANCE :

The paint bag mark is caused by protective bag being imprinted into the paint after leaving MMUS (dark colors only).

Root cause:

1. Insufficient paint cure time (2~4 hrs – after EC change to Housing).
2. Container design (vertical position & rough dunnage).

## COUNTERMEASURES IMPLEMENTED :

- Stabilized curing time (7/25/05)
- New type of protective bag (8/7/05)
- Currently packaging all dark colors outside of the dunnage and protecting part with bubble wrap (extra time & cost).

## REFLECTION TO NEW MODEL :

For CM program, different type of part container / dunnage will be proposed.

13/21

0054

Nov 10 05 04:27p    Rob Cyrus    334-215-1967    p.15

# Bag Mark

<u>Permanent countermeasure :</u>

- Container & Dunnage should be modified.



Current NF Container & Dunnage

Container & Dunnage currently
used by another customer

14/21

0055

# Poor Heat Staking of Inside Bush Nut

* Root cause of non-conformance:
  1) Machine malfunction  2) Miss-operation (human error)

* Temporary Countermeasure :

1) Operator verification - Mark a Dot on cover-base to ensure the heat stake process is complete
   - First the operator at heat stake process marks a dot on cover-base after the process then the next operator verifies the heat stake condition is acceptable and marks the part ( on cover-base) (1st operator 8/15/05) (2nd / audit operator 9/15/05)

2) Machine check - Increased frequency of machine function check
   - Check 2 times a day ( start & end of shift) (9/14/05)

* Permanent countermeasure :
   - Heat Staking Process to be eliminated by introducing the elimination of Bracket and Bracket A (Engineering Change).

6/7

15/21

0056

# Poor Heat Staking

**Permanent Countermeasure:**

Engineering Change to eliminate heat staking process



Current

New

add rib 9pos h/w

bracket

bracket A

spot melting

16/21

**Cyrus, Robert C HMMA/Part Development**

| | |
|---|---|
| **From:** | McClain, Christopher C HMMA/Parts Development |
| **Sent:** | Monday, October 03, 2005 9:50 AM |
| **To:** | Cyrus, Robert C HMMA/Part Development |
| **Subject:** | FW: C.O.O. Meeting Observation |
| **Importance:** | High |

FYI, you were copied too...

# Chris McClain

*Buyer - Parts Development*
**Hyundai Motor Manufacturing Alabama, LLC**
PHONE: (334) 387-8172
FAX:    (334) 387-8298
Email: chrismcclain@hmmausa.com
www.hmmausa.com

 **HYUNDAI**

**WARNING:**
*The information contained in this communication is confidential, may be Hyundai-Supplier priviledged, and is intended only for the addressee. Unauthorized use, disclosure, or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you receive this communication in error, please notify us immediately by return e-mail or by calling the number above, and destroy this communication and all copies therof, including all attachments.*

-----Original Message-----
**From:** McClain, Christopher C HMMA/Parts Development
**Sent:** Friday, September 16, 2005 3:27 PM
**To:** Choi, Jung Yun HMMA/Parts Development
**Cc:** Cyrus, Robert C HMMA/Part Development
**Subject:** C.O.O. Meeting Observation

Hello Mr. Choi...below is a summary of what I observed in the meeting this morning.

> - Our mirror supplier, Murakami was called in and asked to do a short presentation regarding an issue that occurred earlier this week
> - Murakami had not received the parts in question to do root cause analysis and requested that they be allowed to attend next Friday's meeting
> - In an effort to comply with HMMA's request, the supplier's quality general manager, sales general manager and VP of manufacturing re-arranged their schedules to attend this meeting
> - After beginning the presentation, it became clear that Murakmi would not be allowed to address the real cause of the rejected parts although they were listed on HMMA's agenda
> - Murakmi personnel became upset that after driving 8 hours to be here, they were not being allowed to speak
> - Parts development staff attempted to explain the supplier's position, they were told that the meeting was not the place to discuss these issues.
> - The suppliers point of view is that if they were not to speak, there was not reason for them to come to HMMA on such short notice
> - Staff from other departments made negative non-factual comments about the supplier's parts...again, purchasing staff intervened in an attempt to stick to facts and be fair.
> - Neither purchasing, nor the supplier denies that there was an issue on a sample of parts, but the real

10/3/2005

*17/21*

consensual root cause was not able to be discussed.
➤  At not time, were purchasing staff disrespectful during the meeting. They were trying to do the right thing by addressing real issues which was supposed to be the reason for having the meeting.

**Chris McClain**
*Buyer - Parts Development*
**Hyundai Motor Manufacturing Alabama, LLC**
PHONE: (334) 387-8172
FAX:    (334) 387-8298
Email: chrismcclain@hmmausa.com
www.hmmausa.com

**HYUNDAI**

WARNING:
The information contained in this communication is confidential, may be Hyundai-Supplier priviledged, and is intended only for the addressee. Unauthorized use, disclosure, or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you receive this communication in error, please notify us immediately by return e-mail or by calling the number above, and destroy this communication and all copies thereof, including all attachments.

10/3/2005

*18/21*

Meeting with Mr. Duckworth.

List of issues

- Supervisors were not familiar using SAP to record workers' overtime which will get annoyed. There shouldn't be any mistakes on the pay.
    - Extra help is required to entering those data.
- Communication with employee. Currently, there is no way to communicate with employees. It is very difficult to put people together in the meeting.
    - We need to invest some money to put CCTV in the plant, so the president can talk to workers at same time. Cafeteria is also good place. It is budged for 2006.
- Plant objectives. Employees do not understand plant objective other than making cars.
    - We need let workers know that objectives are more than building cars. Quality, quantity, and providing jobs to support their family are also objective. And those plant goal as well
- Executive management needs some strategic plan in coordinated operation.
- Bonus was budged but nothing paid other than blanket.
- Vehicle lease program
- Internal investigation will be done for wrong-doing on executive side. If the rumors (financial payment being made by supplier or other sexual service may be provided) are true, the action must take now.
    - Mitsubishi lost 15 million dollar as well as company reputation over public. We must cut it really fast.
- Managements are not able to get approve regiment expenses. Mostly, it is turn down. This is showing the Company tried to limit the expense by cutting down the benefits.
- Holiday party plan. There was some concern that we may not have holiday party because of budget issue.
- Employee protection demand. There is impression that safety policy secondary in the plant. It is perception issue. To American workers some of the Korean workers are not following the policy even though Korean worker knows what he is doing and this gives impression that supervisor doesn't care about safety. UAW can attack on these issues.
- American manage complains that they have limited authority. They (Director, Senior Manager) say that their signature means nothing. One of the director

*JOHN KALSON*

*19/21*

couldn't send out federal express mail with getting approval by Korean manager.
- We need to work on these

Hyundai Culture must be developed.
- We need to build sense of Unity.

Team unification.
- A team needs to work, think and eat together. They need spend more time together.

- Family enrichment program.
- Family picture at the plant. Hyundai jacket, because in Alabama wearing cloth with where they belong is very important.

- Plant friendly.
- We need to put benches around the plant, so workers can rest. Sports centers such as Softball field and basketball fields. Korean and/or American management must tell workers that we will do these after we make profit. Average workers don't understand when we are going to start making profits. UAW will use this to attack us.

- Flue shot for all employee
- This shows workers that we care and it also helps good attendance.

- Making productive place than fighting against UAW. If we just fight with UVW, we will just end up spending so much money.
- We need integrated program. Give confidence and direction to workers. Care the team member family. Care suppliers because UVW will attack because they are weaker. We must work together and get support from City and State. We need to show that we are here.

- Majority can be solved we act soon. We are still in honeymoon period.

- Food price is too high.
- We need to force vendors to keep price low.

- Enforce rules equally. ➡ *REALLY MAINLY FAIRLY !*
- Workers don't understand if some Korean/American executive park inside of the plant.

- Amount Money to invest.
- We need much to show that we care.

- Salary is currently acceptable at least 2 ~ 3 years.
- Pay is the last reason for workers join the Union. Lack of simple programs such as family program is what force workers to join the Union.

- Bonus is the name we want use. Appreciation is more proper work to use.

*20/21*

- ■ Workers don't understand if line is down because of robotic problem or any machinery problem.
- 401k.
  - ■ We need to meet current industry standard.
- Do it partially over the period of time.
- Mr. Ahn needs to be more visible to workers and all employees. He needs to become like father of the plant.
- Ay negative issue must come from American management side. They must be able say. They need to have authority and responsibility. With strong responsibility, they must take care of their own people.
- HR must coordinate and all others such as HMA, HAC, Mobis, Glovis and etc.

21/21

| Concern | If Left Un-resolved | Recommended Solution |
|---|---|---|
| Control issues are creating an us and them environment | Will hinder the Positive Team Atmosphere that we are trying to create and will create more of an environment that could foster union mentality. | Evaluate and commit to understanding the root cause if. Lack of Trust. (Team Building) Recommend Coordinator roles instead of Direct Management |
| Opinions are not necessarily welcomed and when they are sought, they are typically not implemented or changed. When opinions are requested they are challenged as being wrong i.e. (Calls are made to Bankers, Vendors after things are decided and completed) | Team Members will be reluctant to give opinions or advice.

Feelings from Team Members that they are not trusted | When Team Members present information we can not always challenge. We hired them for their expertise but do not allow them to use it or respect their talents |
| American Leadership feels that they are not well respected or supported or allowed to make decisions. | Team Members will avoid American Managers or go over their heads or worst will not share critical information to support the organization. | Create more Win/Win situations rather than adversarial Win/Loose. Be allowed to make decisions without fear of American managers to win sometime. |
| Team Members are frustrated that policies are still not in place. By not having policies it causes our management to be inconsistent from department to department. | Team Members believe others are being shown favoritism because of inconsistencies. | Approve all policies as soon as possible. So the handbook can be completed, printed, and distributed. |
| Approval process requires too many levels of approval. Once all approvals have been obtained another department has the authority to refuse. | Team Members impression is that HR is the sole decision maker. When we have made a decision and then another department says no they don't agree. The Team Members view us as unreliable. | We must support decisions that have been approved by our executives. |



EXHIBIT

*ıﻼﻟ*

CYRUS   371

| Korean Team Members are not sharing information about business plan. | Causes duplication of work. One department believes it is their responsibility to develop a program only to find out the responsibility is in another department. | Communicate clearly to all departments their area's of responsibility. |
| --- | --- | --- |

**HYUNDAI**

**Hyundai Motor Manufacturing Alabama, LLC**
700 Hyundai Boulevard, Montgomery, AL 36105
TEL: 334-387-8000 FAX: 334-387-8999
www.hmmausa.com

October 24, 2005

Mr. Rob Cyrus
7016 Old Southwick Place
Montgomery, AL  36117

Dear Rob,

In order to ensure clear understanding of the employment differences between HMMA and yourself, as discussed in our business dinner of October 22, 2005, the following information will clarify actions necessary to resolve the issues which were raised.

    a.  Prior to coming back to HMMA, you are directed to make an appointment to further discuss your issues of concern about your employment with HMMA. This appointment should be made with me through Nancy Powers at extension 8164. Please provide two days notice so that I can arrange my schedule.

    b.  During your work absence from HMMA you are not to represent the company in any business negotiations or conduct any company business on behalf of HMMA

    c.  Please note, until your employment relationship can be evaluated, your access card will be temporarily suspended. Please do not remove any items from HMMA premises until we complete further discussions concerning your employment status.

    d.  During your absence, with appropriate medical documentation you will be on medical leave, at which time if because of my schedule we are unable to meet, you will be placed on administrative leave pending consideration and action by the company.

I believe my instructions to you are prudent and will seek to protect all parties in this matter from misunderstanding or mistake.

Sincerely,

M. Keith Duckworth
Deputy President and Chief Administrative Officer

*18*



Hyundai Motor Manufacturing Alabama, LLC
700 Hyundai Boulevard, Montgomery, AL 36105
TEL: 334-387-8000 FAX: 334-387-8999
www.hmmausa.com

Via Federal Express and Certified Mail, Return Receipt Requested

December 6, 2005

Mr. Rob Cyrus
7030 Heathermore Loop
Montgomery, AL  36117

Dear Rob,

Hyundai Motor Manufacturing Alabama, LLC ("HMMA") is exercising its rights under Alabama's employment-at-will doctrine to end your employment with the company at the close of business on December 7, 2005. HMMA will pay your salary and furnish your company car through that date and continue your existing health insurance through December 31, 2005. As you know, your letter of engagement dated May 16, 2002 specifically states that your employment with HMMA is "at will" and may be terminated by either party at any time.

It is with regret that this action is necessary.

In order to help you transition to other employment or endeavors of your choice, HMMA is prepared to offer you a payment equal to twenty-four (24) weeks of your gross salary (minus appropriate legally-required state and federal deductions and tax withholdings) subject to your execution of the attached Separation Agreement and Release, and on the terms set forth therein. Additionally, HMMA will pay you a lump sum amount equal to the current amount of your health insurance premiums for a period of twenty-four (24) weeks. This offer will remain open (subject to the following paragraph) for 21 days in accordance with current law, but may be accepted prior to the expiration of that time. Additionally, by law, you have 7 days within which to revoke your acceptance.

Regardless of your decision, please be advised that HMMA will vigorously enforce the terms and provisions of the Confidentiality Agreement you executed on August 12, 2003, and will pursue its legal remedies in the event of any breach of that agreement. Any violations of that agreement that become known to HMMA prior to your acceptance of the Separation Agreement shall void this offer. Any violations of that agreement after your acceptance of the Separation Agreement shall entitle HMMA to recover any amounts paid to you thereunder.

EXHIBIT
19

- As of the effective date of your separation from employment, you are no longer an authorized operator of HMMA's company-provided vehicle. Please make immediate arrangements to return your car to HMMA by contacting David Colmans in the Vehicle Services Department. Additionally, we will need to promptly collect from you all other HMMA-issued property.

You are encouraged to review this offer with legal counsel of your own choice and at your own expense. Should your legal counsel have questions about this matter, they should be addressed to Mr. Rick Neal, General Counsel, HMMA at 700 Hyundai Blvd, Montgomery, AL 36105, telephone 334-387-8043. If you have any questions, you may direct them to my attention.

I regret that your employment with HMMA was not in concert with your expectations but I sincerely wish you the greatest success in the future.

Sincerely,

M. Keith Duckworth
Deputy President and Chief Executive Officer

CYRUS   830

November 6, 2005

Mr. Keith Duckworth
HMMA Deputy President

Subject: Formal complaint for racial discrimination as written in HMMA policies
   HR-AL-HR-TR-S-00014 and HR-AL-HR-TR-S-00037.

Per your requested dinner meeting held with me on October 22, 2005 as you stated "to
check on how I am doing (health wise), and to see if you could be of any help". I
attended in good faith and actually brought my medical documentation for you to review.
I had over 100 pages of documentation which you glanced at for maybe 30 seconds.

Upon my arrival at the restaurant City Grill I ran into Mr. Michael Hansford and his wife
outside. They were surprised to see me as I had been mostly bed ridden of the past few
weeks. They asked what I was doing here and I said Keith had requested a dinner with
me to check to see if I was doing okay. Michel said he would like to meet Mr. Duckworth
and joined us at our table maybe 10 minutes after I arrived. The discussions about my
medical issues were sidelined until Mr. Hansford could excuse himself as I needed to talk
with Keith about my ongoing medical problems.

While Mr. Hansford was present Keith asked about Mike's experience at HMMA. He
went into some detail on his termination but then the remaining topics switched to
"grilling" Mike I about what we knew about serious ongoing problems at HMMA.
Specifically he asked us if Mr. John Kalson was still sleeping with his past Assistant
Staff. Mike replied that he was confident from trusted sources that this was still taking
place. I did not comment on this issue. Keith then asked about possible prior indiscretions
with Mr. Kalson and a temporary receptionist. Mike again said he had first hand
knowledge of this activity as he was at the event where this supposedly took place.

He asked us of other concerns he had heard of such as "kick-backs". We both said we had
heard simply rumors about Mr. J.H. Kim in with no concrete proof. The conversation
initiated by Keith went on for some time. At this point I asked Mike to please excuse
himself as I needed some time in private with Keith. Mike then left.

Out of the blue Mr. Duckworth said well "Rob the executive management at Hyundai is
upset with you and we would like you to resign". I was flabbergasted. I said what? I don't
understand I wasn't aware of any performance, demeanor or relationships issues. I told
Keith as you may or may not be aware we have no review process for employee
performance after three years with a Human Resources Director and full staff on board. I
asked Keith specifically just who is "executive management". He said President Ahn,
COO H.H. Kim and Rick Neal HMMA in-house General Council.

I told Keith President Ahn has only been at HMMA a few months and speaks very
limited English. Our conversations have been "hello" in the hallways and bathroom. He



**EXHIBIT**

26

CYRUS    825

has never expressed any dissatisfaction with me directly or through any Korean colleagues. As far as Mr. H.I. Kim is concerned my only encounters with him have been in relation to issues with PPG's performance. We can go into excruciating detail on this topic when you wish.

The other quite astounding meeting with H.I. Kim was regarding his unreasonable demand for Murakami to come down to HMMA immediately from Lexington, Kentucky to address a perceived quality problem concerning their outside mirrors. The demanded date was September 16th at HMMA at 10:00 in the Pearl Room.

See my meting minutes provided to President Ahn via Mr. H.J. Hyun.

As the meeting minutes clearly show Mr. H.I. Kim appeared to strangely enraged over our efforts to have the supplier Murakami address the quality concerns and related line stoppage. This was specifically what Murakami was asked to come down for. It was on the agenda for the meeting, all parties attending had copies and in fact H.I. Kim's department wrote the agenda and H.I. Kim proceeded over the meeting.

As my meeting minutes clearly and accurately indicate Mr. H.I. Kim became enraged at Murakami, Mr. J.Y Choi (Director of HMMA Purchasing) and apparently me (Director of HMMA Purchasing / Parts Development) for I could feel his anger even though he only barked in Korean. Mr. J.Y. Choi and I spoke as one voice with the same inflection to simply try to allow Murakami to make their presentation. As Mr. Choi and I later that afternoon discussed our surprised reaction from C.O.O. H.I. Kim to Mr. Jason (Jae Rok) Lee, Mr. J.Y. Choi said repeatedly  stated in English to Jason in my presence that we (Purchasing), (Choi and Cyrus), did absolutely nothing wrong, Mr. Choi was very upset almost crying. We both spoke to H.I. Kim calmly and with respectfully.

Still on September 16th 2005 I receive a call from Mr. Choi approximately 1:30pm. He said that quote "Rob, you and I may be going home early today". I said what? He said H.I. Kim has gone to President Ahn to complain about the Murakami meeting. I said what? What for, he is the one that acted juvenile and unprofessional in his meeting. He said I know we did nothing wrong he (H.I. Kim), should actually apologize to HMMA staff and Murakami.

He told me to leave my present meeting in the plant and come to my desk immediately. I arrived back at my desk approximately 1:45pm. He said H.I. Kim has demanded that Mr. Choi and I write meeting minutes to cover what occurred in the Murakami meeting.

I asked why we had to write meeting minutes. There were 30+ people in the meeting along with the two suppliers, (Murakami and Hwashin), everyone knew what happened. I told him that I had many critical things to finish today and this seems like an unreasonable priority. In the three plus years I have been with Hyundai I had never has such a request.

At this point I went immediately to Mr. Keith Duckworth's office and met with him to discuss this greatly inflated issue. I explained in detail to Keith what had occurred in the meeting. He stated quote "don't worry about it. It's just the Korean's style". I said I don't want a black mark next to my name because of this meeting. He said quote "Again don't give it another thought; everyone knows your good standing at Hyundai". I specifically told him that this was a very hostile environment and was surprised that the now Third set of Executive management sent over form HMC was acting in such a non American type hostile fashion. He said again don't give it another thought your reputation and standing in the company were excellent. I then went back to my desk.

As I continued to work on my scheduled activities for that afternoon I was again called over to Mr. Choi's desk. H.J. Hyun then joined us. Choi now updated me and told me that H.I. Kim has now also phoned President Seo in Korea (HMC) to vent about this one meeting. I discussed this new escalating factor with Mr. Hyun my boss and Mr. Choi my peer. They both agreed fully that we acted in the proper fashion in the meeting and just let his anger try to blow over.

Now I am getting more concerned about this situation and how it appeared to be escalating out of reasonableness.

It was now late in the afternoon on the 16th (9/2005) and I again went over to see Mr. Duckworth. I explained the latest developments and my concern about H.I. Kim's wrath. Keith calmly said "again don't give it another thought; I haven't heard anything about this meeting". I then specifically stated that I don't want any negative repercussions or retaliation from H.I.Kim". Keith then again reassured me that I have nothing to worry about and to forget about it and have a nice weekend. I thanked Keith for his time.

This takes us back to my first paragraph and my surprise dinner requested by Mr. Keith Duckworth.

On the 24th of October 2005 I phoned Mr. J.Y. Choi my peer as Director of Purchasing – Administration. I asked him what ever happened with the H.I. Kim Murakami situation. He said "nothing happened, it is done". I reminded him of his call to me the day of the meeting when he said "Rob, you and I may be going home early today". He acknowledged the conversation. I asked him if he was or will be penalized in any way. He said "no, nothing happens to me, I don't mind about his opinion my boss is in head office (HMC). He said again nothing at all happened to me.

As a current employee of HMMA I wish to formally file a complaint about clear violations of HMMA's policies that protect employees based on race. I the American am asked to resign and my peer Mr. J.Y. Choi (Korean) has had absolutely no penalty, or been asked to resign.
Please follow up on this request to me formally in writing.

Sincerely,
Robert C. Cyrus C.P.M.    HMMA Director of Purchasing Parts Development

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form.

ENTER CHARGE NUMBER
☐ FEPA
X EEOC  420-2006-01267

| NAME | HOME TELEPHONE NO. |
|---|---|
| Robert C. Cyrus | 334-215-1967 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 7030 Heathermore Loop | Montgomery, AL 36117 | Montgomery |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NO. OF EMPLOYEES/MEMBERS | TELEPHONE NUMBER |
|---|---|---|
| Hyundai Motor Manufacturing Alabama LLC | SEVERAL HUNDRED 500 + | 334-387-8000 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| 700 Hyundai Blvd., Montgomery, AL 36105 | |

| CAUSE OF DISCRIMINATION BASED ON | DATE MOST RECENT OR CONTINUING DISCRIMINATION TOO PLACE |
|---|---|
| Race, National Origin and Retaliation | 12/6/05 |

THE PARTICULARS ARE:

I am a white American. I was employed at HMMA. Prior to October 22, 2005, I had no problems in my position at HMMA. My position with HMMA was director of purchasing. In September I had met with Mr. Duckworth and reported issues of Koreans discriminating against Americans, sexual harassment and Koreans involved in workplace violence. I had no difficulty with anyone except on one occasion in September, 2005. I and my Korean counterpart Mr. J. Y. Choi went to a meeting where Mr. H. I. Kim became enraged at some visitors. Mr. J. Y. Choi, also director of purchasing at HMMA, but a Korean, and I both spoke to have Mr. Kim allow the visitor to make their presentation. Later that afternoon Mr. Choi told me in front of Mr. Lee, another Korean that we had done nothing wrong. Mr. Choi told me that Mr. Kim had gone to President Ahn, another Korean, complaining about the meeting. I then spoke with Mr. Duckworth, an American, who is Deputy President of HMMA. Mr. Duckworth assured me that I had nothing to worry about, it was just the Korean's style. He said my reputation and standing with the Company were excellent. However, on October 22, 2005, with nothing in the intervening period, Mr. Duckworth called me to a meeting away from work and asked me to turn in my resignation stating that President Ahn and Mr. Kim were upset with me and would like for me to resign. I asked Mr. Choi after this meeting with Mr. Duckworth, Mr. Choi said nothing happened to him. I wrote a letter to President Ahn, Mr. Duckworth, and Mr. Kim, the director of Human Resources of HMMA complaining about race discrimination on November 6, 2005. On December 6, 2005, I received a letter from Mr. Duckworth terminating my employment at HMMA. Between the time of my meeting with Mr. Duckworth on October 22, 2005, and my termination on December 6, 2005, I was not allowed to return to my regular duties. I believe that my termination was based on race and National Origin and that I am a American and a Korean, who did exactly what I did, was in the exact same position that I was, received no adverse employment action. Furthermore, the individual requesting my resignation were identified as the Korean President and Korean Chief Operating Officer of HMMA.

I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

| I declare under penalty of perjury that the foregoing is true and correct. | ATTORNEY FOR THE CHARGING PARTY: |
|---|---|
| MARCH 2, 2006 | Richard J. Stockham, III |
| Date | Stockham, Carroll & Smith, P.C. |
| | 2204 Lake Shore Drive, Suite 114 |
| Charging Party (Signature) | Birmingham, AL 35209 |
| | Telephone (205) 879-9954 |

Copy of EEOC FORM 5

EXHIBIT
21

0036

# CYRUS DECLARATION

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ROBERT CYRUS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No.: 2:07-cv-144-ID |
| | ) | |
| HYUNDAI MOTOR | ) | |
| MANUFACTURING OF | ) | |
| ALABAMA LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF ROBERT CYRUS

1.     My name is Robert Cyrus and I have personal knowledge of the following facts:

2.     I have reviewed the Declaration of Keith Duckworth filed in this case. There are several assertions of fact which he makes in that Declaration which are not true. In ¶ 4 of his Declaration Mr. Duckworth says that on the day of the Murakami meeting, September 16, 2005, that I spoke with him only briefly. This is not true. I spoke with him on two separate occasions and discussed extensively what occurred in the Murakami meeting. The first time I met with him I explained how Mr. Choi had told me that Mr. H.I. Kim was angry and suggested we were going to be terminated. I told him that Mr. Choi and I had done nothing wrong. I described at length what occurred in the meeting.

3.     I told Mr. Duckworth that I considered the environment to be hostile because of the yelling and the throwing paper that Mr. H. I. Kim had done. I informed Mr. Duckworth that I was concerned because I had heard of Mr. Kim's reputation for vindictiveness. Mr. Duckworth told me that everyone at HMMA thought the world of me, that I was doing an excellent job, and that he had not heard of any complaints from anyone about me. Mr. Duckworth's Declaration suggest that when

he told me that he was not aware of any complaints that it was limited to complaints about the things that occurred in the Murakami meeting that day. This is not what Mr. Duckworth told me. He told me that there had been no complaints about me that he was aware of from anyone, he assured me that my job was secure, and not to be concerned. Later that afternoon I again met with Mr. Choi and he told me Mr. Kim had not only complained to President Ahn, but had also called Korea and talked to the President of Quality in Korea. I was told to write meeting minutes for the Murakami meeting. I had never been asked to write meeting minutes before during my entire time at HMMA. Mr. Choi and I met with Mr. Jason Lee, the Chief Financial Officer for HMMA and explained what happened. Mr. Choi had cried in that meeting, telling Mr. Lee that he and I had done nothing wrong, and that it was Mr. Kim who should apologize. Mr. Lee told us he was going directly to discuss the matter with President Ahn. I then went and explained all of these things to Mr. Duckworth that afternoon. I told him things appeared to be escalating and that I was concerned about retaliation from Mr. Kim because of his reputation. Mr. Duckworth again reassured me that nothing would come of the matter, that this was just the Hyundai style.

4.    Mr. Duckworth asserts in ¶ 5 that he was informed in a meeting in October with President Ahn that I argued with officials from the Quality Assurance Department in front of the outside supplier as to the correctness of their actions in assessing a down time penalty against the supplier. He states that he was informed that I made several inappropriate comments in the meeting; including telling Mr. Susock that "that's bullshit" in response to a statement by Mr. Susock and making a remark to Mr. Kalson challenging Mr. Kalson's competency by comparing manufacturing processes at Hyundai to those of Toyota. Mr. Duckworth states that I had questioned the judgment of Mr. Kim in the meeting. I did not do any of those things and Mr. Duckworth never raised any

2

of these points with me though he knew that I had told him that Mr. Choi and I had done nothing wrong when I explained what had happened.

5.      With respect to ¶ 6 of Mr. Duckworth's Declaration, he says that he received reports of deterioration in relationships between me and members of my staff and that I was engaging in adversarial or antagonistic behavior in the department. On the contrary, when I spoke with Mr. Duckworth on the afternoon of September 16, 2005, he told me that he had not heard of any complaints from anyone and that I was doing an excellent job and that everyone thought the world of me. After Friday, September 16, 2005, I was out of work until the week of October 2, and then I worked much of that week, and then was off again because of problems regulating my heart mediation. So before the Murakami meeting on September 16, 2005, based on what Mr. Duckworth told me that day, there were no complaints about me whatsoever by anyone that he knew of, and I worked less than a week after that before Mr. Duckworth told me the company wanted my resignation. So Mr. Duckworth's statement that he had become aware of other problems with my behavior "in recent months" was contradicted by what he said to me.

6.      Mr. Duckworth also states that he was present during an incident at an executive directors' meeting in which I verbally berated a fellow executive named Kenny Song. This is not true. Mr. Song had not been using the SAP system which the company had paid ten million dollars to coordinate the efforts of all the different departments. I requested that he put his requests in via the SAP system. I was very polite. Mr. Song agreed and said that he would comply. After that meeting I had a meeting with Mr. Duckworth in which I discussed the problems with Mr. Song's failure to use the SAP system and the problems it caused for my department. Mr. Duckworth did not mention that there was anything wrong with the way I acted in the meeting with Mr. Song. Mr.

3

Duckworth did not mention that there was any embarrassment expressed to him by Mr. Song, that he observed, or that there was anything wrong with the way that I behaved. On the contrary, Mr. Duckworth told me he would address the matter so that Mr. Song used the SAP system. On September 16, when he told me he was not aware of any problems with anyone he did not say that there was any complaint by Mr. Song or about that incident.

7.    With respect to ¶ 8 of Mr. Duckworth's Declaration, he states that for approximately one hour Mr. Hansford criticized HMMA's relationship with its suppliers and complained about his termination. This is not true. The conversation with Mr. Hansford lasted so long only because Mr. Duckworth quizzed both Mr. Hansford and me extensively about matters that went on at HMMA.

8.    In ¶ 9 of his Declaration Mr. Duckworth states that after Mr. Hansford departed, he addressed performance issues with me. That is not true. Mr. Duckworth never mentioned my performance or issues regarding my performance during that dinner meeting. Mr. Duckworth, in his Declaration, states that he advised me that there was concern over my attitude and the adversarial and antagonistic way in which I had conducted myself recently. Mr. Duckworth said nothing about any adversarial or antagonistic way in which I had conducted myself. Nor did he ask me to comment on these issues. On the contrary, Mr. Duckworth informed me that executive management wanted me to resign and I asked him who. He told me Mr. H.I. Kim, President Ahn, and Rick Neal. I told him he could call Rick Neal right then because Mr. Neal was a friend. Mr. Duckworth said no, it was not Mr. Neal. I asked him if there was anything I could do and he told me no. He said that the decision had already been made. He told me that he, himself had nothing to do with the decision to ask for my resignation. When Mr. Duckworth asserts that he made the decision to terminate my employment, this directly contradicts what he told me at the restaurant. Based on what he told me

4

it was Mr. H. I. Kim and President Ahn who made the decision to terminate me.

9.      In ¶ 11, Mr. Duckworth states that I never made any complaints of discrimination or harassment during our conversations about the Murakami meeting. However, I did tell him that I thought that it was a hostile environment and that I was afraid I would be retaliated against.

10.     Mr. Duckworth states that the only concern I raised with respect to Mr. Kim during the meetings with him on September 16, 2005, was that I believed that Mr. Kim was a "prima donna" with a bad temper and that Mr. Kim did not like the fact that I questioned his judgment. I did not say that I thought Mr. Kim was a "prima donna" to Mr. Duckworth. Nor did I tell him that Mr. Kim did not like the fact that I had questioned his judgment.

11.     With respect to ¶ 13 of Mr. Duckworth's Declaration he states that I had not raised any comparison between Mr. Choi's behavior and my behavior at the Murakami meeting prior to my formal complaint on November 10, 2005. This is not true. I told him on September 16, 2005, that Mr. Choi had said that because of our conduct during the Murakami meeting that we, Mr. Choi and I were going to be sent home early, that is, we were going to be terminated. I told him we, Mr. Choi and I, had done nothing wrong when I had described what Mr. Choi and I had done.

Pursuant to 28 U.S.C. §1746 I declare under penalty of perjury that the foregoing information contained in this Declaration is true and correct executed this the 9TH day of February, 2008.

_____
Robert Cyrus

5

# CYRUS SUPPLEMENTAL DECLARATION

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| ROBERT CYRUS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )     Civil Action No.: 2:07-cv-144-ID |
| | ) |
| HYUNDAI MOTOR | ) |
| MANUFACTURING OF | ) |
| ALABAMA LLC, | ) |
| | ) |
| Defendant. | ) |

### SUPPLEMENTAL DECLARATION OF ROBERT CYRUS

1.     My name is Robert Cyrus and I have personal knowledge of the following facts:

2.     I have reviewed the transcript of the taped conversation with Mr. J. Y. Choi and compared it with the tape of the conversation. The transcript is incomplete. In particular on the transcript of tape #1, telephone conversation # 7, page 22, line18 to page 23 line 8 the it says:

| Page 22 | 18 | ROB CYRUS; remember when you |
|---|---|---|
| | 19 | called me that first day and you said, you |
| | 20 | know, Rob, you and I may have the |
| | 21 | afternoon off early, HI Kim is very upset? |
| | 22 | So did they - - are you scared you're going |
| | 23 | to lose your job, or did they say anything |
| Page 23 | 1 | about that? |
| | 2 | MR. CHOI:  No, I don't |
| | 3 | think - - because (*inaudible*). |
| | 4 | ROB CYRUS:  So, I mean, there |
| | 5 | has been - - you know, is he upset with you |
| | 6 | now or - - |
| | 7 | MR. CHOI: I don't mind about |
| | 8 | his opinion. (*Inaudible*). |

3.     The place in line 3, page 23 which says (*inaudible*) is, in fact, understandable. Where the transcribt says (*inaudible*) Mr. Choi can be heard to say: " it is not my boss, different boss." The place in line 8, page 23 which says (*Inaudible*) is also understandable. Where the transcribt says (*Inaudible*) Mr. Choi can be heard to say: "My boss is controlled by head office."

4.     So the correct transcript should read:

| Page 22 | 18 | ROB CYRUS; remember when you |
| | 19 | called me that first day and you said, you |
| | 20 | know, Rob, you and I may have the |
| | 21 | afternoon off early, HI Kim is very upset? |
| | 22 | So did they - - are you scared you're going |
| | 23 | to lose your job, or did they say anything |
| Page 23 | 1 | about that? |
| | 2 | MR. CHOI:  No, I don't |
| | 3 | think - - because it is not my boss, different boss. |
| | 4 | ROB CYRUS:  So, I mean, there |
| | 5 | has been - - you know, is he upset with you |
| | 6 | now or - - |
| | 7 | MR. CHOI: I don't mind about |
| | 8 | his opinion. My boss is controlled by head office. |

5.     With respect to ¶ 13 of Mr. Duckworth's Declaration he states that I had not Pursuant to 28 U.S.C. §1746 I declare under penalty of perjury that the foregoing information contained in this Declaration is true and correct executed this the _____ day of February, 2008.

_____
Robert Cyrus

# HMMA'S RESPONSE TO PLAINTIFF'S EEOC CHARGE DATED 6-15-06



**Ogletree**
**Deakins**
ATTORNEYS AT LAW

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

One Federal Place
1819 Fifth Avenue North, Suite 1000
Birmingham, Alabama 35203-2118
Telephone: 205.328.1900
Facsimile: 205.328.6000
www.ogletreedeakins.com

Brian R. Bostick
Direct Dial: (205) 714-4433
Email: brian.bostick@odnss.com

June 15, 2006

**VIA HAND DELIVERY**
Veneda K. Jordan
Enforcement Supervisor
U.S. Equal Employment Opportunity Commission
Birmingham District Office
Ridge Park Place
1130 22nd Street South, Suite 2000
Birmingham, AL 35205

|       | Re:  | Charging Party:  | Robert Cyrus |
|-------|------|------------------|--------------|
|       |      | EEOC Charge No.: | 420-2006-01267 |
|       |      | Respondent:      | Hyundai Motor Manufacturing Alabama, LLC |

Dear Ms. Williams-Kimbrough:

Our firm represents Hyundai Motor Manufacturing Alabama, LLC ("HMMA") in the above-referenced matter. The charging party is Robert Cyrus, a Caucasian male. This letter sets forth HMMA's Statement of Position regarding Mr. Cyrus' allegations of race and national origin discrimination and retaliation.[1]

---

[1] This Statement of Position and documents attached herewith are submitted to assist the Equal Employment Opportunity Commission ("EEOC") in its investigation of this Charge of Discrimination and to facilitate the resolution of this matter at the earliest possible stage to minimize the needless expense to HMMA. By responding to the Charge, HMMA does not waive any of its rights, contentions, or defenses. Also, HMMA does not consent to the use of this Statement of Position and documents being attached herewith in any adjudicatory proceeding.

The information contained in this response is confidential. It should not be divulged to anyone other than the necessary EEOC representatives involved in this investigation without the express written consent of HMMA. See 29 C.F.R. § 1601.22.

This Statement of Position is based upon information presently known to HMMA and is subject to supplementation or modification if additional information becomes known to it and the need for supplementation or modification arises or is warranted. Further, HMMA is not in possession of other information set forth in the Charge other than what is set forth in the Notice of Charge and the accompanying documents. If any additional evidence exists that Mr. Cyrus contends supports his allegations of discrimination, we request that you provide this information to us for our review and consideration.

---

**0381**

Veneda K. Jordan
Re: Robert Cyrus, Charge No: 420-2006-01267
June 15, 2006
Page 2



Mr. Cyrus alleges that HMMA discriminated against him on the basis of his race and national origin and retaliated against him in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* (hereinafter "Title VII"), with respect to his termination. His claims are completely without merit. HMMA strongly denies Mr. Cyrus' allegations. HMMA is firmly committed to treating all job applicants and employees equally without regard to race, religion, national origin, sex, age, disability, or any other protected characteristic or activity. Attached as Exhibit A is a copy of the HMMA Harassment Policy.

## I.    BACKGROUND INFORMATION

### A.    Hyundai Motor Manufacturing Alabama, LLC

HMMA operates an automobile manufacturing facility in Montgomery, Alabama that produces the Hyundai Sonata and Santa Fe automobiles. HMMA's facility includes a stamping shop, a welding shop, a paint shop, a general assembly shop, a two-mile test track, and an engine shop, where Hyundai's 3.3-liter V6 engines are produced.

HMMA currently employs over 2,700 Team Members. HMMA prides itself on establishing and maintaining a diverse workplace, and it is committed to providing a work environment that is free from discrimination and unlawful harassment and retaliation.

### B.    Mr. Cyrus' Employment With HMMA

Mr. Cyrus was employed by HMMA from September 1, 2002, until December 7, 2005. Between May 22, 2002 and September 1, 2002, Mr. Cyrus was employed by Hyundai Motor America ("HMA").[2] Mr. Cyrus worked as the Director of Purchasing – Parts Development for HMMA. At the time of his initial hiring by HMA in May of 2002, HMMA was still in its formative stages. He was initially interviewed and hired as an employee of HMA by Mr. Keith Duckworth (Caucasian Male), Vice President of Administrative Services for HMA, with the intention of being transferred to HMMA at a future date when HMMA was more established. Mr. Duckworth is currently the Deputy President and Chief Administrative Officer of HMMA, while also maintaining duties and responsibilities at HMA, including those of Acting Chief Operating Officer.

As Director of Purchasing – Parts Development, Mr. Cyrus was responsible for negotiating with outside vendors to obtain contracts for the purchase of all parts that would be necessary for the production of automobiles at HMMA's plant. As an executive of HMMA and a member of senior management, Mr. Cyrus had a fiduciary

---

Finally, because the undersigned represents HMMA in this matter, any and all future contact, including questions, requests and notifications regarding the Charge of Discrimination should be made with the undersigned.

[2] HMMA is a single member Delaware limited liability company. The single member of HMMA is Hyundai Motor America, a California corporation.



duty and an obligation of loyalty to serve the best interests of HMMA.[3]  In his job, Mr. Cyrus and company representatives would constantly engage in "arms length" negotiations with outside vendors and suppliers.  As with any business negotiations, it is important for the company representatives to present a unified position when negotiating and dealing with other parties.  This is especially true in the competitive automobile industry in which it is imperative for automobile manufacturers to obtain the best quality parts for the lowest possible price.

### C.    Mr. Cyrus' Unprofessional and Adversarial Attitude During the September Supplier Meeting

In his EEOC charge Mr. Cyrus references a meeting with a supplier that took place in September of 2005.  HMMA had called the meeting with the supplier (*i.e.* Murakami Manufacturing Company) to discuss the quality control issue of buff marks and bag marks that were appearing on several of the outside mirrors that Murakami was producing for HMMA.

Murakami representatives advised that low light levels in the plant prevented their operators from seeing the "buff" marks and that the lighting levels in the Murakami plant had been increased to attempt to resolve the issue.  When HMMA officials voiced their concern over such a basic quality issue, Mr. Cyrus began to argue *against* the other HMMA officials in front of the Murakami representatives about issues unrelated to the "buff" mark issue.  Mr. Cyrus then claimed that scratch marks were being caused by Glovis Alabama ("Glovis"), the operator of the parts consolidation warehouse.  He continued to take an adversarial stance against HMMA by arguing *against* other HMMA officials (in front of the Murakami representatives) that HMMA was wrong in charging Murakami for downtime in HMMA's plant that HMMA contended was caused by the receipt of faulty product from Murakami.  When one of HMMA's officials stated that Murakami's products were, in fact, the cause for the downtime in the plant, Mr. Cyrus said "that's bullshit."  At another point during the meeting, Mr. Cyrus disrespectfully informed HMMA's Director of Production, again in front of the supplier, that Cyrus could "teach [him] something about production systems."

During the meeting, Chief Operating Officer H.I. Kim, who was chairing the meeting, attempted several times to bring the focus of the meeting back to the issue at hand (*i.e.* buff marks and bag marks caused by Murakami's quality control issues and packaging), but Mr. Cyrus insisted upon directing the focus of the meeting to other issues, consistently taking positions contrary to other HMMA officials, including the Chief Operating Officer.  Mr. Kim ultimately ended the meeting because of Mr. Cyrus' continued efforts to divert the focus of the meeting from its true purpose, as well as his

---

[3] "It is an agent's duty to act, in all circumstances, with due regard for the interests of his principal, and to act with the utmost good faith and loyalty." Allied Supply Co. v. Brown, 585 So.2d 33, 36 (Ala. 1991)(citing Williams v. Williams, 497 So. 2d 481 (Ala. 1986)).



attempts to side with the supplier on these quality issues against the best interests of HMMA. In fact, Mr. Kim was so exasperated with Mr. Cyrus' conduct and his failure to adhere to the agenda for the meeting that it was reported that he stated in Korean to other Korean HMMA officials in the meeting: "How can I run this meeting when my own Purchasing [Department] is siding with suppliers on the quality issue?"

Contrary to Mr. Cyrus' statement in his Charge, Mr. J.Y. Choi, Director of Purchasing & Procurement, did not engage in similar adversarial and disruptive behavior at the meeting. Mr. Cyrus was only HMMA official engaging in this type of behavior. Indeed, Mr. Choi initially made the points he wished to make in a controlled and very polite manner, and in Korean, to one of his Korean colleagues in HMMA's Quality Control Department. One of those points was the scratches allegedly being made by Glovis during Glovis' handling and processing of the Murakami mirrors to put them in sequential order for line-side delivery. Mr. Choi was immediately chastised by Mr. Kim, in Korean, for this remark and was told that the scratching issue was not the purpose of this meeting and that those issues should be resolved directly between HMMA and Glovis at a working level meeting. Mr. Choi immediately ceased any further mention of that issue.

Mr. Cyrus, however, despite being advised on more than one occasion that the purpose of the meeting was the Murakami's quality issues, did not cease. He continued to advance the position of Murakami in a manner contrary to the interests of HMMA. It was at this point that one of the Murakami representatives jumped up, grabbed two mirrors, slammed them together causing scratches to the paint, and threw them on the table, saying "that is what Glovis does." The Murakami representative added, "HMMA has asked us to come here and speak and we are going to speak about what we want to speak about!" At this point, Mr. Kim became very angry at this unprofessional outburst from the supplier. When Mr. Cyrus continued to side with the supplier and argue against other HMMA officials about the causes of the quality issues and the responsibility for down time on HMMA's production line, Mr. Kim ended the meeting.

### D.    Mr. Duckworth Attempts to Address Performance Issues with Mr. Cyrus

As a result of concerns over Mr. Cyrus' behavior (such as the actions in the Murakami meeting, another incident in which Mr. Cyrus sought to embarrass a fellow executive at an Executive Directors Meeting, and reports from Mr. Cyrus' co-workers of his antagonistic behavior), Mr. Duckworth decided to meet with Mr. Cyrus to advise him of HMMA's concerns and to inquire as to his feelings on the matter.[4] This meeting took place on Saturday October 22, 2005. There was some delay in the occurrence of this conversation because Mr. Cyrus was out on paid medical leave for an extended period of time. Mr. Duckworth hoped to discuss his concerns with Mr. Cyrus and get a positive

---

[4] By this time, Mr. Duckworth was working as HMMA's Deputy President and Chief Administrative Officer.



response from Mr. Cyrus that he was willing to work to improve his attitude. That did not happen.

Mr. Duckworth contacted Mr. Cyrus by telephone on Saturday, October 22, 2005, and advised him that HMMA was concerned about the deterioration of his work performance as attributable to his attitude, and asked Mr. Cyrus if they could meet for dinner to discuss the company's concerns. Mr. Duckworth met with Mr. Cyrus for dinner at a restaurant called the "City Grill" on that Saturday night. Upon his arrival, Mr. Duckworth met Mr. Cyrus and they sat at the table together. They were immediately met by Michael Hansford, who was unknown to Mr. Duckworth, but who greeted Mr. Cyrus in a friendly and familiar manner. Mr. Hansford is a former HMMA employee who was discharged after the company learned that he falsified information on his employment application regarding his education. Mr. Cyrus and Mr. Hansford then spent the next hour complaining to Mr. Duckworth about numerous problems they perceived as existing at HMMA. Specifically, they complained that American managers at HMMA were "spineless," they claimed that HMMA was not worthy of the trust of its suppliers, and they raised issues regarding any scandalous rumors that they had heard at HMMA. It became apparent to Mr. Duckworth that Mr. Cyrus and Mr. Hansford had pre-planned to "ambush" him with their numerous attacks on HMMA.

Mr. Hansford eventually left the table, and Mr. Duckworth was finally allowed to address the performance issue for which the dinner meeting was called. Mr. Duckworth advised Mr. Cyrus that there was concern over his attitude and the adversarial and antagonistic way in which he had been conducting himself recently. Mr. Duckworth asked Mr. Cyrus what he thought about these issues, and Mr. Cyrus refused to acknowledge that there were any problems with his attitude, and argued that there was a conspiracy at work to see him terminated. Mr. Duckworth concluded that Mr. Cyrus was unwilling to try to improve his attitude. It was apparent to Mr. Duckworth that Mr. Cyrus was very unhappy with HMMA and his unhappiness was reflected in his attitude, which prevented him from being a productive member of senior management. Rather than having all members of senior management pulling in the same direction toward a common goal, Mr. Cyrus was often pulling in the opposite direction, to the detriment of the organization.

Although the decision had been made in October that Mr. Cyrus should be discharged, HMMA allowed Mr. Cyrus to exhaust his medical leave before terminating his employment. Mr. Cyrus attempted to return to work on December 6, 2005. By letter dated December 6, 2005, Mr. Duckworth advised Mr. Cyrus that HMMA was exercising its rights under Alabama's employment-at-will doctrine to end his employment relationship, effective at the close of business on December 7, 2005.[5]

---

[5] Mr. Cyrus alleges in his EEOC charge that "[b]etween the time of my meeting with Mr. Duckworth on October 22, 2005, and my termination on December 6, 2005, *I was not allowed* to return to my regular duties." (emphasis added). However, this is simply not true. Mr. Cyrus was out of work on extended paid medical leave **continuously** from October 22, 2005 through December 5, 2005, and did not even *attempt* to report back to work during that period.



**Ogletree Deakins**
ATTORNEYS AT LAW

---

E.    **HMMA Promptly Investigates the Matters Raised by Mr. Cyrus**

HMMA encourages all of its Team Members to report allegations of harassment. All reports of harassment are promptly and thoroughly investigated. HMMA's company philosophy also opposes retaliation. HMMA has an express policy that protects Team Members against retaliation. Specifically, paragraph 2 of HMMA's Harassment Policy states as follows: "HMMA will not retaliate against any Team Member who makes a good faith report of alleged harassment, even if the Team Member was in error." <u>See</u> Exhibit A.

Under HMMA's Harassment Policy, Mr. Cyrus had an obligation to bring forward any complaints of any alleged discriminatory behavior to the appropriate officials as soon as he has any notice of such an issue.

Mr. Cyrus obviously was not legitimately concerned about any of the conduct about which he complained to Mr. Duckworth because several of the issues he complained about had taken place long before their meeting, and Mr. Cyrus only raised these issues in response to being made aware that there were concerns with his attitude and job performance. Despite the fact that Mr. Cyrus was insincere in raising these issues, Mr. Duckworth nonetheless followed HMMA's anti-harassment policy and reported these issues to the HMMA Legal Department. Some of the issues he raised were old and had already been investigated and handled by HMMA. To the extent that new issues were raised, HMMA promptly investigated those new issues and took appropriate remedial action where required.

Mr. Cyrus filed his EEOC charge in March of 2006. He filed a state court lawsuit asserting employment claims against HMMA in May of 2006.

II.    <u>**DISCUSSION OF CHARGE**</u>

A.    **Mr. Cyrus Has No Proper Comparator Evidence**

To establish a *prima facie* case of disparate treatment based on race or national origin, an employee must show: (1) he is a member of a protected class; (2) he was qualified for the position or entitled to the benefit sought; (3) he was subjected to an adverse employment action; and (4) the employer treated similarly-situated employees outside the class more favorably.[5] <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 804 (1973); <u>Holifield v. Reno</u>, 115 F.3d 1555, 1562 (11th Cir. 1997).

---

[5] The Eleventh Circuit Court of Appeals has adopted a variation of the fourth prong. <u>See, e.g.</u>, <u>Weaver v. Casa Gallardo, Inc.</u>, 922 F.2d 1515, 1525 (11th Cir. 1991)(holding employee claiming he was discharged because of his race may satisfy the fourth prong by showing that his position was filed by a non-minority); <u>Morris v. Emory Clinic, Inc.</u>, 402 F.3d 1076, 1082 (11th Cir. 2005)(holding employee claiming age discrimination may satisfy prong by identifying an individual who replaced him or was treated better than he who was not a member of a protected class).



Mr. Cyrus cannot establish the fourth requirement of McDonnell Douglas (*i.e.*, the employer treated similarly-situated employees outside the class more favorably). Employees are similarly situated when they are involved in similar misconduct yet disciplined in different ways. Jones v. Firestone Tire & Rubber Co., 977 F.2d 527, 537 (11th Cir. 1992). "The most important factors in the disciplinary context . . . are the nature of the offenses committed and the nature of the punishment imposed." Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1259 (11th Cir 2001), cert denied, 535 U.S. 1013 (2002). The burden is on the employee (*i.e.*, Mr. Cyrus) to show the similarity between his conduct and that of other employees who were treated differently, and not on the employer to disprove their similarity. Jones v. Gerwens, 874 F.2d 1534, 1541 (11th Cir. 1989).

As discussed above, Mr. Cyrus' assertion in his Charge that "a Korean, who did exactly what I did, was in the exact same position that I was, received no adverse employment action" is utterly and completely false. As has been demonstrated above, the language, behavior and attitude that Mr. Cyrus used and exhibited during the September supplier meeting was far different from the language, behavior and attitude used and exhibited by Mr. Choi. The difference was stark. Mr. Cyrus was loud, profane and disrespectful. Mr. Choi was quiet, controlled and respectful. Further, unlike Mr. Cyrus, Mr. Choi followed Mr. Kim's instruction to cease discussing issues separate from the quality control issue for which the meeting had been called. Thus, Mr. Cyrus cannot meet his burden of showing the similarity between his conduct and that of Mr. Choi See Silvera v. Orange County School Bd., 244 F.3d 1253, 1258 (11th Cir. 2001)(holding that plaintiff is required to show the comparator's misconduct is nearly identical to the plaintiff's in order "to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges").

**B.    HMMA Had Legitimate, Non-Discriminatory and Non-Retaliatory Reasons for Terminating Mr. Cyrus' Employment**

Assuming Mr. Cyrus could establish his *prima facie* case, HMMA had legitimate, nondiscriminatory and non-retaliatory reasons for his discharge. See Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981); McDonnell Douglas, 411 U.S. at 803. Specifically, HMMA terminated Mr. Cyrus' employment because he displayed poor judgment for a member of senior management and an unprofessional, antagonistic and adversarial attitude in the workplace.[6]

Mr. Cyrus implicitly acknowledges in his EEOC Charge that he had engaged in unprofessional behavior at the September 2005 meeting, in that, he was apparently concerned about the possibility of being discharged immediately after the September meeting with the Murakami representatives. An employer may legitimately discharge an

---

[6] Mr. Cyrus' implication in his EEOC charge that the supplier meeting in September was the sole determining factor resulting in Mr. Cyrus' discharge from employment at HMMA is simply not correct. It was, however, indicative of Mr. Cyrus' adversarial and combative attitude and behavior.



employee who displays a poor attitude or who seeks to engage in adversarial and antagonistic behavior with his co-workers. See Herron v. DaimlerChrysler Corp., 388 F.3d 293, 301 (7th Cir. 2004) (holding that "volatile behavior and poor attitude" was a legitimate, nondiscriminatory reason for termination, and that the plaintiff could offer no evidence to prove that reason was pretext for unlawful discrimination). Indeed, an employee can be discharged for antagonistic behavior that involves opposition to discriminatory behavior (which did not occur here). See Rollins v. Florida Dept. of Law Enforcement, 868 F.2d. 397, 399-401 (11th Cir. 1989) (court balanced "the purpose of [Title VII] and the need to protect individuals asserting their rights thereunder against an employer's legitimate demands for loyalty, cooperation, and a generally productive work environment," and held the plaintiff's numerous prior complaints fell outside the protection of Title VII's anti-retaliation provision because, among other things, of the "insubordinate and antagonistic manner" by which the plaintiff expressed her opposition to her employer's conduct).

### C.     Mr. Cyrus Cannot Show that HMMA's Legitimate, Non-Discriminatory and Non-Retaliatory Reasons for Discharging His Employment Are Pretextual.

The facts surrounding Mr. Cyrus' discharge clearly show that race, national origin, or retaliation had absolutely no bearing on HMMA's decision to discharge him. Notably, Mr. Duckworth (a Caucasian male), Acting COO of HMA and Deputy President & Chief Administrative Officer of HMMA, is the person who both hired Mr. Cyrus at HMA and terminated Mr. Cyrus' employment with HMMA. Mr. Duckworth hired him, believing him qualified and suitable for the position. Mr. Duckworth fired him when it became apparent that Mr. Cyrus was either unwilling or unable to conform his attitude and behavior to the behavior expected from a member of senior management. No reasonable person could conclude that Mr. Duckworth would hire Mr. Cyrus into this executive position if his true intention was to later discriminate against him on the basis of race or national origin. See Williams v. Vitro Services Corp., 144 F.3d 1438, 1443 (11th Cir. 1998) (holding that it is permissible for Courts to draw an inference of non-discrimination when the alleged discriminator was the same person who previously hired the plaintiff).

Further, the anti-discrimination laws do not allow Mr. Cyrus to manufacture a retaliation claim by making complaints only in response to learning that his job is in jeopardy. Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir.) ("Although contesting an unlawful employment practice is protected conduct, the anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the workplace."), cert. denied, 528 U.S. 818 (1999); Mason v. Huttig Sash & Door Co. Ret. Plan for Salaried Employees, 26 Fed. Appx. 531, 535 (6th Cir. 2004) (plaintiff could not show causal connection between his complaint and discharge where he had already been notified that his job was in jeopardy before making any complaints). This was obviously the case given that many of Mr. Cyrus' complaints involved issues

Veneda K. Jordan
Re: Robert Cyrus, Charge No: 420-2006-01267
June 15, 2006
Page 9



that he had apparently been aware of for a long time but had made no effort to complain about until he was advised that there were concerns over his job performance.

A Charging Party "is not allowed to recast an employer's proffered nondiscriminatory reason or substitute his business decision for that of the employer." Chapman, 229 F.3d at 1030. Thus, "[p]rovided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarrelling with the wisdom of that reason." Id. The fact that Mr. Cyrus may disagree with whether his employment should have been terminated is immaterial.

## III.    CONCLUSION

For the foregoing reasons, HMMA asserts that Mr. Cyrus has failed to show that he was subjected to a violation of Title VII or any other federal or state laws. Because Mr. Cyrus was discharged for legitimate non-discriminatory reasons unrelated to his race, national origin, or any supposed retaliatory reason, his charge must be dismissed.

Please let me know if you have any questions or if I can be of further assistance.

Sincerely,

Ogletree, Deakins, Nash, Smoak & Stewart, P.C.

Brian R. Bostick

BRB/clc
Enclosure

0389