IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| ROBERT CYRUS,<br><br>    Plaintiff,<br><br>v.<br><br>HYUNDAI MOTOR<br>MANUFACTURING ALABAMA, LLC,<br><br>    Defendant. | Case No.:  2:07-cv-00144-ID-TFM |

**DEFENDANT'S REPLY BRIEF IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

Timothy A. Palmer
J. Trent Scofield
Brian R. Bostick
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART
One Federal Place, Suite 1000
1819 5th Avenue North
Birmingham, Alabama 35203
(205) 328-1900 Telephone
(205) 328-6000 Facsimile

Attorneys for Defendant
Hyundai Motor Manufacturing
Alabama, LLC

## **TABLE OF CONTENTS**

I. ARGUMENT .................................................................................................................. 1

    A. Cyrus' Discrimination Claims Must Be Dismissed ................................................ 2

        1. Cyrus Has Failed to Show That J.Y. Choi is a Proper Comparator ............. 2

        2. Cyrus Has Failed to Prove That the Reasons for His Termination Are Pretextual ....................................................................................................... 5

            a. Cyrus Cannot Dispute the First Reason for His Discharge: Reports of His Unprofessional Behavior at the Murakami Meeting ............ 6

            b. Cyrus Cannot Dispute the Second Reason for His Discharge: His Unwillingness to Improve His Attitude .......................................... 8

            c. Cyrus' Own Contentions in the Case Do Not Support a Finding of Discrimination ................................................................................ 8

    B. Cyrus' Retaliation Claim Must Be Dismissed ...................................................... 10

        1. Cyrus Has Failed to Show That He Engaged in Protected Activity Before He Was Notified of His Termination ...................................................... 10

        2. Cyrus Cannot Prove a Causal Connection Between His Termination and His Supposed Protected Expression ......................................................... 14

        3. Cyrus Has Failed to Dispute HMMA's Reasons for His Termination ..... 15

II. CONCLUSION ........................................................................................................... 15

## I.     ARGUMENT

A review of plaintiff's opposition brief reveals that no material issues of fact are in dispute. Although generally denying any misconduct, Cyrus acknowledges that his actions in the meeting with Murakami representatives on September 16, 2005, started the process that led to his ultimate termination. Cyrus' own testimony reflects that he believed his actions in the meeting offended HMMA's Chief Operating Officer, H.I. Kim. Further, Cyrus does not dispute that President Ahn conducted an independent review of what occurred at the meeting, and was apprised by Cyrus' Caucasian, American co-workers that Cyrus had engaged in unprofessional behavior during the meeting, including cursing at and challenging the competency of fellow HMMA executives and ignoring the instructions of his superior. It is undisputed that these reports of his misconduct led to the meeting between Keith Duckworth and Cyrus on October 22, 2005, in which Duckworth undisputedly told Cyrus that there was a concern by HMMA management with Cyrus' attitude and ultimately concluded that Cyrus should be discharged.

Cyrus speculates that the decision to discharge him was made by either Kim or Ahn, but the record does not support that contention. Nonetheless, Cyrus does not dispute that both men had independent reasons for being displeased with him that have absolutely nothing to do with Cyrus' race or national origin. The mere fact that Kim and Ahn happen to be Korean does not create a discrimination claim. Finally, Cyrus confusingly argues that he was not given a specific offer in words by Duckworth to improve his attitude at the termination meeting, while at the same time continuing to assert that there was nothing wrong with his attitude and refusing to acknowledge that he did anything wrong in the Murakami meeting. Cyrus' own testimony does nothing but confirm

1

the conclusion drawn by Duckworth that Cyrus was unwilling to acknowledge a problem or to change his behavior. HMMA is entitled to summary judgment on all claims.

**A.    Cyrus' Discrimination Claims Must Be Dismissed**

Plaintiff, Robert Cyrus, asserts that he was subjected to disparate treatment on the basis of his race and national origin under Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981.[1] "Disparate treatment . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin." Teamsters v. United States, 431 U.S. 324, 335-36 n.15 (1977). The essence of a disparate treatment claim is that similarly situated individuals were accorded different treatment on the basis of race. 6 B. Schlei & P. Grossman, Employment Discrimination Law at 13 (2d ed. 1983). Cyrus' evidence of discrimination is insufficient as a matter of law. Cyrus cannot prove that he was similarly situated to his comparator, J.Y. Choi, because Choi was not accused of the same degree of misconduct as Cyrus. In addition, Cyrus cannot dispute either of the reasons for his termination: (1) the reports of his unprofessional behavior, and (2) Keith Duckworth's determination that Cyrus was unwilling to improve his attitude. For these reasons, his discrimination claims must be dismissed.

**1.    Cyrus Has Failed to Show That J.Y. Choi is a Proper Comparator**

Cyrus argues that language in a footnote in Cooper-Houston v. Southern Railway Co., 37 F.3d 603 (11th Cir. 1994), relieves a plaintiff of the burden of showing disparate application of a work rule when the discipline culminates in termination. The prima facie case method established

---

[1] Although 42 U.S.C. § 1981 allows for a discrimination claim against a Caucasian, see McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273 (1976), Cyrus cannot continue to pursue a national origin claim under Section 1981. See Bullard v. OMI Georgia, Inc., 640 F.2d, 632, 634 (5th Cir. Unit B 1981).

2

in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), was "never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978). Cyrus' attempt to read the requirement of disparate treatment out of the anti-discrimination statutes must be rejected.

Whether considered as part of the prima facie case or as part of the pretext inquiry, Cyrus' evidence regarding his treatment as compared to J.Y. Choi requires proof that Choi engaged in the same misconduct as him, but did not receive the same treatment. See e.g., Silvera v. Orange County School Bd., 244 F.3d 1253, 1258 (11th Cir. 2001) (finding that plaintiff failed to establish pretext and holding that "[i]n order to satisfy the similar offenses prong, the comparator's misconduct must be nearly identical to the plaintiff's to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges"), cert. denied, 534 U.S. 976 (2001); Anderson v. Savage Laboratories, Inc., 675 F.2d 1221, 1224 (11th Cir. 1982)("Where the discharge was assertedly for the violation of a work rule … a plaintiff, in order to prove the employer's justification to be pretextual, must show either that he did not violate the work rule or that, if he did, other employees not within the protected class who engaged in similar acts were not similarly treated.").

Cyrus claims the following in his brief about Choi's behavior at the Murakami meeting: "Cyrus says that he and Choi spoke in lockstep during the meeting and that each of them addressed points about the scratches with people in production and in the meeting. Cyrus has offered evidence that he and Choi both stuck to the agenda topic regarding the scratches…" (Plaintiff's Brief at 31). But the conduct attributed to Cyrus went far beyond speaking "to the agenda topic regarding the

3

scratches." (Plaintiff's Brief at 31). It is undisputed that Caucasian, American members of HMMA management reported to President Ahn that Cyrus: (1) challenged the judgment of HMMA's Quality Control Department and used profanity toward another HMMA member of management, Chris Susock, by saying "that's bullshit" when Susock tried to explain that Quality Control believed it had properly assessed a penalty for downtime against Murakami; (2) questioned the knowledge and experience of HMMA's Director of Production, John Kalson, in front of one of HMMA's outside suppliers, by telling him "let me teach you something about production systems"; and (3) ignored numerous directives of HMMA's Chief Operating Officer not to discuss issues that the COO did not want to discuss at the meeting. (Cyrus Depo., Exs. 8, 9) (Jin Decl., Ex. 1, Bates Nos. 0205-06, 0249).

None of the reports to President Ahn, including Cyrus' own report, accuse Choi of using vulgar language, disrespecting and challenging the competency of other members of HMMA management, or arguing with them in front of this supplier. (Duckworth Decl. ¶ 13) (Jin Decl., Ex. 1, Bates Nos. 0205-06, 0238-40, 0244-46, 0249, 0258-60). Cyrus himself did not even make any comments in his statement about any supposed misconduct by Choi. (Cyrus Depo., Ex. 5) (Duckworth Decl., ¶ 13). Cyrus admits that Choi never argued with other HMMA executives during the meeting. (Cyrus Depo., at 178:18-21). Cyrus also admits that Choi did not make any derogatory

comments during the meeting. (Cyrus Depo., at 178:10-17). Therefore, Cyrus and Choi are not similarly situated.[2]

These reports by Cyrus' co-workers attributed several unprofessional actions to Cyrus that no one, not even Cyrus, has leveled against Choi. It is undisputed that President Ahn concluded from these reports that Cyrus' attitude and behavior was a problem and sought Duckworth's advice on how best to address the issue. Duckworth and President Ahn were entitled to rely to this end on what Cyrus' co-workers reported. See Jones v. Gerwins, 874 F.2d 1534, 1540 (11th Cir. 1989)("The law is clear that, even if a Title VII claimant did not in fact commit the violation with which he is charged, an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation.").

### 2. Cyrus Has Failed to Prove That the Reasons for His Termination Are Pretextual

HMMA has offered two specific reasons for Cyrus' termination: (1) his unprofessional behavior as exemplified in the Murakami meeting, and (2) his unwillingness to improve his attitude when Duckworth discussed HMMA management's concerns with him at their meeting on October 22, 2005. To survive summary judgment, Cyrus must challenge the legitimacy of each of these reasons. See Chapman v. AI Transp., 229 F.3d 1012, 1025 (11th Cir. 2000) (noting that plaintiff must rebut each of the employer's proffered reasons for its challenged action) (emphasis added)

---

[2] Cyrus cites to Choi's deposition testimony in support of his argument that Choi replaced him, but Choi testified that he held the position of Senior Manager, not a Director like Cyrus, and that he only has some duties similar to those previously performed by Cyrus. (Choi Depo., at 35:7-37:18)(Cyrus Depo., at 31:13-16). Indeed, Cyrus previously admitted that Choi "worked for him." (Cyrus Depo., at 302:23-303:19).

5

(citing Combs v. Plantation Patterns, 106 F.3d 1519, 1529 (11th Cir. 1997), cert. denied, 522 U.S. 1045 (1998)).

### a. Cyrus Cannot Dispute the First Reason for His Discharge: Reports of His Unprofessional Behavior at the Murakami Meeting

It is undisputed that President Ahn told Keith Duckworth that he was of the opinion that disciplinary action was warranted based upon the reports of Cyrus exhibiting poor judgment and inappropriate behavior at the Murakami meeting. (Duckworth Decl. ¶¶ 4-6). Cyrus does not dispute that the Murakami meeting started the process that ultimately led to his termination. (Cyrus Depo., Ex. 21).

Cyrus has sought to dispute the reports of his misconduct by offering his testimony that he did nothing wrong in the meeting and by challenging the veracity of his American co-workers that reported his misconduct. Both of these efforts miss the point. The relevant inquiry is whether HMMA management had a good faith belief that Cyrus engaged in unprofessional behavior, not whether Cyrus actually did. The Court's analysis from Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991), wherein the Plaintiff relied on the same type of denial and claim of conspiracy, is worth repeating:

> Much of Elrod's proof at trial centered around whether Elrod was in fact guilty of the . . . allegations leveled at him by his former co-workers. We can assume for purposes of this opinion that the complaining employees interviewed by [the employer] were lying through their teeth. The inquiry . . . is limited to whether [the employer] *believed* that Elrod was guilty . . ., and if so, whether this belief was the reason behind Elrod's discharge.

Elrod, 939 F.2d at 1470 (emphasis in original).

6

The case of Holifield v. Reno, 115 F.3d 1555 (11th Cir. 1997), provides an additional example of why Plaintiff's arguments fail. In Holifield, the Plaintiff asserted a race discrimination claim after he was discharged based on the reports of his co-workers that he was engaging in disruptive behavior within his department. Holifield claimed, just as Cyrus does, that he did nothing wrong and that the reports against him were untrue. Holifield went one step further than Cyrus and claimed that the persons who reported him did so because they were racist. Nonetheless, the Court concluded that the proper focus was on "the employer's beliefs, and not the employee's own perception of his performance." Holifield, 115 F.3d at 1565. The Court held that Holifield's "assertion that the defendants began documenting an untrue assessment of his performance in order to terminate him because of his race is unsubstantiated." Id. The same result is required here.

It is undisputed that the reports of those who attended the Murakami meeting (including Cyrus' white American co-workers) advised President Ahn of alleged behavior by Cyrus that he himself admits would warrant disciplinary action. (Cyrus Depo., at 119:13-20) (Jin Decl., Ex. 1, Bates Nos. 0205-06, 0238-40, 0244-46, 0249). Cyrus has offered no evidence of discriminatory animus by Chris Susock, John Kalson, Gerald Horn, Jason Chi, H.I. Kim, or any other HMMA employees who attended the Murakami meeting and who reported that Cyrus engaged in unprofessional behavior. (Cyrus Depo., at 118:22-119:20, 133:8-22, 136:13-141:21).[3] Cyrus cannot

---

[3] Cyrus argues that there is something suspicious in the fact that H.I. Kim did not know that Cyrus had said "bullshit" during the meeting. (Plaintiff's Brief at 30). But Kim and other Korean managers at the meeting spoke in Korean and their comments were translated into English. (Cyrus Depo., at 62:22-63:5)(Kim Depo., at 53:14-19). It does not show pretext that Kim or other Koreans in attendance at the meeting do not clearly speak or understand the English language. (Kim Depo., at 12:3-12) (Cyrus Depo., at 48:17-19, 107:12-13, 115:3-16). Moreover, the fact that the statements of Cyrus' American co-workers are far more damaging than those of the Korean workers compels the conclusion that his race and national origin had nothing to do with his termination.

7

defeat summary judgment now by simply denying that he committed the misconduct of which he was accused by his co-workers.

  b.  **Cyrus Cannot Dispute the Second Reason for His Discharge: His Unwillingness to Improve His Attitude**

Cyrus quarrels over semantics as to what specific words were used at the meeting between he and Duckworth in the same manner that he parses through the versions of the statements of his American co-workers from the Murakami meeting. Cyrus does not dispute that Duckworth told him at the meeting that HMMA management was unhappy with his attitude. (Cyrus Depo., at 216:3-217:23, 310:17-312:12). Cyrus gave the following description of what Duckworth told him at their meeting: "Rob, the executive management at Hyundai is uncomfortable with your attitude and we would like to ask you to resign." (Ex. E, Tape 2, at 57:4-7). Further, Cyrus' own words show that he was not and still is not willing to acknowledge that there were any problems with his attitude: "Attitude. You know what is attitude? It's simply because I've been sick and they don't like it." (Ex. E, Tape 4, at 22:16-18). "Attitude problem. I'm no different than I was day one when you guys hired me and said we recruited you because of your fantastic reputation." (Ex. E, Tape 2, at 45:8-11). Thus, there is no inconsistency between the testimony of Duckworth and Cyrus – both state that there was discussion about Cyrus' attitude and Cyrus' own words reflect his unwillingness to acknowledge any problems.

  c.  **Cyrus' Own Contentions in the Case Do Not Support a Finding of Discrimination**

Cyrus also argues that there is a "cat's paw" theory of liability at play. Under this theory, if the plaintiff shows that a colleague with a racial animus lacked the power to terminate an employee,

8

but that the colleague made a biased recommendation to his superior that the employee be discharged and that recommendation was followed, it may be inferred that it was the colleague's racial animus that was the cause in fact of the termination. The superior who carries out the adverse employment action acts merely as the "cat's paw" for the person with the discriminatory animus. See, e.g., Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1331-32 (11th Cir. 1999) (per curiam), cert. denied, 529 U.S. 1053 (2000).

To establish causation under such a theory, however, the plaintiff must establish "that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the [colleague's] recommendation, was an actual cause of the other party's decision to terminate the employee." Id. at 1331. That is, in such cases "causation may be established if the plaintiff shows that the decision maker followed the biased recommendation without independently investigating the complaint against the employee." Id. at 1332. Here, the undisputed evidence shows that President Ahn conducted an independent investigation. Indeed, Cyrus submitted his own version of events from the meeting to President Ahn.

Cyrus argues that his American workers provided false information in their reports to attempt to have Cyrus fired. (Plaintiff's Brief at 30). Cyrus now argues that these persons were lying "for the purpose of [flattering] their vengeful boss." (Plaintiff's Brief, at 31, n.2). Undoubtedly, this is a continuation of Cyrus' assertion that there was a conspiracy at work to see him discharged. (Duckworth Decl., ¶ 9). There is simply no evidence that any of the persons at the meeting made any recommendation to take disciplinary action against Cyrus. Even if there was, there is not one shred of evidence that Chris Susock, John Kalson, Gerald Horne, or Jason Chi were motivated by

9

discriminatory animus. The same is true for H.I. Kim. Cyrus has already described his belief as to why Cyrus upset Mr. Kim; he contends Kim is a "prima donna," who is "not used to being questioned…" (Cyrus Depo., at 305:1-11). Cyrus went on to state that H.I. Kim was "in charge of the entire plant in Seoul, and he's not used to being questioned." (Ex. E, Tape 4, at 25:5-8).

Cyrus' contention that he offended HMMA's Chief Operating Officer, who happens to be Korean, by challenging his authority might suggest a "personality clash" between the two men, but it does not provide evidence of a violation of Title VII or § 1981. A mere personality clash among co-workers, no matter how severe, is not grounds for a Title VII discrimination complaint. See Hawkins v. Ceco Corp., 883 F.2d 977, 986 (11th Cir. 1989) (manager's personal dislike of employee is not evidence of illegal discrimination), cert. denied, 495 U.S. 935 (1990); McCollum v. Bolger, 794 F.2d 602, 610 (11th Cir. 1986) (finding no actionable discrimination where female postal worker was singled out for disproportionately harsh punishment, because severity was based on "personal feud" with supervisor rather than gender), cert. denied, 479 U.S. 1034 (1987). Cyrus' suggestion of a "cat's paw" theory of liability simply is not supported by the evidence, and further does not support the conclusion that discrimination occurred.

**B.   Cyrus' Retaliation Claim Must Be Dismissed[4]**

    **1.   Cyrus Has Failed to Show That He Engaged in Protected Activity Before He Was Notified of His Termination**

---

[4] Plaintiff is pursuing his retaliation claim only under Title VII, not 42 U.S.C. §1981. (Plaintiff's Complaint, ¶ 18). The U.S. Supreme Court heard argument on February 20, 2008, as to whether a plaintiff can even pursue a retaliation claim under 42 U.S.C. § 1981. See Humphries v. CBOCS, 474 F.3d 387 (7th Cir. 2007), cert. granted, 128 S. Ct. 30, 168 L. Ed. 2d 807, 2007 U.S. LEXIS 9079, 76 U.S.L.W. 3154 (U.S. 2007).

10

To show protected expression under the "opposition clause," an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Several of the subjects that Cyrus asserts as protected activity (conversations about safety issues, altercations between Korean workers, consensual relationships, communication breakdowns between departments) have absolutely nothing to do with the prohibitions against discrimination under Title VII.[5] (Cyrus Depo., at 242:14-246:16). To engage in protected activity, an employee must make a specific and reasonably clear protestation against conduct that the employee believes violates the anti-discrimination laws.

Cyrus says that he mentioned issues such as American workers having delays in receiving reimbursement checks, access to lease cars, and not being included in meetings. (Plaintiff's Brief at 32-33). It is undisputed that Cyrus never complained to Duckworth in these meetings that he felt that he or anyone else had been the subject of discriminatory conduct. (Cyrus Depo., at 252:15-255:9). Cyrus raised various issues because he was merely voicing "concerns for the benefit of the company, the things that we needed to rectify." (Cyrus Depo., at 254:20-255:9). There is a far difference between speaking about conditions in the workplace and complaining of intentional discrimination. Cyrus may have complained about company practices, but there is no record evidence that he stated any belief that those practices were motivated by race or national origin discrimination as opposed to complications caused in any start-up operation that is transplanting employees half-way around the world.

---

[5] Plaintiff does not argue that he engaged in protected activity under the "participation clause" of Title VII.

11

These generalized discussions about company practices do not constitute protected expression. See Galdieri-Ambrosini v. National Realty & Development Corp., 136 F.3d 276, 292 (2nd Cir. 1998)("[Plaintiff's] complaints to Simon and Chiaro did not state that [she] viewed Simon's actions as based on her gender, and there was nothing in her protests that could reasonably have led National Realty to understand that that was the nature of her objections."); Jurado v. Eleven-Fifty Corporation, 813 F.2d 1406, 1411 (9th Cir. 1987(Hispanic employee who opposed format change at radio station to English-only broadcasts did not engage in protected activity where he expressed his concern that change would impact his "numbers" because he had a large number of Hispanic listeners); Webb v. R & B Holding Company, Inc., 992 F. Supp. 1382, 1389 (S.D. Fla. 1998)("The employee must, at the very least, communicate her belief that discrimination is occurring to the employer. It is not enough for the employee merely to complain about a certain policy or certain behavior of coworkers and rely on the employer to infer that discrimination has occurred.")(citing Jurado, supra); EEOC v. Shoney's, Inc., 536 F. Supp. 875, 877 (N.D. Ala. 1982)("His very generalized complaints were that he was not being treated fairly in that other managers could date waitresses who worked at the restaurant. There is nothing in his own testimony of what he said that would put Shoney's on notice that he was protesting an illegal employment practice.").[6]

---

[6] Cyrus similarly seeks to now morph his conversations with Duckworth immediately following the Murakami meeting into supposed complaints of discrimination and retaliation. Cyrus says that he told Duckworth that Kim was very hostile, throwing paper and that he walked out of the room twice. (Cyrus Depo., at 190:104). He said that it was very embarrassing and that it was "a hostile environment." (Cyrus Depo., at 190:5-8). Cyrus says that he also told Duckworth that he was worried about retaliation from H.I. Kim because of his reputation. (Cyrus Depo., at 190:14-191:1). Once again, these generic complaints to not constitute opposition to conduct made unlawful by Title VII.

In addition, to engage in protected activity, the employee must actually <u>oppose</u> the conduct made unlawful under Title VII. The Eleventh Circuit's holding in Coutu <u>v. Martin County Bd. of County Commissioners</u>, 47 F.3d 1068, 1074 (11th Cir. 1995), confirms this point. The Eleventh Circuit held that a filed grievance did not amount to statutorily protected activity where the written grievance contained a conclusory allegation of racial discrimination, but during the hearing, the plaintiff made no allegation and offered no proof of discrimination. The Court concluded that unfair treatment alone does not qualify as an unlawful employment practice under Title VII, absent evidence of discrimination based on some unlawful category. Thus, the mere fact that an employee makes a conclusory allegation of discrimination, without any opposition, is not protected activity. To accept Cyrus' interpretation of the <u>Coutu</u> case would require the removal of the word "opposed" from the retaliation provision of Title VII. <u>See</u> 42 U.S.C. § 2000e-3(a).

The mere fact that Cyrus may have mentioned incidents of which he had no personal knowledge, and of which he never complained, and of which had been fully investigated and resolved months earlier, does not constitute <u>opposition</u> to conduct made unlawful under Title VII as a matter of law. Because Cyrus had no "connection to the protected activity" of these situations, these allegations cannot support his retaliation claim. See <u>United States EEOC v. Bojangles Rests., Inc.</u>, 284 F. Supp. 2d 320, 326 (M.D.N.C. 2003) ("the plain language of [Title VII] clearly covers only those who 'actually oppose' discrimination or those who "participate, assist, etc.," in an investigation or proceeding. In other words, the person must have some connection to the protected activity") (emphasis added).

13

### 2.   Cyrus Cannot Prove a Causal Connection Between His Termination and His Supposed Protected Expression

Cyrus now argues that his meetings with Duckworth regarding these plant-wide issues took place in August of 2005. Nonetheless, "close temporal proximity between two events, standing alone, is not a panacea, absent any other evidence that the employment decision was causally related to the protected activity." Hankins v. Airtran Airways, Inc., 237 Fed. Appx. 513, 520 (11th Cir. 2007). In Hankins, the plaintiff was terminated 20 days after he had made a complaint of discrimination. The Court noted the following had occurred in between those two dates:

> Here, it is undisputed (indeed, Hankins herself acknowledges), that on 14 September -- five days after Hankins allegedly reported Durham's suspected racial bias to Head -- Hankins yelled at a co-worker for cutting her off in line and stated that she would "kick his ass if he ever tried to cut in front of [her] again in line." R2-34 at 124. <u>This intervening act of misconduct ... severed the causal connection (if any) between Hankins' initial complaint of discrimination and AirTran's decision to terminate her employment</u>.

Hankins, 237 Fed. Appx. at 520 (emphasis added).[7] Where, as here, there is a significant intervening event, such as alleged behavior by Cyrus at the Murakami meeting, no causal connection can be inferred. This is particularly true given the vague and ambiguous nature of what Cyrus contends constitutes his protected expression.

Cyrus spends much of his brief arguing that H.I. Kim and President Ahn were the persons who decided that Cyrus should be terminated. The record does not support this claim. Nonetheless,

---

[7] Although the Hankins opinion is unpublished, it relied on another Eleventh Circuit case Fleming v. Boeing Company, 120 F.3d 242, 248 (11th Cir. 1997) -- and a former Fifth Circuit case -- Whatley v. Metropolitan Atlanta Rapid Transit Authority, 632 F.2d 1325, 1329 (5th Cir. 1980), as support for its holding.

14

Cyrus admits that neither man had any knowledge of any alleged complaints of discrimination made by Cyrus before Cyrus was notified of his termination. (Cyrus Depo., at 284:5-13) Thus, Kim could not have been motivated to retaliate when he complained about the Murakammi meeting, and President Ahn could not have been motivated to retaliate when he told Duckworth that he felt Cyrus should be disciplined based upon the reports from the meeting. See e.g., Brungart v. BellSouth Telecommunications, Inc., 231 F.3d 791, 799 (11th Cir. 2000)("A decision maker cannot have been motivated to retaliate by something unknown to him."), cert. denied, 532 U.S. 1937 (2001). For these reasons, Plaintiff has failed to prove a prima facie case of retaliation.

### 3. Cyrus Has Failed to Dispute HMMA's Reasons for His Termination

HMMA has offered legitimate, non-retaliatory reasons for Cyrus' discharge. He exhibited unprofessional behavior and an unwillingness to improve his attitude. As discussed supra at pages 5 – 10, Cyrus has failed to offer any evidence to suggest that HMMA's stated reasons for its actions are a pretext for discrimination or retaliation. For all of these reasons, Cyrus' retaliation claim must be dismissed.

## II. CONCLUSION

For all the foregoing reasons, HMMA is entitled to summary judgment on all of the Plaintiff's claims. HMMA respectfully requests that this Court grant its Motion for Summary Judgment, dismiss this case with prejudice, and award the HMMA its costs and attorneys' fees in defending against this case.

/s/ Brian R. Bostick
TIMOTHY A. PALMER (PAL009)
J. TRENT SCOFIELD (SCO024)
BRIAN R. BOSTICK (BOS015)
**OGLETREE, DEAKINS, NASH,**

15

       **SMOAK & STEWART, P.C.**
       One Federal Place, Suite 1000
       1819 Fifth Avenue North
       Birmingham, AL 35203
       (205) 328-1900
       brian.bostick@odnss.com

       Attorneys for Defendant Hyundai Motor
       Manufacturing Alabama, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of February, 2008, I electronically filed the foregoing Defendant's Reply Brief in Support of Its Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Richard J. Stockham, III, Esq.

/s/ Brian R. Bostick
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone: (205)328-1900
Facsimile: (205)328-6000
brian.bostick@odnss.com