IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ROBERT CYRUS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:07cv144-ID |
| | ) | (WO) |
| HYUNDAI MOTOR MANUFACTURING | ) | |
| ALABAMA, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

## I.  INTRODUCTION

Plaintiff Robert Cyrus ("Plaintiff") was fired from his managerial job with Defendant, Hyundai Motor Manufacturing Alabama, LLC ("Defendant").  In this lawsuit, Plaintiff sues Defendant, claiming that Defendant fired him because he is Caucasian and American, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17 ("Title VII") and 42 U.S.C. § 1981 ("§ 1981").  Plaintiff also claims that his termination was retaliatory, in violation of Title VII.

Before the court is Defendant's motion for summary judgment which is accompanied by a brief and an evidentiary submission.  (Doc. Nos. 22-24.)  Plaintiff filed a response and evidence in opposition to the motion, and Defendant filed a reply.  (Doc. Nos. 30-32.)  After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that Defendant's motion is due to be granted in part and denied in part.

## II.  JURISDICTION AND VENUE

The court properly exercises subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction).  Personal jurisdiction and venue are adequately pleaded and not contested.

## III.  STANDARD OF REVIEW

A court considering a motion for summary judgment must construe the evidence and make factual inferences in the light most favorable to the nonmoving party.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970).  At the summary judgment juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) (citations omitted).

Summary judgment is entered only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323.  The movant can meet this burden by presenting evidence showing that there is no dispute of material fact or by showing that the non-

moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Id. at 322-23, 325.  The burden then shifts to the nonmoving party, which "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Summary judgment will not be entered unless the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party.  See id. at 587.

## IV.  FACTS[1]

Defendant operates an automobile assembly and manufacturing facility in Montgomery, Alabama.  (Pl. Ex. 9 (Doc. No. 31).)  Plaintiff, a Caucasian-American male, began working for Defendant in or about May 2002 as the director of the Purchasing and Parts Development Department.  When Plaintiff was hired, Defendant still was in its formative stages and its manufacturing facility was under construction.  (Pl. Dep. at 23-24, 31, 33.)  When operations commenced at the Montgomery facility, Plaintiff supervised approximately thirty individuals and had hiring authority.  (Pl. Dep. at 35-38); (Def. Resp. to Pl. EEOC charge (Doc. No. 31-10).)  As a member of management, Plaintiff negotiated with outside vendors to obtain contracts for the purchase of all parts needed to produce automobiles at Defendant's facility in

---

[1] The material facts are presented in the light most favorable to Plaintiff.  Facts which are immaterial to the pivotal issues are omitted.  When pertinent, the court notes disputes in the material facts.

Montgomery.  (Def. Resp. to Pl. EEOC charge (Doc. No. 31-10).)  At all pertinent times, Plaintiff reported to H. J. Hyun ("Hyun").  (Pl. Dep. at 183, 263.)

In August 2005, J. Y. Choi ("Choi"), who previously served as the manager of the Department of Development for Parts Overseas at Defendant's headquarters in Seoul, Korea, joined Defendant's management team at the Montgomery plant.  (Choi Dep. at 16-17.)  Choi, a Korean male, was assigned to work in the Purchasing and Parts Development Department and reported directly to Hyun.  (Choi Dep. at 18-19, 45-46.)  At some point after Choi's arrival, Plaintiff's position was split.  Plaintiff maintained his duties as director of parts development, and Choi took over as director of purchasing.  (Pl. Dep. at 303); (see also Pl. Dep. at 50-51, describing Choi as his equal.)

Plaintiff worked harmoniously with his peers and superiors and without any negative feedback until September 16, 2005.  (Pl. Dep. at 216, 323.)  On September 16, 2005, Defendant held a meeting with a parts supplier, Murakami Manufacturing Company ("Murakami"), to discuss defects that were appearing on several of the outside mirrors that Murakami produced for Defendant.  The defects were particularly problematic because they caused downtime on the production line.  Some of the defects were the result of "scratch marks," caused not by Murakami, but by Glovis Alabama ("Glovis"), which operates a parts consolidation warehouse and delivers the mirrors to Defendant's plant.  (Pl. Dep. at 74-77, 93.)  Other defects were the result of "buff marks" and "bag marks" caused by improper lighting and curing time at the Murakami plant.  (Id. at 61, 63-65, 67-70, 99-100, 108-10.)  There is a dispute between Plaintiff and Defendant as to the purpose of the September 16 meeting, with Defendant arguing that its sole

4

purpose was to discuss the "buff"/"bag" mark defects which were within Murakami's control and Plaintiff contending that the "scratch mark" defects also were ripe for discussion.  (Id. at 72, 87, 123.)

The meeting was called by H. I. Kim ("Kim"), Defendant's chief operating officer, who also chaired the meeting.  (Id. at 47, 53.)  Kim and the other attendees, who were not fluent in the English language, spoke in Korean and their comments were translated into English for the benefit of the English-only speaking attendees which included Plaintiff. (Id. at 48, 107.)  Choi also was present at the meeting.  In all, there were approximately thirty individuals at the meeting.  (Id. at 191.)  It is unnecessary to set out all of the details of this meeting.  Suffice it to say, Plaintiff ultimately was fired because of his alleged unprofessional (but disputed) conduct during this meeting.

After the meeting, Kim reported to J. S. Ahn ("Ahn"), the president and chief executive officer, that he was concerned that Plaintiff's unprofessional behavior during the meeting had damaged his (Kim's) credibility and authority.  (Kim Dep. at 63-64, 166-68.)  Consequently, either Ahn or Kim requested that several of those in attendance at the meeting provide written statements as to what occurred.  (Pl. Dep. at 107.)  Overall, there were twelve statements, including Plaintiff's and Choi's.  (Id. at 184); (Pl. Summ. J. Resp. at 14.)  The statements were conflicting, but there were reports from individuals other than Kim that Plaintiff used profanity once during the meeting (saying "bullshit"), that he twice interrupted Kim to make arguments in support of Murakami, that he disregarded Kim's directives to cease discussion about the "scratch marks" and to focus on the "buff" and "bag" marks, and that he compared Defendant's production system to

Toyota's.[2]  (See Def. Summ. J. Br. at 7-8); (Pl. Dep. at 117); (Def. Ex. G, translated statements of September 16 meeting, attached to Ihn Hwan Chu Decl.).)  Plaintiff denies all of these accusations.  (Pl. Dep. at 111-12, 116, 118-19, 125, 127-28, 133-36.)

Plaintiff says that Kim, not him, acted "childish" and inappropriately by yelling during the meeting, throwing papers and abruptly adjourning the meeting.  (Id. at 71, 104, 115, 117, 190); (Pl. Dep. Ex. 5 (Pl. statement concerning September 16 meeting).)  Plaintiff also asserts that he and Choi, as representatives from the Purchasing and Parts Development Department, "spoke in lockstep" during the meeting, raising the same issues concerning the "scratch marks."  (Pl. Summ. J. Br. at 9, 31); (Pl. Dep. at 142-43.)  For instance, Plaintiff testifies that both he and Choi explained during the meeting that the downtime on the production line was multifaceted and not caused solely by the "buff" and "bag" marks, but also by Glovis' handling of the mirrors.  (Pl. Dep. at 114-15, 141.)  Plaintiff also states that, at one point during the meeting, Kim said to Choi, "Are you here to defend the vendors?"  (Kim Dep. at 209-12.)  As for his conduct, Plaintiff says that, at all times during the meeting, he acted professionally and in Defendant's "best interest."  (Pl. Dep. at 147-48.)

After the meeting, fearing that his job was in jeopardy, Plaintiff spoke twice with Deputy President Keith Duckworth ("Duckworth"), Hyun and Chief Financial Officer

---

[2] Discussion or mention of "Toyota" is "taboo" at Defendant's facility.  (Pl. Dep. at 136.)

Jason Lee about what had occurred earlier in the day at the meeting.[3]  (Pl. Dep. at 155, 189-90); (Pl. Decl. ¶ 3.)  Plaintiff told Duckworth that during the meeting Kim acted very "hostile"; he yelled, threw paper and twice walked out of the meeting room.  (Pl. Dep. at 190); (Pl. Decl. ¶ 3.)  Plaintiff said that Kim's conduct was very "embarrassing" and created "a hostile environment."  (Pl. Dep. at 190.)  Plaintiff also informed Duckworth that he was worried about "retaliation" from Kim "because of his reputation" for vengefulness.  (Pl. Decl. ¶ 3); (Pl. Dep. at 193.)  Duckworth responded that Plaintiff's work performance was excellent and assured him that his job was secure.  (Pl. Decl. ¶ 3); (Pl. Dep. at 140.)

This was not the first time that Plaintiff had discussed with Duckworth adverse working conditions at Defendant's plant.  According to Plaintiff, when Duckworth was transferred to the Montgomery facility, Duckworth requested a meeting with each director, individually, to discuss "improprieties" allegedly occurring at the facility.  (Pl. Dep. at 221, 280.)  Plaintiff pinpoints his meeting with Duckworth as occurring during the last week of August 2005.  (Pl. Summ. J. Resp. at 32 n.3); (Pl. Dep. at 222-50.)  Plaintiff cited for Duckworth examples of what he described as preferential treatment of Korean employees.  Specifically, he said that non-Korean employees were excluded from certain meetings (under the guise that expediency required that the meetings be conducted only in the Korean language), (id. at 233), that the Korean and non-Korean employees

---

[3] Plaintiff's fears were sparked by discussions he had with Choi after the meeting.  Namely, remarking that Kim was "very upset," Choi told Plaintiff, "You and I may be going home early today."  (Pl. Dep. at 179-80.)

comprised "two separate teams," (id.), that non-Korean employees' expense reports were subjected to stricter scrutiny than those of Korean employees (id. at 243-44), that Korean employees disregarded safety rules without any repercussion, (id. at 245-46), and that Korean employees were assigned favorable work duties.  (Id. at 246.)  Plaintiff also reported that a managerial employee was having inappropriate sexual relations with a receptionist, (id. at 202, 246-47), that a different manager offered to give a terminated employee two weeks additional pay if she had sex with him,[4] (id. at 247), that a female assistant manager was not permitted to act as the manager in the manager's absence[5] (id. at 248-50), and that two Korean employees were not disciplined for violent workplace behavior.  (Id. at 234-39; see also id. at 210-11.)  Approximately a month after Plaintiff's meeting with Duckworth, in early September 2005, Duckworth asked Plaintiff to discuss these same matters with attorneys from Korea who were visiting the facility (and who presumably worked for Defendant), and Plaintiff complied.  (Id. at 222, 227-29, 252); (Pl. Summ. J. Resp. at 32.)

Shortly after the September 16 meeting, Plaintiff experienced medical problems and, for the most part, was out of the office between September 16, 2005, and October

---

[4] Defendant already knew about this incident and had "sent" the employee "back to Korea" because of his inappropriate conduct.  (Pl. Dep. at 247.)

[5] Plaintiff says that, previously, when the assistant manager had complained to him, he "followed" Defendant's policies and reported the complaint to Team Relations which, "to the best of [his] knowledge," investigated and resolved the complaint.  (Pl. Dep. at 251.)

22, 2005.  (Pl. Decl. ¶ 5.)  On October 22, Duckworth called Plaintiff and asked Plaintiff to meet him for dinner at a local restaurant, stating that he was concerned about Plaintiff's health.  (Pl. Dep. at 185, 199-200.)  During dinner, the topics of conversation were varied, but, after ordering dessert, Duckworth told Plaintiff that Defendant's executive managers, namely, Ahn and Kim, were "unhappy" with him and wanted him to "resign."  (Pl. Dep. at 216, 286); (Pl. Decl. ¶ 8.)  When Plaintiff asked if there was "anything [he] could do" to avoid a forced resignation, Duckworth said that it was a "done deal"; in other words, "the decision had already been made."  (Pl. Decl. ¶ 8); (Pl. Dep. at 218.)  Duckworth also said that he (Duckworth) "had nothing to do with the decision to ask for [Plaintiff's] resignation."  (Pl. Decl. ¶ 8.)  The meeting ended with Duckworth advising Plaintiff to "go home" and think about terms for a severance package.  (Pl. Dep. at 220.)

At this juncture, the court observes that Plaintiff points out that there is contradictory evidence concerning who made the decision to fire him.  (Pl. Summ. J. Resp. at 28.)  Relying on the evidence which the court recited in the preceding paragraph, Plaintiff says that Duckworth told him at the October 22 meeting dinner meeting that Kim and Ahn were the decisionmakers.  (Id.)  Duckworth, however, claims in his declaration, submitted in support of Defendant's motion for summary judgment, that the termination decision was made solely by him.  Namely, Duckworth says that Ahn contacted him after Ahn reviewed the statements prepared by the attendees at the September 16 meeting. Duckworth and Ahn agreed that Duckworth would meet with Plaintiff and explain to him

that management was dissatisfied with his attitude.  If Plaintiff was unwilling to improve his attitude, Duckworth and Ahn agreed that he (Duckworth) would decide whether to terminate Plaintiff's employment.  (Duckworth Decl. ¶ 7.)  Duckworth says that, during the dinner meeting, he "made the decision to terminate [Plaintiff's] employment" and told Plaintiff that, "based on his responses, the only appropriate step to take at that point was [for Plaintiff] to sever his ties with [Defendant]."  (Id. ¶ 9.)

This is not the only dispute.  Duckworth says that, during the dinner meeting, Plaintiff refused to acknowledge that there were any problems with his attitude, denied that he engaged in any unprofessional conduct during the September 16 meeting, and claimed that there was a "conspiracy" to fire him.  (Id.)  In contrast, Plaintiff says that Duckworth did not mention that Plaintiff had conducted himself in an adversarial or antagonistic way during the September 16 meeting and did not bring up any alleged performance problems.  (Pl. Decl. ¶ 8.)

It is undisputed, though, that after the October 22 dinner meeting, Plaintiff remained on approved medical leave and that Duckworth sent a letter to Plaintiff, dated October 24, 2005.  (Ex. 18 to Pl. Dep.)  The letter provided that, "to ensure clear understanding of the employment differences between [Defendant] and yourself, as discussed in our business dinner of October 22, 2005, the following information will clarify actions necessary to resolve the issues which were raised."  (Id.)  Duckworth then instructed Plaintiff "to make an appointment" with him prior to returning to Defendant's facility and not to "represent the company in any business negotiations" during his

medical absence.  (Id.)  He further advised Plaintiff that his "access card w[ould] be temporarily suspended."  (Id.)  Plaintiff did not return to work until his FMLA leave ended, which appears to have been on December 6, 2005.  (Pl. Dep. at 347-48.)  At that time, Duckworth informed Plaintiff that Defendant was terminating his employment, effective December 7, 2005, as memorialized in a letter from Duckworth to Plaintiff.  (Pl. Dep., Ex. 19); (Duckworth Decl. ¶ 10, Ex. 1); (Pl. Dep. at 318.)

As to who replaced him, Plaintiff points to Choi.  During his deposition taken on November 29, 2007, Choi testified that he "currently" works as a senior manager and the "head" of "Parts Development" and reports directly to Hyun.  (Choi Dep. at 36-38.)

Plaintiff filed a charge of discrimination against Defendant with the Equal Employment Opportunity Commission ("EEOC") in March 2006, complaining that Defendant fired him based upon his race (Caucasian) and national origin (American) and because he "reported issues of Koreans discriminating against Americans, sexual harassment and Koreans involved in workplace violence."  (EEOC charge (Doc. No. 31-7).)  After exhausting his administrative remedies before the EEOC (see Compl. ¶ 4), Plaintiff filed this lawsuit on February 16, 2007.  In Count One of his two-count complaint, Plaintiff alleges wrongful termination, asserting that "Defendant discriminated against [him] on the basis of his race and national origin when it terminated him," in violation of Title VII and § 1981.  (Id. ¶ 16.)  In Count Two, Plaintiff alleges that he was terminated in retaliation for "reporting discriminatory treatment," in violation of Title VII. (Id. ¶¶ 18-19.)  Plaintiff requests back pay, reinstatement (or, in lieu, front pay),

compensatory damages, punitive damages, attorney's fees and costs and demands a jury

trial.  (Id. at 6.)  After Defendant filed its answer, it moved for summary judgment on

both counts.


## V.  DISCUSSION

As stated, Defendant moves for summary judgment on Plaintiff's Title VII/§ 1981

wrongful termination claim and Title VII retaliation claim.  Section 1981 provides that

"[a]ll persons within the jurisdiction of the United States shall have the same right in

every State . . . to make and enforce contracts, to sue, be parties, give evidence, and to the

full and equal benefit of all laws and proceedings for the security of persons and property

as is enjoyed by white citizens[.]"[6]  42 U.S.C. § 1981.  Title VII makes it unlawful for an

---

[6] "Section 1981 protects all persons, Caucasian and non-Caucasian[,]" from race-based discrimination.  Ellison v. Chilton County Bd. of Educ., 894 F. Supp. 415, 419 (M.D. Ala. 1995); Chavis v. Clayton County Sch. Dist., 300 F.3d 1288, 1292 n.5 (11th Cir. 2002) (noting that the Supreme Court has decided that a Caucasian plaintiff may bring a claim of discrimination under § 1981).  Although the Supreme Court of the United States broadly has defined "race" discrimination under § 1981, § 1981's protections do not extend to discrimination based "solely on the place or nation of . . . origin."  Saint Francis College v. Al-Khazraji, 481 U.S. 604, 613 (1987); see Tippie v. Spacelabs Med., Inc., 180 Fed. Appx. 51, 56 (11th Cir. 2006) (holding that "[b]y its very terms, § 1981 applies to claims of discrimination based on race, not national origin").  Here, in addition to alleging a race discrimination claim under § 1981, Plaintiff brings a separate § 1981 claim based on his national origin (American).  (See Compl. ¶ 15.)  Defendant has not urged summary judgment on the ground that § 1981 does not recognize discrimination solely on the basis of national origin.  Absent briefing on this legal point from the parties, the court declines to address the issue sua sponte, particularly given that "[t]he line between national origin discrimination and racial discrimination is an extremely difficult one to trace."  Bullard v. Omi Georgia, Inc., 640 F.2d 632, 634 (5th Cir. 1981).  In other words, Plaintiff's American ethnicity is not necessarily irrelevant to

employer "to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's race . . . or national origin[.]"  42 U.S.C. § 2000e-2(a). Title VII's anti-retaliation provision, codified at 42 U.S.C. § 2000e-3, "forbids employer actions that 'discriminate against' an employee (or job applicant) because he has 'opposed' a practice that Title VII forbids or has 'made a charge . . . in' a Title VII 'investigation, proceeding, or hearing.'"  Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 126 S.Ct 2405, 2410 (2006) (quoting 42 U.S.C. § 2000e-3).

To survive summary judgment on his claims, Plaintiff must demonstrate that there is a genuine issue of material fact as to whether his former employer acted with discriminatory or retaliatory intent in terminating his employment.  Hawkins v. Ceco Corp., 883 F.2d 977, 980-81 (11th Cir. 1989).  Because this is not a direct evidence case, Plaintiff's discrimination and retaliation claims are governed by the familiar McDonnell Douglas burden-shifting framework.[7]  McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  In the first McDonnell Douglas phase, the employee must produce evidence sufficient to make out a prima facie case, thus giving rise to a presumption that the

---

his § 1981 race discrimination claim.  As recognized in Bullard, "[i]n some contexts, 'national origin' discrimination is so closely related to racial discrimination as to be indistinguishable."  Id.

[7]  The Title VII circumstantial evidence approach to proving employment discrimination also applies to Plaintiff's § 1981 wrongful termination claim.  See Shields v. Fort James Corp., 305 F.3d 1280, 1282 (11th Cir. 2002) ("[A]s we have repeatedly held, '[b]oth of these statutes [(i.e., § 1981 and Title VII)] have the same requirements of proof and use the same analytical framework.'").

employer unlawfully discriminated or retaliated against him in taking the alleged adverse employment action.  See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993). Next, the employer must rebut this presumption by producing evidence that the negative employment action was motivated instead by a legitimate, nondiscriminatory reason.  St. Mary's Honor Ctr., 509 U.S. at 509.  Finally, to avoid summary judgment, the employee must respond with evidence, which may include previously produced evidence establishing a prima facie case, which would allow a reasonable jury to conclude that the reason given by the employer was not the real reason for the adverse employment decision.  See Combs v. Plantation Patterns, Meadowcraft, Inc., 106 F.3d 1519, 1528 (11th Cir. 1997); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).

## A.  Prima Facie Case

### 1. Wrongful Termination

Urging summary judgment, Defendant argues that Plaintiff's prima facie case fails because Plaintiff cannot point to a similarly-situated coworker of another race or national origin who was treated more favorably.  (Def. Summ. J. Br. at 20.)  Plaintiff says, however, that "according to Choi, he [Choi] took Plaintiff's place as the head of the Parts Development Department" and that, therefore, he proves his prima facie case by demonstrating that he was replaced by a Korean employee who is outside of his protected class (Caucasian and American).  (Pl. Summ. J. Resp. at 26-27); (Choi Dep. at 36-37,

43); (Pl. Dep. at 303.)  In a footnote in its reply brief, Defendant says that Choi held a

position as a senior manager, not the more advanced position of director like Plaintiff,

and that Choi only had some duties similar to those previously performed by Plaintiff.

(Def. Reply Br. at 5 n.2, citing Choi Dep. at 35-37.)  Defendant also cites Plaintiff's

statement that Choi "worked for him."  (Id., citing Pl. Dep. at 302.)  For the reasons to

follow, the court agrees with Plaintiff.

 In its opening summary judgment brief, Defendant focuses its argument on the

"similarly situated" comparator prima facie case, which is articulated in a number of

Eleventh Circuit decisions.  See, e.g., Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d

1313, 1316 (11th Cir. 2003) (evaluating Title VII/§ 1981 wrongful termination claim).

The prima facie case, however, is not "rigid or inflexible," Schoenfeld v. Babbitt, 168

F.3d 1257, 1268 (11th Cir. 1999), and there are more ways than one to raise a

presumption of discrimination.  A plaintiff can bypass the "similarly situated" prong by

demonstrating instead that he was replaced by someone outside his protected class.  See

Maynard v. Bd. of Regents, 342 F.3d 1281, 1289 (11th Cir. 2003).  In this case, Plaintiff

relies on the "replaced" formulation.  The prima facie elements under this scenario

require a plaintiff to show that he "(1) was a member of a protected class, (2) was

qualified for the job, (3) suffered an adverse employment action, and (4) was replaced by

someone outside the protected class."  Cuddeback v. Fla. Bd. of Educ., 381 F.3d 1230,

1235 (11th Cir. 2004).  As stated, in its reply brief, Defendant redirects its focus, arguing

that under this alternative formulation Plaintiff likewise cannot establish a prima facie

case because there is no evidence which establishes the fourth element, as set out in Cuddeback.[8]

The court carefully has reviewed the evidence cited by the parties in support of their competing arguments as to whether Choi replaced Plaintiff.  True, as Defendant says, Choi testified during his deposition, taken on November 29, 2007, that he was a "senior manager," (Choi Dep. at 36), which in Defendant's supervisory hierarchy is a position subordinate to a director.  In his next sentence, however, Choi adds that he also was the "head" of "part[s] development" and that he reported directly to Hyun.  (Id. at 36-38.)  According to Plaintiff's evidence, "head" of parts development was the same position which Plaintiff occupied when he was fired.  (See Pl. Dep. at 303, wherein Plaintiff testifies that he was the director of parts development and was supervised by Hyun.)  Construing the inferences from Choi's testimony in the light most favorable to Plaintiff, the court finds that there is sufficient evidence from which a jury could find that Choi replaced Plaintiff.  Cf. Tolbert v. Briggs & Stratton Corp., 510 F. Supp.2d 549, 554 (M.D. Ala. 2007) (finding that "[i]nsofar as most of [plaintiff's] duties were assumed by a white employee, a reasonable jury could conclude that [plaintiff] was 'replaced by someone outside the protected class'").

Defendant's reliance on page 302 of Plaintiff's deposition testimony does not alter the court's finding.  During Plaintiff's deposition, defense counsel showed Plaintiff a

---

[8] For the purpose of the motion for summary judgment, Defendant has not challenged the other prima facie elements.

transcript in which Plaintiff said, "Choi works for me."[9]  (Pl. Dep. at 302.)  Plaintiff

admitted that he made that statement, but stated that, actually, Choi was Plaintiff's "equal

and peer" as the director of purchasing.  (Id. at 303.)  Again, viewing the evidence in the

light most favorable to Plaintiff, the court finds that a jury could view Plaintiff's

testimony as a clarification of his earlier (and unsworn) statement that "Choi works for

me."  In any event, Plaintiff's statement that "Choi works for me" relates to Choi's

position when Choi "started" working at the Montgomery plant (id.), not Choi's position

after Plaintiff was fired, which obviously is the relevant time period for determining the

identity of Plaintiff's replacement.  Accordingly, based on the foregoing, the court finds

that Plaintiff has demonstrated a prima facie case of discrimination on his Title

VII/§ 1981 wrongful termination claim.

### 2.  Retaliation

Plaintiff also brings a retaliation claim under Title VII.  To prove a prima facie

case of retaliation under Title VII, Plaintiff must demonstrate that (1) he "engaged in

statutorily protected activity, (2) an adverse employment action occurred, and (3) the

adverse action was causally related to the plaintiff's protected activities."  Gregory v. Ga.

---

[9] Plaintiff recorded several conversations he had with his colleagues, family and
other third parties.  (See, e.g., Pl. Dep. at 297, 301-02); (Def. Ex. E to Doc. No. 23.)
These conversations have been transcribed and are part of the summary judgment record.
(Id.)  Plaintiff made the statement that "Choi works for me" during one of these
conversations which he recorded.

<u>Dep't of Human Res.</u>, 355 F.3d 1277, 1279 (11th Cir. 2004) (citation omitted).  The first and third prongs are at issue.  (Def. Summ. J. Br. at 23.)

Turning to the first element, Plaintiff says that he engaged in protected activity when he complained to Duckworth during August 2005 about multiple instances of what he perceived as Defendant's preferential treatment of Korean employees and workplace sex discrimination.  (Pl. Summ. J. Resp. at 32-34); (<u>see</u> Pl. Dep. at 222-50.)  He also says that his complaints to Duckworth on September 16, 2005 – <i>i.e.</i>, that Kim created a "hostile environment" during the meeting earlier that day and that Plaintiff feared "retaliation" from Kim – constitute protected activities.  (Pl. Summ. J. Resp. at 30.)

Moving for summary judgment, Defendant contends that Plaintiff has not demonstrated that he engaged in protected activity in August 2005 because (1) the topics which Plaintiff raised in his meeting with Duckworth "did not implicate Title VII" or were too "vague," (2) Plaintiff did not "actually oppose" any conduct made unlawful under Title VII and (3) Plaintiff merely was doing his job by voicing concerns about matters which Defendant needed to rectify in order to be successful.[10]  (Def. Summ. J. Br. at 25-27.)  Concerning Plaintiff's communication with Duckworth on September 16,

---

[10] In its opening summary judgment brief, Defendant delineated three categories of alleged protected activities upon which it speculated Plaintiff would rely.  (Def. Summ. J. Br. at 24.)  In his summary judgment response, Plaintiff only relies upon one of the categories enumerated in Defendant's brief.  The court, therefore, does not address the other two categories in this opinion and deems Plaintiff to have abandoned any reliance thereon.  <u>Cf.</u> <u>Resolution Trust Corp. v. Dunmar Corp.</u>, 43 F.3d 587, 599 (11th Cir. 1995) ("the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

2005, Defendant says that Plaintiff "seeks to now morph his conversations with Duckworth immediately following the Murakami meeting into supposed complaints of discrimination and retaliation," but asserts that Plaintiff's complaints are too "generic" to qualify as "opposition to conduct made unlawful by Title VII."  (Def. Reply at 12 n.6.)

"Under [Title VII's] opposition clause, an employer may not retaliate against an employee because the employee 'has opposed any practice made an unlawful employment practice by this subchapter.'"  EEOC v. Total Sys. Servs., 221 F.3d 1171, 1174 (11th Cir. 2000) (quoting 42 U.S.C. § 2000e-3(a)).  This clause "protects conduct by an employee who is not the direct victim of a practice made unlawful under Title VII, but who 'opposes' such discrimination against others."  McKenzie v. Renberg's Inc., 94 F.3d 1478, 1487 n.8 (10th Cir. 1996).

The first issue is whether Plaintiff's statements to Duckworth in August 2005 and on September 16, 2005, are too ambiguous to qualify as protected expression under Title VII's opposition clause.  The Eleventh Circuit's decision in Brown v. City of Opelika is instructive concerning the level of specificity required to bring an informal expression within the protections of Title VII's opposition clause.  See 211 Fed. Appx. 862, 863 (11th Cir. 2006).  In Brown, the Eleventh Circuit affirmed the district court's summary judgment ruling on a Title VII retaliation claim in favor of the employer where the employee argued that her statement to a superior that she "wanted to make a complaint of 'harassment'" constituted protected activity.  See id. at 863-64; Brown v. City of Opelika, No. 3:05-CV-236-W, 2006 WL 1515836, *4 (M.D. Ala. May 30, 2006).  Affirming the

19

judgment, the Eleventh Circuit explained that there was no evidence that, when making her complaint, the employee referred to "racial discrimination or harassment" or "mentioned the word 'race'" and that the employee "never voiced a complaint that the City was engaged in an unlawful employment practice."  Brown, 211 Fed. Appx. at 211; see also Jeronimus v. Polk County Opportunity Council, 145 Fed. Appx. 319, 326 (11th Cir. 2005) (plaintiff did not engage in Title VII protected activity when he complained of being "singled out" and being subjected to "harassment" and a "hostile environment" because plaintiff did not "suggest[]" that his "treatment was in any way related to his race or sex").

Applying the foregoing principles, the court finds that Plaintiff's complaints to Duckworth on September 16 fail based upon the reasoning in Brown and Jeronimus.  In complaining that Kim created "a hostile environment," Plaintiff did not use the words "race" or "national origin" or otherwise indicate that he believed he was the victim of any type of harassment made unlawful by Title VII.  Moreover, the mere fact that Plaintiff told Duckworth that he feared "retaliation" from Kim is insufficient because Plaintiff has not provided evidence that any of his complaints to Duckworth pertained to conduct which reasonably could be viewed as a Title VII-prohibited employment practice that could have created a motive for the feared "retaliation" by Kim.  Accordingly, the court finds that summary judgment is due to be entered in Defendant's favor on Plaintiff's Title VII retaliation claim predicated on Plaintiff's September 16 complaints to Duckworth because Plaintiff cannot demonstrate an essential element of his prima facie case.

20

The court also agrees with Defendant that, for the most part, Plaintiff's August 2005 complaints to Duckworth were insufficient to alert Duckworth that Plaintiff was complaining of discriminatory conduct prohibited by Title VII.  The topics discussed during Plaintiff's meeting with Duckworth were varied, and Plaintiff does not allege in this lawsuit that all of his complaints were protected by Title VII.  For instance, one incident which Plaintiff raised during the meeting involved what he described as a "moral issue," not a discrimination issue.  (Pl. Dep. at 245.)  Other topics which undisputedly are not related to discrimination, included Plaintiff and Duckworth's discussion about the need for a "master schedule" and improved communications with suppliers.  (Id. at 239-40.)

Plaintiff, though, points out that he enumerated for Duckworth several instances of Defendant's alleged preferential treatment of Korean workers.  He contends that, in making these complaints, he engaged in protected activities because he reported "adverse employment actions."  (Pl. Summ. J. Resp. at 33-34.)  The issue, however, is not whether the types of differential treatment about which Plaintiff complained are "adverse employment actions," but whether Plaintiff conveyed to Duckworth his belief that the differential treatment was unlawful under Title VII, i.e., occurred on account of a criterion protected by Title VII.  See, e.g., Webb v. R & B Holding Co., 992 F. Supp. 1382, 1389 (S.D. Fla. 1998) (To engage in Title VII protected activity, an employee, "at the very least," must convey to the employer his or her "belief that discrimination is occurring. . . .  It is not enough for the employee merely to complain about a certain

21

policy or certain behavior of co-workers and rely on the employer to infer that discrimination has occurred."); Hill v. IGA Food Depot, No. 2:04cv966-WKW, 2006 WL 3147672, *4 (M.D. Ala. Nov. 2, 2006) (To determine whether a Title VII plaintiff has engaged in opposition conduct, the material issue is "'whether the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner.'").

In this case, Plaintiff has not presented any evidence that he conveyed to Duckworth his belief that discrimination on a basis prescribed by Title VII was the reason underlying Defendant's preferential treatment of Korean employees.  (Pl. Dep. at 242-246.)  There, in fact, is evidence to the contrary.  Namely, during his deposition, Plaintiff did not profess to know the cause of the preferential treatment, stating at one point, "I don't know if it [*i.e.*, the differential treatment] was a lack of trust or what.  It was definitely different – different handling of the same type of procedure[.]"  (Id. at 244.)  As the decisions cited above emphasize, it is Plaintiff's responsibility to alert Defendant that, not only is he complaining about unequal treatment, but that he also believes that the root cause of the unequal treatment is a form of discrimination prohibited by Title VII.  Based on these facts, the court finds that Plaintiff's complaints about disparate treatment are insufficient to constitute protected opposition under Title VII's anti-retaliation provision.

22

Plaintiff also says that he reported three incidents of workplace sexual mistreatment.  (Pl. Summ. J. Resp. at 33-34.)  He points to his reports to Duckworth of one manager's *quid pro quo* sexual offer to a terminated employee, another manager's inappropriate sexual relations with a receptionist, and the female assistant manager who was not allowed to act as the manager in the manager's absence.  (Id.)  Defendant, however, argues that, as to these complaints, and others as well, Plaintiff, as a department director, simply was doing the job for which he was hired by reporting to his superior incidents of alleged discrimination in the workplace.  Defendant relies principally on McKenzie v. Renberg's Inc., 94 F.3d 1478 (10th Cir. 1996), to support its position that a managerial employee does not engage in statutorily protected activity when his job requires him to report alleged unlawful conduct because he is not stepping outside his normal employment role to take action against discriminatory conduct.

In McKenzie, the Tenth Circuit held that a personnel director did not engage in protected activity when she advised her employer about potential violations of wage and hour laws because it was her job to monitor compliance with laws regulating the workplace.  The Tenth Circuit explained, "[Plaintiff] never crossed the line from being an employee merely performing her job as personnel director to an employee lodging a personal complaint about the wage and hour practices of her employer and *asserting* a right adverse to the company."  Id. at 1486 (emphasis in original).  To constitute protected activity, "the employee must step outside his or her role of representing the

company."  Id.  Activities which the Tenth Circuit said would bring the employee outside of his or job role include "fil[ing] (or threaten[ing] to file) an action adverse to the employer" or providing active assistance to other employees in asserting protected statutory rights.  Id.; see also EEOC v. HBE Corp., 135 F.3d 543, 554 (8th Cir. 1998) (An employee steps out of his or her normal job role where he or she takes "some action against a discriminatory policy . . . and that the action was based on a reasonable belief that the employer engaged in discriminatory conduct.").

While McKenzie addressed protected activities under the Fair Labor Standards Act ("FLSA"), Plaintiff has not presented any reason why the court should not apply McKenzie's reasoning, which the court finds persuasive, in this case.[11]  See, e.g., Wolf v. Coca-Cola Co., 200 F.3d 1337, 1342-43 (11th Cir. 2000) (analyzing FLSA retaliation claim consistent with the burden-shifting approach applicable to Title VII retaliation claims).  Plaintiff undisputably was a high-level manager at Defendant's Montgomery plant.  As a member of Defendant's management team, Plaintiff admits that his job constantly required him to bring to the management roundtable areas of concern in the workplace.  During his deposition, for example, Plaintiff explained that, on a weekly basis, he participated in meetings convened between Duckworth and the directors for the specific purpose of addressing "concerns for the benefit of the company" and flagging problems that needed to be "rectif[ied]."  (Pl. Dep. at 254-55.)

---

[11] The court notes that Defendant has not cited any similar decision from the Eleventh Circuit, and the court is not aware of one.

While Plaintiff's meeting with Duckworth in August 2005 was an individual (versus a group) meeting, Plaintiff provides no evidence that, in talking with Duckworth on this occasion, he was doing anything other than performing the regular duties of his job.  Significantly, Plaintiff confirms that the August 2005 meeting was not initiated by him, but rather by Duckworth, who at the time recently had been assigned to work at the Montgomery plant as the deputy president.  In other words, Plaintiff participated in the meeting with Duckworth because in essence he was asked by Duckworth to do so.  Moreover, Duckworth met not only with Plaintiff, but also with the other directors at the Montgomery facility, and the undisputed purpose of Duckworth's individual meetings with the directors was to familiarize himself with "improprieties" which previously had been identified as problems at the Defendant's Montgomery plant.  (Pl. Dep. at 221, 280.) Indeed, the purpose of the meeting between Duckworth and Plaintiff was achieved, as Plaintiff discussed with Duckworth employee issues of which his superiors already were aware.  For example, Plaintiff admits that one of the "issues" which Plaintiff and Duckworth discussed – *i.e.*, the manager who requested sex from a terminated employee as a *quid pro quo* for two-weeks pay – had been addressed already by upper management. (Id. at 247.)

Another example also highlights why Plaintiff's present argument that his reports to Duckworth are protected conduct runs counter to the evidentiary record.  Plaintiff testified that, prior to his August 2005 meeting with Duckworth, the female assistant

manager, referred to above, complained to him that she "felt" that she was not allowed to serve as the acting manager because she was not a Korean male.  (Id. at 249-51.)  Having received this complaint, Plaintiff reported the incident to the appropriate officials as he was required to do in accordance with company policy.  (Id. at 251); (see also Pl. Dep. at 234-36.)  Not only does this evidence reinforce that Plaintiff's job entailed receiving and properly redirecting employee complaints, but there also is no evidence that Plaintiff reported the conduct, then or later in August 2005, because of his personal opposition to what he believed was treatment prescribed by Title VII.  See HBE Corp., 135 F.3d at 554.  Specifically, during his deposition, Plaintiff did not take the position that he believed that unlawful discrimination had occurred against the female assistant manager. He concurred with opposing counsel that "quite possibly" there could have been "concerns about her performance" or other non-discriminatory reasons for the failure of the manager to put the female assistant manager in charge in his absence.  (Pl. Dep. at 251.)

There simply is no evidence that Plaintiff stepped out of his role as a director and asserted a right adverse to Defendant.  The facts are distinguishable from HBE Corp., *supra*, where the Eighth Circuit applied the McKenzie rule, but reached a different result because the plaintiff stepped outside of his "normal managerial role which [was] to further company policy" and "refused to implement a discriminatory company policy." 135 F.3d at 554.  Here, there is no evidence that Plaintiff took a similar action adverse to

Defendant or, as provided in <u>McKenzie</u>, threatened to file an action adverse to Defendant. Plaintiff merely was acting within the confines of his managerial job duties.  Likewise, then, the facts are distinguishable from those in <u>Conner v. Schnuck Markets, Inc.</u>, in which the Tenth Circuit concluded that a food clerk engaged in protected activity when he reported that he was denied overtime pay because he had "no management responsibilities regarding the calculation of overtime wages."  121 F.3d 1390, 1394 (10th Cir. 1997).

In sum, to the extent that Plaintiff's complaints to Duckworth in August 2005 relate to unlawful Title VII practices by Defendant, the court finds that the undisputed evidence demonstrates that, consistent with his job responsibilities, Plaintiff discussed the matters, which he now says are protected complaints, at Duckworth's request in order to assist Duckworth address workplace problems for the betterment of the company. Because in reporting misconduct to Duckworth in August 2005 Plaintiff was merely doing his job, not engaging in protected conduct, Plaintiff's cannot establish a prima facie case.[12]  Accordingly, the court finds that summary judgment is due to be entered in Defendant's favor on Plaintiff's Title VII retaliation claim.

B.  <u>Defendant's Legitimate, Nondiscriminatory Reasons for Plaintiff's Termination</u>

---

[12] Given the court's findings, the court need not and declines to address Defendant's arguments pertaining to the third prima facie element.

Defendant argues that, even if Plaintiff could demonstrate a prima facie case on his wrongful termination claim, Plaintiff is unable to raise a genuine issue of material fact as to whether Defendant's proffered reasons for his termination are pretextual.  Defendant asserts that it legitimately, for nondiscriminatory reasons, fired Plaintiff (1) based upon its "good faith" belief that Plaintiff exhibited unprofessional behavior during the September 16 meeting, (Def. Summ. J. Br. at 25-26), and (2) because Plaintiff subsequently demonstrated an "unwilling[ness] to improve his attitude."  (Id. at 24 (citing Duckworth Decl. ¶ 9)); (Def. Reply at 5.)  The alleged unprofessional conduct is outlined in Duckworth's declaration.  Namely, Duckworth says he received reports that, during the September 16 meeting, Plaintiff was argumentative, cursed once, compared Defendant's manufacturing process to Toyota's, and directly questioned the judgment of Kim, causing Kim embarrassment.  (Duckworth Decl. ¶ 5.)  Moreover, concerning the second reason, Duckworth says that, when he met with Plaintiff to discuss Plaintiff's alleged behavior at the September 16 meeting, Plaintiff denied that he had any attitude problems and was unwilling to accept any form of correction, thus, causing Duckworth to conclude that termination was warranted.  (Id. ¶ 9.)

The court finds, and no contrary argument has been advanced, that Defendant has "clearly set forth, through the introduction of admissible evidence, the reasons for [Plaintiff's] [termination]."  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255 (1981).  The court also finds that Defendant's properly-supported reasons are legitimate

and nondiscriminatory.  <u>Coutu</u>, 47 F.3d at 1073; <u>see</u> <u>also</u> <u>Ashe v. Aronov Homes, Inc.</u>,

354 F. Supp.2d 1251, 1259 (M.D. Ala. 2004) (finding that failure to follow instructions

and insubordination are legitimate, nondiscriminatory considerations); <u>Garcia-Cabrera v.</u>

<u>Cohen</u>, 81 F. Supp.2d 1272, 1281 (M.D. Ala. 2000) (finding that "[i]t is beyond question

that an inability to get along with co-workers and demonstrated caustic or rude behavior

is a legitimate, non-discriminatory reason for an employment decision").


C.  <u>Pretext</u>

Because Defendant has satisfied its burden of producing competent evidence of

legitimate, nondiscriminatory reasons for Plaintiff's termination, the burden shifts to

Plaintiff to "meet [the proffered] reason[s] head on and rebut [them]."  <u>Chapman</u>, 229

F.3d at 1030.  To satisfy his burden on summary judgment, Plaintiff "must come forward

with evidence sufficient to permit a reasonable fact finder to conclude that the legitimate

reasons given by the employer were not its true reasons, but were a pretext for

discrimination."  <u>Vessels v. Atlanta Indep. Sch. Sys.</u>, 408 F.3d 763, 771 (11th Cir. 2005).

The pretext inquiry focuses on whether the employee has presented "such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in [Defendant's]

proffered legitimate reasons . . . that a reasonable factfinder could find them unworthy of

credence."  <u>Combs</u>, 106 F.3d at 1538 (citation and internal quotation marks omitted); <u>see</u>

also Rioux v. City of Atlanta, Ga., ___ F.3d ___, ___, *7 2008 WL 710441 (11th Cir. March 18, 2008).

As discussed below, Plaintiff focuses principally on inconsistencies in the evidence as indicative of pretext.  For the reasons to follow, the court is persuaded that Plaintiff's Title VII/§ 1981 wrongful termination claim cannot be decided as a matter of law and that the issue of whether Defendant's proffered reasons are nondiscriminatory is for the jury to decide.

Plaintiff argues that he has shown pretext because there is contradictory evidence as to who made the decision to fire Plaintiff and who had input in that decision.  (Pl. Summ. J. Resp. at 28.)  According to Plaintiff's evidence, Duckworth told Plaintiff at the October 22 restaurant meeting that Kim and Ahn already had made the decision to terminate Plaintiff's employment, that he "had nothing to do with the decision to ask for [Plaintiff's] resignation," and that he did not have the authority to reverse the decision. (Pl. Decl. ¶ 8.)  In contrast, according to Defendant's evidence, which takes the form of Duckworth's declaration, Duckworth says that Ahn "left it to [him]" as to whether to terminate Plaintiff and that, during the October 22 restaurant meeting, Duckworth independently "made the decision to terminate [Plaintiff's] employment."  (Duckworth Decl. ¶¶ 7, 9.)  These facts create a dispute as to whether Duckworth made the decision to fire Plaintiff or whether the decision involved a collaborative decision between Kim and

Ahn.  Each party has presented competent evidence in support of its and his competing

positions.

The issue is whether the contradiction is material.  See, e.g., Valance v. Wisel, 110

F.3d 1269, 1274-75 (7th Cir. 1997) ("existence of a factual dispute will not preclude

summary judgment if the disputed fact is not material").  Defendant says that it is not.

Because neither Ahn nor Duckworth attended the September 16 meeting, Defendant says

that each was entitled to rely upon the reports he received concerning Plaintiff's conduct

during the meeting.  Defendant says that, under these facts, the relevant inquiry is

whether Defendant "had a good faith belief that [Plaintiff] engaged in unprofessional

behavior, not whether [Plaintiff] actually did."  (Def. Summ. J. Br. at 22, citing Elrod v.

Sears, Roebuck & Co., 939 F.2d 1466 (11th Cir. 1991)).  The court is not persuaded by

Defendant's argument.

Plaintiff's testimony, if credited by a jury, undercuts Defendant's assertion that

Duckworth was the decisionmaker and brings Kim into the picture as a decisionmaker.

Defendant's argument, above, does not account for Plaintiff's evidence concerning Kim's

role in the decisionmaking process.  At the summary judgment juncture, though, the court

must credit Plaintiff's testimony that Kim is a decisionmaker.  Kim's involvement is

significant for purposes of determining whether Plaintiff survives summary judgment on

his wrongful termination claim.  Because Kim was present at the September 16 meeting,

the holding in Elrod would be inapplicable if Kim made the decision to terminate

Plaintiff.  Rather, the holding in Damon v. Fleming Supermarkets, Inc., 196 F.3d 1354

(11th Cir. 1999), would apply.  In Damon, the Eleventh Circuit held that, when the

employer justifies the plaintiff's discharge by relying on a work rule violation, one way a

plaintiff may prove pretext is by proffering evidence "that [he or] she did not violate the

cited work rule."  Id. at 1363.  As explained by this court in Sweeney v. Alabama

Alcoholic Beverage Control Board, "That part of the Damon holding, which allows a

plaintiff to establish pretext by demonstrating that the work rule violation did not occur,

applies in cases where the decisionmaker observes the alleged work rule violation and,

thus, has personal knowledge thereof."  117 F. Supp.2d 1266, 1272 (M.D. Ala. 2000).

Plaintiff vehemently denies that, during the September 16 meeting which Kim

chaired, he committed any of the misconduct of which he was accused.  He says that he

was not disrespectful toward Kim, did not curse, did not mention the "taboo" Toyota

word, and did not otherwise act unprofessionally.  (Pl. Dep. at 111-12, 116, 118-19, 125,

127-28, 133-36.)  At this stage, the court regards the facts submitted by Plaintiff as true

since those facts are supported by evidentiary material, i.e., deposition testimony.  See

Adickes, 398 U.S. at 157.  A comparison of Defendant's evidence against Plaintiff's

reveals that the evidence is disputed on the issue of whether Plaintiff committed the

misconduct which led to his termination.[13]   Hence, because there also is evidence that

Kim was a decisionmaker, the court finds that the contradictory evidence concerning who

actually made the decision to terminate Plaintiff creates a *material* issue of disputed fact

for the jury to decide.  See Fed. R. Civ. P. 56(c); see also Miller v. King, 384 F.3d 1248,

1259 (11th Cir. 2004) ("Issues of credibility and the weight afforded to certain evidence

are determinations appropriately made by a finder of fact and not a court deciding

summary judgment.").

Citing Chapman, *supra*, however, Defendant argues that, at the very least, Plaintiff

has failed to rebut Defendant's second independent reason for his termination.  As stated,

the second reason focuses on Duckworth's perception that Plaintiff was unwilling to

improve his attitude when Duckworth discussed management's concerns with Plaintiff

during the October 22 restaurant meeting.  (Def. Reply at 5); see Chapman, 229 F.3d

at 1037 (holding that "to avoid summary judgment, a plaintiff must produce sufficient

evidence for a reasonable factfinder to conclude that *each* of the employer's proffered

nondiscriminatory reasons is pretextual").  Defendant asserts that there "is no

---

[13] In addition to denying that he "did the things in the September 16 Murakami
meeting that Duckworth claims he did," (id. at 29), Plaintiff argues that Choi is a
similarly-situated Korean employee who acted in "lockstep" with him during the meeting.
Yet, Plaintiff says that Choi was treated more favorably because he was not fired.  To
show pretext, a plaintiff may rely on evidence of disparate treatment of a similarly-
situated employee outside the protected class.  See Rioux, ___ F.3d ___, ___, 2008 WL
710441, *5 (analyzing sufficiency of comparator evidence at the McDonnell Douglas
pretext stage).  Because the evidence is otherwise sufficient to raise a genuine issue of
material fact on the question of pretext, the court need not factor into its decision whether
Choi, in fact, is a similarly-situated employee.

inconsistency" between Plaintiff's and Duckworth's testimony because Plaintiff's unwillingness to acknowledge that there was a "problem[] with his attitude" is manifested in a telephone conversation Plaintiff had with his mother on an unspecified date.  (Def. Reply at 10.)  The material dispute, however, lies not in an unrelated, separate conversation Plaintiff had with his mother (which Plaintiff recorded and later transcribed), but rather in the evidence presented by Plaintiff that, at the October 22 dinner meeting, Duckworth did not seek any dialogue from Plaintiff concerning his work performance or criticize his work performance, but rather simply pronounced that the decision had been made to end Plaintiff's employment.  (Pl. Decl. ¶ 8.)  Again, at the core of the dispute is who terminated Plaintiff.  Did Duckworth make that decision on October 22 based upon Plaintiff's denials of wrongdoing and Duckworth's perception that Plaintiff was "unwilling to accept any form of correction or [to] consider the possibility that his behavior needed improvement"?  (Duckworth Decl. ¶ 9.)  Or was Plaintiff's termination already a "done deal," with Kim and Ahn instructing Duckworth to deliver the news of Plaintiff's fate at the October 22 dinner meeting?  (Pl. Dep. at 218); (Pl. Decl. ¶ 8.)  This dispute is central to both reasons asserted by Defendant for Plaintiff's termination.

It also has not gone unnoticed by the court that Defendant's evidence that Duckworth made the decision to terminate Plaintiff undercuts Defendant's reliance on Elrod, *supra*, concerning Defendant's second articulated reason for Plaintiff's

34

termination.  As discussed above, an employer may not rely on an employer's honest belief that an employee engaged in misconduct "when the actual predicate of such a belief is the personal knowledge of the decisionmaker."  Strickland v. Prime Care of Dothan, 108 F. Supp.2d 1329, 1334 (M.D. Ala. 2000) (discussing Elrod, *supra*, and Damon, *supra*.)  Here, Duckworth and Plaintiff present different accounts of what occurred during their October 22 restaurant meeting, and the court must accept Plaintiff's version at the summary judgment juncture.  While the contradictory evidence as to who is the decisionmaker and whether Plaintiff engaged in the charged misconduct may well be sufficient to raise a jury issue on the subject of pretext, the court need not rest its decision solely on these contradictions.

Plaintiff has identified other inconsistencies in the evidence, as well.  As pointed out by Plaintiff, in paragraph six of his declaration, Duckworth cites instances of alleged "problems" with Plaintiff's "behavior" which allegedly occurred during the "recent months" preceding the September 16 meeting.  (Duckworth Decl. ¶ 6.)  For example, Duckworth says that he observed Plaintiff "verbally berate[] and attempt[] to embarrass a fellow executive."  (Id.)  Construed in the light most favorable to Plaintiff, the inference, *albeit* subtle, is that the problematic "behavior" which Duckworth discussed with Ahn, as set out in paragraph seven of Duckworth's declaration, encompassed the "behavior" which Duckworth described in paragraph six of his declaration and that, therefore, this "behavior" encompassed part of the reason for Plaintiff's termination.  (Id. ¶¶ 6-7.)

Plaintiff asserts that these so-called behavioral problems surfaced for the first time when Defendant submitted Duckworth's declaration in support of its motion for summary

judgment.  Not only does Plaintiff deny that he committed any of the infractions listed in paragraph six of Duckworth's declaration, (see Pl. Decl. ¶¶ 5-6), but, in contrast to Duckworth's present assertion of repeated behavioral problems, Plaintiff presents evidence of a history of positive feedback from Duckworth.  On September 16, in direct response to Plaintiff's concerns about his job security, Duckworth told Plaintiff that "everyone at [Hyundai] thought the world of [Plaintiff], that [he] was doing an excellent job, and that he had not heard of any complaints from anyone about [Plaintiff]."  (Pl. Decl. ¶ 3.)  While "there were no reviews" of Plaintiff's job performance, which the court takes to mean no formal written evaluations, Plaintiff testified also that, during his tenure, he never received any criticism of his work, not from Duckworth or anyone else.  (Pl. Dep. at 323.)  To the contrary, Plaintiff said that he "was given letters from the chairman's son and handwritten notes from the president about how good a job [he] [was] doing."  (Id.)

Plaintiff's argument that the conflicting evidence concerning his job performance further demonstrates pretext finds support in the law.  The Eleventh Circuit has held that inconsistent reasons articulated by an employer for the adverse action can be evidence of pretext.  Bechtel Constr. Co. v. Secretary of Labor, 50 F.3d 926, 935 (11th Cir. 1995).  As stated, Plaintiff has submitted evidence that Duckworth expressly told him that he was an exemplary employee, a fact which a reasonable jury could conclude directly opposes Duckworth's present assertion that, prior to the September 16 meeting, Duckworth was aware of and personally observed Plaintiff engage in unprofessional workplace conduct.  Moreover, courts have held that, in appropriate circumstances, evidence of satisfactory

work performance can belie an employer's assertion that the employee was fired for

performance-related problems.  See Abramson v. William Paterson College, 260 F.3d

265, 284 (3[d] Cir. 2001) (plaintiff established jury issue as to pretext on religious

discrimination claim, in part, because her evidence of "glowing teaching evaluations" and

other positive reviews refuted employer's reliance on performance problems as a reason

for her discharge); Wilson v. AM Gen. Corp., 167 F.3d 1114, 1120-21 (7th Cir. 1999)

(plaintiff raised question of fact as to whether employer's performance-related reasons for

his termination were pretext for age discrimination with evidence which included

exemplary performance reviews and plaintiff's testimony that no one ever mentioned any

performance problems to him).  Based on the foregoing authorities and the facts of this

case, the court finds that the contradictions surrounding Plaintiff's job performance are

relevant to the question of pretext.

Based on the record as a whole, the court finds that Plaintiff has identified a

sufficient number of disputes in the material facts on the issue of pretext that, when

combined with the evidence supporting his prima facie case, demonstrates such

"weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in

[Defendant's] proffered legitimate reasons . . . that a reasonable factfinder could find

them unworthy of credence."  Combs, 106 F.3d at 1538.  The court agrees with Plaintiff

that the trier of fact, not the court on summary judgment, must resolve the factual

disputes and determine the ultimate issue of discrimination.  Accordingly, the court finds

that Defendant's motion for summary judgment on Plaintiff's Title VII/§ 1981 wrongful

termination claim is due to be denied.

## VI.  CONCLUSION

Applying the summary judgment standard, the court finds that Plaintiff has not demonstrated a Title VII prima facie case of retaliation and that summary judgment in Defendant's favor is appropriate on this claim.  Plaintiff, though, has raised genuine issues of material fact on his Title VII/§ 1981 wrongful termination claim.  Defendant's motion for summary judgment, therefore, is due to be granted in part and denied in part.


## VII.  ORDER

Accordingly, it is CONSIDERED and ORDERED that Defendant's motion for summary judgment (Doc. No. 24) be and the same is hereby GRANTED in part and denied in part.

Done this 24th day of April, 2008.

/s/ Ira DeMent
SENIOR UNITED STATES DISTRICT JUDGE